```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4   KOVE IO, INC.,                    )
                                       )
 5                    Plaintiff,       )   Docket No. 18 C 8175
                                       )
 6              vs.                    )
                                       )
 7   AMAZON WEB SERVICES, INC.,        )   Chicago, Illinois
                                       )   May 30, 2019
 8                    Defendant.       )   10:33 a.m.

 9

10          TRANSCRIPT OF PROCEEDINGS - Oral Arguments
          BEFORE THE HONORABLE REBECCA R. PALLMEYER

11

12   APPEARANCES:

13   For the Plaintiff:      THOMPSON COBURN LLC
                             BY:  MR. RENATO T. MARIOTTI
14                                MS. HOLLY H. CAMPBELL
                             55 East Monroe, 37th Floor
15                           Chicago, Illinois  60603

16                           REICHMAN JORGENSEN LLP
                             BY:  MR. PHILLIP LEE
17                                MR. COURTLAND REICHMAN
                             303 Twin Dolphin Drive, Suite 600
18                           Redwood Shores, California  94065

19                           REICHMAN JORGENSON LLP
                             BY:  MR. JAIME F. CARDENAS-NAVIA
20                           100 Park Avenue, Suite 1600
                             New York, New York  10017
21

22   For the Defendant:      JENNER & BLOCK LLP
                             BY:  MS. TERRI L. MASCHERIN
23                                MR. MICHAEL G. BABBITT
                                  MR. MICHAEL T. WERNER
24                           353 North Clark Street
                             Chicago, Illinois  60654
25
```

1    APPEARANCES (Continued):

2
                              JENNER & BLOCK LLP
3                             BY:  MR. ADAM UNIKOWSKY
                              1099 New York Avenue, NW
4                             Washington, DC  20001

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22
                              FRANCES WARD, CSR, RPR, RMR, FCRR
23   Court Reporter:          Official Court Reporter
                              219 S. Dearborn Street, Suite 2144D
24                            Chicago, Illinois  60604
                              (312) 435-5561
25                            frances_ward@ilnd.uscourts.gov

1            THE CLERK:  18 C 8175, Kove IO versus Amazon Web
2    Services, for motion hearing.
3            MR. MARIOTTI:  Good morning, your Honor.
4            Renato Mariotti, Courtland Reichman, Phil Lee,
5    Jaime Cardenas-Navia, and Holly Campbell on behalf of Kove
6    IO.
7            And the CEO of Kove, Mr. Overton, one of the
8    inventors, is here as well.
9            THE COURT:  Okay.  Good morning.
10           MS. MASCHERIN:  Good morning, your Honor.
11           Terri Mascherin, Jenner & Block, on behalf of
12   Amazon.
13           With me today are my partners Adam Unikowsky and
14   Michael Babbitt and our colleague Michael Werner.  And we
15   also have a summer associate observing this morning as well.
16           Mr. Unikowsky will be making the argument for
17   Amazon today, your Honor.
18           THE COURT:  All right.  Good morning.
19           I have read the briefs, but I'm anxious to hear
20   your arguments.  I am not any computer expert, as you
21   probably could guess, but interested in the area of
22   intellectual property.  So I'm happy to dive in.
23           So we will certainly begin with -- it's Amazon's
24   motion to dismiss.  So we will begin with Amazon.
25           MS. MASCHERIN:  Thank you, your Honor.

1      MR. UNIKOWSKY:  Thank you, your Honor.

2      May I proceed?

3      THE COURT:  Sure.

4      MR. UNIKOWSKY:  The Court should dismiss the

5  complaint because the asserted claims are directed to

6  patent-ineligible subject matter under 35 USC, Section 101.

7      The Federal Circuit has made clear that claims

8  directed to methods of manipulating and organizing data are

9  abstract and are not saved by abstractness merely because

10  they are implemented on generic computer components, like

11  servers or processors or networks.

12      Rather, to be patentable, they have to be

13  necessarily rooted in computer technology.  And the claim

14  that merely reflects ordinary human activities implemented on

15  generic computer parts isn't necessarily rooted in computer

16  technology.

17      Now, it may be, in some cases, the line between

18  claims that are and are not necessarily rooted in technology

19  is difficult to draw, but I actually think that it's not hard

20  to draw in this case.  These are really the paradigmatic

21  example of claims directed to abstract methods of data

22  manipulation on generic computers that aren't patentable.

23      So as we explained in our brief, really the claims

24  functionally work the exact same way as claims directed to

25  organizing books in a library and card catalogues.  And Kove

1    refers to our argument as a gimmick and an
2    oversimplification, but I actually don't think we are
3    oversimplifying anything.  The claims really do work the
4    exact same way as claims directed to organizing library
5    books.
6            So I am happy to step through each of the asserted
7    claims, if that's helpful for the Court.
8            I will start with the first claim we talk about in
9    our brief, which is Claim 17 of the '978.  I can go through
10   them in any order, but I will do it in the order that our
11   brief talks about.
12           THE COURT:  That's fine.
13           MR. UNIKOWSKY:  So imagine you have a scheme where
14   you have got a bunch of libraries scattered around a city,
15   for instance, and you have got a librarian with a bunch of
16   card catalogues.  And every time a new book comes in, the
17   librarian prepares a new card and puts it in one of the card
18   catalogues.  And if one of the card catalogues gets too full,
19   then some cards are transferred into a different card
20   catalogue.
21           So that's exactly what this claim is saying with
22   the sole exception being that there is a reference to a
23   generic server.
24           So if you look through the entire claim language,
25   the only even generic computer component appearing anywhere

1    in this claim is the word "location server."

2            And Kove doesn't claim to have invented a new

3    server.  It's a completely generic object that stores the

4    information about the locations of things, just like the card

5    catalogue is a big box that stores cards about locations of

6    things.  That's it.  That's the only even generic computer

7    component anywhere in this claim.

