# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Kove IO, Inc., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Hon. Rebecca R. Pallmeyer |
| v. | Jury Trial Demanded |
| Amazon Web Services, Inc., | |
| Defendant. | |

## KOVE IO, INC.'S RESPONSE TO AMAZON WEB SERVICES, INC.'S
## OPENING CLAIM CONSTRUCTION BRIEF

# **TABLE OF CONTENTS**

I.    THE KOVE PATENTS ............................................................................................. 1

II.   LEGAL PRINCIPLES OF PATENT CLAIM CONSTRUCTION ................................. 3

III.  ARGUMENT ........................................................................................................ 4

    A.     "location" ..................................................................................................... 4

       1.   "Location" Is Expressly Defined In The Patents. ......................................... 5

       2.   AWS's Construction Ignores Express Lexicography, Adds Limitations, And Excludes Preferred Embodiments. ......................................................... 8

       3.   AWS's Criticisms Of Kove's Proposed Construction Are Inaccurate. ..................... 10

    B.     "location information" .................................................................................. 12

    C.     "location server" ......................................................................................... 13

    D.     "client" ....................................................................................................... 16

    E.     "based on a hash function…" ...................................................................... 17

       1.   Claim 1 Of The '170 Patent Is Not Indefinite. .......................................... 17

       2.   AWS Improperly Imports A Limitation From The Specification Into Its Construction Of "Hash Function Used To Organize" ................................... 19

    F.     "hash table" ................................................................................................ 22

    G.     "data pertaining to the entity" ..................................................................... 23

    H.     "redirect message" ...................................................................................... 25

IV.  CONCLUSION .................................................................................................... 25

# **TABLE OF AUTHORITIES**

**Federal Cases**                                                                                            **Page(s)**

*Aventis Pharma S.A. v. Hospira, Inc.*,
   743 F. Supp. 2d 305 (D. Del. 2010)............................................................................18

*BASF Corp. v. Johnson Matthey Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017)................................................................................18

*Baxter Healthcare Corp. v. Hospira, Inc.*,
   No. 18-CV-303-RGA, 2018 WL 5342623 (D. Del. Oct. 29, 2018) .........................11

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
   750 F.3d 1304 (Fed. Cir. 2014)................................................................................20

*Hormone Research Foundation, Inc. v. Genentech, Inc.*,
   904 F.2d 1558 (Fed. Cir. 1990)................................................................................16

*Hospira, Inc. v. Fresenius Kabi USA, LLC*,
   No. 16-cv-651, 2017 WL 5891058 (N.D. Ill. Nov. 27, 2017) .................................5, 6, 11, 12

*Innogenetics, N.V. v. Abbott Laboratories*,
   512 F.3d 1363 (Fed. Cir. 2008)................................................................................22

*Insituform Techs., Inc. v. Cat Contracting, Inc.*,
   99 F.3d 1098 (Fed. Cir. 1996)..................................................................................8

*Martek Biosciences Corp v. Nutrinova Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009)................................................................................5

*Mastermine Software v. Microsoft Corp.*,
   874 F.3d 1307 (Fed. Cir. 2017)................................................................................14, 18

*Novelaire Techs., L.L.C. v. Munters AB*,
   No. 13-cv-472 CM, 2013 WL 8508578 (S.D.N.Y. Nov. 21, 2013) .........................10

*Pfizer, Inc. v. Teva Pharms., USA, Inc.*,
   429 F.3d 1364 (Fed. Cir. 2005)................................................................................22

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)................................................................................3, 4, 16

*Rembrandt Data Techs., LP v. AOL, LLC*,
   641 F.3d 1331 (Fed. Cir. 2011)................................................................................18

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
   511 F.3d 1132 (Fed. Cir. 2007)................................................................................5

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
   775 F.2d 1107 (Fed. Cir. 1985)..........................................................................22

*Symantec Corp. v. Acronis, Inc.*,
   2014 WL 230023 (N.D. Cal. Dec. 13, 2013)..................................................20, 21

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015).........................................................................................3

*UltimatePointer, LLC v. Nintendo Co.*,
   816 F.3d 816 (Fed. Cir. 2016)......................................................................17, 18

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996).......................................................... *passim*

Plaintiff Kove IO, Inc. ("Kove") submits this brief in Response to Amazon Web Services, Inc.'s Opening Claim Construction Brief (Dkt. 219, the "Brief" or "Br.").

## I. THE KOVE PATENTS

In the 1990's, the Internet was nascent yet fast-growing, the debate around "big data" just began percolating, and the "cloud" as known today was years away. Prior art distributed storage systems required knowing which data repository to query for particular information. For example, a hospital may have various data storage servers that each store different patient data, such as x-rays and cardiology records, but the only way to collect a patient's complete medical records was to query every known data storage, which was inefficient and impractical. The inventors of the '640 patent, '170 patent, and '978 patent (collectively, "the Kove Patents") recognized this problem and solved it with a widely applicable technique that separates the "where" (*i.e.*, which data storage server(s) to query) from the "what" (*i.e.*, the data itself). In other words, the Kove Patents view "data" independently from its "location" and introduced the concept of specialized servers, called "location servers," to act as intermediaries between clients requesting data and the corresponding data storage. A client seeking data first requests the location of data from a location server and then requests the data itself from the appropriate data storage server(s).

To guarantee consistency and completeness for data queries, each "entity" for which data is stored (*e.g.*, a patient) is uniquely identified by an identifier (*e.g.*, a social security number). '978 patent,2:21-37, 4:19-38, 7:54-8:25, JA0072-74; '170 patent, 4:10-49, JA0016. This unique identifier in turn is associated with the locations of data associated with that entity (*e.g.*, servers storing a patient's medical records). *Id.* The location servers store these identifier/location mappings and can provide data locations in response to client requests that identify a particular entity. *Id.* The basic architecture of this system is shown in the figure below.



'170 patent., Fig. 11, JA0038. The client (112) requests the location of data from location server (110) and obtains the data from the appropriate data storage server(s) (114). *Id.*, 16:53-61, Fig. 11, JA0038, 47; *see also* '978 patent, Fig. 18, JA0067; 18:37-57, JA0080.

