# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| IN RE: 100% GRATED PARMESAN CHEESE MARKETING AND SALES PRACTICES LITIGATION<br><br><br>*This Document Relates to All Cases on the Target Corp. and ICCO-Cheese Company, Inc. Track* | 16 CV 5802<br><br>MDL 2705<br><br>Judge Gary S. Feinerman |

<br><br>

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT <u>AGAINST TARGET CORP. AND ICCO-CHEESE COMPANY, INC.</u>

Plaintiffs Ann Bell, Rodney Zachary, Alfonso Fata, and Nancy Reeves, individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to themselves and on information and belief as to all other matters, by and through undersigned Interim Co-Lead Counsel, bring this second amended consolidated class action complaint against Defendants Target Corp. ("Target") and ICCO-Cheese Company, Inc. ("ICCO") (collectively, "Defendants").

## NATURE OF THE ACTION

1.     This consumer class action arises out of Defendants' misbranding and false and misleading advertising of their grated Parmesan cheese products sold under the Market Pantry brand ("Product" or "Products") as "100% Grated Parmesan Cheese." Defendants' advertisements, including the Products' labels, represent the Products as "100% Grated Parmesan Cheese" and "Parmesan 100% Grated Cheese" (together, the "100% Claims"), but these representations are false, misleading, and likely to deceive the reasonable consumer because the Products are not 100% cheese.

2.     Instead, rather than being comprised of 100% cheese that is grated, the Products contain fillers and additives, such as cellulose, an inexpensive filler derived from wood pulp. They also contain potassium sorbate, corn starch, and cheese cultures that are not the type of cheese listed on the label. The Products are not "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese."

3.     Nonetheless, according to a recent survey, the vast majority of consumers who purchase the Products believe the Products are 100% cheese and do not contain fillers or artificial ingredients. In fact, in excess of 90% of consumers believe that the label means the Products are 100% cheese and fully grated. Only a very small percentage believed the Products do not consist of 100% cheese.

1

4.      Further, the Products contain more cellulose powder than needed to achieve anticaking effects. That is, Defendants use the cellulose powder as filler. Defendants state, albeit in small print on the back of the Products' container, that the Products contain cellulose powder for anticaking purposes and omit the fact that the cellulose powder is included as a filler.

5.      As a result of Defendants' deceptive and unfair practices, Plaintiffs and the Class members did not receive that which was promised.

6.      Plaintiffs bring this action on behalf of themselves and all other similarly situated consumers to recover the amounts Plaintiffs and the Class members overpaid, to prevent Defendants from continuing to engage in their unlawful, deceptive, and unfair conduct, and to correct the false perception they have created in the marketplace through their misrepresentations and omissions of material facts.

## JURISDICTION AND VENUE

7.      The Court has original subject matter jurisdiction over the case under 28 U.S.C. § 1332(d) because the case is brought as a class action under Fed. R. Civ. P. 23, at least one proposed Class member is of diverse citizenship from Defendants, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds five million dollars, excluding interest and costs.

8.      Venue is proper in this District under 28 U.S.C. § 1391 because Defendants engaged in substantial conduct relevant to Plaintiffs' claims within this District and have caused harm to Class members residing within this District. Additionally, the lawsuits comprising this consolidated complaint have been transferred to this Court for coordinated pretrial proceedings pursuant to the Transfer Order of the JPML dated June 2, 2016. Plaintiffs in the transferred actions

reserve their rights of remand to the districts from which they were transferred at or before the conclusion of the pretrial proceedings.

## **PARTIES**

9.      Plaintiff Ann Bell ("Bell") is a citizen of the State of Illinois, residing in Palatine, Illinois. Bell has purchased the Market Pantry "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese" products approximately four times per year from her local Target. Bell purchased the "100% Grated Parmesan Cheese" or the "Parmesan 100% Grated Cheese" believing it was 100% Parmesan cheese. Bell did not receive that which she was promised.

10.      Plaintiff Rodney Zachary ("Zachary") is a citizen of the State of Missouri, residing in Florissant, Missouri. Zachary has purchased the Market Pantry "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese" products several times per year from various stores in Missouri. Zachary purchased the "100% Grated Parmesan Cheese" or the "Parmesan 100% Grated Cheese" believing it was 100% Parmesan cheese. Zachary did not receive that which he was promised.

11.      Plaintiff Alfonso Fata ("Fata") is a citizen of the State of Florida, residing in Orlando, Florida. Fata purchased the Market Pantry "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese" several times at various stores in Florida over the past four years. Fata purchased the "100% Grated Parmesan Cheese" or the "Parmesan 100% Grated Cheese" believing it was 100% Parmesan cheese. Fata did not receive that which he was promised.

12.      Plaintiff Nancy Reeves ("Reeves") is a citizen of the State of California, residing in Imperial, California. Reeves has purchased the Market Pantry "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese" products several times per year from the Target store in El Centro, California. Reeves purchased the "100% Grated Parmesan Cheese" or the "Parmesan

"100% Grated Cheese" believing it was 100% Parmesan cheese. Reeves did not receive that which she was promised.

