EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

~~In re: 100% Grated Parmesan Cheese Marketing and Sales Practices Litigation~~

~~16 CV 5802~~

~~MDL 2705~~

~~Judge Gary S. Feinerman~~

~~*This Document Relates to All Cases on*~~

~~*The Publix Super Markets, Inc. Track*~~

| | |
|---|---|
| IN RE: 100% GRATED PARMESAN CHEESE MARKETING AND SALES PRACTICES LITIGATION | 16 CV 5802 |
| | MDL 2705 |
| | Judge Gary S. Feinerman |
| *This Document Relates to All Cases on* *The Publix Super Markets, Inc. Track* | |

## SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT AGAINST PUBLIX SUPER MARKETS. INC.

Plaintiffs Carmen Pellitteri and Erin Rudder ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to themselves and on information and belief as to all other matters, by and through undersigned Interim Co-Lead Counsel, bring this second amended consolidated class action complaint against Defendant Publix Super Markets, Inc. ("Publix" or "Defendant").

## NATURE OF THE ACTION

1.      This consumer class action arises out of Publix's misbranding and false and misleading advertising of its grated Parmesan cheese products ("Product" or "Products") as "100% Real Grated Parmesan Cheese" and "100% Real Grated Romano Parmesan Cheese." Defendant's advertisements, including its labels, represent the Products as "100% Real Grated Parmesan Cheese" and "100% Real Grated Romano Parmesan Cheese" (together, the "100% Claims"), but these representations are false, misleading, and likely to deceive the reasonable consumer because the Products are not 100% cheese.

2.      Instead, rather than being comprised of 100% cheese that is grated, the Products contain fillers and additives, such as cellulose, an inexpensive filler derived from wood pulp. The Products are not "100% Real Grated Parmesan Cheese" or "100% Real Grated Romano Parmesan Cheese."

3.      Nonetheless, according to a recent survey, the vast majority of consumers who purchase the Products believe the Products are 100% cheese and do not contain fillers or artificial ingredients. In fact, in excess of 90% of consumers believe that the label means the Products are 100% cheese and fully grated. Only a very small percentage believed the Products do not consist of 100% cheese.

4.      Further, the Products contain more cellulose powder than needed to achieve anticaking effects. That is, Defendant uses the cellulose powder as filler. Defendant states, albeit in small print on the back of the Products' container, that the Products contain cellulose powder for anticaking purposes and omits the fact that the cellulose powder is included as a filler.

5. 4.As a result of Defendant's deceptive and unfair practices, Plaintiffs and the other Class members did not receive that which was promised.

6. 5.Plaintiffs bring this class action on behalf of themselves and all other similarly situated consumers to recover the amounts Plaintiffs and the other Class members overpaid, to prevent Defendant from continuing to engage in its unlawful, deceptive, and unfair conduct, and to correct the false perception it has created in the marketplace through its misrepresentations and omissions of material facts.

## JURISDICTION AND VENUE

7. 6.The Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. § 1332(d) because the case is brought as a class action under Fed. R. Civ. P. 23, at least one proposed class member is of diverse citizenship from Defendant, the proposed Class includes more than 100 members, and the aggregate amount in controversy exceeds $5,000,000, excluding interest and costs.

8. 7.Venue is proper in this District because the underlying lawsuits in this matter were transferred by the Judicial Panel on Multidistrict Litigation to this Court for coordinated pretrial proceedings pursuant to 28 U.S.C. § 1407. Venue is proper in the transferor courts' districts because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the districts and Defendant conducted (and continues to conduct) substantial business in the districts. Plaintiffs in the transferred actions reserve their rights of remand to the districts from which they were transferred at or before the conclusion of the pretrial proceedings.

## PARTIES

9. 8.Plaintiff Carmen Pellitteri ("Pellitteri") is a citizen of Florida. Pellitteri purchased Publix's "100% Real Grated Romano Parmesan Cheese" in December of 2015 from the Publix Supermarket in Lake Worth, Florida, after reading the label representing that it was "100% Real Grated Romano Parmesan Cheese." Pellitteri purchased the Product believing it was 100% Romano and Parmesan

cheese. Pellitteri did not receive that which he was promised.

