**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KOVE IO, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 18 C 8175 ) |
| AMAZON WEB SERVICES, INC., | ) Judge Rebecca R. Pallmeyer ) Magistrate Judge Finnegan |
| Defendant. | ) |

**ORDER**

Plaintiff Kove IO, Inc., filed suit against Defendant Amazon Web Services, Inc. ("AWS"), alleging infringement of three patents disclosing "a data storage network architecture that permits cloud-based storage of information on a large scale." *Kove IO, Inc. v. Amazon Web Servs., Inc.*, 448 F. Supp. 3d 849, 851 (N.D. Ill. 2020). Currently before the Court is Plaintiff's motion to compel discovery of Andrew Jassy, CEO of Amazon.com, Inc. ("Amazon") [351, 352]. For reasons set forth here, the motion is granted in part and denied without prejudice in part.

**BACKGROUND**

Plaintiff holds three patents related to a distributed data storage technology that can be utilized in cloud computing. (Doc. 1, Compl., ¶¶ 1-2). The patented distributed network system allows storage systems to grow to a significant size by "not only storing data files in different locations but storing location information across multiple servers, as well." *Kove IO*, 448 F. Supp. 3d at 852. This system "enabled hyper-scalable cloud storage and improved upon the scalability limitations of conventional storage systems." (Doc. 1, Compl., ¶ 18). Plaintiff alleges that two of Defendant's products infringe the three

patents: Amazon Simple Storage ("Amazon S3") and DynamoDB. (*Id*. ¶ 26). Defendant launched Amazon S3 in 2006, stating that it "allows users to store data in the cloud" in a "highly scalable, reliable, and low-latency data storage infrastructure." *Kove IO*, 448 F. Supp. 3d at 854 (quoting Press Release, Ex. 7 to Compl., [1-1] at 1). DynamoDB is "a database service that Defendant says permits users to 'create database tables that can store and retrieve any amount of data, and serve any level of request traffic.'" *Id*. (quoting DynamoDB Developer Guide, Ex. 11 to Compl., [1-11] at 1).

In this motion, Plaintiff seeks to compel discovery of Andrew Jassy. Jassy was a principal founder of AWS and a member of the "S-Team" that helped review and develop the design of the accused Amazon S3 product. (Doc. 351, at 7). He served as Senior Vice President of AWS until 2016 when he became CEO. On July 5, 2021, Jassy took over as CEO of Amazon. Plaintiff seeks to compel production of Jassy's emails and a copy of the six-page AWS vision document Jassy authored in 2003. Plaintiff has also issued a Rule 30(b)(1) notice for Jassy's deposition testimony. Defendant objects that Plaintiff's proposed email search terms are not narrowly tailored to particular issues as required in this patent case, and that the vision document is irrelevant. As for the deposition, Defendant declines to produce Jassy pursuant to the apex doctrine.

## **DISCUSSION**

I. **Jassy's Emails**

Plaintiff first seeks to compel the production of Jassy's emails. For purposes of ESI discovery, the parties have agreed to follow both the Federal Circuit Model Order Regarding E-Discovery in Patent Cases ("Model Order") and the Northern District of Illinois Local Patent Rules for Electronically Stored Information ("LPR ESI"). (Doc. 52, Jt.

Motion for Entry of Report of Parties' Planning Meeting and Agreed Case Schedule, at 4; Doc. 54). As discussed in more detail below, discovery of emails is subject to specific limitations that must be applied here based on the parties' agreement.

### A. Email Production Requests

LPR ESI 2.6(a) provides that "[g]eneral ESI production requests . . . shall not include email," and "to obtain emails parties must propound specific email production requests." The Model Order similarly states that email production requests "shall only be propounded for specific issues, rather than general discovery of a product or business." (Doc. 361-5, Model Order, at 7 ¶ 7).

In this case, Plaintiff seeks emails from Jassy (and four other email custodians) related to the following topics:

- Marketing, advertising, and customer support related to speed, scalability, and availability for Amazon S3 and DynamoDB.

- Telemetry, usage data, and metrics regarding speed, scalability, and availability, including any customer testing (such as A/B testing), of Amazon S3 and DynamoDB.

- Surveys, studies, analyses or purchase journey mapping relating to pricing, sales, and customer procurement and retention for Amazon S3 and DynamoDB, including any studies commissioned by AWS.

