```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
     KOVE IO, INC.,                 )
 4                                  )
                      Plaintiff,    )   Docket No. 18 C 8175
 5                                  )
                vs.                 )
 6                                  )
     AMAZON WEB SERVICES, INC.,     )   Chicago, Illinois
 7                                  )   July 23, 2021
                      Defendant.    )   9:37 a.m.
 8

 9              TRANSCRIPT OF PROCEEDINGS - Hearing
        BEFORE THE HONORABLE CHIEF JUDGE REBECCA R. PALLMEYER
10
     APPEARANCES:
11
     For the Plaintiff:        REICHMAN JORGENSON LEHMAN
12                               & FELDBERG LLP
                               BY:  MR. JAIME F. CARDENAS-NAVIA
13                                  MS. KHUE HOANG
                               750 3rd Avenue, Suite 2400
14                             New York, New York  10017

15                             REICHMAN JORGENSEN LEHMAN
                                 & FELDBERG LLP
16                             BY:  MR. ADAM ADLER
                               1710 Rhode Island Ave. NW, 12th Floor
17                             Washington, DC  20036

18                             REICHMAN JORGENSEN LEHMAN
                                 & FELDBERG LLP
19                             BY:  MS. TAYLOR MAUZE
                               100 Marine Parkway, Suite 300
20                             Redwood Shores, California  94065

21   For the Defendant:        FISCH SIGLER LLP
                               BY:  MR. ALAN M. FISCH
22                                  MR. R. WILLIAM SIGLER
                                    MR. ADAM ALLGOOD
23                                  MS. ELIZABETH BERNARD
                               5301 Wisconsin Avenue NW, Fourth Floor
24                             Washington, DC  20015

25
```

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Court Reporter:           FRANCES WARD, CSR, RPR, RMR, FCRR
23                        Official Court Reporter
                        219 S. Dearborn Street, Suite 2524A
24                        Chicago, Illinois  60604
                        (312) 435-5561
25                        frances_ward@ilnd.uscourts.gov

```
 1              (The following proceedings were had via
 2    videoconference:)
 3              THE CLERK:  18 C 8175, Kove versus Amazon Web
 4    Services.  Claim construction hearing.
 5              THE COURT:  Good morning.
 6              Let me get your appearances for the record.  We
 7    will begin with Kove.
 8              MS. HOANG:  Good morning, your Honor.
 9              This is Khue Hoang on behalf of the plaintiff, Kove
10    IO.
11              I have with me Jaime Cardenas-Navia, Adam Adler,
12    Taylor Mauze.
13              THE COURT:  Good morning.
14              And for Amazon Web Services?
15              MR. FISCH:  Thank you, your Honor.  Good morning.
16              This is Alan Fisch on behalf of Amazon.  I am
17    joined by Elizabeth Bernard, Adam Allgood, and R. William
18    Sigler.
19              THE COURT:  Okay.  Great.
20              All right.  Well, we have the case set for a claims
21    construction hearing this morning.
22              I had -- I'm sorry I had to move you around more
23    than once.  I know originally we were set for April.  And
24    then once that trial went away, you had already -- we had to
25    reschedule until July, but we are good to go today.  And then
```

1    I also moved the case start time, but I am glad that you are

2    ready to proceed.

3            I have seen the demonstrative exhibits that were

4    submitted in a Dropbox submission earlier this week and,

5    despite my poor tech skills, had absolutely no trouble

6    opening those and looking at them.  So I appreciate it.

7            So we are ready to get started whenever you are.

8            MS. HOANG:  If I may, your Honor?

9            Kove has prepared a short tutorial.  And if it's

10   okay with your Honor, I would like to share my screen.  There

11   are some animations there that the Court might find

12   illuminating.

13           THE COURT:  Great.

14           MS. HOANG:  You should have a hard copy in PDF that

15   leads to this slide.  So if I can get this to work, I will

16   pull up our tutorial.

17           Is everyone able to see my screen?

18           THE COURT:  I see it now.

19           MS. HOANG:  Okay.  Terrific.  All right.  I will

20   keep going.

21           Good morning, your Honor.

22           Again, this is Khue Hoang on behalf of Kove IO.

23           And may it please the Court, this is a technology

24   tutorial that will give a brief overview of the technology of

25   the patents-in-suit in this case.

1      We wanted to begin with sort of a contextual
2   background of the state of play when the inventors first
3   applied for their patent.

4      This is the late '90s.  The Internet was barely a
5   decade old.  Digital data, at least relatively speaking, was
6   pretty manageable.  You would store data on CDs, disks,
7   drives.  And single servers or small numbers of servers were
8   generally good enough to get the job done.

9      You did have to know where to look for your data,
10  and you had to go there to get it.  And it was into this
11  environment that Kove introduced ideas that would
12  revolutionize the way data was stored and retrieved.

13      Now, even 20 years ago data was growing very
14  quickly.  People still didn't have a solid grasp of just how
15  much and how quickly it would scale.  The cloud was still
16  years away.

17      But by 1998, the inventors predicted that data
18  would proliferate and grow so fast that storing and
19  retrieving it reliably and efficiently would require a new
20  way of doing things, and they were right.

21      I found this statistic to be sort of mind-boggling,
22  and it's 11 years old.  But in 2017, the estimate is that
23  there were two zettabytes of data.  That's 21 zeros.  That's
24  about six quadrillion books.  Again, that was a decade ago.
25  We are up to about 50 zettabytes today, and it's continuing

1 | to compound.

2 | So the three patents that are part of this

3 | litigation are all related to one another but in slightly

4 | different ways.

5 | The '640 patent, which was the first to debut, is

6 | what we call the parent patent.

7 | And the '170 is the child of that parent.  It

8 | shares an identical set of disclosures, specifications, and

9 | figures.

10 | The '978, the third patent, is related as well, and

11 | it shares some of the same disclosures, but it also adds

12 | additional material.

13 | We have made this little chart to sort of

14 | contextualize the relationships among the three patents that

15 | are in suit here.

16 | Now, the primary concept of the patent has to do

17 | with storing and retrieving data where the location of that

18 | data is managed separately from the data itself.

19 | You may recall that it's been a couple years now

20 | when the parties argued before the Court at the 101 hearing.

21 | Counsel for Kove talked about this idea, using the phrase

22 | "separating the what from the where."

23 | And this figure in the patent, which is common to

24 | all three patents, uses a high-level idea of what that looks

25 | like.

1              It talks about an architecture where the data

2   associated with particular applications can be managed and

3   obtained independently of the data itself.

4              You can see that in this figure where the data is

5   represented by the orange canister in the lower right, the

6   repository; and the location server, which manages the

7   location of that data, is depicted as that blue cloud.

8              We are going to get into more detail on those

9   relationships and what's inside that cloud in the next few

10   slides.

11              And just as a high-level starting point, I wanted

12   to put up here a representative claim.  This is Claim 1 from

13   the '170 patent.

14              And again, for a high-level context, you can see

15   that the claim claims, "A system for managing data stored in

16   a distributed network."

17              There are two primary elements with subelements.

18              The primary elements talk about a data repository,

19   which is that yellow canister -- or orange canister; and,

20   separately, a data location server network.  That's the blue

21   cloud.

22              Now we are going to dive a little bit deeper into

23   what each of those means.

24              We thought it would be helpful to just use an

25   example, and we are going to use a fellow by the name of

1   Mike.

2           And Mike, like most people, has a medical history,

3   health records that have been accumulated perhaps through the

4   years.  The health record is likely formed of lots of

5   different types of records obtained in lots of different

6   locations.  You could imagine hospital records, blood bank

7   records, X-ray records, et cetera.

8           Because he probably didn't go to just one country

9   doctor to have all of this done, these different providers --

10  excuse me? I heard a noise; sorry -- these different

11  providers have Mike's data, in all likelihood, in different

12  locations.  In order to depict that at a high level, we are

13  representing that as these five orange canisters, these five

14  repositories.

15          Of course, in a network environment, there aren't

16  just five.  There is lots.  So the question of the day is:

17  Where is Mike's data?  What's a good way, an efficient way,

18  and reliable way to find it?

19          Well, the patent provides some basic vocabulary,

20  which I'm going to walk through quickly to give everyone a

21  foundational set of words, which we will see over and over

22  again as we go through the rest of the tutorial and also the

23  claim construction arguments today.

24          Mike is known as the entity.  The patent teaches a

25  concept of a unique identifier or an identifier string,

1    sometimes referred to as a key.  For the purposes of this

2    analyses, we are going to say that that's Mike's social

3    security number.  It's a unique identifier that identifies

4    Mike and only Mike.

5             Mike's medical records, we will just call that

6    data.

7             The whereabouts of that data are called locations.

8    Simple enough.

9             Locations are stored on one or more location

10   servers.

11            And Mike or his doctors can use a client -- we will

12   see that as one of the claim terms -- to access that data by

13   querying the location server.

14            So with that basic vocabulary in mind, we will see

15   just how this works.  We have created a graphic here that

16   depicts the interplay, again, at a very high level among the

17   items we just heard about.

18            So Mike's social security number, his identifier,

19   is one primary component.  You have his data, which is

20   represented by these orange canisters.  And you have the

21   location servers that contain data location information.

22            Mike's data is stored across a network at various

23   locations.  His data is just his identifier.  Hi, I'm Mike.

24   This is my social security number.  You know I'm me, and each

25   of my pieces of data is going to be associated with me.

10

1    His identifier is mapped to the locations of his

2    data.  I will get into that in just a minute, but it's a

3    fundamental concept, that the identifier is mapped to the

4    locations of his data.  And those locations are maintained on

5    location servers.

6    Mike uses his identifier to query the network to

7    find a location server that will return his data location.

8    And having that information, he can then access his data.

9    So (unintelligible) our analogy.  Mike's data is

10   represented by these five repositories.  They are stored

11   somewhere in the network, and they have locations.  Where is

12   the data?  That location is associated with Mike because

13   Mike's unique identifier is mapped (audio interruption).

14   Those mappings, that information is what's stored

15   on location servers.  Right?

16   If Mike wants to find his data, instead of having

17   to query that network and look around and perhaps assess each

18   individual repository, which is a time-consuming and possibly

19   not terribly reliable technique, he can instead, as the

20   patent teaches, use his social security number to send a

21   query to the location server and say, I'm Mike.  Where is my

22   data?

23   Now, of course, in the cloud, in a network, there's

24   lots of location servers.  There's lots of people, and

25   there's lots of data.  Which location server has Mike's

11

1     identifier location information?  The patent teaches that as

2     well.  It does so -- again, I'm referring back to this

3     high-level Figure 11.  It does so in a variety of ways.

4           One technique that the patent can use is that

5     Mike's unique identifier, his social security number, can be

6     run through a function, and the output of that function will

7     take him to his location server.  You will hear a little bit

8     more detail about this in one of the claim terms.  The patent

9     provides a lot of specificity and detail.  But this is one

10    technique that it teaches for getting from Mike's unique

11    identifier to the appropriate location server.

12          Another technique that the patent teaches is, again

13    using Mike's unique identifier, run through, in this

14    instance, a hash function.  And the output of that hash

15    function provides indices, and the indexes are indexed into a

16    hash table.

17          And you can see that here.  You take Mike's unique

18    identifier.  You run it through a hash function.  The output

19    of that hash function, in this example, (inaudible).  Two in

20    the hash table is associated with a particular value.  You

21    will see that in the far right column.  There is a key value

22    there.  And that provides the location server information for

23    Mike's data.

24          The same hash function, as the patent teaches, can

25    be used for a lot of people's unique identifiers.  And the

12

1  outputs of their hash functions will provide indices into the
2  hash table as well.

3  So applying this to Claim 1 of the '170 patent
4  again, what you see is the data repository configured to
5  store data identity, orange canisters; the data location
6  server network comprising a plurality of data location
7  servers, green boxes; and it walks you through each of the
8  steps, the association between -- the association between the
9  identifier, the data, and the location server.

10  And it talks about, in this particular instance,
11  the use of a hash function to find the data location server
12  or give an identifier, in this case, in our analyses, Mike.

13  Now, the patent also has claims that require use of
14  a redirect message.  The patent teaches what that is.  This
15  is just a technique that enables clients looking for their
16  data to be redirected to the server that contains that
17  information if the original server doesn't have it.

18  And this is how it works.  The client; i.e., Mike,
19  will send a first request to the server constellation.  In
20  this case, server zero.  That first request will say, where
21  is my data?  Here is my unique identifier.  My data.

22  If server zero is not associated with Mike, then it
23  will send a response, or redirect message, directing Mike to
24  the right location server.  Mike can put the information in
25  that redirect message and send a query to the correct server.

1 And that server will respond with his data location
2 information.
3 Now, this entire time we have been talking about it
4 in the context of receiving data or getting data.  The same
5 technique can be used for putting data into the network,
6 adding it.
7 You can see the steps are analogous here.  So let's
8 say Mike wants to add some data.  He sends a request to the
9 server saying, please add this new data.
10 If that server -- quote, unquote -- owns his
11 identifier, meaning it has the information associated with
12 Mike, he will just return an acknowledgment saying, I got it.
13 Add it.
14 If it does not, then it will return a redirect
15 message with the relevant information to say, not me.  Go to
16 Server 1, and it continues.
17 Claim 15 of the '170 patent is an example of this
18 redirect method.  You can see the claims method talks about,
19 again, the particulars of the association between the
20 identifier, the data location, and data location server.  And
21 then if the query is to the right server, it will just send a
22 response with the requested information.  If it's not, then
23 it will send a redirect message.
24 Now, I had mentioned earlier that the '978 patent,
25 while related, does include a new disclosure.  And among that

1   is this concept of failing to respond to performance and

2   logistical requirements in the system.

3        It's not terribly difficult to imagine that, with

4   -- what did I say? -- zettabytes of data or trillions of

5   bytes of data, you will run out of room.  And servers can

6   suffer performance fast if they are overstressed or

7   overloaded.

8        So the '978 patent teaches techniques for

9   distributing the information load on any given server and

10  organizing the location servers to allow that.

11       Here is an example.  The patent teaches, in this

12  case, five location servers configured in a particular way.

13  There are other ways to configure them as well.  This is just

14  one example.

15       And as I mentioned, as data grows, the demand on

16  any given server increases, and that could really affect its

17  performance and ability to deliver.

18       So how do you permit failing?  How do you permit

19  data to grow without sacrificing performance?

20       The patent provides an example of this.  I will

21  refer back to Figure 22 of the '978 patent.  Let's just say

22  you have a location server in that network, in that blue

23  cloud.  That's Server 1.  It has multiple sets of location

24  data in it.

25       The patent talks about being able to off-load or

1    split that into a different server, an associated server.

2            So in this instance, if you have Sets A and B -- a

3    whole nother explanation for Set B, which isn't really

4    relevant to my example here, so I won't discuss that.  But if

5    you have multiple sets of data -- A and B, for example -- you

6    can split them.  You can offload one set to Server 2.  And

7    Server 2 will then have Set B, and Server 1 will have less to

8    deal with, with only Set A.

