**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KOVE IO, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 18 C 8175** |
| **v.** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **AMAZON WEB SERVICES, INC.** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Kove IO, Inc. ("Kove") has sued Amazon Web Services, Inc. ("AWS") for alleged infringement of three patents: U.S. Patent Nos. 7,103,640, 7,233,978, and 7,814,170. The patents in suit disclose a distributed-data-storage technology that can be used for large-scale cloud computing. Kove alleges that two AWS products, Amazon S3 and DynamoDB, infringe its patents. Amazon S3 allows users to store data in the cloud, while DynamoDB provides access to scalable database tables.

Kove has filed four discovery motions, and AWS has filed two. In this Order, the court rules on four motions and reserves ruling on the remaining two pending brief oral argument, as further set forth below.[1]

## I. AWS's Motion to Compel Sufficient Time to Depose John K. Overton and to Compel Production of Non-Email ESI Documents [ECF No. 392/393]

AWS has combined two requests in this motion. First, AWS seeks to depose a key witness, Kove CEO John K. Overton, for a longer duration than Kove has agreed to. Second, AWS seeks to compel Kove to search for and produce non-email electronically stored information ("ESI") from several current and former employees. The court denies the motion as to the Overton deposition and grants it in part with respect to non-email ESI.

---

[1] Each of the six motions has been briefed separately. Where the court uses shortened names in its citations to the parties' briefs (e.g., "Kove Mot." or "AWS Resp."), the shortened names apply solely to the motion under consideration.

A.      Time to Depose John K. Overton

The parties have not been able to agree on time limits for the deposition of John K. Overton.  Overton, Kove's CEO and a named inventor on all three patents in suit, will testify both in his individual capacity and as Kove's sole designee for 38 of the 41 Rule 30(b)(6) topics that AWShas identified.  AWS argues that three seven-hour days is "reasonable and necessary" for Overton's deposition.  (AWS's Mot. to Compel Sufficient Time to Depose John K. Overton and Non-Email ESI Documents [392] (hereinafter "AWS Mot.") at 1.)  But Kove has agreed to only two days of seven hours each—a length it suggests is ample.

Under the Federal Rules of Civil Procedure, the default durational limit for a single deposition is one seven-hour day.   FED. R. CIV. P. 30(d)(1).   If an individual is deposed simultaneously in their individual capacity under Rule 30(b)(1) and as a corporate designee under Rule 30(b)(6), those two depositions are considered to be separate for purposes of allotting (and limiting) time.  *See* 8A Wright & Miller, *Federal Practice and Procedure* § 2104.1 n.7 (3d ed. 2021).  Thus, the deposing party is "entitled to two seven-hour sessions."   *Berkeley*IEOR v. Teradata Operations, Inc.*, No. 17 C 7472, 2021 WL 3566596, at *3 (N.D. Ill. Aug. 12, 2021).

Although a court may order more deposition time "if needed to fairly examine the deponent," FED. R. CIV. P. 30(d)(1), "[a]dditional time is not available for the asking," *Apollo v. Stasinopoulos*, No. 18 C 6475, 2021 WL 1414090, at *2 (N.D. Ill. Apr. 14, 2021).  "A party seeking additional time must show good cause."  *Id.* (internal quotation marks omitted); *see also* FED. R. CIV. P. 30(d) advisory committee's notes (2000).  For example, courts may consider the need to question the witness about "numerous or lengthy documents," or about events that occurred "over a long period of time."  FED. R. CIV. P. 30(d) advisory committee's notes (2000).  Determining whether a party has established good cause requires a "fact-intensive inquiry."  *United States Sec. & Exch. Comm'n v. Kandalepas*, No. 18 CV 2637, 2018 WL 4005201, at *2 (N.D. Ill. Aug. 22, 2018).

In seeking three days of deposition time, AWS emphasizes that Overton is "the principal Kove witness on all facts relating to the three asserted patents and all attempts to license or commercialize those patents." (AWS's Reply in Support of Mot. to Compel Sufficient Time to Depose John K. Overton and Non-Email ESI Documents [454] (hereinafter "AWS Reply") at 1.) He was "personally involved in the formation of Kove and its predecessors, all efforts to license or commercialize those patents, and the prior sales and purchases of the patents." (*Id.* at 3.) It would be "unfair and prejudicial," according to AWS, to limit his deposition testimony to 14 hours. (AWS Mot. at 7.)

Kove argues that AWS has not established good cause for additional time. Citing the "apex doctrine," Kove contends that Overton cannot afford to take three days out of his duties as CEO. (Kove IO, Inc.'s Opp. to Amazon Web Services, Inc.'s Motion to Compel Sufficient Time to Depose John K. Overton and Non-Email ESI Documents [434] (hereinafter "Kove Resp.") at 7–8.) Kove also suggests that the relevant topics can easily be covered in 14 hours, and that AWS could request additional deposition time later if it could establish that two full days were insufficient. (*Id.* at 1, 6–7.)

The court agrees with Kove. Preemptive requests for time extensions are generally disfavored. "[T]he better practice is for the deposition to go forward to determine how much is able to be covered in the seven hours . . . ." *Kandalepas*, 2018 WL 4005201, at *2 (internal quotation marks omitted). Should two days prove inadequate, AWS may seek Kove's agreement to, or court authorization for, additional deposition time. In *Canal Barge Co. v. Commonwealth Edison Co.*, No. 98 C 0509, 2001 WL 817853 (N.D. Ill. July 19, 2001), cited by AWS, the court preemptively directed that a Rule 30(b)(6) witness be deposed for three full days, but that case involved particularly extensive factual issues. *Id.* at *4 (emphasizing "the factual complexity of discussing repair work performed on 56 barges and the need to refer to numerous accompanying documents" for each). In another case cited by AWS, the defendant had agreed to the amount of additional time that the court ultimately granted to the plaintiff. *See Brennan v. Ford Motor Co.*,

No. CV 14-0006 JAP/KBM, 2016 WL 10592217, at *2–3 (D.N.M. Feb. 1, 2016) (granting an additional three hours).

AWS has failed to establish, in advance, that it needs more than two days of seven hours each to "fairly examine" Overton under Rules 30(d)(1) and 30(b)(6). The court denies its motion as to this issue.

### B. Non-Email ESI

AWS argues that Kove's document production is deficient in two ways: the organization of the documents, and the scope of Kove's search for non-email ESI.

### 1. Organization of Kove's Production

First, Rule 34 requires that a responding party must produce documents "as they are kept in the usual course of business or must organize and label them to correspond to the categories" in the opposing party's request. *See* FED. R. CIV. P. 34(b)(2)(E)(i). AWS contends that Kove has not met this requirement, given the more than 2,000 documents that Kove produced without identifying a specific custodian beyond the name "Kove."[2] AWS claims that "Kove's refusal to provide any information associating the 'Kove' documents with its employees . . . leaves AWS unable to effectively prepare for the depositions of Kove employees." (AWS Mot. at 12.)

A party who chooses to produce documents as "kept in the usual course of business" (as Kove evidently has) bears the burden of showing that it has done so. *Johnson v. Kraft Foods N. Am., Inc.*, 236 F.R.D. 535, 540–41 (D. Kan. 2006). But this task is "not difficult." *In re Sulfuric Acid Antitrust Litig.*, 231 F.R.D. 351, 363 (N.D. Ill. 2005). The producing party must provide "at least some modicum of information regarding how [the documents] are ordinarily kept in order to allow the requesting party to make meaningful use of the documents." *Pass & Seymour, Inc. v. Hubbell Inc.*, 255 F.R.D. 331, 337 (N.D.N.Y. 2008).

---

[2]     The parties disagree about the exact number of documents associated with the custodian "Kove." AWS says the number is 2,125, while Kove cites the number 2,836. (*See* AWS Mot. at 10 n.8.)

4

The court concludes that Kove has satisfied this requirement. Kove produced the vast majority of documents with individual custodian tags and has now explained the significance of the "Kove" custodian tag: About 25% of these documents are from Kove's internal, centralized "wiki" (and are marked as such); about 25% are "Amazon-owned patents that reference the three asserted Kove patents"; and about 43% are "miscellaneous documents collected by Kove's attorneys specifically for this litigation" (including, for example, "screenshots of AWS webpages and marketing materials" and "publicly available articles about AWS"). (Kove Resp. at 10.) That leaves just 7% of the "Kove" set (i.e., approximately 200 documents) unaccounted for. (*Id.*) According to Kove, 200 documents is a "very reasonable number of documents to attribute to a company for records . . . kept in the ordinary course of business," especially where the set includes documents like check registers and profit-and-loss statements. (*Id.*)

Cases cited by AWS all appear to involve document productions with far more pervasive organizational problems. *See Pass & Seymour, Inc.*, 255 F.R.D. at 334 (document production did not identify "where the documents produced were maintained, whether they came from a single source or file or from multiple points of origin, the identity of the record custodians, [or] the manner in which they were organized"—and, even after amendment, referred to custodians unknown to the opposing party); *Venture Corp. Ltd. v. Barrett*, No. 5:13-CV-03384-PSG, 2014 WL 5305575, at *2 (N.D. Cal. Oct. 16, 2014) (41,000-page document production "contained no custodial index, no table, no information at all—just folders of the files themselves"); *Century Jets Aviation LLC v. Alchemist Jet Air LLC*, No. 08 CIV. 9892 GBDKNF, 2011 WL 724734, at *3–4 (S.D.N.Y. Feb. 8, 2011) (document production identified no custodians and included a conclusory assertion that the party had "essentially produced 'the file' " it maintained for the aircraft at issue); *Program Mgmt. Int'l v. Tetra Tech EC, Inc.*, No. SA-09-CA-877-OLG, 2010 WL 11601879, at *3 (W.D. Tex. Sept. 3, 2010) (48,236-page production of "unlabeled and unorganized" documents); *United States v. Medco Health Sols., Inc.*, No. 08-14201-CIV, 2012 WL 12850244, at *2 (S.D. Fla. Aug. 3, 2012) (no custodian identified for more than 50% of the documents produced).

