IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KOVE IO, INC.,                        )
                                      )
                  Plaintiff,          )   Docket No. 18 C 8175
                                      )
            vs.                       )
                                      )
AMAZON WEB SERVICES, INC.,            )   Chicago, Illinois
                                      )   January 28, 2022
                  Defendant.          )   10:30 a.m.

TRANSCRIPT OF PROCEEDINGS - Motions
BEFORE THE HONORABLE CHIEF JUDGE REBECCA R. PALLMEYER

APPEARANCES:

For the Plaintiff:        REICHMAN JORGENSON LEHMAN
                            & FELDBERG LLP
                          BY:  MS. KHUE HOANG
                          750 3rd Avenue, Suite 2400
                          New York, New York  10017

                          REICHMAN JORGENSEN LEHMAN
                            & FELDBERG LLP
                          BY:  MR. ADAM ADLER
                          1710 Rhode Island Ave. NW, 12th Floor
                          Washington, DC  20036

                          REICHMAN JORGENSEN LEHMAN
                            & FELDBERG LLP
                          BY:  MS. TAYLOR MAUZE
                          100 Marine Parkway, Suite 300
                          Redwood Shores, California  94065

For the Defendant:        FISCH SIGLER LLP
                          BY:  MR. ALAN M. FISCH
                               MR. R. WILLIAM SIGLER
                          5301 Wisconsin Avenue NW, Fourth Floor
                          Washington, DC  20015

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Court Reporter:                  FRANCES WARD, CSR, RPR, RMR, FCRR

23                                    Official Court Reporter

                                      219 S. Dearborn Street, Suite 2524A

24                                    Chicago, Illinois  60604

                                    (312) 435-5561

25                                    frances_ward@ilnd.uscourts.gov

```
 1              (The following proceedings were had telephonically:)
 2                   THE COURT:  Good morning.
 3                   Do I have everybody on the line for Kove versus
 4      AWS?
 5                   THE CLERK:  You do, Judge.
 6                   THE COURT:  Okay.  We can call the case.
 7                   THE CLERK:  18 C 8175, Kove versus Amazon Web
 8      Services.
 9                   THE COURT:  Good morning.
10                   I wonder if I can get your appearances for the
11      record.  We will begin with the plaintiff.
12                   MS. HOANG:  Good morning, your Honor.
13                   Khue Hoang of Reichman Jorgensen Lechman & Feldberg
14      on behalf of plaintiff, Kove IO.  With me are my colleagues
15      Adam Adler and Taylor Mauze.
16                   May it please the Court, Mr. Adler and Ms. Mauze
17      will be handling arguments today.  Mr. Adler will address our
18      motion to enforce, Docket 493, and our motion to compel
19      certain usage and financial data, Dockets 405 and 406; and
20      Ms. Mauze will be addressing our motion to compel hardware
21      and metrics information, Dockets 409 and 410.
22                   THE COURT:  Okay.  Thank you.
23                   And the appearances for AWS.
24                   MR. SIGLER:  Good morning, your Honor.  This is
25      Bill Sigler on behalf of AWS from Fisch Sigler LLP.  And
```

1    today I'm joined by my colleague Alan Fisch.  And I will be

2    handling the argument on all three motions today, your Honor.

3              THE COURT:  Okay.

4              All right.  We have those three motions that I

5    would like to address this morning.  We also have a motion to

6    stay pending *ex parte* review, and I know that's being

7    briefed.  I just saw a brief that was submitted on that.

8              Why don't we begin with -- although it's the most

9    recently filed motion, I would like to begin with the motion

10   to enforce.  I think I heard initially it was Mr. Adler who

11   would be addressing that motion.

12             MR. ADLER:  That's right, your Honor.  This is Adam

13   Adler.

14             THE COURT:  Do you want to just briefly outline

15   your position again?  I have seen the brief, but if you want

16   to briefly outline your position, and then I will hear from

17   defense counsel on that.

18             MR. ADLER:  Sure.

19             On the motion to enforce, the question is whether

20   AWS complied with the court's order to provide AWS-level

21   financial statements.

22             The court order was very clear, and it ordered AWS

23   to produce AWS-level financial statements, such as cash flow

24   statements, income statements, balance sheet statements, and

25   profit and loss statements, as well as contemporaneously

1    created financial disclosures or explanatory footnotes that

2    would commonly accompany and explain those statements.

3           In response to the order, AWS produced a

4    single-sheet document that doesn't provide any of the

5    information that was ordered by the Court and is instead

6    comprised almost entirely of rolled-up categories with no

7    details as to what was included in those categories.  And, in

8    fact, the documents that they produced explicitly states that

9    it isn't a financial statement.

10          So the main thrust of our motion is that AWS should

11   have complied with the court order.  And now, after six and a

12   half months of back and forth meet and confers with them

13   where AWS states that they are investigating and might have

14   more to produce, but they have already produced, and they

15   don't have any more documents to produce, we are asking for a

16   court order to compel them to produce the documents by a date

17   certain.

18          THE COURT:  Response from AWS.  I guess it's

19   Mr. Sigler.

20          MR. SIGLER:  Yes, your Honor.  Bill Sigler on

21   behalf of AWS.

22          Your Honor, at the crux of this issue really is the

23   fact that AWS's financial data is maintained according to

24   standard accounting practices and AWS's business needs.  It

25   isn't maintained in accord with the 15-factor *Georgia-Pacific*

1    test governing patent damages here.

2            We created the reports that we produced in response

3    to the Court's order to comply with that order and provided

4    it to Kove.  Our brief details how that particular report,

5    which was compiled through significant effort by AWS's

6    finance team, does comply with the Court's order.

7            We have also tried to accommodate additional

8    follow-up requests from Kove for more granular data.  We have

9    determined that some additional cost information could

10   specifically be generated from AWS's finance system.

11           As we did with the prior report, we have employed a

12   dedicated team to undertake that collection and compile that

13   data.  That's taken more than 40 hours, your Honor.  And we

14   will produce that data upon securing certain required

15   approvals concerning security and other regulations, your

16   Honor.  Those approvals are necessary to help avoid potential

17   derivative suits and to comply with any applicable securities

18   regulations.

