# Exhibit 1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

_____

KOVE IO, INC.,                    )
                                  )
          Plaintiff,              )
                                  )
v.                                )   No. 1:18-cv-08175
                                  )
AMAZON WEB SERVICES, INC.,)
                                  )
          Defendant.              )
_____)      VOLUME I


HIGHLY CONFIDENTIAL


     Video-recorded deposition of JOHN OVERTON,

     PH.D., taken at 161 North Clark Street,

     Chicago, Illinois, before Donna M. Kazaitis,

     IL-CSR, RPR, CRR, commencing at the hour of

     8:11 a.m. on Tuesday, May 16, 2023.


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 33

1    claims of Kove's patents are invalid against the

2    prior art that Amazon has asserted in this case?

3              MR. CARDENAS-NAVIA:  Objection, form,

4    vague.

5              THE WITNESS:  Would you restate the

6    question, please.

7              MR. SIGLER:  Sure.

8    BY MR. SIGLER:

9         Q.   Have you ever analyzed whether the

10   claims of Kove's patents are invalid against the

11   prior art that Amazon is asserting in this case?

12        A.   I'm not sure.  "Analyze" and so forth

13   suggests something that I wouldn't know how to do

14   that might be legal in nature.  I haven't really

15   reviewed them very specifically at all.

16        Q.   Okay.  Have you reviewed any of the

17   prior art that Amazon is asserting in this case?

18        A.   Yes, I have.

19        Q.   Which prior art references?

20        A.   I don't recall.  A number of them

21   related to DNS or Oracle.

22        Q.   When did you review that prior art?

Page 34

```
 1          A.   I don't recall.  It would have been

 2   within the last two years.

 3          Q.   Did you review any of that prior art

 4   to prepare for your deposition today?

 5          A.   No, not for the deposition -- or, I

 6   don't think so.

 7          Q.   Have you ever analyzed what damages

 8   Kove should be entitled to in this case?

 9          A.   I have no idea about any of that.

10          Q.   All right.  Kove's attorneys told us

11   you were incredibly busy and had to rearrange your

12   schedule to appear today.  What were you -- what

13   are you busy with?

14          A.   Last week I was at a conference with

15   John Kerry and the Secretary of Agriculture for

16   the United States, 47 delegates from 47 countries,

17   and I was scheduling this so that I could not show

18   up to that.

19          Q.   And that conference was last week?

20          A.   Yes.

21          Q.   Have you ever been deposed before?

22          A.   I have.
```

Page 35

1          Q.    How many times?

2          A.    Once.

3          Q.    When was that?

4          A.    Last year sometime, I believe.  It

5     might have been earlier this year.  It was a

6     personal lawsuit.

7          Q.    What do you mean by "personal"?

8          A.    It was with a condo association.

9          Q.    Who was the -- well, strike that.

10               Were you one of the parties in that

11    case?

12         A.    I was the plaintiff.

13         Q.    And who was the defendant?

14         A.    The condo association.

15         Q.    What's the nature of the claim you

16    made?

17         A.    We would like the tuck pointing done

18    on our condo.

19         Q.    You'd like the what?

20         A.    The tuck pointing done on our condo.

21         Q.    When did you file that case?

22         A.    I don't recall.  A number of years

Page 36

1   ago.

2          Q.    That's the only deposition you've ever

3   had?

4          A.    That's correct.

5          Q.    Have you ever testified in court

6   before?

7          A.    I don't think so.

8          Q.    Have you ever served as a corporate

9   witness for a deposition before?

10         A.    I don't think so.

11         Q.    Did you do anything to prepare for the

12  deposition today and tomorrow?

13         A.    Yes.

14         Q.    What did you do to prepare?

15         A.    I just reviewed documents.  I looked

16  at some of our source code, a number of the

17  corporate documents that we're responsible for.

18         Q.    How many documents did you review?

19         A.    I don't know.

20         Q.    How long did you spend reviewing

21  documents?

22         A.    Many hours.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc. John Overton, Ph.D., Vol I
                                  Highly Confidential

```
1          Q.   Did you meet with anyone to prepare

2    for the deposition?

3          A.   Yes.

4          Q.   Who?

5          A.   My lawyer.

6          Q.   You mean Mr. Cardenas-Navia?

7          A.   Yes.

8          Q.   When did you meet with him?

9          A.   Yesterday.

10         Q.   How long did you meet?

11         A.   All day yesterday.

12         Q.   Did you meet with anyone else?

13         A.   Yes.

14         Q.   Who?

15         A.   Gina.  I've forgotten Gina's last

16   name.

17         Q.   Is she one of the attorneys for Kove

18   in this case?

19         A.   She is.

20         Q.   Did you meet with anyone else?

21         A.   Yes.

22         Q.   Who?
```

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                                    Highly Confidential

Page 38

1          A.    Courtland Reichman.

2          Q.    And he's another attorney for Kove in

3    this case?

4          A.    Yes.

5          Q.    Aside from Kove's attorneys, did you

6    talk to anyone else to prepare for the deposition?

7          A.    No.

8          Q.    Aside from Kove's attorneys, did you

9    meet with anyone else to prepare for the

10   deposition?

11         A.    No.

12               (Deposition Exhibit 1 was marked

13                for identification.)

14   BY MR. SIGLER:

15         Q.    I'm passing you what I've marked as

16   Exhibit 1, sir.  (Document tendered to the

17   witness.)

18         A.    Okay.

19         Q.    Do you have Exhibit 1?

20         A.    Yes.

21         Q.    Exhibit 1 is entitled "First Notice of

22   30(b)(6) Deposition to Kove IO Inc. by Amazon Web

Page 39

1    Services, Inc."  Do you see that, sir?

2          A.   I do.

3          Q.   If you turn to the last page, there's

4    a Certificate of Service.  And you see the date

5    there is February 12, 2020?

6          A.   Yes.

7          Q.   Have you seen this document before,

8    sir?

9          A.   I have seen so many documents through

10   this that I could have.

11         Q.   Well, this 30(b)(6) notice identifies

12   17 topics starting on Page 3 and going to Page 5.

13   Do you see that, sir?

14         A.   So I see 15 paragraph numbers on

15   Appendix A and I see Topics 1 through 17.  I see,

16   yes.

17         Q.   All right.  It's our understanding

18   that as part of your testimony today and tomorrow

19   you're here to provide testimony on behalf of Kove

20   for these 17 topics.

21              MR. CARDENAS-NAVIA:  Subject to Kove's

22   objections.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc. John Overton, Ph.D., Vol I
                              Highly Confidential

Page 76

1    privileged information.  If you believe you can do

2    that, go ahead and do that.  If not, we can take a

3    break to discuss.

4               THE WITNESS:  Would you repeat the

5    question, please?

6               MR. SIGLER:  Sure.

7    BY MR. SIGLER:

8        Q.   How is Kove financing this litigation?

9        A.   We have a contract with Reichman

10   Jorgensen.

11       Q.   Has Kove received any funding from any

12   other entities to support this litigation?

13              MR. CARDENAS-NAVIA:  I'm just going to

14   go ahead and object as it's irrelevant and caution

15   the witness not to reveal any privileged

16   information and I'm going to on that basis

17   instruct the witness not to answer.

18   BY MR. SIGLER:

19       Q.   Are you going to follow your

20   attorney's instruction?

21       A.   Of course.

22       Q.   Why is Kove named Kove?

Page 102

1    not in control of right now because I don't have

2    my files in front of me, but I think it's

3    probable, yes.

4          Q.   It's hard to say what you did or

5    didn't do 15 years ago; right?

6          A.   Could you be more specific?

7          Q.   Sure.  It seems like you're having

8    problems remembering what you may or may not have

9    done 15 years ago; is that fair?

10              MR. CARDENAS-NAVIA:  Objection to

11   form, vague.

12              THE WITNESS:  I'm not sure how to

13   answer the question.  It is my testimony that to

14   my ability level I try to be as diligent as I

15   could be when reviewing documents.  To further

16   specify specific actions that I did about all

17   documents in all ways 15 years ago is a difficult

18   thing to ask anyone, unless I were to have the

19   documents to review them, which I'm happy to do.

20   If you would like to give me these documents, I'll

21   go through every single one of them and then I can

22   give you a more definitive response.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                              Highly Confidential

                                                              Page 103

 1    BY MR. SIGLER:

 2          Q.   It's hard to remember what you did 15

 3    years ago; right?

 4               MR. CARDENAS-NAVIA:  Objection, asked

 5    and answered.

 6    BY MR. SIGLER:

 7          Q.   Can you answer my question?

 8          A.   I have, numerous times now.

 9          Q.   Okay.  Where would you keep documents

10    like the references cited in the '640 Patent?

11          A.   It depends.  I have file cabinets,

12    file storage.  There's a variety of places.  We

13    have locker boxes.  We had backups on things.

14          Q.   Do you recall if you discussed any

15    specific prior art references with your attorneys

16    at Brinks & Hofer during the application process

17    for the '640 Patent?

18               MR. CARDENAS-NAVIA:  And I'm going to

19    instruct the witness not to answer on the basis of

20    privilege.

21               MR. SIGLER:  It's a "Yes" or "No"

22    question.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                                  Highly Confidential

                                                                    Page 104

 1                    MR. CARDENAS-NAVIA:  You're asking

 2      about specific references that were discussed with

 3      attorneys.  That's part of the attorney work

 4      product.

 5                    MR. SIGLER:  I'm not.  I'm asking him

 6      did he discuss any specific references with

 7      attorneys at Brinks & Hofer.

 8                    MR. CARDENAS-NAVIA:  You may answer

 9      that question "Yes" or "No."

10                    THE WITNESS:  Yes.

11      BY MR. SIGLER:

12           Q.   Which ones?

13                    MR. CARDENAS-NAVIA:  And I'm going to

14      now instruct you not to answer.

15                    THE WITNESS:  I'll follow counsel's

16      advice.

17                    MR. SIGLER:  Okay.  Put the '640 aside

18      for now.

19                    (Deposition Exhibit 12 was marked

20                     for identification.)

21      BY MR. SIGLER:

22           Q.   I'm passing you Exhibit 12.

Page 105

1    (Document tendered to the witness.)

2              Do you have Exhibit 12 in front of

3    you, sir?

4         A.   I do.

5         Q.   And this is U.S. Patent Number

6    7,233,978; right?

7         A.   Yes.

8         Q.   This is one of the three patents at

9    issue in this case; right?

10        A.   Yes.

11        Q.   Is it okay if I refer to this as the

12   '978 Patent today?

13        A.   Yes.

14        Q.   The date of this patent issued is

15   June 19, 2007; right?

16        A.   Yes.

17        Q.   Again, you're identified as one of the

18   inventors on the cover of the patent; right?

19        A.   I am.

20        Q.   And Mr. Bailey is identified as the

21   other inventor; correct?

22        A.   Yes.

Page 108

1    BY MR. SIGLER:

2          Q.   But you don't know for sure one way or

3    the other?

4          A.   We're in the same loop.  I would want

5    to review the documents.  I would want to have all

6    of them put in front of me.  I'm happy to review

7    those right now.  If you'd like to provide them,

8    we can go through them.

