# Exhibit 2
# (Filed Under Seal)

Page 417

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

_____

KOVE IO, INC.,                  )
                                )
          Plaintiff,            )
                                )
v.                              )   No. 1:18-cv-08175
                                )
AMAZON WEB SERVICES, INC.,)
                                )
          Defendant.            )
_____)   VOLUME II


HIGHLY CONFIDENTIAL


          Video-recorded deposition of JOHN OVERTON,

          PH.D., taken at 161 North Clark Street,

          Chicago, Illinois, before Donna M. Kazaitis,

          IL-CSR, RPR, CRR, commencing at the hour of

          8:06 a.m. on Wednesday, May 17, 2023.


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

5/17/2023      Kove IO, Inc. v. Amazon Web Services, Inc.      John Overton, Ph.D., Vol II
Highly Confidential

Page 447

1          Q.   Do you see that this is entitled
2     "OverX, Inc. Bid Form"?
3          A.   Yes, I do.
4          Q.   And this is a bid from Redleaf Group,
5     Inc.; right?
6          A.   It would appear so, yes.
7          Q.   Have you ever seen this document
8     before?
9          A.   I don't know.  I mean this is a long,
10    long, long, time ago.  Possibly, but I don't think
11    so.
12         Q.   All right.  Do you see there's a bid
13    submitted for both the patent applications and
14    Xpress source code?
15         A.   I do.
16         Q.   ███████████████████████████████████
      ████████████████████████████████████████████████
      ████  ████████
19         A.   I do.
20         Q.   Do you know what that's referring to
21    there, the convertible bridge note?
22         A.   Yeah, the last -- approximately.  The

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
                              Highly Confidential

Page 448

1   last round of funding that OverX got was a bridge

2   note, a convertible debt.  I believe this is their

3   portion of that.  I think the other investors also

4   matched that plus a little bit, if I recall

5   correctly, but I don't recall specifically.

6          Q.   All right.  Are you aware of any bids

7   that were submitted to Founders that didn't

8   include a bid for the Xpress source code?

9          A.   I don't know.  Again, this is so long

10  ago.

11         Q.   Okay.  In exchange for -- well, strike

12  that.

13                              ████████████████████

    ██  ████████

15         A.   I believe so, yes.

16         Q.   Did Econnectix ever pay the ███

    ██  █████████████████████████████████████

    ██  █████  to Founders?

19         A.   We have not.  We've never had those

20  kinds of profits.

21         Q.   And in exchange for that ████████

    ██  ██████████████████████████████████

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
                              Highly Confidential

                                                              Page 449

1    ███████████████████████████████████, Econnectix

2    received the OverX patent applications and Xpress

3    source code; right?

4         A.   Yes, I believe so.

5         Q.   That was the valuation of those assets

6    that you submitted for in this bid; right?

7              MR. CARDENAS-NAVIA:  Objection to

8    form, vague.

9              THE WITNESS:  I don't know what

10   "valuation" means in this context.  We paid that

11   to acquire assets.

12   BY MR. SIGLER:

13        Q.   And you paid that to acquire the

14   patent applications and Xpress source code as part

15   of a competitive bidding process in 2002; right?

16        A.   As a part of the ABC, yes.

17        Q.   What do you mean by "ABC"?

18        A.   It was an assignment for the benefit

19   of creditor.

20        Q.   Do you know how much creditors with

21   claims of debt got back from OverX?

22        A.   I presume all of what we gave in our

Page 450

1    bid since we won the bid.

2                        (Deposition Exhibit 64 was marked

3                          for identification.)

4    BY MR. SIGLER:

5          Q.   I'm passing you Exhibit 64.   (Document

6    tendered to the witness.)

7                        Exhibit 64 on the front page bears

8    the Bates stamp KOV 00000002.   Have you seen this

9    document before, Mr. Overton?

10         A.   I don't know if I have or if I

11   haven't.

12                   MR. CARDENAS-NAVIA:   Take a moment to

13   flip through if you need to.

14                   THE WITNESS:   Yeah, if that's okay.

15                   So this appears to be the

16   announcement or the discharge of the OverX assets

17   to me, or to Econnectix, that we created.   I don't

18   recall reviewing this in -- I can't even tell what

19   the dates are.   This looks like it's from June 2nd

20   of '03 from the fax.   But that's what that appears

21   to be.

22

Page 452

1    to say:  "This transaction was effectuated as part

2    of an assignment for benefit of creditors to

3    provide for the orderly liquidation and winding up

4    of OverX."  Do you see that, sir?

5         A.   I do.

6         Q.   So OverX was liquidated and wound up;

7    right?

8         A.   Yes.

9         Q.   And as part of that liquidation and

10   winding up of OverX, all of its intellectual

11   property was transferred to Econnectix; right?

12        A.   That is correct.

13        Q.   So at this time in 2002 Econnectix

14   bought the applications that became the patents

15   asserted in this case as part of a liquidation and

16   winding up?

17        A.   That is correct.

18        Q.   Did Mr. Roizen receive anything in

19   return for forgiving his debt?

20        A.   Not that I know of, not that I know

21   of.

22        Q.   Did Mr. Carmichael receive anything in

Page 453

1    return for forgiving his debt to OverX?

2          A.   Not that I know of.

3          Q.   Do you know if OverX's -- well, strike

4    that.

5               Did Econnectix ever pay OverX's

6    creditors any money from subsequent profits?

7          A.   We never have been profitable in that

8    way, so we've never done that.

9          Q.   Did Econnectix ever send any

10   statements to creditors?

11              MR. CARDENAS-NAVIA:  Objection to

12   form, vague.

13   BY MR. SIGLER:

14         Q.   Did Econnectix --

15              THE REPORTER:  Wait, I didn't get your

16   answer...

17              THE WITNESS:  I'm waiting for him to

18   ask whatever he's going to ask.  I didn't

19   understand it.

20              MR. CARDENAS-NAVIA:  Well, hold on.

21   Bill, I don't think there was a clear answer here

22   to your last question.

Page 454

1            THE REPORTER:  You have to wait for

2    him to --

3            THE WITNESS:  Yeah, yeah, I know.  He

4    objected.  I'm sorry.

5    BY MR. SIGLER:

6        Q.  Did Econnectix ever send statements to

7    OverX creditors concerning Econnectix's gross

8    profits?

9            MR. CARDENAS-NAVIA:  Objection to

10   form, vague.

11           THE WITNESS:  So what kind of

12   statements are you asking about?

13   BY MR. SIGLER:

14       Q.  Like a quarterly statement, for

15   example.

16       A.  No.

17       Q.  Did Econnectix ever send any annual

18   statements to OverX creditors concerning

19   Econnectix's gross profits?

20       A.  No.

21       Q.  All right.  So that percentage of

22   gross profits up to ████████████, none of that

Page 455

1   was ever paid to OverX creditors; right?

2              MR. CARDENAS-NAVIA:  Objection to

3   form, vague.

4              THE WITNESS:  We previously reviewed

5   our financial circumstances which have not been

6   profitable for a while.  So it would not make

7   sense to send profits when we did not have

8   profits.  So we did not do that.

9   BY MR. SIGLER:

10       Q.   Yeah, and my question was a little

11   different than that.  My question was did

12   Econnectix ever pay any of that ████████████

    ██ ████████████████████████████████████  to

14   OverX creditors?

15             MR. CARDENAS-NAVIA:  Objection, asked

16   and answered.

17             THE WITNESS:  It's the same answer as

18   I gave before.

19   BY MR. SIGLER:

20       Q.   The answer is "No"; correct?

21       A.   No, the answer is that we've not been

22   profitable.  And, therefore, not being profitable,

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
                              Highly Confidential

                                                                    Page 456

 1    we couldn't send profit.

 2           Q.   I'm not asking whether you could or

 3    couldn't.  My question is did Econnectix ever pay

 4    any of that ███████████████████████████████

 █    ██████████████████████     to any OverX creditor?

 6                 MR. CARDENAS-NAVIA:  Objection to

 7    form, vague, asked and answered.

 8                 THE WITNESS:  It's the same answer.

 9    We did not have profits, and, therefore, we did

10    not send money that we did not have as profits.

11    BY MR. SIGLER:

12           Q.   So the answer is "No"?

13                 MR. CARDENAS-NAVIA:  Same objection.

14                 THE WITNESS:  The answer is same

15    answer I've given.

16    BY MR. SIGLER:

17           Q.   You can't answer that question "Yes"

18    or "No"?

19                 MR. CARDENAS-NAVIA:  He's answered the

20    question multiple times.

21    BY MR. SIGLER:

22           Q.   This will go a lot smoother if you

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.      John Overton, Ph.D., Vol II
                              Highly Confidential

                                                                  Page 457

1    just answer my question.

2          A.   I have, three times.

3          Q.   No, you haven't.

4          A.   I have.

5          Q.   Can you answer my question with a

6    "Yes" or "No"?

7               MR. CARDENAS-NAVIA:  Bill, he's

8    answered your question.

9               THE WITNESS:  I have.

10              MR. CARDENAS-NAVIA:  And he has no

11   obligation to answer "Yes" or "No" if it's not a

12   "Yes" or "No" answer.

13              MR. SIGLER:  Well, that's not how

14   you've treated our witnesses in this case at all,

15   certainly your colleagues.

