# Exhibit 14

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DISTRICT DIVISION

_____

KOVE IO, INC.,                    )
      Plaintiff,          )
                    )      Civil Action No.
  -against-                     )      1:18-cv-08175
AMAZON WEB SERVICES, INC., )
      Defendant.          )
_____)

VOLUME I

*** HIGHLY CONFIDENTIAL ***

*** ATTORNEYS' EYES ONLY ***

*** CONTAINS SOURCE CODE ***

VIDEO-RECORDED DEPOSITION OF

MICHAEL GOODRICH PH.D.

Reichman Jorgensen LLP

400 Madison Avenue

New York, New York

09/09/2023

9:08 a.m. (EDT)

REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

1                                09/09/2023

2              9:08 a.m. (EDT)

3

4

5    VIDEO-RECORDED DEPOSITION OF MICHAEL GOODRICH

6    Ph.D., held at Reichman Jorgensen LLP, 400

7    Madison Avenue, New York, New York, before Amanda

8    Gorrono, Certified Live Note Reporter, and Notary

9    Public of the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1    A P P E A R A N C E S

 2    ON BEHALF OF PLAINTIFF KOVE IO, INC.:

 3       Jaime F. Cardenas-Navia, Esquire

 4       Reichman Jorgensen Lehman & Feldberg LLP

 5       400 Madison Avenue

 6       Suite 14D

 7       New York, NY 10017

 8       PHONE:  (646) 921-1474

 9       E-MAIL: Jcardenas-navia@reichmanjorgensen.com

10                  - AND -

11       Philip Eklem, Esquire

12       Reichman Jorgensen Lehman & Feldberg

13       1909 K Street, NW

14       Suite 800

15       Washington, D.C., 20006

16       PHONE:  (202) 894-7451

17       E-MAIL: Peklem@reichmanjorgensen.com

18                  - AND -

19       Adam Adler, Esquire (Via Zoom)

         Reichman Jorgensen Lehman & Feldberg LLP

20       1909 K Street, NW

         Suite 800

21       Washington, D.C. 20006

         PHONE:  (650) 623-1480

22       E-MAIL: Aadler@reichmanjorgensen.com
```

Page 4

```
 1    A P P E A R A N C E S (CONT'D)
      ON BEHALF OF DEFENDANT AMAZON WEB SERVICES, INC.
 2    AND THE WITNESS:
 3      Bill Sigler, Esquire
        Fisch Sigler LLP
 4      5301 Wisconsin Avenue NW
        Fourth Floor
 5      Washington, D.C. 20015
        PHONE:  (202) 362-3620
 6      E-MAIL: Bill.Sigler@FischLLP.com
 7              - AND -
 8      Andrew Ramos, Esquire
        Fisch Sigler LLP
 9      5301 Wisconsin Avenue NW
        Washington, DC 20015
10      PHONE:  +1.202.362.3522
        E-MAIL: Andrew.Ramos@FischLLP.com
11              - AND -
        Jeffrey Saltman, Esquire (Via Zoom)
12      Fisch Sigler LLP
        5301 Wisconsin Avenue NW
13      Suite 400
        Washington, DC 20015
14      PHONE: +1.202.362.3640
15      E-MAIL: Jeffrey.Saltman@FischLLP.com
16
17    ALSO PRESENT:
18
19    Robert Rudis, Videographer - Digital Evidence
20    Group
21    Lance Rieck, Videographer Intern - Digital
22    Evidence Group
```

Page 5

1                          I N D E X

2     WITNESS                  EXAMINATION BY              PAGE

3     MICHAEL GOODRICH      MR. SIGLER                 10, 403

4     Ph.D.                    MR. CARDENAS-NAVIA          398

5

6                          E X H I B I T S

7     EXHIBIT        DESCRIPTION                         PAGE

8     Exhibit 1      Corrected Opening Expert Report of

9                    Michael Goodrich Regarding U.S.

10                   Patent Nos. 7,103,640; 7,233,978;

11                   and 7,814,170......................... 12

12    Exhibit 2      Article titled "Litigation Boutique

13                   Spins Off From McKool Smith

14                   Promising Innovative Model........... 16

15    Exhibit 3      US Patent 7,257,711.................. 82

16    Exhibit 4      Declaration of Dr. Michael Goodrich... 102

17    Exhibit 5      Technical Expert Consulting Summary... 117

18    Exhibit 6      "Cache-Oblivious Dictionaries and

19                   Multimaps with Negligible Failure

20                   Probability"......................... 129

21    Exhibit 7      US Patent 7,103,640.................. 174

22    Exhibit 8      US Patent 7,233,978.................. 174

Page 7

1                    R E Q U E S T S

2    DESCRIPTION                                       PAGE

3    Instruction not to answer............................  23

4    Review billing records..............................  101

5    Mark the transcript as attorneys' eyes only source

6    code................................................  247

7    Ending attorneys' eyes source code portion of

8    transcript..........................................  281

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 8

1             THE VIDEOGRAPHER:  Good morning.  We

2      are going on the record at 9:08 a.m. on

3      September 9, 2023.

4             Please note that the microphones are

5      sensitive and may pick up whispering and

6      private conversations.

7             Please mute your mobile phones at

8      this time.

9             Audio and video recording will

10     continue to take place unless all parties

11     agree to go off the record.

12            This is Media Unit 1 of the

13     video-recorded deposition of Michael Goodrich

14     taken by counsel for the defendant in the

15     matter of Kove IO, Inc. versus Amazon Web

16     Services, Inc. filed in the United States

17     District Court, Northern District of

18     Illinois, Eastern District Division.  Civil

19     action No. 1:18-cv-08175.

20            The location of this deposition is

21     Reichman Jorgensen LLP, 400 Madison Avenue

22     New York, New York.

1          My name is Robert Rudis.  I am the

2     videographer.  The court reporter is Amanda

3     Gorrono.  And we represent the firm Digital

4     Evidence Group.

5          I'm not related to any party in this

6     action, nor am I financially responsible for

7     the outcome.

8          If there are any objections to

9     proceeding, please state them at the time of

10    your appearance.

11         Counsel, all present, including

12    remotely via Zoom, will now please state your

13    appearances and affiliations, beginning with

14    the noticing attorney.

15         MR. SIGLER:  Good morning.  I'm Bill

16    Sigler of Fisch Sigler LLP.  And I'm joined

17    today by my colleague Andrew Ramos, and we

18    are here representing the defendant Amazon.

