**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Kove IO, Inc., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Hon. Matthew F. Kennelly |
| v. | Jury Trial Demanded |
| Amazon Web Services, Inc., | |
| Defendant. | |

**PLAINTIFF KOVE IO, INC.'S OPPOSITION TO AWS'S MOTION FOR SUMMARY
JUDGMENT AND CROSS MOTIONS FOR SUMMARY JUDGMENT
<u>AND TO EXCLUDE</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

**Kove's Response to AWS's Summary Judgment Motion and
Kove's Related Motion to Exclude** ................................................................................ 1

Background ...................................................................................................................... 2

    A. Kove's Foundational Innovations ........................................................................ 2

    B. The Patented Technology ..................................................................................... 3

Argument ........................................................................................................................ 5

    I. AWS Is Not Entitled to Summary Judgment Under the Operative Claim Construction. ........ 6

    A. AWS Is Not Entitled to Summary Judgment as to the S3 Product. ........................... 6

        1. Genuine disputes of material fact preclude summary judgment as to S3. .............. 6

        2. Dr. Grama's noninfringement opinions apply the wrong claim construction. ..... 10

            a. Dr. Grama's error is more reason to deny summary judgment ...................... 10

            b. Dr. Grama's opinion applying the wrong construction should be excluded. ..... 14

    B. AWS Is Not Entitled to Summary Judgment as to DynamoDB. .............................. 14

        1. AWS's argument misapprehends Kove's infringement theory as to
DynamoDB's primary keys. ........................................................................ 15

        2. AWS's arguments as to ▮▮▮▮▮▮▮▮ misapprehend the claim construction. ... 17

            a. Kove's evidence defeats summary judgment as to the '170 and '640 patents. ... 20

            b. AWS's noninfringement theory is premised on an incorrect claim
construction and so should be excluded. ...................................................... 23

            c. Fact issues preclude summary judgment to the extent the location server
must store an identifier string, as with the '978 patent. ................................. 23

    II. AWS's Request for a New Claim Construction Fails:
There Was No Prosecution History Disclaimer. ................................................................ 24

    A. Facts Relating to Reexamination of the Kove Patents ............................................ 26

        1. '640 patent ('036 reexam) ........................................................................... 27

        2. '172 patent ('035 reexam) ........................................................................... 29

        3. '978 patent ('034 reexam) ........................................................................... 30

    B. AWS Falls Far Short of Its Burden to Establish Disclaimer. .................................. 32

        1. Kove's statements regarding "non-hierarchical" configurations described the
claim scope—they did not disclaim it. .......................................................... 33

        2. Kove did not make any statements (let alone disclaimers) about
claims 17, 23, 24 or 30 of the '978 patent. ..................................................... 34

i

3.  Kove's statements regarding "non-hierarchical" did not apply to claim 6 of the '978 patent. ............................................................. 35

C.  AWS's Proposed Constructions Are Far Afield from Kove's Reexam Statements, Illustrating That This Is Not a Question of Disclaimer. ............................... 36

1.  "network"/"system" ...................................................................... 38

2.  "location server" ........................................................................... 40

3.  "providing"/"determining"/"retrieving" location information "return"/"sending"/"transmitting" a redirect message .................... 41

III. Summary Judgment Is Not Warranted Under AWS's Proposed New Constructions. ..... 42

A.  "Geographical Hierarchies"—Even If They Exist—Do Not Preclude Infringement Under AWS's Proposed New Construction. ..................................................... 42

B.  Nor Do AWS's Other Alleged Hierarchies Disprove Infringement. ........................ 44

1.  Hierarchies unrelated to location servers are irrelevant. ...................... 45

2.  Hierarchies related to █████████ are irrelevant. ............................. 45

C.  AWS's █████████████" Theory Is Too Little, Too Late. ............... 46

1.  The "█████████████" theory should be excluded as untimely and prejudicial..... 46

2.  In any event, █████████████ are non-hierarchical, so summary judgment is not warranted. .................................................................. 47

IV. A Reasonable Jury Could Find That AWS Willfully Infringed. ..................................... 47

A.  A Reasonable Jury Could Find Pre-Suit Willful Infringement. ................................ 48

1.  AWS knew or should have known that it infringed Kove's patents. ...... 48

2.  AWS willfully blinded itself to the risk of infringement. ...................... 52

B.  A Reasonable Jury Could Find Post-Suit Willful Infringement. .............................. 54

Conclusion ....................................................................................................................... 55

**Kove's Motion for Summary Judgment and to Exclude**..................................................... **56**

I.  AWS's § 101 Defense Fails as a Matter of Law. ............................................................ 56

A.  The Court's Ruling That the Claims Are Eligible Should Stand. ............................. 57

1.  The Court rejected AWS's § 101 defense as a matter of law. ............... 57

2.  There is no reason to reconsider the Court's purely legal ruling. ......... 58

B.  Regardless, AWS's § 101 Defense Cannot Survive Summary Judgment. ................ 60

II. AWS Lacks Evidence of Equitable Estoppel, Waiver, or Inequitable Conduct. ............. 61

A.  AWS Cannot Establish Equitable Estoppel. ........................................................... 61

B.  AWS Cannot Establish Waiver. ............................................................................. 62

C.  AWS Cannot Establish Inequitable Conduct. ........................................................ 64

III. Mr. Greene's Double Patenting Opinions Are Inadmissible, and Kove Is Entitled to Summary Judgment on AWS's Double Patenting Defense....................................... 65

A. Mr. Greene's Opinions on Double Patenting Are Inadmissible. ............................. 66

    1. Mr. Greene's conclusory opinions are not adequately disclosed......................... 66

    2. In any event, Mr. Greene applies the wrong legal standard................................ 69

B. AWS's Double Patenting Defense Cannot Survive Summary Judgment................... 70

IV. Because AWS Fails to Qualify Multiple References as Prior Art, Kove Is Entitled to Summary Judgment, and Mr. Greene's Associated Opinions Are Inadmissible............. 70

A. Factual Background ................................................................................................. 71

B. Mr. Greene's Opinions About the Prior Art Status of DNS (BIND 8.1) and Cache Resolver Are Unreliable *Ipse Dixit* and Must Be Excluded. ..................................... 72

    1. BIND 8.1 ........................................................................................................ 72

        a. BIND 8.1 does not qualify as a prior art reference. ........................................ 73

        b. BIND 8.1 is not a "single reference" and thus cannot anticipate....................... 75

    2. Cache Resolver .............................................................................................. 76

        a. Cache Resolver does not qualify as a prior art reference............................... 76

        b. Cache Resolver is not a "single reference" and thus cannot anticipate. ......... 77

C. Boukobza, Karger '618/'420, and Steen Do Not Qualify as Prior Art ...................... 78

    1. Boukobza, Karger '618, and Karger '420 issued after the latest priority date. .... 78

    2. Steen ............................................................................................................. 79

D. Kove Is Entitled to Summary Judgment as to Any Invalidity Ground That Relies on AWS's Unqualified References. ................................................................. 80

Conclusion ...................................................................................................................... 80

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Labs. v. Church & Dwight Co., Inc.*,
2008 WL 5387848 (N.D. Ill. Dec. 22, 2008) ........................................................36

*Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*,
764 F.3d 1366 (Fed. Cir. 2014)............................................................................67

*ADASA Inc. v. Avery Dennison Corp.*,
55 F.4th 900 (Fed. Cir. 2022) ..............................................................................57

*Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*,
344 F.3d 1186 (Fed. Cir. 2003).............................................................................77

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
805 F.3d 1368 (Fed. Cir. 2015).............................................................................14

*Alice Corp. v. CLS Bank Int'l*,
573 U.S. 208 (2014)....................................................................................56, 57, 59

*Align Tech., Inc. v. 3Shape A/S*,
2020 WL 4926164 (D. Del. Aug. 14, 2020) (Stark, J.) ........................................68

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...............................................................................................5

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017).............................................................................48

*Arigna Tech. Ltd. v. Nissan Motor Co.*,
2022 WL 17978913 (E.D. Tex. Oct. 5, 2022) ......................................................55

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
788 F.3d 1371 (Fed. Cir. 2015).............................................................................59

*Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*,
915 F.3d 743 (Fed. Cir. 2019)...............................................................................57

*Avid Tech., Inc. v. Harmonic, Inc.*,
812 F.3d 1040 (Fed. Cir. 2016).......................................................................33, 34

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017).............................................................................32

*Baxter Int'l, Inc. v. CareFusion Corp.*,
  2020 WL 10486005 (N.D. Ill. Aug. 12, 2020) .......................................................46

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020).............................................................................38

*Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*,
  998 F.3d 1320 (Fed. Cir. 2021)........................................................................19, 55

*Blue Calypso, LLC v. Groupon, Inc.*,
  815 F.3d 1331 (Fed. Cir. 2016)........................................................................71, 78

*Brengettcy v. Horton*,
  423 F.3d 674 (7th Cir. 2005) .................................................................................59

*CardioNet, LLC v. InfoBionic, Inc.*,
  955 F.3d 1358 (Fed. Cir. 2020)..............................................................................57

*Cephalon, Inc. v. Watson Pharm., Inc.*,
  707 F.3d 1330 (Fed. Cir. 2013)..............................................................................80

*Cordis Corp. v. Boston Scientific Corp.*,
  561 F.3d 1319 (Fed. Cir. 2009)..............................................................................80

*Core Wireless Licensing v. Apple, Inc.*,
  899 F.3d 1356 (Fed. Cir. 2018)..............................................................................63

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
  509 U.S. 579 (1993)...............................................................................................80

*Dexcowin Global, Inc. v. Aribex, Inc.*,
  2017 WL 3478492 (C.D. Cal. June 29, 2017) .......................................................80

*Duncan Parking Techs., Inc. v. IPS Grp.*,
  914 F.3d 1347 (Fed. Cir. 2019)..............................................................................32

*EagleView Techs., Inc. v. Xactware Solutions, Inc.*,
  485 F. Supp. 3d 505 (D.N.J. 2020) ........................................................................79

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
  689 F.3d 1368 (Fed. Cir. 2012)........................................................................68, 69

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
  845 F.3d 1357 (Fed. Cir. 2017)........................................................................65, 66

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed. Cir. 2016)........................................................................57, 58

*Epistar Corp. v. Int'l Trade Comm'n*,
566 F.3d 1321 (Fed. Cir. 2009)................................................................32, 37

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
240 F. Supp. 3d 605 (E.D. Tex. 2017) (Bryson, J.) ..................................48

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
955 F.3d 1317 (Fed. Cir. 2020)...........................................................59, 60

*Estech Sys. IP, LLC v. Carvana LLC*,
2023 WL 3292881 (E.D. Tex. May 5, 2023) ...........................................78

*Exergen Corp. v. Wal–Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009).............................................................10, 23

*Ferring B.V. v. Allergan, Inc.*,
980 F.3d 841 (Fed. Cir. 2020).................................................................62

*Finjan, Inc. v. Sophos, Inc.*,
2016 WL 4560071 (N.D. Cal. Aug. 22, 2016) ........................................68

*Fujisawa Pharm. Co. v. Kapoor*,
115 F.3d 1332 (7th Cir. 1997) ................................................................59

*Fujitsu Ltd. v. Tellabs Operations, Inc.*,
2012 WL 3018027 (N.D. Ill. July 23, 2012).............................................46

*Galvan v. Norberg*,
678 F.3d 581 (7th Cir. 2012) ...........................................................58, 59, 60

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)...................................................................71, 75, 77

*Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*,
972 F.2d 1272 (Fed. Cir. 1992).............................................................69

*Glob.–Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011).............................................................................48, 52

*Grace Instrument Indus., LLC v. Chandler Instruments Co.*,
57 F.4th 1001 (Fed. Cir. 2023) ............................................................36

*Green Pet Shop Enters. v. Maze Innovations, Inc.*,
2016 WL 7451629 (N.D. Ill. Dec. 28, 2016) (Kennelly, J.)...................37

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
579 U.S. 93 (2016)..................................................................................54

*Hazeltine Rsch., Inc. v. Brenner*,
    382 U.S. 252 (1965) ............................................................................. 78

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996) ............................................................ 69

*High Point SARL v. Sprint Nextel Corp.*,
    817 F.3d 1325 (Fed. Cir. 2016) .......................................................... 62

*Hynix Semiconductor Inc. v. Rambus Inc.*,
    645 F.3d 1336 (Fed. Cir. 2011) .................................................... 62, 63

*Immunex Corp. v. Sandoz Inc.*,
    964 F.3d 1049 (Fed. Cir. 2020) .......................................................... 65

*Innogenetics, N.V. v. Abbott Labs.*,
    512 F.3d 1363 (Fed. Cir. 2008) .................................................... 67, 68

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
    496 F.3d 1334 (Fed. Cir. 2007) .......................................................... 69

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014) .................................................... 67, 69

*Jaranowski v. Ind. Harbor Belt R.R. Co.*,
    72 F.4th 744 (7th Cir. 2023) ................................................................ 5

*Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*,
    529 F.3d 371 (7th Cir. 2008) ............................................................. 10

*Kyocera Wireless Corp. v. International Trade Commission*,
    545 F.3d 1340 (Fed. Cir. 2008) .................................................... 76, 78

*Lincoln Elec. Co. v. Harbor Freight Tools USA, Inc.*,
    2018 WL 10809987 (N.D. Ohio Aug. 15, 2018) ............................... 79

*In re Lister*,
    583 F.3d 1307 (Fed. Cir. 2009) .......................................................... 79

*M&K Holdings v. Samsung Elecs. Co.*,
    985 F.3d 1376 (Fed. Cir. 2021) .......................................................... 71

*Mahurkar v. C.R. Bard, Inc.*,
    79 F.3d 1572 (Fed. Cir. 1996) ............................................................ 70

*Mass. Inst. of Tech. v. Shire Pharms., Inc.*,
    839 F.3d 1111 (Fed. Cir. 2016) .................................................... 35, 37

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) ............................................................................. 57

*Medline Indus., Inc. v. C. R. Bard, Inc.*,
    2020 WL 10485718 (N.D. Ill. Jan. 8, 2020) ......................................................... 46

*Meyer Intell. Props. Ltd. v. Bodum, Inc.*,
    690 F.3d 1354 (Fed. Cir. 2012) ....................................................................... 67, 68

*Meyers v. Asics Corp.*,
    974 F.2d 1304 (Fed. Cir. 1992) ............................................................................. 62

*Microsoft Corp. v. i4i Ltd. P'ship*,
    564 U.S. 91 (2011) ................................................................................................. 61

*MONEC Holding AG v. Motorola Mobility, Inc.*,
    897 F. Supp. 2d 225 (D. Del. 2012) ...................................................................... 52

*Navico Inc. v. Garmin Int'l, Inc.*,
    2017 WL 3750252 (E.D. Tex. July 28, 2017) ....................................................... 79

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,
    903 F.3d 1365 (Fed. Cir. 2018) ............................................................................. 79

*Nuance Commc'ns, Inc. v. ABBYY USA Software House, Inc.*,
    813 F.3d 1368 (Fed. Cir. 2016) ....................................................................... 13, 14

*Pactiv Corp. v. Multisorb Techs., Inc.*,
    2013 WL 2384249 (N.D. Ill. May 29, 2013) ........................................................ 46

*Parallel Networks, LLC v. Abercrombie & Fitch Co.*,
    704 F.3d 958 (Fed. Cir. 2013) ............................................................................... 80

*Personalized User Model, LLP v. Google Inc.*,
    2014 WL 807736 (D. Del. Feb. 27, 2014) (Stark, J.) ........................................... 10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................................... 28, 37

*Pickett v. Prince*,
    207 F.3d 402 (7th Cir. 2000) ................................................................................. 58

*Polara Eng'g, Inc. v. Campbell Co.*,
    894 F.3d 1339 (Fed. Cir. 2018) ............................................................................. 70

*ProStrakan, Inc. v. Actavis Labs. UT, Inc.*,
    2018 WL 11363829 (E.D. Tex. Sept. 28, 2018), *aff'd*, 787 F. App'x 757 (Fed.
    Cir. 2019) ............................................................................................................... 65

*Qualcomm v. Broadcom Corp.*,
    548 F.3d 1004, 1010-12 (Fed. Cir. 2008) .............................................................63

*In re Rambus Inc.*,
    694 F.3d 42 (Fed. Cir. 2012).............................................................................19

*Richmond v. Dart*,
    2013 WL 1174436 (N.D. Ill. Mar. 20, 2013) (Kennelly, J.)...................................10

*Rohm & Haas Co. v. Brotech Corp.*,
    127 F.3d 1089 (Fed. Cir. 1997)....................................................................43, 44

*Ryder v. Bank of Hickory Hills*,
    585 N.E.2d 46 (Ill. 1991) ..................................................................................63

*Salgado ex rel. Salgado v. Gen. Motors Corp.*,
    150 F.3d 735 (7th Cir. 1998) ............................................................................67

*Santamarina v. Sears, Roebuck & Co.*,
    466 F.3d 570 (7th Cir. 2006) ............................................................................58

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
    580 U.S. 328 (2017).................................................................................50, 63

*Scripps Clinic & Rsch. Found. v. Genentech, Inc.*,
    927 F.2d 1565 (Fed. Cir. 1991), *overruled in other part by Abbott Labs. v.*
    *Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009) ......................................................75

*Seachange Int'l, Inc. v. C-COR, Inc.*,
    413 F.3d 1361 (Fed. Cir. 2005).........................................................................19

*SmithKline Beecham Corp. v. Apotex Corp.*,
    439 F.3d 1312 (Fed. Cir. 2006)....................................................................71, 78

*Sonix Tech. Co. v. Publ'ns Int'l Ltd*,
    2017 WL 4357425 (N.D. Ill. Oct. 2, 2017) (St. Eve, J.).....................................10, 23

*Soverain IP, LLC v. Microsoft Corp.*,
    2018 WL 1465792 (E.D. Tex. Mar. 26, 2018) ......................................................52

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    14 F.4th 1323 (Fed. Cir. 2021) .....................................................................48, 54

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
    930 F.3d 1295 (Fed. Cir. 2019).........................................................................75

*Storage Tech. Corp. v. Cisco Sys.*,
    329 F.3d 823 (Fed. Cir. 2003)......................................................................14, 18

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
　726 F.2d 724 (Fed. Cir. 1984)............................................................75

*SunTiger, Inc. v. Sci. Rsch. Funding Grp.*,
　189 F.3d 1327 (Fed. Cir. 1999)..........................................................43

*SuperGuide Corp. v. DirecTV Enters.*,
　358 F.3d 870 (Fed. Cir. 2004).............................................................13

*Symbol Techs., Inc. v. Opticon, Inc.*,
　935 F.2d 1569 (Fed. Cir. 1991)..........................................................65

*Thales Visionix Inc. v. United States*,
　850 F.3d 1343 (Fed. Cir. 2017)..........................................................61

*Therasense, Inc. v. Becton, Dickinson & Co.*,
　649 F.3d 1276 (Fed. Cir. 2011)....................................................64, 65

*Trading Techs. Int'l, Inc. v. Open E Cry, LLC*,
　728 F.3d 1309 (Fed. Cir. 2013)....................................................32, 33

*Treehouse Avatar LLC v. Valve Corp.*,
　54 F.4th 709 (Fed. Cir. 2022) ............................................................14

*Trivascular, Inc. v. Samuels*,
　812 F.3d 1056 (Fed. Cir. 2016)..........................................................35

*UCB, Inc. v. Accord Healthcare, Inc.*,
　890 F.3d 1313, 1323 (Fed. Cir. 2018)...........................................66, 70

*UCP Int'l Co. v. Balsam Brands, Inc.*,
　787 F. App'x 691 (Fed. Cir. 2019) ................................................14, 18

*United States v. Olano*,
　507 U.S. 725 (1993).............................................................................62

*Va. Innovation Scis., Inc. v. Samsung Elecs. Co.*,
　983 F. Supp. 2d 700 (E.D. Va. 2013) .................................................52

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*,
　234 F.3d 1370 (Fed. Cir. 2000)....................................................35, 37

*Vitronics Corp. v. Conceptronic, Inc.*,
　90 F.3d 1576 (Fed. Cir. 1996)............................................................11

*Washington v. Parkinson*,
　737 F.3d 470 (7th Cir. 2013) .............................................................54

*Weaver v. Champion Petfoods USA Inc.*,
    3 F.4th 927 (7th Cir. 2021) ...................................................................................56

*Winbond Elecs. Corp. v. Int'l Trade Comm'n*,
    262 F.3d 1363 (Fed. Cir. 2001) ...........................................................................62

*Yu v. Apple Inc.*,
    1 F.4th 1040 (Fed. Cir. 2021) ..............................................................................59

**Statutes**

35 U.S.C. § 101 ........................................................................................... *passim*

35 U.S.C. § 102 ................................................................................70, 73, 78

35 U.S.C. § 102(a) .........................................................................................71

35 U.S.C. § 102(a), (b) ................................................................................ *passim*

35 U.S.C. § 103 ......................................................................................66, 67

35 U.S.C. § 122 ..............................................................................................78

35 U.S.C. § 282(a) .........................................................................................61

35 U.S.C. § 286 ..............................................................................................63

Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011)............................70

**Rules**

Fed. R. Civ. P. 12(b)(6)...........................................................................57, 59

Fed. R. Civ. P. 12(c) .....................................................................................65

Fed. R. Civ. P. 26 ..........................................................................................67

Fed. R. Civ. P. 26(a) ...............................................................................67, 68

Fed. R. Civ. P. 26(a)(2)(B) ...........................................................................66

Fed. R. Civ. P. 37(c) .....................................................................................67

Fed. R. Civ. P. 37(c)(1)..................................................................................67

Fed. R. Civ. P. 54(b) .....................................................................................58

Fed. R. Civ. P. 56(a) .......................................................................................5

Fed. R. Evid. 702 ..................................................................................................67, 69, 71

**Other Authorities**

Giles S. Rich, *The Extent of the Protection and Interpretation of Claims—American Perspectives*, 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499 (1990). ...........................37

*Hash Functions*, AWS, https://docs.aws.amazon.com/redshift/latest/dg/hash-functions.html (last visited Nov. 5, 2023)..................................................................................5

**KOVE'S RESPONSE TO AWS'S SUMMARY JUDGMENT MOTION
AND KOVE'S RELATED MOTION TO EXCLUDE**

Despite fact disputes at nearly every turn, AWS asks the Court to keep this case from a jury. None of its reasons justify doing so. First and most fundamentally, AWS's noninfringement theory under the Court's operative claim construction falls far short.

