# Exhibit K34

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

--------------------------------X

KOVE IO, INC.,                          :

                    Plaintiff,          :

                                        : Civil Action No.:

     v.                                 :

                                        : 1:18-cv-08175

AMAZON WEB SERVICES, INC.               :

                    Defendant.          :

--------------------------------X

*** HIGHLY CONFIDENTIAL ***

Deposition of SWAMI SIVASUBRAMANIAN, PH.D., as the

corporate representative of Amazon Web Services,

Inc. and personally

Conducted Remotely

Wednesday, May 10, 2023

9:01 a.m. PST


Reported by: Matthew Goldstein, RMR, CRR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 7

```
 1                 P R O C E E D I N G S

 2    Whereupon,

 3                 SWAMI SIVASUBRAMANIAN, PH.D.

 4    being first duly sworn or affirmed to testify to the

 5    truth, the whole truth, and nothing but the truth, was

 6    examined and testified as follows:

 7        EXAMINATION BY COUNSEL FOR THE PLAINTIFF

 8    BY MR. ADLER:

 9        Q.   All right.  Good morning,

10    Mr. Sivasubramanian.

11        A.   Good morning.

12        Q.   Is this the first time you've been

13    deposed?

14        A.   For this case?

15        Q.   Ever?

16        A.   No, I think I've been done once before.

17        Q.   And do you remember which case that was

18    in?

19        A.   No.

20        Q.   And do you remember about how long ago

21    that was?

22        A.   Not exactly.
```

1    that from.  Is that right?

2        A.   Yes, that's how Raju phrased it.  I

3    would phrase it as a highly scalable database

4    service.  Because the term "non-relational,"

5    that's vague, but yes.

6        Q.   Okay.  And so the correct way to say

7    that would be your new responsibilities were

8    motivated, at least in part, by the need to offer

9    a highly scalable database service to serve the

10   needs of AWS's largest customers; is that right?

11       A.   Yes, to serve the needs of our

12   customers, yes.

13       Q.   And in the second paragraph, it says,

14   ██████████████████████████████████████████████

15   ████████████████████████████████████████

16   ██████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████████████████

19            Do you see that?

20       A.   Yes.

21       Q.   Now, ultimately you decided not to

22   enhance the SimpleDB service and to develop the

1    product that became DynamoDB instead; is that

2    right?

3        A.   That's not quite right.  I mean, yes, we

4    actually called it DynamoDB, but it did use

5    several of the models of like data models and so

6    forth similar to SimpleDB.

7        Q.   So would it be correct to say --

8        A.   DynamoDB is a separate service, that is

9    correct, if that is your question.

10        Q.   So would it be correct to say that

11    DynamoDB forked off of SimpleDB?

12            MR. SALTMAN:  Objection; vague, scope.

13            THE WITNESS:  Yeah.  Fork -- can you say

14    more specifically what do you mean by "fork"?

15    BY MR. ADLER:

16        Q.   Meaning you started with the SimpleDB

17    code base and then at some point diverged onto a

18    different path?

19            MR. SALTMAN:  Objection; scope.

20            THE WITNESS:  I don't know, actually.  I

21    don't remember if we actually used any parts of

22    SimpleDB code base to bootstrap DynamoDB.  I know

Page 47

1    versus another.  So that seems like a very

2    conflict-driven way instead of a customer obsessed

3    way in saying we are trying to build it together.

4             And so I don't view it as Rande versus

5    Swami, which is what you're trying to get at.

6    Instead, Rande and I were excited to partner

7    together to build together.  And he was --

8    SimpleDB was getting used by our customers.  So we

9    still had to support it.

10            So the way you're characterizing that

11   someone was actually thrown down to go run

12   SimpleDB sounds a little bit not customer obsessed

13   either because we still had to operate it for our

14   customers.  And that was still my job, too.  So I

15   was still on call carrying a pager to support

16   those customers.  So I'm genuinely confused with

17   the intent of the question.

