# Exhibit K42

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| KOVE IO, INC., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Hon. Matthew F. Kennelly |
| v. | Jury Trial Demanded |
| AMAZON WEB SERVICES, INC., | |
| Defendant. | |

**EXPERT REPORT OF JOSEPH B. GREENE REGARDING
INVALIDITY OF U.S. PATENT NOS. 7,103,640, 7,233,978, AND 7,814,170**

28.     In sum, my explanation of the state of the art is based on my review of the Asserted Patents, including but not limited to the above statements, the prior art, and my firsthand experience as a POSITA in the art at the relevant priority date.

**B.     Technology Background**

29.     In this section, I discuss the state of the art relevant to the subject matter of the Asserted Patents, as it would have been known, understood, and appreciated by a POSITA prior to the asserted 1999 priority date. I rely on and incorporate the understandings below regarding such known features and technologies to support my opinions regarding the knowledge of a POSITA at the relevant timeframe and the motivations relating to how the prior art discloses and/or suggests the limitations of the Asserted Claims.

**1.     Domain Name Services**

30.     The Domain Name System ("DNS") is a naming system for computers, services, and other Internet resources and IP networks. The DNS includes a protocol that converts human-readable services or domains (*e.g.*, www.website.com) into a numerical IP address (*e.g.*, that computers use to identify each other on the network). Developed in the early 1980s by Paul Mockapetris, the DNS predates the Asserted Patents by over a decade. Throughout the 1980's, numerous RFCs regarding the DNS were publicly available, including RFCs 882 and 883 (dated in November 1983) and RFCs 1034 and 1035 (dated in November 1987).[10]

31.     As websites became more developed with more services offered, simple domains became insufficient, and more specificity was needed. This led to the use of Fully Qualified Domain Names or "FQDNs," which provide a url to the exact service or server that you wish to

---

[10] RFCs 882, 883, 1034, and 1035.

associated with a particular entity in a distributed data collection? The data location is a key question when a distributed data collection has highly dynamic data distribution properties.[77]

59.     And the patents recognize that hashing algorithms were known in the art, such as the "hashpjw function presented by Aho, Sethi and Ullman in their text *Compilers, Principles, Techniques and Tools*."[78]

60.     Nothing disclosed in the Asserted Patents was new. It was not a new idea to store data in separate servers than its location information. *E.g.*, OracleNamesAdminGuide, Skagerwall, Karger, and RFC1034. The prior art confirms that using hash functions and tables to organize data across servers was not new. *E.g.*, Skagerwall, Steen, Sherman, and Karger. And the prior art further confirms that redirecting requests to prevent failure was not new either. *E.g.*, Wolff, OracleNamesAdminGuide, OracleUnleashed, and Sherman.

## B.     Priority Date

61.     I understand that the parties have not agreed on the priority date to which the asserted claims are entitled. I have therefore applied a priority date of September 14, 1999, which aligns with the filing date of U.S. Provisional Application No. 60/153,709 ("the '709 Application").[79] I further understand that Kove has also claimed a conception date of October 28, 1999.[80] I understand that the Asserted Patents attempt to claim priority to U.S. Provisional Application No. 09/111,896 (the "'896 Application"), dated July 8, 1998. It is my opinion that the asserted claims of the Asserted Patents claim subject matter not disclosed in the '896 Application

---

[77] '170 Patent at 1:58-67; '640 Patent at 1:56-65; '978 Patent at 1:59-67.

[78] '170 Patent at 15:15-19; '640 Patent at 15:1-20; '978 Patent at 17:19-40.

[79] Kove's May 7, 2023 Seventh Amended Objections and Responses to Amazon's Interrogatories (Nos. 1, 2, 5, 6, 9), 272-273.

[80] Kove's May 7, 2023 Seventh Amended Objections and Responses to Amazon's Interrogatories (Nos. 1, 2, 5, 6, 9), Appendices A-D.

and aren't entitled to its priority date. I further understand that the Examiners at the USPTO have agreed that the Asserted Claims aren't entitled to the July 8, 1998 priority date.[81] It is my further understanding that Kove does not claim priority to the '896 Application's July 8, 1998 priority date for any of the Asserted Claims.[82] If Kove changes this position, I reserve the right to supplement my analysis.