8            And every single other term is a purely abstract

9    word referring to data manipulation.  So you have got things

10   like "identifier," information related to the identifier,

11   "data locations."  All of these things have existed since

12   time immemorial.  We have always identified information and

13   stored things in different locations.

14           And if you go through every single claim step, it

15   really works exactly the same way as what I have just

16   described, the method of organizing cards in card catalogues.

17   So this is just a classic example of data manipulation on a

18   generic server.

19           I think the analysis is the same with respect to

20   all the claims, which are all pretty similar.  So I will turn

21   to Claim 1 of the '170, which is the next one we talk about

22   in our brief.

23           So suppose again you have a library system, and you

24   have got so many cards, you need several card catalogues.

25   And in every card catalogue, there is a little chart that

1    says, here is how you find out which card catalogue you are

2    looking at.  So if the first letter of the last name of the

3    author is A through I, go to No. 1.  If it's J through R, go

4    to No. 2, and so forth.

5         So on every card catalogue, stapled is this chart

6    that allows you to discern the location of the card catalogue

7    that you are looking for to find the book.

8         So that scheme is, again, exactly what this claim

9    is saying, except it's implemented on a generic computer.

10        So again, there is a reference to data location

11   servers, which are just like the card catalogues -- they are

12   just boxes that store the locations of things -- and a

13   generic distributed network, which is just like the library.

14   It's just a network of libraries that have books in them.

15        But the scheme that's disclosed in this claim --

16   and we are not oversimplifying at all; we really accounted

17   for every single limitation in the claim -- is identical to

18   the scheme I just described.

19        And the claim includes the word "hash function,"

20   but hash function is not like a transistor or a diode.  It's

21   not like some physical component.  It's like an abstract

22   mathematical function that maps a big thing to a small thing.

23        So the chart we described is a species of hash

24   function.  It maps an author's last name, which could be of

25   any length, to a card catalogue, 1, 2, or 3.  That's a type

1   of hash function.

2       And when you realize that, that it's an abstract

3   mathematical object that isn't technology, you realize that

4   really what we have described with the card catalogues is

5   exactly what this is saying.

6       And the same is true for the last one, Claim 18 of

7   the '640, which is substantively similar.  It just involves

8   you going from -- if you go to one card catalogue, it tells

9   you, you are in the wrong place.  Go to another card

10   catalogue based on a similar chart.  It just redirects you to

11   a different one.

12       THE COURT:  Here was where you lost me on the card

13   catalogue analogy.

14       MR. UNIKOWSKY:  Yes.

15       THE COURT:  This is no doubt a function of my

16   ignorance here.

17       You posit this university library that has what I

18   understand to be more than one location -- more than one

19   physical location, right?

20       MR. UNIKOWSKY:  Just a bunch of libraries, but like

21   a single campus with a bunch of card catalogues.

22       THE COURT:  Right.  Okay.

23       And what I understand, then, is that some books

24   will be in one physical location and other books will be in

25   other physical locations.

1          MR. UNIKOWSKY:  Yeah.  You might have, like, ten

2    buildings.

3          THE COURT:  Right.  So you know, the *Rise and Fall*

4    *of the Roman Civilization* might be at Point B but not at

5    Points C, D, and E.

6          MR. UNIKOWSKY:  Right.

7          THE COURT:  Okay.  Now, we go to -- the card

8    catalogue is at Point A.

9          MR. UNIKOWSKY:  So the way to think about it is

10   that --

11         THE COURT:  Are we talking about a card catalogue

12   in every single location?

13         MR. UNIKOWSKY:  No, we are not.  No, no, no, we are

14   not talking about that.

15         So the way to think about it is, suppose you have

16   lots of far-flung libraries all over the city, for instance.

17         THE COURT:  Right.

18         MR. UNIKOWSKY:  And then you have got a single

19   campus, and you have got a bunch of card catalogues just on

20   campus.  There is too many cards to fit in one.  So you have

21   got several of them.

22         THE COURT:  Are all the card catalogues in one

23   building?

24         MR. UNIKOWSKY:  Yes.  That's consistent with what

25   we are saying.

1          THE COURT:  Okay.  So the student --

2          MR. UNIKOWSKY:  They don't have to be, but they can

3     be.

4          THE COURT:  The student who wants to read Gibbon

5     goes to the central card -- central location and says, I want

6     to read *Rise and Fall of the Roman Civilization*, whatever it

7     is.

8          MR. UNIKOWSKY:  Right.

9          THE COURT:  And the librarian flips through the

10    card catalogue for G and finds the book, and then says, okay,

11    it's at Library B.  You can go get it.

12         MR. UNIKOWSKY:  Right.

13         THE COURT:  All right.  Now, if our student walks

14    into B and says, I want to read this book and doesn't know

15    it's there -- no.  Say the student walks into Library C and

16    says, I want to read this book.  There isn't a card catalogue

17    there, or there could be.

18         MR. UNIKOWSKY:  There could be.

19         THE COURT:  Does the card catalogue get

20    automatically updated at every one of these locations when a

21    new book is acquired by the university?

22         MR. UNIKOWSKY:  No, not necessarily.

23         So the way to think about it is that you might have

24    a single building with lots of card catalogues, and the

25    librarian is managing all of them.  And the thing is, not all

1    the cards fit in one.  So you need to have several, right?

2              THE COURT:  Sure.  I get that.  I get that.  The

3    box is too small.

4              MR. UNIKOWSKY:  The box is too small.  Exactly.

5    So -- yes.

6              So, I mean, I'm not sure which claim you are

7    referring to.  I can -- so, for instance, with the first --

8    Claim 1 of the '170, I can talk about that one.

9              THE COURT:  That's the second one, right?

10             MR. UNIKOWSKY:  Yeah.

11             So just imagine that, like, stapled to every card

12   catalogue is information that tells you which card catalogue

13   to go to.  So you go to some random card catalogue.  You

14   don't know which one is the right one, but it has this chart

15   that says, if the first name is A to E, go to this one.  If

16   not, go to that one.