The inventors also anticipated that distributed storage systems would someday contain so many data files that it would become impractical (if not impossible) to store the corresponding location information in one place. '978 patent, 1:59-2:15, JA0072. Moreover, they recognized that the data and location information would not be static, but would instead be dynamically changing, thereby requiring a system that could keep up.[1] *Id.* The inventors recognized that a network of location servers was needed to address these issues. *Id.*, 15:45-63, JA0079; 18:37-57, JA0080, Fig. 18, JA0067. Each location server stores just a *portion* of the complete set of location information. *Id.* Distributing the location information across a plurality of servers reduces the strain on each location server and enables "massive scale." *Id.*, 19:26-37, JA0081. Preferably, a hash function is used to allocate the location information across the location servers, *i.e.*, a hash function is applied to an identifier to determine the location server at which to store or retrieve location information. *Id.*, 17:6-67, JA0080.

To prevent the problem of a client not knowing which location server to query, when a location server gets a query that cannot be answered with its portion of the location information,

---

[1] This has come to pass. Amazon's S3 cloud storage service product, for example, stores **trillions** of objects, and handles millions of transactions **per second**. *See, e.g.*, https://aws.amazon.com/blogs/aws/amazon-s3-two-trillion-objects-11-million-requests-second/.

it must be able to redirect the client, through a redirection message, to the location server that can answer the query. *Id.*, 15:64-16:17, JA0079.



'640 patent, Fig. 12, JA0038. The client sends a request (122a) to a first location server (120a). *Id.*, 17:8-21, 17:45-60, JA0048; *see also,* '978 patent, 15:64-16:17, JA0079, 18:60-19:3, JA0080-81, Fig. 19, JA0067. When the first location server does not have the requested location information, it returns a redirection message to the client. *Id.* The client then sends its request (122b) to a second location server (120b) that returns the requested location information. This redirect capability reduces the number of transactions, thereby reducing load and easing network congestion. *Id.*, 15:34-63, JA0079.

## II.     LEGAL PRINCIPLES OF PATENT CLAIM CONSTRUCTION

Claim construction is a question of law, although subsidiary fact finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015). Claim terms are given their "ordinary and customary meaning" to a person skilled in the art ("POSA") at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). Even "readily apparent" claim terms must be read "in the context of the entire patent, including the specification." *Id.* at 1312-13. The specification "is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). If the specification defines or gives consistent meaning to certain terms, "the inventor's lexicography

governs." *Id.* If the specification merely provides examples or preferred embodiments of an invention, however, it is improper to limit the claims to those embodiments. *Phillips*, 415 F.3d at 1323. Constructions that exclude preferred embodiments are "rarely, if ever, correct." *Vitronics*, 90 F.2d 1576, 1583 (Fed. Cir. 1996). Like the claim language and the specification, the prosecution history, while less reliable than the specification, is also intrinsic evidence of the claim term's meaning and "provides evidence of how the PTO and the inventor understood the patent." *Id.* at 1317.

The court may also consider extrinsic evidence, including expert and inventor testimony, dictionaries, and learned treatises. *Id.* (*quoting Markman*, 52 F.3d at 980). Extrinsic evidence "is less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id.* (quoting C.*R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). However, "extrinsic evidence in the form of expert testimony can be useful to a court for a variety of purposes, such as to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318.

## III. <u>ARGUMENT</u>

### A. "location"[2]

| CLAIMS | KOVE'S CONSTRUCTION | AWS'S CONSTRUCTION |
|---|---|---|
| '978 patent: claims 1, 3, 6, 14, 17, 23-24, 30-31 '170 patent: claims 1-2, 6, 8, 12, 15 '640 patent: claims 17-18, 24 | an encoding that is a member of a set of associations with an identifier in a location server, and that ***specifies a location of data pertaining to the entity identified by the identifier*** | an encoding that is a member of a set of associations with an identifier in a location server, and that ***is used to directly contact a server storing data and retrieve the data*** |

---

[2] Here and where applicable throughout, the relevant differences between the parties' constructions are bolded and italicized for ease of reference.

1.    **"Location" Is Expressly Defined In The Patents.**

The term "location" is foundational to the technologies disclosed and claimed in the Kove

Patents.  It appears more than 200 times in the 19 claims at issue, and hundreds more times in the

specifications.  The inventors took care to define the term, acting as their own lexicographer for it

and other key terminology, including "identifier," "location server," and "client."[3]  These terms

must be construed in accordance with the inventors' express lexicography.  *See Martek*

*Biosciences Corp v. Nutrinova Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) ("When a patentee

explicitly defines a claim term in the specification, the patentee's definition controls"); *Sinorgchem*

*Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1136 (Fed. Cir. 2007) (holding that

specification's use of the term "is" and using terms "set off by quotation marks" are strong

indicators of definitional language); *Hospira, Inc. v. Fresenius Kabi USA, LLC*, No. 16-cv-651,

2017 WL 5891058, at *5 (N.D. Ill. Nov. 27, 2017) (Pallmeyer, J.) (construing the term "ready to

use" in accordance with definition in specification where "inventor has clearly acted as his own

lexicographer").  Kove's proposed construction of "location" reflects the inventors' intended

definition, which is set forth below:

> The following terms are used to describe the operation of the presently preferred distributed
> database system.  A network distributed tracking protocol (NDTP) is a transfer protocol
> having the capability to manipulate location information used to efficiently track the
> location of information associated with an individual entity in the distributed database
> system.  An "entity identifier" or an "identifier" is a unique encoding, which may be a
> string in one embodiment, with which zero or more data location specifiers are associated
> in an NDTP server. A "data location" or ***"location" is an encoding***, for example a string,
> ***that is a member of a set of associations with an identifier in an NDTP server***.  An "NDTP
> client" or a "client" is a network-attached component that initiates add, delete, lookup and
> update of identifier/location mappings, or associations, from an NDTP server with NDTP
> request messages.  An "NDTP server" or a "server" is a network-attached component that
> maintains a set of identifier/location mappings that are modified or returned in response to
> NDTP request messages from clients.

---

[3] The parties agree as to the construction of "identifier," which tracks the inventors' lexicography
(*see* Dkt. No. 219, p. 25).  But for "location," "location server" (*infra*, Section II.C), and "client" (*infra*,
Section II.D), while Kove's constructions hew closely to the patents' definitions, AWS's constructions
materially diverge from those chosen by the inventors.