13.    Defendant Target Corporation is a Minnesota Corporation with its principal place of business located at 1000 Nicollet Mall, Minneapolis, Minnesota 55403. Target manufactures, sells, distributes, and advertises its Market Pantry "100% Grated Parmesan Cheese" on a nationwide basis.

14.    Defendant ICCO-Cheese Company, Inc. is a New York corporation with its principal place of business located at 1 Olympic Drive, Orangeburg, New York 10962. ICCO manufactures private label food products for retailers across the country. ICCO has supplied Target with Market Pantry "100% Grated Parmesan Cheese" at least as early as 2012. ICCO conducts business in this District and elsewhere throughout the United States.

## FACTUAL ALLEGATIONS

15.    Parmesan cheese has become increasingly popular with consumers. According to the United States Department of Agriculture, in 2015, output of Parmesan cheese rose 11% from 2014, to around 336 million pounds.

16.    Target and ICCO are co-participants in committing the acts of consumer fraud alleged. ICCO manufactures, packages, and labels the Products so Target can sell the Target Products in its retail stores. As the manufacturer of the Target Products, ICCO knowingly manufactured the Target Products with the type and amount of substances other than cheese used in the Products. It also packaged and labeled the Products with the representation that the Products consisted of "100%" Parmesan cheese, knowing that the label was false.

17.    Because of ICCO's actions in adding substances other than Parmesan to its "100%" Parmesan cheese products, the Target Products contain non-cheese ingredients, including

4

cellulose, potassium sorbate, and corn starch, and the representations it made on the packaging that it is "100% Grated Parmesan Cheese" and "Parmesan 100% Grated Cheese" are false, misleading, and deceptive to consumers.

18.     The Products' package labels prominently represent the Products as "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese." Representative packaging of the Products appear below:

 



19.     Contrary to Defendants' 100% Claims, the Products are not 100% cheese. Instead, a significant portion of Defendants' Products is cellulose. An independent testing facility determined that a sample of Defendants' Products allegedly consisting of 100% grated Parmesan cheese actually contained 8.2% cellulose.

20.     Cellulose is an organic polymer. It is not cheese or any other type of dairy product. Its main use is in the production of paperboard and paper. Humans cannot digest cellulose, and it provides no nutritional calories. Cellulose is often used as a filler. Also found in the Products are potassium sorbate (a synthetic chemical additive used in some foods and personal care products), and corn starch (a derivative of corn grain or kernels used as an additive in food and medical products).

21.     Because the Products are not all cheese, Defendants' advertising, including the Products' labels, is false, misleading, unfair, deceptive, and intended to induce consumers to purchase the Products.

22.     It is understandable that consumers believed what Defendants told them about these products. Parmesan cheese—a cured, dried, hard Italian cheese—keeps a long time without refrigeration and does not clump. In fact, "[f]ully cured Parmesan cheese is very hard and keeps almost indefinitely." U.S. Patent No. 6,242,016 B1. The patent also explains that the grated Parmesan cheese usually available in the marketplace is dried after curing to a moisture level of about 12–18%. At this moisture level, "there is little problem of clumping or agglomeration of the grated cheese product." *Id.*

23.     Defendants add powdered cellulose in amounts that exceed what is necessary to achieve anticaking effects in the Products.

24.     Further, the Products' use of antimycotics, such as potassium sorbate, for the preservation of grated cheese products, is far from a universal practice. Other similar products, such as Essential Everyday 100% Grated Parmesan, do not contain antimycotics. *See, e.g.*, ECF No. 158-1.

25.     According to a survey conducted in connection with this litigation, the vast majority of consumers who purchase the Products believe the Products are 100% cheese and do not contain fillers or artificial ingredients. In fact, in excess of 90% of consumers believe that the label means the Products are 100% cheese and fully grated. Only a very small percentage believed the Products do not consist of 100% cheese.

26.     It is also understandable that consumers reasonably interpret the Products' labels as meaning the Products consist only of cheese. As explained by linguists Anne Curzan, Ph.D., Ezra Keshet, Ph.D., and Kyle Johnson, Ph.D., in two separate analyses of the phrase "100% Grated Parmesan Cheese," the phrase is linguistically subject to only one plausible interpretation, which

is that the Product contains nothing other than grated parmesan cheese. *See* Report of Anne Curzan and Ezra Keshet, attached as Exhibit A; Report of Kyle Johnson, attached as Exhibit B.

27.     Some of Defendants' competitors no longer engage in the deceptive practice of labeling their grated cheese as "100% Grated Parmesan Cheese." After being sued, Publix Super Markets, Inc. changed the labels on its grated Parmesan cheese products by deleting "100%" from its "100% Grated Parmesan Cheese" representation.

28.     After it was sued, Wal-Mart Stores, Inc. also dropped "100%" from its claim that its grated Parmesan cheese products were "100% Parmesan Grated Cheese" or "100% Grated Parmesan Cheese."

29.     Despite this, Defendants persist in selling the Products with false and misleading labels that omit the material facts that the Products contain substances other than Parmesan cheese and that the amount of the other substances is excessive and unnecessary.

30.     Plaintiffs and the Class members did not receive that which was promised and represented to them. Each has been exposed to Defendants' advertisements and has seen the Products' labels. Plaintiffs and the Class members overpaid for the Products they purchased.