10. 9. Plaintiff Erin Rudder ("Rudder") is a citizen of Florida. Rudder purchased Publix's "100% Real Grated Parmesan Cheese" in 2014 from the Publix Supermarket in Lake Worth, Florida, after reading the label representing that it was "100% Real Grated Parmesan Cheese." Rudder purchased the Product believing it was 100% Parmesan cheese. Rudder did not receive that which she was promised.

11. 10. Defendant Publix is a Florida corporation with its principal place of business located at 3300 Publix Corporate Parkway, Lakeland, Florida 33811. Publix was founded in Florida in 1930, and is one of the 10 largest volume supermarket chains in the United States. In 2015, its retail sales were $32.4 billion. Publix has a total of 1,128 stores with locations in Florida, Alabama, Georgia, North Carolina, South Carolina, and Tennessee. Publix manufactures, sells, distributes, and advertises the Products.

## FACTUAL BACKGROUND

12. 11. Parmesan and Romano cheese have become increasingly popular with consumers. According to the United States Department of Agriculture, in 2015, output of Parmesan cheese

rose 11% from 2014, to around 336 million pounds, while Romano production grew 20% to 54 million pounds.

13. ~~12.~~The Products' package labels prominently represent the Products as "100% Real Grated Parmesan Cheese" or "100% Real Grated Romano ~~Parmesan~~ Pannesan Cheese." Representative packaging of the Products appears below:









14. 13. Contrary to Defendant's 100% Claims, the Products are not 100% cheese. Instead, a significant portion of Defendant's Products is cellulose. An independent testing facility determined that a sample of Defendant's Products allegedly consisting of 100% grated Parmesan cheese actually contained 6.6% cellulose.

15. Cellulose is an organic polymer. It is not cheese or any other type of dairy product. Its main use is in the production of paperboard and paper. Humans cannot digest cellulose, and it provides no nutritional calories. Cellulose is often used as a filler. Potassium sorbate, also found in the Products, is a synthetic chemical additive used in some foods and personal care products.

16.   ~~14.~~Because the Products are not all cheese, Defendant's advertising, including the labels, is false, misleading, unfair, deceptive, and intended to induce consumers to purchase the Products.

17.   ~~15.~~It is understandable that consumers believed what Defendant told them about these products. These cheeses—cured, dried hard Italian cheeses—keep a long time without refrigeration and do not clump. In fact, "[f]ully cured Parmesan cheese is very hard and keeps almost indefinitely." U.S. Patent No. 6,242,016 Bl. The patent also explains that the grated Parmesan cheese usually available in the marketplace is dried after curing to a moisture level of about 12-18%. At this moisture level, "there is little problem of clumping or agglomeration of the grated cheese product." *Id.*

18.   Defendant adds powdered cellulose in amounts that exceed what is necessary for achieving anticaking effects in the Products.

19.   ~~16.~~Further, the Products' use of antimycotics, such as potassium sorbate, for the preservation of grated cheese products is far from a universal practice. Other similar products, such as Essential Everyday 100% Grated Parmesan, do not contain antimycotics. *See, e.g.,* ~~ECF~~ EOF No. 158-1.

20.   ~~17.~~According to a ~~recent~~ survey conducted in connection with this litigation, the vast majority of consumers who purchase the Products believe the Products are 100% cheese and do not contain fillers or artificial ingredients. In fact, in excess of 90% of consumers believe that the label means the Products are 100% cheese and fully grated. Only a very small percentage believed the Products do not consist of 100% cheese.

21.   ~~18.~~It is also understandable that consumers reasonably interpret the Products' labels as meaning the Products consist only of cheese. As explained by linguists Anne Curzan, Ph.D., Ezra Keshet, Ph.D., and Kyle Johnson, Ph.D., in two separate analyses of the phrase "100% Grated Parmesan Cheese," the phrase is linguistically subject to only one plausible interpretation, which is that the Product contains nothing other than grated parmesan cheese. *See* Report of Anne Curzan and Ezra Keshet,

6

attached as Exhibit A; Report of Kyle Johnson, attached as Exhibit B.