(Doc. 361, at 8; Doc. 361-6). Defendant has not argued that these email production requests fail to comply with the local patent rules and Model Order. Nor does Defendant dispute that to the extent Jassy has emails relating to the above topics, they may be relevant to the case. Instead Defendant takes issue with the search terms that Plaintiff proposes Defendant use to identify the universe of emails that would be reviewed for responsiveness under these topics. The Court turns to that issue.

**B.     Search Terms**

Under LPR ESI 2.6(d) and (e), each party "shall limit its email production requests to a total of five custodians" and "a total of five search terms per custodian per party" unless the parties "jointly agree to modify this limit."  In addition, LPR ESI 2.6(e) requires that search terms be "narrowly tailored to particular issues.  Indiscriminate terms, such as the producing company's name or its product name, are inappropriate unless combined with narrowing search criteria that sufficiently reduce the risk of overproduction."

Defendant argues that Plaintiff's proposed search terms for Jassy's emails are not "narrowly tailored to particular issues" as required by LPR ESI 2.6(e).  By letter dated April 14, 2021, Plaintiff requested that Defendant run the following search terms:

> S3 AND (price OR pricing OR (rate w/5 charge) OR fee OR tier OR scale OR scalability OR speed OR availability OR durability OR durable OR throughput OR "bucket size" OR "bytes uploaded" OR (first-byte w/5 latency) OR (total-request w/5 latency) OR "total time" OR (elapsed w/4 time) OR downstream OR "A/B" OR survey! OR (conjoint w/2 study) OR (conjoint w/2 analysis) OR "focus group" OR telemetry OR "journey map" OR "journey mapping" OR ██████████████).
>
> (DB OR DynamoDB) AND (price OR pricing OR (rate w/5 charge) OR fee OR tier OR scale OR scalability OR speed OR availability OR durability OR durable OR (replicat! w/5 latency) OR (successful-request w/5 latency) OR (write w/5 latency) OR (elapsed w/4 time) OR downstream OR "samplecount" OR (sample w/2 count) OR "A/B" OR survey! OR (conjoint w/2 study) OR (conjoint w/2 analysis) OR "focus group" OR telemetry OR "journey map" OR ██████████████).

(Doc. 351-7, 4/14/2021 Letter from J. Cardenas-Navia to J. Saltman, at 3-4).  Plaintiff had proposed similar search terms for other custodians (e.g., Werner Vogels, current Chief Technology Officer ("CTO") of Amazon, and Allan Vermeulen, former CTO of Amazon), which had already prompted an objection from Defendant that they produced too many

hits (more than 57,000 combined even after replacing "AND" with "W/100"). (Doc. 361, at 9 n.19, 11). In response, Plaintiff agreed to replace "AND" with "W/65," but Defendant said this still yielded too many hits (13,123 emails), as did "W/30" (over 10,000 hits). (*Id*. at 9 and n.20).

Defendant ultimately agreed to review the email hits for Vogels and Vermeulen, though it says it did so only to break the impasse and without waiving its objections. (*Id*. at 9). Defendant completed production of responsive documents on March 12, 2021.[1] (*Id*.; Doc. 351-6, 3/12/2021 Letter from E. Bernard to J. Cardenas-Navia). Around that same time (March 8, 2021), Plaintiff indicated for the first time that it might request emails from Jassy, and the following month (on April 14, 2021) it tentatively identified him as one of the five allotted email custodians. (Doc. 361, at 10). This time the parties were unable to reach agreement on the search terms. Defendant was unwilling to use the same search terms it had used for the Vogels and Vermeulen emails, insisting it would not run any search terms until Plaintiff "revise[s] the terms to comply with the LPR ESI and Model Order requirements." (*Id*. at 11). Aside from arguing generally that the search terms must be "narrowly tailored," however, Defendant provided no guidance as to what acceptable terms would look like. Defendant rejected Plaintiff's latest proposal adding the delimiter "W/50" and reducing the temporal scope from 2006-2020 to 2006-2018, without proposing any alternative suggestions. (Doc. 351, at 12; Doc. 361, at 11 n.33; Doc. 369, at 14, objecting that Defendant effectively "insisted Kove bargain against itself.").