9            Claim 17 of the '978 patent is an example of that.

10   It's, "A method of scaling at least one of capacity and

11   transaction rate capability in a location server" network.

12   And it talks about, again, the association among them.  It

13   requires a scenario where, if you want to add another set of

14   information to the server but adding it violates or exceeds

15   some performance limit, it claims transferring that to a

16   second data location server.  So this is just an example of

17   the splitting or the off-loading that I just discussed.

18            That actually takes us to the end of the tutorial.

19            So unless your Honor has any questions for me, I

20   think we can move on to the claim construction argument.

21            THE COURT:  I think that was great.  That was quite

22   helpful.

23            I am ready to move on to the claims construction

24   argument unless somebody on the other side has a comment to

25   make right now about the tutorial.

16

1       MR. FISCH:  Good morning, your Honor.  This is Alan

2   Fisch again.

3       We have integrated our technology tutorial

4   contemporaneous with each of the subarguments.  So your Honor

5   will be hearing our implementation of the technology tutorial

6   with each of the arguments.  And we welcome the opportunity

7   to answer any additional questions you may have about the

8   core technology in that context, your Honor.

9       THE COURT:  Okay.  Great.

10      Well, for now, that was, even for me, relatively

11  straightforward.  So I think we can move on to the claims

12  construction and take up comments as you want to present

13  them.  This looks good.

14      MS. HOANG:  Terrific.  I will stop sharing my

15  screen now.

16      THE COURT:  Okay.

17      MR. CARDENAS-NAVIA:  I will start sharing my

18  screen.

19      THE COURT:  All right.

20      MR. CARDENAS-NAVIA:  Can everyone see my

21  presentation?

22      THE COURT:  Yes.

23      MS. HOANG:  Yes.

24      MR. CARDENAS-NAVIA:  Okay.  Jaime Cardenas-Navia on

25  behalf of the plaintiff, Kove.

1      May it please the Court?

2      I want to start by summarizing the state of claim

3   construction.

4      The parties have agreed upon the construction of

5   five of the claim terms, and the parties still dispute six

6   claim terms, which will be argued today.

7      One thing I wanted to note is that AWS had

8   initially raised an argument that one of the claims was

9   indefinite.  AWS has since withdrawn that argument.  There

10   are currently no disputes about indefiniteness before the

11   Court.

12      For the Court's reference, we have included here in

13   our slide deck the constructions for the five agreed-upon

14   claim terms.

15      The first disputed claim term, Term No. 1, is

16   "location information."  This term appears in all three of

17   the patents.  And the parties agree on the construction of

18   this claim term for the '978 patent, but we disagree for the

19   '640 and '170 patents.

20      And essentially, AWS's position here is that the

21   same construction should be afforded across all three

22   patents, while Kove's position is that the '640 and the '170

23   patents assign one meaning to this term, but then

24   the '978 patent assigns a narrower meaning to this term.

25      So let me walk through why Kove has that view.

18

1           This is a version of the slide that shows the
2   relationship between the patents.  And importantly -- what's
3   important here is that the '640 and the '170 patents have the
4   exact same specifications, and that's because the '170 patent
5   is a continuation of the '640 patent.

6           By contrast, the '978 patent, which is represented
7   by the blue box on the right, is what's called a
8   continuation-in-part application.  It's a continuation in
9   part of the '640 patent.

10          It contains a lot of the same disclosure of the
11  '640 patent, but it also includes additional materials, and
12  these additional materials are important.  As I am going to
13  go through, these additional materials actually more narrowly
14  define that term "location information."

15          So I'm going to start my analysis with the '640 and
16  the '170 patents.  And as we stated in the brief, in these
17  patents there are actually two types of location information.

18          The first of these types, Type 1, is the location
19  of the data itself, which is often referred to as "the
20  location" or "a data location."

21          The second type, Type 2, is the identity of the
22  location server that stores a particular data location, and
23  this is often referred to as a "redirect information."

24          As was just described in the tutorial, these two
25  types of location information are the two types of

19

1    information that a location server can provide in response to

2    a request from a client.

3         So if the location server receives a request for

4    data locations and it has -- and it is storing those

5    requested locations, then it will provide them.  And that's

6    Type 1 location information.

7         If the location server doesn't have the requested

8    locations, then it will provide a redirect information.

9    That's Type 2.  And that's essentially:  I don't have it, but

10   here is the identity of the location server that should have

11   your data locations.

12        THE COURT:  So just let me ask.

13        So "redirect information" doesn't just mean, I

14   don't have it.  Go someplace else.

15        It means, I don't have it, but here is where you

16   can find it.

17        MR. CARDENAS-NAVIA:  That's exactly correct, your

18   Honor.

19        THE COURT:  All right.

20        MR. CARDENAS-NAVIA:  It isn't just, try again.

21        It's, here is information for you to go to the --

22   what should be the correct location.

23        THE COURT:  Okay.  Thanks.

24        MR. CARDENAS-NAVIA:  And, your Honor, Kove's

25   construction, as encompassing both types of location

1    information, is supported by the intrinsic evidence.  And a

2    prime example of that is Claims 1 and 5 of the '170 patent.

3    So looking here, this claim term uses the term "location

4    information" five different times.  And four of those times

5    "location information" is modified by this term "data" in

6    front of it.

7              And what that tells us is that when the patentee

8    wanted to refer to Type 1 location information, which are

9    data locations, it would do that by adding the word "data" in

10   front of "location information."

11             And we also see there is one instance where

12   "location information" is not modified with "data."  And that

13   tells us the patentee, when they wanted to refer to "location

14   information" in its more broad form, would do that as well.

15             And then, if we turn to Claim 5, which depends from

16   Claim 1 of the '170 patent, we see that it further defines

17   what is part of the location information, the broader form of

18   location information.  And it defines it to include, among

19   other things, "at least one identifier of the at least one of

20   the plurality of data location servers."  That's the Type 2

21   location information.

22             So this supports Kove's construction, your Honor.

23   And the problem with AWS's construction is that it's too

24   narrow.  It actually is not broad enough to include this

25   Type 2 location information.  And it also actually can't

1    include anything else that's described here in Claim 5 as

2    being part of the location information.  That would be the

3    hash table as well as, within that hash table, an association

4    between the hash of the string identifier and the highlighted

5    portion, which is Type 2 location information.

6         So that reason alone is enough to exclude AWS's

7    construction.  It's in direct conflict with Claim 5 here.

8         In their brief, AWS kind of implies that Kove is

9    overrelying on Claim 5, but Claim 5 isn't the only support

10   for Kove's construction.

11        Here we have an excerpt in the specification of

12   both the '170 and '640 patents.  And it also supports Kove's

13   construction.

14        The pertinent part here is really the second

15   highlighted portion.  It says, "An NDTP_GET_RSP message" --

16   and what that is, it's a response message from a location

17   server.  And it "may contain any mixture of real data

18   location strings" -- that's Type 1 location information, data

19   locations -- "and NDTP server redirection pointers."  That's

20   Type 2 location information.  That's the redirect

21   information.

22        So what the specification is saying is that, in a

23   response message, you can have either Type 1 or Type 2, any

24   mixture of those.  And that's exactly consistent with Kove's

25   construction, which includes Type 1 and/or Type 2 location

22

1   information.  So this is further support for Kove's

2   construction.

3        Unless your Honor has any questions about the

4   '170 and '640 patents, I am going to turn now to

5   the '978 patent.

6        THE COURT:  That's fine.

7        MR. CARDENAS-NAVIA:  For the '978 patent, the

8   parties largely agree here, actually.  The parties agree on

9   what the construction should be, one or more identifiers and

10  their associated locations.

11       And the parties agree that in the '978 patent, the

12  patentee acted as a lexicographer and specifically defined

13  this term that had this meaning.

14       The parties did so with good reason.  Here we see

15  several excerpts from the specification, and in each of these

16  excerpts, the patentee describes "location information"

17  consistent with that definition.

18       One thing that's critical to note is that each of

19  these portions of the specification, these all only appear in

20  the '978 patent.  None of these excerpts appear in the '170

21  or the '640 patents.  It was part of that new material that

22  was added into the '978 patent.

23       If we turn to the claims of the '978 patent, they

24  again have this definitional language where they are

25  assigning a precise meaning to "location information."

1    Again, this language, which is in the claims, is neither in
2    the specification or claims of the '170 patent.

3            Now, AWS makes several arguments for why they
4    believe that the construction of the '978 patent should apply
5    to all three patents.  The primary argument is that the
6    patents are related, so there is a presumption that the same
7    meaning should apply across all claims.  And there is a
8    couple of issues with that, your Honor.

9            The first one is that it doesn't appear that their
10   cases apply to the situation.

11           If you look at their cases -- *OMEGA Engineering*,
12   and they also cite this *NTP* case -- they both involve
13   situations where a prosecution disclaimer argument was made
14   in the -- a parent application, and then there became a
15   presumption that that narrowing disclaimer in the parent
16   would apply to the same claim terms in the child application.
17   And that's just not what's going on here.  There is no
18   argument related to prosecution disclaimer.

19           The *NTP* case is similar with the parent-child
20   relationship as well there.

21           What we have here instead, your Honor, and what AWS
22   must effectively be arguing, is that language that only
23   appears in the '978 patent is somehow also binding on the
24   '170 and '640 patents, even though in the case of the
25   '640 patent it's actually the parent application.

1       And we just don't think that's possible.  It's

2   prime claim construction principle that claim terms are

3   interpreted in light of their intrinsic evidence.  And the

4   problem is, the '978 patent, the portions of its intrinsic

5   evidence that define "location information" are not in the

6   '170 or '640 patents.

7       So it seems to be an attempt to define location

8   information based on the intrinsic evidence of other patents.

9       In either case, your Honor, even if there is a

10  presumption for all the reasons I went through, it's

11  certainly overcome here.

12      And, in fact, we have a case here from this

13  district from years ago, *IP Innovation* case, and the facts

14  here are nearly identical.  There was a -- there were two

15  patents.  One was a continuation-in-part of the other.  And

16  both involved the word "voids."

17      One party was arguing that the patentee assigned

18  one particular meaning to the term "voids" in the parent

19  application and then narrowly defined it in the child

20  application.  That's the exact same arguments we are making

21  here.

22      And the court went through, analyzed.  And it

23  started with the parent patent, and it analyzed "voids."  And

24  it found that it was not expressly defined, so interpreted it

25  in light of the intrinsic evidence of that parent patent.

1          The court then looked at the continuation-in-part

2  patent, the child patent, and it found that there the

3  patentee had acted as a lexicographer and assigned a very

4  specific meaning to the term "void."

5          So based on that, the court assigned different

6  constructions to the terms in the two different patents.  The

7  court actually expressly noted that, to the extent there is

8  any presumption, it's overcome here in this case.  Again,

9  that's a highly similar case here.

10          Unless your Honor has any questions, I have nothing

11  further for now.  We will reserve time for rebuttal.

12          THE COURT:  Thank you.

13          Anything from Amazon on this?

14          MR. FISCH:  Yes, your Honor.

15          Again, Alan Fisch on behalf of Amazon.

16          Our presentation on the specific claim terms is

17  going to be split between Ms. Bernard and Mr. Allgood.  This

18  is a term that Ms. Bernard has prepared on.

19          If I may turn it over to her, your Honor?

20          THE COURT:  Fine.

21          Let me just point out, I really like it when you do

22  it this way, one and one.  I think that's very effective.  I

23  often encourage lawyers to try to break up the argument in

24  this way.  It makes it even easier for me later when I am

25  trying to remember how to analyze an issue.  So that's great.

1    All right.  Ms. Bernard, you are ready to hold

2    forth on "location information."

3    MS. BERNARD:  Yes.

4    Good morning, your Honor.  Thank you.

5    I will go ahead and share my screen.

6    Your Honor, can you see my screen?

7    THE COURT:  I can, and I think I saw a version of

8    this yesterday.  But, yes.

9    MS. BERNARD:  Thank you, your Honor.

10   As your Honor is aware, "location information" is a

11   term that appears in all three related patents in suit.

12   AWS asks the Court to construe "location

13   information" the same across all three patents-in-suit.

14   Kove proposes a different, broader construction for

15   two of the three patents that notably doesn't even require

16   location information to include a location.

17   Now, AWS's construction complies with the Federal

18   Circuit precedent as we see in the *OMEGA Engineering* case

19   that AWS cited in its opening brief as well as in its reply

20   brief.

21   Specifically, *OMEGA Engineering* confirms that the

22   Federal Circuit presumes, unless otherwise compelled, that

23   the same term in related patents should be construed the

24   same.

25   Now, that legal principle applies here.  Location

1    information should be construed the same across all three

2    related patents and as agreed to by the parties for the '978

3    patent.

4           Now, Kove didn't dispute the application of this

5    case until we saw that today.  And Kove never distinguished

6    this case in its briefing.  But now Kove claims that AWS's

7    cases don't apply, including *OMEGA Engineering*.  But Kove is

8    incorrect.

9           So though *OMEGA Engineering* did involve issues of

10   prosecution disclaimer, and it did involve the application of

11   this principle of patent law -- one that's applicable here --

12   notably *OMEGA Engineering* did address continuations in part

13   and apply the principle equally.

14          This was a new case.  This *IP Innovations* case that

15   we just saw cited on Slide 20 of its presentation itself, on

16   Page 7, cited to this exact principle and presumption from

17   *OMEGA Engineering*.

18          The court stated, "Courts presume that a claim term

19   carries the same meaning throughout a particular patent and

20   related patents, including a continuation in part."  And it

21   cited *OMEGA Engineering*, the same cite and page that we see

22   here on the slide.

23          So *OMEGA Engineering* isn't limited in its

24   applicability.

25          *IP Innovations*, also on Page 7, states that the

1    presumption of *OMEGA Engineering* may be overcome by evidence

2    that the patentee clearly assigned different meanings to a

3    term that appears in two related patents.

4    So while we agree that *OMEGA Engineering*'s

5    presumption can be overcome and the Court held that was the

6    case in the *IP Innovations* case that Kove now cites in its

7    presentation, here Kove hasn't provided the evidence to

8    overcome the *OMEGA Engineering* presumption, and nor can it.

9    Taking a look at the '978 patent specifications,

10   this patent specification contains express definitions for

11   several terms, many of which the parties are relying on for

12   claim construction as the patentee's express lexicography

13   across all three related patents.

14   Highlighted here --

15   THE COURT:  This is from '978, right?

16   MS. BERNARD:  This is from the '978 patent -- this

17   is in Column 4 -- where we see a passage that begins with the

18   first definition of "NDTP," the network distributed tracking

19   protocol.

20   And it defines it at the beginning of this passage

21   as "a transfer protocol having the capability to manipulate

22   location information used to efficiently track the location

23   of information associated with an individual entity."

24   Now, below that -- this is the beginning of the

25   passage in the '978 patent, Column 4 -- there are going to be

1    other explicit definitions that the patentee has provided,

2    and we are going to discuss those for other terms today.  But

3    "location information" isn't one of them.