AWS's objection to the organization of Kove's production is overruled.

**2. Scope of Kove's Search**

AWS also complains that Kove failed to collect non-email ESI (such as reports, notes, and presentations) from four specific custodians—Stephen Bailey, Keith Connolly, Andy Poling, and Brian Toonen—and it requests an order directing Kove to search for non-email ESI in their possession.

Kove responds that it searched three main repositories for non-email documents: Overton's computer, Kove's corporate server, and Kove's internal "wiki." (Kove Resp. at 11–12.) Additional searches are unnecessary, Kove asserts, because it "already searched relevant repositories, . . . individual laptops were not reasonably expected to contain relevant information, and . . . even if they did, it would be redundant of sources already searched." (*See id.* at 11.) Kove notes that Bailey and Toonen are no longer employees, so it need not (and cannot) search their personal devices. (*Id.* at 13.) As for Connolly and Poling, Kove claims that it "confirmed through custodial interviews that [they] were not expected to have non-duplicative responsive documents, which aligns with the fact that both have minimal involvement with the underlying issues of the litigation" based on their respective tenures at the company. (*Id.*) These efforts, Kove says, fully satisfied its obligations to produce relevant, responsive documents. Kove reports, further, that it "recently searched Poling's and Connolly's laptops and confirmed its original belief that neither have unique, relevant information stored there." (*Id.* at 14.) While Poling had no relevant documents, Connolly had a handful that were created after Kove had conducted its initial search, and Kove subsequently produced them.[3] Thus, Kove says, AWS's request is moot.

---

[3]     It is not clear to the court precisely how many documents Kove produced following its recent searches. In the introduction to its response brief, Kove says that its recent searches "found only about 40 non-duplicative documents, which are in the process of being produced." (Kove Resp. at 2.) Later in the brief, Kove seems to suggest that it would be producing 17 documents from Connolly's computer. (*Id.* at 14.)

AWS highlights the fact that Connolly stated during his deposition that his computer had not been searched. (*See, e.g.*, AWS Mot. at 11.) But, as Kove explains, "Connolly's testimony demonstrates the documents stored on his laptop are not unique—they are executed documents he keeps locally 'for reference,'" which would have been uploaded to Kove's server anyway. (Kove Resp. at 14.) Moreover, there is no reason to believe that the documents Connolly vaguely referred to (such as nondisclosure agreements) are relevant to this case. (*Id.*)

AWS makes one final, narrow argument, pointing out that Kove has never outright stated "that it lacks metadata or other information allowing it to easily identify who uploaded the 'Kove' custodial documents to its servers." (AWS Reply at 11.) Such information is, according to AWS, "routinely available in cloud computing environments." (*Id.*) AWS therefore asks the court to require, at a minimum, that Kove disclose all such identifying information for the approximately 200 documents that remain unaccounted for in its breakdown of "Kove" documents. (*See id.* at 10–11.) This request is reasonable. For the approximately 200 "Kove"-tagged documents that Kove has described as general company documents uploaded to its company server, Kove must identify the specific custodian who uploaded the document, if such information is contained in existing metadata. But Kove need not go to greater lengths, such as conducting additional custodial interviews, to track down this information.

In conclusion, the court declines to order Kove to search for additional non-email ESI in the possession of Bailey, Connolly, Poling, or Toonen. The court will require Kove to identify custodians for the "Kove"-tagged documents that Kove has already produced.

## II. AWS's Motion for Protective Order Regarding 30(b)(6) Topic Nos. 84–85 and 87–88 and Requests for Production Nos. 219–21 and 223–26 [ECF Nos. 397/398]

AWS seeks a protective order that bars Kove's discovery requests in three separate substantive areas. For reasons explained here, that request is denied with respect to the "SimpleDB" documents but otherwise granted.

The Federal Rules of Civil Procedure provide for broad discovery. *See Lukis v. Whitepages Inc.*, 535 F. Supp. 3d 775, 797 (N.D. Ill. 2021) (citing FED. R. CIV. P. 26(b)(1)). Parties may obtain discovery on any matter that is "(1) nonprivileged; (2) relevant to any party's claim or defense; and (3) proportional to the needs of the case." *Hoerchler v. Equifax Info. Servs., LLC*, No. 20 CV 3310, 2021 WL 4902452, at *2 (N.D. Ill. Oct. 21, 2021). There are, however, limits to what is reasonable. A court may issue a protective order covering relevant information if the requested production would cause a party "annoyance, embarrassment, oppression, or undue burden or expense." *See* FED. R. CIV. P. 26(c)(1). The party moving for a protective order bears the burden of establishing "good cause." *ED&F Cap. Markets Ltd. v. JVMC Holdings Corp.*, 335 F.R.D. 174, 177 (N.D. Ill. 2020). And it must make a "particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *U.S. E.E.O.C. v. Source One Staffing, Inc.*, No. 11 C 6754, 2013 WL 25033, at *3 (N.D. Ill. Jan. 2, 2013) (quoting *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n.16 (1981)).

## A.    SimpleDB (Kove RFP Nos. 220–221 & 223–226 and Rule 30(b)(6) Topic Nos. 87–88)

Kove issued RFP Nos. 220, 221, and 223 through 226 on June 14, 2021. (*See* Ex. C to AWS Mot. [397-4] at 10–12.) It served a notice containing Rule 30(b)(6) Topic Nos. 87 and 88 on August 2, 2021. (*See* Ex. B to AWS Mot. [397-3] at 10.) These eight requests (six RFPs and two deposition topics) all seek information about AWS's "NoSQL" products.[4] The "NoSQL" label applies not only to DynamoDB (one of the two products that Kove has accused of infringement) but also to seven unaccused AWS products: DocumentDB, Elasticache, KeySpaces, Neptune, QLDB, SimpleDB, and Timestream. (AWS's Motion for Protective Order Regarding 30(b)(6) Topic Nos. 84–85 and 87–88 and Requests for Production Nos. 219–21 and 223–26 [397] (hereinafter "AWS Mot.") at 3–4.) AWS believes that none of these seven unaccused products

---

[4]    According to Kove, "NoSQL refers to the way a database is structured, and specifically refers to database products that use a nonrelational data model." (Kove Resp. at 5 n.10.)

has even been identified as a non-infringing alternative. It therefore contends that Kove's NoSQL requests seek irrelevant information, are unduly burdensome, and are disproportionate to the needs of the case. (*See id.* at 4.)

Kove concedes that its discovery requests appear to encompass several unaccused NoSQL products, but Kove says it has now narrowed the NoSQL requests to material related to SimpleDB. (Kove IO, Inc.'s Resp. to AWS's Motion for Protective Order Regarding 30(b)(6) Topic Nos. 84–85 and 87–88 and Requests for Production Nos. 219–21 and 223–26 [437] (hereinafter "Kove Resp.") at 5.) SimpleDB *is* a non-infringing alternative, Kove contends, meaning that the material it has requested here is crucial for calculating damages in the form of a reasonable royalty.[5] (*Id.* at 3–5.) For instance, "[b]ecause scalability is a feature enabled by the patented invention, comparing DynamoDB's scalability against SimpleDB's will provide important information regarding how the patented technology benefits DynamoDB." (*Id.* at 3.) For Kove to "understand what value (i.e., what portion of DynamoDB's profitability) is fairly attributable to its ability to scale, Kove needs relevant cost, revenue, and usage information for SimpleDB." (*Id.* at 3–4.)

In support of its request for a protective order, AWS argues, first, that SimpleDB cannot serve as a non-infringing alternative. In AWS's view, Kove's recognition that SimpleDB "cannot scale" as DynamoDB does is an admission that SimpleDB "wouldn't be an acceptable substitute [for] DynamoDB." (AWS Reply at 4 (quoting Kove Resp. at 3).) (*Id.*) But Kove is correct that SimpleDB's relative inability to scale might *advance* Kove's potential argument that the patented technology is a particularly valuable feature for DynamoDB. In any case, AWS seems to confuse threshold discoverability standards with substantive damages calculations. At this stage, Kove

---

[5]     A reasonable royalty may be determined by, among other methods, "estimat[ing] the value of the benefit provided by the infringed features by . . . comparing the accused product to non-infringing alternatives." *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc).

need only establish that the information it seeks about SimpleDB is "relevant" to its claims and "proportional" to the needs of the case—and, of course, that the production would not cause AWS "annoyance, embarrassment, oppression, or undue burden or expense." *See* FED. R. CIV. P. 26(b)(1), (c)(1). Kove does not yet need to prove its damages (including as they relate to a possible non-infringing alternative like SimpleDB) to the satisfaction of either AWS or the court.