19           Your Honor, this and similar Kove requests that AWS

20   has agreed to respond to are nontrivial undertakings.  These

21   aren't reports that can be just spit out by AWS personnel at

22   the touch of a button.  They have to collect the data from

23   different sources, compile it, vet it, and obtain the

24   necessary approvals.  We are doing that for the additional

25   data that Kove has requested, and we hope to provide that to

1    Kove soon.

2              So, your Honor, there is no basis for this motion

3    to enforce.  There is no exigent circumstance justifying it.

4    And there is certainly no circumstance justifying Kove's

5    request for fees and other sanctions here.

6              THE COURT:  In other words, it's AWS's position

7    that you are still in the process of responding to follow-up

8    requests that were made in connection with what you have

9    already produced?

10             MR. SIGLER:  Yes, your Honor.  That's correct.

11             THE COURT:  Do you have an idea when you are going

12   to be completing that process?

13             MR. SIGLER:  Your Honor, with respect to the more

14   granular cost data that I just referred to, that data has

15   been collected and is awaiting the necessary internal

16   approvals to produce it.  I would expect that process to be

17   completed in the next two weeks.

18             Kove has also asked about some additional documents

19   that we referred to in the briefing as the OP1 documents.  We

20   are investigating that internally as well.  Our initial

21   investigation indicates that those documents don't reflect

22   what Kove avers they reflect in the briefing.

23             But nonetheless, we are investigating that.  And if

24   they contain relevant additional information, we will produce

25   that.

1    THE COURT:  When you tell me that you are looking

2    for internal approvals to avoid derivative action or

3    something to that effect, what would be a reason that an

4    internal control would tell you that you can't produce

5    something that the court orders be produced under seal, just

6    so I am clear?

7    MR. SIGLER:  Your Honor, if there is a court order

8    to produce that under seal, we will abide by that as we did

9    with the prior production of information.

10    It's just in the process right now of securing the

11    necessary approvals from the SEC, responsible personnel at

12    Amazon.  There is -- of course, your Honor, there is a

13    protective order in place here.  And we will produce that as

14    attorneys' eyes only, of course, but such information can

15    become unsealed later in the case through an order or through

16    a third-party request or, of course, at trial.  So there is

17    that consideration being taken by AWS as they evaluate this

18    information.

19    MR. ADLER:  Your Honor, may I be heard briefly?

20    THE COURT:  Sure.

21    MR. ADLER:  I think it's helpful to kind of provide

22    some context as to the path that we have taken and how we got

23    here.

24    The Court issued its order in July of 2021, over

25    six and a half months ago, and Kove didn't hear anything from

1    AWS -- didn't receive any documents for about six weeks after
2    that.

3              After that, Kove reviewed the production and found
4    that it was deficient.  So we reached back out to AWS and
5    asked them to supplement.  At first, they refused.  But then,
6    after a few more weeks and we had our meet and confer, they
7    said they would investigate.  And that investigation, which
8    purportedly started in October or November, has been ongoing
9    since with no benefits whatsoever.

10             So there is a certain point where a claim that "we
11   are investigating" is no longer credible.  And here, where
12   AWS has purportedly been looking into these documents for
13   months with nothing to show for it, gives us real cause for
14   concern that their statement in response to our motion that
15   they are investigating -- and with respect to the OP1
16   documents that they have only recently started investigating
17   in January, these kind of documents, which are plainly
18   responsive to the court order and should have been produced
19   in the first place, you know, makes it important that the
20   relief that the Court provides accounts for the distinct
21   possibility that these searches and investigations that AWS
22   is conducting may turn up fruitless and that they might need
23   to look at other kind of documents that don't have exemplar
24   instances in the productions that AWS has produced that Kove
25   happened to find to actually provide this underlying

1    information.

2         THE COURT:  I guess I'm just trying to determine

3    exactly what it is I need to order.

4         It sounds as though AWS is prepared to produce at

5    least some additional information that's responsive to your

6    follow-up request.  We don't know exactly what that is, or at

7    least I don't know exactly what it is.  Perhaps you do.

8         They need to get approvals from somebody internally

9    with respect to -- who handles SEC matters.  Respectfully, I

10   have got to say, important as those people are, a court order

11   is more important.  So I think that we are going to have to

12   expect that those approvals will either come, or if they

13   don't come, that the material will have to be produced

14   anyway.

15        And maybe once those productions have taken place,

16   we will be in a better position to know how egregious

17   noncompliance was or was not.

18        I'm hearing from Mr. Sigler that we are talking

19   about 14 days for the approvals.  Why don't I direct that the

20   material be produced in 14 days.  I don't know exactly

21   whether that's going to resolve all of the concerns that

22   Mr. Adler has about compliance with the July 21 order.  I,

23   too, am a little disappointed that it's taken until -- well,

24   now the end of January for this to bubble up.

25        I'm not hearing AWS say that there is nothing more

1    to be produced.  It sounds like there will be something more

2    to be produced.  Whether that satisfies Kove's concerns or

3    not, I guess remains to be seen.

4            I think what I need to do on this is direct that

5    the review be completed promptly, that the additional

6    material that has been requested subsequent to the July 21

7    order be produced, and we will enter and continue the motion

8    to compel compliance until after that additional production

9    has taken place and see what the outstanding issues are.

10           The second motion that we have this morning is the

11   motion to compel.  That's 405 and 406.  And when I read the

12   briefs on that, it seemed to me that there might have been at

13   least some narrowing of the issues raised by that motion.

14           So why don't I ask -- I think, Mr. Adler, you are

15   also arguing the motion to compel, 405/406; is that right?

16           MR. ADLER:  That's right, your Honor.

17           So I want to be clear about the issues that are

18   still in dispute.  Our motion at Docket 405 identifies six

19   categories of information that we are looking for in the

20   motion.

21           In response to that motion, AWS agrees that there

22   are four categories of that information -- Categories 3

23   through 6 from the last page of our brief on Docket 405 --

24   that are plainly in dispute and that weren't even claimed to

25   have been addressed in AWS's subsequent productions.

1    So there are two other categories of information

2  that are in dispute, and those are usage data -- usage data

3  and revenue information by pricing category is the first of

4  those categories.  And the second one is accounting documents

5  that describe how AWS is accounted and charged for internal

6  use of the accused products.

7    Now, as to the first category, AWS's subsequent

8  productions that it provided after we filed the motion makes

9  substantial progress toward providing what we needed, but

10  there are still substantial gaps in what they provided there.

11  And AWS actually, reminiscent of what they argued on the

12  motion to enforce, said they would investigate and get back

13  to us.  And since we filed our surreply, we haven't heard

14  anything about that.