9               I would never want to testify

10   something that I don't have a definitive answer

11   on.  I don't have a definitive answer because I

12   don't have the documents.

13         Q.   You would need to have every single

14   one of those documents in front of you to answer

15   my question about whether you reviewed them all

16   during the prosecution of this patent?

17         A.   It would help because I would be able

18   to review and try to recall that I had read these

19   before.

20         Q.   Okay.  So, again, there are dozens of

21   U.S. patent documents, foreign patents, and other

22   publications identified as references cited in the

Page 109

1    '978 Patent; right?

2         A.   Yes.

3         Q.   Do you know if Mr. Bailey reviewed all

4    those references cited during the prosecution of

5    the '978 Patent?

6         A.   I don't know what Mr. Bailey did or

7    did not do.

8         Q.   Did you discuss any of these prior art

9    references cited with your attorneys at Brinks &

10   Hofer during the prosecution of the '978 Patent?

11              MR. CARDENAS-NAVIA:  I'm going to

12   instruct -- well, you may answer that question

13   "Yes" or "No."

14              THE WITNESS:  Yes.

15   BY MR. SIGLER:

16        Q.   Which ones did you discuss with your

17   attorneys at Brinks Hofer during the prosecution

18   of the '978 Patent?

19              MR. CARDENAS-NAVIA:  I instruct the

20   witness not to answer on the basis of privilege.

21              THE WITNESS:  I agree with my counsel.

22              MR. SIGLER:  All right.  You can put

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
Highly Confidential

Page 110

1   that aside.

2                    (Deposition Exhibit 13 was marked

3                     for identification.)

4   BY MR. SIGLER:

5        Q.   I'm passing you Exhibit 13.  (Document

6   tendered to the witness.)

7                    You have Exhibit 13 in front of

8   you, sir?

9        A.   I do.

10       Q.   Exhibit 13 is U.S. Patent Number

11   7,814,170; right?

12       A.   Yes.

13       Q.   Let's refer to this as the '170 Patent

14   today; all right?  Is that all right with you,

15   sir?

16       A.   Yes.

17       Q.   The date of this patent is October 12,

18   2010; right?

19       A.   Yes.

20       Q.   Again, you and Mr. Bailey are named as

21   the inventors; right?

22       A.   Yes.

Page 111

1          Q.    And the assignee is Econnectix; right?

2          A.    Yes.

3          Q.    And Brinks & Hofer again acted as your

4     attorneys in applying for the '170 Patent; right?

5          A.    Yes.

6          Q.    This patent was filed on February 13

7     -- strike that.

8                The application for this patent was

9     filed on February 13, 2006; right?

10         A.    Yes.

11         Q.    The '170 Patent also includes a number

12    of references cited on the front cover and the

13    second page; right?

14         A.    Yes.

15         Q.    Do you recall if you reviewed all of

16    these references cited during the prosecution of

17    the '170 Patent?

18         A.    The same as the other two, it is

19    probable that I looked at these.

20         Q.    But sitting here today, you can't tell

21    me for sure one way or the other whether you

22    looked at all these references during the

Page 112

1    prosecution of the '170 Patent; right?

2          A.   Again, it would be the same answer:

3    That I would want to look at the documents to be

4    more specific.  And I'm happy to do that.

5          Q.   Did you discuss any of the references

6    cited with your attorneys at Brinks & Hofer during

7    the prosecution of the '170 Patent?

8               MR. CARDENAS-NAVIA:  You may answer

9    that question "Yes" or "No."

10              THE WITNESS:  Yes.

11   BY MR. SIGLER:

12         Q.   And which of these references cited

13   did you discuss with your attorneys at Brinks &

14   Hofer during the prosecution of the '170 Patent?

15              MR. CARDENAS-NAVIA:  I'm going to

16   instruct the witness not to answer on the basis of

17   privilege.

18              THE WITNESS:  I accept my counsel's

19   recommendation.

20              MR. SIGLER:  We'll be applying the

21   sauce rule in this case.

22

Page 113

1   BY MR. SIGLER:

2          Q.   So the first of the three patents at

3   issue was issued by the Patent Office in September

4   2006; right, sir?

5          A.   Which one are you referring to?

6          Q.   The '640 Patent.  That one issued

7   September 5, 2006; right?

8          A.   Yes.

9          Q.   And that was the first of the three

10  patents at issue to be issued by the Patent

11  Office; right?

12         A.   It would appear so given the dates on

13  these three, yes.

14         Q.   Okay.  And the last of these three

15  patents to issue was the '170 Patent which the

16  Patent Office issued October 12, 2010; right?

17         A.   It would appear so with the dating,

18  yes.

19         Q.   All right.  So all three of the

20  patents-in-suit had issued by 2010; right?

21         A.   Yes, by October 12, 2010, as I

22  understand it.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
Highly Confidential

Page 114

1          Q.   Do you understand, sir, that these

2    three patents are expired?

3          A.   I do.

4          Q.   And do you understand that they

5    expired in September of 2020?

6          A.   I don't know the dates exactly when

7    they expired.

8          Q.   Do you know when -- well, strike that.

9               Kove has accused Amazon's S3

10   product of infringing in this case; right?

11         A.   It is my understanding of that, yes.

12         Q.   And Kove has accused Amazon's DynamoDB

13   product of infringing these patents in this case;

14   right, sir?

15         A.   It is my understanding, yes.

16         Q.   When did Amazon launch S3?

17         A.   I don't know the specific date.

18         Q.   When did Amazon launch DynamoDB?

19         A.   I don't know the specific date.

20              (Deposition Exhibit 14 was marked

21               for identification.)

22

5/16/2023        Kove IO, Inc. v. Amazon Web Services, Inc. John Overton, Ph.D., Vol I
Highly Confidential

```
                                                   Page 115

 1    BY MR. SIGLER:

 2         Q.   I'm passing you Exhibit 14.  (Document

 3    tendered to the witness.)

 4              Do you have Exhibit 14 in front of

 5    you, sir?

 6         A.   I do.

 7         Q.   Exhibit 14 is entitled "Complaint";

 8    right?

 9         A.   I don't know what you're looking at.

10         Q.   Sure, at the top here it says

11    "Complaint"; right?

12         A.   Yes, yes.

13         Q.   And if you go to the final page, Page

14    37, do you see that it's signed December 12, 2018?

15         A.   Yes.

16         Q.   And the caption on the front page is

17    Kove IO, Inc., Plaintiff, vs. Amazon Web Services,

18    Inc., Defendant.  Do you see that, sir?

19         A.   Yes.

20         Q.   Have you seen this document before?

21         A.   Yes.

22         Q.   Did you review it before it was filed?
```

Page 118

1    ever ask anyone at Amazon if Amazon would be

2    interested in taking a license to the '640, '978,

3    or '170 Patents?

4          A.    Would you restate the question?

5          Q.    Sure.  Before Kove filed its complaint

6    against Amazon on December 12, 2018, no one from

7    Kove asked Amazon if Amazon would be interested in

8    taking a license to the '640, '978, or '170

9    Patents?

10         A.    I believe that that is true.  But,

11   again, I can specify definitely that I did not and

12   it is my belief that someone else did not.  But I

13   do not know what every action somebody in the

14   company did.

15         Q.    So if someone at Kove communicated

16   with Amazon about three patents-in-suit before

17   filing this complaint, you're not sure if you

18   would have known about that?

19         A.    I think I would likely have, yes, I

20   think it is likely.

21         Q.    Okay.  Let's go to Paragraph 27,

22   please.  Paragraph 27, it is on Page 8.

Page 119

1          A.    I see it, yes.

2          Q.    In Paragraph 27 it says:  "As an

3     example, Amazon S3 allows users to store data in

4     the cloud.  In fact, it is described as 'storage

5     for the internet.'  Specifically, it launched in

6     2006," and then it goes on.  Do you see that

7     language, sir?

8          A.    I do.

9          Q.    So based on this, would you agree that

10    Amazon launched S3 in 2006?

11         A.    I don't know.  That's a further

12    conclusion than this states.  It would appear

13    that, right, I'm sorry, specifically it launched

14    in 2006, yes.  Sorry, I didn't see that.

15         Q.    So Amazon launched S3 in 2006; right?

16         A.    Presuming this is correct, yes.

17         Q.    And this is Kove's complaint; right?

18         A.    Yes.

19         Q.    And you reviewed it before Kove filed

20    it; right?

21         A.    Yes.

22         Q.    So you agree that Kove filed this

Page 120

1    lawsuit 12 years after Amazon launched S3?

2          A.   Yes.

3          Q.   Are you aware that Amazon launched

4    DynamoDB in 2012?

5          A.   It may be in this document, in which

6    case we could find this area.  Those are specific

7    dates, and if the document provides that I'm happy

8    to look at that to make sure.

9          Q.   All right.  Well, you'd agree that

10   Kove filed this lawsuit six years after 2012;

11   right?

12         A.   Yes.

13         Q.   All right.  Has anyone ever paid for a

14   license to the '640, '978 or '170 Patents?

15         A.   No.

16         Q.   Has Kove ever offered a license to

17   anyone to the '640, '978, or '170 Patents?

18         A.   What do you mean by "offer"?

19         Q.   Do you have an understanding of what

20   the word "offer" means?

21         A.   I think it could mean lots of things.

22         Q.   Well, has Kove ever communicated with

Page 121

1    anyone about potentially taking a license to the

2    '640, '978, and '170 Patents?

3           A.    Kove you're talking about.  So this is

4    not OverX.  So it is possible that right after

5    Econnectix acquired that we had a discussion with

6    EMC about that possibly, but that would have been

7    right after the acquisition.  We may have had

8    other licenses for evaluation, but I'd want to see

9    the specific documents that we did.

10          Q.    All right.  We'll come back to that.

11                No one has ever paid Kove for the

12   right to practice the technology in the '640,

13   '978, and '170 Patents though; right?

14          A.    That is correct.

15          Q.    All right.  Let's go to Paragraph 1 of

16   the complaint.  It's on the front page.  You see

17   Paragraph 1 there, sir?

18          A.    I do.

19          Q.    In Paragraph 1 in the third sentence

20   says:  "Five years after this breakthrough, the

21   MIT Technology Review recognized that the type of

22   distributed data storage technology described in

Page 128

1          A.    That's correct.

2          Q.    And you didn't invent distributed hash

3     tables; did you?

4          A.    That's a tricky question.  Our concept

5     was distributed hash tables for locality

6     management, and I don't believe anybody had done

7     that before us.

8          Q.    Okay.  Had anyone before you invented

9     distributed hash tables in general?

10          A.    Again, that's a very specific set of

11    terms and there are some implementations that

12    would definitely have been prior to that.  I would

13    never assert that we invented distributed hash

14    tables.  But that's used very, very diversely what

15    it means.  So there's some nuance, technical

16    nuance.  But yes, I would agree.

17          Q.    Okay.  So you'd agree that you didn't

18    invent distributed hash tables; right?

19          A.    Yes.

20          Q.    All right.  And then about

21    three-fourths of the way down the page on Page 1

22    on the right side there's a paragraph that starts

Page 129

1   with "Balakrishnan's work is part of IRIS."  Do

2   you see that?