16   BY MR. SIGLER:

17         Q.   "Yes" or "No," did Econnectix ever pay

18   a percentage of its gross profits to any OverX

19   creditors?

20              MR. CARDENAS-NAVIA:  Same objections,

21   objection to form, vague, asked and answered.

22              THE WITNESS:  I say the same response

Page 458

1 that I've said three times.  We can ask this many

2 more times; it's the same response because that's

3 the truth.  I've said the truth every time.  You

4 can bully me a little bit, but it doesn't change

5 the truth, sir.

6 BY MR. SIGLER:

7   Q.   I'm not bullying you.

8   A.   It sure feels like that.

9   Q.   I want a clear answer.

10   A.   I've given you an unambiguously clear

11 answer.  I'll give it a fourth time.  I'm sorry

12 about this, I'm emotional, but it's a little bit

13 offensive.

14     But the fact is we have never made

15 money on this.  We have never done that.  As a

16 result, we have never sent profit that we didn't

17 have.  Ever.  We didn't have the money.  You can

18 ask me another time and I'll say the same thing

19 because that's the actual truth.

20   Q.   I understand that you're trying to

21 tell the truth, sir.  I'm just trying to get an

22 answer to a simple factual question.

5/17/2023      Kove IO, Inc. v. Amazon Web Services, Inc.    John Overton, Ph.D., Vol II
Highly Confidential

Page 459

1          A.   And I have given it to you.  So I

2     don't know what to do at this point.  I can give

3     the fifth answer, the sixth answer, seventh, we

4     can do this all day if you would like.  It doesn't

5     make it less comfortable for me and it doesn't

6     make it less true of what I'm saying.

7          Q.   So Econnectix never paid any OverX

8     creditors a percentage of Econnectix profits;

9     correct?

10               MR. CARDENAS-NAVIA:  Same objections.

11               THE WITNESS:  I don't know.  Should I

12     just stop answering or do I have to say this seven

13     times in a row?

14               MR. CARDENAS-NAVIA:  Answer the

15     question as best you're able.

16               THE WITNESS:  Okay.  We have never

17     made profit, and as a result we have never sent

18     money that we did not have.

19               MR. SIGLER:  All right.  We'll see how

20     you answer in front of a jury.

21     BY MR. SIGLER:

22          Q.   When was Econnectix, LLC formed?

Page 460

1          A.   I don't know the specific date, but it

2     was at some point we had to have a receptacle to

3     be able to, after winning the assets, to receive

4     the assets and it was formed somewhere in that

5     timeframe so that the acquisition could go into

6     Econnectix.

7          Q.   All right.  Who was part of

8     Econnectix, LLC?

9          A.   It was myself, and I don't know at

10    which point I included Lee Auspitz.  I did at some

11    point.  I don't know if it was at the origination

12    point or not.

13         Q.   What did Econnectix, LLC do?

14         A.   It was a receptacle that we formed to

15    acquire these assets and then we started an

16    operating company immediately thereafter.

17         Q.   Was the operating company Econnectix

18    Corporation?

19         A.   That was changed.  We were

20    contemplating at some point going to get external

21    funding, VC funding or something, and we moved it

22    to a corporation to make that an easier

Page 555

1    there.  Do you see that?

2          A.   I don't, but I know it's here, but I

3    don't see it.  Where is it?

4          Q.   Down here.

5          A.   Yes, I see it.

6          Q.   This balance sheet for the year end

7    2007 identifies a revolving promissory note in the

8    amount of ████████        right?

9          A.   Yes.

10         Q.   Was that promissory note from you?

11         A.   Yes.

12         Q.   So you loaned that amount of

13   money -- strike that.

14              You had loaned that amount of money

15   to Econnectix as of year end 2007; right?

16         A.   That's what that says.  I don't know

17   how this is done, if the interest, accruing

18   interest, is included in that or if it's just

19   additional or what the accounting standard is or

20   practice.  I'm sure Art figured it out, but there

21   could be more nuance there than I understand.  But

22   yes, that's what that says.

Page 556

 1          Q.   As of year end 2007, were you still

 2    personally funding Econnectix?

 3          A.   Yes.

 4          Q.   I asked you some questions about that

 5    for 2006 and I think you said you may have cashed

 6    in some IRAs for funding; is that accurate?

 7          A.   Yeah, I don't recall what I did, but I

 8    was doing anything I could to get the money.  I

 9    was also working, doing some consulting on the

10    side to also bring in money too at the time.

11          Q.   What IRAs were you referring to?

12          A.   Oh, I don't know.  I think, as I

13    recall, I had some from previous years and I just

14    cashed them out and threw them into the company.

15          Q.   Where did you get those IRAs from

16    previous years from?

17          A.   I don't recall.  They probably were

18    investments -- or, it might have been 401(k), it

19    might have been IRAs.  I can't remember what they

20    were exactly.

21          Q.   For which -- well, strike that.

22               Where would you have had a 401(k)

Page 557

1    from, what prior position?

2          A.    It might have been -- OverX was

3    certainly Open Software Foundation because I put

4    money in from OFS.  Again, I don't remember the

5    instrument.  It was some kind of retirement

6    vehicle.  It was done through my UBS account.

7          Q.    Did anyone else provide you with money

8    to fund Econnectix at this time?

9          A.    Not that I can remember.

10         Q.    █████████████████████████████

   █    ████████████████████████████████

   █    ████    ██████████████████    ████

   █    ███████████████████████████  █████

   █    ████    █████████████████    ████

   █    █████████████████████████████████

   █    ████████    ██████████████

17         Q.    █████████████████████████

   █    ██████████████████████████████████

   █    █████████

   █    ████    ██████████

   █    ████    █████████████

   █    ████    ████████████████

Page 558

1        Q.    ████████████████████████

  ██   ██████████

  ██      ██    ████████████

  ██      ██    ████████████████████████

  ██   ████████████████████████████████

  ██   ██████

  ██      ██    ████████████████████████

  ██   ██████████████████████████

  ██      ██    ██████████████████

  ██      ██    ████████████

11        Q.    Have you ever been the beneficiary of

12    a trust?

13        A.    No.

14        Q.    You said you also may have contributed

15    some money from savings to Econnectix around this

16    time?

17        A.    Yeah, it would be any money that I had

18    on consulting, I was doing some consulting at the

19    same time.

20        Q.    How much money did you have in savings

21    at the time?

22        A.    I don't recall.

Page 559

1       Q.   ██████████████████████████

     ██  ████████████████████████████████

     ██       ██   ████████████████████  █

     ██  ████████████████   I'm sure there's documents

5    somewhere.

6       Q.   I'll mark the next exhibit.

7            (Deposition Exhibit 77 was marked

8             for identification.)

9    BY MR. SIGLER:

10      Q.   I'm passing you Exhibit 77.   (Document

11   tendered to the witness.)

12           You see Exhibit 77 is a profit and

13   loss previous year comparison?

14      A.   Yes.

15      Q.   For Econnectix Corporation; right?

16      A.   Yes.

17      Q.   And it includes figures for year end

18   2007 and year end 2008; right?

19      A.   Yes.

20      Q.   For 2007 this P&L identifies sales

21   income of ██████; right?

22      A.   Yes.

Page 560

 1          Q.    Had Econnectix sold any product before

 2    2007?

 3          A.    I don't know.  When we started doing

 4    this, it would have been, again, recalling by

 5    memory, which has, you know, subject to skew with

 6    what you remember, at some point we started

 7    producing the XPD box and then we started selling

 8    that and then we produced the XFM.  I don't know

 9    if this is when the sales just started kicking in

10    or not.

11          Q.    Okay.  And then for 2008 ████████ in

12    sales income is reported; right?

13          A.    Yes.

14          Q.    And then there are a number of

15    expenses identified in this document; right?

16          A.    Yes.

17          Q.    For example, there's insurance

18    expenses; right?

19          A.    Uh-huh.

20          Q.    There's office supplies and postage;

21    right?

22          A.    Yes.

Page 589

 1    that question "Yes" or "No."

 2              THE WITNESS:  On my own?  Yes.

 3    BY MR. SIGLER:

 4         Q.   What did you do?

 5         A.   It's okay for me to proceed?  Okay.

 6              So I'm just going to use the '640

 7    on this.  Any time we were coming up with

 8    something, Steph and I would look around on

 9    whatever we could find out about the topic before.

10    He and I would talk fairly extensively on what we

11    were trying to accomplish with the patent, the

12    patent disclosure we were going.  He and I would

13    dig around ourselves.

14              After we did that, we would go to

15    Brinks and we would --

16              MR. CARDENAS-NAVIA:  I'm going to

17    caution you not to talk about anything with

18    Brinks.

19              THE WITNESS:  Okay.  So yes, I did do

20    some patent searches on my own and I think Steph

21    did also.

22

Page 590

1    BY MR. SIGLER:

2          Q.    How did you go about performing those

3    searches?

4          A.    The searches that we did I think were

5    fairly ad hoc.  I mean we would just look around

6    to anything that we thought might be applicable.

7          Q.    How would you identify art that you

8    thought might be applicable?

9          A.    It ranged from a lot of things,

10   application by application.  For example, I looked

11   very carefully at RFC 1035 with Steph in detail to

12   understand what the restrictions limits of RFC

13   1035 is, or are.