19         MR. CARDENAS-NAVIA:  Good morning.

20    I'm Jaime Cardenas-Navia of Reichman

21    Jorgensen Lehman Feldberg.  With me is my

22    colleague Phil Eklem on behalf of plaintiff

1      of Kove IO, Inc. and the witness.

2              THE VIDEOGRAPHER:  Would the person

3      on Zoom please announce yourself.

4              MR. ADLER:  This is Adam Adler.  I'm

5      also representing Kove and the witness.

6              THE VIDEOGRAPHER:  Thank you.

7              Would the court reporter please

8      swear in the witness.

9              And then counsel may proceed.

10     MICHAEL GOODRICH, Ph.D., called as a witness,

11     having been first duly sworn by a Notary Public

12     of the State of New York, was examined and

13     testified as follows:

14             THE WITNESS:  I do.

15             THE COURT REPORTER:  Please state

16     your full name and address for the record.

17             THE WITNESS:  Michael T. Goodrich.

18     11 Twain Street, Irvine, California.

19     EXAMINATION

20     BY MR. SIGLER:

21         Q.   Good morning, Dr. Goodrich.

22         A.   Good morning.

Page 12

1    City, right?

2          A.    That's right.

3          Q.    All right.  You understand this case

4    is about three patents?

5          A.    That's right.

6          Q.    Okay with you if I call them the

7    '640, '170, and '978 patents today?

8          A.    Yes, that's how I refer to them in

9    my report, for example.

10         Q.    When did you first learn of the

11   '640, '170 and '978 patents?

12         A.    May I have a copy of my report,

13   please?

14         Q.    Sure.  We can go ahead and mark that

15   as Exhibit 1.

16               (Whereupon, Exhibit 1, Corrected

17         Opening Expert Report of Michael Goodrich

18         Regarding U.S. Patent Nos. 7,103,640;

19         7,233,978; and 7,814,170 was marked for

20         identification.)

21   BY MR. SIGLER:

22         Q.    All right.  Dr. Goodrich, I'm

Page 13

1    handing you what I've marked as Exhibit 1, which

2    you can take a look at, but I'll represent for

3    the record that it's a copy of your July 3rd,

4    2023 report and the appendices and exhibits.

5              MR. CARDENAS-NAVIA:  I'll just note

6         for the record that it's the -- dated

7         July 6th, corrected expert report of

8         Dr. Goodrich.

9              MR. SIGLER:  Thank you, Counsel.

10        A.    Yeah, so I -- I learned of the three

11   patents right around the time that I was retained

12   for this engagement, which I believe was February

13   of 2019.

14   BY MR. SIGLER:

15        Q.    All right.  So you were retained by

16   Kove around February 2019 for work on this case;

17   is that correct?

18        A.    That is my recollection.

19        Q.    Okay.  And before you were retained

20   by Kove, you hadn't heard of the '640, '170, or

21   '978 patents, right?

22        A.    I believe that is correct.

Page 14

1          Q.    Okay.  And when was the first time

2     you heard of Kove?

3          A.    I think it was right around that

4     same time.

5          Q.    So the first time you heard of Kove,

6     the plaintiff in this case, was around

7     February 2019 when you were retained?

8          A.    Yes.

9          Q.    Are you familiar with a company

10    called OverX?

11         A.    No, not before this engagement.

12         Q.    Okay.  Are you familiar with a

13    company called Econnectix?

14         A.    Not before this engagement.

15         Q.    All right.  So the first time you

16    had heard of OverX and Econnectix is when you

17    were --

18               MR. SIGLER:  Strike that.

19    BY MR. SIGLER:

20         Q.    Before you were retained in

21    February 2019 to work on this case, you haven't

22    heard of OverX or Econnectix; is this right?

Page 15

1          A.     That is my recollection, yes.

2          Q.     Who retained you in February 2019?

3          A.     I don't recall which attorney

4     retained me from the law firm.

5          Q.     And the law firm you're referring to

6     is Reichman Jorgensen, right?

7          A.     That's right.

8          Q.     Had you worked with the attorneys

9     representing Kove in this case as an expert in

10    cases before this case?

11         A.     I don't recall having done that

12    before this case, right.

13         Q.     Okay.  You've worked as an expert

14    witness for the firm McKool Smith over the years,

15    right?

16         A.     I have.

17         Q.     And you've done expert witness work

18    for that firm in several cases, right?

19         A.     Yes, that's correct.

20         Q.     And do you understand that the

21    Reichman Jorgensen firm was formed by

22    attorneys --

Page 16

1          MR. SIGLER:  Well, strike that.

2     BY MR. SIGLER:

3          Q.    Do you understand that McKool Smith

4     is the former law firm of some of Kove's lawyers

5     in this case?

6          A.    I think I may have heard that.  I'm

7     not recalling the details, though, as I sit here

8     today.

9          Q.    Okay.  All right.  I'm going to pass

10    you Exhibit 2.

11         A.    Thank you.

12              (Whereupon, Exhibit 2, Article

13       titled "Litigation Boutique Spins Off From

14       McKool Smith Promising Innovative Model", was

15       marked for identification.)

16    BY MR. SIGLER:

17         Q.    Do you have Exhibit 2 in front of

18    you, sir?

19         A.    I do.

20         Q.    All right.  And you see that this is

21    an article titled "Litigation Boutique Spins Off

22    From McKool Smith Promising Innovative Model"?

Page 206

1    the S3 product, if that is your question.

2              If instead you're asking about a

3    technical success to be able to store trillions

4    of objects, then in my opinion, it was a

5    technical success to have that ability to store

6    trillions of objects.

7    BY MR. SIGLER:

8         Q.   Okay.  So S3's technical success of

9    being able to store over a trillion of object --

10             MR. SIGLER:  Strike that.

11   BY MR. SIGLER:

12        Q.   So S3's ability to store over a

13   trillion objects is a technical success, in your