So it is no surprise that AWS relegates that argument to a fallback position, focusing instead on attempting to reopen claim construction so that it can add new limitations in hopes of evading an infringement finding. There is no reason to reconstrue the claims. AWS's only argument for doing so is an alleged prosecution history disclaimer. But that theory confuses mere description with disclaimer and so cannot meet the demanding standard. AWS's proposed new claim constructions give up the game; they have nothing to do with the supposed disclaimer and everything to do with smuggling new limitations into the claims. In any event, a reasonable jury could still find infringement under AWS's proposed new claim constructions.

What is more, several of AWS's noninfringement arguments rely on expert opinions that rest on incorrect claim constructions or undisclosed theories and should therefore be excluded.

The willfulness case also belongs with a jury. The record contains ample evidence from which a reasonable jury could find that AWS has had actual knowledge of Kove's patents and AWS's infringement for years before this suit was filed but nonetheless chose to continue infringing because the alternative would mean turning off an essential feature. A reasonable jury could also find that AWS's head-in-the-sand policies demonstrate willful blindness.

Kove thus respectfully requests that the Court deny AWS's motion for summary judgment, Dkt. 686 ("Mot.").

## Background

### A. Kove's Foundational Innovations

In the 1990s, the internet was nascent yet fast-growing, the debate around "big data" was just beginning to percolate, and the "cloud" as known today was years away. Dkt. 1, Compl. ¶¶ 1, 12, 15-16, 19. It was during this time that Drs. Overton and Bailey, the inventors of the Kove patents at issue here, foresaw that data storage requirements would grow beyond the capabilities of conventional systems. *Id.* ¶¶ 2, 12, 13, 16.

Dependency on traditional ways of centrally indexing data in a distributed storage system was a key issue. Dkt. 1 ¶ 13. For example, as information was added to a network, previous technology would require that it be indexed in some hierarchical fashion. *Id.* Those indices would have to be updated, and the need for continual updates to central servers was unworkable for computer networks, where data files are spread across millions of servers and changing rapidly. *Id.* While traditional indices worked to a certain point, a distributed network of data servers would become so vast and complex that ordinary hierarchical indices no longer could handle the load without high levels of inefficiency. *Id.*

The inventors anticipated that distributed storage systems would someday contain so many distinct data files that it would become impractical—if not impossible—to store the corresponding location information in one place. Dkt. 1 ¶ 16. Drs. Overton and Bailey conceived of an elegant technological solution, realizing, among other things, that storing location information associated with data files across multiple servers would reduce the processing time to find a data file. *Id.* ¶ 17. Likewise, the inventors understood the need to efficiently identify which of the multiple location information servers stored the location information for a particular data file. *Id.* Their solution, as described in detail below, used intermediate location servers to store location information associated with identifier strings organized with hash functions. This server and

storage architecture allowed for hyperscalability to the types of extraordinary data needs in today's cloud in a way that prior hierarchical systems could not achieve. Years after the relevant patent application, the *MIT Technology Review* recognized that the type of distributed data storage technology described in the Kove's patents was one of "10 Emerging Technologies That Will Change Your World." *Id.* ¶¶ 1, 19.

Kove filed this lawsuit on December 12, 2018 against AWS, alleging infringement of U.S. Patent Nos. 7,103,640 ("the '640 patent"), 7,223,978 ("the '978 patent"), and 7,814,170 ("the '170 patent"). Dkt. 1. After years of litigation, this case is set for trial on April 1, 2024. Dkt. 671.

### B. The Patented Technology

Given that claim construction and the technology tutorial occurred earlier in the case before it was reassigned, a brief explanation of terminology in the patents may be helpful.

As noted, the internet of the 1990s looked much different from today's. Prior art distributed storage systems required knowing which data repository to query for particular information. For example, a hospital may have various data storage servers that each store different patient data, such as x-rays and cardiology records, but the only way to collect a patient's complete medical records was to query every known data storage, which was inefficient and impractical. The inventors of the '640 patent, '170 patent, and '978 patent recognized this problem and solved it with a widely applicable technique that separates the "where" (which data storage server(s) to query) from the "what" (the data itself). In other words, the patents view "data" independently from its "location" and introduced the concept of specialized servers, called "location servers," to act as intermediaries between clients requesting data and the corresponding data storage, along with a host of technological improvements to make distributed storage practical and efficient. A client seeking data first requests the location of data from a location server and then requests the data itself from the appropriate data storage server(s).

3

To guarantee consistency and completeness for data queries, each "entity" for which data is stored (*e.g.*, a patient) is uniquely identified by an identifier (*e.g.*, a social security number). Dkt. 221 at JA0072-75 ('978 patent 2:21-37, 4:19-38, 7:54-8:25); *id.* JA0016 ('170 patent 4:10-49). This unique identifier is in turn associated with the locations of data associated with that entity (*e.g.*, servers storing a patient's medical records). *Id.* The location servers store these identifier/location mappings and can provide data locations in response to client requests that identify a particular entity. *Id.* This system's basic architecture of this system is shown below:



*Id.* at JA0038 ('170 patent fig.11). The client (112) requests the location of data from location server (110) and obtains the data from the appropriate data storage server(s) (114). *Id.* at JA0038 ('170 patent fig.11, 16:53-61); *id.* at JA0067, -80 ('978 patent fig.18, 18:37-57).

The inventors also anticipated that distributed storage systems would someday contain so many data files that it would become impractical (if not impossible) to store the corresponding location information in one place. Dkt. 221 at JA0072 ('978 patent 1:59-2:15). Moreover, they recognized that the data and location information would not be static but would instead be dynamically changing, requiring a system that could keep up. *Id.* The inventors recognized that a network of location servers was needed to address these issues. *Id.* at JA0079 ('978 patent 15:45-63); *id.* at JA0067, -80 ('978 patent fig.18, 18:37-57). Each location server stores just a portion of the complete set of location information. *Id.* Distributing the location information across multiple

servers reduces the strain on each location server and enables "massive scale." *Id.* at JA0081 ('978 patent 19:26-37). The inventors envisioned a hash function being used to allocate the location information across the location servers.[1] That is, a hash function is applied to an identifier to determine the location server at which to store or retrieve location information. *Id.* at JA0080 ('978 patent 17:6-67).

To prevent the problem of a client not knowing which location server to query, when a location server gets a query that cannot be answered with its portion of the location information, it must be able to redirect the client, through a redirection message, to the location server that can answer the query. Dkt. 221 at JA0079 ('978 patent 15:64-16:17); *id.* at JA0038 ('640 patent fig.12). When a first location server does not have the requested location information, it returns a redirection message to the client. The client then sends its request to a second location server that returns the requested location information. This redirect capability reduces the number of transactions, which reduces load and eases network congestion. *Id.* at JA0079 ('978 patent 15:34-63).

## Argument

Summary judgment is appropriate only if no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); Fed. R. Civ. P. 56(a). At the summary judgment stage, "the court does not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Jaranowski v. Ind. Harbor Belt R.R. Co.*, 72 F.4th 744, 750 (7th Cir. 2023) (cleaned up). Because a reasonable jury could find for Kove, AWS is not entitled to summary judgment.

---

[1] "A hash function is a mathematical function that converts a numerical input value into another value." *Hash Functions*, AWS, https://docs.aws.amazon.com/redshift/latest/dg/hash-functions.html (last visited Nov. 5, 2023).

I.     **AWS Is Not Entitled to Summary Judgment Under the Operative Claim Construction.**

    A.  **AWS Is Not Entitled to Summary Judgment as to the S3 Product.**

Because a reasonable jury could find that AWS's S3 product meets the limitations in question, AWS's motion for summary judgment of noninfringement as to its S3 product (*see* Mot. 23-26) should be denied. Moreover, AWS relies on an expert opinion that applies the wrong claim construction—indeed, a narrower construction that AWS initially proposed but later abandoned, agreeing with Kove as to the broader construction that the Court ultimately adopted. AWS's incorrect claim construction cannot support summary judgment, and any expert opinion based on it must be excluded.

    1.  **Genuine disputes of material fact preclude summary judgment as to S3.**

AWS contends that S3 does not satisfy the "location" limitation in the asserted claims. Mot. 23-26. Under the Court's claim construction, the term "location" means:

> an encoding that is a member of a set of associations with an identifier in a location server, and that specifies **where data** pertaining to the entity identified by the identifier **is stored**.

Dkt. 484 at 11 (emphasis added). Kove's technical expert, Dr. Michael Goodrich, explained in detail how S3 satisfies this limitation. Kove's LR 56.1(b)(3) Statement of Additional Facts ("ASMF") ¶¶ 29-34. AWS focuses on the phrase "specifies where data . . . is stored." Mot. 23-26. That requirement is met by ███████████████████████████ ASMF ¶ 29. As Dr. Goodrich explained, ███████████████████" which in turn contains a ██████████ ████████████ *Id.* The combination of information provided by the ████████████████ █████████████ specifies where the data in S3 (objects) are stored:

> Volumes are a common way of distinguishing between different collections of data (*e.g.*, volumes on a computer hard drive), and ████████████ are commonly used to identify and locate those collections of data (*e.g.*, "the movie is stored on your C drive"). ██████, which often stands for ████████████, refers to a particular █████████████ ██████ are commonly used to identify and locate a particular ████. The combination of ████████████, which are contained ████████, contains a specific location of an object

stored in S3.

*Id.* The ▮▮▮▮ which is part of ▮▮▮▮ provides the ▮▮▮▮▮▮▮▮ and thus provides "**locator information for where the actual data is**." *Id.* ¶ 30; *see id.* ("'[t]he ▮▮▮▮ is used to locate a user object in the S3 system'—that is, to specify an 'object location'").

Dr. Goodrich's opinions are based on AWS documents, videos, source code, and deposition testimony that all show that "objects in S3 have ▮▮▮▮ **that tell S3 where the object is stored**"; that the ▮▮▮▮ corresponds to ▮▮▮▮ **locations at which the** ▮▮▮▮ **is stored**"; and that "the ▮▮▮▮ contains information that is used to efficiently **locate** ▮▮▮▮" that is "the ▮▮▮▮ which contains the ▮▮▮▮ within the volume." ASMF ¶ 31; *see also id.* (the ▮▮▮▮ includes "the **locations** at which the ▮▮ is stored"; ▮▮▮▮ identify "**where** your object is stored"); *id.* ¶¶ 29-40.

In many instances, AWS documents and engineers expressly describe the ▮▮▮▮ as a "location" that specifies "where" the data "is stored." ASMF ¶ 32 (collecting examples, including "The S3 ▮▮▮▮ maintains a map of a ▮▮▮▮ at which the ▮▮▮▮ is stored. This value associated with every ▮▮▮▮"; "In S3, the ▮▮▮▮ component is primarily responsible for maintaining a mapping between a ▮▮▮▮ and the locations at which ▮▮▮▮ is stored. Hence the data stored in the ▮▮▮▮ is called an ▮▮▮▮"; "The ▮▮▮▮ maps a customer's S3 ▮▮▮▮ which contains the ▮▮▮▮ that identifies the customer data stored with the ▮▮"; ▮▮▮▮ are "used to locate a user object in the S3 system"— that is, to specify an "object location.").

The ▮▮▮▮ contain a "location" because they specify which ▮▮▮▮ a particular ▮▮▮▮ is stored in, and they uniquely identify the sought-after ▮▮ within the ▮▮▮▮ ASMF ¶ 29. A real-world analogy to the ▮▮▮▮ would be specifying the "location" of a courtroom with the combination of "Northern District of Illinois"

and "Judge Kennelly."  The former is akin to the ███████ in that it identifies a specific group of

courtrooms, and the latter is akin to the ██████ in that it uniquely specifies the desired courtroom

within that group.  To answer the question "Where is the hearing in *Kove v. AWS*?", one could

answer, "Judge Kennelly's courtroom in the Northern District of Illinois."  That is the location of

the hearing.  That there are other ways to specify the same location, such as "219 South Dearborn

St.," does not mean that the initial answer is incorrect or not a location.  There are multiple ways

to specify where something is—that is, its location.

Kove's evidence is thus sufficient to meet the "location" limitation—more specifically, an

encoding that "specifies where data . . . is stored."  AWS identifies other evidence that it believes

contradicts Kove's theory of infringement, including testimony from its engineers and contrary

opinions by its expert, Dr. Grama.  Mot. 24-25.  All of that presents, at most, a factual dispute for

the jury to decide.[2]  For example, AWS argues that "the ██████ labels a ████████ of data, but

doesn't include the location of any of the ██████████ in any of its fields" based on a statement

by an AWS engineer (Seth Markle) that the ████████ "is like a name or a label associated with the

storage of the data," but "[y]ou cannot tell from the █████████ where [the desired data] is."  Mot. 24.

Dr. Goodrich disagrees, explaining in detail why the ██████ is a "location" and citing reams of

evidence in support.  ASMF ¶¶ 29-34.  This garden variety fact dispute is the province of the jury.

AWS likens the ████████ to the name of the Magna Carta.  Mot. 25.  That analogy is inapt.

Of course, just the name "Magna Carta" does not tell you where it is located.  But that does not

mean that the name of something can never be a location.  If someone says, "Let's meet at the

Dirksen Building," they have specified where to meet (the location), even though they have just

provided the name of a building.  Context matters when determining whether something is a

---

[2] As discussed below, Dr. Grama applies the wrong claim construction, so his testimony should not
go to the jury in the first place.  But even with his testimony, there would be a genuine dispute of fact.

location, and context is precisely what is missing from AWS's Magna Carta example. The example does, however, demonstrate that the nature of "location" is inherently contextual, which further indicates that the dispute over whether an ███ contains a location is, at best, factual. Moreover, the ████████████████ are not names, but rather specify a particular object within a particular ████ just like specifying "Courtroom 2103" in the "Dirksen Building" is not just a name, unlike like AWS's "Magna Carta" example.

Next, AWS argues that "the ████████████ never updates, including when data is moved" between ████████ Mot. 25; *see id*. at 23 (arguing that data is "stored on different components" called ████. Like AWS's prior arguments, this argument assumes that the ████ does not specify where data is stored and thus is not a "location." It is premised on a narrow view of how locations can be expressed that, whatever its superficial appeal, is not true as a general matter. ASMF ¶¶ 29-39. Again, the example of a hearing location specified as "Judge Kennelly's courtroom in the Northern District of Illinois" helps illustrate the error in AWS's logic. Judge Kennelly is typically in courtroom 2103, and so a different way to express the location of the courtroom could be "219 South Dearborn St., Courtroom 2103." These are both locations. But, if there is construction happening to courtroom 2103, and Judge Kennelly is temporarily in courtroom 2125, then the first location (Judge Kennelly's courtroom in the Northern District of Illinois) remains fully accurate and can be used to arrive at the correct courtroom (2125), such as by using a directory board at the courthouse or reviewing the Court's website.

Yet by AWS's logic, "Judge Kennelly's courtroom in the Northern District of Illinois" is not a location, because the courtroom moved while the location stayed the same. That makes no sense. In the S3 product, that the ████████████████████████████████ is not definitive proof that the ████ is not a location.

9

ASMF ¶¶ 29-34.  It just means that AWS uses a location for its data objects ████████ ██████████████████████████████  That makes sense in a system comprising ████████ ████████████████  with many failing or being replaced each day.[3]

In short, Dr. Goodrich explains how S3 meets the location limitation, ASMF ¶¶ 29-34, which enables a reasonable jury to return a verdict for Kove.  Summary judgment is not warranted.[4]

### 2. Dr. Grama's noninfringement opinions apply the wrong claim construction.

#### a. Dr. Grama's error is more reason to deny summary judgment.

Experts cannot offers opinions based on a claim construction other than the Court's. *Exergen Corp. v. Wal–Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009) ("Once a district court has construed the relevant claim terms, . . . that legal determination governs for purposes of trial.  No party may contradict the court's construction to the jury."); *Sonix Tech. Co. v. Publ'ns Int'l Ltd*, 2017 WL 4357425, at *12 (N.D. Ill. Oct. 2, 2017) (St. Eve, J.) (excluding expert opinion that was inconsistent with the Court's construction); *Personalized User Model, LLP v. Google Inc.*, 2014 WL 807736, at *1 (D. Del. Feb. 27, 2014) (Stark, J.) ("[E]xpert testimony inconsistent with the Court's claim construction is unreliable and unhelpful to the finder of fact . . . .").  AWS's summary judgment motion relies on Dr. Grama's application of construction of "location" that is materially different from the Court's operative construction.  *See* Mot. 23-26.

---

[3] AWS points to a statement from a Kove reexamination where Kove purportedly distinguished its claims from the prior art by characterizing them as directed to "dynamic" associations between location and identifier instead of "static" associations.  Mot. 25.  AWS takes these statements out of context and misreads the prosecution history.  Anyhow, the argument is beside the point.  As explained, a superficially "static" location (such as "Judge Kennelly's courtroom in the Northern District of Illinois") can specify where something is even if it moves, and so can actually track dynamic associations.  That is true of the ████████ which specifies the location of data in S3 even if the ████████████████████

[4] AWS's Local Rule 56.1(a)(2) statement includes several additional arguments that are not in its brief.  Dkt. 687 ¶¶ 76-83.  Those arguments are not properly before the Court.  LR 56.1(d)(4); *see also, e.g.*, *Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 382 n.2 (7th Cir. 2008) ("It is inappropriate to make legal arguments in a Rule 56.1 statement of facts."); *Richmond v. Dart*, 2013 WL 1174436, at *4 (N.D. Ill. Mar. 20, 2013) (Kennelly, J.) (declining to consider "improper argument").

The Court's construction of "location" for these purposes boils down to "specif[ying] where [the] data . . . is stored." The ███████████ do that because they specify which ████ █████████████████ is stored in, and uniquely identify the sought-after ████ within the ████ ASMF ¶ 29-34. But Dr. Grama takes the position that something cannot be a location if the ███████████████████████████ Mot. 25; ASMF ¶¶ 35-39. As explained above, that is not a valid way to decide whether something is a location as construed.

Indeed, Dr Grama's location "test" excludes multiple preferred embodiments from the Kove patents' specifications, ASMF ¶¶ 24, 35-40. That runs afoul of bedrock claim construction principles. *See, e.g.*, *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (construction that excludes preferred embodiments is "rarely, if ever, correct"). Kove's patents provide multiple examples of "locations," including an "HTTP Universal Resource Locator (URL)." ASMF ¶ 40. AWS acknowledges that a URL is within the scope of "location" and understood as a "location"; in fact, a URL is colloquially called a "web *address*." Dkt. 219 at 7-8. But Dr. Grama's interpretation excludes these URL-based embodiments. ASMF ¶¶ 35-40.

Retrieving data specified by a URL requires sending a request to a network of servers that translate the URL into an IP address. Dkt. 247-1 ¶¶ 15-16. This is akin to knowing you are going to a specific place (like Judge Kennelly's courtroom), but then having to look up the courtroom number. As in the courtroom example, because URLs are mapped to IP addresses, the IP addresses that correspond to a URL can change over time while the URL remains the same. It is useful to disconnect the URL (which is easy to remember and represents the location of the webpage data) from the specific servers that store the webpage data. So when you type in the same URL, for example "https://www.amazon.com," you will, over time, retrieve the webpage data from different servers located at different IP addresses. Dr. Grama's construction excludes URLs because the

servers that provide a webpage's data may change while the URL stays the same. ASMF ¶ 37.