18   BY MR. ADLER:

19       Q.   So you were the senior manager of NoSQL

20   services; is that right?

21       A.   Yes.

22       Q.   And what did you do as senior manager of

1      NoSQL services?

2                MR. SALTMAN:   Objection; vague.

3                THE WITNESS:   I managed in the

4      development of a few services, database services.

5      So another being SimpleDB, the another one which

6      eventually became DynamoDB.  And at some point, I

7      think I also took over management of our caching

8      service called ElastiCache.

9      BY MR. ADLER:

10          Q.    And were you responsible for --

11          A.    And --

12          Q.    Were you responsible for the decision to

13     build the product that became DynamoDB?

14                MR. SALTMAN:   Objection; assumes facts

15     not in evidence, scope.

16                THE WITNESS:   I was involved in actually

17     analyzing what is the right way to launch a

18     scalable database service product and what is the

19     right API to scale and then pass on.

20     BY MR. ADLER:

21          Q.    When did DynamoDB launch?

22          A.    I think January 2012, if I'm not wrong.

Page 49

1      Q.    And then how did your responsibilities

2    change, if at all, after the launch of DynamoDB?

3      A.    After the launch of DynamoDB, we also --

4    I mean, I think leading up to DynamoDB itself, I

5    started managing the product managers.  So I

6    was -- the business function I was in, which is

7    different from the internal title, but the

8    business title was -- business title is probably

9    more a general manager.  And the functional title

10   is I'm still a senior manager.

11     Q.    And I'm going to pull back up Exhibit 1

12   because I think it will help nail down some dates.

13            According to your LinkedIn, you became

14   general manager of NoSQL and analytics in April of

15   2012; is that right?

16     A.    April 2012, probably.  So that is

17   three months after the launch of DynamoDB.  Is

18   your question did my role change after -- in

19   April?

20     Q.    Yeah.

21     A.    I think in April I was promoted to a

22   director, if I'm not wrong.  And that is also -- I

1 think business title might have been a general

2 manager, but the actual internal title was also a

3 director.

4   Q. Okay. And so because your answer had

5 indicated that there was a point in time where

6 your responsibilities or -- responsibilities

7 expanded to include business functions, as well as

8 technical management.

9   A. Yes.

10   Q. When was that?

11   A. Trying to remember. The product

12 managers at some point moved over reporting to me,

13 maybe late 2011, maybe sometime in Q4 2011.

14   Q. And prior to that time, your role was

15 leading the engineering teams?

16   A. Yes.

17   Q. And as part of that role of leading the

18 engineering teams, is it correct to say that you

19 were driving -- you were one of -- scratch that.

20    Is that correct to say that in that role

21 you were one of the main decision-makers regarding

22 major design decisions for DynamoDB?

Page 58

1    perspective?

2         A.    Technical, I'm assuming you're not

3    expecting me to know all the code and every little

4    detail, but I can speak to it as reasonable

5    enough.

6         Q.    Good.

7    ████████████████████████████████

8    ████████████████████████████  ████████

9    ████████████████████████████████

10   ████████████████████████████

11             Do you see that?

12        A.    Yes.

13        Q.    And this was a while ago, November 2016.

14   Do you know how many patents you have today?

15        A.    I don't.

16        Q.    Is it more than 150?

17        A.    I would think so.

18        Q.    Do you know if it's more than 200?

19             MR. SALTMAN:  Objection; scope.

20             THE WITNESS:  I genuinely don't because

21   I stopped keeping track.

22

Page 66

1          Is that your full understanding of what

2     a patent is?

3               MR. SALTMAN:  Objection; scope, asked

4     and answered.

5               THE WITNESS:  Yeah.  I thought I

6     answered it.  A patent involves an invention.  Is

7     there something more?  I'm happy to get educated.