62.     Unless specifically noted in my report, however, my opinions expressed in this report don't depend on whether the priority date is the filing date of the '896 Application or the '709 Application or any other date between October 1998-September 2000. A POSITA in this timeframe would have viewed the prior art in a similar way throughout that period.

## C.     Summary of the Asserted Claims[83]

63.     The Asserted Claims of the '640, '978, and '170 patents each recite methods and systems having multiple location servers. Each location server contains location information associated with identifiers and provides a responsive message if the location server contains the location information of a desired entity.

64.     For example, representative claim 17 of the '640 patent recites:

> *A system for retrieving data location information for data stored in a distributed network, the system comprising*:
>
> a plurality of data repositories configured to store data, wherein the data is associated with a respective identifier string in each data repository;
>
> *a data location se[rv]er network having a plurality of data location servers, each of the plurality of data location servers*

---

[81] 05/08/2023 Grant in Reexamination Control No. 90/019,162; 04/04/2023 Grant in Reexamination Control No. 90/019,166; 03/29/2023 Grant in Reexamination Control No. 90/019,165.

[82] *E.g.*, 5/17/23 J. Overton Dep. Tr. at 761:21-763:18, Ex. 8

[83] This summary does not address every limitation of each claim. A specific analysis of the specific claim limitations is contained in the sections addressing invalidity below.

## C.      Steen

176.      Steen is a printed publication written by Maarten van Steen.[231] It was published in the January 1998 edition of IEEE Communications Magazine with the title "Locating Objects in Wide-Area Systems." IEEE Communications Magazine was well known to those of ordinary skill in the art at the time of its publishing in January of 1998. It's inclusion in the January 1998 issue of IEEE Communications Magazine is confirmed by ACM Digital library, which lists it in the table of contents for the issue.[232] Those in the art were reading and even citing to Steen throughout 1998, confirming its public availability.[233] Thus, Steen was a publicly available printed publication no later than January 31, 1998. As a result, Steen is a printed publication that is prior art under 35 U.S.C. § 102(b) because it published more than one year prior to the earliest possible priority date of the Asserted Patents (September 14, 1999) and under § 102(a) because an author other than the named inventors published it before that date. During the original examination of the Asserted Patents, the Examiners didn't cite or rely on Steen's disclosures in any Office action.

177.      Steen describes a system for managing and locating data on a wide-area distributed network. As Steen describes, its system "present[s] a scalable location service" to

---

[231] AMZ_KOVE_000530071.

[232] Ex. 32 (ACM Digital Library TOC)

[233] "An Efficient Mobility Management Strategy for Personal Communication Systems," Yigd Bejerano and Israel Cidont, Department of Electrical Engineering, October 25, 1998 (Ex. 33 to the '162, '165, & '166 Reexamination Request); "Lightweight Crash Recovery in a Wide-area Location Service," Ballintijn, C.; van Steen, M.; Tanenbaum, A.S., (VU Technical Report; No. IR-451 (October)). (Ex. 34 to the '162, '165, & '166 Reexamination Request); "An Efficient Hierarchical Scheme for Locating Highly Mobile Users," Pitoura, Evaggelia and Fudos, Ioannis, Dept. of Computer Science, University of Ioannina, (1998) (Ex. 35 to the '162, '165, & '166 Reexamination Request); "Active Naming: Programmable Location and Transport of Wire-Area Resources," Vahdat, A., Anderson, T., and Dahlin, M. (1998) (Ex. 36 to the '162, '165, & '166 Reexamination Request).

203.    I understand that Yocum is currently being considered by the Patent Office for substantial new questions of patentability with respect to claims 17, 23, 24, and 30 of the '978 Patent in Reexamination Control No. 90/019,109.

### G.    Boukobza

204.    U.S. Patent No. 6,122,664 ("Boukobza") is titled "Process For Monitoring A Plurality Of Object Types Of A Plurality Of Nodes From A Management Node In A Data Processing System By Distributing Configured Agents."[267] Boukobza issued on September 19, 2000 from an application filed on June 27, 1997. That application claims priority to French Patent Application No. 96 08019. During the original examination of the '978 Patent, the Examiner didn't cite or rely on Boukobza's disclosures in any Office Action. Because Boukobza's filing date precedes the claimed September 1999 date of the Asserted Patents by over 1 year, Boukobza is prior art under at least pre-AIA 35 U.S.C. § 102(a) and (b).