17             And so by going to the card catalogue, it tells you

18   which one to go to, right?  So if you go to No. 2

19   arbitrarily, it will say, okay, I should go to No. 7, because

20   the first letter of the author's last name is B through F or

21   something.

22             So that's it.  That's all that this is saying.

23             THE COURT:  Your analogy, it seems to me, assumes

24   there is -- you are right that there is more than one card

25   catalogue.  They won't all fit in one.  But there isn't more

1    than one location for the card catalogues.

2           MR. UNIKOWSKY:  I mean, they are in

3    physically different -- it actually doesn't matter whether

4    they are all in one building or they are in lots of

5    buildings.  It's just a bunch of servers.  They could be

6    different parts in one building or they could be in lots of

7    buildings.  It doesn't really matter.  It's just a bunch of

8    card catalogues.

9           That's what this claim is saying.  It's just saying

10   that there is a plurality of data location servers.  That's

11   it.

12          So I am happy to go through every single word of

13   this claim.

14          It says there is "a data location server network

15   comprising a plurality of data location servers."  So that's

16   just a bunch of boxes -- a bunch of card catalogues.  Whether

17   they are in the same building or in different buildings

18   doesn't really matter.  The relevant point is that there is

19   just lots of card catalogues.  And by going to any one of

20   them, you can figure out which one to go to.

21          THE COURT:  Well, okay.  I don't want to spend too

22   much time on this.  I know you have got other things to say.

23          Here is why I was focusing on that.  To make this

24   analogy meaningful to me, I have got to see how this setup in

25   an actual physical library corresponds to the virtual

1    categorization that's going on under the patented invention

2    allegedly that you believe is not even patentable.

3         And the first thing that jumps out of my mind from

4    your analogy is, but if I'm the student, do I have to -- what

5    happens if I go to one of the other locations?  Do they have

6    the cards, too?

7         MR. UNIKOWSKY:  No, I don't think so.  So

8    conceptually --

9         THE COURT:  They don't have them.

10        If I want to know whether the book I want is in the

11   university system, there is only one place for me to go, and

12   that is the room that has all these boxes of card catalogues.

13        MR. UNIKOWSKY:  Right.  That is equivalent to this.

14        THE COURT:  All right.

15        MR. UNIKOWSKY:  Now, it's not limited to that.  You

16   could have card catalogues in lots of places, but, you know,

17   it's a network.  It's just lots of card catalogues.  It could

18   be in one building.  That's fine.  It's just a bunch of them

19   that are all -- just a bunch of them.

20        So what you would do is, you'd go to the central

21   building, like the campus building, and then you have 10,

22   10 of these.

23        THE COURT:  There's drawers full of cards.

24        MR. UNIKOWSKY:  Right, drawers full of cards.

25        And you're like, well, I want to figure out the

1    book that I want, but I have to figure out which card

2    catalogue to look in.  If you go to any one of them, there is

3    a chart that tells you which one to go to.  Okay?

4            So you go to Card Catalogue No. 3, and it says,

5    well, the first letter of the author's last name is H.  So

6    actually I should go to No. 5.  So you go to No. 5 and you

7    open it, and that's it.  That's what you do.

8            I mean --

9            THE COURT:  Although in real life, I mean, I'm old

10    enough to have done exactly this.  In real life, you wouldn't

11    open a box and say, okay, it's in the -- the drawers are all

12    marked.  So you just open the drawer.

13            MR. UNIKOWSKY:  Yeah, they are marked.  That's --

14    yeah.  I mean, yes, exactly.  There is markings.

15            I think that if you go carefully through every

16    single element of this claim, that's what's happening.  So it

17    says -- you know, I'm happy to go through every single claim

18    limitation.

19            It says, "wherein data location information for a

20    plurality of data entities is stored in the data location

21    server network."

22            Okay.  That's just saying that the location of

23    information about data is stored in all these boxes.

24            "At least one of the plurality of data location

25    servers includes location information associated with the

1    identifier string."

2             "Identifier string" is not a computer term.  Like

3    the Dewey decimal code is an identifier string.  So at least

4    one of these boxes has location information associated with

5    the string.

6             "Each one of the plurality of . . . servers

7    comprises a processor" -- it's a completely generic

8    processor -- "and a portion of the data location

9    information."

10            So that's just cards.

11            The portion of the -- and it goes on in that vein.

12            Every single claim -- and I'm happy to go through

13   all of them if there is any one that troubles you.  But it

14   really does work -- it does work the same way, as I think we

15   have described.

16            And I think the relevant point is that there is

17   nothing here other than just these very generic servers and

18   networks.  There is no claim that a new server, a new network

19   has been invented.  It's a way of just pushing data around.

20            So I think that -- so Kove makes a series of

21   arguments that its claim is patentable, but really every

22   single one of their arguments is identical to an argument

23   that the Federal Circuit has rejected.

24            So the core argument made by Kove is that these

25   claims don't actually recite physical card catalogues.  They

1   do say that there is things like servers and processors.  But

2   we know from the Federal Circuit's cases that's not enough.

3   Just the mere recitation of those generic objects can't make

4   a data manipulation claim patentable.

5           And similarly, there is this discussion of the

6   *MIT Technology Review* article and things like that.  But

7   that's -- the Federal Circuit requires this focus analysis on

8   the claim language.  I think it's quite telling that they

9   rely on this general article, which is not about the claims.

10  It's not about the patent.  It's not even about the

11  inventors.  It's just a general discussion of technology.

12  And I think what that shows is that maybe some claims could

13  hypothetically have been written in this area that might be

14  patentable, but you have got to have this focused look at the

15  claims themselves, and I think that they are truly abstract.

16          I think that really the gravamen of the claims --

17  of the argument that Kove is making in this case is that,

18  really, this method is particularly useful on a network.  So

19  you know, if we have this method of organizing and

20  manipulating data on a network, then it would be helpful to

21  process large amounts of data.  And really that argument has

22  been repeatedly made and repeatedly rejected by the Federal

23  Circuit, almost the identical argument.

24          So, for instance, the *Two-Way* case, which we cite

25  in our brief, in that case -- the words of that case could

1    have almost been lifted out of this case.  The specification,

2    "describe the invention as an improved scalable architecture

3    for delivering real-time information."