'978 patent, 4:19-38, JA0073;'170 patent, 4:8-31, JA0016 (materially identical language).[4]  The definitions in this passage build on one another.  For example, the first defined term, "network distributed tracking protocol" or "NDTP," sets forth relationships between the subsequently defined terms that constitute part of the definition of those terms.[5]  Notably, the definitions are largely focused on the relationships between one another.  This flows from the fact that the Kove Patents set forth a novel system architecture for storing data, and these terms represent the building blocks of that system.  Describing their relationships to one another is essential to explaining how the system works.

For the term "location," Kove's proposed construction starts with the express definition of "data location" / "location" set forth above: "an encoding . . . that is a member of a set of associations with an identifier in an NDTP server."[6]  '978 patent, 4:28-30, '170 patent, 4:12-14.  Kove's construction further clarifies that a "location" necessarily "specifies the location of data pertaining to the entity identified by the identifier."  In other words, each "location," by virtue of its association with an identifier, must specify the *location of data* for the entity that is uniquely identified by the identifier.  '978 patent, 4:20-30, JA0073; '170 patent, 4:8-17, JA0016.

That "location" refers to the "location of data" is apparent from the fact that the terms "***data***

---

[4] The definition of "location" in the '978 patent differs from that in the '170/'640 patents in that the '978 patent defines "location" as "an encoding, for example a string," while the '170/'640 patents define it as "a string..."  '978 patent, 4:28-29; '170 patent, 4:12.  Because that difference is immaterial to issues in this case, the parties agree there should be a single construction across all Kove Patents.

[5] In its decision denying institution of AWS's *inter partes* review ("IPR"), the Patent Trial and Appeal Board ("PTAB") endorsed Kove's proposed construction of the term "identifier," which is now the parties' agreed-upon construction for the claim term "identifier."  Ex. A, IPR Decision Denying Institution, at 10-11.  Kove arrived at its proposed construction for the claim term "identifier" using the same type of analysis applied herein to arrive at Kove's proposed constructions for the terms "location," "location server," and "client."

[6] Kove's construes "NDTP server" as "location server."  (Notably, AWS does too).  The phrases are used interchangeably throughout the specification, but the claims themselves use "location server," making it the more consistent and less confusing choice for construction.  *E.g.*, *compare* '978 patent, 2:19-37, JA0072, *with id.*, 4:19-38, JA0073. '170 patent, 4:8-26, JA0016.  For the same reason, Kove's proposed construction of the term "location server" uses "location request" rather than "NDTP request."

location" and "location" are defined synonymously in the specification. *Id.* (emphasis added). Further, the definition of "NDTP" as "track[ing] the location of ***information associated with an individual entity*** in the distributed database system" indicates that the term refers to the location of data that is associated with that entity. '978 patent, 4:23-25, JA0073 (emphasis added); 170 patent, 4:29-31, JA0016. And the definition of "identifier" indicates that the location data is associated with an entity through an identifier ("'identifier' is a unique encoding . . . with which zero or more data location specifiers are associated"). Kove's construction logically flows from the basic architecture of the system. Each "location" is associated with an entity through an identifier, and tracks where data for that entity/identifier is stored. Kove's construction therefore captures the defined relationships between the term "location" and other core components of the Kove Patents.

Citations throughout the specification corroborate Kove's construction. The Abstract states that "one or more locations [are] ***associated with an identifier***" and that each "location represents a ***location of data pertaining to the identifier***." The Brief Summary section of the specification states that there is "at least one location ***associated with the identifier***" and that "each data location specifies a ***location of data*** in a network ***pertaining to the entity***" specified by the identifier. *Id.*, 2:21-28, JA0072 (emphasis added); *see also id.*, 2:59-60, JA0072 3:10-14, JA0073. The Detailed Description of the Preferred Embodiments section, after setting forth the express construction, further gives real-world examples where the location is the network address for an application server that stores data pertaining to the entity, as part of a distributed database, or to run applications such as instant messaging or phone routing. *Id.*, 4:46-64 JA0073; *see also id.*, 8:3-25, JA0075; 21:55-22:1, JA0082.

Finally, the claims' use of the term "location" is consistent with Kove's construction. Claim 1 requires that there be "at least one location string ***associated with the identifier***, wherein

the identifier identifies an entity and the location string specifies a ***location of data pertaining to the entity***[.]" *Id.*, Claim 1 (emphasis added). Claim 17 states that there is "an identifier and at least one location ***associated with the identifier***, wherein the identifier uniquely specifies an entity and wherein each location specifies a ***location of data*** in a network ***pertaining to the entity***." *Id.* (emphasis added); *see also id.*, claims 10, 14, 17.

### 2. AWS's Construction Ignores Express Lexicography, Adds Limitations, And Excludes Preferred Embodiments.

While AWS's proposed construction for "location" begins similarly to Kove's proposal, it omits language defining a "location" by its associated identifier and entity, and instead adds a functional requirement that the location must be "used to *directly* contact a server storing data and retrieve the data." AWS's construction is unsupportable for two important reasons.

#### a. A "Location" Is Necessarily Associated With An "Entity" And "Identifier."

By omitting language that ties each location to a *specific* entity (*i.e.*, "an encoding . . . that specifies a location of data pertaining to the entity identified by the identifier") AWS leaves open the possibility that the locations can refer to *any* kind of data, whether associated with an entity or not. This is a stark departure from the system architecture that is expressly defined and described in the Kove Patents, which fundamentally relies on the relationship between a location and its associated data entity. '978 patent, 4:19-38, JA0073; '170 patent, 4:8-31, JA0016 (materially identical language). AWS's only explanation for removing this foundational tie – which AWS *agrees* is accurate ("AWS agrees with Kove that the 'data' in question is the 'data pertaining to the entity identified by the identifier.'") — is a footnoted statement saying Kove's construction may be "unwieldy" for a jury. Dkt. 219, n. 2. A vague worry about "unwieldiness" is not a basis for disconnecting "location" from the entity and identifier it is necessarily tied to.[7] *See Insituform*

---

[7] AWS's argument that "the claims do not refer to any other type of 'data'" underscores the need

*Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1106 (Fed. Cir. 1996) ("[A]ttorney argument cannot control in light of the language of the claim.").

### b. The Data's "Location" Is Not Contingent On Whether Such Location Is "Directly" Contacted.

AWS argues that a "location" must be used to "directly" contact a server to retrieve data. The intrinsic evidence does not support this construction. In fact, AWS's proposal would *exclude* preferred embodiments, something well-settled claim construction law sternly warns against. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (holding that a claim construction that excludes preferred embodiments is "rarely, if ever, correct").