## CLASS ALLEGATIONS

31.     Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (3), on behalf of a Class defined as follows:

> All persons in the United States and its territories who purchased, other than for resale, Target's Market Pantry "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese" products.

Excluded from the Class and subclasses listed below are: (i) Defendants and their officers and directors, agents, affiliates, subsidiaries, and authorized distributors and dealers; (ii) all Class

members that timely and validly request exclusion from the Class; and (iii) the Judge presiding over this action.

32. Alternatively, Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23(b)(3), on behalf of the following subclasses:

a. Missouri, and all states with laws at issue similar to Missouri, by Plaintiff Zachary ("Missouri Class"):

> All persons who purchased, other than for resale, in the State of Missouri [and all states with laws at issue similar to Missouri] Target's "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese" products.

b. Illinois, and all states with laws at issue similar to Illinois, by Plaintiff Bell ("Illinois Class"):

> All persons who purchased, other than for resale, in the State of Illinois [and all states with laws at issue similar to Illinois] Target's "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese" products.

c. Florida, and all states with laws at issue similar to Florida, by Plaintiff Fata ("Florida Class'):

> All persons who purchased, other than for resale, in the State of Florida [and all states with laws at issue similar to Florida] Target's "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese" products.

d. California, and all states with laws at issue similar to California, by Plaintiff Reeves ("California Class'):

> All persons who purchased, other than for resale, in the State of California [and all states with laws at issue similar to California] Target's "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese" products.

33. Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

34. The members of the Class are so numerous that joinder of the Class members would be impracticable.

35. Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

A. Whether Defendants engaged in the conduct alleged;

B. Whether Defendants misrepresented the content of the Products or misbranded them;

C. Whether Defendants' 100% Claims are false, misleading, or likely to mislead a reasonable person;

D. Whether Defendants' Products contain more cellulose powder than needed to prevent caking;

E. Whether Defendants' representation that the Products' contents consisted of 100% cheese created an express warranty;

F. Whether Plaintiffs and the Class members paid for a product that they did not receive;

G. Whether Plaintiffs and the Class members have been damaged and, if so, the measure of such damages;

H. Whether Defendants unjustly retained a benefit conferred by Plaintiffs and the Class members; and

I. Whether Plaintiffs and the Class members are entitled to equitable relief, including, but not limited to, a constructive trust, restitution, and injunctive relief.

36. Plaintiffs' claims are typical of the claims of the Class members because, among

other things, Plaintiffs and the Class members were injured through the substantially uniform misconduct described above. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

37.     Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent; they have retained counsel competent and experienced in complex commercial and class action litigation; and Plaintiffs intend to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

38.     A class action is also warranted under Fed. R. Civ. P. 23(b)(2), because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole. Defendants have directed and continue to direct their conduct to all consumers in a uniform manner. Therefore, injunctive relief on a classwide basis is necessary to remedy continuing harms to Plaintiffs and the Class members caused by Defendants' continuing misconduct.

39.     A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiffs and the Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By

contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

**CLAIMS**

**COUNT I**
**Breach of Express Warranty**
**on Behalf of the Nationwide Class,**
**or in the Alternative, on Behalf of Plaintiffs' Respective State Classes**

40.     Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

41.     Defendants made affirmations of fact to Plaintiffs and the Class members relating to and describing the Products as 100% grated Parmesan cheese. The Products also stated in fine print on the back of their labels that cellulose powder was added to prevent caking.

42.     Defendants' affirmations of fact and descriptions of the Products formed the basis of the bargain between Plaintiffs and the Class members and Defendants, creating an express warranty under Uniform Commercial Code, 2-313—an identical or substantially similar version of which has been and is currently enacted in each and every state.

43.     Defendants' Products were accompanied by an express warranty when placed in the stream of commerce by Defendants.

44.     All conditions precedent have occurred or been performed.

45.     Defendants breached the express warranty by selling a product that did not conform to the affirmations of fact and descriptions. The Products are not 100% cheese, but rather contain other substances in addition to the type of cheese on the label. Further, the added cellulose powder exceeds the amount needed for anticaking purposes.

46.     At the time of sale to Plaintiffs and the Class members, Defendants had actual knowledge that they breached express warranties with Plaintiffs and the Class members.

47. As the foreseeable and actual result of Defendants' breach of express warranty, Plaintiffs and the Class members were damaged.

## COUNT II
### Unjust Enrichment
### on Behalf of the Nationwide Class,
### or in the Alternative, on Behalf of Plaintiffs' Respective State Classes

48. Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

49. Defendants have been unjustly enriched to Plaintiffs' and the Class members' detriment as a result of their unlawful and wrongful retention of money conferred by Plaintiffs and the Class members, such that Defendants' retention of their money would be inequitable.

50. Defendants' unlawful and wrongful acts, as alleged above, enabled Defendants to unlawfully receive monies they would not have otherwise obtained.

51. Plaintiffs and the Class members have conferred benefits on Defendants, which Defendants have knowingly accepted and retained.

52. Defendants' retention of the benefits conferred by Plaintiffs and the Class members would be against fundamental principles of justice, equity, and good conscience.