22. 19. Publix no longer labels its grated cheese as "100% Real Grated Parmesan Cheese" or "100% Real Grated Romano Parmesan Cheese." It changed the labels on its grated Parmesan cheese products by deleting "100%" only after it was sued for making these deceptive, misleading representations.

23. 20. After it was sued, Wal-Mart Stores, Inc. also dropped "100%" from its claim that its grated Parmesan cheese products were "100% Parmesan Grated Cheese" or "100% Grated Parmesan Cheese."

24. 21. Plaintiffs and the other Class members did not receive that which was promised and represented to them. Each has been exposed to Defendant's advertisements and has seen the Products' labels. Plaintiffs and the other Class members overpaid for the Products they purchased.

## CLASS ACTION ALLEGATIONS

25. 22. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3), on behalf of a class defined as:

> All persons who purchased, other than for resale, Publix's 100% Real Grated Parmesan Cheese or 100% Real Grated Romano Parmesan Cheese products.

Excluded from the Class are: (i) Defendant and its officers and directors, agents, affiliates, subsidiaries, and authorized distributors and dealers; (ii) all Class members that timely and validly request exclusion from the Class; and (iii) the Judge presiding over this action.

26. 23. Alternatively, Plaintiffs bring this action on behalf of a class defined as:

All persons who purchased, other than for resale, in the State of Florida [and all states with laws at issue similar to Florida] Publix's 100% Real Grated Parmesan Cheese or 100% Real Grated Romano Parmesan Cheese products.

Excluded from the Class are: (i) Defendant and its officers and directors, agents, affiliates, subsidiaries, and authorized distributors and dealers; (ii) all Class members that timely and validly request exclusion from the Class; and (iii) the Judge presiding over this action.

27.      24.Certification of Plaintiffs' claims for classwide treatment is appropriate because Plaintiffs can prove the elements of their claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

28.      25.The members of the Class are so numerous that joinder of the Class members would be impracticable.

29.      26.Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law and fact include, *inter alia:*

      A.      Whether Defendant engaged in the conduct alleged;

      B.      Whether Defendant misrepresented the content of the Products or misbranded them;

      C.      Whether Defendant's 100% Claims were false, deceptive, or likely to mislead a reasonable person;

      D.      Whether Defendant's Products contained more cellulose powder than needed to prevent caking;

      E.      D.Whether Defendant's representation that the Products' contents consisted of 100% cheese created an express warranty;

      F.      E.Whether Plaintiffs and the other Class members paid for a product that they did

not receive;

G. F. Whether Plaintiffs and the other Class members have been damaged, and if so, the measure of such damages;

H. G. Whether Defendant unjustly retained a benefit conferred by Plaintiffs and the other Class members; and

I. H. Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, a constructive trust, restitution, and injunctive relief.

30. 27. Plaintiffs' claims are typical of the claims of the Class members because, among other things, Plaintiffs and the other Class members were injured through the substantially uniform misconduct described above. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

31. 28. Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent, they have retained counsel competent and experienced in complex commercial and class action litigation, and Plaintiffs intend to prosecute this action vigorously. The interests of the Class members will be fairly and adequately protected by Plaintiffs and their counsel.

32. 29. A class action is also warranted under Fed. R. Civ. P. 23(b)(2), because Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole. Defendant has directed its conduct to all consumers in a uniform manner. Though Defendant voluntarily removed the 100% Claims from its labels after this litigation began, there is nothing preventing Defendant from implementing the 100% Claims again at any point. Therefore, injunctive relief on a classwide basis is necessary to ensure continuing harms to Plaintiffs and the other Class members are not caused by Defendant's misconduct.