---

[1] It is not entirely clear which delimiter Defendant used for this production. Defendant stated that the delimiter "W/65" captured 13,123 emails (Doc. 361, at 9), but that it reviewed "more than 15,000 emails" from Vogels and Vermeulen. (*Id*. at 17 n.64).

5

### C. Ruling on Jassy Emails

Based on the current record, the Court is not persuaded that Plaintiff's proposed search terms are "narrowly tailored to particular issues" as required by LPR ESI 2.6(e). Important information bearing on this disputed issue has not been provided and should have been. The fault lies with both parties. Plaintiff argues that the emails it seeks are relevant to "the origin of AWS and the development of the accused S3 product," and are "expected to yield information relevant to issues relating to damages, including commercial success, pricing, profitability, and convoyed sales." (Doc. 351, at 10). Yet it says nothing in its briefing about the effectiveness of the very same search terms when used to identify responsive emails of other custodians, namely, Vogels and Vermeulen. It is possible the search terms led to the production of many helpful emails that were probative of disputed issues in this case. Conversely, it is also possible the emails, while related to the S3 or DynamoDB products, were generally unhelpful. In determining whether these very same search terms should be used again, and are "narrowly tailored to particular issues" so as to "sufficiently reduce the risk of overproduction[,]" the Court requires this information.

Fault also lies with Defendant. It ran the searches for at least some other custodians using the search terms now at issue, yet it has provided no information regarding the volume of "false positives," that is, the volume of emails containing the search terms that were not responsive. Nor has Defendant indicated whether, based on its review of the responsive emails that *were* produced, these emails appeared to be relevant to specific issues in the case or instead seemed largely duplicative or otherwise unhelpful. Finally, Defendant anticipates that "running the terms for Jassy would be a

very time-consuming and costly process that would yield at best cumulative information" given that the same search terms with the delimiter "W/65" produced more than 15,000 emails for Vermeulen and Vogels. (Doc. 361, at 11, 17 n.64). But Defendant reportedly refused Plaintiff's request to run the proposed search terms against Jassy's emails and provide a "hit" count. (Doc. 351, at 7). As a result, this Court has no idea of the volume of Jassy's emails that would be flagged for review using those terms, or the number if those terms were used with the narrower delimiter "W/50" for the years 2006-2018. In this Court's experience, it is relatively common (and not unduly burdensome) for a party to preliminarily run the searches to at least identify the number of "hits." And this is helpful information for the parties and the Court to consider in evaluating not only the burden of reviewing the emails but also whether the search terms are sufficiently narrowly tailored.

For all of these reasons, Plaintiff's motion to compel Jassy's emails is denied but without prejudice. Given the missing information described above, the Court is not able to determine that the proposed search terms comply with the requirement in LPR ESI 2.6(e) that they be "narrowly tailored to particular issues[,]" and that "[i]ndiscriminate terms, such as the … product name" be "combined with narrowing search criteria that sufficiently reduce the risk of overproduction." The parties are directed to confer in an effort to reach agreement on suitable search terms. To that end, Defendant must run the search terms to determine the number of hits, and provide this to Plaintiff. Depending on the results, the parties should discuss possible techniques to improve on the terms and capture a more reasonable subset of documents. For example, the parties may wish to consider further limiting the time period (Plaintiff has indicated it is "particularly interested in ESI during the early years of the accused products" (Doc. 351-7, 4/14/2021 Letter from

J. Cardenas-Navia to J. Saltman, at 3)), using a smaller delimiter (e.g., W/30), or trying a sampling protocol. In the event the motion is re-filed, the parties should provide the missing information described in this order about the results of the other custodian searches that were done using the same terms, and Defendant must more specifically address the burden issue.

II.     The "Six-Pager"

Plaintiff next seeks a copy of Jassy's six-page AWS vision document (the "six-pager"). In 2003, Jassy and others were part of a one-day brainstorming session at Jeff Bezos' house to come up with a list of project ideas. (Doc. 351-20, 11/11/2019 Blog Post, at 3). This list served as "a starting point" for "a narrative to define the AWS business." (*Id*.). Allan Vermeulen, former Amazon CTO and early S-Team member who helped develop and design the Amazon S3 product, testified at his June 4, 2021 deposition that Jassy ultimately "wrote the original six-page document that describes . . . the AWS vision and laid out kind of the strategy for how the business would grow." (Doc. 351-2, at 6, Vermeulen Dep., at 37). Jassy later presented the "six-pager" to the Amazon Board of Directors and "spearheaded Amazon's move into a new field: cloud computing." (Doc. 351-3, 2/3/2021 New York Times article, at 2).