4         Instead, moving on further in Claim 4 of the

5    '978 patent, the term "location information" is found where

6    the inventors explained that using the NDTP protocol, the

7    NDTP servers maintain location information in the form of a

8    list of location associations with an entity.

9         Now, heading to Claim 1 of the '978 patent, the

10   recitation that the location information comprises an

11   identifier and at least one location string associated with

12   that identifier.  The location string is specifying a

13   location of data.

14        So in accordance with the '978 patent

15   specification, NDTP is a protocol for maintaining or

16   manipulating location information, and the NDTP servers

17   maintain that information.  And location information

18   comprises an identifier and at least one location string that

19   specifies the location of the data.

20        So that context and discussion in the '978

21   specification are the examples that support the parties'

22   agreed construction of one or more identifiers in associated

23   locations for the '978 patent and location information.

24        Now, this agreed construction is not only

25   consistent with the plain meaning of the term "location

1    information" as it includes a location of the data, but also

2    from the meaning in the context of the patent that we just

3    saw.

4           But to note, there is no express definition in the

5    '978 patent for "location information" like we are going to

6    see for other terms throughout the course of the hearing

7    today or like what's found in the *IP Innovations* case that

8    Kove cited.

9           There is no definition that clearly demonstrates

10   the patentee was using the term "location information" in a

11   manner different than its ordinary meaning in the

12   '978 patent.  Nor is there any evidence that the inventors

13   were clearly assigning a different meaning to "location

14   information" in the '978 patent than in the '640 and the

15   '170 patent specifications.

16          For instance, taking a look at the background of

17   invention in the '640 patent specification -- and I will note

18   that the '640 patent and the '170 patent share the same

19   specifications, so I will be referring to the '640 patent

20   specification today.

21          And this was mentioned in the tech tutorial as

22   well.  The question, it said, that's being addressed by the

23   inventors is:  Where is the data?  Where is the data

24   associated with the particular entity in the distributed data

25   collection?

1       The data location identified by the inventors is a

2   key question in a distributed data system.

3       In view of this key question, in the brief summary

4   of invention in the '640 patent specification, the inventors

5   identified the invention as providing a network distributed

6   tracking wire transfer protocol.

7       This protocol includes two basic components:

8   Identification strings for specifying the identity of an

9   entity and location strings for specifying network locations

10  of data associated with that identifier.

11      The brief summary of the invention in Column 3 of

12  the '640 patent specification further confirms that the

13  protocol "efficiently manages mappings from one or more

14  identifier strings to zero or more location strings."

15      Now, your Honor, this language is very similar to

16  the parties' agreed construction for the '978 patent.  It's

17  also the same language that we saw of the '978 patent's

18  recitation of the location information that is efficiently

19  tracked by NDTP.

20      In the detailed description of the invention in the

21  '640 patent specification the inventors again confirmed that

22  the NDTP protocol of the invention "efficiently tracks the

23  location of data associated with an individual entity."

24      Again, this tracks the language from the

25  '978 patent specification that is the basis for the parties'

1    agreed construction and confirms yet again that the focus of

2    the invention of the '640 and '170 patent is to track the

3    location of data.

4         Furthermore, in the '640 patent, the NDTP server is

5    defined as maintaining the set of identifier/location

6    mappings that are returned in response to an NDTP request

7    from the NDTP client.  So although I haven't shown this on

8    the slide, this is the same definition of NDTP server that we

9    are going to see later from the '978 patent.

10        Also, this description in the '640 patent

11   specification aligns with what we saw in Column 4 of the

12   '978 patent specification that stated, "using NDTP, the NDTP

13   server maintains location information."

14        So while the '640 and the '170 patents don't use

15   the term "location information" in the specification

16   disclosure, it claims, and from the context of the patent

17   that we just saw, it's clear it has the same exact meaning as

18   "location information" in the '978 patent.

19        For instance, all patent specifications defined the

20   NDTP server the same way as maintaining the identifier

21   location mapping, and that's consistent with the '978 patent

22   and that's the location information.

23        So AWS's position here is that *OMEGA Engineering*

24   applies, and Kove hasn't overcome the presumption.

25   Therefore, the Court should adopt AWS's construction on that

33

1    basis as well as the support for AWS's construction in the

2    '640 and '170 patent specifications that we just saw.

3           Furthermore, it's clear that Kove's proposed

4    construction can't be correct, as it doesn't even require a

5    location for the term "location information" or any

6    association of the identifier and a location that's

7    repeatedly discussed as an invention in the patent

8    specification and that we saw in the tech tutorial earlier

9    today.

10          Kove's construction is much broader in ways not

11   supported by the specification, including the proposed

12   (unintelligible) "information pertaining to one or more

13   locations of data" and the inclusion of information

14   pertaining to "the identities of one or more location

15   servers."

16          Kove's main argument in trying to differentiate the

17   term "location information" from the '978 patent is that, in

18   the '640 patent and the '170 patent specifications, there are

19   two types of location information described in those patents.

20          Now, this is an excerpt from their brief, and we

21   just heard more about it today, so-called Type 1 and Type 2

22   for "location information."

23          Now, notably, Kove didn't provide any support in

24   the specification disclosure for two types of location

25   information.  Kove didn't provide any in its briefing.  And

34

1    what Kove discussed today doesn't show any support for
2    "location information" but just discuss redirect messages,
3    which is something separate, and we will demonstrate that
4    here today.

5           Now, Kove's support for its claim of the second
6    type of location information, as we saw, is focused on
7    Dependent Claim 5 of the '170 patent.

8           Now, as an initial point, your Honor, Claim 5 isn't
9    asserted in this case.  So it's unclear why it isn't
10   asserted, but this isn't a claim the parties have focused on
11   for purposes of infringement or invalidity issues, like
12   indefiniteness, written description, or enablement.

13          But AWS disagrees with Kove's interpretation of
14   Claim 5, and it -- that it provides any support for Kove's
15   claim construction for multiple reasons, as we discussed in
16   our reply brief.

17          But mostly there is no Type 1 or Type 2 location
18   information.  There is just Claim 1 of the '170 patent and
19   Claim 5, which is a dependent claim that adds a limitation.
20   Claim 5 adds a limitation not in Claim 1.

21          So "location information" doesn't have to be
22   broader to encompass the new limitation in Claim 5.  Claim 5
23   is a stand-alone claim and system.

24          And AWS doesn't believe that the single unasserted
25   claim provides support to redefine the term "location

1    information" as it's used in the specifications and to

2    overcome the *OMEGA Engineering* (unintelligible).

3            And we believe that it certainly doesn't provide

4    any support for Kove's broader "information pertaining to"

5    language that doesn't even include any location.

6            And we think Claim 15 of the '170 patent, which is

7    asserted and is a claim that the jury will need to address in

8    this case, not only provides support for AWS's position but

9    shows why Kove's two types of location information isn't

10   correct.

11           So Claim 15 demonstrates that the location

12   information as used in the '640 patent and the '170 patent,

13   just like the '978 patent, identifies the location of the

14   data, not a location of the location or the identity of the

15   location server.  That's separate information.

16           So we see here in Claim 15, this is a claim

17   directed to, "A method of handling location queries in a

18   network, the network comprising a plurality of location

19   servers, including data location information."

20           And also, we see here in this claim, "location

21   information" is identifying a location of data.  Now, this

22   provides explicit further support for AWS's construction as

23   it includes a location of data and explicitly defines

24   "location information" as identifying a location of the data

25   in the '170 patent.

1        Next in the claim's method, there is a step of
2    determining which of a plurality of location servers includes
3    the location information.  And one of two things is going to
4    happen according to the claims method, depending on whether
5    the determined location server has the location information.

6        If the location server does have the location
7    information, a location response message is sent to the
8    client that includes the location information.  Again, that
9    will be location information identifying a location of the
10   data.

11       If the location server doesn't have the location
12   information, a redirect message is sent to the client
13   identifying which of the location servers includes the
14   location information.

15       So Claim 15 demonstrates, your Honor, that any
16   location of the location or identity of the server or this
17   redirect information that is in a redirect information is
18   separate from the location information that identifies the
19   location of the data.  And that's consistent with AWS's
20   construction.

21       So in sum, *OMEGA Engineering*'s principle and
22   presumption applies here to the term "location information,"
23   and Kove hasn't provided any evidence that the patent clearly
24   assigns different meanings to the term "location
25   information."  And there is no support for two types of

1    location information in the '640 and the '170 patent

2    specifications.

3         But even so, again, Kove's construction is even

4    broader than these just two types of location information.

5    What "information pertaining to" encompasses is unclear.

6    There is no evidence in the intrinsic record that suggests

7    such a broad meaning.

8         Thus, not only is it confusing for the jury to have

9    to apply two different constructions for "location

10   information" across the claims, it's unclear how to apply

11   Kove's construction.

12        AWS's construction is clear, includes a location

13   consistent with the plain meaning of the term and is fully

14   supported by the specifications in the case law.

15        So for those reasons, we believe that the Court

16   should adopt AWS's construction.

17        So I am happy to answer any questions that the

18   Court may have at this time about this term.

19        THE COURT:  I don't have questions at this time.  I

20   want to thank you.

21        I think we can move to our next term.

22        MS. MAUZE:  Good morning, your Honor.

23        Taylor Mauze for Kove.

24        I have the next term.  And if you will permit me

25   some time to share my screen?

38

 1          THE COURT:  Sure.

 2      (Brief pause.)

 3          MS. MAUZE:  Okay.  Can everyone see my screen?

 4          THE COURT:  Yes, I can.

 5          MS. MAUZE:  Important.

 6          I have Term No. 2, "location server."  As you can

 7   see, this term appears in quite a lot of claims throughout

 8   the three patents.

 9          And Kove and AWS largely agree on the construction

10   which comes out of the patent, the patentee acted as

11   lexicographer, with the exception that Kove maintains that an

12   NDTP request message, as you can see in AWS's proposed

13   construction, requires a little bit of further construction

14   to prevent jury confusion.  This NDTP location substitute

15   doesn't change the scope of the claims, but is intended

16   really to prevent further construction down the line and

17   prevent jury confusion.

18          So as you can see, Claim 1 of the '978 patent uses

19   "location server."  And I'll make this brief because

20   Ms. Hoang went over this.  The location server is this green

21   box on the side and is really used to -- this one right here

22   (indicating) -- to manage location information.

23          So "location server" is the term that appears in

24   the claims, but we will start off talking about an NDTP

25   server, which the patentee defined as a "server" or a

1  location "network-attached component that maintains a set of

2  identifier/location mappings that are modified or returned in

3  response to NDTP request messages."

4         And you will note that this definition is the

5  definition that the parties are discussing in their proposed

6  constructions, and we will discuss NDTP request messages in a

7  second.

8         The definition of "NDTP server" is functionally the

9  same as a "location server," which -- on this next slide you

10  will see an NDTP server has these four main functionalities

11  and a location server has the same functionalities.

12         So we will go through them one by one now.

13         On the right side you'll see that an NDTP server is

14  a network-attached component; and on the left side, a

15  location server is also in a network.

16         On the right side, you can see that an NDTP server

17  maintains a set of identifier/location mappings.  And on the

18  left side, a location server, which -- as you can see, my

19  pointer is right here (indicating) -- contains location

20  information correlating or mapped to identifiers.

21         On the next slide, an NDTP server modifies or

22  returns these mappings.  And on the left side, you can see

23  that a location server does the same thing.  A location

24  server -- right here (indicating) -- transports or

25  manipulates this information and sends it.

1    And an NDTP server does this in response to NDTP

2  request messages, which -- right here (indicating) you see a

3  location query or an NDTP request message right here as well

4  (indicating), and this is what is done in response.

5    So you can see on the slide the functional

6  differences between these two.

7    And the parties agree on this point, that a

8  location server and an NDTP server are used interchangeably

9  in the patent but disagree as to whether or not this NDTP

10  request message right here (indicating) should properly be

11  construed as a location request message.  And Kove maintains

12  that it can and that it doesn't change the scope of the

13  claim.

14    So here, once again, is the definition that when

15  the patentee acted as lexicographer.  And here you will see

16  that what NDTP is requesting is a location.  As Ms. Bernard

17  went through, an NDTP, network distributed tracking protocol,

18  which is used essentially as a tool to request a location.

19    And on this slide you will see an example of an

20  NDTP request, known as a "get request."  A get request --

21  Ms. Hoang went over this in her tech tutorial -- is really

22  getting location information, as you can see right here.

23    At the bottom you can see that a query of an NDTP

24  server or an NDTP request is really sending back, is asking

25  for and receiving locations.

1    And on this next slide you will see two more

2    examples of NDTP requests that are given in the patent.  An

3    NDTP put, which is putting someplace in a location; and an

4    NDTP delete, which is deleting a location.

5    So Kove's position is that an NDTP server is the

6    location server and that, similarly, the NDTP request message

7    is the location request message.

8    And unless the Court has any questions, that's my

9    presentation on server -- "location server."  I will save

10   some time for rebuttal.

11   THE COURT:  Okay.

12   MS. BERNARD:  Your Honor, this is Elizabeth

13   Bernard.  I will handle this term for AWS.

14   I will go ahead and share my screen.

15   So "location server" is, again, another term that

16   appears in all of the related patents and several asserted

17   claims.

18   But unlike "location information," the parties

19   agree that the term should be construed the same across all

20   three related patents.

21   The dispute here between the parties for the Court

22   to resolve is whether Kove can replace the term "NDTP" in the

23   inventors' express definition with "location."

24   The case law regarding lexicography is clear and

25   Kove's construction is improper.

1          The *Martek* case, for example, is a case that was

2    cited by Kove in its response brief for the legal principle

3    that the lexicography of the inventors controls.

4          And like here, in the *Martek* case, as shown on the

5    slide, the court found that *Martek* explicitly defines the

6    term "animal" in the patent, and the court found that

7    definition controls.

8          AWS asks the Court to apply the law in the federal

9    circuit and construe this term consistent with the inventors'

10   intended definition as expressly defined in the

11   specification.

12         To the extent Kove argues that "location" is

13   synonymous with "NDTP," or that "NDTP" would require further

14   construction or is confusing, AWS disagrees.

15         "NDTP" doesn't mean location.  Location has a

16   separate agreed construction in this case.  "NDTP" itself is

17   a separately defined term, as we looked at earlier in our

18   discussion of "location information," is unquestionably a key

19   term to the invention of the patents.

20         First, just starting at the front of the

21   '640 patent, the title is "Network Distributed Tracking Wire

22   Transfer Protocol."

23         The abstract upfront identifies what the invention

24   is in terms of the network distributed wire transfer

25   protocol.

43

1          And as we saw earlier, NDTP is explicitly defined

2     in the '978 patent in Column 4.  And as both parties

3     recognize, the specification showed here, where the '978

4     patent expressly defines several terms, the parties both rely

5     on this passage from the '978 patent for the claim

6     construction proposals.