Second, AWS makes a timeliness argument against the SimpleDB discovery. According to AWS, Kove's response brief "marks the first time—after 30 months of discovery—that [Kove] has alleged that SimpleDB is a non-infringing alternative." (AWS's Reply in Support of Its Motion for Protective Order Regarding 30(b)(6) Topic Nos. 84–85 and 87–88 and Requests for Production Nos. 219–21 and 223–26 [449] (hereinafter "AWS Reply") at 1; *see also id.* at 3–4 (similar; AWS Mot. at 1, 8 (similar).)[6] As Kove declined to identify non-infringing alternatives earlier, AWS argues, the court should bar this late-stage discovery request. (AWS Reply at 3 & n.10.) In support, AWS cites Federal Rule of Civil Procedure 37(c)(1), which provides that a party that fails to provide information in discovery is "not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." FED. R. CIV. P. 37(c)(1). But the sole case AWS cites on this score, *Sanofi-Aventis Deutschland GMBH v. Genentech, Inc.*, No. C-08-4909-SI, 2011 WL 839411 (N.D. Cal. Mar. 7, 2011), does not support AWS's interpretation of the rule. In *Sanofi-Aventis,* the court refused to permit the plaintiff patentee to present a theory of domestic conception and reduction to practice that the plaintiff had not disclosed in discovery and that the defendant therefore had no opportunity to investigate. *Id.* at *27. In this case, by contrast, Kove has not surprised AWS by introducing new information in a post-discovery motion. Kove instead is using discovery to investigate its theory that SimpleDB is a non-infringing alternative to DynamoDB. Kove's arguably

---

[6]     AWS admits that "[d]uring the parties' meet and confer, Kove indicated that [NoSQL] services might be non-infringing alternatives that could be relevant to its damages case." (AWS Mot. at 8.) But AWS seems to believe that Kove did not articulate this theory with "the necessary specificity." (*Id.*)

tardy disclosure of its theory does not require that discovery be barred. Should Kove's requests prompt a genuine need for AWS to engage in additional discovery, AWS is free to request it.

Third, AWS cites a Delaware district court opinion that lays out a test used to determine whether a patent-infringement plaintiff may obtain discovery into unaccused products. (AWS Mot. at 8 & n.26 (citing *Invensas Corp. v. Renesas Elecs. Corp.*, 287 F.R.D. 273, 282 (D. Del. 2012)); AWS Reply at 5.) According to AWS, Kove has not satisfied that test, which requires an infringement plaintiff seeking information concerning a non-infringing product to show "(1) how the unaccused products are relevant to its infringement claims with specificity, (2) that it couldn't obtain the relevant information publicly, and (3) [that] the burden on the defendant [would not be substantial]." (AWS Mot. at 8.) Assuming this test does limit discovery regarding non-infringing alternatives, Kove contends it can satisfy the test (Kove Resp. at 5 & n.9), and the court agrees.

As for the first *Invensas* element, relevance, Kove has explained why it seeks "information sufficient to show the comparative benefits and drawbacks of SimpleDB versus DynamoDB, from both a technical and financial perspective." (Kove Resp. at 4; *see also id.* at 3–4.) As set forth above, the court finds that explanation satisfying and specific enough for discovery purposes. As for the second *Invensas* element, the public availability of the information, there can be no doubt that *some* information about SimpleDB is available publicly,[7] but AWS has not shown that the specific information Kove seeks in its requests—such as "information regarding SimpleDB's pricing, revenue, costs, and usage data" (*id.* at 4 (citing Kove's RFP No. 221))—is available publicly without discovery.

With respect to the third *Invensas* element—the burden—AWS complains that "Kove's requests would set discovery back to the beginning." (AWS Mot. at 1; *see also id.* at 9; AWS Reply at 6–7.) For instance, "AWS would have to collect documents and source code from [SimpleDB's] technical, financial, and operational teams" in order to "collect, review, and produce

---

[7]     For example, AWS cites this webpage: https://aws.amazon.com/simpledb/details. (AWS Reply at 3 n.8.)

relevant source code, wiki's, financial, and operational performance documents." (AWS Mot. at 1, 9.) But Kove points to circumstantial evidence that AWS maintains the information sought for SimpleDB in readily available form, as it does for the accused products. (Kove Resp. at 5–6.) Kove notes, further, that it seeks information only about SimpleDB, not the other NoSQL products. (*Id.* at 5.) That limitation undermines AWS's assertion that the requests would take "months" to satisfy—an assertion premised on the notion that the requests encompassed all seven of AWS's unaccused NoSQL products. (*See* AWS Mot. at 9.) While the court appreciates AWS's concern that satisfying these requests would require a considerable effort, that burden does not appear to be disproportionate, in light of SimpleDB's relevance to Kove's damages theory.

Kove has adequately justified its requests for information pertaining to SimpleDB. AWS's motion for a protective order is denied.

### B. Amazon.com, Inc. (Kove Rule 30(b)(6) Topic No. 85)

On May 10, 2021, Kove served a notice containing Rule 30(b)(6) Topic No. 85, which seeks testimony concerning

> [t]he operational, financial, and managerial relationship between AWS and Amazon.com, Inc., including the corporate structure of each, the management structure of each, including any overlapping directors, officers, or employees between AWS and Amazon.com, Inc., any policies and procedures concerning the sharing of documents or information between AWS and Amazon.com, Inc., and Amazon.com, Inc.'s involvement in this litigation.

(*See* Ex. F. to AWS Mot. [397-7] at 7 (AWS's Responses and Objections).) According to AWS, Kove clarified in an August 2021 conference that Topic No. 85 seeks "testimony regarding the founding and history of AWS, why Amazon Web Services, Inc. was created, the corporate structure of Amazon.com and AWS, documents or information shared between the two companies, employees and resources shared between the two companies, Amazon.com's involvement in this case, and technical support provided by Amazon.com to AWS and vice versa."

(AWS Mot. at 5; *see also id.* at 10; AWS Reply at 7.)  AWS attaches an August 2021 letter in which it memorialized the parties' conference.  (*See* Ex. G to AWS Mot. [397-8] at 3–4.)[8]

This request, AWS urges, seeks irrelevant information because it does not touch on questions of infringement, validity, or damages.  (*See* AWS Mot. at 10.)  AWS also argues that, even to the extent that Topic No. 85 is relevant, it is unnecessarily cumulative vis-à-vis three of Kove's prior discovery requests.  (*See id.* at 10–11, 10 n.36 (citing Rule 30(b)(6) Topic Nos. 33 & 79–80).)[9]  Finally, AWS argues that Topic No. 85 is unduly burdensome.  "For example, just on documents or information shared between the companies [AWS and Amazon.com, Inc.], such witnesses would have to speak with the technical, marketing, and financial teams for AWS's 200 services to confirm what type of information, if any, is shared between the companies."  (AWS Mot. at 11.)

Kove largely ignores AWS's arguments.  It never disputes AWS's summary of the representations that Kove made about Topic No. 85 previously.  And on the question of Topic No. 85's cumulativeness with respect to other discovery requests, Kove responds only as to Topic No. 33, asserting without explanation that "Topic 85 addresses particular aspects of AWS's

---

[8]     In the August 2021 letter, which Kove has not rebutted, AWS recounted that, during the parties' conference, "Kove provided examples of some of the information it intended to seek within this topic, including, the founding and history of AWS, why AWS was spun off of Amazon, if S3 was the reason for that spinoff, how documents and resources are shared, overlap in employees, and Amazon.com's involvement in this litigation and in technical support (such as with design arounds), among others."  (Ex. G to AWS Mot. at 3–4.)

[9]     Topic No. 33: "The nature of Your company, including its founding, history, current and past corporate organization structure, and relation to Amazon.com, Inc. and other Amazon.com, Inc. subsidiaries."  (Ex. H to AWS Mot. [397-9] at 13.)

Topic No. 79: "The nature and extent to which the Accused Products are used by any Other Amazon Entity or any product or service operated by any Other Amazon Entity."  (Ex. N to AWS Mot. [397-15] at 9.)

Topic No. 80: "How AWS accounts or charges for use of the Accused Products by any Other Amazon Entity."  (*Id.* at 10.)

'operational, financial, and managerial relationship' with Amazon.com not addressed in Topic 33.'" (Kove Resp. at 10.)

Kove does address the issue of relevance, but only in a general way:  Kove asserts that the relationship between AWS and Amazon.com is relevant to damages (mainly the determination of a reasonable royalty rate) because it speaks to the "benefits derived from the accused products." (*Id.* at 7–8, 10.)  In short, "[d]iscovery into why AWS and Amazon.com consider themselves 'the same company' with 'the same ability to deploy capital,' and why they make coordinated pricing decisions for the benefit of 'Amazon,' bears on the profitability and value of the accused products to their shared business." (*Id.* at 7–8.)

As for the burden of responding to the broad requests in Topic No. 85, Kove insists that it "seeks, and has always sought, information relevant to the accused products (i.e., S3 and DynamoDB)." (*Id.* at 10.)  Kove promises to make the request more "concrete and manageable," explaining that Kove seeks to know "how AWS and Amazon arrived at their pricing; the information underlying the 'six-pager' memo in which Jassy—who was eventually named AWS CEO—justified the formation of AWS; investments by Amazon.com and the use of its personnel and other resources to develop, market, analyze, price, and sell the accused products; resources provided by Amazon.com to launch AWS and the accused products." (*Id.* at 9–10.)

As AWS sees things, Kove has effectively rewritten Topic No. 85 to implicate specific subject matter that was not previously discussed—and which Topic No. 85 does not encompass anyway. (AWS Reply at 8.)  AWS also reiterates that preparing for a deposition on Topic No. 85 would impose a heavy burden even if the topic were limited to S3 and DynamoDB.  "Hundreds of technical, financial, and marketing employees work on each of those services.  A witness would have to determine what documents, information, and resources those employees have shared with Amazon.com since 2006 and if any have worked for Amazon.com during that period. And employees in other departments, such as legal or human resources, may do work relating both to the accused services and for Amazon.com." (*Id.* at 10.)