15    The specific items that are missing -- I can talk

16  about them if you'd like, but they are kind of detailed, and

17  they are outlined specifically in bullet points in our

18  surreply.

19    The second category regarding accounting documents

20  and documents that explain how AWS charges for internal use

21  of the accused products and the amounts that -- how it

22  actually is accounted for, both methodologically and on the

23  numbers on the accounting sheets, is very much different

24  because AWS claims that it has provided a substantial portion

25  of the information we seek, but they haven't really.  They

1    haven't made any progress on that.  So that category is still

2    very much in dispute.

3              THE COURT:  Okay.  So with respect to the pricing

4    category materials, the accounting documents, those -- I'm

5    sorry.

6              With respect to pricing category materials, AWS is

7    making additional -- is investigating that further and

8    potentially producing more information.  But there is a

9    continuing dispute about accounting documents for the

10   internal use of these products.

11             So let me hear from -- I guess once again I will

12   ask Mr. Sigler to respond to this issue.

13             MR. SIGLER:  Yes, your Honor.  This is Bill Sigler

14   on behalf of AWS again.

15             With respect to the internal cost allocation

16   documents, the internal accounting, as we explained in our

17   surreply, we produced everything that we have on that.  So

18   there is nothing further that we can provide.  I understand

19   Kove has made these requests for this internal accounting

20   information.  But, again, even including the supplemental

21   productions that we have made during the motions practice

22   because Kove had not asked for this information before filing

23   its motion, even with that production, there is nothing more

24   for us to produce.  We completed that investigation and don't

25   have anything further to produce.

14

1          Your Honor, I'm happy to address the other motion

2     as well.

3          MR. ADLER:  If I can respond to that briefly?

4          This is not -- the statement that they don't have

5     any more documents on this just isn't credible and doesn't

6     line up with the documents that they have produced.

7          In particular, if the Court -- the Court can look

8     at Exhibit DD to AWS's surreply.  And in Exhibit DD in the

9     appendix -- I can give you the page number on that.

10          THE COURT:  Why don't you do that.

11          MR. ADLER:  It's Page 7.

12          It describes basically a process at a very high

13    level without any details, but shows that AWS has a specific

14    process for assigning costs to internal customers.  And it

15    even shows snapshots of tables as to how those costs are

16    allocated to specific products, not the accused products but

17    other products.  And it shows that there is a drop-down menu

18    that you could actually use to select to figure out and to

19    get a statement for how the costs have actually been

20    allocated.  And that's a "how" in terms of the data, not in

21    terms of the methodology.

22          Given the size of AWS's accounting department and

23    the fact that they have these cost assignment statements and

24    the actual data, it shows two things.

25          First, it shows that they have additional data from

1   their database that they could produce and haven't produced.

2   And second, it shows that AWS's methodological

3   bookkeeping is incredibly complex, incredibly advanced, and

4   that they wouldn't have a database without an explanation as

5   to how that database works or as to what the -- as to what

6   the different categories in that database mean.

7   So AWS's position seems to be that they don't have

8   any additional documents on this.  And a multibillion dollar

9   company with over 50 percent of AWS's use of the accused

10   products is internal to the company, that they don't have any

11   documents on that to quantify the value that is encaptured in

12   that use, then we want a witness -- an educated witness under

13   oath who could testify to that because I just -- I don't

14   think that that's what a witness would say.  It doesn't

15   square with the documents.

16   MR. SIGLER:  Your Honor, if I may respond to that,

17   please?

18   THE COURT:  Sure.  Mr. Sigler, go ahead.

19   MR. SIGLER:  Your Honor, the point I made was, we

20   don't have further documents to produce on this.  We have

21   made a production to Kove on this topic.  We made multiple

22   additional productions to Kove on this topic as detailed in

23   our surreply.

24   Opposing counsel is making inferences based on what

25   Kove is seeing in certain documents.  As he said -- alluded

1    to there, Kove hasn't taken any testimony on this at all from

2    any AWS witnesses.  These are simply inferences being drawn

3    from an outside party that is not inside AWS and does not

4    have full context of AWS's internal accounting system.

5          So this is a little premature, your Honor, and

6    again, it's just based on speculation and inference, like a

7    lot of these issues presented in these motions.

8          THE COURT:  You know, I think you are right that

9    there is a dispute about what documents you actually do have

10   or don't have.

11          You are saying that the material is produced.  For

12   example, the Exhibit BB that I'm being looking at, that would

13   be all there is.  There is no underlying data that supports

14   those numbers; is that right?

15          MR. SIGLER:  I'm sorry, your Honor.  Could you

16   repeat that.  I apologize.

17          THE COURT:  Well, counsel asked me to take a look

18   at -- I think he said Exhibit BB.  Is that right?

19          MR. ADLER:  Exhibit DD.

20          THE COURT:  So D as in David -- David, David.

21          MR. ADLER:  David, David.

22       (Unintelligible.  Multiple speakers.)

23          THE COURT:  Yes. And that would be -- again, it's

24   Document 475 in the docket, correct?

25          MR. ADLER:  Let me just double-check to make sure I

17

1  have that right.

2  THE COURT:  475 is the unsealed version perhaps.

3  Hold on.

4  MR. ADLER:  474.06.

5  THE COURT:  Okay.  If you look at 474DD -- David,

6  David -- what I think I'm hearing from AWS, from Mr. Sigler,

7  is that the numbers -- hold on -- the information in that

8  document has no -- there is no -- what's the word I want?

9  There are no background documents that support that.  This is

10  just a report that was created without any other documents.

11  Is that right?

12  MR. SIGLER:  Your Honor, that document describes

13  how AWS allocates costs and is consistent with the

14  explanation we also provided in response to Interrogatory

15  No. 6.

16  So it provides that explanation that Kove needs.

17  And Kove can itself perform the calculations it's talking

18  about based on the information provided in that document.

19  So there is underlying data with respect to that

20  document, your Honor, but it's sufficient for what Kove

21  claims it needs to do on that accounting point.

22  MR. ADLER:  Your Honor?

23  THE COURT:  Yes.

24  MR. ADLER:  If AWS performs these allocations and

25  the database screenshots in this document show that they do,

1    there is no reason why Kove should have to perform the
2    allocations themselves.  And we definitely disagree that we
3    have the underlying data that we would need to perform those
4    allocations in the first place.