3          A.   I did.

4          Q.   It says:  "Balakrishnan's work is part

5   of IRIS, the infrastructure for resilient internet

6   systems project, a collaboration among researchers

7   at MIT, the University of California, Berkeley,

8   the International Computer Science Institute in

9   Berkeley, California, New York University, and

10  Rice University."  Do you see that, sir?

11         A.   I do.

12         Q.   Were you ever involved in IRIS?

13         A.   I was not.

14         Q.   All right.  You can put that aside.

15              (Deposition Exhibit 16 was marked

16               for identification.)

17  BY MR. SIGLER:

18         Q.   I'm passing you Exhibit 16.  (Document

19  tendered to the witness.)

20              For the record, Exhibit 16 is

21  entitled "Kove's First Amended Response to AWS's

22  Third Set of Interrogatories (No. 18)."

```
                                              Page 130

 1                    Sir, if you can turn to Page 5 of

 2     this document.

 3           A.    Yes.

 4           Q.    This response is dated February 12,

 5     2021; right?

 6           A.    Yes, I see that.

 7           Q.    If you turn to the next page, Page 6.

 8           A.    Yes.

 9           Q.    That's your signature on Page 6,

10     right?

11           A.    Yes.

12           Q.    You verified the accuracy of this

13     Interrogatory response; correct?

14           A.    Yes.

15           Q.    And you did so under the penalty of

16     perjury; right?

17           A.    Sure.

18           Q.    Let's go to Page 2, please.

19     Interrogatory 18 states:  "Identify all products,

20     devices, systems, or services created, made, sold,

21     used, distributed, given away, produced or

22     manufactured by Kove, its predecessor entities, or
```

Page 131

1    the named inventors of the patents-in-suit from

2    1995 to and including 2020, including the Kove

3    products and services."  Do you see that language,

4    sir?

5          A.   Yes, I do.

6          Q.   All right.  Let's take a look at the

7    response.  On Page 3, the substantive response

8    starts there about halfway down the page there's a

9    sentence that says:  "OverX created the OverX

10   location servers."  Do you see that, sir?

11         A.   I do.

12         Q.   It says:  "OverX created the OverX

13   location servers, OXLS."  What was OXLS?

14         A.   It was part of the OverX product that

15   Steph and I built, with some others.

16         Q.   When did you create OXLS?

17         A.   Again, there are probably specific

18   dates and we can probably get the dates out of the

19   CVS logs or, whichever one we were using at --

20              THE REPORTER:  "Out of the" what?

21              THE WITNESS:  Sorry about that.  CVS

22   logs, which would have precise date stamps.

Page 132

1    BY MR. SIGLER:

2         Q.   Okay.  And then the answer goes on to

3    say:  "The technology was then transferred to

4    Econnectix, and Econnectix referred to OXLS as the

5    Xpress Association Database.  Additionally, XTN

6    for telecommunications, XRN for registry services,

7    XSN for storage services, and the Xpress Database

8    are the same as OXLS; the different names were

9    used by Econnectix to indicate different use

10   cases."  Do you see that there, sir?

11        A.   I do.

12        Q.   Is that accurate?

13        A.   Yes.

14        Q.   Then it goes on to say:  "Each of

15   these products, which are the same, embody the

16   patents-in-suit."  Do you see that, sir?

17        A.   I do.

18        Q.   Okay.  So those products practiced the

19   '978, '170, and '640 Patents; right?

20             MR. CARDENAS-NAVIA:  Objection to

21   form, calls for legal conclusion and expert

22   testimony.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                                    Highly Confidential

                                                                    Page 133

 1   BY MR. SIGLER:

 2          Q.    You can answer, sir.

 3          A.    I don't understand the question again.

 4          Q.    Well, those products embody the

 5   patents-in-suit; right?

 6                MR. CARDENAS-NAVIA:  Same objections.

 7                THE WITNESS:  To the degree that this

 8   is a legal conclusion, I'm not a lawyer.  To the

 9   degree they're talking about the technology, it

10   was my understanding that we were making those

11   available out of the code base that we had from

12   the OXLS into these products.

13   BY MR. SIGLER:

14          Q.    Okay.  Did OverX ever offer OXLS for

15   sale?

16          A.    Not OXLS; we weren't selling that.  We

17   were selling that through these other tradenames,

18   XTN and so forth.  We tried to sell them in OverX,

19   we tried to sell them in Econnectix; we were

20   unsuccessful.

21          Q.    Okay.  So OverX tried to sell these

22   products identified -- well, strike that.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                              Highly Confidential

Page 134

1                    I just want to get this straight.

2    OverX tried to sell OXLS; is that correct?

3         A.   Yes.

4         Q.   And then Econnectix tried to sell

5    Xpress Association Database, XTN for

6    telecommunications, XRN for registry services, XSN

7    for storage services, and the Xpress Database; is

8    that correct?

9         A.   Yes.

10        Q.   And neither OverX nor Econnectix ever

11   sold any of those products; right?

12        A.   That's correct.

13        Q.   The response goes on to say:  "None

14   was sold, distributed, given way, or otherwise

15   provided to any third party."  Do you see that?

16        A.   Yes.

17        Q.   Is that correct?

18        A.   I think so.

19        Q.   You don't know one way or the other?

20        A.   No, I think so, I think it is.

21        Q.   All right.  Again, the answer says

22   that each of those products embody the

Page 135

1    patents-in-suit; right?

2          A.    Where are you referring to?

3          Q.    There's a sentence that says "Each of

4    these products."  Do you see that?

5          A.    I don't yet.

6          Q.    In the middle of the paragraph.

7          A.    Yes, I see, yes.

8          Q.    And this response that you verified

9    states that "each of these products, which are the

10   same, embody the patents-in-suit"; right?

11         A.    That is what it says, yes.

12         Q.    Did Kove ever offer to sell any

13   products that embody the patents-in-suit?

14         A.    Of the ones listed here, to the degree

15   that's Kove.  So the question is nuanced it would

16   appear.  Kove I believe started in -- the name

17   Kove started somewhere around 2010.  Again, the

18   specifics I'd like to have in specific documents.

19   Econnectix was the company name prior to that.

20   Econnectix definitely did.  Whether there's an

21   overlap to the Kove name and these named products,

22   I don't know specifically.

Page 136

1          Q.   Okay.  But OverX never sold any

2    product that embodies the '978, '170, or '640

3    Patents; right?

4          A.   OverX never sold the OXLS, that is

5    correct.

6          Q.   And Econnectix never sold any product

7    that practices the '978, '170, or '640 Patents;

8    right?

9          A.   It did not sell any of the listed

10   products right here.

11         Q.   And those listed products are

12   identified as embodying the patents-in-suit;

13   right?

14         A.   You're referring to which sentence?

15         Q.   The sentence that says:  "Each of

16   these products, which are the same, embody the

17   patents-in-suit."

18         A.   Yes, that's what it says.

19         Q.   So OverX never sold any product that

20   included OXLS; right?

21         A.   That's correct.

22         Q.   And Econnectix never sold any product

Page 137

1    that included OXLS; right?

2          A.    Well, it was never called "OXLS" in

3    Econnectix.

4          Q.    Econnectix never sold any product that

5    embodied the '978, '170, or '640 Patents; right?

6          A.    It never sold XTN, XRN, XSN, Xpress

7    Database, the enumerated products right there.

8          Q.    Those are the products that Kove

9    enumerated as embodying the patents-in-suit;

10   right?

11         A.    I'm not a lawyer, so I'm not sure what

12   some of this means.  But to the degree that what

13   you're referring to is the sentence "each of these

14   products, which are the same, embody the

15   patents-in-suit," yes, that's what it says, and I

16   signed this document.

17         Q.    Do you have any reason to believe

18   that's inaccurate?

19         A.    No.

20         Q.    All right.  So this answer then goes

21   on at the bottom of Page 3 to identify a product

22   called Xpress Disk.  Do you see that?

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc. John Overton, Ph.D., Vol I
                                     Highly Confidential

Page 138

1          A.   I do.

2          Q.   It says:  "Econnectix created Xpress

3     Disk, XPD."  Do you see that, sir?

4          A.   I do.

5          Q.   And then it goes on to say:

6     "Additionally, Xpress Disk for metadata

7     controllers, XMC, is the same as XPD.  The

8     different names were used by Econnectix to

9     indicate different use cases."  Do you see that,

10    sir?

11         A.   I do.

12         Q.   And then this response states that

13    "These products, which are the same, do not embody

14    the patents-in-suit."  Do you see that?

15         A.   I do.

16         Q.   Is that accurate?

17         A.   Yes.

18         Q.   Then if we turn the page to Page 4,

19    there's a sentence starting on the second line at

20    the top that says:  "XPD is a data storage device

21    that does not pertain to locating and retrieving

22    data over a distributed network and does not

Page 139

1    embody the patents-in-suit."  Do you see that,

2    sir?

3          A.   Yes.

4          Q.   Is that accurate?

5          A.   Yes.

6          Q.   Then this answer goes on to talk about

7    XMC again?

8          A.   Yes.

9          Q.   It says:  "XMC is an enterprise class

10   storage accelerator product sold as a standard

11   fiber-channel disk appliance that offers gigabytes

12   per second read and write throughput.  It is a

13   hardware device that improves the local i/o speed

14   and throughput of the particular server on which

15   it was installed, and does not pertain to any

16   architecture involving the location and retrieval

17   of data across a distributed network.  It does not

18   embody the patents-in-suit."  Do you see that,

19   sir?

20         A.   Yes.

21         Q.   And is that accurate?

22         A.   Yes.

Page 140

1          Q.   All right.  So the XPD product and the

2     XMC product do not embody the patents-in-suit;

3     right?

4          A.   Yes, that's what it says.

5          Q.   Is that correct?

6          A.   Yes.

7          Q.   Let's look at the following paragraph

8     after that, which starts with "Econnectix created

9     Xpress for FileMaker, XFM."  Do you see that?

10          A.   I do.

11          Q.   And actually let me back up for a

12     second.

13               Did Econnectix ever sell any XPD or

14     XMC product?

15          A.   Yes, we sold XPDs.

16          Q.   Did Econnectix ever sell any XMC

17     product?

18          A.   I'm not sure.  I don't recall.  But

19     since they were kind of the same code based, we

20     might have or we might not have, but we were

21     selling XPD successfully.

22          Q.   Okay.  Let's go back to talk about

Page 141

1    XFM.

2                 The response states:  "This product

3    was made and sold.  XFM is a hardware product that

4    combines a multi-core CPU running FileMaker Server

5    with a fully integrated storage system that

6    enables a FileMaker database of any size to be

7    backed up in one second.  XFM is used to back up

8    databases and does not pertain to locating and

9    retrieving data over a distributed network.  It

10   does not embody the patents-in-suit."  Do you see

11   that language, sir?

12        A.   I do.

13        Q.   Is that accurate?

14        A.   Yes.

15        Q.   So the XFM product does not embody the

16   '978, '170, and '640 Patents; right?

17        A.   I don't know what you're referring to.

18   It is unrelated to the patents-in-suit.

19        Q.   This response states that the XFM

20   product does not embody the patents-in-suit, which

21   are the '978, '170, and '640 patents; right?