14              We looked at relational databases,

15   we looked at directory services, technology on --

16   I may have attended some IEEE conferences on some

17   of this.  I don't recall.  It was ad hoc, best

18   effort, rather than some systematic search policy

19   that we had as individuals.

20         Q.    You mentioned "relational databases."

21   What did you mean by that?

22         A.    We both looked at, before doing any of

Page 591

1    this, we looked at what could be done to approach

2    the area that we were approaching.  And at that

3    moment in the technology world, there was really

4    directory services, relational databases.  You

5    could look at flat files, but that was kind of a

6    joke, we didn't really consider that.  And then we

7    extrapolated from that if that would meet the

8    requirements or the target objectives of what the

9    IP was.  And that's how we arrived at what we did.

10        Q.   Can you give me an example of a

11   relational database that existed back then?

12        A.   Informix I believe -- Posgress is

13   actually the one, P-O-S-G-R-E-S-S.

14        Q.   Did Oracle have any relational

15   databases on the market back then --

16        A.   I believe so --

17             MR. CARDENAS-NAVIA:  Objection, form,

18   vague as to time.

19             MR. SIGLER:  I was going to state a

20   time.

21   BY MR. SIGLER:

22        Q.   Before you applied for the '640

Page 592

1    Patent, did Oracle have any relational database

2    products on the market?

3         A.   Yeah, we did look at some of them.

4    But they weren't doing what we were doing, so we

5    did not spend a lot of time on the relational

6    databases because the design and philosophy and

7    implementation were very different.

8         Q.   But you did look at Oracle databases

9    before developing your inventions with Mr. Bailey?

10        A.   Well, we considered whether they would

11   achieve the kind of objectives that we had.

12        Q.   Okay.  You mentioned Posgress?  Is

13   that what you said?

14        A.   Yes.

15        Q.   Were they an Oracle competitor at that

16   time in the 1990s?

17        A.   I don't know if they were a competitor

18   but they were open source and they were heavily

19   involved in relational database theory out of

20   Berkeley, at least some of the people who were

21   looking at it, and we could see source code.  We

22   couldn't see source code with Oracle.

Page 594

1    doing creative technical work.

2          Q.    So you found value in attending those

3    IEEE conferences?

4          A.    Yes.

5          Q.    Did you mention a company called

6    Ingress?

7          A.    Informix, but I don't know if they

8    were around at that point.  That was some RDMS

9    stuff that I did when I was at OverX.  I think

10   they might have been out of business.  I'm lumping

11   them in there.  I would have looked at them if

12   they were still around.  I don't know if they

13   were.  I'm pretty sure Posgress was and Oracle

14   was.

15         Q.    So you were an IEEE member at one

16   time; is that right?

17         A.    I was never an IEEE member.

18         Q.    Did you ever apply to be an IEEE

19   member?

20         A.    No.

21         Q.    A few moments ago you mentioned

22   directory services.  Do I have that right?

Page 595

 1          A.   Yes.

 2          Q.   What are directory services?

 3          A.   It was one of the first NoSQL

 4     alternatives database technologies that came out

 5     somewhere around in there.  The most well known

 6     one at the time was called LDAP or something

 7     before LDAP.  I can't remember if there was

 8     another name.

 9               MR. SIGLER:  All right.  We've been

10     going about an hour and I'm about to kind of

11     switch topics.  So is it a good time to break for

12     lunch?  Does that work for everybody?

13               THE WITNESS:  Sure.

14               THE VIDEOGRAPHER:  Going off the

15     record at 11:53 a.m.

16                    (A lunch recess was taken and said

17                     deposition continued as follows:)

18               THE VIDEOGRAPHER:  Going on the record

19     at 12:55 p.m.

20     BY MR. SIGLER:

21          Q.   Welcome back, Mr. Overton.

22                    In the prosecution of the '640 and

Page 596

1    '978 and '170 Patents, Brinks Hofer represented

2    you and Mr. Bailey; right?

3         A.    Yes.

4         Q.    Did Brinks & Hofer's attorneys provide

5    you any instructions about whether to search for

6    prior art on your own?

7              MR. CARDENAS-NAVIA:  You can answer

8    that question "Yes" or -- well, actually I'm just

9    going to instruct you not to answer.

10             THE WITNESS:  Okay.

11             MR. SIGLER:  What's the basis?

12             MR. CARDENAS-NAVIA:  On the basis of

13   privilege.

14             MR. SIGLER:  Are you going to follow

15   your attorney's instruction?

16             THE WITNESS:  Yes.

17   BY MR. SIGLER:

18        Q.    Okay.  I'd like to go back and ask you

19   questions about Exhibit 8 which are the notes you

20   brought, the second page of that specifically.

21        A.    This?

22        Q.    Yes.  I asked you some questions about

Page 597

1   this yesterday.  I just want to follow up on a few

2   things.

3                     Again, who are the people listed

4   here on Page 2 of Exhibit 8?

5        A.   They are recipients of some form of an

6   investment memorandum that we prepared I believe.

7        Q.   Did they each receive different

8   versions of that investment memorandum?

9        A.   I don't know.  I think it's roughly

10  the same but it goes over from 5/9/2020 to 6/11.

11  So there probably were some minor modifications

12  from time to time.

13                    (Deposition Exhibit 83 was marked

14                     for identification.)

15  BY MR. SIGLER:

16       Q.   All right.  I'm going to mark Exhibit

17  83.

18                    MR. CARDENAS-NAVIA:  Counsel, this

19  document doesn't have a Bates stamp.

20                    MR. SIGLER:  We printed it last night

21  and the Bates numbers didn't print.  I can

22  represent you what the Bates stamp is.

Page 626

1    memorandum was sent to Tim McHugh on May 13, 2020;

2    right?

3          A.    Yes.

4          Q.    On the first page of Exhibit 84, it

5    says near the top "Securities Offered:

6    Convertible Bonds."  Do you see that?

7          A.    Yes.

8          Q.    And the offering amount was ██

9    █    ████████; right?

10         A.    Yes.

11         Q.    And the conversion price is stated as

12   ████████████; right?

13         A.    Yes.

14         Q.    Do you know what that conversion price

15   is referring to there?

16         A.    I don't off the top of my head.  I

17   believe that could be -- may I look at this just a

18   little bit?

19         Q.    Sure.

20         A.    Okay.  I have a recollection of this

21   now.

22         Q.    What does that conversion price refer

Page 627

1   to?

2          A.    That was a conversion into stock with

3   the then value of the company from the pre-money

4   valuation of the company.

5          Q.    What was the pre-money valuation of

6   the company?

7          A.    Approximately ████████.

8          Q.    Who made that valuation?

9          A.    A collection of investors.

10         Q.    Who in particular?

11         A.    I don't know.  We've had a couple of

12   rounds of money.  This isn't a comprehensive list.

13   I don't know.  I think we have a number of

14   investors.

15         Q.    So these investors value Kove at

16   approximately ████████ as of May 2020; is that

17   correct?

18         A.    Yes, yes.

19         Q.    Can you go to Page 5, please.

20         A.    I'm there.

21         Q.    Just backing up for a moment.  So at

22   this point did Kove have institutional investors?

Page 628

1          A.   I don't know what the number of

2   investors and who they are off the top of my head,

3   but we had a number of investors.  And I don't

4   know, we did not have a -- we had one that was --

5   I think no, I think the answer is no.

6          Q.   Can you name one of those investors?

7          A.   Tim McHugh and Reuben Auspitz.  I'll

8   give you two.  They're on the list here.

9          Q.   They were already investors in Kove at

10  this time in May 2020?

11         A.   I don't know the timelines of various

12  investments that we received unfortunately off the

13  top of my head.  It's possible, yes.

14         Q.   This memo is dated May 13, 2020;

15  right?

16         A.   Yes.

17         Q.   And you believe those gentlemen may

18  have invested in Kove before that; is that

19  correct?

20         A.   It's possible, yes.

21         Q.   If Kove had investors at this point

22  who valued the company at █████████   why was

Page 629

1    Kove seeking additional investment through this

2    investment memorandum?

3          A.    It made sense at the time.

4          Q.    Why did it make sense at the time?

5          A.    We were growing.

6          Q.    How many employees did Kove have at

7    this time?

8          A.    ███████████, it might have been

9    a little bit more, a little bit less, but it's a

10   good target number.

11         Q.    Okay.  And on Page 5 there's an

12   investment summary there; right?

13         A.    Yes.

14         Q.    In the second paragraph it says:

15   "Kove IO, Inc. is offering up to ███████ in

16   convertible bonds, convertible into shares of the

17   company's common stock"; right?

18         A.    Yes.

19         Q.    Why in particular were bonds offered

20   in this memorandum?

21         A.    I don't know the particular reason for

22   that.

Page 630

1          Q.   Again, who drafted this memorandum?

2          A.   A number of people would have worked

3     on it.  Keith Connolly was heavily involved and

4     then Dellenbach Venture Capital, but I'm not sure

5     who at Dellenbach Venture Capital was involved.

6          Q.   Below that this memorandum also states

7     that -- well, strike that.

8               This memorandum states that "the

9     bonds are secured by an interest in available

10    proceeds from the lawsuit filed by the company

11    against Amazon Web Services, Inc."; right?

12         A.   That's correct.

13         Q.   And that's this case; right?

14         A.   Yes.

15         Q.   So here in this memorandum Kove was

16    offering bonds for a stake in the outcome of this

17    case; right?