14   view?

15        A.   Yeah, I would say that is true, yes.

16        Q.   Okay.  Below that -- let's go

17   Paragraph 70, please.

18        A.   I am there.

19        Q.   All right.  And the first sentence

20   says, "Kove filed its Complaint for patent

21   infringement on December 12, 2008 [sic]."

22             Do you see that, sir?

Page 207

1          A.     I think it says 2018.

2          Q.     Let me try again.

3                 In Paragraph 70, in the first

4     sentence, your report says "Kove filed its

5     Complaint for patent infringement on December 12,

6     2018," correct?

7          A.     Yes, that is correct.

8          Q.     All right.  And December 12, 2018 is

9     over 12 years after Amazon launched S3, right?

10         A.     Yes, that is correct.

11         Q.     All right.  And so Kove waited

12    12 years after Amazon started selling S3 to sue

13    Amazon, right?

14         A.     I can't speak to whether or not they

15    were waiting for this or what they did.  I am

16    just commenting on and opining on the facts, as I

17    see them.

18                And the facts are that Kove filed

19    its complaint on December 12, 2018.

20         Q.     Okay.  And you go on to say in the

21    next sentence that it's your understanding that

22    Kove may claim damages for infringement starting

Page 208

1    from December 12, 2012, through the expiration of

2    the patent in September 2020, right?

3          A.    That's right.

4          Q.    All right.  And are you aware of how

5    much in damages Kove is seeking in this case?

6          A.    I don't know.  I'm not aware of

7    that.

8          Q.    Would it surprise you to learn that

9    they are seekin ███████████████████ in

10   damages in this case?

11         A.    I'm not an economist.  I don't have

12   a reference point to be surprised or not

13   surprised about economics.

14         Q.    All right.  You would agree, though,

15   that all three of the '640, '170, and '978

16   patents had expired by September 25, 2020, right?

17         A.    Yes, they had all expired by then.

18         Q.    Okay.  Let's go back to the body of

19   your report and talk about DynamoDB now.  And I'm

20   going to take you to Paragraph 61, which is on

21   Page 21.

22         A.    I'm there.

Page 211

1          A.    Without the problems that I

2    identified here.  Of using the throughput

3    capacity to then scale up or down, without

4    downtime or performance degradation.

5          Q.    Okay.  And sitting here today, do

6    you know who the biggest external to Amazon

7    customer of DDB is?

8               MR. CARDENAS-NAVIA:  Objection to

9       form.  Vague.

10         A.    I -- I don't recall that, just

11   sitting here today, no.

12   BY MR. SIGLER:

13         Q.    Okay.  Let's go to Exhibit E,

14   please.

15         A.    I'm there.

16         Q.    Let's go to Page 42, please.

17         A.    I'm there.

18         Q.    Please take a look at Paragraph 67.

19   In the first two sentences of Paragraph 67, your

20   report states that "DynamoDB launched publicly on

21   January 18, 2012.  It is a highly complex system

22   and has changed in a multitude of ways from its

Page 212

1    launch through today."

2              Do you see that?

3         A.    Yes.

4         Q.    All right.  So Amazon launched

5    DynamoDB publicly on January 18, 2012, right?

6         A.    That is right.

7         Q.    And it was available to the public

8    then, right?

9         A.    I agree.

10        Q.    And DynamoDB is a highly complex

11   system, right?

12        A.    I agree with that too, yes.

13        Q.    And it's changed in a multitude of

14   ways from its launch to present, right?

15        A.    I agree.

16        Q.    Do you know who at Amazon created

17   DynamoDB?

18              MR. CARDENAS-NAVIA:  Objection to

19      form.  Vague.

20        A.    I'm not recalling a name, as I sit

21   here today, or names.

22   BY MR. SIGLER:

Page 213

1          Q.    Do you know how many people at

2    Amazon worked at DynamoDB before its launch?

3          A.    I'm not recalling that either, as I

4    sit here today.

5                Is there a place in my report where

6    you feel I've addressed that?

7          Q.    No.

8                Do you recall how much Amazon spent

9    to create DynamoDB?

10         A.    I don't recall having seen that.

11         Q.    Do you recall having seen when

12   Amazon personnel began to work on DynamoDB?

13         A.    I don't recall, as I sit here today.

14         Q.    All right.  And we talked about

15   previously that Kove filed its complaint in this

16   case on December 12, 2018, right?

17         A.    That's right.

18         Q.    And that's over six years after

19   Amazon launched DynamoDB, right?

20         A.    Yes, that's correct.

21         Q.    Okay.  Do you know who owns Kove?

22         A.    What do you mean by "owns Kove"?

Page 214

1          Q.     Do you know who the shareholders of

2     Kove are?

3          A.     I -- I know that John Overton is

4     one.  I think that was mentioned in his

5     deposition transcript.  Other than that, I'm not

6     recalling any other names.

7          Q.     Okay.  You don't have a financial

8     stake in Kove, right?

9          A.     That is correct.

10          Q.     And you don't have a financial stake

11     in the outcome of this case, right?

12          A.     That is also correct.

13          Q.     All right.  Does Kove have a final

14     interest in the outcome of this case?

15          A.     I'm not an economist.  I don't feel

16     comfortable opining on economic issues.  It's

17     very likely that they do, but I can't speak

18     beyond the knowledge of a layperson for that.

19          Q.     Do you know how Kove is financing

20     this litigation?

21          A.     I do not know that.

22          Q.     Are you familiar with the concept of

Page 267

1          A.    So at a high level, that's certainly

2    accurate.  But then if you get down into the

3    details, there's a lot more going on there, which

4    it's kind of mixing my two reports, one on