Dr. Grama's attempt to apply a different, narrower construction of "location" is improper. The Court's construction requires only "specif[ying] where data . . . is stored"; it does not mandate that the location ██████████████████████████████ Dkt. 484 at 11. There is nothing in the Court's construction to support Dr. Grama's additional requirement.

Extinguishing any doubt, Dr. Grama's narrowed construction turns out to be an attempt to resurrect a position AWS previously abandoned. During claim construction in 2020, AWS tried to limit "location" in essentially the same way Dr. Grama does now. Dkt. 219 at 2-8. It ultimately forfeited that position when it agreed to a broader construction. Dkt. 382 Ex. B at 1. These are the constructions the parties originally proposed for "location," with the differences in bold:

| Kove's proposed construction | AWS's proposed construction |
|---|---|
| an encoding that is a member of a set of associations with an identifier in a location server, and that **specifies a location of data pertaining to the entity identified by the identifier** | an encoding that is a member of a set of associations with an identifier in a location server, and that **is used to directly contact a server storing data and retrieve the data** |

Dkt. 219 at 2. Kove pointed out that AWS's proposed construction would read out preferred embodiments. Dkt. 247 at 9-10. AWS then abandoned its construction and agreed to one substantially the same as what Kove proposed:

| Parties' joint proposed construction (adopted by the Court) |
|---|
| an encoding that is a member of a set of associations with an identifier in a location server, and that specifies *where* data pertaining to the entity identified by the identifier *is stored* |

Dkt. 382, Ex. B at 1.[5] The Court adopted this agreed-to construction. Dkt. 484 at 11. The critical point here is the total absence of AWS's "directly contact" requirement. AWS forfeited that requirement when it gave up its position and agreed to Kove's.

---

[5] The differences between Kove's original construction and the joint construction the Court adopted are noted in italics. Those clarifications did not change anything meaningful in Kove's construction.

Now, three years later, the purported requirement reemerges in Dr. Grama's application of the Court's construction. Dr. Grama's argument that ████████████ s not a "location" because it ████████████████████████████████████ is a way to achieve the same narrowed claim scope AWS's "directly contact" addition might have achieved. ASMF ¶ 37. By requiring that the ████████████████████████████████ Dr. Grama is excluding implementations where a location is mapped to a different form of location before the data is retrieved—as happens with a URL (which is mapped to an IP address) and with "Judge Kennelly's courtroom in the Northern District of Illinois" (which is mapped to courtroom 2103). That is, Dr. Grama is using different words to require that a location be "used to **directly** contact a server storing data and retrieve the data," Dkt. 219 at 2. Both AWS's abandoned construction and Dr. Grama's narrow construction prohibit a level of **indirection** between a location and how data is retrieved (*i.e.*, the mapping of a location in one form to the location in a different form). As a result, both improperly exclude the same preferred embodiments of the Kove patents. ASMF ¶ 40.

Dr. Grama should not be permitted to resurrect substantively the same claim construction AWS long since forfeited. His construction is different from the Court's, and the difference matters; it improperly excludes scope and attempts to recapture forfeited ground. *See, e.g.*, *Nuance Commc'ns, Inc. v. ABBYY USA Software House, Inc.*, 813 F.3d 1368, 1373 (Fed. Cir. 2016) (an attempt to "reverse[] course and . . . get a new construction of disputed terms shortly before trial" is "properly denied," particularly where the party proposing the new construction "initially proposed" the original construction); *SuperGuide Corp. v. DirecTV Enters.*, 358 F.3d 870, 889 (Fed. Cir. 2004) (holding that a party "waived its right to assert a construction other than" the one the parties presented as having been agreed to).

Because AWS's argument rests on an incorrect claim construction, summary judgment

should be denied.  *See Storage Tech. Corp. v. Cisco Sys.*, 329 F.3d 823, 834 (Fed. Cir. 2003) (vacating summary judgment where the court imported an incorrect construction); *UCP Int'l Co. v. Balsam Brands, Inc.*, 787 F. App'x 691, 704-707 (Fed. Cir. 2019) (vacating summary judgment based on an erroneous requirement implicit in the district court's application of its construction).

### b.  Dr. Grama's opinion applying the wrong construction should be excluded.

Expert testimony that departs from the Court's claim construction is inadmissible.  *E.g.*, *Treehouse Avatar LLC v. Valve Corp.*, 54 F.4th 709, 715 (Fed. Cir. 2022) (collecting cases).  As explained, Dr. Grama proposed testimony would do just that.  ASMF ¶¶ 35-39.  Here, as in *Treehouse*, the Court "adopted a construction that the parties requested and agreed upon," only for Dr. Grama to apply a "materially different construction," 54 F.4th at 714-15.  That warrants exclusion.  *See id.* (affirming the district court's grant of a motion to strike).

That AWS forfeited this claim construction by initially proposing it, then agreeing to a broader (and correct) claim construction, is all the more reason to exclude its expert opinion seeking to resurrect the narrower, forfeited construction.  *See, e.g.*, *Nuance*, 813 F.3d at 1373 ("The fact that shortly before trial [a party] became dissatisfied with its own proposed construction and sought a new one does not give rise to an *O2 Micro* violation."); *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1376 (Fed. Cir. 2015) (defendant cannot seek broader construction "at the jury instruction stage" after agreeing to a construction at the *Markman* stage).

Accordingly, paragraphs 263-67 of Dr. Grama's report, which rely on an incorrect claim construction different than the Court's, should be excluded.

### B.  AWS Is Not Entitled to Summary Judgment as to DynamoDB.

Numerous fact issues preclude summary judgment on Kove's claim that AWS's DynamoDB ("DDB") product infringes its patents.  AWS's arguments to the contrary (Mot. 26-29) misapprehend Kove's infringement theory and the claims' requirements.

14

AWS's motion is based on two arguments. First, AWS's argument about "partition keys" is based on an infringement theory Kove does not assert. AWS contends that the "partition key" in DDB does not satisfy the "identifier" claim limitation because partition keys ████████████ ████████████████████████ Mot. 27-29. The problem with this argument is that Kove does not rely on DDB's "**partition** keys" alone. Instead, Kove's infringement theory is based on DDB's "**primary** keys" satisfying the "identifier" limitation.

Second, AWS argues that the ████████████ in DDB do not satisfy the "location server" claim limitation ████████████████████████ Mot. 27-29 (emphasis added). But the Court's claim construction as to the '170 and '640 patents does not contain this requirement—there is no requirement that each location server must "store" identifiers. And as to the '978 patent, Kove has adduced evidence that location servers store identifiers in the requisite circumstances.

### 1. AWS's argument misapprehends Kove's infringement theory as to DynamoDB's primary keys.

First, AWS contends that DDB does not meet the "identifier" limitation because ████████ ████████████████████████ Mot. 27. The Court construed the "identifier" limitation as follows: "a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server." Dkt. 484 at 11.

Some background information is needed to understand AWS's argument and its flaws. DDB is a database product that stores "items" in "tables." ASMF ¶ 46. Each item in DDB has a "primary key" that "uniquely identifies [the] item." *Id.* ¶ 54 (quoting the DDB Developer Guide). Because each primary key is unique, "no two items can have the same key." *Id.* (quoting the DDB Developer Guide). There are two kinds of primary keys: ████████████████████████ *Id.* ¶ 42. ████████ consist of a ████████████████████ *Id.* In tables that use ████ no two items can share a ████████████████████ *Id.* ¶¶ 42,

48. ███████████ comprise two values: ███████████████████" *Id.* ¶ 42. When a
███████████████ is used, items can have the ██████████████ but they must have
█████████████. *Id.* (citing the DDB Developer Guide). In other words, where ███████
██ are used, each item is uniquely identified by the ████████████████████████████
██ *Id.* ¶¶ 42, 48.

Each of the asserted claims requires a unique "identifier." Dkt. 484 at 11. Kove contends
that DDB's ██████████████████████████ constitutes the claimed identifier
because no two items in DDB can share the ████████████ ASMF ¶ 41. AWS ignores this
██████████ theory, and instead argues that ██████████ do not alone always satisfy the
identifier limitation, since multiple items in DDB can in certain circumstances share the ███
████████ Mot. 27. This subtly misleading argument misses the point. It is true that the
███████ does not always ████████████████—sometimes the ████████████
███████████████████ identify the data entity. ASMF ¶ 42. Kove has adduced evidence
that both types of ████████ satisfy the identifier limitation. ASMF ¶¶ 42-43, 46-55. Because
AWS points to the wrong evidence and does not address Kove's infringement theory based on
██████████ AWS's summary judgment motion on this point should be denied.[6] It is not Kove's
theory that when a ██████ is present the ██████████ by itself meets the "identifier" limitation;
in that case, the ████████████████████ meets the limitation. ASMF ¶ 41.

Finally, AWS's argument is flawed even under its skewed reading of Kove's theory, as
AWS ignores the fact that ██████████████ (and thus satisfy the "identifier" limitation) in
tables that use ████████████. ASMF ¶¶ 42-43, 48, 54. AWS would thus infringe even under

---

[6] AWS makes a prosecution disclaimer argument in addressing the strawman theory that partition
keys ████████████████ Mot. 28-29. Because that is not Kove's theory, AWS's
prosecution disclaimer argument is irrelevant.

a ████████-identifier theory.

**2. AWS's arguments as to ████████ misapprehend the claim construction.**

Second, AWS argues that the ████████ in DDB do not satisfy the "location server" claim limitation because they do not store ████████ Mot. 27-29. But the Court's claim construction does not require that each location server store identifiers, such as ████████

The term "location server" is present in each of the claims Kove accuses DDB of infringing. An example is claim 1 of the '170 patent, which provides:

> 1. A system for managing data stored in a distributed network, the system comprising:
>
> a data repository configured to store a data entity, wherein ████████ ████████ ; and
>
> a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, ==at least one of the plurality of data location servers includes location information associated with the identifier string==, each one of the plurality of data location servers comprises a processor and a portion of the data location information, the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.

ASMF ¶ 49 (emphasis added). The yellow highlighted claim language requires that at least one of the data location servers include "location information associated with the identifier string." In turn, the green highlighted language states that an "identifier string identifies the data entity." The '170 patent's other claims are similar, as are the asserted claims of the '640 patent. ASMF ¶ 44.[7]

AWS's argument assumes that each location server must "**store**" identifier strings. Mot. 27-29 (emphasis added). That premise is contrary to the claim language. If the patentee meant to say the identifier string itself had to be stored on the location server, the claim would

---

[7] Specifically, '170 claims 1, 2, 6, 8, 12, and 15 and '640 claims 17, 18, and 24.

have said that.  Instead, it says that only location information "*associated with*" the identifier string must be stored.  AWS's argument improperly rewrites the claim language to add new limitations. *Storage Tech.*, 329 F.3d at 834; *UCP*, 787 F. App'x at 704-07.

Further, the Court's construction of "location server" does not support AWS's argument that the claims require a location server to store the identifier string.  The construction reads:

> a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients.

Dkt. 484 at 35.  The construction requires only that the location server maintain a set of "identifier/location mappings"—not the identifier string.  Location servers must thus be able to map identifiers to locations.  Storing every identifier string and their corresponding location(s) would be one way to achieve this, but it is not the only way.  The claim is written more broadly, requiring only information "associated with" the identifier string.  And consistent with this, the "location server" must maintain merely a set of "identifier/location mappings."[8]  Neither require a location server to store an identifier string, as such.

This understanding is reinforced by the Court's construction of "location information."  In the '170 and '640 patents, "location information" is defined as

> information pertaining to one or more locations of data and/or the identities of one or more location servers.

Dkt. 484 at 35.  Just as the rest of the claim, as construed, does not require that identifier strings be stored on the server, the definition of "location information" contains no such requirement. Instead, it simply requires information *pertaining* to locations of data or to location servers.

The construction of "location information" in the '978 patent is different:

> one or more identifiers and their locations.

---

[8] This aligns with the specification, which describes mappings as merely associations.  ASMF ¶ 44.

Dkt. 484 at 35. Thus, for the '978 patent, "location information" must include at least one identifier and its location.[9] Unlike the '170 and '640 patents, which do not require the location server to store an identifier, the '978 patent does require storage of an identifier by virtue of the "location information" definition. That the limitations of the related patents are different buttresses the conclusion that AWS is reading a different limitation into the '170 and '640 patents under the doctrine of claim differentiation. *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005). Claim differentiation is "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope." *Id.* This creates a "presumption that two independent claims have different scope when different words or phrases are used in those claims." *Id.* at 1369; *see In re Rambus Inc.*, 694 F.3d 42, 48 (Fed. Cir. 2012) (applying claim differentiation across related patents); *Bio-Rad Labs., Inc. v. Int'l Trade Comm'n*, 998 F.3d 1320, 1334 (Fed. Cir. 2021) (same).

That AWS's noninfringement argument for the '170 and '640 patents seeks to impose an additional requirement of storing an identifier string is apparent throughout. For example, AWS asserts that "there's no evidence that ███████ . . . store ██████ . . . [s]o, ██████, ███ don't qualify as the required 'location servers,' as they don't contain the requisite 'identifier/location' mappings.'" Mot. 27. Implicit in this argument is that ████████ (which are the location servers) must store ██████ (identifiers) to qualify as location servers. However, as discussed above, there is no requirement in the '170 and '640 patents that the identifiers themselves be stored on the location servers. As another example, AWS asserts that "the DDB source code shows that ██████████████████" from which it concludes that "there's no dispute that the ████████████████████"

---

[9] "Identifier" and "identifier string" are synonymous. Dkt. 484 at 11.

Mot. 27-28.  Again, an identifier need not be stored in the ███████████ to prove infringement.

In short, the Court's construction of "location server" for the '170 and '640 patents does not require that location servers store identifier strings.  Rather, the construction is agnostic as to the specific means through which the identifier/location mappings are maintained.  AWS's motion is thus premised on reading a limitation into the claims that does not exist.  As shown below, under the correct claim construction, Kove has amply demonstrated why ████████████ meet the "location server" limitation, and so AWS's motion must be denied.[10]

### a.  Kove's evidence defeats summary judgment as to the '170 and '640 patents.

A reasonable jury could find that DDB meets the location server limitation because it shows that at least one location server includes location information associated with an identifier string.  Dr. Goodrich catalogs the evidence meeting this limitation. ASMF ¶¶ 42-43, 46-55.  As he explains, the ████████████ in DDB maintain ████████████████████ and their corresponding locations ("████████████") by using ████████████████ ████████████████ ASMF ¶ 46.  AWS does not dispute that DDB operates in this way.  There is thus at minimum a genuine dispute as to whether DDB meets the "location server" claim limitations, and so AWS's motion must be denied.

As noted, data in DDB are referred to as "items."  ASMF ¶ 48. ████████████████ ███████████████████████████████████████████████████, but it need not include the item's location.  As a rough analogy, a person's unique identifier could be her social security number.  Or a document might have a unique identifier that identifies the precise

---

[10] As noted, the '978 patent does require that the location server stores one or more identifier strings. As discussed in § I.B.2.c below, Kove has adduced evidence that DDB nonetheless infringes this '978 patent limitation in certain circumstances.  For the same reason, even under AWS's incorrect interpretation of the '170 and '640 patents (adding the limitation that the location server must store an identifier string), DDB nonetheless infringes in certain circumstances.  *See infra* § I.B.2.c.

document, but that identifier need not provide the location of the document on the servers.

As discussed above, a ███████████ may consist of ████████████████████████████████

████████████████████████ ASMF ¶ 42. In retrieving and returning data items requested by

customers, DDB may request the location of items from █████████████████. *Id.* ¶ 48. That is, a

request containing a ████████████ is received by DDB. *Id.* ¶ 49. The request will reach a ████████

████████ and if the ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.* ¶ 49. AWS

acknowledges all of this. Mot. 26-28.

████████████████████ are configured to provide the requested locations for every item stored in

DDB. ASMF ¶ 49. The way this works is that the ████████████ for the requested item is ████████

████████████████████████████████ *Id.* ¶ 50. This ████████████ is then used by the queried

████████████████████████████████████████████████████████████████ *Id.*

¶ 51. That is, using the ████████████████████ look up and return the locations for the

specific ████████████ that was provided in a customer's request. ████████████████ thus maintain the

"identifier/location mappings" that the Court's construction requires. And ████████████████ are the

location servers, and maintain information associated with the identifier strings. *Id.* ¶ 51.

That the claim language requires only that the location server have location information

*associated with* the identifier string makes sense in terms of how a system is set up to efficiently

retrieve a massive volume of location information. Consider an analogy: Telephone numbers in

this country uniquely identify a subscriber. Those can be thought of as the identifiers in the context

of the patent. The first three numbers of a telephone number are the "area code," the next three

are the "prefix," and the last four are the "subscriber number."

The '170 and '640 patents require the location server to store location information

associated with the identifier. Historically, the area code corresponded to a particular geographic area of the country. If one wanted to map every telephone number to its corresponding geographic area, one could do so by storing a mapping of every telephone number with its corresponding geographic area (which would be no more specific that the geographic area associated with the area code). That would be location information (the geographic area) associated with the identifier (the entire telephone number). Alternatively, and much more efficiently, one could maintain every telephone number/geographic area mapping by storing the relationship between each *area code* (instead of the whole telephone number) and its corresponding geographic area, and then use just the area code to look up the geographic area. Both approaches achieve the same result of providing the geographic area (location information) associated with a telephone number (identifier).

So too with DDB. The system does not have to store every ███████ (the identifier) to maintain a mapping of where information associated with the ███████ is located. It is enough ████████████████████████████████████████████████████████ ████████████████ The locations where every item is stored could be maintained by ████████████████████████████ But one could maintain all the █████████████████████████████████████ ███████ As in the telephone example, where the full telephone number is necessary to uniquely identify a subscriber but only the area code is needed to determine the geographic location for each telephone number, the full ███████ is necessary to uniquely identify an item but only the ███████ (which is ████████████████████████████████ is needed to determine the location of each item. That is so because ████████████████ ████████████████████ which means that they are stored in the same locations. ASMF ¶ 52. Thus, in DDB, the ████████████████████████ and

Metadata Nodes store the locations that map to each ███████ *Id.* ¶ 53.

In sum, a reasonable jury could find that DDB meets the location server limitation.

### b. AWS's noninfringement theory is premised on an incorrect claim construction and so should be excluded.

As discussed above, AWS's summary judgment motion as to DDB fails because it applies the incorrect claim construction. For the same reason, at trial, AWS's expert should not be permitted to testify as to a noninfringement position based on an incorrect claim construction. *See Exergen*, 575 F.3d at 1321; *Sonix*, 2017 WL 4357425, at *12. Paragraphs 224-228 of Dr. Grama's report analyze infringement based on the incorrect claim construction. Dr. Grama should be precluded from discussing or applying this incorrect claim construction at trial.

### c. Fact issues preclude summary judgment to the extent the location server must store an identifier string, as with the '978 patent.

As discussed, the '978 patent differs from the '170 and '640 patents in that at least one location server must store an identifier string. A reasonable jury could find this limitation satisfied. Dr. Goodrich, demonstrates how DDB meets this limitation. ASMF ¶¶ 42-43, 46-55.

Specifically, DDB meets the location server limitation of the '978 patent when the ███  ████████████████████████████████████████ For ████████ that consist only of a ████████ the parties agree that the ████████████████ ASMF ¶ 54. The parties also agree that these ████████ (which are ████████████████████ are ████████████████, and that ████████████████ *Id.* ¶ 54. Finally, as AWS acknowledges, Dr. Goodrich explains why the person of ordinary skill in the art would view ████████ as storing these ████████ (*i.e.*, the identifiers). *Id.* ¶ 55 ("The person of ordinary skill in the art would understand that a ████████████ is a representation of the ████████ The ████████████ determines ████████ in which an item's data is stored."); Mot. 27-28.

23

AWS does not assert that Dr. Goodrich's explanation of why ███████ that ██████ ███████████ are stored on █████████ fails to raise a genuine dispute of material fact, nor could AWS reasonably do so.

For the same reason, even under AWS's incorrect interpretation of "location server" in the '170 and '640 patents, summary judgment must be denied because the evidence shows that DDB infringes when the ████████████████████████ as discussed above. In other words, even if a location server needed to contain an identifier string to satisfy the '170 and '640 limitations, fact issues nonetheless preclude summary judgment because the facts just discussed show that DDB meets this (incorrect) limitation.