8     BY MR. ADLER:

9          Q.   Yeah, I mean, it's more like you have

10    over 150 patents, and so I want to get to the

11    bottom of your full understanding of what a patent

12    is is just a document that describes an invention.

13              Is that your full being of what a patent

14    is?

15         A.   Yes.

16              MR. SALTMAN:  Objection; scope.

17    BY MR. ADLER:

18         Q.   Do you know what it means to infringe a

19    patent?

20              MR. SALTMAN:  Objection; calls for a

21    legal conclusion and scope.

22              THE WITNESS:  I'm no lawyer to speak

Page 67

1    authoritatively what infringement is and it

2    doesn't.

3    BY MR. ADLER:

4        Q.    Yeah, and I appreciate that you're not a

5    lawyer.  And despite Mr. Saltman's objections, I'm

6    not asking for a legal conclusion.  I'm asking for

7    your understanding of what it means to have a

8    patent and what it means for a patent to exist.

9            And so my question is:  Do you have an

10   understanding of what it means to infringe a

11   patent?

12           MR. SALTMAN:  Objection; scope, calls

13   for a legal conclusion.

14           THE WITNESS:  Yeah.  I know what

15   "infringement" word in English means, that you are

16   actually not -- it means something.  But I don't

17   know what a patent infringement exactly means.

18   That's why.  I'm not trying to be difficult.  I'm

19   generally just interested in knowing.  If you give

20   me an example of what is infringement and what is

21   not and so forth, it will be helpful.

22

1  BY MR. ADLER:

2       Q.    Well, so what I'm interested in is

3  understanding what you know.   And so

4  understanding, taking it as a given, we both

5  understand you're not a lawyer and you might not

6  understand the intricacies of a legal system, do

7  you have even a high-level understanding of what

8  it means to infringe a patent?

9         MR. SALTMAN:   Objection; scope, calls

10  for a legal conclusion.

11         THE WITNESS:   I generally -- I'm trying

12  to parse out what you're after, trying to be

13  helpful.   So, again, I don't understand IP

14  infringement and nuances.   That's why we have IP

15  lawyers at Amazon, and probably they employ

16  outside counsel.   So...

17  BY MR. ADLER:

18       Q.    Okay.

19       A.    I'm an engineer.   I'm a builder.   So --

20  at the end of the day.

21       Q.    Do you understand that it's wrong to

22  infringe a patent?

 1          MR. SALTMAN:  Objection; scope, vague.

 2          THE WITNESS:  If I go by what

 3  infringement -- what you are saying, that if --

 4  again, depending on, actually, I assume when --

 5  actually, can you just define "infringement" and

 6  make my life easier?  Because you keep asking --

 7  you say, what is infringement, what is your

 8  understanding, and then you're jumping to is it

 9  wrong, but you haven't defined what you mean by

10  "infringement."  So I kind of find derivative

11  questions harder to answer when you haven't

12  defined what you mean by it.

13  BY MR. ADLER:

14    Q.  Well, I'm not interested in what I think

15  infringement is.  I'm interested in what you

16  understand infringement to be.  And so, you know,

17  if your answer is "I don't know," that can be your

18  answer.  If your answer is "I don't understand

19  what your question is," that can be your answer.

20          But my question is:  For infringement,

21  as you understand it -- or scratch that.

22          My question is:  Given what you

5/10/2023    Kove IO, Inc. v. Amazon Web Services, Inc. Swami Sivasubramanian, Ph.D.
Highly Confidential

Page 70

1 understand infringement to be, do you think it is

2 wrong to infringe a patent?

3     MR. SALTMAN:  Objection; calls for a

4 legal conclusion and scope.

5     THE WITNESS:  I'm confused because

6 you're saying you don't want to define what

7 infringement is, but you still want me to answer

8 what is infringement.  That's what I keep getting

9 tripped over.  I'm really trying to be helpful.

10 So --

11 BY MR. ADLER:

12   Q. Yeah, I want you to answer based on your

13 understanding of infringement.