205.    Boukobza is directed towards monitoring the performance of a plurality of components in a data processing system.[268] As shown below in its Figure 1, Boukobza discloses a means to monitor machines $N_2$-$N_N$.[269]

---

[267] AMZ_KOVE_000530077.
[268] *See* Boukobza at Abstract.
[269] *See* Boukobza at 4:36-39.

Neimat's technique involves each server in a distributed system having at least one memory bucket and the client generating a memory address identifying one of these buckets.[281] The servers generate second and third memory addresses until the correct data record is identified.[282]

216. I understand Neimat was not previously considered by the Patent Office.

## I.    Minami

217. U.S. Patent No. 6,212,521 ("Minami") was filed March 27, 1998 and issued April 3, 2001.[283] Because Minami's filing date precedes the claimed September 1999 priority date of the Asserted Patents, Minami is prior art under at least 35 U.S.C. § 102(e).

218. As the Abstract states, Minami describes a data management system divided into primary and secondary areas. The primary hash function identifies which primary server responsible for an area including a secondary server holding the relevant data record. Once identified, the primary server uses a secondary hash function to identify the specific secondary server holding the data record. Through the use of primary and secondary hash functions, data registration and retrieval processes are divided.

219. I understand Minami was not previously considered by the Patent Office.

## J.    The DNS System ("DNS")

220. The DNS system (BIND version 8.1) was known at least by May 1997. I understand the DNS system is prior art under pre-AIA 35 U.S.C. § 102(a), (b), and/or (f), e.g., because it was publicly available in May 1997, which is more than a year before Kove's October 28, 1999 claimed

---

[281] *Id.* at 5:30-37.
[282] *Id.* at 38:55.
[283] AMZ_KOVE_000062299.

priority dates. The DNS system as described in DNS and BIND,[284] RFC 1034,[285] Sherman,[286] and Karger/Sherman[287] anticipates and/or renders obvious claims of the Asserted Patents, as described below. RFC1034 is a request for comments introducing domain style names and the domain name system and was published November 1987.

221. DNS describes the design goals and the structure of DNS.[288] The elements of DNS including the name space and resource records, name servers, and resolvers are identified along with their requirements. *Id.* at 6. DNS explains the domain name space is a tree structure.[289] DNS also details the resource records (RRs) used in the system.[290]

222. I understand DNS was not previously considered by the Patent Office.

**K.    Karger '618/420**

223. U.S. Patent No. 6,430,6118 ("Karger '618") was filed March 13, 1998 and issued August 6, 2002.[291] U.S. Patent No. 6,553,420 ("Karger '420") was filed June 2, 1998 and issued April 22, 2003.[292] Karger '420 identifies itself as a continuation-in-part of Karger '618. Karger '618/420 is prior art under pre-AIA 35 U.S.C. § 102(a), (b), and/or (f), e.g., because it has a priority date of March 15, 1998.

224. Karger '618/420 describe a technique for caching that uses consistent hashing allowing the system to adapt as the available resources change.[293] Karger '618/420 describe a

---

[284] AMZ_KOVE_000081149.
[285] AMZ_KOVE_000062528.
[286] AMZ_KOVE_000062052.
[287] AMZ_KOVE_000070470.
[288] DNS at 2-3.
[289] *Id.* at 7.
[290] *Id.* at 11-12, 17.
[291] AMZ_KOVE_000081113.
[292] AMZ_KOVE_000062395.
[293] *E.g.* Karger '618 at 6:22-34.