4           The patentee said that it solves "various technical

5    problems, including excessive loads on a source server,

6    network congestion, unwelcome variations in delivery times,

7    scalability of networks, lack of precise recordkeeping."

8           That's essentially the same set of problems that

9    Kove claims to have solved.  And so the patentee made the

10   exact same argument, that this claim of moving data around

11   and organizing it is useful on networks, and so it's rooted

12   in technology.

13          And the Federal Circuit rejected that argument.

14   They said, you've got to look at the specific claim language.

15   The claim language is directed to manipulation and

16   organization of data.  That's not patentable.

17          And I think the *BSG* case, almost identical.  So the

18   argument in that case is this way of structuring databases,

19   "allows users to quickly and efficiently access hundreds of

20   thousands or even millions of records."  That's language from

21   the specification.  Very similar to the improvement that's

22   claimed here.

23          And the court said, no, it doesn't matter if the

24   specification touts that.  You have got to look at the claim

25   language, and really there is just manipulation of data.

1       So I would like to say a word about this *Enfish*

2    case, which is the case that is primarily relied upon by

3    Kove.

4       So I think that *Enfish* underscores what we are

5    saying here, which is that you have to look at the claim

6    language specifically and whether or not that's necessarily

7    rooted in technology.

8       So the *Enfish* case involved a -- quote/unquote --

9    means-plus-function claim.  And that's a type of claim in

10   which the claim language includes words like "means for

11   configuring."  And that's a reference to the fact that there

12   is an algorithm in the specification that provides structure

13   for the configuring function.

14      And under the rules of claim construction, that

15   portion of the specification, the structure, is actually part

16   of the claim.  In other words, you have to do those things to

17   infringe the claim.  So really you should treat that

18   structure and the specification as a portion of the claim.

19      So what's notable in that case is that the

20   arguments of the parties were really inverted from the

21   arguments of the parties this morning.

22      In that case, there is this very specific algorithm

23   that I honestly don't see how you could possibly implement in

24   a library -- or how it could possibly be practically

25   implemented in a library.  It involves this particular way of

1    structuring computer memory.  We had certain rows containing

2    fields corresponding to other columns and memory.  And there

3    is two points there.

4         First of all, I just don't see how you would do

5    that at a library in any meaningful way.

6         And second of all, Microsoft, the defendant -- the

7    very sophisticated defendant in that case, did not even try

8    to make that argument.  They just made this very argument at

9    a high-level of generality.  This is just organizing data.

10   Therefore, it's unpatentable.

11        And what the court held is that it was "untethered

12   from the language of the claims."  And the court pointed to a

13   particular claim limitation which was in that algorithm in

14   the specification.

15        But again, because this was a means-plus-function

16   claim, it was part of the claim.  So they pointed to this

17   particular step involving the creation of the

18   self-referential table, and they pointed out that the

19   abstract idea as claimed by Microsoft didn't focus on that

20   step, which was really an improvement to database technology.

21   It couldn't be analogized to anything in the real world.

22        And here, I think that the shoe is really on the

23   other foot.  I think that we have really explained every

24   single step here.  We are not ignoring any steps at all.  We

25   are saying how every single step is just a method of

1    organizing data that's equivalent to a library.  And then

2    Kove is saying, well, look at these general articles in *MIT*

3    *Technology Review* and these statements in the specification

4    that aren't reflected in the claim.

5          So I think that when you have this analysis of the

6    claim language, I do think this claim -- all of the asserted

7    claims are directed to abstract ideas.

8          So I'm happy to answer any other questions from the

9    Court.

10          THE COURT:  No.  I am ready to hear from Kove.

11          MR. UNIKOWSKY:  Okay.  Thank you.

12          MR. REICHMAN:  Thank you, your Honor.

13          May it please the Court?

14          We have some slides we may use, if we can put them

15    up?

16          THE COURT:  Sure.

17          THE COURT REPORTER:  Could you state your name

18    again.

19          MR. REICHMAN:  Sure.  Courtland Reichman.

20          May it please the Court?

21          Any claim can be characterized in abstract terms.

22    The Federal Circuit has made that very clear, especially when

23    they are untethered from the claim language.  And the Federal

24    Circuit and Supreme Court cases are equally clear that

25    characterizing things at such a high level of abstraction

1    could just swallow the rule.

2            If you think about it, after all, the light bulb is

3    just light, or the *Enfish* patent is just a table, or

4    autonomous driving is just driving.

5            There is no all-encompassing rule.  And one thing I

6    want to be very clear about in the argument is that the test

7    is not some free-for-all about whether we can come up with an

8    analogy.

9            Instead, the baseline, as your Honor is aware, is

10    that you are to look at the comparison cases.  And the

11    Supreme Court has let the law evolve by looking at these

12    cases.

13            But in this particular area, when we are talking

14    about computer science and computer networks and computers

15    more generally, the Federal Circuit has given us a test, and

16    it's up on the screen.

17            The test that the Court is to apply is whether the

18    focus of the claims -- and I am going to coming to it, but we

19    are by no means running away from these claims.

20            The focus of the claims is on a specific asserted

21    improvement in computer capabilities.  That's the question

22    that we are here to answer.

23            This differs from an abstract idea where you are

24    just taking an idea that exists out in the world and saying,

25    hey, let's apply a computer to it.

1    One of the quintessential examples is escrow.  You

2    take escrow and say, let's do it on a computer.  Or if I were

3    to tell the patent office, I have got an idea.  Wouldn't it

4    be great if you could get radio through a satellite.

5    Well, you're not doing anything different.  That's

6    just the abstract idea of getting radio through a satellite

7    and implementing it on a general-purpose computer.