AWS's own example using the courthouse address illustrates the illogic of its construction. *See* Dkt. 219 at 6. This Court's address is 219 South Dearborn St., Chicago, IL 60604. If a person begins at Millennium Park and walks *directly* to 219 South Dearborn St., then the address would meet AWS's construction of "location." But, if instead of walking directly, the person stops at a gas station to ask for directions on how to get to 219 South Dearborn St., then, according to AWS, the address would no longer qualify as a "location" because it was not used to "directly" reach the Court. But the location of a thing does not cease to be its location if it is reached indirectly (i.e., with intermediate stops along the way); a location is a characteristic of the thing, regardless of how it is used. Goodrich Decl., ¶22.[8] AWS's added limitation of "directly" is illogical, and, as explained below, contrary to what the patent teaches.

The Kove Patents provide multiple examples of a "location," including that it may be an "Internet machine name," a "TCP/IP port number," or an "HTTP Universal Resource Locator

---

for a precise construction, not a vague one. Dkt. 219, n.2. Notably, AWS's initial proposed construction contained the same language it now seeks to omit. Ex. B, at 1 ("An encoding that…specifies…information used to send a request *for data pertaining to the entity identified by the identifier*." (emphasis added).)

[8] "Goodrich Decl." refers to the Declaration of Michael T. Goodrich, Kove's technical expert, which is filed concurrently herewith.

(URL)." '978 patent, 8:10-13, JA0075; '170 patent, 4:53-57, JA0016.[9] AWS acknowledges that each of these examples are intended to be encompassed within the scope of the claim term "location," and that they are generally understood as "locations" (*e.g.,* a URL is colloquially referred to as a "web address"). Dkt. 219 at 7-8. Yet, AWS's proposed construction would *exclude* these embodiments. Retrieving data specified by a URL, for example, requires sending requests that are passed through multiple intermediate servers, such as routers and gateways. (Goodrich Decl., ¶¶ 15-16.) Like the gas station in the example above, these intermediate servers are "stops" along the way, such that the server containing the sought after information is no longer "directly" contacted.[10] *See Novelaire Techs., L.L.C. v. Munters AB*, No. 13-cv-472 CM, 2013 WL 8508578, at *3 (S.D.N.Y. Nov. 21, 2013) (rejecting reading "directly" into the claims because doing so would exclude disclosed embodiments).

AWS cites to uses of the word "directly" in the Kove Patents as support for its construction (Dkt. 219 at p. 7), but it is clear from those examples (as well as others throughout the patents) that "direct" contact is dependent on context and cannot be imported into the construction without excluding clear examples of "non-direct" contact (e.g., the URL example above). *See* Goodrich Decl., ¶¶ 15-16. Inclusion of this limitation into its construction is improper, particularly where doing so would result in exclusion of preferred embodiment(s). *Vitronics*, 90 F.3d at 1583.

### 3. AWS's Criticisms Of Kove's Proposed Construction Are Inaccurate.

AWS attacks Kove's construction by mischaracterizing it. AWS claims that Kove's construction encompasses information that is not itself a location but is merely used to retrieve the location from a different server. This argument is readily disproven.

---

[9] The sections of the '640/'170 patents and '978 patents from which these examples are taken are entitled "Detailed Description of the Presently *Preferred Embodiments* of the Invention." (emphasis added)

[10] In the case of a URL, there is an additional step that must be taken before even beginning the "trip": a network of computers must be queried to translate the URL into an IP address. *Id.*, ¶¶ 15-16. This is analogous to knowing you are going to a specific place (like this Court), but then having to look up its address before starting the trip there.

Kove's construction requires that a "location" must "specif[y] a location of data pertaining to the entity identified by the identifier." In other words, a "location" must specify where particular data is stored. AWS's "telephone number" example is inapposite and needlessly confusing. Dkt. 219 at 6. Kove agrees that the Court's telephone number is not its "location" – a phone number does not "specify a location" for the courthouse. Nothing in Kove's construction permits "location" to be anything other than the data's actual location.

AWS also asserts that Kove's construction is "useless" because it is purportedly "circular" and does not describe what a "location" is.[11] This criticism fails for two reasons. First, the inventors of the Kove Patents chose to define "location" by its relationships to other elements of the novel architecture, not by fine-tuning the word "location" itself. This lexicography must govern. *See Baxter Healthcare Corp. v. Hospira, Inc.*, No. 18-CV-303-RGA, 2018 WL 5342623, at *2 (D. Del. Oct. 29, 2018) (rejecting argument that construction of "intensive care unit" that included the term "intensive care" "is circular and thus inherently ambiguous" because term itself "has a well understood plain and ordinary meaning to a person of skill in the art" and adopting proposed construction based on the patentee's lexicography); *see also Hospira, Inc. v. Fresenius Kabi USA, LLC*, No. 16-cv-651, 2017 WL 5891058, at *5 (N.D. Ill. Nov. 27, 2017) (Pallmeyer, J.) (construing same term).

Second, the Kove Patents use the term "location" in a manner consistent with its commonly understood meaning. It is described as encompassing geographic locations (*e.g.*, "GPS," "latitude/longitude") as well as network locations (*e.g.*, "Internet machine name," "TCP/IP port number," "URL"). '978 patent, 22:53-23:6, JA0082, 8:7-13, JA0075. It is not highly-technical and can be readily understood by a fact-finder without further parsing.

---

[11] The same could be said about AWS's proposed construction, as it describes how data is retrieved rather than what a location is.

### B. "location information"

| CLAIMS | KOVE'S CONSTRUCTION | AWS'S CONSTRUCTION |
|---|---|---|
| '170 patent: claims 1-2, 6, 8, 15<br>'640 patent: claims 17-18, 24 | information pertaining to one or more locations of data and/or the identities of one or more location servers | one or more identifiers and their associated locations |

There are two types of "location information" described in the '170 and '640 patents: (1) the "location" discussed in the previous section, which specifies the location of data stored in a distributed system, and (2) the identity of the location server that stores a particular "location," *i.e.*, the location of the "location." Kove's construction captures both kinds of "location information," while AWS's construction excludes the second.