53. Plaintiffs and the Class members seek to disgorge Defendants' unlawfully retained profits and other benefits resulting from their unlawful conduct, and seek restitution and rescission for the benefit of Plaintiffs and the Class members.

54. Plaintiffs and the Class members are entitled to the imposition of a constructive trust upon Defendants, such that their unjustly retained profits and other benefits are distributed equitably by the Court to and for the benefit of Plaintiffs and the Class members.

**COUNT III**
**Breach of Implied Warranty of Merchantability**
**on Behalf of the Nationwide Class,**
**or in the Alternative, on Behalf of Plaintiffs' Respective State Class**

55.     Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

56.     Defendants, as the manufacturers, marketers, distributors, and sellers of the Products are merchants.

57.     Plaintiffs and the other Class members purchased Products that were manufactured and sold by Defendants in consumer transactions. The implied warranty of merchantability attended the sale of the Products.

58.     To be merchantable, the Products must, at the least:

(a)     Pass without objection in the trade under the contract description;

(b)     In the case of fungible goods, be of fair average quality within the description;

(c)     Run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved;

(d)     Be adequately contained, packaged, or labeled as the agreement may require; and

(e)     Conform to the promises and affirmations of facts made on the container or label.

59.     The Products are not adequately contained, packaged and labeled because they are packaged as "100% Grated Parmesan Cheese" or "Parmesan 100% Grated Cheese," but do not consist of 100% of the stated cheese. Instead, they contain ingredients other than the cheese stated on the front label.

60.     The Products do not conform to the promises and affirmations of fact made on their containers and labels because they do not consist of 100% of the stated cheese as their packaging and labeling warrants.

61.     The Products do not pass without objection in the trade and are not of fair average quality within the contract description because they contain cellulose powder in excessive quantities.

62.     Plaintiffs and the Class members did not receive the Products as warranted. The Products they purchased were worth less than the products they were promised and expected.

63.     As a result of Defendants' breach of warranty, Plaintiffs and members of the Class suffered damages.

**COUNT IV**
**Violation of the Illinois Deceptive Practices and Consumer Fraud Act ("ICFA"),**
**815 ILCS 505/2**
**on Behalf of the Illinois Class**

64.     Plaintiff Bell ("Plaintiff" for purposes of Count IV) repeats and realleges all preceding paragraphs as if fully set forth herein.

65.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2 prohibits unfair methods of competition and unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, or misrepresentation in the conduct of any trade or commerce.

66.     Plaintiff and the other Class members are consumers who purchased the Products.

67.     Defendants' conduct, described above, in misrepresenting and omitting material facts regarding the Products constitutes an unfair or deceptive practice and was and is likely to mislead a reasonable consumer, as detailed above.

68.     A reasonable consumer would consider the promise of receiving something other than as promised to be important when making a decision to purchase the Products.

69.     Defendants' practices were unfair because they offended public policy, were immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

70.     Defendants' unfair and deceptive acts or practices were the foreseeable and actual cause of Plaintiff and the other Class members suffering actual damage on account of receiving a product that was not as advertised.

71.     Plaintiff and the other Class members paid a particular price for a product in accordance with Defendants' representations. When they received a product that was not in conformity with those representations and their reasonable expectations, Plaintiff and the other Class members were damaged on account of receiving Products other than as advertised.

## COUNT V
### Violation of the Missouri Merchandising Practices Act
### Mo. Rev. Stat. §§ 407.010, *et seq.*
### on Behalf of the Missouri Class

72.     Plaintiff Zachary ("Plaintiff" for purposes of Count V) repeats and realleges all preceding paragraphs as if fully set forth herein.

73.     At all times material hereto, Plaintiff, the Class members, and Defendants, were persons within the meaning of Mo. Rev. Stat. § 407.010(5).

74.     At all times material hereto, Plaintiff and the Class Members were purchasers within the meaning of Mo. Rev. Stat. § 407.025.1.

75.     At all times material hereto, Defendants conducted trade and commerce within the meaning of Mo. Rev. Stat. § 407.010(7).

76.     The Missouri Merchandising Practices Act, § 407.020.1, provides in pertinent part that:

The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . in or from the state of Missouri, is declared to be an unlawful practice . . . Any act, use or employment declared unlawful by this subsection violates this subsection whether committed before, during or after the sale, advertisement or solicitation.

77. Beginning the first date Defendants placed the Products into the stream of commerce in Missouri and continuing through the present, Defendants intended to induce Plaintiff and members of the Class to purchase the Products through one or more of the following unfair and/or deceptive acts and practices:

A. Knowingly, intentionally, and/or recklessly omitted, suppressed, and/or concealed the content of the Products;

B. Knowingly, intentionally, and/or recklessly omitted, suppressed, and/or concealed the true nutritional value of the Products;

C. Knowingly, intentionally, recklessly, or negligently omitted proper labels from being placed on their packaging, or otherwise calling attention to the actual ingredients in the Products; and

D. Omitted, suppressed, and/or concealed the content of the Products they marketed, promoted, distributed, and/or sold.

78. The facts which Defendants omitted, suppressed, and concealed were material and would have been important to a reasonable consumer in making a decision whether to purchase the Products.