33. 30.A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress for Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system should not be required to undertake such an unnecessary burden. Individualized litigation would also create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CLAIMS

## COUNT I
## Violation of the Florida Deceptive and Unfair Trade Practices Act
Fla. Stat. §§ 501.201, 501.20L *et sea.*
on Behalf of Plaintiffs and the Multistate Class,
or in the Alternative, on Behalf of the Florida Class

34. 31.Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

35. 32.The express purpose of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. §§ 501.201, *et seq.* ("FDUTPA"), is "[t]o protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or

practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2). The FDUTPA declares such acts and practices to be unlawful. Fla. Stat. § 501.204(1).

36. 33.The sale of the Products was a consumer transaction within the scope of FDUTPA.

37. 34.Plaintiffs and the Class members purchased the Products and are "consumers," as that term is defined by Section 501.203(7) of FDUTPA.

38. 35.Defendant's Products are goods within the meaning of FDUTPA, and Defendant is engaged in "trade or commerce" within the meaning of FDUTPA. *See* Fla. Stat. § 501.203(8).

39. 36.Defendant's unfair and deceptive practices were likely to mislead and have misled reasonable consumers, such as Plaintiffs and members of the Class.

40. 37.Reasonable consumers rely on Defendant to honestly represent the true nature of the contents of the package.

41. 38.Defendant has deceived reasonable consumers, like Plaintiffs and members of the Class, into believing the Products are something they are not; specifically that the Products are being supplied in accordance with representations.

42. 39.Plaintiffs and Class members have been aggrieved by Defendant's unfair and deceptive practices in violation of FDUTPA, in that they paid money for Defendant's mislabeled Products.

43. 40.Defendant violated FDUTPA by engaging in the unfair and deceptive practices described above, which offend public policy and are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers.

44. 41.Pursuant to Sections 501.211(2) and 501.2105 of the FDUTPA, Plaintiffs and members of the Class make claims for damages, attorneys' fees, and costs. The damages suffered by Plaintiffs and the Class were directly and proximately caused by the deceptive, misleading, and unfair practices of Defendant. Plaintiffs and the Class also seek restitution and disgorgement.

45. 42.Pursuant to Section 501.211(1) of the FDUTPA, Plaintiff and the Class seek injunctive relief for, inter alia, the Court to enjoin Defendant's above-described wrongful acts and practices and for restitution and disgorgement.

46. 43.Plaintiffs seek all available remedies, damages, and awards as a result of Defendant's violations of FDUTPA.

## COUNT II
### Breach of Express Warranty
### on Behalf of Plaintiffs and the Multistate Class,
### or in the Alternative, on Behalf of the Florida Class

47. 44.Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

48. 45.Defendant, as the marketer, distributor, or seller of the Products is a merchant.

49. 46.Plaintiffs and the other Class members purchased the Products that were manufactured and sold by Defendant in consumer transactions.

50. 47.Defendant made affirmations of fact to Plaintiffs and the other Class members relating to and describing the Products as 100% Parmesan cheese or 100% Romano and Parmesan cheese

51. 48.Defendant's affirmations of fact and descriptions of the Products formed the basis of the bargain between Plaintiffs and the other Class members and Defendant, creating an express warranty under Uniform Commercial Code, 2-313—an identical or substantially similar version of which has been and is currently enacted in each and every state.

52. 49.Defendant's Products were accompanied by an express warranty when placed in the stream of commerce by Defendant.

53. 50.All conditions precedent have occurred or been performed.

54. 51.Defendant breached the express warranty by selling products that did not conform to the affirmations of fact and descriptions. The Products are not 100% cheese, but rather contain other

substances in addition to the type of cheese on the label. Further, the added cellulose powder exceeds the amount needed for anti-caking purposes.

55. 52.At the time of sale to Plaintiffs and the other Class members, Defendant had actual knowledge that it breached express warranties with Plaintiffs and the other Class members.

56. 53.As the foreseeable and actual result of Defendant's breach of express warranty, Plaintiffs and the Class members were damaged.

<u>COUNT III</u>
**<u>Breach of Implied Warranty of Merchantability</u>**
**<u>on Behalf of the Multistate Class,</u>**
**<u>or in the Alternative, on Behalf of the Florida Class</u>**

57. 54.Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

58. 55.Defendant, as the marketer, distributor, or seller of the Products is a merchant.