Though the "six-pager" likely lays out Jassy's earliest vision for AWS, Defendant refuses to produce a copy of it to Plaintiff. As Defendant explains, Plaintiff has consistently limited its email search terms for Jassy (and other email custodians) to 2006 forward. (Doc. 361, at 19). Since the "six-pager" was drafted years earlier in 2003, it would not be captured by Plaintiff's proposed search terms. The flaw in this argument is that Defendant concedes Plaintiff specifically asked for the document in its Sixth Set of

8

Requests for Production in February 2021. (*Id*.). In such circumstances, the 2003 date of creation is not a basis to deny production of the document.[2]

Defendant also argues the "six-pager" has no relevance to the case because it is a "non-technical document" written "before AWS or any of the accused products existed, before the asserted patents issued, and before the time period for which Kove is claiming damages." (*Id*.). To begin, Defendant cites no authority for the suggestion that only "technical" documents are discoverable in this case. Moreover, Plaintiff has alleged that the "six-pager" is "relevant to the value of infringing features and the hypothetical negotiation."[3] It reasons that the document "describes the vision for the architecture and significance of S3 – the very accused feature that infringes Kove's patents – and is contemporaneous with the hypothetical negotiation" occurring at the time infringement began. (Doc. 369, at 16). The Court is persuaded that the "six-pager" meets the bar for relevance. *See* FED. R. EVID. 401 (relevant evidence is that which "has any tendency to make a fact more or less probable" and "is of consequence in determining the action."). Moreover, AWS does not claim it would be burdensome or difficult to produce this small document that already is in hand. This portion of the motion to compel is granted.

---

[2] Defendant also argues that the motion to compel production of the "six-pager" is not properly before the Court because the parties did not meet and confer about it. (Doc. 361, at 19). Plaintiff disputes this (Doc. 369, at 17), and it is apparent from the briefing that further conference would be futile in any event.

[3] The "hypothetical negotiation" "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Sloan Valve Co. v. Zurn Indus., Inc.*, 33 F. Supp. 3d 984, 990 (N.D. Ill. 2014) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)).

### III. Jassy Deposition

#### A. The Apex Doctrine

The parties' primary dispute concerns whether Jassy, who is now serving as Amazon's CEO, should have to sit for a deposition. Courts may protect high-level executives from being deposed pursuant to the "apex doctrine" if any of four circumstances exist: "(1) the official has no unique personal knowledge of the matter in dispute; (2) the information can be garnered from other witnesses; (3) the information can be garnered from other discovery methods; or (4) sitting for the deposition would impose a hardship in light of the officer's other duties." *DeLeon-Reyes v. Guevara*, Nos. 18 C 1028, 18 C 2312, 2021 WL 3109662, at *3 (N.D. Ill. July 22, 2021). *See also Lee v. City of Chicago*, No. 20 C 1508, 2021 WL 2399999, at *2 (N.D. Ill. June 11, 2021); *Little v. JB Pritzker for Governor*, No. 18 C 6954, 2020 WL 868528, at *1 (N.D. Ill. Feb. 21, 2020). Though "the apex doctrine . . . is not an ironclad rule, [it] bespeaks sensitivity to the risk that very valuable executive time would be wasted where the officer has no real information." *Id*. (quoting *Dyson, Inc. v. Sharkninja Operating LLC*, No. 14 C 779, 2016 WL 1613489, at *1 (N.D. Ill. Apr. 22, 2016).