7          Further on down the passage, the inventors' express

8     definition of "NDTP server" or "server" is found, and this is

9     AWS's construction, including the defined "NDTP request

10    messages."

11         In Kove's response brief, Kove cited to this

12    passage in the '978 patent.  And what Kove said about the

13    definitions in this passage was instructive.  Kove said the

14    definitions in this passage build on one another and even

15    identified the first defined term as "network distributed

16    tracking protocol," or "NDTP."

17         Kove, therefore, recognized that the definitions

18    are largely focused on the relationships between one another

19    because these terms, like "NDTP," represent the building

20    blocks of the actual claimed system.

21         And Kove concluded that "describing their

22    relationships to one another is essential to explaining how

23    the system works."

24         So the system, the invention, is the NDTP and its

25    architecture, as defined in the patent specification.

1    The NDTP request messages as cited in the

2    definition of "NDTP server" constitute a part of this NDTP

3    invention, the system, and architecture.

4    So it's AWS's position that these definitions are

5    controlling and shouldn't be changed.

6    And to the extent claims that NDTP can't be

7    explained to a jury or requires construction itself, as we

8    saw, it's defined in the specification, and Kove said it was

9    defined in its briefings to the Court.

10    And as we see here, Kove's expert indicated that he

11    could explain NDTP to a jury.  So AWS's proposed construction

12    remains true to the lexicography of the inventors in the

13    essential definitions of NDTP, in the invention, and its

14    architecture.  And it's not confusing, as NDTP is defined in

15    the specification, and can be explained to the jury.

16    So unless there are any questions from the Court --

17    THE COURT:  No.  I'm making notes here.  Just

18    writing some things down.

19    Okay.  I think we are ready.

20    Is this a good time for a short break?

21    MR. FISCH:  Your Honor, this is Alan Fisch.

22    If the Court would like to take a break, this would

23    be a natural place for it, your Honor.

24    THE COURT:  Why don't we just take five minutes.  I

25    am going to get coffee, and I will be right back.  Thanks.

1      MR. FISCH:  Thank you.

2          (A brief recess was taken at 10:37 a.m.)

3      THE COURT:  Everybody back in action?  I don't mean

4  to rush anybody.

5      MR. FISCH:  Your Honor, Amazon is prepared to

6  proceed.

7      THE COURT:  Okay.

8      Ms. Hoang, your team all back in place?  It looks

9  like they are.

10      MS. HOANG:  Yes, your Honor.

11      I am going to ask Ms. Mauze if she has any -- we

12  didn't know, your Honor, if you wanted to save rebuttal until

13  the very end, for whatever reason.  Is it appropriate to --

14      THE COURT:  Either way.

15      Rebuttal right now is fine.  If Ms. Mauze wants to

16  weigh in on that, that's fine.

17      MS. HOANG:  Thank you, your Honor.

18      MS. MAUZE:  Your Honor, Ms. Mauze for Kove.  Taylor

19  Mauze.  Excuse me.

20      I wanted to point to three points on the "location

21  server" term.

22      First off, Kove doesn't maintain that an NDTP

23  request message is an improper construction, just that this

24  would kick the can down the road to permit further

25  construction later.

46

1          NDTP request message, much like NDTP server and

2     location server, are synonymous.  Both constructions are

3     correct, but one of them is much easier for a jury to see.

4          And the fact that Dr. Goodrich can testify as to

5     what an NDTP request message is doesn't change this.  It

6     would be much simpler to construe the term now to another

7     proper location request message.  It's easier for the jury to

8     understand.

9          The other thing is, Kove isn't of the mind that

10    NDTP and the location are always synonymous, but when NDTP is

11    used as a modifier as "NDTP server" or "NDTP request

12    message," really what is being used is to garner a location.

13         And finally, Ms. Bernard pointed you to a *Martek*

14    case, and that case is fully consistent with Kove's position.

15         In *Martek*, the patentee had acted as lexicographer,

16    and the opposing party had actually sought to import a

17    limitation that had not been supported in this fact into that

18    construction.  That is the portion of the construed term that

19    the Federal Circuit said was improper.

20         THE COURT:  Okay.  Thanks.

21         MS. MAUZE:  So --

22         THE COURT:  I'm sorry.  I didn't mean to cut you

23    off.

24         MS. MAUZE:  I was going to say, if you are ready to

25    move to the next term, I will share my screen for that term

47

1    as well.

2              THE COURT:  Sure.  This is the third of our terms,

3    right?

4              MS. MAUZE:  Yes, your Honor.

5              MR. CARDENAS-NAVIA:  Your Honor, may I interject?

6              If your Honor is willing, I did have some rebuttal

7    for the first term, "location information."

8              THE COURT:  Yes, We can back up to that.  I think

9    that's a good idea.  I could have invited you earlier, but

10   let's get it straightened out now.

11             So if you want to go back to rebuttal on the first

12   term, the "location information" term, let me go back to my

13   notes on that.  Okay.

14             MR. CARDENAS-NAVIA:  Thank you, your Honor.

15             Let me pull up that slide.  Your Honor, I just had

16   a couple of points.

17             During AWS counsel's presentation, they went

18   through a variety of intrinsic evidence.  And I just wanted

19   to point out that none of the intrinsic evidence AWS's

20   counsel put up is inconsistent with Kove's construction for

21   "location information" for the '170 and '640 patents.

22             The intrinsic evidence that was shown, it generally

23   shows that type -- the importance of Type 1 location

24   information, which, of course, Kove's construction includes.

25   Nothing that AWS's counsel put up was in any way

1    contradictory to the idea that Type 2 information can also be

2    included.  That's Point 1.

3            Number 2 is that AWS's counsel did not provide any

4    explanation for how to square their construction with

5    Claim 5.  All they did was criticize Claim 5.

6            And the fact that Claim 5 is not asserted in this

7    litigation is legally irrelevant to its impact on any claim

8    construction analysis.  So that's not a reason to ignore

9    Claim 5.

10           Another thing I wanted to point out is that counsel

11   put up Claim 15 of the '170 patent and pointed out that in

12   Claim 15 there is a description of performing a redirect.

13   That does not specifically mention location information.

14           THE COURT:  Right.

15           MR. CARDENAS-NAVIA:  And again, that's not

16   inconsistent with, in some embodiments, the redirect

17   information being part of the location information.

18           In fact, in that portion of the specification that

19   I put up, it showed one embodiment where location -- data

20   location and redirect information were treated together.  But

21   directly following that, there is embodiments where redirect

22   information is treated separately.  And so that's what

23   Claim 15 is directed to.

24           But you have to take that into concert with

25   Claims 1 and 5, for example, where, in those embodiments,

49

1    "location information" includes both.

2            And so given all the intrinsic evidence, it points

3    to the conclusion that "location information" should be broad

4    enough to encompass both types of location information.

5            Another thing I wanted to point out, your Honor --

6    and this relates to the slide up here -- is that counsel

7    implied that our construction does not include data

8    locations.  That's not correct.  It does include data

9    locations, as well as the Type 2.

10           In fact, if you look at all the claims through

11   their language, they all end up requiring Type 1 location

12   information, because, for example, this modifier data.  And

13   they also include a lot of these relationships that counsel

14   said were absent from Kove's construction, such as the

15   relationship with the identifier string.

16           You see a couple lines in it says, "location

17   information associated with the identifier string."

18           So in these claims, as opposed to the '978

19   patent -- where in the '978 patent the patentee chose to, by

20   definition, tie locations to an identifier, that's not what

21   happened in this '170 and '640 patents.  "Location

22   information" was given a broader meaning, and then the

23   patentee would use additional wording in the claims

24   themselves to note all the required relationships.

25           Unless your Honor has any other questions, that's

1    it for now.

2            THE COURT:  All right.  Thanks.

3            And I will make sure that I call for rebuttal after

4    AWS's response to the remaining terms, which are coming up

5    right now.

6            Okay.  So the third -- I think we are up to the

7    third term.  And we will hear first from Kove and then from

8    AWS in a brief rebuttal.

9            MS. BERNARD:  Your Honor, I was wondering if I

10   could add a few points in response to Kove's rebuttal on

11   "location information"?

12           THE COURT:  Why don't we do surrebuttal all the way

13   at the end.

14           So, in other words, we will hear from each side --

15   first from Kove, then Amazon, and then Kove again.  And at

16   the end, if we need to do some surrebuttal on any of these

17   points, we can do that.

18           MS. BERNARD:  Okay.  Thank you, your Honor.

19           MS. MAUZE:  Your Honor, Taylor Mauze for Kove

20   again.

21           The next term is "client."

22           THE COURT:  Right.

23           MS. MAUZE:  And is my screen visible?

24           THE COURT:  Yes.  Wait.  Hold on.  Yes, it is.  It

25   is.

51

1          MS. MAUZE:  So the dispute over "client," which

2     also appears in all three asserted patents, is very similar

3     to the dispute over "location server," and that's that, when

4     "NDTP" is used as a modifier -- in "NDTP server" and in "NDTP

5     request messages," the exact two terms we discussed

6     previously, are respectively a location server and a location

7     request message.

8          And AWS -- so this construction that Kove and AWS

9     have is, because patentee acted as lexicographer, AWS

10    maintains that "client" should be afforded its plain and

11    ordinary meaning and, in the alternative, largely agrees with

12    the lexicography of the patentee.

13         So here is where the patentee acted as

14    lexicographer for a client and defined it in both the

15    '978 and the '170 and '640 patent specification, which, you

16    will recall, they share a specification.

17         And so the disputes right here are that an NDTP

18    server is a location server and an NDTP request message is a

19    location request message for the same reasons that we

20    previously discussed, which was that "NDTP server" and "NDTP

21    request message" are not improper constructions, but would be

22    much more confusing to a jury than the further proper

23    construction location request.

24         And there is one more dispute between the parties

25    that isn't apparent on the face of the proposed

1    constructions, but AWS maintains in the briefing that a

2    client should be limited to exclude software, and there is no

3    support in the specification for this.

4              So Kove has pointed out on the screen right here in

5    the '978 patent, "the client" is defined to be "any mechanism

6    capable of communicating with the NDTP server," and a person

7    of skill in the art just would not understand this to exclude

8    software.

9              And this is true of the '640 and the '170 patents

10   as well, where a client is defined as an "entity for

11   manipulating data in the distributed data collection," which,

12   once again, a person of skill in the art would not understand

13   to exclude software.

14             And Kove maintains that there is nowhere in the

15   specification that would exclude software for a client, but

16   should your Honor want to look to extrinsic evidence to

17   confirm this, you will see that -- you will recall that

18   "client" is defined as a component.  And these are

19   contemporaneous technical dictionaries, which show that a

20   person of skill in the art at the time would also understand

21   a component to include both hardware and software, or even

22   to -- right here (indicating) -- be software.

23             THE COURT:  Let me ask, do these computer

24   dictionaries also include the term "client"?

25             MS. MAUZE:  We operated off of the -- let me go

1    back on the slide -- the component, which is the -- right

2    here (indicating).

3              The definition of "component," because the patentee

4    acted as lexicographer, so a client is properly a

5    network-attached component, and component is what AWS

6    maintains must exclude software.

7              THE COURT:  Okay.  So that's why we are looking at

8    "component" as opposed to "client."

9              MS. MAUZE:  Yes, your Honor.

10             THE COURT:  Even from the beginning of the computer

11   age -- I'm old enough to remember it -- I always found it

12   peculiar that the term "client" -- I'm a lawyer, of course.

13   So I have a feeling -- I have an understanding what the word

14   "client" means.  And the meaning is so different in the

15   computer world.

16             I recognize it's -- we are all agreed here that

17   it's defined as "component" and "network-attached component,"

18   and then there are some other disputes about exactly what the

19   construction should say.

20             But just an observation that "client" itself is an

21   odd term but has its uses that are quite different in network

22   talk than in talk about attorney-client relationships and the

23   like.

24             MS. MAUZE:  Right.  Sorry.

25             THE COURT:  No.  Go ahead.

54

1        MS. MAUZE:  AWS actually points that out, that
2   "client" is contact specific, because one of the investors so
3   testified that -- which is completely consistent with Kove's
4   position that we are not talking about an attorney-client
5   relationship right here.  We are talking about "client" as
6   used in the patents.  And as used in the patents, it's a
7   network-attached component . . .
8        THE COURT:  Okay.  So AWS response.
9        MS. BERNARD:  Yes, your Honor.  I will be handling
10  the response for AWS.
11       I will go ahead and share my screen.
12       THE COURT:  Sure.
13       MS. BERNARD:  For the term "client," AWS proposes
14  the plain and ordinary meaning as explained in its brief.
15       And the reason why AWS has proposed the plain and
16  ordinary meaning for "client" is because "client" has a
17  well-known and common use in computer science.  It has a
18  widely accepted meaning as a commonly understood term unlike
19  other terms that are defined in the patent, like "location
20  server," for example.
21       But if Kove claims that the client of these patents
22  isn't what is well understood by one of ordinary skill in the
23  art, brought narrower because the inventors defined "client"
24  in the specification, then "client" should be construed as
25  what is defined as the specific NDTP client in the

1    specification.

2         And again, as we discussed for the term "location

3    server," to the extent that Kove claims that "NDTP" is

4    synonymous with "location" or that "NDTP" as used as a

5    modifier is synonymous with "location," AWS agrees again

6    "NDTP" itself is specifically defined in the patent, and we

7    believe that this lexicography should control.

8         And also, I think it's worth mentioning to the

9    Court that the term "location request message" doesn't ever

10   appear in any of the patents-in-suit.  "NDTP request message"

11   appears throughout the specifications.  So we don't agree

12   that it's simply proper to replace "location" with "NDTP"

13   whenever "NDTP" is used as a modifier.  It has its own

14   meaning and "NDTP request messages" do as well.

15        Now, regarding Kove's argument on the term

16   "component," AWS doesn't believe this is a dispute for the

17   Court to resolve in claim construction.

18        The dispute here is whether the plain and ordinary

19   meaning of "client" should be used or, if the lexicography

20   controls, whether it should be the exact lexicography that we

21   see in the patent specifications.

22        Now, Kove hasn't asked the Court to construe a

23   separate component term or the actual term that we see in the

24   claim, which is "network-attached component."  Therefore, the

25   Court should decline any invitation to construe "component"

56

 1    in isolation.

 2            Now, to the extent the Court is inclined to

 3    construe "component," AWS asks the Court to do so with

 4    reference to the intrinsic record and not the extrinsic

 5    record.  And this is consistent with Kove's claim that the

 6    lexicography controls for the term "client" and not the plain

 7    and ordinary meaning.

 8            For example, Kove's Slide No. 39 shows examples

 9    from the specification for "client" that are hardware.  Kove

10    also, in its 101 briefing, identified from the specification

11    instances of the client being hardware.

12            So it's not AWS's position that "component" should

13    exclude software.  It's just that it must include hardware.

14            So unless the Court has any other questions for

15    AWS, we can move on.

16            THE COURT:  I want to hear a rebuttal from Kove, if

17    there is any.