The court concludes that AWS is entitled to a protective order as to Topic No. 85. First, Kove has not adequately responded to AWS's argument that Topic No. 85 is cumulative. For example, Topic No. 33 addresses the "relation" between AWS and Amazon.com, while Topic No. 80 addresses how AWS "accounts or charges" for Amazon.com's use of the accused products.[10] Those topics appear to encompass much of the information that AWS believes is captured by Topic No. 85. Furthermore, Kove's understanding about Topic No. 85 is difficult to square with its plain text, which does not mention the accused products at all. In any event, it appears Kove has been evasive with AWS during the parties' communications. While Kove has taken pains to explain to the court why Topic No. 85 is relevant to the case, it evidently failed to articulate that understanding of its request during the parties' prior discussions. AWS's request for a protective order as to this topic is granted.

### C. Email Distribution Lists (Kove RFP No. 219 and Rule 30(b)(6) Topic No. 84)

On May 10, 2021, Kove served a notice containing Rule 30(b)(6) Topic No 84, which seeks testimony concerning

> [AWS's] e-mail accounts, reflectors, mailing lists, central mailing repositories, or communication archives (collectively "group accounts") (e.g., s3-metrics@ amazon.com, awsmetrics@amazon.com, aws-compete@amazon.com, aws-compete-team@amazon. com) relating to the Accused Products, from 2006 through 2020, including who maintains group accounts, how group accounts are maintained, and where messages sent to or from group accounts are stored.

(Ex. F to AWS Mot. [397-7] at 6.) On June 11, 2021, Kove issued RFP No. 219, which seeks,

> [t]o the extent not already requested, documents relating to AWS's mailing list system(s), including documents sufficient to identify mailing lists relating to the Accused Products or Relevant Features, documents sufficient to identify the software AWS uses to run its mailing list systems, documents sufficient to identify how mailing lists or group e-mail accounts are preserved or maintained, and documents sufficient to show where and how messages sent to or from mailing lists or group accounts are preserved.

---

[10]     While Topic No. 79 encompasses the "nature and extent" of Amazon.com's use of the accused products, AWS evidently objected to this request on the basis that such information is not in its possession, custody, or control. (*See* Ex. N to AWS Mot. at 9 (Response to Topic No. 79).)

(Ex. I to AWS Mot. [397-10] at 19.)  As with their dispute about discovery into Amazon.com, Inc., the parties disagree fundamentally about the nature of the information Kove is seeking.  In part, that disagreement stems from the parties' disagreement about what function AWS's email distribution lists serve within its business.

For purposes of ESI discovery, the parties have agreed to follow the Northern District of Illinois Local Patent Rules for Electronically Stored Information ("LPR ESI").  (*See* Joint Mot. for Entry of Rpt. of Parties' Planning Meeting and Agreed Case Schedule [52] at 4.)  Consistent with LPR ESI 2.6(d), which provides that a party "shall limit its email production requests to a total of five custodians per producing party," Kove previously identified five AWS email custodians.  (AWS Mot. at 5–6.)[11]  In AWS's view, Kove's requests seek additional "email discovery" in contravention of the parties' LPR ESI 2.6(d) agreement.  (*Id.* at 11–12.)  It also argues that Kove's requests are unduly burdensome, in light of the large number of email lists that it maintains and the broad time period (2006 through 2020) for which Kove seeks this information.  (*Id.* at 12–13.)

In response, Kove rejects the basic premise that it seeks "email discovery."  Kove contends that AWS uses its email distribution lists not as "a traditional email repository," but more in the nature of "a folder that has database search functionality." (Kove Resp. at 13.)  Kove characterizes this system as a "List Archive" that AWS uses "to preserve specific, topic-oriented documents directly relevant to this case, and to store key metrics relating to the accused products, including data that AWS seemingly has failed to preserve elsewhere."  (*Id.* at 1.)  This List Archive is more "[l]ike Wikis (and unlike emails)" in that it is "open to all employees" and its contents "can be linked, shared, referenced, and stored."  (*Id.* at 13.)  Ultimately, Kove says, "the fact that a document is sent via email does not independently shield that document (or, as here, the archive housing that document) from discovery."  (*Id.* at 10 n.28; *see also id.* at 13–14 (similar).)  Email is merely the "distribution mechanism" by which documents are added to the List Archive.  (*Id.*)

---

[11]     The emails of Andy Jassy, one of the five AWS custodians identified by Kove, were the subject of a separate motion not relevant here.  (*See* Kove Mot. at 6, 12 & n.39.)

Kove extensively details why it believes AWS's "List Archive" is relevant to the litigation. (*See id.* at 11–13 & nn.29–38; *see also, e.g.*, *id.* at 11 (noting the existence of "directories that relate specifically to AWS's internal usage, marketing, finances, and metrics relating to the accused products").)  A request for production of this information complies with the plain terms of LPR ESI 2.6(d), Kove says, because "AWS's List Archive is *non-custodial* and does not belong to any individual." (*Id.* at 14.)  Because documents contained in what Kove refers to as the List Archive are already preserved and archived, Kove also argues that production would not be burdensome, beyond the task of "identifying which directories are relevant to this litigation—a task that Kove volunteered to assist with, if provided information on the directories AWS maintains." (*Id.*)

AWS calls this request excessive and inconsistent with the parties' agreements. (AWS Reply at 11.)  Specifically, AWS asserts, Kove previously represented that it was "*not* requesting e-mails, only information relating to the mailing lists themselves." (*Id.* (quoting Ex. O to AWS Reply [449-3] at 1 (June 2021 letter from Kove's counsel)).)  AWS also disputes Kove's characterization of the data it is seeking:  AWS insists its email distribution lists are in fact "email distribution lists, not a central repository for storing key documents." (*Id.* at 12.)  Finally, AWS reiterates the burden of responding to Kove's requests, attaching an attorney declaration to the effect that collection of the email addresses Kove seeks would require AWS to "gather emails" from employees on "hundreds of such lists," some of which "include dozens of recipients." (*Id.* at 14.)  "And once all of these emails are collected, the parties would have to negotiate search terms, [and] AWS would have to review the results, produce any responsive documents, and log any privileged documents." (*Id.* citing Decl. of Jeffrey Saltman in Support of AWS's Reply in Support of Its Mot. for Protective Order [449-1] ¶¶ 2–7).)

As the court reads Kove's Rule 30(b)(6) Topic No. 84, it seeks testimony *about* the AWS email lists that relate to the accused products and *about* whatever adjacent recordkeeping system might exist.  In other words, the topic seeks administrative information about "who maintains group

17

accounts, how group accounts are maintained, and where messages sent to or from group accounts are stored."  And RFP No. 219 seeks similar information: documents sufficient to "identify mailing lists," "identify the software AWS uses to run" them, "identify how mailing lists or group e-mail accounts are preserved or maintained," and "show where and how messages sent to or from mailing lists or group accounts are preserved."  This request does not appear, as Kove suggests, to be a request for substantive S3- or DynamoDB-related emails that were sent using email distribution lists—nor does it appear to seek substantive S3- or DynamoDB-related documents that are associated with the relevant email distribution lists within the recordkeeping system that Kove alleges to exist.  Though Kove contends that it has, all along, requested "that AWS provide information about its List Archive and search its relevant directories" (Kove Resp. at 11), RFP No. 219 does not set forth such a broad request; at most, it seeks a search *about* the relevant directories.  As quoted above, in correspondence, Kove's counsel assured AWS asserted that Kove is "*not* requesting e-mails."  (*Id.* (quoting Ex. O to AWS Reply at 1).)  In any event, as AWS points out, Kove has already sought and obtained email discovery for its chosen custodians.  To the extent that a custodial account included emails that were distributed through an email distribution list, those emails would have been produced already.  (*See* AWS Reply at 12–13, 13 n.54 (citing an email previously produced from a custodian's files that was addressed "only to S3scale@amazon.com").)  Kove cannot evade the five-custodian limit on email discovery under the guise of seeking access to a recordkeeping system that it claims to be distinct.  Finally, the court credits AWS's argument that fulfilling Kove's request would impose a heavy burden, especially given how long the parties have already been involved in discovery.  The court will grant AWS a protective order as to Kove's RFP No. 219 and Rule 30(b)(6) Topic No. 84.

### III.  Kove IO, Inc.'s Motion for Protective Order Regarding Discovery into Litigation Financing [ECF Nos. 400/401]

Kove's motion arises from several efforts by AWS to obtain discovery about third-party funding of this litigation.  Although Kove has not entered into any such funding agreements, it has

previously discussed the possibility with third parties. (*See* Kove IO, Inc.'s Mot. for Protective Order Regarding Disc. into Litigation Financing [400] (hereinafter "Kove Mot.") at 3–4.)

Over a year ago, AWS moved to compel Kove to produce documents and interrogatory responses related to litigation funding [222]. The parties resolved their dispute after further correspondence, and AWS withdrew its motion [239]. More recently, the conflict reignited during AWS's deposition of Kove's Operations Manager, Keith Connolly. AWS repeatedly asked Connolly funding-related questions, which Kove objected to on the basis of relevance, attorney–client privilege, or the work product doctrine. During the deposition, Kove also requested the clawback of a document that it says contains attorney work product.[12] Shortly after Connolly's deposition, AWS served a Rule 30(b)(6) notice containing at least three topics that mention litigation funding. AWS also suggested to Kove that it would seek more time for its deposition of Connolly.