5              To provide some more context on this, the
6    product-level financial statements that -- financial sheets
7    that AWS has produced, some of them have line items for
8    allocations that are being made.  They are not consistent,
9    and they are not across time, but it shows that there are
10   allocations that are made and that we are missing data on
11   them.

12             So the statement -- the assertion that Kove has
13   what it needs to perform these calculations is untrue and
14   beside the point.

15             THE COURT:  Well, I'm not sure it's beside the
16   point, but I am concerned about whether it's true or not.

17             MR. ADLER:  Yeah.  I say it's beside the point
18   because if AWS has the allocations already performed, which
19   the document shows they do, then whether Kove can perform it
20   itself -- I guess you're right.  It's still relevant.  But
21   what we really want is to know how AWS did it.

22             MR. SIGLER:  And, your Honor, this is Bill Sigler
23   on behalf of AWS again.

24             Again, that document describes how AWS allocates
25   costs.  It also tracks what AWS has provided in response to

19

1    Interrogatory No. 6.  So, again, we have provided that

2    information to Kove.

3                THE COURT:  By "that information," you are talking

4    about what's in this document, correct, Exhibit DD?

5                MR. SIGLER:  Yes, information on how AWS allocates

6    internal costs.  That appears to be what they are looking for

7    and why they are interested in this information.

8                MR. ADLER:  Your Honor, I think I might have a

9    solution that can help us short-circuit this problem, and

10   it's something I alluded to earlier.

11               Earlier in the case we had asked for -- we had

12   filed a motion to have early document depositions to help get

13   to the bottom of productions that we thought were

14   insufficient.  And at the time, Magistrate Finnegan had ruled

15   that we should combine those document depositions with the

16   substantive depositions.

17               For an issue that's as important as AWS's internal

18   accounting methods, I think the best approach might be just

19   to have that document deposition now so that when it comes

20   time for the substantive depositions, we know that we have

21   all the documents that we need to actually perform those

22   depositions.

23               THE COURT:  I will say I like that idea, except

24   that I'm concerned about the time.  How soon could we conduct

25   what I will call a 30(b)(6) deposition on the document

1  production?

2  　　　　MR. ADLER:  From our perspective, we would be able

3  to do it as soon as next week or the week after.

4  　　　　MR. SIGLER:  Your Honor, this is Bill Sigler on

5  behalf of AWS again.

6  　　　　Are we talking about a narrow deposition on the

7  financial document production?  I mean, this is a very large

8  production of a variety of information in this case regarding

9  two accused AWS services, financial information, source code,

10  a disparate set of hundreds of thousands of pages of

11  documents and 114,000 source code files.

12  　　　　So a deposition regarding -- or depositions

13  regarding all that production could not be accomplished in

14  the next week from AWS's perspective.

15  　　　　MR. ADLER:  I was contemplating something more

16  along the lines of about the internal accounting documents.

17  So it wouldn't be as expansive as Mr. Sigler is suggesting

18  or, I guess, fearing.

19  　　　　THE COURT:  Well, I am thinking it would have to be

20  relatively narrow because I can't imagine one person -- I

21  shouldn't say that.  I would be surprised to learn that one

22  person is going to have detail about the various issues that

23  are obviously in dispute.  But with respect to this issue, it

24  seems to me that one person probably does, and I'm guessing

25  that would be a relatively narrow deposition.

1    You know, I am at a disadvantage in terms of

2    exactly knowing the specifics here, but from what I'm

3    hearing, it wouldn't be particularly broad.  It would be a

4    more narrowly focused set of questions about this accounting

5    practice and the way the data is maintained and transmitted.

6    Why don't I direct that you do that within the

7    next, say, 14 to 21 days and see whether that helps to

8    resolve whatever it is with respect to the second aspect of

9    this motion -- of this issue that has not yet been resolved

10   with the understanding that, with respect to the pricing

11   category of materials, AWS is still producing additional

12   information on that as well.

13   MR. ADLER:  That makes sense from Kove's

14   perspective.  We would just ask on the first category that,

15   as with the motion to enforce, the Court provide a date

16   certain by which AWS should have to complete those

17   investigations and make those productions.  It could be 14

18   days, 21 days, but we want to have some certainty about that.

19   THE COURT:  I am going to suggest 14 days on that

20   as well.  And then the deposition with respect to the

21   other -- the accounting allocation issues, that would be

22   within 21 days.

23   Now, I think that takes us to motion 409/410.  And

24   with respect to that motion, I understand it's Ms. Mauze that

25   will be arguing that.

1          MS. MAUZE:  Yes, your Honor.

2          THE COURT:  All right.  I will hear from you.

3          MS. MAUZE:  Okay.  Your Honor, there are four main

4    categories of information that our motion seeks.  And if the

5    Court has any particular areas for me to address, I'm happy

6    to jump straight through them or straight to the areas that

7    you would like me to address.  But if not, my plan is just to

8    address each of the four areas and give a brief summary of

9    what we are asking for, why we need it, what we received, and

10   why it's insufficient, and why we know that this information

11   is available.

12         THE COURT:  Well, I have read the briefs, but I do

13   think it makes sense for you to walk through the four areas.

14   Go ahead with that.

15         MS. MAUZE:  Yes, your Honor.

16         So we are seeking four specific areas of discovery,

17   and that's specific hardware information, specific metrics

18   information, a fulsome response to Interrogatory No. 14,

19   which is really just a very specific request for metrics

20   information, and some information on predecessor products.

21   And all four of these areas are important to our damages case

22   and our ability to isolate the value of the inventions

23   (unintelligible) of the accused products.  And as we have

24   explained in our briefing, which I know you are familiar

25   with, this is a critical component in our determination of

1  damages.

2      So I will start with hardware where we've asked for

3  cost information, storage capacity, throughput capacity, and

4  utilization level information.  And we are asking for this

5  information for the particular infringing hardware components

6  of the accused products.

7      And AWS points to -- points us to a pair of profit

8  and loss statements as responsive to this request, that they

9  just don't have the information we are asking for.  They are

10  very high level, and they don't have the granularity that we

11  need.  The best that these spreadsheets have are line items

12  for the server expenses and the data center expenses, but

13  they don't break it down any further.