22        A.   That is what it says, yes.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                                    Highly Confidential

```
                                                   Page 142

 1          Q.    Is that accurate?

 2          A.    Yes.

 3          Q.    All right.  You can put that aside.

 4          A.    We're done with that exhibit?

 5          Q.    Yes.

 6                (Deposition Exhibit 17 was marked

 7                 for identification.)

 8   BY MR. SIGLER:

 9          Q.    I'm passing you Exhibit 17 --

10                THE WITNESS:  Can we take a quick

11   bathroom break?

12                THE VIDEOGRAPHER:  Going off the

13   record at 10:44 a.m.

14                (A recess was taken.)

15                THE VIDEOGRAPHER:  Going on the record

16   at 11:00 a.m.

17   BY MR. SIGLER:

18          Q.    Welcome back, Mr. Overton.  Do you

19   have Exhibit 17 in front of you?  (Document

20   tendered to the witness.)

21          A.    I do.

22          Q.    Mr. Overton, do you have Exhibit 17 in
```

Page 143

1    front you?

2          A.    I do.

3          Q.    For the record, Exhibit 17 is Kove's

4    Third Amended Response to Amazon's First Set of

5    Interrogatories (No. 3).  If you can go to the

6    fourth page of this document, please, sir.  Do you

7    see it's dated April 14, 2021?

8          A.    Yes.

9          Q.    And if you turn to the next page, Page

10   5, your signature is there; correct?

11         A.    Yes.

12         Q.    And you verified this response under

13   the penalty of perjury; correct, sir?

14         A.    Yes.

15         Q.    Let's go to Page 2.  There is an

16   Interrogatory No. 3 there.  Do you see that, sir?

17         A.    Yes.

18         Q.    And it says:  "Identify every product,

19   device, system, or service created, made, sold,

20   used, distributed, given away, produced, or

21   manufactured by any person or entity, including

22   Amazon Co., the inventors named on the face of the

Page 144

1    patents-in-suit, or any third party that embodies

2    or that is capable of embodying any asserted claim

3    of the patents-in-suit."  Do you see that language

4    there, sir?

5           A.   I do.

6           Q.   If we look at the response on Page 3,

7    please.  About a third of the way down the page

8    there's a paragraph that starts with "OverX

9    location servers."  Do you see that?

10          A.   I do.

11          Q.   It says:  "OverX location servers,

12   OXLS, which is also referred to as Xpress

13   Association Database, XTN for telecommunications,

14   XRN for registry services, XSN for storage

15   services, and Xpress Database, embodies one of

16   more of the asserted claims of the

17   patents-in-suit."  Do you see that there, sir?

18          A.   Yes.

19          Q.   And is that accurate?

20          A.   Yes.

21          Q.   The answer goes on to say:  "OXLS as

22   well as each of Xpress Association Database, XTN

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                                    Highly Confidential

                                                                    Page 161

1    website.  We had moved to Kove.

2          Q.   This page doesn't identify those data

3    management products as practicing the '978, '170,

4    and '640 Patents; right?

5          A.   This does not, but I don't know what

6    the cook-throughs are and so forth.  I don't

7    recall how this was done.

8          Q.   Who would know that?

9          A.   It would be on the archive.org, it

10   would be on the website.

11         Q.   Do you know if these data management

12   products were on the Econnectix website say in

13   2015?

14         A.   I don't off the top of my head, but I

15   think there are records that would show that.

16         Q.   All right.  You can put that side.

17              (Deposition Exhibit 19 was marked

18               for identification.)

19   BY MR. SIGLER:

20         Q.   I'm passing you Exhibit 19.  (Document

21   tendered to the witness.)

22         A.   Are we done with --

Page 162

 1          Q.    Yeah, you can put that aside.

 2          A.    Okay.

 3          Q.    Do you have Exhibit 19 in front of

 4     you, sir?

 5          A.    I do.

 6          Q.    For the record, Exhibit 19 is entitled

 7     "Kove's Sixth Amended Objections and Responses to

 8     Amazon's Second Set of Interrogatories (Nos. 10

 9     and 12)."  If you could please turn to Page, well

10     it doesn't have a page number.  Well, let's go to

11     Page 14, please.

12          A.    Okay, I'm there.

13          Q.    This response is dated May 7, 2023;

14     right?

15          A.    Yes.

16          Q.    If you turn two pages beyond that,

17     there's a verification page?

18          A.    Yes.

19          Q.    There we see your signature; correct?

20          A.    Yes.

21          Q.    And you signed this on May 7, 2023;

22     right?

Page 163

```
 1        A.   Yes.

 2        Q.   And you verified these responses as

 3   accurate; correct?

 4        A.   I believe so, yes.

 5        Q.   And you did so under penalty of

 6   perjury; right?

 7        A.   Yes.

 8        Q.   All right.  Let's go to Page 4,

 9   please.  Interrogatory No. 12 on Page 4 states:

10   "Describe each customer and target customer of

11   each Kove embodiment, including an identification

12   of each customer, a description of the

13   relationship with the customer, including the

14   start and end dates of the relationship, and

15   identification of meetings and communications, and

16   whether the customer used or bought a Kove

17   embodiment, including in the course of a beta or

18   test development."  Do you see that, sir?

19        A.   I do.

20        Q.   If you can go to Page 5, please.  A

21   little above the middle of the page there there's

22   a sentence that starts with "There were."  Do you
```

Page 164

1    see that?

2            A.    Page 5, yes.

3            Q.    Kove's response says:  "There were no

4    customers for any Kove embodiment.  Kove

5    embodiments were marketed to a variety of

6    companies, including technology companies and

7    financial institutions."  Do you see that, sir?

8            A.    I do.

9            Q.    We've talked about this a little bit

10   already today, but so Kove marketed products

11   practicing the patents-in-suit to a variety of

12   companies; right?

13           A.    Yeah.  These are -- there's some

14   nuance here.  Many of these companies listed were

15   companies that OverX had approached, not Kove.

16           Q.    Okay.  So is it fair to say that OverX

17   and Econnectix marketed products embodying the

18   '978, '170, and '640 Patents to a variety of

19   companies?

20           A.    So I don't know about this list and I

21   would want to check it because it's quite a large

22   list here for several pages.  So I know that when

```
                                                     Page 170
 1          Q.    And it also identifies Cisco?

 2          A.    Yes.

 3          Q.    It also identifies Compaq; right?

 4          A.    Yes.

 5          Q.    So OverX, or Econnectix, marketed

 6    products that practiced the '978, '170, and '640

 7    Patents to Motorola, Chicago Board of Trade, Sun,

 8    Lockheed Martin, Sprint, HP, IBM, Cisco, and

 9    Compaq; right?

10          A.    Yes, that's what it says.

11          Q.    And each of those companies declined

12    to purchase those products; correct?

13          A.    Yes.

14          Q.    All right.  You can put that aside.

15                (Deposition Exhibit 20 was marked

16                 for identification.)

17    BY MR. SIGLER:

18          Q.    I'm going to mark Exhibit 20.

19    (Document tendered to the witness.)

20                Sir, you have Exhibit 20 in front

21    of you?

22          A.    I do.
```

Page 171

1          Q.    Exhibit 20 is entitled "Kove's

2    Responses and Objections to Amazon's Second Set of

3    Interrogatories (Nos. 10-14)."

4               If you could please turn to Page

5    12.  There's a verification page.

6          A.    Yes.

7          Q.    And your signature there is on Page

8    12; correct?

9          A.    Yes.

10          Q.    And you verified these Interrogatory

11   responses on June 19, 2020; right?

12          A.    Yes.

13          Q.    And you verified that they were true

14   and accurate; correct?

15          A.    Yes.

16          Q.    And you did so under penalty of

17   perjury; right?

18          A.    Yes.

19          Q.    Let's go to Page 4, please.  On Page 4

20   there's Interrogatory No. 11.  It starts by

21   stating "Separately for each Kove embodiment,

22   describe in detail on a month-by-month basis and

Page 172

1    by customer:  All revenues, income, sales, and

2    profits generated or realized for licensing,

3    sales, and/or distribution," and then it says

4    "including but not limited to."  Do you see that

5    language, sir?

6          A.   I do.

7          Q.   Turning to Kove's response on Page 5,

8    please, sir, in the middle of the page.  Kove's

9    response states -- well, strike that.

10               There's a sentence there that

11   starts with "There was no licensing."  Do you see

12   that, sir?

13         A.   I do.

14         Q.   It says:  "There was no licensing,

15   sale, or distribution of any Kove embodiment, and

16   thus there are no associated revenues, income,

17   sales, or profits associated with any licensing,

18   sales, and/or distribution of any Kove

19   embodiment."  Do you see that, sir?

20         A.   I do.

21         Q.   So Kove -- well, strike that.

22               OverX never realized any revenue

Page 174

```
 1        A.   Yes.

 2             MR. CARDENAS-NAVIA:  Objection to

 3   form, mischaracterizes the document.

 4   BY MR. SIGLER:

 5        Q.   Kove has -- strike that.

 6             No one's ever paid for a license to

 7   use products practicing the '978, '170, or '640

 8   Patents; right?

 9        A.   To my knowledge, that is correct.

10        Q.   No one's ever bought any products that

11   practice the '978, '170, or '640 Patents; right?

12        A.   That is true, to my knowledge.

13        Q.   So based on all of that and this

14   response, Kove has -- well, strike that.

15             Based on this response as well,

16   OverX, Econnectix, and Kove never made any profit

17   based off any products practicing the '978, '170,

18   or '640 Patents; right?

19        A.   You're referring to the sentence

20   "there was no licensing, sale, distribution" and

21   so forth, "income, sales, or profits associated

22   with licensing," is that what you're referring to?
```

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                               Highly Confidential

```
                                                   Page 175
  1            Q.    I'm just asking you the question.

  2            A.    To my knowledge, yes, that was never

  3     accomplished.

  4            Q.    Okay.  So OverX never made any profit

  5     for the sale of any products practicing the '978,

  6     '170, and '640 Patents; right?

  7            A.    To my knowledge, that is correct.

  8            Q.    And similarly, Econnectix and Kove

  9     have never made any profit off of any products

 10     practicing the '978, '170, or '640 Patents; right?

 11            A.    That is my understanding, yes.

 12            Q.    All right.  Put that aside.  I'll mark

 13     the next exhibit, which will be Exhibit 21.

 14                  (Deposition Exhibit 21 was marked

 15                   for identification.)

 16     BY MR. SIGLER:

 17            Q.    Exhibit 21 is entitled "Kove's First

 18     Amended Response to Amazon's Fifth Set of

 19     Interrogatories (No. 20)."

 20                  If you could turn to page 5,

 21     please, Mr. Overton.

 22            A.    Yes.
```

Page 176

1          Q.    That's your signature on Page 5;

2     right?

3          A.    Yes.

4          Q.    And you signed this on April 9, 2021;

5     right?

6          A.    Yes.

7          Q.    And by that signature you verified the

8     truth and accuracy of this response; right?

9          A.    Yes, it is my understanding.

10          Q.    And you did so under penalty of

11     perjury; right?