18         A.   Well, that was a securitization.  They

19    were investing -- the offer was to invest in the

20    main business of Kove IO, the current memory

21    product.  With the securitization, you know, fall

22    back onto the investment after this lawsuit.

Page 417

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

_____

KOVE IO, INC.,                    )
                                  )
          Plaintiff,              )
                                  )
v.                                )   No. 1:18-cv-08175
                                  )
AMAZON WEB SERVICES, INC.,)
                                  )
          Defendant.              )
_____)      VOLUME II


HIGHLY CONFIDENTIAL


Video-recorded deposition of JOHN OVERTON,

PH.D., taken at 161 North Clark Street,

Chicago, Illinois, before Donna M. Kazaitis,

IL-CSR, RPR, CRR, commencing at the hour of

8:06 a.m. on Wednesday, May 17, 2023.


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 643

1    mean the people -- there are people in the

2    conference that we worked with.  I don't know all

3    their names.  There are people in the military

4    that I have had interactions with, which I don't

5    remember names.  I probably have them written down

6    somewhere, but sure.

7              At the conference last week it

8    would have been Hope Bigla, something or other,

9    and it would have been, what's his name, Patrick,

10   something or other which I can't remember.  We

11   hosted a -- we were introduced to the Secretary

12   Vilsack and the minister of agriculture, Al

13   Murray.

14        Q.   You said "we were introduced."  Who's

15   "we"?

16        A.   It's the Enterprise Neuro System, I'm

17   vice chair of Enterprise Neuro System.

18        Q.   What's Enterprise Neuro System?

19        A.   It's kind of an R&D group, an open

20   source R&D group, research and development group,

21   for AI and machine learning with a number of

22   people involved in it.

Page 644

 1          Q.    Is that a non-profit?

 2          A.    Yes.

 3          Q.    Where is that based?

 4          A.    I think it's registered, my

 5     understanding it's registered in Delaware.

 6          Q.    Does it have an office?

 7          A.    No, it's mostly volunteers just with

 8     the 503C status.

 9          Q.    All right.  You mentioned Secretary

10     Vilsack; right?

11          A.    Yes.

12          Q.    Had you ever met or spoken to him

13     before last week?

14          A.    No.

15          Q.    Has the U.S. military ever been a

16     customer of Kove or Econnectix?

17          A.    Yes.

18          Q.    Which parts of it?

19          A.    DARPA, National Geospatial Agency.

20     And there could be some others I'm not

21     remembering.

22          Q.    What's DARPA?

5/17/2023     Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
Highly Confidential

Page 645

1          A.   It's a research group for the Army.

2          Q.   What products have those military

3    entities bought from Kove?

4          A.   The XPD and the memory product.

5          Q.   Do you know anyone that works at the

6    United States Patent & Trademark Office?

7          A.   I do not.

8               MR. SIGLER:  All right.  We've been

9    going about an hour.  Let's take a break.  I'm

10   about to switch gears.

11              THE VIDEOGRAPHER:  Going off the

12   record at 1:58 p.m.

13                   (A recess was taken.)

14              THE VIDEOGRAPHER:  Going on the record

15   at 2:16 p.m.

16   BY MR. SIGLER:

17         Q.   Mr. Overton, has Kove ever received

18   any funding from any venture capital firms?

19         A.   No.

20         Q.   Has Kove ever received any funding

21   from any hedge funds?

22         A.   Not directly.

5/17/2023       Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
Highly Confidential

Page 707

 1          A.   Yes, they had no access to this, yes.

 2          Q.   So this document wasn't distributed at

 3    your talk at Yale in October 2002; right?

 4               MR. CARDENAS-NAVIA:   Objection to

 5    form, vague.

 6               THE WITNESS:   I think it might have

 7    been.  I don't recall, but it might have been.  I

 8    wasn't given any feedback besides the meeting that

 9    we had in the auditorium.

10    BY MR. SIGLER:

11          Q.   How many people attended?

12          A.   45 or 50.

13          Q.   Who was in the audience?

14          A.   The math department.

15          Q.   Was it students?

16          A.   No, it was faculty and graduate -- I

17    was invited by two faculty.  I met with a number

18    more.  And then there were probably half a dozen,

19    dozen graduate, post docs and then some graduate

20    students in addition.  And then there were people

21    who were specializing in DNS research in the

22    audience.  They were full professors working on

Page 708

 1   DNS.

 2        Q.   Have you ever given any other

 3   presentations at Yale?

 4        A.   I don't think so.

 5        Q.   You can't remember one way or the

 6   other?

 7        A.   I might have given something for

 8   religion to the theology department in some other

 9   context but it's vague.  I mean I don't recall the

10   time or anything.  It would have been years before

11   this.

12        Q.   Since this presentation in October

13   2002, have you given any other presentations at

14   Yale?

15        A.   No.

16        Q.   Have you been invited to give any

17   other presentations at Yale since 2002?

18        A.   No.

19             MR. SIGLER:  All right.  Why don't we

20   take a break.

21             THE VIDEOGRAPHER:  Going off the

22   record at 3:21 p.m.

5/17/2023      Kove IO, Inc. v. Amazon Web Services, Inc.      John Overton, Ph.D., Vol II
Highly Confidential

                                                        Page 709

 1                    (A recess was taken.)

 2                    THE VIDEOGRAPHER:  Going on the record

 3     at 3:41 p.m.

 4                    (Deposition Exhibit 87 was marked

 5                     for identification.)

 6     BY MR. SIGLER:

 7          Q.   Mr. Overton, I'm passing you Exhibit

 8     87.  (Document tendered to the witness.)

 9                    Do you have Exhibit 87 in front of

10     you, sir?

11          A.   I do.

12          Q.   There's a page of metadata attached to

13     the front of Exhibit 87.  Do you see that, sir?

14          A.   I do.

15          Q.   And then if you turn to the next page,

16     do you see that this is a paper called "Consistent

17     Hashing and Random Trees:  Distributed Caching

18     Protocols for Relieving Hotspots on the Worldwide

19     Web"?

20          A.   Yes.

21          Q.   Are you familiar with this paper?

22          A.   Vaguely.

5/17/2023      Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
Highly Confidential

Page 710

1          Q.    Turning back to the front page of this

2    document.  Do you see there that there's a

3    custodian ID about four lines down?

4          A.    Yes.

5          Q.    And this indicates that you were the

6    custodian of this document.  Do you understand

7    that?

8          A.    Okay, sure.

9          Q.    There's a created date time about

10   three quarters of the way down the page.  Do you

11   see that?

12         A.    I do.

13         Q.    And the created date time is

14   January 3, 1999, at 2:52 p.m.; right?

15         A.    I see that.

16         Q.    Turn to the paper again, please.

17         A.    Sure.

18         Q.    There are six authors of the paper

19   identified near the top.  Do you see that?

20         A.    I do.

21         Q.    The first author identified is David

22   Karger.  Do you see that?

Page 711

```
 1          A.   Yes.

 2          Q.   Have you ever communicated with

 3   Mr. Karger?

 4          A.   I don't believe so.

 5          Q.   Do you know who Mr. Karger is?

 6          A.   Not off the top of my head.

 7          Q.   Eric Lehman is listed as an author of

 8   this paper as well; right?

 9          A.   Yes.

10          Q.   Have you ever communicated with

11   Mr. Lehman?

12          A.   I don't believe so.

13          Q.   Do you know who Mr. Lehman is?

14          A.   I don't think so.

15          Q.   And a Tom Leighton is listed as an

16   author.  Do you see that?

17          A.   Yes.

18          Q.   Have you ever communicated with Tom

19   Leighton?

20          A.   I don't know.  The name's familiar.  I

21   don't recall.  I don't think I've communicated

22   with Tom Leighton.  The name is somehow more
```

Page 724

1    aside.

2                      Are you familiar with the term

3    "cloud computing"?

4          A.   Generally, yes.

5          Q.   You didn't invent cloud computing; did

6    you?

7          A.   I did not.

8          Q.   You didn't invent storing data in a

9    database; did you?

10         A.   That's correct.

11         Q.   And you didn't invent database

12   partitions; did you?

13              MR. CARDENAS-NAVIA:  Objection to

14   form, vague.

15              THE WITNESS:  I did not.

16   BY MR. SIGLER:

17         Q.   And you didn't invent the concept of

18   requesting data from a database; right?

19         A.   I did not.

20         Q.   And you didn't invent the concept of

21   returning requested data either; right?

22         A.   That is correct, I did not.

Page 725

1          Q.   And you didn't invent the concept of

2     redirecting request; did you?

3               MR. CARDENAS-NAVIA:  Objection to

4     form, vague.

5               THE WITNESS:  I think it depends on

6     how that's construed.  I think our patents have

7     something very distinctive in our use of redirect.

8     BY MR. SIGLER:

9          Q.   Well, was the general concept of a

10    redirect message around before your inventions?

11              MR. CARDENAS-NAVIA:  Objection to

12    form, vague.

13              THE WITNESS:  That's a very -- it

14    depends on lots of specifics on the use of

15    redirect.

16    BY MR. SIGLER:

17         Q.   You didn't invent using an identifier

18    for data in a database; right?

19         A.   I did not.

20         Q.   And you didn't invent organizing data

21    according to a hash function; did you?

22         A.   I did not.

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
                              Highly Confidential

Page 726

 1          Q.   And you didn't invent using keys to

 2     retrieve data; did you?