5    infringement and the other on invalidity.  But

6    there's a lot of things that are not taught in

7    this paper that the patents-in-suit disclose.

8                And with respect to then S3, in my

9    opinion, S3 i ██████████████████████████████

10   ████████  for location servers in a way that

11   infringes the patent -- the asserted claims.

12   BY MR. SIGLER:

13          Q.    Okay.  Let's go to Paragraph 68 in

14   Appendix A, which is on Page 17.

15          A.    I'm there.

16          Q.    All right.  And in Paragraph 68, it

17   states, "Amazon S3 source code indicated that the

18   ██████████████████████████████████████████████

19   ████████████████████████████████  to store

20   and retrieve data location information."

21                Do you see that, sir?

22          A.    Yes.

Page 268

1      Q.     So th ███████████████████████

2     ████████████████, right?

3      A.     Which ones to contact is determined

4    based on the lookups usin ████████████

5    ████████.

6      Q.     And that determination based on the

7    ████████████████████████████████,

8    right?

9      A.     As one of the components, yes.

10     Q.     And that determination based on the

11   ████████████████████████████████████,

12   right?

13     A.     Yeah.   And some implementations --

14   █████████████ wasn't always there.   So in the

15   cases when it's not there, then, yes, it's done

16   by ████████████████████████.

17     Q.     And that determination based on the

18   ███████████████████████████████, right?

19     A.     Yes.

20     Q.     All right.   And then you point to --

21   in this portion of your appendix, it looks like

22   you point to 14 different source code files for

Page 269

1    support, right?

2         A.    One, two, three, four (counting to

3    self.)  Yes, that's correct.

4         Q.    All right.  And for each of those

5    files, you describe how you relied on it for your

6    opinions, right?

7         A.    That's right.

8         Q.    All right.  Do you know which of

9    those 14 files supports your opinion that th █████

10   ███████████████████████████████████████████████

11   ██████████████████████████████████?

12        A.    I'm not recalling all of those

13   details.

14              Can I see the 14 files that I cite

15   to?

16        Q.    Yeah.  I've got limited time, so

17   we'll just move on.  It's fine.

18        A.    Okay.

19        Q.    All right.  Let's go to -- given the

20   time -- let's go to Appendix B, please.

21        A.    Okay.

22        Q.    And Appendix B --

Page 275

1    refer to a redirect message?

2          A.    Could I mark this or no?

3    BY MR. SIGLER:

4          Q.    Sure.

5                (Witness marking the document.)

6    BY MR. SIGLER:

7          Q.    Could you just let me know what you

8    identified there?

9          A.    I marked Line 239 as potentially

10   relevant to your question.

11         Q.    And that line references a ███████

12   ██, right?

13         A.    Yes.

14         Q.    Okay.

15         A.    Do you want me to continue reading

16   or not?

17         Q.    No.  Let me ask you -- let me ask

18   you a question about ████████████ before we

19   move forward.

20                So on the first page of Exhibit 14,

21   I'm going to direct you to Line 59.

22         A.    Yes, I am there.

Page 276

1          Q.    And there is a reference to ██████

2    ████████████  right?

3          A.    Yes, I see that.

4          Q.    Okay.  So DynamoD ███████████

5    ████████████████, right?

6          A.    It's an optional field.

7          Q.    Okay.  And then down below that, do

8    you see Line 85?

9          A.    Yes.

10         Q.    And Line 85 refers to █████

11   ████████████████████, right?

12         A.    Yes.

13         Q.    So DynamoDB ████████████████

14   ████████████  right?

15         A.    Can have what they call ██████

16   ██████████.  That is right, which in my opinion,

17   Dr. Grama incorrectly interprets to imply a

18   hierarchical organizational structure for

19   location servers in the DynamoDB system.

20         Q.    All right.  Are parent and child

21   structures generally associated with each other

22   in computer science?

Page 277

1          A.     They can be, yes, depending on the

2     context.

3          Q.     Okay.  Do you know what   ███   is?

4          A.     Yes, I reference it repeatedly in my

5     report.

6          Q.     What's   ███  ?

7          A.     Why don't we go to the section where

8     I discuss that.

9          Q.     You reference it at Paragraph 89, if

10    you want to go there.

11         A.     Yeah.  89 in the main or 89 in

12    exhibit -- Exhibit E, right.

13         Q.     Appendix B?

14         A.     Appendix B.  Right.  "Amazon source

15    code indications that 'location message' or

16    'redirect message' (e.g. ██████ ) sent back to

17    the ████████████ is formatted in conformance

18    with the transfer protocol."

19                And then I have a number of

20    citations to support that, my mapping of ████████

21    to the redirect message.

22         Q.     Okay.  Is the location message ███

Page 278

1    █████?

2         A.    I'm not understanding what you mean

3    by that.

4         Q.    I'm just trying to interpret what

5    you wrote here on Paragraph 89.  You say "(e.g.

6    ████████)."

7              Do you see that?

8         A.    Yes.

9         Q.    Okay.  So in your view, is the

10   redirect message ████████?

11        A.    It can be.  The redirect can be in

12   terms of ██████.

13        Q.    Okay.  And is the location message

14   ██████?

15        A.    Depending on what is sent back, it

16   can be.

17        Q.    Okay.  Could they both be ████████?

18        A.    It depends on what's in it, if it's

19   just a location message coming back or is it a

20   redirect message.  Because in this case, the

21   ████████████████████████████████████████

22   ███████████████████████████████████████.

Page 281

1      part because this part is now just describing at

2      a high level ho ███████████ work.

3                    And then later in Appendix E, I also

4      do my element-by-element analysis which has