## II. AWS's Request for a New Claim Construction Fails: There Was No Prosecution History Disclaimer.

AWS's primary noninfringement theory is based on its request that the Court change the claim construction that has been operative for years. It requests the Court reopen long-since closed claim construction based on alleged prosecution history disclaimer that occurred after claim construction in this case. AWS cannot meet its heavy burden to prove "clear and unmistakable" prosecution history disclaimer, and thus there is no basis for reopening claim construction.

Prosecution history disclaimer exists to prevent a patentee from giving up claim scope to secure a patent, only to later seek to recapture that scope to prove infringement by claiming that an accused product practices the disclaimed scope. Under this doctrine, although a patentee is normally entitled to the full scope of its claim language, the patentee may disavow or give up some of that scope during prosecution (if "clear and unmistakable"). That is, a patentee cannot *dis*claim scope unless they claimed that scope in the first place. Merely distinguishing the prior art is not enough. If, for instance, a patent claims a cylindrical shape, and the examiner cites prior art with a square shape, the patentee would distinguish the prior art on the ground it was not cylindrical.

That is not a disclaimer. The patent never claimed a square shape, so there is nothing to disclaim. The patentee was simply distinguishing the prior art.

So too here. AWS contends that when, in reexaminations of its patents, Kove distinguished prior art because it did not have the '"non-hierarchical' structures" required by the patents, it was disclaiming hierarchical structures. But that which is not claimed cannot be disclaimed. Kove expressly stated and made clear in the reexaminations that the claim language at issue required non-hierarchical structures, so hierarchical prior art did not read on the claim limitations—just as square prior art does not read on cylindrical claim language. AWS has failed to show that the claims ever had scope that included hierarchical structures—and it cannot because they do not— much less that there was clear and unmistakable disavowal by Kove.

AWS merely points to places in the reexamination record where Kove said "non-hierarchical," but it omits the surrounding language making clear that the existing claim limitation can only be read to require a non-hierarchical topology. Kove pointed out that the claims *as written* refer only to non-hierarchical topology, and thus the prior art does not meet the claim limitations. The examiner agreed and issued the patents on that basis. Kove never disclaimed scope.

AWS's proposed new claim constructions expose its overreach in trying to change the claim language as a gambit to evade infringement. It asks the Court to add language to a part of the claim not even at issue during reexamination regarding "non-hierarchical," then points to "hierarchy" in *unaccused* aspects of its products (S3 and DynamoDB) to argue noninfringement. Tellingly, it never says the *accused* portions are hierarchical. Put differently, AWS's theory points to irrelevant hierarchical features in a bid to secure noninfringement, while ignoring the actually accused non-hierarchical features—and it wants a construction that will facilitate that tactic.

Indeed, AWS's proposed claim constructions wander so far afield of disclaimer that it now

seeks revised constructions of other limitations that have nothing to do with the supposed prosecution history at issue. It simply slides in a host of new constructions with hardly any discussion. AWS fails to show any reason to reopen claim construction, how its constructions are tethered to the alleged disclaimer, or how importing new limitations is appropriate.

Accordingly, AWS's proposed new constructions should be rejected. It has failed to meet its heavy burden of demonstrating prosecution history disclaimer.

### A. Facts Relating to Reexamination of the Kove Patents

The table below shows the reexaminations relevant here.

| Reexam Control No. | Patent | Challenged Claims | Result |
|---|---|---|---|
| 90/019,036 ('036 reexam) | '640 patent | 17-18 and 24 | All claims determined patentable |
| 90/019,035 ('035 reexam) | '170 patent | 1-2, 6, 8-9, 12 and 15 | All claims determined patentable |
| 90/019,034 ('034 reexam) | '978 patent | 1, 3, 6, 10, 14, 17, 23, 24, 30, and 31 | Claims 17, 23, 24, 30 determined patentable without substantive reexamination; Claims 1 and 31 canceled; Remaining determined patentable |

All challenged claims of the '640 and '170 patents were subjected to substantive reexamination. The Patent Office issued Office Actions in each reexam, identifying the prior art and reasons why the Office believed the art rendered the claims unpatentable. ASMF ¶ 1. Kove responded to the Office Actions, detailing why the claims are distinguishable from the prior art. *Id.* ¶ 2. The Patent Office agreed and upheld the patentability of all claims.

For the '978 patent, not all challenged claims were substantively reexamined. ASMF ¶ 2. The Patent Office found claims 17, 23, 24, and 30 patentable before any response from Kove. *Id.* ¶ 3. The remaining claims (1, 3, 6, 10, 14, and 31) were subject to the reexamination, and Kove submitted a response only as to them. *Id.* The Patent Office upheld the patentability of claims 3,

6, 10, and 14, and issued a final rejection as to claims 1 and 31. *Id.*[11]

### 1. '640 patent ('036 reexam)

The Patent Office undertook substantive reexamination of whether claims 17, 18, and 24 are obvious over prior art, including Oracle Names Admin Guide ("ONAG").[12]  Claim 17, as an example, recites:

> 17. A system for retrieving data location information for data stored in a distributed network, the system comprising:
>
> a plurality of data repositories configured to store data, wherein the data is associated with a respective identifier string in each data repository;
>
> a data location server network having a plurality of data location servers, each of the plurality of data location servers containing location string associated with respective identifier strings and each of the plurality of data location servers having computer executable code configured to execute the following steps:
>
> in response to receiving a data location request from a client to retrieve a location string associated with an identification string provided in the data location request, transmitting a redirect message to the client if the identification string is not associated with a location string at the data location server, wherein the redirect message contains information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string.

In responding to the Patent Office's rejections, Kove explained that its claims include limitations that distinguish them from ONAG.  Kove argued that ONAG teaches a system that "depends on a hierarchical structure where a client can only query the node immediately 'above' or 'below' it in the 'tree.'"  ASMF ¶ 4.  Kove contrasted ONAG's "hierarchical tree" with the requirements of claims 17 and 18, which contain limitations allowing:

> [a] client [to] send a query to any server in the network—not just its local region, as taught by Oracle Admin (see Oracle Admin, p. 190).  If the queried server does not have the requested information, that server (as are all servers in the data location server network) is configured to return a message to the client containing information that the client can then

---

[11] Claims 1 and 31 are no longer asserted in this case.

[12] Limitations present in claim 18 are also present in claim 24, which depends from it.

use to calculate the location of the server that does have the requested information.

*Id.* Kove identified the limitations distinguishing the claims from ONAG's hierarchy:

> Claims 17 and 18 require that "**each of the plurality of data location servers** having computer executable code *[be] configured to*" carry out specific activity. In particular, each location server must be able to "transmit[] a redirect message to the client if the identification string is not associated with a location string at the data location server, wherein the **redirect message contains information for use by the client to calculate a location of a different data location server** in the plurality of data location servers, **wherein the different data location server contains the location string**."

*Id.* (emphasis in original). Using terminology that contrasted what the claim limitations require with ONAG's hierarchical structure, Kove explained that the claims' "**non-hierarchical cluster composition is expressly claimed**" in claims 17 and 18 through the requirement that 'each' (i.e., all) of the data location servers be similarly configured to respond to a client request with the aforementioned information." *Id.* ¶ 5 (emphasis added). Similarly, Kove argued that ONAG "lacks the non-hierarchical structure required to enable every server in the network to return information useable by the client to locate the server that contains the requested information," pointing to the "each of the plurality of data location servers" and "redirect message" requirements of claims 17 and 18. Each time, Kove used "non-hierarchical" as a synonym for the patent's claim limitations describing that topology.

Kove's response also included a declaration from Dr. Goodrich, stating:

> Claims 17 and 18 both require 'each' data location server in the claimed data location network have computer executable code 'configured to execute' certain steps, including transmitting a redirect message to the client containing information for use by the client to calculate the location of the location server that contains the location string. **It is my opinion that a POSA at the time of this invention would understand this limitation to require a nonhierarchical cluster configuration as taught by the '640 patent**.

ASMF ¶ 6 (emphasis added).[13] Dr. Goodrich confirmed that a POSA would understand the

---

[13] A "POSA" or "POSITA" is a person of ordinary skill in the art. Dr. Goodrich was explaining how such a person would understand the claim language. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (Generally, the words of a claim should be given their ordinary and customary

limitations to mean non-hierarchical topology.

The Patent Office confirmed the patentability of all reexamined claims, reasoning that "[t]he cited prior art fail to teach individually or in combination" the limitations of the claims requiring a "redirect message." ASMF ¶ 7.

### 2. '172 patent ('035 reexam)

The Patent Office conducted substantive reexamination of '172 patent claims 1, 2, 6, 8, 12, and 15 to determine whether they are obvious over prior art, including ONAG.[14] Claim 1, as an example, recites:

1. A system for managing data stored in a distributed network, the system comprising:

a data repository configured to store a data entity, wherein an identifier string identifies the data entity; and

a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, at least one of the plurality of data location servers includes location information associated with the identifier string, each one of the plurality of data location servers comprises a processor and a portion of the data location information, the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.

In responding to the Office's rejections, much like it did for the '640 patent, Kove identified specific limitations from each independent claim that differentiates them from ONAG, pointing out that the limitations cannot be met by ONAG's hierarchical tree topology:

- "[C]laim 1 requires data location information to be portioned and organized across the data location servers in the network based on a hash function. **A hash function necessarily organizes data in a non-hierarchical manner**, meaning claim 1 can only be accomplished

---

meaning, [which is] "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention . . . ." (cleaned up)).

[14] Claims 1, 6, and 15 are independent claims. Claim 2 depends from claim 1; and claims 8 and 12 depend from claim 6 from claim 18.

through the cluster configuration taught by the specification." ASMF ¶ 8.

- "**Claim 6's non-hierarchical configuration is embodied [by]** [sic] the requirement that the location server must be able to return a 'redirect message' where 'the redirect message compris[es] a list of at least one other location server known to have the location information for the desired entity.' This limitation cannot be met in hierarchical configurations such as Names Server because location servers in tree-structures do not necessarily know which other server has the desired information." ASMF ¶ 8 (emphasis added).

- "**Claim 15 contains a similar requirement** that location servers in the network be capable of returning 'redirect messages' identifying other servers in the network with the desired information. This is embodied in the limitation 'the redirect message identifying which of the plurality of location servers includes the location information.' . . . [T]he redirect message limitations, as recited by claims 6 and 15, demonstrate that claims 6 and 15 **recite a non-hierarchical cluster configuration**." ASMF ¶ 8 (emphasis added).

Kove also submitted a declaration from Dr. Goodrich that stated, "It is my opinion that a **POSITA** at the time of this invention **would understand claims 1, 6, and 15**, through various limitations in each of the claims, **to require a non-hierarchical cluster** configuration as taught by the '170 patent." ASMF ¶ 9 (emphasis added). As with the '640 patent, Dr. Goodrich confirmed that the claims' plain language requires non-hierarchical topology.

The Patent Office confirmed the patentability of all reexamined claims, and identified the limitations requiring "redirect message" and the "each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string" as not being disclosed in the prior art. ASMF ¶ 10.

### 3. '978 patent ('034 reexam)

The Patent Office confirmed the patentability of '978 patent claims 17, 23, 24, and 30, and engaged in substantive reexamination of claims 1, 3, 6, 10, 14, and 31 to determine whether they are obvious over prior art, including ONAG.[15] Claim 10, as an example, recites:

10. A system having a plurality of location servers for managing location information and

---

[15] Claims 1, 10, 14, 17, and 31 are independent claims. Claims 3 and 6 depend from claim 1; and claims 23, 24 and 30 depend from claim 17. Claims 1 and 31 are no longer asserted.

providing location information to location queries, the system comprising:

a plurality of location servers containing location information corresponding to a plurality of entities, the location information formatted according to a transfer protocol configured for manipulating location information, and comprising at least one application server address, wherein the plurality of location servers are arranged in a cluster topology such that each location server contains a unique set of location information of an aggregate set of the location information; and

programming logic stored on each of the plurality of location servers responsive to a location query for a desired identifier to return one of a location message, wherein a queried location server returns a location message if the queried location server contains location information for the desired identifier, and a redirect message if the queried location server does not contain location information relevant to the desired identifier, wherein the redirect message comprises information for finding a location server having location information related to the desired identifier.

Here too, Kove pointed to the limitations in the claims responsible for the structural configurations of each claim's location servers:

- "Independent claims 10 and 14 and dependent claim 3 require, **expressly or impliedly, a non-hierarchical cluster configuration of locations servers in a network**. For example, claim 10 recites "the plurality of location servers are arranged in a cluster topology such that each location server contains a unique set of location information of an aggregate set of the location information […] programming logic stored on each of the plurality of location servers responsive to a location query for a desired identifier to return one of a location message […] a redirect message if the queried location server does not contain location information relevant to the desired identifier, wherein the redirect message comprises information for finding a location server having location information related to the desired identifier." As such, claim 10 explicitly recites that the location servers are arranged in a cluster topology. Furthermore, claim 10 requires each location server be configured to transmit a redirect message comprising information to for finding a location server having location information. Therefore, **these limitations require a non-hierarchical cluster configuration**." ASMF ¶ 11 (emphasis added).

- "**Claim 14's non-hierarchical configuration** is embodied in the requirement that the location server must be able to receive a location query from a client and return a "redirect message to the client if the queried location server does not contain data location information relevant to the entity identified in the query, the redirect message comprising information for finding a location server storing the entity identified in the query." ASMF ¶ 11 (emphasis added).

- "**Claim 3 contains a similar requirement** that location servers in the network be capable of returning "redirect messages" where the "redirect message comprising information for finding a location server known to have location information relevant

31

to the location query." Therefore, the redirect message indicates with specificity and certainty which data location server in the network contains the location information for the desired entity. **A hierarchical configuration does not enable nodes to have such knowledge**." ASMF ¶ 11 (emphasis added).

Dr. Goodrich also submitted a declaration where he stated, "**It is my opinion that a POSITA** at the time of this invention **would understand** claims 3, 10, and 14, through various limitations in each of the claims, **to require a non-hierarchical cluster configuration** as taught by the '978 patent," thus confirming that the claim's plain language requires a non-hierarchical topology. ASMF ¶ 12 (emphasis added).

The Patent Office confirmed the patentability of all challenged claims except claims 1 and 31, which were finally rejected.[16] The Office specifically identified the limitations that distinguished the claims over the prior art as the bases for patentability. ASMF ¶ 13.

### B. AWS Falls Far Short of Its Burden to Establish Disclaimer.

As the party alleging disclaimer, AWS bears the burden of establishing it. *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009). Disclaimer arises where a patentee "disavows the full scope of the claim term during prosecution." *Duncan Parking Techs., Inc. v. IPS Grp.*, 914 F.3d 1347, 1364 (Fed. Cir. 2019). A patentee may, through arguments made during prosecution, "narrow the literal scope of an *otherwise more expansive claim limitation*." *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013) (emphasis added). For prosecution disclaimer to apply, "the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d

---

[16] Claims 1 and 31, which do *not* have limitations requiring non-hierarchical topologies, were never argued as being distinguishable from ONAG for this reason. ASMF ¶ 16. These claims were rejected as unpatentable over ONAG, consistent with the Patent Office's confirmation of claims that *do* have limitations requiring non-hierarchical topologies. This underscores that these limitations are the basis for confirming the claims that have them, *i.e.*, the difference between patentable and not patentable claims are the limitations that define the non-hierarchical topologies.

1353, 1359 (Fed. Cir. 2017). "Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations, we have declined to find prosecution disclaimer." *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) (cleaned up).

In short, the claim language must claim something within its scope before it can be disclaimed. Here, the claim language unambiguously requires non-hierarchical topologies, meaning topologies that are hierarchical cannot invalidate them. Kove's statements to the Patent Office made this clear. In explaining why the language never encompassed the prior art in the first place, Kove was not disclaiming the "literal scope" of the claims, *Trading Techs.*, 728 F.3d at 1322—it was not giving up anything it previously claimed.

### 1. Kove's statements regarding "non-hierarchical" configurations described the claim scope—they did not disclaim it.

The literal scope of the claims at issue is unaffected by Kove's statements to the Patent Office about location server configuration because those statements *described* the claims' scope, rather than narrowing the claims to less than what they otherwise would have been. As Kove consistently explained to the Patent Office in each of the three reexams, the claims require location servers to have certain capabilities. *Supra* § II.A. It further explained that, in contrast to ONAG's hierarchical topologies, the claims have limitations that cannot be met with hierarchical topologies. *Id.* Describing the claims as "non-hierarchical" was simply Kove's shorthand way of contrasting what its claim limitations require with what ONAG discloses—it was crystal clear that what Kove meant by "non-hierarchical" was exactly what the claims already said. Kove never argued (or implied) that its claims could be read to *include* hierarchical topologies or that Kove was disavowing them for the sake of overcoming ONAG. Dr. Goodrich confirmed Kove's descriptions, telling the Patent Office that a person of ordinary skill in the art at the time of the invention would have understood the various limitations to require a non-hierarchical

configuration.  ASMF ¶ 15.  AWS has never disputed this.

A brief analogy crystallizes the issue.  Assume a claim recites a system comprising a bulb that radiates light at a frequency of 400-484 THz and a wavelength of 620-750 nm.  A person of ordinary skill in that art would understand the limitations to require red light, even though the claim never uses the word "red."  "Red" in this context then means "light having a frequency of 400-484 THz and a wavelength of 620-750 nm."  In distinguishing a prior art reference that discloses blue light, the patentee may explain that its claim requires light that is "not blue."  This is not "disclaiming" blue light because the full scope of the claim never included light that is blue (rather, it excluded it because blue light would not meet the requirements of the claim).  Just so here.  To distinguish ONAG's "hierarchical" configuration, Kove explained that specific limitations dictate that the claims are "not hierarchical," much in the same way that the frequency and wavelength requirements dictate the claimed light is "not blue."

Disclaimer brooks no ambiguity—Kove's intent to disavow claim scope must be clear. That which is not claimed cannot be disclaimed, and AWS has not shown that the full scope of Kove's claims ever allowed the types of "hierarchies" it says Kove disavowed.  The record is clear that Kove described its claims using convenient terminology so as to avoid endless, unhelpful, verbatim repetition of the claim's words; what those words describe is a non-hierarchical topology. AWS comes nowhere near showing that Kove clearly and unambiguously disclaimed scope.  *Avid Tech.*, 812 F.3d at 1045 ("Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations, we have declined to find prosecution disclaimer.").

### 2. Kove did not make any statements (let alone disclaimers) about claims 17, 23, 24 or 30 of the '978 patent.

AWS contends that Kove's reexam statements resulted in disclaimers across all 17 asserted claims.  But the Patent Office found claims 17, 23, 24, and 30 of the '978 patent to be patentable

at the outset. Dkt. 690-31 at 5 ("Claims 17, 23, 24, and 30 are found patentable as discussed below."). That finding preceded any submission by Kove about any claim of the '978 patent. In fact, in its response, Kove "thank[ed] the Office for confirming patentability of these four claims" and went on to address "the rejections *as to the remaining claims*." ASMF ¶ 16 (emphasis added). So the statements AWS cites in alleging disclaimer could not have been about these claims, and Kove cannot have "clearly and unambiguously" disavowed some part of their scope.

AWS's only argument in support of disclaimer is that Dr. Goodrich did not "provide a clear opinion either way on whether [these claims] require a 'non-hierarchical cluster configuration.'" Mot. 9 n.29. How this amounts to disclaimer—which the law requires to be "clear and unmistakable"—AWS does not say. *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1063–64 (Fed. Cir. 2016) (alleged infringer bears the burden of proving "a 'clear and unmistakable' disclaimer that would have been evident to one skilled in the art"). "Instead," AWS says, Dr. Goodrich "argues that Kove didn't make statements concerning those five claims in Reexamination No. 90/019,034." Mot. 9 n.29. This only proves Kove's point: Having been silent as to these claims, Kove cannot be said to have clearly and unmistakably disclaimed anything about them. *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1120 (Fed. Cir. 2016) (rejecting disclaimer argument based on statements made "in the context of different claims that did not include the terms" at issue); *see also Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) (affirming district court's refusal to read limitations relating to alleged disclaimer from one claim into another). AWS therefore fails, as a matter of law, to prove disclaimer as to claim 17, 23, 24, and 30 of the '978 patent.

### 3. Kove's statements regarding "non-hierarchical" did not apply to claim 6 of the '978 patent.

AWS contends that Kove's statements in the '978 patent reexam also limited claim 6. In

addition to there being no disclaimer for the reasons explained above, the statements AWS relies on pertain only to claims 3, 10, and 14. Kove called out the claims by number:

- "Independent claims 10 and 14 and dependent claim 3 require, expressly or impliedly, a non-hierarchical cluster configuration of locations servers in a network." ASMF ¶ 17.

- "Claim 14's non-hierarchical configuration is embodied in the requirement that the location server must be able to receive a location query from a client and return a "redirect message to the client if the queried location server does not contain data location information relevant to the entity identified in the query, the redirect message comprising information for finding a location server storing the entity identified in the query." ASMF ¶ 17.