14   A. Okay.  I don't know the intricacies of

15 IP law to answer, but I would think IP

16 infringement is that when a certain patent -- you

17 probably want to protect one versus -- you want to

18 discuss that these ideas are getting -- that two

19 people own the same idea, maybe, and that is -- I

20 generally don't know what infringement covers.

21 So -- for me to make a legal opinion.  So -- and

22 you're asking me to play lawyer, and I'm not a

Page 71

1     lawyer.

2          Q.   Do you think intellectual property

3     should be protected?

4               MR. SALTMAN:  Objection; scope.

5               THE WITNESS:  I would think so.

6     BY MR. ADLER:

7          Q.   In your time at Amazon, has there ever

8     been a moment where in designing a product or a

9     service you said or thought to yourself, We

10    shouldn't do it this way because that would

11    infringe a patent?

12              MR. SALTMAN:  And the question doesn't

13    call for this, but just to caution you, if it

14    involves any discussion with counsel, either

15    in-house or outside counsel, I'm going to instruct

16    you not to answer the question.

17              But otherwise you can answer.

18              THE WITNESS:  I'm sorry, Jeff, can you

19    repeat the question again?

20              MR. SALTMAN:  Sure.  Or instruction?

21    BY MR. ADLER:

22         Q.   The question was --

Page 72

1          THE WITNESS:  Can you repeat your

2    instruction, sorry?

3    BY MR. ADLER:

4        Q.   The question was:  In your time at

5    Amazon, has there ever been a moment wherein

6    designing a product or service you said or thought

7    to yourself, We shouldn't do it this way because

8    that would infringe a patent?

9          MR. SALTMAN:  And I'm just going to

10   caution the witness not to reveal the substance of

11   any attorney-client communications in giving your

12   answer.

13          To the extent you can answer his

14   question without doing so, you can do so.

15          THE WITNESS:  We are not -- when we

16   build systems, we look at what we need to build

17   and what is the right algorithms to go build and

18   so forth.  The design doesn't involve actually

19   taking like 20 lawyers in the room to go into

20   building, if that's what you're asking.

21   BY MR. ADLER:

22       Q.   Yeah.  So you're saying when you're

1    two more questions and then take a break?

2               MR. SALTMAN:  It's up to the witness.

3               THE WITNESS:  A break would be great.

4               MR. ADLER:  All right.  Let's take a

5    break.

6               Let's go off the record.

7               THE VIDEOGRAPHER:  All right.  The time

8    is 10:16 a.m.  We're off the record.

9               (Recess from the record.)

10             THE VIDEOGRAPHER:  The time is

11   10:25 a.m.  We're back on the record.

12   BY MR. ADLER:

13      Q.  All right.  So when we left off, we were

14   talking about the role of intellectual property in

15   your product development.

16           Do Amazon engineers consider

17   intellectual property rights when developing their

18   products?

19           MR. SALTMAN:  Objection; scope, calls

20   for speculation.

21           THE WITNESS:  I'll tell you what we -- I

22   feel like I answered this before.  When we build

Page 75

1    it, we actually look for customer requirements and

2    feedback, and then we go and look at what are the

3    best ways to solving it.  And so go write the

4    design docs and so forth.

5

6

7

8

9    BY MR. ADLER:

10        Q.

11

12            MR. SALTMAN:  Objection; scope.

13            THE WITNESS:

14

15

16

17   BY MR. ADLER:

18        Q.   So you've never conducted a patent

19   search in connection with one of the -- in

20   connection with your work at Amazon?

21            MR. SALTMAN:  And I just want to caution

22   the witness to the extent your answer calls for

Page 77

1    instructed -- he asked whether you've ever done a

2    patent search.  So if legal counsel had instructed

3    you to do one or not to do one, that would be

4    privileged is an example.  So I just want to --

5    BY MR. ADLER:

6        Q.    Right.  So I'll make it easy.  It's a

7    yes-or-no question.  So I'm not yet asking for

8    details or what.