## M.    Cache Resolver System

229.    The Cache Resolver system was known at least by February 1999.[299] As such, I understand that the Cache Resolver system is prior art under at least 35 U.S.C. §§ 102(a), (b), (g) because it was known by at least February 1999, well before any of the asserted priority dates. The Cache Resolver system as described in Distributed Web Caching System with Consistent Hashing by Alexander Sherman (February 1999)[300] and Web Caching with Consistent Hashing by Karger, Sherman, et al. (March 4, 1999)[301] anticipates and/or renders obvious claims of the Asserted Patents, as described herein. Alexander Sherman made the Cache Resolver system known to at least Madhu Sudan and Arthur C. Smith when he submitted his thesis to the Department of Electrical Engineering and Computer Science at MIT.[302] Dr. Sudan was Dr. Sherman's Thesis Supervisor and Dr. Smith was the Chairman, Department Committee on Graduate Students at that time.[303] David Karger, Alex Sherman, Andy Berkheimer, Bill Bogstad, Rizwan Dhanidina, Ken Iwamoto, Brian Kim, Luke Matkins, and Yoav Yerushalmi, the authors of Karger/Sherman, made the Cache Resolver system known to at least the readers of the May 1999 issue of Computer Networks: The International Journal of Computer and Telecommunications Networking.[304] That publication included a copy of the Karger/Sherman paper that describes the Cache Resolver system.[305]

---

[299] Sherman at 1.
[300] AMZ_KOVE_000062052.
[301] AMZ_KOVE_000070470.
[302] *Id.*
[303] *Id.*
[304] Karger/Sherman at 1.
[305] *Id.*

230.     Both Sherman and Karger/Sherman describe aspects of the same Cache Resolver system. Therefore, citations herein regarding Sherman apply equally to Karger/Sherman, and vice versa. All of the features and functionality of DNS are inherent to systems using DNS, such as the use of DNS in the Cache Resolver system. In particular, the Cache Resolver system uses DNS servers running BIND 8 and the program "dnshelper." The authors of these papers used the Cache Resolver system. The Cache Resolver system describes how consistent hashing is used to help reduce the amount of inter-cache communication.[306]

231.     The inventors of the Asserted Patents were familiar with Karger and Sherman's consistent hashing work. Dr. Overton wrote a draft letter to Paul Carmichael claiming that the patents-in-suit include "method claims and specific system claims regarding distributed hash tables."[307] In this letter, Dr. Overton demonstrated his knowledge of this work being done at MIT (where Dr. Karger is a professor) regarding distributed hash tables and systems, but claimed that the work only post-dated the patents-in-suit. Even further, Dr. Overton was at least aware of Karger's consistent hashing system since at least January 3, 1999. Specifically, co-inventor Overton had a copy of Karger's article "Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hotspots on the Web" in his files at least since that date.[308] In my view, this article and Karger's work at MIT are material to the subject matter of the applications that became the Asserted Patents.

---

[306] Sherman at 13, 22-40.

[307] See KOV_00057828. The metadata for this letter indicates it was created on October 31, 2005, during the prosecution of the patents-in-suit. Kove's April 10, May 12 and May 27, 2020 privilege logs provide a date of November 4, 2005.

[308] 5/17/23 J. Overton Dep. Tr., at 709:9-710:14, Ex. 87.

260.     When determining whether a specification contains adequate written description, I understand that one must make an objective inquiry into the four corners of the specification from the perspective of a POSITA. A patentee may rely on information that is well-known in the art for purposes of meeting the written description requirement. However, when the four corners of the specification contradict information that the patentee alleges is well-known to a POSITA, such information doesn't demonstrate that the patentee possessed the claimed invention. In addition, a description that merely renders the invention obvious does not satisfy the written description requirement.

## VIII.  THE ASSERTED CLAIMS CLAIM UNPATENTABLE SUBJECT MATTER.

261.     As part of this report, I have also been asked to provide my opinion on whether the asserted patents are invalid under 35 U.S.C. § 101 under *Alice*[313] and *Mayo*.[314] I understand that early on in this case, before discovery, Kove's limiting statements in reexamination, testimony by the inventors, and the Court's claim constructions, the Court ruled on this issue, denying Amazon's motion to dismiss and finding that the claims were not ineligible under 35 U.S.C. § 101. However, after being informed of the relevant standards for making this determination and taking the intervening developments into account, it is my opinion that the asserted patents are invalid under 35 U.S.C. § 101.

262.     I have been informed that when performing an analysis of invalidity under 35 U.S.C. § 101 under *Alice* and *Mayo*, two steps must be met for a finding of invalidity. First, it must be shown that the claims at issue are directed to a patent-ineligible concept, such as a law of nature, abstract phenomenon, or abstract idea. And second, if step one is met, it must be shown that the

---

[313] *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 573 U.S. 208 (2014).
[314] *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012).

claims contain no inventive concept. It is my opinion that the asserted patents meet both steps and are therefore invalid for at least this reason.