8    So the question here is whether the claim language

9    read in light of the specification is rooted in computers,

10   computer technology, and improves how the computer functions.

11   I want to pause and say something about the

12   specification.

13   The law that Amazon is -- it talks about it in its

14   reply brief.  Its reply brief's focus is, hey, you need to

15   look at the claims.  And we agree.  But what they are asking

16   the Court to do -- and this is important -- is a sharp break

17   from virtually every Federal Circuit case that talks about

18   claims.

19   Of course, you have to look at the claims in light

20   of the specification.  And the cases are replete.  Case after

21   case looks at not only, what did these claim terms mean in

22   light of the specification?  But the place that you look --

23   or one of the places, anyway, that you look to determine

24   whether it's an improvement over other things that existed

25   before is in the specification.  That's the point.

1    You also can look at the prosecution history.  You

2    can look at the complaint.

3    What's really going on -- and this, I think,

4    informs the entire analysis -- is what I would call an

5    undercover claim construction, saying that, well, these

6    claims should mean this, or they would mean that.  I will

7    just give you one example that makes it very clear.

8    Amazon says, well, "identifier" or "identifier

9    string."  That's just a regular word.  That could mean the

10   Dewey decimal system.  It doesn't mean anything particular in

11   this context.

12   Let's start with the proposition that, that right

13   there, before I even get to the actual patent -- right there,

14   that's claim construction.  That's them saying, in their

15   view, one skilled in the art, an electrical engineer or a

16   computer scientist who read "identifier string" would

17   understand it to mean the Dewey decimal system.

18   Of course, you can't do claim construction at this

19   stage, particularly taking the defendant's view of what the

20   claim should mean.

21   But this underscores many points, like, you have to

22   look at the specification.  That particular term is actually

23   defined in the specification to mean a computer networking.

24   In Column 4, Line 10, "identifier string" or "identifier" is

25   a unique string with zero or more location strings that are

1    associated in an NDTP server.

2            It's inextricably rooted in technology, and anybody

3    skilled in the art would understand, and we have to assume

4    for these purposes, construing inferences in our favor, that

5    they would understand that to be a computer term.

6            So again, the test is -- without the undercover

7    claim construction, the test is, do these improve the way a

8    computer functions in the way that the cases talk about it?

9            And they do.  I will list some of the ways in which

10   they improve it.  This is in the specification, and it's in

11   the complaint.

12           And I guess I should say, of course, you have to,

13   in a 12(b)(6), assume that the allegations in the complaint

14   are true.

15           And one of the areas that we heard Amazon, in their

16   brief and sitting here today, takes aim at Kove is to say,

17   well, this MIT article may describe advances, improvements,

18   but that's not this patent.  And we should assume, for these

19   purposes, is what they are saying, that this isn't this

20   patent.  This isn't these inventors.

21           But if you look at Paragraphs 1 and 19 of the

22   complaint, they say that the invention described in the MIT

23   article is substantially identical to the invention in Kove's

24   patents.  That's what we have to take as true.

25           And we use that article to show that this is not

1  some routine improvement over prior systems.  There is no way
2  that MIT said this is one of the top ten technologies that
3  are going to change the world, because somebody said, do a
4  card catalogue on a computer.

5         So what are those improvements?

6         Well, first it's the idea of using an intermediate
7  server.  Using an intermediate server that, of course, itself
8  is rooted in technology, but that stores location
9  information.  Before, the information had to be out on the
10  actual server.  The way your Honor described it in the
11  analogy, they had to be out at the library.  Nobody had
12  thought to put intermediate servers in between the user or
13  the cluster of servers that represents the user, what they
14  call the client, and the actual data entities that could be
15  located anywhere in millions of servers.

16         It used to be that you had to go to a central index
17  that was associated with that data.  This is separating the
18  two and doing an intermediate server on which the location
19  information is associated with an identifier string, not the
20  Dewey decimal system, but a computer identifier string.  It's
21  in the patents.  It describes what the identifier string is.
22  That term would have to be defined by reference in the
23  specification since it's in quotes and it's defined in the
24  specification.

25         You then store this location information

1    independent from the data entities.  That's one of the things

2    that the MIT article talks about and the complaint talks

3    about, is a dramatic break from what existed before.  When

4    you separate what we characterize as the where from the what,

5    there is some magic in that.

6              But then it goes on, very similar to the MIT

7    article.  It's in the specification and it's in the

8    complaint.  It's using a distributed hash table to store the

9    location information or portions of it across a network of

10    intermediate location servers.

11             Now, again, as we start talking about the actual

12    language of the claims -- and I'm focused -- you might put up

13    the '170 claim.  I'm walking through that.  I think that's

14    the baseline, and the other ones build off of that.

15             This is at the heart of the invention, your Honor.

16    It's -- let's just -- I will deal with the analogy later, but

17    I am not hearing in this analogy that there are distributed

18    hash tables nor could there be.

19             Distributed hash tables, if you even just look them

20    up on Wikipedia, are computer science terms.  In fact, what

21    it says in there is that this term arises out of computer

22    science.

23             And what is it?  Well, it is a type of table, type

24    of lookup table, not different at that level, that it's a

25    table that you would have in *Enfish*.  And hash tables have

1    been a tool that have been used.

2            To be clear, every single patent, your Honor -- and

3    I defy the defendants to put up a patent that is not built

4    out of things that already existed.  As the courts have

5    recognized, of course they are, because nobody is inventing

6    new matter.  It's all based on stuff that's in the world.  So

7    you can't just pick a word out and say, well, distributed

8    hash tables or hash tables existed before.  That's not the

9    question, no more than it was the question in the Supreme

10   Court case *Diehr*, if I'm pronouncing it correctly, where they

11   used a mathematical equation for purposes of curing rubber.

12   You are using it as a tool, like you would use any other

13   technology.

14            But here what's going on is really interesting.

15   You have got these intermediate location servers, and no one

16   server -- this, I guess, goes to one of your questions, your

17   Honor.  No one server of these intermediate location servers

18   has the entire hash table on it.