The intrinsic record of the '170 / '640 patents support the breadth of Kove's construction. First, the claims themselves expressly refer to both categories of "location information." For example, Claim 1 of the '170 patent refers to "*data* location information," which is the first type of location information, *i.e.*, the location of the data. '170 patent, claim 1. Claim 1 separately recites "location information," which must be broad enough to include (as recited in dependent Claim 5) "a hash table and the hash table includes an association between a hash of the string identifier and *at least one identifier of the at least one of the plurality of data location servers*." *Id.*, Claim 5 (emphasis added). That is, Claim 5 requires that "location information" include the second type of "location information," *i.e.*, the location of the "data location information."

In arguing that "location information" should have the same meaning across all three patents, AWS ignores the differences between their specifications. The '978 patent uses the term "location information" consistently and repeatedly throughout the specification and claims to refer to "one or more identifiers and their associated locations." '978 patent, 2:28-32, 2:40-42, JA0072 4:55-57, JA0073, claims 1, 10, 14, 17. In contrast, the '170 / '640 patents do not use the term "location information" *even a single time* in their specifications; the term is only used in the claims,

and in a manner that encompasses both types of "location information." Accordingly, in the '170 / '640 patents, "location information" should be afforded the broader meaning proposed by Kove.

### C. "location server"

| CLAIMS | KOVE'S CONSTRUCTION | AWS'S CONSTRUCTION |
|---|---|---|
| '978 patent: claims 1, 3, 6, 10, 14, 17, 23, 30-31)<br>'170 patent: claims 1, 6, 8, 12, 15<br>'640 patent: claims 17-18, 24) | a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to ***location*** request messages from clients | a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to request messages from clients***, and that does not store data to which locations pertain*** |

The patents use "NDTP server" and "location server" interchangeably. *E.g.*, *compare id.*, 2:19-37, JA0072, *with id.*, 4:19-38, JA0073. "NDTP server" is expressly defined by the patentees, making this lexicography controlling:

> An "NDTP server" or a "server" is a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to NDTP request messages from clients.

Kove's construction mirrors that of the patents, with only the non-substantive substitution of "location request" in place of "NDTP request." '978 patent, 4:34-38, JA0073; *see supra*, 21, n.6; '170 patent, 4:17-20, JA0016. Citations throughout the specifications consistently employ this construction. For example, the Abstract states that "one or more locations [are] associated with an identifier in the location store of a location server" and that "the location server contains programming logic operative to provide responses to location queries." '978 patent., Abstract, JA0001. The Brief Summary section of the specification states that "location servers contain[] location information correlating each of a plurality of unique identifiers with at least one location . . . [t]he queried location server sends a location response message to the client[.]" *Id.*, 2:38-47, JA0072; *see also id.*, 2:21-37, 2:57-67, JA0072.

AWS's construction begins with the patentee's definition of "location server," but grafts

13

on a requirement that the location server "not store data to which locations pertain." AWS argues that this limitation is supported by the patent disclosures and disclaimers made during prosecution. Neither assertion is true.

In arguing that "a location server cannot *also* serve as a data repository," AWS strongly implies, but never states, that "isolating" or "separating" data from its location information requires the two to be *physically* separated. Dkt. 219, p. 11. This is a vast and unsupported narrowing of the invention. Nothing in the intrinsic record or the claim language requires such a thing. The "separation" of data from its location information is a *logical* separation, meaning the two types of information (data information and location information) are managed separately.[12] But logical separation in no way requires physical separation. The patentees made this clear when they defined "location server" (as well as "client," *see infra*, Section II.D) as "*components*" rather than "computers" or "machines." Goodrich Decl., ¶¶ 25-28. This means that a location server may be *software* running on the *same* physical machine that corresponds to a "client" or a device storing data. Fig. 2 of the '978 patent illustrates this by depicting a "location server" (box 18) as a component on the same "application server" (box 16) that stores the requested data, *i.e.,* a single physical server *can* also serve as both a "location server" and a data repository (and vice versa):



'978 patent, Fig. 2, JA0056, 4:44-5:36, JA0073; *see also* Fig. 23, JA006921:51-64, JA0082.

---

[12] The portions of the specification that AWS cites to as supposedly supporting its construction merely describe the *conceptual* separation of locations from the data they point to, and so do not conflict with Kove's proposed construction. Dkt. 219, pp. 11-13.

Similarly, the '170 and '640 patents state that the "first server entity" (*i.e.*, a location server) "may be *coupled to* a client entity and/or data repository." '170 patent, 2:33-38, JA0015 (emphasis added). AWS's proposed construction impermissibly excludes embodiments where a location server is software running on the same machine that stores data. Goodrich Decl., ¶28. *Vitronics*, 90 F.2d at 1583.

AWS's arguments with respect to prosecution history disclaimer are similarly incorrect. During examination of the '978 patent, the Patent Examiner initially rejected claims based on a reference to Lumelsky. JA1284-1293. The patentees overcame the rejection by arguing that Lumelsky *does not describe location servers at all*. That is, the patentees argued that Lumelsky merely describes managing *data*, not *locations*, as the '978 patent claims require:

> Lumelsky's 'transient replica' refers to a multimedia object, not location information. Therefore, Lumelsky teaches transferring data objects to additional servers but does not teach transferring portions of location information to additional servers separate from data objects. Lumelsky fails to teach or suggest **the separate management of location information pertaining to the data**, therefore Lumelsky does not teach transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit as claimed in claim 24.

JA1315-1316 (emphasis added). The "separation" between data and its location information refers to its separate *management*, not its physical separation. This distinction is underscored by the fact that Lumelsky's disclosure of "transferring data objects to additional servers" is not the relevant disclosure in distinguishing the prior art – it is Lumelsky's failure to disclose "the separate management of location information," something that does not require physical separation from the associated data.

### D. "client"

| CLAIMS | KOVE'S CONSTRUCTION | AWS'S CONSTRUCTION |
|---|---|---|
| '978 patent: claim 14<br>'170 patent: claim 15<br>'640 patent: claims 17-18, 24 | a network-attached component that initiates update or lookup of identifier/location mappings from a location server with location request messages | This claim term need not be construed; plain and ordinary meaning may be used. |

When the "specification reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess… the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316. Because the patentees expressly defined the term "client" in the specifications of the asserted patents, their lexicography decides the construction:[13]

> An "NDTP client" or a "client" is a network-attached component that initiates update or lookup of identifier/location mappings from an NDTP server with NDTP request messages. '170 patent, 4:14-17, JA0016; '640 patent, 4:11-14, JA0041.