79. Defendants' conduct was unfair, offended public policy, was immoral, unethical, oppressive, and unscrupulous, and caused substantial economic injury to consumers, including Plaintiff and members of the Class.

80.     Defendants' unfair and deceptive acts and practices occurred in connection with Defendants' conduct of trade and commerce in Missouri.

81.     Defendants intended for Plaintiff and the Class members to purchase Defendants' Products in reliance upon Defendants' unfair and deceptive acts and practices in the marketing, promotion, and sale of the Products.

82.     Defendants' unfair and deceptive acts and practices were committed with willful and wanton disregard for whether or not Plaintiff and the other members of the Class would actually receive the product as represented.

83.     Defendants' unfair and deceptive acts and practices violate the Missouri Merchandising Practices Act, § 407.020.1.

84.     As a foreseeable and actual result of Defendants' unfair and deceptive acts and practices, Plaintiff and the other members of the Class did not receive that which was represented, and have suffered damage and lost money as a result.

**COUNT VI**
**Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")**
**Fla. Stat. §§ 501.201,** *et seq.*
**on Behalf of the Florida Class**

85.     Plaintiff Fata ("Plaintiff" for purposes of Count VI) repeats and realleges all of the preceding paragraphs as if fully set forth herein.

86.     The express purpose of FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). The FDUTPA declares such acts and practices to be unlawful. Fla. Stat. § 501.204(1).

87.     The sales of the Products are "consumer transactions" within the scope of FDUTPA.

88.     Plaintiff is a "consumer" as defined by Section 501.203, Florida Statutes.

89.     Defendants' Products are "goods" within the meaning of FDUTPA, and Defendants are engaged in "trade or commerce" within the meaning of FDUTPA.

90.     Defendants' unfair and deceptive practices are likely to mislead and have misled reasonable consumers, such as Plaintiff and members of the Class.

91.     Defendants have violated FDUTPA by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous, and substantially injurious to consumers.

92.     Plaintiff and Class members have been aggrieved by Defendants' unfair and deceptive practices in violation of FDUTPA, in that they paid money for Defendants' mislabeled Products.

93.     Reasonable consumers rely on Defendants to honestly represent the true nature of the contents of the package.

94.     Defendants have deceived reasonable consumers, like Plaintiff and members of the Class, into believing the Products are something they are not; specifically that the Products are being supplied in accordance with their representations.

95.     Pursuant to Sections 501.211(2) and 501.2105, Florida Statutes, Plaintiff and members of the Class make claims for damages, attorneys' fees, and costs. The damages suffered by Plaintiff and the Class were directly and proximately caused by the deceptive, misleading, and unfair practices of Defendants. Pursuant to Section 501.211(1), Florida Statutes, Plaintiff and the Class seek injunctive relief for, *inter alia*, the Court to enjoin Defendants' above-described wrongful acts and practices and for restitution and disgorgement.

96.     Plaintiff seeks all available remedies, damages, and awards as a result of Defendants' violations of FDUTPA.

## COUNT VII
### Violation of California Unfair Competition Law ("UCL"), California Business & Professions Code §§ 17200, *et seq.* on Behalf of the California Class

97.     Plaintiff Reeves ("Plaintiff" for purposes of Counts VII and VIII) reasserts and realleges all of the preceding paragraphs as if fully set forth herein.

98.     The Unfair Competition Law, Business & Professions Code §§ 17200, *et seq.*, prohibits any unlawful, fraudulent, or unfair business act or practice and any false or misleading advertising.

99.     In the course of conducting business, Defendants committed unlawful business practices by, among other things, making representations (which also constitute advertising within the meaning of §§ 17200 and 17500) and omitting material facts regarding the Products in their advertising campaign, including the Products' packaging, as set forth more fully herein. Defendants' conduct constitutes the adulteration and misbranding of the Products, as prohibited by Sections 110710, 110585, 110625, and 110765 of the California Health & Safety Code, and the Food and Drug Administration's regulations, 21 C.F.R. §§ 101.18, and 21 U.S.C. §§ 342 and 343, because Defendants' advertising and labeling are false and misleading in that they assert the 100% Claims, when in fact they contain substances other than the stated cheese, and Defendants added substances to the Products to increase their bulk or weight or reduce their quality or strength or make them appear better or of greater value than they are.  Defendants have also violated the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 342–343, because they manufactured and introduced into interstate commerce adulterated and misbranded Products. This conduct constitutes violations of the unlawful prong of Section 17200.

81.     In the course of conducting business, Defendants committed unfair business practices by, among other things, making the representations (which also constitute advertising within the meaning of §§ 17200 and 17500) and omitting material facts regarding the Products in their advertising campaign, including the Products' packaging, as detailed above. There is no societal benefit from false advertising, only harm. Plaintiff and the other Class members paid for lower-value products that were not what they purported to be. While Plaintiff and the other Class members were harmed, Defendants were unjustly enriched by their false misrepresentations and omissions. As a result, Defendants' conduct is unfair, as it offended an established public policy. Further, Defendants engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

82.     Defendants' conduct violated consumer protection, unfair competition, and truth in advertising laws in California and other states, resulting in harm to consumers. Defendants' acts and omissions also violate and offend the public policy against engaging in false and misleading advertising, unfair competition, and deceptive conduct towards consumers. This conduct violates the unlawful prong of Section 17200.