59. 56.Plaintiffs and the other Class members purchased the Products that were sold by Defendant in consumer transactions. The implied warranty of merchantability attended the sale of the Products.

60. 57.To be merchantable, the Products must, at the least:

    (a)    Pass without objection in the trade under the contract description;

    (b)    In the case of fungible goods, be of fair average quality within the description;

    (c)    Run, within the variations permitted by the agreement, of even kind, quality, and quantity within each unit and among all units involved;

    (d)    Be adequately contained, packaged, and labeled as the agreement may require; and

(e)     Conform to the promises or affirmations of fact made on the container or label.

61.     ~~58.~~The Products are not adequately contained, packaged, or labeled because they are packaged as "100% Real Grated Parmesan Cheese" and "100% Real Grated Romano Parmesan Cheese," but do not consist of 100% of the stated cheeses. Instead, they contain ingredients other than the cheeses stated on the front label.

62.     ~~59.~~The Products do not conform to the promises and affirmations of fact made on their containers and labels because they do not consist of 100% of the stated cheeses as their packaging and labeling ~~warrants~~warranted.

63.     The Products do not pass without objection in the trade and are not of fair average quality within the contract description because they contain cellulose powder in excessive quantities.

64.     ~~60.~~**Plaintiffs and the other members of the Class did not receive the Products as warranted. The Products they purchased were worth less than the Products they were promised and expected.**

65.     ~~As a~~ As a result of Defendant's breach of warranty, Plaintiffs and members of the Class suffered damages.

## COUNT IV
## Unjust Enrichment
## on Behalf of the Multistate Class,
## or in the Alternative, on Behalf of the Florida Class

66.     ~~61.~~Plaintiffs repeat and reallege all preceding paragraphs as if fully set forth herein.

67.     ~~62.~~Defendant has been unjustly enriched to Plaintiffs' and the Class members' detriment as a result of its unlawful and wrongful retention of money conferred by Plaintiffs and the other Class members, such that Defendant's retention of their money would be inequitable.

68.     ~~63.~~Defendant's unlawful and wrongful acts, as alleged above, enabled Defendant to unlawfully receive monies it would not have otherwise obtained.

69. <del>64.</del>Plaintiffs and the Class members have conferred benefits on Defendant, which Defendant has knowingly accepted and retained.

70. <del>65.</del>Defendant's retention of the benefits conferred by Plaintiffs and the Class members would be against fundamental principles of justice, equity, and good conscience.

71. <del>66.</del>Plaintiffs and the Class members seek to disgorge Defendant's unlawfully retained profits and other benefits resulting from its unlawful conduct, and seek restitution and rescission for the benefit of Plaintiffs and the other Class members.

72. <del>67.</del>Plaintiffs and the other Class members are entitled to the imposition of a constructive trust upon Defendant, such that its unjustly retained profits and other benefits are distributed equitably by the Court to and for the benefit of Plaintiffs and the other Class members.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that the Court enter judgment in their favor and against Defendant as follows:

A.  Certifying the Class under Federal Rule of Civil Procedure 23, as requested herein;

B.  Appointing Plaintiffs as Class Representatives and Plaintiffs' Interim Co-Lead Counsel as Class Counsel;

C.  Awarding Plaintiffs and the other Class members actual, compensatory, statutory, and consequential damages;

D.  Awarding Plaintiffs and the other Class members declaratory and injunctive relief;

E.  Awarding Plaintiffs and the other Class members restitution and disgorgement;

F.  Imposing a constructive trust for the benefit of Plaintiffs and the other Class members on the unjustly retained benefits conferred by Plaintiffs and the other Class members upon Defendant;

G.  Awarding Plaintiffs and the other Class members reasonable attorneys' fees, costs, and expenses; and

H.  Granting such other relief as the Court deems just and appropriate.

### JURY TRIAL DEMAND

Plaintiffs, individually and on behalf of all others similarly situated, hereby request a jury trial,

Dated: October 19, 2017                    Respectfully submitted,

pursuant to Federal Rule of Civil Procedure 38, on all claims so triable.


s/ BenBamow


Ben Bamow

Erich P. Schork

Bamow and Associates, P.C.