Under the apex doctrine, the party seeking to avoid discovery "bears the burden of 'showing that good cause exists to prevent' the discovery." *Dyson*, 2016 WL 1613489, at *1 (quoting *Powertech Tech., Inc. v. Tessera, Inc*., No. C 11-6121 CW, 2013 WL 3884254, at *1 (N.D. Cal. July 26, 2013). "This makes sense, as the logical underpinnings of the apex doctrine seeks to prevent a high-ranking corporate executive from being run through the wringer of civil discovery, when they do not have personal knowledge of the relevant facts; in other words, to protect apex employees 'from annoyance,

10

embarrassment, oppression, or undue burden or expense'" as contemplated by Rule 26(c)(1). *Id*. at *1. Moreover, "[a] strong showing is required before a party will be denied entirely the right to take a deposition." *City of Rockford v. Mallinckrodt ARD, Inc.*, No. 17 C 50107, 20 C 50056, 2020 WL 1675593, at *1 (N.D. Ill. Apr. 6, 2020) (citing *Nucap Indus. Inc. v. Robert Bosch LLC*, No. 15 C 2207, 2017 WL 6059770, at *4 (N.D. Ill. Dec. 7, 2017)).

### B. Unique Personal Knowledge Unavailable from Other Sources

"Courts have not hesitated to block efforts to depose high-ranking officials where . . . the officials do not have unique personal knowledge of the facts underlying the events that lead to the lawsuit in question." *Lee*, 2021 WL 2399999, at *3 (citing *Little*, 2020 WL 868528, at *2) (holding that the governor should not be deposed where he lacked unique or specialized knowledge relevant to the litigation); *Murillo v. Kohl's Corp.*, No. 16-CV-196-JPS, 2016 WL 6090862, at *3 (E.D. Wis. Oct. 18, 2016) (holding that defendant's chief merchandising and customer officer should not be deposed where she lacked "any 'specialized' or 'unique' knowledge about the manner in which the defendants price[d] their merchandise").

There can be little doubt that Jassy has personal knowledge related to the accused products in this case. As noted, he is a founding member of AWS and he was an original member of the S-Team that created the Amazon S3 product. In addition, Vermeulen testified that Jassy was "responsible for" AWS and "managed the teams." (Doc. 351-2, at 6, Vermeulen Dep., at 37). The question is whether Jassy's knowledge is unique, or whether Plaintiff can obtain the same information from other sources.[4]

---

[4] Plaintiff cites *Johnson v. Jung*, 242 F.R.D. 481 (N.D. Ill. 2007), for the proposition that an apex deponent's knowledge need not be "unique." (Doc. 369, at 6 n.7). That case is inapposite

11

Defendant argues that Jassy does not have any unique knowledge that cannot be obtained from Vermeulen, Sr. Principal Engineer of DynamoDB James Sorenson, AWS Chief Evangelist Jeff Barr, and others.  As a preliminary matter, Defendant finds it suspect that Plaintiff did not identify Jassy as a knowledgeable witness in its Rule 26(a) disclosures or throughout 25 months of discovery despite knowing his significant role within the company.  In fact, Plaintiff waited until March 8, 2021, just one month after Amazon made an announcement that Jassy would be taking over as CEO, before mentioning for the first time that it "may" request emails from him.  (Doc. 351-5).  Plaintiff then noticed Jassy's deposition on May 26, 2021, less than two months before he became Amazon CEO.  (Doc. 361, at 6).  Defendant also notes that even before his promotion to CEO of Amazon, Jassy was AWS's highest-ranking executive so oversaw the entire company, including its "more than 200 different products, only two of which are relevant here" (Amazon S3 and DynamoDB).  (*Id*. at 12).

In addition, in emails spanning a 10-year period that Defendant produced for Vogels and Vermeulen, Jassy is listed in the To: or CC: line in less than 4%, "with most of his responses spanning one word." (*Id*.).  For example, though Plaintiff finds it significant that Jassy was copied on two email threads discussing "S3 Daily Metrics" in August and October 2007, Jassy merely responded to one with "I love the beginning of the month!  congrats ███████," and to another with "Nice!!"  (Doc. 351, at 10; Doc. 351-18; Doc. 351-19).  Defendant says even the more substantive emails reflect that Jassy was involved at a very high level.  (*See* Doc. 351-22, at 4, 9/21/2007 Email from A.

---

because it did not address the apex doctrine.  Rather, the court allowed the deposition of the defendant's CEO because she had information considered "relevant" "as that term is expansively defined in Rule 26."  *Johnson*, 242 F.R.D. at 485.