18            Does the fact that AWS recognizes that "client"

19    does not exclude software make a difference at this point?

20            MS. MAUZE:  That "client" does not exclude

21    software --

22            THE COURT:  It doesn't exclude software.  It's just

23    that it should also include hardware.

24            MS. MAUZE:  Right.  Your Honor, the specification

25    is not so limiting.  It says "any mechanism," which could be

57

1    hardware, software, or any combination thereof.

2              And if you don't mind a few other points, so the

3    plain and ordinary meaning is not proper here because the

4    patentees' lexicography governs, as AWS mentions.  And AWS

5    pointed out as well that "location request message" is not

6    used in the specification, but this is because there are

7    multiple terms used in the specification.  Throughout you get

8    "location request message."

9              Earlier Kove pointed your Honor to an NDTP request

10   query, which is on Slide 35.  An "NDTP request message," a

11   "location query," an "NDTP query," all these terms are used

12   in the same way throughout.

13             And as to AWS's point that hardware must be

14   included, that requirement just is not in the specification

15   anywhere.  The component is just not -- the client is not so

16   limited.

17             THE COURT:  All right.  Anything further on that

18   term?

19        (No response.)

20             THE COURT:  We can go on to the fourth of the

21   disputed claim terms.

22        (Brief pause.)

23             THE COURT:  I think you maybe muted.  I'm not sure.

24   At least am not --

25             MR. ADLER:  It gets me every time.

58

1          THE COURT:  It gets everybody.

2          MR. ADLER:  Good afternoon, your Honor.

3          This is Adam Adler on behalf of Kove.

4          THE COURT:  Good afternoon.

5          MR. ADLER:  And I will be presenting the fourth

6     claim term.

7          I am pulling up my screen here now.

8          THE COURT:  Okay.

9          MR. ADLER:  All right.  And you should see Slide 43

10    up on the screen.

11          THE COURT:  Right.  Got it.

12          MR. ADLER:  Okay.  So the fourth claim term is

13    "based on a hash function used to organize the data location

14    information."  And there is a ". . ." there because the

15    actual claim term is quite long, as you can see on the

16    screen.

17          This slide shows the parties' respective

18    constructions of the term, and the highlights show how each

19    proposal differs from the original claim language.

20          Because the claim term is so long, I think it will

21    be helpful to kind of contextualize how the claim term fits

22    into the claim as a whole.

23          This is from Claim 1 of the '170 patent.  You saw

24    it earlier in the tech tutorial.

25          Just as a quick refresher, Claim 1 describes a

59

1    system for managing data that has two parts: A data
2    repository configured to store data, which was represented by
3    the orange canister in the tech tutorial; and then a data
4    location network, which is a group of location servers to
5    tell you where the data is located.

6              Now, the disputed claim term is part of that second
7    limitation, and it's in this lower paragraph at the bottom of
8    the slide.  And the disputed claim term relates to how the
9    location information is distributed across the various
10   location servers.

11             Now, both parties agree that the claim system uses
12   a hash function to organize data location information.  The
13   dispute relates to how hash functions organize the
14   information.

15             Under Kove's construction, the hash function is
16   used to organize the location information through a mapping
17   and, as this slide shows, through paraphrased constructions,
18   specifically "by mapping identifier strings to one or more
19   data location servers."

20             AWS's construction, on the other hand, requires
21   that, "The function result of the hash function organizes the
22   data location information by giving an index into a data
23   structure that provides the location of an indicated location
24   server."  And we will see what that means in just a moment.

25             I will start with Kove's construction, because the

1   idea that a hash function is used to organize the data

2   location information through a mapping is kind of embedded in

3   the DNA of the patent.

4          So the specification explains that, "The goal of

5   NDTP," which is the claim system, "is to support a network

6   service that efficiently manages mappings from each

7   individual key string, an identifier, to an arbitrary set of

8   strings, locations."

9          Elsewhere in the patent, the specification gives

10   specific examples -- a first server entity that maps

11   identifier strings from a client entity to location strings.

12   Likewise, a data repository entity that stores data, once

13   again, by mapping identification strings to location strings

14   associated with the first data repository.

15          So at a high level, the specification teaches that

16   mappings are what the patented system is about.

17          But the patent dives deeper and actually gives more

18   specific details through disclosed embodiments.  And

19   specifically, it describes two ways of performing this

20   mapping and two ways of performing the mapping specifically

21   using hash functions.

22          We can think of these as a direct mapping and an

23   indirect mapping.  Both are explicitly disclosed by the

24   specification.

25          You saw these briefly during the tech tutorial, but

1    here we are going to take a little bit of a deeper dive.

2           So direct mapping can be understood -- I made a

3    little example to help us understand.  Suppose you have got a

4    picture of Herbie, the Love Bug, and that picture is titled

5    "VolkswagenBug53.jpeg," and you want to know where to store

6    the location information for this Bug.

7           Under a direct mapping, you would take that file

8    name, which here we can call an identifier, sometimes might

9    be called a key, and we will put it through a hash function.

10   The output of that hash function in a direct mapping will be

11   the location itself or, rather, the location of the location

12   server.  So here you would know to go to vw.b53.com to look

13   up where that image is stored.

14          The patent calls this a second variant.  And to put

15   it in simple terms or to rephrase it -- simplify -- the

16   direct mapping basically takes a key or an object identifier,

17   and it uses a hash function to map it directly to a location

18   server.

19          And as I said before, the patent specification

20   explicitly lays this out.  It states that you can use a

21   general function, which is a function that can include a hash

22   function, and that the output of that function will be the

23   NDTP server URL.

24          This is what it was presented as in the tech

25   tutorial where we explained that you could map Mike's social

1  security number using a function to a specific location

2  server.

3           So that's direct mapping.

4           Indirect mapping is similar, but there is an

5  additional step.

6           So in indirect mapping, you still want to find

7  where the picture is stored.  And so you still want to map

8  the object identifier, the key, VolkswagenBug53.jpg, to a

9  location server.

10          Once again, you apply a hash function, except this

11  time the outcome of the hash function is different.  The

12  outcome of the -- the output of the hash function is not the

13  URL but is instead a number.  And that number correlates --

14  or corresponds to a particular row or index in a hash table.

15  Here it's Row 15, because here the hash function output is

16  15.  And that's how you know you go to Row 15 of the table,

17  and you end up at vw.b53.com, and you end up with a picture

18  of Herbie instead of a picture of Airforce 1 or Knight Rider

19  or Harry Potter's Nimbus 2000.

20          So again, to simplify, indirect mappings take a

21  key, and they map it to an index, and that index is then

22  associated with a particular location server.

23          Once again, this implementation with indirect

24  mapping is specifically culled out in the patent

25  specification.  This is the '170 patent at Column 15, Rows 4

1    to 17.  And the previous example was in the '170 patent at

2    Column 15, Rows 50 to 56.

3            And just to associate it in your mind with the tech

4    tutorial, this is the picture associated with indirect

5    mapping in the tech tutorial (indicating).

6            So at a high level, Kove's construction is

7    supported by the specification both broadly through

8    statements about what the system is supposed to do and

9    specifically through specific disclosed embodiments.

10           Now we can turn to AWS's construction.  There are

11   three problems with AWS's construction.

12           First, it excludes disclosed embodiments; second,

13   it adds unsupported limitations to the claims; and third,

14   it's just really long and hard to understand.  So we will

15   start with the first one.

16           AWS's construction excludes disclosed embodiments

17   and, in particular, AWS's construction excludes direct

18   mapping.  And we can see this.

19           I have got AWS's construction up on the screen.

20   And AWS's construction requires that the result of the hash

21   function, meaning what you have coming out of the box --

22           THE COURT:  Wait a minute.

23           MR. ADLER:  I'm sorry.  What's that?

24           THE COURT:  It would be an index as opposed to a

25   location.

64

1          MR. ADLER:  That's exactly right.

2          THE COURT:  Right.

3          MR. ADLER:  So it requires the indirect mapping

4   that we talked about before, and thus excludes the direct

5   mapping that is specifically contemplated by the

6   specification.

7          And as you can see, the exclusion isn't warranted

8   by either the specification or the claim.  The specification,

9   in fact, explicitly contemplates that you would have direct

10  mapping.

11         This is a reason to strike AWS's -- not to go with

12  AWS's construction because, as we know, an interpretation

13  that excludes a disclosed embodiment from the scope of the

14  claim is rarely, if ever, correct.

15         Now, the second problem with AWS's construction is

16  that it adds unsupported limitations to the claim.  We saw

17  this indirectly because it excludes an implementation of a

18  disclosed embodiment that the claim seems to allow, but we

19  can also see it just by comparing AWS's claim language --

20  AWS's proposal with the claim language.

21         So we have got the claim language on the left and

22  AWS's construction on the right.  And as we walk through the

23  construction, we will see several additional limitations that

24  AWS adds.

25         The only thing the claim requires is that the hash

1    function be used to organize the data location information.

2           AWS's construction, on the other hand, requires the

3    use of a data structure to organize the location, requires

4    that the data structure have an index, and it requires

5    specifically that the index be -- that the function result,

6    meaning the output of the hash function, is an index into the

7    data structure, so a specific relation of how the index is

8    used.  None of those requirements are in the claim language

9    or would be required by the claim language.

10          And the extrinsic evidence shows there are several

11   ways to use hash functions -- in addition to the specific

12   examples identified in the specification, several ways to use

13   hash functions that don't use -- that use a data structure

14   but don't use an index or that use a data structure with an

15   index but don't have that same indirect mapping index into

16   requirement that is incorporated into AWS's construction.

17          Another way to understand what AWS's construction

18   is and what it actually requires is to compare its

19   construction of hash function with its proposed construction

20   for a hash table.

21          Now, we will talk about hash table by itself as a

22   construction in a few minutes, but AWS's construction of hash

23   table is, "a data structure in which a hash function is

24   applied to an input and the function result is used as an

25   index to a table in which the desired output can be found."

1    And this highlighted language appears almost word

2    for word in the construction of "hash function" to the point

3    where you could actually just replace AWS's construction by

4    incorporating "hash table" in.  And as far as we can tell,

5    there wouldn't be any difference between the claim as AWS

6    proposed it and the claim as substituted over here with a

7    "hash table."

8    And this is problematic.  The reason why it's a

9    problem is because Claim 1 doesn't require a hash table.  And

10   we know Claim 1 doesn't require a hash table because

11   Dependent Claim 2 does require a hash table.  So by the

12   doctrine of claim differentiation, we could confirm that

13   Claim 1 is not limited to a hash table.

14   And we can see here up on the screen, Claim 2

15   states, "The system of Claim 1, wherein the location

16   information comprises any portion of a hash table generated

17   with the hash function."

18   And I want to make sure that this is clear, how the

19   substitution was made, because AWS's construction of "hash

20   function," of this term that we are talking about now, states

21   that, "the function result organizes the data location

22   information by giving an index into a data structure that

23   provides the location."

24   And as I said earlier, perhaps a little bit too

25   quickly, this is essentially word for word the construction

1   of "hash table."

2           So instead of saying, "based on a hash function

3   applied" where "the function result organizes the data

4   location information by giving an index into a data

5   structure," which is kind of a mouthful, you would just say,

6   "organized" -- or is "determined through the use of a hash

7   table."  And my argument is that that's essentially

8   equivalent to what AWS is proposing.

9           And once again, this is supported through not

10  particularly controversial case law that, "Reading a

11  limitation from the written description into the claims" is

12  "one of the cardinal sins of patent law."  And AWS does it

13  three times.

14          The final reason why -- the final reason to prefer

15  Kove's construction over AWS's is that AWS's construction is

16  hard to understand.

17          The claim language -- the disputed aspect of the

18  claim language is about two lines.  Kove's construction is a

19  little over two, maybe two and a half or three.  AWS's

20  construction takes that and expands it into seven or eight

21  lines, and it does it twice.

22          So what we would have with AWS's construction is,

23  later on down the line, we would end up having to construe

24  AWS's construction again; whereas, Kove's construction avoids

25  that problem and uses simple language to explain what the

1    patent is actually trying to do.

2            Finally, I will mention briefly, the extrinsic

3    evidence supports Kove's position, but the Court doesn't

4    actually need to consider the extrinsic evidence here.

5            *Phillips* tells you that you only need to consider

6    extrinsic evidence if the patent specification and the

7    intrinsic evidence is unclear.  And for the reasons I

8    explained, that evidence here is very clear.

9            So the extrinsic evidence does support Kove's

10   position; and, in particular, AWS's expert acknowledges that

11   there are many ways of organizing information that involve,

12   at one point, the application of a hash function, which

13   supports Kove's construction that it shouldn't be limited to

14   a particular use of a hash function, or the indirect mapping,

15   but the Court doesn't even need to consider that.

16           So with that, I will save some time for rebuttal

17   unless the Court has questions.  I am happy to answer those,

18   too.

19           THE COURT:  No, no questions for now.

20           Response from AWS on this term.

21           MR. ALLGOOD:  Good morning, your Honor.

22           Adam Allgood for defendant, AWS.

23           THE COURT:  Good morning, Mr. Allgood.

24           MR. ALLGOOD:  May it please the Court?

25           With regard to the "based on a hash function" term,

1    the '170 specification describes specifically how it intended

2    for this hash function to be used, and that's by applying the

3    function to an identifier and then using that function result

4    as an index into a data structure.  That's how hash functions

5    have been used for almost 70 years, and that's how this term

6    should be construed.

7            In early 1953, Hans Peter Luhn, an inventor at IBM,

8    sent an internal memo in which he first suggested putting

9    information into buckets in order to speed up a search.

10           So, for example, if you wanted to look up a

11   10-digit phone number in the database to find out who it

12   belonged to, the computer could simply search a list row by

13   row, one number at a time until you found a matching entry.

14   But even in the U.S. alone, there are billions of phone

15   numbers.  So imagine searching a table with four billion

16   rows.  That search could take a while.

17           So Mr. Luhn's idea was to assign each entry to a

18   number bucket as follows:  The phone number digits were kind

19   of chopped and mixed together by first grouping the numbers

20   into pairs, and then those paired digits were added together.

21   And from that, a new number was generated consisting of kind

22   of each of the single-digit results.  But -- and then if

23   there was a double-digit result, you just used the last

24   digit.  So this would result in an integer of 46884.   Then

25   that phone number and the name or address corresponding to it

1    would be put into a bucket labeled "46884."

2              Looking up an entry for a phone number then

3    involved just quickly calculating the bucket number, using

4    Mr. Luhn's method, and then retrieving the information by

5    going directly to the row, by going directly to the row

6    "46884" of the table.

7              And this breakthrough from the 1950s is still used

8    today in a number of industries.  That chopping and mixing

9    and scrambling became known as hashing.

10             In fact, Kove pointed out this well-known use of

11   hash functions in an exhibit to the complaint, which notes

12   that hash tables have been around since the 1950s in order to

13   provide a quick way to organize data.  Again, a simple

14   mathematical operation, a hash function, assigns each file

15   its own row in a table and then stores that file's location.