In the pending motion, Kove "request[s] a protective order from discovery related to litigation funding, including document requests, interrogatories, and witness questioning." (Kove Mot. at 3.) AWS responds that Kove's objections are baseless and that the "speaking objections, demands for breaks, and instructions not to answer" made by Kove's counsel during the Connolly deposition were inappropriate. (AWS's Opp. to Kove's Mot. for Protective Order Regarding Disc. into Litigation Financing [425] (hereinafter "AWS Resp.") at 1.) AWS therefore requests that, in addition to denying Kove's motion, the court order Kove to "(1) produce all of the relevant documents on this topic that Kove has clawed back or withheld, (2) produce Mr. Connolly for a

---

[12] After the deposition, Kove updated its privilege log with the clawed-back document and a second document for which it had requested clawback on similar grounds. According to Kove, there is nothing particularly special about these two documents, and Kove has insinuated that it possesses additional documents about its litigation funding discussions. (*See* Kove Mot. at 3 ("Kove provided the updated log as to these two documents only because they were the subject of a specific dispute at the deposition and to provide AWS sufficient information to assess Kove's work product claim. Kove has no obligation to log irrelevant documents.").)

further half-day of deposition, and (3) refrain in future depositions from repeating the improper, obstructive conduct that derailed the Connolly deposition."  (*Id.* at 2.)

### A. Relevance

The first issue is relevance.  Kove contends that "litigation funding information is generally irrelevant to proving the claims and defenses in a case."  (Kove Mot. at 4–5 (quoting *Fulton v. Foley*, No. 17-CV-8696, 2019 WL 6609298, at *2 (N.D. Ill. Dec. 5, 2019)).)  AWS urges, however, that in patent litigation, where a plaintiff seeks to establish damages based on a reasonable royalty, litigation funding information helps show what a "hypothetical negotiation" for a patent license would look like.  (AWS Resp. at 7–11.)  In AWS's view, "Kove's dealings with third-party funders are likely to shed light on the actual value of its patents," particularly in this context, where Kove has never licensed the patents in suit, and there are no other third-party negotiations that might shed light on their value.  (*Id.* at 8–9.)  Separately, AWS believes that evidence of litigation funding discussions may be useful for "rebut[ting] Kove's anticipated David-and-Goliath theme at trial."  (*Id.* at 3 n.13 (internal quotation marks omitted); *see also id.* at 9–10, 10 n.55 (similar).)

Kove contends that in its briefs and in the case authorities it cites, AWS has conflated litigation funding and patent licensing.  (Kove Reply at 2.)  *See, e.g., In re Andre*, No. 19-MC-80266-VKD, 2019 WL 6699958, at *3 (N.D. Cal. Dec. 9, 2019) (discussing a discovery request for information about the transaction through which plaintiff had obtained the patents in suit); *Intel Corp. v. Prot. Cap. LLC*, No. 13CV1685 GPC (NLS), 2013 WL 12313348, at *3 (S.D. Cal. Oct. 2, 2013) (discussing a discovery request for information about a third party's financial backing of the purchase of the patents in suit); *Bally Techs., Inc. v. Bus. Intel. Sys. Sols., Inc.*, No. 2:10-CV-00440-PMP, 2011 WL 3892221, at *3 (D. Nev. Aug. 30, 2011) (discussing a discovery request for information about the infringement plaintiff's agreements to license technologies akin to the patent in suit); *Volumetrics Med. Imaging, LLC v. Toshiba Am. Med. Sys., Inc.*, No. 1:05CV955, 2011 WL 2470460, at *16 (M.D.N.C. June 20, 2011) (discussing a discovery request for information about the patent licenses awarded to settling defendants); *Fresenius Med. Care*

*Holding Inc. v. Baxter Int'l, Inc.*, 224 F.R.D. 644, 653 (N.D. Cal. 2004) (discussing a discovery request for information about licenses for the patent in suit and for comparable products); *AM Int'l, Inc. v. Eastman Kodak Co.*, 100 F.R.D. 255, 258 (N.D. Ill. 1981) (discussing a discovery request for information about the infringement plaintiff's past "licensing and attempts to license the patents at issue").

The court does not find the analogy between patent licensing and litigation funding to be as strong as AWS assumes it is. A transaction in which a patent is sold or licensed is undoubtedly a "'real-world' indicator[ ]" of the patent's market value. (*See* AWS Resp. at 8.) That transaction directly reflects how much money a patent has commanded on the market, thus shedding light on what "reasonable royalty" the defendant might have paid to the plaintiff for a license. But a litigation funding agreement is a step of abstraction removed from any "'real-world' indicators" of value like the *Georgia Pacific* factors. (*See id.* at 7–8 (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120–21 (S.D.N.Y. 1970)).) At best, a funding agreement embodies the patentholder's and funder's subjective calculations about the value they might prove the patent to possess in the context of litigation. Fundamentally, a litigation funding transaction does not exist in the market for patents or patented technologies; it exists in the market for litigation funding.

AWS has pointed to a handful of cases that have found certain litigation funding information to be relevant in patent infringement cases, but most of these cases are either thinly reasoned or factually inapposite. The court in *Odyssey Wireless*, for example, simply noted, without discussion, that the disputed documents shed light on "valuations placed on the [plaintiff's] patents prior to the present litigation." *Odyssey Wireless, Inc. v. Samsung Elecs. Co., Ltd.*, No. 315CV01735HRBB, 2016 WL 7665898, at *7 (S.D. Cal. Sept. 20, 2016). There is some truth to this, but the valuations that might be revealed here would be less useful: Kove has never finalized a litigation funding agreement, meaning that no party has relied on any such valuation even for the purpose of funding any litigation. *See Space Data Corp. v. Google LLC*, No. 16-CV-03260

BLF (NC), 2018 WL 3054797, at *1 (N.D. Cal. June 11, 2018) ("Even if litigation funding were relevant (which is contestable), *potential* litigation funding is a side issue at best.").

The court in *Continental Circuits* found that some litigation funding information was relevant because the information "concern[ed] Plaintiff's financial resources and could be used to refute any David vs. Goliath narrative at trial." *Continental Circuits LLC v. Intel Corp.*, 435 F. Supp. 3d 1014, 1019 (D. Ariz. 2020). Candidly, this court questions whether a party's interest in refuting a "theme"—as opposed to supporting a claim or defense—provides a proper basis for discovery under the Federal Rules of Civil Procedure. In any event, *Continental Circuits* did not involve draft documents or discussions between the plaintiff and a third-party funder. It ruled only on the relevance of *final* litigation funding agreements, which Kove has never entered.

The court concludes that materials regarding litigation funding negotiations are minimally relevant, at best.

## B.     Work Product

Whatever their relevance, Kove argues, in addition, that negotiations with potential third-party litigation funders are shielded by the work product doctrine. That doctrine, codified in Federal Rule of Civil Procedure 26(b)(3)(A), generally bars from discovery any "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." FED. R. CIV. P. 26(b)(3)(A). Despite this protection, work product may nevertheless be subject to production if the discovering party "shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *Id.* Where discovery is ordered under this exception, the court "must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." FED. R. CIV. P. 26(b)(3)(B). The rules afford this latter type of material, known as opinion work product, "absolute or nearly absolute" protection from discovery. *Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 616 (N.D. Ill. 2000).

22

The "threshold" issue in a work product claim is determining whether material was prepared "in anticipation of litigation." *See Allen v. Chi. Transit Auth.*, 198 F.R.D. 495, 500 (N.D. Ill. 2001). Documents that are created for purposes of obtaining litigation funding are self-evidently created "because of the prospect of litigation." *See Logan v. Com. Union Ins. Co.*, 96 F.3d 971, 976–77 (7th Cir. 1996) (emphasis omitted) (quoting *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983).) AWS contends the litigation funding documents must nevertheless be produced. AWS asserts that it has "a substantial need for these documents because . . . Kove never licensed the asserted patents and hasn't produced comparable sources of information." (AWS Resp. at 12.) AWS's claim of substantial need thus relies on the same premise as its theory of relevance: that "Kove's agreements and negotiations with its third-party litigation funders will shed light on the actual value of its patents outside the context of an expert report motivated by litigation." (AWS's Mot. to Compel Responses to Disc. Requests Regarding Third-Party Litigation Funding [222] at 5.) For the reasons explained above, the court questions whether unsuccessful negotiations will shed significant light on the Kove patents' "actual value." The fact that the patents in suit have never been licensed robs both parties of meaningful "real-world" data; Kove's negotiations with potential third-party funders does not effectively fill that gap.

AWS cites just one case in which a patent defendant was found to satisfy the "substantial need" and "undue hardship" exception with respect to litigation funding documents. *See Odyssey Wireless*, 2016 WL 7665898, at *7. In concluding that that the defendant had a "substantial need" for the plaintiff's litigation funding documents, that court relied on the relevance argument that has less force here, where no funding agreement resulted. In concluding that the defendant could not, without "undue hardship," obtain substantially equivalent information by other means, that court merely noted that "Defendants have not been given any other documents regarding valuations of Plaintiff." *Id.* To the extent that Kove's litigation funding documents might include relevant facts that directly reflect the value of the patents, AWS has not offered specific arguments

showing that it cannot reasonably obtain those facts elsewhere. AWS has therefore failed to overcome the work product protection as to Kove's litigation funding materials.

### C. Connolly Deposition

In addition to opposing Kove's motion for a protective order, AWS has asked the court to order that Kove "produce Mr. Connolly for a further half-day of deposition, and . . . refrain in future depositions from repeating the improper, obstructive conduct that derailed the Connolly deposition." (AWS Resp. at 2.) AWS has alleged a rash of improper conduct by Kove's counsel, including (1) inappropriately coaching the witness, (2) directing the witness not to answer on grounds that were either legally impermissible (relevance) or factually nonexistent (an agreement between the parties not to discuss litigation funding), and (3) asserting attorney–client privilege or work product protection where it does not apply.