14      And, your Honor, this cost information at such a

15  high level doesn't allow us to determine what components --

16  what hardware components specifically cost and what specific

17  components would be needed in order to mimic in our damages

18  cases the performance of the accused products as they perform

19  with the invention.  So this is relevant for a noninfringing

20  alternative.

21      And then on metrics, we have asked for a specific

22  four things.  Those four things are metadata node counts,

23  partition information, metadata updates, and the number of

24  inodes.

25      We have got no information at all for the last

1    three things.  AWS doesn't say that they produced these
2    things.

3         The thing that AWS points to is the metadata node
4    count.  And they say that -- they pointed to a few documents
5    that just aren't responsive to this request.

6         What we have asked for is the number of metadata
7    nodes, and instead they point us to documents that show the
8    changes in metadata nodes, which is not the information that
9    was asked for.

10        With respect, your Honor, that would be like asking
11   how many people are in the courtroom, and if AWS responded
12   how many people left the courtroom or how many people entered
13   the courtroom, we are not in a position to calculate the
14   information that we have asked for from the information that
15   AWS has given us.

16        The second thing AWS points to for interrogatory
17   responses -- sorry -- for its -- the search requests are its
18   interrogatory responses, and its interrogatory responses also
19   just don't answer the metrics information that we have asked
20   for.

21        AWS really defaults to two positions in its
22   interrogatory response, and that's either that they don't
23   have the information or that they will provide us proxy
24   information that they have deemed sufficient to answer the
25   questions that we have asked, just like the metadata node

1    example that we just went over.  And these -- the information

2    just don't answer the questions that we have asked.

3         The other thing about the information that AWS has

4    provided us with is that, much like the profit and loss

5    statement, when AWS provides us with this proxy information,

6    it's too high a level for Kove to be able to use it to

7    isolate the value of the invention.  We only get a

8    big-picture idea, and we aren't provided with the information

9    that we need to calculate the data that we do need.

10        And, your Honor, AWS's response to Interrogatory

11   No. 14, this is the third item in our motion.  It's deficient

12   in other ways than the other two.

13        Interrogatory No. 14 is really asking AWS to

14   identify the metrics that it uses to measure the performance

15   of the features in the accused products, but AWS has not even

16   purported to answer the question.  Instead, they have

17   essentially used Interrogatory No. 14 as a placeholder and a

18   way to shoehorn responses to other requests that we have

19   made.  But at bottom, they just provided us with

20   nonresponsive answers to the question that we have actually

21   posed.  And we just want a straightforward answer to the

22   questions that we have asked in Interrogatory No. 14, not to

23   our other requests.

24        And then I have got one more point, which is the

25   final issue of predecessor products.  We are asking for three

1    specific AWS projects here.  The three projects were
2    predecessors to the accused products.  And they really speak
3    to how the accused products were developed.  And the features
4    of the predecessor products that made it into the accused
5    products really speak to the benefits of the accused features
6    in the invention in those products.  So with that predecessor
7    products request, we are really asking for the story of the
8    accused products and how the benefits of the invention made
9    their way into the accused products.

10    Two of the predecessor products that we had
11    specifically identified -- and these are S4 and Fargo -- are
12    essentially just early versions of the accused products.
13    They were stopped at some point, but they were -- they had
14    been developed and discarded.

15    We have testimony that they essentially predated
16    what ended up being the commercial embodiment of the accused
17    product.  These ask for some particular information about the
18    accused products, such as detailed in our motion.

19    And that's all the overview I have, but I'm happy
20    to answer any questions or to reserve some time for rebuttal.

21    THE COURT:  I will hear from Mr. Sigler on these
22    four issues.

23    If you don't mind, why don't we -- if you don't
24    mind, Mr. Sigler, let's go in reverse.  In other words, let's
25    begin with the predecessor products issue.

1    MR. SIGLER:  Happy to do that, your Honor.  Again,
2    this is Bill Sigler on behalf of AWS.

3    I think, your Honor, some context on what we've
4    produced on all four of these issues would be helpful as I
5    begin on each one.

6    With respect to the predecessor products, your
7    Honor, we produced documents on those products that discuss
8    them in the context of the development of the accused
9    products.

10   For example, we have produced documents discussing
11   the options that were addressed during the development of
12   DynamoDB, one of the accused products here, including whether
13   to implement some of the same features as SimpleDB.

14   Your Honor, the additional information they want on
15   these products isn't relevant to how the accused products
16   work here.  The source code that we have produced in this
17   case shows how they work.

18   And the other justification that they offer is
19   speculation that these predecessor products could be relevant
20   to the noninfringing alternatives analysis here.  I
21   understand your Honor addressed that point in the order that
22   came out earlier this week at least relating to SimpleDB.

23   But this motion encompasses more than SimpleDB.  It
24   encompasses S4, Fargo, and potentially other predecessor
25   products.

1       Your Honor, Kove shouldn't be given *carte blanche*

2  to take discovery on any product that it claims could

3  potentially be relevant to the noninfringing alternative

4  analysis.  That logic would open the door to discovery on any

5  of the other hundreds of AWS services that it offers or has

6  offered.

7       And it's unclear what they actually want in

8  response to their requests on this issue.  It could encompass

9  source code, financial information, the production of

10 additional Wiki documents.

11      So this portion of the motion should be denied,

12 your Honor.  Our production thus far is sufficient.

13      Turning to the -- I would like to take the second

14 and third points together because they both deal with the

15 metrics issue.

16      THE COURT:  Sure.

17      MR. SIGLER:  For context, your Honor, AWS maintains

18 over 10,000 performance metrics on the accused products.  We

19 worked with Kove over a number of months to narrow the

20 relevant metrics down to a reasonable amount and produce

21 reports on those metrics on the ones that we agreed to.  That

22 was a nontrivial task, your Honor.

23      As the head of engineering for DynamoDB, Mr. Walsh

24 testified it took the DynamoDB team several weeks to collect

25 that metrics information that was produced to Kove before he

1    was deposed in this case.

2            We also supplemented our response to Interrogatory

3    No. 14 with an 11-page narrative detailing the metrics for

4    DynamoDB and S3.  So the allegation that we haven't provided

5    a real interrogatory response on that issue is incorrect.

6            We also produced Mr. Walsh to testify about our

7    metrics and our response to Interrogatory No. 14.