12          A.    Yes.

13          Q.    Let's go to Page 2, please.

14     Interrogatory No. 20 on Page 2 asks Kove to

15     separately for each Kove product and service

16     describe in detail on a month-by-month basis and

17     by customer all revenues, income, sales and

18     profits generated or realized for licensing,

19     sales, and/or distribution and then it says

20     including but not limited to.  Do you see that

21     language there, sir?

22          A.    I do.

Page 177

```
 1          Q.   So this Interrogatory requests
 2   information on revenues, income, sales and profits
 3   for products and services that Kove has sold;
 4   right?
 5          A.   I'm sorry.  My brain blanked out for a
 6   second.  Could you restate that?
 7          Q.   Sure.  So this Interrogatory is asking
 8   for information on revenues, income, sales and
 9   profits relating to Kove's sales of products and
10   services; right?
11          A.   Yeah, is this about -- I'm not
12   understanding.  Is this about the patents-in-suit
13   or something different than the patents-in-suit?
14          Q.   Well, let's take a look at the
15   response.  Go to Page 3, please.
16          A.   Okay.
17          Q.   The second to the last line of the
18   response identifies you as a person most
19   knowledgeable about Kove's answer; right?
20          A.   Yes.
21          Q.   And above that do you see that there's
22   an identification of a number of documents?
```

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                                    Highly Confidential

                                                              Page 201
 1                      (A lunch recess was taken and said

 2                       deposition continued as follows:)

 3                 THE VIDEOGRAPHER:  Going on the record

 4      at 1:04 p.m.

 5      BY MR. SIGLER:

 6           Q.   Welcome back, Mr. Overton.

 7           A.   Thank you.

 8           Q.   S3 is one of the products Kove has

 9      accused of infringing its patents in this case;

10      right?

11           A.   Yes.

12           Q.   When did you first become aware of S3?

13           A.   I don't know precisely, but it

14      wouldn't surprise me this goes back to long time

15      ago.

16           Q.   DynamoDB is one of the products Kove

17      has accused of infringing its patents in this

18      case; right?

19           A.   Yes.

20           Q.   When did you first become aware of

21      DynamoDB?

22           A.   Same thing, probably a long time ago.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc. John Overton, Ph.D., Vol I
                          Highly Confidential

```
                                              Page 202
 1    I don't know the exact date off the top of my

 2    head.

 3                  (Deposition Exhibit 24 was marked

 4                   for identification.)

 5    BY MR. SIGLER:

 6         Q.   Okay.  I'm passing you Exhibit 24.

 7    (Document tendered to the witness.)

 8                  You have Exhibit 24 in front of

 9    you, sir?

10         A.   I do.

11         Q.   Exhibit 24 is entitled "Kove's Seventh

12    Amended Objections and Responses to Amazon's First

13    Set of Interrogatories (Nos. 1, 2, 5, 6, 9)."

14                  If you could please turn to Page

15    56.

16         A.   The verification?

17         Q.   Yeah, actually the verification page

18    is fine.  Is that your signature on the

19    verification page?

20         A.   It is.

21         Q.   And it's dated May 7, 2023?

22         A.   Yes.
```

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                                Highly Confidential

1          Q.   And you verified these Interrogatory

2     responses as truthful and accurate; right?

3          A.   Yes.

4          Q.   And you did so under penalty of

5     perjury; right?

6          A.   Yes.

7          Q.   Let's go to Page 26, please.  At the

8     bottom of Page 26 Interrogatory No. 6 starts and

9     it says:  "Identify each employee or agent of Kove

10    who has or had any knowledge or awareness of

11    Amazon Web Services or any of its products or

12    services, including S3 and DynamoDB, along with a

13    statement of the nature of the knowledge of each

14    person relating to each such product or service,

15    including an identification of the product or

16    service and the earliest date upon which each such

17    person was aware of each such product or service

18    or of any alleged infringement by Amazon relating

19    to any of these products or services."  Do you see

20    that language there, sir?

21         A.   Yes.

22         Q.   And if we turn to Page 28, I'd like to

Page 204

1    ask you some questions about Kove's response.

2              A.   Sure.

3              Q.   Slightly below the middle of Page 28

4    there's a sentence that starts with "Kove

5    identifies at this time."  Do you see that?

6              A.   Yes.

7              Q.   And the response says:  "Kove

8    identifies at this time John Overton, chief

9    executive officer of Kove, who may have become

10   generally aware of Amazon S3 at least on or around

11   March 14, 2006, and who may have become generally

12   aware of Amazon DynamoDB at least on or around

13   January 18, 2012, and Stephen Bailey may have

14   become generally aware of Amazon S3 at least on or

15   around March 14, 2006, and may have become

16   generally aware of Amazon DynamoDB at least on or

17   around January 18, 2012."  Do you see that

18   language there, sir?

19             A.   I do.

20             Q.   This verified Interrogatory response

21   states that you may have become generally aware of

22   Amazon S3 at least on or around March 14, 2006;

Page 207

1     but I think there were some emails floating around

2     sent to me or I sent to somebody.  I don't recall

3     the specifics of it at this point.  So that would

4     be where my recollection comes from.

5          Q.   Okay.  So you can't tell me if you

6     were aware of Amazon S3 on or around March 14,

7     2006?

8          A.   I think there are some emails floating

9     around somewhere that I have seen that would give

10    that date.  It seems very reasonable to me, yes,

11    it seems very reasonable to me.  But not having

12    the specific documents that would give that

13    specific date, you know, I see a lot of documents

14    right now.  So I think that sounds reasonable to

15    me.

16         Q.   March 14, 2006, is over a dozen years

17    before you filed this lawsuit; right?

18         A.   Uh-huh, yes.

19         Q.   So you waited a dozen years after you

20    may have become aware of S3 to file this lawsuit;

21    right?

22         A.   Yes.

Page 208

1      Q.   Why didn't you sue Amazon when S3 was

2   introduced in 2006?

3      A.   You've seen our finances.   We were

4   working our tail off just to be able to make ends

5   meet and to evolve the company.   I was super busy

6   and I couldn't get to it.

7      Q.   Why did you wait 12 years to accuse

8   Amazon of infringing -- excuse me.   Strike that.

9       Why did you wait 12 years after S3

10   was launched to accuse Amazon of infringing your

11   patents?

12      A.   As I said, we're a startup and it was

13   much harder earlier on than it is now, much

14   harder.   I had to prioritize everything I did

15   every single day and just didn't have the time to

16   get to it.

17      Q.   It was lower down on the list of

18   priorities; is that fair?

19      A.   Yes.

20      Q.   If you hadn't waited 12 years after

21   Amazon introduced S3 to accuse Amazon of

22   infringing, Amazon could have made changes to its

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                                      Highly Confidential

                                                                Page 209

1     products to not infringe during that time; right?

2                MR. CARDENAS-NAVIA:  Objection to

3     form, calls for speculation.

4     BY MR. SIGLER:

5          Q.   Can you answer my question?

6          A.   I have no idea what Amazon could or

7     could not have done.

8          Q.   Well, if you accused Amazon of

9     infringing your patents in 2006, they could have

10    stopped offering S3; right?

11               MR. CARDENAS-NAVIA:  Objection to

12    form, calls for speculation.

13               THE WITNESS:  I have no idea to

14    speculate what Amazon might or might not have

15    done.

16    BY MR. SIGLER:

17         Q.   All right.  So if someone from Amazon

18    told the jury at trial that if they had received

19    notice of your contention that Amazon S3 infringes

20    in 2006 that they would have made changes to that

21    product, you'd have no basis to dispute that;

22    right?

Page 210

1          A.    I have no opinion on any of this.  I

2     have no knowledge of anybody at Amazon.  I have no

3     idea who the people are, what they think, or what

4     they might think.

5          Q.    Has anyone ever notified Kove that

6     they believe Kove is infringing on their patents?

7          A.    I don't think so.

8          Q.    According to this Interrogatory

9     response, you may have become generally aware of

10    Amazon DynamoDB at least on or around January 18,

11    2012; right?

12         A.    Yes, that's what it says.

13         Q.    Did you become aware of DynamoDB on or

14    around January 18, 2012?

15         A.    Probably.  Again, I don't like to ever

16    say things where there's a specific date where I

17    don't see the specific referred document to it,

18    but that wouldn't be there were that not likely

19    and probably to be correct.  I believe that is the

20    case.

21         Q.    January 18, 2012, is more than six

22    years before you filed this lawsuit against

Page 211

1    Amazon; right?

2          A.   Yes.

3          Q.   So you waited over six years after

4    Amazon launched DynamoDB to sue Amazon; right?

5          A.   Yes.

6          Q.   Why didn't you sue Amazon when

7    DynamoDB was introduced in 2012?

8          A.   The same reason.  We're a startup and

9    we were doing our best just to keep payroll and

10   prioritize things that would evolve the business.

11         Q.   So it wasn't a priority at the time in

12   2012?

13         A.   It was of lesser priority, yes.

14         Q.   And this response cites two documents

15   at the end.  Do you see that?

16         A.   Yes.  You mean 126084 and the one

17   following that?

18         Q.   Yes.

19         A.   Okay.

20         Q.   Let's take a look at those documents.

21              (Deposition Exhibit 25 was marked

22                for identification.)

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc. John Overton, Ph.D., Vol I
                              Highly Confidential

                                                          Page 212

 1    BY MR. SIGLER:

 2          Q.    I'll pass you Exhibit 25.  (Document

 3    tendered to the witness.)

 4          A.    Thank you.

 5          Q.    Do you have Exhibit 25 in front of

 6    you, sir?

 7          A.    I do.

 8          Q.    On the first page it says the Bates

 9    number KOV 00126084.

10                This is one of the documents cited

11    in the Interrogatory response that's Exhibit 24;

12    right?

13          A.    Yes.

14          Q.    And Exhibit 25 is -- well, the first

15    page of Exhibit 25 is an email from Darren Bock;

16    right?

17          A.    Yes.

18          Q.    And it was sent on December 30, 2018;

19    right?

20          A.    Yes.

21          Q.    And it was sent to you; correct?

22          A.    Yes.

Page 226

1    have been made up.  But I don't know off the top

2    of my head of all the emails I have.  If it's an

3    email or if it's a document or if it's something

4    else, I don't know.

5                    So my testimony is I presume

6    there's some reason that those dates are specific

7    that I don't recall right now.

8         Q.   Did you look at any other documents

9    when you verified this Interrogatory response?

10        A.   I don't recall looking at these

11   documents, you know, carefully in the way that

12   you're asking right now.

13        Q.   You don't recall looking at what

14   document carefully?

15        A.   So this is signed seven days ago or

16   something, or whatever, and I do remember reading

17   it, but I don't believe that I read that as

18   carefully as I often read documents.  I mean, for

19   example, on this page there's a whole lot of these

20   and I know I did not read every one of those, for

21   example.  That is page -- I don't know what page

22   it was but it was a huge list.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc. John Overton, Ph.D., Vol I
                                    Highly Confidential

Page 227

1          Q.   I'm not asking you about that

2    Interrogatory response.  I'm just asking you about

3    the response to No. 6 and trying to understand

4    where this March 14, 2006 and January 18, 2012

5    date came from.