 3          A.   That's correct.

 4          Q.   Are you familiar with something called

 5     a "hash key"?

 6          A.   Yes.

 7          Q.   Those were around before your

 8     invention; right?

 9               MR. CARDENAS-NAVIA:  Objection to

10     form, vague.

11               THE WITNESS:  Could you restate that?

12     BY MR. SIGLER:

13          Q.   You didn't invent hash keys; right?

14          A.   That's correct.

15          Q.   And you didn't invent storing

16     information about where data is located; did you?

17          A.   That's correct.

18          Q.   And you didn't invent the concept of

19     location information; did you?

20               MR. CARDENAS-NAVIA:  Objection to

21     form, vague.

22               THE WITNESS:  "Location information"

Page 727

1    is a very broad term and it would depend on its

2    context.

3    BY MR. SIGLER:

4          Q.   Are you the first person in the United

5    States to utilize the concept of location

6    information?

7          A.   It depends in which context.  I think

8    what our patents are distinctive and the invention

9    and my technology in particular is distinctive in

10   its use of location information.

11         Q.   Okay.  But the concept of location

12   information in general existed before your

13   inventions; right?

14         A.   It depends on lots of specifics.  In

15   the most abstract case of that, you know, you

16   could look in a dictionary and it would say

17   "location" and it would just define a term.  And

18   that definitely existed before we created location

19   service.

20         Q.   Had any system before yours used any

21   type of redirect message?

22              MR. CARDENAS-NAVIA:  Objection to

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
                              Highly Confidential

                                                                       Page 728

1    form, vague.

2              THE WITNESS:  I don't know.  That's a

3    very general term and I would want to define that

4    in specific ways to understand what makes that

5    distinctive or not distinctive or uniform or not

6    uniform.

7    BY MR. SIGLER:

8         Q.   Well, how would you define a redirect

9    message?

10        A.   We define it in our disclosures very

11   specifically.

12        Q.   You didn't invent directory servers;

13   right?

14        A.   That's correct.

15        Q.   Is it fair to say you invented a

16   specific way of organizing location information

17   and identifiers on a location server network?

18        A.   I think that the technology is

19   distinctive in many of its properties in managing

20   location information.

21        Q.   Are you familiar with the concept of

22   data dictionaries?

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.      John Overton, Ph.D., Vol II
Highly Confidential

Page 729

1          A.    Yes.

2          Q.    You didn't invent data dictionaries;

3    did you?

4          A.    That is correct.

5          Q.    And you didn't invent location

6    servers; did you?

7          A.    I don't know --

8               MR. CARDENAS-NAVIA:  Objection to

9    form, vague.

10               THE WITNESS:  Would you specify that

11   in the context of this?

12   BY MR. SIGLER:

13         Q.    Well, let me ask you about something

14   else.  Are you familiar with the concept of a

15   string in networking?

16         A.    In networking?

17         Q.    Yeah.

18         A.    That's not a commonly used expression

19   in networking.  It's usually used in data

20   structures, but I think you could apply it.

21         Q.    Okay.  Are you familiar with the

22   concept of performance metrics?

Page 730

```
 1        A.   Yes.

 2        Q.   And performance metrics existed before

 3   your patents; right?

 4             MR. CARDENAS-NAVIA:  Objection to

 5   form, vague.

 6             THE WITNESS:  In which context do you

 7   mean that?

 8   BY MR. SIGLER:

 9        Q.   Did you invent the concept of a

10   performance metric?

11             MR. CARDENAS-NAVIA:  Objection to

12   form, vague.

13             THE WITNESS:  In the context of -- in

14   what context?  That's a very general term.  That

15   could apply to almost anything.

16   BY MR. SIGLER:

17        Q.   Generally speaking, did performance

18   metrics exist before your patents?

19             MR. CARDENAS-NAVIA:  Same objection.

20             THE WITNESS:  Depending on the

21   context, yes.

22
```

Page 731

1    BY MR. SIGLER:

2          Q.   I can't remember if it was yesterday

3    or today, but I believe you described your

4    invention as distributed hash tables on

5    localities?

6          A.   For location information.

7          Q.   So would distributed hash tables used

8    on other parts of a network infringe the claims of

9    your patents?

10          MR. CARDENAS-NAVIA:  Objection to

11   form, vague, to the extent it calls for a legal

12   conclusion and expert testimony.

13          THE WITNESS:  I couldn't make a legal

14   conclusion.

15   BY MR. SIGLER:

16          Q.   Do you know what double patenting is?

17          A.   Yes, or I know the concept, heard of

18   the concept.  I don't know if I know it

19   specifically in the legal terms when I'm in a room

20   with legal people.

21          Q.   Well, are you aware that you can't

22   claim the same invention multiple times?

Page 732

 1                    MR. CARDENAS-NAVIA:  Objection to

 2      form, vague, calls for speculation, lack of

 3      foundation.

 4                    THE WITNESS:  Could you restate that?

 5      BY MR. SIGLER:

 6          Q.   Let me ask you this:  Are there any

 7      differences in the claims between your three

 8      patents?

 9                    MR. CARDENAS-NAVIA:  Objection to

10      form, vague.

11                    THE WITNESS:  That's also a legal

12      conclusion I think.

13      BY MR. SIGLER:

14          Q.   Okay.  I thought you testified a few

15      moments ago that the Karger paper wasn't material

16      to the inventions claimed in your patents.  Is

17      that what you said?

18          A.   When I looked at the abstract or some

19      portion of it as I was reading it, it was talking

20      about caching.  And what we were doing was not

21      about caching.

22          Q.   You were able to determine on your own

Page 733

1    that that paper wouldn't be material to the

2    examiner's examination of your applications;

3    right?

4         A.   I don't know that I'm expert in any of

5    this.  But when I looked at that, it would never

6    occur to me that that would be germane because

7    that's about caching and one of the critical

8    components, not the only one, but one very

9    foundational component of our patents and of the

10   technology is to eliminate caching.  You can

11   deploy it that way but that's not the part that's

12   the most distinctive.

13        Q.   And that's your view; right?

14        A.   I think it's -- yes, yes, that's my

15   view.

16        Q.   Can you take out the '978 Patent,

17   please.

18        A.   Sure.

19        Q.   And what exhibit number is that?

20        A.   12.

21        Q.   Can you turn to the claims, please?

22        A.   Sure.

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
                              Highly Confidential

                                                                    Page 734

1          Q.   Specifically -- sorry, I had the wrong

2     patent.  That was the problem.

3               Can you take out the '640 Patent.

4     What exhibit number is that, sir, for the record?

5          A.   11.

6          Q.   Let's go to Claim 24 of that patent,

7     please.  Claim 24 says:  "The system of Claim 18

8     wherein the location information comprises a

9     portion of a hash table distributed over the

10    plurality of data location servers."  Do you see

11    that there, sir?

12         A.   I do.

13         Q.   And that Claim 24 in the '640 Patent

14    describes hashing location information; right?

15              MR. CARDENAS-NAVIA:  Objection to

16    form, mischaracterizes the document.

17              THE WITNESS:  I'm not a lawyer and

18    these are claims.  I don't think I'm qualified to

19    discuss claims.

20    BY MR. SIGLER:

21         Q.   You're not qualified to discuss the

22    claims of your own patents?

5/17/2023        Kove IO, Inc. v. Amazon Web Services, Inc.    John Overton, Ph.D., Vol II
                          Highly Confidential

Page 750

1     for that.  I presume it's right.

2            Q.    There's a bar code up here.

3            A.    Okay.  Yes, yes.

4            Q.    All right.  Can you take a look at the

5     front of the '640 Patent, please.

6            A.    Yes.

7            Q.    In the related U.S. application data,

8     the '640 Patent doesn't cite to the '896

9     application; correct?

10           A.    I presume so.  I haven't checked that.

11           Q.    Well, take a look at the related U.S.

12    application data.

13           A.    Okay, gotcha.

14           Q.    There's a citation there to

15    Provisional Application 60/153709 --

16           A.    Right.

17           Q.    -- filed on September 14, 1999; right?

18           A.    Right.

19           Q.    So it doesn't claim priority to this

20    '896 application; correct?

21           A.    I see, yes, that's correct.

22           Q.    Take a look at the '170 Patent,

Page 751

1    please.

2          A.    Yes.

3          Q.    The related U.S. application data, do

4    you see that?

5          A.    Yes.

6          Q.    Do you see that the '170 Patent does

7    claim priority to the '896 application?

8          A.    Which is the '896?

9          Q.    This provisional application.

10         A.    So you're saying the '170 claims

11   priority to this; is that correct?

12         Q.    Is that correct, sir?

13         A.    Hold on.  Yes.

14         Q.    But the named inventors on the '170

15   Patent are you and Mr. Bailey; right?

16         A.    Yes.

17         Q.    Mr. Roizen is not named as an inventor

18   on the '170 Patent; correct?

19         A.    That is correct.

20         Q.    Please take a look at the '978 Patent.

21         A.    Yes.

22         Q.    Do you see the related U.S.

Page 752

1    application data?

2         A.   Yes.

3         Q.   Do you see that that related U.S.

4    application data on the '978 Patent claims

5    priority to the '896 provisional application?

6         A.   I do.

7         Q.   And Mr. Roizen is not named as an

8    inventor on the '978 Patent; correct?