5      additional citations.

6                    MR. SIGLER:  Okay.  Why don't we

7           take a break because I might be done with

8           source code so we can demarcate that in the

9           transcript.

10                   MR. CARDENAS-NAVIA:  Sure.

11                   THE VIDEOGRAPHER:  Okay.  Going off

12          the record, 1544.  This ends Media 5.

13                   (Recess taken.)

14                   THE VIDEOGRAPHER:  And we are back

15          on the record at 1555, and this is Media 6.

16                   MR. SIGLER:  I just want to note on

17          the record that this concludes the portion of

18          the transcript that should be marked as

19          attorneys' eyes only source code.

20                   (Whereupon, a request for Ending

21          attorneys' eyes source code portion of

22          transcript, was made.)

Page 282

1    BY MR. SIGLER:

2           Q.    All right.  Dr. Goodrich, do you

3    have an AWS account?

4           A.    I do not currently, no.

5           Q.    Have you ever had one?

6           A.    I did do some research in 2012 where

7    we used S3 as a part of that research.

8           Q.    And so you had an AWS account then?

9           A.    My student did in that case.

10          Q.    Which student?

11          A.    Let's see.  So that would be Olga,

12   or Olga, in Russian, Ohrimenko,

13   O-H-R-I-M-E-N-K-O.

14          Q.    Okay.  Have you ever personally used

15   S3?

16          A.    That I used, no.

17          Q.    Okay.  So you've never used S3

18   Intelligent, right?

19          A.    Correct.

20          Q.    You've never used S3 Standard,

21   right?

22          A.    That's right.

Page 283

1          Q.    And you've never used S3 One Zone,

2    right?

3          A.    Not directly.

4          Q.    And you've never used S3 Glacier,

5    right?

6          A.    That's right, also not directly

7    myself.

8          Q.    What do you mean?

9          A.    Like, I've directed students to do

10   these things, but I've not done so myself

11   directly.

12         Q.    Okay.  So you've never personally

13   used S3 One Zone or S3 Glacier, right?

14         A.    That's right.

15         Q.    Okay.  Have you ever personally used

16   DDB?

17         A.    No.

18         Q.    Okay.  So before issuing your

19   infringement opinions in this case, you had not

20   ever personally used S3 or DDB, right?

21         A.    That's right.

22         Q.    Okay.  Have you ever personally used

Page 284

1    Amazon Lambda?

2         A.    No.

3         Q.    Okay.  And in your work on other

4    litigations, you've performed testing on the

5    accused products in some of those cases, right?

6         A.    That's right.

7         Q.    In how many of those cases have you

8    performed testing?

9         A.    Well, I don't know the exact number,

10   as I sit here today.  Certainly some of them even

11   are ongoing currently.

12        Q.    When is the last time you've

13   performed testing that you've used in

14   infringement opinions in another case?

15        A.    I think I've done so in the last few

16   months, for example.

17        Q.    In which case?

18        A.    I believe it was the -- oh, even

19   more recent.  It was in the case with VideoLabs.

20   I did some testing for that.

21        Q.    Okay.  And that's the -- another

22   case where you were working with Reichman

Page 296

1    this OverX technology.

2         Q.   Okay.  Are you aware that no one has

3    ever paid --

4              MR. SIGLER:  Well, strike that.

5    BY MR. SIGLER:

6         Q.   Are you aware nobody has bought any

7    products that practices the asserted patents?

8              MR. CARDENAS-NAVIA:  Objection to

9       form.

10        A.   I don't recall having addressed that

11   question.

12   BY MR. SIGLER:

13        Q.   You didn't consider that in forming

14   your infringement opinions, right?

15        A.   I don't recall that that would have

16   come up in my analysis.

17        Q.   Okay.  Let's go back to -- actually

18   not back to.  Let's go to Exhibit D, please, sir,

19   of your infringement report.

20        A.   I am there.

21        Q.   Okay.  And in Exhibit D, you analyze

22   whether S3 infringes the '978 patent and '170

Page 297

1    patents, right?

2         A.    That's right.

3         Q.    Okay.  Let's go --

4         A.    Yeah.  The title should have not

5    included the '640.

6         Q.    Okay.  Let's go to Paragraph 3 on

7    Page 1, please.

8         A.    I am there.

9         Q.    And the beginning of Paragraph 3

10   states that S3 is an "object storage service"

11   that is "built to store and retrieve any amount

12   of data from anywhere."

13               Do you see that, sir?

14        A.    Yeah.  That's citing from an Amazon

15   document.

16        Q.    All right.  And so S3 stores data,

17   right?

18        A.    Yes.

19        Q.    And it can store and retrieve large

20   datasets, right?

21        A.    I agree.

22        Q.    And you can store that data anywhere

Page 298

1    in the world, right?

2          A.    Broadly speaking, more or less, yes.

3          Q.    For example, you could be in

4    northern Virginia and store data anywhere that

5    S3 -- excuse me -- that Amazon has S3 servers,

6    right?

7          A.    I believe that is correct.  Yes.

8          Q.    So you can store in Ohio or Sydney

9    or Beijing, right?

10         A.    Yes.  I think those are all possible

11   places you can store S3 data.

12         Q.    Let's go to Paragraph 9, please.  It

13   starts on Page 3 and spans onto Page 4.

14         A.    I am there.

15         Q.    Okay.  At the end of that paragraph,

16   it states that ███████████████████████████

17   ███████████' where "[t]he ████████████████████

18   ██████████████' and '[t]he ████████████████████

19   █████████████████████████████████████."

20               Do you see that, sir?

21         A.    Yes.

22         Q.    All right.  So the ████████████████

Page 299

1      ██████████████████████████████████████,

2      right?

3           A.    It's inclusive of it, yes.  This is

4      citing to an Amazon document that is stating