- "Claims 3 contains a similar requirement that location servers in the network be capable of returning "redirect messages" where the "redirect message comprising information for finding a location server known to have location information relevant to the location query." ASMF ¶ 17.

Kove never made (and AWS does not cite) any statements about "non-hierarchical" in relation to claim 6 of the '978 patent and therefore cannot be said to have made any disclaimers to that effect. ASMF ¶ 17.

### C. AWS's Proposed Constructions Are Far Afield from Kove's Reexam Statements, Illustrating That This Is Not a Question of Disclaimer.

AWS's only basis for asking the Court to reopen claim construction is its incorrect assertion that disclaimer altered the claims' ordinary scope. Absent disclaimer, there is no reason to construe (or reconstrue) any claim term, and the Court need not consider AWS's proposed constructions. AWS's desired eleventh-hour changes to the claim language are untethered to Kove's statements in the prosecution history. That underscores that AWS's arguments are not really about disclaimer, but rather a gambit to escape infringement by importing new claim limitations.

Claim construction begins with "the language of the claims themselves." *Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1008 (Fed. Cir. 2023). "A claim term's ordinary and customary meaning, as understood by persons skilled in the relevant technology, is the default meaning." *Abbott Labs. v. Church & Dwight Co., Inc.*, 2008 WL 5387848, at *2 (N.D.

Ill. Dec. 22, 2008); *accord Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).  A patent's prosecution history (here, the reexamination) "can reveal 'an intentional disclaimer, or disavowal, of claim scope by the inventor,' resulting in a claim that is narrower than its language might otherwise suggest." *Green Pet Shop Enters. v. Maze Innovations, Inc.*, 2016 WL 7451629, at *3 (N.D. Ill. Dec. 28, 2016) (Kennelly, J.) (quoting *Phillips*, 415 F.3d at 1316). Disavowal cannot be found "absent clear intent by the patentee." *Id.* (citing *Epistar*, 566 F.3d at 1334).  Statements in the prosecution history must be considered in the context of the claim terms discussed and do not apply to other claim terms. *Vanguard*, 234 F.3d at 1372 (affirming the district court's refusal to read limitations relating to alleged disclaimer from one claim into another); *see also Mass. Inst. of Tech.*, 839 F.3d at 1120 (rejecting disclaimer argument based on statements made "in the context of different claims that did not include the terms" at issue).

It bears emphasizing that this is not ordinary claim construction, which was completed long ago in February 2021.  AWS's only basis for reopening claim construction is the alleged prosecution disclaimer in the interim.  Because there was no disclaimer, there is no reason to revisit claim construction, and none is provided.  AWS's disclaimer argument rests on the erroneous supposition that because the specification refers to both nonhierarchical and hierarchical structures, Kove "disclaimed" hierarchical structures when it described its claims as "non-hierarchical." *See* Mot. 11-12.  But what is in the *specification* has nothing to do with prosecution history estoppel or the disclaimer doctrine.  As Judge Rich famously said, "the name of the game is the claim."[17]  The universe of what can be disclaimed is limited to what is claimed.  That the specification includes concepts beyond what the claims say is immaterial.

---

[17] Giles S. Rich, *The Extent of the Protection and Interpretation of Claims—American Perspectives*, 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499 (1990).

1. **"network"/"system"**

| Term | Court's Construction | AWS's Proposed Construction |
|------|---------------------|----------------------------|
| network/system | (not previously construed) | network/system **arranged in a non-hierarchical, cluster topology** |

AWS's proposed construction shows how it is seeking to import a limitation untethered to the alleged disclaimer. The terms *network* and *system* were not the subject of Kove's statements regarding "non-hierarchical," let alone the subject of unambiguously disclaimed scope.

Taking "system" first, the term appears only in the preambles of certain claims,[18] and the parties agree that those preambles are not limiting. ASMF ¶ 18. Non-limiting preambles do not impact claim scope, making it unnecessary to construe them. *See Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1369 (Fed. Cir. 2020) ("[A] preamble is generally not limiting unless there is 'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'"). The Court can reject AWS's construction for this reason alone. Additionally, AWS does not explain why Kove's reexam statements could plausibly (let alone unmistakably) limit entire claim "systems," which includes far more than just the limitations Kove's statements were describing.

For example, claim 17 of the '640 patent claims, "A *system* for retrieving data location information for data stored in a distributed network, the *system* comprising . . . ." The claim then recites the elements that compose the system, including the limitation "each of the plurality of data location servers having computer executable code configured to execute . . . ," followed by another limitation specifying how the claimed location servers respond to client requests by providing a "redirect message" that is required to contain particular information.

In the reexam, Kove explained that the claim's "non-hierarchical cluster composition is

---

[18] Claims 1-13, 17, and 31 of the '978 patent; claims 1-14 of the '170 patent; and claims 17-25 of the '640 patent.

expressly claimed . . . through the requirement that 'each' (i.e., all) of the data location servers be similarly configured to respond to a client request with the aforementioned information." ASMF ¶ 19. Kove's statements are therefore directed only to those limitations, not the "system" as a whole (which comprises *every* limitation in the claim). AWS never addresses these issues and does not attempt to link this term to its disclaimer argument.

AWS's proposed construction of "networks" fares no better. It should be rejected for at least two reasons: First, AWS contends that all instances of "network" that appear in the claims should be equally limited, but "network" is not consistently used among the claims. Sometimes it appears in non-limiting preambles, which are not amenable to construction.[19] Second, as with "system," AWS fails to explain why it believes Kove's alleged disclaimers pertain to the term "network," when the record is clear that Kove was describing other limitations. Taking claim 17 of the '640 patent as an example, "network" appears in the body of the claim in the element "a data location server network having a plurality of data location servers." But Kove's statements regarding "non-hierarchical cluster compositions" refer to "the [claim's] requirement that 'each' (*i.e.*, all) of the data location servers be similarly configured to respond to a client request with the aforementioned information." ASMF ¶ 19. Kove was not talking about the "network" at all.

AWS's noninfringement arguments reveal its true purpose for trying to limit *system* and *network* to "non-hierarchical cluster topologies": AWS wants to argue that if there is "hierarchy" *anywhere* in AWS's "network" or "system"—even if unrelated to Kove's infringement theory—it does not infringe. Mot. 16-21 (relying on purportedly hierarchical "product," "structure," "data storage," "storage system," "each and every server," "components," and "metadata"). This contorted non-infringement theory has nothing to do with what Kove was discussing with the

---

[19] Claims 1, 10, 17, and 18 of the '640 patent have non-limiting preambles; claim 14 of the '978 is only limiting after the word "comprising", such that "network" is not a limiting term. Dkt. 382, Ex. B at 1.

examiner. The only aspects of the claims that are "non-hierarchical" are already embodied in the particular limitations that claim them. If AWS's products meet those limitations, they infringe. AWS cannot escape infringement by asking the Court to transform a descriptive phrase into a broad disclaimer that radically alters the scope of Kove's claims in ways it could not possibly have intended. The Court should deny AWS's requested constructions.

### 2. "location server"

| Term | Court's Construction | AWS's Proposed Construction |
|------|---------------------|----------------------------|
| location server | a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients | a network-attached component that maintains, **for satisfying every request for the location of data on a network,** a set of **at least one of (1)** identifier/location mappings **or (2) information about the location of such mappings** that are modified or returned in response to **all** location request messages from clients |

AWS asks the Court to adopt this construction, but it spends no time advocating for it. The totality of AWS's argument about this term is a summary statement asking the Court to

> construe the asserted claims to require: (1) location servers in non-hierarchical, cluster structures, where each location server (2) contains the relevant location information, or information to locate the relevant location information, and (3) can resolve the request in two or fewer steps.

Mot. 11. AWS provides no supporting analysis; it does not discuss the claim language, the intrinsic record, or anything else. AWS does not point to any allegedly disclaiming statements about the need to "*satisfy[] every request for the location of data on a network*" or that require a location server to be for "*all* location request messages." Nor does it explain why it would be necessary to add "(2) information about the location of such mappings" to the Court's construction when any claim that requires its location server to have that limitation already expressly includes that limitation. KSMF ¶ 8 (identifying redirect claims). There is no basis to accept AWS's

construction.[20]

### 3. "providing"/"determining"/"retrieving" location information "return"/"sending"/"transmitting" a redirect message

| Terms | Court's Construction | AWS's Proposed Construction |
|---|---|---|
| providing determin[e/ing] retrieving location information or servers | (not previously construed) | providing, without performing any request iterations, . . . location information<br><br>determin[e/ing], **without performing any request iterations**, . . . location servers<br><br>retrieving **in two steps or fewer request iterations** location information |
| return sending transmit[s/ing] a redirect message | (not previously construed) | return/sending/transmit[s/ting] a redirect message without performing any request iterations |

AWS spends even less time supporting its constructions for this series of terms than it did "location server." There is no rationale for accepting any of them. AWS has not proved disclaimer, citing only a single instance where Kove used the term "iterations":

> The structured relationships of the invention allow clients to access data in distributed environments through a non-hierarchical, limitlessly scalable, server structure that enables retrieval of requested information in not more than two iterations.

Mot. 12. This isolated sentence is anything but a clear, unmistakable, and intentional disavowal of claim scope, much less one that supports AWS's constructions. AWS's constructions are also confusing and lack intrinsic support. What is a "request iteration"? The term is not used anywhere else, and AWS offers no definition. Similarly, in AWS's "without performing any request iterations" language, it is unclear what "request iterations" AWS would disallow. Do the claims' original scopes include them? Where is Kove supposed to have excluded them? And as for

---

[20] Notably, none of AWS's noninfringement arguments in its summary judgment motion depend on this proposed construction.

"retrieving *in two steps or fewer request iterations* location information," that term appears only in claim 17 of the '978 patent—a claim that was never discussed during reexam and therefore cannot be subject to any allegation of disclaimer. *See supra* pp. 26-27, 30. These terms also do not feature in AWS's noninfringement arguments, perhaps explaining its lack of attention to supporting them. The Court should decline to construe any of them.

## III. Summary Judgment Is Not Warranted Under AWS's Proposed New Constructions.

Even AWS's proposed new constructions cannot save it from having to face a jury; fact issues still preclude summary judgment. AWS's argument under its preferred construction begins with misdirection: Right off the bat, it says: "But 'a non-hierarchical, cluster topology' *isn't present* in the accused S3 and DDB products—instead, their structures are hierarchical." Mot. 17 (emphasis added). That argument relies on facts outside of what is accused. Kove has shown (through Dr. Goodrich) that non-hierarchical cluster topologies *are present* in both S3 and DDB. AWS does not disagree. Instead, what AWS is really arguing is that *all* topologies present in S3 and DDB must be non-hierarchical in order for there to be infringement. That argument is contrary to well-settled patent law that says if a claim reads on just a part of an accused device (*i.e.*, if there is evidence of *some* non-hierarchical topologies), the device infringes. The existence of other things (like hierarchical structures) that are not part of the accused functionality does not matter and does not preclude infringement.

A reasonable jury could accept Dr. Goodrich's ample and detailed explanation of how AWS's products infringe even under its proposed new constructions. ASMF ¶¶ 22-23, 25-26, 28.

### A. "Geographical Hierarchies"—Even If They Exist—Do Not Preclude Infringement Under AWS's Proposed New Construction.

AWS argues that S3 and DDB do not infringe because they are organized into "geographic hierarchies." Mot. 17. AWS explains that S3 and DDB servers are physically located in different

geographies, which AWS characterizes as "█████████████████" Mot. 17. Each region is divided into multiple "availability zones," which AWS characterizes as "a second layer of geographic hierarchy." *Id.* Regardless of how the servers are organized outside of availability zones, AWS does not contend that there are any hierarchies within the availability zones. AWS's theory suffers from at least two fatal flaws.

First, AWS does not explain why or provide any record support to show how the servers' geographies (either at the region or availability zone level) constitute "hierarchies." The only thing AWS cites is an "AWS Global Infrastructure webpage," which says nothing about "hierarchies" among regions or availability zones. Mot. 17 n.66; Dkt. 687-49. Because AWS's entire theory rests on the presence of hierarchies among servers, and because there is no evidence of actual hierarchies, a reasonable jury could reject it (and might well be required to).

Second, even if there were hierarchies between availability zones or between regions, inter-region and inter-availability zone hierarchies are irrelevant because they are not the topologies Kove relies on to prove infringement. ASMF ¶¶ 22-23, 25-26, 28.

To show infringement, Kove need only show that "the accused product or process meets every element or limitation of a claim." *Rohm & Haas Co. v. Brotech Corp.*, 127 F.3d 1089, 1092 (Fed. Cir. 1997). "If a claim reads merely on a part of an accused device, that is enough for infringement." *SunTiger, Inc. v. Sci. Rsch. Funding Grp.*, 189 F.3d 1327, 1336 (Fed. Cir. 1999). Here, each asserted claim is directed to a "network" or a "system" comprising the claim's limitations. As long as the network or system has *at least* each of those limitations, it infringes. That means if the network or system has *more* to it than just those limitations, it still infringes. "It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device." *Id.* (attribution omitted).

Each of Kove's asserted claims requires at least two "location servers" (among other things not at issue here). ASMF ¶ 20. Other limitations in substance require that the claimed location servers have a non-hierarchical topology. *See supra* § II.B. Thus, if an accused product has at least two location servers, non-hierarchically arranged, it infringes. Dr. Goodrich cites evidence showing that S3 and DDB have multiple location servers at any given geography, ███████████ ████████████████████████████████████████████████████████████ ASMF ¶¶ 22-23, 25-26, 28. Because location servers ██████████████████ are undisputedly ███████████ ██████ *id.*, those location servers satisfy the limitation.[21] And because availability zones exist in every region, the entirety of S3 and DDB infringes, whether it is treated as a monolithic whole of all regions combined, as a collection of regions, or as a collection of availability zones. Thus, even assuming the existence of geographic hierarchies, and even applying AWS's construction requiring a "location server network/system 'arranged in a non-hierarchical, cluster topology,'" S3 and DDB still infringe because every availability zone infringes. That precludes summary judgment.

Finally, AWS makes assertions about how user requests are processed and where data can be stored, but it never says how those assertions are supposed to undermine Dr. Goodrich's infringement analysis. Mot. 17-18. It also faults Dr. Goodrich for "try[ing] to fit the accused products to the claims," Mot. 18—otherwise known as performing an infringement analysis. *See Rohm & Haas*, 127 F.3d at 1092 (requiring the patentee to "supply sufficient evidence to prove that the accused product or process meets every element or limitation of a claim").

### B. Nor Do AWS's Other Alleged Hierarchies Disprove Infringement.

AWS also points to a grab bag of other "hierarchies" supposedly present in S3 and DDB

---

[21] AWS does not appear to dispute that location servers *within a region* are non-hierarchically arranged either. Mot. 18 ("[T]he alleged location servers in S3 and DDB that have the information to respond to [user] request *are* ['within a region'].").

that it claims preclude infringement. Each fails for the same reasons explained above.

### 1. Hierarchies unrelated to location servers are irrelevant.

AWS itself says that its constructions "require a *location server* network/system 'arranged in a non-hierarchical, cluster topology.'" Mot. 16-17 (emphasis added). Any hierarchies in components other than location servers are therefore irrelevant. A reasonable jury could find that each of S3 and DDB have *location servers* arranged in non-hierarchical topologies. Dr. Goodrich identifies S3's ███████████████ as location servers for claims 1 and 2 of the '170 patent and both █████████████████ as location servers for claims 17, 23, 24, and 30 of the '978 patent. ASMF ¶¶ 26, 28. And he explains why they are non-hierarchically arranged. *Id.* ¶ 28; *infra* § III.C.2. Dr. Grama does not dispute Dr. Goodrich's reasoning. ASMF ¶ 28. For DDB, Dr. Goodrich analyzes the ████████ as location servers for all asserted claims and explains their non-hierarchical relationships. *Id.* ¶ 28; *infra* § III.C.2. Dr. Grama does not dispute that reasoning either. ASMF ¶ 28.

### 2. Hierarchies related to ████████ are irrelevant.

AWS argues that S3 uses ████████ which it contends are hierarchical, to organize data. Mot. 19-20. AWS's brief paints with a broad brush, but all the evidence it points to shows that ████████ are used to store data in ████████████ *Id.* ¶ 28; *see* Kove's LR 56.1(b)(2) Response ("RSMF") ¶¶ 63-66. AWS's failure to offer any basis for a finding that ████ in S3 are hierarchical means that, at a minimum, its motion should be denied as to Kove's ████████ infringement analyses. ASMF ¶¶ 22, 25, 28.

As for ████ Kove does not allege that they are location servers in claims that require non-hierarchical structures. ASMF ¶ 26. Kove only maps ████ to the "location server" for claims 17, 23, 24, and 30 of the '978 patent, which Kove contends encompass both hierarchical and non-hierarchical structures. *Id.* ¶ 23. That is because, as explained above, these claims do not include

any of the limitations (such as a redirect message) that require non-hierarchical topologies. Because there is no need for a non-hierarchical topology for those claims, AWS's ██████ theory fails.

**C.  AWS's ████████████ Theory Is Too Little, Too Late.**

**1.  The ██████████████ theory should be excluded as untimely and prejudicial.**

The Court's Local Patent Rules exist to prevent trial by ambush. AWS's new ████████ ████ noninfringement theory, Mot. 21, is just that: ambush. ASMF ¶ 27. AWS first presented it in its expert's rebuttal report on noninfringement—after claim construction, final noninfringement contentions, and Kove's infringement report. Specifically, Dr. Grama's rebuttal report unveiled the brand-new theory that AWS does not infringe because, he asserts, ████████████████ ████████████████████████████████████████████████████ Mot. 21 n.88; ASMF ¶ 27. AWS never disclosed this theory or the allegedly supporting source code in its interrogatory responses or noninfringement contentions. ASMF ¶ 27. Paragraphs 336-337 of Dr. Grama's rebuttal report should therefore be excluded.

Courts in this District routinely exclude expert infringement reports that "introduce theories not previously set forth in infringement contentions." *Fujitsu Ltd. v. Tellabs Operations, Inc.*, 2012 WL 3018027, at *4 (N.D. Ill. July 23, 2012); *see also Pactiv Corp. v. Multisorb Techs., Inc.*, 2013 WL 2384249, at *3 (N.D. Ill. May 29, 2013) ("To allow an expert to go beyond [the final contentions] would render them useless and ignore the specificity requirements of the Local Patent Rule 2.3."); *Baxter Int'l, Inc. v. CareFusion Corp.*, 2020 WL 10486005, at *1-2 (N.D. Ill. Aug. 12, 2020) ("Expert reports are . . . bound by the propositions advanced in the Final Contentions."). Expert reports must detail "particular" theories with "sufficient specificity" to put the other side on notice." *Medline Indus., Inc. v. C. R. Bard, Inc.*, 2020 WL 10485718, at *2 (N.D. Ill. Jan. 8, 2020). AWS's final noninfringement contentions do not disclose this theory; do not contain the

words "parent," "child," "master," or "slave"; and do not cite the source code AWS relies on to support its theory. ASMF ¶ 27. AWS never sought leave to add these items to its disclosures. Because AWS is bound to its final contentions, its new theory is untimely and should be excluded.

Allowing AWS to carry its untimely theory forward would prejudice Kove. Kove reasonably relied on AWS's noninfringement contentions to guide what discovery to take or not take, how to advocate for construction of certain claim terms, and what positions to address in its expert reports. Because of AWS's failure to disclosure this theory, Kove had no opportunity to address it, whether in its infringement contentions or in Dr. Goodrich's expert reports. There is no excuse for AWS's late disclosure; it could have disclosed this theory at any time because it relies only on its own source code. That AWS now moves for summary judgment on this new theory (*see* Mot. 19-21), drives home the prejudice. The Court should exclude AWS's new theory and reject the summary judgment arguments that depend on it.

### 2. In any event, ███████████████ are non-hierarchical, so summary judgment is not warranted.

Regardless, a reasonable jury could find that both ███████████████ are non-hierarchical. As Dr. Goodrich explains, a person of ordinary skill in the art would understand that the alleged location servers in S3 and DDB ███████████ are non-hierarchical. *See* ASMF ¶ 28 (explaining that ████ in Amazon S3 are arranged in a ███████████" and are not hierarchical); *id.* (explaining that ███████ in DDB "are arranged in a ████████ ██████ and are not hierarchical). A reasonable jury could accept Dr. Goodrich's explanation and find that the accused products infringe even under AWS's proposed new constructions.