9            The question is:  Have you ever searched

10   for a patent or searched a patent database to make

11   sure that what you were developing does not

12   infringe a patent?

13       A.    I have not.

14       Q.    ████████████████████████████████████

15   ████████████████████████████████

16            MR. SALTMAN:  Objection; scope.

17            THE WITNESS:  ████████████████████████

18   ████████████████████████████████████  ██████

19   ████████████████████████████████████████

20   █████████████████████████████████████

21   ██████  ███████████████████████████████████

22   ██████████████████████████████

1    BY MR. ADLER:

2         Q.    Would you have an answer to provide if

3    not for the instruction not to answer?

4              Well, this is -- this is an improper

5    privilege objection.  It's a yes-or-no question.

6    Have you ever asked anyone to conduct a patent

7    search?

8              So I'm going to ask the question again

9    and you can answer with a "yes" or a "no" and then

10   we can move on from there.

11             MR. SALTMAN:  I'm going to instruct --

12   sorry, go ahead.

13   BY MR. ADLER:

14        Q.    So the question is:  Have you ever asked

15   anyone to conduct a patent search?

16             MR. SALTMAN:  And to the extent that it

17   involves communications with counsel, I'm going to

18   instruct the witness not to answer.  Otherwise,

19   you can answer the question.

20             THE WITNESS:  I don't recall.

21   BY MR. ADLER:

22        Q.    I was reviewing your LinkedIn profile

Page 80

1    during the break.  I'm going to put it back up.  I

2    had asked you before if you have over 200 patents,

3    and you couldn't remember.  On your LinkedIn

4    profile, it states, "I have been awarded or filed

5    for more than 250 patents."

6                 Do you see that?

7          A.   Yeah, I see it now.

8          Q.   Is it correct that you've been awarded

9    or filed for more than 250 patents?

10                MR. SALTMAN:  Objection; scope.

11                THE WITNESS:  Okay.  I suspect so.

12   BY MR. ADLER:

13         Q.    And is it correct to say that the vast

14   majority of those patents were awarded in

15   connection with your work at Amazon?

16         A.    Yes.

17         Q.    And so is it also correct to say that

18   you're pretty familiar with how the process goes

19   for applying for a patent at Amazon?

20                MR. SALTMAN:  Objection; scope, vague.

21                THE WITNESS:  Yeah, can you define what

22   you mean by "process" there?

Page 81

1    BY MR. ADLER:

2      Q.   Well, I'll ask you, and then you can

3   tell me. ███████████████████████████

4   ████████████████████████████████

5      ███████████████   ██████████████

6   █████

7      █████████████████████████████████

8   █████████████████████████████████████

9   ███████████████████████████████████

10     ███████████████   ██████████████

11   ████████████████████████████████

12   █████████████████████████████████████

13   ██████████████████████████████████████

14   ████████████████████████████████████

15   █████████████████████████████████████

16   ██████████████████████████████████████

17   ████████████████████████████████████

18   ████████████

19     Q.   ██████████████████████████

20   ████████████████████

21     A.   ████

22     Q.   ██████████████████████████████████

Page 82



Page 224

1    STATE OF MARYLAND      )

2                          ss:

3    COUNTY OF MONTGOMERY  )

4

5              I, Matthew Goldstein, Notary Public within

6    and for the State of Maryland, do hereby certify:

7

8              That I reported the proceedings in the within

9    entitled matter, and that the within transcript is a

10   true record of said proceedings.

11

12             I further certify that I am not related to

13   any of the parties to the action by blood or marriage,

14   and that I am in no way interested in the outcome of

15   this matter.

16

17             IN WITNESS WHEREOF, I have hereunto set my

18   hand this 22nd day of May, 2023.

19

20                    _____

21

                     Matthew Goldstein, RPR

22