263.    I have been informed that step one is met if, for example, the claims simply consist of generalized steps to be performed on a computer using conventional computer activity. It is my opinion that the asserted claims consist of generalized steps performed on generic and conventional computers. For example, claim 17 of the '978 patent describes generalized location services (yellow) and transport protocols (green):

> 17. A method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information, wherein each of the plurality of location servers stores unique set of location information of an aggregate set of location information, the method comprising:
>
> providing a transfer protocol configured to transport identifier and location information, the location information specifying the location of information related to the identifier;
> storing location information formatted according to the transfer protocol at a first location server;
>
> receiving an identifier and a location relevant to the identifier at the first location server;
> storing the received location in a location store at the first data location server, the location store comprising a plurality of identifiers, each identifier associated with at least one location, wherein the received location is associated with the received identifier in the location store; and
> transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit.

264.    As shown above, the '978 Patent claims include a generic "location server" and "location stores" that only "store and retrieve location information." And the patent specification

confirms that the functions performed by the claimed servers "may be implemented on any of a number of standard computer platforms."[315]

265.    And this is further supported by the Court's claim construction of "location server." The Court construed this term as "**network-attached component** that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients."[316] And in its ruling, the Court further cautioned construing the term to a specific kind of server.[317] As such, in light of the patent's specification and the Court's claim construction order, a POSITA would understand that these "location servers" and "location stores" could be implemented on any conventional, standard, and well-known computer or server.

266.    It is also my opinion that the functions claimed relate to the abstract idea of receiving and storing location information based on some undefined "predetermined" "criterion." The claims and the specification vaguely state a "criterion" or "protocol" in which the storing and retrieving is performed. And that dependent claims include examples, such as available storage space and transaction rate limit,[318] does not clarify the issue as these parameters are innate in any resource storage system. For example, if a single drawer in a file cabinet was full of files, then it would be normal to move files to accommodate new files. Or if certain files were constantly accessed more than others, it would be likely to store those in a more readily accessible place for convenience.

---

[315] '978 Patent, Col. 7:36-38.
[316] Dkt. No. 484.
[317] "[I]t would be improper to limit the construction of "location server" with the use of "NDTP."" *Id.* at 21.
[318] *See, e.g.,* '978 Patent, claims 23 and 24.

267.    And other than the reliance on "identifiers," no other guidance is given on how this data storage paradigm is implemented. The idea of using an "identifier" to store and locate resources can be implemented in other mediums, due to its abstract nature. One example is a library's card catalogue with identifiers for authors and shelving locations. The '978 Patent claims simply takes this abstract idea of sorting data by identifiers and place it on generic computers.

268.    And the same is seen in the '170 patent. Below is claim 1 of the '170 patent identifying the same generic computer components (yellow) with the addition of a generic "processor" (green):

> 1. A system for managing data stored in a distributed network, the system comprising:
>
>    a data repository configured to store a data entity, wherein an identifier string identifies the data entity; and
>
>    a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, at least one of the plurality of data location servers includes location information associated with the identifier string, each one of the plurality of data location servers comprises a processor and a portion of the data location information, the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.

269.    But as explained above, a POSITA would understand the claimed data storing and retrieving functions could be implemented on any conventional, standard, and well-known computer or server. And like the '978 Patent, implementation is based on a vague and generic method, an undefined "hash function." But hash functions are a simple mathematical function for

mapping, correlating, and organizing data. And it is my understanding that abstract mathematical formulas are generally considered abstract in a 101 analysis.

270.     And the Court's construction of this term confirms this understanding. In its claim construction order, the Court construed the term "based on a hash function used to organize the data location information across the plurality of data location servers . . . based on the hash function applied to the identifier string" as "the portion of the data location information included in a corresponding one of the data location servers is based on a hash function that maps identifier strings to one or more of the data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string."[319] But as the Court's order provides, this construction broadly describes the mathematical purpose of hash functions, to map one set of data points (identifier strings) to another set of data points (data location servers).[320] And this can further be seen in the Court's construction of "hash table" as an undefined generic hashing function well-known in the art.[321] As such, it is my opinion that the '170 patent claims are also directed to a patent-ineligible concept.