19            One of the innovations -- this was talked about in

20   the MIT article, talked about in the patent, talked about in

21   the complaint -- is breaking that hash table up so that it

22   sits across all of these different intermediate location

23   servers.

24            And then, when you -- it's not hashing -- this was

25   what was in the prior technology.  And this is all in the

1    complaint and in the patent.

2              In the prior technology, you would be hashing; that

3    is, breaking apart and creating locations for the underlying

4    data.

5              This said, no, we are not going to do that.  There

6    is too much data.  We are talking about, you know,

7    quadrillions -- I learned that word -- quadrillions of data

8    entities, more than that even.  That would be impossible.

9    That's why you couldn't do these sorts of massive data cloud

10   applications with the prior technology.

11             We are not hashing the data entities.  We are

12   hashing the location information.  That's a much more

13   discrete piece of information.  And we are spreading it

14   across these different servers so that when you go to one

15   server and you say, okay, I would like to know the electrical

16   engineering professors at the University of Chicago, that

17   server may not have that on it.  It may not even know the

18   location, but it runs a hash table, and it says, I think if

19   you go to these other servers, it might have the information,

20   or go to these other servers and it might have the

21   information.

22             As the MIT article describes, the use of

23   distributed hash tables to organize location information was

24   a major breakthrough in computer science.  It is what enabled

25   cloud technology.

1       Hash function, these are -- if the Court were to
2   look it up on Wikipedia or if we were to actually have
3   evidence around this -- and this is part of the problem,
4   evidence -- it's a highly sophisticated term rooted in
5   computers.

6       And the idea -- I'm not a computer scientist by any
7   means.  I'm the last person.  But I did enough research to
8   figure it out.  And what it is, is, you can take information,
9   like, please tell me the electrical engineering professors at
10  the University of Chicago.  It could be any sentence that you
11  want to put in.  And it runs this hash function on it, and it
12  turns that into this -- it could be 32 or
13  hundreds-of-digit-long code.  Think of it -- the example that
14  is given in the literature is like cryptography, that if you
15  were to take your message and convert it into letters and
16  numbers and ones and zeros, you could have a
17  hundred-digit-long unique identifier.  So if you say, all
18  identifiers are all going to be 300 lengths long, it will do
19  the hash function and convert it into that.  It's
20  inextricably tied to computers.

21      It then has this redirection mechanism and the
22  transfer mechanism.

23      What emerges out of all this, your Honor, is that
24  you are organizing the architecture for how the computer
25  works.  And when you organize that architecture, what the

1    cases say is, you are improving the way the computer works.

2         I am going to come back to *Enfish,* but I want to

3    start on defendant's cases, because I think it highlights

4    what is so different.

5         This type of patent has never been considered by

6    the Federal Circuit to be a data manipulation patent.

7         I mean, what are those patents that are data

8    manipulation?  For example, the *BSG* patent.  That was a

9    Federal Circuit case the defendants cited.  And the idea here

10   is that they had what they call the self-evolving database.

11        And what did that mean?  It meant that you collect

12   information, and then when I want to type in a tag for that

13   information, it gives me a suggestion of what other people

14   typed in as tags.  There was no structural organization of

15   how the servers connect to each other, how they are

16   organized.

17        Similarly in *Two-Way*, the other case that was cited

18   here today, the claim involved the following:  Sending

19   information, directing the sent information, monitoring the

20   receipt of the sent information, and accumulating records

21   about the receipt of the information.

22        You see how in these patents all you are doing is

23   moving the information around.  You are not organizing the

24   architecture for a computer.

25        Now, contrast that with *Enfish*, which I think is

1    right on point for us.  In *Enfish*, the conclusion was that

2    you are organizing the architecture of a computer.

3              Now, what was that architecture?  I think this says

4    it all.  The architecture was a table in which some of the

5    rows had the same name as some of the columns.

6              It could be done.  It's what they call the

7    self-referential table.  And that was distinguished from a

8    relational table, where you might relate a piece of

9    information on this one table to information on another

10   table.  They said, hey, wouldn't it be great?  We will put it

11   all in the same table, and we will have cross-references in

12   the table where some rows have the same name as some columns.

13             This could be done in the human mind.  It could be

14   done with pen and paper.  In fact, if you look at the *Enfish*

15   decision, you will see it's done with pen and paper.  The

16   Federal Circuit writes it out, gives examples that it makes

17   up of these tables.

18             So why was it patentable?  It was patentable

19   because it was an architecture for how you build a computer

20   system in a way that improves over other computer systems.

21             What did it improve over?  Well, one example that

22   was given was relational databases.  Instead of having to

23   create all of those relationships between the different

24   tables, it would -- it could be automatically updated in a

25   self-referential table, because you are just using one table.

1    You don't have to create a connection.

2            Well, although it's just one facet of the

3    invention, a distributed hash table is so much more complex

4    than a table with rows and columns that have the same names.

5    It's like saying a Big Wheel is a vehicle but a Ferrari

6    isn't.  *A fortiori*, if the table in *Enfish* is a sufficient

7    architecture for a database, then using distributed hash

8    tables on intermediate location servers is sufficiently

9    complex.

10           We don't think you get past Step 1, but it's, I

11   think, useful to consider the question here of preemption.

12           I guess before I do, I just want to underscore this

13   point about the picking on these technical words.

14           As I said before, there is no patent that you

15   couldn't pick out a technical word, as Amazon is doing.  They

16   stood up here and in their brief they said, well, it's says

17   "server."  Servers are everywhere.  Or it says "database."

18   Well, databases are everywhere.

19           If you pick any individual word -- and I would

20   posit -- maybe I'm overstating -- in any electronics patent,

21   every individual thing listed in there exists somewhere else.

22   That's not the test.

23           If you look at the analogy -- I want to pull up --

24   why don't we pull up the *Enfish* patent first.