> An "NDTP client" or a "client" is a network-attached component that initiates add, delete, lookup and update of identifier/location mappings, or associations, from an NDTP server with NDTP request messages. '978 patent, 4:30-34, JA0073.

AWS's proposal ignores the patentees' chosen definition of "client," and attacks it for narrowing the term "from its ordinary meaning." Dkt. 219 at 15. This criticism ignores the very doctrine of lexicography, which permits patentees to define terminology however they chose, regardless of whether it alters the term's ordinary meaning. *Hormone Research Foundation, Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1563 (Fed.Cir.1990) ("It is a well-established axiom in patent law that a patentee is free to be his or her own lexicographer and thus may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings."). The patentees chose to define the term to distinguish it from its ordinary meaning, including the express disclosure that a "client" is a "network-attached *component*," which may include hardware and/or software. '170 patent, 2:30-45, JA0015. *See also* Goodrich Decl., ¶31.

---

[13] A POSA would have understood "update" to subsume "add, delete." Goodrich Decl., ¶31.

**E.    "based on a hash function…"**

| CLAIMS | KOVE'S CONSTRUCTION | AWS'S CONSTRUCTION |
|---|---|---|
| '170 patent: claim 1 | Not indefinite<br><br>the portion of the data location information included in a corresponding one of the data location servers is based on a hash function *that maps identifier strings to one or more of the data location servers*, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string | Indefinite. Alternatively, if the Court determines that the term can be construed:<br><br>the portion of the data location information included in a corresponding one of the data location servers is based on a hash function *applied to an identifier string in which the function result organizes the data location information by giving an index into a data structure that provides the location of an indicated location server*, and each one of the data location servers is configured to determine at least one of the plurality of data location servers *by applying the hash function to the identifier string in which the function result is an index into a data structure on the location server containing the location of an indicated location server for the identifier string* |

**1.    Claim 1 Of The '170 Patent Is Not Indefinite.**

AWS contends that Claim 1 of the '170 patent is an impermissible mixed method-apparatus claim because it employs the phrase "used to" in conjunction with a component of the claimed "system." AWS misapplies the legal standard. The rule prohibiting hybrid method-apparatus claims is only triggered when there is *demonstrable* ambiguity over when the infringement occurs "when one *creates* an infringing system" or "when the user *actually uses* the system in an infringing manner." *UltimatePointer, LLC v. Nintendo Co.*, 816 F.3d 816, 826 (Fed. Cir. 2016). No such ambiguity exists in Claim 1, which claims:

A system for managing data stored in a distributed network, the system comprising:

a data repository configured to store a data entity, wherein an identifier string identifies the data entity; and

a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, at least one of the plurality of data location servers includes location information associated with the identifier string, each one of the plurality

of data location servers comprises a processor and a portion of the data location information, the portion of the data location information included in a corresponding one of the data location servers is based on ***a hash function used to organize the data location information*** across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.

Claim 1 is a system claim, comprising two elements: "a data repository" and "a data location server," each having specific characteristics. Unlike the claims in both *Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331 (Fed. Cir. 2011) and *Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305 (D. Del. 2010), Claim 1 requires no action or step to take place. The "used to" language merely describes what the hash function does – it's a hash function that organizes the location information. It does not require an implementer of the claim to perform any activity. *Cf. Rembrandt*, 641 F.3d at 1339 (wherein the last step of an apparatus claim requires "transmitting…frames"); *Aventis*, 743 F. Supp. 2d at 320 (wherein the claimed composition "is used to form an injectable solution" with certain characteristics).

The claim here is most similar to that in *UltimatePointer*. Like the claim there – which recited "a handheld device including: an image sensor, ***said image sensor generating data*** related to the distance between a first point and a second point…," *UltimatePointer*, 816 F.3d at 819 – the "used to organize" limitation only indicates that the associated hash function has this capability. There is no requirement that the implementer actually use the hash function to organize. *See also Mastermine Software v. Microsoft Corp.*, 874 F.3d 1307, 1315-16 (Fed. Cir. 2017) (holding that active verbs used in the claim ("receives, presents, and generates") was "permissible functional language used to describe the capabilities of the reporting module"). Accordingly, AWS has failed to carry its burden of proving by clear and convincing evidence that Claim 1 of the '170 patent is indefinite. *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) ("[Defendant] had the burden of proving indefiniteness by clear and convincing evidence.").

### 2. AWS Improperly Imports A Limitation From The Specification Into Its Construction Of "Hash Function Used To Organize"

Claim 1 of the '170 patent requires that "the portion of the data location information" included on each "data location server" be "based on a hash function used to organize" that information across those data location servers. That same hash function is applied by each data location server to any particular "identifier string" to "determine" the data location server containing the data location information that corresponds to that identifier string. Importantly, Claim 1 is not limited to any *particular* way of organizing data location information through the application of a "hash function;" it is directed to *any* way of "organiz[ing]" data location information using a hash function that would have been known to a skilled artisan.

Kove's construction, which construes a limited portion of the claim (in green below), clarifies the mechanism by which "data location information" is "organize[d]," while preserving the breadth of the claim: the "hash function" of Claim 1 maps identifier strings to data location servers, but is not tethered to any particular algorithm for establishing such a mapping. This is fully supported in the '170 patent specification.[14] '170 patents, 2:66-3:7, JA0015.

| CLAIM LANGUAGE | KOVE'S CONSTRUCTION |
|---|---|
| the portion of the data location information included in a corresponding one of the data location servers is **based on a hash function used to organize the data location information across the plurality** of **data location servers**, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers **based on the hash function applied to the identifier string** | the portion of the data location information included in a corresponding one of the data location servers is **based on a hash function that maps identifier strings to one or more of the data location servers**, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers **based on the hash function applied to the identifier string** |

AWS's construction (in blue below), on the other hand, limits the organization of data location information to the specific "algorithm [disclosed] in the specification." Dkt. 219 at 19.

---

[14] The non-green portions in Kove's construction mirrors the claim language and should be given their ordinary meaning.