83.     There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

84.     In the course of conducting business, Defendants committed fraudulent business acts or practices by, among other things, making the representations (which also constitute advertising within the meaning of §§ 17200 and 17500) and omitting material facts regarding the Products in their advertising campaign, including on the Products' packaging and labeling, as detailed above. Defendants made the misrepresentations and omissions regarding the ingredients, character, and contents of their Products.

85. Plaintiff and the other Class members have suffered injury in fact and lost money or property as a result of Defendants' conduct.

86. Plaintiff relied on Defendants' material misrepresentations and omissions, which are described above. Plaintiff has suffered injury in fact and lost money as a result of Defendants' unlawful, unfair, and fraudulent practices.

87. Unless restrained and enjoined, Defendants will continue to engage in the above-described conduct in violation of Section 17200, entitling Plaintiff and the other Class members to injunctive relief. If Defendants continue to engage in the violations of Section 17200 described above, Plaintiff and the Class members will likely be deceived in the future when they shop for Defendants' Products, not knowing the truth about the Products.

**COUNT VIII**
**Violation of the California Consumers Legal Remedies Act ("CLRA")**
**California Civil Code §§ 1750, *et seq.***
**on Behalf of the California Class**

88. Plaintiff Reeves ("Plaintiff" for purposes of Counts VII and VIII) repeats and realleges the foregoing paragraphs as if fully set forth herein.

89. The Products are goods within the meaning of Section 1761(a).

90. Defendants violated and continue to violate the CLRA by engaging in the following prohibited practices in transactions with Plaintiff and the Class members which Defendants intended to result in, and did result in, the sale of Products:

A. Representing that the Products have characteristics, ingredients, uses, benefits, or quantities which they do not have (Cal. Civ. Code § 1770(a)(5));

B. Representing that the Products are of a particular standard, quality, or grade when they are of another (Cal. Civ. Code § 1770(a)(7));

C. Advertising goods with intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9)); and

D. Representing that the Products have been supplied in accordance with a previous representation when they have not (Cal. Civ. Code § 1770(a)(16)).

91. Defendants violated the CLRA by representing and failing to disclose material facts on the Products' labeling and associated advertising, as described above, when they knew that the representations were false and misleading and that the omissions were of material facts they were obligated to disclose.

92. Pursuant to Section 1782(d), Plaintiff, individually and on behalf of the Class members, seeks a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution and disgorgement.

93. Pursuant to Section 1782, Plaintiff notified Defendants in writing by certified mail of the particular violations of Section 1770 and demanded that Defendants rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendants' intent to so act. A copy of the letter is attached to the underlying complaints filed in the transferred cases.

94. Defendants have failed to rectify or agree to rectify the problems associated with the actions detailed above and to give notice to all affected consumers within 30 days of the date of written notice. Plaintiff therefore is entitled to, and hereby seeks, actual, punitive, and statutory damages for Defendants' violations of the CLRA. Defendants' conduct was knowing, fraudulent, wanton, and malicious, thereby entitling Plaintiff and the members of the Class to whom this claim applies to punitive damages.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

A.    Certifying the Class under Federal Rule of Civil Procedure 23, as requested herein;

B.    Appointing Plaintiffs as Class Representatives and Plaintiffs' Interim Co-Lead Counsel as Class Counsel;

C.    Awarding Plaintiffs and the Class members actual, compensatory, statutory, and consequential damages;

D.    Awarding Plaintiffs and the Class members declaratory and injunctive relief;

E.    Awarding Plaintiffs and the Class members restitution and disgorgement;

F.    Imposing a constructive trust for the benefit of Plaintiffs and the Class members on the unjustly retained benefits conferred by Plaintiffs and the Class members upon Defendants;

G.    Awarding Plaintiffs and the Class members reasonable attorneys' fees, costs, and expenses; and

H.    Granting such other relief as the Court deems just and appropriate.

## <u>JURY TRIAL DEMAND</u>

Plaintiffs, individually and on behalf of all others similarly situated, hereby request a jury trial, pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.


DATED: November 28, 2018                                Respectfully submitted,


                                            s/ Ben Barnow
                                            Ben Barnow
                                            Erich P. Schork
                                            Barnow and Associates, P.C.
                                            1 North LaSalle St., Suite 4600
                                            Chicago, Illinois 60602
                                            b.barnow@barnowlaw.com
                                            e.schork@barnowlaw.com

(312) 621-2000 (ph)
(312) 641-5504 (fax)

Timothy G. Blood
Blood Hurst & O'Reardon, LLP
501 West Broadway, Suite 1490
San Diego, CA 92101
tblood@bholaw.com
 (619) 338-1100 (ph)
(619) 338-1101 (fax)

Eduard Korsinsky
Andrea Clisura
Levi & Korsinsky LLP
30 Broad Street, 24th Floor
New York, NY 10004
ek@zlk.com
aclisura@zlk.com
(212) 363-7500 (ph)
(212) 363-7171 (fax)

*Plaintiffs' Interim Co-Lead Counsel*

John J. Driscoll
The Driscoll Firm, P.C.
211 N. Broadway, 40th Floor
St. Louis, MO 63102
john@thedriscollfirm.com
(314) 932-3232 (ph)
(314) 932-3233 (fax)

Janine Pollack
The Sultzer Law Group P.C.
351 West 54th Street, Suite 1C
New York, NY 10019
pollackj@thesultzerlawgroup.com
(212) 969-7810 (ph)
(888) 749-7747 (fax)

*Plaintiffs' Executive Committee for Target
Corp. and ICCO-Cheese Co., Inc. Track*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing document was filed on November 28, 2018, with the Clerk of the Court by using the CM/ECF system which will send a notice of filing to all counsel of record.