1 North LaSalle St., Suite 4600
Chicago, Illinois 60602
b.barnow@bamowlaw.com e.
schork@b arnowl aw. com (312)
621-2000 (ph)

(312) 641-5504 (fax)


16

Timothy G. Blood Camille S. Bass

Blood Hurst & O'Reardon, LLP 701 B Street, Suite 1700 San Diego, CA 92101 tblood@bholaw.com cbass@bholaw.com (619)338-1100 (ph) (619)338-1101 (fax)

Eduard Korsinsky Andrea Clisura Levi & Korsinsky LLP 30 Broad Street, 24th Floor New York, NY 10004 ek@zlk.com aclisura@zlk.com (212)363-7500(ph) (212)363-7171 (fax)

*Plaintiffs' Interim Co-Lead Counsel*

Dated: November 28, 2018

Respectfully submitted,

s/ BenBamow

Ben Bamow
Erich P. Schork
Bamow and Associates, P.C.
1 North LaSalle St., Suite 4600
Chicago, Illinois 60602
b.barnow@bamowlaw.com e. schork@b arnowl
aw. com (312) 621-2000 (ph)
(312) 641-5504 (fax)

Timothy G. Blood
Blood Hurst & O'Reardon, LLP
501 West Broadway, Suite 1490
San Diego, CA 92101 tblood@bholaw.com
(619)338-1100(ph)
(619)338-1101 (fax)

Eduard Korsinsky
Andrea Clisura
Levi & Korsinsky LLP
30 Broad Street, 24th Floor
New York, NY 10004 ek@zlk.com
aclisura@zlk.com (212)363-7500(ph)
(212)363-7171 (fax)

*Plaintiffs ' Interim Co-Lead Counsel*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a copy of the foregoing document was filed on ~~October 19~~November 28, ~~2017~~ 2018, with the Clerk of the Court by using the CM/ECF system which will send a notice of filing to all counsel of record.

<u>/s/ Ben Barnow</u>

# Exhibit A

Anthony Parkhill Bamow and Associates, P.C. 1 North Lasalle Street Chicago, IL 60602

October 4, 2017

Dear Mr. Parkhill,

We are pleased to submit the following report, which you requested.

## Introduction

1. We have been asked to report on advertising language for various grated cheese products. Specifically, we will address the question of what constitute reasonable readings of the phrases "100% Grated Parmesan Cheese/' "100% Grated Parmesan and Romano Cheese/' and "100% Grated Three Cheese Blend/' In the analysis below, we focus on the phrase "100% Grated Parmesan Cheese" as representative of all three phrases.

2. The noun phrase "100% grated Parmesan cheese" consists of a head noun ("cheese") and three attributive modifiers ("100%," "grated," and "Parmesan"). Although phrases with three modifiers have the potential for multiple interpretations in terms of how the modifiers stack (in other words the scope of what an initial modifier modifies), it is our opinion that only one interpretation of this phrase is plausible in context.

## Readings

3. Judge Gary Feinerman has supplied three possible interpretations of the phrase, and we address the plausibility of each reading below.

### Reading 1: [100% grated] [Parmesan cheese]

   a. Reading 1 can be paraphrased as "Parmesan cheese that is 100% grated."

   b. A modifier like "100%" may only apply to a word that is *gradable* (one that has various levels). For instance, a person can be 100% satisfied, since there are various levels of satisfaction, but it's odd to call someone "100% pregnant," since in common speech there aren't different levels of being pregnant.

   c. When you grate a hunk of cheese at home, it does progress through levels of being 50%, 75%, and finally 100% grated. However, in the context of packaged cheese, such levels do not obtain: no cheese is sold in packages with, for instance, 50% sliced, 25% grated, and 25% whole cheese. Therefore it's odd to call any packaged cheese "100% grated" in the same way it's odd to call someone "100% pregnant."

   d. Thus, no reasonable shopper would conclude that Reading 1 is the meaning of the phrase "100% grated Parmesan cheese."