Jassy to D. Grismore, et al) (███████████████████████████████████████████████████████████████████); (Doc. 351-23, 1/18/2012 Email from A. Jassy to S. Sivasubramanian et al) (congratulating team members about the launch of DynamoDB and describing it as ███████████████████████████████████████████████████████████████████████████████.").

Plaintiff denies that it can reasonably get the information it needs from anyone but Jassy, who it says has unique knowledge about the early days of AWS, including "how the company was structured, how and what drove the early product development (including S3), projects, pricing, and metrics at the outset." (Doc. 351, at 14). Of course, this begs the question why Plaintiff waited more than two years to identify Jassy as a potential witness and email custodian. Plaintiff is correct that one proffered alternative witness, James Sorenson, was not an original S-Team member (Doc. 351, at 17), and another (Jeff Barr) testified at his recent deposition that he did not know how Jassy made decisions in the early days or how he built teams within AWS. (Doc. 379-2, at 10, 13, Barr Dep., at 96, 147). Nor was Barr involved in the design and development of Amazon S3 or DynamoDB. (*Id*. at 11-12, 15, Barr Dep., at 107-08, 278). But Vermeulen was present during the 2003 brainstorming session at Bezos's house that led to the creation of AWS and was part of the original S-Team, so he has knowledge of the company's origins along with Jassy. (Doc. 351-20, Barr Blog, at 3).

Plaintiff disagrees, citing Vermeulen's testimony that he and Jassy "came from very different directions with very different backgrounds." (Doc. 351-2, at 7, Vermeulen Dep., at 38). As Vermeulen testified, he is a "very technical person" while Jassy is a "business-oriented person." (*Id*.). Nevertheless, Vermeulen made clear that "the entire

team [had] full responsibility for the entire product." (*Id*.). Though Jassy had "more responsibility for overall thinking about what market segments we were going to approach" and "how we would position our products, what our pricing strategy would be" (*id*.), these are not topics Plaintiff attributed to Jassy in its Third Amended Initial Disclosures served on July 6, 2021. (Doc. 361-4, at 9) (stating that Jassy has knowledge about the "[h]istory of AWS and the development and launching of Amazon S3; benefits of speed, performance, scalability, and availability of S3."). And in those same disclosures, Plaintiff identified 12 other individuals as having knowledge about marketing, pricing, and pricing strategy, as well as speed, performance, scalability, and availability of S3. (*Id*. at 4-10).

Significantly, Plaintiff has served eight Rule 30(b)(6) deposition notices covering 90 topics, many of which Plaintiff now claims are uniquely within Jassy's knowledge. (Doc. 361, at 15; Doc. 384, at 2). For example, Topic 6 addresses "[t]he history of the development of the Accused Products, including Your decisions to develop [them] and . . . implement the Relevant Features." (Doc. 361-16, at 10). And Topic 28 addresses "[t]he pricing of the Accused Products, including the manner in which You derive or establish Your pricing and any analyses or studies associated with Your pricing." (*Id*. at 13). If Plaintiff can obtain the information it needs from Rule 30(b)(6) witnesses (as yet to be determined), then it cannot establish that Jassy has "unique" personal knowledge that is unavailable from other sources. *See, e.g., Hallmark Licensing LLC v. Dickens Inc.*, No. 17 C 2149, 2018 WL 6573435, at *5 (E.D.N.Y. Dec. 13, 2018) (denying motion to compel apex deposition where at least "some of the information sought will be addressed during the 30(b)(6) deposition, with a deponent who has the best knowledge.").

Plaintiff argues that Jassy is still "uniquely positioned to testify as to how and why" Amazon S3 became "critical to other services offered by AWS." (Doc. 351, at 14) (citing Doc. 351-2, 13-14, Vermeulen Dep., at 83-84). But the cited testimony from Vermeulen in no way establishes that Amazon S3 was critical to other AWS services, or that Jassy would have unique information in that regard. Vermeulen testified only that Amazon S3 is "valuable" and "useful" ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (Doc. 351-2, at 13, Vermeulen Dep., at 83).