16             So according to an article cited by Kove, using

17   hash tables to store location information has been around

18   since the 1950s.

19             So the question is, how is "hash function" used in

20   the context of Claim 1 of the '170 patent?

21             So when we look at Claim 1, a hash function in

22   Claim 1 is used in two different ways.

23             First, the hash function is used to organize the

24   data location information across multiple servers; and then

25   second, a server is determined based on the hash function.

71

1    But what does it actually mean that a hash function
2    is used to organize?  What does it mean to determine based on
3    a hash function?

4    Well, the claim language actually doesn't tell us.
5    So now we have to look at the specification.

6    There is actually only one mention of a hash
7    function in the specification of the '170 patent, and that's
8    in the context of the redirection function.

9    So what we see again in Column 15 of the
10   specification is, the patent discusses a table of NDTP server
11   URLs.

12   And then the appropriate NDTP server is selected
13   from the table by applying a well-known function to the
14   identifier string and then using that function result as an
15   index into the NDTP server table.

16   And then it goes on and says that well-known
17   function -- that well-known function is preferably the
18   hashpjw function, the hash function.

19   So, for example, using a similar process as
20   described by Mr. Luhn, you could take an individual's
21   identifier, perform some mathematical operations on that
22   integer, and then output a different value.

23   So, for example, a function result of 7 that is
24   hashed from a particular phone number or social security
25   number will provide an index into the table where we can

1  identify the URL location of the appropriate NDTP server.  So

2  the retrieval request could then be forwarded to that NDTP

3  server, which should be maintaining these identifier location

4  associations in order to provide the location for a

5  particular stored data option.

6     And you see here -- here is a sample -- here is the

7  example from the specification of the hash function.

8     For this function, you would input the identifier

9  in as an integer.  You would perform some mathematical

10  operations, which include kind of shifting the bits left or

11  shifting the bits right and then dividing that number by the

12  number of elements in the NDTP server URL table, and then you

13  return the remainder of that division as the function result.

14  And then that resulting integer is used as the index into the

15  NDTP server URL table.

16     That's how the specification describes determining

17  a server based on the hash function.

18     But in order to organize the location information

19  about a stored data object across multiple servers, the

20  '170 patent describes using the exact same NDTP server

21  URL table.

22     The server table is divided so that the potential

23  hash function index values are distributed to various NDTP

24  servers.

25     So here, for example, the specification describes

73

1    splitting 2,039 different hash function index values across

2    two different NDTP servers.

3          Now, this technique will effectively partition the

4    set of all the identifier to location associations that are

5    stored on these servers across multiple NDTP servers.  That's

6    how the '170 specification describes using a hash function to

7    organize location information across multiple servers.

8          Now, if I can show your Honor -- I want to look at

9    Kove's slides.  And if you can see here Slide 45 --

10         THE COURT:  Yes.

11         MR. ADLER:  -- from Kove's presentation?

12         Now, Kove's construction for used to organize based

13   on a hash function is not correct.  The specification doesn't

14   describe mapping identifier strings to one or more data

15   location servers.  It describes associating the result of a

16   hash function applied to an identifier string to the

17   appropriate server responsible for storing that location

18   information associated with the identifier.

19         So Kove's construction would actually read out the

20   purpose of the hash function.

21         So mapping identifier strings to data location

22   servers would just be a table of identifiers in one column

23   and servers in the other, and that's not what the

24   specification discloses.

25         Kove then argues that our construction excludes

 1    disclosed embodiments.

 2            If we turn to Slide 50 of Kove's presentation, they

 3    specifically point to a second variant of the NDTP redirect

 4    response that uses a general function rather than the

 5    well-known function in the first variant.  But a patentee

 6    must distinctly claim their invention, and not every claim

 7    has to encompass all disclosed embodiments.

 8            So if we look at the '170 specification -- and here

 9    I have pulled up Column 14, starting at Line, kind of, 43, I

10    believe.

11            Sorry, your Honor.  Let me get to the right one.

12            Here we are.  "Server redirection mechanism."

13    There is actually three embodiments of the server redirection

14    mechanism.

15            The first is actually the use of embedded

16    redirection links.  Now, this first embodiment doesn't

17    describe using hash functions at all, doesn't describe using

18    any kind of functions at all.  So therefore, kind of Claim 1,

19    which requires a hash function, doesn't improperly exclude

20    this embodiment.  It's just not a part of that particular

21    claim.

22            And then, if we look further down, we see the

23    second redirection mechanism.  And as we go to the next page,

24    this is the one that we just talked about.  That's this

25    second redirection mechanism, which is the first variant.

75

1            And in this one -- this is where a well-known

2    function -- again, this is important -- a well-known function

3    is applied to an identifier string.  And then the results of

4    that well-known function applied to that identifier string is

5    used as an index into the data structure.

6            Now, we all agree that the only data structure

7    disclosed in the '170 specification is a hash table.  But it

8    could be another index data structure, such as a sorted array

9    or a B-Tree.

10            But then the third embodiment is further down here,

11   which is kind of referred to as the second variant.  Well,

12   this embodiment uses a general function, which is different

13   from the well-known hash function.  And we know the general

14   function is different from the well-known hash function

15   because the specification tells us so.

16            The general function has an advantage -- advantages

17   over the well-known function approach.  It has disadvantages

18   over the well function approach, because it's less efficient

19   to compute than the well-known hash function.

20            So the general function is different than the

21   well-known hash function provided in the second -- in the

22   first variant, the second embodiment.

23            And then it goes on.  So the example provided in

24   this second variant describes a pattern match, a pattern

25   comparison function of an identifier that -- then that

1    pattern is matched to a particular server.

2            Again, instead of sending, like, Version 1, the

3    NDTP server URL table -- instead of sending the table as in

4    kind of the first variation, this general function is

5    actually sent in a redirection message as a serialized object

6    containing executable code.

7            So again, if you go to the top of Column 16, you

8    will see that this serialized object is used to send code.

9    It's a block of an executable function that gets sent in the

10   redirect message, not a server -- NDTP server URL redirection

11   table.

12           And then, again, none -- none of this mentions

13   hashing.  Nothing about this particular embodiment mentions

14   hashing and specifically talks about using a different

15   function from the well-known hash function in the first

16   variant.

17           And so again, this executable code object is sent

18   in the redirection message.

19           But if we look back at Claim 1, you will see here,

20   Claim 1, there is actually no redirection message that's

21   claimed in Claim 1.

22           But then, if you compare that to Claim 6 and

23   Claim 15 where these redirection messages are claimed, you

24   will see that, again, Claim 1 doesn't claim this variant,

25   this recurring or redirection message that has the serialized

77

1    object that contains executable code, that we know that that

2    is different from the well-known function of the first

3    variant.

4         Counsel for Kove then makes this argument about

5    claim differentiation of Claim 2.  So let's look at Claim 2.

6         Again, Claim 2 is describing the location

7    information.  That's the identifier to location key pairs.

8    So that's what's being stored in the hash table in Claim 2.

9    That's different than using a hash function to determine the

10   appropriate server to store that location information in a

11   hash table.  That's what's in Claim 1.

12        And there was -- they seem to be making this

13   argument that location information and data location

14   information were intended to be different things in Claim 1.

15   So it's different.  But that's just not the case.  And we can

16   tell what happened if we take a look at the file history.

17        So if we actually look at the file history of the

18   '170 patent, we will see kind of the original claims as they

19   were presented back in 2006 for this claim.  And Claim 1 is

20   very bare bones.  It's very different than the way it looks

21   today.  "A network-distributed tracking wire transfer

22   protocol that has a variable length identification string

23   specifying the identity of an entity and a distributed data

24   collection; a location string for specifying the network

25   location of data associated with an entity; and then where

78

1    the relationship where the identification string and a

2    location string can be spontaneously and dynamically created

3    and modified."

4            Now, the examiner rejected that in light of the

5    prior art.  So as you would suspect, they made some

6    amendments.  And the amendments they made were later in 2006.

7    They canceled Claim 1 and all the rest of the claims and

8    started with -- started fresh with a new set of claims.  This

9    one is starting to look a little bit more familiar.

10           Here, a system for managing data stored in a

11   distributed network; a data repository configured to store

12   data where that data is associated with an identifier string;

13   and then a location server, that network that has a plurality

14   of servers containing location information associated with

15   the identifier string.

16           Again, that's location information of where to find

17   that stored data object.  Then they added Claim 18, which

18   eventually became Claim 2, wherein the location information

19   comprises any portion of the hash table.

20           So what they are talking about here, again, is, now

21   there is a hash table that's associating the identifier with

22   the location of where it's stored.

23           Then the examiner rejected that one as well.

24           So then, actually, we have to go three years later.

25   Three years later they modified their claim language.

79

1       And here we are looking at the March 2nd, 2009,

2   amendment.  And you will see here, this is where they started

3   adding a bunch of additional words, right?  So now we are

4   storing a data entity.  And then the data location

5   information makes an appearance in this kind of first claim.

6       And then includes -- oh, but it seems like they

7   forgot to put the word "data" in front of this location

8   information, but then they put it everywhere else.  The

9   portion of data location information includes, organized the

10  data location information.

11      But what they didn't change is Claim 18, where

12  again, wherein the location information comprises a portion.

13  They are referring to the same thing they were referring to

14  before.  They just didn't put the word "data" in front of it.

15  It's still referring to the same thing.  It didn't magically

16  change the meaning.  And we know that, that they didn't

17  intend to change the meaning, because they didn't tell the

18  patent office they intended to change the meaning.

19      When we look in their response and arguments, they

20  don't mention anything about a difference between data

21  location information and location information.  They just

22  simply addressed the prior art and never talk about any

23  attempted distinction that they are trying to make.

24      It means the same thing in the context of Claim 1.

25  So -- and because of that, there is no claim differentiation

1    argument to be made.  There is no issue with claim
2    differentiation between Claim 1 and Claim 2 as it relates to
3    these hash tables.

4         They are two separate -- two different hashing
5    objects.  One is to store the hash of an index -- an index,
6    an identifier to a location; and the other one is to actually
7    distribute those hash tables in order to find different
8    servers.

9         So what we would ask, your Honor, is just kind of
10   exactly what is described in the specification with regard to
11   "based on the hash function."

12        It's very simply -- exactly what we show here in
13   Column 5 is that "based on the hash function" means applying
14   a hash function to an identifier and then using that function
15   result as an index into a data structure.  That's almost
16   verbatim the claim language from Column 15.  That's what they
17   intended for it to mean, and that's how the Court should
18   construe it.

19        THE COURT:  All right.  Thank you.

20        Any brief rebuttal on this?

21        MR. ADLER:  Yes, your Honor.  I will take a moment
22   to share my screen.

23        THE COURT:  Okay.

24      (Brief Pause.)

25        MR. ADLER:  Is the screen up?

81

1          THE COURT:  Yes.

2          MR. ADLER:  Fantastic.

3          So AWS's argument seems to boil down to, look, what

4   we call -- what we have called direct mapping is described in

5   the specification.  He acknowledges that.  But the

6   specification refers to the function as a general function,

7   not a hash function.

8          Therefore, AWS concludes, because it says "general

9   function" and does not specify "hash function" specifically,

10  the claim thus cannot cover hash functions.

11         But that's a fallacy, because this description of

12  the general function doesn't actually specify any general

13  function.  It gives an example of how you would apply a

14  general function, but it does not give a specific example of

15  what that general function is.

16         So under AWS's reading, no general function would

17  apply, and this part of the patent specification would

18  essentially be completely untethered to the claims.

19         And we can see this because, if we go ahead and we

20  look at the indirect mapping and how that appears in the

21  specification, the patent uses a very similar approach.  The

22  specification says, "applying a well-known function to the

23  identifier string and using the function result as an index

24  into the NDTP server table."

25         Now, does this highlighted portion, does it specify

1    a hash function?  It does not.  The only specificity it
2    specifies is "a well-known function."

3         It's only in the next sentence that the
4    specification says, "The well-known function preferably
5    applied is the hashpjw function."  It gives a specific
6    example of the function, but under AWS's reading, the claim
7    could just as well be limited to the hashpjw function.

8         But that's not how claim construction works.  This
9    isn't a means-plus-function claim.  You don't limit the scope
10   of the claims based on the specific examples provided in the
11   specification.  Instead, you look at what the claim discloses
12   and how that relates to what's described in the
13   specification.

14        And here, notably, AWS does not identify anything
15   in the specification that would exclude hash functions in
16   either the indirect mapping or the direct mapping, which
17   means that their argument is essentially doing exactly what
18   we saw, and the Federal Circuit said that you shouldn't do,
19   which is importing limitations -- importing limitations --
20   I'll skip ahead -- you know the case law -- importing
21   limitations from the specification into the claim.  And it
22   specifically instructs you not to do that.

23        Now, opposing counsel spoke at length about the
24   patent prosecution history.  The arguments seem more closely
25   directed to the dispute over the "location information" term.

1    But what they -- what his arguments don't really refute is

2    that the difference between Claim 1 and Claim 2 is that

3    Claim 2 specifies the use of a hash table and Claim 1 does

4    not.  That's the distinction between Claim 1 and Claim 2.

5         So the claim differentiation argument that I made

6    before, which is that Claim 1 thus cannot require or cannot

7    be limited to a hash table, is borne out, regardless of his

8    arguments about how "location information" should be

9    construed.

10        So the long and short of it is, there is certainly

11   no dispute that the specification covers AWS's construction.

12   The specification certainly contemplates the use of indirect

13   mapping.  But AWS has not pointed to anything, either in

14   their briefing or in their presentation, that would show why

15   the direct mapping should be excluded, other than the mere

16   observation, which is true, that the specification does not

17   disclose specifically the term "hash function" in conjunction

18   with the general function.

19        That's not enough.  But even if the Court were

20   inclined to think that it is enough or that it would be

21   close, the extrinsic evidence supports Kove's construction

22   once again.

23        Kove's expert, Dr. Goodrich, explained in his

24   declaration that, "A person of ordinary skill in the art

25   would understand this disclosure in the '170 patent to be

84

1    describing a hash function, which is specified as a general

2    function description, such as using instructions in a

3    computer programming language."

4        So a person of ordinary skill in the art would read

5    the specification, especially in light of the first variant,

6    which is the indirect mapping, and would know to use a hash

7    function in that situation, especially given the particular

8    use case that's being applied of mapping a particular

9    identifier to a particular URL in the way that's described in

10   the specification.

11       I have two other quick notes in rebuttal.

12       The first note is to go back to the paraphrasing of

13   the parties' constructions.

14       I can't say that I'm completely sure I followed

15   what AWS's argument was, but I will do my best.

16       AWS's argument seems to be that Kove's construction

17   misreads the patent and that the patent indirected to mapping

18   identifier strings to one or more data location servers and

19   uses this visualization, or imagery, of a table with an

20   identifier string in one column and a location server URL in

21   the next column.  He says that's plainly not supported by the

22   specification.