Kove responds that "[t]he only predicate AWS has for seeking to recall [Mr. Connolly] concerns protected and irrelevant matters." (Kove Mot. at 8.) More specifically, Kove insists that its objections and instructions were appropriately tailored to its concerns that certain questions "directly called for disclosure of protected information or were broad enough to potentially cause the witness to inadvertently disclose protected information." (Kove Reply at 6–7.)

The court agrees with Kove. AWS chose to spend a substantial portion of Mr. Connolly's deposition pursuing lines of questioning about Kove's discussions with third-party litigation funders—matters that, as explained, are only minimally relevant to the claims and defenses in this case and that are likely to contain protected work product. Having read the transcript from Mr. Connolly's deposition, the court finds that AWS's complaints are overblown. Despite Kove's broad (and justified) concerns about the relevance of litigation funding discussions, Kove's counsel generally objected to questions only where counsel reasonably expected that responsive testimony threatened to reveal protected information. The transcript includes numerous pages of questions and testimony that are not interrupted by any objections. (*See, e.g.*, Connolly Dep. [400-5] 51:9–53:3 (discussing the identities of prospective litigation funders); *id.* at 57:4–60:17

24

(discussing various details about specific meetings with prospective litigation funders); *id.* at 71:12–73:18 (discussing Kove's creation of spreadsheets assessing "potential payout scenarios for the litigation with AWS"); *id.* at 83:3–88:18 (discussing an email from Connolly to Kove's accountant regarding litigation funding); *id.* at 94:11–99:4 (discussing a memorandum that Kove provided to prospective funders).)

The court also rejects the notion that Kove's counsel impermissibly coached the witness, as AWS contends. It is true that "speaking objections," in which an attorney suggests an answer to a witness or is otherwise argumentative, are improper under Rule 30(c)(2). *See Specht v. Google, Inc.*, 268 F.R.D. 596, 598 (N.D. Ill. 2010). But Kove's counsel did not suggest substantive answers to Connolly; she merely advised him, when articulating some of her objections, not to disclose prior attorney–client communications. (*See, e.g.*, Connolly Dep. 50:10–20 ("Keith, again, I caution you not to answer with anything that you may have learned in a discussion involving attorneys, and not to get into the substance of any discussions with counsel.").) To ensure that the witness did not inadvertently divulge privileged information, counsel occasionally directed him to answer only "yes or no." (*See, e.g.*, Connolly Dep. 56:19–57:2, 67:16–68:11, 69:11–16, 76:15–21.) Those directions may not have been necessary, as the questions themselves plainly sought "yes or no" answers, but they were hardly so unreasonable as to justify a new deposition.

The court grants Kove's motion for a protective order as to discovery requests about litigation funding.

## IV. Kove IO, Inc.'s Motion to Enforce Compliance with Court Order and to Compel Various Discovery [ECF Nos. 403/407]

Kove has combined four separate requests in this motion. The motion is granted in part and denied in part, as explained below.

### A.     AWS's Production of Wiki Documents

Kove alleges that AWS failed to comply with a prior order [310] directing it to produce copies of its Wikis.[13]  According to Kove, over 800 pages of Wikis that AWS has produced are "missing substantive content," such as diagrams showing the accused products' architecture. (*See* Kove IO, Inc.'s Mot. to Enforce Compliance with Court Order and to Compel Various Discovery [403] (hereinafter "Kove Mot.") at 1–3.)  In Kove's view, AWS's production substantially violates the requirement that parties produce electronic documents in a "reasonably usable form." (*Id.* at 2 (citing FED. R. CIV. P. 34(b)(2)(E)(ii)).)[14]

AWS responds that Kove's request is both untimely and infeasible.[15]  As for timeliness, AWS essentially argues that Kove has waived its argument by failing to raise it in status reports, during discovery conferences, or at other opportunities.  (AWS Resp. at 2–3.)  For example, a document that Kove cites as exemplifying AWS's production deficiencies was produced in August 2020, well before the court's March 2021 decision on the Wiki production issues.  (*See id.*)  As for feasibility, AWS explains that "tracking down a broken link or missing image is a case-by-case endeavor" that could take "months," because AWS "would have to perform individual searches for each of the 1,707 produced Wikis . . .  and then, to the extent the specific Wiki can be located

---

[13]     Wikis are "internal documents where AWS records technical descriptions and instructions relating to its services."  (AWS's Opp. to Kove's Mot. to Enforce Compliance with Court Order and to Compel Various Disc. [432] (hereinafter "AWS Resp.") at 1 n.1.)

[14]     Kove notes several important limitations on its request.  First, it "seeks only reproduction of documents from AWS's current Wiki system," not its older Wiki system.  (Kove Mot. at 2 n.2.)  Second, "Kove is . . . not seeking reproduction of Wikis that have substantive content but are missing only non-substantive logos or icons."  (*Id.*)  Third, "Kove only seeks to compel the reproduction of Wikis with working in-line images," not those in which images are accessed via click-through links.  (Kove Mot. at 3 n.3.)

[15]     Additionally, AWS runs through the history of the parties' disputes over the production of Wiki documents.  (AWS Resp. at 1–2.)  That history includes a court-ordered "sampling" process through which the Kove narrowed its list of requested search terms.  (*Id.* at 2 & n.8.)  Besides vaguely suggesting that Kove is too greedy for documents, it is unclear what point AWS is attempting to make.  Although AWS claims that Kove's motion "entirely ignores . . . what the Court ordered on the record" (*id.* at 2), it does not identify the conflict between Kove's motion and the previous Wiki ruling.

and actually contains images, print each one individually . . . ." (*Id.* at 3, 4–5.) AWS also suggests that Kove rejected AWS's offer to "attempt to retrieve particular missing images, if Kove were willing to identify a manageable number of Wikis that it believes contain relevant information." (*Id.* at 4.)

The court is not convinced by AWS's timeliness argument. As Kove points out, the deadline to file discovery motions was September 9, 2021, and Kove filed its motion by that date. (Kove IO, Inc.'s Reply Brief in Support of Mot. to Enforce Compliance with Court Order and to Compel Various Disc. [462] (hereinafter "Kove Reply") at 3.) Although Kove and AWS previously represented to the court, in a joint status report, that "AWS's production of the Wikis is complete" (*see* AWS Resp. at 2), that statement, read fairly, merely acknowledged that "AWS had physically produced the documents the Court ordered it to produce" (Kove Reply at 2 n.2). It did not waive Kove's right to ensure that AWS's productions were adequate.

Nor is the court moved by AWS's claim of infeasibility. Kove is not asking AWS to do the impossible by recovering broken links or retrieving unviewable files. Kove instead merely asks AWS to "produce the full contents of the Wikis in its possession that are *capable* of being produced with *embedded* images." (Kove Reply at 4 (emphasis added); *see also id.* at 3 n.6; Kove Mot. at 3 n.3.) AWS has suggested that some Wikis are not, in fact, capable of being produced with embedded images (for example, because the images are not visible even to authorized users), but it is not clear to the court that the missing images in AWS's production are limited to circumstances in which the images are unviewable even within the Wiki environment. AWS certainly has not verified that they are, and it has phrased many of its assertions in vague terms that conceal the precise nature of the problem. (*See, e.g.*, AWS Resp. at 4 ("[T]here's no quick action AWS can take to make *all* embedded images appear." (emphasis added)).) Moreover, the court rejects AWS's suggestion that it is Kove's responsibility to identify which Wikis "it believes contain relevant information." (*Id.* at 4.) As Kove points out, the relevance and proportionality of

the Wiki documents has already been established (by the prior court order, at the least). (*See* Kove Mot. at 2.)

The court will therefore grant Kove's request in part. In the interests of efficiency, Kove must provide AWS with the list of approximately 800 Wiki documents that Kove has already identified as possibly missing data. (*See* Kove Reply 2 (mentioning such a list and proposing that Kove could provide it to AWS).) AWS need not investigate whether the remaining Wiki documents are missing any data. But to the extent that any of the 800 documents are capable of being produced with embedded images, AWS must reproduce them in that manner.

### B.  Additional AWS ESI Custodians

Kove seeks ESI for three additional AWS custodians (Robbie Wright, Giselle Goicochea, and Swami Sivasubramanian) beyond the presumptive five-custodian limit. In Kove's view, "[t]he complexities of the issues in this case, including two highly technical accused products, an infringement period spanning nearly 15 years, and the dispersed nature of relevant information, make this request relevant and reasonable." (Kove Mot. at 3.)

As explained above, the parties agreed early in this case to conform their ESI discovery to the LPR ESI. Most relevant here, LPR ESI 2.6(d) provides that a party "shall limit its email production requests to a total of five custodians per producing party." LPR ESI 2.6(d). It also provides, however, that courts "shall consider contested requests for up to five additional custodians per producing party, upon showing a distinct need based on the size, complexity, and issues of this specific case." *Id.*

Kove contends the size and complexity of this case amply justify its request, noting that AWS itself designated eight different witnesses in connection with Rule 30(b)(6) deposition topics. (Kove Mot. at 4–5.) And in response to Kove's interrogatory seeking the identities of persons most knowledgeable about various categories of information, AWS identified 21 different people, including all three of the proposed additional custodians. (*Id.* at 4.) These three custodians, Kove explains, possess important knowledge about the accused products; based on their respective

28

tenures at AWS, ESI discovery "will fill the gaps in technical and marketing discovery left by the first set of custodians." (*Id.* at 5–6.) Kove describes in detail the knowledge that it expects Wright, Goicochea, and Sivasubramanian to possess concerning DynamoDB and S3. (*Id.* at 6–7.) Kove also suggests that, given AWS's size and resources and the significant amount in controversy in this case, the request is reasonable and not overly burdensome to AWS. (*Id.* at 7–8.)