8            And interestingly, your Honor, as we detailed in

9    our brief, Kove asked that Mr. Walsh be prepared to testify

10   about our response to Interrogatory 14 and these

11   metrics-related issues.  They didn't ask him about

12   Interrogatory No. 14.  They refused to put it in front of

13   him.  Instead, they turned around and filed this motion

14   demanding that we supplement that interrogatory and produce

15   more metrics.

16           And their request now for the production of

17   additional metrics reports exemplifies the ever-expanding

18   nature of their requests here.  Indeed, your Honor, as we

19   detail in our briefing, they are relying on delayed requests

20   and correspondence after the request for production,

21   interrogatory supplementation, and depositions.

22           So the further production of metrics information,

23   that request should be denied.

24           With respect to Interrogatory No. 14, we can't

25   satisfy their request for additional information on that

1    interrogatory because it asks for what metrics are most

2    important to AWS or which metrics are the key metrics for

3    AWS.

4              Our deponents have explained here why it's

5    impossible to answer that question the way Kove has phrased

6    it.

7              Mr. Walsh testified that, given that there are tens

8    of thousands of metrics, any one of them can be very

9    important at any point in time.  And they may be -- different

10   metrics, such as speed, may be more important to different

11   people at AWS.  What may be important to the engineering team

12   may not be important to the financial team at AWS on these

13   services.

14             And, again, your Honor, we supplemented that

15   response before Mr. Walsh was deposed.  They were free to ask

16   him for additional context, additional information on that

17   topic, and they didn't.

18             So that portion of the motion should be denied.

19             And then finally, turning to the first issue, the

20   hardware issue, again for context, your Honor, we already

21   produced profit and loss statements for DynamoDB and S3, the

22   two accused products here, showing the monthly hardware and

23   infrastructure costs.

24             What Kove is asking for now is not so narrow, as

25   counsel indicated.  They now want detailed data down to the

1    individual pieces of hardware on which these services run.

2    They are seeking storage capacity, throughput capacity, the

3    utilization for each make and model of hardware that's been

4    used over a 15-year period.

5          That ask, your Honor, should be denied for three

6    main reasons.

7          The first is that that granular data isn't relevant

8    to the disputed issues here.  The cases that Kove has put

9    forward as a justification for this are not relevant to the

10   issues here.  They address lost profit damages issues, which

11   Kove is not claiming here.  Then they also cite a case about

12   the devaluation of certain IP.

13         Kove has also asserted that it needs the

14   information to estimate the accused products' performance and

15   help formulate the expected performance of alternative

16   products.  But, your Honor, we have already produced the

17   performance metrics that are referred to before on the two

18   accused services, the ones that the parties agreed would be

19   sufficient for production.

20         And it's unclear what alternate products Kove is

21   referring to in its motion on the hardware issue since

22   neither party has identified any hardware-related

23   noninfringing alternatives.

24         Second, your Honor, Kove never asked in a request

25   for production for this hardware documentation that it's now

1   seeking through its motion.  They rely on request for

2   production 12 in their motion.  That request mentions

3   hardware requirements in passing.  It does not -- it doesn't

4   ask for the particulars that they want here over a 15-year

5   period on storage capacity, throughput capacity, and the

6   like.

7        And then third, your Honor, and finally, given the

8   lack of relevance here, proportionality should be considered.

9   Again, they are asking for 15 years of data for S3 and nine

10  years of data for DynamoDB on every make and model of

11  hardware across the four AWS data centers in the United

12  States that we are talking about here, your Honor.  That's

13  thousands of servers, routers, and other devices that would

14  need to be investigated here.  And we detail that further in

15  our brief.

16       So, your Honor, Kove's motion on all four of these

17  items should be denied for those reasons.

18       THE COURT:  Anything further from Kove on this?

19       MS. MAUZE:  Yes, your Honor.

20       If you have any particular request that I should

21  start with or go through, I'm happy to do that.  But if not,

22  I will address them briefly in the order that Mr. Sigler did.

23       First, to say that these requests are not

24  proportional to the needs of the case is a little bit missing

25  the narrowing process that the parties have undertaken over

33

1    the past months.

2           The correspondence between the parties has

3    consistently been Kove narrowing the requests and

4    specifically pointing out the items that we do need and that

5    are important to our case, such that we have come to this

6    universe that we are now at where we specifically identified

7    the exact information that we need.  And with respect, AWS

8    refuses to provide it despite the fact that their productions

9    show that they have it.

10          So starting with the predecessor products, what I'm

11   hearing from AWS is that they simply refuse to search for

12   these products.  AWS has maintained their position that they

13   have searched for S3 and DynamoDB, and to the extent the

14   predecessor products are relevant, they are encompassed

15   within those searches.  We are really asking for information

16   on these products that would have to be -- they would have to

17   be separately searched for.

18          The predecessor products are relevant to our case

19   for all the reasons that you identified in your recently

20   issued omnibus order, which was that they are relevant not

21   only to how the finally commercialized S3 and DynamoDB works

22   but also to the decisions that were made about the

23   functionalities that are in -- pardon me -- the

24   functionalities and the features that are in the products and

25   that are at issue that encompass these inventions.

1    The idea that there are just so many documents on

2  these predecessor products out there and that this would be

3  overly burdensome for AWS is unlikely.  Two of these products

4  were never even deployed.  They were essentially internal

5  projects that were eventually rolled into the products as

6  they were accused.

7    Your Honor, I said I would be brief, so I will just

8  address the final three points as briefly if I can.

9    For the metrics request, as I said earlier, we have

10  correspondence detailing the narrowing that the parties have

11  undertaken over the past quite a few months resulting in the

12  metrics request that -- the four metrics requests that we

13  specifically identified.

14    I would like to talk about Interrogatory No. 14 in

15  particular because the reality is, AWS has simply not

16  answered it.  I mean, they say that they supplemented it with

17  multiple pages, but none of those pages answer the question

18  that we are asking, which was how AWS measured the benefits

19  of the invention, which was one of the *Georgia-Pacific*

20  factors.  And this is important because we need to know

21  what's important to AWS.

22    And Mr. Walsh was unable to answer the question

23  about what metrics were specifically important to AWS.

24    In the correspondence between the parties, we

25  consistently offered to narrow and to work with AWS as to

1    what Rog 14 is really getting at.  Can we have 50 metrics?

2    Can we have 25 metrics?  And AWS just refuses to engage.

3         Finally, with respect to the hardware request, we

4    have asked for documents sufficient to show this information.