6               It's your belief that there are

7    documents reflecting the fact that you became

8    generally aware of Amazon S3 on or around

9    March 14, 2006?

10         A.   No.  It's my belief that those are

11   specific dates and there wouldn't be specific

12   dates unless there was some way to make those

13   specific dates.  I don't know if that's the

14   introduction to S3 and the introduction of

15   DynamoDB and that's that date, or if there's an

16   email or if there's something else, I don't know,

17   but those are specific dates.

18              I always prefer to be as exact as I

19   can.  So if there's a specific date, I presume

20   there's some specific reason for that specific

21   date.

22         Q.   All right.  We'll come back to that.

Page 228

1          A.    May I close that one?

2          Q.    Sure.  When did Kove first consider

3    filing a patent infringement lawsuit against

4    Amazon?

5          A.    I don't know the specific date, but I

6    think we considered some of that as early as maybe

7    2015, maybe.  Again, I'm going by recollection.

8    That can be fraught with error, but I think that's

9    about the timeframe.

10                  (Deposition Exhibit 27 was marked

11                    for identification.)

12    BY MR. SIGLER:

13          Q.    All right.  I'm passing you Exhibit

14    27.  (Document tendered to the witness.)

15                  Do you have Exhibit 27 in front of

16    you, sir?

17          A.    I do.

18          Q.    Exhibit 27 bears the Bates stamp

19    KOV_00132385.

20                  Do you see, sir, that Exhibit 27 is

21    an email at the top from Mr. Connolly to you?

22          A.    Yes.

Page 238

1          A.   I think it's his own firm.  He had a

2     small firm is my understanding, my recollection.

3          Q.   Is he here in Chicago?

4          A.   No.

5          Q.   Where is he located?

6          A.   I believe he's in California, but I'm

7     not exactly sure about that.

8          Q.   Okay.  So you had prepared a summary

9     of claims of patents at the request of Mr. King at

10    this time; right?

11               MR. CARDENAS-NAVIA:  I'm going to

12    caution the witness not to reveal any privileged

13    information, but you can answer that question

14    "Yes" or "No."

15               THE WITNESS:  Okay.  Yes.

16    BY MR. SIGLER:

17         Q.   And you prepared that in anticipation

18    of litigation, sir?

19         A.   That's what it says here.

20         Q.   Were you contemplating filing a

21    litigation at this time in July 2014?

22         A.   I don't think I can discuss that.

Page 239

```
 1                 THE WITNESS:  Can I?  I think that's

 2     privileged; right?

 3                 MR. CARDENAS-NAVIA:  What's in this

 4     privilege log is not privileged.  Anything beyond

 5     that in terms of communications or discussions,

 6     that is privileged.  So to the extent you need to

 7     rely on anything beyond this document, yes, that's

 8     privileged and I instruct you not to answer.

 9                 THE WITNESS:  Okay.  Then I think

10     that's privileged.

11     BY MR. SIGLER:

12          Q.   Well, it says here that this document

13     was prepared in anticipation of litigation; right?

14          A.   Yes.

15          Q.   What litigation was it prepared in

16     anticipation of?

17                 MR. CARDENAS-NAVIA:  And I'm going to

18     instruct the witness not to answer.

19     BY MR. SIGLER:

20          Q.   Are you going to follow your counsel's

21     instruction?

22          A.   I am.
```

Page 240

1          Q.   As of July 12, 2014, were you

2    contemplating a lawsuit against Amazon for patent

3    infringement?

4          A.   I don't recall.

5               MR. CARDENAS-NAVIA:  I instruct the

6    witness not to answer.  Please pause before

7    answering any questions.

8               THE WITNESS:  Yes.

9    BY MR. SIGLER:

10         Q.   All right.  Let's go to the next

11   entry, No. 46, on the next page.  That entry is

12   dated November 18, 2014; right?

13         A.   I see that.

14         Q.   The document is described as "Notes

15   from meeting held between John Overton and Stephen

16   Bailey and attorneys Rob Dellenbach and Edward

17   King regarding infringement litigation, including

18   counsel's legal advice regarding litigation."  Do

19   you see that, sir?

20         A.   I do.

21         Q.   So at this time in November 2014 you

22   and Mr. Bailey had a meeting with attorneys Rob

Page 241

1    Dellenbach and Edward King about infringement

2    litigation; correct?

3                MR. CARDENAS-NAVIA:  You may answer

4    that question "Yes" or "No."

5                THE WITNESS:  Yes.

6    BY MR. SIGLER:

7        Q.  What was the infringement litigation

8    that was the subject of this November 18, 2014

9    document?

10               MR. CARDENAS-NAVIA:  I'm going to

11   instruct the witness not to answer on the basis of

12   privilege.

13               THE WITNESS:  And I follow counsel's

14   advice.

15   BY MR. SIGLER:

16       Q.   Mr. Dellenbach is -- strike that.

17               What firm is Mr. Dellenbach at?

18       A.   Dellenbach Venture Counsel.

19       Q.   Did you and Mr. Bailey provide any

20   written -- well, strike that.

21               Did you or Mr. Bailey draft any

22   documents that you provided to Mr. King and

Page 242

1    Mr. Dellenbach at this time?

2          A.    I don't recall.

3          Q.    Did Mr. King ever represent Kove in

4    any litigation?

5          A.    No.

6          Q.    Did he decline to represent Kove in

7    infringement litigation?

8                MR. CARDENAS-NAVIA:  You can answer

9    that question "Yes" or "No."

10               THE WITNESS:  No.

11   BY MR. SIGLER:

12         Q.    Let's go to entry 47.  The document

13   there is identified as dated March 7, 2017; right?

14         A.    Yes.

15         Q.    And it's described as a memorandum

16   prepared by Lee Auspitz regarding potential

17   infringement damages prepared in anticipation of

18   potential infringement litigation; right?

19         A.    Yes.

20         Q.    Who's Lee Auspitz?

21         A.    He's a board member.

22         Q.    Is he an attorney?

Page 243

1        A.    No.

2        Q.    Why was Mr. -- well, strike that.

3              Do you recall why Mr. Auspitz

4    prepared a memorandum about potential infringement

5    damages at this time in March 2017?

6              MR. CARDENAS-NAVIA:  I'm going to

7    caution the witness not to reveal any privileged

8    communications.

9              If you can answer the question

10   without revealing privileged communications, you

11   can.  If you can't because attorneys were

12   involved, then I instruct you not to answer.

13             THE WITNESS:  Okay.  I decline

14   answering that for privilege.

15   BY MR. SIGLER:

16       Q.    Let's take a look at entry 49.  It's

17   dated May 15, 2015.  Do you see that?

18       A.    Yes.

19       Q.    And the description is "Notes from

20   meeting between John Overton, attorney Kent Genin,

21   and other attorneys from Brinks Gilson & Lione

22   regarding potential infringement litigation

Page 244

1    including counsel's legal advice regarding

2    litigation."  Do you see that?

3          A.   I do.

4          Q.   So you met with attorneys from the

5    Brinks firm at this time in May 2015; correct?

6          A.   Yes.

7          Q.   And you discussed with them potential

8    infringement litigation; is that correct?

9               MR. CARDENAS-NAVIA:  And I'm going to

10   instruct the witness you can answer that question

11   "Yes" or "No."

12              THE WITNESS:  Yes.

13   BY MR. SIGLER:

14         Q.   And did you discuss potential

15   infringement litigation against Amazon at that

16   time in May 2015?

17              MR. CARDENAS-NAVIA:  I'm going to

18   instruct the witness not to answer on the basis of

19   privilege.

20              THE WITNESS:  I accept counsel's

21   advice.

22

Page 245

1    BY MR. SIGLER:

2          Q.    Amazon is the only entity that Kove

3    has ever sued for patent infringement; right?

4          A.    Yes.

5          Q.    All right.  Let's take a look at entry

6    50.  It's dated June 5, 2015; right?

7          A.    Yes.

8          Q.    And you are identified as the author;

9    right?

10         A.    Yes.

11         Q.    And the description is "Notes from

12   meeting between John Overton, attorney Kent Genin,

13   and other attorneys from Brinks Gilson & Lione

14   regarding potential infringement litigation,

15   including counsel's legal advice regarding

16   litigation."  Do you see that, sir?

17         A.    Yes.

18         Q.    Did you or Mr. Bailey provide written

19   work product to Brinks at this time?

20               MR. CARDENAS-NAVIA:  Objection.  I'm

21   going to caution the witness you can answer that

22   question "Yes" or "No."

Page 251

```
 1              MR. CARDENAS-NAVIA:  You can answer

 2   that question "Yes" or "No."

 3              THE WITNESS:  No.

 4   BY MR. SIGLER:

 5       Q.   Did McKool Smith decline to represent

 6   Kove in patent infringement litigation?

 7              MR. CARDENAS-NAVIA:  You can answer

 8   that question "Yes" or "No."

 9              THE WITNESS:  No.

10   BY MR. SIGLER:

11       Q.   All right.  Take a look at entry 51,

12   please.  Entry 51 is dated May 19, 2015; right?

13       A.   Yes.

14       Q.   And you're identified as the author;

15   correct?

16       A.   Yes.

17       Q.   And the description is "Notes from

18   meeting between John Overton and attorneys from

19   Cooley LLP regarding potential infringement

20   litigation, including counsel's legal advice

21   regarding litigation."  Do you see that, sir?

22       A.   I do.
```

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc. John Overton, Ph.D., Vol I
                                Highly Confidential

                                                                    Page 252

 1          Q.    So you met with attorneys from the

 2   firm Cooley LLP in May 2015; right?

 3          A.    Yes.

 4          Q.    And that meeting was about potential

 5   patent infringement litigation; right?

 6                MR. CARDENAS-NAVIA:  And you can

 7   answer that "Yes" or "No."

 8                THE WITNESS:  Yes.

 9   BY MR. SIGLER:

10          Q.    And at the time -- well, strike that.

11                Did that meeting concern potential

12   patent litigation against Amazon?

13                MR. CARDENAS-NAVIA:  I'm going to

14   instruct the witness not to answer on the basis of

15   privilege.

16                THE WITNESS:  I accept the attorney

17   instruction.

18   BY MR. SIGLER:

19          Q.    Take a look at entry 57, please.  That

20   document is dated June 20, 2016; right?

21          A.    Yes.

22          Q.    And you're identified as the author;

Page 253

1    right?

2          A.   Yes.

3          Q.   And the description is "Notes from

4    meeting between John Overton, Stephen Bailey, and

5    Rob Dellenbach, and attorney Jim Glass of Quinn

6    Emanuel regarding potential infringement

7    litigation, including counsel's legal advice

8    regarding litigation."  Do you see that, sir?

9          A.   I do.

10         Q.   So in June 2016, you met with

11   attorneys from Quinn Emanuel; right?

12              MR. CARDENAS-NAVIA:  You can answer

13   that "Yes" or "No."

14              THE WITNESS:  Yes.

15   BY MR. SIGLER:

16         Q.   And your meetings with them were in

17   anticipation of potential patent infringement

18   litigation; right?

19              MR. CARDENAS-NAVIA:  You can answer

20   that "Yes" or "No."

21              THE WITNESS:  Yes.

22

Page 254

1   BY MR. SIGLER:

2        Q.   And were you evaluating a potential

3   patent infringement litigation against Amazon at

4   this time in June 2016?