9         A.    That is correct.

10        Q.   Why wasn't Mr. Roizen named as an

11   inventor on the '170 or '978 Patents?

12             MR. CARDENAS-NAVIA:  You can to the

13   extent you can answer that question without

14   revealing privileged information if you're able

15   to.  If not, I'll instruct you not to answer.

16             THE WITNESS:  I don't know how to

17   answer this because it was deemed that he was not

18   an inventor.  Mike asked me to come up with an

19   illustration that was a medical illustration, so I

20   did so.

21   BY MR. SIGLER:

22        Q.   What do you mean by "a medical

Page 753

1    illustration"?

2         A.    In this application right here that

3    you're looking at, at some point he simply said to

4    me I would like you to create an image or an

5    illustration that uses something medical.  So I

6    did.

7         Q.    And then based on that, you submitted

8    this application naming you and Mr. Roizen as

9    inventors; right?

10        A.    Well, that followed at some point.  I

11   don't know about "based on that."  Those are all

12   legal conclusions.

13        Q.    Does this application discuss that

14   medical illustration?

15        A.    It does to some degree, yes.

16        Q.    If you look at the page that ends with

17   the Bates stamp ending in 761, it's the second

18   page of the document.

19        A.    Yes.

20        Q.    Do you see there it says "Background

21   of the invention"?

22        A.    Yes.

Page 754

1          Q.    And the first sentence says "Medical

2     records can reside in many different places";

3     right?

4          A.    Yes.

5          Q.    So this does discuss the medical

6     illustration you referred to; right?

7          A.    That I came up with, yes.

8          Q.    And looking above that in the "Field

9     of the invention," do you see that above the

10    background of the invention?

11         A.    Yes.

12         Q.    It says there:  "This invention

13    relates generally to storage to data and retrieval

14    of records.  More particularly, this invention

15    relates to a universal method for generating an

16    index of medical records at the time services are

17    rendered and retrieving medical records based upon

18    the automated indexing performed."  Do you see

19    that, sir?

20         A.    I do.

21         Q.    So that, again, describes the medical

22    illustration that you mentioned; correct?

Page 755

 1          A.   It describes some portion of that,

 2     yes.

 3          Q.   And it describes an index; right?

 4          A.   Yes.

 5          Q.   It describes an index of medical

 6     records; right?

 7          A.   As an implementation, yes.

 8          Q.   The field of invention there doesn't

 9     describe any index with the location information;

10     does it?

11               MR. CARDENAS-NAVIA:  Objection to

12     form, vague.

13               THE WITNESS:  Could you reask the

14     question?

15     BY MR. SIGLER:

16          Q.   The field of invention doesn't

17     reference any index of the location information;

18     does it?

19               MR. CARDENAS-NAVIA:  Objection, vague.

20               THE WITNESS:  I don't know how that

21     applies to this context.  This was in a very

22     early, a very, very early prototype of this, of

Page 756

1    this technology.

2    BY MR. SIGLER:

3          Q.   Can you take a look at the '640

4    Patent, please.

5          A.   Sure.

6          Q.   If you could turn to Column 1, please.

7          A.   I am there.

8          Q.   Can you go to Line 50, please.  Are

9    you there?

10         A.   Yes.

11         Q.   It says there at Column 1, Line 50 of

12   the '640 Patent:  "Yet another problem in current

13   retrieval systems is that video and sound files

14   related to the request may not even be found in

15   the search results.  For example, a doctor might

16   be able to retrieve medical records on a specific

17   patient but cannot view an MRI or x-ray results

18   associated with that record."  Do you see that

19   there, sir?

20         A.   I do.

21         Q.   So the specification of the '640

22   Patent discusses medical records; right?

5/17/2023       Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
                          Highly Confidential

                                                              Page 757

    1          A.   It's one illustration, yes.

    2          Q.   And the provisional application that

    3     you filed with Mr. Roizen also discussed medical

    4     records; right?

    5          A.   Yes.

    6          Q.   And Mr. Roizen is a doctor; right?

    7          A.   Yes.

    8          Q.   He's a medical doctor; right?

    9          A.   Yes.

   10          Q.   Let's go back to Exhibit 89, the

   11     provisional application.  If you could please turn

   12     to the page that has a Bates number ending in 774.

   13          A.   I am there.

   14          Q.   There's a paragraph there that starts

   15     with "SDTP can support."  Do you see that?

   16          A.   Yes.

   17          Q.   It says:  "SDTP can support machine

   18     clusters, LANs, WANs, heterogeneous networks,

   19     collections of link networks or any set of these.

   20     This design explicitly includes support for full

   21     internet-wide search and retrieval of records.

   22     Essentially there are no network restrictions for

Page 758

```
 1    SDTP.  It can transport and retrieve information

 2    for local or global systems alike."  Do you see

 3    that language there, sir?

 4         A.   I do.

 5         Q.   So this states that SDTP can support

 6    machine clusters; right?

 7         A.   Yes.

 8         Q.   Would that include replications?

 9         A.   It includes lots of things.

10         Q.   Would it include replications?

11         A.   What do you mean by "replication" in

12    this case?

13         Q.   Do you know what a replication?

14         A.   I do, but I don't know how you're

15    using it.

16         Q.   How are you defining it?

17         A.   I'm not.  Can you help me understand

18    what you are asking and I will do my best.

19         Q.   Well, let me ask you this:  Under this

20    description here two servers could contain the

21    same datasets; right?

22         A.   I don't see where this says anything
```

Page 759

1   of that variety one way or the other in this

2   language.

3          Q.   All right.  Well, we have limited

4   time, so let's move ahead to --

5          A.   I'm sorry.  I'm sincere.  I would like

6   to answer.

7          Q.   Well, I'm sincere that I have limited

8   time.  So let's move ahead to the Bates number

9   ending in 813.

10         A.   This?

11         Q.   Yes.  Do you see that this is a

12  Declaration and Power of Attorney for Patent

13  Application?

14         A.   I do.

15         Q.   And if you look at the next page, it

16  was signed by you; right?

17         A.   Yes.

18         Q.   On July 7, 1998; right?

19         A.   Yes.

20         Q.   In this declaration looking at the

21  page that ends with 814, at the top of that it

22  says:  "I declare that all statements made herein

Page 760

1    of my own knowledge are true and that all

2    statements made on information and belief are

3    believed to be true."  Do you see that, sir?

4          A.   I do.

5          Q.   So by signing this you declared that

6    all statements made in this application were true;

7    correct?

8          A.   They were believed to be true, yes, as

9    it states.

10          Q.   And at this point in July -- excuse

11   me.  At this point on July 7, 1998, you believed

12   that Mr. Roizen was a co-inventor for this

13   application; correct?

14          A.   I did.

15          Q.   And Mr. Roizen too believed that he

16   was a co-inventor; right?

17          A.   I don't know what Mr. Roizen thought

18   one way or the other.

19          Q.   Well, can you turn the page to the

20   next page that ends in 815.

21          A.   Yes.

22          Q.   Do you see that this is another

Page 765

1          Q.    Then it lists patent owner and

2     co-inventor, Mr. John Overton; right?

3          A.    Yes.

4          Q.    Then it identifies representatives of

5     patent owner Ms. Khue Hoang and Mr. Naveed Hasan;

6     right?

7          A.    Yes.

8          Q.    Do you recall participating in a

9     meeting on July 21, 2022, with these patent

10    examiners?

11         A.    Yes, I generally recall it.

12         Q.    Did you provide background about the

13    invention at that meeting?

14         A.    I'm sure I did.  It's listed there.  I

15    don't know what I said, but I'm sure I did.

16         Q.    Were these the only participants in

17    that meeting?

18         A.    To my knowledge, yes.

19         Q.    No one from Amazon participated in

20    this meeting; right?

21         A.    Not to my knowledge.

22         Q.    Amazon wouldn't be allowed to

Page 766

 1   participate in this meeting; right?

 2          A.   I don't know what the rules are.

 3          Q.   Did you mention Amazon at this

 4   meeting?

 5          A.   I don't know.

 6          Q.   This was less than a year ago and you

 7   can't recall whether you mentioned Amazon during

 8   this meeting?

 9          A.   I get hundreds of emails a day.  It's

10   very hard for me to remember stuff like that.

11          Q.   This isn't an email; right, sir?

12          A.   It's even more challenging to remember

13   what one said verbally.

14          Q.   This was an important meeting; right?

15          A.   Uh-huh.

16          Q.   Is that a "Yes"?

17          A.   Yes, yes.

18          Q.   Amazon had filed these ex parte

19   reexaminations against the '170 and '640 Patents;

20   right?

21          A.   Yes.

22          Q.   And the claims in those patents were

Page 767

1    at risk of being canceled; right?

2           A.    I think so, yes.

3           Q.    There's an interview agenda on this

4    page.  Do you see that?  And it says:  "Invention

5    Background, John Overton"; right?

6           A.    Yes, I see, yes.

7           Q.    Then it says:  "Certain Claim

8    Constructions"; right?

9           A.    Yes.

10          Q.    And then below that there's a heading

11   3 that says:  "Distinctions among asserted

12   references and reexamined claims."  Do you see

13   that?

14          A.    I do.

15          Q.    Below that is a list of distinctions

16   between the prior art and the claims of the '640

17   and '170 Patents; right?