5      that.

6           Q.    An ███████████ would include

7      location information, right?

8           A.    In this case, yes.

9           Q.    And location information is used to

10     retrieve the object for the user, right?

11          A.    That's right.

12          Q.    And ████████ would also include

13     identifiers, right?

14          A.    Yes.

15          Q.    And identifiers are also used to

16     retrieve the object for the user, right?

17          A.    That's right.

18          Q.    Without the identifier, you can't

19     retrieve an object, right?

20          A.    Depending on what you mean by

21     "retrieve," the user needs to have the identifier

22     to be able to retrieve their data.

Page 300

1          Q.    Okay.  So without the identifier,

2     the user wouldn't be able to retrieve their data,

3     right?

4          A.    I believe that is correct.

5          Q.    Okay.  And okay -- but the

6     identifier isn't the same thing as the location

7     information, right?

8          A.    No, not in this case, no, not what

9     I've identified as the identifier in S3 for the

10    sake of the claims.

11         Q.    Okay.  Let's go back to -- in the

12    same document -- to Paragraph 4, please, which is

13    on Page 2.

14         A.    I am there.

15         Q.    And the final sentence in this

16    paragraph says "Amazon S3 achieves high levels of

17    data durability and availability 'by

18    automatically and synchronously storing your data

19    across both multiple devices and multiple

20    facilities within your selected geographical

21    region,' such that 'Amazon S3 is designed to

22    sustain the concurrent loss of data in two

Page 301

1    facilities, making it very well suited to serve

2    as the primary data storage for mission-critical

3    data."

4              Do you see that, sir?

5        A.    Yes, this is quoting to Amazon

6    document.

7        Q.    All right.  And you're relying on an

8    Amazon document here, right?

9        A.    That's right.

10       Q.    And so you'd agree S3 automatically

11   stores data across multiple devices, right?

12       A.    Yes.

13       Q.    And it automatically stores data

14   across multiple facilities, right?

15       A.    I agree with that too.

16       Q.    And S3 automatically stores data

17   across multiple cells, right?

18       A.    I agree.

19       Q.    And S3 automatically stores data

20   across multiple regions, right?

21       A.    It can, depending on how you use it.

22       Q.    Okay.  For your infringement

Page 302

1    analysis of S3, did you analyze whether S3's data

2    storage infringes across multiple devices?

3            MR. CARDENAS-NAVIA:  Objection to

4        form.  Vague.

5        A.    Yes, I mean, I -- that's a part of

6    my analysis.  That's right.

7    BY MR. SIGLER:

8        Q.    Okay.  Did you analyze whether it

9    infringes across multiple facilities?

10           MR. CARDENAS-NAVIA:  Objection to

11       form.  Vague.

12       A.    Yes, that's inclusive of my

13   analysis.

14   BY MR. SIGLER:

15       Q.    And did you analyze whether S3's

16   data storage infringes across multiple cells and

17   multiple regions?

18           MR. CARDENAS-NAVIA:  Same objection.

19       A.    Yes, in the sense that it infringes

20   in each of those cells based on how S3 works and

21   how I did my analysis.

22   BY MR. SIGLER:

Page 306

1    agreed construction for location.

2            Q.    Okay.  Did you also conclude that

3    ███████████  is the location information on S3?

4                  MR. CARDENAS-NAVIA:  Objection to

5        form.  Vague.

6            A.    Th ██████████████████████████

7    satisfies the parties' agreed construction for

8    location.

9    BY MR. SIGLER:

10           Q.    Did you conclude that ████████████

11   is the location information on S3?

12           A.    That also comprises part of the

13   location information, █████████████████████████

14   ████████████.

15           Q.    Okay.  Is there location information

16   stored on any other components in S3 besides the

17   ██████████████████████████████?

18                  MR. CARDENAS-NAVIA:  Objection to

19       form.  Vague.

20           A.    I'm confused by your question.

21   You're asking about data structures.  Now you're

22   asking about where they are stored.  Is that your

Page 307

1    question?

2    BY MR. SIGLER:

3         Q.    Backing up for a second, and let's

4    talk about those structures.  Did you conclude

5    that th ███████████      contains location

6    information?

7         A.    I believe it does, yes.

8         Q.    Did you conclude tha ████████████

9    contains location information?

10        A.    Yes.

11        Q.    Did you conclude that ███████████

12   ████████  contain location information?

13        A.    Yes.

14        Q.    Did you conclude that the ███████

15   ██████████████    contain location information?

16        A.    Yes.

17        Q.    And did you conclude that ████████

18   contains location information?

19        A.    I don't recall having an opinion

20   about ███████.

21              Is there a place in my report you

22   believe I addressed that?

Page 308

1          Q.    No.

2                Did you conclude that th ███████

3    contain location information?

4          A.    I don't recall having that opinion.

5                Is there somewhere in my report

6    where you believe I said that?

7          Q.    No.

8                Did you conclude that th █████

9    ████████  contains location information?

10         A.    I didn't have to render an opinion

11   about that with respect to my analysis.

12         Q.    Okay.  Let's go on to Paragraph 27,

13   please in Appendix D.  And that is on Page 19.

14         A.    Do you mean Exhibit D?

15         Q.    Yes, sorry.

16         A.    I apologize too.  But okay.  I am on

17   Paragraph 27 in Exhibit D.

18         Q.    All right.  And that paragraph

19   starts by stating, ████████████████████████

20   ████████████████████████████████████

21   ████████████████████████████████████

22   ████████████████████████████."

Page 309