## IV. A Reasonable Jury Could Find That AWS Willfully Infringed.

Because there is ample evidence from which a reasonable jury could find that AWS's infringement was willful both before and after Kove sued, AWS's motion for summary judgment

on willfulness (*see* Mot. 30-38) should be denied. Willfulness is a question of fact and "requires a jury to find no more than deliberate or intentional infringement." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 240 F. Supp. 3d 605, 618 (E.D. Tex. 2017) (Bryson, J.) ("Determining willfulness is a highly fact-based endeavor."). A patentee can establish willfulness by showing, by a preponderance of the evidence, "that the defendant acted despite a risk of infringement that was either known or so obvious that it should have been known to the accused infringer." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (cleaned up).

Knowledge can be proved either directly or through evidence of willful blindness. *See Glob.–Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766-70 (2011) ("[P]ersons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts."). To establish willful blindness, a plaintiff need only show (i) that the defendant "subjectively believe[d] that there is a high probability that a fact exists," and (ii) that the defendant "[took] deliberate actions to avoid learning of that fact." *Id.* at 769. Here, the summary judgment record would enable a reasonable jury to find knowledge on either theory. AWS's disagreements with the facts are for the jury to resolve.

### A. A Reasonable Jury Could Find Pre-Suit Willful Infringement.

#### 1. AWS knew or should have known that it infringed Kove's patents.

AWS has had actual knowledge of the asserted patents for years, long before this lawsuit was filed. AWS has known the '978 patent since at least August 24, 2011, when the Patent Office initially rejected an Amazon patent application, No. 13/042,301 ("the '301 application") as anticipated by the '978 patent. ASMF ¶ 56. Specifically, the Patent Office found that each claim was anticipated by the '978 patent's disclosure of location servers and the associated routing

protocol—the concepts at the heart of Kove's patents. *Id.*[22] The examiner specifically called out Kove's "mapping between identifiers and locations" and Kove's claimed redirect messages. *Id.*

To overcome this rejection, Amazon dropped more than half of its claims and attempted to distinguish the remainder. ASMF ¶ 57. In attempting to distinguish the '978 patent (Overton), Amazon acknowledged its deep familiarity with the patent. It stated that it had "evaluated the portions of Overton cited in the Office Action, and indeed *the entirety of Overton*." *Id.* (emphasis added). Amazon then provided a detailed description of the '978 patent's specification and claims, along with arguments as to why the '978 claims differed from Amazon's. *Id.* Thus, by its own admission, AWS knew that the '978 patent claims the use of a location server "to determine where data associated with a particular entity is located," including by "maintain[ing] a set of identifier/location mappings that are modified or returned in response to [location] request messages from clients." *Id.* And that was not the only time Amazon cited the '978 patent when prosecuting its patents. Indeed, over the years and throughout the infringement period, AWS has cited the '978 patent more than 200 times. *Id.* ¶ 58. Viewed in the light most favorable to Kove, this evidence supports a finding that AWS had actual knowledge of Kove's '978 patent.

A reasonable jury also could find that AWS has been aware of Kove's '170 patent since at least March 22, 2012, when the Patent Office cited the '170 patent application in a Notice of Allowance for another Amazon patent. ASMF ¶ 58. And like the '978 patent, AWS has cited the '170 patent application more than 200 times. *Id.* A reasonable jury could readily conclude that AWS has actual knowledge of patents it has cited more than 400 times since 2012, *id.*

Finally, a reasonable jury could infer that AWS knew about the '640 patent, too. Both the

---

[22] The Patent Office called the claimed routing mechanism NDTP (short for Network Distributed Tracking Protocol), ASMF ¶ 57, which the Court construed as "location servers" here. Dkt. 484 at 20-21. The terms "location server" and "NDTP server" refer to the same concept. *Id.*

'978 and '170 patents claim priority to the '640 patent application. ASMF ¶ 58. Given that relationship, the frequency with which AWS cited the '978 and '170 patents, and AWS's admission that it evaluated "the entirety of Overton" (the '978 patent), there is ample evidence showing that AWS had actual knowledge of the '640 patent and the inventions it discloses.

But that is just the tip of the iceberg. Beyond knowledge of the patents themselves, there is substantial evidence that AWS knew or should have known that it infringed Kove's patents. There are three key indicators of that fact.



*First*, Amazon ███████████████████████████████████████ ███████████████████████████████████ ASMF ¶ 59. Put differently, Amazon ████████ ██████████████████████████████████ *Id.* Thus, the fact that Amazon filed the '301 application ████████████████████████ Against that background, the fact that the Patent Office found those claims anticipated by Kove's '978 patent—and that Amazon agreed to drop most of them—shows that Amazon knew that it likely infringed the '978 patent: Because the '978 patent anticipated the '301 application, products practicing the '301 application met all the limitations of and therefore infringed the '978 patent.

What is more, the timing of the Patent Office's rejection of the '301 application perfectly aligned with Amazon's ████████████████████████████████ such that Amazon knew or should have known to account for Overton when designing it. ASMF ¶ 60. Amazon ████████████████████████████████████████████████

shortly before the Patent Office rejected the '301 application in August 2011. *Id.* Amazon then launched DDB in January 2012, RSMF ¶ 17, and responded to the '301 rejection the next month, ASMF ¶ 57.

*Second*, the first named inventor of the rejected '301 application, Swami Sivasubramanian,

was one of DDB's key architects, responsible for its design, development, and overall architecture. ASMF ¶ 60. The fact that the same engineer was personally involved with both the '301 application and DDB further demonstrates that Amazon—and the DDB team in particular—knew or should have known that DDB likely infringed the Overton patent. That leaves AWS with no room to argue that its left hand (the team responsible for the '978-anticipated '301 application) did not know what its right hand (the team developing DDB) was doing. There was only one hand.

*Third*, AWS has in-depth knowledge about and experience with the United States patent system. AWS employs sophisticated counsel to prosecute patents, analyze asserted patents, and defend against infringement allegations. ASMF ¶ 61. AWS's VP of Intellectual Property Scott Hayden testified that AWS ███████████████████████████████████████ ███████████████████████████████████ *Id.* AWS also █████████████████ ████████████████████████████████████████████████████████ ████ *Id.* If an asserted patent ██████████████████████████████████ ███████████████████████████████ but ███████████████████████████████ ███████████████████████████████ to AWS. *Id.* If AWS ███████████████████ ██████████████████████████████████████████ *Id.* Although it may be possible to ██████████████████████████████████████████████████████ ██████████████████████ *Id.*

These robust policies show that, in the ordinary course, AWS is fully aware of its obligation to avoid infringement and ████████████████████████████████████████ In view of this sophistication, a reasonable jury could find that AWS was aware of Kove's patents and the high risk of infringement and could further find that AWS ████████████████████ ██████████████████████████████████ Likewise, a reasonable jury could find that AWS

determined that the accused products infringe, yet chose to continue infringing because Kove's patents enable foundational features like scalability.  ASMF ¶ 61.

All in all, the willfulness evidence here aligns with numerous cases recognizing that plaintiffs can prove knowledge based on Patent Office rejections involving the asserted patents. *See Va. Innovation Scis., Inc. v. Samsung Elecs. Co.*, 983 F. Supp. 2d 700, 712 (E.D. Va. 2013) (actual knowledge of patents can be shown through Patent Office citations in office actions); *Soverain IP, LLC v. Microsoft Corp.*, 2018 WL 1465792, at *2 (E.D. Tex. Mar. 26, 2018) (same, where the Patent Office cited the asserted patent in eleven of the defendant's applications); *MONEC Holding AG v. Motorola Mobility, Inc.*, 897 F. Supp. 2d 225, 229-30 (D. Del. 2012) (same, if "a defendant previously filed papers with the PTO identifying the patents as prior art").  Indeed, Kove's evidence is stronger still.  Here, the record includes more than mere citations: AWS has expressly acknowledged relevant limitations; the events at the Patent Office coincided with AWS's ██████████████████████████████████████████████████████████ and AWS's stated policies regarding patent investigations provide further support.  A reasonable jury would have no difficulty finding knowledge from those facts.

## 2.  AWS willfully blinded itself to the risk of infringement.

A reasonable jury could also find that AWS willfully blinded itself to the risk of infringement through policies that seek to ██████████████████████████████████ ████████████████████████████████████████ AWS cannot evade a willful infringement finding by being on notice of infringement but ████████████████████████ ██████████████—that is what the willful blindness doctrine is designed to prevent. *See Glob.–Tech*, 563 U.S. at 766-70 (2011) ("[W]illful blindness is as culpable as actual knowledge.").

Amazon's policy of willful blindness starts with its engineers.  Amazon ████████████ ████████████████████████████████████████████████████████████████████

███████████████████████████████ ASMF ¶ 62.  Amazon engineers ███████████████████

█████████████████████████████████████████████████████████

*Id.*  As Amazon's former CTO and a core member of the S3 design team Allan Vermeulen

explained: ████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *Id.*

Dr. Sivasubramanian (DDB's lead developer) testified similarly and confirmed that ██████████

████████████████████████████████████████████ *Id.*  In fact, he

said ████████████████████████████████████████████████████

███████ *Id.* ¶ 63.  Alyssa Henry, S3's former manager, shared this sentiment.  *Id.*

In addition to willful blindness in the development process, Amazon ensures that

employees involved in the patent application process █████████████████████████

██████████████████████████ ASMF  ¶ 64.   For  example,  Dr.

Sivasubramanian, who has filed hundreds of patent applications with Amazon, testified that he

████████████████████████████████████████████████████████

██████████████████████████████ *Id.* ("Q: █████████████████████████

██████ [Sivasubramanian]: ███████).  Similarly, AWS's corporate designee on IP policies confirmed

that █████████████████████████████████████████████████████

████████████████████████████████████ *Id.*  Mr. Hayden also asserted that Amazon

████████████████████████████████████████████████████████

███████████████████████████ *Id.*

These  robust  policies  allow  Amazon  to  ████████████████████████████

████████████████████████████████████████████████████████ But

that fiction is no defense; Amazon's outside counsel are its agents, and so their knowledge is

imputed to the company by law. *Washington v. Parkinson*, 737 F.3d 470, 473 (7th Cir. 2013) ("[A]n attorney is the agent of her client, and an agent's knowledge is imputed to her principal."). When followed, that turns Amazon's ███████████████████████████ ████████████ into yet another fiction: Amazon ██████████████████████████ ███████████████ Juries might differ on whether, in this case, Amazon followed its more responsible policy ███████████████████████████████████ ███████████████ The record supports a reasonable jury in finding either way.

AWS's arguments miss the point. Mot. 30-38. AWS does not engage with the substance of Kove's willfulness case, and it largely relies on cases decided under the outdated "clear and convincing" standard that the Supreme Court has since overruled in favor of a "preponderance" standard. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 94 (2016).

## B. A Reasonable Jury Could Find Post-Suit Willful Infringement.

A reasonable jury could find that AWS continued to willfully infringe Kove's patents after this lawsuit was filed. Like pre-suit willfulness, post-suit willfulness requires knowledge of the patents and intentional infringement. *See SRI Int'l, Inc.*, 14 F.4th at 1330. Kove's complaint, filed December 12, 2018, gave AWS additional notice of the asserted patents and detailed how its accused products infringe those patents. Dkt. 1. Once AWS was served with the complaint, there is no question that AWS knew of the asserted patents, accused products, and accused features. Yet AWS made no attempt to stop its infringing behavior, despite claiming that it could design around the infringing features in a matter of hours. ASMF ¶ 65.

As with pre-suit willfulness, a reasonable jury could find that AWS willfully infringed Kove's patents during this lawsuit because maintaining the highly scalable nature of the accused products was a better business decision than designing around Kove's patents and fundamentally altering the products. The jury could find knowledge based on Kove's detailed complaint, which

identifies the asserted claims, the accused products, their infringing features, and the benefits the accused products derive from Kove's patents. A reasonable jury could conclude that AWS determined that it infringes, yet continued its infringement because it was unable to design around the asserted patents in a way that would preserve the accused products' essential features.

AWS's arguments about the sufficiency of this evidence go to its weight, demonstrating a genuine dispute of material fact. AWS argues that there cannot be post-suit willfulness because two patents expired before AWS answered the complaint and the third expired a few months later. *See* Mot. 35-36. That does not follow. Neither law nor logic supports AWS's assertion that it did not know about the patents until it filed its answer. A reasonable jury could find that AWS knew of the patents no later than December 12, 2018, when Kove filed its complaint. Dkt. 1; *see, e.g.*, *Bio-Rad Labs.*, 998 F.3d at 1335 (affirming a finding that the defendant knew of the asserted patents as of the complaint); *Arigna Tech. Ltd. v. Nissan Motor Co.*, 2022 WL 17978913, at *2 (E.D. Tex. Oct. 5, 2022) ("The requisite element of post-suit knowledge of the patent is satisfied by the complaint."). AWS continued to infringe, even after receiving service of the complaint, losing its motion to dismiss, and filing and losing its IPR petition. ASMF ¶ 65. The parties' genuine dispute over post-suit willfulness precludes summary judgment.

## Conclusion

For these reasons, the Court should deny AWS's motion for summary judgment and grant Kove's motion to exclude.

**KOVE'S MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE**

Kove is entitled to summary judgment on several of AWS's defenses. "Summary judgment is the proverbial put up or shut up moment in a lawsuit," yet AWS has nothing to show for defense after defense that it is continuing to press. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021). For starters, the Court already decided patent eligibility, rejecting AWS's 35 U.S.C. § 101 defense as a matter of law; AWS should not be permitted to resurrect it for trial. Next, AWS falls far short of carrying its burden on its equitable estoppel, waiver, and inequitable conduct defenses; no reasonable jury could find in its favor. AWS's obviousness-type double patenting argument fares no better; its expert's opinions are both conclusory and (as far as can be gleaned from what little support he provides) rest on an application of the wrong legal standard, making them both insufficient to clear the summary judgment hurdle and inadmissible to boot. Finally, AWS fails to qualify several of its invalidity references are prior art, requiring summary judgment on the invalidity theories that rely on those references.

## I.    AWS's § 101 Defense Fails as a Matter of Law.

This Court has already determined as a matter of law that three of the asserted claims are patent eligible under 35 U.S.C. § 101. Dkt. 110. There is no reason to distinguish the remaining claims, and AWS has not attempted to do so. AWS nonetheless insists on putting its § 101 defense to the jury. Kove's LR 56.1(a)(2) Statement ("KSMF") ¶ 1. This Court should adhere to its earlier decision—which correctly applied controlling precedent to a purely legal issue—and grant summary judgment for Kove on AWS's § 101 defense.

The Supreme Court applies a two-step test to determine patent eligibility under § 101. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014). The first step asks whether the claims as a whole "are directed to" a "patent-ineligible concept[]," such as an abstract idea. *Id.* at 217. Step one is "a legal question that can be answered based on the intrinsic evidence"—that is, the

four corners of the patent, and nothing more. *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372-74 (Fed. Cir. 2020); *see Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 750 (Fed. Cir. 2019) ("based on both the written description and the claims"). "If the focus of the claim is a specific and concrete technological advance," the *Alice* "inquiry ends and the claim is eligible." *ADASA Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022); *accord McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) ("If the claims are not directed to an abstract idea, the inquiry ends.").

That is the case here, as this Court has already decided. In denying AWS's Rule 12(b)(6) motion, the Court ruled that the claims are not directed to an abstract idea and are therefore eligible at step one. Dkt. 110 at 20. There was no need then, and no need now, to proceed to step two.

### A. The Court's Ruling That the Claims Are Eligible Should Stand.

#### 1. The Court rejected AWS's § 101 defense as a matter of law.

AWS litigated and lost its § 101 arguments in its Rule 12(b)(6) motion. Dkt. 36. The Court concluded that the claims at issue were "directed to a specific improvement in the way networks operate," not "to an abstract idea," and so were eligible at step one. Dkt. 110 at 14 (Pallmeyer, C.J.) (cleaned up). The Court thus did not "proceed to the second step of the *Alice* analysis." *Id.* at 20 (citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1355-36 (Fed. Cir. 2016)).

Every move in the Court's analysis confirms that it was answering a legal question, and no more. Applying binding precedent, the Court found that "not only do the patents' specifications explain how they improve on prior systems; the asserted claims also 'focus on the specific asserted improvement in computer capabilities' and are not simply directed to 'an "abstract idea" for which computers are involved merely as a toll.'" Dkt. 110 at 12 (quoting *Enfish*, 822 F.3d at 1335-36).

For starters, the Court rejected AWS's "dismissive characterization" of claim 1 of the '170 patent: That claim, the Court said, "is not directed at simply storing and locating information in

57

different places." Dkt. 110 at 12-13. Rather, it is "directed to a specific network architecture that employs multiple location servers that organize location information based on a distributed hash table," and that "architecture functions differently than—and improves upon—conventional systems." *Id.* So too for the other claims at issue. The Court explained that claim 18 of the '640 patent covers a network architecture similar to the '170 patent's claim 1, with "one critical component: a 'redirect message' from one data location server that permits the client to determine the location of a different data location server." *Id.* at 13. Focusing on the claim language, the Court rejected AWS's contrary characterization as involving "such a high level of abstraction" that it ran afoul of controlling precedent and was "untethered from the language of the claim[]" to boot. *Id.* (quoting *Enfish*, 822 F.3d at 1337). Likewise for claim 17 of the '978 patent. As the Court recognized, that claim "enables . . . on-the-fly addition and removal of data repositories, which makes possible the distributed network's growth in scale." *Id.* at 13-14 (cleaned up).

### 2. There is no reason to reconsider the Court's purely legal ruling.

Unfazed by the Court's ruling, AWS has stated that it intends to maintain its § 101 defense for trial, claiming that events following the Court's order rejecting it "may impact that defense, including at least for reasons detailed in Mr. Greene's expert report." KSMF ¶ 1. Neither Mr. Greene's report nor anything else provides any reason to upend the law of this case.

The Rule 12(b)(6) decision is, of course, an interlocutory order under Rule 54(b). Fed. R. Civ. P. 54(b); *see Galvan v. Norberg*, 678 F.3d 581, 587 n.3 (7th Cir. 2012). Reconsideration of interlocutory orders is nonetheless governed "by the doctrine of the law of the case." *Pickett v. Prince*, 207 F.3d 402, 407 (7th Cir. 2000); *see also Galvan*, 678 F.3d at 587. Under that doctrine, reconsideration is appropriate only when "there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006). Said another way, the doctrine serves as a

presumption against "reopening a decided issue." *Galvan*, 678 F.3d at 587.

That presumption is especially strong where, as here, the Court is asked to reconsider a previously assigned judge's decision. *E.g.*, *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1339 (7th Cir. 1997) ("The doctrine of the law of the case requires the second judge . . . to abide by the rulings of the first judge unless some new development, such as a new appellate decision, convinces him that his predecessor's ruling was incorrect."); *see also Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005) ("Generally speaking, a successor judge should not reconsider the decision of a transferor judge at the same hierarchical level of the judiciary . . . ."). After all, "litigants have a right to expect consistency even if judges change." *Galvan*, 678 F.3d at 587.

To be sure, the § 101 issue is now presented through the lens of summary judgment, not Rule 12(b)(6). But the legal question at step one remains the same. Facts come into the picture only at step two, which asks whether the "elements of the claim" contain "an 'inventive concept' sufficient to 'transform' *the claimed abstract idea* into a patent-eligible application." *Alice*, 573 U.S. at 221 (emphasis added); *see also, e.g.*, *Yu v. Apple Inc.*, 1 F.4th 1040, 1045 (Fed. Cir. 2021) (same); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015) (step two implicates factual questions, such as whether the claims require more than "conventional, routine and well understood applications in the art"). And there is no way to get to step two without first identifying an abstract idea at step one. *Supra* pp. 56-57. In short, step two's fact questions have nothing to do with step one's purely legal inquiry. Given this Court's holding that the asserted claims are "not directed to an abstract idea at step one, there [is] no set of facts that [AWS] could . . . adduce[] at trial to change that conclusion." *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1321 (Fed. Cir. 2020). Reversing the Court's step one holding is AWS's only way to prevail.

AWS offers no suitable reason for reconsideration; nothing whatsoever has changed. The Court carefully and correctly applied binding precedent. *See* Dkt. 110 at 8-11. AWS does not argue that the law has changed. Nor have the asserted patents' claims and specifications changed. And without a relevant change, there is no reason to reconsider. *See, e.g.*, *Galvan*, 678 F.3d at 587.

AWS's own argument for reconsideration confirms the point. AWS touts Mr. Greene's report as new information, KSMF ¶ 1, but in fact his § 101 analysis merely repackages the same arguments AWS already made and this Court rejected. *See, e.g.*, KSMF ¶¶ 2-5; *see also* Dkt. 38 at 5-8, 11, 12. Summary judgment is no place for rehashing those issues.