271.     And the '640 patent claims fair no better as they are substantively identical to the '170 patent claims. Claim 18 of the '640 patent is shown below, highlighting the same identification of generic computer components (yellow) with "computer executable code" (green):

---

[319] Dkt. No. 484.
[320] *Id.* at 24-30.
[321] Accepting the parties' construction of "hash table" as "a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table." *Id.* at 30-31.

18. A system for retrieving data location information for data stored in a distributed network, the system comprising:

      a data repository configured to store data, wherein the data is associated with an identifier string;

      a client responsive to a data query to query a data location server for location information associated with the identifier string;

      a data location server network comprising a plurality of data location servers, at least one of the plurality of data location servers containing location information associated with the identifier string, wherein each of the plurality of data location servers comprises computer executable code configured to execute the following steps in response to receiving a data location request from the client:

      if the data location server contains the location string associated with the identification string provided in the data location request, the data location server transmits location information for use by the client to calculate a location of the data associated with the identification string;

      if the data location server does not contain the location string associated with the identification string, the location server transmits a redirect message to the client, wherein the redirect message contains redirect information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string.

272.    Like the '170 and '978 patents, the '640 patent relies on the use of conventional, standard, and well-known computers or servers. And again, the implementation is an undefined "computer executable code" that performs the same abstract idea of storing and retrieving location based on location identifiers. The only primary difference in the '640 patent is the inclusion of a redirect message. But this is similarly abstract as a pointer to other storage locations within a storage system is a general idea that would be implemented in storage systems of varying mediums. For example, looking again at a library card catalogue, if a given item's

location isn't written on a particular card, there would likely be information guiding the reader to another card to inspect. As such, it is my opinion that the '640 patent claims are also directed to a patent-ineligible concept.

273.     As stated before, I have been informed that when the first step is met, by showing that the asserted claims are directed to a patent-ineligible concept, a second inquiry of "inventive concept" must be performed to determine validity under 35 U.S.C. § 101. And it is my understanding that the inclusion of a conventional computer or network components is insufficient to meet the requirements of an inventive concept. And in the case of all three Asserted Patents, it is my opinion that there is no inventive concept beyond the abstract idea of storing and retrieving resources through a method of correlated identifiers.

274.     As explained above, the asserted claims point to generic "servers" and "processors" capable of storing and retrieving resources. And a POSITA would understand that these claimed functions are performed in conventional, standard, and well-known computers or network components. As such, the inclusion of these generic computer and network components can't be the "inventive concepts" necessary to meet the requirements for validity under 35 U.S.C. § 101.

275.     And as discussed above, the claimed data storage and retrieval methods can't be the inventive concept either. In all three instances, the patent simply states that the resource to location correlation is done by some undefined "protocol," "hash," or "code." And as explained above, a POSITA would understand that this resource to location correlation would be implemented by a well-known method, such as a hashing function. The specifications themselves

acknowledge that hashing was well known in the art, referencing the "hashpjw function presented by Aho, Sethi and Ullman in their text *Compilers, Principles, Techniques and Tools*."[322]

276.    Further, as outlined above in Section II.C, inventor John Overton has admitted that many of the routine, well-understood, and conventional limitations were not inventive:

- Transport Protocols[323]

- Configuring Servers[324]

- Processors[325]

- Client-Server Relationships[326]

- Server Clusters[327]

- Database Storage[328]

- Distributed Databases[329]

- Data Queries and Responses[330]

- Location Services & Servers[331]

- Directory Services & Servers[332]

- Location Queries & Responses[333]

---

[322] '170 Patent at 15:15-19; '640 Patent at 15:1-20; '978 Patent at 17:19-40.
[323] 5/17/23 J. Overton Dep. Tr., at 684:11-13.
[324] 5/17/23 J. Overton Dep. Tr., at 687:8-11.
[325] 5/17/23 J. Overton Dep. Tr., at 686:10-12.
[326] 5/17/23 J. Overton Dep. Tr., at 686:1-9.
[327] 5/17/23 J. Overton Dep. Tr., at 696:6-11.
[328] 5/17/23 J. Overton Dep. Tr., at 724:8-10.
[329] 5/17/23 J. Overton Dep. Tr., at 670:20-671:5.
[330] 5/17/23 J. Overton Dep. Tr., at 724:17-22.
[331] 5/17/23 J. Overton Dep. Tr., at 671:17-21.
[332] 5/17/23 J. Overton Dep. Tr., at 728:12-14.
[333] 5/17/23 J. Overton Dep. Tr., at 726:15-17.