25           If you look at the analogy, your Honor, we could

1    take this library card catalogue point, and I think you could
2    apply it to any database patent to invalidate it.  There is
3    no authority for rewriting the patent to substitute claims.
4    I mean, Amazon's point, in its opening brief at least, was,
5    this isn't rooted in technology because it could apply to a
6    library.

7         And to get there what they do is, they strip all
8    the technical words out of the patent and substitute them
9    with nontechnical words and then construe things like
10   "identifier string" -- contrary to the specification and the
11   way people skilled in the art would understand them -- to
12   have nontechnical meanings.

13        Well, if we took the very patent in *Enfish* and did
14   the same word substitution exercise, as you could see here,
15   we end up at the same place that the defendants end up.  Yet
16   we know that this is patentable.

17        Or the patent that we cite in the brief, the Amazon
18   patent -- if we could pull that up.

19        We could take Amazon's patent -- why don't we put
20   up the full claim.  Do you happen to have it there?  Maybe
21   the next one.  There you go.

22        I will show you the word substitution, your Honor.
23   But if we take -- this is the patent that we cite of
24   Amazon's.  And I'll tell you, there are more than 70 Amazon
25   distributed network-type patents that cite the Kove patent,

1   and we took a look at them.  Not one of them cites a library

2   card catalogue.

3          If they thought a library card catalogue was prior

4   art -- if it was the same thing as the Kove patent, they had

5   a duty to bring that to the examiner's attention.  That was

6   never done because, of course, nobody in computer science

7   would consider a card catalogue to be this.

8          If you take one of their patents, the '482, you see

9   it's a lot of the same terms.  And I could pick any of them

10  out and say they existed before -- a structured data record,

11  receiving a request, mapping a request, a hash function of

12  the partition key.

13         What happens -- if we put up the other slide -- if

14  we try and do the word substitution exercise, we end up right

15  back at a library card catalogue.  I strip out the technical

16  words, and I write non-technical words.

17         So a computer-implemented method becomes a library

18  card catalogue-implemented method.

19         We receive a request from a client, so we receive

20  it from a librarian.  To store structured data, we could just

21  call it a book.

22         And this is the point I started with, your Honor.

23  The test that the Court is to apply is not some free-for-all

24  about whether you can rewrite claims or characterize them

25  abstractly.

1    The question is whether the architecture here
2 improves the way computers function.

3    And then where I was going was, undergirding all of
4 these laws, the Supreme Court has made clear, is a concern
5 around preemption.

6    So one of the questions that's relevant to ask is,
7 is this taking the entire field?  It's not something we hear
8 much about in Amazon's briefs, but it clearly isn't.

9    In *Enfish* we see that a self-referential table is
10 not preempting because you have a relational table, a
11 relational database.

12    Similarly, in this case you have self-referential
13 tables.  You have relational databases.  You have
14 hierarchical indexes.  You have databases where you don't
15 have intermediate location servers.  You cannot use a hash
16 table at all.  And you certainly don't have to make it a
17 distributed hash table.

18    Again, deciding whether this is an improvement over
19 conventional systems is a fact question, as *Berkheimer* and
20 other Federal Circuit cases made clear.  And at this stage we
21 are to assume or construe the facts in the plaintiff's favor.
22 And the complaint, paragraph after paragraph -- it's through,
23 roughly, Paragraph 20 or 22 -- makes clear that this is an
24 improvement over conventional systems.

25    And in Paragraph 1 and 19 it makes clear that we

1    are talking about -- the MIT article is talking about the

2    same thing as the Kove invention, and it's talking about how

3    using distributed hash tables to store location information

4    is one of the top ten innovations.  I'm not talking about

5    computer science innovations.  I'm talking about one of the

6    top ten innovations that are going to change the world.

7              This is deeply rooted in technology, every word in

8    the patent.  And the actual claims is rooted in technology,

9    and it is an architecture for improving how computers

10   function.

11             That architecture point is the key one, because it

12   ties you right into *Enfish*.  It's architecture in just the

13   same way that *Enfish* is, your Honor.

14             THE COURT:  Thank you.

15             MR. REICHMAN:  Thank you.

16             THE COURT:  Any rebuttal?

17             MR. UNIKOWSKY:  Thank you, your Honor.  Yes.

18             I would just like to make a couple of quick points.

19             THE COURT:  Sure.

20             MR. UNIKOWSKY:  First of all, we are certainly not

21   arguing that just you can arbitrarily take some words, change

22   them into different words, and therefore prove that the

23   patent is abstract.

24             So I'm not saying that in any claim in the entire

25   world you can take a word like "light bulb" and replace it

1  with a word like "book," and suddenly you have shown that
2  it's an abstract idea.
3            What I'm saying is, look at the words of this
4  particular claim.  And if you replace these
5  technical-sounding words with their nontechnical equivalents,
6  you have something that you could do in the real world that
7  works in the exact same way as what these claims are
8  describing on a computer.
9            So just to take a concrete example of something
10  that was said during my colleague's prior remarks,
11  "identifier string."  So, of course, an identifier string is
12  just a string that identifies something.  But we are told
13  that, look at the specification.  It says the identifier
14  string is something on a computer.
15            So you go to the specification at Column 4, and it
16  defines the identifier string as "a unique string with which
17  zero or more location strings are associated in an NDTP
18  server."  So it's a string that identifies something on a
19  generic server.
20            Okay.  That's just like "server."  It's a
21  completely generic thing on computers that works the exact
22  same way as something in the real world not on the computers.
23  It's something that identifies something on a generic server.
24  And just as the word "server" in a claim doesn't make it
25  nonabstract, the statement in the specification that an

1   identifier string appears on a server doesn't make it

2   nonabstract when the idea here is just something that

3   identifies something, which you don't need a computer to do.

4          And it's similar with this idea of these

5   distributed hash tables.  So I construed from my colleague's

6   remarks that they think that the inventive concept here,

7   what's really rooted in technology, is this notion of

8   distributed hash tables.  That's what they seem to think is

9   technological.