But AWS fails to adduce any evidence of a "clear indication in the intrinsic record" that the patentees intended to limit Claim 1 to that algorithm. *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014); *see Symantec Corp. v. Acronis, Inc.*, 2014 WL 230023 at *6 (N.D. Cal. Dec. 13, 2013). Consequently, the ordinary and customary meaning of the term must control.

| CLAIM LANGUAGE | AWS'S CONSTRUCTION |
|---|---|
| the portion of the data location information included in a corresponding one of the data location servers is **based on a hash function used to organize the data location information across the plurality of data location servers**, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers **based on the hash function applied to the identifier string** | the portion of the data location information included in a corresponding one of the data location servers is **based on a hash function applied to an identifier string in which the function result organizes the data location information by giving an index into a data structure that provides the location of an indicated location server**, and each one of the data location servers is configured to determine at least one of the plurality of data location servers **by applying the hash function to the identifier string in which the function result is an index into a data structure on the location server containing the location of an indicated location server for the identifier string** |

*Symantec Corp.* is instructive. There, the plaintiff construed the term "hash function values" as "value generated by a hash function," in accordance with its ordinary meaning. *Symantec*, 2014 WL230023 at *6. The defendant, as AWS does here, attempted to limit that term to the specification's discussion of hashed values as being "shorter than the 'original string'" that is hashed. *Id.* The district court rejected defendant's construction, holding that even though the specification described the hash value as "a *short* bit string" and stated that the "value of the hash data is *much less* in size than the data itself," such descriptions did not "clearly indicate that the patentee was setting out a special definition and acting as his or her own lexicographer." *Id.* at *5-6. Similarly, even though the specification of the '170 patent describes at least two algorithms for organizing data location information using a hash function, a first variant that is disclosed as using

a hash table ('170 Patent at 15:4-49) and a second variant that isn't (*id.* at 15:50-63), there is no clear indication that the patentees wished to limit Claim 1 to only the first-variant algorithm. Goodrich Decl., ¶¶ 38-39, 42-43. To the contrary, the '170 patent clearly describes the first-variant algorithm as one that is merely "preferably applied." '170 patent, 15:12-18. In the absence of any clear disclaimer of claim scope, Claim 1 must be construed in accordance with its ordinary and customary meaning to a skilled artisan. *Id.* at *2, 6.

A skilled artisan as of the effective filing date of the '170 patent would have understood that the mapping of identifier strings to data location servers in Claim 1 could be achieved through multiple different hashing algorithms – not just the exemplary first-variant algorithm disclosed in the patent. Goodrich Decl. at ¶¶ 38-43. This understanding is corroborated by AWS' own expert, Dr. Mitzenmacher, who in his declaration identifies at least *four* different "ways of organizing information" based on "the application of a hash function" that were well-known to skilled artisans as of the effective date of the '170 patent. *See* Dkt. 219, Ex. 2 at ¶ 24 (citing Merkle Trees, first proposed in 1988; Treaps, in 1989; Bloom Filters, in 1970; and Skip Lists, in 1989). Dr. Mitzenmacher also admitted at his deposition that "treaps," which was first proposed a decade before the effective filing date of the '170 patent, could be used to take an identifier string as an input to obtain the URL of a data location server as an output, *i.e.*, to map an identifier string to a data location server. Ex. C, Mitzenmacher Tr. at 38:19-25.[15] Further, as mentioned above, AWS's construction excludes a preferred (second-variant) embodiment of the specification, in which the hash function directly outputs a URL. '170 patent, 15:50-63, JA0022. In that embodiment, the result of applying the hash function is used directly rather than being "an index into a data structure," as AWS's construction requires. Goodrich Decl., ¶¶ 39, 43-44.

---

[15] Q. Could you use a treap to start with an identifier as an input and obtain the URL for a location server? A. I believe, yes.· I haven't thought about this carefully, but I believe that is one of the things you can use a treap for.

AWS argues in passing that Kove's construction would invalidate the claim for "lack of written description and enablement." Dkt. 219 at 20. Because it is AWS's burden to demonstrate invalidity by clear and convincing evidence, and because AWS has presented no such evidence whatsoever, this argument should be given no weight. *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1376 (Fed. Cir. 2005) (declining to find lack of enablement where proponent has "not presented sufficient evidence for us reasonably to infer that"). In any case, the law is clear that patent claims may encompass technology developed after the date of invention. *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363, 1371-72 (Fed. Cir. 2008) ("Our case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough.") (citing *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 878–80 (Fed. Cir. 2004)); *see also SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121–22 (Fed. Cir. 1985) ("The law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention.").

F.      **"hash table"**

| CLAIMS | KOVE'S CONSTRUCTION | AWS'S CONSTRUCTION |
|--------|---------------------|--------------------|
| '978 patent: claim 6<br>'170 patent: claims 2, 12<br>'640 patent: claim 24 | a data structure *that stores values in a table, where values are stored and retrieved based on the output of a hash function* | a data structure *in which a hash function is applied to an input and the function result is used as an index to a table in which the desired output can be found* |

The parties agree that a "hash table" is a data structure that retrieves information by using the results of a hash function. AWS' construction, however, further narrows "hash table" to require the result of the hash function to always be used as "as an index to a table in which a desired output can be found." That definition contradicts the ordinary and customary meaning of "hash table."

A "hash table" is conventionally described as, for example:

In databases, a table of hash values that provides rapid access to data records. The hash values are generated by running a hash function on the keys of each record,

such as a person's last name. The has function uniquely identifies each record, and the hash table includes pointers to each record. Ex. D, *Webster's New World Dictionary of Computer Terms*, 8th Ed. (2000), at 2

A two-dimensional table of items in which a hash function is applied to the key of each item to determine its hash value. The hash value identifies each item's primary position in the table, and if this position is already occupied, the item is inserted either in an overflow table or in another available position in the table. Ex. E, *The Authoritative Dictionary of IEEE Standards Terms*, 7th Ed. (2000), at 3.

These definitions comport with Kove's construction of hash values generated by hash functions being stored in a table.