/s/ Ben Barnow

# Exhibit A



Anthony Parkhill
Barnow and Associates, P.C.
1 North Lasalle Street
Chicago, IL 60602

October 4, 2017

Dear Mr. Parkhill,

We are pleased to submit the following report, which you requested.

**Introduction**

1.  We have been asked to report on advertising language for various grated cheese products. Specifically, we will address the question of what constitute reasonable readings of the phrases "100% Grated Parmesan Cheese," "100% Grated Parmesan and Romano Cheese," and "100% Grated Three Cheese Blend." In the analysis below, we focus on the phrase "100% Grated Parmesan Cheese" as representative of all three phrases.

2.  The noun phrase "100% grated Parmesan cheese" consists of a head noun ("cheese") and three attributive modifiers ("100%," "grated," and "Parmesan"). Although phrases with three modifiers have the potential for multiple interpretations in terms of how the modifiers stack (in other words the scope of what an initial modifier modifies), it is our opinion that only one interpretation of this phrase is plausible in context.

**Readings**

3.  Judge Gary Feinerman has supplied three possible interpretations of the phrase, and we address the plausibility of each reading below.

    **Reading 1: [100% grated] [Parmesan cheese]**

    a.  Reading 1 can be paraphrased as "Parmesan cheese that is 100% grated."

    b.  A modifier like "100%" may only apply to a word that is *gradable* (one that has various levels). For instance, a person can be 100% satisfied, since there are various levels of satisfaction, but it's odd to call someone "100% pregnant," since in common speech there aren't different levels of being pregnant.

    c.  When you grate a hunk of cheese at home, it does progress through levels of being 50%, 75%, and finally 100% grated. However, in the context of packaged cheese, such levels do not obtain: no cheese is sold in packages with, for instance, 50% grated, 25% sliced, and 25% whole cheese. Therefore it's odd to call any packaged cheese "100% grated" in the same way it's odd to call someone "100% pregnant."

    d.  Thus, no reasonable shopper would conclude that Reading 1 is the meaning of the phrase "100% grated Parmesan cheese."

    **Reading 2: [100% [grated Parmesan]] cheese**

    a.  Reading 2 can be paraphrased as "cheese that is 100% grated Parmesan"





b. Something that is merely called "grated Parmesan" could potentially contain minor additives, preservatives, etc. The linguistic imprecision that allows such extra ingredients is the same kind of imprecision that allows "lean beef" to contain some fat and allows a "3pm meeting" to start at 3:05. Linguists call such imprecision "pragmatic slack."[1]

c. Speakers vary the level of slack they intend for phrases such as "3pm meeting" and "lean beef." This effectively make such terms gradable and suitable for modification by terms like "90%," "100%," and "precisely." For instance, a meeting at "precisely 3pm" has very little slack, i.e., it cannot start at 3:05; and "90% lean beef" cannot contain any more than 10% fat. In the same way, something that is "100% grated Parmesan" has no slack: it cannot contain anything that is not grated Parmesan.

d. Thus, "cheese that is 100% grated Parmesan" contains nothing that is not grated Parmesan, and therefore nothing that is not cheese (since Parmesan is cheese). This makes Reading 2 identical in meaning to Reading 3 below.

**Reading 3: 100% [grated Parmesan cheese]**

a. Reading 3 can be paraphrased as "(food that is) 100% cheese that is grated Parmesan." Again, the 100% modifier removes slack from the meaning, disallowing additives or other ingredients.

**Implicature**

4. If there is only one phrase on the front of a container's label, it can be understood to represent everything that is in the container. Here we rely on philosopher H. P. Grice's theory of conversational implicature, which distinguishes between what is literally entailed by an utterance and what is conventionally implicated by an utterance (or in this case a phrase on a label).

5. Conversational implicature is governed by convention. Two key general principles are that the information will be relevant and adequately informative within the context.

6. If a label reads "cheese and crackers," it is conventionally implied that the container contains both cheese and crackers. It does not contain only olives (without cheese and crackers) because this would make the label "cheese and crackers" irrelevant. It also does not contain cheese, crackers, and olives because this would make the label inadequately informative, as it does not include one of the three main items in the container.

7. In the context of labels, it would be odd to see something labeled only "cheese" or "grated Parmesan cheese" that also contained something clearly not cheese-like, such as crackers or wine or pickles, etc.

8. And, as described in paragraph 3 above, the addition of "100%" in Readings 2 and 3 of the phrase "100% grated Parmesan cheese" removes imprecision or slack from the meaning of "grated Parmesan cheese," disallowing additive ingredients. Finally, Reading 1 (where "100%" only modifies "grated") is pragmatically ruled out in this context.