### Reading 2: [100% [grated Parmesan]] cheese

   a. Reading 2 can be paraphrased as "cheese that is 100% grated Parmesan"

Please recycle

440 Lorch Hall, 611 Tappan Street
Ann Arbor MI 48109-1220

I: 734-764-0353 F: 734-936-3406
lsa.umich.edu/linguistics/

b. Something that is merely called "grated Parmesan" could potentially contain minor additives, preservatives, etc. The linguistic imprecision that allows such extra ingredients is the same kind of imprecision that allows "lean beef to contain some fat and allows a "3pm meeting" to start at 3:05. Linguists call such imprecision "pragmatic slack."[1]

c. Speakers vary the level of slack they intend for phrases such as "3pm meeting" and "lean beef." This effectively make such terms gradable and suitable for modification by terms like "90%," "100%," and "precisely." For instance, a meeting at "precisely 3pm" has very little slack, i.e., it cannot start at 3:05: and "90% lean beef cannot contain any more than 10% fat. In the same way, something that is "100% grated Parmesan" has no slack: it cannot contain anything that is not grated Parmesan.

d. Thus, "cheese that is 100% grated Parmesan" contains nothing that is not grated Parmesan, and therefore nothing that is not cheese (since Parmesan is cheese). This makes Reading 2 identical in meaning to Reading 3 below.

**Reading 3: 100% [grated Parmesan cheese]**

a. Reading 3 can be paraphrased as "(food that is) 100% cheese that is grated Parmesan." Again, the 100% modifier removes slack from the meaning, disallowing additives or other ingredients.

## Implicature

4. If there is only one phrase on the front of a container's label, it can be understood to represent everything that is in the container. Here we rely on philosopher H. P. Grice's theory of conversational implicature, which distinguishes between what is literally entailed by an utterance and what is conventionally implicated by an utterance (or in this case a phrase on a label).

5. Conversational implicature is governed by convention. Two key general principles are that the information will be relevant and adequately informative within the context.

6. If a label reads "cheese and crackers," it is conventionally implied that the container contains both cheese and crackers. It does not contain only olives (without cheese and crackers) because this would make the label "cheese and crackers" irrelevant. It also does not contain cheese, crackers, and olives because this would make the label inadequately informative, as it does not include one of the three main items in the container.

7. In the context of labels, it would be odd to see something labeled only "cheese" or "grated Parmesan cheese" that also contained something clearly not cheese-like, such as crackers or wine or pickles, etc.

8. And, as described in paragraph 3 above, the addition of "100%" in Readings 2 and 3 of the phrase "100% grated Parmesan cheese" removes imprecision or slack from the meaning of "grated Parmesan cheese," disallowing additive ingredients. Finally, Reading 1 (where "100%" only modifies "grated") is pragmatically ruled out in this context. [1]

---

1 Therefore, it is our expert opinion that no reasonable shopper would expect that a container labeled "100% grated Parmesan cheese" would contain significant amounts of non-cheese-like ease recycle substances.

[1] Lasersohn, P. (1999). Pragmatic Halos. Language, 75(3), 522-551. doi:10.2307/417059

440 Lorch Hall, 611 Tappan Street
Ann Arbor MI 48109-1220

I: 734-764-0353 F: 734-936-3406
lsa.umich.edu/linguistics/



Sincerely,

Anne Curzan, Ph.D.

Professor of English, Linguistics, & Education, University of Michigan

Ezra Keshet, Ph.D.
Professor of Linguistics, University of Michigan

Please recycle

# Exhibit B

# Kyle Johnson, Ph.D.

Professor, University of Massachusetts at Amherst
Department of Linguistics

My name is Kyle Johnson. I am a linguistics professor at the University of Massachusetts at Amherst. My areas of expertise are syntax and semantics. I have been asked to provide an analysis of the syntax and semantics of the expression "100% grated parmesan cheese." In my opinion, this expression has only one salient interpretation, and that can be paraphrased as "entirely parmesan cheese that is grated." This interpretation entails that the contents of a container bearing "100% grated parmesan cheese" on its label contains only parmesan cheese, and no other ingredient.