Also unavailing is Plaintiff's theory that Jassy should be deposed simply because he "may have different facts or perspectives" than other witnesses. (Doc. 351, at 17) (citing *Mendez v. City of Chicago*, No. 18 C 5560, 2020 WL 3510692 (N.D. Ill. June 29, 2020)). If all a party needed to show under the apex doctrine was that a high-level executive has a different perspective from other witnesses, then such executives could routinely be deposed. But the caselaw does not support such a rule. Indeed the *Mendez* court did not address the apex doctrine at all; it merely allowed the defendants to depose a child who personally witnessed an encounter between the plaintiffs (the child's parents) and the defendant officers while they were executing a search warrant. 2020 WL 3510692, at *2. The plaintiffs objected that the child's testimony was unnecessary in light of an interview he gave about the incident to CBS News, but the court found it significant that the child had offered "contradictory statements regarding the subject encounter" which the defendants were "entitled to explore." *Id*. Nothing in *Mendez* supports Plaintiff's request to depose Jassy.

Even if much of Jassy's knowledge about AWS is not entirely unique, there is at least one topic about which it appears he may have unique knowledge: his creation of the

15

"six-pager" setting forth the vision for AWS. *See In re Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, No. 3:12-MD-02385-DRH-SCW, 2014 WL 257566, at *2-3 (S.D. Ill. Jan. 23, 20014) (denying motion for protective order where apex deponent had "first-hand, nonrepetitive knowledge of facts at issue in th[e] case."). As noted earlier, Defendant insists the document is irrelevant because it predates the 2006 launch date of Amazon S3 – and the existence of the accused products – by some three years. (Doc. 361, at 19). This Court already has overruled that objection and ordered Defendant to produce this document that reportedly lays out the foundation of the company that led to the development of the accused Amazon S3 product. Whether the document contains any specific information about the accused products that will be helpful to Plaintiff remains to be seen.

Without that information, Plaintiff's rationale for needing to depose Jassy about the content or creation of the "six-pager" is speculative. Plaintiff says it wants to question Jassy about "what prompted the drafting of the document, who was involved in it, when and to whom the document was presented, who was involved in executing the items therein, and whether and how the ideas manifested themselves in the development of AWS and the accused S3 product." (Doc. 351, at 14). But without knowing the specific content of the document, Plaintiff is hard-pressed to persuasively argue (and this Court to find) that Jassy's testimony about the six-pager would be probative of matters at issue in this lawsuit, and that the information sought could not be obtained from other witnesses. Plaintiff also says "[t]he creation and promulgation of this document are relevant to understanding the business incentives, profits and design decisions, corporate genesis, and corporate structure of the Defendant." (Doc. 351, at 14). This broad statement is

equally unhelpful. Plaintiff fails to explain, for example, what it is seeking to learn about Defendant's "corporate structure," how that information bears on the issues in dispute in the lawsuit, and why the information cannot be obtained through other witnesses.

For these reasons, Plaintiff's motion to compel Jassy to sit for a deposition is denied. But that denial is without prejudice. If, after reviewing the "six-pager" and completing the Rule 30(b)(6) and other depositions, Plaintiff is able to demonstrate that it has been unable to obtain information on specific topics that bear on the elements of the claims or the alleged damages, and that Jassy has unique knowledge of this information, the motion may be renewed. If that happens, the Court will consider 'the totality of the circumstances, weighing the value of the material sought against the burden of providing it, and taking into account society's interest in furthering the truthseeking function in the particular case before the court.'" *In re Pradaxa*, 2014 WL 257566, at *2 (quoting *Patterson v. Amery Dennison Corp.*, 281 F.3d 676, 681 (7th Cir. 2002)). *See also Nucap Indus. Inc.*, 2017 WL 6059770, at *4 (quoting *Serrano v. Cintas Corp.*, 699 F.3d 884, 901 (6th Cir. 2012)) (the key consideration is "the executive's knowledge of relevant information. Discovery has limits which 'grow more formidable as the showing of need decreases.'").[5]

## CONCLUSION

For the reasons stated above, Plaintiff's Motion to Compel Discovery of Andrew Jassy [351, 352] is granted in part and denied without prejudice in part.

---

[5] In light of this ruling, the Court need not address Defendant's argument that requiring Jassy to sit for a deposition would impose a hardship in light of his other duties. *DeLeon-Reyes*, 2021 WL 3109662, at *3. If the motion is re-filed, Defendant will be required to address this issue with specificity.

ENTER:

Dated:  October 15, 2021

_____
SHEILA FINNEGAN
United States Magistrate Judge

18