23       The problem is, that imagery that he is describing

24   incorporates into it a hash table or incorporates into it a

25   table structure, which is not required by the claims.  All

1   that's required by the claims is that the hash function is

2   used to organize the data location information.

3          The idea that the specification itself doesn't

4   support mappings, isn't about mappings is belied by the

5   portions of the specification I spoke about earlier.

6          The final point that I want to make relates to

7   extrinsic evidence, which is that AWS's construction seems to

8   limit the use of hash functions to a hash table.  And we see

9   that in their argument that a person of ordinary skill in the

10  art would understand a hash function to use a hash table.

11         The problem is, if you look to the extrinsic

12  evidence on this and you look to the evidence that you would

13  use to determine how a person of ordinary skill in the art

14  would use hash functions, it shows the opposite.

15         So this table (indicating), which is the last slide

16  in the deck, for your reference, Slide 79, shows in the left

17  column the dictionary name that AWS's expert used to support

18  their argument that hash functions have to be used as an

19  index into a table.

20         And then the second column shows an expanded

21  definition, meaning a larger definition than the one quoted

22  in Dr. Mitzenmacher's declaration, that shows that hash

23  functions don't actually have to be used as an index into a

24  hash table.

25         For example, the first row states that, "In the

1    simplest version of the technique, the hash value identifies

2    a position in the table."  However, it then recognizes a

3    specific scenario where the output of the hash function is

4    not indexed into a table.  For example, if that bucket is

5    already occupied, then you have to put it somewhere else.

6           Perhaps more obviously, the *Dictionary of Computer*

7    *and Internet Terms* in the second row states that a hash

8    function is simply, "A function that converts a string of

9    characters to a number or a shorter string."

10          So as these definitions make clear, it's certainly

11   true that a hash function could be used -- the output of a

12   hash function could be used as an index into a hash table,

13   but neither the specification nor the plain and ordinary

14   meaning of the term means that it should be limited to that.

15          And there are several definitions -- or several

16   data structures in several instances in which you would use a

17   hash function without making it as an index into a table.  We

18   have described some of them here.  The specification

19   describes it through the use of a general function.

20          So unless the Court has any other questions, I'm

21   happy to move on to the next claim term.

22          THE COURT:  I think we can move on.

23          MR. ADLER:  Okay.  The fifth claim term is "hash

24   table."  And I'll note at the outset that the dispute over

25   "hash table" is more along the lines of the dispute with NDTP

87

1    and less like the previous dispute, even though it involves

2    some of the same language.

3           As Kove understands it, there is not a substantive

4    dispute over what a hash table is.

5           This is the wrong slide. Excuse me. It happens

6    when you bounce around a little bit.

7           So "hash table" -- the parties agree "hash table"

8    is not defined in the patent but has a well-known meaning in

9    the art. And both parties seek to have a construction that

10   conforms with the well-known meaning of "hash table" in the

11   art.

12          Kove's construction is straightforward. It's that

13   a hash table is "a data structure that stores values in a

14   table, where values are stored and retrieved based on the

15   output of a hash function."

16          AWS's construction uses some of the language that

17   we saw earlier and states that a hash table is "a data

18   structure in which a hash function is applied to an input and

19   the function result is used as an index to a table in which

20   the desired output can be found."

21          So the dispute here ought not be over any

22   substantive disagreement between the parties as to what they

23   mean -- what the terms mean but, rather, which parties'

24   construction is most in conformance with the meaning that

25   would most conform with a person of ordinary skill in the

1    art.

2         In this respect, there are two deficiencies with

3    AWS's construction.

4         The first problem with their construction is that

5    it requires that the output of the hash function be used as

6    an index "to a table" rather than into a table, meaning

7    rather than to a row, cell, or bucket in a table.

8         The problem is, that's not how a hash table works.

9    You saw this -- you can see this in the definitions that AWS

10   cites in their expert report.  A hash table uses a hash

11   function to map inputs to a particular address in a table.

12        This isn't in dispute.  The image shown on the

13   slide now comes from AWS's expert report.  And it confirms

14   that when you use a hash table, the output of the hash

15   function points to a particular part of the table.  That's

16   why Row 5 is circled rather than the table as a whole.

17        So by using the term "to a table" rather than "into

18   a table," AWS's construction departs from the meaning that

19   would normally be used.

20        Now, in the abstract, this might not seem

21   significant.  One could argue that the Court could simply

22   instruct the jury or that one could interpret "to a table" to

23   mean "into a table."

24        The problem is, the construction that AWS has of

25   "to a table" is different than the language that they used

89

1    earlier with respect to "hash function."

2         With respect to "hash function" and throughout the

3    patent specification, the phrase used is "index into a data

4    structure."

5         Now, we asked AWS to reconcile this difference or

6    to explain it, and they opted not to bring these two

7    constructions into alignment, which means that this

8    difference could either be the result of a clerical error,

9    not substantive, in which case it's still a reason not to --

10   for AWS's construction; or there is some substantive

11   disagreement as to what "to" versus "into" means that the

12   Court needs to resolve.  In which case, at a minimum, the

13   Court would have to rewrite AWS's construction, but really

14   this is just a reason to reject it and to prefer Kove's

15   construction.

16        Now, the second problem with AWS's construction is

17   that it requires that the structure be used and requires the

18   structure to contain the desired output.  And you can see

19   this in the highlighted portions of the claim here:  "A data

20   structure in which a hash function is applied to an input and

21   the function result is used" and "the desired output can be

22   found."

23        The significance of this is that if you just have a

24   table or a hash table structure sitting on a server, it

25   wouldn't count as a hash table under AWS's construction,

90

1    because if you have a table that's not used, then there is no
2    application of the hash function to an input and there is no
3    function result.

4         AWS's construction would be like saying a filing
5    cabinet is a structure in which the alphabet is used to
6    identify a drawer in which the desired file can be found.
7    But a filing cabinet is a filing cabinet, even if it's empty
8    and even if it doesn't have the file you want.

9         And the same is true for hash tables.  You can have
10   an empty hash table.  You can query a hash table for an
11   object and have that object not be found.

12        Under Kove's construction, it would still count as
13   a hash table.  Under AWS's construction, it wouldn't.

14        So those basically explain the difference between
15   AWS's construction and Kove's construction, and that's why
16   Kove's construction best conforms with the understanding of a
17   person of ordinary skill in the art.

18        Once again, happy to entertain any questions from
19   the Court, but that's my presentation on this term.

20        THE COURT:  All right.  We can hear from AWS on
21   this term.

22        MR. ALLGOOD:  Yes, your Honor.

23        Adam Allgood for the defendant, AWS.

24        "Hash table" should be construed specifically as
25   it's specifically disclosed in the specification, and that's

1    by applying the function to an identifier and then using that

2    function result as an index into the data structure.

3              The "hash table" term appears in a number of

4    different claims.  All these hash tables are describing kind

5    of the hash table of location information, again, that

6    identifier to location key pair, and then with that hash

7    table being stored on a particular server.

8              Now, unfortunately, neither the '640 patent nor the

9    '170 patent specification specifically mentioned the term

10   "hash table" anywhere in the specification, but the

11   '978 patent does.  It mentions it one single time.

12             So now, here we see it in the '978 patent.  Now,

13   this isn't the same hash table as we discussed earlier in the

14   asserted claims, but it confirms that the NDTP server URL

15   table that we did discuss before is a hash table.  So the

16   specification, again, tells us exactly how a hash table

17   functions.

18             Again, as with the prior discussion of the

19   '170 patent, a hash table is a structure where a hash

20   function is applied to the identifier string and the function

21   result is used as an index into the table.

22             It's the output of the hash function that matters.

23   That provides the index needed.

24             Now, (unintelligible) two problems that they have

25   with our construction.

1       The first is that the function result is used as an

2  index to a table versus into a table.  We don't have a

3  problem making that change from "to" to "into."  That's fine.

4       The second was that the hash table must contain the

5  desired output, that somehow that doesn't allow for empty

6  tables.  While we agree with -- or disagree with that

7  attempted distinction, particularly in the context of the

8  claims in the claim language, I think that we can use some of

9  Kove's proposed language to address that issue.

10      Our problem with Kove's construction is the "based

11  on" language.  We want to make sure we are talking about

12  exactly what it means for something to be based on the output

13  of the hash function.

14      So they are getting closer using the output of the

15  hash function, but what does it mean to be based on?

16      We want to make sure that the use of the hash

17  function isn't somehow disassociated with kind of directly

18  accessing the hash table; like, we want to make sure that the

19  hash function is used to directly access the hash table.

20      So actually, while counsel was talking, we kind of

21  want to propose a different construction that hopefully --

22  that addresses kind of both parties' identified concerns, and

23  that's, "a data structure that stores values in a table,

24  where values are stored and retrieved by applying a hash

25  function to an input and using the function result as an

93

1    index into the table."  I think that construction addresses

2    both parties' concerns and is supported by the clear language

3    of the specification.

4                THE COURT:  That's helpful, Mr. Allgood.

5                Could I hear a rebuttal from Kove on this?

6                MR. ADLER:  Yeah.  We just saw this proposed

7    construction.  We tried to do something like that earlier.

8    We were negotiating with them over the terms.

9                This is promising.  We will take it under

10   advisement.

11               THE COURT:  Good.

12               MR. ADLER:  And we will get back with the Court

13   over whether it's acceptable to us.  It might still have the

14   empty hash table problem.

15               THE COURT:  Well, I wonder -- speaking of the empty

16   hash table problem, go back to the proposed revised

17   construction one more time.

18               MR. ALLGOOD:  Yes, your Honor.  Just give me a

19   moment.  And I will pull it up.

20               THE COURT:  Sure.  I had a thought about that.

21               You have the word "are," a-r-e, "where values are

22   stored and retrieved."

23               Maybe it could be "where values can be stored and

24   retrieved," or "are stored and can be retrieved."

25               Maybe -- the idea that it could be empty.  But if

1    there is something in it, it can be stored and retrieved.

2              MR. ALLGOOD:  So, your Honor, "where values can be

3    stored and retrieved by applying a hash function"?

4              THE COURT:  Yes.

5              MR. ADLER:  "Can be" or "may be."

6              THE COURT:  "May be" or -- "may be retrieved,"

7    something like that.

8              I don't want to -- you know, I mean, I'm not good

9    at drafting on the fly, but that might solve the problem of

10   the empty set.

11             MR. ADLER:  You know, I think this is one where the

12   parties could come and put their heads together again, now

13   with guidance from the Court that you are open to this and

14   our positions that we both articulated here, and come up with

15   a good solution.

16             THE COURT:  Sure.  Okay.  That sounds good.

17             Then, maybe we should move on to the -- I guess

18   there is one more term, correct?

19             MR. ADLER:  That's correct.

20             And this will be presented by --

21             THE COURT:  We will table this one -- pardon the

22   expression -- pardon the use of the word "table" -- and take

23   up Term No. 6, then.

24             MR. ADLER:  I will pass the mic to

25   Mr. Cardenas-Navia.

95

 1        THE COURT:  Okay.

 2        MR. CARDENAS-NAVIA:  Let me share my screen.

 3        Term No. 6 is "data pertaining to the entity."

 4        The differences between the parties' constructions

 5   here, I believe they are actually less than it initially

 6   appears to be.

 7        Both parties' constructions keep the language "data

 8   pertaining to," and both parties' constructions effectively

 9   interpret "entity" as "person or thing."

10        Where the constructions begin to differ is that

11   Kove's construction has this additional parenthetical

12   clarifying that the person or thing can be real, digital, or

13   abstract.  Kove included that because we believe it may be

14   helpful to the jurors as they assess what an entity can be.

15        Now, I don't want to put words in AWS's mouth, but

16   I suspect that they don't necessarily disagree with our

17   parenthetical.  It didn't seem to be a major point of

18   discussion in their briefs.

19        And if that's the case, then the dispute really is

20   just about these four additional words that are appended at

21   the end of AWS's construction.

22        And it's really not clear to Kove why those words

23   are there.  There doesn't seem to be a hook for it in the

24   claims.  Both parties retained verbatim "data pertaining to,"

25   and the parties seem to agree that an entity is at least a

1    person or thing.

2              So it appears to us that AWS has basically taken a

3    claim term with a meaning the parties seem to agree on and

4    basically tack on a limitation.  And that, in and of itself,

5    is an indication that their construction is incorrect.

6              What AWS's limitation does, as we understand it,

7    is, it seeks to narrow the claims by removing from their

8    scope situations from where the data and the entity are not

9    distinct, which we understand to mean where the data and the

10   entity are the same thing.

11             So it's a basic claim construction principle that

12   if you are seeking to narrow the plain meaning of a claim

13   term, which AWS is doing here, then there needs to be clear

14   disavowal of that claim scope.

15             We don't believe AWS can show that.  To the

16   contrary, we believe AWS's construction can't be correct

17   because it conflicts with the express language of claims and

18   excludes embodiments.

19             THE COURT:  All right.  Let me hear from AWS why we

20   need the language --

21             MR. CARDENAS-NAVIA:  Apologies, your Honor.  I was

22   just having a lag to get to the next slide.

23             THE COURT:  Oh, I'm sorry.  Go ahead.

24             MR. CARDENAS-NAVIA:  I had some technical

25   difficulties.

97

1      Thank you.

2          So if we look at Claim 1, the highlighted language

3    shows that a data repository is configured to store a data

4    entity.  So the claim is saying that the data that is being

5    stored is a data entity.

6          The claim then goes on to say, "wherein an

7    identifier string identifies the data entity."  That is

8    saying that the entity being identified by an identifier is

9    the same data entity that is being stored.

10         So by the express language of this claim, both the

11   entity and the data are the same.  And this claim, therefore,

12   requires exactly what AWS's construction implies is improper.

13         I'm sure AWS will point out that this is not one of

14   the claims that has the claim term that is being construed,

15   but that doesn't really make a difference, because, again,

16   AWS's primary argument is that, for its construction to be

17   correct, the data and an entity must be different.  And this

18   claim proves that that is incorrect, that an entity and its

19   associated data can be the same.

20         On this next slide, we have some additional

21   evidence of this.  This is from a provisional application for

22   the '978 patent.  And provisional applications are intrinsic

23   evidence to patents.

24         And here, we see that the inventors listed specific

25   types of entities that are listed over their inventions.  And

1    the first one they identify is "song."  And, of course,

2    "song" is the entity, and the data associated with it would

3    be that song.  So again, another situation where the entity

4    and its data are the same.

5            And another example of that is "software object"

6    where, again, the entity and the data would be the same.

7            So therefore, based on this, AWS's construction is

8    excluding these embodiments, and it's contrary to that Claim

9    1 of the '170 patent, as well as another claim in the

10   '170 patent.

11           And so for those reasons, we don't believe that

12   this additional limitation is justified.

13           Unless your Honor has any questions, I am happy to

14   pass it on.

15           THE COURT:  Let me just ask, the reference to the

16   song, "Hotel California," you are not talking, then, about

17   the title of the song.  You are saying the song itself.