AWS does not challenge Kove's assertions regarding the size and complexity of this case. Instead of engaging with the LPR ESI 2.6(d) standard, AWS suggests that Kove simply regrets its past strategic decisions. After all, AWS says, it previously identified Wright, Goicochea, and Sivasubramanian as persons with relevant knowledge, but Kove chose instead to designate high-level individuals (such as Werner Vogels and Andy Jassy) in its slate of five email custodians. (AWS Resp. at 5–7.) AWS went so far as to specifically propose Wright as a custodian, for example, but Kove rejected that proposal earlier in 2021. (*Id.* at 6–7.) AWS also emphasizes, without much detail, the burden that it believes would be imposed by additional email discovery. (*Id.* at 7–8.)

Kove rejects the suggestion that it regrets its initial selection of custodians. Kove asserts that it made that initial selection "based on those custodians' intimate involvement with the accused products during their inception and early post-launch years." (Kove Reply at 5.) After reviewing the evidence obtained from those custodians, however, Kove realized that it needed to designate more custodians "given the complexity and size of the products at issue, the fact that the infringement period spans nearly 15 years, and the dispersed nature of the relevant information." (*Id.* at 4–5.) Kove reiterates that AWS previously identified each of the three proposed custodians—Wright, Goicochea, and Sivasubramanian—as possessing relevant, recent knowledge about DynamoDB or S3. (*Id.* at 6.) Finally, Kove notes that AWS's undue burden argument is vague and speculative. (*Id.* at 6–7.)

The court will grant Kove this motion for the designation of three additional email custodians: Robbie Wright, Giselle Goicochea, and Swami Sivasubramanian. While AWS may

be correct that Kove theoretically could have selected Wright, Goicochea, or Sivasubramanian sooner, AWS has not rebutted Kove's showing of a "distinct need" for this additional discovery under LPR ESI 2.6(d), based on the "size, complexity, and issues of this specific case." *See* LPR ESI 2.6(d).

### C. Kove's Interrogatory Nos. 23–25

Kove asks the court to compel AWS to respond to Interrogatory Nos. 23, 24, and 25. The parties agreed to a limit of 25 interrogatories, but AWS contends that several of Kove's interrogatories have contained subparts that should each be counted separately, meaning that Kove has exceed that limit.[16]

Federal Rule of Civil Procedure 33(a)(1) provides that "a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts." FED. R. CIV. P. 33(a)(1). In seeking to distinguish between "discrete" subparts (which each count toward the limit) and "non-discrete" subparts (which do not), courts have explained that "an interrogatory containing subparts directed at eliciting details concerning a common theme should be considered a single question." *Jacks v. Directsat USA, LLC*, No. 10 C 1707, 2011 WL 382858, at *2 (N.D. Ill. Feb. 1, 2011) (internal quotation marks and alteration omitted). In Kove's view, the interrogatories that AWS says are compound merely elicit details on a common theme, so none of the subparts are discrete. Kove thus argues that it has not exceeded the agreed-upon limit. (*See* Kove Mot. at 8–10.)

The parties give significant attention to Kove's Interrogatory No. 22, in part because it exemplifies what AWS considers to be discrete subparts that should count as separate interrogatories.[17] According to AWS, Interrogatory No. 22 seeks three distinct categories of

---

[16]     The parties previously adopted a limit of 25 interrogatories per side. (*See* Joint Mot. for Entry of Rpt. of Parties' Planning Meeting and Agreed Case Schedule [52] at 4 (citing FED. R. CIV. P. 33).)

[17]     Interrogatory No. 22 reads as follows: "For each storage class and configuration of Amazon S3 that has ever been provided to a customer and for each configuration of DynamoDB

information: storage classes, pricing, and metrics. And because the interrogatory seeks such information for each of the two accused products, it should count as six interrogatories in total. (AWS Resp. at 8–9.) Kove argues, conversely, that Interrogatory No. 22 "should be counted as only one interrogatory, as the main thrust is storage class/configuration and the items listed in the interrogatory merely add specificity on what information Kove would consider responsive to the topic." (Kove Reply at 8.)

The court does not accept Kove's construction of Interrogatory No. 22 as simply eliciting "details concerning a common theme." As one of the cases Kove has cited explains, "interrogatory subparts are to be counted as one interrogatory . . . if they are logically or factually subsumed within and necessarily related to the primary question." *Bell v. Woodward Governor Co.*, No. 03 C 50190, 2005 WL 3829134, at *1 (N.D. Ill. June 30, 2005) (quoting *Kendall v. GES Exposition Servs., Inc.*, 174 F.R.D. 684, 685 (D. Nev. 1997)). In the case of Interrogatory No. 22, what is the "primary question"? Kove says that the subparts merely "add specificity" to what it "would consider responsive to the topic." (Kove Reply at 8.) As the court reads the subparts, however, they are not merely illustrative categories; they *are* the questions, and the prefatory language would be indecipherable without them. That structure distinguishes Kove's Interrogatory No. 22 from other interrogatories that Kove identifies as having non-discrete

---

that has ever been provided to a customer: (i) identify the storage class and/or configuration; (ii) identify and describe the products and services offered related to the storage class and/or configuration; (iii) provide the pricing of the products and services offered related to the storage class and/or configuration (including any surcharges or discounts, and by storage tier), and identify and describe the methodology by which the pricing was arrived at; (iv) provide metrics on a per-month (or as often as possible) basis that cover the following: (a) durability (min/max/average/SLA values), (b) availability (min/max/average/SLA values), (c) scalability (min/max/average/SLA values), (d) latency (min/max/average/SLA values), (e) throughput (get and put) (min/max/average/SLA values), (f) latency when a KFC provides the requested i-node (only applies for S3) (min/max/average), and (g) latency when a BM provides the requested i-node (only applies for S3) (min/max/average); and (v) identify and describe all data, values, equations, assumptions, and methodologies used to arrive at the metrics in (iv). Your answer should include an identification of all documents and communications related to Your answer and the persons most knowledgeable about Your answer." (*See* Ex. K to AWS Resp. [432-13] at 10 (AWS's Responses and Objections).)

subparts. (*See* Kove Reply at 8 n.22 (citing Kove's Interrogatory Nos. 12–13.) Interrogatory No. 12, for example, seeks "the reasons why [AWS] implemented the Relevant Features in the Accused Instrumentalities" and then expands on that primary question through subcategories: "the identity of all studies, treatises, consultants, employees, or reports" that AWS considered, "the identity of all alternatives" that AWS considered, "the reasons why [AWS] decided not to implement such alternatives," and "the identity of all documents and things related to [AWS's] decision to implement the Relevant Features and the Accused Instrumentalities." (Ex. C to Kove Reply [462-4] at 9.) Interrogatory No. 22 does not mirror this structure, in which subparts are subsumed under a primary question. Because the court finds that Kove's Interrogatory No. 22 constitutes at least three separate interrogatories, it agrees with AWS that Kove exceed the parties' agreed-upon limit when it served Interrogatory Nos. 23, 24, and 25.

Second, Kove argues that, even if it has exceeded twenty-five interrogatories, AWS has waived any numerosity objection by failing to raise the issue sooner. *See* FED. R. CIV. P. 33(a)(1) ("Any ground not stated in a timely objection is waived . . . ."); *see also N.Y. Life Ins. Co. v. Peters*, No. 19 C 2269, 2021 WL 229659, at *3 (N.D. Ill. Jan. 22, 2021) (noting that an "excessive number of interrogatories" is a "a waivable or forfeitable objection"). It argues that "by waiting until *after* Kove had (purportedly) exceeded the interrogatory limit, AWS took away any opportunity to cure any alleged deficiency." (Kove Mot. at 10–11, 10 n.19.)

AWS disagrees that it failed to preserve its numerosity objection. (AWS Resp. at 9–10.) As early as September 2020, when AWS responded to Kove's Interrogatory No. 18, it noted that the subparts should count as separate interrogatories. (*See* AWS Resp. at 10 n.54 (citing Ex. H to AWS Resp. [432-10] at 2).) Then, in November 2020, when AWS first responded to Kove's Interrogatory No. 22, it lodged a numerosity objection—stating that "Interrogatory No. 22 is actually Kove's 27th interrogatory"—but it nevertheless provided a substantive response "in an attempt to avoid Court involvement." (*See* Ex. K to AWS Resp. [432-13] at 10–11.) Months later, in August 2021, AWS repeated that numerosity objection when it provided a lengthy supplemental

response to Interrogatory No. 22.  (*See* Ex. L to AWS Resp. [432-14] at 2–3.)  And in response to Kove's Interrogatory Nos. 23, 24, and 25 (i.e., the interrogatories at issue in this motion), AWS restated its numerosity objection unambiguously.  (*See* Ex. 11 to Kove Mot. [403-12] at 3–4, 5–6; Ex. 14 to Kove Mot. [403-15] at 2–3.)  According to AWS, it followed the rules, as "the 'appropriate course' for a party objecting to the number of interrogatories is to do so once the limit is exceeded," not before that time.  (AWS Resp. at 10–11 (quoting *Fair Hous. Ctr. of Cent. Ind., Inc. v. Welton*, No. 118CV01098JMSDLP, 2019 WL 2422594, at *4 (S.D. Ind. June 10, 2019)).)  "Hence, AWS properly objected to the interrogatories it didn't answer and that are the subject of Kove's instant motion to compel."  (*Id.* at 11.)