5    That is not as cumbersome as AWS perhaps addressed.

6         We are not asking for every single document on

7    hardware information for the past 15 years.  But the reality

8    is that there are other components in these inventions; for

9    example, the data location servers.  And even the software

10   components of this case necessarily runs on hardware, and

11   hardware is part of the accused products.

12        For Kove to be able to quantify what it looks like

13   to have something that doesn't utilize the invention, we need

14   this hardware information on the level of granularity such

15   that we can rearrange the hardware to see what it looks like

16   in a world where we don't have these inventions, and perhaps

17   we need more hardware.  So then we need

18   component-by-component information to see what that looks

19   like.

20        THE COURT:  Do you want to respond to Mr. Sigler's

21   assertion that you didn't ask the relevant witness about

22   Interrogatory 14 at a deposition on these topics?

23        MS. MAUZE:  Yes, your Honor.  Mr. Sigler's

24   position, I think, is elevating form over substance.

25        Mr. Walsh was asked about the information that is

1  contained in Interrogatory 14 and was asked to identify the

2  kinds of metrics that AWS uses.  He testified that any

3  engineer could run this type of information who could run

4  these queries, but he was not prepared to go into more detail

5  or to answer specific questions about those queries.  So I

6  think AWS is essentially representing that -- the things that

7  AWS points to is perhaps a little more politeness to the

8  witness than it is that he was never asked about things.

9           MR. SIGLER:  Your Honor --

10          MS. MAUZE:  (Unintelligible).

11          MR. SIGLER:  I'm sorry.  Apologies, your Honor.

12          THE COURT:  Go ahead.  Ms. Mauze, did you have

13  something else you wanted to say?

14          MS. MAUZE:  Yes, your Honor.

15          My final point was that Mr. Walsh was designated

16  for DynamoDB topics.  So even to the extent that perhaps he

17  could have been asked more questions about Interrogatory 14,

18  AWS has not addressed in sufficient answers and productions

19  with respect to S3 at all.

20          THE COURT:  All right.  Mr. Sigler, do you want to

21  respond one more time?

22          MR. SIGLER:  Sure, your Honor.  I will just respond

23  with two brief points.

24          One, with respect to Mr. Walsh's deposition -- we

25  detailed this in our briefing, your Honor, and I would

1    certainly invite the Court to review the transcript that we

2    provided.

3            But Mr. Walsh was prepared to answer questions on

4    Interrogatory No. 14.  Kove began asking him questions about

5    it.  He asked to see a copy of Interrogatory No. 14 given

6    that they were asking him questions about it.  Kove declined

7    to put that in front of him, which, of course, hindered his

8    ability to answer questions about that response, which I then

9    mentioned contained an 11-page narrative discussion on the

10    metrics issues.

11            So that's Point 1, your Honor.

12            And then Point 2, as an overarching point really on

13    all four of these topics raised in this motion, on the

14    burden, your Honor, the fact that Kove delayed so long in

15    filing this case presents a real challenge for AWS on all of

16    these issues.

17            S3 was introduced in 2006, your Honor.  And as we

18    have seen in the discussion today, Kove is, for example,

19    asking for documentation on the hardware going back to the

20    beginning of S3 in 2006, more than 15 years ago.  Asking

21    about predecessor products to the accused products here again

22    going back in time more than 15 years to almost two decades

23    ago, that presents some significant challenges on the

24    predecessor products, the metrics over the course of that

25    time frame, as well as the hardware, your Honor.

1    They delayed until 2018 to file this case, 12 years
2    after one of the accused products was introduced by AWS in
3    2006.  So, again, that's really increasing the burden here
4    inappropriately on AWS.

5    So, respectfully, your Honor, for those reasons and
6    the others in our briefing, we request that their motion be
7    denied in full.

8    THE COURT:  All right.  With respect to this
9    motion, this 409/410 motion, I think I need to review the
10    briefs and exhibits one more time.  There are a lot of
11    complicated issues here.

12    I am concerned about the burden, I have got to say.
13    Recognizing that I think there is some important information
14    that Kove is going to need with respect to the damages
15    issues, I recognize also significant concerns about the fact
16    that we are looking at data from a long time ago maintained
17    in, I think, probably a variety of different places in
18    different ways.

19    I am also very conscious of the fact that these
20    parties have been engaged in discovery now for months and
21    months.  You have had a lot of intervention from
22    Judge Finnegan and a little bit more recently from me.  I
23    would love to get this sewn up.

24    And we have our -- our fact discovery deadline has
25    come and gone, so we need to get it wrapped up as soon as

1  possible.  And to the extent that that means that there are

2  some things that in an ideal world we would get hold of, it

3  might be that we are not going to be getting hold of anymore.

4         I can't make you any firm promises about when I am

5  going to be able to rule on 409 and 410, but I will certainly

6  make an effort to do that in the next, say, eight weeks.

7         In the meantime, I know we have got some other --

8  we have got issues regarding the other motions that have been

9  semi-resolved and that we are going to need to talk about

10  again.

11         There is also the matter of the stay.  If the Court

12  grants the motion for a stay pending the *ex parte* review,

13  will that -- what effect, if any, would that have on

14  discovery in this case?  I'm hoping you will have discovery

15  complete in this case regardless of when I rule on that

16  motion, but I'm curious.

17         MS. HOANG:  Your Honor, Khue Hoang on behalf of

18  Kove.

19         As you noted, we filed our opposition motion last

20  night -- sorry -- our opposition brief last night.  And

21  actually, the tail end of the prior conversation dovetails

22  right into this issue.

23         It has been a number of years, obviously, within

24  our enforcement period.  The case has been pending for three

25  years.  Any kind of stay for any duration is only going to

1    exacerbate the situation we are currently facing.

2    And, again, with all due respect, your Honor, I
3    don't see discovery completing because we haven't really --
4    aren't more than halfway through the number of depositions we
5    have yet to take, the majority of which, just by a sheer
6    count, are of Amazon witnesses.  So if there is a stay, then
7    we certainly, almost definitely, run the possibility of
8    losing one or more of these witnesses as they move or change
9    jobs, more responsibility, documents, memories fade as a
10   matter of course.  So there is particular danger and
11   particular prejudice to that.

12   And as evidenced just in the last hour that we have
13   spent here and just the volumes of motion practice, Kove has
14   expended so much effort, resource, money, and time into this
15   case.  We think that the prejudice to our small company would
16   be severe, and we don't think that a stay is warranted.