5             MR. CARDENAS-NAVIA:  I'm going to

6   instruct the witness not to answer on the basis of

7   privilege.

8             THE WITNESS:  I accept counsel's

9   recommendation.

10  BY MR. SIGLER:

11       Q.   Has Quinn Emanuel ever represented

12  Kove in patent infringement litigation?

13            MR. CARDENAS-NAVIA:  You can answer

14  that question "Yes" or "No."

15            THE WITNESS:  No.

16  BY MR. SIGLER:

17       Q.   Okay.  So before Kove filed this

18  lawsuit, you met with Ed King; correct?

19       A.   Yes.

20       Q.   And you met with lawyers from McKool

21  Smith; correct?

22       A.   Yes.

Page 255

1          Q.   And you met with lawyers from the

2     Brinks firm, Cooley LLP, and Quinn Emanuel as

3     well; right?

4          A.   Yes.

5          Q.   And in those meetings with those five

6     other law firms, you discussed potential patent

7     infringement litigation; right?

8               MR. CARDENAS-NAVIA:  You can answer

9     that question "Yes" or "No."

10              THE WITNESS:  Yes.

11    BY MR. SIGLER:

12         Q.   And those meetings began in 2014, four

13    years before you filed this lawsuit against

14    Amazon; right?

15              MR. CARDENAS-NAVIA:  Again, you can

16    answer that question "Yes" or "No."  And I'll

17    object to form as vague.

18              THE WITNESS:  Yes.

19    BY MR. SIGLER:

20         Q.   And those discussions with the five

21    other law firms continued through 2015, 2016,

22    2017, and 2018; right?

Page 258

```
 1                  THE WITNESS:  No.

 2    BY MR. SIGLER:

 3        Q.   You depended on Kove's outside lawyers

 4    to analyze whether Amazon infringes before filing

 5    the lawsuit; right?

 6                  MR. CARDENAS-NAVIA:  Same caution.

 7    You may answer that question "Yes" or "No."

 8                  THE WITNESS:  Yes.

 9    BY MR. SIGLER:

10        Q.   Going back to the privilege log.  Just

11    a couple more questions.

12                  Let me direct you to entry 61.

13    Entry 61 is dated March 22, 2020; right?

14        A.   Yes.

15        Q.   And it's described as a spreadsheet

16    relating to potential litigation payout scenarios

17    reflecting work product by and attorney-client

18    communications from Rob Dellenbach concerning

19    pending litigation communicated internally within

20    Kove from Dan Doyle to Keith Connolly.  Do you see

21    that, sir?

22        A.   Yes.
```

Page 259

1          Q.   Does that spreadsheet deal with

2    payouts in areas relating to this litigation?

3               MR. CARDENAS-NAVIA:  And I'm going to

4    instruct the witness not to answer the question on

5    the basis of privilege.

6               THE WITNESS:  I accept the

7    recommendation of counsel.

8               MR. SIGLER:  All right.  And if I ask

9    him about entry 62, are you going to give him the

10   same instruction?

11              MR. CARDENAS-NAVIA:  Well, it kind of

12   depends on the specifics of your question.  But if

13   it's the same type of question, I suspect I'd give

14   the same instruction.

15   BY MR. SIGLER:

16        Q.   All right.  So entry 62 is dated

17   May 22, 2020 as well; right, Mr. Overton?

18        A.   Yes.

19        Q.   And the description is spreadsheet

20   relating to potential litigation settlement and

21   payouts in areas reflecting work product by AC

22   communications from Rob Dellenbach concerning

Page 260

1    anticipated and pending litigations communicated

2    internally within Kove from Keith Connolly to Dan

3    Doyle.  Do you see that, sir?

4          A.   I do.

5          Q.   Does that spreadsheet relate to

6    potential settlement and payout scenarios relating

7    to this case?

8               MR. CARDENAS-NAVIA:  And I'm going to

9    instruct the witness not to answer on the basis of

10   privilege.

11              THE WITNESS:  And I accept counsel's

12   recommendation.

13              MR. SIGLER:  All right.  Why don't we

14   take a break.

15              THE VIDEOGRAPHER:  Going off the

16   record at 2:04 p.m.

17                   (A recess was taken.)

18              THE VIDEOGRAPHER:  Going on the record

19   at 2:23 p.m.

20                   (Deposition Exhibit 29 was marked

21                    for identification.)

22

Page 261

1    BY MR. SIGLER:

2         Q.    Mr. Overton, I'm passing you Exhibit

3    29.  (Document tendered to the witness.)

4              For the record, Exhibit 29 on the

5    front page bears the Bates stamp KOV_00016621.  Do

6    you see at the top of Exhibit 29, sir, this is an

7    email from Mr. Bailey?

8         A.    Yes.

9         Q.    And it's to Mr. Dellenbach; correct?

10        A.    Yes.

11        Q.    Did you say he's the general counsel

12   for Kove?

13        A.    Yes.

14        Q.    And you're copied; correct?

15        A.    Yes.

16        Q.    And it's dated October 15, 2018;

17   right?

18        A.    Yes.

19        Q.    Do you recall this set of emails that

20   was sent in October 2018?

21        A.    I don't, but just a moment.  Yes, I

22   recall this.

Page 266

1    recall the dates on how this all combines.  So I

2    don't recall the specifics of this, you know, in

3    the agreement that's in discussion.

4         Q.   Why did you say you wanted to resolve

5    this as soon as possible?

6         A.   I don't recall the specifics of this

7    but there was some urgency to it.

8         Q.   All right.  And then Mr. Bailey

9    responded to you on October 15, 2018; right?

10        A.   Yes.

11        Q.   And he said: "Yes, but I need Rob to

12   call me now, please.  I'll be up for another few

13   minutes and then crashola."  Do you see that?

14        A.   I do.

15        Q.   And then Mr. Dellenbach sent him a

16   dial-in number; right?

17        A.   Yes.

18        Q.   Did you participate in that call?

19        A.   I don't recall.

20        Q.   All right.  And then above that the

21   top email, Exhibit 29, is from Mr. Bailey to

22   Mr. Dellenbach; right?

Page 267

1          A.   Yes.

2          Q.   And he attaches a signed version of

3     the advisors agreement; right?

4          A.   Yes.

5               (Deposition Exhibit 30 was marked

6                for identification.)

7     BY MR. SIGLER:

8          Q.   Let's take a look at the next exhibit,

9     Exhibit 30.  (Document tendered to the witness.)

10              Exhibit 30 is Kove's responses and

11    objections to Amazon's fourth set of Interrogatory

12    No. 19.  If you go to the second to last page of

13    Exhibit 30, which is labeled Page 5 at the bottom,

14    is that your signature there, sir?

15         A.   It is.

16         Q.   And you signed this on December 7,

17    2020; right?

18         A.   Yes.

19         Q.   And you verified that the information

20    in this response is truthful and accurate; right?

21         A.   Yes.

22         Q.   And you did so under penalty of

Page 268

1    perjury; right?

2            A.    Yes.

3            Q.    Let's go to Page 2, please.  Do you

4    see Interrogatory No. 19 there?

5            A.    I do.

6            Q.    And it asks for some information about

7    the Econnectix Corporation advisors agreement

8    between Econnectix Corporation and Stephen Bailey;

9    right?

10           A.    I do.

11           Q.    Let's go to Kove's response which

12   starts at the bottom of Page 2.  There's a

13   paragraph that starts with "Drafting of."  Do you

14   see that?

15           A.    I do.

16           Q.    It states there:  "Drafting of the

17   advisors agreement occurred on or before

18   October 14, 2018."

19                     Who drafted that advisors

20   agreement?

21           A.    I don't know.

22           Q.    But according to this Interrogatory

Page 269

1    response, the agreement was drafted on or about

2    October 14, 2018?

3          A.    Yes, that's what that says.

4          Q.    And then the next sentence says that

5    Mr. Bailey signed the agreement on October 15,

6    2018; right?

7          A.    Yes.

8          Q.    And then it says that you signed the

9    agreement between October 15 and October 19, 2018;

10   right?

11         A.    Yes, it says that.

12         Q.    And then it goes on to state that as

13   stated in the advisors agreement itself, its

14   effective date is April 2, 2004; right?

15         A.    Yes.

16         Q.    So you and Mr. Bailey signed this

17   advisors agreement over 14 years after its

18   effective date; correct?

19         A.    That's what it says.

20         Q.    That's what happened; right?  You and

21   Mr. Bailey signed this advisors agreement in

22   October of 2018; right?

Page 344

1    this one way or the other.

2           Q.   You don't have an opinion one way or

3    the other about Amazon's dealings with startups?

4               MR. CARDENAS-NAVIA:  Objection, asked

5    and answered.

6               THE WITNESS:  I mean I don't, I think

7    companies make their own decisions about how they

8    behave and you do business.  I don't really have

9    an opinion about Amazon one way or the other.

10   BY MR. SIGLER:

11          Q.   When you had your dealings with AWS in

12   2017 and 2018, did you feel that they were

13   professional with you?

14          A.   Some were, some weren't.

15          Q.   Did you feel that Amazon Web Services

16   treated you ethically?

17          A.   Some were, some of the individuals

18   did, some of the individuals didn't.

19          Q.   Which individuals didn't?

20          A.   I don't recall.  I just remember some

21   of the people were really fine and some of the

22   people were kind of harassing.

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                                Highly Confidential

Page 345

1          Q.    What do you mean by "harassing"?

2          A.    Pushy, you know, arrogant.

3          Q.    Do you believe Amazon is an arrogant

4     company?

5          A.    I don't have an opinion about them as

6     a company.  I focus on individuals I work with.

7                (Deposition Exhibit 45 was marked

8                  for identification.)

9     BY MR. SIGLER:

10         Q.    I'm passing you Exhibit 45.  (Document

11    tendered to the witness.)

12               Do you have Exhibit 45 in front of

13    you, sir?

14         A.    I do.

15         Q.    There's a heading, well, not a

16    heading.  There's a logo here at the top that says

17    "Aim for the Climate."  Do you see that?

18         A.    Yes, I do.

19         Q.    What is that?

20         A.    It's a conference I was at last week.

21         Q.    And on this document it says "Grand

22    Challenge Winner."  Do you see that?

5/16/2023              Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
                                    Highly Confidential

Page 346

1          A.    I do.

2          Q.    What's a grand challenge?

3          A.    I am the vice chair of an organization

4    called Enterprise Neuro System.  And the USDA and

5    a number of other organizations have engaged or

6    are in the process of engaging that organization.

7                The USDA just held a conference

8    where they had delegates from a number of

9    countries come into the U.S. to discuss using AI

10   and machine learning for benefit of agriculture,

11   and they ask us to partner with them to create a

12   grand challenge competition which we hosted.

13               We had a number of folks compete

14   from around the world for this.  And then we

15   released -- we had a series of judges and we did a

16   blind vote to see who would win the innovation

17   award, or the grand prize, or the grand challenge

18   winner.  And this I believe is a copy of what was

19   projected onto the screen when we announced the

20   grand challenge winner.  Or it might be a copy of

21   the certificate that was awarded to the winners.

22         Q.    And it identifies a grand prize?

Page 347

1          A.   It does.

2          Q.   And that grand prize includes Kove SDM

3    software-defined memory; right?