18          A.    It would appear so, yes.

19          Q.    Who provided that list of

20   distinctions?

21          A.    I don't know.

22          Q.    Was it you?

Page 768

1          A.   I don't know.

2          Q.   Was it Kove's lawyers?

3          A.   I don't know.

4          Q.   Does this agenda reference any

5     distinction between hierarchical and

6     non-hierarchical systems?

7          A.   Just a moment.  I'll read it.  I do

8     not see that it does.

9          Q.   Does it say anywhere in these

10    distinctions that Oracle is hierarchical?

11         A.   I don't see that it does.

12         Q.   Does it say anywhere in these

13    distinctions that the claims at issue require

14    non-hierarchical architecture?

15         A.   I didn't understand the question.

16    Could you say it again?

17         Q.   Does it say anywhere here in these

18    distinctions that the claims require

19    non-hierarchical architecture?

20         A.   I don't see it saying anything about

21    the claims.  Maybe I'm being dumb here, but I

22    don't see anything about claims on this.

Page 769

 1          Q.   It says -- if you see letter A under

 2     "Distinctions"?

 3          A.   Yes.

 4          Q.   And do you see a reference -- well, do

 5     you see number 1 under that?

 6          A.   Yes.

 7          Q.   Do you see a reference to the '640,

 8     Claim 1?

 9          A.   I don't -- ah, I do at the end.  Yes,

10     I see what you're saying now, yes.

11          Q.   Below that -- well, strike that.

12               It says in that paragraph labeled

13     A(1):  "Separating data from location information

14     as required in all reexamined claims of the '640

15     and '170 Patents."  Do you see that?

16          A.   I do.

17          Q.   Separating data from its location is

18     the whole point of a location server; right?

19               MR. CARDENAS-NAVIA:  Objection to

20     form, vague.

21               THE WITNESS:  "The whole point" is a

22     strong claim.  It's certainly a feature,

Page 770

1    separating location data from data.

2    BY MR. SIGLER:

3         Q.   The location server contains

4    information about where to find the stored data;

5    right?

6              MR. CARDENAS-NAVIA:  Objection to

7    form, vague.

8              THE WITNESS:  In which context?  The

9    '640, '170 disclosure?  Is that what you're

10   referring to?

11   BY MR. SIGLER:

12        Q.   In the '640 and '170 Patents, sir, the

13   location server contains information about where

14   to find the stored data; right?

15        A.   And you're referring to the disclosure

16   and not to the claims, or are you referring to the

17   claims?

18        Q.   I'm referring to the claims.

19        A.   Okay.  I'm not comfortable talking

20   about claims because I'm not a lawyer.  I'm happy

21   to discuss the technology.

22        Q.   Did you talk about the claims at all

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
                              Highly Confidential

                                                                    Page 771

 1    with these examiners at the Patent Office in this

 2    interview?

 3          A.    I think it would be very unlikely.

 4          Q.    You can't recall one way or the other

 5    whether you did?

 6          A.    I don't recall this meeting in the way

 7    I would like to right now.  I just don't

 8    unfortunately.

 9          Q.    And the meeting was less than a year

10    ago; right?

11          A.    Yes.

12          Q.    And the claims of your patents that

13    you're asserting in this case were in danger of

14    being canceled; right?

15          A.    Yes.

16          Q.    And you're asking for millions of

17    dollars in damages in this case from Amazon;

18    right?

19          A.    I don't know what we're asking for.

20    That's a damages claim and I don't know how that

21    works either.

22          Q.    You've solicited investment from

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
                                    Highly Confidential

                                                                    Page 772

1    investors based on this litigation against Amazon;

2    right?

3          A.    Yes.

4          Q.    Did you discuss any of the claims in

5    the '640 Patent with the examiners in this

6    interview?

7          A.    I'm sure that they were discussed.  I

8    think it's very unlikely I would have discussed

9    anything.

10         Q.    Did you discuss any of the claims of

11   the '170 Patent with the examiner in this

12   interview?

13         A.    I think it would be very unlikely that

14   I did.  I think I just talked about the invention

15   background of the technology.  That's it.

16         Q.    And, again, Amazon wasn't in

17   attendance at this meeting; right?

18         A.    That is correct.

19         Q.    So Amazon has no way of knowing what

20   you discussed with the examiner in this meeting

21   other than asking you questions about it; right?

22         A.    I don't know how that works.

Page 773

1                    (Deposition Exhibit 91 was marked

2                      for identification.)

3    BY MR. SIGLER:

4          Q.   Let's take a look at another document

5    about an interview.  I'm passing you Exhibit 91.

6    (Document tendered to the witness.)

7                    Do you have Exhibit 91 in front of

8    you, sir?

9          A.   I do.

10         Q.   And on the front cover do you see it

11   references the '170 Patent?

12         A.   Under the first named inventor?

13         Q.   Yes.

14         A.   Yes.

15         Q.   Can you go to the third page of this

16   document, please.  The Bates number ends in 295.

17         A.   Yes, I'm there.

18         Q.   This is entitled "Ex Parte

19   Reexamination Interview Summary."

20         A.   Yes.

21         Q.   Do you see that?

22         A.   Yes.

Page 774

1          Q.   And it identifies participants in this

2    interview; right?

3          A.   Yes.

4          Q.   And those participants are Luke

5    Wassum; correct?

6          A.   Yes.

7          Q.   Michael Fueling; correct?

8          A.   Yes.

9          Q.   And Peng Ke; right?

10         A.   Yes.

11         Q.   Those are all patent examiners; right?

12         A.   I suspect so, yes.

13         Q.   And it identifies you; correct?

14         A.   Yes.

15         Q.   And identifies Attorneys Khue Huang

16   and Naveed Hasan; right?

17         A.   Yes.

18         Q.   Those are attorneys representing Kove

19   in this case; right?

20         A.   Yes.

21         Q.   It says the date of the interview was

22   July 21, 2022; right?

5/17/2023        Kove IO, Inc. v. Amazon Web Services, Inc.        John Overton, Ph.D., Vol II
Highly Confidential

Page 775

1        A.   Yes, I see that.

2        Q.   And it says it was conducted by video

3    conference; right?

4        A.   Yes.

5        Q.   And then two sections below that it

6    says:  "Agreement with respect to the claims."  Do

7    you see that?

8        A.   Yes.

9        Q.   And it says:  "Agreement with respect

10   to the claims was not reached"; correct?

11       A.   Yes, I see that.

12       Q.   A little bit below that it has an

13   identification of the prior art discussed; right?

14       A.   Yes.

15       Q.   And the prior art is identified as

16   Oracle; right?

17       A.   That is correct.

18       Q.   So the Oracle prior art was discussed

19   during this interview; right?

20       A.   Yes, that's what it says.

21       Q.   No one from Amazon was permitted to

22   attend; right?

Page 776

1          A.   I don't know how that works.

2          Q.   The examiners did not agree with Kove

3    about the claims; right?

4               MR. CARDENAS-NAVIA:  Objection to

5    form, vague.

6               THE WITNESS:  I see that it says

7    "Agreement with respect to the claims was not

8    reached," I see that.

9    BY MR. SIGLER:

10         Q.   Can you turn to the next page, please,

11   that ends in 296.

12         A.   I am there.

13         Q.   In the bottom paragraph there, do you

14   see there's a reference to the Oracle Names

15   Administration Guide?

16         A.   Give me just a moment.  Yes.

17         Q.   And that was the prior art discussed

18   with the examiner during this interview; right?

19         A.   It may have been, yes.

20         Q.   Are you familiar with that Oracle

21   Names Administration Guide?

22         A.   Yes, I'm familiar with it.

Page 777

1          Q.    How are you familiar with it?

2          A.    I've looked at it before.

3          Q.    Did you look at it before this

4     reexamination?

5          A.    As I recall, yes.

6          Q.    When?

7          A.    I don't remember when.

8          Q.    Was it before or after you applied for

9     the '640 Patent?

10          A.    You mean back to the origin date of

11     this, of the patent?  I'm not sure what you mean

12     by "before."

13          Q.    Did you review the Oracle Names

14     Administration Guide before you applied for the

15     '640 Patent?

16          A.    So prior to September 14, 1999?  Is

17     that what you are referring to?

18          Q.    Sure.  Did you review the Oracle Names

19     Administration Guide before September 14, 1999?

20          A.    I don't know.

21          Q.    You don't recall when you reviewed it?

22          A.    No, I reviewed it before the patent

Page 778

1    examination, before this meeting, as I said.

2          Q.   Before Amazon filed this reexamination

3    proceeding, had you ever seen the Oracle Names

4    Administration Guide?

5          A.   I don't know.  I recall years ago

6    looking at Oracle related products, years and

7    years ago, but I don't know if I reviewed that or

8    not specifically.

9          Q.   When did you look at Oracle products?

10         A.   In which context, like timeframes and

11   so forth?  Back to 1999, 2000?  What timeframe are

12   you looking for?

13         Q.   I'm just asking you.  You said you

14   looked at Oracle products at a certain point.

15   When is that?

16         A.   I looked sometime during the period of

17   the submissions of the initial patents, I looked

18   at a bunch of relational database information.  I

19   remember specifically that I looked at Posgress

20   and I think I looked at Oracle, but I don't

21   remember that specifically.