```
1                Do you see that, sir?

2        A.    Yes.

3        Q.    Okay.  So most requests get served

4    ████████████, right?

5        A.    In this context, yes.

6        Q.    And the requests that aren't served

7    ████████████████████, right?

8        A.    That is right.

9        Q.    S████████████████ when they

10   receive a request they don't have, right?

11       A.    That's another way to put it, yes.

12       Q.    They don't send ████████ a

13   redirect message, do they?

14             MR. CARDENAS-NAVIA:  Objection to

15       form.  Vague.

16       A.    I don't render an opinion about

17   redirect messages with respect to S3, if that's

18   your question.

19   BY MR. SIGLER:

20       Q.    Okay.  So ████████ don't use a

21   redirect message either, right?

22             MR. CARDENAS-NAVIA:  Same objection.
```

Page 310

1      A.    I didn't form an opinion about that.

2  I wasn't asked to form an opinion with respect to

3  any redirect claims with respect to Amazon S3.

4  BY MR. SIGLER:

5      Q.    Th ███████████████████████████

6  ██████, right?

7      A.    If b ███████████████ you mean on

8  ████████, yes.

9      Q.    And th ███████████████████ for

10 every object, right?

11     A.    No, they do not.

12     Q.    Do ████████████████ use a replacement

13 policy?

14          MR. CARDENAS-NAVIA:  Objection to

15     form.  Vague.

16     A.    That wasn't relevant -- answering

17 that question wasn't relevant for my analysis.

18 So I didn't address that.  I don't recall

19 addressing that.

20          If you feel there is a place in my

21 report where I did, I'd be happy to comment on

22 that.

Page 311

1    BY MR. SIGLER:

2         Q.    Do you know what a replacement

3    policy is?

4         A.    I do.

5         Q.    Okay.  Do you know if the

6    replacement policy would determin ██████████

7    ████████████████████████████?

8              MR. CARDENAS-NAVIA:  Objection to

9       form.  Vague.

10        A.    What do you mean by that question?

11   What are you asking precisely?

12   BY MR. SIGLER:

13        Q.    Let me ask this:  You didn't

14   consider what replacement policies ██████████

15   used in forming your opinions on infringement,

16   right?

17              MR. CARDENAS-NAVIA:  Objection to

18      form.  Vague.

19        A.    It wasn't -- it wasn't relevant.  It

20   wasn't needed for my analysis.

21              As we just discussed, ████████ is

22   storing a different set of things as determined

Page 312

1     ███████████████████████████.  And that was

2     already sufficient for my analysis.  I didn't

3     have to address the issue of replacement policies

4     for them.

5     BY MR. SIGLER:

6          Q.     Okay.  So you didn't consider what

7     replacement policies th ██████████████ used

8     in forming your infringement opinions, right?

9                    MR. CARDENAS-NAVIA:  Objection to

10        form.  Vague.

11         A.     Unless there is a place where you

12    think I addressed that in my report, I don't

13    believe that's relevant.  Like I said, what is

14    relevant is how things were signed with respect

15    to ███████████████.

16    BY MR. SIGLER:

17         Q.     Did my question ask you whether that

18    was relevant?  I can have it read back.

19         A.     Is there a place in my report where

20    you believe I've addressed this question?

21         Q.     No, there's not.  So I'm asking

22    you --

Page 313

1      A.    So that's why I answered it in the

2   way that I did.

3      Q.    I don't care if you think it's

4   relevant or not.

5            You didn't consider what replacement

6   policie ███████████████ used in forming your

7   opinions on infringement, right?

8            MR. CARDENAS-NAVIA:  Objection to

9     form.  Vague.

10     A.    That analysis was not necessary for

11  my opinions.

12  BY MR. SIGLER:

13     Q.    So the answer is no?

14     A.    The answer is no, it was not

15  necessary for my opinions, as I've stated now

16  three times.

17     Q.    Okay.  All right.  Let's go to

18  Paragraph 167 in Exhibit D, which is on Page 88.

19     A.    I am there.

20     Q.    All right.  And that paragraph says

21  at the beginning, "The transferring step is not

22  required by the claim to be performed by anything

Page 314

1     in particular - it just needs to be performed.

2     The plain language of the claims makes this

3     clear."

4                 Do you see that, sir?

5          A.    Yes.

6          Q.    Okay.  And you go on to say, "The

7     claim does not state, for example, that a

8     'location server' performs the transferring.

9     Thus, any component or group of components, such

10    as ███████████████████████████████████████

11    ████████████████████████████  or others may

12    perform the transferring."

13                Do you see that, sir?

14         A.    Yes.

15         Q.    And here, you're discussing the

16    transferring step of '978 patent, Claim 17,

17    right?

18         A.    That is correct, what I call Claim

19    Element 17e.

20         Q.    And Claims 23, 24, and 30 depend

21    from Claim 17, right?

22         A.    That is correct.

Page 325

1   partition key?

2        A.   So you're now asking about the

3   request that is -- I'm not sure what you're

4   referring to here.  Which request are you now

5   referring to?

6        Q.   The request that goes to th ██████

7   ██████.

8        A.   Request that goes to th ██████

9   ██████, as I mentioned here ████████████ is

10  looked up in the ████████████.

11       Q.   Okay.  Okay.  So the ████████████

12  looks up the key on ████████████████, right?

13       A.   The ████████████.  There's a lot of

14  ████████████, so we have to be very precise

15  about which ones we're referring to here.  This

16  is referring to now ████████████.

17       Q.   Okay.  So the ████████████ sends

18  the ████████████████████████, right?

19       A.   That's right.

20       Q.   ████████████████████████████

21  ████████████████.

22       A.   Yes, broadly speaking.  Yes.

Page 326

1        Q.     And th ████████████████ includes

2    whic ██████████████████████████████,

3    right?

4        A.     That's right.

5        Q.     And th ████████████ uses the

6    ██████████ to look u ████████████████,

7    right?

8        A.     Yes.

9        Q.     Th ████████████ doesn't use the

10   ████████, does it?

11       A.     It uses ████████ of the -- in the

12   case where there is ████████, then the -- the

13   key that is a part of ████████████ is this

14   ████████████████████████████████████████

15   ████████████████. And that instance, then that

16   is computed to be and then ████████████████

17   that then in turn is ██████████████████████

18   ██. And then that's what is looked up in the

19   ████████████.

20       Q.     Okay. Does the ██████████████

21   ████████████████████████████████████?