For example, Mr. Greene says the '978 patent's claim 17 "fails at step one" because it "describes generalized location services . . . and transport protocols." KSMF ¶ 2. AWS made and lost that same argument before. *See* Dkt. 38 at 5-8; Dkt. 110 at 17. Similarly, Mr. Greene recycles AWS's unsuccessful card catalog analogy. He argues, for instance, that using "'identifiers' to store and locate resources can be implemented in other mediums" such as "a library's card catalogue with identifiers for authors and shelving location." KSMF ¶¶ 3-5. The Court disagreed:

> [T]here are several problems with this analogy . . . . Defendant's suggested rewrite [of the claims] ignores the patents' specifications, which make clear that the invention is aimed at improving computer network storage. As explained above, conventional storage systems used hierarchical indices that could limit growth and slow down searches. It is not clear that this is a problem encountered by libraries or that the distributed card catalogue system in Defendant's rewrite would provide any improvement for them.

Dkt. 110 at 16. Moreover, anything Mr. Greene has to say on the facts is irrelevant to, and thus cannot justify reopening, step one's purely legal inquiry. *See Ericsson*, 955 F.3d at 1321; KSMF ¶ 6 (Mr. Greene discussing what is "routine, well-understood, and conventional," a step two issue). Nothing has changed, and so there is no reason to revisit the Court's decision.

## B. Regardless, AWS's § 101 Defense Cannot Survive Summary Judgment.

Kove is entitled to summary judgment rejecting AWS's § 101 defense as to all asserted

claims. As discussed, the Court correctly determined that claim 1 of the '170 patent, claim 18 of the '640 patent, and claim 17 of the '978 patent are patent eligible. Dkt. 110 at 12-20. AWS offers no separate basis for challenging any other asserted claim. KSMF ¶ 7. AWS therefore cannot meet its burden to establish that the remaining claims are invalid. *See* 35 U.S.C. § 282(a) (patents are presumed valid); *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011) (challenger bears burden to prove ineligibility by clear and convincing evidence).

AWS's silence is understandable. The remaining independent claims are eligible for much the same reason as the previously adjudicated claims are. For example, similar to claim 18 of the '640 patent, claim 17 of the '640 patent, claims 10 and 14 of the '978 patent, and claims 6 and 15 of the '170 patent all also include a "redirect message" from one data server that permits the client to determine the location of a different data location server, when a location server fails to include the location information for the requested data. KSMF ¶ 8. The Court explained that the "redirect message" is a "critical component" to claim 18 and "is essential because it makes possible the distributed network architecture disclosed in the patents-in-suit"—which the Court concluded was an improvement in computer capabilities, not an abstract idea. Dkt. 110 at 12-13. And the dependent claims are by definition eligible when the independent claims from which they depend are eligible. *See Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1346 n.1 (Fed. Cir. 2017).

## II. AWS Lacks Evidence of Equitable Estoppel, Waiver, or Inequitable Conduct.

Discovery revealed nothing that could meet the governing legal standards for AWS's equitable estoppel, implied waiver, and inequitable conduct affirmative defenses, but AWS continues to maintain them. Kove is therefore entitled to summary judgment on these defenses.

### A. AWS Cannot Establish Equitable Estoppel.

To prove equitable estoppel, AWS must show by a preponderance of the evidence that Kove, "through misleading conduct, led [AWS] to reasonably infer that [Kove] [did] not intend to

enforce its patent against [AWS]." *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1348

(Fed. Cir. 2011). The "most common situation" giving rise to equitable estoppel is when "the

patentee specifically objects to the activities currently asserted as infringement in the suit and then

does not follow up for years." *Ferring B.V. v. Allergan, Inc.*, 980 F.3d 841, 853 (Fed. Cir. 2020).

There is no evidence that Kove engaged in misleading conduct or that it objected to AWS's

infringement then failed to follow up. Silence is not enough; it "must be accompanied by *some*

*other factor* which indicates that the silence was sufficiently misleading as to amount to bad faith."

*High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016) (emphasis added);

*Meyers v. Asics Corp.*, 974 F.2d 1304, 1309 (Fed. Cir. 1992) ("threaten[ing] immediate or vigorous

enforcement" only to "d[o] nothing for an unreasonably long time" (attribution omitted)).

There is no evidence that Kove's silence was "accompanied by some other factor." *See*

*High Point SARL*, 817 F.3d at 1330. AWS argues only that Kove's patents issued as early as 2006;

that Dr. Overton (an inventor and Kove's CEO) became generally aware of the accused products

around the time they publicly launched in 2006 and 2012; and that Kove sued in 2018. KSMF ¶ 9.

When deposed, AWS's corporate designee could not identify any additional facts supporting its

defense. KSMF ¶ 10. So all AWS has is mere silence, which is insufficient as a matter of law.

Moreover, AWS's position that it lacked any pre-suit knowledge of Kove or its patents,

Mot. 30, is independently fatal to its equitable estoppel defense. That defense requires AWS's

"knowledge of the patentee and its patent." *Winbond Elecs. Corp. v. Int'l Trade Comm'n*, 262 F.3d

1363, 1374 (Fed. Cir. 2001). AWS's equitable estoppel defense thus fails as a matter of law.

### B. AWS Cannot Establish Waiver.

Waiver is the intentional relinquishment of a known right. *See, e.g.*, *United States v. Olano*,

507 U.S. 725, 733 (1993). AWS bears the burden to prove waiver by clear and convincing

evidence. *See Hynix*, 645 F.3d at 1348 (describing waiver). Waiver may be by express agreement

62

or overt act, or it may be implied where "the patentee's conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished." *Id.* (cleaned up). AWS does not allege express waiver, and there is no evidence of it. Instead, it seemingly claims implied waiver based merely on when Kove filed this case.

AWS's implied waiver theory requires clear and convincing evidence that Kove had a duty to disclose its patents sooner and that it breached that duty. *Hynix*, 645 F.3d at 1348; *see Ryder v. Bank of Hickory Hills*, 585 N.E.2d 46, 49 (Ill. 1991) ("clear, unequivocal, and decisive act").

Kove had no such duty here. All AWS can point to is that the patents issued between 2006 and 2010, the accused products were publicly released in 2006 and 2012, and this lawsuit was filed in 2018. KSMF ¶¶ 9-10. Kove did not notify AWS of its patents, nor did the parties engage in any communication regarding the patented technology at any point before Kove filed its complaint. RSMF ¶ 90. The Federal Circuit has only recognized a duty to disclose in the context of standard-essential patents, which does not apply here. *Hynix*, 645 F.3d at 1348; *Qualcomm v. Broadcom Corp.*, 548 F.3d 1004, 1010-12 (Fed. Cir. 2008); *see also Core Wireless Licensing v. Apple, Inc.*, 899 F.3d 1356, 1365 (Fed. Cir. 2018).

Absent a duty to disclose, Kove is free to bring suit on any of its patents at any point during their enforcement period, which is six years past the expiration date. 35 U.S.C. § 286; *see SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 335 (2017) (no laches defense to patent infringement suits brought within six years because the statute of limitations is a congressional determination of timeliness). As relevant here, the last of Kove's patents (the '978 patent) expired September 25, 2020. RSMF ¶ 25. Kove had no duty to disclose or assert its patent by any earlier date (and AWS points to none). This means that Kove can, at its own discretion, bring suit on the '978 patent up through September 25, 2026. Kove filed this suit in December

2018, well within that congressionally authorized timeframe.  KSMF ¶ 9.

### C.  AWS Cannot Establish Inequitable Conduct.

Invalidating a patent for inequitable conduct is an extraordinary remedy, requiring clear and convincing evidence of what is essentially fraud on the Patent Office.  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1287 (Fed. Cir. 2011) (clear and convincing evidence that the inventor "misrepresented or omitted material information with the specific intent to deceive the PTO").  To establish specific intent, AWS must prove "that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it."  *Id.* at 1290.  Specific intent to deceive "must be the single most reasonable inference able to be drawn from the evidence."  *Id.* at 1276.  "[G]ross negligence or negligence under a 'should have known' standard does not satisfy this intent requirement."  *Id.* at 1290.  AWS has no evidence to meet this high bar.

AWS contends that the patents' inventors, Drs. Overton and Bailey, intentionally withheld an invalidating piece of prior art from the examiner during prosecution.  KSMF ¶ 11.  The prior art at issue is a 1997 article by David Karger and others.  *Id.*  Drs. Overton and Bailey both testified that they understood their duties to disclose material information and believe they complied.  *Id.* ¶¶ 13-14.  When asked whether he disclosed the article, Dr. Overton testified, "I don't know why I would have.  This is very different."  *Id.* ¶ 14.  AWS never asked Drs. Overton or Bailey whether they intended to deceive the Patent Office, and AWS never deposed the law firm that prosecuted the patents.  *Id.* ¶ 12.  AWS does not identify any other evidence supporting a finding that Dr. Overton or Dr. Bailey or anyone acting on their behalf deliberately withheld the Karger article from the Patent Office with the specific intent of deceiving it.  There is no authority for the proposition that an inventor withholding what he understood to be irrelevant prior art is sufficient to support an inequitable conduct defense.

This lack of clear and convincing evidence of a deliberate and knowing intent to deceive

dooms AWS's inequitable conduct defense. *Therasense*, 649 F.3d at 1290. AWS has no direct evidence of intent to deceive, let alone enough to support a finding that "the single most reasonable inference able to be drawn from the evidence" is intent. *Id.* AWS never even asked the inventors whether they intended to deceive the Patent Office, and it failed to depose the prosecuting law firm. *See ProStrakan, Inc. v. Actavis Labs. UT, Inc.*, 2018 WL 11363829, at *55 (E.D. Tex. Sept. 28, 2018) (rejecting inequitable conduct defense where the defendant did not ask the inventors or prosecuting attorney whether they intended to deceive the Patent Office), *aff'd*, 787 F. App'x 757 (Fed. Cir. 2019). The testimony AWS did elicit establishes that Dr. Overton lacked any intent to deceive because he believed that the paper concerned "a very, very different concept" from his inventions and so did not need to be disclosed. *See id.* at *56 (rejecting defense where "the only sworn testimony elicited on whether any inventor believed the data . . . were false or erroneous is Dr. Watkinson's resounding 'No.'"). AWS's defense therefore cannot survive summary judgment.

### III. Mr. Greene's Double Patenting Opinions Are Inadmissible, and Kove Is Entitled to Summary Judgment on AWS's Double Patenting Defense.

AWS alleges that claims 3, 6, 10, 14, 17, 23, 24, and 30 of '978 patent are invalid for obviousness-type double patenting. KSMF ¶ 15. "Double patenting is an affirmative defense" that AWS must prove "by clear and convincing evidence, a heavy and unshifting burden." *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1580 (Fed. Cir. 1991); *accord Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1375 (Fed. Cir. 2017). AWS falls far short of that burden.[23]

Obviousness-type double patenting is a judge-made "doctrine aimed at preventing" separate patents from claiming "obvious variants of the same subject matter where granting both exclusive rights would effectively extend the life of patent protection." *Immunex Corp. v. Sandoz*

---

[23] AWS moved under Rule 12(c) for judgment on the pleadings on this issue in May 2020. Dkt. 131, 132. The Court struck the motion without prejudice to renewing it after claim construction. Dkt. 304. AWS has stated that it intends to pursue its double patenting defense at trial. KSMF ¶ 16.

*Inc.*, 964 F.3d 1049, 1056 (Fed. Cir. 2020) (cleaned up). It "prohibits an inventor from obtaining a second patent for claims that are not patentably distinct from the claims of the first patent." *UCB, Inc. v. Accord Healthcare, Inc.*, 890 F.3d 1313, 1323 (Fed. Cir. 2018) (attribution omitted).

The analysis "involves two steps: First, the court construes the claims in the earlier patent and the claims in the later patent and determines the differences. Second, the court determines whether those differences render the claims patentably distinct." *UCB*, 890 F.3d at 1323 (cleaned up). The second step "is analogous to the obviousness inquiry under 35 U.S.C. § 103 in the sense that if an earlier claim renders obvious or anticipates a later claim, the later claim is not patentably distinct and is thus invalid for obviousness-type double patenting." *Id.* Obviousness-type double patenting "is a question of law based on underlying facts." *Eli Lilly*, 845 F.3d at 1375.

AWS's double patenting defense primarily relies on its invalidity expert, Mr. Greene. But Mr. Greene's analysis of the second step is both conclusory and, as far as can be determined, irreconcilable with controlling law. His opinions about step two of the double patenting analysis (paragraphs 278-289 and Appendix E of his July 3, 2023 report) should therefore be excluded.[24] Regardless of admissibility, Mr. Greene's assertions are insufficient as a matter of law to prove double patenting invalidity, particularly under the clear and convincing standard.

**A. Mr. Greene's Opinions on Double Patenting Are Inadmissible.**

**1. Mr. Greene's conclusory opinions are not adequately disclosed.**

Expert reports must contain "a complete statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B). And expert opinion testimony must be "based on sufficient facts or data" and "the product of reliable principles and methods,"

---

[24] The remaining parts of Mr. Greene's discussion of double patenting are directed to claim construction (which goes to the first step) and general statements about inventive concept and disclosures in patent applications, none of which are relevant here. KSMF ¶ 17.

"reliably applied." Fed. R. Evid. 702. Inadequately disclosed opinions are automatically excluded. Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information . . . as required by Rule 26(a) . . . , the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."); *see* Fed. R. Civ. P. 37(c) advisory committee's note to 1993 amendment (sanction is "automatic" and "self-executing"); *Salgado ex rel. Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 (7th Cir. 1998) ("automatic and mandatory" absent a showing of substantial justification or harmlessness).

Experts' conclusory opinions about obviousness are "deficient for purposes of disclosure under Rule 26." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (cannot "merely list[] a number of prior art references and then conclude[] with the stock phrase 'to one skilled in the art it would have been obvious to perform the [claimed invention]'"); *Meyer Intell. Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1375 (Fed. Cir. 2012) (same); *see also InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1351 (Fed. Cir. 2014) ("Dr. Yanco's testimony was vague and did not articulate reasons why a person of ordinary skill in the art at the time of the invention would combine these references."). So too for the obviousness-type double patenting analysis, which asks a closely analogous question to § 103 obviousness. *Abbvie Inc. v. Mathilda & Terence Kennedy Inst. of Rheumatology Tr.*, 764 F.3d 1366, 1378 (Fed. Cir. 2014) ("[T]he law of obviousness-type double patenting looks to the law of obviousness generally.").

Mr. Greene's step two opinions amount to the same type of conclusory statements the Federal Circuit has rejected. Here is all he has to say about that step:

> Further, there are no material differences between remaining portions of the Asserted Claims of the '978 Patent and the claims in the '640 and '170 Patents. Attached as Appendix E, I provide a comparison table between the '978 Patent claims and the disclosures and claims of the '640 and '170 Patents. As shown in the Appendix E tables, each and every claim limitation in the asserted '978 Patent claims is explicitly disclosed by the '640 Patent and '170 Patent.

KSMF ¶ 18.  Case after case excludes conclusory opinions like these.  *See, e.g.*, *Innogenetics*, 512 F.3d at 1373; *Align Tech., Inc. v. 3Shape A/S*, 2020 WL 4926164, at *10 (D. Del. Aug. 14, 2020) (Stark, J.) (striking opinion where "the entirety of [the expert's] obviousness analysis consists of a conclusory paragraph in his opening report and a similar paragraph in his reply report"); *Finjan, Inc. v. Sophos, Inc*., 2016 WL 4560071, at *7 (N.D. Cal. Aug. 22, 2016) ("even a simple analysis requires an explanation and foundation so that a fact finder can evaluate and assess the opinion").

The charts in Appendix E do not rescue Mr. Greene's conclusory paragraph.  All the charts do is attempt to match similar language between the patents using a color-coding scheme that purports to map portions of the challenged claims to portions of the '640 and '170 patents' claims and specifications.  KSMF ¶ 19.  Mr. Greene provides no further analysis or explanation in the charts or anywhere else, and he nowhere considers the claims "as a whole," as required.  *Eli Lilly & Co. v. Teva Parenteral Meds., Inc*., 689 F.3d 1368, 1377 (Fed. Cir. 2012) (differences in subject matter between the claims "cannot be considered in isolation").  He does not address the differences between the claims, let alone explain why the '978 patents' claims would be obvious despite these differences.  Nor does he explain why a person of ordinary skill in the art would be motivated to combine the various limitations from different claims cobbled together in his charts.

Mr. Greene's failure to adequately disclose his opinions is no mere technicality.  It prejudices Kove by leaving Kove without notice of Mr. Greene's actual opinions (if any) or his intended testimony at trial.  *See Bodum, Inc.*, 690 F.3d at 1374-75 ("The purpose of [Rule 26(a)] is to convey the substance of the expert's opinion so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary." (cleaned up)).  And if all Mr. Greene intends to do at trial is recite his conclusory opinions, "[s]uch vague testimony" is not helpful to the jury and thus is inadmissible.  *Innogenetics*, 512 F.3d at 1373.

### 2. In any event, Mr. Greene applies the wrong legal standard.

Expert testimony that applies the wrong legal standard is inadmissible under Rule 702. *See, e.g.*, *InTouch*, 751 F.3d at 1348-49, 1352-53 (reversing judgment of invalidity where the defendant's expert's opinion on obviousness rested on the wrong legal standard); *Integra Lifesciences I, Ltd. v. Merck KGaA*, 496 F.3d 1334, 1342 (Fed. Cir. 2007) ("[W]hen an expert witness' statement of the law is incorrect, that view of the law cannot be relied upon to support the verdict."); *Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) ("Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories."). Although it can hardly be described as analysis, Mr. Greene's color-coded chart appears to repeatedly rely on the patents' specifications rather than their claims. Binding precedent rejects that approach. "[T]he correct double patenting analysis . . . turns on an evaluation of what [the patent holder] has claimed, not what it has disclosed." *Eli Lilly*, 689 F.3d at 1380; *see also Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272, 1281 (Fed. Cir. 1992) (specification "cannot be used as though it were prior art" in the double patenting analysis).

To take just one example, claim 17 of the '978 patent includes a transfer mechanism between a "first location server" and a "second location server," where a portion of the identifiers and associated locations is transferred to the second data location server when a performance criterion of the first location server reaches a predetermined performance limit. KSMF ¶ 20. Mr. Greene does not identify any corresponding claim language in the '170 or '640 patents. *Id.* ¶ 21. Instead, he points to portions of the '640 and 170 patents' specifications that discuss the Transmission Control Protocol. *Id.* That approach is contrary to Federal Circuit precedent. Moreover, Mr. Green does not explain what those disclosures have to do with claim 17 and does not say how they would disclose or render obvious the limitations in question.

Mr. Greene also departs from the proper analysis by making general statements about the

patents covering the same inventive concept and about Kove's characterization of the patents in reexaminations that have nothing to do with the double patenting analysis. KSMF ¶ 22. Mr. Greene provides no analysis linking those assertions to the claims' scope or double patenting.

### B. AWS's Double Patenting Defense Cannot Survive Summary Judgment.

AWS cannot carry its clear and convincing evidence burden on its double patenting defense. Mr. Greene's testimony is insufficient as a matter of law for the reasons discussed above; it not only fails to meet the controlling standard, but also is so deficient that it is not admissible.

Because the parties agree that there are no material differences in construction of the claim terms among the patents involved, KSMF ¶ 23, the first step is not in dispute. But AWS's defense collapses at the second step. AWS does not identify anything to support a finding that the claims at issue are not "patentably distinct," *UCB*, 890 F.3d at 1323. It offers no analysis of the differences in claim language and subject matter on which the double patenting analysis turns, much less any reason to conclude that those differences are mere obvious variation. *See id.*

### IV. Because AWS Fails to Qualify Multiple References as Prior Art, Kove Is Entitled to Summary Judgment, and Mr. Greene's Associated Opinions Are Inadmissible.

AWS bears the burden of proving invalidity of the asserted claims by clear and convincing evidence. As part of this burden, AWS must prove that each reference it relies on qualifies as prior art under pre-AIA 35 U.S.C. § 102. *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996).[25] AWS has failed to meet that burden for certain references and so cannot use those references as prior art. AWS's invalidity expert Mr. Greene provides invalidity opinions based on these unqualified references. In some cases, he offers only his own *ipse dixit* to conclude that references qualify; in others, he relies on improper or insufficient information to do so. In all

---

[25] Because the patents issued before the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), the pre-AIA version of § 102 applies. *See Polara Eng'g, Inc. v. Campbell Co.*, 894 F.3d 1339, 1344 n.2 (Fed. Cir. 2018). Citations are to the pre-AIA version unless otherwise noted.

events, Mr. Greene's opinions are unreliable and should be excluded under Rule 702.