- Identification Strings[334]

- Hashkeys[335]

- Hash Functions[336]

277. And the network architecture type required to implement the Asserted Claims cannot be the inventive concept either. The patents' specifications require a hierarchical server structure to implement the claimed inventions.[337] And despite this disclosure, Kove has taken the position that only a non-hierarchical server structure is capable of implementing the Asserted Claims.[338] Further, it is my understanding that .[339] But regardless of the server structure architecture Kove claims its patents cover, it is undisputed that these server structure types were well-known and traditional in the field.[340] As such, any claimed server architecture by Kove can't be the inventive concept necessary to overcome the second step of a 35 U.S.C. § 101 analysis.

---

[334] 5/17/23 J. Overton Dep. Tr., at 725:17-19.

[335] 5/17/23 J. Overton Dep. Tr., at 726:1-14.

[336] 5/17/23 J. Overton Dep. Tr., at 725:20-22.

[337] *See, e.g.,* '640 Patent, 14:28-31, 16:14-38, 17:22-24, 17:61-18:16, 18:36-58; '170 Patent, 14:43-46, 16:32-56, 17:38-42, 18:9-30, 18:49-19:4; '978 Patent, 7:37-53; 19:38-48.

[338] *See, e.g.,* August 4, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ('640 patent) at 23; August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 25-26; September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 35-36.

[339] *See, e.g.,* 05/17/2023 J. Overton Dep. Tr. at 793:3-7.

[340] *See, e.g.,* '640 Patent, 16:15-19 ("While the NDTP server topology supported by the server redirection mechanism described above and shown in FIGS. 9(a) and 9(b) is an extremely powerful and **general scaling technique, suitable for diverse topology deployments**.")(emphasis added).

278.     As explained above, it is my opinion that the asserted claims are directed to a patent-ineligible concept and doesn't contain an inventive concept. Therefore, it is my opinion that the asserted claims are invalid under a 35 U.S.C. § 101 *Alice* analysis.

## IX.     CLAIMS 3, 6, 10, 14, 17, 23, 24, AND 30 OF THE '978 PATENT ARE INVALID FOR DOUBLE PATENTING.

279.     It is my opinion that claims 3, 6, 10, 14, 17, 23, 24, and 30 of the '978 Patent are invalid for double-patenting. It is my understanding that if a later-expiring patent is obvious in light of an earlier-expiring patent, the later-expiring patent is invalid for obviousness-type double patenting. In other words, if a later expiring patent is merely an obvious variation of an invention disclosed and claimed in the reference patent, the later expiring patent is invalid. And it is my opinion that the '978 Patent is invalid for obviousness-type double patenting. The '978 Patent is directed to the same invention as the '640 and '170 Patents and expires later.

280.     Kove asserts eight claims of the '978 Patent, claims 3, 6, 10, 14, 17, 23, 24 and 30. And it is my opinion that all eight claims are invalid for obviousness-type double patenting in view of the '640 and '170 Patents.

281.     The '640 patent application was filed on September 13, 2000, and claims priority to Patent Application No. 09/111,896, filed on July 8, 1998, and was issued with a 640-day term extension under 35 U.S.C. § 154(b). As such, it is my understanding that the '640 patent expired on April 8, 2020. The '170 patent application was filed on February 13, 2006, and is a continuation-in-part of the same Patent Application No. 09/111,896. And though it received a 749-day extension, a terminal disclaimer relative to the '640 Patent was filed. As such, it is my understanding that the '170 Patent therefore expired on the same date as the '640 Patent, on April 8, 2020. The '978 patent application was filed on June 1, 2001. It is also a continuation-in-

part of the same Patent Application No. 09/111,896 and received an 810-day extension. But since a terminal disclaimer was not filed for the '978 Patent, it expired on a later date, on September 25, 2020.

282.    Because the '640 and '170 Patents expired earlier, they are double patenting references against the '978 Patent. And since the asserted claims of the '978 Patent aren't patentably distinct from the claims of the '640 and '170 Patents, it is my opinion that the asserted claims of the '978 Patent are invalid.