10          So I think that they are referring to Claim 1 of

11  the '170.  That's the only claim that even uses the word

12  "hash."  But it doesn't actually say -- the words

13  "distributed hash tables" don't appear.

14          And again, I think that the Federal Circuit's

15  requirement to look at the language of the claims is

16  instructive.  I'm happy to just read the exact same claim

17  language that uses the word "hash" and demonstrate that there

18  is nothing about that, that couldn't be implemented in a

19  library.  It's really the exact same thing.

20          So it's the last two elements of Claim 1 of the

21  '170.

22          It says, "the portion of the data location

23  information" -- so those are likes the cards -- "included in

24  a corresponding one of the data location servers" -- that's

25  the card catalogue -- "is based on a hash function used to

1    organize the data location information across the plurality

2    of data location servers."

3              So it just says, use a hash function to organize

4    the cards -- to organize the information in the boxes.  Okay?

5    And there's no dispute that a hash function is just a piece

6    of mathematics.  That chart which we describe, that's a hash

7    function.

8              So my colleague talks about distributed hash

9    tables, but the relevant claim limitation, all it's saying

10   is, you use a hash function to organize the cards in the

11   boxes.

12             And then the next one says, "each one of the data

13   location servers is configured to determine the at least one

14   of the plurality of data location servers based on the hash

15   function applied to the identifier string."

16             So each one of the card catalogues -- so you can go

17   to any one of these boxes, and you can determine which server

18   to go to by looking at the chart and applying it to the

19   person's name.

20             So it says, "each . . . of the data location

21   servers is configured to determine the at least one of the

22   plurality of data location servers" -- so the at least one

23   card catalogue -- "based on the hash function applied to the

24   identifier string."  So just by looking in the chart and

25   applying that chart to the person's name.  That's all this

1  says.  That's the entire claim.

2          And although I understand that there may be an

3  article in the *MIT Technology Review* saying distributed hash

4  tables are an important technology, that's just not enough to

5  get a patent.  You have to look at the language of these

6  claims.

7          And just one final point.  There is reference to

8  factfinding and claim construction, but I think that they

9  have to show something concrete, like a particular claim term

10  that has to be construed that will actually affect the

11  abstractness analysis or some question of fact that has to be

12  determined.

13          There is a number of Federal Circuit cases that

14  have affirmed dismissals under Rule 12(b)(6).  You can't just

15  arbitrarily try to get facts and claim construction without

16  showing why it matters.  And I don't think that there is any

17  factual dispute or claim construction dispute on which this

18  dispute will turn.  I just think that the claims are plainly

19  abstract, according to their plain meaning.

20          If the Court has no further questions --

21          THE COURT:  Let me just ask.

22          MR. UNIKOWSKY:  Yes.

23          THE COURT:  When you refer to the hash function to

24  organize data, is that, in your mind, akin to A through G are

25  in this box?

1          MR. UNIKOWSKY:  Yes.  That's what it is, yes.

2          THE COURT:  I wanted to make sure I understood

3     that.

4          All right.  Well, thank you.  Great case.  Great

5     case.  I have been here long enough that I like the hard

6     ones.

7          MR. UNIKOWSKY:  Thank you, your Honor.

8          THE COURT:  And I hope to rule within the next 60

9     days.  I can't make you any promises, but that would be a

10    hope.

11         Thank you.

12         MS. MASCHERIN:  Your Honor, before we break, may I

13    just ask for clarification on one thing?

14         The last time we were before you, you entered a

15    minute order staying discovery other than the initial

16    disclosures, which the parties have exchanged.

17         THE COURT:  Was stayed.  You know, I am going to

18    lift the stay at this point.  I realize you won't get a whole

19    lot done within 60 days anyway, but I think we can go ahead

20    and lift the stay so you can at least initiate other

21    discovery mechanisms.

22         MS. MASCHERIN:  Could I ask your Honor that we

23    continue the stay with respect to the portion of the local

24    patent rules that require the initial infringement,

25    noninfringement, and invalidity disclosures? because those

1    really do require some more intensive work.

2              THE COURT:  That makes sense to me.  That makes

3    sense to me.

4              MR. REICHMAN:  I think that --

5              THE COURT:  Did you want to hand up your

6    PowerPoint?

7              I will let you respond to this.  Sure.

8              MR. REICHMAN:  May I hand it up?

9              THE COURT:  Yes.  That would be great.

10         (Document tendered.)

11             MR. REICHMAN:  We can wait or not wait, but leaving

12   out those things are the heart of what we are supposed to be

13   continuing with.  And I think what it ends up doing is

14   putting the disclosure obligations on the plaintiff and not

15   on the defendant.

16             So we are just leaving out where the defendant has

17   to produce something and saying that the plaintiff should

18   have to go ahead.

19             I think there is plenty of time in the local rules.

20   We have had months here to just move forward in a methodical

21   and measured way with the patent local rules and not leave

22   out some of them.  Of course we will work with them on

23   extensions, if that's necessary.

24             MR. MARIOTTI:  We have given them, Judge, multiple

25   extensions at this point.  We filed -- when did we file this

1    complaint?  Last year.

2            We have already -- we gave them multiple extensions

3    before we even got to this point, Judge.  I mean, they have

4    had a lot of time to get prepared for this.

5            THE COURT:  I wish I had a more firm sense of what

6    I am going to do on this motion.  I think you have made some

7    good points, though.

8            We will adopt -- we will initiate discovery for all

9    purposes.  Again, you won't have a whole lot to do between

10   now and 60 days in any event.

11           MR. REICHMAN:  Thank you, your Honor.

12           THE COURT:  Thank you.

13           MS. MASCHERIN:  Thank you, your Honor.

14       (An adjournment was taken at 11:21 a.m.)

15                       *   *   *   *   *

16   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
17

18   /s/ Frances Ward_____June 18, 2019.
     Official Court Reporter
19   F/j

20

21

22

23

24

25