AWS's construction begins similarly ("a hash function is applied to an input and the function result") but adds the limitation that the function result must be "used as an index to a table in which the desired output can be found." Nothing in the conventional understanding of a hash table, including the extrinsic definitions above, requires this restriction. Moreover, AWS requires the "input" into the hash function to always yield "the desired output," but this runs afoul of a common scenario: an empty hash table. It is well known that a hash table can be empty or return an empty set for any given input. Goodrich Decl., ¶¶49-50. In fact, the patents make clear that the "identifier string" (the "input" to which the hash function is applied) may be associated with "*zero* or more location strings." *See, e.g.,* '170 patent, 4:10-14, 3:7-13, JA0016. In other words, the "hash table" claimed by the asserted patents must be capable of *not* storing "the desired output" (something Kove's construction permits). AWS's construction excludes a preferred embodiment of "hash table" and must be rejected. *Vitronics*, 90 F.2d at 1583. *See also* Goodrich Decl., ¶49.

### G. "data pertaining to the entity"

| CLAIMS | KOVE'S CONSTRUCTION | AWS'S CONSTRUCTION |
|---|---|---|
| '978 patent: claims 1, 31<br>'170 patent: claim 6 | data pertaining to a person or thing **(real, digital, or abstract)** | data pertaining to a person or thing **distinct from that data** |

The parties' dispute is limited to the term "entity." Where, as here, the patentees did not provide an express definition, a term should be granted its plain and ordinary meaning. The parties

agree that an "entity," is "a person or thing." Kove's construction clarifies that a "person or thing" may be "real, digital, or abstract." This is supported by the specifications, which gives examples of "entities" in the context of a person, an image, or video and sound files. '170 patent, 1:47-57, JA0001; '978 patent, 1:48-58, JA0072. Specific examples are provided in the provisional applications of the patents, including "Customer" (real), "Software object" (digital), and "messaging group" (abstract):

| Entity |
| --- |
| Customer |
| Manufactured part |
| Part type |
| Legal contract |
| Software object |

Ex. F, at 5; *see also* Ex. G, at 11. Dictionaries from the time of the inventions also support Kove's construction. For example, the Authoritative Dictionary of IEEE Standards Terms defines "entity," in the context of "data management," as "a distinguishable object, either real or abstract, about which data are recorded." Ex. E, at 2.

AWS's construction artificially narrows the term "entity" by requiring it to be "distinct" from the data "pertaining to" it.[16] AWS's argument misstates what the Kove Patents teach to be the relationship between an "entity" and its corresponding "data." In the context of data storage, the patent teaches that an entity and data may, in practical terms, be the same. For example, assume Netflix stores copies of movies on servers around the world. To track where each copy of each movie is stored using the Kove Patent architecture, Netflix defines each movie as an "entity," and tracks the location of that entity (*i.e.*, the "data" comprising that entity). In other words, the location of the data *is* the location of the entity, making entity and data effectively the same. *See* Ex. F, at 6 (inventors describing using their technology to track copies music files).

---

[16] AWS makes no argument against the fact that an entity can be "real, digital or abstract."

24

Additionally, Claims 1 and 15 of the '170 patent expressly recite "entity" and "data" as the same thing: a "data entity." *See, e.g.,* '170 patent, Claim 1 ("data repository configured to store a data entity, wherein an identifier string identifies the *data entity*"). Further, during prosecution of the '978 patent, the Patent Examiner identified a prior art reference's disclosure of "data object" to both the "entity" and the "data." *See* JA1382-83 ("Lumelsky also teaches a replica directory (66) for storing location information of a data object to retrieve all replicas of the data object using the user provided unique object identifier."). AWS's construction contradicts this intrinsic evidence and should be rejected.

### H.    "redirect message"

| CLAIMS | KOVE'S CONSTRUCTION | AWS'S CONSTRUCTION |
|---|---|---|
| '978 patent: claims 3, 10, 14<br>'170 patent: claims 6, 8, 12, 15<br>'640 patent: claims 17-18, 24 | a message that is sent back to the client in response to a location query that contains the identity of at least one location server that is known to have the location information responsive to the location query | No construction is necessary. |

Kove withdraws its proposed construction for this claim term and adopts AWS's position that the term does not require construction.

## IV.    <u>CONCLUSION</u>

For the reasons above, Kove's proposed claim constructions should be adopted.

Dated: November 24, 2020

Respectfully submitted,

*/s/ Courtland L. Reichman*

Renato Mariotti (State Bar No. 6323198)
rmariotti@thompsoncoburn.com
Holly H. Campbell (State Bar No. 6320395)
hcampbell@thompsoncoburn.com
THOMPSON COBURN LLP
55 E. Monroe St., 37th Floor
Chicago, IL 60603
Telephone: (312) 346-7500

Sarah O. Jorgensen (*pro hac vice*)
sjorgensen@reichmanjorgensen.com
REICHMAN JORGENSEN LLP
1201 West Peachtree, Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
Telecopier: (650) 623-1449

Courtland L. Reichman (*pro hac vice*)
creichman@reichmanjorgensen.com
Shawna L. Ballard
(Identification No. 155188)
sballard@reichmanjorgensen.com
Jennifer P. Estremera (*pro hac vice*)
jestremera@reichmanjorgensen.com
Michael G. Flanigan (State Bar No. 6309008)
mflanigan@reichmanjorgensen.com
Kate M. Falkenstien (*pro hac vice*)
kfalkenstien@reichmanjorgensen.com
REICHMAN JORGENSEN LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Telecopier: (650) 623-1449

Christine E. Lehman (*pro hac vice*)
clehman@reichmanjorgensen.com
REICHMAN JORGENSEN LLP
1710 Rhode Island Avenue, NW, 12th Floor
Washington, DC 20036
Telephone: (202) 894-7310
Telecopier: (650) 623-1449

Khue Hoang (*pro hac vice*)
khoang@reichmanjorgensen.com
Jaime F. Cardenas-Navia (*pro hac vice*)
jcardenas-navia@reichmanjorgensen.com
Wesley White (*pro hac vice*)
wwhite@reichmanjorgensen.com
Rahul Sarkar (*pro hac vice*)
rsarkar@reichmanjorgensen.com
Michael W. Marvin (*pro hac vice*)
mmarvin@reichmanjorgensen.com
REICHMAN JORGENSEN LLP
750 Third Avenue, Suite 2400
New York, NY 10017
Telephone: (212) 381-1965
Telecopier: (650) 623-1449

*Attorneys for Kove IO, Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and exact copy of the foregoing, and all exhibits thereto, was filed electronically on November 24, 2020, with the Clerk of the Court to be served by operation of the Court's electronic filing system upon all registered counsel of record or was emailed to all registered counsel of record.

/s/    Holly Campbell
Holly H. Campbell