9. Therefore, it is our expert opinion that no reasonable shopper would expect that a container labeled "100% grated Parmesan cheese" would contain significant amounts of non-cheese-like substances.

---

[1] Lasersohn, P. (1999). Pragmatic Halos. Language, 75(3), 522-551. doi:10.2307/417059

440 Lorch Hall, 611 Tappan Street
Ann Arbor MI 48109-1220   T: 734-764-0353  F: 734-936-3406   lsa.umich.edu/linguistics/   Please recycle 



Sincerely,

Anne Curzan, Ph.D.
Professor of English, Linguistics, & Education, University of Michigan

Ezra Keshet, Ph.D.
Professor of Linguistics, University of Michigan



# Exhibit B

# Kyle Johnson, Ph.D.

Professor, University of Massachusetts at Amherst
Department of Linguistics

My name is Kyle Johnson. I am a linguistics professor at the University of Massachusetts at Amherst. My areas of expertise are syntax and semantics. I have been asked to provide an analysis of the syntax and semantics of the expression "100% grated parmesan cheese." In my opinion, this expression has only one salient interpretation, and that can be paraphrased as "entirely parmesan cheese that is grated." This interpretation entails that the contents of a container bearing "100% grated parmesan cheese" on its label contains only parmesan cheese, and no other ingredient.

There are two ways the expression "100% grated parmesan cheese" can be syntactically parsed, and these correspond to two, distinct, meanings. Those parses are indicated with brackets in (1), and for each I have paraphrased the meanings that the semantic rules of English would assign.[1]

(1)  a.  [100% [grated [parmesan cheese]]] = entirely parmesan cheese that is grated.

   b.  [[100% grated] [parmesan cheese]] = parmesan cheese that is entirely grated

While these are the two meanings made available by English syntax, only one of them is semantically and pragmatically salient, and that is the first (i.e. (1a)). I will briefly sketch the reasons for this below.

A central factor guiding speakers' choices in forming linguistic expressions is their desire to maximize informativity. Hearers use the linguistic choices a speaker has made to deduce some of the information intended, and speakers, in turn, make their linguistic choices in a way that guides those deductions.[2] This can be illustrated by considering the meaning that we associate with numerical expressions. If I say the sentence in (2) in a classroom setting, my students will understand that I mean "10 points" to refer to the minimum number of points they need to get.

(2)  You must get 10 points on this test to pass.

The meaning of (2) does not entail that a student who gets 20 points on the test will fail. By contrast, if my daughter reports her performance on a test with (3),

---

[1] This analysis assumes that the expression "parmesan cheese" is the name of a kind of cheese. An alternative analysis would decompose "parmesan" into a modifier and "cheese" into a common noun. The resulting meaning would be that "parmesan cheese" is cheese from Parma.

[2] See Grice (1989).

I will understand her to mean that she missed no more than 10 points.

(3)   I missed 10 points on the math test.

The expression "10 points" refers to a lower bound in (2) and an upper bound in (3). The reason for this is that in (2) what is relevant for knowing what it takes to pass a test is the lower bound of scores, whereas what is relevant for knowing the performance on a test in (3) is the upper bound of the points missed. The literal meaning of "10 points" is a bound on a scale of points; whether that bound is at the lower end of the scale or at the upper end of the scale is determined by which conveys relevant information. If my daughter had decided to use (3) to report how she did on a test in which she missed
40 points, she would be choosing her linguistic materials in a way that misleads. She would be exploiting the fact that an upper bound is relevant in this context, and that this will lead the hearer to draw the conclusion that she missed no more than 10 points. Her linguistic choices would indicate an intention to mislead.

A similar dynamic is at play with the two parses in (1). Because of the choice of the term "100%," the author of this expression has designed it to communicate the meaning associated with (1a) and not (1b). The term "100%" is a more natural modifier of "parmesan cheese" than it is of "grated," as can be seen by comparing the naturalness of the two sentences in (4).

(4)   a.   This pile is 100% parmesan cheese.
        b.   This pile is 100% grated.

Because "grated" does not denote a scalable property, it is not allowed to be quantified in the same way that the meaning of "parmesan cheese" is. As a consequence, using a quantity expression like "100%" is odd with "grated." If the authors had not intended to convey the meaning in (1a), they wouldn't have chosen "100%," but would have instead used an expression that could be parsed with "grated." Such a word is "entirely," as can be seen by the absence of a contrast in naturalness between (5a) and (5b).

(5)   a.   This pile is entirely parmesan cheese.
        b.   This pile is entirely grated.

That the author chose the expression "100%" over "entirely" would be used by a reader to deduce that the author intended the meaning in (1a). The reasoning here is entirely parallel to that employed in deducing that the sentence "I missed 10 points on the test" communicates that the number of missed points does not exceed 10. That the author chose the expression "100%" over "entirely" signals that the intention was to communicate the meaning in (1a). If the meaning associated with (1b) is descriptively true, then the choice of "100%" to form the label is an indication that the author intends to mislead.

## References

Grice, Paul. 1989. Logic and conversation. In *Studies in the Way of Words*, 22–40. Harvard University Press.