There are two ways the expression "100% grated parmesan cheese" can be syntactically parsed, and these correspond to two, distinct, meanings. Those parses are indicated with brackets in (1), and for each I have paraphrased the meanings that the semantic rules of English would assign.[2]

(1)  a. [100% [grated [parmesan cheese]]] = entirely parmesan cheese
         that is grated.
     b. [[100% grated] [parmesan cheese]] = parmesan cheese that is entirely
         grated

While these are the two meanings made available by English syntax, only one of them is semantically and pragmatically salient, and that is the first (i.e. (la)). I will briefly sketch the reasons for this below.

A central factor guiding speakers' choices in forming linguistic expressions is their desire to maximize informativity. Hearers use the linguistic choices a speaker has made to deduce some of the information intended, and speakers, in turn, make their linguistic choices in a way that guides those deductions.[3] This can be illustrated by considering the meaning that we associate with numerical expressions. If I say the sentence in (2) in a classroom setting, my students will understand that I mean "10 points" to refer to the minimum number of points they need to get.

(2)  You must get 10 points on this test to pass.

The meaning of (2) does not entail that a student who gets 20 points on the test will fail. By contrast, if my daughter reports her performance on a test with (3), I will understand her to mean that she missed no more than 10 points.

(3)  I missed 10 points on the math test.

_____

[2] This analysis assumes that the expression "parmesan cheese" is the name of a kind of cheese. An alternative analysis would decompose "parmesan" into a modifier and "cheese" into a common noun. The resulting meaning would be that "parmesan cheese" is cheese from Parma.

[3] See Grice (1989).

The expression "10 points" refers to a lower bound in (2) and an upper bound in (3). The reason for this is that in (2) what is relevant for knowing what it takes to pass a test is the lower bound of scores, whereas what is relevant for knowing the performance on a test in (3) is the upper bound of the points missed. The literal meaning of "10 points" is a bound on a scale of points; whether that bound is at the lower end of the scale or at the upper end of the scale is determined by which conveys relevant information. If my daughter had decided to use (3) to report how she did on a test in which she missed 40 points, she would be choosing her linguistic materials in a way that misleads. She would be exploiting the fact that an upper bound is relevant in this context, and that this will lead the hearer to draw the conclusion that she missed no more than 10 points. Her linguistic choices would indicate an intention to mislead.

   A similar dynamic is at play with the two parses in (1). Because of the choice of the term "100%," the author of this expression has designed it to communicate the meaning associated with (la) and not (lb). The term "100%" is a more natural modifier of "parmesan cheese" than it is of "grated," as can be seen by comparing the naturalness of the two sentences in (4).

   (4)   a. This pile is 100% parmesan cheese, b. This pile is 100% grated.

Because "grated" does not denote a scalable property, it is not allowed to be quantified in the same way that the meaning of "parmesan cheese" is. As a consequence, using a quantity expression like "100%" is odd with "grated." If the authors had not intended to convey the meaning in (la), they wouldn't have chosen " 100%," but would have instead used an expression that could be parsed with "grated." Such a word is "entirely," as can be seen by the absence of a contrast in naturalness between (5a) and (5b). [4]

## References

Grice, Paul. 1989. Logic and conversation. In *Studies in the Way of Words,* 22-40. Harvard University Press.

---

[4]   a. This pile is entirely parmesan cheese, b. This pile is entirely grated.

That the author chose the expression "100%" over "entirely" would be used by a reader to deduce that the author intended the meaning in (la). The reasoning here is entirely parallel to that employed in deducing that the sentence "I missed 10 points on the test" communicates that the number of missed points does not exceed 10. That the author chose the expression "100%" over "entirely" signals that the intention was to communicate the meaning in (la). If the meaning associated with (lb) is descriptively true, then the choice of "100%" to form the label is an indication that the author intends to mislead.