18           How do we distinguish that?

19           MR. CARDENAS-NAVIA:  Yes.  Let me reshare my screen

20   so I can point to a couple of things.

21           The entity is described as the "song."  And then,

22   in the box I have below that, you see it's describing what

23   the purpose of defining an entity as a song would be.  And

24   it's content delivery.

25           So generally the way that you would do that is, you

99

1    don't just have -- basically you want to have the song, and

2    then you want to have potentially multiple copies of the

3    song.  So that's why you know that the song -- the entity and

4    the data are the same, because it's copies that you are

5    making available to deliver that content to various users.

6              THE COURT:  Okay.

7              All right.  Response from AWS on this last term,

8    the "entity" term -- "data pertaining."

9              MR. ALLGOOD:  Yes, your Honor.

10             Adam Allgood for AWS.

11             The "data pertaining to the entity" term, it's --

12   there is a dispute as to what an entity is.  Particularly, is

13   that entity different, or can it be the same thing as the

14   data pertaining to it?

15             Now, plain language alone -- plain English alone

16   would indicate that the entity and the data pertaining to it

17   are separate and distinct things.  And if you look at the

18   specification in these provisional applications, they explain

19   what an entity is in the context of the phrase "data

20   pertaining to the entity."  And again, the context is very

21   important.

22             So, for example, if we go to a different

23   provisional application than what Kove presented, it is,

24   again, a similar thing, similar table.

25             Here you have a list of entity types -- customer,

1    manufactured part, et cetera.

2         So then, an entity would be a single instance of a

3    particular entity type.  So, for example, the person Steve

4    Smith would be an entity of type "customer."  And then Steve

5    Smith would have a unique customer identifier, such as his

6    phone number.  But that entity is a distinct thing that

7    exists kind of outside the storage system.  You don't store

8    Steve Smith.  What you store are data objects that are

9    associated with the unique identifier for Steve Smith.  And

10   that makes sense.

11        So as you may recall kind of from earlier -- the

12   earlier tutorial presentation by Kove, they use an example of

13   a patient's medical records.

14             THE COURT:  Right.

15             MR. ALLGOOD:  And then, one of the provisional

16   applications kind of uses the same example of medical

17   records.

18        So what you will see, then, is, in this particular

19   example, Steve Smith has medical records as UCH.  Steve goes

20   for treatment at a different hospital, MGH.  The client, MGH,

21   sends its request with Steve's identifier to the NDTP server

22   to get the locations of any medical records that pertain to

23   Steve Smith.

24             That NDTP server responds that, yes, we do have

25   existing data objects, but they are stored over at UCH.  So

101

1    then the client, MGH, then requests those objects directly

2    from UCH.

3           Then you kind of have -- the second part of that is

4    that, okay, well, Steve now returns to UCH for follow-up

5    treatment.  Now the client at UCH performs kind of a similar

6    search to the NDTP server.  Where are these medical records

7    for Steve Smith's identifier?

8           Well, now, since there is medical records -- kind

9    of medical data objects stored at multiple locations, the

10   NDTP server would provide the locations of those data objects

11   to both of the data repositories.

12          So what all that's describing is that there is data

13   objects stored and retrieved in the system that are distinct

14   from the entity.

15          What the system stores are units of data.  So what

16   Kove is trying to do is equate data pertaining to the entity

17   in different claims the same as data entity in Claim 1 of the

18   '170 patent.  But in Claim 1, the word "entity" is used in a

19   completely different context.  You have to ask yourself, what

20   are you storing?

21          So if we look at Claim 1 of the '170 patent, again,

22   we see a system for managing data stored in a distributed

23   network comprising a data repository configured to store a

24   data entity and associating an identifier string with that

25   stored data entity.

1      Note that the phrase "data pertaining to the

2  entity" doesn't exist anywhere in Claim 1.  The term "data

3  entity" itself doesn't appear anywhere in the

4  '170 specification either, nor does "data entity" appear in

5  the '978 specification, nor does it appear in the

6  '640 specification.

7      But what the '170 patent specification does

8  describe is storing a particular data unit.

9      So we see here, a first data repository entity

10  stores an association identification string with "each

11  particular stored unit of data."  And that particular stored

12  unit of data has a location string.  It is stored on a first

13  server entity.  A client entity stores a request to the first

14  server entity in order to determine a location of the

15  particular stored unit of data.

16      So what you see here is -- I would also note that

17  the word "entity" is used in a variety of contexts within the

18  specification.  You have repository entities, server

19  entities, client entities.  They are used in different

20  contexts.  And that's how you have to understand the term

21  "data pertaining to the entity" and how that's different from

22  "data entity."

23      So in the context of Claim 1, a data entity, in

24  light of the specification, is a particular stored unit of

25  data.  It's a stored data object, which is different from

1    data pertaining to the entity in Claim 6, which would be

2    stored units of data pertaining to a person or thing distinct

3    from those data objects.  It's a different organizational

4    structure.

5         The identifier in Claim 1 is associated with the

6    stored data object itself -- for example, an X-ray image --

7    while the identifier in Claim 6 is associated with the

8    patient Steve Smith and particular data objects, such as

9    X-ray images, MRI images, diagnoses pertaining to but

10   distinct from Steve Smith.  That's what's being stored.

11        I would also note that the terms "data entity" and

12   "data pertaining to the entity" never coexist in the same --

13   together in the same claim.  So Independent Claims 1 and

14   15 of the '170 patent store data entities, the data objects

15   themselves.

16        Independent Claim 6 of the '170 patent and then

17   Independent Claims 1 and 31 of the '978 patent store data

18   pertaining to an entity.  That's data objects pertaining to a

19   person or thing.

20        The system stores units of data.  That's what the

21   system stores.  Kove's addition of "real, digital, or

22   abstract" is unnecessary.  It doesn't really resolve any

23   disputes.  It wouldn't be helpful to a jury.  I think a jury

24   knows what a person or thing is.

25        And as you may recall from Kove's tutorial

104

1   presentation at Slide 14, Kove explains that Mike is an

2   entity, and Mike's medical records are data that pertain to

3   Mike.  So it's clear that Mike is distinct from his stored

4   medical records.

5             Your Honor --

6             THE COURT:  Let me just interrupt here for a

7   second.

8             Your argument that it's clear that Mike is

9   distinct -- Mike is an entity distinct from his medical

10  records and your acknowledgment that the words "real,

11  digital, or abstract" are, in your view, unnecessary,

12  suggests to me that what AWS is really arguing for -- or

13  maybe both sides are -- is that this term needs no

14  construction.

15            I think you are telling me that it's obvious.  If

16  it's pertaining to the entity, that means it's something

17  other than the data that pertains to the entity, and it's not

18  the entity itself.

19            You are suggesting nobody would say that an entity

20  need be -- could not be real, digital, or abstract.  You are

21  suggesting that that's just superfluous, right?

22            MR. ALLGOOD:  Your Honor, that language is

23  superfluous and doesn't really appear anywhere in the

24  specification.  I don't really know why they are trying to

25  kind of import that language in.

1      The problem is with not just having "data

2      pertaining to a person or thing."  It's that we actually do

3      have a dispute.

4      We are saying that, yes, it makes sense.  Plain

5      language says that the data pertaining to a person or thing

6      is not that person or thing, right?  That's not how it's used

7      in the context of this particular claim.

8      They are disagreeing with that.  That's why we have

9      the dispute.

10      THE COURT:  How do you deal with the song analogy,

11      the "Hotel California" --

12      MR. ALLGOOD:  Right.  So you have kind of the list

13      of particular entities.  Like, if the entity was a song,

14      "Hotel California," you have to again ask yourself, what are

15      you storing?

16      Are you storing "Hotel California"?  No.  What you

17      are storing is a software-encoded digital replication of

18      someone's performance of the song "Hotel California."  Right?

19      Was that song the Eagles version of "Hotel

20      California"?  Which Eagles version of the song "Hotel

21      California"?  How was it encoded?  Where was it made?

22      So it's not the same thing.  It's kind of a level

23      above.

24      So you could have an entity that's "Hotel

25      California," but then the data objects that you store about

1    it could be various things that are all associated with

2    "Hotel California."  It's not the same thing.

3              MR. CARDENAS-NAVIA:  May I address that point, your

4    Honor?

5              THE COURT:  Sure.

6              MR. CARDENAS-NAVIA:  I do disagree with that

7    characterization of the "Hotel California" example.

8              It is talking about content delivery.  And in our

9    briefs, we use the example of Netflix.  So Netflix does have

10   lots of versions of movies.  But they also have, for every

11   single movie they have, every specific version, a specific

12   resolution, a specific language.  They are not just going to

13   have a single copy of that movie file, because there is no

14   way they could possibly deliver it to all of their customers

15   if they just had a single copy.  So they create many, many

16   copies of every single movie.  They are called replications.

17             And then what you need to do is, you would use a

18   system, like Kove's technology here, to track all the

19   locations of what are all essentially copies of that original

20   data file.

21             That's content delivery.  You don't just have one

22   file or just a single version of -- or a single copy of

23   various versions of a file.  It's the exact same data entity

24   that you have many copies of.

25             And I must point out, your Honor, that that's the

1   business AWS is in, of taking people's data and, so that they

2   don't lose it, creating lots of copies of them and keeping

3   track of where they all are.  And that's what AWS is --

4   frankly, appears to be trying to exclude from the scope of

5   the claims.

6          And if I can address one other point?

7          THE COURT:  I see.  Just to inject for a moment.

8   That's helpful.

9          I have sort of an attitude about claims

10   construction that one should make the decision about what its

11   claims terms mean, divorced from any consideration of what

12   that would mean for the case itself.

13          Now, other judges see this differently.  This is a

14   debate among judges about what is the appropriate approach at

15   claims construction?  Do we dive in, in the pure abstract, or

16   do we consider it in the context of the actual dispute

17   between the parties?

18          Judges will have strong views in various

19   directions, maybe based upon the experience they have had

20   with particular cases.  I don't know.

21          But it is helpful to me, because otherwise it is

22   hard for me to know what difference it makes.

23          All right.  Go ahead.

24          MR. CARDENAS-NAVIA:  Thank you.

25          And I raise that point just to point out that this

1    idea that you store lots of copies of the same object and

2    want to track all their locations is not something out of

3    left field.  It's content delivery.  It's what envisioned

4    here with the song "Hotel California."

5            It's also that idea of software object.  A software

6    object could be, for example, an image file that you display

7    on your website.  And it's the same practical concern of,

8    lots of people are going to access your website all across

9    the country, maybe all over the world.  And so you have many

10   copies of that single software object, and you are tracking

11   the locations of them.  And they are all the same.  That's

12   exactly what it's intended to cover.

13           I did want to talk about this "data pertaining to

14   entity."

15           First of all, as a matter of plain language, I

16   don't think that "data pertaining to an entity" implies that

17   they have to be different things.

18           If they are both the same, then, of course, one

19   pertains to the other.  I mean, it would be a little like

20   saying my arm doesn't pertain to me.  It's part of me.  They

21   pertain to one another.  It's perhaps a little awkward, but

22   patent claims often are awkward.

23           And here, what we also have is, we did use an

24   example in our tutorial of Mike because it's a readily

25   understandable example, where the entity is a person and

1    its data associated with it are data files.

2              But as this excerpt shows, there can be lots of

3    entities.  It is a broad word.  These are all perfectly

4    acceptable entities and used cases.

5              And I did want to make one other final point, which

6    is, counsel pointed out -- or counsel stated that this "data

7    pertaining to" language is not used anywhere else in the

8    other claims that Kove is pointing to.

9              Let me share my screen for one minute.

10             Your Honor, if you look at the construction for the

11   term "location," this is a term that the parties agree on the

12   construction.  It's in every single claim that's asserted.

13   And part of it requires, on Line 4, is "data pertaining to

14   the entity."  So this language actually is in every claim,

15   including Claims 1 and 15 of the '170 patent that

16   specifically recite a data entity.

17             And so, your Honor, given all this intrinsic

18   evidence, we do believe that there is isn't -- adding in this

19   additional limitation just isn't warranted.

20             THE COURT:  All right.  I think we have completed

21   the six terms with a response and rebuttal.

22             But I wonder now if I should be giving you at least

23   a brief opportunity for surrebuttal on some of these terms.

24   I cut you off earlier on that.  So maybe I should hear again

25   from the AWS people on any of these claims as to which there

110

1   is still some comment to be made.

2           MS. BERNARD:  Yes, your Honor.  I would like to

3   have a quick rebuttal on the "location information,"

4   "location server," and "client" terms that I discussed

5   earlier.

6           So for "location information," simply *OMEGA*

7   *Engineering*'s presumption applies here, even per Kove's new

8   case, *IP Innovations*.  The presumption isn't overcome here as

9   there is no clear change by the patentee of location

10  information across the patent.  So the same term should be

11  construed the same across all three related patents.

12          So for "location server" and for "client," AWS's

13  constructions, again, are supported by the Federal Circuit

14  case law.  There is no dispute here between the parties that

15  the inventors expressly defined certain terms in the patent

16  specifications.

17          Indeed, Kove, in its response brief, referred to

18  these definitions as the building blocks of the invention.

19  So now Kove wants to change those express definitions that

20  were put in the specifications by the inventors.  But that's

21  improper under the clear case law from the Federal Circuit

22  that says, like the *Martek* case that we saw earlier, that the

23  patentee's lexicography controls.

24          Thank you, your Honor, unless you have any

25  questions.

1      THE COURT:  Thank you.

2      Is there other surrebuttal from AWS that I should

3    be considering?

4      (No response.)

5      MR. ALLGOOD:  Not for the remainder of the terms,

6    your Honor.  None from me.

7      THE COURT:  All right.  Well, thank you for, I

8    think, a really well-organized and well-put-together

9    presentation.

10     You know, these video platforms are sometimes

11   rocky, and particularly at the beginning of the pandemic, we

12   really struggled.  I think it's gotten better.  And today's

13   presentation was a really good illustration of that.  I don't

14   think we had any dropped people or dropped slides or awkward

15   confusion.  And for me at least, that's very refreshing.

16     I also think you did a nice job on your briefs.

17   They are pretty bulky, but that's fine.  And I hope I will be

18   able to get a resolution on these issues out within the next

19   several weeks.  I can't make any guarantees.  If you are

20   waiting 60 days and you haven't heard from us, please do call

21   chambers and find out whether there is something else we

22   need.

23     MS. HOANG:  Thank you, your Honor.

24     THE COURT:  All right.  Thanks.

25     MS. HOANG:  Thank you, your Honor.

172

1          MR. FISCH:  Thank you, your Honor.

2          MR. ADLER:  Thank you.

3          MR. CARDENAS-NAVIA:  Thank you.

4      (An adjournment was taken at 12:19 p.m.)

5                    *    *    *    *    *

6  I certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

7

8  /s/ Frances Ward_____November 19, 2021.
   Official Court Reporter
9  F/j