The court finds that AWS properly preserved its argument—and that Kove has misstated the nature of AWS's objection.  AWS does not object to Kove's *use* of discrete subparts (i.e., the fact that it has served "compound" interrogatories).[18]  AWS objects, rather, to Kove's surpassing of the 25-interrogatory limit by means of such subparts.  Thus, AWS could not reasonably have objected to earlier-numbered interrogatories that did not cause the total interrogatory count to exceed 25.  *See Paananen v. Cellco P'ship*, No. C08-1042 RSM, 2009 WL 3327227, at *4 (W.D. Wash. Oct. 8, 2009) ("If a responding party answers an initial set of 15 interrogatories and is then served with 11 more, it would defy logic to hold that that party has waived its objection to the numerosity of the new set.").  AWS needed to object only once it believed that the limit had been reached.  *See Fair Hous. Ctr.*, 2019 WL 2422594, at *4 ("When a party is confronted with what it believes to be an excessive number of interrogatories, the appropriate course of action is to either move for a protective order before answering any interrogatories or answer up to the numerical limit and object to the remainder without answering." (internal quotation marks omitted)).

---

[18]     Kove argues, confusingly, that "AWS did not timely raise a compound objection to Kove's Interrogatory Nos. 1–21 and as a result waived those objections."  (Kove Reply at 7 & n.21; *see also* Kove Mot. at 10 n.19 (similar).)  But AWS does not make a "compound" objection; it makes a numerosity objection.

Finally, Kove argues that if the court finds it has exceeded the 25-interrogatory limit, the court should allow the excess. Kove notes that AWS itself served interrogatories that contained several subparts,[19] and Kove responded in full because "it believed both parties were of the understanding that a single interrogatory may include exemplary categories, subparts, and requests for information relating to multiple products, patents, claims, or defenses." (Kove Mot. at 11–12.) As an example, Kove highlights AWS's Interrogatory No. 20, which it believes should count as "at least 10 interrogatories" under AWS's theory. (*Id.* at 11.) Kove thus believes that AWS is simply asking the court to "hold Kove to a different standard from itself." (*Id.* at 12.) In any event, Kove says, "[t]his is a complex case involving significant information necessary to assess infringement and damages, and Kove's interrogatories are at the core of the discovery it needs." (*Id.*) Kove "would never have agreed to a limit of 25" if it knew that AWS would claim that Kove's subparts are discrete. (*Id.*)

AWS responds that it drafted Interrogatory No. 20 as it did only because Kove's responses to other, previous interrogatories had been evasive. (AWS Resp. at 11.) AWS also says that Kove "wasn't burdened by providing a full response" to Interrogatory No. 20 given that its response was only three sentences. (*Id.* at 11–12.) By contrast, "AWS provided nearly 50 pages of detailed information in response to Kove's No. 22." (*Id.* at 12.) Requiring AWS to answer even more lengthy interrogatories would, in its view, be "unfair, prejudicial, and unduly burdensome." (*Id.* at 12–13.)

The court will reject Kove's request. Federal Rule of Civil Procedure 33 provides that "[l]eave to serve additional interrogatories may be granted to the extent consistent with Rule 26(b)(1) and (2)." FED. R. CIV. P. 33(a)(1). Instead of explaining with particularity why the disputed interrogatories satisfy these standards, Kove has engaged in the very same "whataboutism" that

---

[19]    Kove argues that if the accounting scheme that AWS now urges is applied to its own interrogatories, AWS served "at least 49 distinct interrogatories (likely more)." (Kove Mot. as 11; *see also id.* at 11 n.20.)

it accuses AWS of promoting.  (*See* Kove Reply at 9.)  It may be true that AWS's own requests exceeded the agreed numerical limit, but Kove did not object to those requests, and they are not at issue in this motion.

### D.      AWS's Responses to Various RFPs

Kove believes that AWS has violated Federal Rule of Civil Procedure 34 in responding to several different requests for production.  Kove therefore seeks an order compelling AWS to supplement the disputed responses by stating, for each one, that (1) it "has conducted or will conduct a reasonable search for responsive documents," and (2) it "has produced or will produce responsive documents."  (Kove Mot. at 12–13.)  Rather than justifying its initial responses on the merits, AWS responds to Kove's motion with a slew of procedural arguments.  The court finds that AWS's responses are indeed deficient and that none of its procedural arguments hold water. It will therefore compel the supplemental responses that Kove has requested.

In responding to a request for production, a party "must either state that inspection and related activities will be permitted as requested or state with specificity the grounds for objecting to the request."  FED. R. CIV. P. 34(b)(2)(B).  An objection, in turn, "must state whether any responsive materials are being withheld on the basis of that objection."  FED. R. CIV. P. 34(b)(2)(C).  If a putative objector fails to do so, the court may overrule the objection or strike the response.  *See, e.g.*, *Lloyd v. Whirlpool Corp.*, No. 19 C 6225, 2020 WL 8115869, at *4 (N.D. Ill. Oct. 27, 2020); *Gabiola v. Mugshots.com, LLC*, No. 16 C 2076, 2019 WL 426143, at *2 (N.D. Ill. Feb. 4, 2019).

Kove has identified 30 specific requests for production for which it finds AWS's response deficient.  As for the first 15 (RFPs 2b, 3, 12, 27, 36, 54, 79, 89, 90, 113, 117–118, 210, 217–218), Kove says that AWS merely "interposes boilerplate objections followed by an agreement to produce documents limited to a revised and narrowed version of the request."  (Kove Mot. at 13–

14.)[20]   As for the second 15 (RFPs 51, 59–67, 73, 80, 125–126, and 231), Kove says that "objected on grounds of privilege but has not provided a privilege log," leaving similar uncertainty about what documents AWS may have withheld on the basis of the objection.  (*Id.* at 13–14.)  In summary, Kove contends that "AWS's oblique, incomplete, and carefully sculpted response[s] leave Kove guessing as to what otherwise responsive information might be shielded from view."  (*Id.* at 14.)

AWS's response misrepresents Kove's request.  (*See* AWS Resp. at 13–15.)  Kove is plainly not seeking supplementation of AWS's responses to either (1) all 237 of Kove's requests for production, or (2) some smaller number of Kove's requests that Kove has failed to individually identify in its motion.  Rather, Kove has identified 30 specific requests for which it alleges AWS's responses are deficient.  Accordingly, it is not true that Kove "didn't confer with AWS" about this issue.  (*See id.* at 13.)  Kove identified the problematic responses directly to AWS—and then met and conferred with AWS telephonically—before presenting the issue to the court.  (*See* Ex. 1 to Kove Mot. [403-2] (May 2021 letter from Kove's counsel); Kove Mot. at 14 n.24; Kove Reply at 11 n.38.)

The court also rejects AWS's suggestion that Kove is required to prove that the information sought in each request is relevant.  (*See* AWS Resp. at 13–14.)  AWS has not objected on this basis, and the court has no trouble concluding that the requests seek information that is relevant to the claims and defenses in this case.  *See* FED. R. CIV. P. 26(b)(1).  Likewise, Kove did not need to copy the text of each disputed request and response into its motion.  As Kove points out, it "identified the specific RFPs by number, discussed AWS's common approach to objections, and explained why Kove was moving to compel, including specific examples of AWS's failure to

---

[20]   As an example, Kove cites its RFP No. 3, which sought "[d]ocuments sufficient to identify where (geographically) the Accused Products were and/or are developed, created, tested, maintained, licensed and/or sold."  AWS responded so:  "Subject to the foregoing general and specific objections, AWS will produce relevant and non-privileged documents responsive to this Request within its possession, custody, or control, if any, which identify AWS offices with engineers who work directly on Amazon S3 and DynamoDB."  (*See* Kove Mot. at 13–14.)

comply with Rule 34." (Kove Reply at 11.) Kove also attached the disputed responses as exhibits. (*See* Ex. 4 to Kove Mot. [403-5]; Ex. 12 to Kove Mot. [403-13].) That solution was reasonable given the scope of the alleged problem. Finally, AWS makes a handful of vague timeliness arguments, but Kove filed this motion by the deadline of September 9, 2021.

In summary, the court will grant Kove's motion as to this issue. AWS must supplement its responses to the 30 requests for production that Kove has identified (i.e., RFPs 2b, 3, 12, 27, 36, 51, 54, 59–67, 73, 79–80, 89, 90, 113, 117–118, 125–126, 210, 217–218, and 231). AWS must state in each response whether (1) it has conducted or will conduct a reasonable search for responsive documents, and (2) it has produced or will produce responsive documents. Where AWS intends to withhold materials on the basis of an objection, including privilege, it must do so with greater particularity.

## CONCLUSION

For the foregoing reasons, certain of the parties' discovery motions ([392/393], [397/398], [400/401], and [403/407]) are granted in part and denied in part. That leaves two remaining, fully-briefed discovery motions. The parties appear to have narrowed their differences on one of these ([405/406]), and the court believes it would benefit from brief oral presentations on the other [409/410]). As the court will hear oral argument on Kove's more recent motion to compel compliance with an earlier order ([493/494]]), the court reserves ruling on 405/406 and 409/410 and invites counsel to address, at that hearing, remaining issues relevant to these motions as well.

ENTER:

Dated: January 25, 2022

REBECCA R. PALLMEYER
United States District Judge