17   Honestly talking about delay, as Mr. Sigler brought
18   up, they had a firm deadline that they were well aware of
19   under the local rules to bring any action they wanted to in
20   the USPTO by a certain time so that they could move this
21   Court for a stay.  That was 16 months ago.  They chose not to
22   do it.  And the reasons for not doing it are just simply
23   unremarkable.  They weren't ready.  They didn't find the
24   right references.  But the rule doesn't leave any room open
25   for people to say, oh, I'm sorry.  I just wasn't prepared by

1    that time.  Give me another year and a half to figure it out.

2            And so in that interim, as I mentioned, resources

3    have been spent, time has been spent.  Certainly the Court

4    has devoted an enormous amount of time to this case.  And we

5    are at a point where we should be wrapping it up, your Honor.

6    We should not be putting it on ice.  I think the harm is --

7    it's hard to even calculate what the potential harm to Kove

8    would be if a stay were granted.

9            Obviously I apologize for basically making argument

10   right now, but that's our position.  We would be happy to

11   have argument on it again if the Court would like that after

12   it receives all the briefing.

13           THE COURT:  Once it's fully briefed, I may very

14   well want to convene another hearing.  I may want to hear an

15   argument about that motion and have any -- review any

16   additional questions I have about these other discovery

17   matters.

18           I recognize enormous amounts of resources have been

19   devoted to this.  That does, of course, include the resources

20   of the court that the taxpayers are paying for.  Your clients

21   are paying for your efforts, and I know those efforts have

22   been -- I know the efforts you devoted to this are worth

23   whatever it is the client is paying you.

24           But let me just ask, have you had any recent

25   responsible discussions about settlement?

1          MS. HOANG:  No, your Honor.

2          THE COURT:  I wonder why not?

3          MR. SIGLER:  Your Honor, may I be heard on that and

4    in response to the arguments made by Kove?

5          THE COURT:  Sure.  Of course.

6          MR. SIGLER:  On the settlement issue, your Honor,

7    Amazon is always open to reasonable settlement discussions

8    and will continue to be available for those.

9          With respect to the stay, the harms that counsel

10   for Kove has just mentioned from a stay are not unique to

11   Kove.  They are a part of any case that's stayed due to a

12   patent office or other proceeding in a nonpatent case.  So

13   they are just not unique here, your Honor.

14         In terms of -- we will be detailing that more in

15   our reply brief next week, your Honor, and would, of course,

16   be happy to convene again for further argument on the issue.

17         And for now, I just want to mention on this delay

18   issue, I mean, a portion of the delay here in this case -- a

19   significant portion recently has been on the part of Kove.

20   The parties have jointly agreed to a number of scheduling

21   adjustments in the case, as your Honor has seen in the joint

22   submissions on that, including with respect to discovery and

23   briefing deadlines.

24         Several of those recent adjustments were the result

25   of Kove's request for the postponement of deadlines due to

43

1  its counsels' pretrial and trial obligations in other cases.

2  That trial has continued to move, and they continued to ask

3  us to agree to move deadlines based on that.  AWS

4  accommodated that.  If they are going to use that against us

5  now, I'm not sure we will be agreeing to any further

6  adjustments based on their other trial obligations.

7             MS. HOANG:  May I respond to that, your Honor?

8             THE COURT:  You may.  It sounds like it's

9  premature, but go ahead.

10            MS. HOANG:  Sure.

11            The delay I was referring to was Amazon's delay in

12  bringing its reexam and moving for a stay.

13            We understand that the case has taken quite a long

14  time.  So, again, all due respect, Mr. Sigler is bringing up

15  an issue that's not on the table here.  We are well aware

16  that this case has taken a very, very long time.  We are not

17  laying the blame squarely on anyone.  We understand that the

18  situation has just unspooled over a far longer period of time

19  than would otherwise be desirable.  Some of it, candidly,

20  yes, was due to trial schedules by us.  Obviously large

21  chunks of it are due to the detailed delays in discovery

22  procurement that your Honor, I think, is probably tired of

23  hearing.  It's all very well documented that a lot of

24  discovery has been halted because of our inability to get

25  relevant discovery.

1          So as you mentioned, that aspect of it doesn't

2     justify their lateness in bringing this.

3          Insofar as not being unique to Kove, the burden of

4     uniqueness is not on Kove.  LPR 3.5's "exceptional

5     circumstances" is something that AWS has to prove, and they

6     haven't and they can't.  So to try to shift this over as

7     somehow Kove's problem is absolutely a red herring, your

8     Honor.

9          THE COURT:  Well, again, the suggestion on the part

10    of Mr. Sigler was that he wasn't going to be favorably

11    disposed to additional requests for extensions of time based

12    on your trial schedule.  I don't know that we need to address

13    that until such a request is made.

14          I think -- I understood your argument to be that

15    the request for an *ex parte* review was tardy, but I don't

16    need to go down that road either because I will be ruling on

17    the motion when it's fully briefed.  And when it is, again, I

18    think it's at least possible and maybe likely that I will

19    want to hear at least a brief oral argument on that as well.

20          I am going to continue working particularly on the

21    issues presented in the motion 409/410 and try to get a

22    ruling on that to you as quickly as I can.

23          In the meantime, I know that Amazon is going to be

24    producing -- AWS -- I'm sorry -- is going to be producing

25    additional material that may resolve at least some of the

1   issues on the other two motions, and I hope that it does.  We

2   can talk about that once the motion for stay is fully briefed

3   as well.

4        All right.  I'm sorry I can't provide more closure

5   this morning, but we are making some progress.  I know that

6   there is going to be additional production on the part of AWS

7   within 14 days and that we will have a deposition within 21

8   days on one of the issues as well.

9        Beyond that, I hope to get some written rulings to

10  you.

11       And I am going to ask, given that there hasn't been

12  any recent, as I understand it, efforts toward settlement,

13  that you at least exchange a proposal or advise me whether

14  you would want to use a mediator or a magistrate judge to

15  talk about that with you.

16            MS. HOANG:  Thank you, your Honor.

17            THE COURT:  Thank you.  Thank you for your time

18  this morning.

19            MR. SIGLER:  Thank you, your Honor.

20       (An adjournment was taken at 11:32 a.m.)

21                    *   *   *   *   *

22  I certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.
23

24  /s/ Frances Ward_____February 2, 2022._
    Official Court Reporter - F
25