4          A.   That is correct.

5          Q.   It also includes Amazon promotional

6    cloud credits; right?

7          A.   It does.

8          Q.   What are those?

9          A.   They were $2,000 awards, and I believe

10   there was a $50,000 aggregate of the Amazon that

11   we awarded to the five finalists, $10,000 each in

12   equivalency value.

13         Q.   Were you one of the judges?

14         A.   I was.

15              (Deposition Exhibit 46 was marked

16                for identification.)

17   BY MR. SIGLER:

18         Q.   I'll pass you Exhibit 46.  (Document

19   tendered to the witness.)

20              Do you have Exhibit 46 in front of

21   you, sir?

22         A.   I do.

Page 348

1          Q.   The front page has the Bates stamp

2     KOV_00279932.  Do you see that, sir?

3          A.   I do.

4          Q.   This document provides some

5     biographies for the grand challenge judges; right?

6          A.   It does.

7          Q.   So you were a judge for this grand

8     challenge; right?

9          A.   Yes.

10          Q.   And there were six other judges;

11     right?

12          A.   Yes.

13          Q.   And one of them is Andrea Muscadin,

14     head of partnerships, philanthropic education

15     initiatives at Amazon; right?

16          A.   Yes.

17          Q.   So you served as a judge on this panel

18     with someone from Amazon; right?

19          A.   Yes.  Andrea was fantastic, by the

20     way, a lovely, lovely lady.

21          Q.   Was she aware that Kove is currently

22     suing Amazon Web Services?

5/16/2023          Kove IO, Inc. v. Amazon Web Services, Inc. John Overton, Ph.D., Vol I
                                    Highly Confidential

Page 349

1          A.    I have no idea.

2          Q.    Did you tell her that Kove is

3     currently suing Amazon Web Services?

4          A.    No.  We have an active litigation.  I

5     don't discuss things.

6          Q.    But you were fine serving with someone

7     from Amazon as a judge for this grand challenge;

8     right?

9          A.    Of course.  As I said earlier, I make

10    judgments on people, not companies.  She was a

11    fantastic lady.

12         Q.    Let's look at the biographies.  It

13    starts -- yours is on the second page of the

14    document.

15         A.    Yes.

16         Q.    Do you see that?

17         A.    Yes, I do.

18         Q.    It says you're the CEO of Kove IO,

19    Inc.; right?

20         A.    Yep.

21         Q.    The third sentence of your biography

22    says:  "In the 1990s he co-invented and patented

Page 355

1                You have Exhibit 49 in front of

2    you, sir?

3           A.    Yes, I do.

4           Q.    There's some handwriting on Exhibit

5    49.  Do you see that?

6           A.    I do.

7           Q.    Whose handwriting is that?

8           A.    I'm not sure.

9           Q.    Have you seen this document before?

10          A.    I've seen the Global Indices case many

11   times.

12          Q.    And what is the Global Indices case?

13          A.    It was one of the early patents that

14   we have.  It's one that was issued at some point.

15   This predated some of the work that Steph and I

16   did.

17          Q.    And this is work you did with Michael

18   Roizen?

19          A.    There's some debate about that work,

20   yes.

21          Q.    Well, it says inventor John Overton

22   and Michael Roizen; right?

Page 356

```
 1          A.    I see that.

 2          Q.    Who is Michael Roizen?

 3          A.    He was a doctor I worked with very

 4   early on before the formation of OverX.

 5          Q.    Where did you work with him?

 6          A.    I played squash with him.  So I met

 7   him playing squash.  And we really kind of --

 8   that's a -- it's a confusing way to think about

 9   the relationship with Mike because he was more

10   like a mentor or an early partner that allowed me

11   to get my -- so I don't know how to answer your

12   question.  When you say "work with," where and

13   things like this.

14          Q.    Where did you meet him?

15          A.    Playing squash at the University of

16   Chicago.

17          Q.    Was he working for the University of

18   Chicago?

19          A.    He was.  He was a doctor.

20          Q.    And he was a mentor to you; is that

21   correct?

22          A.    We were good friends and played
```

Page 357

1   squash.

2          Q.   Are you still friends with him?

3          A.   We are not in communication now.

4          Q.   When's the last time you talked to

5   him?

6          A.   Long time ago.

7          Q.   Did you ever talk to him about this

8   case?

9          A.   I have not talked to him about this

10  case.

11              (Deposition Exhibit 50 was marked

12               for identification.)

13  BY MR. SIGLER:

14         Q.   I'm passing you Exhibit 50.  (Document

15  tendered to the witness.)

16              Exhibit 50 on the front page has

17  the Bates stamp KOV_00221063.  Have you seen this

18  document before, sir?

19         A.   I do.  I see the Bates number and I'm

20  pretty sure that I've seen this document.

21         Q.   What is this document?

22         A.   This is -- it looks like this is an

Page 358

1    early draft of a marketing campaign that we will

2    be releasing sometime this year or next year.

3          Q.   What product is it for?

4          A.   Kove SDM.

5          Q.   Kove SDM doesn't practice the '170,

6    '640, or '978 Patents; right?

7          A.   That's correct.

8          Q.   All right.  You can put that aside.

9               How much time are you spending each

10   week dealing with this litigation?

11         A.   I don't know.

12         Q.   More than five hours?

13         A.   I think it goes up and down.

14   Sometimes a lot more and sometimes a lot less.

15         Q.   When it's gotten to be a lot more, how

16   much time a week has it occupied?

17         A.   Oh, it could be a considerable

18   amount -- I'm sorry.  Let me start the answer

19   again.  When it peaks, it can be a considerable

20   amount of time.

21         Q.   How do you define a considerable

22   amount of time?

Page 359

1          A.    Above 20 or 40 hours a week.

2          Q.    I'm going to mark Exhibit 51 and pass

3     that to you.

4                  (Deposition Exhibit 51 was marked

5                   for identification.)

6     BY MR. SIGLER:

7          Q.    Do you have Exhibit 51 in front of

8     you, sir?  (Document tendered to the witness.)

9          A.    I do.

10          Q.    Do you see that this is a United

11     States patent?

12          A.    I do.

13          Q.    Its patent number is 6,185,601; right?

14          A.    I do, I see that.

15          Q.    It's titled "Dynamic load balancing of

16     a network of client and server computers."  Do you

17     see that?

18          A.    I do.

19          Q.    Inventor is James J. Wolff; right?

20          A.    I see that.

21          Q.    And the assignee is Hewlett Packard

22     Company; right?

Page 369

1    the technical material.  And that's what I think

2    you're asking me to do.  In which case I would not

3    be comfortable talking about the internals of a

4    carburetor if I didn't know what the carburetor

5    was or understand what the terms were.  These are

6    not defined terms.  These are very generic terms

7    that are used and reused, many of them, in many,

8    many contexts.

9           Q.   So if, for example, one of Kove's

10   attorneys put the abstract of a patent in front of

11   an Amazon witness, you wouldn't expect that Amazon

12   witness to be able to answer questions about what

13   that patent discloses based on the abstract;

14   right?

15              MR. CARDENAS-NAVIA:  Objection to

16   form, calls for speculation.

17              THE WITNESS:  I have no idea what I

18   would expect from someone else.  I can only speak

19   for myself.

20   BY MR. SIGLER:

21           Q.   It's reasonable to you, speaking for

22   yourself, that you would need to review the

Page 370

1    remainder of the patent to talk intelligently

2    about what's disclosed in the abstract; is that

3    fair?

4              MR. CARDENAS-NAVIA:  Objection, asked

5    and answered.

6              THE WITNESS:  I've already answered

7    the question.

8    BY MR. SIGLER:

9         Q.   All right.  You can put that aside.

10   I'm going to mark the next exhibit.

11              (Deposition Exhibit 52 was marked

12               for identification.)

13   BY MR. SIGLER:

14        Q.   I've passed you Exhibit 52.  (Document

15   tendered to the witness.)

16              Do you have that, sir?

17        A.   I do.

18        Q.   Exhibit 52 is titled "Kove's Responses

19   and Objections to Amazon's Sixth Set of

20   Interrogatories (Nos. 22-25)."  Do you see that,

21   sir?

22        A.   I do.

Page 371

1          Q.   If you could turn to the second to

2    last page, the verification page, please, sir.

3          A.   Which page is that?  I'm sorry.  I was

4    trying to get water.

5          Q.   That's all right.  It's Page 24.

6          A.   Yes, I see it.

7          Q.   You verified these Interrogatory

8    responses; correct?

9          A.   I did.

10         Q.   You signed this verification on

11   July 15, 2021?

12         A.   Yes.

13         Q.   And you verified that these responses

14   were truthful and accurate; right?

15         A.   To my best recollection, yes.

16         Q.   And you did so under the penalty of

17   perjury; right?

18         A.   Yes.

19         Q.   Let's go to Page 6, please.  At the

20   bottom of Page 6, Interrogatory No. 22 is there.

21   Do you see that?

22         A.   I do.

Page 372

1          Q.    And that Interrogatory says:

2     "Identify and describe in detail any and all

3     offers, discussions, evaluations, communications,

4     demands, negotiations, and agreements related to

5     the asserted patents or related patents, whether

6     oral or written including, without limitation, all

7     offers to license, sell, or transfer attempts to

8     negotiate a license, sale, or transfer or to

9     enforce sale, transfer, or license negotiations,

10     notice letters, demand letters, cease and desist

11     letters, lawsuits, settlement negotiations,

12     settlement agreements, covenants not to sue, and

13     any offered, negotiated, or agreed bids, selling

14     price, licensing fee, royalty rate and base, and

15     the calculations thereof, including all revenue

16     projections and valuations related to the asserted

17     patents and related patents and all related

18     documents."  Do you see that, sir?

19          A.    I do.

20          Q.    Let's take a look at Kove's response

21     starting on Page 8, please.  About two thirds of

22     the way down the page there's a paragraph that

Case: 1:18-cv-08175 Document #: 667-2 Filed: 07/17/23 Page 104 of 104 PageID #:28017

5/16/2023     Kove IO, Inc. v. Amazon Web Services, Inc.John Overton, Ph.D., Vol I
Highly Confidential

Page 413

 1 STATE OF ILLINOIS )

 2 COUNTY OF C O O K )

 3  I, Donna M. Kazaitis, CRR, RPR, IL-CSR

 4 No. 084-003145, do hereby certify:

 5  That the foregoing deposition of JOHN

 6 OVERTON, PH.D. was taken before me at the time and

 7 place therein set forth, at which time the witness

 8 was put under oath by me;

 9  That the testimony of the witness and all

10 objections made at the time of the examination

11 were recorded stenographically by me, were

12 thereafter transcribed under my direction and

13 supervision and that the foregoing is a true

14 record of same.

15  I further certify that I am neither counsel

16 for nor related to any party to said action, nor

17 in any way interested in the outcome thereof.

18  IN WITNESS WHEREOF, I have subscribed my name

19 this 26th day of May, 2023.

20

21 DONNA M. KAZAITIS, IL-CSR, RPR, CRR
  Registered Professional Reporter
22 Certified Realtime Reporter
  IL-CSR License No. 084-003145