22                   Prior to this meeting, I did look

5/17/2023        Kove IO, Inc. v. Amazon Web Services, Inc.        John Overton, Ph.D., Vol II
Highly Confidential

Page 779

1     at the documents that are referred to in here.

2          Q.   And did you submit any Oracle

3     publications to the Patent Office when you applied

4     for the '640 Patent?

5          A.   I don't know.

6          Q.   Are any Oracle publications identified

7     as references cited on the '640 Patent?

8          A.   I don't know.  There's a big long list

9     of references.  Some of them could be Oracle.  I

10    don't know.  I know I would have submitted

11    something if it seemed like it applied even

12    remotely.

13         Q.   Look at the other publications listed

14    on the '640 Patent, please.

15         A.   They're just a bunch of names.

16         Q.   Do you see any Oracle guides listed

17    there?

18         A.   No.

19         Q.   Look at the other publications on the

20    '978 Patent, please.

21         A.   Again, just a bunch of names.

22         Q.   Do you see any Oracle guides

Page 780

1    identified there?

2          A.   There's this Other Publications.  Hold

3    on a second.  I think I need to look at the other

4    one.  Just a second.  I'm sorry, I have to look at

5    the other publications on both of those.  I did

6    not review those.

7                So I don't see any Oracle listed

8    references on the '640 in the Other Publications.

9    Let me look at the other one.

10               I see in both cases we're citing

11   IEEE and IBM related documents.  It's possible

12   that I looked at Oracle related stuff after this

13   or not at all.  As I said, I'm not totally

14   confident.  I think I did.  But they're not listed

15   on either of the '640 or the '978.

16         Q.   Okay.  So no Oracle publications are

17   identified as references cited on the '640, '170,

18   or '978 Patents; right?

19         A.   I --

20               MR. CARDENAS-NAVIA:  Objection to

21   form, calls for speculation.

22               THE WITNESS:  I also did not review

Page 781

 1   the '170.  Would you like me to look at that also?

 2   BY MR. SIGLER:

 3        Q.   Yes, please.

 4        A.   Okay.  I did not see an Oracle

 5   reference listed on the '170 Patent.

 6        Q.   All right.  So fair to say you didn't

 7   submit any Oracle guides to the Patent Office when

 8   you applied for the '640, '978 and '170 Patents?

 9        A.   I only know what I just read.  I don't

10   know about those kinds of details.  But on these

11   three patents they are not listed.

12        Q.   And if the examiner considered a

13   reference, it would be listed on the patent;

14   right?

15        A.   I don't know how all that process

16   works.  I can only review what I've reviewed.

17        Q.   All right.  Let's mark the next

18   exhibit.  It's Exhibit 92.

19                  (Deposition Exhibit 92 was marked

20                   for identification.)

21   BY MR. SIGLER:

22        Q.   Do you have Exhibit 92 in front of

Page 782

1    you?  (Document tendered to the witness.)

2           A.    I do.

3           Q.    Turn to the third page, please.

4           A.    This is the page ending in 7231?

5           Q.    Yes.  Do you see that this is an

6    Ex Parte Reexamination Interview Summary?

7           A.    Yes.

8           Q.    It says the patent under examination

9    is the '640 Patent; right?

10          A.    Yes.

11          Q.    And this identifies the same people

12   attending the meeting as the meeting we just

13   looked at for the '170 and '978 Patents; right?

14          A.    I don't know that.  I'll confirm --

15          Q.    Well, you attended this meeting;

16   right?

17          A.    Okay.  Yes.

18          Q.    And Kove's attorneys attended this

19   meeting; right?

20          A.    Yes.

21          Q.    And it was with three patent

22   examiners; right?

Page 783

1        A.   I believe so.  I don't know the

2   distinction between 1 and 2.

3        Q.   The date of the interview is July 21,

4   2022; right?

5        A.   Yes, I see that.

6        Q.   Was this the same interview as the one

7   we just looked at for the '170 Patent?

8        A.   Possibly.  I don't know.

9        Q.   It says this was a telephonic

10  interview; right?

11       A.   Yes.

12       Q.   And no one from Amazon attended this

13  interview; correct?

14       A.   Not to my knowledge.

15       Q.   Well, no one from Amazon is identified

16  as a participant; right?

17       A.   Agreed.

18       Q.   Do you know who Michael Goodrich is?

19       A.   Yes.

20       Q.   Who is he?

21       A.   I believe he is the expert that

22  Reichman Jorgensen has hired.

Page 784

1          Q.    Has he done work on behalf of Kove?

2                MR. CARDENAS-NAVIA:  Objection to

3     form, vague.

4                THE WITNESS:  Could you restate the

5     question?

6     BY MR. SIGLER:

7          Q.    Did Mr. Goodrich participate in this

8     interview?

9          A.    Not to my knowledge, not to my

10    knowledge.

11         Q.    All right.  And it says -- there's a

12    sentence almost halfway down the page that says:

13    "Agreement with respect to the claims."  Do you

14    see that?

15         A.    Yes.

16         Q.    It says:  "Agreement with respect to

17    the claims was not reached"; right?

18         A.    I see that.

19         Q.    So the examiners didn't agree with

20    Kove's arguments made during this interview;

21    right?

22         A.    I don't know.  That's a legal thing.

5/17/2023          Kove IO, Inc. v. Amazon Web Services, Inc.     John Overton, Ph.D., Vol II
                             Highly Confidential

                                                             Page 785

1    It says agreements with respect to the claims not

2    reached, I see that.

3           Q.   That's what it says on this document;

4    right?

5           A.   Yes, it says that.

6                   (Deposition Exhibit 93 was marked

7                    for identification.)

8    BY MR. SIGLER:

9           Q.   I'm passing you Exhibit 93.  (Document

10   tendered to the witness.)

11                  Do you have Exhibit 93 in front of

12   you, sir?

13          A.   I do.

14          Q.   Can you go to the third page of the

15   document, please?

16          A.   I do, I see it.

17          Q.   This is also an Ex Parte Reexamination

18   Interview Summary; right?

19          A.   Yes.

20          Q.   And the patent under reexamination is

21   the '978 Patent; right?

22          A.   Yes.

Page 786

1        Q.   There's an identification of who

2   participated in the interview; right?

3        A.   Yes.

4        Q.   Those participants are identified as

5   Joshua Campbell, Adam Basehoar, Alex Kosowski.  Do

6   you see that?

7        A.   I do.

8        Q.   And then it also identifies Naveed

9   Hasan; right?

10       A.   Yes.

11       Q.   And he's one of Kove's attorneys;

12  right?

13       A.   Yes.

14       Q.   And then this also says "See

15  Attached"; right?

16       A.   Yes.

17       Q.   Did you participate in this interview?

18       A.   I don't know.  I don't see my name

19  there.

20       Q.   Do you know who else attended this

21  interview?

22       A.   I don't.

Page 787

1          Q.   It says "Identification of prior art

2     discussed."  Do you see that on this page?

3          A.   Yes, I see it -- "Identification of

4     prior art discussed," is that what you're

5     referring to?

6          Q.   Yeah, and the prior art is identified

7     as Oracle references and McGarvey; right?

8          A.   Yes, I see that.

9               (Deposition Exhibit 94 was marked

10              for identification.)

11     BY MR. SIGLER:

12          Q.   I'm passing you Exhibit 94.  (Document

13     tendered to the witness.)

14               Exhibit 94, have you seen this

15     document before?

16          A.   I don't know if I've seen this before.

17     I've seen that picture before on 308.

18          Q.   Why have you seen that picture before?

19          A.   I don't know.  I just know I have.

20     Maybe it's from one of our patents.

21          Q.   Well, I'll represent to you that this

22     was a powerpoint shown in the reexamination of the

Page 788

1    '978 Patent.

2          A.   Okay.

3          Q.   Do you know who drafted this

4    powerpoint?

5          A.   I don't.

6          Q.   All right.  Well, let's take a look at

7    that page you referred to that ends in 308.

8          A.   Yes.

9          Q.   It says at the top:  "Oracle teaches a

10   hierarchical architecture, not a cluster topology,

11   which enables redirect messages."  Do you see

12   that?

13         A.   I see that.

14         Q.   And below that on the left side of the

15   page it depicts an architecture taught by Oracle;

16   right?

17         A.   I don't know.  I can't really read

18   what this says at the bottom.

19         Q.   Well, do you see here it says "Oracle

20   Names"?

21         A.   Yeah, I can read that up there.  I

22   can't read the bottom.

Page 826

```
 1   STATE OF ILLINOIS )

 2   COUNTY OF C O O K )

 3        I, Donna M. Kazaitis, CRR, RPR, IL-CSR

 4   No. 084-003145, do hereby certify:

 5        That the foregoing deposition of JOHN

 6   OVERTON, PH.D. was taken before me at the time and

 7   place therein set forth, at which time the witness

 8   was put under oath by me;

 9        That the testimony of the witness and all

10   objections made at the time of the examination

11   were recorded stenographically by me, were

12   thereafter transcribed under my direction and

13   supervision and that the foregoing is a true

14   record of same.

15        I further certify that I am neither counsel

16   for nor related to any party to said action, nor

17   in any way interested in the outcome thereof.

18        IN WITNESS WHEREOF, I have subscribed my name

19   this 30th day of May, 2023.

20

21   DONNA M. KAZAITIS, IL-CSR, RPR, CRR

22   IL-CSR License No. 084-003145
```