22       A.     It associates ████████ with ██

Page 327

1    ███████    of the source code int ████████████

2    ██ .

3          Q.    Okay.  So it associate ████████

4    ██████████████████████████, right?

5          A.    That's right.

6          Q.    And if th ████████████ received a

7    request wit ████████████████, for example, it

8    wouldn't know wha ████████████████████████,

9    right?

10          A.    I don't understand your question.  I

11    don't think there is any source code that does

12    that.  So I don't know how to answer your

13    question in that hypothetical.

14          Q.    Okay.  So you can't answer that

15    hypothetical?

16          A.    I don't think -- based on my

17    analysis, I don't think there's any source code

18    that does what you just said.  So I don't know

19    how to answer that question in the abstract as a

20    hypothetical.  I analyze the system as it exists.

21          Q.    Okay.  Let's -- so you haven't --

22    you haven't seen that particular scenario in the

Page 328

1    source code; is that right?

2          A.    Not that I recall.

3          Q.    Okay.  And is that because that

4    circumstance doesn't happen, sir?

5          A.    I don't recall seeing it.  So -- and

6    it wasn't required for analysis anyway so that's

7    why I can't answer this hypothetical.  I just

8    don't recall having seen that; hence, I can't

9    answer in the hypothetical how a system would

10   react when it gets something that I have not seen

11   it ever receive, whether or not that is an error

12   message.  I could look at the source code again

13   and try to contemplate whether or not that would

14   create an error message or not, if you would

15   like.

16         Q.    Okay.  All right.  Let's press onto

17   Page 45, Paragraph 80, please.

18         A.    Paragraph 80, I'm there.

19         Q.    And here, we're talking about --

20   we're talking about Claim 3, right?

21         A.    Claim 3, but because Claim 3 derives

22   from Claim 1, we have to start with Claim 1 from

Page 333

1    location, if that is your question.

2    BY MR. SIGLER:

3         Q.    Well, can you take a look and let me

4    know what did you conclude was the location

5    information stored by th ███████████.

6         A.    Sure.

7              So with respect to location

8    information, we actually have -- it's more of a

9    nuance thing -- the '978 has a slightly different

10   construction.  So for the '978, the construction

11   is one or more identifiers and their associated

12   locations.

13             And then for the '170/'640, it is

14   information pertaining to one or more locations

15   of data and/or the identities of one or more

16   location servers.

17             So then where we were looking, in

18   Appendix -- or Exhibit E was with respect to

19   Claim 3 of the '978 patent.  So for that, we have

20   to use the first construction for location

21   information.  I believe I addressed that

22   elsewhere.  Let me try to find it.

Page 334

1          Q.      You want to go to Paragraph 93?

2          A.      Sure.  I'll go there.  Yeah, there

3     is it.

4                  So  ████████████  and their

5     ████████████████████████████████████

6     satisfy the Court's construction of "location

7     information" for the '978 patent, i.e., 'one or

8     more identifiers and their associated

9     locations.'"

10                 And here just to be clear, when I

11    put in parentheses ████████████  I'm talking

12    about ██████████████████████████████

13    ██████████████.

14         Q.      Okay.  So you concluded that the

15    ██████████████████████████████████

16    ██████████  are the location information in this

17    '978 patent, right?

18         A.      That is right.

19         Q.      ██████████████  doesn't go to the

20    ██████████████, right?

21         A.      That's why I had this additional

22    parenthetical that ████████████████████████

Page 335

1    █████████████████, which then is what goes to

2    ███████████████.

3        Q.   So it's your view that the

4    primary -- excuse me.

5            It's your view that th ██████████

6    does g █████████████████; is that right, sir?

7        A.   I didn't say that.  I think that's

8    mischaracterizing what I just said.

9        Q.   Okay.  So my question was:  The

10   ███████████ doesn't go to █████████████,

11   right?

12       A.   And, again, what my opinion is that

13   an ███████████████████████████████████████

14   ████████████████████████████████.

15       Q.   Okay.  But the ██████████ itself

16   doesn't get sent to ██████████████, right?

17       A.   Not ███████████████ of it, no.  ████

18   ███████████████████████████████████████.

19       Q.   What did you conclude was the

20   claimed identifier?

21       A.   In this case, as we talked about

22   earlier -- go to Paragraph 83.  "An item's

Page 336

1    ███████████████████████ -- which again should

2    be read as th ███████████████████████████

3    ███████████████ -- "is an identifier under the

4    parties' agreed construction, i.e., 'a unique

5    encoding that identifies an individual entity,

6    and with which zero or more location strings are

7    associated in a location server.'"

8           Q.    And there, you're referring to

9    Paragraph 83?

10          A.    Correct.

11          Q.    We talked about the ████████ a few

12    minutes ago.  The ████████ identifies the ████████

13    ██████, right?

14              MR. CARDENAS-NAVIA:  Objection to

15       form.  Vague.

16          A.    I disagree with that

17    characterization.  Instead, as I talked about

18    earlier, ████████████ in DynamoDB can be of ██

19    ████████████████.  The first type is just a

20    ████████████████████████████████████████████████

21    ████████████████████████████████████.

22              But then there's this other way you

Page 405

1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2                    I, Amanda Gorrono, the officer

3           before whom the foregoing deposition was

4           taken, do hereby certify that the foregoing

5           transcript is a true and correct record of

6           the testimony given; that said testimony was

7           taken by me stenographically and thereafter

8           reduced to typewriting under my direction;

9           and that I am neither counsel for, related

10          to, nor employed by any of the parties to

11          this case and have no interest, financial or

12          otherwise, in its outcome.

13                   IN WITNESS WHEREOF, I have hereunto

14          set my hand this 9th day of September, 2023.

15

16

17

18          _____

            AMANDA GORRONO, CLR

19          CLR NO:  052005 - 01

            Notary Public in and for

20          The State of New York

            County of Suffolk

21          My Commission No.  01G06041701

22          Expires:  01/07/2027