To qualify as prior art under § 102(a), a reference must be a patent or printed publication that existed, or something that was known or used, before the invention at issue. 35 U.S.C. § 102(a). To qualify under § 102(b), a reference must be a patent or printed publication or something that was in public use or on sale more than one year before the date of the application for the patent at issue. *Id.* § 102(b). A "printed publication" must have been publicly accessible before a claim's priority date. *M&K Holdings v. Samsung Elecs. Co.*, 985 F.3d 1376, 1379 (Fed. Cir. 2021). A U.S. patent is publicly accessible when issued. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1317 n.5 (Fed. Cir. 2006). A non-patent printed publication is publicly accessible if it was "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence[] can locate it." *Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1348 (Fed. Cir. 2016).

Expert testimony is admissible only if is "based on sufficient facts or data" and "is the product of reliable principles and methods," "reliably applied . . . to the facts of the case." Fed. R. Evid. 702. Opinions "connected to existing data only by the *ipse dixit* of the expert" are inadmissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

### A. Factual Background

AWS agrees that Kove's asserted claims have the following priority dates. KSMF ¶ 24.

| Asserted Patent | Asserted Claims | Priority Date |
|---|---|---|
| 7,103,640 | 17, 18, 24 | October 28, 1999 |
| 7,233,978 | 3, 6, 10, 14 | October 28, 1999 |
| 7,233,978 | 17, 23, 24, 30 | June 2, 2000 |
| 7,814,170 | 1, 2, 6, 8, 12, 15 | October 28, 1999 |

AWS's invalidity contentions allege that the asserted claims are invalid based on references that allegedly anticipate or render obvious each claim. KSMF ¶¶ 25-26. AWS's Fourth Amended Final Unenforceability and Invalidity Contentions ("Fourth Invalidity Contentions") applied the

Court's claim constructions. KSMF ¶ 25.[26] AWS asserts 14 invalidity "references" (some of which actually consist of multiple references) as prior art. KSMF ¶ 26.

Mr. Greene's July 3, 2023 expert report includes Appendices C and D, each of which has multiple exhibits detailed the alleged grounds of invalidity for each asserted claim. Appendix C copies (verbatim) AWS's Fourth Invalidity Contentions; Appendix D copies (also verbatim) AWS's Fifth Invalidity Contentions. KSMF ¶ 27. Mr. Greene does not provide any invalidity opinions beyond those in his report and AWS's Invalidity Contentions.

This motion addresses six references: (i) DNS (BIND 8.1) system; (ii) Cache Resolver system; (iii) Boukobza; (iv) Karger '618; (v) Karger '420; and (vi) Steen. KSMF ¶ 26. The DNS (BIND 8.1) and Cache Resolver systems are each made up of multiple separate references.

### B. Mr. Greene's Opinions About the Prior Art Status of DNS (BIND 8.1) and Cache Resolver Are Unreliable *Ipse Dixit* and Must Be Excluded.

Mr. Greene opines that the asserted claims are invalid over certain references he alleges are prior art, including the DNS (BIND 8.1) system ("BIND 8.1") reference and the Cache Resolver system ("Cache Resolver") reference. KSMF ¶ 28. Mr. Greene opines that each system anticipates and that each, in combination with other references, renders the claims obvious.

#### 1. BIND 8.1

DNS stands for "domain name services" and is, at a general level, a distributed naming framework for internet resources. KSMF ¶ 29.The framework has many implementations and may be applied or adapted in any number of ways. *Id.* ¶¶ 29-30. Berkeley Internet Name Domain (BIND) 8.1 is one specific implementation. *Id.* ¶¶ 30-32. AWS contends that "BIND 8.1, a version

---

[26] AWS's Fifth Amended Final Unenforceability and Invalidity Contentions ("Fifth Invalidity Contentions") applied its new proposed claim constructions. KSMF ¶ 25. AWS's Fifth Invalidity Contentions are operative only if the Court adopts AWS's new claim constructions; otherwise, AWS relies on its Fourth Invalidity Contentions. *Id.*

of DNS and available as of May 1997, is a prior art DNS system that anticipates and/or renders obvious claims of the Asserted Patents." *Id.* ¶¶ 32-33. AWS provided a URL that links to a page hosting what is allegedly the BIND 8.1 source code. *Id.* ¶¶ 33-34.

Mr. Greene opines that BIND 8.1 is "prior art under pre-AIA 35 U.S.C. § 102(a), (b), and/or (f), *e.g.*, because it was publicly available in May 1997, more than a year before Kove's [priority dates]." KSMF ¶ 42.[27] But rather than relying on the system's source code, Mr. Greene chose (without ever saying why) to rely exclusively on other documents—a "DNS & BIND" book and three papers: RFC 1034, Sherman, and Karger/Sherman. *Id.* ¶ 39. Mr. Greene says "the operation" of BIND 8.1 "is described" in these four documents, but he provides no basis for that conclusory statement of fact. *Id.* ¶ 43. He also never alleges that the documents are themselves prior art; he only cites them as allegedly "describing" BIND 8.1 (and as "inherent" to Cache Resolver).

### a. BIND 8.1 does not qualify as a prior art reference.

The question whether a reference qualifies as prior art normally turns on its date of publication or public accessibility. This is not a normal case. Here, AWS identifies, and Greene opines, that BIND 8.1 is prior art under various provisions of § 102 based on an allegation that the system was available to the public as of May 1997. Kove does not contest that date for purposes of this motion.[28] What is at issue here is what Mr. Greene contends that BIND 8.1 *comprises* and whether there is sufficient basis to find his contention reliable.

BIND 8.1 has corporeal form—its source code. Mr. Greene does not identify any other document that identifies itself as being about BIND 8.1 (*e.g.*, a user's guide or programming notes). Yet he ignores the source code, instead relying exclusively on other documents that he insists

---

[27] Mr. Greene sometimes refers to BIND 8.1 simply as "DNS," but it is clear in these instances that he is referring to the BIND 8.1 implementation because he refers to the May 1997 date, which is associated only with BIND 8.1 *See, e.g.*, KSMF ¶ 42.

[28] Kove reserves the right to challenge the sufficiency of evidence purporting to qualify BIND 8.1.

"describe" BIND 8.1's "operations." Mr. Greene provides no insight into how he reached this conclusion. And the documents he relies on cast significant doubt on it; DNS & BIND, RFC 1034, Sherman, and Karger/Sherman all appear to indicate that they are about something else.

"DNS & BIND" is a book by Paul Albitz and Cricket Liu, neither of whom are the authors of BIND 8.1 or have been shown to be involved with its development. KSMF ¶ 44. The version of the book Mr. Greene relies on bears a publication date of September 1998, over a year after the May 1997 BIND 8.1 version. *Id.* ¶ 45. Its preface states: "This book deals with the *new 8.1.2 version of BIND* as well as the older 4.9 versions." *Id.* ¶ 46 (emphasis added). It neither mentions BIND 8.1 nor explains the differences (or similarities) between the 8.1 and 8.1.2 versions.

RFC 1034 is a partial list of "requests for comments" memoranda titled "Domain Concepts and Facilities" and assembled by the Internet Engineering Task Force. KSMF ¶ 47. There is no evidence in the record that anyone at the Task Force authored or was involved in the development of BIND 8.1. After all, RFC 1034 bears a date of November 1987—nearly a decade before BIND 8.1 even existed. *Id.* ¶ 48. Mr. Greene does not explain why he thinks a document from ten years earlier "describes" (foretells?) any (or all?) parts of BIND 8.1's operation. *Id.* ¶ 49.

Sherman is a graduate school paper by Alexander Sherman dated February 1999 and titled "Distributed Web Caching System with Consistent Hashing." KSMF ¶ 50. Karger/Sherman is a "preprint" paper by David Karger, Alex Sherman, and others dated March 1999 and titled "Web Caching with Consistent Hashing." *Id.* Both are dated nearly two years after BIND 8.1's May 1997 release. *Id.* ¶ 42. None of the authors are alleged to have participated in developing BIND 8.1. *Id.* ¶ 51. Sherman says, "We use a number of DNS servers each running a copy of unmodified *BIND 8.0* . . . . In addition to BIND, each DNS machine runs *one of our programs, called 'dnshelper*.'" *Id.* ¶ 52 (emphasis added). Karger/Sherman contains similar language. *Id.*

Mr. Greene does not clarify what he thinks describes BIND 8.1, what refers to BIND 8.0, or what is rooted in "dnshelper" (an authors' creation not possibly present in BIND 8.1). *Id.* ¶ 53.

Mr. Greene does not run any of these inconsistencies to ground. More substantively, he makes no effort to show that the documents' disclosures he relies on are *necessarily* part of BIND 8.1—something that must be true in order for his contention that they *describe* BIND 8.1 as a prior art system to be reliable. Ultimately, Mr. Greene offers no facts to connect DNS & BIND, RFC 1034, Sherman, or Karger/Sherman with his conclusory assertion that they describe the BIND 8.1 implementation of DNS or that BIND 8.1 operates in accordance with the cited documents beyond his own say-so. That *ipse dixit* is insufficient to connect Mr. Greene's opinion to the facts of this case, and so his invalidity opinions based on BIND 8.1 are inadmissible. *See, e.g.*, *Gen. Elec.*, 522 U.S. at 146.

### b. BIND 8.1 is not a "single reference" and thus cannot anticipate.

"It is hornbook law that anticipation must be found in a single reference, device, or process." *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 726 F.2d 724, 726-27 (Fed. Cir. 1984); *accord SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1306 (Fed. Cir. 2019) ("a single prior art reference" must "disclose each and every limitation"). If "facts beyond those disclosed in the [single] reference" are needed "to meet the claim limitations," the reference does not anticipate. *Scripps Clinic & Rsch. Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576-77 (Fed. Cir. 1991), *overruled in other part by Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009). Extrinsic evidence can illuminate but it cannot "fill gaps in the reference." *Id.* (attribution omitted).

BIND 8.1, as Mr. Greene applies it, is four separate documents, not one. It therefore cannot anticipate. True, extrinsic evidence can be used to illuminate "what the reference meant to persons of ordinary skill in the field of the invention." *Scripps Clinic*, 927 F.3d at 1576. But it cannot "fill gaps in the reference." *Id.* Here, Mr. Greene uses *only* extrinsic evidence to fill *every* gap because

there is no actual BIND 8.1 reference. This disqualifies the reference.

*Kyocera Wireless Corp. v. International Trade Commission*, 545 F.3d 1340 (Fed. Cir. 2008), has an analogous fact pattern and is controlling. There, the Federal Circuit affirmed a finding that a collection of eleven documents could not be treated as a single prior art reference for anticipation purposes; although the documents were "part of [a] greater" standard, each was "a separate document in its own right." *Id.* at 1351. The documents "were authored by different subsets of authors at different times," and the "standard include[d] hundreds of individual specifications drafted by approximately ten different subgroups, each with its own title and separate page numbering." *Id.* That standard thus was "not a single reference." *Id.*

The facts here are worse. The documents Mr. Greene relies on as constituting BIND 8.1 are not part of a standard. Each paper was authored by different people at different times on ostensibly different subject matter. None is explicitly about BIND 8.1. Without any facts showing that the documents "describe" BIND 8.1, they cannot be fused into a "single reference" to anticipate any claim. Mr. Greene's opinions that rely on asserting BIND 8.1 as a single reference therefore fail as a matter of law and must be excluded.[29]

### 2. Cache Resolver

Cache Resolver is a distributed web caching system developed at MIT. KSMF ¶ 54. It is described in the Sherman and Karger/Sherman papers just discussed.

#### a. Cache Resolver does not qualify as a prior art reference.

Kove does not dispute that Sherman and Karger/Sherman describe Cache Resolver; the papers are contemporaneous, share common authorship, and describe a system by that name. But they are not the totality of what Mr. Greene contends the *Cache Resolver prior art system* to be.

---

[29] AWS does not assert the four references as prior art independently.

According to Mr. Greene, "the complete features and functionality of DNS is inherent to any system using DNS, such as described in Sherman or Karger/Sherman." KSMF ¶ 56. Mr. Greene then uses this alleged inherency to pull in RFC 1034 and DNS & BIND, which he relies on (along with Sherman and Karger/Sherman) to find the asserted claims invalid. *Id.* ¶ 57.

Mr. Greene provides no support for his theory of inherency. The totality of his evidence that Cache Resolver (*i.e.*, Sherman and Karger/Sherman) "inherently" discloses every "feature and functionality of DNS" is the following paragraph:

> All of the features and functionality of DNS are inherent to systems using DNS, such as the use of DNS in the Cache Resolver system. In particular, the Cache Resolver system uses DNS servers running BIND 8 and the program "dnshelper." The authors of these papers used the Cache Resolver system. The Cache Resolver system describes how consistent hashing is used to help reduce the amount of inter-cache communication.

KSMF ¶ 60. To prove inherency, however, Mr. Greene must show how Sherman and Karger/Sherman disclose, as he summarily states, "*all* the features and functionalit[ies]" of BIND 8. *Id.* And because he relies on RFC 1034 and DNS & BIND (not BIND 8 itself), Mr. Greene also has to explain how BIND 8 inherently discloses "*all* the features and functionalities" of RFC 1034 and DNS & BIND. *Akamai Techs., Inc. v. Cable & Wireless Internet Servs., Inc.*, 344 F.3d 1186, 1192 (Fed. Cir. 2003) ("A claim limitation is inherent in the prior art if it is necessarily present in the prior art, not merely probably or possibly present."). But Mr. Greene simply declares "inherency" without explanation, making that theory yet more inadmissible handwaving. *See Gen. Elec.*, 522 U.S. at 146. Because the Cache Resolver system is not qualified as prior art, Mr. Greene's opinions asserting it as prior art should be stricken.

### b. Cache Resolver is not a "single reference" and thus cannot anticipate.

As with BIND 8.1, Mr. Greene fails to establish that the four separate documents he relies on can be consolidated into a *single* reference as required for anticipation. His bare assertion that Sherman or Karger/Sherman "inherently" disclose RFC 1034 and DNS & BIND is unsupported.

RFC 1034 and DNS & BIND are distinct from the Cache Resolver papers, with different authors from those papers and each other. KSMF ¶ 58. As a result, these documents are not a single reference and cannot anticipate any claim. *See Kyocera*, 545 F.3d at 1351.

### C. Boukobza, Karger '618/'420, and Steen Do Not Qualify as Prior Art

Mr. Greene asserts that the Boukobza, Karger '618, Karger '420, and Steen references are prior art under § 102(a), (b), and (f), but he fails to qualify them under the appropriate standards. Because these references fail as a matter of law, Mr. Greene's invalidity opinions based on them should be excluded, which in turn entitles Kove to summary judgment on the affected defenses.

#### 1. Boukobza, Karger '618, and Karger '420 issued after the latest priority date.

Boukobza, Karger '618, and Karger '420 are U.S. patents that issued September 19, 2000, August 6, 2022, and April 22, 2003, respectively. KSMF ¶¶ 64, 66. Mr. Greene opines that these patents are prior art under § 102(a) and (b) because their filing dates precede the asserted patents' priority dates by more than a year. *Id.* ¶¶ 65, 67. That is not how the statute works.

To qualify as a printed publication, a patent's *publication* date—that is, its issuance date, not its filing date—must have been before a claim's priority date. *SmithKline Beecham*, 439 F.3d at 1317 n.5. All the claims at issue here have priority dates (October 28, 1999 or June 2, 2000) before the Boukobza and Karger patents' issuance date. KSMF ¶ 64. That disqualifies these patents as "printed publication[s]" under § 102(a) and (b). Nor were the patents publicly "known" under § 102(a); their applications were confidential and did not publish before their issue dates. 35 U.S.C. § 122; *Hazeltine Rsch., Inc. v. Brenner*, 382 U.S. 252, 254 (1965). Mr. Greene offers no opinions supporting AWS's contention that the references qualify under § 102(f). KSMF ¶¶ 65, 67. His invalidity opinions based on Boukobza, Karger '618, and Karger '420 are therefore unreliable and should be stricken. *Blue Calypso*, 815 F.3d at 1350-51 n.10 (non-prior art references cannot be used to establish invalidity); *Estech Sys. IP, LLC v. Carvana LLC*, 2023 WL 3292881,

78

at *12 (E.D. Tex. May 5, 2023) (excluding invalidity opinions based on non-prior art references).

### 2. Steen

Mr. Greene opines that Steene is a "printed publication" under § 102(a) or (b). KSMF ¶ 68. He relies on the January 1998 date on Steen's face, a table of contents from an IEEE Communications Magazine pulled from a website in 2023 that purportedly shows that Steen was published in 1998, and his opinion that "[t]hose in the art were reading and even citing to Steen throughout 1998." *Id.* That does not add up to clear and convincing evidence of public availability.

Dates on a reference are "not dispositive of the date of public accessibility." *Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1376 (Fed. Cir. 2018). They may suggest when a document was created, but they do not prove public *accessibility*, which is "the touchstone in determining whether a reference" qualifies as prior art. *In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009). Courts routinely find dates on references, including copyright and publication dates, insufficient to demonstrate public accessibility. *Lincoln Elec. Co. v. Harbor Freight Tools USA, Inc.*, 2018 WL 10809987, at *11 (N.D. Ohio Aug. 15, 2018); *Navico Inc. v. Garmin Int'l, Inc.*, 2017 WL 3750252, at *3 (E.D. Tex. July 28, 2017).

The table of contents pulled from a website in 2023 (decades after Kove's priority dates) similarly fails to show that a person of ordinary skill in the art would have been able to locate Steen in 1998. *Lister*, 583 F.3d at 1311-12. And the evidence Mr. Greene offers to support his contention that "[t]hose in the art were reading and even citing to Steen throughout 1998" has nothing to do with the Steen paper or its accessibility in that timeframe. KSMF ¶ 68; *see also EagleView Techs., Inc. v. Xactware Solutions, Inc.*, 485 F. Supp. 3d 505, 520 (D.N.J. 2020) (a citation to a reference is not evidence of how the reference would have been located).

Because Mr. Greene does not rely on sufficient facts to prove by clear and convincing evidence that Steen qualifies as prior art, his invalidity opinions and testimony that rely on Steen

should be excluded. *Dexcowin Global, Inc. v. Aribex, Inc.*, 2017 WL 3478492, at \*19 (C.D. Cal. June 29, 2017) ("Grundfest's expert report does not rely on sufficient facts to establish that the [references] are prior art, and therefore, does not satisfy the *Daubert* standard.").

**D. Kove Is Entitled to Summary Judgment as to Any Invalidity Ground That Relies on AWS's Unqualified References.**

AWS cannot meet its clear and convincing evidence burden for any invalidity ground that relies on any reference it failed to qualify as prior art. As to the BIND 8.1 and Cache Resolver systems, AWS has identified no admissible evidence—only its invalidity expert's say-so. Because Mr. Greene's *ipse dixit* statements "cannot be enough to constitute clear and convincing evidence," *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1338 (Fed. Cir. 2013), they "are not sufficient to avoid summary judgment," *Parallel Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 970 (Fed. Cir. 2013). AWS's lack of evidence that Boukobza, Karger '618 and '420, or Steen is prior art likewise requires summary judgment on all invalidity grounds for which Mr. Greene relies on any of those references. *See, e.g.*, *Cordis Corp. v. Boston Scientific Corp.*, 561 F.3d 1319, 1332-35 (Fed. Cir. 2009).

## Conclusion

For these reasons, the Court should grant Kove's motion for summary judgment and to exclude.

Dated: November 6, 2023

Respectfully submitted,

*/s/ Courtland L. Reichman*

Khue V. Hoang *(pro hac vice)*
khoang@reichmanjorgensen.com
Jaime F. Cardenas-Navia *(pro hac vice)*
jcardenas-navia@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
400 Madison Avenue, Suite 14D
New York, NY 10017
Telephone: (212) 381-1965
Facsimile: (650) 560-3501

Christine E. Lehman *(pro hac vice)*
clehman@reichmanjorgensen.com
Adam Adler *(pro hac vice)*
aadler@reichmanjorgensen.com
Philip Eklem *(pro hac vice)*
peklem@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
Facsimile: (650) 560-3501

Taylor Mauze *(pro hac vice)*
tmauze@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
901 S. Mopac Expressway, Bldg. 1, Suite 300
Austin, TX 78746
Telephone: (650) 623-1401
Facsimile: (650) 560-3501

Renato Mariotti (State Bar No. 6323198)
renatto.mariotti@bclplaw.com
Holly H. Campbell (State Bar No. 6320395)
holly.campbell@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
161 North Clark Street, Suite 4300
Chicago, IL 60601
Telephone: (312) 602-5000

Courtland L. Reichman *(pro hac vice)*
creichman@reichmanjorgensen.com
Shawna L. Ballard *(pro hac vice)*
sballard@reichmanjorgensen.com
Gina H. Cremona *(pro hac vice)*
gcremona@reichmanjorgensen.com
Navid Bayar *(pro hac vice)*
nbayar@reichmanjorgensen.com
Savannah Carnes *(pro hac vice)*
scarnes@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 560-3501

***ATTORNEYS FOR PLAINTIFF
KOVE IO, INC.***