283.    It is my understanding that in analyzing whether a patent is invalid for obviousness double-type patenting, a two-step process is performed. First, the claims are construed in the patents and differences are determined. And second, the determination is made of whether those differences render the claims patentably distinct.

284.    As detailed above in Section V, the Court has issued its claim construction order.[341] With the exception of "location information," the Court has found that the claim terms across the '978 Patent and the '640 and '170 Patent are to be construed the same.

285.    But this difference in the construction for "location information" is immaterial for this analysis for obviousness double-type patenting because it does not render the claims patentably distinct. As explained in the Court's claim construction order, the claimed "location information" in the '978 Patent is an explicitly disclosed subset of the "location information" claimed in the '640 and '170 Patents.

> . . . the '640 and '170 Patents contemplate two types of "location information": (1) the location of data stored in a distributed system, and (2) the identity of the location server that stores a particular data location, or "the location of the location." . . . [the '978 Patent]

---

[341] Memorandum Opinion and Order (Dkt. No. 484)

> cover[s] only the first type of location information, not the second.[342]
>
> And because the '170 Patent and '640 Patent share the same specification, it is appropriate to apply this broader construction to both patents.[343]

286.    As such, for this analysis of obviousness double-type patenting, there are no material differences between the construction of claim terms in the '978 Patent and the '640 and '170 Patents.

287.    Further, there are no material differences between remaining portions of the Asserted Claims of the '978 Patent and the claims in the '640 and '170 Patents. Attached as Appendix E, I provide a comparison table between the '978 Patent claims[344] and the disclosures and claims of the '640 and '170 Patents.

288.    As shown in the Appendix E tables, each and every claim limitation in the asserted '978 Patent claims is explicitly disclosed by the '640 Patent and '170 Patent. And as I explained above, the three patents cover the same inventive concept: a distributed data storage system that can be used on a large scale cloud computing. And as seen in Kove's responses in the *ex parte* reexaminations, Kove employs nearly the same language when describing the overview of the technology and patents at issue.[345] As such, it is my opinion that the Asserted Claims of the '978

---

[342] Memorandum Opinion and Order (Dkt. No. 484) at 13.

[343] Id. at 17.

[344] I understand that while certain independent claims, such as '978 Patent, claim 1, are no longer being asserted by Kove, an analysis is still necessary as Kove asserted claims that depend from those claims.

[345] August 4, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ('640 patent) at 7-9 (Section B: "Overview of the Technology"); September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 8-11 (Section C: "Overview of claimed

Patent are invalid based on obviousness double-type patenting in light of the disclosures and claims of the '640 Patent and '170 Patent.

289.     Further, Kove also contends that certain of the Asserted Claims of the '978 Patent are wholly disclosed by the '640 Patent application. Kove has taken the position that at least claims 3, 6, 10, and 14 of the '978 Patent were "constructively reduced . . . to practice at least as early as September 13, 2000, based on the filing of U.S. App. No. 09/661,222, which became the '640 patent" and that "the '222 application provide written description and enablement support for [the asserted '978 Patent] claim element[s] pursuant to 35 U.S.C. § 112, as they convey with reasonable clarity to those skilled in the art that the inventors were in possession of the invention and contain sufficient information to enable one skilled in the art to make and use the invention without undue experimentation."[346] As such, at least claims 3, 6, 10, and 14 are invalid based on obviousness double-patenting based on the '640 patent application.

## X.     THE ASSERTED CLAIMS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION AND ENABLEMENT.

290.     As part of this report, I have provided opinions addressing whether the Asserted Claims comply with the enablement and written description requirements. While it is my opinion that the Asserted Claims are invalid for lack of written description and enablement because of the ambiguity discussed below, it is also my opinion that any resolution of that ambiguity would still describe subject matter than is invalid over the prior art as described in Sections XI and XII.

---

technology and continued patentability of the claims"); August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 8-11 (Section B: "Overview of the Technology and continued patentability of the claims").
[346] Kove's May 7, 2023 Seventh Amended Objections and Responses to Amazon's Interrogatories (Nos. 1, 2, 5, 6, 9), Appendix B at 33 (claim 3), 38 (claim 6), 39 (claim 10), and 53 (claim 14).

480.    I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Dated: July 3, 2023

Joseph B. Greene

Joseph B. Greene