# Exhibit K51

Page 409

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DISTRICT DIVISION

_____

KOVE IO, INC.,                    )

       Plaintiff,          )          Civil Action No.

  -against-                       )          1:18-cv-08175

AMAZON WEB SERVICES, INC., )

       Defendant.          )

_____)


VOLUME II

*** HIGHLY CONFIDENTIAL TRANSCRIPT ***


VIDEO-RECORDED DEPOSITION OF

MICHAEL GOODRICH PH.D.

Reichman Jorgensen LLP

400 Madison Avenue

New York, New York


09/11/2023

9:06 a.m. (EDT)



REPORTED BY:  AMANDA GORRONO, CLR

CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 410

1                                          09/11/2023

2                 9:06 a.m. (EDT)

3

4        VIDEO-RECORDED DEPOSITION OF MICHAEL GOODRICH

5    Ph.D., VOLUME II, held at Reichman Jorgensen LLP,

6    400 Madison Avenue, New York, New York, before

7    Amanda Gorrono, Certified Live Note Reporter, and

8    Notary Public of the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 411

1   A P P E A R A N C E S:

2

3   ON BEHALF OF PLAINTIFF KOVE IO, INC.:

4      Khue V. Hoang, Esquire

5      Reichman Jorgensen Lehman & Feldberg LLP

6      400 Madison Avenue, Suite 14D

7      New York NY 10017

8      PHONE: (646) 921-0704

9      E-MAIL: Khoang@reichmanjorgensen.com

10

11              -AND-

12

13      Naveed Hasan, Esquire

14      Reichman Jorgensen Lehman & Feldberg
        1909 K Street NW, Suite 800

15      Washington, D.C. 20006
        PHONE: (202) 894-7305

16      E-MAIL: Nhasan@reichmanjorgensen.com

17

18

19

20

21

22

Page 412

1    A P P E A R A N C E S:  (CONT'D)

2

3    ON BEHALF OF DEFENDANT AMAZON WEB SERVICES, INC.

4    AND THE WITNESS:

5      Bill Sigler, Esquire

6      Fisch Sigler LLP

7      5301 Wisconsin Avenue NW

8      Fourth Floor

       Washington, D.C. 20015

9      PHONE:  (202) 362-3620

       E-MAIL: Bill.Sigler@FischLLP.com

10

                - AND -

11

       Andrew Ramos, Esquire

12     Fisch Sigler LLP

       5301 Wisconsin Avenue NW

13     Washington, DC 20015

       PHONE:  +1.202.362.3522

14     E-MAIL: Andrew.Ramos@FischLLP.com

15

16

17

18    ALSO PRESENT:

19    Danny Ortega, Videographer - Digital Evidence

20    Group

21

22

Page 413

1                    I N D E X

2   WITNESS                 EXAMINATION BY                PAGE

3   MICHAEL GOODRICH    MR. SIGLER                        417

4   Ph.D.

5                       MS. HOANG                         763

6

7                    E X H I B I T S

8   EXHIBIT     DESCRIPTION                               PAGE

9   Exhibit 18  Michael Goodrich Rebuttal Expert          417

10              Report................................

11  Exhibit 19  Michael Goodrich Invalidity Report......  418

12  Exhibit 20  "Ten Emerging Technologies That Will      449

13              Change Your World" article..............

14  Exhibit 21  Ex Parte Examination request............  525

15  Exhibit 22  Ex Parte Reexamination Interview          528

16              Summary...............................

17  Exhibit 23  Ex Parte Reexamination Interview          531

18              Summary...............................

19  Exhibit 24  declaration of Michael Goodrich, Ph.D...  540

20  Exhibit 25  declaration of Michael Goodrich.........  557

21  Exhibit 26  Ex Parte Reexamination Interview          559

22              Summary...............................

Page 414

1                    E X H I B I T S  CON'T

2     EXHIBIT        DESCRIPTION                          PAGE

3     Exhibit 27     Presentation...........................   561

4     Exhibit 28     Dr. Goodrich declaration...............   590

5     Exhibit 29     Notice of Intent to Issue Ex Parte        599

6                    ReExamination Certificate..............

7     Exhibit 30     Notice of Intent to Issue Ex Parte        611

8                    ReExamination Certificate..............

9     Exhibit 31     Supplemental Notice of Intent to Issue    617

10                   Ex Parte Reexamination Certificate......

11    Exhibit 32     Reexamination Control No. 10/019,034....   623

12    Exhibit 33     Reexamination document.................   639

13    Exhibit 34     Skagerwall Reference...................   643

14    Exhibit 35     Reexamination 90/019,165...............   649

15    Exhibit 36     Steen Reference........................   660

16    Exhibit 37     Reexamination 90/019,109...............   668

17    Exhibit 38     Presentation...........................   672

18    Exhibit 39     Boukobza...............................   688

19    Exhibit 40     Document in the 90/019,109 re-exam......   691

20    Exhibit 41     Dr. Overton Presentation at Yale          718

21                   University.............................

22    Exhibit 42     US Patent 6,430,618....................   740

Page 415

1　　　　　　　　　E X H I B I T S CON'T

2　　EXHIBIT　　　DESCRIPTION　　　　　　　　　　　　　　PAGE

3　　Exhibit 43　Oracle Names Administrator's Guide　　752

4　　　　　　　　　　Release 2.0...........................

5　　Exhibit 44　Yocom patent...........................　758

6

7

8　　　　　PREVIOUSLY MARKED EXHIBITS IDENTIFIED

9　　EXHIBIT　　　DESCRIPTION　　　　　　　　　　　　　　PAGE

10　Exhibit 10　Complaint..............................　447

11　Exhibit 1　 Dr. Goodrich Corrected Expert Report....　465

12

13

14　　　　　　　　　R E Q U E S T S

15　DESCRIPTION　　　　　　　　　　　　　　　　　　　　PAGE

16　Highly confidential transcript....................... 779

17

18

19

20

21

22

Page 416

1              THE VIDEOGRAPHER:  We are now on the

2       record.  My name is Danny Ortega and I'm the

3       legal videographer from Digital Evidence

4       Group.

5              Today's date is September 11, 2023,

6       and the time is 9:06 a.m.

7              This video deposition is being held

8       at 400 Madison Avenue New York, New York, in

9       the matter of Kove versus AWS.

10             The deponent today is Michael

11      Goodrich.

12             Counsel, please identify yourself

13      for the record.

14             MR. SIGLER:  Good morning.  Bill

15      Sigler from Fisch Sigler LLP of Washington,

16      D.C., and with me today is my colleague

17      Andrew Ramos.  And we're appearing on behalf

18      of the defendant, Amazon.

19             MS. HOANG:  Khue Hoang, Reichman

20      Jorgensen Lehman & Feldberg.  With me is

21      Naveed Hasan, and we're representing

22      plaintiff, Kove, as well as Dr. Goodrich.

Page 417

1            THE VIDEOGRAPHER:  The court

2       reporter today is Amanda Gorrono, who will

3       now swear in the witness.

4    MICHAEL GOODRICH, called as a witness, having

5    been first duly sworn by a Notary Public of the

6    State of New York, was examined and testified as

7    follows:

8            THE WITNESS:  I do.

9            THE COURT REPORTER:  Thank you.

10   EXAMINATION

11   BY MR. SIGLER:

12       Q.    Good morning, Dr. Goodrich.

13       A.    Good morning.

14       Q.    You have Exhibits 18 and 19 in front

15   of you, sir?

16       A.    I do.

17       Q.    All right.  Let's start with

18   Exhibit 18.  Exhibit 18 is your Rebuttal Expert

19   Report, correct?

20            (Whereupon, Exhibit 18, Michael

21       Goodrich Rebuttal Expert Report, was marked

22       for identification.)

Page 418

1              (Whereupon, Exhibit 19, Michael

2      Goodrich Invalidity Report, was marked for

3      identification.)

4          A.    Yes.

5          Q.    And is that your signature on the

6      front cover of it?

7          A.    Yes.

8          Q.    And you signed this Rebuttal Expert

9      Report on August 18, 2023, correct?

10         A.    Yes, that is correct.

11         Q.    And did you do everything you could

12     to make sure this report was truthful and

13     accurate before you signed it?

14         A.    I did, yes.

15         Q.    And sitting here today are you aware

16     of any errors or inaccuracies in your Rebuttal

17     Report?

18         A.    I noticed several typos when I was

19     reviewing yesterday, this report.  But nothing

20     came to the level of an error that I would like

21     to correct today.  I believe all the typos are

22     obvious from context what they should be.  But if

Page 419

1    we encounter any today and those need

2    clarification, I'll be happy to do that today.

3          Q.    Okay.  Understood.

4                Can you turn to Page 1, please?

5          A.    I'm there.

6          Q.    All right.  I want to direct you to

7    Paragraph 3, please.  And in the last sentence of

8    Paragraph 3, your report says "Based on the

9    analysis set forth in this report, I have made

10   the following determinations."

11               Do you see that?

12         A.    That's right.

13         Q.    And the determinations that you made

14   are that the asserted claims of the '640, '978,

15   and '170 patents are valid; is that correct?

16         A.    That they are valid, yes.

17         Q.    All right.  And so you address the

18   validity of those patents in this report, right?

19         A.    Yes, as a rebuttal and reaction to

20   opinions of a Mr. Greene.

21         Q.    Who drafted your Rebuttal Report?

22         A.    I am the author of this report, but

Page 420

1    in terms of the typing, some of the typing was

2    done by attorneys; some of the initial draft was

3    done also by me, and then I edited the entire

4    document, so it comprises my opinions in this

5    matter.

6          Q.   Okay.  Did anyone help you draft

7    your validity report?

8          A.   As I mentioned, some of the first

9    drafts of some sections were typed first by

10   attorneys, which I then edited too, so that they

11   would be comprising my opinions in this matter.

12         Q.   Okay.  And the portions that were

13   first drafted by attorneys, are you referring to

14   the attorneys representing Kove in this case?

15         A.   Yes.

16         Q.   Approximately when did you begin

17   working on your validity report?

18         A.   I believe I started -- I'm not sure

19   the exact date.  I already was familiar with some

20   invalidity contentions.  It really started in

21   earnest once I received the report from

22   Mr. Greene.

Page 421

1          Q.     All right.   Why were you already

2     familiar with some invalidity contentions?

3          A.     My recollection is that Amazon had

4     submitted some invalidity contentions.   So there

5     was sort of a heads-up on what would be some

6     possible prior art.   And so I may have -- I can't

7     remember the details, but I may have started

8     looking at some of that prior art prior to

9     receiving the report of Mr. Greene.

10          Q.     Okay.   About how many hours did you

11     spend working on your validity report?

12          A.     I did not break out my hours

13     separately for this report and my Opening Report.

14                 But you had asked on Saturday for me

15     to review my hours overall, and my hours that

16     I've spent total since roughly February/March of

17     this year.   And I did do that.   If you'd like to

18     know those details, I'd be happy to share those.

19          Q.     Yeah, please share those.

20          A.     In terms of total hours I've worked

21     even up until today, since February 2019, I have

22     worked approximately 500 hours on this case,

Page 422

1    again, spread out over those four years.

2             And then, since roughly February-ish

3    time, I've spent approximately 150 hours on this,

4    including the work on both my Opening Report and

5    this Rebuttal Report.

6        Q.    Okay.  So since February 2023,

7    you've worked about 150 hours on this case,

8    right?

9        A.    That's right.

10        Q.    Okay.  And then overall, since you

11    were retained in February 2019, you've worked

12    about 500 hours for Kove, right?

13        A.    That's right.

14        Q.    Okay.  And so that 150 hours would

15    cover the work you did on your infringement

16    report and invalidity reports, right?

17        A.    That's right.

18        Q.    Okay.  Did you discuss your opinions

19    in your validity report with anyone before you

20    issued it?

21        A.    I discussed it with attorneys, if

22    that's what you're asking.

Page 423

1      Q.   So you discussed it with Kove's

2  attorneys?

3      A.   Yes.

4      Q.   Okay.  Anyone else?

5      A.   Not that I recall, just sitting here

6  today.

7      Q.   Which Kove attorneys did you discuss

8  your opinions in your validity report with?

9      A.   I discussed it with the two

10  attorneys here, Khue Hoang and Naveed Hasan, as

11  well as Gina Cremona I think is her last name.

12      Q.   Okay.  Did you talk to any Kove

13  employees about the opinions in your validity

14  report?

15      A.   Not that I recall.

16      Q.   So you didn't talk to, for example,

17  Dr. Overton about the opinions in your validity

18  report?

19      A.   Not that I recall.

20      Q.   Can you go to your Materials

21  Considered Appendix.  Sorry.  It's Exhibit B.  We

22  only have two exhibits today, Doctor, this will

Page 424

1    be easier, I hope.

2           A.    You're welcome.

3                 Yes, I am there.

4           Q.    Okay.  And is Exhibit B the list of

5    materials you considered for your validity

6    report?

7           A.    Yes, this appears to be that.

8           Q.    Okay.  So on the first page of your

9    materials considered, that identifies the expert

10   reports of Mr. Bergman and Mr. Fanous, right?

11          A.    That's right.

12          Q.    So you reviewed those reports --

13          A.    That's right.

14          Q.    -- for purposes of your validity

15   report?

16          A.    Yes.

17          Q.    Why did you review those reports for

18   purposes of your validity report?

19          A.    I was asked to consider them as a

20   part of the materials, by the Kove attorneys.

21          Q.    Okay.  And you -- turning to Page 3

22   of your materials considered.

Page 425

1          A.    I'm there.

2          Q.    All right.  You reviewed three

3     deposition transcripts for testimony at

4     deposition of John Overton, correct?

5          A.    That's correct.

6          Q.    And so for your validity report --

7               MR. SIGLER:  Well, strike that.

8     BY MR. SIGLER:

9          Q.    For your validity report you didn't

10    review any other deposition transcripts on the

11    case, right?

12         A.    None other are coming to mind, as I

13    sit here today.  But, again, I did include this

14    sentence at the end of this, that says "All

15    materials relied upon and referenced and cited in

16    this Expert Report."

17              So if something didn't appear here

18    but was cited in the report, that still would be

19    comprised as something that would be a part of my

20    materials considered.

21         Q.    Okay.  Did you review Kove's

22    validity contentions before issuing your opinions

Page 426

1    on validity?

2         A.    I may have seen those.  I'm not sure

3    if that got listed here or not.  That could be an

4    oversight.

5         Q.    Did you draft any portion of Kove's

6    validity contentions in this case?

7         A.    I don't recall having drafted those.

8         Q.    Did you edit any portion of Kove's

9    validity contentions in this case?

10        A.    I may have commented on it.  It's

11   been a while.  I don't recall having edited it.

12        Q.    Okay.  For the purposes of your

13   validity report, did you review any testimony of

14   Amazon witnesses?

15        A.    I don't recall having done that,

16   that -- no, I don't recall having done that.

17        Q.    Okay.  And have you heard of a

18   gentleman named Michael Pechette [phonetic]?

19        A.    It's not ringing a bell as I sit

20   here today.

21        Q.    Okay.  So is it fair to say you

22   didn't review Mr. Pechette's deposition before

Page 427

1    forming your opinions on invalidity?

2        A.    I don't recall having done that,

3    sitting here today.

4        Q.    And Mr. Pechette's deposition isn't

5    listed among the deposition transcripts you

6    reviewed among your materials considered, right?

7        A.    That's right.

8        Q.    And have you heard of a gentleman

9    named Andy Poling that provided a deposition in

10   this case?

11       A.    I'm not recalling any details about

12   that, as I sit here today.

13       Q.    Okay.  And so is it fair to say you

14   didn't review Mr. Poling's deposition transcript

15   before issuing your validity report?

16       A.    I don't recall having done that,

17   just sitting here today.

18       Q.    And his deposition isn't listed

19   among the depositions you considered in your

20   materials considered for your validity report,

21   right?

22       A.    That's right.

Page 428

1        Q.    Okay.  We'll come back to the main

2    report, but let me -- let me ask you some

3    questions about the supplemental report, which is

4    Exhibit 19.

5        A.    I'm there.

6        Q.    Okay.  All right.  And what's the

7    title of Exhibit 19?

8        A.    "First Supplemental Rebuttal Expert

9    Report of Michael Goodrich Regarding Validity of

10   US Patent Numbers 7,103,640, 7,233,978 and

11   7,814,170."

12       Q.    And is that your signature on the

13   cover?

14       A.    Yes.

15       Q.    And you signed it on September 7th,

16   2023, right?

17       A.    That's right.

18       Q.    And you did everything you could to

19   make sure the content of this report was accurate

20   before you signed it?

21       A.    I -- I did my best, yes.

22       Q.    Okay.  Sitting here today, are you

Page 429

1    aware of any errors or inaccuracies in your

2    supplemental report?

3          A.    None are coming to mind, as I sit

4    here today.

5          Q.    Who drafted your Supplemental

6    Validity Report?

7          A.    In terms of the typing, I think

8    first draft was typed by attorneys, which then I

9    edited so that it comprised my opinions in this

10   matter.

11         Q.    So Kove's attorneys created the

12   first draft of your supplemental report?

13         A.    That is my recollection, yes, and

14   then I edited that so that it comprises my

15   opinions in this matter.

16         Q.    Did anyone else assist you with

17   drafting your supplemental report?

18         A.    Not that I recall, no.

19         Q.    And aside --

20               MR. SIGLER:  Well, strike that.

21   BY MR. SIGLER:

22         Q.    Did you discuss -- discuss the

Page 430

1    opinions expressed in your supplemental report

2    with Kove's attorneys before issuing it?

3         A.    Yes.

4         Q.    And did you discuss the opinions in

5    your supplemental report with Dr. Overton before

6    issuing it?

7         A.    No.

8         Q.    Did you discuss the opinions in your

9    supplemental report with anyone else besides

10   Kove's attorneys before you issued it?

11        A.    No.

12        Q.    All right.  Okay.  Did you do

13   anything to prepare for the deposition today?

14        A.    Yes.

15        Q.    Did you meet with Kove's attorneys

16   to prepare for the deposition today?

17        A.    I did.

18        Q.    When?

19        A.    Yesterday.

20        Q.    Which attorneys did you meet with?

21        A.    The two that are here today, Naveed

22   and Khue.

Page 431

1          Q.     Where did you meet with them?

2          A.     I met with them here in the office,

3     in this room that we are in today.

4          Q.     Approximately how long did you meet?

5          A.     Roughly seven hours that we met.

6          Q.     Aside from Kove's attorneys, did you

7     speak with anyone else to prepare for your

8     deposition today?

9          A.     No.

10         Q.     Okay.  Did you review any documents

11    to prepare for the deposition today?

12         A.     Yes.

13         Q.     Okay.  Did you review Mr. Greene's

14    report to prepare for the deposition today?

15         A.     Yes.

16         Q.     Did you review Dr. Grama's report to

17    prepare for the deposition today?

18         A.     I don't recall having looked at it.

19    I think it was something that I at least may have

20    glanced at.  I'm not sure for how long, though.

21         Q.     All right.  Did you review any

22    deposition transcripts to prepare for the

Page 432

1   deposition today?

2          A.    I don't recall having looked at

3   deposition transcripts yesterday.

4          Q.    Did you review your reports to

5   prepare for the deposition today?

6          A.    I did, yes.

7          Q.    Did you review declarations you've

8   submitted to the patent office about the

9   patents-in-suit to prepare for your deposition

10  today?

11         A.    Yes.

12         Q.    Okay.  All right.  Let's go back to

13  Exhibit 18, which is your Validity Report, and

14  I'd like you to go to Page 2, please, sir, where

15  there is a section starting at Paragraph 7 that

16  is titled "LEGAL PRINCIPLES."

17         A.    I'm there.

18         Q.    Okay.  And did Kove's attorneys

19  draft this section of your Validity Report?

20         A.    Yes, they -- they drafted the first

21  draft of this section.

22         Q.    Okay.  And you say that in the first

Page 433

1    sentence of Paragraph 7, "While I am not an

2    attorney, I have been informed of certain legal

3    principles that relate to forming opinions

4    regarding anticipation, obviousness, and patent

5    eligibility."

6              Do you see that, sir?

7         A.   Yes.

8         Q.   And who informed you of these

9    certain legal principles that you referred to

10   here?

11        A.   The attorneys for Kove did that.

12        Q.   Okay.  All right.  Let's go to

13   Paragraph 15, please.

14        A.   I am there.

15        Q.   And stepping back for a moment, you

16   relied on these legal principles expressed in

17   this section of your report for your opinions in

18   your Validity Report, right?

19        A.   That's right.

20        Q.   Okay.  Okay.  Are you at Paragraph

21   15, sir?

22        A.   Yes.

Page 434

1        Q.    All right.  And the first sentence

2   of Paragraph 15 states, "I am informed that claim

3   construction is a matter of law for the Court to

4   decide."

5              Do you see that, sir?

6        A.    I do.

7        Q.    And do you agree that claim

8   construction is a matter of law that the Court

9   will decide in this case?

10       A.    I'm not an attorney, but that is

11   indeed my understanding.

12       Q.    Okay.  So is it your understanding

13   that if this case goes to trial, you as an expert

14   won't be permitted to offer your opinions on

15   claim construction to the jury, right?

16             MS. HOANG:  Objection; scope.

17        Expertise.

18       A.    I -- I'm not an attorney so I don't

19   know what I would be allowed or not allowed to

20   say, but I would take whatever instruction I get

21   from attorneys and do my best to follow them.

22   BY MR. SIGLER:

Page 435

1          Q.    Okay.  Fair enough.  Let's go to

2     Paragraph 19, please.

3                And you've -- you've offered

4     opinions on claim construction in this case

5     previously, right?

6          A.    That's right, yes.

7          Q.    And you've -- you've offered

8     opinions on claim construction in other cases,

9     right?

10         A.    Yes, that's also correct.

11         Q.    Okay.  And at Paragraph 19, it

12    states, "I have reviewed the Court's

13    constructions (Dkt. 484) and the parties

14    agreed-to claim constructions (Dkt. 382) and

15    applied those constructions in my analysis.  To

16    the extent claim terms have not been construed or

17    their meaning has not agreed to by the parties,

18    unless expressly indicated otherwise, I have used

19    their plain and ordinary meaning to a person of

20    ordinary skill in the art at the time of the

21    invention at the time of the patent at issue."

22                Do you see that language there, sir?

Page 436

1          A.    Yes.

2          Q.    When a claim term hasn't been

3    construed, you relied on your understanding of

4    the plain and ordinary meaning to a person of

5    ordinary skill in the art, right?

6          A.    Yes, with the caveat that I

7    understand that there's some terms that are now

8    not yet agreed to by the parties.  I believe

9    Amazon has raised some new issues, and for those,

10   I considered both the original Court's claim

11   constructions as well as those constructions that

12   were being proposed by Amazon.

13         Q.    Okay.  I understand.  Let's go to

14   Paragraph 38, please.

15         A.    I am there.

16         Q.    All right.  And just for context,

17   Paragraph 38 appears in the section of your

18   report on the legal principles for written

19   description and enablement, right?

20         A.    That's right.

21         Q.    Okay.  And Paragraph 38 states, "I

22   understand that the test for sufficiency is

Page 437

1    whether the disclosure of the application relied

2    upon reasonably conveys to one skilled in the art

3    that the inventor had possession of the claimed

4    subject matter as of the filing date.  In other

5    words, I understand that the test requires an

6    objective inquiry into the four corners of the

7    specification to determine if the specification

8    describes an invention understandable to a person

9    of ordinary skill to show the inventor actually

10   invented the invention claimed."

11            Do you see that, sir?

12       A.   Yes.

13       Q.   Is it your understanding the test

14   for sufficiency requires inquiry into what

15   appears in the specification of the patent?

16       A.   I agree.

17       Q.   Okay.  And looking further down the

18   page, at Paragraph 41, your report states there

19   "I also understand that the patent need not teach

20   what is well known in the art to one skilled in

21   the art."

22            Do you see that?

Page 438

1          A.    Yes, I do.

2          Q.    Okay.  And would you agree, sir,

3     that at the time of the inventions in the

4     asserted patents here, hierarchical topologies

5     were well known?

6               MS. HOANG:  Objection; vague.

7       Foundation.

8          A.    It depends what is meant by

9     "hierarchical topologies."  That's a very broad

10    phrase.  So, yeah, that would require more

11    context for me to be able to answer that

12    question.

13    BY MR. SIGLER:

14         Q.    Was just the general concept of

15    hierarchical topology known at the time of the

16    invention here?

17              MS. HOANG:  Same objections.  Vague.

18      Foundation.

19         A.    There certainly were things that

20    were known that would use word "hierarchical" and

21    "topology."

22                   But with respect to how those

Page 439

1    phrases are being used in the patents-in-suit,

2    that would be something that I don't think was

3    well known in terms of, like, the knowledge of a

4    person of ordinary skill in the art, with respect

5    to, say, location servers.

6    BY MR. SIGLER:

7        Q.    The specifications of the

8    patents-in-suit discuss hierarchical

9    architectures, right?

10       A.    Yes, that's correct.

11       Q.    And the specifications in the

12   patents-in-suit discuss nonhierarchical

13   architecture, right?

14       A.    Yes, I agree.

15       Q.    And the patents-in-suit discuss

16   mixed architectures, right?

17       A.    I think they referred to them as

18   "hybrid," but, yeah, that's I think consistent

19   with what you're asking.

20       Q.    Okay.  So the patents-in-suit

21   discuss hybrid architectures, right?

22       A.    Yeah.  So, for example, the '978

Page 440

1    patent, in Column 19, beginning at Line 26 has a

2    paragraph that it has as a heading "Hybrid

3    Constellations."  And then it goes on to describe

4    preferred embodiment for hybrid constellations.

5              And then it has a next paragraph,

6    after that called "Topology:  Hierarchical and

7    Clustered."

8         Q.    Okay.  So, the patents-in-suit

9    discuss hybrid architectures, right?

10        A.    Again, it's with respect to the

11   topologies of how location servers are related to

12   one another, but indeed it has this section that

13   it describes as a hybrid constellation.

14        Q.    Okay.  And then in the portion of

15   the '978 specification in Column 19 that you

16   pointed to, below the hybrid constellations, that

17   portion has a heading "Topology:  Hierarchical

18   and Clustered," right?

19        A.    That's right.  As I just previously

20   mentioned.

21        Q.    And the first sentence there at

22   Lines 39 to 40 in Column 19 of that section says

Page 441

1     "Hierarchical and clustered topologies may be

2     created using a server-centric or client-centric

3     approach."

4              Do you see that?

5        A.    Yes.

6        Q.    So this portion of the specification

7     of the '978 is describing hierarchical and

8     clustered topologies, right?

9        A.    Yes, with respect to the location

10    the servers that are taught from this patent

11    specification.

12            MS. HOANG:  I'm going to interrupt

13        for one second.  You don't have copies of

14        these for me, do you?

15            MR. SIGLER:  The patents?  I think

16        Jaime took those copies.  Do you want to take

17        a break and get them?

18            THE WITNESS:  One of them actually

19        didn't print correctly.

20            THE VIDEOGRAPHER:  Do you want to go

21        off the time right now?  The time right now

22        is 9:32 a.m.

Page 442

1            We are off the record.

2            (Recess taken.)

3            THE VIDEOGRAPHER:  The time right

4      now is 9:38 a.m.

5            We're back on the record.

6  BY MR. SIGLER:

7      Q.    Okay.  Dr. Goodrich, before the

8  break I was asking you about Column 19, Lines 39

9  to 40 of the '978 patent.  Let's return to that.

10           And the first -- that sentence there

11  says:  Hierarchical and cluster topologies may be

12  created using a server-centric or client-centric

13  approach.

14           Do you see that language again

15  there, sir?

16     A.    Yes.

17     Q.    And so this portion of the '978

18  patent specification is describing hierarchical

19  and clustered topologies for the location

20  servers; is that your testimony?

21     A.    I agree, yes.

22     Q.    Above that we were talking a few

Page 443

1    moments ago about hybrid constellations.  Does --

2    do the patents --

3                MR. SIGLER:  Well, strike that.

4          Q.    Can the hybrid constellations

5    described here use the hashing described in the

6    patents?

7                MS. HOANG:  Objection; vague.

8          A.    So, for example, if we turn to

9    Figure 21 in the '978 patent, which also is

10   figure in the other patents-in-suit, we see an

11   example of a hybrid topology.

12                And what, again, that means is

13   there's some components that are themselves and

14   those components or clustered topology are

15   nonhierarchical topology.

16                So in this figure, for example, the

17   root node, which is labeled as number 102,

18   consists of three nodes marked 106 that are

19   themselves in a clustered or nonhierarchical

20   topology.

21                So with respect to them alone, that

22   cluster, they can use the hashing technology for

Page 444

1    located location servers within that cluster, but

2    then that hashing would not apply to the other

3    nodes in this topology that's a hierarchical --

4    otherwise a hierarchical topology.

5               MS. HOANG:  Do you mean 108?

6               THE WITNESS:  Oh, I guess that's a

7         108.  Yeah, sorry.  This print is a little

8         fuzzy.

9         A.    (Continuing) So to be clear, the

10   other nodes are labeled 108.

11   BY MR. SIGLER:

12        Q.    We'll go back to that.  Thank you

13   for that.

14               Let's go to Paragraph 48 of your

15   report, please.  And here starting at Paragraph

16   48 you discussed the legal principles for double

17   patenting, right, sir?

18        A.    That's right.

19        Q.    Have you opined on double patenting

20   in any other cases before?

21        A.    I have discussed it, I think in

22   other cases.  I don't know if it actually ended

Page 445

1    up in any report or declaration.  I'm not

2    recalling that detail as I sit here today.

3          Q.    Okay.  Have you ever offered any

4    opinions to a jury about double patenting?

5          A.    Not that I recall, just sitting here

6    today.

7          Q.    Okay.  And looking at -- looking

8    below that at Paragraph 49, that states "I

9    understand that the analysis for obviousness-type

10   double patenting requires two steps:  (1)

11   construction of the claims in the earlier patent

12   and the claim in the later patent to identify any

13   differences, and (2) determination of whether the

14   differences in subject matter between the claims

15   render the claims patentably distinct."

16                Do you see that, sir?

17         A.    Yes.

18         Q.    All right.  So, the tests for double

19   patenting asks whether differences between the

20   claims are distinct; is that your understanding?

21         A.    I understood it just exactly as it

22   says here.  So that is the legal principle that I

Page 446

1    used for my analysis.

2         Q.    Okay.  And then in Paragraph 50 on

3    the next page, your report states "I also

4    understand that for a double patenting analysis,

5    the language of the claims themselves is what

6    matters and not the specification, but that the

7    specification can be used for construing the

8    claims."

9              Do you see that, sir?

10        A.    Yes.

11        Q.    Is that the standard you applied to

12   the double patenting issues in your validity

13   report?

14        A.    Yes.

15        Q.    Okay.  And per that standard, the

16   specification can be used for construing the

17   claims, right?

18        A.    Yes.

19        Q.    Okay.  Let's -- let's take a look at

20   the Complaint that was marked as an exhibit the

21   other day.  I believe it's Exhibit 14 that's in

22   your stack right there.

Page 447

1          A.     That stack on the side?

2          Q.     No.  This one.

3                 MS. HOANG:  No.  Sure it's 14 and

4          not 10?

5                 MR. SIGLER:  I guess it's

6          Exhibit 10.  Thank you, Counsel.  That must

7          have been a mark from another deposition.

8                 (Whereupon, Exhibit 10, Complaint,

9          was identified.)

10    BY MR. SIGLER:

11         Q.     Okay.

12         A.     So you're asking now about

13    Exhibit 10 from the previous deposition?

14         Q.     Yes.

15                Do you recognize this as the

16    Complaint in this case filed December 12, 2018?

17         A.     Yes.  We discussed this, as I

18    recall, on Saturday.

19         Q.     Okay.  And I want to ask you some

20    questions starting at Paragraph 1 of the

21    Complaint.

22                Paragraph 1 of Kove's Complaint

Page 448

1    says:  Kove's inventors developed breakthrough

2    technology enabling high performance,

3    hyper-scaled that distributed cloud storage years

4    before the advent of the cloud.  They were

5    awarded patents for their innovations.  Five

6    years after this breakthrough, the MIT Technology

7    Review recognized that the type of distributed

8    data storage technology described in Kove's

9    patents was one of the top ten emerging

10   technologies that have changed the world?"

11              Do you see that, sir?

12   A.    Yes.

13   Q.    Are you familiar with MIT Technology

14   Review?

15   A.    Yes, I believe I even cite to this

16   article in my rebuttal report.

17   Q.    I was going to ask you that

18   question.  Thank you for that.

19              Have you ever read the MIT

20   Technology Review outside of the context of this

21   case?

22   A.    Yes.  In fact, I myself have been

Page 449

1    mentioned in the MIT Technology Review.

2        Q.   And was -- do you consider that an

3    honor to have your name mentioned in the MIT

4    Technology Review?

5        A.   I did, yes.

6        Q.   Okay.  All right.  Let's -- let's

7    take a look at the article referenced there.  I'm

8    going to mark that as Exhibit 20.

9               (Whereupon, Exhibit 20, "Ten

10     Emerging Technologies That Will Change Your

11     World" article, was marked for

12     identification.)

13        A.   I'm there.

14    BY MR. SIGLER:

15        Q.   Okay.  And this is a -- you see at

16    the bottom of the page, it says:  Technology

17    Review February 20 -- excuse me -- February 2004?

18        A.   Yes.

19        Q.   Okay.  And you read this article for

20    purposes of your opinions in this case, right?

21        A.   That's right.

22        Q.   Had you seen this article before

Page 450

1    your work on this case?

2          A.    I don't recall having seen it before

3    this case.

4          Q.    And the title of this article is

5    "Distributed Storage."

6                Do you see that?

7          A.    I think the title is "Ten Emerging

8    Technologies That Will Change the World," and

9    then I think one of the subject headings is

10   called "Distributed Storage."

11         Q.    Okay.  Okay.

12         A.    Like a sub-article inside of it.

13         Q.    Understood.

14               Yeah, I want to talk to you about

15   that sub-article on distributed storage.  Are you

16   there with me?  It's on Page 44.

17         A.    I am there.

18         Q.    Okay.  And the article discusses a

19   gentleman named Hari Balakrishan, right?

20         A.    Yes.

21         Q.    Do you know who he is?

22         A.    I don't recognize that name.

Page 451

1          Q.    Okay.  Do you know if he's ever

2     worked for Kove?

3          A.    I -- I don't recognize that name.

4          Q.    Okay.

5          A.    So I'm not aware if he worked for

6     Kove previously or not.

7          Q.    Do you know whether he's currently a

8     professor at MIT?

9          A.    I don't know that either, no.

10         Q.    Okay.  Looking at the right-hand

11    column of text on Page 44, there's a paragraph

12    about a third of the way down the page that

13    starts with:  Balakrishnan's work centers on.

14              Do you see that?

15         A.    Yes.

16         Q.    And it says:  Balakrishnan's work

17    centers on distributed hash tables, an update on

18    a venerable computer science concept.  Around

19    since the 1950s, hash tables provide a quick way

20    to organize data.  A simple mathematical

21    operation assigns each file its own row in a

22    table.  The row stores the file's location.  Such

Page 452

1    tables are now ubiquitous, forming an essential

2    part of most software.

3              Do you see that, sir?

4         A.    Yes.

5         Q.    Would you agree that hash tables

6    have been around since the 1950s?

7         A.    Certainly things called hash tables

8    have been indeed around since the 1950s.  But I

9    believe hash tables as they are used in the

10   patents are novel.

11        Q.    And would you agree that hash tables

12   were ubiquitous as of February 2004?

13        A.    I believe that things that would be

14   called hash tables could be considered

15   ubiquitous, but that's a very broad set of things

16   and that the hash tables as used in the patents

17   for, say, determining location service to contact

18   is novel.

19        Q.    Okay.  But you'd agree that

20   Dr. Overton and Dr. Bailey didn't invent just the

21   general concept of hash tables, right?

22        A.    The general concept of things called

Page 453

1   hash tables did exist prior to the

2   patents-in-suit, but I believe they did invent

3   hash tables for location servers.

4          Q.    Okay.  Did they invent distributed

5   hash tables?

6          A.    I believe they did invent

7   distributed hash tables for location servers.

8          Q.    Okay.  All right.  If something is

9   referred to as a hash table, does that make it a

10   hash table, in your opinion?

11          MS. HOANG:  Objection; vague.

12          A.    That depends on the context.  I have

13   a pretty accurate way of doing my analysis, and

14   so I'd like to know the context and setting

15   before answering such a broad question.

16   BY MR. SIGLER:

17          Q.    Okay.  That's fair.

18          So the -- the context of the way

19   something is referred to a hash table would

20   impact your opinion of whether it is a hash

21   table; is that right?

22          A.    That's right.  That's right.

Page 454

1          Q.    All right.  And going back to the

2    article on the last paragraph there on Page 44,

3    it starts with:  Balakrishnan's work is part of

4    IRIS, the Infrastructure for Resilient Internet

5    Systems project, a collaboration among

6    researchers at MIT; the University of California

7    Berkeley; the International Computer Science

8    Institute Berkeley, California; New York

9    University and Rice University.

10              Do you see that?

11         A.    Yes.

12         Q.    Were you involved in IRIS at all?

13         A.    I was not involved in IRIS as I

14    recall.

15         Q.    Do you know if John Overton or

16    Stephen Bailey were?

17         A.    I'm not recalling that as I sit here

18    today.

19         Q.    So you don't know one way or the

20    other whether they were involved in IRIS?

21         A.    I don't recall as I sit here today.

22         Q.    Okay.  And then on the -- on the

Page 455

1    left side of Page 44, do you see there is a

2    heading that says -- that says:  Other leaders in

3    distributed storage?

4            A.    Yes.

5            Q.    And it lists four names there,

6    right?

7            A.    That's right.

8            Q.    And one of them is Tom Leighton,

9    right?

10           A.    That's right.

11           Q.    And he's the current CEO of Akamai,

12   right?

13           A.    I believe that is correct.

14           Q.    Okay.  And another person identified

15   there is Ian Clarke, right?

16           A.    That's right.

17           Q.    And he developed Freenet; is that

18   correct?

19           A.    I'm not recalling.  It's listed here

20   that he is, you know, Freenet so that seems to be

21   that implication, but I'm not recalling as I sit

22   here today that detail.

Page 456

1          Q.    Okay.  And then also named there is

2     John Kubiatowicz, right?

3          A.    Yes.

4          Q.    And it identifies him as a professor

5     at University California Berkeley, right?

6          A.    That's right.

7          Q.    And then the final name in the other

8     leader section of the article is Michael Lynch,

9     right?

10          A.    That's right.

11          Q.    Do you know who he is?

12          A.    He's not ringing a bell as I sit

13     here today.

14          Q.    Okay.  Do you know if he's a

15     professor at Cornell?

16          A.    It's not ringing a bell as I sit

17     here today.

18          Q.    Do you know if Ian Clarke, John

19     Kubiatowicz, Tom Leighton, or Michael Lynch ever

20     worked for Kove or its predecessor companies?

21          A.    I'm fairly confident Tom Leighton

22     never worked for Kove.  I can't speak to the

Page 457

1    others.

2         Q.    Okay.  At this time in 2004, was

3    Kove trying to sell products that practiced the

4    '640, '170, and '978 patents?

5              MS. HOANG:  Objection; vague.

6    Scope.  Foundation.

7         A.    I don't recall.  I believe I did do

8    some analysis about Kove products in my opening

9    report, but not recalling those dates, as I sit

10   here today.

11   BY MR. SIGLER:

12        Q.    Okay.  Kove had filed -- and if you

13   want to -- if you want to refer to the patents,

14   you can, but Kove had filed the 64 -- the

15   application for the '640 patent in 2000, right?

16        A.    The -- the application itself did,

17   yeah, and then its -- refers back and has

18   priority to a provisional application from before

19   that.

20        Q.    And Kove had filed the application

21   that became the '978 patent in 2001, right?

22        A.    Yes, with the same kind of language

Page 458

1    that it was a continuation in part from -- that

2    stemmed from earlier provisional and other

3    applications.

4         Q.    Okay.  This MIT Technology Review

5    article from February 2004 doesn't mention John

6    Overton, correct?

7         A.    I don't believe it directly mentions

8    his name; instead, my opinion is it's mentioning

9    the technology that is claimed in the patents.

10        Q.    Okay.  So the article doesn't

11   mention Dr. Overton's name, right?

12        A.    I agree it doesn't specifically

13   mention his name.

14        Q.    And the article doesn't specifically

15   mention OverX, right?

16        A.    I agree with that too, instead my

17   opinion, as I expressed in my report is that it's

18   praising the technologies that were claimed and

19   were innovative from the patents-in-suit.

20        Q.    Okay.  And the article doesn't

21   mention Stephen Bailey, right?

22        A.    I agree with the same issue, instead

Page 459

1    it's praising the technologies that are claimed

2    in the patents-in-suit that Steve Bailey is a

3    coinventor for.

4          Q.    Okay.  And the article doesn't

5    mention Kove or Econnectix either, right?

6          A.    That's correct.  With the same issue

7    that its praising the technologies they

8    developed.

9          Q.    Okay.  So in your view this article

10   is praising the technology that Drs. Overton and

11   Bailey developed but doesn't mention their names

12   in the article, right?

13         A.    That's right.  That's the extent of

14   it.

15         Q.    Okay.  And the article certainly is

16   praising the work that Mr. Balakrishnan was doing

17   at this time, right?

18         A.    Yes.

19         Q.    And the article also identifies four

20   other people working in distributed storage at

21   this time in 2004, right?

22         A.    That's right too.

Page 460

1          Q.    Okay.  You can put that aside.

2                Would you agree, sir, that the

3     inventors of --

4                MR. SIGLER:  Well, strike that.

5     BY MR. SIGLER:

6          Q.    Would you agree Drs. Overton and

7     Bailey didn't invent cloud computing?

8                MS. HOANG:  Objection; vague.

9       Foundation.

10         A.    We just read a statement from my

11    report about how I believe they did -- were

12    innovators with respect to cloud computing and

13    enabled a type of scalability for cloud computing

14    that did not exist before through the use of

15    location servers.

16    BY MR. SIGLER:

17         Q.    Did cloud computing itself exist

18    before the '640, '170, and '978 patents?

19                MS. HOANG:  Objection; vague.

20         A.    I believe things that were called

21    "cloud computing" did exist prior to that.  But,

22    again, what I think they invented was a type of

Page 461

1    more scaleable cloud computing through the use of

2    location servers.

3    BY MR. SIGLER:

4          Q.    Did the concept of redirect messages

5    exist before the '640, '170, and '978 patents?

6                MS. HOANG:  Objection; vague.

7          A.    They were things called "redirect

8    messages" that existed before that, but not the

9    type of redirect messages that allowed this very

10   scaleable type of cloud computing wherein you

11   were doing redirect messages as described in the

12   claims with respect to location servers.

13   BY MR. SIGLER:

14         Q.    Did the concept of location

15   information exist before the '640, '170, and '978

16   patents?

17               MS. HOANG:  Objection; vague.  Lacks

18       foundation.

19         A.    So if by "location information"

20   you're referring to the claimed location

21   information that the Court construed, for the

22   '978 patent is:  One or more identifiers and

Page 462

1    their associated locations.  Or for the other two

2    patents:  Information pertaining to one or more

3    locations of data and/or the identities of one or

4    more location servers within locations and

5    servers in turn have Court constructions.

6              I believe that is novel.  But there

7    was things in prior to that that could have been

8    called location information, that just wouldn't

9    have been this location information.  I think

10   this is novel.

11        Q.    Okay.  Would you agree that

12   Drs. Overton and Bailey invented a specific way

13   of organizing location information on a location

14   server network?

15        A.    That sounds generally accurate at a

16   high level.

17        Q.    Okay.  And would you agree that they

18   didn't invent every kind of location server

19   network?

20              MS. HOANG:  Objection; vague.

21        A.    I'm not following that question.

22   BY MR. SIGLER:

Page 463

1          Q.    Would you agree that there are other

2     types of location server networks that don't meet

3     the claims of the asserted patents?

4          A.    I don't recall that being a question

5     I was asked to opine on.  I'd need more time --

6               Unless there is a place in my report

7     you feel I addressed that -- I don't recall

8     having address that.  I would want more time to

9     consider that.  That seems kind of a broad

10    concept of what is encompassed by "other types."

11         Q.    Okay.  Are you familiar with the

12    concept of eventual consistency?

13              MS. HOANG:  Objection; vague.  Lacks

14         foundation.

15         A.    Yes, I'm familiar with how people

16    are using that term today.

17    BY MR. SIGLER:

18         Q.    What do you understand "eventual

19    consistency" to mean?

20         A.    The way that we use that term

21    today -- again, depending on the context -- let's

22    say in the context of distributed computing, is

Page 464

1    it typically refers to having data stored in

2    multiple locations where you have the same

3    dataset that is stored in multiple locations.

4    And then one of the locations makes a change, for

5    example to insert or delete a new element, and

6    then that needs to be reflected across all the

7    different copies.

8              And we say that a system is

9    eventually consistent, if that occurs eventually.

10   And eventually they are all the same and

11   consistent with each other.

12             That's a very high level description

13   and, you know, it's not necessarily a, you know,

14   specific to any prior art or the patents.

15        Q.   Okay.  Are S3 and DDB eventually

16   consistent?

17             MS. HOANG:  Objection; vague.  Lacks

18      foundation.  Scope.

19        A.   So now we're asking a question about

20   infringement?  I thought that was for Saturday.

21   Let me get my other report.

22   BY MR. SIGLER:

Page 465

1      Q.     Have you considered that question at

2   all, sir?

3      A.     Let me get my other report for that.

4         (Whereupon, Exhibit 1, Dr. Goodrich

5     Corrected Expert Report, was identified.)

6      A.     All right. So I now have in front

7   of Appendix -- or Exhibit 1 from my Saturday

8   deposition where I opine on Amazon S3 and

9   DynamoDB.

10         Yeah. And I don't have it in

11   electronic format. I believe I may have

12   addressed some issues in that report. It's

13   pretty big. I can try to find it if you like.

14      Q.     Why don't we press forward and

15   perhaps we'll come back to that.

16      A.     Okay.

17      Q.     Let's go -- turn back to the

18   patents-in-suit.

19      A.     Okay.

20      Q.     You know what NDTP is as described

21   in the patents-in-suit, right?

22      A.     Yes. So, for example, if we go to

Page 466

1     the '170 patent.  Go to, for example, Column 4,

2     Line 29, it refers to:  The Network Distributed

3     Tracking Protocol (NDTP) efficiently tracks the

4     location of data associated with an individual

5     entity in a distributed data collection.

6          Q.    Okay.  And would you agree that NDTP

7     is in the preferred embodiments of the '170,

8     '640, and '978 patents?

9          A.    Yes, I agree with that.

10          Q.    Okay.  In your understanding, sir,

11     what is -- what are the purposes of claim

12     construction?

13               MS. HOANG:  Objection; scope.

14       Vague.

15          A.    I'm not following your question.

16     I'm sorry.

17     BY MR. SIGLER:

18          Q.    Is informing the jury one of the

19     purposes of claim construction?

20               MS. HOANG:  Objection; scope.  Calls

21       for legal expertise.

22          A.    I'm not an attorney, but I have, as

Page 467

1    we discussed earlier, opined on claim

2    construction.  And I've been told that it's a

3    desirable feature for constructions to be able to

4    be understood by a jury, if that is your

5    question.

6    BY MR. SIGLER:

7          Q.    Okay.  And it's a desirable feature

8    of claim construction to prevent confusion by the

9    jury about what the claims mean, right?

10               MS. HOANG:  Objection; vague.

11      Scope.

12         A.    Generally speaking, I've been told

13   by attorneys that it's also a desirable feature

14   of claim construction to avoid confusing a jury.

15   BY MR. SIGLER:

16         Q.    Okay.  All right.  Let's go to

17   Paragraph 56 in your validity report, please,

18   sir.

19               And this is in the section where

20   you're discussing the alternative constructions

21   that Amazon has proposed, right, sir?

22         A.    Yes.  That is correct.  That's what

Page 468

1   is discussed here.

2        Q.   Okay.  And in the first sentence of

3   Paragraph 56 you state "I agree with Kove that

4   the plain language of Claim 17 and 18 of the '640

5   patent requires each server in the data location

6   server network to be capable of transmitting

7   information to client via a redirect message that

8   must contain information that would allow the

9   client to determine the data location server with

10   the location string information."

11        Do you see that language, sir?

12        A.   Yes.

13        Q.   Okay.  So here you're stating that

14   you agree with Kove that each server must be able

15   to perform this function, right?

16        MS. HOANG:  Objection; vague.

17        A.   So Claim 17 and 18 of the '640

18   patent are system claims, and then these are

19   components respectively in Claims -- of 17 and 18

20   of those systems.  But then just from the plain

21   language of the claims themselves, those servers

22   have to have this capability.

Page 469

1    BY MR. SIGLER:

2         Q.    Okay.  So it's your opinion that

3    Claims 17 and 18 require the servers to have this

4    capability, right?

5         A.    Yes, just from the language of the

6    claim itself.

7         Q.    Okay.

8         A.    I mean, we could read it into the

9    record, but I think it's clear from the -- the

10   elements themselves of the Claims 17 and 18.

11   Hence, in my opinion, already from the plain and

12   ordinary meaning of the terms, this is required.

13        Q.    Okay.  Let's go to the next sentence

14   in Paragraph 56 of your validity report.  And you

15   state there, "I also agree with Kove that for

16   each data location server to have this

17   capability, they must be structured in a

18   non-hierarchical cluster configuration, because

19   not every server ordered in a hierarchical

20   topology would have this capability."

21              Do you see that language, sir?

22        A.    Yes.

1        Q.   Okay.  So it's your opinion that

2  each location server must be structured in a

3  nonhierarchical configuration, right?

4        A.   That it is my opinion that, again,

5  just based on the language of the claim itself,

6  it requires -- in order to have this ability,

7  based on the specification of the '640 patent,

8  requires that the logical organization among the

9  location servers must be a nonhierarchical

10  clustered topology.

11       Q.   Okay.  So in your view, the data

12  location servers must be structured in a

13  nonhierarchical topology, right?

14       A.   In this context for Claims 17 and

15  18, the data location server network that is

16  disclosed or claimed in Claims 17 and 18 has this

17  logical organization of nonhierarchical clustered

18  topology.  And to be clear, this does not mean

19  that every server is exactly the same distance

20  from every other server.  Instead it's that they

21  have this capability to do this type of a

22  redirect message, which implies this type of a

Page 471

1    nonhierarchical clustered topology.

2        Q.    Okay.  And in the last clause of

3    that sentence, you say that "not every server

4    ordered in a hierarchical topology would have

5    this capability," right, sir?

6        A.    Yes, I say that.

7        Q.    Okay.  So some servers ordered in a

8    hierarchical topology would be able to transmit

9    information to the client via redirect message,

10   right?

11           MS. HOANG:  Objection; vague.

12     Scope.

13       A.    That's not implied by that sentence.

14   BY MR. SIGLER:

15       Q.    Well, you say "not every server,"

16   right?

17       A.    That's right.

18       Q.    Wouldn't that imply that some

19   servers would be able to have this capability

20   that are ordered in a hierarchical topology?

21           MS. HOANG:  Objection; vague.

22     Foundation.

Page 472

1          A.     No, that does not follow logically

2     from that sentence.

3     BY MR. SIGLER:

4          Q.     Why didn't you say -- why didn't you

5     state because no server ordered in a hierarchical

6     topology would have this capability?

7          A.     I said it this way because I thought

8     this was a fine way to say it.  It's accurate,

9     conveys the requirement, in my opinion.

10          Q.     Okay.  Would -- would a POSITA know

11     that not every server ordered in a hierarchical

12     topology would have this capability?

13               MS. HOANG:  Objection; vague.

14        Scope.

15          A.     Yes, and I can explain why.

16     BY MR. SIGLER:

17          Q.     Okay.  So it's your opinion that

18     Claims 17 and 18 of the '640 patent require a

19     nonhierarchical structure for the location

20     servers, right?

21          A.     Yes, from the plain language of the

22     claim.

Page 473

1          Q.    Okay.

2          A.    We don't need to read anything else

3     in.

4          Q.    Okay.  You go on in Paragraph 57 to

5     state that "Kove presented similar explanations

6     for claims 1, 6, and 15 of the '170 patent, all

7     of which have particular claim limitations

8     requiring each location server in the server

9     network to know which location server among them

10    contains the location of the desired data."

11              Do you see that language, sir?

12         A.    I do.

13         Q.    Okay.  So you'd agree that Kove made

14    similar statements to the patent office that

15    Claims 1, 6 and 15 of the '170 patent require a

16    nonhierarchical structure, correct?

17              MS. HOANG:  Objection; vague.

18         A.    So to be precise, what I understood

19    Kove to be saying to the patent office is that

20    because of the plain language from Claims 1, 6,

21    and 15 of the '170 patent, that language itself

22    requires that the location servers are organized,

Page 474

1     for example, into a data location server network

2     comprising a plurality of data location servers

3     where those data location servers are organized

4     in a nonhierarchical topology simply because of,

5     again, the plain language of the claims and the

6     requirements that are in those claims.

7          Q.    And it's your opinion that those

8     claims, Claims 1, 6, and 15 of the '170 patent

9     require a nonhierarchical structure, right?

10         A.    Again, to be clear, it's only for

11    the data location server network that that

12    applies to.  So, for example, Claim 1 recites a

13    system in its preamble, and then it talks about

14    data repositories as well as data location server

15    network.

16         Q.    Okay.  So --

17         A.    In my opinion, Kove did not try to

18    limit into a hierarchical or a nonhierarchical

19    topology the entire system or the network for the

20    data repositories.  Instead what -- again, just

21    following straight from the claim language is

22    that the data location server network must be

Page 475

1    organized using a nonhierarchical topology.

2          Q.    Okay.  All right.  So just to be

3    clear, it's your opinion that Claims 1, 6, and 15

4    of the '170 patent all require a nonhierarchical

5    topology for the location servers, right?

6          A.    Yeah, at a high level, that's

7    right --

8          Q.    Okay.

9          A.    -- for the data location server

10   network in the claims.

11         Q.    Okay.  Let's go to Paragraph 59,

12   please.

13         A.    I'm there.

14         Q.    And here, you're discussing Claims

15   3, 10, and 14 in the '978 patent, right?

16         A.    Yes.  So it's going actually back to

17   Paragraph 58 where I state that this analysis now

18   at Claim 59 [sic] only applies to Claims 3, 10,

19   and 14 and their dependent claims and not to, for

20   example, Claims 1 or 6 or 17 or 23 or 24 or 30.

21         Q.    Okay.  And it's your opinion that

22   Claims 3, 10, and 14 of the '978 patent require a

Page 476

1    nonhierarchical topology for the location

2    servers, right?

3          A.    Yes, at a high level, that is

4    correct.

5          Q.    Okay.  Let's go on to Paragraph 60,

6    please, sir.

7          A.    I'm there.

8          Q.    Okay.  And here, you state that "It

9    is therefore" -- let me direct you to it.  In the

10   last sentence of Paragraph 60, you say, "It is

11   therefore my opinion that there is no need for

12   further construction of any claim term."

13          Do you see that, sir?

14          A.    Yes.

15          Q.    Okay.  And there's no current

16   construction in the case that requires a

17   nonhierarchical structure for the location

18   servers, right?

19          MS. HOANG:  Objection; vague.

20          A.    I kind of disagree with that

21   because, as I mentioned earlier today, the

22   Court's already construed a bunch of terms.  We

Page 477

1    also have the language of the claims as written.

2    And based on the plain language, plain and

3    ordinary meaning, my understanding is for every

4    term that the Court does not construe, we're

5    supposed to use the plain and ordinary meaning.

6                And just based on, again, the

7    Court's constructions and the plain and ordinary

8    meaning of the terms in the claims that I'm

9    discussing here and only the ones that -- then

10    based on the language of the claims themselves

11    require a nonhierarchical topology for the data

12    location servers.  That, I think is already there

13    in the claims.  And so I -- in my opinion,

14    there's no need for any further construction.

15    BY MR. SIGLER:

16        Q.    Okay.  And at trial, do you intend

17    to tell the jury that, for example, Claims 17 and

18    18 of the '640 patent require a nonhierarchical

19    topology for the location servers?

20                MS. HOANG:  Objection; vague.

21        A.    So this is a little bit of a

22    conditional, right, because Amazon is hoping that

Page 478

1    the Court will reconstrue.  So if by that

2    question you're asking if the Court agrees with

3    me that all the claim terms are already construed

4    that need to be construed and then if I'm asked

5    to explain Claims 17 and 18 to the jury, I intend

6    to stand by my opinions and tell them my

7    opinions, just like I shared with you this

8    morning.

9    BY MR. SIGLER:

10        Q.    Okay.  And it's your opinion that

11   the plain and ordinary meaning of those claims to

12   a person of ordinary skill in the art, would

13   require them to have a nonhierarchical topology

14   for the location servers, right?

15             MS. HOANG:  Objection; vague.

16      Misstates prior testimony.

17        A.    At a high level, that's very close

18   to what I'm saying.

19   BY MR. SIGLER:

20        Q.    How is it different?

21        A.    Well, it's not exactly what I said

22   this morning, but it's very close.

Page 479

1          Q.    All right.  Fair enough.

2                So and it's also --

3                MR. SIGLER:  Well, strike that.

4     BY MR. SIGLER:

5          Q.    And at trial do you intend to tell

6     the jury that your understanding of the plain and

7     ordinary meaning of Claims 1, 6, and 15 of the

8     '170 patent requires that the data location

9     servers be in a nonhierarchical topology?

10               MS. HOANG:  Objection; vague.

11       Scope.

12          A.    If I'm given the opportunity to

13    testify at trial, I will stand by my opinions

14    with respect to Claims 1, 6, and 15 of the '170

15    patent, as I've shared them with you today.

16    BY MR. SIGLER:

17          Q.    All right.  And part of that opinion

18    is that those claims require nonhierarchical data

19    location servers, right?

20               MS. HOANG:  Objection; vague.

21       Misstates prior testimony.

22          A.    Again, that's not exactly how I put

Page 480

1　it.  But as we talked about this morning, I

2　believe that the plain language of Claims 1, 6,

3　and 15 of the '170 patent requires that the data

4　location server network is organized in a

5　nonhierarchical topology.

6　　　　　　　And if asked to testify to the jury

7　about those patents, I will stand by that

8　opinion.  I intend to.

9　BY MR. SIGLER:

10　　　　Q.　　Okay.  For Claims 3, 10, and 14 of

11　the '978 patent, do you intend to tell the jury

12　at trial that those claims require a

13　nonhierarchical topology for the data location

14　servers?

15　　　　　　　MS. HOANG:　Objection; vague.

16　　Misstates prior testimony.

17　　　　A.　　So, again, that's not exactly how I

18　said it.  But if I'm given an opportunity to

19　testify at trial about Claims 3, 10, and/or 14 of

20　the '978 patent, I intend to stand by the

21　opinions in my report as I've shared them with

22　you today, including that the plain language of

Page 481

1    the claims, requires that the -- the

2    relationships the topological organizational

3    relationships in the network between the data

4    location servers, is a nonhierarchical clustered

5    topology.

6    BY MR. SIGLER:

7         Q.    In your view, what would be the harm

8    of the Court further construing those claims to

9    include those requirements?

10             MS. HOANG:  Objection; vague.

11        Scope.  Calls for speculation and legal

12        testimony.

13        A.    I'm not an attorney.  But as we've

14   discussed this morning, I've been told by

15   attorneys that it's helpful if claim construction

16   does not confuse a jury, and to be adding on what

17   are, in my opinion, additional limitations that

18   are already there in the claims and are clear, in

19   my opinion, that this is required, I believe it

20   would be redundant, which is potentially

21   confusing to a jury to add on that additional

22   language that's already there.

Page 482

1   BY MR. SIGLER:

2        Q.   Do you believe a juror reading Claim

3   17 of the '640 patent would understand that it

4   requires a nonhierarchical topology for the data

5   location servers?

6             MS. HOANG:  Objection; vague.  Calls

7        for speculation.

8        A.    I mean, we're not in trial right

9   now, but I would anticipate that after I explain

10  these terms -- this is very speculative, of

11  course -- but after I explain these terms to the

12  jury, the way that the Court has already

13  construed them, what is implied by those

14  constructions, I believe that the jury will be

15  able to understand what is required.  That's my

16  hope.  That then they will render their decision

17  based on sound principles that I've explained to

18  them.

19  BY MR. SIGLER:

20       Q.   Do you think a single juror will

21  know what a nonhierarchical topology is?

22            MS. HOANG:  Objection; vague.  Calls

Page 483

1          for speculation.  Foundation.  Scope.

2               A.    I would answer that similarly, that

3      I will do my best -- that's my intent certainly.

4      I know it's still a long ways in the future.

5      I'll do my best to explain to the jury all the

6      concepts at play in this case, some of them are

7      admittedly complicated.

8                    But I believe I will be able to

9      explain that to a jury, even to a single juror on

10     the panel, in a way that then they would

11     understand and be able to render a verdict that

12     is based on sound principles.

13     BY MR. SIGLER:

14               Q.    Okay.  And you've offered opinions

15     in your validity report that certain prior art

16     doesn't meet these claims because it has

17     hierarchical topology, right?

18               A.    Again, a very broad brush terms, in

19     some cases I do distinguish the prior art,

20     because what Mr. Greene identified as location

21     servers in the prior art is not organized in a

22     nonhierarchical way, instead is organized in a

Page 484

1 hierarchical way amongst themselves; hence, would

2 not be invalidating the claims that require a

3 nonhierarchical cluster topology.

4    Q. Okay.  And do you intend to offer

5 that opinion at trial?

6     MS. HOANG:  Objection; vague.  Calls

7  for speculation.

8    A. If I'm asked to opine on and respond

9 to Mr. Greene's opinions with respect to any of

10 those claims, I intend to stand by my opinions in

11 my report as I have shared them with you today.

12 BY MR. SIGLER:

13    Q. Okay.  And one of those opinions is

14 that prior art organized in a nonhierarchical

15 topology doesn't meet certain claims of the

16 asserted patents because they require

17 nonhierarchical location servers, right?

18     MS. HOANG:  Objection; vague.

19  Foundation.

20    A. No.  That's actually the opposite of

21 what I just said.  Instead what I said is if

22 prior art is disclosing a system where what

Page 485

1    Mr. Greene calls "location servers," are

2    organized in hierarchical topology, then they

3    would not invalidate these claims of the

4    patents-in-suit that require a nonhierarchical

5    topology for data location servers.

6         Q.    Okay.  I get it.

7               And that's an opinion you may offer

8    at trial, correct?

9         A.    It's possible.  Again, if I'm asked

10    to respond to testimony from Mr. Greene with

11    respect to those claims, I intend to stand by the

12    opinions in my report, as I've shared them with

13    you today.

14               MR. SIGLER:  Okay.  Thank you.  Why

15        don't we take a break.  We've been going for

16        a while.

17               THE VIDEOGRAPHER:  The time right

18        now is 10:26 a.m.

19               We are off the record.

20               (Recess taken.)

21               THE VIDEOGRAPHER:  The time right

22        now is 10:39 a.m.

                                           Page 486

1                We're back on the record.

2     BY MR. SIGLER:

3          Q.    All right.  Welcome back,

4     Dr. Goodrich.  I'd like to forge ahead to

5     Paragraph 63 of your report.

6          A.    I'm there.

7          Q.    Okay.  And here in Paragraph 63

8     you're offering some opinions on Claims 17 and 18

9     of the '640 patent, right?

10         A.    Let's see.  That's inclusive of

11    that, yeah.  In this paragraph, yes.  That's

12    right.

13         Q.    Okay.  And turning over to Page 23

14    in the same paragraph.  There is a paragraph that

15    starts with "Thus, both claims..."

16                Do you see that?

17         A.    Yes.

18         Q.    And first sentence says "Thus, both

19    claims plainly recite the need for each server in

20    the network to be able to return information for

21    calculating the location of the server that

22    contains the requested information - which is all

Page 487

1     that Kove's statement says."

2                Do you see that, sir?

3          A.    Yes.

4          Q.    Okay.  So it's your opinion that

5     both of those claims require the need for each

6     server in the network to be able to return

7     information for calculating the location of the

8     server that contains the requested information,

9     correct?

10         A.    So, for example, if we go to Claim

11    17 in the '640 patent, it recites that towards

12    the end:  Wherein the redirect message contains

13    information for use by the client to calculate a

14    location of a different data location server in

15    the plurality of data location servers.

16                So that's in summary form what I'm

17    saying here in that sentence on the top of

18    Page 23.

19         Q.    Okay.  And in your view, that is

20    claims of the '640 patent require each server in

21    the network to be able to return information for

22    calculating the location of the server that

Page 488

1     contains the requested information, right?

2          A.    So if we then continue in Claim 17

3     it says:  Wherein the different data location

4     server contains the location string.

5                So, again, just from the plain

6     language of the claim, matches in summary form

7     what I said at the top of Page 23.

8          Q.    And that is that the -- the claims

9     require each server in the network to be able to

10    return information for calculating the location

11    of the server that contains the requested

12    information, right?

13               MS. HOANG:  Objection; asked and

14        answered.

15         A.    Yeah, I would say that just like I

16    did before.  That plain language of the claim,

17    the redirect message has to have -- it contains

18    information for use by the client to calculate a

19    location of a different data location server in

20    the plurality of data location servers wherein

21    the different data location server contains a

22    location string.

Page 489

1                 And this is all a part of this

2      limitation about what is done in response to

3      receiving a data location request from a client

4      to retrieve a location string associated with an

5      identifying string provided in the data location

6      request.  So all of that again is in summary

7      form, what I'm saying here on the top of Page 23.

8          Q.    Okay.  At trial do you intend to

9      tell the jury that Claims 17 and 18 require that

10     each server in the network be able to return

11     information for calculating the location of the

12     server that contains the requested information?

13             MS. HOANG:  Objection; vague.  Calls

14        for speculation.

15         A.    If I'm asked at trial to opine on

16     Claims 17 and 18, my intent is to stand by my

17     opinions as recited in my report, including that

18     statement at the top of Page 23.

19     BY MR. SIGLER:

20         Q.    Okay.  Thank you.

21             Let's go ahead in your report to

22     Paragraph 184, which is on Page 179.

Page 490

1          A.     What paragraph again?

2          Q.     184.

3          A.     Paragraph 184.

4          Q.     On Page 79.

5          A.     Oh, sorry.  I'm there.

6          Q.     Okay.  And in the second sentence in

7     that paragraph, it states, "As I have explained

8     elsewhere in this report, certain of the asserted

9     claims, as claimed, require non-hierarchical

10    cluster composition, while others, like claims

11    17, 23, 24, and 30 of the '978 patent, do not."

12                Do you see that, sir?

13         A.     Yes.

14         Q.     Okay.  Is it your opinion that the

15    asserted claims here, except for Claims 17, 23,

16    24 and 30, of the '978 patent require

17    nonhierarchical cluster composition?

18                MS. HOANG:  Objection; vague.

19        Misstates the evidence.

20         A.     So I was referring to Claims 17, 23,

21    24, and 30 of the '978 patent here in an

22    exemplary way.  And when I was referring here to

Page 491

1    a nonhierarchical cluster composition, I was

2    using that as a shorthand for nonhierarchical

3    cluster composition for the organizational

4    structure among data location servers.

5              So to be precise, as I opined back

6    in the sections we were just in, there are

7    certain claims of the patents-in-suit that

8    require nonhierarchical cluster topology for the

9    data location server network or the relationships

10   between data location servers, but that does not

11   apply to all of the claims, nor does it apply to

12   the terms "system" or "network" generally.

13        Q.   Okay.  Does that apply to all of the

14   asserted claims except for Claims 17, 23, 24, 30

15   of the '978 patent?

16              MS. HOANG:  Objection; vague.

17        Misstates evidence.

18        A.   No, for example, that also does not

19   apply to Claim 6 of the '978 patent, which I

20   understand is also a -- an asserted claim.

21   BY MR. SIGLER:

22        Q.   Any other claims?

Page 492

1      A.    Yeah, I think that's it, again just

2   with respect to that term "data location server

3   network" or the organizational structure between

4   data location servers as I've opined in my

5   report.

6      Q.    Okay.  Let's go ahead to Paragraph

7   185 on the next page.

8      A.    I'm there.

9      Q.    All right.  Towards the middle of

10  that paragraph, there is a sentence that says, "I

11  disagree."

12          Do you see that?

13     A.    Yes.

14     Q.    All right.  And then in the next

15  sentence, your report says, "Had Mr. Greene

16  analyze the actual claim language, he would have

17  seen that the limitations of asserted claims and

18  the structure relationships among them provide

19  clear indication to a POSITA that, for example,

20  in claim 1 of the '170 patent, the claimed

21  location servers are necessarily arranged in a

22  non-hierarchical structure so as to enable each

Page 493

1    location server in the claimed network have the

2    capability of determining the location of the

3    requested information based on applying a hash

4    function."

5            Do you see that sentence, sir?

6        A.    Yes.

7        Q.    Okay.  So in your view, Claim 1 of

8    the '170 patent requires that the location

9    servers are necessarily arranged in a

10   nonhierarchical structure, right?

11       A.    Yes.  Now, this is with respect to

12   this language, again, from the plain text of

13   Claim 1 of the '170 patent, where it says that it

14   has a data location server network comprising a

15   plurality of data location servers where each one

16   of the plurality of data location servers

17   comprises a processor and a portion of the data

18   location information.  The portion of the data

19   location information included in a corresponding

20   one of the data location servers is based on hash

21   function used to organize the data location

22   information across the plurality of data location

Page 494

1    servers.  And each one of the data location

2    servers is configured to determine at least one

3    of the plurality of data location servers based

4    on the hash function applied to the identifier

5    string.

6              So it's again straight from the

7    plain language of the claim that a person of

8    ordinary skill in the art would understand that

9    the way that type of a hash function is used, as

10   claimed, requires that the data location servers

11   and the data location server network are

12   organized in a nonhierarchical structure.

13        Q.    Okay.  And as you say in your

14   report, the location servers are necessarily

15   arranged in a nonhierarchical structure because

16   they need to enable each location server to have

17   the capability of determining the location of the

18   requested information based on applying a hash

19   function, right?

20        A.    That's right.

21        Q.    Okay.  So you're basing your view

22   that that claim requires a nonhierarchical

Page 495

1    structure on the presence of that hash function

2    requirement in the claim, right?

3              MS. HOANG:   Objection; vague.

4         A.    At a high level, that's more or less

5    right, that it's because of that language that a

6    person of ordinary skill in the art would

7    understand that that implies that the data

8    location servers and the data location server

9    network are organized in a nonhierarchical

10   cluster topology.

11        Q.    Okay.  And let's go ahead to

12   Paragraph 189 where you talk about that some

13   more.  In the third sentence of Paragraph 189,

14   you state that "A POSITA would understand that

15   the particular hash function limitations of

16   claims 1, 2, and 12 of the '170 Patent, claim 6

17   of the '978 Patent, and claim 24 of the '640

18   Patent imply a non-hierarchical topology for the

19   location servers, and this is supported by the

20   specifications of the Patents-in-Suit."

21              Do you see that, sir?

22        A.    I do see that.

Page 496

1          Q.     And here, you're expressing the

2     opinion that those claims imply a nonhierarchical

3     topology, right?

4          A.     Unfortunately, this is one of those

5     typos.  This does not actually apply to Claim 6

6     of the '978 patent, but it does apply to the

7     others.

8          Q.     Okay.  And with respect to those

9     other claims that you specify here in Paragraph

10    189, it's your view that the language of those

11    claims implies a nonhierarchical for location

12    servers, right?

13         A.     That's right.

14         Q.     And you actually go on in the next

15    sentence to state, "For example, a POSITA would

16    understand that, unlike binary search trees,

17    B-trees and T-trees, in the context of the

18    Asserted Claims, use of a hash function implies a

19    non-hierarchical topology."  Right?

20         A.     That's right.  The way that this

21    particular type of a hash function is applied,

22    according to the way the language of the claims

Page 497

1    requires, that then in turn requires a

2    nonhierarchical topology for the data location

3    servers.

4          Q.    Does the language of those claims

5    require a nonhierarchical topology for the

6    location servers or imply it?

7          A.    I'm -- I'm not a lawyer.  I am not

8    understanding the distinction between those two

9    in your question.

10         Q.    You don't -- you don't see any

11   distinction between the two words "require" and

12   "imply" in the English language?

13         A.    I mean, they're different words, but

14   in the context of the claims, I'm not quite

15   following your question.

16               So I believe that that is required

17   for something to satisfy those claims.  Again,

18   with this type of Claim 6 of the '978 patent is

19   not included.

20         Q.    Okay.  And you believe that

21   nonhierarchical topology of the location servers

22   is required due to the presence of this hash

Page 498

1    function in the claims, right?

2        A.    The way the hash function is recited

3    in those claims.  Not just any hash function but

4    the particular way that in each of those claims a

5    hash function is recited requires a

6    nonhierarchical topology for the data location

7    servers.

8        Q.    Okay.  And if asked at trial, would

9    you present this opinion to the jury that those

10   claims require a nonhierarchical topology for the

11   location servers?

12            MS. HOANG:  Objection; vague.  Calls

13      for speculation.

14       A.    If I'm given the opportunity to

15   testify at trial about these claims, again, with

16   the caveat that this does not apply to Claim 6 of

17   the '978 patent, I intend to stand by what I've

18   said here and shared with you today.  That's

19   exactly what we've been saying.

20   BY MR. SIGLER:

21       Q.    Okay.  And on the basis of your

22   opinion that these claims require a

Page 499

1  nonhierarchical topology for the location

2  servers, will you offer the opinion at trial that

3  prior art disclosing hierarchical topology for

4  location servers doesn't meet the limitations of

5  these claims?

6           MS. HOANG:  Objection; vague.  Calls

7     for speculation.  Foundation.

8       A.  If given the opportunity at trial to

9  rebut and respond to opinions of Dr. Greene with

10  respect to any of these claims, I intend to stand

11  by my opinions as disclosed here, with the caveat

12  that it does not apply to Claim 6 of the '978

13  patent; that because of the particular way that

14  the hash function limitations are recited in

15  these claims, that they indeed require a

16  nonhierarchical topology for data location

17  servers; hence, any prior art that discloses a

18  hierarchical topology for what Mr. Greene is

19  identifying as "data location servers," would not

20  invalidate the patents-in-suit.

21       Q.  Okay.  Thank you.

22           Let's move on to -- well, actually

Page 500

1     before we do that.

2              Do the specifications of the three

3     patents-in-suit explain that the hash function

4     limitation in these claims requires a

5     nonhierarchical topology for the data location

6     servers?

7              MS. HOANG:  Objection; vague.

8         A.    It's more that the -- it's the claim

9     language itself that requires these elements that

10    I've been explaining this morning.

11             The specification, of course, you

12    know, provides the support for that, but it is

13    the claims themselves that require it, in my

14    opinion.

15    BY MR. SIGLER:

16        Q.    Okay.  So -- and you're basing your

17    opinion on the language of the claims and what a

18    person of ordinary skill in the art would

19    understand them to mean, right?

20        A.    Yes, that is correct.

21        Q.    Okay.  Is it possible for a location

22    server to satisfy the hash function limitations

Page 501

1    if the location servers are structured

2    hierarchically?

3              MS. HOANG:  Objection; vague.

4        Incomplete hypothetical.  Calls for

5        speculation.

6        A.    One of the reasons why I was sort of

7    flagging Claim 6 of the '978 patent is that it

8    recites a hash function limitation that, in my

9    opinion, does not imply -- or require, that is, a

10   nonhierarchical topology for the data location

11   servers that there could be a hierarchical

12   topology for the data location servers with

13   respect to Claim 6 or a nonhierarchical topology

14   for Claim 6 of the '978 patent.

15       Q.    Okay.  So for Claim 6 of the '978

16   patent, it's your view that a hierarchical

17   topology or a nonhierarchical topology for the

18   data location servers could meet that claim,

19   right?

20       A.    Yes, that is correct.  Because if we

21   go to Claim 6 of the '978 patent, we see that it

22   says:  The system of Claim 1 wherein the location

Page 502

1    information in the location server is maintained

2    in the indexed location store indexed by a hash

3    table.

4              And then Claim 1 does not have any

5    limitations with respect to a hash table or hash

6    function.

7              So what we see here in Claim 6 is

8    that it's limiting the organizational structure

9    on an individual location server that that has to

10   be maintained in an index location store indexed

11   by a hash table, which unlike the hash table or

12   hash function limitations in these other claims

13   that I've identified require a different type of

14   a hash functionality than is claimed here in

15   Claim 6 of the '978 patent.

16        Q.    So in your view, some of the claims

17   in the asserted patents can be met by

18   hierarchical topologies of location servers,

19   right?

20              MS. HOANG:  Objection; vague.

21        A.    Yes, it's possible.  And that's how

22   I perform my analysis.

Page 503

1     BY MR. SIGLER:

2          Q.     Okay.

3          A.     So, for example, Claim 6 of the '978

4     patent does not, in my opinion, require a

5     nonhierarchical cluster topology and neither do

6     Claims 17, 23, 24, or 30 of the '978 patent.

7          Q.     Okay.  And just with reference to

8     the claims you were discussing in Paragraph

9     189 -- with the understanding that Claim 6 of the

10    '978 patent shouldn't be in there -- so for --

11    for Claims 1, 2 and 12 of the '170 and Claim 24

12    of the '640, you don't believe it's possible for

13    a system of location servers to satisfy the hash

14    function limitations in those claims if those

15    location servers are structured hierarchically,

16    right?

17         A.     That's right.  I think that doesn't

18    make sense to a person of ordinary skill in the

19    art.

20         Q.     Okay.  Does the specification

21    explain that it's not possible for a hierarchical

22    network of location servers to practice those

Page 504

1     particular claims?

2               MS. HOANG:  Objection; vague.

3          A.    I believe to a person of ordinary

4     skill in the art, the specification explains the

5     cluster or nonhierarchical topology, the hybrid

6     topology and the hierarchical topology and then

7     explains how you may use hash functions in the

8     disclosed invention for some embodiments.

9               And then the way that it's

10    describing the hash functions use in order to

11    determine a data location server to contact based

12    on an identifier, does inform a person of

13    ordinary skill in the art that that only applies

14    to the nonhierarchical cluster topology

15    structures.

16    BY MR. SIGLER:

17         Q.    Does the specification ever state

18    that it's not possible for a hierarchical network

19    of location servers to practice the hash function

20    claims?

21              MS. HOANG:  Objection; vague.

22         A.    I don't recall it saying negatively

Page 505

1    that that's not possible, but, instead, that it

2    discloses those topologies and then explains the

3    way that the hash function works, in a way that

4    in my opinion informs a person of ordinary skill

5    in the art that that only applies to the

6    nonhierarchical cluster topologies for data

7    location servers, because of the way that that is

8    explained in the patents.

9              And, indeed, just the way that hash

10   functions work generally, a person of ordinary

11   skill in the art would understand that the way

12   that then hash function functionality is recited

13   in those claims, again, not Claim 6 of the '978

14   patent, requires that the data location server

15   topology be nonhierarchical.

16   BY MR. SIGLER:

17        Q.    The specification network connects

18   the hash functions to the architecture, right?

19              MS. HOANG:  Objection; vague.

20        A.    Could you repeat the question,

21   please?

22   BY MR. SIGLER:

Page 506

1          Q.     The specification network connects

2     the hash function to the architecture, right?

3               MS. HOANG:  Same objection.

4          A.     I disagree.  I think that the way

5     that the hash function embodiments are explained,

6     for example in the '978 patent, in Claim 17 from

7     Lines 15 to 67 and then in the very next page,

8     then talks about the hybrid constellations, the

9     hierarchical cluster topologies indeed is a

10    connection.  It's the very next page.

11    BY MR. SIGLER:

12         Q.     Okay.  Let me ask you this:  Does

13    the specification state that it's not possible to

14    use the claimed redirect messages in a

15    hierarchical network?

16              MS. HOANG:  Objection; vague.

17         A.     Could you repeat the question,

18    please?

19    BY MR. SIGLER:

20         Q.     Does the specification state that

21    it's not possible to use the claimed redirect

22    messages in a hierarchical network?

Page 507

1          MS. HOANG:  Same objection.

2          A.    Yes.  So if we go, for example, in

3     the '978 patent, now to the discussion in Column

4     18, beginning at Line 60, and going through 25,

5     that then is now talking about the hybrid

6     hierarchical and clustered topologies in Column

7     19.  Right before that it talks about the

8     redirect messages and how there's a

9     client-centric approach and a server-centric

10    approach.  These are different embodiments that

11    are disclosed in the patent.  And the first one,

12    the client-centric approach, is now the one that

13    is being recited in the claims; namely, that a

14    client issues a request to a data location

15    server.  If it does not have the correct

16    information, it sends back an answer for the

17    client for it to then contact another server.

18    And then it says:  A successful response from the

19    second server 120b is then sent to the client.

20    Arrow 4.  This is with respect to Figure 19 in

21    the '978 patent.

22                And then it goes on to describe a

Page 508

1    server-centric approach that could apply to a

2    hierarchical topology.

3            And then it goes on and explains in

4    more detail the difference between hybrid,

5    hierarchical, and cluster topologies; hence, to a

6    person of ordinary skill in the art who is

7    reading this, would understand that that

8    server-centric approach could be used would

9    involve things that could be called "redirect

10   messages," but now in a server-centric way where

11   it's forwarding those requests on to another

12   server, say, higher or lower in a hierarchy, that

13   then it says:  An important aspect of this

14   topology -- I'm now reading in Column 19 at Line

15   20 -- An important aspect of this topology is

16   that it pushes processing emphasis towards

17   servers 130 A, B rather than towards clients.

18        Q.   Okay.  So in your view, certain

19   embodiments disclosed in the specification only

20   apply to --

21            MR. SIGLER:  Well, strike that.

22   BY MR. SIGLER:

Page 509

1          Q.     So in your view, specific

2     embodiments disclosed in the specification only

3     apply to specific claims, right?

4                 MS. HOANG:  Objection; vague.

5          Mischaracterizes testimony.

6          A.     I'm sorry.  I'm not understanding

7     your question.

8     BY MR. SIGLER:

9          Q.     Well, you seem to be telling me that

10    a particular embodiment disclosed in the

11    specification only applies to certain claims in

12    the patent; is that -- is that correct?  Am I

13    understanding you correctly?

14                MS. HOANG:  Objection.  Misstates

15         testimony.

16         A.     No, that doesn't sound accurate.

17    Instead what I'm saying -- it sounded like you

18    were asking me -- maybe I misunderstood your

19    question -- line of questioning from the

20    beginning.

21                But it sounded like you were asking

22    me that, you know, does the claimed invention in

Page 510

1　each of these claims find support from the

2　specification with respect to this specificity

3　of, in some instances, requiring a

4　nonhierarchical cluster topology.

5　　　　　　　　And my answer is yes, there is

6　support for that, and I just read you portions

7　where there are embodiments where that is

8　required, that that would be understood, as

9　required by a person of ordinary skill in the

10　art.

11　　　　　　　　And then I'm acknowledging, as you

12　asked, that there are other embodiments in the

13　patent that talk about hierarchical topologies

14　and how those also could be having these kind of,

15　like, redirection type of a message.  But that's

16　not the claimed type of redirection message

17　because in those hierarchical ones, the server

18　just passes onto another server which passes

19　potentially onto yet another server looking for

20　the answer, whereas in the recited redirect

21　messages, the response that's coming back has the

22　correct answer.

Page 511

1    BY MR. SIGLER:

2          Q.    Okay.  So the specification does

3    disclose hierarchical topologies that have

4    redirection messages, right?

5          A.    Yes, just not the claimed type of

6    redirection message.

7          Q.    Okay.  And going back to Column 19,

8    Line 7, and there, it's discussing the

9    server-centric approach, right?

10          A.    Yes.

11          Q.    And in that approach, it says that

12    the server receives a request from a client,

13    right?

14          A.    Yes.

15          Q.    And looking ahead in the

16    specification -- can you go to Column 25, please?

17          A.    I am there.

18          Q.    And at Line 15, the specification

19    says:  It is to be understood that a wide range

20    of changes and modifications to the embodiments

21    described above will be apparent to those skilled

22    in the art and are contemplated.  It is therefore

Page 512

1     intended that foregoing detailed description be

2     regarded as illustrative rather than limiting and

3     that it be understood that is the following

4     claims, including all equivalents, that are

5     intended to follow the spirit and scope of the

6     invention.

7              Do you see that, sir?

8        A.   Yes.

9        Q.   And did you consider that portion of

10    the specification in your analysis?

11       A.   Yes, absolutely.

12       Q.   Okay.  Let's go back to -- well,

13    before I go on to Paragraph 191 in your report,

14    do the redirect claims in the patents allow for

15    hybrid constellations?

16              MS. HOANG:  Objection; vague.

17       Foundation.

18       A.    It depends what you mean by that

19    question.  So if by your question, you're saying

20    can the redirect -- the claims that have redirect

21    messages in them apply to hybrid constellations,

22    the answer is yes, with respect to the components

Page 513

1    that are themselves nonhierarchical clustered

2    topologies.

3              So, for example, if we look at -- we

4    had before looked at Figure 21.  Maybe now we can

5    look at Figure 6 in the '978 patent.  And in

6    Figure 6 of the '978 patent, we see a hybrid

7    topology (indicating) where there are two

8    components.  I think they are both marked as 54

9    or 50, depending how you see the arrows -- no --

10   50, they both are marked as 50, but they are

11   clustered topologies.

12             So inside any of these 50

13   components, they could, you know, use and are

14   capable of doing the type of redirect message in

15   the claims.  But the overall, you know, other

16   nodes, such as Node A0, C0, D0, they cannot.  So

17   it's a limited -- when of course in the hybrid,

18   that's always going to be true, right, that

19   there's going to be some things that could do it

20   because they satisfy the requirements and others

21   that do not.

22   BY MR. SIGLER:

Page 514

1          Q.    Right.  In a hybrid technology,

2    there would be hierarchical elements and

3    nonhierarchical elements, right?

4          A.    Exactly.  I think that's what is

5    meant by "hybrid" in this context.

6          Q.    Okay.  And the claims that have

7    redirect messages in them apply to hybrid

8    constellations, right?

9               MS. HOANG:  Objection; vague.  Lacks

10        foundation.

11         A.    Yes, with respect to this -- the

12   components that are themselves nonhierarchical

13   (indicating), it would not apply to a hybrid

14   constellation overall, but just inside each

15   component that is itself a nonhierarchical

16   clustered topology.

17   BY MR. SIGLER:

18         Q.    Okay.  Let's go to Paragraph 191 of

19   your report, please.

20         A.    I am there.

21         Q.    Okay.  And in the first sentence, of

22   Paragraph 191, you state, "A POSITA would also

Page 515

1    understand that redirect message limitations of

2    claims 6, 8, 12, and 15 of the '170 Patent,

3    claims 3, 10, and 14 of the '978 Patent, and

4    claims 17, 18, and 24 of the '640 Patent imply a

5    non-hierarchical topology for the location

6    servers, and this is supported by the

7    specifications and claims themselves."

8              Do you see that, sir?

9        A.    Yes.

10       Q.    Okay.  So it's your opinion that the

11   redirect message limitations in these claims

12   recited in Paragraph 191 imply a nonhierarchical

13   topology for the location servers, right?

14       A.    Yes, I agree with that.

15       Q.    Okay.  And here, are you using --

16             MR. SIGLER:  Well, strike that.

17   BY MR. SIGLER:

18       Q.    Is it your opinion that the redirect

19   message limitations of the claims enumerated in

20   Paragraph 191 require a nonhierarchical topology

21   for the location servers?

22       A.    As I mentioned earlier, I'm not an

Page 516

1    attorney, so I'm not quite following what you

2    think is the difference between "imply" and

3    "require."

4              When I say "imply" here, I mean the

5    logical implication, the way that a person of

6    ordinary skill in the art would use that word.

7    Hence, it would require that to be true, in this

8    case, that the location servers are organized in

9    a nonhierarchical topology, again, just for the

10   location servers themselves.

11        Q.   Okay.  So you're using "imply" here

12   to mean the same thing as "require," right?

13        A.   As I mentioned, I'm not an attorney,

14   so I don't understand what you mean as a

15   distinction between "imply" and "require."

16              I'm using it in the same way that a

17   person of ordinary skill in the art would use it

18   here, that is, that "imply" is a logical

19   implication.

20        Q.   Okay.  Have you heard --

21              MR. SIGLER:  Well, strike that.

22   BY MR. SIGLER:

Page 517

1　　　　　Q.　Does --

2　　　　　　　MR. SIGLER:　Strike that, too.

3　BY MR. SIGLER:

4　　　　　Q.　Do you believe it's -- it's not

5　possible for a location server to achieve the

6　knowledge necessary to complete the claimed

7　redirect messages if the location servers are

8　structured hierarchically?

9　　　　　　　MS. HOANG:　Objection; vague.

10　　　　　A.　I'm not -- I'm not following your

11　question.　I'm sorry.　What -- what do you mean

12　by "knowledge"?

13　BY MR. SIGLER:

14　　　　　Q.　Well, let me ask you this:　You

15　believe it's not possible for a hierarchical

16　network of location servers to practice these

17　redirect message limitations, right?

18　　　　　A.　I think the way that I would say it

19　instead is that with respect to all of the

20　alleged prior art that Mr. Greene identifies,

21　much of it involves what he calls data location

22　servers that are organized in logical

Page 518

1    hierarchies.  And so far for every single one of

2    those that I've seen, they do not disclose or

3    suggest the redirect messages as claimed in these

4    claims.

5          Q.    And that's because they are

6    hierarchical, in your view?

7          A.    That's part of the reason, but it

8    also goes into the details of how they function,

9    each single one of them.  So I -- it's hard for

10   me, just sitting here today, to think about every

11   possible way.

12               That would take more time for me to

13   do such an exhaustive analysis, but instead I

14   understood my task was to respond to Mr. Greene's

15   report.  And in that case, every single one of

16   the alleged prior art references that he

17   identifies that has a hierarchical structure for

18   what he calls data location servers, they do not

19   disclose or suggest this type of a redirect

20   message.

21         Q.    But you've also expressed the

22   opinion that the redirect message limitations in

Page 519

1    '170, Claims 6, 8, 12, and 15, '978 Claims 3, 10,

2    and 14 and '640 Claims 17, 18, and 24 require a

3    nonhierarchical topology for their location

4    servers, right?

5         A.    That's right.

6         Q.    Okay.  And you've applied that

7    requirement in distinguishing the prior art here,

8    right?

9         A.    That's also true, yes.

10        Q.    And you've applied that requirement

11   on behalf of Kove in opinions submitted to the

12   patent office where you distinguished prior art,

13   correct?

14        A.    Yes, that's also true.

15        Q.    Okay.  And you've applied --

16              MR. SIGLER:  Well, strike that.  Let

17      me move on.

18   BY MR. SIGLER:

19        Q.    Let's go to Page 12 of your report,

20   where you talk about priority dates.

21              Are you there, sir?

22        A.    I'm at Page 12.  I'm not seeing

Page 520

1    anything --

2         Q.    I meant Paragraph 12.  It's on Pages

3    3 and 4.

4         A.    Oh.  Yes, I'm at Paragraph 12.

5         Q.    Okay.  And you have a chart here in

6    Paragraph 12?

7         A.    That's right.

8         Q.    Do you see that?

9               And you say in Paragraph 12 in the

10   second sentence, "And, as explained in Section

11   VIII of my July 6, 2023 Corrected Opening Expert

12   Report, I have determined that the inventions

13   described in the Asserted Claims of the Asserted

14   Patents are entitled to the dates of invention

15   shown in the table below."

16              Do you see that, sir?

17        A.    Yes.

18        Q.    And so in the table, the earliest

19   date of invention that you identify is

20   October 28, 1999, correct?

21        A.    Yes, that is correct.

22        Q.    And you haven't offered any opinion

Page 521

1    that any of the asserted claims are entitled to a

2    date earlier than October 28, 1999, right?

3         A.    I don't recall having an opinion

4    besides what I'm saying here at the beginning of

5    Paragraph 12, that it -- namely, that the

6    priority dates claim for each of the '640, '978,

7    and '170 patents can be as early as July 8, 1998.

8    But then for the sake of this analysis I'm doing

9    here in my rebuttal to Mr. Greene with respect to

10   the validity of the patents, I used, for the sake

11   of my analysis, the dates I show in this table on

12   the top of Page 4.

13        Q.    Okay.  And you haven't offered an

14   opinion in your reports that any of the asserted

15   claims are entitled to a priority date as early

16   as July 8, 1998, correct?

17        A.    I don't recall besides that

18   statement at the beginning having other places in

19   my report where I address that.

20             If you believe there are, I can go

21   there and talk about that, but I don't recall

22   that, sitting here today.

Page 522

1              It was sufficient for my analysis,

2     in any case, to use the dates shown here in the

3     table on the top of Page 4.

4         Q.    All right.  And you're -- the

5     priority date you used in your analysis of all of

6     the asserted claims except the transfer claims is

7     October 28, 1999, right?

8         A.    Yes.  If by "transfer claims" you're

9     referring to Claim 17, 23, 24, and 30 of the '978

10    patent.

11        Q.    Okay.  And you conclude --

12             MR. SIGLER:  Well, strike that.

13    BY MR. SIGLER:

14        Q.    The priority dates you've applied

15    for those claims in the '978 patent, Claims 17,

16    23, 24, and 30, is June 2nd, 2000, right?

17        A.    Yes, that's correct.

18        Q.    Okay.  And you also analyzed what

19    the person of ordinary skill in the art would be

20    here, correct?

21        A.    I did.  Yes.

22        Q.    What date did you use for analyzing

Page 523

1    what a person of ordinary skill in the art would

2    be in this case?

3         A.    In that case, it was the priority

4    date for each of the asserted claims with respect

5    to this table on the top of Page 4.

6         Q.    Would your analysis of the person of

7    ordinary skill in the art have changed if you

8    used the July 8, 1998, date?

9              MS. HOANG:  Objection.  I think you

10        misstated that.  Or maybe you didn't.  Never

11        mind.  Withdrawn.

12        A.    I would use the same definition that

13   I give here in Paragraph 13, even if the priority

14   dates were determined to be July 8, 1998, for any

15   of the asserted claims.

16   BY MR. SIGLER:

17        Q.    And would you also have used the

18   same definition that you gave here in Paragraph

19   13 if the priority date were determined to be

20   sometime in 1996, for example?

21             MS. HOANG:  Objection; calls for

22        speculation.

Page 524

1          A.     I don't recall having been asked

2     that question.

3                Is there a place in my report where

4     you feel like that issue came up?

5     BY MR. SIGLER:

6          Q.     No.  I'm just asking you, sitting

7     here today, would your analysis have changed if

8     the priority date would have been in 1996?

9                MS. HOANG:  Objection; calls for

10        speculation.

11         A.     Yeah.  I'd want more time to think

12    about that for 1996.  But certainly within, you

13    know, plus or minus one year of the priority

14    dates that I'm considering, I think this is the

15    appropriate definition of a person of ordinary

16    skill in the art.

17                But if we're starting to stray too

18    far either into the future or the past, I would

19    want to have more time to think about that.

20    BY MR. SIGLER:

21         Q.     Okay.  And that analysis would apply

22    if the priority date for all of the claims were

Page 525

1    in 2000, right?

2           MS. HOANG:  Objection; vague.

3      A.   As I just said, I believe that this

4    analysis that I did with respect to a person of

5    ordinary skill in the art, would still apply even

6    if the priority date was determined to be, like I

7    said, plus or minus one year.

8           So, for example, the patents that

9    have a date of invention of October 28, 1999,

10   that would also carry into 2000.

11      Q.   All right.  Thank you for that, sir.

12          You know what an ex parte

13   reexamination is, right?

14      A.   Yes, I've been included on

15   interviews into some of them.

16      Q.   You've participated in interviews in

17   ex parte reexaminations related to the patents in

18   this case, right?

19      A.   Yes, that is correct.

20          (Whereupon, Exhibit 21, Ex parte

21     examination request, was marked for

22     identification.)

Page 526

1    BY MR. SIGLER:

2         Q.    I'm going to pass you what I marked

3    as Exhibit 12 -- excuse me -- Exhibit 21.  I

4    apologize.

5         A.    Thank you.

6         Q.    You're welcome.

7               And on the front cover of

8    Exhibit 21, do you see that there is an

9    application number there.  It states 90/014,552?

10        A.    I do.

11        Q.    And there's a mail date of

12   September 9, 2020, right?

13        A.    Yes, I see that.

14        Q.    Okay.  And if you turn over to the

15   second page of the document, there's a -- in the

16   top left portion, it identifies the third-party

17   requester's correspondence address?

18        A.    I see that.

19        Q.    And do you see the third-party

20   requester is identified as Aneeta Mishra?

21        A.    I do see that.

22        Q.    The third-party requester for this

Page 527

1    particular third-party reexamination is not

2    Amazon, right?

3          A.    I don't know who Aneeta Mishra is or

4    who she works for.

5          Q.    Okay.  So you don't know if Amazon

6    filed this particular reexamination request?

7          A.    I cannot determine it based on the

8    name Aneeta Mishra.

9          Q.    Did you do any work on this

10   reexamination for Kove?

11         A.    I worked on some.  I'm not recalling

12   if it was this one or not, as I sit here today.

13         Q.    Okay.  Okay.  You can put that

14   aside.

15              MR. SIGLER:  And actually we're a

16        little short of an hour.  I'd like to go on a

17        break and pull out some more documents.

18              THE WITNESS:  It's fine with me.

19              THE VIDEOGRAPHER:  The time right

20        now is 11:40 a.m.

21              And we're off the record.

22              (Recess taken.)

Page 528

1             THE VIDEOGRAPHER:  The time right

2       now is 11:49 a.m.

3             We're back on the record.

4             (Whereupon, Exhibit 22, Ex Parte

5       Reexamination Interview Summary, was marked

6       for identification.)

7   BY MR. SIGLER:

8       Q.    Dr. Goodrich, I put Exhibit 22 in

9   front of you there during the break.

10            Do you have that?

11      A.    I do.  I have it in front of me now.

12      Q.    Okay.  And do you see on the --

13  let's go to the third page of the document,

14  please.

15            Do you see that it's -- it says "Ex

16  Parte Reexamination Interview Summary" on the

17  left upper corner?

18      A.    I do.

19      Q.    This is the Re-examination Control

20  No. 90/019,035?

21      A.    I see that.

22      Q.    And the patent under reexamination

Page 529

1      is the '170 patent, right?

2            A.    I see that too.

3            Q.    And did you participate in this

4      interview, sir?

5            A.    I remember participating in at least

6      one.  This may have been it.

7            Q.    Okay.  And do you see it says that

8      the date of the interview is July 21, 2022?

9            A.    I do see that.

10           Q.    And right below that, it says that

11     it was by videoconference, right?

12           A.    Yep.

13           Q.    All right.  And do you see where it

14     says:  Identification of prior art discussed?

15           A.    Yes.

16           Q.    And it says Oracle there?

17           A.    Yes.

18           Q.    All right.  Do you understand that

19     to be the OracleNamesGuide?

20           A.    If it's the one I participated in,

21     then that, I think, was one of the alleged prior

22     art references.

1          Q.     And if you turn over to the back

2     page, there is some references to the

3     OracleNamesAdministrativeGuide, right?

4          A.     Where are you now?

5          Q.     On the next page.

6          A.     The next page.  Sorry, not finding

7     it.  Where on the next page?

8          Q.     In the final paragraph, there is a

9     cite to OracleNamesAdministrative --

10    AdministrationGuide, Page 137, right?

11         A.     Yes, I see that now.

12         Q.     Okay.  And going back to the prior

13    page we were looking at, do you see slightly

14    above the middle of the page, it says:  Agreement

15    with respect to the claims?

16         A.     I do see that.

17         Q.     And it says that agreement was not

18    reached, right?

19         A.     I see that box has been checked.

20         Q.     And -- okay.  And -- okay.  You can

21    put that aside.

22         A.     Okay.

Page 531

1              MR. SIGLER:  We can mark the next

2        exhibit.

3              (Whereupon, Exhibit 23, Ex Parte

4        Reexamination Interview Summary, was marked

5        for identification.)

6    BY MR. SIGLER:

7        Q.    Here's Exhibit 23, sir.

8        A.    I have that.

9        Q.    All right.  If you go to the third

10   page, again, do you see that this is an ex parte

11   reexamination interview summary?

12       A.    I do.

13       Q.    And it was in the Control No.

14   90/019,036 reexamination, right?

15       A.    Yes.

16       Q.    And it identifies the '640 patent,

17   right?

18       A.    I agree.

19       Q.    Okay.  And the date of the interview

20   is identified as July 21, 2022, right?

21       A.    That's right.

22       Q.    That's the same date as we saw on

Page 532

1    Exhibit 22, right?

2          A.    Yep.

3          Q.    Okay.  This identifies that it was a

4    telephonic interview, right?

5          A.    That box has been checked on this

6    page.

7          Q.    Okay.  Do you recall participating

8    in this interview?

9          A.    I don't recall if I was on this one

10   or not, just sitting here today.

11         Q.    Okay.  Was this the same interview

12   as the videoconference interview identified in

13   Exhibit 22?

14              MS. HOANG:  Objection; lacks

15      foundation.

16         A.    It's on the same day, but it's for a

17   different patent.

18              I'm not understanding your question.

19   BY MR. SIGLER:

20         Q.    Okay.  This -- this -- this

21   particular interview summary identifies

22   participants, right?

Page 533

1        A.    It identifies participants, yes.

2        Q.    Okay.

3        A.    But there are different sets of

4  participants.

5        Q.    Okay.  Mr. Overton is identified as

6  a participant, right?

7        A.    Yes, in both.

8        Q.    And Kove's attorneys Ms. Hoang and

9  Mr. Hasan are identified as participants, right?

10       A.    Yes, they are both on -- on both

11  pages.

12  BY MR. SIGLER:

13       Q.    Okay.  And then examiners from the

14  patent office are identified as participants,

15  right?

16       A.    Oh, yeah, but they list the

17  different ones.

18       Q.    Okay.  And Amazon wasn't represented

19  at this interview with the patent office

20  examiners, right?

21         MS. HOANG:  Objection; foundation.

22       A.    What do you mean by "represented"?

Page 534

1    BY MR. SIGLER:

2         Q.    Were there any Amazon lawyers at

3    these interviews?

4              MS. HOANG:  Objection; foundation.

5         A.    I am not an attorney so what you

6    mean by "represented" or present or here.

7              I notice your law firm is listed as

8    the one who is the third party on the second page

9    in both of these.

10   BY MR. SIGLER:

11        Q.    Okay.

12        A.    So to the degree that that implies

13   participation -- again, I'm not an attorney, but

14   that -- that seems to imply that there's some

15   relationship from, at least your law firm,

16   involved.

17        Q.    And you can't recall whether you

18   participated in either one of these interviews?

19        A.    I do recall being part of at least

20   one re-exam interview with respect to at least

21   one of the patents-in-suit.  I'm not recalling

22   the exact which one, though, as I sit here today.

Page 535

1        Q.    All right.  And did you -- did you

2  speak at the interview that you attended?

3        A.    I recall speaking at the interview I

4  did attend.  I recall it being on

5  videoconference, if that helps, yes.

6        Q.    What did you speak about?

7        A.    I generally tried to convey to the

8  examiner and the others on the call that -- or on

9  the videoconference that, you know, what the

10  claims of the patent I was opining about mean.

11  And in this case, in my opinion, the

12  OracleNameServer guide does not disclose or

13  suggest the claims that were at issue in that

14  re-exam.

15        Q.    Okay.  Was Mr. Greene at the

16  interview that you participated in?

17        A.    I don't recall Mr. Greene being

18  there.

19        Q.    So he didn't have the opportunity to

20  explain what he believed the claims of that

21  patent required?

22            MS. HOANG:  Objection; vague.  Lacks

Page 536

1          foundation.  Calls for speculation.

2              A.    Again, I'm not an attorney, but I

3      don't know what you mean by "given the

4      opportunity."  I don't know who is allowed to be

5      at these meetings and who's not.  I'm not an

6      attorney.

7                    I know that I was invited and that

8      seemed to be approved.  I don't know whether

9      Mr. Greene was invited, could have been invited.

10     I -- I don't know that.

11     BY MR. SIGLER:

12             Q.    Okay.  And when you -- in the

13     interview you did attend, did you use any

14     materials during your discussion?

15             A.    My recollection is that there were

16     some demonstratives that I used during my

17     discussion, during that interview.

18             Q.    Okay.  Were they demonstrative

19     slides?

20             A.    That's my recollection.  They were

21     slides like in a PowerPoint presentation.

22             Q.    Okay.  Who invited you to attend

Page 537

1    that interview?

2         A.    I think it was attorneys for Kove

3    who invited me to participate.  I'm not

4    requiring -- remembering exactly who that was,

5    though.

6         Q.    Okay.  Did Dr. Overton participate

7    in that interview?

8         A.    Yes, as we see here, he's one of the

9    participants.

10        Q.    Okay.  And did --

11              MR. SIGLER:  Well, strike that.

12   BY MR. SIGLER:

13        Q.    Did Stephen Bailey participate in

14   that interview?

15        A.    I don't recall Stephen Bailey being

16   there.  I'm not recalling everyone on the Zoom.

17   I think it was a Zoom.  But just sitting here

18   today, I don't recall Stephen Bailey being on

19   that Zoom.

20        Q.    Did Dr. Overton speak at that

21   interview?

22        A.    I'm not recalling if he spoke or

Page 538

1    not.

2          Q.    Did Dr. Overton speak about the

3    requirements of the claims in his patent in that

4    interview?

5          MS. HOANG:  Objection; vague.  Lacks

6       foundation.  Calls for speculation.

7          A.    I'm not recalling if he spoke or

8    not, just sitting here today.  I do recall, at

9    least at the interview I was on, that I spoke and

10   used slides, but I'm not remembering anything

11   that Dr. Overton may have said or not.

12   BY MR. SIGLER:

13         Q.    Okay.  And when you made your

14   presentation to the patent office, who -- who

15   were you speaking to?

16         A.    I understood that I was speaking to

17   the examiner, and there's like a -- I'm not sure

18   the terms in the patent office, but like a

19   supervisor type of a person that was a part of

20   the PTO as well.  That's who I was directing my

21   discussions to personally, again, just to try to

22   explain, as best I could, what the claims require

Page 539

1    and why, in my opinion, the alleged prior art did

2    not disclose or suggest those claims.

3         Q.    And what did you tell the patent

4    office about the meaning of the claims of the

5    patent?

6              MS. HOANG:  Objection; vague.

7         A.    I'm not recalling the exact words I

8    used.  That was over a year ago now.  Yeah, I'm

9    not recalling those exact words.

10   BY MR. SIGLER:

11        Q.    Okay.  Did Kove's attorneys speak at

12   the interview you attended at the patent office?

13        A.    My recollection is that at least one

14   Kove attorney did speak.

15        Q.    Which one?

16        A.    I believe Ms. Hoang spoke.  That's

17   my recollection.

18        Q.    Okay.  And what did she speak about?

19        A.    I recall her introducing me.  I

20   recall her presenting my credentials at a high

21   level.  I recall her discussing Kove's view and

22   Kove's opinion or Kove's position with respect to

Page 540

1    the claims at issue.  These are high level

2    summaries of what I recall.

3              MR. SIGLER:  Okay.  Let's mark the

4        next exhibit.

5    BY MR. SIGLER:

6        Q.    Here is Exhibit 24.

7              Do you see Exhibit 24 is a

8    declaration by you, sir?

9        A.    I don't see that actually, where is

10   that?

11       Q.    Oh, sorry.

12             MR. SIGLER:  We marked the wrong

13       thing.  Sorry.

14             THE WITNESS:  Oh, you want this

15       back?

16             MR. SIGLER:  Yeah.

17             THE WITNESS:  Okay.  No problem.

18             (Whereupon, Exhibit 24, declaration

19       of Michael Goodrich, Ph.D., was marked for

20       identification.)

21   BY MR. SIGLER:

22       Q.    All right.  Do you have the new

Page 541

1     Exhibit 24 in front of you, sir?

2          A.    I do.

3          Q.    And that is a declaration of Michael

4     Goodrich, Ph.D., right?

5          A.    Yes.

6          Q.    All right.  And if you turn to

7     Page 26.

8          A.    I am there.

9          Q.    You signed this on August 11, 2022,

10    right?

11         A.    Correct.

12         Q.    All right.  And you signed it under

13    penalty of perjury, right?

14         A.    Yes.

15         Q.    Okay.  Okay.  And you see that this

16    is on the cover the patent referenced is the '170

17    patent?

18         A.    Yes.

19         Q.    And that's one of the

20    patents-in-suit in this case, right?

21         A.    That is correct.

22         Q.    And you submitted this declaration

Page 542

1    to the patent office in Reexamination 90/019,035,

2    right?

3          A.    Yes.

4          Q.    And you submitted it in support of

5    Kove's positions in that reexamination, right?

6          A.    I offered my opinions in this case,

7    which did support Kove's position.

8          Q.    Okay.  Let's go to Paragraph 28,

9    please.

10         A.    I am there.

11         Q.    And before we start with

12   Paragraph 28, who wrote this declaration?

13         A.    I am the author of this declaration.

14   Some of the typing was done by me; some of the

15   typing was done by attorneys, which I then

16   edited.  So that comprises my opinions with

17   respect to the issues I was asked to opine on.

18         Q.    Okay.  And in Paragraph 28 you

19   state:  It is my opinion that a POSITA at the

20   time of this invention would understand Claims 1,

21   6, and 15 through various limitations in each of

22   the claims to require a nonhierarchical cluster

Page 543

1    configuration as taught by the '170 patent.

2                Do you see that, sir?

3         A.    Yes.

4         Q.    All right.

5         A.    To be clear, this is in reference to

6    the data location servers --

7         Q.    Okay.

8         A.    -- which is how I then jumped right

9    literally to the next paragraph to provide more

10   specificity.

11        Q.    Okay.  And, thus, in --

12                MR. SIGLER:  Well, strike that.

13   BY MR. SIGLER:

14        Q.    So you told the patent office in

15   this declaration, that Claims 1, 6, and 15

16   require a nonhierarchical cluster configuration

17   of data location servers, right?

18        A.    Yes, I agree.

19        Q.    Okay.  And at the end of that

20   Paragraph 28 you say:  As taught by the '170

21   patent.

22                Do you see that?

Page 544

1        A.     That's right.

2        Q.     What did you mean by the words "as

3   taught by the '170 patent"?

4        A.     What I meant by this is kind of like

5   what we were talking about earlier today, that,

6   in my opinion, a person of ordinary skill in the

7   art just reading the claims, in this case, 1, 6

8   and 15 of the '170 patent, would understand that

9   it requires a nonhierarchical cluster topology

10  for the data location servers.

11             And like we talked about this

12  morning, I believe that is supported from the

13  specification of the '170 patent.

14       Q.     Okay.  Let's forge ahead to

15  Paragraph 61, please, which is on Page 19.

16       A.     I am there.

17       Q.     Okay.  And the sentence starting at

18  the very bottom of Page 19 and going over to the

19  next page states:  Oracle admin describes a

20  hierarchical tree structure and Claim 2 requires

21  a nonhierarchical cluster configuration.

22             Do you see that, sir?

Page 545

1          A.     I do.

2          Q.     So here you told the patent office

3     that in your opinion, that Claim 2 of the '170

4     patent requires a nonhierarchical cluster

5     configuration, right?

6          A.     Yes, because Claim 2 is dependent

7     claim that derives from Claim 1 and Claim 1

8     already required the nonhierarchical cluster

9     topology for the data location servers.

10          Q.     Okay.  And there in that sentence

11     you're differentiating the OracleAdminGuide prior

12     art because it has a hierarchical tree structure,

13     right?

14          A.     In this case, yes, at a high level.

15     That's what I'm describing here.

16          Q.     Okay.  Let's look at Paragraph 64 on

17     the same page.  Paragraph 64 of your declaration

18     states:  Claims 6 and 15 require that a redirect

19     message indicates with specificity and certainty

20     the location server that contains the requested

21     location information.

22                    Do you see that, sir?

Page 546

1        A.    Yes.

2        Q.    Okay.  All right.  And so here you

3    expressed the opinions to the patent office that

4    Claims 6 and 15 of the '170 patent require

5    specificity and certainty in the location server

6    that contains the requested location information,

7    right?

8              MS. HOANG:  Objection; misstates

9        evidence.

10        A.    So Claim 6 is a system claim and

11    Claim 15 is a method claim.

12              So what I'm saying here is that with

13    respect to the system, for Claim 6, that it be

14    capable of performing that redirect message with

15    that type of properties as claimed in Claim 6.

16              And with respect to 15, that the

17    method, when it is performed, that that method

18    must include that redirect message with that type

19    of specificity that I'm describing here at a high

20    level in Paragraph 64.

21    BY MR. SIGLER:

22        Q.    Okay.  And so you're saying here

Page 547

1    that the redirect message in these claims

2    indicates with specificity and certainty the

3    location server that contains the requested

4    location information, right?

5          A.    Yeah, that just comes from the claim

6    language itself.  So, for example, if we go to

7    Claim 6, it says:  The programming logic is

8    further configured to return a redirect message

9    if a location server lacks the location

10   information for the desired entity.  The redirect

11   message comprising a list of at least one other

12   location server known to have the location

13   information for the desired entity.

14         Q.    Do Claims 6 and 15 explain how to

15   achieve that certainty that you refer to here?

16         A.    I'm not following your question.

17   What do you mean?

18         Q.    Well, you say here that Claim 6 and

19   15 require that a redirect message indicates with

20   specificity and certainty, right?

21         A.    Yes.

22         Q.    Do those claims explain how to

Page 548

1   achieve that specificity and certainty that

2   you're referring to here?

3           MS. HOANG:  Objection; vague.

4      A.   I believe they explain with

5   sufficient detail to inform a person of ordinary

6   skill in the art how to either build or perform

7   what is recited in these claims in light of the

8   patent specification.

9           But the requirement is clear, that

10  it says:  A list of at least one other location

11  server known -- and I emphasize "known" when I

12  read it earlier -- to have the location

13  information for the desired entity.

14     Q.   Where in the specification does it

15  tell a person of ordinary skill in the art how to

16  achieve that certainty?

17     A.   Sure.  Yeah, so, for example, if we

18  go in the '170 patent to Column 17, beginning at

19  Line 26, it's describing what it describes as the

20  "client-centric approach."

21          And it says:  The first basic

22  pattern that NDTP supports is driven by the

Page 549

1     client 112, and can be called "client centric."

2     Referring to FIG. 12, a single client (not shown)

3     asks a server 120a in the server constellation

4     110 for operations that the client desires

5     executed (represented by Arrow 1 in FIG. 12).  If

6     the client doesn't receive the data requested, it

7     will -- emphasis "will" -- receive a redirection

8     message or response message (NDTP_RDR_RSP) from

9     the contacted server 120a (Arrow 2).  The client

10    then uses the information it receives to ask

11    another server 120b for the operations the client

12    wants to initiate (Arrow 3).  A successful

13    response from the second server 120b is then sent

14    to the client (Arrow 4).

15         Q.    Okay.  Where does that say anything

16    about certainty?

17         A.    Oh, sorry if you missed it.  The

18    very last sentence of that paragraph says:  A

19    successful response from the second server 120b

20    is then sent.

21         Q.    Okay.

22         A.    So again, it says here that it's a

Page 550

1    successful response that is then sent.  And then

2    if we, for example, go to Figure 12 which is

3    being described there, we see that's -- that's

4    illustrated here in Figure 12, which as I recall

5    was, I think, a part of the demonstrative that I

6    was showing the patent office, for example

7    (indicating).

8        Q.    That Figure 12 is in the

9    demonstratives you presented to the patent

10   office?

11       A.    That's my recollection, something --

12   either Figure 12 itself or something very close

13   to that.

14       Q.    Okay.  Okay.  Where --

15             MR. SIGLER:  Well, strike that.

16   BY MR. SIGLER:

17       Q.    Does this portion of the

18   specification explain how that successful

19   response is achieved?

20       A.    Yes, I mean, I could read it.  It's

21   a lot of stuff, but it starts in the very next

22   line, in Figure 17 -- in Column 17, at Line 37,

Page 551

1    and goes to the next paragraph where it says:

2    NDTP supports two specific redirect mechanisms.

3                  And then that paragraph describes

4    the first mechanism.  Then it says:  The second

5    NDTP redirect mechanism.  And then next paragraph

6    describes that.

7                  And then like we've been saying all

8    day, it says in the next paragraph:  FIG. 12

9    illustrates a cluster topology for client

10   interactions with NDTP servers.

11        Q.    Okay.  So it explains how to be

12   certain by saying that the response is

13   successful?

14                  MS. HOANG:  Objection; misstates --

15        misstates testimony.  Mischaracterizes the

16        evidence.

17        A.    No, instead it says, as I just

18   highlighted, but now I will read from Column 17,

19   Line 38 until Column 18, Line 22.

20   BY MR. SIGLER:

21        Q.    Okay.

22        A.    This design --

Page 552

1       Q.     You don't have to read it.   I'm just

2   going to write that down, and we can -- we can

3   move forward.

4       A.     Okay.

5       Q.     You're identifying Column 17, Line

6   38 to 18:22; is that correct?

7       A.     Yes, that's correct.   And I'm happy

8   to read it into the record because I think that

9   fully answers your question.

10      Q.     You don't have to read it into the

11   record.

12            Let's get back to -- excuse me --

13   yeah, Paragraph 64 of your declaration.

14      A.     Okay.

15      Q.     And we walked through the first

16   sentence of Paragraph 64 together.   Let's talk

17   the rest of it.   That paragraph goes on to say:

18   Claim 15 further requires that the redirect

19   message be transmitted to the client.   Therefore,

20   the redirect message limitations of Claims 6 and

21   15 require a nonhierarchical cluster

22   configuration as taught by the '170 patent.

Page 553

1              Do you see that, sir?

2         A.    Yes.

3         Q.    All right.  So here, you told the

4    patent office that it was your opinion that Claim

5    6 and 15 of the '170 patent require a

6    nonhierarchical cluster configuration, correct?

7         A.    Yes, for the data location server

8    network -- I think it was the network, at least

9    the way that the data location servers are

10   organized amongst themselves.

11             To be clear, I don't immediately see

12   the phrase "data location server network" in

13   Claim 6 and 15, but it does talk about the

14   relationships between the data location servers

15   and what is required in a redirect message, which

16   as I mentioned earlier -- and which is absolutely

17   supported by the specification, requires a

18   nonhierarchical cluster topology for the data

19   location servers.

20        Q.    Okay.  And here in Paragraph 64, you

21   don't reference the data location servers,

22   correct?

Page 554

1          A.     No.  I thought that that was

2    understood from the context, that we're talking

3    about the data location servers themselves, not

4    the entire network or the entire system.

5          Q.     Okay.  And here -- here in Paragraph

6    64, you just say:  Require a nonhierarchical

7    cluster configuration, correct?

8          A.     Right, which, again, I understood

9    from context and I -- I felt personally that the

10   patent office would understand that this applies

11   only to the data location servers because I say

12   it's about a redirect message which only comes

13   from the data location servers, not from any

14   other server.

15         Q.     Do you know if the patent office

16   understood it that way?

17         A.     I don't know how to answer that

18   question about what another entity understood.  I

19   hope they did.  That's literally what I was

20   trying to convey.  I believe I conveyed it

21   correctly, but I can't speak to what they

22   understood.

Page 555

1          Q.    Okay.  Let's go to Paragraph 64,

2     please -- excuse me -- Paragraph 74 on Page 23.

3          A.    I am there.

4          Q.    Paragraph 74, the first sentence

5     says:  Furthermore, Oracle admin describes the

6     hierarchical tree structure in Claims 6 and 15

7     requires a nonhierarchical cluster configuration.

8               Do you see that, sir?

9          A.    That's right.

10          Q.    So you told the patent office here

11     in your declaration that the Oracle prior art

12     doesn't describe what's in Claims 6 and 15

13     because it doesn't disclose a nonhierarchical

14     cluster configuration, right?

15          A.    Yes, at a high level, because the

16     way that the Oracle names works, it does not have

17     that redirect type of a message with -- as it

18     responds with the correct answer.  Instead it

19     passes it on, passes it on.  Does all these extra

20     things.  Does not respond with that certainty I

21     talked about earlier.

22          Q.    Okay.

Page 556

1         A.     And, again, I was opining with

2    respect to the data location servers here when I

3    talk about the hierarchical tree structure or

4    nonhierarchical cluster configuration.

5         Q.     You argued to the patent office here

6    that the OracleAdminGuide was different than

7    these claims of the '170 patent because it used a

8    hierarchical tree structure, right?

9         A.     Right, with respect to the names

10   servers which was allegedly being mapped to the

11   location servers of the claim.

12        Q.     Okay.

13        A.     So in that context, we're talking

14   about name servers versus location servers.  This

15   Paragraph 74, I believe, would be understood to

16   apply to the location servers exclusively.

17        Q.     Okay.  And, again, you don't know

18   whether the patent office understood it that way,

19   right?

20        A.     I cannot speak to what another

21   person understands.  I can only speak to what I

22   tried to convey, and that is literally what I

Page 557

1    tried to convey.

2              (Whereupon, Exhibit 25, declaration

3       of Michael Goodrich, was marked for

4       identification.)

5    BY MR. SIGLER:

6         Q.    Okay.  I'm going to pass you

7    Exhibit 25, which is another one of your

8    declarations.

9         A.    I have it.

10        Q.    And could you go to Page 19, please.

11        A.    I am there.

12        Q.    Is that your signature there?

13        A.    Yes.

14        Q.    And you signed it on -- or excuse

15   me.  You signed it on August 4, 2022, right?

16        A.    That is correct.

17        Q.    And you signed it under penalty of

18   perjury, right?

19        A.    That is also correct.

20        Q.    And you submitted this declaration

21   in support of Kove's positions in the '036

22   reexamination, right?

Page 558

1         A.    So I submitted this declaration to

2  the patent office with my opinions which in this

3  case were in support of Kove's position with

4  respect to 90/019,036.

5         Q.    And that was a reexamination

6  regarding the '640 patent, right?

7         A.    Yes, that's correct.

8         Q.    Okay.  Can you go to Paragraph 30,

9  please?

10        A.    I am there.

11        Q.    Okay.  And in Paragraph 30, you

12  state:  Claims 17 and 18 both require each data

13  location server in the claimed data location

14  network have computer executable code configured

15  to execute certain steps, including transmitting

16  a redirect message to the client containing

17  information by -- information for use by the

18  client to calculate the location of the location

19  server that contains the location string.  It is

20  my opinion that a POSA at the time of this

21  invention would understand this limitation to

22  require a nonhierarchical cluster configuration

Page 559

1    as taught by the '648 patent.

2              Do you see that language there, sir?

3        A.    Yes.

4        Q.    So here, you expressed your opinion

5    that this redirect limitation in Claims 17 and 18

6    requires a nonhierarchical cluster configuration

7    of the location servers, right?

8        A.    Yes, for the data location network.

9        Q.    Okay.  Let's -- you can put that

10   aside.

11             (Whereupon, Exhibit 26, Ex Parte

12        Reexamination Interview Summary, was marked

13        for identification.)

14             MR. SIGLER:  Oh, I'm going to pass

15        you Exhibit 26.  This is the one I passed

16        earlier so you should have a copy of it.

17             THE WITNESS:  Yeah, now it's 26.

18             MS. HOANG:  Got it.

19        A.    I have that in front of me.

20   BY MR. SIGLER:

21        Q.    Okay.  And if you please turn to the

22   third page of the document.

Page 560

1          A.    I am there.

2          Q.    Do you see that this is another Ex

3     Parte Reexamination Interview Summary?

4          A.    Yes.

5          Q.    And this is the summary of an

6     interview conducted in the -- in a reexamination

7     of the '978 patent, right?

8          A.    That is correct.

9          Q.    And it's Reexamination Control No.

10    90/019,034, right?

11         A.    Yes, I see that.

12         Q.    And it says that the date of the

13    interview was September 12, 2022, right?

14         A.    Yes.

15         Q.    Do you recall if you attended this

16    interview?

17         A.    I do recall attending at least one

18    ex parte re-exam interview.  I don't recall if

19    this was one of them --

20         Q.    Okay.

21         A.    -- just sitting here today.

22         Q.    All right.

Page 561

1                    (Whereupon, Exhibit 27,

2            Presentation, was marked for identification.)

3                    MR. SIGLER:  Pass you the next

4            exhibit, Exhibit 27.

5                    THE WITNESS:  I have it.

6    BY MR. SIGLER:

7            Q.    Do you recognize Exhibit 27, sir?

8            A.    This looks familiar to me.

9            Q.    Is this the presentation that you

10   gave to the patent office in a reexamination

11   interview?

12           A.    This -- this may be that

13   presentation.  I'm not recalling every detail,

14   but, like I said, it looks very familiar.  It

15   looks very close to what I was presenting when I

16   did do a presentation for the patent office.

17           Q.    Okay.  Did you only make one

18   presentation to the patent office in the

19   reexamination to these patents?

20           A.    I recall doing at least one.  I may

21   have done at least two.

22           Q.    Okay.  All right.  Let's go to the

Page 562

1    page that has "Claim Constructions" as the title

2    at the top.

3            A.    I see that.

4            Q.    Did you use slides each time you

5    presented to the patent office in the

6    reexaminations of the Kove patents?

7            A.    Yes, that is my recollection.

8            Q.    Okay.  All right.  And you see a

9    list of claim constructions here on this page of

10   Exhibit 27?

11           A.    I do.

12           Q.    Did you create this list of claim

13   constructions that's on Page 2?

14           A.    My recollection is that I

15   participated in the creation of these slides.

16                 If you're asking if some of the

17   typing was done by others, I believe some of the

18   typing was.  But I also participated in their

19   creation.

20           Q.    Okay.

21           A.    And in the end, what I presented to

22   the patent office were slides that I agreed with

Page 563

1    and I supported with respect to my opinions.

2          Q.    Okay.  So you helped create

3    Exhibit 27; is that fair?

4          A.    If indeed this is one of the

5    presentation that I presented, yes, I recall

6    having participated in its creation.

7          Q.    Okay.  Do you see on the left-hand

8    side there, there are some claim terms?

9          A.    I see that.

10          Q.    One of them is location/data

11    location.

12                Do you see that?

13          A.    Yes.

14          Q.    What is a location/data location?

15          A.    So here it says:  A unique

16    encoding -- oh, that's identifier.  Sorry.

17                Location:  An encoder that is a

18    member of a set of associations with an

19    identifier in a location server and that

20    specifies where data pertaining to the entity

21    identified by the identifier is stored.

22          Q.    Okay.  So a location needs to

Page 564

1    specify where data pertaining to an identifier

2    is, right?

3              MS. HOANG:   Objection; misstates the

4         evidence.

5         A.    I -- I used the actual exact words I

6    used here, which I think matches right up with

7    what I'm saying in my rebuttal report in

8    Paragraph 16; namely:  An encoding that is a

9    member of a set of associations with an

10   identifier in the location server and that

11   specifies where data pertaining to the entity

12   identified by the identifier is stored.

13   BY MR. SIGLER:

14        Q.    And you're reading from -- where are

15   you reading from?

16        A.    I'm -- right then was reading from

17   the slide.  But I just confirmed that it is, near

18   as I can tell, a word-for-word equivalence to

19   what I included as the claim construction for

20   "location" as we got from the parties and I

21   express in my Paragraph 16 in my rebuttal report.

22        Q.    Okay.  And so under that

Page 565

1     construction, the location has to be associated

2     with an identifier, right?

3          A.    Yes, in this case that's what it's

4     saying.  An encoding that is a member of a set of

5     associations with an identifier in a location

6     server.

7          Q.    Okay.  So -- okay.

8                This also identifies the claim term

9     "location server/server," right?

10         A.    Yes.

11         Q.    And is that the Court's construction

12    for that term listed there under "Construction"?

13         A.    Yes.  So it says same words:  A

14    location attached component that maintains a set

15    of identifier/location mappings that are modified

16    or returned in response to location request

17    messages from clients.

18                And then in my Paragraph 15, with --

19    in my rebuttal report with respect to the Court's

20    construction, I have those same words.  In the

21    table there's like a little empty bracket, but

22    that doesn't have anything inside of it.  So it's

Page 566

1    the same construction.

2          Q.    Okay.  So the location server needs

3    to store object identifier object location

4    mappings, right?

5               MS. HOANG:  Objection; misstates

6        evidence.

7          A.    It says that it maintains a set of

8    identifier/location mappings that are modified or

9    returned in response to location request messages

10   from clients.

11   BY MR. SIGLER:

12         Q.    Okay.  And the location server needs

13   to receive location requests, right?

14              MS. HOANG:  Objection; vague.

15         A.    As a part of the construction, the

16   functionality of a location server is described

17   to what it does in response to location request

18   messages from clients, if that is your question.

19   BY MR. SIGLER:

20         Q.    Okay.  And implied in this is that

21   the location server needs to receive location

22   request messages, right?

Page 567

1          MS. HOANG:  Objection; vague.

2          A.    If by your question you're saying is

3    a location server a location server when it is

4    first created versus does it become a location

5    server on the day it receives its first request,

6    if that is your question, I don't think that that

7    is what the claim construction is saying.

8               I think the claim construction is

9    saying to a person of ordinary skill in the art,

10   that a location server can be a location server

11   on the day it's created because it would be

12   storing a set or maintaining a set of

13   identifier/location mappings that are modified or

14   returned in response to location request messages

15   from clients.

16               If that gets at your question, maybe

17   I'm misunderstanding your question, if it does

18   not.

19          Q.    No, that's not really my question.

20               Let me ask you this:  In response to

21   a location request message, this says that the

22   location server sends a location response to the

Page 568

1    client, right?

2          A.    It says that --

3                MS. HOANG:  Objection; misstates the

4      evidence.

5          A.    It says that just what it says.  It

6      says:  A network attached component that

7      maintains a set of identifier/location mappings

8      that are modified or returned in response to

9      location request messages from clients.

10               I think that's clear from the

11     language from the Court.

12         Q.    Okay.  Going back to the

13     location/data location claim term.  If a location

14     isn't associated with an identifier, then it

15     wouldn't meet that construction, right?

16               MS. HOANG:  Objection; vague.

17         A.    If by your question you're asking if

18     something that is not encoding that is a member

19     of a set of associations with an identifier could

20     be a data location, just sitting here today, I

21     can't think of how that is possible.  That's the

22     wording of the claim construction.

Page 569

1        Q.    Okay.  Let's press ahead to the last

2    slide in this slide deck.

3              It's this one, sir (indicating).

4        A.    I am there.

5        Q.    All right.  And the title of this

6    slide is "Oracle Teaches a Hierarchical

7    Architecture Not a Cluster Topology Which Enables

8    Redirect Message," correct?

9        A.    Yes, that's what it says.

10       Q.    Okay.  And the slide -- does the

11   slide anywhere indicate --

12             MR. SIGLER:  Well, strike that.

13   BY MR. SIGLER:

14       Q.    So this slide says that Oracle

15   teaches a hierarchical structure, right?

16       A.    Yes, for what was allegedly being

17   mapped to location servers.

18       Q.    Okay.  Does the slide say that the

19   hierarchical structure is limited to the name

20   servers?

21       A.    I'm not following your question.

22   I'm sorry.

Page 570

1          Q.     Does the slide say that Oracle only

2     teaches a hierarchical architecture for the name

3     servers?

4                 MS. HOANG:  Objection; vague.

5          A.     I'm still not quite following.  This

6     is a demonstrative, so it was meant to support

7     more detailed analysis that I recall providing in

8     a declaration, as well as the words that I was

9     using to describe what's going on here.

10    BY MR. SIGLER:

11         Q.     Okay.

12         A.     It's just a demonstrative.  So it's

13    trying to hit at, like I said, a high level the

14    main themes, why Oracle name servers does not

15    disclose or suggest the redirect message of the

16    claims.

17         Q.     Okay.  Does the slide say that the

18    data repositories have to be in a hierarchical

19    topology but the name servers are in a

20    nonhierarchical topology?

21                MS. HOANG:  Objection; form.  Scope.

22         A.     I'm not -- I'm sorry.  I'm really

Page 571

1    not understanding your question.

2    BY MR. SIGLER:

3         Q.    Okay.  Well, you -- we talked about

4    this earlier, but would you agree that a system

5    with nonhierarchical location server topology but

6    hierarchical data repository topology would be a

7    mixed topology?

8              MS. HOANG:  Objection; form.

9         A.    I don't recall having addressed

10   that, but that doesn't sound like it would work

11   to do the claimed invention.

12   BY MR. SIGLER:

13        Q.    Okay.  I'm just asking you -- I'm

14   asking you generally, and I'm sorry that the

15   question wasn't clear.

16             So let's say you had a system with a

17   nonhierarchical location server topology but a

18   hierarchical data repository topology.  Are you

19   with me?

20        A.    Oh, yeah, I think I -- I can

21   understand that hypothetical.

22        Q.    That would be a mixed topology

Page 572

1    network, right?

2              MS. HOANG:  Objection; form.  Vague.

3         Lacks foundation.

4         A.    No, I think you're misunderstanding

5    what is a mixed topology in this case.

6    BY MR. SIGLER:

7         Q.    Okay.  What am I missing -- I'm not

8    talking about in this case.  I'm talking just in

9    general.

10         A.    Yeah, in your hypothetical.

11         Q.    What am I missing?

12         A.    So to be precise, what a mixed

13    topology or a so-called hybrid topology as taught

14    in the patent is referring to is still with

15    respect to the location server network

16    exclusively, but now it's saying that that -- the

17    network of data location servers itself is

18    structured in this hybrid way, that there's some

19    components that are grouped and clustered into a

20    nonhierarchical cluster topology and then there's

21    others that are grouped in a hierarchical way,

22    such as Figure 10 from the '170 and '640 patent

Page 573

1    or Figure 21 from the '978 patent.

2                   And in those cases, it's still just

3    about the topology of the data location servers.

4    It has nothing to do with the data repository

5    network.

6                   And then now you're asking about

7    mixing different topologies between the data

8    location server network and the data repository

9    network, and data repository network doesn't

10   really play a role there at all.

11        Q.   Okay.  But overall, if you had a

12   nonhierarchical location server topology and then

13   a hierarchical data repository topology, if we

14   drew a big circle around that, would you agree

15   that that's a mixed topology?

16                   MS. HOANG:  Objection; form.  Vague.

17       Foundation.

18        A.   No, I disagree.

19   BY MR. SIGLER:

20        Q.   Okay.  All right.  Going back to the

21   slide, on the left side, it's teaching that

22   Oracle discloses a hierarchical architecture,

Page 574

1    right?

2         A.    Yes, with respect to its name

3    servers.

4         Q.    Okay.

5         A.    So if you look at, for example, in

6    the picture, every little one of these circles,

7    like the root DR 1, DR 2, DR 2.1, DR 2.2, each of

8    them has, like, a little box inside there.

9              And if you have better eyes than me,

10   you could see that inside those little boxes,

11   each of them has a letter N.  And that letter N

12   is, as I recall, from the OracleNameServerGuide

13   is referring to the fact that each one of those

14   has a named server associated with it.  Hence,

15   the organization of the named servers is

16   hierarchical.

17             And then this whole sequence of

18   arrows and numbers talks about an exemplary way

19   that a client can get a response using the

20   hierarchy, which again does not give the same

21   kind of functionality; cannot, in fact, do the

22   type of redirect message that is claimed in the

Page 575

1   patent.

2          Q.    Does it show the connections between

3   the little boxes with the Ns?

4          A.    Yes, those are shown in the

5   connections.  There's like -- there's, like, a

6   line.  There's arrows that are showing the

7   messages going between the different entities,

8   and then there's, like, little lines in between

9   those lines with arrows that are showing the

10  connections.

11         Q.    Okay.

12         A.    So, for example, the name server

13  associated with DR 2.2 has a connection,

14  hierarchical connection, to its parent DR 2, but

15  in this example, did not receive or send any

16  messages.

17         Q.    Okay.  So the -- in the Oracle

18  example here, the location servers and data

19  repositories use the same connections?

20               MS. HOANG:  Objection; foundation.

21     Vague.

22         A.    Yeah, so that question is presuming

Page 576

1    that the name servers are location servers.   In

2    my opinion, they don't satisfy the requirements

3    to be location servers.

4              And then if you're also asking what

5    could be mapped to data repositories are also

6    there, those are in this case coincidently in

7    that same hierarchical relationship.

8    BY MR. SIGLER:

9         Q.    And those name servers and what

10    could be mapped to data repositories use the same

11    connections, right?

12             MS. HOANG:  Objection; foundation.

13       Vague.

14        A.    They have the same relationship, the

15    same hierarchical relationship, if that is your

16    question.  That is what is being shown here.

17    BY MR. SIGLER:

18        Q.    No.  My question was about the

19    connections, and you answered my question earlier

20    about the connections between the name severs.

21    So obviously, you understand what I mean by

22    connections.

Page 577

1          So my question is:  The name

2     servers, and as you said, what could be mapped to

3     the data repositories use the same connections,

4     right?

5          MS. HOANG:  Same objections.  Vague.

6        Foundation.

7          A.    Yeah, that's not what I was actually

8     trying to say earlier.  Instead what I'm trying

9     to say is that the organizational structure

10    between the name servers is this hierarchical

11    such that their relationship, their connections,

12    if you will, are according to this hierarchical

13    structure.  And they are organized in this same

14    sort of way, that each of them is like one of

15    these nodes and is a part of that node, like,

16    Root DR 1, DR 2, and so on.

17          And then not shown here is that

18    there's also some data associated with each of

19    these that is also organized in this same

20    hierarchical way.  And if now you're asking would

21    they have literally the same, let's say, TCP

22    connections when they communicate, I don't think

Page 578

1　so.　But they would still have the same

2　hierarchical relationship.　They would still have

3　these topological connections.

4　BY MR. SIGLER:

5　　　　Q.　　Okay.　All right.　And the side of

6　the slide depicting Oracle indicates that it

7　scales vertically, right?

8　　　　A.　　That's what it says because it is

9　hierarchical tree topology.

10　　　　Q.　　And the hierarchical architecture's

11　ability to scale allows them to grow, right?

12　　　　A.　　In this case, it's referring to that

13　it scales vertically.　And to a person of

14　ordinary skill in the art, what's that's

15　referring to is the fact that the route in this

16　case is in charge of the entire thing.　Each node

17　itself is then in charge of what -- of the nodes

18　that are below it.

19　　　　　　　　So as you go vertically, you get

20　bigger and bigger things that are the

21　responsibility of that node.　Hence, it scales

22　vertically.　That's what that term means here.

Page 579

1          Q.    And scaling vertically allows this

2     architecture to grow.  Right?

3               MS. HOANG:  Objection; vague.

4          A.    That's not what I'm trying to

5     explain here with respect to what scaling

6     vertically means.

7     BY MR. SIGLER:

8          Q.    Well, is it true, though?

9               MS. HOANG:  Same objection.

10         A.    It -- there is a way for a

11    hierarchical topology to scale now in size.  But

12    now this is using the word "scale" in a different

13    way.  So now instead of saying do the -- the --

14    you know, the entities and the groupings grow as

15    you go vertically, yes, that's what this arrow

16    and says scales vertically means (indicating).

17               And if now you're asking about

18    scaling in a different context, namely, can the

19    system grow?  Can you add new components to it?

20    The answer is yes, and this hierarchical topology

21    allows for that.

22    BY MR. SIGLER:

Page 580

1        Q.    Okay.  So there are database designs

2   that can scale hierarchically, right?

3            MS. HOANG:  Objection; vague.

4    Foundation.

5        A.    It depends what you mean by "scales

6   hierarchically."  So, again, there's two

7   different ways that scales is used.  It sounds --

8   actually I don't know which way you're using it.

9            So if by that "scales

10  hierarchically," you mean can a hierarchical

11  architecture, literally like Oracle, be

12  structured so that as you go vertically in the

13  hierarchy, you keep having each node be

14  responsible to something that keeps getting

15  bigger and bigger and bigger as you go up, then,

16  yes, the hierarchical nature of Oracle names

17  supports that.

18  BY MR. SIGLER:

19       Q.    Okay.  And did you create this

20  slide, sir?

21       A.    My recollection is that I

22  participated in the creation of this slide.

Page 581

1          Q.    So you were --

2          A.    Or one that's very, very like it,

3    very similar to it.

4          Q.    So you worked with Kove's attorneys

5    to create this slide?

6          A.    My recollection is I worked with

7    Kove's attorney to make either this slide or one

8    that's very, very similar to this.

9          Q.    And the slide that you worked on

10   creating with Kove's attorneys was submitted to

11   the patent office, right?

12         A.    That is my recollection, yes.

13         Q.    Okay.  And on the right-hand side of

14   this particular slide, there is a depiction of

15   Kove's patented design, right?

16         A.    Yes.  Where the top part is from

17   that Figure 12 we talked about earlier today.

18         Q.    Okay.  And it says:  Kove

19   nonhierarchical linear, right?

20         A.    Yes.

21         Q.    And it doesn't explicitly say that

22   the hierarchical architecture is limited to the

Page 582

1     location servers, right?

2                    MS. HOANG:   Objection; form.

3          A.     No.   You completely misunderstood

4     what I was trying to explain here.

5                    So instead what I'm trying to show

6     here is on the left, the OracleNameServer is

7     scaled vertically, that is -- as you go

8     vertically in the hierarchy, you're getting

9     bigger and bigger sets of things; whereas, in the

10    Kove invention, as shown on the right, and here

11    where it says:   NDTP server constellation.

12                    This is just location servers.

13                    And the Court even -- my

14    recollection at least is -- the Court said that

15    location servers not limited to NDTP servers, but

16    that there are an embodiment of location servers

17    from the patent specifications.

18                    So here we see a constellation of

19    location servers, that is growing horizontally;

20    that as you keep adding another NDTP server that

21    is a location server to this cloud.   And each one

22    of them is all in the same cluster.   Then each of

Page 583

1    them still have this beautiful redirect

2    capability, where you go, you know, up to one

3    server that does -- if it has the answer, it just

4    answers.  But if it doesn't, it gives you this

5    redirect message that then allows you to go to a

6    server that does have the right answer.  And then

7    it gives you the right answer.

8          Q.    The slide doesn't explicitly say the

9    hierarchical architecture is limited to the

10   location servers, does it, sir?

11         A.    Your question has a couple of

12   contradictions in it, so I don't know how to

13   correct the contradictions to answer what you're

14   intending.

15         Q.    I'm just asking you what the slide

16   says.

17               It doesn't say that Kove's

18   nonlinear -- excuse me -- it doesn't say that

19   Kove's nonhierarchical linear architecture is

20   limited to just the location servers, right?

21               MS. HOANG:  Objection.  The document

22       speaks for itself.

Page 584

1          A.    Sorry to be a little pedantic, but

2    your previous question was about a hierarchical

3    organization for the Kove invention.  And that's

4    not what is being shown.

5                What is being shown here is instead

6    a nonhierarchical.

7          Q.    I understand --

8          A.    -- linear.

9          Q.    I understand your answer now.

10               Let me ask it again.

11               The slide itself doesn't explicitly

12   say that the nonhierarchical architecture of Kove

13   is limited to the location servers, right?

14         A.    I disagree.  I believe that is

15   literally what it's saying.

16         Q.    Where?

17         A.    Right here when it says:  NDTP

18   server constellation (indicating).

19         Q.    Okay.  Where does it say that the

20   nonhierarchical architecture of Kove only applies

21   to the location servers?

22         A.    Right here where it says:  NDTP

Page 585

1    server constellation inside the cloud

2    (indicating) that is labeled 110.

3              And, again, this is a demonstrative,

4    that I then would explain.  I recall explaining

5    to the patent office that this -- that what is

6    called here the NDTP servers are embodiments of

7    location servers.

8              So this applies exclusively just to

9    the data location server network.

10       Q.    What's shown here in the -- there is

11   a cloud at the bottom of the right-hand side of

12   this slide, right?

13             Do you see that?

14       A.    Yes.

15       Q.    And in that cloud, there is a data

16   repository, right?

17       A.    In this example, yes.

18       Q.    Okay.  And the slide doesn't say

19   that the nonhierarchical architecture doesn't

20   apply to that data repository, does it?

21             MS. HOANG:  Objection; form.

22       A.    I believe it does.  Again, this is a

Page 586

1    demonstrative, so you have to, you know, it's a

2    visual explanation, if you will, using visual

3    language (indicating).  And so if you use that

4    understanding, we see there's like a parallel

5    structure on the left and a parallel structure on

6    the right, what we see at the top half of each

7    side is what is on the left allegedly being

8    mapped to location servers, on the right is

9    literally just location servers.

10                   And we're saying the top part on the

11   left is hierarchical; the top part on the right

12   is not hierarchical.  Just the data location

13   servers network.

14                   Now over this big arrow on the

15   middle on each side is now added to figures from

16   each of those references to then say that --

17   those components are part of a bigger system, but

18   that bigger system is not what is being

19   referenced at the top, when it says on the left

20   "hierarchical" and on the right

21   "nonhierarchical."

22                   I personally believe it's clear from

Page 587

1    the picture that it is exclusively saying the

2    nonhierarchical linear topology taught in the

3    Kove inventions is just for location server

4    constellations.

5          Q.    Do you know if that was clear to the

6    patent examiners that this was presented to?

7          A.    I can only talk about what I

8    conveyed.  And I conveyed that in a way that I

9    felt was clear.  I can only hope they understood

10   it in the way it was conveyed.  I can't speak to

11   the understanding of another person.

12              MS. HOANG:  Can we break soon?  It's

13       one o'clock.

14   BY MR. SIGLER:

15         Q.    Yeah.  I think just one more

16   question.

17              The slide could have said:  Kove

18   nonhierarchical linear location servers, right?

19              MS. HOANG:  Objection; calls for

20       speculation.

21         A.    I think that would have been

22   redundant.  (Indicating)  It already says that

Page 588

1    when it says:  NDTP server constellation.

2                   Why put extra words?

3                   Again, slides -- another thing about

4    slides is you want them to be concise and just

5    say what needs to be said.  Why say the same

6    thing twice?  I think it already says that very

7    clearly.

8    BY MR. SIGLER:

9         Q.    Nothing prevented you from adding

10   those words to the slide, correct?

11                   MS. HOANG:  Objection; vague.

12        Argumentative.

13        A.    I disagree.  I think the principle

14   of presenting clear demonstratives would have, in

15   this hypothetical now, prevented me from doing

16   that.  I don't recall having contemplated that

17   even.  Because I felt -- I mean, I feel even

18   today this slide is still clear of what it is

19   trying to convey.

20                   MR. SIGLER:  All right.  Let's take

21        a break for lunch.

22                   THE VIDEOGRAPHER:  The time right

1       now is 1:01 p.m.

2                   We are off the record.

3                   (Whereupon a lunch recess was taken

4       at 1:01 p.m.)

5

6

7                       *           *           *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 590

1        A F T E R N O O N   S E S S I O N

2          (Time noted:  1:58 p.m.)

3

4            *      *      *

5

6          THE VIDEOGRAPHER:  The time right

7   now is 1:58 p.m.

8          We're back on the record.

9  BY MR. SIGLER:

10       Q.   Dr. Goodrich, I've put what I've

11  marked as Exhibit 28 in front of you.

12         (Whereupon, Exhibit 28, Dr. Goodrich

13   declaration, was marked for identification.)

14       A.   I have it.

15  BY MR. SIGLER:

16       Q.   All right.  And that was a

17  declaration by you, correct?

18       A.   Yes.

19       Q.   And if you go to Page 28, you signed

20  this declaration on September 28, 2022, right?

21       A.   That's right.

22       Q.   And you signed it under the penalty

Page 591

1      of perjury, right?

2            A.     That is correct.

3            Q.     Okay.  And on the front cover, we

4      see that this declaration was submitted in a

5      reexamination of the '978 patent, right?

6            A.     That's right.

7            Q.     And it's Control No. 90/019,034,

8      right?

9            A.     That's correct.

10           Q.     Okay.  And let's -- let's go to

11     Paragraph 35, please, which is on Page 11.

12           A.     I am there.

13           Q.     And here, you're talking about

14     Claims 3, 10, and 14 of the '978 patent, right?

15           A.     That's right.

16           Q.     And you say in Paragraph 35:  It is

17     my opinion that a POSITA at the time of this

18     invention would understand Claims 3, 10, and 14

19     through various limitations in each of the claims

20     to require a nonhierarchical cluster

21     configuration as taught by the '978 patent.

22                  Do you see that, sir?

Page 592

1          A.    Yes, as I explained in the next

2     paragraph, as applied to the location servers.

3          Q.    Okay.  And here, in Paragraph 35,

4     you're informing the patent office of your

5     opinion that Claims 3, 10, and 14 of the '978

6     patent require a nonhierarchical cluster --

7     nonhierarchical cluster configuration for the

8     location servers, right?

9          A.    Yes, that is correct.

10          Q.    Okay.  And you didn't offer an

11     opinion in this declaration that Claim 1 of the

12     '978 patent requires a nonhierarchical cluster,

13     correct?

14          A.    Correct, nor did I say that about

15     Claim 6, as I recall.

16          Q.    And you also didn't offer the

17     opinion in this declaration that Claim 31 of the

18     '978 patent requires a nonhierarchical cluster,

19     right?

20          A.    I agree.  I don't recall having said

21     that in this declaration.

22          Q.    Okay.  Let's go to Paragraph 39,

Page 593

1    please.  And in Paragraph 39, you state that a

2    POSITA at the time of this invention would

3    understand the aforementioned limitations of

4    Claim 14 connotes a nonhierarchical cluster

5    configuration as taught by the '978 patent.

6            And then you have see, e.g., '978

7    patent, 18:38 to 19:3.  This is because Claim 14

8    requires each location server in the network to

9    be configured to transmit a redirect messages to

10   a client.  As such, a POSITA at the time of the

11   invention would understand that these

12   requirements impose a nonhierarchical cluster

13   configuration.

14           Do you see that language there, sir?

15       A.    Yes.

16       Q.    All right.  So here, you're telling

17   the patent office of your opinion that Claim 14

18   of the '978 patent requires a nonhierarchical

19   cluster configuration, correct?

20       A.    Yes, for the location servers

21   because of the -- the type of redirect messages

22   that is recited in Claim 14.

Page 594

1          Q.    Okay.  And so you're expressing your

2     opinion here that due to that redirect message

3     being recited in Claim 14, that claim requires a

4     nonhierarchical cluster configuration of location

5     servers, right?

6          A.    That is correct.

7          Q.    Okay.  Moving on down the page to

8     Paragraph 40, you discuss -- excuse me -- you

9     discuss Claim 3 of the '978 patent there; is that

10    correct, sir?

11         A.    Yes, that's correct.

12         Q.    And you also state there in

13    Paragraph 40 that Claim 3 requires that the

14    information in the redirect message will allow

15    for finding the location server known to have the

16    location information with specificity and

17    certainty.  Therefore, a POSITA at the time of

18    this invention would understand Claim 3 recites a

19    nonhierarchical cluster configuration.

20              Do you see that there, sir?

21         A.    Yes, for the location servers.

22         Q.    Okay.  So you're stating here to the

Page 595

1    patent office your opinion that Claim 3 requires

2    a nonhierarchical cluster configuration of

3    location servers, right?

4          A.    Yes, that is correct.

5          Q.    Let's go to Paragraph 56.

6          A.    I am there.

7          Q.    Let's start with the first sentence

8    of Paragraph 56, and there, you state:  Oracle

9    admin's hierarchical configuration is

10   foundationally different from the nonhierarchical

11   cluster configuration required by Claims 3, 10,

12   and 14.

13                Do you see that, sir?

14         A.    I do.

15         Q.    Okay.  So here, you compared

16   Oracle's --

17                MR. SIGLER:  Strike that.

18   BY MR. SIGLER:

19         Q.    Here, you compared Oracle admin's

20   hierarchical configuration to the nonhierarchical

21   cluster topology that you believe is required by

22   Claims 3, 10, and 14, right?

Page 596

1          A.    Yes, for location servers.

2          Q.    And you argued here to the patent

3     office that Oracle admin was different because it

4     didn't use a nonhierarchical cluster

5     configuration, right?

6          A.    Yes, for its named servers, which I

7     understood were being mapped to location servers

8     in the claims.

9          Q.    Okay.  And then you go on in the

10    next sentence to say:  An important distinction

11    is that unlike the nonhierarchical cluster

12    configuration required by Claims 3, 10, and 14,

13    the name servers in Oracle admin's hierarchical

14    structure does not allow for data location

15    information to be portioned and organized across

16    the named servers based on a hash function.

17              Do you see that, sir?

18          A.    I do, yes.

19          Q.    And is it your opinion that

20    hierarchical structures don't allow for data

21    location information to be organized across

22    location servers based on hash function?

Page 597

1          A.     Not in the way that is claimed in

2     these claims, no.

3          Q.     What about outside the context of

4     these claims?  Can hierarchical structures allow

5     for data location information to be organized

6     across location servers based on hash function?

7               MS. HOANG:  Objection; vague.

8     Foundation.  Scope.  Calls for speculation.

9          A.     It depends on what you mean by that.

10    So if by "organized across," you mean that each

11    location server individually has a hash table, I

12    believe that is what is claimed in Claim 6, for

13    example, of the '978 patent which I do not

14    believe requires a nonhierarchical cluster

15    topology for the location servers.

16               But if it's done in the way that is

17    claimed in Claims 3, 10, and 14 of the '978

18    patent, then, yes, I believe that that does

19    require a nonhierarchical cluster topology for

20    the way that the location servers are organized.

21    BY MR. SIGLER:

22         Q.     You go on to state in Paragraph 56:

Page 598

1    Furthermore, Oracle admin's hierarchical

2    instruction does not enable each and every name

3    server to be configured to determine the location

4    of the requested location information, e.g., the

5    specific data location server storing the

6    location information.

7              Do you see that, sir?

8       A.    That's right.

9       Q.    And in your view, hierarchical

10   structures don't allow location servers to know

11   the specific data location of servers storing the

12   location information without -- excuse me -- with

13   any certainty or specificity, right?

14             MS. HOANG:  Objection; vague.

15      A.    Generally, that's true, and

16   certainly, it was true for Oracle admin's

17   hierarchy like is shown on the figure on the

18   previous page above my Paragraph 53 where each

19   query had to go on and then forward it on to yet

20   another name server either above them or below

21   them in the hierarchy in order to ultimately find

22   the answer.

Page 599

1    BY MR. SIGLER:

2         Q.    Okay.  And we've looked at three

3    declarations that you submitted to the patent

4    office so far, right?

5         A.    I think that's what we're up to now.

6         Q.    Okay.

7         A.    Yeah, sounds right.

8         Q.    Okay.  All right.  Let's move on to

9    the next exhibit.

10                (Whereupon, Exhibit 29, Notice of

11          Intent to Issue Ex Parte ReExamination

12          Certificate, was marked for identification.)

13    BY MR. SIGLER:

14         Q.    I'm passing you Exhibit 29.

15         A.    Thank you.

16         Q.    Do you see that this is a document

17    from a reexamination of the '170 patent, sir?

18         A.    I do, yes.

19         Q.    And it's from the Application No.

20    90/019,035, right?

21         A.    Yes.

22         Q.    And if you turn to Page 3 of the

Page 600

1    document, do you see that this is a Notice of

2    Intent to Issue Ex Parte ReExamination

3    Certificate?

4          A.    Yes, I see that.

5          Q.    And actually going back to the front

6    page, the mail date of this document is

7    September 27, 2022, right?

8          A.    That is correct.

9          Q.    All right.  Let's go to page -- it

10   says Page 6 in the upper right corner.

11         A.    I am there.

12         Q.    All right.  Do you see on that page,

13   there is a listing of prior art cited in the

14   reexamination request?

15         A.    I do see that.

16         Q.    All right.  And it says:  The

17   following reference was cited by the third-party

18   requester in the request for ex parte

19   reexamination.

20               Do you see that?

21         A.    I do.

22         Q.    And it identifies

Page 601

1    OracleNamesAdminGuide, OracleSG, McGarvey and

2    Rajami, right?

3          A.    Oh, yeah, these references referred

4    to as OracleNamesAdminGuide, all one word, and

5    then OracleSG, one word, and then McGarvey.

6          Q.    And then on the next page, there's

7    also Rajami, right?

8          A.    Then there's also a reference that's

9    named Rajami, yes.

10          Q.    And are you familiar with a piece of

11    prior art in this case called "OracleUnleashed"?

12          A.    I believe I opine on that alleged

13    prior art in my rebuttal report.

14          Q.    Okay.  And OracleUnleashed isn't

15    listed in the prior art cited in this

16    reexamination request, correct?

17          A.    It is not specifically recited in

18    this list.

19          Q.    And the Skagerwall patent is also

20    not cited in this list, right?

21          A.    I am not seeing the Skagerwall

22    reference in this list.

Page 602

1          Q.    Okay.  And the Steen patent is not

2     cited in this list, right?

3          A.    The patent that we've been naming

4     and calling Steen is not in this list.

5          Q.    Okay.  And the references we've --

6     actually we've been -- I misspoke the Steen

7     article isn't cited in this list?

8          A.    The Steen article is not listed,

9     yes.

10         Q.    And are you familiar with prior art

11    references in the case that we've been referring

12    to as Yocom, Boukobza, and Wolff?

13         A.    I have discussions about those in my

14    rebuttal report including Skagerwall and Steen,

15    beginning on page -- oh, and OracleUnleashed too,

16    beginning on Page 44 of my rebuttal report.

17         Q.    And those references Boukobza,

18    Yocom, and Wolff and aren't specifically

19    identified in this list of prior art considered

20    in the ' '035 reexamination, correct?

21         A.    Which references?

22         Q.    Yocom, Boukobza, and Wolff.

Page 603

1         A.    I don't come, Boukobza and Wolff.

2    No, I don't see them on that list.

3         Q.    Okay.  And there's two patents to

4    Karger that have been cited as prior art in this

5    case, Karger '618 and Karger '610 patents?

6         A.    Yes, I'm familiar with that

7    designation.

8         Q.    Those Karger patents also are not

9    identified in this list of references considered

10   in the ' '035 reexamination, right?

11        A.    Correct.  They are not listed in

12   this list.

13        Q.    Okay.  And are you familiar with the

14   Sherman reference in the case?

15        A.    Yes.  I opine on the Sherman

16   reference, for example, in my Paragraph 79, where

17   I dispute that it is prior art.

18        Q.    And the Sherman reference isn't

19   mentioned in this list of prior art considered in

20   the '035 examination, right?

21        A.    As I just mentioned, I'm disputing

22   that it qualifies as prior art and it is not

Page 604

1    listed in this list.

2          Q.    Okay.  And RFC1034 is another

3    reference at issue in this case, correct?

4          A.    That is correct.

5          Q.    And the RFC1034 isn't identified on

6    the list of references considered in the ' '035

7    reexamination, right?

8          A.    That is correct.

9          Q.    All right.  And the Minami patent is

10   another prior art reference at issue in this

11   case, right?

12         A.    Yes.

13         Q.    And the Minami patent is not

14   identified as one of the references considered in

15   the ' '035 reexamination, right?

16         A.    That is correct.

17         Q.    All right.  And the --

18               MR. SIGLER:  Strike that.

19   BY MR. SIGLER:

20         Q.    There is a Neimat patent that is a

21   reference in this case.  Are you familiar with

22   that?

Page 605

1          A.    I do.

2          Q.    And the Neimat patent isn't

3    identified in this last of prior art considered

4    in the ' '035 reexamination, right?

5          A.    That is correct.

6          Q.    And a patent Venkatasubramanian is a

7    reference in this case, correct?

8          A.    No, that's incorrect.

9          Q.    How is that incorrect?

10         A.    It's a paper, not a patent.

11         Q.    All right.  Thank you for that.

12               The paper to Venkatasubramanian is

13   also not identified in this list of prior art

14   considered in the '035 reexamination, right?

15         A.    That's correct.  Venkatasubramanian,

16   who happens to be a colleague of mine at UC

17   Irvine wrote this paper that then is not listed

18   on this list in the re-exam.

19         Q.    Okay.  So in the '035 re-exam the

20   patent office didn't consider Skagerwall, Steen,

21   Yocom, Boukobza, Wolff, Karger '618, Karger '420,

22   Sherman, RFC1034, Minami, Neimat, or

Page 606

1　Venkatasubramanian, right?

2　　　　A.　　I agree.

3　　　　Q.　　Okay.

4　　　　MS. HOANG:  I'm going to -- sorry

5　　　for the late objection.  I'm going to object

6　　　to foundation for that.

7　BY MR. SIGLER:

8　　　　Q.　　Okay.  And then --

9　　　　A.　　With the caveat that I'm disputing

10　that at least one of those are prior art.

11　　　　Q.　　Okay.  And, additionally, the patent

12　office didn't consider the Oracle Names

13　Administrator's Guide in combination with any of

14　those references in this reexamination, right?

15　　　　MS. HOANG:  Same objection; vague.

16　　　Lacks foundation.

17　　　　A.　　That one I'm not clear as clear on.

18　The patent office did include Oracle Names

19　Administrator's Guide, what we're calling ONAG or

20　ONAG, and then as I recall Mr. Greene in his

21　analysis sometimes just relies on that, hence,

22　for those arguments I would say that that was

Page 607

1    considered by the patent office in this action.

2    BY MR. SIGLER:

3         Q.    Okay.  Let's go to Page 15, please,

4    of the Exhibit 29.

5         A.    I am there.

6         Q.    And here starting on Page 15 the

7    patent office identifies the Statements For

8    Reasons Patentability and/Or Confirmation,

9    correct?

10        A.    That's the heading on the top of

11   Page 15.

12        Q.    Okay.  And the examiner --

13             MR. SIGLER:  Well, strike that.

14   BY MR. SIGLER:

15        Q.    Do you see the italicized language

16   on Page 15 at Lines 14 and 15?

17        A.    I do.

18        Q.    Okay.  And is it your understanding

19   that the examiner has identified there the

20   portion of independent Claim 1 that he believes

21   wasn't met in this case?

22             MS. HOANG:  Objection; vague.

Page 608

1          A.     I'm not an attorney, but that's how

2     I would see this, just as a layperson, that when

3     the very next sentence says:  The prior art of

4     record fails to teach this feature.

5               It appears from context that "this

6     feature" is referring to the italicized portion

7     in the previous paragraph.

8          Q.    Okay.  And the italicized portion

9     is:  Each one of the data location servers is

10    configured to determine the at least one of the

11    plurality of data location servers based on the

12    hash function applied to the identifier string.

13              Right?

14         A.    That is correct.

15         Q.    Okay.  All right.  So the examiner

16    here identified that particular limitation as not

17    being met by the prior art that we just reviewed

18    earlier in the decision, right?

19         A.    Right.  What we're calling the ONAG

20    and OracleSG, McGarvey, and Rajami.

21         Q.    Okay.  The examiner concluded that

22    those prior references didn't teach the

Page 609

1     italicized limitations, correct?

2          A.     That's how I would read this, yes.

3          Q.     And below that claim he states that

4     Claim 2 is allowed for the same reason, right?

5          A.     That's how I would read that

6     sentence, as well.

7          Q.     And then going over to the next

8     page.  The examiner identifies there that he's

9     finding Claim 6 allow -- excuse me -- allowable

10    because of the limitation and the redirect

11    message comprising a list of at least one

12    location server known to have the location

13    information for the desired entity, right?

14         A.     Yeah.  You skipped over the word

15    "other," but that's how I would read this as a

16    layperson.

17         Q.     Okay.  All right.  So the examiner

18    here is identifying that he found that the prior

19    art didn't meet the italicized limitation, right?

20         A.     That's how I would read this as a

21    layperson, yes.

22         Q.     Okay.  And he goes on to say that:

Page 610

1    Claims 8, 9, and 12 incorporate the feature from

2    independent Claim 6 and are confirmed on the same

3    basis, right?

4         A.    I see that.

5         Q.    Okay.  And then the examiner goes on

6    to address Claim 15, right?

7         A.    That is correct.

8         Q.    Okay.  And there he's citing the

9    same redirect message limitation that was

10   identified for Claim 1, right?

11        A.    It's -- let's see Claim 1.

12        Q.    It's actually not the same

13   limitation.  I apologize.  I wasn't trying to

14   trick you.

15        A.    There's a similar limitation in

16   Claim 6.  It's not word for word the same, but

17   there is an italicized portion that states for

18   Claim 15:  The redirect message identifying which

19   of the plurality of location servers includes the

20   location information.

21        Q.    Okay.  And that was the limitation

22   the examiner found wasn't met by prior art in

Page 611

1     this decision, right?

2          A.    That's how I would read the next

3     sentence in this document as a layperson where

4     the examiner states:  The prior art of record

5     fails to teach this feature.

6          Q.    Okay.  All right.  You can put that

7     aside.

8               MR. SIGLER:  Let's mark the next

9          exhibit as Exhibit 30.

10              (Whereupon, Exhibit 30, Notice of

11         Intent to Issue Ex Parte ReExamination

12         Certificate, was marked for identification.)

13    BY MR. SIGLER:

14         Q.    Passing you Exhibit 30.

15         A.    Thank you.

16         Q.    Do you see Exhibit 30 is a document

17    in reexamination 90/019,036?

18         A.    Yes, I see that.

19         Q.    And that was a reexamination of the

20    '640 patent, correct?

21         A.    That is correct.

22         Q.    And the mail date is September 22,

Page 612

1     2022, right?

2          A.    Yes, that is correct.

3          Q.    All right.  And if we go to the

4     third page, this is also a Notice of Intent to

5     Issue Ex Parte ReExamination Certificate, right?

6          A.    Yes.

7          Q.    And this decision confirms Claims 17

8     to 18 and 24 of the '640 patent, right?

9          A.    Yes.

10          Q.    And on Page 3, there is a listing of

11     the prior art references considered in this

12     reexamination, correct?

13          A.    That is correct.

14          Q.    And the references identified as

15     considered in this reexamination are the

16     OracleNamesAdminGuide, OracleSG, McGarvey, and

17     Rajami, right?

18          A.    Yes.

19          Q.    All right.  And do you agree that

20     the following prior art references were not

21     considered in this reexamination,

22     OracleUnleashed, Skagerwall, Steen, Yocom,

Page 613

1    Boukobza, Wolff, Karger 6.18, Karger 4.20,

2    Sherman, RFC1034, Minami, Neimat to

3    Venkatasubramanian?

4          A.    I agree that those references are

5    not included in this list, but I am disputing the

6    status of at least one of them as alleged prior

7    art.

8          Q.    Yeah, and I'm not asking you whether

9    you agree they're prior art or not.  My question

10   is just that those references are not identified

11   in this list of references that were considered

12   in the '036 reexamination, right?

13                MS. HOANG:  I'm going to object to

14         foundation.

15         A.    Yeah.  Just for clarification, the

16   reason why I added that comment is because my

17   understanding is that the patent office restricts

18   what it considers to be prior art to actual prior

19   art.  So whether or not something then would be

20   considered, at least to me, seems to depend on

21   its status as prior art.

22                But if your question is just on the

Page 614

1    plain face of the document, does it mention those

2    other documents, I do not see those mentioned

3    here.

4         Q.    Okay.  So, for example, this list

5    doesn't include OracleUnleashed, right?

6         A.    It doesn't include that particular

7    document, but I understand that it -- it could be

8    cumulative to the things it's already considering

9    in this list.

10         Q.    And the list of references in the

11    '036 reexamination also, for example, doesn't

12    include the Skagerwall patent, right?

13         A.    That's correct.  It doesn't include

14    the Skagerwall patent in this list.

15         Q.    And the list of references

16    considered in the '036 reexamination doesn't

17    include the Karger '618 or '420 patents, right?

18              MS. HOANG:  Objection to foundation.

19         A.    It doesn't include those listing of

20    those patents here on this page.

21    BY MR. SIGLER:

22         Q.    Okay.  Thank you.

Page 615

1            Let's go to Page 4, please, of this

2    document.  And here, we see the statement of

3    reasons for patentability and for confirmation,

4    right, sir?

5         A.    Yes, I see that at the top.

6         Q.    And I'm going to focus you on

7    Paragraph 8, please.

8         A.    I am there.

9         Q.    All right.  And here in Paragraph 8,

10   the examiner states that the cited prior art

11   fails to teach individually or in combination

12   transmitting a redirect message to the client if

13   the identification string is not associated with

14   a location string at the data location server and

15   wherein the redirect message contains information

16   for use by the client to calculate a location of

17   a different data location server.

18            Do you see that, sir?

19        A.    I do.

20        Q.    So the examiner identifies here the

21   transmitting or redirect message limitation,

22   right?

Page 616

1          A.     In broad strokes, yes, with all the

2     details of the limitation, highlighted in bold

3     face.

4          Q.     Okay.  And then if we look further

5     down, I want to ask you about Paragraph 11,

6     please.  Are you there?

7          A.     I am.

8          Q.     All right.  It says:  Specifically,

9     the cited prior arts do not set a population

10    threshold, nor do they display message only with

11    the home neighborhood and selections with the

12    nearby neighborhoods.

13               Do you see that, sir?

14         A.     I do.

15         Q.     Okay.  Do you agree with that

16    statement in Paragraph 11 regarding the prior art

17    in this matter?

18               MS. HOANG:  Objection; foundation.

19         A.     Yeah, to answer your question would

20    take more time because, as I read it, Claim 24 of

21    the '640 patent recites:  The system of Claim 18

22    wherein the location information comprises a

Page 617

1   portion of a hash table distributed over the

2   plurality of data location servers.

3              So I would -- I would need a little

4   more time to try to understand what the examiner

5   is referring to in Paragraph 11 of this document.

6   BY MR. SIGLER:

7         Q.    And Claim 24 doesn't include any

8   language about a population threshold, right?

9         A.    That's -- the plain language of 24,

10  I don't see those words which is why I would want

11  to spend more time seeing why the examiner

12  apparently found that relevant.  Maybe it's in

13  some of the other documents that -- that are

14  building up and leading to this one.

15             Like I said, I'd want more time to

16  try to study to determine whether or not I agree

17  with the examiner's Paragraph 11.

18             (Whereupon, Exhibit 31, Supplemental

19      Notice of Intent to Issue Ex Parte

20      Reexamination Certificate, was marked for

21      identification.)

22  BY MR. SIGLER:

Page 618

1          Q.     I'm going to pass you Exhibit 31.

2                 Do you see Exhibit 31 is another

3     document in the '036 reexamination?

4          A.     I see it is a reexamination document

5     for the '640 patent.

6          Q.     And it's in Reexamination

7     90/019,036, right?

8          A.     Yes.  And it has a mail date of

9     September 29, 2022.

10         Q.     Okay.  And if you go to the third

11    page, it's a -- states at the top that it's a

12    Supplemental Notice of Intent to Issue Ex Parte

13    Reexamination Certificate.

14         A.     I see that.

15         Q.     And if we go to the next page where

16    it says detailed action at the top.

17         A.     I see that.

18         Q.     And it says at the top in underlined

19    text:  This is a supplemental ex parte notice of

20    intent to issue a re-exam certificate that is to

21    replace the ex parte notice of intent to issue a

22    re-exam certificate issued on 9/22/2022 in which

Page 619

1     included an erroneous statement on Page 4 of the

2     office action.

3                    Do you see that, sir?

4          A.    I do.

5          Q.    Have you seen this document before?

6          A.    It's not -- it's not ringing a bell,

7     as I sit here today.

8          Q.    Okay.  So the patent office is

9     saying here that the reexamination certificate at

10    issue the week before this contained an erroneous

11    statement, right?

12         A.    As a layperson, that is how I would

13    read that sentence.

14         Q.    So the patent office is saying here

15    that it made a mistake, right?

16         A.    I would read it just how it says,

17    that there was an erroneous statement on Page 4

18    and that's -- that's what they are now

19    correcting.

20         Q.    Would you agree the patent office

21    makes mistakes sometimes?

22                    MS. HOANG:  Objection; vague.

Page 620

1          Foundation.  Calls for speculation.

2               A.    And -- and what do you mean by

3      "makes mistakes"?  In what sense?

4      BY MR. SIGLER:

5               Q.    Has the patent office ever issued a

6      ruling that's incorrect?

7                    MS. HOANG:  Objection; foundation.

8          Calls for speculation.

9               A.    I -- I don't recall having an

10     opinion about that for this matter.  I'm not sure

11     what you're referring to.

12     BY MR. SIGLER:

13              Q.    Well, you in your supplemental

14     report, you make some statements that you

15     disagree with portions of a decision that the

16     patent office just rendered in August, right?

17              A.    So that's an example of something I

18     disagree with, there you go, so.

19              Q.    So you don't agree with every

20     decision that the patent office makes, right?

21                   MS. HOANG:  Objection; foundation.

22         Vague.

Page 621

1            A.    It depends on the context.  I've

2     been told by attorneys -- again, I'm not an

3     attorney -- but I've been told by attorneys that

4     an issued patent is presumed to be valid.  And

5     I've also been told then to render it invalid

6     requires clear and convincing evidence of

7     invalidity.  So that seems to be a very high

8     standard to me that says admittedly, maybe

9     sometimes the patent office makes a mistake, but

10    in order to correct an issued patent as an

11    alleged mistake requires clear and convincing

12    evidence, for example.

13    BY MR. SIGLER:

14            Q.    Okay.  But you would agree that

15    sometimes the patent office makes a mistake,

16    right?

17              MS. HOANG:  Objection; foundation.

18    Vague.  Calls for speculation.

19            A.    I would answer that the same way I

20    did before.  That, yeah, I would just answer it

21    exactly the same way.  It seems like the same

22    question, unless you'd like to clarify how the

Page 622

1    question is different.

2    BY MR. SIGLER:

3         Q.    Sometimes the patent office makes

4    decisions that you disagree with, right?

5         A.    I think we just highlighted an

6    example of such a thing.

7              But, again, as I understood it, as

8    explained to me by attorneys, an issued patent is

9    presumed valid and then to invalidate it requires

10   clear and convincing evidence of invalidity.

11        Q.    And that's something that the jury

12   could find in this case, right?

13             MS. HOANG:  Objection.

14        A.    That's something the jury could

15   find?

16        Q.    Yeah.  The jury could find there's

17   clear and convincing evidence that claims in the

18   asserted patents are invalid, right?

19             MS. HOANG:  Objection; calls for

20        speculation.

21        A.    I understand that to be a decision

22   that the jury will -- could be asked to decide

Page 623

1    upon.

2              But, indeed, the standard they'll be

3    asked to use is this -- what I've been told is a

4    very high standard -- of clear and convincing

5    evidence.

6         Q.    All right.  And juries from time to

7    time have found that there is clear and

8    convincing evidence and invalidated claims of

9    patents, right?

10             MS. HOANG:  Objection; vague.  Lacks

11        foundation.  Calls for speculation.

12        A.    I'm not recalling any specific

13   instances where that occurred as I sit here

14   today.  It may have happened, I'm not trying to

15   say it never happened in the history of our court

16   system.

17   BY MR. SIGLER:

18        Q.    All right.  Let's press on to

19   Exhibit 32.

20             (Whereupon, Exhibit 32,

21        Reexamination Control No. 10/019,034, was

22        marked for identification.)

Page 624

1    BY MR. SIGLER:

2            Q.    Do you have Exhibit 32,

3    Dr. Goodrich?

4            A.    Yes, I have it in front of me.

5            Q.    And on the front cover, you see that

6    this is a document in Reexamination Control No.

7    10/019,034?

8            A.    I do.

9            Q.    And that's a reexamination regarding

10   the '978 patent, right?

11           A.    That is correct.

12           Q.    And there is a mailed date stamp on

13   the upper right of October 27, 2022, right?

14           A.    That's right.  Right next to the

15   name and address of your law firm.

16           Q.    All right.  Going to -- let's go to

17   Page 2, please.  It says Page 2 in the upper

18   right corner.

19           A.    Oh, I see it.  Yes, I'm there.

20           Q.    And in the paragraph numbered 3

21   there, it says:  The examiner has considered the

22   declaration of Michael T. Goodrich filed on

Page 625

1    September 28, 2022.

2              Do you see that?

3         A.    I do see that.

4         Q.    All right.  And this is an office

5    action, right?

6         A.    Where does it say that?

7         Q.    On the prior page in the upper left

8    corner it says:  Office action and ex parte

9    reexamination.

10        A.    Yes, I see it now.  Thank you.

11        Q.    All right.  So the patent office

12   considered your September 28, 2022, declaration

13   before issuing this office action, right?

14        A.    That's what this document appears to

15   be saying here on this Page 2.

16        Q.    Okay.  And on Page 2, it states

17   that -- do you see the part that says "Summary of

18   Action"?

19        A.    No, I'm not seeing that.

20        Q.    It says "Summary of Action" right

21   here, on this?

22        A.    Oh, that Page 2.

Page 626

1        Q.    I'm sorry.  Sorry about that.

2     That's 2.  Page 2.  These patent office

3     documents, they are hard to navigate through.

4        A.    No problem.  What actually is the

5     physical Page 2 of this document, I see there's

6     something called "Summary of Action."

7        Q.    Okay.  Item 4 under Summary of

8     Action says:  Claims 1 and 31 rejected, right?

9        A.    Yes, I see that.

10       Q.    And above that in 1A it says:

11    Claims 1, 3, 6, 10, 14, 17, 23, 24, and 30 to 31

12    are subject to reexamination, right?

13       A.    Oh, yeah, in part 1A it says that.

14    Wait, no --

15       Q.    Yeah.  That's what I was referring

16    to 1A?

17       A.    No.  I think you're reading 3, 6,

18    10, 14, 17, 23, 24, 30 in Line 3 it says:  Are

19    patentable and confirmed.

20       Q.    I'll go to that next.

21            Item 3 says:  Claims 3, 6, 10, 14,

22    17, 23, 24, and 30 are patentable and/or

Page 627

1    confirmed, right, sir?

2          A.    Yes, that's correct.

3          Q.    But the examiner rejected Claims 1

4    and 31, right?

5          A.    That's how I would understand this

6    document to be saying.

7          Q.    For those two claims you didn't

8    opine that they required nonhierarchical

9    topology, right?

10         A.    That's my recollection.

11         Q.    Okay.  And let's go to page --

12    actually, backing up for a moment.

13               You did provide opinions, though,

14    that you believed Claims 1 and 31 were not

15    invalidated by the prior art, right?

16         A.    That's correct.

17         Q.    Okay.  But the examiner disagreed

18    with those opinions here, right?

19         A.    Yes.

20         Q.    Okay.  And --

21         A.    That's how I would read this

22    document.

Page 628

1          Q.    -- would that be a decision that the

2     patent office made that you disagree with?

3          A.    That could be an example of such a

4     thing, now that you mention it, yes.

5          Q.    Okay.  Let's go to Page 21.  Where

6     it says Page 21 in the upper right corner.

7          A.    I'm at page that's marked as Page

8     21.

9          Q.    All right.  And here in the section

10    identified with the letter D it says:  Regarding

11    the secondary considerations of nonobviousness.

12               Do you see that?

13         A.    Yes.

14         Q.    Okay.  And under there, it says

15    that -- excuse me -- PO argues that there is

16    long-felt but unsolved needs and industry praise

17    thus the claims are not obvious.

18               Do you see that, sir?

19         A.    I do.

20         Q.    Do you understand PO refers to

21    patent owner?

22         A.    That's how I would understand that

Page 629

1    statement in that context.

2            Q.    And that would be Kove here, right?

3            A.    I agree.

4            Q.    And under that statement the

5    examiner states that he respectfully disagrees,

6    right?

7            A.    Yes, with respect to the evidence of

8    secondary considerations that were offered for

9    this.

10           Q.    Okay.  So Kove offered --

11                 MR. SIGLER:  Strike that.

12   BY MR. SIGLER:

13           Q.    Kove argued that there was a

14   long-felt but unsolved need, right?

15           A.    That's how I would read this

16   statement.

17           Q.    And the examiner found that was the

18   not a long-felt need, right?

19           A.    With respect to the evidence that

20   was provided at that time, that appears to be

21   what the examiner is respectfully disagreeing

22   with.

Page 630

1        Q.    Okay.  And below that section, about

2   two-thirds of the way down the page, it says:

3   Patent Owner argues that there is evidence of the

4   failure of others and unexpected results, thus

5   the claims are not obvious.

6              Do you see that, sir?

7        A.    Where is that again?

8        Q.    About two-thirds of the way down the

9   page, same page.

10             A.    Oh, I do see that.  Yes.

11             Q.    Okay.  So Kove argued that there's

12  evidence of the failure of others and unexpected

13  results, correct?

14             A.    Can I see the PO response there in

15  order to answer your question?

16             Q.    I'm just asking about what the

17  examiner said here?

18             A.    I misunderstood your question, then.

19  I thought you were asking with respect to what

20  was in this PO response.

21             Q.    No.  Let me --

22             A.    If you're asking instead do the

Page 631

1    words on this page say what they are saying, then

2    yes, I agree they say what they are saying.

3          Q.    The examiner is stating his

4    understanding the patent owner argued that there

5    was evidence of failure of others and unexpected

6    results, right?

7          A.    I just read the statement as it

8    says.  And without seeing what was in the patent

9    owner response, I can only presume whether or not

10   that would be the same evidence, for example,

11   that I'm offering in my report rebutting

12   Mr. Greene.

13         Q.    I'm not asking you anything about

14   whether it's the same evidence you're offering.

15   I'm just asking you about this decision.

16               The examiner disagreed that Kove had

17   shown there was evidence of the failure of others

18   and unexpected results in this reexamination,

19   right?

20         A.    Again, without you showing me what

21   is in the PO response, I can only answer with

22   what are the words on this page.  And the words

Page 632

1    are:  PO argues that there is evidence of the

2    failure of others and unexpected results, thus

3    the claims are not obvious, Pages 73 to 76 of PO

4    response.

5              I agree that those are the words on

6    this page.

7         Q.    All right.  And did you review this

8    office action as part of your analysis for your

9    validity report?

10        A.    So this Reexamination Control No.

11   90/019,034 is listed on my materials considered,

12   Appendix B, Page 1.

13        Q.    And this was an office action in

14   that reexamination, right?

15        A.    Yes.

16        Q.    All right.  So you did consider it

17   before issuing your validity report, right?

18        A.    That is my recollection, as I sit

19   here today.

20        Q.    Okay.  And going onto Page 22 of

21   this office action, the examiner states:  Patent

22   owner argues that there is evidence of commercial

Page 633

1     success, thus the claims are not obvious.

2                Do you see that, sir?

3          A.    Yes, I see those words on this page.

4          Q.    And the examiner disagreed with that

5     argument from Kove, correct?

6          A.    The next sentence says:  Examiner

7     respectfully disagrees.

8                I cannot speak to the substance of

9     that without seeing the patent owner response

10    that the examiner is responding to other than to

11    acknowledge the words on this page.

12         Q.    You acknowledge that the examiner

13    stated that he disagreed with that argument,

14    right?

15         A.    I acknowledge the words on this page

16    where the examiner writes:  Examiner respectfully

17    disagrees.

18         Q.    All right.  Thank you.

19                Let's go to Page 24 of the office

20    action.

21         A.    I am there.

22         Q.    And do you see there is a paragraph

Page 634

1    -- last paragraph on the page, it starts with:

2    In regards to Independent Claims 10 and 14.

3         A.    I see that.

4         Q.    All right.  All right.  And it says:

5    In regards to Independent Claims 10 and 14 and

6    Dependent Claim 3, the claims all require the use

7    of a redirect message comprising information for

8    finding a location server known to have location

9    information relevant to the location query as

10   found in Claim 3, similar language in claims 10

11   and 14.

12             Do you see that, sir?

13        A.    I do see that.

14        Q.    Okay.  Is it your understanding that

15   those claims were allowed to remain valid because

16   the redirect message contains a location server

17   known to have the relevant location information?

18             MS. HOANG:  Objection; foundation.

19   Vague.

20        A.    I do note that -- that those claims

21   were allowed as a response to this reexamination,

22   and that paragraph that we just read together

Page 635

1    goes on to talk about the redirect message not

2    being found in Oracle name servers.

3    BY MR. SIGLER:

4         Q.    Okay.  And you agree with that

5    conclusion by the examiner here, right?

6         A.    I would want to spend more time to

7    double-check the words, but after just a quick

8    read, this appears consistent with the opinions

9    I'm offering in my rebuttal report.

10        Q.    Okay.  And pressing on to the next

11   paragraph, which starts with:  In regards to

12   Dependent Claim 6.

13             Do you see that, sir?

14        A.    I do.

15        Q.    And the first sentence of that

16   paragraph says:  In regards to Dependent Claim 6,

17   the claim requires that the location information

18   in the location server is maintained in an index

19   location store indexed by hash table.

20             Do you see that?

21        A.    I do.

22        Q.    All right.  And it goes on to say:

Page 636

1    If Oracle names server had this ability, there

2    would be no need to pass requests up and down a

3    hierarchy of named servers.  It could determine

4    on its own the named server having the desired

5    information and send the request directly to that

6    named server.  While OSG discloses the use of

7    hashing in resolving queries, it fails to

8    disclose the use of hashing at any given location

9    server, i.e., by any given named servers to

10   determine the location server -- named server

11   that contains the desired information.

12            Do you see that, sir?

13       A.   Yes.

14       Q.   You agree with that conclusion by

15   the examiner too, right?

16       A.   I'd want to take more time to

17   double-check all the words, but at a high level,

18   it sounds like this is consistent with the

19   opinion that I'm offering in my rebuttal report.

20       Q.   Okay.  Let's -- actually staying on

21   Page 25, the paragraph below which starts with:

22   In regards to Independent Claim 17.

Page 637

1             Do you see that, sir?

2       A.     I do.

3       Q.     And it says: In regards to

4 Independent Claim 17, the claim requires

5 explicitly transferring a portion of the

6 identifiers and associated locations to a second

7 data location server when a performance criterion

8 reaches a limit.

9             Do you see that, sir?

10      A.     Yes.

11      Q.     And then it goes on to say: Under

12 the Phillips construction, the ordinary and

13 customary meaning as understood by a person of

14 ordinary skill in the art at the time of the

15 invention of the requirement of explicitly

16 transferring a portion of the identifiers and

17 associated locations to a second data location

18 server would require that the identifiers and

19 associated locations first be stored on the first

20 data location server and then be transferred from

21 said first location server to said second

22 location server.

Page 638

1          Do you see that, sir?

2     A.    Yes.

3     Q.    And do you agree with that

4  conclusion by the examiner in the '034

5  reexamination?

6     A.    I would want to take more time to

7  double-check every word, but this appears on

8  first glance to be consistent with the opinions

9  I'm offering in my rebuttal report.

10     Q.    Okay.  It's generally consistent

11  with your opinion on the transferring claims in

12  your rebuttal report, right?

13     A.    That is what I believe I just said,

14  that generally speaking, that's -- sounds

15  consistent.  The data has to first be stored on

16  the first location server and then be transferred

17  from first data location server to second data

18  location server.

19          We talked about on Saturday how, in

20  my opinion, that does not have to be what I was

21  calling a direct transfer, but nevertheless, this

22  other requirement that it first be stored on the

Page 639

1    first data location server, I think is required.

2         Q.   Okay.  Thank you for that, sir.  You

3    can put that document aside.  I'm going to pass

4    you Exhibit 33.

5              (Whereupon, Exhibit 33,

6         Reexamination document, was marked for

7         identification.)

8              THE WITNESS:  I have Exhibit 33 in

9         front of me.

10   BY MR. SIGLER:

11        Q.   Okay.  And this is a document from

12   Reexamination No. 90/019,162, right?

13        A.   That's right.

14        Q.   And that reexamination regards the

15   '978 patent, right?

16        A.   That is correct.

17        Q.   And the mail date of this document

18   is May 16, 2023, right?

19        A.   That's right.

20        Q.   And if we turn to the third page of

21   Exhibit 33 --

22        A.   And by third page, do you mean the

Page 640

1    physical third page or the one that says Page 3

2    at the type?

3             Q.     Physical third page.

4             A.     I am there.

5             Q.     At the top of this page, it says:

6    Order Granting Request For Ex Parte

7    Reexamination, right?

8             A.     I see that.

9             Q.     All right.  Now let's go to the next

10    page, which is labeled Page 2 in the upper right

11    corner.

12            A.     I am there.

13            Q.     Okay.  And it says there that Amazon

14    Web Services is the requester of this particular

15    ex parte reexamination, right?

16            A.     That is how I would read that first

17    sentence, yes.

18            Q.     Okay.  And that the challenged

19    claims are Claims 6 --

20                   MR. SIGLER:  Excuse me.  Strike

21        that.

22    BY MR. SIGLER:

Page 641

1          Q.    And the claims at issue in this

2     reexamination are Claims 3, 6, 10, and 14 of the

3     '978 patent, right?

4          A.    Yes, I agree.

5          Q.    Okay.  And if we -- if we could

6     please go to the next page which is labeled Page

7     3 in the upper right corner.  This page is

8     labeled:  Listing of Prior Art, right?

9          A.    Yes, that's what it says.

10          Q.    And it says:  The request alleges

11     the existence of at least one SMQ based on the

12     following patents and/or printed publications.

13               Do you see that, sir?

14          A.    Yes.

15          Q.    And then it lists Skagerwall, Wolff,

16     Steen, Oracle Names Administrator's Guide, and

17     OracleUnleashed, right?

18          A.    Yes, and we've been referring to

19     Oracle Names Administrator's Guide as ONAG or

20     ONAG.

21          Q.    And then at the bottom of that page,

22     it says:  Of the five references listed above,

Page 642

1    Skagerwall, Wolff, and Steen are newly cited with

2    the instant request, while ONAG and

3    OracleUnleashed was cited in prior and/or

4    concurrent reexaminations of the '978 patent.

5              Do you see that, sir?

6         A.    I do see that.

7         Q.    And that indicates the patent office

8    had not previously considered Skagerwall, Wolff,

9    and Steen with regards to the '978 patent, right?

10             MS. HOANG:  Objection; calls for

11        speculation.

12        A.    Those are the words.  And it also

13   says that -- that they did consider already ONAG

14   and OracleUnleashed.

15   BY MR. SIGLER:

16        Q.    Okay.  Let's go to Page 16.

17        A.    I am at the page that is marked in

18   the upper right-hand corner marked as Page 16.

19        Q.    Okay.  I'm going to ask you about

20   the last sentence on that page which carries over

21   to Page 17.  That sentence says:  Skagerwall

22   teaches each of the directory servers DS1-DSn

Page 643

1     also stores a list of all available directory

2     servers and hash tables.

3                    Do you see that, sir?

4          A.    I do.

5          Q.    And do you agree with this

6     conclusion by the examiner that Skagerwall

7     teaches the use of a hash table on its directory

8     servers?

9                    MS. HOANG:  Objection; foundation.

10        Vague.

11         A.    Could you please hand me the

12    Skagerwall reference to answer your question?

13    BY MR. SIGLER:

14         Q.    Okay.  Sure.  Or you can refer to

15    your report.

16         A.    I would like to do both, please.

17                    (Whereupon, Exhibit 34, Skagerwall

18        Reference, was marked for identification.)

19    BY MR. SIGLER:

20         Q.    I'm handing you Exhibit 34, which is

21    the Skagerwall reference.

22         A.    (Witness reviewing documents.)

Page 644

1                    So I speak to this in my report, for

2        example, beginning on Paragraph 688 on Page 278

3        and going to Paragraph 695 in -- on Page 283.

4        This language.

5                    And here I state that I -- it's my

6        opinion that Skagerwall does not teach each

7        location server configured to determine which

8        location server stores the sought-out information

9        with certainty and specificity.

10                   And then I talk about how this hash

11       function is used in Skagerwall with respect to,

12       for example, a primary server and secondary

13       servers.  And it cannot know with certainty that

14       the hash is then used to determine what is being

15       mapped by Mr. Greene to a location server has the

16       requested -- what Mr. Greene is identifying as

17       location information.

18            Q.    Okay.  My question was:  Do you

19       agree with the examiner's conclusion that

20       Skagerwall teaches the use of a hash table on its

21       directory servers?

22            A.    So if by that are you asking does

Page 645

1    Skagerwall use a hash table in some of its

2    teachings, yes, it has what it recites as -- for

3    example in Column 3, beginning at Line 15:

4    Memory means for storing a list of available

5    directory servers in a hash table.

6              For what it is calling directory

7    servers.

8         Q.    So Skagerwall does teach the use of

9    a hash table on its directory servers?

10        A.    With what it calls directory

11   servers, it has a hash table.  In my opinion, the

12   way that it discloses the use of its hash table

13   does not read all the requirements for the hash

14   table requirements in the asserted claims.

15        Q.    Are Skagerwall directory servers

16   arranged hierarchically?

17        A.    In my opinion they are, yes.

18        Q.    Okay.  Let's -- turning back to --

19   before we do that.  Why, in your opinion, are

20   Skagerwall's directory servers arranged

21   hierarchically?

22        A.    Because of this notion of how

Page 646

1   there's a primary server and secondary servers in

2   that DS or directory server configuration in

3   Skagerwall.  Because primary and secondary the

4   way you first go to primary and then go to

5   secondary to get the answer back implies a

6   hierarchical topology to a person of ordinary

7   skill in the art.

8   BY MR. SIGLER:

9        Q.    Turning back to --

10              MS. HOANG:  Can we take break?

11              THE VIDEOGRAPHER:  The time right

12      now is 3:07 p.m.

13              And we're off the record.

14              (Recess taken.)

15              THE VIDEOGRAPHER:  The time right

16      now is 3:17 p.m.

17              We're back on the record.

18   BY MR. SIGLER:

19        Q.    All right.  Dr. Goodrich, let's go

20   back to Exhibit 33.  A couple more questions

21   there.  I'd like to take you to Page 19, please.

22        A.    I am there.

Page 647

1          Q.     And do you see halfway down Page 19

2     it says SM Q1 analysis?

3          A.     I do I see that.

4          Q.     And then the second sentence of that

5     portion, this order says:  Both Skagerwall and

6     Wolff are newly cited with respect to the '978

7     patent and their teachings are significant as

8     Skagerwall expressly discloses the limitation in

9     Claim 6 found patentable in concurrent EP

10    processing 90/019,034.

11              Do you see that?

12         A.     I do.

13         Q.     And so the examination here says

14    both Skagerwall and Wolff are newly cited with

15    respect to the '978 patent, correct?

16         A.     I see those words, yes.

17         Q.     Do you know what he means when he

18    says "newly cited"?

19              MS. HOANG:  Objection; vague.

20         A.     I'm not 100 percent sure.  I'd like

21    to take more time to double-check but it appears

22    he's referring to the patent history for the '978

Page 648

1    and suggesting that they are newly cited for

2    that.

3                    But, again, I'd want to double-check

4    that and take more time to make sure that is the

5    case.

6    BY MR. SIGLER:

7           Q.     Okay.  Let's go to Page 29, please.

8           A.     I'm at the page marked 29.

9           Q.     And the second sentence of the first

10   paragraph on Page 29 it says:  ONAG and

11   OracleUnleashed have been considered in prior

12   examinations of the '978 patent; however, Steen

13   is newly cited, thus ONAG and OracleUnleashed and

14   Steen is a new combination of references.

15                   Do you see that, sir?

16          A.     I do see those words.

17          Q.     All right.  And do you know what the

18   examiner is referring to here when he states that

19   Steen is "newly cited"?

20          A.     I would want to take more time to

21   double-check, but it appears he's referring to

22   Steen as being a new reference with respect to

Page 649

1    the history of the '978 patent.

2              But, again, I'd want to take more

3    time to double-check.

4         Q.    Okay.  And the examiner also states

5    that ONAG and Unleashed and Steen is a new

6    combination of references, right?

7         A.    Right.  With ONAG and

8    OracleUnleashed had been previously considered,

9    and now adding in Steen.

10        Q.    Okay.  You can put that document

11   aside.

12        A.    All right.

13              (Whereupon, Exhibit 35,

14       Reexamination 90/019,165, was marked for

15       identification.)

16   BY MR. SIGLER:

17        Q.    I'm passing you Exhibit 35.

18        A.    Thank you.

19        Q.    All right.  Exhibit 35 is a document

20   from Reexamination 90/019,165, right?

21        A.    Yes, I see that.

22        Q.    And that reexamination concerns the

Page 650

1    '170 patent, right?

2        A.    Correct.

3        Q.    And the mail date on this Exhibit 35

4    is March 29, 2023, right?

5        A.    Yes, I see that.

6        Q.    And if you go to the third page of

7    the document itself -- it's not labeled Page 3 --

8    which is the third page.

9        A.    I am there.

10        Q.    And in the upper left-hand corner it

11    says:  This is an order granting request for ex

12    parte reexamination.

13              Right?

14        A.    I see that.

15        Q.    And if you could please turn to the

16    next page, which is labeled Page 2 in the upper

17    right-hand corner.

18        A.    I am there.

19        Q.    And at the top it says:  Decision on

20    request.

21              Right?

22        A.    Yes, that's what it says.

Page 651

1        Q.   And it says:  A substantial new

2  question SNQ of patentability affecting Claims 1,

3  2, 6, 8, 9, 12 and 16 of United States Patent No.

4  7,814,170, hereinafter '170 patent, is raised by

5  the request for an ex parte reexamination filed

6  17 February 2023.

7           Do you see that, sir?

8        A.   I do, yes.

9        Q.   And this was a reexamination filed

10  by Amazon, right?

11        A.   I believe so because it lists your

12  law firm as the place where it's coming from.

13        Q.   Okay.  And so this decision found

14  that there was a substantial new question of

15  patentability affecting Claims 1, 2, 6, 8, 9, 12

16  and 16 of the '170 patent, right?

17        A.   I'm not a lawyer, but as a

18  layperson, that's how I would read that first

19  sentence marked No. 1 on what is labeled Page 2.

20        Q.   Okay.  Please turn to Page 3.  It

21  says "Page 3" in the upper right-hand corner.

22        A.   I am there.

Page 652

1          Q.    All right.  And about halfway down

2     the page there is a section headed "Prior Art

3     Cited in the Request."

4                Do you see that?

5          A.    I do see that.

6          Q.    And it says under there:  The

7     present request indicates and the requester

8     considers that a substantial new question of

9     patentability is raised as to Claims 1, 2, 6, 8,

10    9, 12, and 15 of the '170 patent by the following

11    prior art references.

12               Do you see that?

13         A.    I do.

14         Q.    And then it lists Skagerwall, Wolff,

15    ONAG, OracleUnleashed, and Steen, right?

16         A.    Yes, that's listed here.

17         Q.    And those are all prior art

18    references that are at issue in this litigation,

19    right?

20         A.    Those are all alleged prior art

21    references that are also at issue in this case

22    and that I comment on in my rebuttal report.

Page 653

1        Q.     All right.  Let's go to Page 12,

2    please.

3        A.     I am at the page marked Page 12.

4        Q.     All right.  And there is a paragraph

5    about two-thirds of the way down the page that

6    starts with:  The Skagerwall and Wolff

7    references.

8               Do you see that?

9        A.     Yes, I see that.

10       Q.     It says:  The Skagerwall and Wolff

11    references were not previously discussed by the

12    examiner nor applied to Claims 1, 2, 6, 8, 9, 12,

13    and 15 of the prior examination of the '170

14    patent as discussed above.

15               Do you see that, sir?

16       A.     I do.

17       Q.     Okay.  And then -- well, so the

18    examiner is noting here that Skagerwall and Wolff

19    weren't discussed by the examiner in the prior

20    reexamination of the '170 patent, right?

21       A.     That's -- again, I'm not a lawyer,

22    but as a layperson, that is how I would read this

Page 654

1    sentence.

2          Q.    Okay.  And then the examiner goes on

3    in the next paragraph to state that:  Skagerwall

4    in view of Wolff raises a substantial new

5    question of patentability with respect to at

6    least Independent Claims 1, 6, and 15, right?

7          A.    Again, I'm not a lawyer, but as a

8    layperson, that is how I would read that

9    sentence.

10         Q.    Do you feel that you need to be a

11   lawyer in order to understand decisions issued by

12   the patent office?

13         MS. HOANG:  Objection; vague.

14         A.    No.  The reason why I'm saying that

15   is because it's saying words that sound on the

16   surface at least like they're dealing with the

17   law, namely, this notion of being a substantially

18   new question of patentability.  That's a question

19   that I've had attorneys explain to me.  Hence, I

20   believe that's starting to impinge on the kinds

21   of things that lawyers would know about so that's

22   why I've been prefacing my statements that I'm

Page 655

1    reading these words from the perspective of

2    someone who is not a lawyer.

3    BY MR. SIGLER:

4          Q.    Do you have an understanding of what

5    "substantial new question of patentability"

6    means?

7          A.    I don't know if I've addressed that

8    in this report.  Let me double-check.

9                Yeah.  So I just reviewed my

10   Section 2 on "Legal Principles," which begins on

11   Page 2, at Paragraph 7, and goes to Page 14 at

12   Paragraph 50.  And I didn't see any discussion

13   here about substantial new questions of

14   patentability.

15               I don't recall anywhere in my

16   rebuttal report where that issue came up, but if

17   there is a place in my report where you feel I

18   have addressed that issue, I'd be happy to go

19   there and answer that.

20               Otherwise, just sitting here today,

21   that sounds like lawyer kind of words, so I

22   would -- that's why I've been prefacing my

Page 656

1      statements that I'm reading the words from the

2      patent office from the perspective of someone who

3      is not a lawyer.

4           Q.    All right.  And you've addressed --

5      in your validity report, you've addressed

6      decisions from the reexaminations of the

7      patents-in-suit, right?

8           A.    I believe so.

9                 Where -- where would you like me to

10     go to discuss that?

11          Q.    I'm just asking you in general if

12     you recall providing opinions on events that have

13     occurred in the reexaminations of these patents.

14          A.    Let me double-check.

15                So, yes, in my rebuttal report

16     beginning on Paragraph 1070 on Page 483, I

17     address some statements made by Mr. Greene with

18     respect to response to the nonfinal office action

19     currently pending in reexamination 90/019,109,

20     which concerns only Claims 17, 23, 24, and 30 of

21     the '978 patent.

22                And then I go on to provide some

Page 657

1    rebuttal opinions from Paragraphs 1071 to 1076 so

2    that's at least one example where I addressed

3    examination in the patent office.

4         Q.   Okay.  So you've --

5              MR. SIGLER:  Strike that.

6    BY MR. SIGLER:

7         Q.   In your report on validity, you rely

8    on certain decisions that the patent office has

9    made in the reexaminations; is that fair?

10             MS. HOANG:  Objection; vague.

11        A.   And -- and now what are you

12   referring to?  You're referring to this one or

13   some other ones as well?

14   BY MR. SIGLER:

15        Q.   That's one example, right, where

16   you've addressed reexamination decision in your

17   validity report?

18        A.   Yes, indirectly because I'm

19   responding to what Mr. Greene said about that

20   reexamination.

21        Q.   Okay.  All right.  Let's go back to

22   Exhibit 35, please.

Page 658

1　　　　A.　　I'm back to Exhibit 35.

2　　　　Q.　　Okay.　And -- and you would agree

3　that in this reexamination of the '170 patent

4　that the patent office is currently reexamining

5　Claims 1, 2, 6, 8, 9, 12, and 15 of the '170

6　patent, right?

7　　　　A.　　Yes, that's how I understood the

8　statement, for example, on the top of what is

9　marked as Page 2.

10　　　　Q.　　Okay.　So the patent office is

11　currently reviewing whether the prior art that

12　Amazon submitted in this reexamination

13　invalidates those claims of the '170 patent,

14　right?

15　　　　A.　　That's how I would read this

16　document, that they're considering that with

17　respect to Claims 1, 2, 6, 8, 9, 12, and 15 of

18　the '170 patent in light of Skagerwall, Wolff,

19　ONAG, OracleUnleashed, and Steen.

20　　　　Q.　　Okay.　Thank you.

21　　　　　　Let's go to Page 13, please, of this

22　document.

Page 659

1         A.    I'm at the page marked Page 13.

2         Q.    All right.  And here, on Page 13,

3    the examiner is discussing ONAG in view of

4    OracleUnleashed and Steen, right?

5         A.    It says:  ONAG in view of

6    OracleUnleashed and Steen, at the top.

7         Q.    Okay.  And in the second-to-last

8    paragraph on this page, it says:  Steen describes

9    that each sub-node should be aware of how the

10   directory node with which it communicates is

11   partitioned, allowing the avoidance of querying

12   the management service each time a sub-node needs

13   to communicate with its parent or children,

14   Page 108 of Steen.

15              Do you see that, sir?

16        A.    Yes.

17        Q.    Okay.  So the patent office found

18   here that Steen discloses a server knowing how

19   data is distributed -- distributed within its

20   class, right?

21        A.    Could you please give me the Steen

22   reference, in order to answer your question?

Page 660

1          Q.    Yes.

2                (Whereupon, Exhibit 36, Steen

3          Reference, was marked for identification.)

4    BY MR. SIGLER:

5          Q.    It's Exhibit 36.

6          A.    Could you please repeat the

7    question?

8          Q.    So the patent office found here that

9    Steen discloses a server knowing how data is

10   distributed within its class, right?

11         A.    I disagree that that is what is

12   being found here.  Instead, in my opinion, this

13   is referring to a concept in Steen that is

14   referred to as "partitioning" where there is a

15   hierarchy of servers organized in a

16   tree-structured hierarchy wherein each node in a

17   hierarchy is itself then split into sub-nodes so

18   that then the hierarchy is repeated across the

19   sub-nodes using a binary encoding.

20                And so what happens here is that

21   with the sub-nodes, you can query immediately

22   with respect to children and parents, without

Page 661

1   then going to some central location because you

2   already know the connections, the pointers, if

3   you will, between the sub-nodes now of the

4   parent-child hierarchical relationships.

5       Q.    Okay.   And where are you looking at

6   in Steen?

7       A.    Sorry.   I was just pointing -- I'm

8   looking to the section that is cited by this Page

9   13 which is on page marked 108 in Steen.   There

10   is a Figure 6 at the top (indicating) that shows

11   this sub-node partitioning with respect to the

12   tree hierarchy.   And then there's paragraphs

13   right under that that talk about how that then is

14   used and what is illustrated in that Figure 6.

15       Q.    Okay.   And in that -- in the

16   paragraph below that figure, there's a paragraph

17   that starts with:   As an example.

18       Do you see that?

19       A.    Yes, that's the one I was referring

20   to.

21       Q.    Okay.   And it says:   As an example

22   we can use the first end bits of an object

Page 662

1    handled to identify the sub-node responsible for

2    that object.

3                    Do you see that, sir?

4         A.    That's right.

5         Q.    All right.  And then further down in

6    that paragraph, the second sentence from the end

7    says:  We note that we have developed more

8    realistic hashing-based methods than explained

9    here.

10                   Do you see that?

11        A.    Yes.

12        Q.    All right.  And so Steen uses

13   hashing on its directory sub-nodes, right?

14                   MS. HOANG:  Objection; vague.

15   Foundation.

16        A.    I disagree.  This is more like what

17   sometimes happens in research papers that authors

18   sometimes try to foreclose future research.  And

19   by putting in this statement, we've also thought

20   about hashing, I think they are trying to

21   foreclose other people using hashing and saying

22   that, oh, supposedly they had invented it first.

Page 663

1                But that is not what's actually is

2       being disclosed in document.  Instead this

3       document is disclosing this binary system based

4       on binary coding with sub-nodes and the

5       partitioning.

6                So I disagree that it's actually

7       disclosing the hashing in this case.  And in any

8       case, even if it were, I believe that it's still

9       describing hierarchical system that does not have

10      all the requirements that would disclose or

11      suggest all the limitations of the asserted

12      claims.

13      BY MR. SIGLER:

14           Q.    It says that using hashing is

15      possible, though, right?

16           A.    It doesn't even say what they are

17      applying it to, how they are doing it, what --

18      it's so vague.  This just reminds me of the kind

19      of thing sometimes my students do when they are

20      bluffing on an exam.  It's like, oh, I know how

21      to do it.  And they put down some words and

22      didn't actually ever explain how to do it.

Page 664

1    That's what this reminds me of.  Sorry.  It just

2    does.

3         Q.    And have you seen the Steen article

4    before this case?

5         A.    I don't recall having seen this

6    article before.

7               And just to be a little -- again --

8    sort of annoying.  I think the way you say the

9    first author's name is Van Steen.  There was a

10   lot of friends I had that were Dutch.  I think

11   they include the Van as a part of their last

12   name.  If we want to keep calling it Steen that's

13   fine.

14        Q.    And this article appeared in the

15   IEEE Communications magazine in January 1998,

16   right?

17        A.    That is how it's marked, yes.

18        Q.    And you are a recognized IEEE

19   scholar, right?

20        A.    I am an IEEE fellow, actually, which

21   is more than just a scholarly.

22        Q.    IEEE is a well-known organization

Page 665

1    for over 30 years, right?

2          A.    I agree.

3          Q.    IEEE --

4                MR. SIGLER:  Well, strike that.

5    BY MR. SIGLER:

6          Q.    How long have you been an IEEE

7    fellow?

8          A.    If you go to Appendix A in my

9    report, you will see that I was named as a fellow

10   of the IEEE in 2009.

11         Q.    All right.  And do you know Maarten

12   van Steen?

13         A.    I do not know Maarten van Steen.  It

14   doesn't ring a bell.

15         Q.    Does IEEE often publish articles

16   where the authors like Mr. van Steen are

17   bluffing?

18                MS. HOANG:  Objection; vague.  Calls

19        for speculation.

20         A.    Yes, all the time.

21   BY MR. SIGLER:

22         Q.    Have you published any articles

Page 666

1    where you have been bluffing?

2          A.    No, I don't.  I don't do that.  I've

3    seen articles published in IEEE venues where they

4    will say things like, oh, in the future version

5    of the paper we'll solve this problem.  In the

6    final version of the paper -- sometimes they will

7    publish preliminary versions -- in the final

8    version of the paper, we'll do this, we'll do

9    that.  And this has that flavor.  That's all I'm

10   saying.

11         Q.    Are the sub nodes in Steen a

12   cluster?

13               MS. HOANG:  Objection; foundation.

14      Vague.

15         A.    I don't recall Mr. Greene ever

16   saying anything about that.  I'd want more time

17   to think about it.  I don't think it's relevant.

18               Sitting here today, what matters is

19   being able to go to the parent or child next, not

20   going to the sub node.  I think -- once you go to

21   a sub node, those should be identical.  And then

22   going to the sub-sub nodes, like the

Page 667

1   child-parent, then requires following this

2   pointer, which then you can do in this more

3   distributed way, because they've split the node

4   into sub nodes, as shown in Figure 6.

5           Q.    Okay.  And so it's your view that

6   someone reading this article by Mr. van Steen

7   would take the reference to hashing-based method

8   as a suggestion to try hashing; is that correct?

9           MS. HOANG:  Objection; vague.

10      Misstates prior testimony.

11          A.    No, instead, in my opinion, someone

12  reading that statement would just say they had

13  some vague reference to hashing, that does not

14  have any details, doesn't fit into with the prior

15  discussion, and would have to dismiss it, because

16  it's just so vague, so lacking in details, and

17  doesn't sound like it even fits in with what they

18  are talking about, that then they wouldn't --

19  yeah, they wouldn't be clear how -- what -- what

20  the authors are even meaning by that statement.

21          Q.    Okay.  Let's move on to the next

22  exhibit.

Page 668

1                    (Whereupon, Exhibit 37,

2          Reexamination 90/019,109, was marked for

3          identification.)

4     BY MR. SIGLER:

5          Q.    Its Exhibit 37.  It's paper-clipped.

6     It's all one exhibit.

7                    Do you have Exhibit 37 in front of

8     you, sir?

9          A.    I do.

10          Q.    That is document from Reexamination

11     90/019,109, right?

12          A.    That is correct.

13          Q.    And that's the same reexamination of

14     the '978 patent we were discussing in the prior

15     exhibit, right?

16          A.    Yes.

17          Q.    And the mail date on this exhibit is

18     June 20, 2023, right?

19          A.    Yes, that is correct.

20          Q.    All right.  Let's go to the third

21     page of this document, please.

22          A.    I am there.  The physical Page 3.

Page 669

1          Q.    And do you see this is an Ex Parte

2     Reexamination Interview Summary?

3          A.    Yes.

4          Q.    And the interview took place on

5     June 13, 2023, right?

6          A.    That's right.

7          Q.    And it took place by a

8     videoconference, right?

9          A.    That's correct.

10         Q.    And it says below that that:

11    Exhibits shown or demonstration conducted -- and

12    the "yes" box is checked, right?

13         A.    Correct.

14         Q.    And it says below that:  That patent

15    owner provided slide deck.

16               Do you see that?

17         A.    I do.

18         Q.    All right.  And you participated in

19    this interview with the examiners, right?

20         A.    That's correct.

21         Q.    And Dr. Overton participated in

22    that, correct?

Page 670

1          A.    That's also listed here on this

2    page.

3          Q.    And Kove's attorneys, Ms. Hoang and

4    Mr. Hasan, participated in this interview, right?

5          A.    That is correct.

6          Q.    And other participants are examiners

7    and other personnel from the patent office,

8    right?

9          A.    We have the Examiner Surel

10   [phonetic], and then we have a Michael Fuling

11   [phonetic] and a Joseph Pra- -- I don't know how

12   to say that last name.

13         Q.    All right.  And no one on behalf of

14   Amazon was present for this interview, right?

15         A.    I don't know if there was somebody

16   sort of on the call that wasn't listed here.  I

17   don't recall there being another person, just

18   sitting here today.  I note that like the other

19   ones, this is coming from your law office.

20         Q.    Do you know if Amazon's counsel

21   would be permitted to participate in this type of

22   interview under the patent office rules?

Page 671

1          A.    I don't -- I don't know the rules.

2          Q.    Okay.  All right.  And the Interview

3     Summary about halfway down the page identifies

4     the prior art discussed as OracleNamesAdminGuide,

5     OracleUnleashed, and Boukobza, right?

6          A.    That's right.  It seems to be

7     missing the slide deck.  It says it's attached,

8     but then it's not a part of the exhibit.

9          Q.    We'll get to the slide deck.

10         A.    Oh, okay.

11         Q.    And is it your understanding that

12    the patent office is treating the

13    OracleNamesAdminGuide as prior art in this

14    proceeding?

15              MS. HOANG:  Objection; vague.

16        Foundation.

17         A.    I don't recall that issue coming up

18    in the discussions, if that's what you're asking.

19    BY MR. SIGLER:

20         Q.    Okay.  Do you recall any discussion

21    in this interview about whether OracleUnleashed

22    is prior art to the '978 patent?

Page 672

1            MS. HOANG:  Same objection.

2        A.    I'm not recalling that discussion

3    having come up.

4    BY MR. SIGLER:

5        Q.    Okay.  Do you recall the slide deck

6    that was presented at this interview?

7        A.    I recall that there was a slide deck

8    presented, that I believe my recollection is that

9    I discussed during the videoconference.

10        Q.    Okay.  I'm going to pass you

11    Exhibit 38.

12            (Whereupon, Exhibit 38,

13        Presentation, was marked for identification.)

14    BY MR. SIGLER:

15        Q.    Do you recognize Exhibit 38?

16        A.    This appears to be either the slide

17    deck that was presented or something very similar

18    to it.

19        Q.    And did you present this slide deck

20    to the patent office during the June 13, 2023,

21    interview?

22        A.    I recall presenting parts of this

Page 673

1    slide deck during the videoconference.

2          Q.    Did someone else present other parts

3    of this slide deck during the videoconference?

4          A.    That is my recollection, yes.

5          Q.    Who did?

6          A.    I believe Ms. Hoang, who's here to

7    my left, presented some aspects of this slide

8    deck.

9          Q.    Did Dr. Overton speak at the

10   June 13, 2023 interview with the patent

11   examiners?

12         A.    I don't recall if he spoke or not or

13   if he said anything other than pleasantries, just

14   sitting here today.

15         Q.    And who prepared Exhibit 38?

16         A.    So I helped, along with the

17   attorneys, to prepare this slide deck.

18         Q.    Okay.  So you prepared it along with

19   Kove's attorneys; is that correct?

20         A.    That is my recollection, yes.

21         Q.    Okay.  And looking at the first page

22   of Exhibit 38, Claim 17 of the '978 patent is

Page 674

1     shown here, right?

2          A.    Yes, marked out into different

3     sub-elements of the claim.

4                MS. HOANG:  I need to plug this in.

5         You want to go off for a second?

6                MR. SIGLER:  Sure.

7                THE VIDEOGRAPHER:  The time right

8         now is 3:54 p.m.  We're off the record.

9                (Discussion held off the record.)

10               THE VIDEOGRAPHER:  The time right

11        now is 3:56 p.m.  We're back on the record.

12    BY MR. SIGLER:

13         Q.    All right.  And, Dr. Goodrich, I

14    actually want to take you for a moment back to

15    Exhibit 37 which is the interview summary.

16         A.    I am there.

17         Q.    All right.  And in the interview

18    summary, about halfway down the page, it says:

19    Description of the general nature of what was

20    agreed to and if an agreement was reached or any

21    other comments.

22               And then it says:  See continuation

Page 675

1    sheet.

2              Do you see that?

3         A.    I do.

4         Q.    And if you could turn it to over to

5    next page, there is a continuation of description

6    of the general nature of what was agreed to, if

7    an agreement was reached or any other comments,

8    right?

9         A.    I see those words.

10        Q.    And it says:  The patent owner

11   argued that the cited prior art combinations

12   failed to teach or suggest that transferring a

13   portion of identifiers and associated locations

14   from a first location server to a second location

15   server as required by Claim 17 using the proper

16   Phillips claim construction.

17             Do you see that, sir?

18        A.    I do.

19        Q.    And that's the only limitation of

20   Claim 17 addressed here, correct?

21             MS. HOANG:  Objection; misstates

22        evidence.

Page 676

1        A.   I'm not quite following your

2  question.  Sorry.  There's a lot of other words

3  on this page after that.

4  BY MR. SIGLER:

5        Q.   Okay.  But the -- you recognize that

6  the transferring limitation is specifically

7  referenced here on the interview summary, right?

8        A.   I do see that it's being called out

9  in that sentence, yes.

10       Q.   All right.  And looking at the slide

11  deck itself on Claim 17 is shown there on the

12  first page, right?

13       A.   That is correct.

14       Q.   And that transferring limitation is

15  shown as Element 17(e), right?

16       A.   That's correct.

17       Q.   All right.  And let's go to the

18  third page of Exhibit 38, please, of the slide

19  deck.

20       A.   What page again?

21       Q.   The third page.

22       A.   Yeah, I'm there.

Page 677

1          Q.     There is a figure on this slide,

2    right?

3          A.     Correct.

4          Q.     Who made that figure?

5          A.     It was a combination of me and the

6    attorneys.

7          Q.     Does that figure describe the NDTP

8    claimed in the patents?

9          A.     At a high level, it's trying to just

10   show this notion of how there's entities, data

11   associated with entities, that there's

12   identifiers that are unique and associated with

13   an individual entity as shown on the right.

14   Those are then mapped to location strings in the

15   middle, which is identi- -- location server, how

16   there's dashed box around location server and

17   then that maps to the data on the left where you

18   can actually go and get the data itself.

19               And this is very high level visual

20   depiction of some of those claim terms that then

21   are listed below that figure on this slide.

22         Q.     Okay.  And those claim terms are

Page 678

1    "identifier location information" and "location

2    server," right?

3          A.    That's right.

4                And then next to each one of those,

5    I have listed here claim construction for those

6    terms.  So, for example, identifier is a unique

7    encoding that identifies an individual entity,

8    and with which zero or more location strings are

9    associated in a location server.

10         Q.    Okay.  And just walking through each

11   of these, an identifier is associated with a data

12   entity, right?

13               MS. HOANG:  Objection; misstates

14      evidence.

15         A.    Oh, I have it right here.

16               I'm not seeing the word "data

17   entity" here.  Is there a place in this document

18   or elsewhere where you feel it said the word

19   "data entity"?

20   BY MR. SIGLER:

21         Q.    I thought you said in your prior

22   answer that there's data associated with

Page 679

1    entities --

2         A.    Oh.

3         Q.    -- and that -- well, is it correct

4    that identifiers are unique and associated with

5    an individual entity?

6         A.    We have the construction for

7    identifiers pretty clear:  A unique encoding that

8    identifies an individual -- and I stress

9    individual -- entity and with which zero or more

10   location strings are associated in a location

11   server.

12        Q.    Okay.  And part of that is that the

13   identifier is a unique encoding that identifies

14   an individual entity, right?

15        A.    There's part of that that says that.

16   That's right.

17        Q.    Okay.  And who made this figure

18   again?

19        A.    It was a combination of me and

20   attorneys for Kove.

21        Q.    Does this correspond to claim --

22             MR. SIGLER:  Well, strike that.

Page 680

1        That's a bad question.

2    BY MR. SIGLER:

3        Q.    Does this figure describe the method

4    claimed in Claim 17?

5            MS. HOANG:  Objection; foundation.

6        Vague.

7        A.    The intent of this figure was to be

8    a demonstrative that shows relationships between

9    various claim terms like "identifier, location

10   information, location server" that we see popping

11   up in Claim 17.  So I just wanted to give the

12   examiner a mental image, a picture, if you will,

13   of the relationship between those various

14   components.  And I did my best to do so in a way

15   that was consistent and not trying to read

16   anything else in except for the language of the

17   claim constructions.

18   BY MR. SIGLER:

19       Q.    All right.  Thank you.

20             Let's go to the next page of

21   Exhibit 38.

22       A.    I am there.

Page 681

1          Q.    There are some excerpts from the

2     Boukobza patent here on this page, right?

3          A.    That's right.

4          Q.    And did you present -- did you

5     present this slide to the patent office in the

6     interview in June?

7          A.    My recollection is that I did

8     present this slide.

9          Q.    All right.  And these portions of

10    Boukobza don't address every embodiment in

11    Boukobza, do they?

12         A.    I'm not following your question.

13    Sorry.

14         Q.    These portions of Boukobza address

15    one embodiment in Boukobza, right?

16              MS. HOANG:  Objection; vague.

17         A.    I'm still not understanding your

18    question.  There's two passages here, not just

19    one, and they're from two pretty far apart

20    locations in the Boukobza reference.

21    BY MR. SIGLER:

22         Q.    Okay.  Let me ask you this:  The

Page 682

1   Boukobza excerpt on the left shows Boukobza

2   teaching measuring a parameter, right?

3         MS. HOANG:   Objection; vague.

4     Misstates testimony -- sorry -- evidence.

5      A.    I'm sorry.   Could you repeat the

6   question?

7   BY MR. SIGLER:

8      Q.    Yeah.   Let me focus you on the

9   beginning of the excerpt on the left of this

10   slide.

11        It says:   The parameter or a

12   fragment TS in which the measurement consists of

13   verifying the condition which corresponds to the

14   case in which the largest of the extents --

15   maxextents of the tables of the tablespace,

16   tablespace is smaller than the largest hole of

17   the tablespace.

18        Do you see that?

19      A.    Yeah, that sentence isn't done yet.

20   It continues.

21      Q.    Okay.   And this, at least that

22   portion of the sentence describes measuring a

Page 683

1    parameter, right?

2             MS. HOANG:  Objection; vague.

3        A.    Can I see the Boukobza reference,

4    please, to see the broader context?  I know we

5    excerpt this for the examiner, but we were trying

6    to focus in on arguments that were raised in what

7    was causing the re-exam.  And I would like to see

8    this in the broader context to answer your

9    question.

10   BY MR. SIGLER:

11       Q.    Was the examiner given a copy of

12   Boukobza during this interview?

13       A.    My understanding was that the

14   examiner had access to the Boukobza reference

15   during the interview, but I was not there

16   physically.  I was only there on videoconference,

17   so the best I can say is that we offered this

18   citation and the Boukobza reference.

19       Q.    Besides these two pieces of

20   Boukobza, did you talk about any other portion of

21   Boukobza with the examiner at this interview?

22       A.    Sorry.  I was not done answering my

Page 684

1    question -- your question from the previous

2    question.

3          Q.    Oh, I thought you were.

4          A.    Yeah.  I'm sorry if I wasn't clear.

5                So as I mentioned in Paragraph 127

6    in my rebuttal report, Boukobza is US Patent

7    6,122,644, which was filed June 27, 1997.

8          Q.    How is that at all responsive to my

9    question?

10               MR. SIGLER:  I'm moving to strike

11         that answer.  That's just time-wasting it's

12         not responsive at all to my question.  My

13         question was --

14         A.    May I explain why?  Or are we going

15   to talk over one another?

16         Q.    I'm going to reask my question --

17         A.    Then you're not going to allow me to

18   finish my answer.

19         Q.    Well, you're not answering my

20   question.  My question is:  Besides --

21         A.    You're not letting me --

22         Q.    -- besides --

Page 685

1          A.     Are we just talking over each other

2     or are we going to try to respect one another,

3     and let you ask a question and then I answer a

4     question.

5                I know we didn't set that up as a

6     protocol at the beginning of my deposition.  But

7     I thought that was the protocol.  I've been in

8     many depositions.  I thought that's how we do

9     things.

10               Am I correct that's how we're going

11    to do it today?

12         Q.    You're incorrect about what my

13    question was.

14               The question I asked you:  Was the

15    examiner given a copy of Boukobza during this

16    interview?

17               MS. HOANG:  Objection; asked and

18        answered.

19    BY MR. SIGLER:

20         Q.    That portion of your report has

21    nothing to do with that.  Reading the patent

22    number has nothing to do with answering my

Page 686

1    question.  So I'm going to move on.

2          A.    To respond to that question, unless

3    you are -- are you withdrawing that question?

4          Q.    You didn't answer it anyway, so

5    sure.  I'll just move on.

6          A.    I disagree.  I believe I was

7    answering it.  And to complete the answer now

8    because you're disputing what I feel is my

9    integrity that I'm not answering fully and

10   accurately today, it's my understanding the

11   patent examiners have access to every patent that

12   has ever been issued; hence, I believed and still

13   do today, that the patent examiner had access to

14   Boukobza.  That's why I read the patent number.

15         Q.    Okay.  We'll see how you answer at

16   trial.

17               All right.  Let's Slide 5, the next

18   one.

19         A.    I am there.

20         Q.    Do you see that there are some

21   excerpts from OracleUnleashed here?

22         A.    I do.

Page 687

1          Q.    OracleUnleashed isn't a patent

2     right, sir?

3          A.    Correct.

4          Q.    So do you know if the examiner had a

5     copy of OracleUnleashed during this interview?

6          A.    I don't recall, just sitting here

7     today.

8          Q.    Who chose to put these words on

9     Slide 5?

10          A.    My recollection, that was a

11     combination of me and the attorneys for Kove,

12     based on what was put into the request for

13     re-exam.

14          Q.    Okay.  And here on this slide, we

15     see that OracleUnleashed refers to something

16     called maxextents, right?

17          A.    That's right.

18          Q.    And Oracle can use that as a

19     parameter, right?

20          A.    I'm not seeing there here.  Sorry.

21               Is there a place you feel I

22     addressed that in my report?

Page 688

1          Q.     Let's go to the previous slide.

2          A.     I am there.

3          Q.     On the right-hand side in the sixth

4     line excerpt of Boukobza there, Boukobza

5     references maxextents as well, right?

6          A.     Correct.

7          Q.     Would you agree that Boukobza's

8     teachings apply to Oracle's systems?

9          A.     I'm not following that question.

10    I'm sorry.

11              Could you please hand me a copy of

12    Boukobza to answer your question?

13         Q.     Passing you Exhibit 39, which is

14    Boukobza.

15              (Whereupon, Exhibit 39, Boukobza,

16         was marked for identification.)

17         A.     So if we go to Column 15 now in the

18    broader context of Boukobza, and go to Line 1, it

19    says:  Some nonlimiting exemplary embodiments of

20    predefined Oracle parameters are offered below.

21              And then we see this excerpt that's

22    on the left of this slide from Boukobza, from

Page 689

1    Column 15, at Line 18, through 36.

2        Q.    So you would agree that Boukobza's

3    teachings apply to Oracle systems?

4        A.    Boukobza is talking about here its

5    invention.  And it's doing in the context of a

6    preferred embodiment that involves Oracle

7    parameters, if that answers your question.

8        Q.    So at least that embodiment in

9    Boukobza applies to Oracle parameters?

10       A.    That embodiment in Boukobza is

11   described using Oracle parameters for the

12   invention of Boukobza.

13       Q.    Okay.  Thank you.  You can --

14             And specifically those parameters

15   include the maxextents parameter we were just

16   discussing, right?

17       A.    Actually it's referring to the

18   ORA_fragment_TS that it refers to as a parameter.

19             And then something else called

20   maxextents is listed in the text, where it says:

21   That the parameter ORA_fragment_TS in which the

22   measurement consists of verifying the condition

Page 690

1   which corresponds to the case in which the

2   largest of the extents (maxextents) of the tables

3   of the tablespace tablespace is smaller than the

4   largest hole of the tablespace and if this

5   condition is true of sending an action

6   proposition window in which it is indicated that

7   the tablespace tablespace must be reorganized

8   according to the following propositions, either a

9   file is automatically created to enlarge the

10  tablespace tablespace or it requests when the

11  standard export_operation_tables/import command

12  is to be executed or the administration is

13  requested to program the start of his

14  reorganization utility.

15       Q.     Thank you for that.

16           And referring back to the slide

17  where there are five excerpts from

18  OracleUnleashed.

19           Are you back there with me, sir?

20       A.     Yes.

21       Q.     You would agree that this slide

22  doesn't show everything that OracleUnleashed

Page 691

1    teaches, right?

2          A.    It necessarily was an excerpt of

3    what I thought were the more relevant portions

4    since this was in response to a request to then

5    grant this re-exam that now was occurring.

6          Q.    All right.  You can put that aside.

7                (Whereupon, Exhibit 40, Document in

8          the 90/019,109 re-exam, was marked for

9          identification.)

10   BY MR. SIGLER:

11         Q.    I'm passing you Exhibit 40.

12         A.    I have that.

13         Q.    All right.  And Exhibit 40 is a

14   document in the 90/019,109 re-exam, right?

15         A.    Yes.

16         Q.    And that's the re-exam we were just

17   discussing regarding the '978 patent, right?

18         A.    Correct.

19         Q.    And the mail date is August 21,

20   2023, right?

21         A.    That's right.

22         Q.    And if you could please go to the

Page 692

1 page labeled "Page 2" in the upper right corner.

2    A. I am there.

3    Q. At the top we see here again that

4 this particular reexamination dealt with Claim

5 17, 23, 24, and 30 of the '978 patent, right?

6    A. I agree that that's what that is

7 saying.

8    Q. All right.  Let's go to Page 8,

9 please.

10    A. I'm at the page marked Page 8.

11    Q. All right.  Thank you, sir.

12    All right.  And in the paragraph

13 that starts close to the top of the page at Page

14 8, I want to ask you about sentence near the end

15 of that.

16    Do you see about a quarter of the

17 way from the bottom there is a sentence that

18 says -- that starts with:  When viewed

19 together...

20    A. I'm there.

21    Q. Okay.  And it says:  When viewed

22 together, a person of ordinary skill in the art

Page 693

1    would recognize that as the database and the name

2    server and ONAG is continually being added to,

3    eventually it would exceed the maximum size that

4    can to be managed by a single named server as it

5    would eventually run out of space.

6              Do you see that, sir?

7         A.    I do.

8         Q.    Do you agree that a named server as

9    described in ONAG that is continually being added

10   to will eventually run out of space?

11        A.    Is there a place in my report where

12   you feel I've addressed that or referenced that

13   describes that in terms of the evidence that

14   Mr. Greene relied upon?

15        Q.    I'm just asking you if you agree

16   with this conclusion by the patent examiner?

17             MS. HOANG:  Objection; foundation.

18   Vague.  Scope.

19        A.    (Witness reviewing documents.)

20             So I believe I addressed the context

21   for this in my report, in paragraph beginning --

22   paragraphs beginning in Paragraph 941, on Page

Page 694

1    391, and going through at least to Paragraph 949

2    on Page 394.

3                So here, I'm talking about how the

4    name servers in ONAG have two different types.

5    One is what Mr. Greene referred to as or what

6    even ONAG refers to as the flat naming

7    convention, and that implementation, every named

8    server is identical.

9                So this description about what would

10   allegedly happen when they overflowed would apply

11   to all of them equally, and then it would be --

12   now the system would not be scaling anymore.

13               And then the alternative is in a

14   hierarchical configuration for the named spaces,

15   and in that case, it no longer has the so-called

16   nonhierarchical topology.  So I believe I've

17   addressed that issue here in my report.

18   BY MR. SIGLER:

19        Q.    How does that address whether a

20   named server that's continually being added to

21   will eventually run out of space?

22        A.    So to reiterate, if we're in the

Page 695

1     nonhierarchical version of ONAG, then every named

2     server is identical.  Hence, it cannot scale past

3     the size that it already is because they are all

4     the same.  Since this -- so this would not apply.

5                 But if you were in the hierarchical

6     version, it could, in principle, apply, but now

7     we're in the hierarchical organization that

8     Mr. Greene says is not what is in the patents so

9     that's where I was disagreeing with him on that

10    issue.

11                There's -- there's other issues too.

12    If you would hand me the ONAG reference, I

13    believe I can mention some other issues as well.

14        Q.    Okay.  We'll get -- we'll get to

15    that later.  I understand your response for now.

16                Going back to Page 8 -- actually --

17    actually, no, let's go to Page 33, please.

18        A.    I'm at the page marked Page 33.

19        Q.    Okay.  And do you see the bold text

20    in the middle of Page 33?

21        A.    Yes.

22        Q.    And that text says:  Claim 17, 23,

Page 696

1    and 30 are rejected under pre-AIA 35 USC 103(a)

2    as being unpatentable over ONAG in view of

3    OracleUnleashed.

4              Do you see that?

5         A.    Yes.

6         Q.    So the patent office concluded in

7    its decision that those three claims of the '978

8    patent are unpatentable over ONAG in view of

9    OracleUnleashed, right?

10        A.    That is how I read that sentence.

11        Q.    And in this decision, the patent

12   office also found Claim 24 of the '978 patent not

13   invalid, right, sir?

14        A.    That is my recollection, yes.

15             MR. SIGLER:  All right.  Why don't

16   we take a break.

17             THE VIDEOGRAPHER:  The time right

18   now is 4:29 p.m.  We are off the record.

19             (Recess taken.)

20             THE VIDEOGRAPHER:  The time right

21   now is 4:42 p.m., and we're back on the

22   record.

Page 697

1    BY MR. SIGLER:

2           Q.    All right.  Welcome back,

3    Dr. Goodrich.

4           A.    Thank you.

5           Q.    Please go to Paragraph 158 of your

6    validity report, which is on Page 68.

7           A.    I am there.

8           Q.    Okay.  And here in Paragraph 158 you

9    state that you disagree with Mr. Greene's opinion

10   that the '978 patent claims recited there are

11   invalid in view of the '640 and '170 patents

12   based on obviousness-type double patenting,

13   right?

14          A.    That is correct.

15          Q.    And below that in Paragraph 159, the

16   first sentence says, "I understand that the

17   Asserted Patents are part of the same family of

18   patents."

19                Do you see that, sir?

20          A.    Yes.

21          Q.    Can obviousness-type double patents

22   invalidate patents in the same family?

Page 698

1            MS. HOANG:  Objection; foundation.

2      Also a legal conclusion.

3            A.    I'm not an attorney, but I've been

4      told by attorneys that such things could be

5      possible, if the patent that came later does not

6      recite distinguishable -- patently

7      distinguishable claims.

8      BY MR. SIGLER:

9            Q.    Okay.  Let's go to Paragraph 165,

10     please, on Page 70.

11           A.    I'm there.

12           Q.    And here you're critiquing

13     Mr. Greene's analysis on the claims of the '978

14     patent, right?

15           A.    In broad brush strokes, that is

16     correct.

17           Q.    Okay.  And there is a sentence that

18     bridges over from Page 70 to 71, and it says, "He

19     also offers no rationale to combine different

20     claim limitations from different claims (or parts

21     of specifications regarding various embodiments)

22     or why there would be an expectation of success

Page 699

1    in the combination, despite frequently relying on

2    such combinations."

3              Do you see that, sir?

4         A.   Yes.

5         Q.   To demonstrate obviousness-type

6    double patenting, is it your understanding that

7    the challenger has to show a motivation they're

8    combined?

9         A.   My understanding, again, from

10   attorneys, is that for obviousness-type double

11   patenting, one can use a single claim from the

12   previous patent and then show that every single

13   limitation in the newer claim is obvious in light

14   of that, but that's not what Mr. Greene was doing

15   here.

16             Instead he was sort of like mixing

17   and matching from different claims, and he did

18   not provide any motivation of why you would mix

19   and match from different claims.

20        Q.   Okay.  Let's go to Paragraph 180,

21   please.

22        A.   I am there.

Page 700

1          Q.    At the end -- the sentence at the

2    end of that paragraph, you state, "Even if

3    Mr. Greene's opinion is correct, the same,

4    broadly-worded 'inventive concept' does not prove

5    by clear and convincing evidence that the '978

6    patent claims the exact same subject matter as

7    the '640 and '170 patent."

8               Do you see that, sir?

9          A.    Yes.

10         Q.    To show obviousness-type double

11   patenting, is it your understanding that you need

12   to establish that the patents claim the exact

13   same subject matter?

14              MS. HOANG:  Objection; vague.  Calls

15      for a legal conclusion.

16         A.    Can I please see a copy of

17   Mr. Greene's report to answer your question?

18   BY MR. SIGLER:

19         Q.    Well, I don't think we have a copy

20   of Mr. Greene's report.

21         A.    Well, the reason why I'm asking for

22   it is because here in that sentence, I'm

1    rebutting what he is describing as the inventive

2    -- alleged inventive concept as he is

3    characterizing it, and I'm trying to say in

4    rebuttal to that.

5              So I believe this sentence here at

6    the end of Paragraph 180 should be read in that

7    context with the context of rebutting to

8    Mr. Greene's invalidity report at Paragraph 288.

9         Q.   Let's go back to -- let me show you

10   the standard for obviousness-type double

11   patenting that you recited on Page 13, in

12   Paragraph 49.

13        A.   I am there.

14        Q.   And you say there that you

15   understand that the analysis for double patenting

16   requires two steps.  The first one is

17   construction of the claims, right?

18        A.   Yes.

19        Q.   And the second one is determination

20   of whether the differences in subject matter

21   between the claims render the claims patentably

22   distinct.

Page 702

1          Do you see that?

2    A.   That's right.

3    Q.   So you agree that the -- the

4  standard for showing obviousness-type double

5  patenting doesn't require showing that the claims

6  cover the exact same subject matter, right?

7        MS. HOANG:  Objection; vague.  Calls

8    for a legal conclusion.

9    A.   Again, I was responding to what

10  Mr. Greene was saying, that they are directed to

11  the same subject matter.  In my opinion, he did

12  not establish that.  So to the degree in which he

13  was using that to support his obviousness-type

14  double patenting opinions, I disagree with those.

15  That was what I was trying to convey here in my

16  Paragraph 180.

17  BY MR. SIGLER:

18    Q.   Okay.  So you believe Mr. Greene

19  opined that the '978 patent claims cover the

20  exact same subject matter as the '640 and '170

21  patents, and that's what you were responding to?

22    A.   I did not memorize Mr. Greene's

Page 703

1    report.  To answer that question would require me

2    to review Mr. Greene's report at Paragraph 288.

3          Q.    Okay.  But nonetheless, based on

4    Paragraph 49 of your report, you would agree that

5    the test can be met by showing that the subject

6    matter between the claims isn't patentably

7    distinct, right?

8          A.    That's right.  That's -- that's the

9    standard that I applied, that's the legal

10   understanding that I applied.  Here in Paragraph

11   180, I'm merely rebutting something that

12   Mr. Greene said in his report at Paragraph 288

13   which we don't have today, so it's difficult for

14   me to remember what he said and be able to

15   respond in more details about my statements in

16   rebuttal to his statements.

17         Q.    All right.  You also rendered some

18   opinions in your validity report on secondary

19   considerations; is that right?

20         A.    Yes, that's correct.

21         Q.    Let's go to Page 433 of your report,

22   please.

Page 704

1          A.    I am there.

2          Q.    Okay.  Let's go to Paragraph 1060.

3          A.    I am there.

4          Q.    Okay.  And here again on Paragraph

5     1060 you're addressing commercial success, right?

6          A.    That's right.

7          Q.    All right.  And you base your

8     opinion on the commercial success of the

9     patents-in-suit here in Paragraph 1060 on the

10    success of Amazon's products S3 and DynamoDB,

11    right?

12         A.    That's right.

13         Q.    You don't base your opinion on

14    commercial success on any sales of Kove products,

15    right?

16         A.    Not here.  No, I don't.

17         Q.    No one has ever licensed the '640,

18    '170, or '978 patents, right?

19               MS. HOANG:  Objection; scope.

20         A.    I'm not familiar with any evidence

21    regarding licenses of these patents as having

22    occurred yet.

Page 705

1          Q.    Would you agree that licenses to

2    patents can show secondary considerations of

3    nonobviousness?

4               MS. HOANG:  Objection; scope.

5          A.    I have used that evidence in the

6    past in other matters, so that can.  But there's

7    other ways to show that as well, such as in this

8    case benefits that AWS has had and successes

9    they've had commercially by, in my opinion,

10   practicing the asserted claims of the

11   patents-in-suit.

12         Q.    And you don't rely on any licenses

13   to the '640, '170, or '978 patents to support

14   your secondary considerations opinions, correct?

15         A.    That's correct.

16         Q.    All right.  And you don't rely on

17   any revenue Kove has received with respect to the

18   '640, '170, or '978 patents to support your

19   secondary considerations opinions, right?

20         A.    I don't recall having relied on such

21   evidence for my secondary considerations

22   analysis.

Page 706

1         Q.    Okay.  And here in Paragraph 1060

2   you also cite industry praise for S3, right?

3         A.    That's correct.

4         Q.    All right.  And specifically you

5   cite to in Footnote 1198 an article on

6   databricks.com right?

7         A.    That's right.

8         Q.    And it appears that article is

9   entitled "Top Five Reasons For Choosing S3 Over

10  HDFS," right?

11        A.    Correct.

12        Q.    So that's an article by a third

13  party praising S3, right?

14        A.    That's correct, right.

15        Q.    All right.  Let's go to Paragraph

16  1061.

17        A.    I am there.

18        Q.    And Paragraph 1061 you cite the MIT

19  Technology Review article that we looked at

20  earlier, correct?

21        A.    That's right.

22        Q.    And you cite that article as showing

Page 707

1    industry praise for the inventions in the '640,

2    '170, and '978 patents, right?

3         A.    I agree, yes.

4         Q.    And, again, that article doesn't

5    mention those patents, right?

6         A.    Not specifically; instead it is

7    praising the technology that is claimed in those

8    patents.

9         Q.    It's actually praising the

10   technology that Mr. Balakrishnan worked on,

11   right?

12        A.    Right.  Which is, in my opinion,

13   practicing the types of benefits that you get and

14   is benefiting itself from the kinds of things

15   that are in the claims of the patents-in-suit.

16        Q.    Who worked on the technology first,

17   Mr. Balakrishnan or Drs. Overton and Bailey?

18        A.    I'm not aware of any alleged prior

19   art being offered by AWS that was authored or

20   invented by Mr. or Dr. Balakrishnan, if that

21   answers your question.  So, I have not seen any

22   evidence that he invented this prior to the Kove

Page 708

1    patents-in-suit.

2         Q.    Okay.  All right.  Let's look at

3    Paragraph 1062, please.

4         A.    I am there.

5         Q.    And in the second sentence you say

6    "In my experience, and based on information from

7    peer-reviewed publications, a large number

8    citations to a patent, particularly by

9    significant industry players like Amazon, is an

10   indicator of industrially important patents."

11              Do you see that?

12        A.    Yes.

13        Q.    And here you're expressing the

14   opinion that Kove's patents are industrially

15   important, right?

16        A.    Correct.  Due to the vast number of

17   citations that they have received by other patent

18   applications, including patent applications by

19   Amazon itself, which I believe began already in

20   2012.  Hence, I know we talked about this on

21   Saturday, I didn't recall this, but after doing

22   the review of my rebuttal to invalidity, I

Page 709

1    realized that already Amazon was aware of the

2    patents-in-suit in 2012, because they were

3    praising it in this way of citing it.

4                    And indeed, in my world of academia,

5    receiving citations to one's work is literally

6    thought of as praise.  And we judge people for

7    the sake of their promotions on that basis.

8          Q.    It's your testimony that Amazon

9    praised Kove's patents in 2012?

10         A.    That is correct.  And I cite to

11   these peer-reviewed papers that talk about how

12   the value of a patent is correlated to the number

13   of citations it receives.

14                   My opinion, based on that evidence

15   from those peer-reviewed papers, this is

16   significant evidence of industry praise,

17   including from Amazon itself.

18         Q.    Who at Amazon knew about the Kove

19   patents in 2012?

20         A.    May I have a computer that can go to

21   Google Patents in order to answer your question.

22   There's over 250 citations that I cite to with

Page 710

1    respect to the patents-in-suit.  Like I said,

2    many of them are from Amazon, hence, we could do

3    this offline as well.  If we go to that page,

4    click on those patents, we'll see the inventors

5    who presumably knew about the patents-in-suit

6    because their patent applications cited to it.

7          Q.    And sitting here today, you can't

8    name any of those inventors?

9          A.    (Laughing.)  Sorry.  I didn't mean

10   to laugh.  No, I cannot recall with crystal

11   clarity all of those websites at Google Patents,

12   but I'd be happy to go there if you would just

13   hand me a computer that is connected to the

14   internet I can tell you that answer.

15         Q.    Would have seemed a lot easier if

16   you knew who at Amazon knew about these patents

17   in 2012 to just put their name in there, wouldn't

18   it?

19              MS. HOANG:  Objection; argumentative

20      and speculative.

21         A.    I felt this was sufficient for my

22   analysis.  Like I said, I cite to what I think is

Page 711

1    important, that I did observe Amazon was citing

2    to these patents numerous times beginning in 2012

3    and that I'm citing to the peer-reviewed papers

4    that talk about the importance of citations as

5    industry praise.

6            Q.    And you're a member of the industry

7    that's relevant here, right?

8            A.    Yes, I agree.

9            Q.    And before 2019 you had never heard

10   of Kove's patents, correct?

11           A.    That is correct.

12           Q.    Okay.  Let's go to Paragraph --

13   actually, before we go to Paragraph 1063, let's

14   go back to the double patenting discussion we

15   had.

16               And I'm going to hand you an

17   electronic copy of Dr. Greene's validity report

18   and it's cued up to Paragraph 288, which is what

19   you were asking to look at when you were

20   answering my questions about double patenting.

21           A.    Could you remind me where we were in

22   my report please?

Page 712

1          Q.    Sure.  We were at Paragraph 181.

2               MS. HOANG:  I'm going to get my

3     copy.

4               MR. SIGLER:  We can take a break.

5               THE VIDEOGRAPHER:  Time right now is

6     5:01 p.m.

7               And we are off the record.

8               (Discussion held off the record.)

9               THE VIDEOGRAPHER:  The time right

10    now is 5:02 p.m.

11              And we're back on the record.

12    BY MR. SIGLER:

13         Q.    All right.  You have Mr. Greene's

14    report on the computer screen?

15         A.    I do.  It's at Paragraph 288, which

16    is the paragraph I cite in my Paragraph 180 that

17    we were discussing earlier.

18         Q.    Okay.  And Mr. Greene, in Paragraph

19    288, doesn't make any reference to the '978

20    patent claims reciting the exact same subject

21    matter as the '640 and '170 patents, right?

22         A.    I'm not following your question.  He

Page 713

1    says that:  The three patents cover the same

2    inventive concept.

3              And that's what I'm referring to

4    here.

5              -- that he has this broadly worded

6    inventive concept that doesn't prove they have

7    the same subject matter.

8         Q.    Does Mr. Greene use the words "exact

9    same subject matter" in Paragraph 288 of his

10   report?

11        A.    No, he does not use that word.

12   Instead, what I'm saying here is that he's trying

13   to do this lining up of elements from the earlier

14   patents.  And then even, in my understanding,

15   improperly including specifications from the

16   patents themselves, not the claims, in those

17   tables.  And then saying, oh, they are the same

18   inventive concept.

19              But what he needs to show is that

20   what's in the '978 is not patentably distinct

21   from what's in those earlier patents.  I believe

22   he has not shown that.

Page 714

1        Q.    He doesn't need to show that what's

2   in the '978 patent claims are the exact same

3   subject matter as the claims of the '640 and '170

4   patents, correct?

5              MS. HOANG:  Objection; vague.

6        A.    What I understand was his burden,

7   which again by which I thought was clear and

8   convincing evidence, that he needed to show that

9   together with knowledge of a POSITA, it would be

10  obvious to get this exact same subject matter as

11  the '978 patent, starting from just the claims of

12  the '640 or the '170 patent.

13             And in my opinion, he has not done

14  that, that he has not provided clear and

15  convincing evidence that those two patents with

16  their claims alone plus knowledge of a POSITA

17  would give you the exact same subject matter as

18  the 79 -- on the '978 patent.  That's what I'm

19  trying to convey in this sentence.

20  BY MR. SIGLER:

21        Q.    Thank you.

22             Turning to secondary considerations

Page 715

1   now, and let's go to Page 436, Paragraph 1063.

2          A.    I'm at Paragraph 1063 in my report.

3          Q.    And here, you refer to a

4   presentation that Dr. Overton made at Yale

5   University; is that correct?

6          A.    That's right.

7          Q.    And that was in 2004, right?

8          A.    Correct.

9          Q.    And you say at the end of that

10  paragraph, "I understand that the audience

11  expressed disbelief that Dr. Overton's inventions

12  were possible, which indicates skepticism of

13  those in the industry."

14               Do you see that, sir?

15         A.    I do.

16         Q.    And you're basing that --

17               MR. SIGLER:  Well, strike that.

18  BY MR. SIGLER:

19         Q.    You cite to Dr. Overton's deposition

20  testimony for that statement, right?

21         A.    As well as Kove's sixth amended

22  responses to AWS's first set of interrogatories,

Page 716

1    Nos. 2, 4, 8, 9 at response to Interrogatories

2    No. 4.

3        Q.    Okay.  And have you ever seen any

4    feedback from the audience from that

5    presentation?

6        A.    Beyond the evidence that I cite

7    right here, this is the evidence I'm relying on.

8    I have not seen other evidence that I, just

9    sitting here today, recall besides this evidence.

10       Q.    You've seen no other evidence aside

11    from Dr. Overton's testimony and Kove's response

12    to Interrogatory No. 4; is that correct?

13       A.    Right.  I mean because it's -- it

14    was an oral presentation, so any evidence would

15    have to come from people who were there.  And so

16    that's why I'm relying on evidence with respect

17    to what Dr. Overton is obviously recalling, and

18    then this response is coming from Kove to AWS's

19    interrogatories.

20       Q.    All right.  Have you ever seen any

21    e-mails from audience members at that

22    presentation providing feedback on it?

Page 717

1          A.    No, I understand that this feedback

2     that Dr. Overton was recalling was oral feedback

3     that was not written down or in an e-mail.

4          Q.    All right.  And did you consider the

5     patent office's findings in the reexaminations

6     about secondary considerations when you provided

7     your opinions on secondary considerations?

8          A.    Yes, which is why I cited to new

9     evidence that was not provided to the patent

10    office such as in my Paragraph 1062.

11         Q.    And that new evidence was other

12    companies' citations to Kove's patents, correct?

13         A.    Yes, that's -- that's at least

14    exemplary of new evidence that, as least as I sit

15    here today, I recall was not presented to the

16    patent office during the reexams.

17         Q.    That evidence was available to Kove

18    during the reexams, right?

19         A.    It may have been.  I -- I don't

20    recall it being presented, and I don't recall

21    that the patent office had considered it before.

22         Q.    Okay.  All right.  Let's pass you

Page 718

1    Exhibit 41.

2                    (Whereupon, Exhibit 41, Dr. Overton

3        Presentation at Yale University, was marked

4        for identification.)

5                    THE WITNESS:  I have that.

6    BY MR. SIGLER:

7        Q.    All right.  Do you recognize this

8    document?

9        A.    This looks familiar to me.

10       Q.    Is this the presentation that

11   Dr. Overton gave at Yale University?

12       A.    Yes, I cite to this in my Footnote

13   1205.

14       Q.    All right.  And the first slide is

15   presentation bears the date October 29, 2002,

16   right?

17       A.    That's right.

18       Q.    So he didn't give the presentation

19   in 2004, as you said in Paragraph 1063, correct?

20       A.    I'm going by the evidence that

21   Dr. Overton provided for the date of 2004.  It's

22   not uncommon for presentations to reuse slide

Page 719

1    decks that were prepared at an earlier date, and

2    that may be what is occurring here.

3          Q.    All right.  And Dr. Overton is one

4    of the named inventors on all three patents,

5    right?

6          A.    That is correct.

7          Q.    And he's the CEO of Kove, right?

8          A.    That is my understanding.

9          Q.    All right.  Let's go to Slide 3.

10         A.    I am at the slide identified as 3

11   which has -- has the No. 3 in the lower

12   right-hand corner of this slide.

13         Q.    Okay.  And the heading of this slide

14   is OverX.

15               Do you see that?

16         A.    I do.

17         Q.    That was the name of John Overton's

18   company at this time, right?

19         A.    I'm not recalling the exact dates,

20   but I believe that was the name of his company

21   and also was a part of the name of the product.

22         Q.    All right.  And what do you mean by

Page 720

1      "part of the name of the product"?

2           A.    I believe in my opening report, I

3      have a section that talks about OverX in my

4      Exhibit F to my opening report.

5                 And, yeah, I refer to OverX

6      technology and OverX distributed database as

7      being part of the name, if you will, of that

8      database.  Maybe that's just how I'm thinking of

9      it, but that's how I sort of thought of the name

10     of this system or the OX servers and so on that I

11     analyze in Exhibit F of my opening report.

12          Q.    Okay.  And it says on this slide

13     that OverX was focused on communication systems,

14     right?

15          A.    Yes, that's what that says.

16          Q.    And would that include

17     telecommunications systems?

18                MS. HOANG:  Objection; calls for

19        speculation.

20          A.    I'm not sure what you're referring

21     to there.  What are you referring to?

22     BY MR. SIGLER:

Page 721

1          Q.    You relied on this slide deck for

2     your opinions, right?

3          A.    Now you're asking about a term

4     that's literally not on this slide.  Could you

5     explain what you mean by "telecommunications

6     systems"?

7          Q.    Do you know what telecommunications

8     systems means?

9              MS. HOANG:  Objection; foundation.

10         A.    It's a very broad term.  I'm asking

11    what you mean in your question.

12    BY MR. SIGLER:

13         Q.    All right.  Let's go to a more

14    specific question.  There's a reference to domain

15    name service here, right?

16         A.    I do.  I see that.

17         Q.    Okay.  Kove inventors didn't invent

18    domain name service, right?

19         A.    Correct, and indeed their own patent

20    specification describes how their invention is

21    different from domain name service and distinct.

22    And indeed, I have pages and pages of opinions

Page 722

1    about how what Mr. Greene identifies as DNS does

2    not disclose or suggest the claimed inventions of

3    the patents-in-suit.

4                MR. SIGLER:  I move to strike as

5          nonresponsive everything in that answer after

6          the word "correct."

7    BY MR. SIGLER:

8          Q.    On the slide, it also references

9    metadata management.

10               Do you see that, sir?

11         A.    I do.

12         Q.    The metadata existed before the Kove

13   patents, right?

14         A.    Things called metadata existed

15   before the Kove patents, but in my opinion, the

16   location information, the way that that is

17   deployed in location servers, that type of

18   metadata, in my opinion, is novel.

19         Q.    The Kove inventors didn't invent

20   managing metadata, correct?

21         A.    I disagree.  With respect to

22   managing metadata that has location information

Page 723

1    and location servers, I believe they did invent

2    that.

3            Q.    Did you read Dr. Overton's

4    deposition?

5            A.    Yes, I did.

6            Q.    Did you read his answer to that

7    question?

8            A.    I did.  You can show it to me, and I

9    can tell you why I still have that opinion based

10   on his deposition.

11           Q.    Okay.  Let's go to the next slide,

12   Slide 4.

13           A.    So you're refusing to show me his

14   deposition; is that correct?

15           Q.    I'm asking the questions.  Go to

16   Slide 4.

17           A.    Okay.  I'm at Slide 4.

18           Q.    All right.  You see it's titled

19   "Vision"?

20           A.    I do.

21           Q.    And the first bullet is:

22   Instantaneous tracking of billions of objects.

Page 724

1          A.     I see that bullet.

2          Q.     Do you recall if that was a goal of

3     OverX at this time?

4          A.     Can you please hand me the OverX OX

5     server technical description white paper to

6     answer that question?

7          Q.     You would need to see that to answer

8     that question?

9          A.     Yes, I do not have infinite memory.

10              MR. SIGLER:  Okay.  I'll withdraw

11        the question.

12              THE WITNESS:  Okay.

13     BY MR. SIGLER:

14          Q.     You'd agree that Amazon tracks

15     billions of objects simultaneously, right?

16          A.     I would agree that they track

17     trillions of object in S3, for example.

18          Q.     Has Kove ever tracked billions of

19     objects instantaneously?

20          A.     To my knowledge, they've invented a

21     technology that allows for that.  I don't know,

22     just sitting here today, if they've actually

Page 725

1    themselves tracked billions of objects.

2         Q.    Okay.  Let's go to Slide 11, please.

3         A.    I am there.

4         Q.    And this is a slide on DNS, right?

5         A.    Yes.

6         Q.    And it says:  Hierarchical

7    administrative control is useful.

8              Do you see that?

9         A.    I do.

10        Q.    Do you agree that DNS is

11   hierarchical?

12        A.    Yes, absolutely.  I believe I've

13   opined on that in my report.

14        Q.    Okay.  Do you agree that the

15   hierarchical administrative control is useful?

16        A.    It's useful in the context of DNS

17   where things are changing very slowly and the

18   structure of how domain names work is itself

19   hierarchical.  So it is -- and it's controlled by

20   many different entities that then exist at

21   different places in this hierarchy.

22              So it has that capability, but then

Page 726

1    as even the slide states, it has a very limited

2    query model and slow updates.  I believe is in

3    part due to this hierarchical structure.

4          Q.    Okay.  Is that not true of

5    nonhierarchical administrative control?

6          A.    I'm not -- I'm sorry.  I'm not sure

7    what you're referring to.

8          Q.    Are there reasons nonhierarchical

9    control would be useful?

10         A.    Are there -- yes, absolutely.

11         Q.    Okay.  And what would make

12   nonhierarchical administrative control useful?

13         A.    What -- there's several things.  So

14   I talk about this in the benefits of the patent

15   in my opening report, about how using the Kove

16   invention with this notion of having data

17   location servers that can need to take a portion

18   of a set of identifiers and be responsible for

19   identifying the location of that rather than

20   storing the actual data for that, it allows for

21   the huge type of scalability that then we see,

22   for example, in Amazon S3.

Page 727

1     Q.    Can you go to the Slide 23, please?

2     A.    I am there.

3     Q.    Do you see there's a Figure 5 there?

4     A.    I do.

5     Q.    And that Figure 5 shows NDTP

6 combined -- combined with DNS, right?

7     A.    I was not in the audience during

8 Dr. Overton's presentation so I can't say with

9 any certainty what he was referring to here in

10 his Figure 5.

11     Q.    Okay. And because you weren't in

12 the audience, you don't have any firsthand

13 knowledge about whether anyone in the audience

14 expressed disbelief that Dr. Overton's inventions

15 were possible, do you?

16     A.    I do not have firsthand experience

17 of that. Instead, I'm relying on Dr. Overton's

18 transcript and the responses from Kove in the

19 sixth amended responses to AWS's first set of

20 interrogatories, Nos. 2, 4, 8, 9 at response to

21 Interrogatory's No. 4.

22     Q.    Have you seen any deposition

Page 728

1    testimony from anyone who was in the audience at

2    this Yale presentation?

3         A.    Just sitting here today, I'm not

4    recalling deposition testimony from somebody who

5    was in the audience at the Yale presentation.

6         Q.    Do you know of anyone who was in the

7    audience at the Yale presentation?

8         A.    I -- could you please tell me some

9    names of people in the audience, and I will tell

10   you if I know them or not.  I know a lot of

11   people at Yale.  I know a lot of people in the

12   computer science department at that time.

13        Q.    I don't know a soul who was in the

14   audience at that time.  I'm not trying to trick

15   you.  I'm just asking --

16        A.    So if Joan Feigenbaum was there, I

17   know her.  There is a number of people I know at

18   Yale.  Computer science is actually a relatively

19   small world, surprisingly small world.  So I

20   probably know people in the audience, but without

21   knowing who was there that day, I can't tell you

22   if that's the person I know because I do know a

Page 729

1    lot of people at Yale.

2        Q.    Did you ask any of those people at

3    Yale whether they were -- that you know whether

4    they were in the audience for this presentation?

5        A.    No, I didn't -- I didn't ask that.

6        Q.    And okay.  Returning to page --

7    excuse me -- Slide 23, Figure 5 on the slide

8    shows DNS, right?

9        A.    No.  Figure 5 says:  NDTP-based DNS.

10       Q.    Okay.  So you don't believe that

11   Figure 5 shows NDTP combined with DNS, right?

12       A.    I was not in the audience, as we

13   talked about earlier, so I don't know, just

14   sitting here today, what Dr. Overton was trying

15   to convey on this slide.

16       Q.    Okay.  And you don't rely on this

17   slide presentation itself for showing any

18   audience feedback about the presentation, right?

19       A.    I don't believe that the slide deck

20   itself has the audience feedback listed.

21   Instead, it has the presentation, which I did

22   cite to, and then Dr. Overton's testimony

Page 730

1    regarding the audience feedback, as well as the

2    Kove interrogatory responses.

3          Q.    All right.  So the presentation

4    itself doesn't include any audience feedback,

5    correct?

6          A.    Yeah, that literally almost never

7    happens, right, that somebody prepares a set of

8    slides, they present it.  I'm not familiar with

9    this ever happening, that somebody goes back and

10   amends the slides to then write in what the

11   audience said at the end.

12         Q.    That's not my question.

13         A.    Okay.  Then I misunderstood your

14   question.

15         Q.    The presentation, the Yale

16   presentation that's in front of you, does not

17   include any audience feedback, correct?

18         A.    Okay.  Then I really don't

19   understand your question.  So I don't understand

20   how a slide deck would show audience feedback.

21         Q.    I don't -- I don't care what you

22   understand or what a regular or normal slide deck

Page 731

1　would show.

2　　　　　　　I'm asking you:  Does that document

3　in front of you show any feedback from the

4　audience at this Yale presentation?

5　　　　　　　MS. HOANG:  Objection.  The document

6　　speaks for itself.

7　　　　A.　　I do not understand your question.

8　BY MR. SIGLER:

9　　　　Q.　　You -- you can't answer that

10　question with a yes or no?

11　　　　A.　　I do not understand your question.

12　　　　Q.　　Okay.

13　　　　A.　　If I understood the question, it's

14　plausible that I could answer with a yes or no,

15　but I do not understand your question.

16　　　　Q.　　Okay.  But you relied on

17　Dr. Overton's recollection of the feedback of the

18　audience to this presentation from 21 years ago,

19　right?

20　　　　A.　　I am relying on his deposition

21　testimony under oath, under penalty of perjury --

22　that's how I understand depositions to work,

Page 732

1    literally today being an example of one -- and

2    Kove's Sixth Amended Responses to AWS's First Set

3    of Interrogatories Nos. 2, 4, 8, 9 in response to

4    Interrogatory No. 4.

5          Q.    And Dr. Overton and Kove would have

6    no reason to embellish the reaction of the

7    audience to this presentation, right?

8                MS. HOANG:  Objection.

9          A.    I can't speak to that.  I -- I don't

10   want to -- I'm not comfortable trying to question

11   someone's motives.

12               I can only speak to what Dr. Overton

13   testified to under oath and the Kove

14   interrogatory responses.  That's the evidence I'm

15   relying on to reach my conclusions.

16   BY MR. SIGLER:

17         Q.    All right.  And it's -- you

18   mentioned that Dr. Overton testified under oath

19   under penalty of perjury, right?

20         A.    That's my understanding of how the

21   oath that we take at the beginning of a

22   deposition works.

Page 733

1　　　　　Q.　　All right.  And when testimony is

2　　offered under the penalty of perjury, do you

3　　believe it to be more reliable?

4　　　　　A.　　I relied on his testimony from his

5　　deposition.  I'm not sure what you're asking.

6　　More reliable than that?  What are you comparing

7　　it to in your question?

8　　　　　Q.　　Testimony that's not under oath.

9　　　　　A.　　I'm not sure what that means.  What

10　　is testimony that is not under oath?  I thought

11　　that's what testimony -- I'm not a lawyer.  So

12　　all these legal terms are starting to confuse me.

13　　　　　　Could you give me an example of what

14　　is testimony that is not under oath and we still

15　　would call it testimony?

16　　　　　Q.　　Sure.

17　　　　　　Someone could provide a declaration,

18　　for example, that's not under oath under penalty

19　　of perjury.

20　　　　　A.　　Oh, that's why I always say at the

21　　end of a declaration, under penalty of perjury.

22　　If I didn't say that, it would not be under

Page 734

1   penalty of perjury; is that correct?  I'm not a

2   lawyer.  I'm sorry if I'm asking questions.  I

3   shouldn't ask questions.

4          Q.    Your process is your process.

5          A.    You got to ask the questions.

6                MS. HOANG:  Stop, stop, stop.

7   BY MR. SIGLER:

8          Q.    Dr. Overton has a financial interest

9   in the outcome of this case, correct?

10               MS. HOANG:  Objection; calls for

11       speculation.

12         A.    I'm not an economist.  I'm not

13  trying to have any opinions with respect to

14  economic interest or economic value in terms of

15  dollars and cents.  I'm just talking about in my

16  reports technical issues.

17  BY MR. SIGLER:

18         Q.    Does Kove have a financial interest

19  in the outcome of this case?

20               MS. HOANG:  Objection; foundation.

21         A.    I don't have an opinion about that.

22  That's not an opinion I was asked to render.  I'm

Page 735

1   not an economist.  I'm limiting my analysis and

2   opinions to technical issues.

3   BY MR. SIGLER:

4        Q.   You read Dr. Overton's deposition,

5   right?

6        A.   I did, yes.

7        Q.   So you don't recall that he

8   testified at length about the amounts of money he

9   will potentially make from the outcome of this

10  case?

11        MS. HOANG:  Objection; foundation.

12       A.   Could you please -- could you please

13  show me Dr. Overton's deposition transcript where

14  he said that?  I'm not recalling those details,

15  as I sit here today.

16  BY MR. SIGLER:

17       Q.   All right.  We can move on.

18           Have you ever done any work for

19  Ericsson?

20       A.   Ericsson doesn't ring a bell that

21  I've done work for them.

22       Q.   They were a well-known company in

Page 736

1    the 1990s, right?

2          A.    That does sound familiar, yes.

3          Q.    And IBM was a well-known company as

4    of the 1990s, right?

5          A.    I agree, yes.

6          Q.    And IBM was well-known in the

7    networking and distributed processing space then,

8    right?

9          MS. HOANG:  Objection; foundation.

10      Vague.

11         A.    That is not as clear.  They

12   definitely were making mainframes then, if that

13   is inclusive of your question.

14   BY MR. SIGLER:

15         Q.    Hewlett-Packard was a well-known

16   company in the 1990s, right?

17         A.    I agree, yes.

18         Q.    And Fujitsu was a well-known company

19   in the 1990s, right?

20         A.    What company again?

21         Q.    Fujitsu.

22         A.    Fujitsu, I believe they make

Page 737

1    computers.  My recollection is that they did have

2    computers at that time, if that's your question.

3           Q.    Have you ever done any --

4           MR. SIGLER:  Well, strike that.

5    BY MR. SIGLER:

6           Q.    You've never been employed by

7    Ericsson, IBM, Hewlett-Packard, or Fujitsu,

8    right?

9           A.    I have not been an employee of any

10   of those companies.  I was, however, retained on

11   a matter on behalf of IBM where they were being

12   sued.

13          Q.    And what analysis did you provide in

14   that case?

15          A.    In that case, I was rebutting an

16   infringement report by another expert.

17          Q.    Okay.  And you've never worked at

18   MIT, right?

19          A.    That is correct.  I've never worked

20   at MIT.

21          Q.    And MIT was well-known for its work

22   in networking in the 1990s, right?

Page 738

1            MS. HOANG:  Objection; foundation.

2       A.    Depends what you mean by that.  If

3    you mean their research on various subject

4    matters, involving networking.  They had already

5    at that time researchers who were working on

6    networking.

7    BY MR. SIGLER:

8       Q.    By the 1990s, Oracle was providing

9    distributed database products, right?

10            MS. HOANG:  Objection; foundation.

11       A.    I speak to some alleged prior art

12    that Mr. Greene cites to, by Oracle.  So if

13    that's what you're referring to, I acknowledge

14    that Oracle, for example, name servers is being

15    alleged as alleged prior art in this case.

16    BY MR. SIGLER:

17       Q.    Have you ever used Oracle products?

18       A.    My recollection is yes, I have.

19       Q.    Did you ever use any Oracle products

20    in the 1990s?

21       A.    That's a long time ago.  I'm not

22    recalling any details about the kind of products

Page 739

1     I was using then.

2        Q.    Do you recall when the first time

3     was you used an Oracle product?

4        A.    I -- oh, no, I take it back. I've

5     used and even written books about Oracle

6     products. Sorry, I just had a sort of a mental

7     block there for a second.

8        Q.    You said you've written books about

9     Oracle products?

10        A.    That is correct.

11        Q.    What books have you written about

12     Oracle products?

13        A.    I have a book called "Data

14     Structures and Algorithms in Java," and it is my

15     understanding that Oracle has purchased Java and

16     owns that as a product now.

17        Q.    When did you publish that book?

18        A.    It's got several iterations and

19     editions. So if we go to Appendix A, the first

20     edition came out in 1998, that's B1. Then the

21     second edition was 2001 B3. The third edition is

22     B7, 2004.

Page 740

1          Q.    So the first edition was 1998; is

2     that right?

3          A.    Correct.

4          Q.    All right.

5          A.    And then the fourth edition was

6     2006, the fifth edition was 2011, and the sixth

7     edition is 2014.  And currently, we're having

8     this book converted into an online textbook

9     that's going to be featured on the ZyBooks

10    platform.

11         Q.    And that book was about Java; is

12    that correct?

13         A.    "Data Structures and Algorithms in

14    Java" which is now an Oracle product.

15         Q.    When did Oracle acquire Java?

16         A.    I'm not recalling the date, but it

17    was somewhere in there.

18         Q.    By 1998, were you familiar with the

19    company Oracle?

20         A.    My recollection is that I was

21    familiar with Oracle as a company in 1998.

22                (Whereupon, Exhibit 42, US Patent

Page 741

1        6,430,618, was marked for identification.)

2    BY MR. SIGLER:

3        Q.    All right.  I'm going to pass you

4    Exhibit 42.

5            Do you have Exhibit 42 in front of

6    you, sir?

7        A.    I have it.

8        Q.    And Exhibit 42 is United States

9    Patent 6,430,618.

10            Do you see that?

11        A.    Yes, I see that.

12        Q.    And the first named inventor is

13    David Karger?

14        A.    Correct.

15        Q.    All right.  And the title of this

16    patent is "Method and Apparatus For Describing

17    Requests Among a Plurality of Resources,"

18    correct?

19        A.    Yes.

20        Q.    So you'd agree that this Karger

21    patent describes managing resources on a network,

22    right?

Page 742

1          MS. HOANG:  Objection; vague.

2     Foundation.

3          A.    So the Karger '618 patent, which is

4     how I referred to this and how Mr. Greene also

5     referred to this patent, describes in the

6     background of the invention leading up to its

7     invention, how in large distributed information

8     systems there are servers that store information

9     and there are clients that request information.

10    And then it gives examples of the World Wide Web.

11          Hence, in my opinion, a person of

12    ordinary skill in the art looking at this

13    reference would understand that it does apply to

14    data that is on a network coming from a server.

15    BY MR. SIGLER:

16          Q.    Okay.  And going back to the front

17    of the patent, do you see that the application

18    for it was filed on March 13, 1998?

19          A.    I do.

20          Q.    And the assignee is MIT, right?

21          A.    Correct.

22          Q.    Oh, had you heard of the Karger '618

Page 743

1   patent before this case?

2        A.    Not as a patent, no.

3              As we talked about on Saturday, I

4   was familiar with the paper that I believe led to

5   this patent, at some point.  I'm not recalling

6   exactly when, but there was a time when I was

7   familiar with that paper.

8        Q.    Was Karger's paper well-known in the

9   industry?

10             MS. HOANG:  Objection; foundation.

11       A.    In my opinion, it eventually became

12  well-known, but as of the priority date of the

13  patents-in-suit, I don't recall it being

14  well-known at that time.

15  BY MR. SIGLER:

16       Q.    Okay.  Okay.  And the other named

17  inventors on the Karger '618 patent are F.

18  Thompson Leighton, Matthew Levine, Daniel Lewin,

19  and Rina Panagrahy, right?

20       A.    Correct, and I recall that those are

21  some of the names same that we saw on that paper

22  we discussed on Saturday.

Page 744

1        Q.    Okay.   Okay --

2        A.    In fact, I think they cite to that

3 paper here, their own paper.

4        Q.    Let's go to the abstract, please,

5 sir.

6        A.    I'm there.

7        Q.    Okay.   And the abstract begins by

8 saying, "The invention relates to a method and

9 apparatus for distributing a request to one of a

10 plurality of resources.   A request is mapped to a

11 location in mathematical mapping space."

12          Do you see that, sir?

13        A.    I do.

14        Q.    So the Karger '618 patent describes

15 mapping location information to resources; is

16 that right?

17        A.    No, I disagree with that statement.

18        Q.    Okay.   Does the Karger '618 patent

19 describe using it to mathematical relationships

20 to map location information and resources?

21        A.    I disagree with that statement.

22        Q.    It does --

Page 745

1                    MR. SIGLER:  Well, strike that.

2       BY MR. SIGLER:

3            Q.    You'd agree that Karger '618

4       describes hashing, right?

5            A.    It does describe a type of hashing,

6       yes.

7            Q.    Okay.  And is hashing an example of

8       a mathematical relationship used to map location

9       information and resources?

10                   MS. HOANG:  Objection; vague.

11           A.    I'm not understanding your question.

12      Sorry.

13           Q.    Does Karger '618 describe mapping a

14      location to resources?

15                   MS. HOANG:  Objection; vague.

16           A.    Yes, but --

17                   MS. HOANG:  Foundation.

18           A.    -- to be clear what Karger '618 is

19      referring to as a location is a point on a

20      circle.  So that's what it means by location.

21                   For example, if we go to Figures 5A

22      or 5B, these little circles and dots on the big

Page 746

1    circle, what it's referring to is locations.

2              So it's not the same locations, for

3    example, that we have in this case and has been

4    construed by the Court.

5         Q.    Okay.  And is what you were pointing

6    me to a hash ring?

7         A.    Yeah.  Some people call this a hash

8    ring.  The circle that is shown on Figures 5A and

9    5B.  It's a type of hash table, a distributed

10   hash table.  Some people call it a hash ring

11   because it's a circle.

12        Q.    All right.  That hash ring we see

13   there in 5A and 5B doesn't match up by what we

14   see in the Kove patents, that's your opinion,

15   right?

16             MS. HOANG:  Objection; foundation.

17      Vague.

18        A.    I'm not sure what you're asking.

19   What do you mean by "doesn't match up"?

20   BY MR. SIGLER:

21        Q.    It's your opinion that a hash ring

22   doesn't satisfy the limitations of Kove's

Page 747

1　patents, right?

2　　　　　　　MS. HOANG:　Objection; vague.

3　　　Foundation.

4　　　　A.　　No.　That's not what I'm saying.

5　　　　　　　Instead what I'm saying is the

6　disclosures in Karger '618 with respect to its

7　teachings about how to use these hash rings or

8　just consistent hashing, as it's called in the

9　patents, does not disclose or suggest the

10　asserted claims of the patents-in-suit; that

11　there's things that are totally missing from

12　Karger, for example, locations the way the Court

13　construed locations, are missing from Karger.

14　Completely absent.　And, hence, it would be a

15　huge job to try to shoehorn them in by looking at

16　Karger '618 alone.

17　　　　Q.　　Okay.　So it's your view that the

18　hashing disclosed in Karger '618 doesn't

19　satisfy --

20　　　　　　　MR. SIGLER:　Well, strike that.

21　BY MR. SIGLER:

22　　　　Q.　　It's your view that the hashing

Page 748

1    disclosed in Karger '618 doesn't meet the

2    limitations of the asserted claims, right?

3              MS. HOANG:  Objection; vague.

4        A.    Correct.  Correct.  What is

5    disclosed in '618 does not disclose or suggest

6    the asserted claims.

7              MS. HOANG:  I know it's late in the

8        day, you've got to let me --

9              THE WITNESS:  I'm sorry.  I moved

10       too fast.

11   BY MR. SIGLER:

12       Q.    And what's described in the Karger

13   paper does not disclose or suggest the

14   limitations of the asserted claims in your

15   opinion, right?

16       A.    And what are you referring to as

17   "the Karger paper" now?

18       Q.    Exhibit -- the Karger paper I'm

19   referring to the document we marked on Saturday,

20   which I think it's in this stack.  I can help.

21   (Indicating.)

22             MR. RAMOS:  13.  I think Exhibit 13.

Page 749

1    BY MR. SIGLER:

2          Q.    Okay.  Exhibit 13.

3          A.    Oh, there it is.  Okay.  I have that

4    in front of me.

5          Q.    All right.  And I was just

6    confirming that it's also your opinion that

7    what's disclosed in the Karger paper does not

8    disclose or suggest the limitations of the

9    asserted claims, right?

10              MS. HOANG:  Objection; foundation.

11        Vague.

12         A.    I don't recall Mr. Greene relying on

13   what we're calling today "the Karger paper" for

14   his opinions.  And I was in this report

15   responding to his opinions.

16              My understanding is he was relying

17   on two Karger patents, plus some other

18   references, as well.

19              But I don't recall him referencing

20   this paper.  So I don't -- unless you can point

21   me to a place in my report, I don't recall having

22   an opinion about that here.

Page 750

1          Q.     Okay.

2          A.     We talked about that on Saturday in

3     general terms.  But now we're really getting into

4     the details of rebutting Mr. Greene.  I don't

5     recall this coming up.

6          Q.     Okay.  All right.  Both the Karger

7     '618 patent and the Karger paper describe the

8     work done by Dr. Karger and the other people

9     listed on the paper in patent, right?

10               MS. HOANG:  Objection; vague.

11               What are you looking for?

12               THE WITNESS:  I'm trying to find the

13          Karger patent '618.

14               MS. HOANG:  It's probably in that

15          stack.

16               What exhibit was that, the Karger

17          patent?

18               THE WITNESS:  What exhibit?

19               MS. HOANG:  42.

20               MR. SIGLER:  I think it's 42.

21               MR. RAMOS:  Yeah.

22               THE WITNESS:  It was right here.

Page 751

1       No, that's the paper.

2               MR. SIGLER:  Did you put it over

3       there?

4               THE WITNESS:  Oh, maybe I did.

5       Thanks.  Here it is.  I got it right now.

6       Sorry for the interruption.

7               Could you repeat your question,

8       please?

9    BY MR. SIGLER:

10              Q.    Yeah.  Sure.

11              The -- both the Karger '618 patent

12   and the Karger paper described the work done by

13   Dr. Karger and the other individuals identified

14   as authors and inventors, right?

15              MS. HOANG:  Objection; vague.

16              A.    Generally speaking, the patent lists

17   those people at inventors, the paper lists them

18   as authors.

19   BY MR. SIGLER:

20              Q.    Okay.

21              A.    So if that's your question, I think

22   it's literally the same -- yeah, we talked about

Page 752

1    that earlier.  It's the same people in both

2    cases.

3          Q.    So the inventors on the Karger '618

4    patent are the same people as the authors of the

5    Karger paper, right?

6          A.    Yes, so just to be clear.  Tom

7    Leighton -- he goes by Tom -- and so here on the

8    paper he lists his name as Tom Leighton but on

9    the patent he's beginning his legal name F.

10   Thompson Leighton.  I think all the other names

11   line up pretty clearly, yes.

12         Q.    Okay.  I'm going to pass you

13   Exhibit 43.  Put those others aside.

14               (Whereupon, Exhibit 43, Oracle Names

15      Administrator's Guide Release 2.0, was marked

16      for identification.)

17         A.    I have that in front of me.

18         Q.    Okay.  And Exhibit 43 is the Oracle

19   Names Administrator's Guide Release 2.0, correct?

20         A.    Yes.  I've been referring to this as

21   ONAG or ONAG.

22         Q.    Okay.  You offered opinions on this

Page 753

1    reference in your validity report, right?

2          A.    That is correct.

3          Q.    Can you please turn to the page that

4    has the Bates -- you see the Bates numbers at the

5    bottom, sir?

6          A.    I do, yes.

7          Q.    It has the Bates No. 528888.

8          A.    528888.  I'm there.

9          Q.    All right.  And do you see the note

10   there?

11         A.    I do.

12         Q.    And it's --

13               MS. HOANG:  What's the last digit?

14               MR. SIGLER:  It's 8888.

15   BY MR. SIGLER:

16         Q.    And the note begins by stating:

17   This manual contains examples and figures that

18   refer to specific machine types, network

19   protocols, and operating systems.  These

20   references are examples of possible

21   configurations and are not representative of all

22   configurations.

Page 754

1           Do you see that, sir?

2      A.    I do.

3      Q.    So this is saying that none of the

4    examples and figures in here should be taken as

5    representatives of every single possible network

6    configuration, right?

7      A.    I took it to be just what this

8    statement is saying.

9      Q.    Okay.  Did you take it to mean that

10   this OracleNamesAdministrativeGuides may apply to

11   configurations not specifically identified in the

12   manual?

13           MS. HOANG:  Objection; vague.

14      A.    I took the statement how it's

15   stated.  And then later when there's figures and

16   examples that then are described in terms of the

17   functionality of Oracle name servers, I took not

18   just the figures, although I often will cite to

19   them exemplary in my report, I took the teachings

20   and did my analysis with respect to the

21   teachings, whether or not they would either

22   disclose or suggest the asserted claims of the

Page 755

1   patents-in-suit.

2          Q.    And it's your opinion that

3   OracleNamesAdminGuides name servers can only be

4   arranged hierarchically?

5                MS. HOANG:  Objection; misstates

6       evidence and testimony.

7          A.    Where are you referring to now in my

8   report?

9   BY MR. SIGLER:

10         Q.    I'm just asking you if that's your

11  opinion?

12               MS. HOANG:  Same objections.

13  BY MR. SIGLER:

14         Q.    Is it your opinion that

15  OracleNamesAdminGuides names servers can only be

16  arranged hierarchically?

17               MS. HOANG:  Same objections.

18         A.    And there's nowhere where you're

19  referring to in my report to answer that

20  question; is that correct?  So I'm free to go and

21  look in my report to answer your question; is

22  that correct, just for understanding your

1    question?

2    BY MR. SIGLER:

3          Q.    You can look.

4          A.    Okay.

5                MS. HOANG:  Could you give us a

6      five-minute warning?

7                THE VIDEOGRAPHER:  (Nods.)

8          A.    So I speak to this, for example, in

9    my report a number of places, but beginning at

10   Paragraph 97 on Page 40 and going to Paragraph

11   106 on Page 44 is one of those places.  So, for

12   example, I highlight several places where inside

13   of ONAG, it describes hierarchical structures

14   with respect to the name servers.  So I talk

15   about that in Paragraph 98.  I talk about that in

16   Paragraph 99, Paragraph 100.

17                I could go and read it, but I know

18   we're getting a little tight on time here.

19   BY MR. SIGLER:

20         Q.    And in your view, can those names

21   servers in the OracleNamesAdminGuide only be

22   arranged hierarchically?

Page 757

1        A.     I believe that each of these

2 citations that I cite to and the ones that I'm

3 rebutting with respect to Mr. Greene are indeed

4 hierarchical. And, in fact, as I recall,

5 Mr. Greene says that any system that has domains

6 has to be hierarchical, and the OracleNameServer

7 in ONAG is based on domains. And so in his

8 opinion even, he's -- his statements imply that

9 ONAG is hierarchical.

10        Q.     If Oracle name servers could be

11 arranged nonhierarchically, would that change

12 your opinions in this case?

13        A.     Do you have a place in my report

14 where you feel I've addressed that or Mr. Greene

15 or someplace in the ONAG reference you'd like to

16 point me to?

17        I don't recall that actually have

18 being disclosed, just sitting here today.

19        Q.     It's a hypothetical, sir. So I

20 don't think it was disclosed in your report. But

21 I'm allowed to ask you hypotheticals, so I'll ask

22 it again.

Page 758

1              If Oracle name servers could be

2      arranged nonhierarchically, would that change

3      your opinions concerning the Oracle prior art?

4              A.    That depends on what you mean by

5      nonhierarchical, how this is arranged, the

6      context.  Based on the evidence, I saw I didn't

7      see evidence of that.  Hence, I would -- it would

8      require more time to analyze this hypothetical.

9              Q.    Had you ever seen the

10     OracleNamesAdministrativeGuide before your work

11     on this case?

12             A.    I'm not recalling, just sitting here

13     today.

14             Q.    So you don't know one way or the

15     other whether you had seen that before?

16             A.    I'm just not recalling.

17             Q.    All right.  I'm going to pass you

18     Exhibit 44.

19             (Whereupon, Exhibit 44, Yocom

20        patent, was marked for identification.)

21     BY MR. SIGLER:

22             Q.    You have Exhibit 44 in front of you,

Page 759

1   sir?

2      A.   ████

3      Q.   ███████████████████████

4   patent?

5      A.   █████████████████████████

6   Yocom patent.

7   █████████████████████

8     █████████████████

9   BY MR. SIGLER:

10      Q.   It says the assignee is ████ right?

11      A.   Correct.

12      Q.   And it was issued May 8, 2001,

13   right?

14      A.   Yes.

15      Q.   And in your report we talked about

16   on Saturday, ████████████████████

██    ███████████   right?

18      A.   Yes.

19      Q.   And under that ███████████

██   ██████████████████████, right?

21      MS. HOANG: Objection; foundation.

22      A.   As I state in my opening report:

1



1    BY MR. SIGLER:

2         Q.   Okay.

3         A.   So I believe that does list -- I

4    mean, it does reference patents, but I did not

5    see a list of the patents that were mentioned.

6         Q.   So th █████████████████████

████████████████████████████████████████████

████████████████████████████, right?

9         A.   That's how I read that statement.

10        Q.   So that would include the ████

11    ████, right?

12        A.   I'm not an attorney.  I don't know

13    if this still was ████████████████████

█████████████████████ so I can't -- I don't know

15    how to answer that question.  Sorry.

16        Q.   Okay.  Would you agree that Yocom

17    was in the field of networking?

18        MS. HOANG:  Objection; vague.

19    Foundation.

20        You have less than one minute.

21        MR. SIGLER:  (Indicating.)

22        A.   So Yocom self-identifies its field

Page 762

1    of invention at Column 1, begin at Line 6:  The

2    invention relates to a method and apparatus for

3    controlling the number of servers in an

4    information handling system in which incoming

5    work request belonged to a first service class

6    are placed in a queue for processing by one or

7    more servers.

8              So this at least suggests one or

9    more servers.  I could dig further to see if it

10   also implies a network.

11   BY MR. SIGLER:

12        Q.   Okay.  So the field of the invention

13   suggests one or more servers, right?

14              MS. HOANG:  Objection; vague.

15        A.   Its -- its list says its field of

16   invention a system involving one or more servers.

17   BY MR. SIGLER:

18        Q.   And those servers are in an

19   information handling system, right?

20              MS. HOANG:  We're done.  Time's up.

21              MR. SIGLER:  You can answer this

22        one.

Page 763

1          MS. HOANG:  You can answer the

2      question.  That's it.  Time's up though.

3          A.   Yes, I agree.

4          MR. SIGLER:  Okay.  Thank you,

5      Dr. Goodrich.

6          MS. HOANG:  I'm going to have some

7      redirect.  I'll need about 15 minutes.

8          You can go off the record.

9          THE VIDEOGRAPHER:  The time right

10     now is 6:00 p.m.

11          We are off the record.

12          (Recess taken.)

13          THE VIDEOGRAPHER:  The time right

14     now is 6:24 p.m.

15          We're back on the record.

16     EXAMINATION

17     BY MS. HOANG:

18          Q.   All right.  Dr. Goodrich, do you

19     remember being asked questions earlier regarding

20     Exhibit 29?

21          A.   Yes.

22          Q.   Okay.  And could you turn to page --

Page 764

1    the page marked 6 in the upper right-hand corner?

2          A.    I am there.

3          Q.    And spanning the bottom half of Page

4    6 and the top of Page 7, do you remember being

5    asked as to what prior art references the

6    examiner considered?

7          A.    Yes.

8          Q.    And do you recall being asked

9    whether or not they considered specific

10   references other than the four listed here?

11         A.    I do recall that.

12         Q.    All right.  Can you please turn

13   to -- it's a page in the back of the same

14   exhibit.  There are no page numbers

15   unfortunately, but it's the Information

16   Disclosure Statement by Applicant.  Looks like

17   this (indicating.)

18         A.    Oh, I see that, yes.

19         Q.    Okay.  Turn to the page that has the

20   word Frey, F-R-E-Y, as the first listed reference

21   under US patents.

22                Do you see it?  Can I find it for

Page 765

1    you?

2           A.    That would be helpful, actually.

3                 I am there.

4           Q.    All right.  Do you know what an

5    Information Disclosure Statement is?

6           A.    Yes, I have seen these before.

7           Q.    Can you -- at the very bottom, it's

8    partially cut off, do you see the sentence that

9    says:  All references considered except where

10   lined through?

11          A.    At the bottom?

12          Q.    At the very bottom of the page.

13          A.    Oh, yeah.

14          Q.    All references considered except

15   where lined through.  And then it's forward slash

16   LSW forward slash.

17                Do you see that?

18          A.    It's mostly cut off in my printout,

19   but I'll -- I'll accept your representation that

20   it's there.

21          Q.    Who is the examiner?

22          A.    That's Luke Wasum.

Page 766

1        Q.    LSW?

2        A.    Yes.

3        Q.    All right.  Do you see, for example,

4  on this page that there is a reference to Neimat

5  cited at No. 2?

6        A.    I see that.

7        Q.    Do you see a reference down at

8  bottom of the No. 8 to Minami?

9        A.    I see that.

10       Q.    Are either of those lined out?

11       A.    No.

12       Q.    What is your understanding of

13  whether or not they were considered by the

14  examiner based on the statement at the bottom?

15       MR. SIGLER:  Objection; lack of

16    foundation.  Calls for a legal conclusion.

17       A.    I've been told by attorneys that

18  what somebody lists on this page and it's not

19  marked out, that this has been disclosed to the

20  patent office.

21  BY MS. HOANG:

22       Q.    I'm going to give you my copy

Page 767

1 because yours is cut off.  I want you had to read

2 this sentence at the bottom to the extent you can

3 see it in -- what does it say?

4    A. It says I think:  AT&T looks like

5 references considered September where lined

6 through JSW [sic] that's the initials of the

7 examination.

8    Q. LSW.

9    MR. SIGLER:  Objection; leading.

10   A. LSW.

11   Q. So more than just being given, does

12 it say that references not lined through are

13 considered by Luke S. Wasum?

14   A. I believe that's what that says.

15   Q. All right.  Turn to the next page.

16   A. I'm there.

17   Q. Do you see on No. 11 a reference to

18 Karger?

19   A. Yes, I see that.  Karger '618.

20   Q. Further down below, do you see a

21 reference to Karger '420?

22   A. I see a reference to Karger '420.

Page 768

1          Q.    Okay.  Turn the page, please.

2    Actually, keep going a couple more pages where

3    you'll see No. 7.  It starts with "Karger, et

4    al."

5                Do you see that?

6          A.    I see that.

7          Q.    Is that the Karger paper that you

8    had previously been asked questions about?

9          A.    Yes, it is.

10         Q.    Number 8, what is that?

11         A.    It says Karger, et al. Web Caching

12   With Consistent Hashing.

13         Q.    Go to 11.  What is that?

14         A.    It says Mica pedis DNS RFC1034.

15   Domain names.

16         Q.    Go down to 16.  What is that?

17         A.    16 is Venkatasubramanian.  Maybe we

18   should trade back references now.

19         Q.    Is that the same reference you were

20   asked about whether or not the examiner had

21   considered as part of this reexamination?

22         A.    Yes.  That's the Venkatasubramanian

Page 769

1    reference we discussed earlier today.

2         Q.    And based on what you are now able

3    to review as part of the IDS submitted in this

4    case, were these references considered by the

5    examiner as part of the reexamination?

6            MR. SIGLER:  Objection; outside the

7      scope.  And calls for legal conclusion.

8         A.    Yes, in my opinion they were, as

9    well as Item No. 13, which appears to be the

10   Sherman reference.

11   BY MS. HOANG:

12        Q.    And were these, in fact, the very

13   references you were asked about by Counsel here

14   today?

15        A.    That is my recollection, sitting

16   here today.

17        Q.    Okay.  Thank you, sir.

18            Can you take out your Rebuttal

19   Report, please?

20        A.    I am there.

21        Q.    All right.  Can you turn to Page 13,

22   please.

Page 770

1          A.    I am there.

2          Q.    On Paragraph 49 -- do you see that?

3          A.    I do.

4          Q.    Do you remember being asked

5     questions earlier today about your opinions

6     regarding double patenting?

7          A.    I do.

8          Q.    And do you see -- do you recall

9     being asked specifically about the standard you

10    put forth in Paragraph 59?

11         A.    Yes, I do recall that.

12         Q.    Can you confirm for me whether or

13    not you applied this standard when you were

14    conducting your obviousness-type double patenting

15    analysis in response to Mr. Greene's opinions?

16         A.    Yes, this is the standard I applied.

17         Q.    Can you turn to Page 68, please?

18         A.    I am there.

19         Q.    And do you see Section VI, the

20    heading "Claims 3, 6, 10, 14, 17, 23, 24 and 30

21    of the '978 Patent Are Not Invalid For Double

22    Patenting"?

Page 771

1          A.     I do.

2          Q.     Does this Section VI of your report

3     spanning Paragraphs 158 to 182 comprise your

4     opinions regarding your rebuttal to Mr. Greene's

5     opinions on obviousness-type double patenting?

6          A.     Yes.

7          Q.     Can you turn to Page 78, please --

8     oh, actually, let me ask a different question

9     first.

10               In Section VI of your report, that

11    spans Paragraphs 158 to 182, did you apply the

12    standard articulated in Paragraph 49 of your

13    report with regarding to obviousness-type double

14    patenting?

15               MR. SIGLER:  Objection; leading.

16        Lack of foundation.

17         A.     Yes, to the best of my ability.

18    BY MS. HOANG:

19         Q.     All right.  Turn to Page 78, please.

20         A.     I am there.

21         Q.     Do you recall being asked questions

22    regarding Paragraph 180?

Page 772

1          A.     Yes.

2          Q.     Do you recall reviewing, on

3     Counsel's laptop, Mr. Greene's report where he

4     opined that the three patents cover the, quote,

5     same inventive concept?

6          A.     I do.

7          Q.     All right.  Do you recall being

8     asked about the last sentence in that paragraph?

9          A.     I do.

10         Q.     Okay.  In rendering your opinions in

11    Section VI, including the opinions from Paragraph

12    158 to 182, did you apply the exact same subject

13    matter standard to your opinions or did you apply

14    the standard set forth in Paragraph 49 of your

15    report?

16              MR. SIGLER:  Objection; leading.

17        Lack of foundation.

18         A.     I used the standard as I mentioned

19    in Paragraph 49 of my report.  This exact subject

20    matter was just words used then to rebut what

21    Mr. Greene was saying about the inventive

22    concept.

Page 773

1          Q.     Did you intend to change the

2    standard applicable for determining

3    obviousness-type double patenting by that word

4    choice?

5          A.     No.

6          Q.     Did you, in fact, apply a different

7    understanding than the standard set forth in

8    Paragraph 49 of your report?

9                 MR. SIGLER:  Objection; leading.

10         A.     No, I did not.

11   BY MS. HOANG:

12         Q.     Can you go to whatever exhibit was

13   the '640.

14         A.     Sure.  I have it in front of me as

15   Exhibit 7.

16         Q.     Can you turn to Claim 17, please.

17         A.     I am there.

18         Q.     Do you recall being asked questions

19   today about the data location servers claimed in

20   Claim 17?

21         A.     I do.

22         Q.     Do you remember being asked numerous

Page 774

1    questions about whether or not the claim language

2    requires that the data location servers be in a

3    nonhierarchical structure?

4          A.    I do.

5          Q.    In your opinion, does a POSITA need

6    to see the word "hierarchy" or "nonhierarchy" in

7    a claim construction to understand the

8    relationships among the data location servers of

9    Claim 17 as written?

10          MR. SIGLER:  Objection; lack of

11     foundation, leading, and outside the scope of

12     his opinions.

13          A.    No, as I've opined in my report, I

14    believe that the plain language of the claims

15    would inform a POSITA sufficiently to know that

16    in order to satisfy the claims as written,

17    requires that the data location server network be

18    organized in the nonhierarchical cluster

19    topology.

20          Q.    And with respect to the other

21    asserted claims at issue here in the '640 patent,

22    if I were to ask you the same question, would you

Page 775

1      provide the same answer?

2                MR. SIGLER:  Objection; leading.

3      Lack of foundation.  Outside the scope of his

4      report.

5           A.   Yes, that also applies to the other

6      asserted claims of the '640 patent.

7      BY MS. HOANG:

8           Q.   Can you find the '170 patent for me,

9      please.

10          A.   I have it in front of me as

11     Exhibit 9.

12          Q.   Can you go to Claim 1 of the '170

13     patent.

14          A.   I am there.

15          Q.   Do you remember being asked

16     questions about the data location servers claimed

17     in Claim 1 of the '170 patent?

18          A.   I do.

19          Q.   In your opinion, would a person of

20     ordinary skill in the art need to be told via a

21     claim construction that the data location servers

22     are nonhierarchical in order to understand based

Page 776

1    on the claim language itself what the structure

2    of those data location servers in the data

3    location server network are?

4            MR. SIGLER:  Objection; leading.

5     Lack of foundation.  Outside the scope of his

6     report.

7        A.    No, as I opine in my report, I

8    believe that the claim language itself -- itself

9    would be clear to a person of ordinary skill in

10   the art, that that requires the data location

11   server network be organized in a nonhierarchical

12   cluster topology.

13   BY MS. HOANG:

14       Q.    And the other asserted claims in the

15   '170 patent include Claims 2, 6, 8, 12, and 15.

16          Do you recall that?

17       A.    I do.

18       Q.    Do any of the claims that I just

19   listed require an express construction for a

20   person of ordinary skill in the art to understand

21   that the claims as written -- I just lost my own

22   question.  Hang on, please.

Page 777

1                    MS. HOANG:  Let me strike that and

2          start over.

3     BY MS. HOANG:

4          Q.    Do any of the claims of the '170

5     patent require an express construction of

6     nonhierarchical for a person of ordinary skill in

7     the art to understand what the relationships

8     among the claimed data location servers are?

9                    MR. SIGLER:  Objection; leading.

10         Lack of foundation.  Outside the scope.

11         A.    No, the other asserted claims of the

12    '170 patent, in my opinion, would be clear from

13    the plain language of the claims that they are

14    requiring that the data location servers be

15    organized in a nonhierarchical cluster topology.

16    BY MS. HOANG:

17         Q.    Can you find the '978 patent for me,

18    please.

19         A.    I have it in front of me, as

20    Exhibit 8.

21         Q.    Can you go to Claim 3, please.

22         A.    I am there.

Page 778

1          Q.    Do you recall being asked questions

2     about the relationships -- the structural

3     relationship among the location servers claimed

4     in Claim 3?

5          A.    I do.

6          Q.    In your opinion, would a person of

7     ordinary skill in the art need to be told in an

8     express construction that the location servers

9     are nonhierarchically related to one another to

10    understand that that's what the claim language

11    requires?

12                MR. SIGLER:  Objection; leading.

13         Lack of foundation.  Outside the scope of his

14         report.

15         A.    No, as I explained in my report,

16    that is the case.

17    BY MS. HOANG:

18         Q.    What about with respect to Claims 10

19    and 14?

20                MR. SIGLER:  Same objections.

21         A.    I have the same answer with respect

22    to Claims 10 and 14.

Page 779

1          MS. HOANG:  No further questions.

2     Pass.

3          MR. SIGLER:  I don't have any

4     further questions.

5               Thank you.

6          THE VIDEOGRAPHER:  The time is right

7     now is 6:40 p.m.

8          We are off the record.

9          (Whereupon, a request for Highly

10    confidential transcript, was made.)

11         MS. HOANG:  Rough today and Thursday

12    final.

13         MR. SIGLER:  Rough today and

14    Thursday final.

15              (Time noted:  6:41 p.m. EDT)

16

17

18

19

20

21

22

Page 780

```
1     CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2              I, Amanda Gorrono, the officer

      before whom the foregoing deposition was

3     taken, do hereby certify that the foregoing

      transcript is a true and correct record of

4     the testimony given; that said testimony was

      taken by me stenographically and thereafter

5     reduced to typewriting under my direction;

6     and that I am neither counsel for, related

7     to, nor employed by any of the parties to

8     this case and have no interest, financial or

9     otherwise, in its outcome.

10             IN WITNESS WHEREOF, I have hereunto

11    set my hand this 11th day of September, 2023.

12

13

14

15    _____

16    AMANDA GORRONO, CLR

17    CLR NO:  052005 - 01

18    Notary Public in and for

19    The State of New York

20    County of Suffolk

21    My Commission No.  01G06041701

22    Expires:  01/07/2027
```

Page 781

1      Michael Goodrich Ph.D., Vol II, c/o

2      Reichman Jorgensen Lehman & Feldberg LLP

3      400 Madison Avenue, Suite 14D

4      New York, NY 10017

5

6      Case: Kove IO, Inc. v. Amazon Web Services, Inc.

7      Date of deposition: September 11, 2023

8      Deponent: Michael Goodrich Ph.D., Vol II

9

10      Please be advised that the transcript in the above

11      referenced matter is now complete and ready for signature.

12      The deponent may come to this office to sign the transcript,

13      a copy may be purchased for the witness to review and sign,

14      or the deponent and/or counsel may waive the option of

signing. Please advise us of the option selected.

15      Please forward the errata sheet and the original signed

signature page to counsel noticing the deposition, noting the

16      applicable time period allowed for such by the governing

Rules of Procedure. If you have any questions, please do

17      not hesitate to call our office at (202)-232-0646.

18      Sincerely,

19      Digital Evidence Group

20      Copyright 2023 Digital Evidence Group

21      Copying is forbidden, including electronically, absent

22      express written consent.

Page 782

1      Digital Evidence Group, L.L.C.

2      1730 M Street, NW, Suite 812

3      Washington, D.C. 20036

4      (202) 232-0646

5

6      SIGNATURE PAGE

7      Case: Kove IO, Inc. v. Amazon Web Services, Inc.

8      Witness Name: Michael Goodrich Ph.D., Vol II

9      Deposition Date: September 11, 2023

10

     I do hereby acknowledge that I have read

11     and examined the foregoing pages

     of the transcript of my deposition and that:

12

     (Check appropriate box):

13     (  ) The same is a true, correct and

     complete transcription of the answers given by

14     me to the questions therein recorded.

     (  ) Except for the changes noted in the

15     attached Errata Sheet, the same is a true,

     correct and complete transcription of the

16     answers given by me to the questions therein

     recorded.

17

18     _____      _____

19      DATE            WITNESS SIGNATURE

20

21     _____      _____

22      DATE            NOTARY

Page 783

1          Digital Evidence Group, LLC

2          1730 M Street, NW, Suite 812

3          Washington, D.C.  20036

4          (202)232-0646

5

6                          ERRATA SHEET

7

8          Case: Kove IO, Inc. v. Amazon Web Services, Inc.

9          Witness Name: Michael Goodrich Ph.D., Vol II

10         Deposition Date: September 11, 2023

11         Page No.    Line No.      Change

12

13

14

15

16

17

18

19

20

21         _____     _____

22              Signature                              Date

**A**

**a.m** 409:15
410:2 416:6
441:22 442:4
485:18,22
527:20 528:2
**A0** 513:16
**ability** 470:6
578:11 636:1
771:17
**able** 438:11
467:3 468:14
471:8,19
482:15 483:8
483:11 486:20
487:6,21 488:9
489:10 666:19
703:14 769:2
**absent** 747:14
781:21
**absolutely**
512:11 553:16
725:12 726:10
**abstract** 744:4,7
**academia** 709:4
**accept** 765:19
**access** 683:14
686:11,13
**accurate** 418:13
428:19 453:13
462:15 472:8
509:16
**accurately**
686:10
**achieve** 517:5
547:15 548:1
548:16
**achieved** 550:19
**acknowledge**
633:11,12,15
738:13 782:10
**acknowledging**
510:11
**acquire** 740:15
**action** 409:3
607:1 618:16

619:2 625:5,8
625:13,18,20
626:6,8 632:8
632:13,21
633:20 656:18
690:5
**actual** 492:16
564:5 613:18
726:20
**add** 481:21
579:19
**added** 586:15
613:16 693:2,9
694:20
**adding** 481:16
582:20 588:9
649:9
**additional**
481:17,21
**additionally**
606:11
**address** 419:17
463:8 521:19
526:17 610:6
624:15 656:17
681:10,14
694:19 759:16
**addressed** 463:7
465:12 571:9
655:7,18 656:4
656:5 657:2,16
675:20 687:22
693:12,20
694:17 757:14
**addressing**
704:5
**admin** 544:19
555:5 596:3
**admin's** 595:9
595:19 596:13
598:1,16
**administration**
690:12
**Administratio...**
530:10
**administrative**

725:7,15 726:5
726:12
**Administrator's**
415:3 606:13
606:19 641:16
641:19 752:15
752:19
**admittedly**
483:7 621:8
**advent** 448:4
**advise** 781:14
**advised** 781:10
**aforementioned**
593:3
**against-** 409:4
**ago** 443:1 539:8
731:18 738:21
**agree** 434:7
437:16 438:2
439:14 442:21
452:5,11,19
458:12,16,22
460:2,6 462:11
462:17 463:1
466:6,9 468:3
468:14 469:15
473:13 515:14
531:18 543:18
571:4 573:14
592:20 606:2
612:19 613:4,9
616:15 617:16
619:20 620:19
621:14 629:3
631:2 632:5
635:4 636:14
638:3 641:4
643:5 644:19
658:2 665:2
688:7 689:2
690:21 692:6
693:8,15 702:3
703:4 705:1
707:3 711:8
724:14,16
725:10,14

736:5,17
741:20 745:3
761:16 763:3
**agreed** 435:17
436:8 562:22
674:20 675:6
**agreed-to** 435:14
**agreement**
530:14,17
674:20 675:7
760:1,12
**agrees** 478:2
**ahead** 486:4
489:21 492:6
495:11 511:15
544:14 569:1
**Akamai** 455:11
**al** 768:4,11
**Algorithms**
739:14 740:13
**alleged** 517:20
518:16 529:21
539:1 601:12
613:6 621:11
652:20 701:2
707:18 738:11
738:15,15
**allegedly** 556:10
569:16 586:7
694:10
**alleges** 641:10
**allow** 468:8
512:14 594:14
596:14,20
597:4 598:10
609:9 684:17
**allowable** 609:9
**allowed** 434:19
434:19 461:9
536:4 609:4
634:15,21
757:21 781:16
**allowing** 659:11
**allows** 578:11
579:1,21 583:5
724:21 726:20

**alternative**
467:20 694:13
**Amanda** 409:18
410:7 417:2
780:2,16
**Amazon** 409:4
412:3 416:18
421:3 426:14
436:9,12 465:8
467:21 477:22
527:2,5 533:18
534:2 640:13
651:10 658:12
670:14 708:9
708:19 709:1,8
709:17,18
710:2,16 711:1
724:14 726:22
759:16,19
760:2 761:6
781:6 782:7
783:8
**Amazon's**
670:20 704:10
**amended** 715:21
727:19 732:2
**amends** 730:10
**amounts** 735:8
**analysis** 419:9
435:15 445:9
446:1,4 453:13
457:8 475:17
502:22 512:10
518:13 521:8
521:11 522:1,5
523:6 524:7,21
525:4 570:7
606:21 632:8
647:2 698:13
701:15 705:22
710:22 735:1
737:13 754:20
770:15
**analyze** 492:16
720:11 758:8
**analyzed** 522:18

analyzing
522:22
AND- 411:11
and/or 462:3
480:19 607:8
626:22 641:12
642:3 781:14
Andrew 412:11
416:17
Andrew.Ramo...
412:14
Andy 427:9
Aneeta 526:20
527:3,8
annoying 664:8
answer 438:11
483:2 507:16
510:5,20,22
512:22 554:17
555:18 579:20
583:3,6,7,13
584:9 598:22
616:19 621:19
621:20 630:15
631:21 643:12
646:5 655:19
659:22 678:22
683:8 684:11
684:18 685:3
686:4,7,15
688:12 700:17
703:1 709:21
710:14 722:5
723:6 724:6,7
731:9,14
755:19,21
761:15 762:21
763:1 775:1
778:21
answered 488:14
576:19 685:18
answering
453:15 683:22
684:19 685:22
686:7,9 711:20
answers 552:9

583:4 689:7
707:21 782:13
782:16
anticipate 482:9
anticipation
433:4
anymore 694:12
anyway 686:4
apart 681:19
apologize 526:4
610:13
apparatus
741:16 744:9
762:2
apparent 511:21
apparently
617:12
appear 425:17
appeared 664:14
appearing
416:17
appears 424:7
436:17 437:15
608:5 625:14
629:20 635:8
638:7 647:21
648:21 672:16
706:8 769:9
Appendix
423:21 465:7
632:12 665:8
739:19
applicable 773:2
781:16
Applicant
764:16
application
437:1 457:15
457:16,18,20
526:9 599:19
742:17
applications
458:3 708:18
708:18 710:6
760:8,10
applied 435:15

446:11 494:4
496:21 519:6
519:10,15
522:14 592:2
608:12 653:12
703:9,10
770:13,16
applies 474:12
475:18 504:13
505:5 509:11
554:10 584:20
585:8 689:9
775:5
apply 444:2
491:11,11,13
491:19 496:5,6
498:16 499:12
508:1,20 509:3
512:21 514:7
514:13 524:21
525:5 556:16
585:20 688:8
689:3 694:10
695:4,6 742:13
754:10 771:11
772:12,13
773:6
applying 493:3
494:18 663:17
approach 441:3
442:13 507:9
507:10,12
508:1,8 511:9
511:11 548:20
appropriate
524:15 782:12
approved 536:8
approximately
420:16 421:22
422:3 431:4
architecture
439:13 505:18
506:2 569:7
570:2 573:22
579:2 580:11
581:22 583:9

583:19 584:12
584:20 585:19
architecture's
578:10
architectures
439:9,16,21
440:9
argued 556:5
596:2 629:13
630:11 631:4
675:11
argues 628:15
630:3 632:1,22
argument 633:5
633:13
argumentative
588:12 710:19
arguments
606:22 683:6
arranged 492:21
493:9 494:15
645:16,20
755:4,16
756:22 757:11
758:2,5
arrow 507:20
549:5,9,12,14
579:15 586:14
arrows 513:9
574:18 575:6,9
art 421:6,8
435:20 436:5
437:2,20,21
439:4 464:14
478:12 483:15
483:19,21
484:14,22
494:8 495:6
499:3,17
500:18 503:19
504:4,13 505:5
505:11 508:6
510:10 511:22
516:6,17
517:20 518:16
519:7,12

522:19 523:1,7
524:16 525:5
529:14,22
539:1 544:7
545:12 548:6
548:15 555:11
567:9 578:14
600:13 601:11
601:13,15
602:10,19
603:4,17,19,22
604:10 605:3
605:13 606:10
608:3,17
609:19 610:22
611:4 612:11
612:20 613:7,9
613:18,19,21
615:10 616:16
627:15 637:14
641:8 646:7
652:2,11,17,20
658:11 671:4
671:13,22
675:11 692:22
707:19 738:11
738:15 742:12
758:3 764:5
775:20 776:10
776:20 777:7
778:7
article 413:13
448:16 449:7
449:11,19,22
450:4,18 454:2
456:8 458:5,10
458:14,20
459:4,9,12,15
459:19 602:7,8
664:3,6,14
667:6 706:5,8
706:12,19,22
707:4
articles 665:15
665:22 666:3
articulated

771:12
arts 616:9
aside 429:19
　431:6 460:1
　527:14 530:21
　559:10 611:7
　639:3 649:11
　691:6 716:10
　752:13
asked 421:14
　424:19 463:5
　478:4 480:6
　484:8 485:9
　488:13 489:15
　498:8 510:12
　524:1 542:17
　622:22 623:3
　685:14,17
　734:22 763:19
　764:5,8 768:8
　768:20 769:13
　770:4,9 771:21
　772:8 773:18
　773:22 775:15
　778:1
asking 422:22
　439:19 442:8
　447:12 464:19
　478:2 509:18
　509:21 524:6
　562:16 568:17
　571:13,14
　573:6 576:4
　577:20 579:17
　583:15 613:8
　630:16,19,22
　631:13,15
　644:22 656:11
　671:18 693:15
　700:21 711:19
　721:3,10
　723:15 728:15
　731:2 733:5
　734:2 746:18
　755:10
asks 445:19

549:3
aspect 508:13,15
aspects 673:7
asserted 419:14
　438:4 463:3
　484:16 490:8
　490:15 491:14
　491:20 492:17
　496:18 502:17
　520:13,13
　521:1,14 522:6
　523:4,15
　622:18 645:14
　663:11 697:17
　705:10 747:10
　748:2,6,14
　749:9 754:22
　774:21 775:6
　776:14 777:11
assigned 759:7
　760:7 761:13
assignee 742:20
　759:10
assigns 451:21
assist 429:16
associated 462:1
　466:4 489:4
　565:1 568:14
　574:14 575:13
　577:18 615:13
　637:6,17,19
　675:13 677:11
　677:12 678:9
　678:11,22
　679:4,10
associations
　563:18 564:9
　565:5 568:19
AT&T 767:4
attached 565:14
　568:6 671:7
　782:15
attend 535:4
　536:13,22
attended 535:2
　539:12 560:15

attending
　560:17
attorney 433:2
　434:10,18
　466:22 481:13
　516:1,13 534:5
　534:13 536:2,6
　539:14 581:7
　608:1 621:3
　698:3 761:12
attorneys 420:2
　420:10,13,14
　422:21 423:2,7
　423:10 424:20
　429:8,11 430:2
　430:10,15,20
　431:6 432:18
　433:11 434:21
　467:13 481:15
　533:8 537:2
　539:11 542:15
　581:4,10 621:2
　621:3 622:8
　654:19 670:3
　673:17,19
　677:6 679:20
　687:11 698:4
　699:10 766:17
audience 715:10
　716:4,21 727:7
　727:12,13
　728:1,5,7,9,14
　728:20 729:4
　729:12,18,20
　730:1,4,11,17
　730:20 731:4
　731:18 732:7
August 418:9
　541:9 557:15
　620:16 691:19
author 419:22
　542:13
author's 664:9
authored 707:19
authors 662:17
　665:16 667:20

751:14,18
　752:4
automatically
　690:9
available 643:1
　645:4 717:17
Avenue 409:11
　410:6 411:6
　412:7,12 416:8
　781:3
avoid 467:14
avoidance
　659:11
awarded 448:5
aware 418:15
　429:1 451:5
　659:9 707:18
　709:1
AWS 416:9
　705:8 707:19
AWS's 715:22
　716:18 727:19
　732:2

**B**

B 413:7 414:1
　415:1 423:21
　424:4 508:17
　632:12
B-trees 496:17
B1 739:20
B3 739:21
B7 739:22
back 428:1
　432:12 433:15
　442:5 444:12
　454:1 457:17
　465:15,17
　475:16 486:1,3
　491:5 507:16
　510:21 511:7
　512:12 528:3
　530:1,12
　540:15 552:12
　568:12 573:20
　590:8 600:5

645:18 646:5,9
　646:17,20
　657:21 658:1
　674:11,14
　690:16,19
　695:16 696:21
　697:2 701:9
　711:14 712:11
　730:9 739:4
　742:16 763:15
　764:13 768:18
background
　742:6
backing 627:12
bad 680:1
Bailey 452:20
　454:16 458:21
　459:2,11 460:7
　462:12 537:13
　537:15,18
　707:17
Balakrishan
　450:19
Balakrishnan
　459:16 707:10
　707:17,20
Balakrishnan's
　451:13,16
　454:3
base 704:7,13
based 419:8
　470:5,7 477:2
　477:6,10
　482:17 483:12
　493:3,20 494:3
　494:18 504:11
　527:7 596:16
　596:22 597:6
　608:11 641:11
　663:3 687:12
　697:12 703:3
　708:6 709:14
　723:9 757:7
　758:6 766:14
　769:2 775:22
basic 548:21

**basing** 494:21
  500:16 715:16
**basis** 498:21
  610:3 709:7
**Bates** 753:4,4,7
**bears** 718:15
**beautiful** 583:1
**began** 708:19
**beginning** 440:1
  507:4 509:20
  521:4,18
  548:18 602:15
  602:16 644:2
  645:3 656:16
  682:9 685:6
  693:21,22
  711:2 732:21
  752:9 756:9
**begins** 655:10
  744:7 753:16
**behalf** 411:3
  412:3 416:17
  519:11 670:13
  737:11
**believe** 418:21
  420:18 436:8
  446:21 448:15
  452:9,13 453:2
  453:6 455:13
  457:7 458:7
  460:11,20
  462:6 465:11
  480:2 481:19
  482:2,14 483:8
  497:16,20
  503:12 504:3
  517:4,15
  521:20 525:3
  539:16 544:12
  548:4 554:20
  556:15 562:17
  584:14 585:22
  586:22 595:21
  597:12,14,18
  601:12 638:13
  651:11 654:20

656:8 663:8
  672:8 673:6
  686:6 693:20
  694:16 695:13
  701:5 702:18
  708:19 713:21
  719:20 720:2
  723:1 725:12
  726:2 729:10
  729:19 733:3
  736:22 743:4
  757:1 761:3
  767:14 774:14
  776:8
**believed** 535:20
  627:14 686:12
**believes** 607:20
**bell** 426:19
  456:12,16
  619:6 665:14
  735:20
**belonged** 762:5
**benefiting**
  707:14
**benefits** 705:8
  707:13 726:14
**Bergman** 424:10
**Berkeley** 454:7,8
  456:5
**best** 428:21
  434:21 483:3,5
  538:22 680:14
  683:17 771:17
**better** 574:9
**Beyond** 716:6
**big** 465:13
  573:14 586:14
  745:22
**bigger** 578:20,20
  580:15,15,15
  582:9,9 586:17
  586:18
**Bill** 412:5 416:14
**Bill.Sigler@Fi...**
  412:9
**billions** 723:22

724:15,18
  725:1
**binary** 496:16
  660:19 663:3,4
**bit** 477:21
**bits** 661:22
**block** 739:7
**bluffing** 663:20
  665:17 666:1
**bold** 616:2
  695:19
**book** 739:13,17
  740:8,11
**books** 739:5,8,11
**bottom** 449:16
  544:18 585:11
  641:21 692:17
  753:5 764:3
  765:7,11,12
  766:8,14 767:2
**Boukobza**
  414:18 602:12
  602:17,22
  603:1 605:21
  613:1 671:5
  681:2,10,11,14
  681:15,20
  682:1,1 683:3
  683:12,14,18
  683:20,21
  684:6 685:15
  686:14 688:4,4
  688:12,14,15
  688:18,22
  689:4,9,10,12
**Boukobza's**
  688:7 689:2
**box** 530:19
  532:5 574:8
  669:12 677:16
  782:12
**boxes** 574:10
  575:3
**bracket** 565:21
**break** 421:12
  441:17 442:8

485:15 527:17
  528:9 587:12
  588:21 646:10
  696:16 712:4
**breakthrough**
  448:1,6
**bridges** 698:18
**broad** 438:9
  452:15 453:15
  463:9 483:18
  616:1 698:15
  721:10
**broader** 683:4,8
  688:18
**broadly** 713:5
**broadly-worded**
  700:4
**brush** 483:18
  698:15
**build** 548:6
**building** 617:14
**bullet** 723:21
  724:1
**bunch** 476:22
**burden** 714:6

---

**C**

**C** 411:1 412:1
**c/o** 781:1
**C0** 513:16
**Caching** 768:11
**calculate** 487:13
  488:18 558:18
  615:16
**calculating**
  486:21 487:7
  487:22 488:10
  489:11
**California** 454:6
  454:8 456:5
**call** 535:8 670:16
  733:15 746:7
  746:10 781:17
**called** 417:4
  440:6 450:10
  452:7,14,22

460:20 461:7
  462:8 508:9
  549:1 585:6
  601:11 626:6
  676:8 687:16
  689:19 722:14
  739:13 747:8
**calling** 602:4
  606:19 608:19
  638:21 645:6
  664:12 749:13
**calls** 466:20
  481:11 482:6
  482:22 484:6
  485:1 489:13
  498:12 499:6
  501:4 517:21
  518:18 523:21
  524:9 536:1
  538:6 587:19
  597:8 620:1,8
  621:18 622:19
  623:11 642:10
  645:10 665:18
  700:14 702:7
  720:18 734:10
  766:16 769:7
**capability**
  468:22 469:4
  469:17,20
  470:21 471:5
  471:19 472:6
  472:12 493:2
  494:17 583:2
  725:22
**capable** 468:6
  513:14 546:14
**care** 730:21
**carries** 642:20
**carry** 525:10
**case** 420:14
  421:22 422:7
  425:11 426:6,9
  427:10 434:9
  434:13 435:4
  447:16 448:21

449:20 450:1,3
476:16 483:6
516:8 518:15
522:2 523:2,3
525:18 535:11
541:20 542:6
544:7 545:14
558:3 565:3
572:5,8 576:6
578:12,16
601:11 602:11
603:5,14 604:3
604:11,21
605:7 607:21
622:12 648:5
652:21 663:7,8
664:4 682:14
690:1 694:15
705:8 734:9,19
735:10 737:14
737:15 738:15
743:1 746:3
757:12 758:11
769:4 778:16
780:8 781:6
782:7 783:8
**cases** 435:8
444:20,22
483:19 573:2
752:2
**causing** 683:7
**caveat** 436:6
498:16 499:11
606:9
**centers** 451:13
451:17
**central** 661:1
**centric** 549:1
**cents** 734:15
**CEO** 455:11
719:7
**certain** 433:2,9
483:15 484:15
490:8 491:7
508:18 509:11
551:12 558:15

657:8
**certainly** 438:19
452:7 459:15
483:3 524:12
598:16
**certainty** 545:19
546:5 547:2,15
547:20 548:1
548:16 549:16
555:20 594:17
598:13 644:9
644:13 727:9
**certificate** 414:6
414:8,10
599:12 600:3
611:12 612:5
617:20 618:13
618:20,22
619:9 780:1
**Certified** 410:7
**certify** 780:3
**challenged**
640:18
**challenger** 699:7
**change** 413:13
449:10 450:8
464:4 757:11
758:2 773:1
783:11
**changed** 448:10
523:7 524:7
**changes** 511:20
782:14
**changing** 725:17
**characterizing**
701:3
**charge** 578:16
578:17
**chart** 520:5
**Check** 782:12
**checked** 530:19
532:5 669:12
**child** 666:19
**child-parent**
667:1
**children** 659:13

660:22
**choice** 773:4
**Choosing** 706:9
**chose** 687:8
**circle** 573:14
745:20 746:1,8
746:11
**circles** 574:6
745:22
**citation** 683:18
**citations** 708:8
708:17 709:5
709:13,22
711:4 717:12
757:2
**cite** 448:15 530:9
706:2,5,18,22
709:10,22
710:22 712:16
715:19 716:6
718:12 729:22
744:2 754:18
757:2
**cited** 425:15,18
600:13,17
601:15,20
602:2,7 603:4
615:10 616:9
642:1,3 647:6
647:14,18
648:1,13,19
652:3 661:8
675:11 710:6
717:8 766:5
**cites** 738:12
**citing** 610:8
709:3 711:1,3
**Civil** 409:3
**claim** 434:2,7,15
435:4,8,14,16
436:2,10
445:12 466:11
466:19 467:1,8
467:14 468:4
468:17 469:6
470:5 472:22

473:7 474:12
474:21 475:18
476:12 478:3
481:15 482:2
487:10 488:2,6
488:16 491:19
491:20 492:16
492:20 493:7
493:13 494:7
494:22 495:2
495:16,17
496:5 497:18
498:16 499:12
500:8 501:7,13
501:14,15,18
501:21,22
502:4,7,15
503:3,9,11
505:13 506:6
521:6 522:9
544:20 545:3,6
545:7,7,7
546:10,10,11
546:11,13,15
547:5,7,18
552:18 553:4
553:13 556:11
562:1,9,12
563:8 564:19
565:8 567:7,8
568:13,22
592:11,15,17
593:4,7,17,22
594:3,3,9,13
594:18 595:1
597:12 607:20
609:3,4,9
610:2,6,10,11
610:16,18
616:20,21
617:7 634:6,10
635:12,16,17
636:22 637:4,4
647:9 673:22
674:3 675:15
675:16,20

676:11 677:20
677:22 678:5
679:21 680:4,9
680:11,17
692:4 695:22
696:12 698:20
699:11,13
700:12 773:16
773:20 774:1,7
774:9 775:12
775:17,21
776:1,8 777:21
778:4,10
**claimed** 437:3
437:10 458:9
458:18 459:1
461:20 470:16
490:9 492:20
493:1 494:10
502:14 506:14
506:21 509:22
510:16 511:5
517:6 518:3
546:15 558:13
571:11 574:22
597:1,12,17
677:8 680:4
707:7 722:2
773:19 775:16
777:8 778:3
**claims** 419:14
445:11,14,15
445:20 446:5,8
446:17 461:12
463:3 467:9
468:18,19,21
469:3,10
470:14,16
472:18 473:6
473:15,20
474:5,6,8,8
475:3,10,14,18
475:19,20,22
477:1,8,10,13
477:17 478:5
478:11 479:7

479:14,18
480:2,10,12,19
481:1,8,18
483:16 484:2
484:10,15
485:3,11 486:8
486:15,19
487:5,20 488:8
489:9,16 490:9
490:10,15,15
490:20 491:7
491:11,14,14
491:22 492:17
495:16 496:2,9
496:11,18,22
497:4,14,17
498:1,3,4,10
498:15,22
499:5,10,15
500:4,13,17
502:12,16
503:6,8,11,14
504:1,20
505:13 507:13
509:3,11 510:1
512:4,14,20
513:15 514:6
515:2,3,4,7,11
515:19 518:4
519:1,1,2
520:13 521:1
521:15 522:6,6
522:8,15,15
523:4,15
524:22 530:15
535:10,13,20
538:3,22 539:2
539:4 540:1
542:20,22
543:15 544:7
545:18 546:4
547:1,14,22
548:7 552:20
555:6,12 556:7
558:12 559:5
570:16 591:14

591:18,19
592:5 595:11
595:22 596:8
596:12 597:2,4
597:17 610:1
612:7 622:17
623:8 626:8,11
626:21 627:3,7
627:14 628:17
630:5 632:3
633:1 634:2,5
634:6,10,15,20
638:11 640:19
640:19 641:1,2
645:14 651:2
651:15 652:9
653:12 654:6
656:20 658:5
658:13,17
663:12 696:7
697:10 698:7
698:13,20
699:17,19
700:6 701:17
701:21,21
702:5,19 703:6
705:10 707:15
712:20 713:16
714:2,3,11,16
747:10 748:2,6
748:14 749:9
754:22 770:20
774:14,16,21
775:6 776:14
776:15,18,21
777:4,11,13
778:18,22
**clarification**
419:2 613:15
**clarify** 621:22
**clarity** 710:11
**Clarke** 455:15
456:18
**class** 659:20
660:10 762:5
**clause** 471:2

**clear** 444:9
469:9 470:18
474:10 475:3
481:18 492:19
543:5 548:9
553:11 568:10
571:15 586:22
587:5,9 588:14
588:18 606:17
606:17 621:6
621:11 622:10
622:17 623:4,7
667:19 679:7
684:4 700:5
714:7,14
736:11 745:18
752:6 776:9
777:12
**clearly** 588:7
752:11
**click** 710:4
**client** 468:7,9
471:9 487:13
488:18 489:3
507:14,17,19
511:12 549:1,1
549:2,4,6,9,11
549:14 551:9
552:19 558:16
558:18 568:1
574:19 593:10
615:12,16
**client-centric**
441:2 442:12
507:9,12
548:20
**clients** 508:17
565:17 566:10
566:18 567:15
568:9 742:9
**close** 478:17,22
550:12 561:15
692:13
**cloud** 448:3,4
460:7,12,13,17
460:21 461:1

461:10 582:21
585:1,11,15
**CLR** 409:18,19
780:16,17
**cluster** 442:11
443:22 444:1
469:18 484:3
490:10,17
491:1,3,8
495:10 503:5
504:5,14 505:6
506:9 508:5
510:4 542:22
543:16 544:9
544:21 545:4,8
551:9 552:21
553:6,18 554:7
555:7,14 556:4
558:22 559:6
569:7 572:20
582:22 591:20
592:6,7,12,18
593:4,12,19
594:4,19 595:2
595:11,21
596:4,11
597:14,19
666:12 774:18
776:12 777:15
**clustered** 440:7
440:18 441:1,8
442:19 443:14
443:19 470:10
470:17 471:1
481:4 507:6
513:1,11
514:16 572:19
**code** 558:14
**coding** 663:4
**coincidently**
576:6
**coinventor** 459:3
**collaboration**
454:5
**colleague** 416:16
605:16

**collection** 466:5
**column** 440:1,15
440:22 442:8
451:11 466:1
507:3,6 508:14
511:7,16
548:18 550:22
551:18,19
552:5 645:3
688:17 689:1
762:1
**combination**
606:13 615:11
648:14 649:6
677:5 679:19
687:11 699:1
**combinations**
675:11 699:2
**combine** 698:19
**combined** 699:8
727:6,6 729:11
**come** 428:1
465:15 603:1
672:3 716:15
781:12
**comes** 547:5
554:12
**comfortable**
732:10
**coming** 425:12
429:3 510:21
651:12 670:19
671:17 716:18
742:14 750:5
**command**
690:11
**comment** 613:16
652:22
**commented**
426:10
**comments**
674:21 675:7
**commercial**
632:22 704:5,8
704:14
**commercially**

705:9
**Commission**
780:21
**communicate**
577:22 659:13
**communicates**
659:10
**communication**
720:13
**Communicati...**
664:15
**companies**
456:20 737:10
**companies'**
717:12
**company** 719:18
719:20 735:22
736:3,16,18,20
740:19,21
**compared**
595:15,19
**comparing**
733:6
**Complaint**
415:10 446:20
447:8,16,21,22
**complete** 517:6
686:7 781:11
782:13,15
**completely**
582:3 747:14
**complicated**
483:7
**component**
514:15 565:14
568:6
**components**
443:13,14
468:19 512:22
513:8,13
514:12 572:19
579:19 586:17
680:14
**composition**
490:10,17
491:1,3

**comprise** 771:3
**comprised**
425:19 429:9
**comprises** 420:4
429:14 493:17
542:16 616:22
**comprising**
420:11 474:2
493:14 547:11
609:11 634:7
**computer**
451:18 454:7
558:14 709:20
710:13 712:14
728:12,18
**computers** 737:1
737:2
**computing**
460:7,12,13,17
460:21 461:1
461:10 463:22
**CON'T** 414:1
415:1
**concept** 438:14
451:18 452:21
452:22 461:4
461:14 463:10
463:12 660:13
701:2 713:2,6
713:18 772:5
772:22
**concept'** 700:4
**concepts** 483:6
**concerning**
758:3
**concerns** 649:22
656:20
**concise** 588:4
**conclude** 522:11
**concluded**
608:21 696:6
**conclusion** 635:5
636:14 638:4
643:6 644:19
693:16 698:2
700:15 702:8

766:16 769:7
**conclusions**
732:15
**concurrent**
642:4 647:9
**condition** 682:13
689:22 690:5
**conditional**
477:22
**conducted** 560:6
669:11
**conducting**
770:14
**confident** 456:21
**confidential**
409:7 415:16
779:10
**configuration**
469:18 470:3
543:1,16
544:21 545:5
552:22 553:6
554:7 555:7,14
556:4 558:22
559:6 591:21
592:7 593:5,13
593:19 594:4
594:19 595:2,9
595:11,20
596:5,12 646:2
694:14 754:6
**configurations**
753:21,22
754:11
**configured**
494:2 547:8
558:14 593:9
598:3 608:10
644:7
**confirm** 770:12
**confirmation**
607:8 615:3
**confirmed**
564:17 610:2
626:19 627:1
**confirming**

749:6
**confirms** 612:7
**confuse** 481:16
733:12
**confusing**
467:14 481:21
**confusion** 467:8
**connected**
710:13
**connection**
506:10 575:13
575:14
**connections**
575:2,5,10,19
576:11,19,20
576:22 577:3
577:11,22
578:3 661:2
**connects** 505:17
506:1
**connotes** 593:4
**consent** 781:22
**consider** 424:19
449:2 463:9
512:9 605:20
606:12 632:16
642:13 717:4
**considerations**
628:11 629:8
703:19 705:2
705:14,19,21
714:22 717:6,7
760:16
**considered**
423:21 424:5,9
424:22 425:20
427:6,19,20
436:10 452:14
465:1 602:19
603:9,19 604:6
604:14 605:3
605:14 607:1
612:11,15,21
613:11,20
614:16 624:21
625:12 632:11

642:8 648:11
649:8 717:21
764:6,9 765:9
765:14 766:13
767:5,13
768:21 769:4
**considering**
524:14 614:8
658:16
**considers** 613:18
652:8
**consistency**
463:12,19
**consistent**
439:18 464:9
464:11,16
635:8 636:18
638:8,10,15
680:15 747:8
768:12
**consists** 443:18
682:12 689:22
**constellation**
440:13 514:14
549:3 582:11
582:18 584:18
585:1 588:1
**constellations**
440:3,4,16
443:1,4 506:8
512:15,21
514:8 587:4
**construction**
434:3,8,15
435:4,8 445:11
466:12,19
467:2,8,14
476:12,16
477:14 481:15
564:19 565:1
565:11,12,20
566:1,15 567:7
567:8 568:15
568:22 637:12
675:16 678:5
679:6 701:17

776:19 777:5
778:8
**constructions**
435:13,14,15
436:11,11
462:5 467:3,20
477:7 482:14
562:1,9,13
680:17
**construe** 477:4
**construed**
435:16 436:3
461:21 476:22
478:3,4 482:13
746:4 747:13
**construing** 446:7
446:16 481:8
**CONT'D** 412:1
**contact** 452:17
504:11 507:17
**contacted** 549:9
**contain** 468:8
**contained**
619:10
**containing**
558:16
**contains** 473:10
486:22 487:8
487:12 488:1,4
488:11,17,21
489:12 545:20
546:6 547:3
558:19 615:15
634:16 636:11
753:17
**contemplated**
511:22 588:16
**content** 428:19
**contentions**
420:20 421:2,4
425:22 426:6,9
**context** 418:22
436:16 438:11
448:20 453:12
453:14,18
463:21,22

470:14 496:17
497:14 514:5
554:2,9 556:13
579:18 597:3
608:5 621:1
629:1 683:4,8
688:18 689:5
693:20 701:7,7
725:16 758:6
**continually**
693:2,9 694:20
**continuation**
458:1 674:22
675:5
**continue** 488:2
**continues**
682:20
**Continuing**
444:9
**contradictions**
583:12,13
**control** 414:11
528:19 531:13
560:9 591:7
623:21 624:6
632:10 725:7
725:15 726:5,9
726:12
**controlled**
725:19
**controlling**
762:3
**convention**
694:7
**converted** 740:8
**convey** 535:7
554:20 556:22
557:1 588:19
702:15 714:19
729:15
**conveyed** 554:20
587:8,8,10
**conveys** 437:2
472:9
**convincing**
621:6,11

622:10,17
623:4,8 700:5
714:8,15
**copies** 441:13,16
464:7
**copy** 559:16
683:11 685:15
687:5 688:11
700:16,19
711:17 712:3
766:22 781:13
**Copying** 781:21
**Copyright**
781:20
**Cornell** 456:15
**corner** 528:17
600:10 624:18
625:8 628:6
640:11 641:7
642:18 650:10
650:17 651:21
692:1 719:12
764:1
**corners** 437:6
**correct** 417:19
418:9,10,21
419:15 425:4,5
435:10 439:10
455:13,18
458:6 459:6
467:22 473:16
476:4 485:8
487:9 500:20
501:20 507:15
509:12 510:22
519:13 520:20
520:21 521:16
522:17,20
525:19 541:11
541:21 552:6,7
553:6,22 554:7
555:18 557:16
557:19 558:7
560:8 569:8
583:13 588:10
590:17 591:2,9

592:9,13,14
593:19 594:6
594:10,11
595:4 600:8
601:16 602:20
603:11 604:3,4
604:8,16 605:5
605:7,15 607:9
608:14 609:1
610:7 611:20
611:21 612:2
612:12,13
614:13 621:10
624:11 627:2
627:16 630:13
633:5 639:16
647:15 650:2
667:8 668:12
668:19 669:9
669:13,20,22
670:5 673:19
675:20 676:13
676:16 677:3
679:3 685:10
687:3 688:6
691:18 697:14
698:16 700:3
703:20 705:14
705:15 706:3
706:11,14,20
708:16 709:10
711:10,11
714:4 715:5,8
716:12 717:12
718:19 719:6
721:19 722:6
722:20 723:14
730:5,17 734:1
734:9 737:19
739:10 740:3
740:12 741:14
741:18 742:21
743:20 748:4,4
752:19 753:2
755:20,22
759:11 780:3

782:13,15
**Corrected**
415:11 465:5
520:11
**correcting**
619:19
**correctly** 441:19
509:13 554:21
**correlated**
709:12
**correspond**
679:21
**correspondence**
526:17
**corresponding**
493:19
**corresponds**
682:13 690:1
**counsel** 416:12
447:6 670:20
769:13 780:6
781:14,15
**Counsel's** 772:3
**County** 780:20
**couple** 583:11
646:20 768:2
**course** 482:11
500:11 513:17
**court** 409:1
417:1,9 434:3
434:8 461:21
462:5 477:4
478:1,2 481:8
482:12 568:11
582:13,14
623:15 746:4
747:12
**Court's** 435:12
436:10 476:22
477:7 565:11
565:19
**cover** 418:6
422:15 428:13
526:7 541:16
591:3 624:5
702:6,19 713:1

772:4
**create** 562:12
  563:2 580:19
  581:5
**created** 429:11
  441:2 442:12
  567:4,11 690:9
**creating** 581:10
**creation** 562:15
  562:19 563:6
  580:22
**credentials**
  539:20
**Cremona** 423:11
**criterion** 637:7
**critiquing**
  698:12
**crystal** 710:10
**cued** 711:18
**cumulative**
  614:8
**current** 455:11
  476:15
**currently** 451:7
  656:19 658:4
  658:11 740:7
**customary**
  637:13
**cut** 765:8,18
  767:1

     **D**

**D** 413:1 628:10
**D.C** 409:21
  411:15 412:8
  416:16 782:3
  783:3
**D0** 513:16
**Daniel** 743:18
**Danny** 412:19
  416:2
**dashed** 677:16
**data** 448:8
  451:20 462:3
  464:1 466:4,5
  468:5,9 469:16

470:11,15
473:10 474:1,2
474:3,11,14,14
474:20,22
475:9 477:11
479:8,18 480:3
480:13 481:3
482:4 485:5
487:14,15
488:3,19,20,21
489:3,5 491:4
491:9,10 492:2
492:4 493:14
493:15,16,17
493:18,20,21
493:22 494:1,3
494:10,11
495:7,8 497:2
498:6 499:16
499:19 500:5
501:10,12,18
504:11 505:6
505:14 507:14
517:21 518:18
543:6,17
544:10 545:9
549:6 553:7,9
553:12,14,18
553:21 554:3
554:11,13
556:2 558:12
558:13 559:8
563:20 564:1
564:11 568:20
570:18 571:6
571:18 572:17
573:3,4,7,8,9
573:13 575:18
576:5,10 577:3
577:18 585:9
585:15,20
586:12 596:14
596:20 597:5
598:5,11 608:9
608:11 615:14
615:17 617:2

637:7,17,20
638:15,17,17
639:1 659:19
660:9 677:10
677:17,18
678:11,16,19
678:22 726:16
726:20 739:13
740:13 742:14
773:19 774:2,8
774:17 775:16
775:21 776:2,2
776:10 777:8
777:14
**database** 580:1
  693:1 720:6,8
  738:9
**databricks.com**
  706:6
**dataset** 464:3
**date** 416:5
  420:19 437:4
  520:19 521:2
  521:15 522:5
  522:22 523:4,8
  523:19 524:8
  524:22 525:6,9
  526:11 529:8
  531:19,22
  560:12 600:6
  611:22 618:8
  624:12 639:17
  650:3 668:17
  691:19 718:15
  718:21 719:1
  740:16 743:12
  760:9,12 761:8
  781:7 782:9,19
  782:22 783:10
  783:22
**dates** 457:9
  519:20 520:14
  521:6,11 522:2
  522:14 523:14
  524:14 719:19
**David** 741:13

**day** 446:21
  532:16 551:8
  567:5,11
  728:21 748:8
  780:11
**DC** 412:13
**DDB** 464:15
**dealing** 654:16
**dealt** 692:4
**December**
  447:16
**decide** 434:4,9
  622:22
**decision** 482:16
  608:18 611:1
  612:7 620:15
  620:20 622:21
  628:1 631:15
  650:19 651:13
  657:16 696:7
  696:11
**decisions** 622:4
  654:11 656:6
  657:8
**deck** 569:2
  669:15 671:7,9
  672:5,7,17,19
  673:1,3,8,17
  676:11,19
  721:1 729:19
  730:20,22
**decks** 719:1
**declaration**
  413:19,20
  414:4 445:1
  540:8,18 541:3
  541:22 542:12
  542:13 543:15
  545:17 552:13
  555:11 557:2
  557:20 558:1
  570:8 590:13
  590:17,20
  591:4 592:11
  592:17,21
  624:22 625:12

733:17,21
**declarations**
  432:7 557:8
  599:3
**defendant** 409:5
  412:3 416:18
**defines** 760:3
**definitely** 736:12
**definition**
  523:12,18
  524:15
**degree** 534:12
  702:12
**delete** 464:5
**demonstrate**
  699:5
**demonstration**
  669:11
**demonstrative**
  536:18 550:5
  570:6,12 585:3
  586:1 680:8
**demonstratives**
  536:16 550:9
  588:14
**department**
  728:12
**depend** 613:20
**dependent**
  475:19 545:6
  634:6 635:12
  635:16
**depending**
  463:21 513:9
**depends** 438:8
  453:12 512:18
  580:5 597:9
  621:1 738:2
  758:4
**depicting** 578:6
**depiction** 581:14
  677:20
**deployed** 722:17
**deponent** 416:10
  781:8,12,14
**deposition** 409:8

410:4 416:7
425:3,4,10
426:22 427:4,5
427:9,14,18
430:13,16
431:8,11,14,17
431:22 432:1,3
432:5,9 447:7
447:13 465:8
685:6 715:19
723:4,10,14
727:22 728:4
731:20 732:22
733:5 735:4,13
780:2 781:7,15
782:9,11
783:10
**depositions**
427:19 685:8
731:22
**derives** 545:7
**describe** 440:3
507:22 555:12
570:9 677:7
680:3 744:19
745:5,13 750:7
**described** 443:5
443:5 448:8
461:11 465:20
511:21 520:13
550:3 566:16
689:11 693:9
748:12 751:12
754:16
**describes** 437:8
440:13 544:19
548:19 551:3,6
555:5 659:8
682:22 693:13
721:20 741:21
742:5 744:14
745:4 756:13
**describing** 441:7
442:18 504:10
545:15 546:19
548:19 663:9

701:1 741:16
**description**
413:8 414:2
415:2,9,15
436:19 464:12
512:1 674:19
675:5 694:9
724:5
**design** 551:22
581:15 760:5,6
**designation**
603:7
**designs** 580:1
**desirable** 467:3
467:7,13
**desired** 473:10
547:10,13
548:13 609:13
636:4,11
**desires** 549:4
**despite** 699:1
**detail** 445:2
455:22 508:4
548:5 561:13
**detailed** 512:1
570:7 618:16
**details** 421:7,18
427:11 518:8
616:2 667:14
667:16 703:15
735:14 738:22
750:4
**determination**
445:13 701:19
**determinations**
419:10,13
**determine** 437:7
468:9 494:2
504:11 527:7
598:3 608:10
617:16 636:3
636:10 644:7
644:14
**determined**
520:12 523:14
523:19 525:6

**determining**
452:17 493:2
494:17 773:2
**developed** 448:1
455:17 459:8
459:11 662:7
**difference** 508:4
516:2
**differences**
445:13,14,19
701:20
**different** 464:7
478:20 487:14
488:3,19,21
497:13 502:13
507:10 532:17
533:3,17 556:6
573:7 575:7
579:12,18
580:7 595:10
596:3 615:17
622:1 674:2
694:4 698:19
698:20 699:17
699:19 721:21
725:20,21
771:8 773:6
**differentiating**
545:11
**difficult** 703:13
**dig** 762:9
**digit** 753:13
**Digital** 409:20
412:19 416:3
781:19,20
782:1 783:1
**direct** 419:6
476:9 638:21
**directed** 702:10
**directing** 538:20
**direction** 780:5
**directly** 458:7
636:5
**directory** 642:22
643:1,7 644:21
645:5,6,9,10

645:15,20
646:2 659:10
662:13
**disagree** 476:20
492:11 506:4
573:18 584:14
588:13 620:15
620:18 622:4
628:2 660:11
662:16 663:6
686:6 697:9
702:14 722:21
744:17,21
**disagreed**
627:17 631:16
633:4,13
**disagreeing**
629:21 695:9
**disagrees** 629:5
633:7,17
**disbelief** 715:11
727:14
**disclose** 511:3
518:2,19
535:12 539:2
555:13 570:15
636:8 663:10
722:2 747:9
748:5,13 749:8
754:22
**disclosed** 470:16
499:11 504:8
507:11 508:19
509:2,10 663:2
747:18 748:1,5
749:7 757:18
757:20 766:19
**discloses** 499:17
505:2 573:22
636:6 645:12
647:8 659:18
660:9
**disclosing**
484:22 499:3
663:3,7
**disclosure** 437:1

764:16 765:5
**disclosures**
747:6
**discuss** 422:18
423:7 429:22
429:22 430:4,8
439:8,12,15,21
440:9 594:8,9
656:10
**discussed** 422:21
423:1,9 444:16
444:21 447:17
467:1 468:1
481:14 529:14
653:11,14,19
671:4 672:9
743:22 769:1
**discusses** 450:18
**discussing**
467:20 475:14
477:9 503:8
511:8 539:21
659:3 668:14
689:16 691:17
712:17
**discussion** 507:3
536:14,17
655:12 667:15
671:20 672:2
674:9 711:14
712:8
**discussions**
538:21 602:13
671:18
**dismiss** 667:15
**display** 616:10
**dispute** 603:17
**disputing** 603:21
606:9 613:5
686:8
**distance** 470:19
**distinct** 445:15
445:20 701:22
703:7 713:20
721:21
**distinction** 497:8

497:11 516:15
596:10
**distinguish**
483:19
**distinguishable**
698:6,7
**distinguished**
519:12
**distinguishing**
519:7
**distributed**
448:3,7 450:5
450:10,15
451:17 453:4,7
455:3 459:20
463:22 466:2,5
617:1 659:19
659:19 660:10
667:3 720:6
736:7 738:9
742:7 746:9
**distributing**
744:9
**DISTRICT**
409:1,1,2
**DIVISION**
409:2
**Dkt** 435:13,14
**DNS** 722:1 725:4
725:10,16
727:6 729:8,9
729:11 768:14
**Doctor** 423:22
**document**
414:12,19
420:4 526:15
528:13 559:22
583:21 599:16
600:1,6 611:3
611:16 614:1,7
615:2 617:5
618:3,4 619:5
624:6 625:14
626:5 627:6,22
639:3,6,11,17
649:10,19

650:7 658:16
658:22 663:2,3
668:10,21
678:17 691:7
691:14 718:8
731:2,5 748:19
**documents**
431:10 527:17
614:2 617:13
626:3 643:22
693:19
**doing** 453:13
459:16 461:11
513:14 521:8
561:20 588:15
663:17 689:5
699:14 708:21
**dollars** 734:15
**domain** 721:14
721:18,21
725:18 768:15
**domains** 757:5,7
**dots** 745:22
**double** 444:16
444:19 445:4
445:10,18
446:4,12
697:12,21
699:6,10
700:10 701:10
701:15 702:4
702:14 711:14
711:20 770:6
770:14,21
771:5,13 773:3
**double-check**
635:7 636:17
638:7 647:21
648:3,21 649:3
655:8 656:14
**Dr** 414:4,20
415:11 416:22
417:12 423:17
430:5 431:16
442:7 452:20
452:20 458:11

465:4 486:4
499:9 528:8
537:6,20 538:2
538:11 574:7,7
574:7,7 575:13
575:14 577:16
577:16 590:10
590:12 624:3
646:19 669:21
673:9 674:13
697:3 707:20
711:17 715:4
715:11,19
716:11,17
717:2 718:2,11
718:21 719:3
723:3 727:8,14
727:17 729:14
729:22 731:17
732:5,12,18
734:8 735:4,13
750:8 751:13
763:5,18
**draft** 420:2,6
426:5 429:8,12
432:19,21
**drafted** 419:21
420:13 426:7
429:5 432:20
**drafting** 429:17
**drafts** 420:9
**drew** 573:14
**driven** 548:22
**Drs** 459:10
460:6 462:12
707:17
**DS** 646:2
**DS1-DSn** 642:22
**due** 497:22
594:2 708:16
726:3
**duly** 417:5
**Dutch** 664:10
**DynamoDB**
465:9 704:10

**E**

**E** 411:1,1 412:1
412:1 413:1,7
414:1 415:1,14
415:14 590:1,1
**e-mail** 411:9,16
412:9,14 717:3
**e-mails** 716:21
**e.g** 593:6 598:4
**earlier** 445:11
458:2 467:1
476:21 515:22
521:2 544:5
548:12 553:16
555:21 559:16
571:4 576:19
577:8 581:17
608:18 706:20
712:17 713:13
713:21 719:1
729:13 752:1
763:19 769:1
770:5
**earliest** 520:18
**early** 521:7,15
**earnest** 420:21
**easier** 424:1
710:15
**EASTERN**
409:2
**Econnectix**
459:5
**economic** 734:14
734:14
**economist**
734:12 735:1
**edit** 426:8
**edited** 420:3,10
426:11 429:9
429:14 542:16
**edition** 739:20
739:21,21
740:1,5,6,7
**editions** 739:19
**EDT** 409:15
410:2 779:15

**effective** 760:8
761:7
**efficiently** 466:3
**either** 451:9
459:5 524:18
534:18 548:6
550:12 581:7
598:20 672:16
690:8 754:21
766:10
**electronic**
465:11 711:17
**electronically**
781:21
**element** 464:5
676:15
**elements** 469:10
500:9 514:2,3
713:13
**eligibility** 433:5
**embellish** 732:6
**embodiment**
440:4 509:10
582:16 681:10
681:15 689:6,8
689:10
**embodiments**
466:7 504:8
506:5 507:10
508:19 509:2
510:7,12
511:20 585:6
688:19 698:21
**emerging** 413:12
448:9 449:10
450:7
**emphasis** 508:16
549:7
**emphasize**
548:11
**employed** 737:6
760:21 780:7
**employee** 737:9
**employees**
423:13
**empty** 565:21

enable 492:22
494:16 598:2
enabled 460:13
enablement
436:19
Enables 569:7
enabling 448:2
encoder 563:17
encoding 563:16
564:8 565:4
568:18 660:19
678:7 679:7,13
encompassed
463:10
encounter 419:1
ended 444:22
English 497:12
enlarge 690:9
entire 420:3
474:19 554:4,4
578:16
entities 575:7
579:14 677:10
677:11 679:1
725:20
entitled 520:14
521:1,15 706:9
760:8
entity 466:5
547:10,13
548:13 554:18
563:20 564:11
609:13 677:13
678:7,12,17,19
679:5,9,14
enumerated
515:19
EP 647:9
equally 694:11
equivalence
564:18
equivalents
512:4
Ericsson 735:19
735:20 737:7
errata 781:15

782:15 783:6
erroneous 619:1
619:10,17
error 418:20
errors 418:16
429:1
Esquire 411:4
411:13 412:5
412:11
essential 452:1
establish 700:12
702:12
et 768:3,11
events 656:12
eventual 463:12
463:18
eventually 464:9
464:9,10,15
693:3,5,10
694:21 743:11
evidence 409:20
412:19 416:3
490:19 491:17
546:9 551:16
564:4 566:6
568:4 621:6,12
622:10,17
623:5,8 629:7
629:19 630:3
630:12 631:5
631:10,14,17
632:1,22
675:22 678:14
682:4 693:13
700:5 704:20
705:5,21
707:22 709:14
709:16 714:8
714:15 716:6,7
716:8,9,10,14
716:16 717:9
717:11,14,17
718:20 732:14
755:6 758:6,7
781:19,20
782:1 783:1

ex 413:14,15,17
413:21 414:5,7
414:10 525:12
525:17,20
528:4,15 531:3
531:10 559:11
560:2,18
599:11 600:2
600:18 611:11
612:5 617:19
618:12,19,21
625:8 640:6,15
650:11 651:5
669:1
exact 420:19
534:22 539:7,9
564:5 700:6,12
702:6,20
712:20 713:8
714:2,10,17
719:19 772:12
772:19
exactly 445:21
470:19 478:21
479:22 480:17
498:19 514:4
537:4 621:21
743:6
exam 663:20
examination
413:2,14
417:10 525:21
603:20 647:13
653:13 657:3
763:16 767:7
examinations
648:12
examined 417:6
782:11
examiner 535:8
538:17 607:12
607:19 608:15
608:21 609:8
609:17 610:5
610:22 611:4
615:10,20

617:4,11
624:21 627:3
627:17 629:5
629:17,21
630:17 631:3
631:16 632:21
633:4,6,10,12
633:16,16
635:5 636:15
638:4 643:6
648:18 649:4
653:12,18,19
654:2 659:3
670:9 680:12
683:5,11,14,21
685:15 686:13
687:4 693:16
764:6 765:21
766:14 768:20
769:5
examiner's
617:17 644:19
examiners
533:13,20
587:6 669:19
670:6 673:11
686:11
example 423:16
439:22 443:8
443:11,16
464:5 465:22
466:1 474:1,12
475:20 477:17
487:10 491:18
492:19 496:15
503:3 506:6
507:2 513:3
523:20 525:8
547:6 548:17
550:2,6 574:5
575:12,15,18
585:17 597:13
603:16 614:4
614:11 620:17
621:12 622:6
628:3 631:10

644:2,12 645:3
657:2,15 658:8
661:17,21
678:6 724:17
726:22 732:1
733:13,18
738:14 745:7
745:21 746:3
747:12 756:8
756:12 766:3
examples 742:10
753:17,20
754:4,16
exceed 693:3
excerpt 682:1,9
683:5 688:4,21
691:2
excerpts 681:1
686:21 690:17
exclusively
556:16 572:16
585:8 587:1
excuse 449:17
526:3 552:12
555:2 557:14
583:18 594:8
598:12 609:9
628:15 640:20
729:7
executable
558:14
execute 558:15
executed 549:5
690:12
exemplary
490:22 574:18
688:19 717:14
754:19
exercise 760:15
exhaustive
518:13
exhibit 413:8,9
413:11,12,14
413:15,17,19
413:20,21
414:2,3,4,5,7,9

414:11,12,13
414:14,15,16
414:17,18,19
414:20,22
415:2,3,5,9,10
415:11 417:18
417:18,20
418:1 423:21
424:4 428:4,7
432:13 446:20
446:21 447:6,8
447:13 449:8,9
465:4,7 525:20
526:3,3,8
528:4,8 531:2
531:3,7 532:1
532:13 540:4,6
540:7,18 541:1
557:2,7 559:11
559:15 561:1,4
561:4,7 562:10
563:3 590:11
590:12 599:9
599:10,14
607:4 611:9,9
611:10,14,16
617:18 618:1,2
623:19,20
624:2 639:4,5
639:8,21
643:17,20
646:20 649:13
649:17,19
650:3 657:22
658:1 660:2,5
667:22 668:1,5
668:6,7,15,17
671:8 672:11
672:12,15
673:15,22
674:15 676:18
680:21 688:13
688:15 691:7
691:11,13
718:1,2 720:4
720:11 740:22

741:4,5,8
748:18,22
749:2 750:16
750:18 752:13
752:14,18
758:18,19,22
763:20 764:14
773:12,15
775:11 777:20
**exhibits** 415:8
417:14 423:22
669:11
**exist** 453:1
460:14,17,21
461:5,15
725:20
**existed** 461:8
722:12,14
**existence** 641:11
**expectation**
698:22
**experience** 708:6
727:16
**expert** 413:9
415:11 417:18
417:21 418:8
424:9 425:16
428:8 434:13
465:5 520:11
737:16
**expertise** 434:17
466:21
**Expires** 780:22
**explain** 472:15
478:5 482:9,11
483:5,9 500:3
503:21 535:20
538:22 547:14
547:22 548:4
550:18 579:5
582:4 585:4
654:19 663:22
684:14 721:5
**explained**
482:17 490:7
505:8 506:5

520:10 592:1
622:8 662:8
778:15
**explaining**
500:10 585:4
**explains** 504:4,7
505:2 508:3
551:11
**explanation**
586:2
**explanations**
473:5
**explicitly** 581:21
583:8 584:11
637:5,15
**export_operat...**
690:11
**express** 564:21
776:19 777:5
778:8 781:22
**expressed** 430:1
433:16 458:17
518:21 546:3
559:4 715:11
727:14
**expressing** 496:1
594:1 708:13
**expressly** 435:18
647:8
**extent** 435:16
459:13 767:2
**extents** 682:14
690:2
**extra** 555:19
588:2
**eyes** 574:9

**F**

**F** 590:1 720:4,11
743:17 752:9
**F-R-E-Y** 764:20
**face** 614:1 616:3
**fact** 448:22
574:13,21
578:15 744:2
757:4 769:12

773:6
**failed** 675:12
**fails** 608:4 611:5
615:11 636:7
**failure** 630:4,12
631:5,17 632:2
**fair** 426:21
427:13 435:1
453:17 479:1
563:3 657:9
**fairly** 456:21
**familiar** 420:19
421:2 448:13
463:11,15
561:8,14
601:10 602:10
603:6,13
604:21 704:20
718:9 730:8
736:2 740:18
740:21 743:4,7
**family** 697:17,22
**Fanous** 424:10
**far** 518:1 524:18
599:4 681:19
**fast** 748:10
**feature** 467:3,7
467:13 608:4,6
610:1 611:5
**featured** 740:9
**February** 421:21
422:6,11
449:17,17
452:12 458:5
651:6
**February-ish**
422:2
**February/Mar...**
421:16
**feedback** 716:4
716:22 717:1,2
729:18,20
730:1,4,17,20
731:3,17
**feel** 463:7 524:4
588:17 654:10

655:17 678:18
686:8 687:21
693:12 757:14
**Feigenbaum**
728:16
**Feldberg** 411:5
411:14 416:20
781:2
**fellow** 664:20
665:7,9
**felt** 554:9 587:9
588:17 710:21
**field** 761:17,22
762:12,15
**fifth** 740:6
**FIG** 549:2,5
551:8
**figure** 443:9,10
443:16 507:20
513:4,5,6
550:2,4,8,12
550:22 572:22
573:1 581:17
598:17 661:10
661:14,16
667:4 677:1,4
677:7,21
679:17 680:3,7
727:3,5,10
729:7,9,11
**figures** 586:15
745:21 746:8
753:17 754:4
754:15,18
**file** 451:21 690:9
**file's** 451:22
**filed** 447:16
457:12,14,20
527:6 624:22
651:5,9 684:7
742:18
**filing** 437:4
760:9 761:7
**final** 456:7 530:8
666:6,7 779:12
779:14

**financial** 734:8
　734:18 780:8
**find** 465:13
　510:1 598:21
　622:12,15,16
　750:12 764:22
　775:8 777:17
**finding** 530:6
　594:15 609:9
　634:8
**findings** 717:5
**fine** 472:8
　527:18 664:13
**finish** 684:18
**firm** 534:7,15
　624:15 651:12
**first** 417:5 420:8
　420:9,13 424:8
　428:8 429:8,12
　432:20,22
　434:1 440:21
　442:10 468:2
　486:18 507:11
　514:21 548:21
　551:4 552:15
　555:4 567:4,5
　595:7 635:15
　637:19,19,21
　638:8,15,16,17
　638:22 639:1
　640:16 646:4
　648:9 651:18
　661:22 662:22
　664:9 673:21
　675:14 676:12
　697:16 701:16
　707:16 715:22
　718:14 723:21
　727:19 732:2
　739:2,19 740:1
　741:12 762:5
　764:20 771:9
**firsthand** 727:12
　727:16
**Fisch** 412:6,12
　416:15

**fit** 667:14
**fits** 667:17
**five** 448:5
　641:22 690:17
　706:9
**five-minute**
　756:6
**flagging** 501:7
**flat** 694:6
**flavor** 666:9
**Floor** 412:8
**focus** 615:6
　682:8 683:6
**focused** 720:13
**follow** 434:21
　472:1 512:5
**following** 419:10
　462:21 466:15
　474:21 497:15
　512:3 516:1
　517:10 547:16
　569:21 570:5
　600:17 612:20
　641:12 652:10
　667:1 676:1
　681:12 688:9
　690:8 712:22
**follows** 417:7
**Footnote** 706:5
　718:12
**forbidden**
　781:21
**foreclose** 662:18
　662:21
**foregoing** 512:1
　780:2,3 782:11
**forge** 486:4
　544:14
**form** 487:16
　488:6 489:7
　570:21 571:8
　572:2 573:16
　582:2 585:21
**format** 465:11
**forming** 427:1
　433:3 452:1

**forth** 419:9
　770:10 772:14
　773:7
**forward** 465:14
　552:3 598:19
　765:15,16
　781:15
**forwarding**
　508:11
**found** 609:18
　610:22 617:12
　623:7 629:17
　634:10 635:2
　647:9 651:13
　659:17 660:8
　660:12 696:12
**foundation**
　438:7,18 457:6
　460:9 461:18
　463:14 464:18
　471:22 483:1
　484:19 499:7
　512:17 514:10
　532:15 533:21
　534:4 536:1
　538:6 572:3
　573:17 575:20
　576:12 577:6
　580:4 597:8
　606:6,16
　613:14 614:18
　616:18 620:1,7
　620:21 621:17
　623:11 634:18
　643:9 662:15
　666:13 671:16
　680:5 693:17
　698:1 721:9
　734:20 735:11
　736:9 738:1,10
　742:2 743:10
　745:17 746:16
　747:3 749:10
　759:21 761:19
　766:16 771:16
　772:17 774:11

　775:3 776:5
　777:10 778:13
**foundationally**
　595:10
**four** 422:1 437:6
　455:5 459:19
　764:10
**fourth** 412:8
　740:5
**fragment** 682:12
**free** 755:20
**Freenet** 455:17
　455:20
**frequently** 699:1
**Frey** 764:20
**friends** 664:10
**front** 417:14
　418:6 465:6
　526:7 528:9,11
　541:1 559:19
　590:11 591:3
　600:5 624:4,5
　639:9 668:7
　730:16 731:3
　741:5 742:16
　749:4 752:17
　758:22 773:14
　775:10 777:19
**Fujitsu** 736:18
　736:21,22
　737:7
**Fuling** 670:10
**fully** 552:9 686:9
**function** 468:15
　493:4,21 494:4
　494:9,19 495:1
　495:15 496:18
　496:21 498:1,2
　498:3,5 499:14
　500:3,22 501:8
　502:6,12
　503:14 504:19
　505:3,12 506:2
　506:5 518:8
　596:16,22
　597:6 608:12

　644:11
**functionality**
　502:14 505:12
　566:16 574:21
　754:17
**functions** 504:7
　504:10 505:10
　505:18
**further** 437:17
　476:12 477:14
　481:8 547:8
　552:18 616:4
　662:5 762:9
　767:20 779:1,4
**Furthermore**
　555:5 598:1
**future** 483:4
　524:18 662:18
　666:4
**fuzzy** 444:8

**G**
**general** 438:14
　452:21,22
　572:9 656:11
　674:19 675:6
　750:3
**generally** 462:15
　467:12 491:12
　505:10 535:7
　571:14 598:15
　638:10,14
　751:16
**gentleman**
　426:18 427:8
　450:19
**getting** 580:14
　582:8 750:3
　756:18
**Gina** 423:11
**give** 523:13
　574:20 659:21
　680:11 714:17
　718:18 733:13
　756:5 766:22
**given** 479:12

480:18 498:14
499:8 536:3
636:8,9 683:11
685:15 767:11
780:4 782:13
782:16
**gives** 583:4,7
742:10
**glance** 638:8
**glanced** 431:20
**go** 423:20 432:12
432:14 433:12
435:1 436:13
441:20 444:12
444:14 465:17
465:22 466:1
467:16 469:13
473:4 475:11
476:5 487:10
489:21 492:6
495:11 496:14
501:21 507:2
511:16 512:12
512:13 514:18
519:19 521:20
527:16 528:13
531:9 542:8
547:6 548:18
550:2 555:1
557:10 558:8
561:22 578:19
579:15 580:12
580:15 582:7
583:2,5 590:19
591:10 592:22
595:5 596:9
597:22 598:19
600:9 607:3
612:3 615:1
618:10,15
620:18 624:16
626:20 627:11
628:5 633:19
640:9 641:6
642:16 646:4,4
646:19 648:7

650:6 653:1
655:18 656:10
656:22 657:21
658:21 665:8
666:19,20
668:20 674:5
676:17 677:18
680:20 688:1
688:17,18
691:22 692:8
695:17 697:5
698:9 699:20
701:9 703:21
704:2 706:15
709:20 710:3
710:12 711:12
711:13,14
715:1 719:9
721:13 723:11
723:15 725:2
727:1 739:19
744:4 745:21
755:20 756:17
763:8 768:13
768:16 773:12
775:12 777:21
**goal** 724:2
**goes** 434:13
440:3 507:22
508:3 518:8
551:1 552:17
609:22 610:5
635:1,22
637:11 654:2
655:11 730:9
752:7
**going** 441:12
448:17 449:8
454:1 475:16
485:15 507:4
511:7 513:18
513:19 526:2
530:12 544:18
552:2 557:6
559:14 568:12
570:9 573:20

575:7 600:5
606:4,5 609:7
613:13 615:6
618:1 624:16
632:20 639:3
642:19 644:3
661:1 666:20
666:22 672:10
684:14,16,17
685:2,10 686:1
694:1 695:16
711:16 712:2
718:20 740:9
741:3 742:16
752:12 756:10
758:17 763:6
766:22 768:2
**Good** 416:14
417:12,13
**Goodrich** 409:9
410:4 413:3,9
413:11,19,20
414:4 415:11
416:11,22
417:4,12,21
418:2 428:9
442:7 465:4
486:4 528:8
540:19 541:4
557:3 590:10
590:12 624:3
624:22 646:19
674:13 697:3
763:5,18 781:1
781:8 782:8
783:9
**Google** 709:21
710:11
**Gorrono** 409:18
410:7 417:2
780:2,16
**governing**
781:16
**Grama's** 431:16
**grant** 691:5
760:13,14

**granted** 760:14
**grantee** 760:13
**granting** 640:6
650:11
**grantor** 760:17
760:18,21
**Greene** 419:20
420:22 421:9
483:20 485:1
485:10 492:15
499:9,18
517:20 521:9
535:15,17
536:9 606:20
631:12 644:15
644:16 656:17
657:19 666:15
693:14 694:5
695:8 699:14
702:10,18
703:12 712:18
713:8 722:1
738:12 742:4
749:12 750:4
757:3,5,14
772:21
**Greene's** 431:13
484:9 518:14
697:9 698:13
700:3,17,20
701:8 702:22
703:2 711:17
712:13 770:15
771:4 772:3
**Group** 409:20
412:20 416:4
781:19,20
782:1 783:1
**grouped** 572:19
572:21
**groupings**
579:14
**grow** 578:11
579:2,14,19
**growing** 582:19
**guess** 444:6

447:5
**guide** 415:3
535:12 606:13
606:19 641:16
641:19 752:15
752:19

___

**H**

**H** 413:7 414:1
415:1
**half** 586:6 764:3
**halfway** 647:1
652:1 671:3
674:18
**hand** 643:11
688:11 695:12
710:13 711:16
724:4 780:11
**handing** 643:20
**handled** 662:1
**handling** 762:4
762:19
**Hang** 776:22
**happen** 694:10
**happened**
623:14,15
**happening** 730:9
**happens** 605:16
660:20 662:17
730:7
**happy** 419:2
421:18 552:7
655:18 710:12
**hard** 518:9
626:3
**Hari** 450:19
**harm** 481:7
**Hasan** 411:13
416:21 423:10
533:9 670:4
**hash** 451:17,19
452:5,7,9,11
452:14,16,21
453:1,3,5,7,9
453:10,19,20
493:3,20 494:4

494:9,18 495:1
495:15 496:18
496:21 497:22
498:2,3,5
499:14 500:3
500:22 501:8
502:2,5,5,11
502:11,12,14
503:13 504:7
504:10,19
505:3,9,12,18
506:2,5 596:16
596:22 597:6
597:11 608:12
617:1 635:19
643:2,7 644:10
644:14,20
645:1,5,9,11
645:12,13
746:6,7,9,10
746:10,12,21
747:7
**hashing** 443:5
443:22 444:2
636:7,8 662:13
662:20,21
663:7,14 667:8
667:13 745:4,5
745:7 747:8,18
747:22 768:12
**hashing-based**
662:8 667:7
**HDFS** 706:10
**headed** 652:2
**heading** 440:2
440:17 455:2
607:10 719:13
770:20
**headings** 450:9
**heads-up** 421:5
**heard** 426:17
427:8 516:20
711:9 742:22
**held** 410:5 416:7
674:9 712:8
**help** 420:6

748:20
**helped** 563:2
673:16
**helpful** 481:15
765:2
**helps** 535:5
**hereinafter**
651:4
**hereto** 760:10
**hereunto** 780:10
**hesitate** 781:17
**Hewlett-Pack...**
736:15 737:7
**hierarchical**
438:4,9,15,20
439:8 440:6,17
441:1,7 442:11
442:18 444:3,4
469:19 471:4,8
471:20 472:5
472:11 474:18
483:17 484:1
485:2 499:3,18
501:11,16
502:18 503:21
504:6,18 506:9
506:15,22
507:6 508:2,5
510:13,17
511:3 514:2
517:15 518:6
518:17 544:20
545:12 555:6
556:3,8 569:6
569:15,19
570:2,18 571:6
571:18 572:21
573:13,22
574:16 575:14
576:7,15
577:10,12,20
578:2,9,10
579:11,20
580:10,16
581:22 583:9
584:2 586:11

586:12,20
595:9,20
596:13,20
597:4 598:1,9
646:6 661:4
663:9 694:14
695:5,7 725:6
725:11,15,19
726:3 756:13
757:4,6,9
**hierarchically**
501:2 503:15
517:8 580:2,6
580:10 645:16
645:21 755:4
755:16 756:22
**hierarchies**
518:1
**hierarchy**
508:12 574:20
580:13 582:8
598:17,21
636:3 660:15
660:16,17,18
661:12 725:21
774:6
**high** 448:2
462:16 464:12
475:6 476:3
478:17 495:4
539:20 540:1
545:14 546:19
555:15 570:13
621:7 623:4
636:17 677:9
677:19
**higher** 508:12
**highlight** 756:12
**highlighted**
551:18 616:2
622:5
**Highly** 409:7
415:16 779:9
**history** 623:15
647:22 649:1
**hit** 570:13

**Hoang** 411:4
413:5 416:19
416:19 423:10
434:16 438:6
438:17 441:12
443:7 444:5
447:3 453:11
457:5 460:8,19
461:6,17
462:20 463:13
464:17 466:13
466:20 467:10
468:16 471:11
471:21 472:13
473:17 476:19
477:20 478:15
479:10,20
480:15 481:10
482:6,22 484:6
484:18 488:13
489:13 490:18
491:16 495:3
498:12 499:6
500:7 501:3
502:20 504:2
504:21 505:19
506:3,16 507:1
509:4,14
512:16 514:9
517:9 523:9,21
524:9 525:2
532:14 533:8
533:21 534:4
535:22 538:5
539:6,16 546:8
548:3 551:14
559:18 564:3
566:5,14 567:1
568:3,16 570:4
570:21 571:8
572:2 573:16
575:20 576:12
577:5 579:3,9
580:3 582:2
583:21 585:21
587:12,19

588:11 597:7
598:14 606:4
606:15 607:22
613:13 614:18
616:18 619:22
620:7,21
621:17 622:13
622:19 623:10
634:18 642:10
643:9 646:10
647:19 654:13
657:10 662:14
665:18 666:13
667:9 670:3
671:15 672:1
673:6 674:4
675:21 678:13
680:5 681:16
682:3 683:2
685:17 693:17
698:1 700:14
702:7 704:19
705:4 710:19
712:2 714:5
720:18 721:9
731:5 732:8
734:6,10,20
735:11 736:9
738:1,10 742:1
743:10 745:10
745:15,17
746:16 747:2
748:3,7 749:10
750:10,14,19
751:15 753:13
754:13 755:5
755:12,17
756:5 759:21
761:18 762:14
762:20 763:1,6
763:17 766:21
769:11 771:18
773:11 775:7
776:13 777:1,3
777:16 778:17
779:1,11

**hole** 682:16
690:4
**home** 616:11
**honor** 449:3
**hope** 424:1
482:16 554:19
587:9
**hoping** 477:22
**horizontally**
582:19
**hour** 527:16
**hours** 421:10,12
421:15,15,20
421:22 422:3,7
422:12,14
431:5
**huge** 726:21
747:15
**hybrid** 439:18
439:21 440:2,4
440:9,13,16
443:1,4,11
504:5 506:8
507:5 508:4
512:15,21
513:6,17 514:1
514:5,7,13
572:13,18
**hyper-scaled**
448:3
**hypothetical**
501:4 571:21
572:10 588:15
757:19 758:8
**hypotheticals**
757:21

**I**

**i.e** 636:9
**Ian** 455:15
456:18
**IBM** 736:3,6
737:7,11
759:10,17,20
760:1,2 761:13
**IBM's** 761:7

**identi-** 677:15
**identical** 666:21
694:8 695:2
**identification**
417:22 418:3
449:12 525:22
528:6 529:14
531:5 540:20
557:4 559:13
561:2 590:13
599:12 611:12
615:13 617:21
623:22 639:7
643:18 649:15
660:3 668:3
672:13 688:16
691:9 718:4
741:1 752:16
758:20
**identified** 415:8
447:9 455:14
465:5 483:20
502:13 526:20
531:20 532:12
533:5,9,14
563:21 564:12
602:19 603:9
604:5,14 605:3
605:13 607:19
608:16 610:10
612:14 613:10
628:10 719:10
751:13 754:11
**identifier** 494:4
504:12 563:16
563:19,21
564:1,10,12
565:2,5 566:3
568:14,19
608:12 678:1,6
678:11 679:13
680:9
**identifier/loca...**
565:15 566:8
567:13 568:7
**identifiers**

461:22 637:6
637:16,18
675:13 677:12
679:4,7 726:18
**identifies** 424:9
456:4 459:19
517:20 518:17
526:16 531:16
532:3,21 533:1
565:8 600:22
607:7 609:8
615:20 671:3
678:7 679:8,13
722:1
**identify** 416:12
445:12 520:19
662:1
**identifying**
489:5 499:19
552:5 609:18
610:18 644:16
726:19
**identities** 462:3
**IDS** 769:3
**IEEE** 664:15,18
664:20,22
665:3,6,10,15
666:3
**II** 409:6 410:5
781:1,8 782:8
783:9
**ILLINOIS** 409:1
**illustrated** 550:4
661:14
**illustrates** 551:9
**illustrative**
512:2
**image** 680:12
**immediately**
553:11 660:21
**impact** 453:20
**impinge** 654:20
**implementation**
694:7
**implication**
455:21 516:5

516:19
**implied** 471:13
482:13 566:20
**implies** 470:22
495:7 496:11
496:18 534:12
646:5 762:10
**imply** 471:18
495:18 496:2
497:6,12 501:9
515:4,12 516:2
516:4,11,15,18
534:14 757:8
**importance**
711:4
**important**
508:13,15
596:10 708:10
708:15 711:1
**impose** 593:12
**improperly**
713:15
**inaccuracies**
418:16 429:1
**include** 425:13
481:9 546:18
606:18 614:5,6
614:12,13,17
614:19 617:7
664:11 689:15
720:16 730:4
730:17 761:10
776:15
**included** 493:19
497:19 525:14
564:19 613:5
619:1
**includes** 610:19
**including** 422:4
480:22 489:17
512:4 558:15
602:14 708:18
709:17 713:15
760:4,6 772:11
781:21
**inclusive** 486:10

736:13
**incoming** 762:4
**Incomplete**
501:4
**incorporate**
610:1
**incorrect** 605:8
605:9 620:6
685:12
**independent**
607:20 610:2
634:2,5 636:22
637:4 654:6
**index** 502:10
635:18
**indexed** 502:2,2
502:10 635:19
**indicate** 569:11
**indicated** 435:18
690:6
**indicates** 545:19
547:2,19 578:6
642:7 652:7
715:12
**indicating** 513:7
514:13 550:7
569:3 579:16
584:18 585:2
586:3 587:22
661:10 748:21
761:21 764:17
**indication**
492:19
**indicator** 708:10
**indirectly**
657:18
**individual** 466:4
502:9 677:13
678:7 679:5,8
679:9,14
**individually**
597:11 615:11
**individuals**
751:13
**industrially**
708:10,14

industry 628:16
706:2 707:1
708:9 709:16
711:5,6 715:13
743:9
infinite 724:9
inform 504:12
548:5 774:15
information
461:15,19,21
462:2,8,9,13
468:7,8,10
471:9 486:20
486:22 487:7,8
487:13,21
488:1,10,12,18
489:11,12
493:3,18,19,22
494:18 502:1
507:16 545:21
546:6 547:4,10
547:13 548:13
549:10 558:17
558:17 594:14
594:16 596:15
596:21 597:5
598:4,6,12
609:13 610:20
615:15 616:22
634:7,9,17
635:17 636:5
636:11 644:8
644:17 678:1
680:10 708:6
722:16,22
742:7,8,9
744:15,20
745:9 762:4,19
764:15 765:5
informed 433:2
433:8 434:2
informing
466:18 592:4
informs 505:4
Infrastructure
454:4

infringement
422:15 464:20
737:16
initial 420:2
initials 767:6
initiate 549:12
innovations
448:5
innovative
458:19
innovators
460:12
inquiry 437:6,14
insert 464:5
inside 450:12
513:12 514:14
565:22 574:8
574:10 585:1
756:12
instances 510:3
623:13
instant 642:2
Instantaneous
723:22
instantaneously
724:19
Institute 454:8
instruction
434:20 598:2
integrity 686:9
intend 477:16
478:5 479:5
480:8,11,20
484:4,10
485:11 489:8
498:17 499:10
773:1
intended 512:1,5
intending
583:14
intent 414:5,7,9
483:3 489:16
599:11 600:2
611:11 612:4
617:19 618:12
618:20,21

680:7
interactions
551:10
interest 734:8,14
734:18 780:8
International
454:7
internet 454:4
710:14
interrogatories
715:22 716:1
716:19 727:20
732:3
interrogatory
716:12 730:2
732:4,14
Interrogatory's
727:21
interrupt 441:12
interruption
751:6
interview 413:15
413:17,21
528:5,16 529:4
529:8 531:4,11
531:19 532:4,8
532:11,12,21
533:19 534:20
535:2,3,16
536:13,17
537:1,7,14,21
538:4,9 539:12
559:12 560:3,6
560:13,16,18
561:11 669:2,4
669:19 670:4
670:14,22
671:2,21 672:6
672:21 673:10
674:15,17
676:7 681:6
683:12,15,21
685:16 687:5
interviews
525:15,16
534:3,18

introducing
539:19
invalid 621:5
622:18 696:13
697:11 770:21
invalidate 485:3
499:20 622:9
697:22
invalidated
623:8 627:15
invalidates
658:13
invalidating
484:2
invalidity
413:11 418:2
420:20 421:2,4
422:16 427:1
621:7 622:10
701:8 708:22
invent 452:20
453:2,4,6
460:7 462:18
721:17 722:19
723:1
invented 437:10
460:22 462:12
662:22 707:20
707:22 724:20
invention 435:21
437:8,10
438:16 504:8
509:22 512:6
520:14,19
525:9 542:20
558:21 571:11
582:10 584:3
591:18 593:2
593:11 594:18
637:15 689:5
689:12 721:20
726:16 742:6,7
744:8 762:1,2
762:12,16
inventions 438:3
520:12 587:3

707:1 715:11
722:2 727:14
760:20
inventive 700:4
701:1,2 713:2
713:6,18 772:5
772:21
inventor 437:3,9
741:12
inventors 448:1
460:3 710:4,8
719:4 721:17
722:19 743:17
751:14,17
752:3
invited 536:7,9,9
536:22 537:3
involve 508:9
involved 454:12
454:13,20
534:16
involves 517:21
689:6
involving 738:4
762:16
IO 409:3 411:3
781:6 782:7
783:8
IRIS 454:4,12
454:13,20
Irvine 605:17
issue 414:5,7,9
435:21 458:22
459:6 524:4
535:13 540:1
599:11 600:2
604:3,10
611:11 612:5
617:19 618:12
618:20,21
619:10 641:1
652:18,21
655:16,18
671:17 694:17
695:10 774:21
issued 422:20

430:10 618:22
620:5 621:4,10
622:8 654:11
686:12 759:12
**issues** 436:9
446:12 465:12
507:14 542:17
695:11,13
734:16 735:2
**issuing** 425:22
427:15 430:2,6
625:13 632:17
760:7
**italicized** 607:15
608:6,8 609:1
609:19 610:17
**Item** 626:7,21
769:9
**iterations** 739:18

**J**

**Jaime** 441:16
**January** 664:15
**Java** 739:14,15
740:11,14,15
**Joan** 728:16
**job** 747:15
**John** 425:4
454:15 456:2
456:18 458:5
719:17
**Jorgensen**
409:10 410:5
411:5,14
416:20 781:2
**Joseph** 670:11
**JSW** 767:6
**judge** 709:6
**July** 520:11
521:7,16 523:8
523:14 529:8
531:20
**jumped** 543:8
**June** 522:16
668:18 669:5
672:20 673:10

681:6 684:7
**juries** 623:6
**juror** 482:2,20
483:9
**jury** 434:15
445:4 466:18
467:4,9,14
477:17 478:5
479:6 480:6,11
481:16,21
482:12,14
483:5,9 489:9
498:9 622:11
622:14,16,22

**K**

**K** 411:14
**Karger** 603:4,5
603:5,8 605:21
605:21 613:1,1
614:17 741:13
741:20 742:3
742:22 743:17
744:14,18
745:3,13,18
747:6,12,13,16
747:18 748:1
748:12,17,18
749:7,13,17
750:6,7,8,13
750:16 751:11
751:12,13
752:3,5 767:18
767:19,21,22
768:3,7,11
**Karger's** 743:8
**keep** 580:13
582:20 664:12
768:2
**keeps** 580:14
**Khoang@reic...**
411:9
**Khue** 411:4
416:19 423:10
430:22
**kind** 457:22

462:18 463:9
476:20 510:14
544:4 574:21
655:21 663:18
738:22
**kinds** 654:20
707:14
**knew** 709:18
710:5,16,16
**know** 421:18
434:19 444:22
450:21 451:1,7
451:9 453:14
454:15,19
455:20 456:11
456:14,18
464:13,13
465:20 472:10
473:9 482:21
483:4 500:12
509:22 513:13
513:15 524:13
525:12 527:3,5
535:9 536:3,4
536:7,8,10
554:15,17
556:17 579:14
580:8 583:2,12
586:1 587:5
598:10 644:13
647:17 648:17
654:21 655:7
661:2 663:20
665:11,13
670:11,15,20
671:1 683:4
685:5 687:4
708:20 721:7
724:21 728:6
728:10,10,11
728:13,17,17
728:20,22,22
729:3,13 748:7
756:17 758:14
761:12,14
765:4 774:15

**knowing** 659:18
660:9 728:21
**knowledge** 439:3
517:6,12 714:9
714:16 724:20
727:13
**known** 437:20
438:5,15,20
439:3 547:12
548:11,11
594:15 609:12
634:8,17
**Kove** 409:3
411:3 416:9,22
420:14 422:12
423:7,12
424:20 433:11
451:2,6 456:20
456:22 457:3,8
457:12,14,20
459:5 468:3,14
469:15 473:5
473:13,19
474:17 519:11
527:10 537:2
539:14 562:6
581:18 582:10
584:3,12,20
587:3,17 629:2
629:10,13
630:11 631:16
633:5 679:20
687:11 704:14
705:17 707:22
709:18 716:18
717:17 719:7
721:17 722:12
722:15,19
724:18 726:15
727:18 730:2
732:5,13
734:18 746:14
781:6 782:7
783:8
**Kove's** 423:1
425:21 426:5,8

429:11 430:2
430:10,15
431:6 432:18
447:22 448:1,8
487:1 533:8
539:11,21,22
539:22 542:5,7
557:21 558:3
581:4,7,10,15
583:17,19
670:3 673:19
708:14 709:9
711:10 715:21
716:11 717:12
732:2 746:22
**Kubiatowicz**
456:2,19

**L**

**L.L.C** 782:1
**labeled** 443:17
444:10 585:2
640:10 641:6,8
650:7,16
651:19 692:1
**lack** 766:15
771:16 772:17
774:10 775:3
776:5 777:10
778:13
**lacking** 667:16
**lacks** 461:17
463:13 464:17
514:9 532:14
535:22 538:5
547:9 572:3
606:16 623:10
**language** 435:22
442:14 446:5
457:22 468:4
468:11,21
469:5,21 470:5
472:21 473:11
473:20,21
474:5,21 477:1
477:2,10 480:2

480:22 481:22
488:6,16
492:16 493:12
494:7 495:5
496:10,22
497:4,12 500:9
500:17 547:6
559:2 568:11
586:3 593:14
607:15 617:8,9
634:10 644:4
680:16 774:1
774:14 776:1,8
777:13 778:10
laptop 772:3
large 708:7
742:7
largest 682:14
682:16 690:2,4
late 606:5 748:7
laugh 710:10
Laughing 710:9
law 434:3,8
534:7,15
624:15 651:12
654:17 670:19
lawyer 497:7
651:17 653:21
654:7,11 655:2
655:21 656:3
733:11 734:2
lawyers 534:2
654:21
layperson 608:2
609:16,21
611:3 619:12
651:18 653:22
654:8
leader 456:8
leaders 455:2
leading 617:14
742:6 767:9
771:15 772:16
773:9 774:11
775:2 776:4
777:9 778:12

led 743:4
left 455:1 526:16
528:17 573:21
582:6 586:5,7
586:11,19
625:7 673:7
677:17 682:1,9
688:22
left-hand 563:7
650:10
legal 416:3
432:16 433:2,9
433:16 436:18
444:16 445:22
466:21 481:11
655:10 698:2
700:15 702:8
703:9 733:12
752:9 766:16
769:7
Lehman 411:5
411:14 416:20
781:2
Leighton 455:8
456:19,21
743:18 752:7,8
752:10
length 735:8
let's 417:17
432:12 433:12
435:1 436:13
442:9 444:14
446:19,19
449:6,6 463:21
465:17 467:16
469:13 475:11
476:5 486:10
489:21 492:6
495:11 499:22
512:12 514:18
519:19 528:13
540:3 542:8
544:14 545:16
552:12,16
555:1 559:9
561:22 569:1

571:16 577:21
588:20 591:10
591:10 592:22
595:5,7 599:8
600:9 607:3
610:11 611:8
615:1 623:18
624:16 627:11
628:5 633:19
636:20 640:9
642:16 645:18
646:19 648:7
653:1 657:21
658:21 667:21
668:20 676:17
680:20 686:17
688:1 692:8
695:17 698:9
699:20 701:9
703:21 704:2
706:15 708:2
711:12,13
715:1 717:22
719:9 721:13
723:11 725:2
744:4
letter 574:11,11
628:10
letting 684:21
level 418:20
462:16 464:12
475:6 476:3
478:17 495:4
539:21 540:1
545:14 546:20
555:15 570:13
636:17 677:9
677:19
Levine 743:18
Lewin 743:18
license 759:16
759:19,20
760:3 761:6,6
761:14
licensed 704:17
760:2

licenses 704:21
705:1,12
760:13
light 548:7
658:18 699:13
limit 474:18
637:8
limitation 489:2
500:4 501:8
558:21 559:5
608:16 609:10
609:19 610:9
610:13,15,21
615:21 616:2
647:8 675:19
676:6,14
699:13
limitations 473:7
481:17 492:17
495:15 499:4
499:14 500:22
502:5,12
503:14 515:1
515:11,19
517:17 518:22
542:21 552:20
591:19 593:3
609:1 663:11
698:20 746:22
748:2,14 749:8
limited 513:17
569:19 581:22
582:15 583:9
583:20 584:13
726:1
limiting 502:8
512:2 735:1
line 440:1 466:2
507:4 508:14
509:19 511:8
511:18 548:19
550:22,22
551:19,19
552:5 575:6
626:18 645:3
688:4,18 689:1

752:11 762:1
783:11
linear 581:19
583:19 584:8
587:2,18
lined 765:10,15
766:10 767:5
767:12
lines 440:22
442:8 506:7
575:8,9 607:16
lining 713:13
list 424:4 533:16
547:11 548:10
562:9,12
601:18,20,22
602:2,4,7,19
603:2,9,12,19
604:1,6 605:13
605:18 609:11
613:5,11 614:4
614:9,10,14,15
643:1 645:4
760:1 761:3,5
762:15
listed 426:3
427:5,18
455:19 534:7
565:12 601:15
602:8 603:11
604:1 605:17
612:11 641:22
652:16 670:1
670:16 677:21
678:5 689:20
729:20 750:9
764:10,20
776:19
listing 600:13
612:10 614:19
641:8
lists 455:5
641:15 651:11
652:14 751:16
751:17 752:8
766:18

**literally** 543:9
554:19 556:22
577:21 580:11
584:15 586:9
709:5 721:4
730:6 732:1
751:22
**litigation** 652:18
**little** 444:7
477:21 527:16
565:21 574:6,8
574:10 575:3,8
584:1 617:3
664:7 745:22
756:18
**Live** 410:7
**LLC** 783:1
**LLP** 409:10
410:5 411:5
412:6,12
416:15 781:2
**located** 444:1
**location** 439:5
440:11 441:9
442:19 444:1
451:22 452:17
453:3,7 460:15
461:2,12,14,19
461:20 462:4,8
462:9,13,13,18
463:2 466:4
468:5,9,10
469:16 470:2,9
470:12,15
472:19 473:8,9
473:10,22
474:1,2,3,11
474:14,22
475:5,9 476:1
476:17 477:12
477:19 478:14
479:8,19 480:4
480:13 481:4
482:5 483:20
484:17 485:1,5
486:21 487:7

487:14,14,15
487:22 488:3,4
488:10,19,19
488:20,21,22
489:3,4,5,11
491:4,9,10
492:2,4,21
493:1,2,8,14
493:15,16,18
493:19,20,21
493:22 494:1,3
494:10,11,14
494:16,17
495:8,8,19
496:11 497:2,6
497:21 498:6
498:11 499:1,4
499:16,19
500:5,21 501:1
501:10,12,18
501:22 502:1,2
502:9,10,18
503:13,15,22
504:11,19
505:7,14
507:14 515:5
515:13,21
516:8,10 517:5
517:7,16,21
518:18 519:3
543:6,17
544:10 545:9
545:20,21
546:5,6 547:3
547:4,9,9,12
547:12 548:10
548:12 553:7,9
553:12,14,19
553:21 554:3
554:11,13
556:2,11,14,16
558:13,13,18
558:18,19
559:7,8 563:11
563:14,17,19
563:22 564:10

564:20 565:1,5
565:9,14,16
566:2,3,9,12
566:13,16,17
566:21,21
567:3,3,4,10
567:10,14,21
567:22,22
568:9,13,13,20
569:17 571:5
571:17 572:15
572:17 573:3,8
573:12 575:18
576:1,3 582:1
582:12,15,16
582:19,21
583:10,20
584:13,21
585:7,9 586:8
586:9,12 587:3
587:18 592:2,8
593:8,20 594:4
594:15,16,21
595:3 596:1,7
596:14,21,22
597:5,6,11,15
597:20 598:3,4
598:5,6,10,11
598:12 608:9
608:11 609:12
609:12 610:19
610:20 615:14
615:14,16,17
616:22 617:2
634:8,8,9,16
634:17 635:17
635:18,19
636:8,10 637:7
637:17,20,21
637:22 638:16
638:17,18
639:1 644:7,8
644:15,17
661:1 675:14
675:14 677:14
677:15,16

678:1,1,8,9
679:10,10
680:9,10
722:16,17,22
723:1 726:17
726:19 744:11
744:15,20
745:8,14,19,20
773:19 774:2,8
774:17 775:16
775:21 776:2,3
776:10 777:8
777:14 778:3,8
**location/data**
563:10,14
568:13
**locations** 462:1,3
462:4 464:2,3
464:4 637:6,17
637:19 675:13
681:20 746:1,2
747:12,13
**logic** 547:7
**logical** 470:8,17
516:5,18
517:22
**logically** 472:1
**long** 431:4,20
483:4 665:6
738:21
**long-felt** 628:16
629:14,18
**longer** 694:15
**look** 446:19
449:7 513:3,5
545:16 574:5
616:4 708:2
711:19 755:21
756:3
**looked** 431:18
432:2 513:4
599:2 706:19
**looking** 421:8
437:17 445:7,7
451:10 510:19
511:15 530:13

661:5,8 673:21
676:10 742:12
747:15 750:11
**looks** 561:8,14
561:15 718:9
764:16 767:4
**lost** 776:21
**lot** 550:21
664:10 676:2
710:15 728:10
728:11 729:1
**lower** 508:12
719:11
**LSW** 765:16
766:1 767:8,10
**Luke** 765:22
767:13
**lunch** 588:21
589:3
**Lynch** 456:8,19

———————

**M**

**M** 409:21 782:2
783:2
**Maarten** 665:11
665:13
**machine** 753:18
**Madison** 409:11
410:6 411:6
416:8 781:3
**magazine** 664:15
**mail** 526:11
600:6 611:22
618:8 639:17
650:3 668:17
691:19
**mailed** 624:12
**main** 428:1
570:14
**mainframes**
736:12
**maintained**
502:1,10
635:18
**maintaining**
567:12

**maintains**
565:14 566:7
568:7
**making** 736:12
**managed** 693:4
**management**
659:12 722:9
**managing**
722:20,22
741:21
**manual** 753:17
754:12
**map** 744:20
745:8
**mapped** 556:10
569:17 576:5
576:10 577:2
586:8 596:7
644:15 677:14
744:10
**mapping** 744:11
744:15 745:13
**mappings**
565:15 566:4,8
567:13 568:7
**maps** 677:17
**March** 650:4
742:18
**mark** 447:7
449:8 531:1
540:3 611:8
**marked** 415:8
417:21 418:2
443:18 446:20
449:11 513:8
513:10 525:21
526:2 528:5
531:4 540:12
540:19 557:3
559:12 561:2
590:11,13
599:12 611:12
617:20 623:22
628:7 639:6
642:17,18
643:18 648:8

649:14 651:19
653:3 658:9
659:1 660:3
661:9 664:17
668:2 672:13
674:2 688:16
691:8 692:10
695:18 718:3
741:1 748:19
752:15 758:20
764:1 766:19
**match** 699:19
746:13,19
**matches** 488:6
564:6
**matching** 699:17
**materials** 423:20
424:5,9,20,22
425:15,20
427:6,20
536:14 632:11
**mathematical**
451:20 744:11
744:19 745:8
**matter** 416:9
420:5,11
429:10,15
434:3,8 437:4
445:14 616:17
620:10 700:6
700:13 701:20
702:6,11,20
703:6 712:21
713:7,9 714:3
714:10,17
737:11 772:13
772:20 781:11
**matters** 446:6
666:18 705:6
738:4
**Matthew** 743:18
**maxextents**
682:15 687:16
688:5 689:15
689:20 690:2
**maximum** 693:3

**McGarvey** 601:1
601:5 608:20
612:16
**mean** 444:5
463:19 467:9
469:8 470:18
482:8 497:13
500:19 512:14
516:4,12,14
517:11 533:22
534:6 535:10
536:3 544:2
547:17 550:20
576:21 580:5
580:10 588:17
597:9,10 620:2
639:22 710:9
716:13 719:22
721:5,11 738:2
738:3 746:19
754:9 758:4
761:4
**meaning** 435:17
435:19 436:4
469:12 477:3,5
477:8 478:11
479:7 539:4
637:13 667:20
**means** 443:12
578:22 579:6
579:16 645:4
647:17 655:6
721:8 733:9
745:20
**meant** 438:8
514:5 520:2
544:4 570:6
**measurement**
682:12 689:22
**measuring** 682:2
682:22
**mechanism**
551:4,5
**mechanisms**
551:2
**meet** 430:15,20

431:1,4 463:2
483:16 484:15
499:4 501:18
568:15 609:19
748:1
**meetings** 536:5
**member** 563:18
564:9 565:4
568:18 711:6
**members** 716:21
**memorize**
702:22
**memory** 645:4
724:9
**mental** 680:12
739:6
**mention** 458:5
458:11,13,15
458:21 459:5
459:11 614:1
628:4 695:13
707:5
**mentioned** 420:8
440:20 449:1,3
476:21 515:22
516:13 553:16
603:19,21
614:2 684:5
732:18 761:5
772:18
**mentioning**
458:8
**mentions** 458:7
**merely** 703:11
**message** 468:7
470:22 471:9
487:12 488:17
510:15,16
511:6 513:14
515:1,11,19
517:17 518:20
518:22 545:19
546:14,18
547:1,8,11,19
549:8,8 552:19
552:20 553:15

554:12 555:17
558:16 567:21
569:8 570:15
574:22 583:5
594:2,14
609:11 610:9
610:18 615:12
615:15,21
616:10 634:7
634:16 635:1
**messages** 461:4
461:8,9,11
506:14,22
507:8 508:10
510:21 511:4
512:21 514:7
517:7 518:3
565:17 566:9
566:18,22
567:14 568:9
575:7,16 593:9
593:21
**met** 431:2,5
502:17 607:21
608:17 610:22
703:5
**metadata** 722:9
722:12,14,18
722:20,22
**method** 546:11
546:17,17
667:7 680:3
741:16 744:8
762:2
**methods** 662:8
**Mica** 768:14
**Michael** 409:9
410:4 413:3,9
413:11,19,20
416:10 417:4
417:20 418:1
426:18 428:9
456:8,19
540:19 541:3
557:3 624:22
670:10 781:1,8

782:8 783:9
**middle** 492:9
  530:14 586:15
  677:15 695:20
**Minami** 604:9
  604:13 605:22
  613:2 766:8
**mind** 425:12
  429:3 523:11
**mine** 605:16
**minus** 524:13
  525:7
**minute** 761:20
**minutes** 763:7
**Mischaracteri...**
  509:5 551:15
**Mishra** 526:20
  527:3,8
**missed** 549:17
**missing** 572:7,11
  671:7 747:11
  747:13
**misspoke** 602:6
**misstated** 523:10
**misstates** 478:16
  479:21 480:16
  490:19 491:17
  509:14 546:8
  551:14,15
  564:3 566:5
  568:3 667:10
  675:21 678:13
  682:4 755:5
**mistake** 619:15
  621:9,11,15
**mistakes** 619:21
  620:3
**misunderstan...**
  567:17 572:4
**misunderstood**
  509:18 582:3
  630:18 730:13
**MIT** 448:6,13,19
  449:1,3 451:8
  454:6 458:4
  706:18 737:18

737:20,21
  742:20
**mix** 699:18
**mixed** 439:16
  571:7,22 572:5
  572:12 573:15
**mixing** 573:7
  699:16
**model** 726:2
**models** 760:5
**modifications**
  511:20
**modified** 565:15
  566:8 567:13
  568:8
**moment** 433:15
  627:12 674:14
**moments** 443:1
**money** 735:8
**morning** 416:14
  417:12,13
  478:8,22 480:1
  481:14 500:10
  544:12
**motivation**
  699:7,18
**motives** 732:11
**move** 499:22
  519:17 552:3
  599:8 667:21
  686:1,5 722:4
  735:17
**moved** 748:9
**moving** 594:7
  684:10
**multiple** 464:2,3

**N**

**N** 411:1 412:1
  413:1 574:11
  574:11 590:1,1
  590:1
**name** 416:2
  423:11 449:3
  450:22 451:3
  456:7 458:8,11

458:13 527:8
  556:14 569:19
  570:2,14,19
  574:2 575:12
  576:1,9,20
  577:1,10
  596:13 598:2
  598:20 624:15
  635:2 664:9,12
  670:12 693:1
  694:4 710:8,17
  719:17,20,21
  720:1,7,9
  721:15,18,21
  738:14 752:8,9
  754:17 755:3
  756:14 757:10
  758:1 782:8
  783:9
**named** 426:18
  427:9 450:19
  456:1 574:14
  574:15 596:6
  596:16 601:9
  636:3,4,6,9,10
  665:9 693:4,8
  694:7,14,20
  695:1 719:4
  741:12 743:16
**names** 415:3
  455:5 459:11
  555:16 556:9
  580:16 606:12
  606:18 636:1
  641:16,19
  725:18 728:9
  743:21 752:10
  752:14,19
  755:15 756:20
  768:15
**naming** 602:3
  694:6
**nature** 580:16
  674:19 675:6
**Naveed** 411:13
  416:21 423:10

430:21
**navigate** 626:3
**NDTP** 465:20
  466:3,6 548:22
  551:2,5,10
  582:11,15,20
  584:17,22
  585:6 588:1
  677:7 727:5
  729:11
**NDTP-based**
  729:9
**NDTP_RDR_...**
  549:8
**near** 564:17
  692:14
**nearby** 616:12
**necessarily**
  464:13 492:21
  493:9 494:14
  691:2
**necessary** 517:6
**need** 419:1
  437:19 463:5
  473:2 476:11
  477:14 478:4
  486:19 487:5
  494:16 617:3
  629:14,18
  636:2 654:10
  674:4 700:11
  714:1 724:7
  726:17 763:7
  774:5 775:20
  778:7
**needed** 714:8
**needs** 464:6
  563:22 566:2
  566:12,21
  588:5 628:16
  659:12 713:19
**negatively**
  504:22
**neighborhood**
  616:11
**neighborhoods**

616:12
**Neimat** 604:20
  605:2,22 613:2
  766:4
**neither** 503:5
  780:6
**network** 462:14
  462:19 466:2
  468:6 470:15
  473:9 474:1,11
  474:15,19,22
  475:10 480:4
  481:3 486:20
  487:6,21 488:9
  489:10 491:9
  491:12 492:3
  493:1,14
  494:11 495:9
  503:22 504:18
  505:17 506:1
  506:15,22
  517:16 553:8,8
  553:12 554:4
  558:14 559:8
  568:6 572:1,15
  572:17 573:5,8
  573:9,9 585:9
  586:13 593:8
  741:21 742:14
  753:18 754:5
  762:10 774:17
  776:3,11
**networking**
  736:7 737:22
  738:4,6 761:17
**networks** 463:2
**never** 456:22
  523:10 623:15
  711:9 730:6
  737:6,17,19
**nevertheless**
  638:21
**new** 409:12,12
  410:6,6,8
  411:7 416:8,8
  417:6 436:9

454:8 464:5
540:22 579:19
648:14,22
649:5 651:1,14
652:8 654:4,18
655:5,13 717:8
717:11,14
780:19 781:4
**newer** 699:13
**newly** 642:1
647:6,14,18
648:1,13,19
**Nhasan@reic...**
411:16
**node** 443:17
513:16 577:15
578:16,21
580:13 659:10
660:16 666:20
666:21 667:3
**nodes** 443:18
444:3,10
513:16 577:15
578:17 666:11
666:22 667:4
**Nods** 756:7
**non-hierarchi...**
469:18 490:9
492:22 495:18
496:19 515:5
**nonfinal** 656:18
**nonhierarchical**
439:12 443:15
443:19 470:3,9
470:13,17
471:1 472:19
473:16 474:4,9
474:18 475:1,4
476:1,17
477:11,18
478:13 479:9
479:18 480:5
480:13 481:4
482:4,21
483:22 484:3
484:14,17

485:4 490:17
491:1,2,8
493:10 494:12
494:15,22
495:9 496:2,11
497:2,5,21
498:6,10 499:1
499:16 500:5
501:10,13,17
503:5 504:5,14
505:6,15 510:4
513:1 514:3,12
514:15 515:12
515:20 516:9
519:3 542:22
543:16 544:9
544:21 545:4,8
552:21 553:6
553:18 554:6
555:7,13 556:4
558:22 559:6
570:20 571:5
571:17 572:20
573:12 581:19
583:19 584:6
584:12,20
585:19 586:21
587:2,18
591:20 592:6,7
592:12,18
593:4,12,18
594:4,19 595:2
595:10,20
596:4,11
597:14,19
627:8 694:16
695:1 726:5,8
726:12 758:5
774:3,18
775:22 776:11
777:6,15
**nonhierarchic...**
757:11 758:2
778:9
**nonhierarchy**
774:6

**nonlimiting**
688:19
**nonlinear**
583:18
**nonobviousness**
628:11 705:3
**nonresponsive**
722:5
**normal** 730:22
**NORTHERN**
409:1
**Nos** 716:1
727:20 732:3
**Notary** 410:8
417:5 780:18
782:22
**note** 410:7
634:20 662:7
670:18 753:9
753:16
**noted** 590:2
779:15 782:14
**notice** 414:5,7,9
534:7 599:10
600:1 611:10
612:4 617:19
618:12,19,21
**noticed** 418:18
**noticing** 781:15
**noting** 653:18
781:15
**notion** 645:22
654:17 677:10
726:16
**novel** 452:10,18
462:6,10
722:18
**Ns** 575:3
**number** 443:17
526:9 685:22
686:14 708:7
708:16 709:12
728:17 756:9
762:3 768:10
**numbered**
624:20

**numbers** 428:10
574:18 753:4
764:14
**numerous** 711:2
773:22
**NW** 409:21
411:14 412:7
412:12 782:2
783:2
**NY** 411:7 781:4

---

**O**

**O** 590:1,1,1
**o'clock** 587:13
**oath** 731:21
732:13,18,21
733:8,10,14,18
**object** 566:3,3
606:5 613:13
661:22 662:2
724:17
**objection** 434:16
438:6 443:7
453:11 457:5
460:8,19 461:6
461:17 462:20
463:13 464:17
466:13,20
467:10 468:16
471:11,21
472:13 473:17
476:19 477:20
478:15 479:10
479:20 480:15
481:10 482:6
482:22 484:6
484:18 488:13
489:13 490:18
491:16 495:3
498:12 499:6
500:7 501:3
502:20 504:2
504:21 505:19
506:3,16 507:1
509:4,14
512:16 514:9

517:9 523:9,21
524:9 525:2
532:14 533:21
534:4 535:22
538:5 539:6
546:8 548:3
551:14 564:3
566:5,14 567:1
568:3,16 570:4
570:21 571:8
572:2 573:16
575:20 576:12
579:3,9 580:3
582:2 583:21
585:21 587:19
588:11 597:7
598:14 606:5
606:15 607:22
614:18 616:18
619:22 620:7
620:21 621:17
622:13,19
623:10 634:18
642:10 643:9
647:19 654:13
657:10 662:14
665:18 666:13
667:9 671:15
672:1 675:21
678:13 680:5
681:16 682:3
683:2 685:17
693:17 698:1
700:14 702:7
704:19 705:4
710:19 714:5
720:18 721:9
731:5 732:8
734:10,20
735:11 736:9
738:1,10 742:1
743:10 745:10
745:15 746:16
747:2 748:3
749:10 750:10
751:15 754:13

755:5 759:21
761:18 762:14
766:15 767:9
769:6 771:15
772:16 773:9
774:10 775:2
776:4 777:9
778:12
**objections**
438:17 577:5
755:12,17
778:20
**objective** 437:6
**objects** 723:22
724:15,19
725:1
**observe** 711:1
**obtains** 760:12
**obvious** 418:22
628:17 630:5
632:3 633:1
699:13 714:10
**obviously** 576:21
716:17
**obviousness**
433:4
**obviousness-ty...**
445:9 697:12
697:21 699:5
699:10 700:10
701:10 702:4
702:13 770:14
771:5,13 773:3
**occurred** 623:13
656:13 704:22
**occurring** 691:5
719:2
**occurs** 464:9
**October** 520:20
521:2 522:7
525:9 624:13
718:15
**offer** 434:14
484:4 485:7
499:2 592:10
592:16

**offered** 435:3,7
445:3 483:14
520:22 521:13
542:6 629:8,10
683:17 688:20
707:19 733:2
752:22
**offering** 486:8
631:11,14
635:9 636:19
638:9
**offers** 698:19
**office** 431:2
432:8 473:14
473:19 519:12
533:14,19
538:14,18
539:4,12 542:1
543:14 545:2
546:3 550:6,10
553:4 554:10
554:15 555:10
556:5,18 558:2
561:10,16,18
562:5,22
581:11 585:5
592:4 593:17
595:1 596:3
599:4 605:20
606:12,18
607:1,7 613:17
619:2,8,14,20
620:5,16,20
621:9,15 622:3
625:4,8,11,13
626:2 628:2
632:8,13,21
633:19 642:7
654:12 656:2
656:18 657:3,8
658:4,10
659:17 660:8
670:7,19,22
671:12 672:20
681:5 696:6,12
717:10,16,21

766:20 781:12
781:17
**office's** 717:5
**officer** 780:2
**offline** 710:3
**oh** 444:6 490:5
520:4 533:16
540:11,14
549:17 559:14
563:16 571:20
601:3 602:15
624:19 625:22
626:13 630:10
662:22 663:20
666:4 671:10
678:15 679:2
684:3 713:17
733:20 739:4
742:22 749:3
751:4 764:18
765:13 771:8
**okay** 419:3
420:6,12
421:10 422:6
422:10,14,18
423:4,12 424:4
424:8,21
425:21 426:12
426:17,21
427:13 428:1,6
428:22 430:12
431:10,13
432:12,18,22
433:12,20,20
434:12 435:1
435:11 436:13
436:21 437:17
438:2 439:20
440:8,14 442:7
445:3,7 446:2
446:15,19
447:11,19
449:6,15,19
450:11,11,18
451:1,4,10
452:19 453:4,8

453:17 454:22
455:14 456:1
456:14 457:2
457:12 458:4
458:10,20
459:4,9,15
460:1 462:11
462:17 463:11
464:15 465:16
465:19 466:6
466:10 467:7
467:16 468:2
468:13 469:2,7
469:13 470:1
470:11 471:2,7
472:10,17
473:1,4,13
474:16 475:2,8
475:11,21
476:5,8,15
477:16 478:10
480:10 483:14
484:4,13 485:6
485:14 486:7
486:13 487:4
487:19 489:8
489:20 490:6
490:14 491:13
492:6 493:7
494:13,21
495:11 496:8
497:20 498:8
498:21 499:21
500:16,21
501:15 503:2,7
503:20 506:12
508:18 511:2,7
512:12 514:6
514:18,21
515:10,15
516:11,20
519:6,15 520:5
521:13 522:11
522:18 524:21
526:14 527:5
527:13,13

528:12 529:7
530:12,20,20
530:22 531:19
532:3,7,11,20
533:2,5,13,18
534:11 535:15
536:12,18,22
537:6,10
538:13 539:11
539:18 540:3
540:17 541:15
541:15 542:8
542:18 543:7
543:11,19
544:14,17
545:10,16
546:2,22
549:15,21
550:14,14
551:11,21
552:4,14
553:20 554:5
555:1,22
556:12,17
557:6 558:8,11
559:9,21
560:20 561:17
561:22 562:8
562:20 563:2,7
563:22 564:22
565:7,7 566:2
566:12,20
568:12 569:1
569:10,18
570:11,17
571:3,13 572:7
573:11,20
574:4 575:11
575:17 578:5
580:1,19
581:13,18
584:19 585:18
591:3,10 592:3
592:10,22
594:1,7,22
595:15 596:9

599:2,6,8
601:14 602:1,5
603:3,13 604:2
605:19 606:3,8
606:11 607:3
607:12,18
608:8,15,21
609:17,22
610:5,8,21
611:6 614:4,22
616:4,15
618:10 619:8
621:14 625:16
626:7 627:11
627:17,20
628:5,14
629:10 630:1
630:11 632:20
634:14 635:4
635:10 636:20
638:10 639:2
639:11 640:13
640:18 641:5
642:16,19
643:14 644:18
645:18 648:7
649:4,10
651:13,20
653:17 654:2
657:4,21 658:2
658:10,20
659:7,17 661:5
661:15,21
667:5,21 671:2
671:10,20
672:5,10
673:18,21
676:5 677:22
678:10 679:12
679:17 681:22
682:21 686:15
687:14 689:13
692:21 695:14
695:19 697:8
698:9,17
699:20 702:18

703:3 704:2,4
706:1 708:2
711:12 712:18
716:3 717:22
719:13 720:12
721:17 723:11
723:17 724:10
724:12 725:2
725:14 726:4
726:11 727:11
729:6,10,16
730:13,18
731:12,16
737:17 742:16
743:16,16
744:1,1,7,18
745:7 746:5
747:17 749:2,3
750:1,6 751:20
752:12,18,22
754:9 756:4
761:2,16
762:12 763:4
763:22 764:19
768:1 769:17
772:10
**ONAG** 606:19
606:20 608:19
641:19,20
642:2,13
648:10,13
649:5,7 652:15
658:19 659:3,5
693:2,9 694:4
694:6 695:1,12
696:2,8 752:21
752:21 756:13
757:7,9,15
**once** 420:21
626:20
**one's** 709:5
**ones** 477:9
510:17 533:17
657:13 670:19
757:2
**online** 740:8

**opening** 421:13
422:4 457:8
520:11 720:2,4
720:11 726:15
759:22
**operating**
753:19
**operation**
451:21
**operations** 549:4
549:11
**opine** 463:5
465:8 484:8
489:15 542:17
601:12 603:15
627:8 776:7
**opined** 444:19
467:1 491:5
492:4 702:19
725:13 772:4
774:13
**opining** 535:10
556:1
**opinion** 453:10
453:20 458:8
458:17 469:2
469:11 470:1,4
472:9,17 474:7
474:17 475:3
475:21 476:11
477:13 478:10
479:17 480:8
481:17,19
484:5 485:7
487:4 490:14
496:2 498:9,22
499:2 500:14
500:17 501:9
503:4 505:4
515:10,18
518:22 520:22
521:3,14
535:11 539:1
539:22 542:19
544:6 545:3
553:4 558:20

559:4 576:2
591:17 592:5
592:11,17
593:17 594:2
595:1 596:19
620:10 636:19
638:11,20
644:6 645:11
645:17,19
660:12 667:11
697:9 700:3
702:11 704:8
704:13 705:9
707:12 708:14
709:14 714:13
722:15,18
723:9 734:21
734:22 742:11
743:11 746:14
746:21 748:15
749:6,22 755:2
755:11,14
757:8 769:8
774:5 775:19
777:12 778:6
**opinions** 419:20
420:4,11
422:18 423:8
423:13,17
425:22 427:1
429:9,15 430:1
430:4,8 433:3
433:17 434:14
435:4,8 445:4
449:20 478:6,7
479:13 480:21
483:14 484:9
484:10,13
485:12 486:8
489:17 499:9
499:11 519:11
542:6,16 546:3
558:2 563:1
627:13,18
635:8 638:8
656:12 657:1

702:14 703:18
705:14,19
717:7 721:2,22
734:13 735:2
749:14,15
752:22 757:12
758:3 770:5,15
771:4,5 772:10
772:11,13
774:12
**opportunity**
479:12 480:18
498:14 499:8
535:19 536:4
**opposite** 484:20
**option** 781:14,14
**ORA_fragme...**
689:18,21
**Oracle** 415:3
529:16 544:19
555:5,11,16
569:6,14 570:1
570:14 573:22
575:17 578:6
580:11,16
595:8,19 596:3
596:13 598:1
598:16 606:12
606:18 635:2
636:1 641:16
641:19 687:18
688:20 689:3,6
689:9,11 738:8
738:12,14,17
738:19 739:3,5
739:9,12,15
740:14,15,19
740:21 752:14
752:18 754:17
756:10 758:1,3
**Oracle's** 595:16
688:8
**OracleAdmin...**
545:11 556:6
**OracleNames...**
601:1,4 612:16

671:4,13
756:21
**OracleNames...**
755:3,15
**OracleNames...**
530:9
**OracleNames...**
530:3 758:10
**OracleNames...**
754:10
**OracleNameS...**
535:12 582:6
757:6
**OracleNameS...**
574:12
**OracleNames...**
529:19
**OracleSG** 601:1
601:5 608:20
612:16
**OracleUnleas...**
601:11,14
602:15 612:22
614:5 641:17
642:3,14
648:11,13
649:8 652:15
658:19 659:4,6
671:5,21
686:21 687:1,5
687:15 690:18
690:22 696:3,9
**oral** 716:14
717:2
**order** 470:6
504:10 598:21
621:10 630:15
640:6 647:5
650:11 654:11
659:22 709:21
774:16 775:22
**ordered** 469:19
471:4,7,20
472:5,11
**ordinary** 435:19
435:20 436:4,5

437:9 439:4
469:12 477:3,5
477:7 478:11
478:12 479:7
494:8 495:6
500:18 503:18
504:3,13 505:4
505:10 508:6
510:9 516:6,17
522:19 523:1,7
524:15 525:5
544:6 548:5,15
567:9 578:14
637:12,14
646:6 692:22
742:12 775:20
776:9,20 777:6
778:7
**organization**
470:8,17
574:15 584:3
664:22 695:7
**organizational**
481:2 491:3
492:3 502:8
577:9
**organize** 451:20
493:21
**organized**
473:22 474:3
475:1 480:4
483:21,22
484:14 485:2
494:12 495:9
516:8 517:22
553:10 577:13
577:19 596:15
596:21 597:5
597:10,20
660:15 774:18
776:11 777:15
**organizing**
462:13
**original** 436:10
781:15
**Ortega** 412:19

416:2
**OSG** 636:6
**outcome** 734:9
734:19 735:9
780:9
**outside** 448:20
597:3 769:6
774:11 775:3
776:5 777:10
778:13
**overall** 421:15
422:10 513:15
514:14 573:11
**overflowed**
694:10
**oversight** 426:4
**Overton** 414:20
423:17 425:4
430:5 452:20
454:15 458:6
459:10 460:6
462:12 533:5
537:6,20 538:2
538:11 669:21
673:9 707:17
715:4 716:17
717:2 718:2,11
718:21 719:3
729:14 732:5
732:12,18
734:8
**Overton's**
458:11 715:11
715:19 716:11
719:17 723:3
727:8,14,17
729:22 731:17
735:4,13
**OverX** 458:15
719:14 720:3,5
720:6,13 724:3
724:4
**owner** 628:21
630:3 631:4,9
632:22 633:9
669:15 675:10

**owns** 739:16
**OX** 720:10 724:4

---

**P**

**P** 411:1,1 412:1
412:1
**p.m** 589:1,4
590:2,7 646:12
646:16 674:8
674:11 696:18
696:21 712:6
712:10 763:10
763:14 779:7
779:15
**page** 413:2,8
414:2 415:2,9
415:15 419:4
424:8,21
432:14 437:18
446:3 449:16
450:16 451:11
451:12 454:2
455:1 486:13
487:18 488:7
489:7,18,22
490:4 492:7
506:7,10
519:19,22
521:12 522:3
523:5 526:15
528:13 530:2,5
530:6,7,10,13
530:14 531:10
532:6 534:8
541:7 544:15
544:18,19
545:17 555:2
557:10 559:22
562:1,9,13
590:19 591:11
594:7 598:18
599:22 600:6,9
600:10,12
601:6 602:15
602:16 607:3,6
607:11,16

609:8 612:4,10
614:20 615:1
618:11,15
619:1,17
624:17,17
625:7,15,16,22
626:2,5 627:11
628:5,6,7,7
630:2,9,9
631:1,22 632:6
632:12,20
633:3,11,15,19
634:1 636:21
639:20,22
640:1,1,3,5,10
640:10 641:6,6
641:7,21
642:16,17,18
642:20,21
644:2,3 646:21
647:1 648:7,8
648:10 650:6,7
650:8,16,16
651:19,20,21
652:2 653:1,3
653:3,5 655:11
655:11 656:16
658:9,21 659:1
659:1,2,8,14
661:8,9 668:21
668:22 670:2
671:3 673:21
674:18 675:5
676:3,12,18,20
676:21 680:20
681:2 692:1,1
692:8,10,10,13
692:13 693:22
694:2 695:16
695:17,18,18
695:20 697:6
698:10,18
701:11 703:21
710:3 715:1
729:6 753:3
756:10,11

763:22 764:1,3
764:4,13,14,19
765:12 766:4
766:18 767:15
768:1 769:21
770:17 771:7
771:19 781:15
782:6 783:11
**pages** 520:2
533:11 632:3
721:22,22
768:2 782:11
**Panagrahy**
743:19
**panel** 483:10
**paper** 605:10,12
605:17 666:5,6
666:8 724:5
743:4,7,8,21
744:3,3 748:13
748:17,18
749:7,13,20
750:7,9 751:1
751:12,17
752:5,8 768:7
**paper-clipped**
668:5
**papers** 662:17
709:11,15
711:3
**paragraph** 419:7
419:8 432:15
433:1,13,20
434:2 435:2,11
436:14,17,21
437:18 440:2,5
444:14,15
445:8 446:2
447:20,22
451:11 454:2
467:17 468:3
469:14 473:4
475:11,17
476:5,10 486:5
486:7,11,14,14
489:22 490:1,3

490:7 492:6,10
495:12,13
496:9 503:8
512:13 514:18
514:22 515:12
515:20 520:2,4
520:6,9 521:5
523:13,18
530:8 542:8,12
542:18 543:9
543:20 544:15
545:16,17
546:20 549:18
551:1,3,5,8
552:13,16,17
553:20 554:5
555:1,2,4
556:15 558:8
558:11 564:8
564:21 565:18
591:11,16
592:2,3,22
593:1 594:8,13
595:5,8 597:22
598:18 603:16
608:7 615:7,9
616:5,16 617:5
617:17 624:20
633:22 634:1
634:22 635:11
635:16 636:21
644:2,3 648:10
653:4 654:3
655:11,12
656:16 659:8
661:16,16
662:6 684:5
692:12 693:21
693:22 694:1
697:5,8,15
698:9 699:20
700:2 701:6,8
701:12 702:16
703:2,4,10,12
704:2,4,9
706:1,15,18

708:3 711:12
711:13,18
712:1,15,16,16
712:18 713:9
715:1,2,10
717:10 718:19
756:10,10,15
756:16,16
770:2,10
771:12,22
772:8,11,14,19
773:8
**paragraphs**
657:1 661:12
693:22 771:3
771:11
**parallel** 586:4,5
**parameter** 682:2
682:11 683:1
687:19 689:15
689:18,21
**parameters**
688:20 689:7,9
689:11,14
**parent** 575:14
659:13 666:19
**parent-child**
661:4
**parents** 660:22
**part** 424:20
425:19 452:2
454:3 458:1
479:17 489:1
518:7 534:19
538:19 550:5
566:15 577:15
581:16 586:10
586:11,17
625:17 626:13
632:8 664:11
671:8 679:12
679:15 697:17
719:21 720:1,7
726:3 768:21
769:3,5
**parte** 413:14,15

413:17,21
414:5,7,10
525:12,17,20
528:4,16 531:3
531:10 559:11
560:3,18
599:11 600:2
600:18 611:11
612:5 617:19
618:12,19,21
625:8 640:6,15
650:12 651:5
669:1
**partially** 765:8
**participant**
533:6
**participants**
532:22 533:1,4
533:9,14 537:9
670:6
**participate**
529:3 537:3,6
537:13 670:21
**participated**
525:16 529:20
534:18 535:16
562:15,18
563:6 580:22
669:18,21
670:4
**participating**
529:5 532:7
**participation**
534:13
**particular** 473:7
495:15 496:21
498:4 499:13
504:1 509:10
527:1,6 532:21
581:14 608:16
614:6 640:14
692:4
**particularly**
708:8
**parties** 435:13
435:17 436:8

564:20 760:18
760:19,20
780:7
**partitioned**
659:11
**partitioning**
660:14 661:11
663:5
**parts** 672:22
673:2 698:20
**party** 534:8
706:13 760:10
**pass** 526:2 557:6
559:14 561:3
618:1 636:2
639:3 672:10
717:22 741:3
752:12 758:17
779:2
**passages** 681:18
**passed** 559:15
**passes** 510:18,18
555:19,19
**passing** 599:14
611:14 649:17
688:13 691:11
**patent** 414:22
415:5 428:10
432:8 433:4
435:21 437:15
437:19 440:1
441:10 442:9
442:18 443:9
445:11,12
457:15,21
461:22 466:1
468:5,18 470:7
472:18 473:6
473:14,15,19
473:21 474:8
475:4,15,22
477:18 479:8
479:15 480:3
480:11,20
482:3 486:9
487:11,20

490:11,16,21
491:15,19
492:20 493:8
493:13 495:16
495:17,18
496:6 497:18
498:17 499:13
501:7,14,16,21
502:15 503:4,6
503:10 505:14
506:6 507:3,11
507:21 509:12
510:13 513:5,6
515:2,3,4
519:12 522:10
522:15 528:22
529:1 531:16
532:17 533:14
533:19 535:10
535:21 538:3
538:14,18
539:3,5,12
541:16,17
542:1 543:1,14
543:21 544:3,8
544:13 545:2,4
546:3,4 548:8
548:18 550:6,9
552:22 553:4,5
554:10,15
555:10 556:5,7
556:18 558:2,6
559:1 560:7
561:10,16,18
562:5,22
572:14,22
573:1 575:1
581:11 582:17
585:5 587:6
591:5,14,21
592:4,6,12,18
593:5,7,17,18
594:9 595:1
596:2 597:13
597:18 599:3
599:17 601:19

602:1,3 604:9
604:13,20
605:2,6,10,20
606:11,18
607:1,7 611:20
612:8 613:17
614:12,14
616:21 618:5
619:8,14,20
620:5,16,20
621:4,9,10,15
622:3,8 624:10
625:11 626:2
628:2,21 630:3
631:4,8 632:21
633:9 639:15
641:3 642:4,7
642:9 647:7,15
647:22 648:12
649:1 650:1
651:3,4,16
652:10 653:14
653:20 654:12
656:2,21 657:3
657:8 658:3,4
658:6,10,13,18
659:17 660:8
668:14 669:14
670:7,22
671:12,22
672:20 673:10
673:22 675:10
681:2,5 684:6
685:21 686:11
686:11,13,14
687:1 691:17
692:5 693:16
696:6,8,11,12
697:10 698:5
698:14 699:12
700:6,7 702:19
708:8,17,18
709:12 710:6
712:20 714:2
714:11,12,18
717:5,9,16,21

721:19 726:14
740:22 741:9
741:16,21
742:3,5,17
743:1,2,5,17
744:14,18
750:7,9,13,17
751:11,16
752:4,9 758:20
759:4,6 760:8
761:11 766:20
770:21 774:21
775:6,8,13,17
776:15 777:5
777:12,17

**patentability**
  607:8 615:3
  651:2,15 652:9
  654:5,18 655:5
  655:14
**patentable**
  626:19,22
  647:9
**patentably**
  445:15 701:21
  703:6 713:20
**patented** 581:15
**patenting**
  444:17,19
  445:4,10,19
  446:4,12
  697:12 699:6
  699:11 700:11
  701:11,15
  702:5,14
  711:14,20
  770:6,14,22
  771:5,14 773:3
**patently** 698:6
**patents** 419:15
  419:18 438:4
  441:15 443:2,6
  448:5,9 452:10
  452:16 457:4
  457:13 458:9
  460:18 461:5

461:16 462:2
463:3 464:14
466:8 480:7
484:16 502:17
505:8 512:14
520:14 521:7
521:10 525:8
525:17 561:19
562:6 603:3,5
603:8 614:17
614:20 622:18
623:9 641:12
656:13 677:8
695:8 697:11
697:17,18,21
697:22 700:12
702:21 704:18
704:21 705:2
705:13,18
707:2,5,8
708:10,14
709:9,19,21
710:4,11,16
711:2,10
712:21 713:1
713:14,16,21
714:4,15
717:12 719:4
722:13,15
746:14 747:1,9
749:17 759:20
760:2,3,4,5,7
760:10 761:4,5
761:7 764:21
772:4
**patents-in-suit**
  432:9 439:1,8
  439:12,15,20
  440:8 443:10
  453:2 458:19
  459:2 465:18
  465:21 485:4
  491:7 495:20
  499:20 500:3
  534:21 541:20
  656:7 704:9

705:11 707:15
708:1 709:2
710:1,5 722:3
743:13 747:10
755:1
**pattern** 548:22
**payment** 760:16
**payments**
  760:18,19
**Pechette** 426:18
**Pechette's**
  426:22 427:4
**pedantic** 584:1
**pedis** 768:14
**peer-reviewed**
  708:7 709:11
  709:15 711:3
**penalty** 541:13
  557:17 590:22
  731:21 732:19
  733:2,18,21
  734:1
**pending** 656:19
**people** 459:20
  463:15 662:21
  709:6 716:15
  728:9,11,11,17
  728:20 729:1,2
  746:7,10 750:8
  751:17 752:1,4
**percent** 647:20
**perform** 468:15
  502:22 548:6
**performance**
  448:2 637:7
**performed**
  546:17
**performing**
  546:14
**period** 781:16
**perjury** 541:13
  557:18 591:1
  731:21 732:19
  733:2,19,21
  734:1
**permitted**

person 435:19
436:4 437:8
439:4 455:14
478:12 494:7
495:6 500:18
503:18 504:3
504:12 505:4
505:10 508:6
510:9 516:5,17
522:19 523:1,6
524:15 525:4
538:19 544:6
548:5,15
556:21 567:9
578:13 587:11
637:13 646:6
670:17 692:22
728:22 742:11
775:19 776:9
776:20 777:6
778:6
personally
538:21 554:9
586:22
personnel 670:7
perspective
655:1 656:2
pertaining 462:2
563:20 564:1
564:11
Ph.D 409:9
410:5 413:4,19
540:19 541:4
781:1,8 782:8
783:9
Phillips 637:12
675:16
PHONE 411:8
411:15 412:9
412:13
phonetic 426:18
670:10,11
phrase 438:10
553:12
phrases 439:1

physical 626:5
640:1,3 668:22
physically
683:16
picture 574:6
587:1 680:12
piece 601:10
pieces 683:19
place 463:6
524:3 651:12
655:17 669:4,7
678:17 687:21
693:11 749:21
757:13
placed 762:6
places 521:18
725:21 756:9
756:11,12
plain 435:19
436:4 468:4,20
469:11 472:21
473:20 474:5
477:2,2,5,7
478:11 479:6
480:2,22 488:5
488:16 493:12
494:7 614:1
617:9 774:14
777:13
plainly 486:19
plaintiff 409:3
411:3 416:22
platform 740:10
plausible 731:14
play 483:6
573:10
players 708:9
pleasantries
673:13
please 416:12
419:4,7 421:19
432:14 433:13
435:2 436:14
444:15 467:17
475:12 476:6
505:21 506:18

511:16 514:19
528:14 542:9
544:15 555:2
557:10 558:9
559:21 591:11
593:1 607:3
615:1,7 616:6
624:17 641:6
643:11,16
646:21 648:7
650:15 651:20
653:2 657:22
658:21 659:21
660:6 668:21
676:18 683:4
688:11 691:22
692:9 695:17
697:5 698:10
699:21 700:16
703:22 708:3
711:22 724:4
725:2 727:1
728:8 735:12
735:12 744:4
751:8 753:3
764:12 768:1
769:19,22
770:17 771:7
771:19 773:16
775:9 776:22
777:18,21
781:10,14,15
781:16
plug 674:4
plurality 474:2
487:15 488:20
493:15,16,22
494:3 608:11
610:19 617:2
741:17 744:10
plus 524:13
525:7 714:16
749:17
PO 628:15,20
630:14,20
631:21 632:1,3

point 743:5
745:19 749:20
757:16
pointed 440:16
pointer 667:2
pointers 661:2
pointing 661:7
746:5
Poling 427:9
Poling's 427:14
popping 680:10
population
616:9 617:8
portion 426:5,8
440:14,17
441:6 442:17
493:17,18
512:9 526:16
550:17 607:20
608:6,8 610:17
617:1 637:5,16
647:5 675:13
682:22 683:20
685:20 726:17
portioned
596:15
portions 420:12
510:6 620:15
681:9,14 691:3
POSA 558:20
POSITA 472:10
492:19 495:14
496:15 514:22
542:19 591:17
593:2,10
594:17 714:9
714:16 774:5
774:15
position 539:22
542:7 558:3
positions 542:5
557:21
possession 437:3
possible 421:6
485:9 500:21
502:21 503:12

503:21 504:18
505:1 506:13
506:21 517:5
517:15 518:11
568:21 663:15
698:5 715:12
727:15 753:20
754:5
potentially
481:20 510:19
735:9
PowerPoint
536:21
Pra- 670:11
practice 503:22
504:19 517:16
practiced 457:3
practicing
705:10 707:13
praise 628:16
706:2 707:1
709:6,16 711:5
praised 709:9
praising 458:18
459:1,7,10,16
706:13 707:7,9
709:3
pre-AIA 696:1
preamble 474:13
precise 473:18
491:5 572:12
predecessor
456:20
predefined
688:20
prefacing 654:22
655:22
preferred 440:4
466:7 689:6
preliminary
666:7
prepare 430:13
430:16 431:7
431:11,14,17
431:22 432:5,9
673:17

673:18 719:1
**prepares** 730:7
**presence** 495:1
497:22
**present** 412:18
498:9 534:6
652:7 670:14
672:19 673:2
681:4,5,8
730:8
**presentation**
414:3,17,20
536:21 538:14
561:2,9,13,16
561:18 563:5
672:13 715:4
716:5,14,22
718:3,10,15,18
727:8 728:2,5
728:7 729:4,17
729:18,21
730:3,15,16
731:4,18 732:7
**presentations**
718:22
**presented** 473:5
550:9 562:5,21
563:5 587:6
672:6,8,17
673:7 717:15
717:20
**presenting**
539:20 561:15
588:14 672:22
**press** 465:14
569:1 623:18
**pressing** 635:10
**presumably**
710:5
**presume** 631:9
**presumed** 621:4
622:9
**presuming**
575:22
**pretty** 453:13
465:13 679:7

681:19 752:11
**prevent** 467:8
**prevented** 588:9
588:15
**previous** 447:13
584:2 598:18
608:7 684:1
688:1 699:12
**previously** 415:8
435:5 440:19
451:6 642:8
649:8 653:11
768:8
**primary** 644:12
646:1,3,4
**principle** 445:22
588:13 695:6
**principles**
432:16 433:3,9
433:16 436:18
444:16 482:17
483:12 655:10
**print** 441:19
444:7
**printed** 641:12
**printout** 765:18
**prior** 421:6,8,8
453:1 460:21
462:7 464:14
478:16 479:21
480:16 483:15
483:19,21
484:14,22
499:3,17
517:20 518:16
519:7,12
529:14,21
530:12 539:1
545:11 555:11
600:13 601:11
601:13,15
602:10,19
603:4,17,19,22
604:10 605:3
605:13 606:10
608:3,17,22

609:18 610:22
611:4 612:11
612:20 613:6,9
613:18,18,21
615:10 616:9
616:16 625:7
627:15 641:8
642:3 648:11
652:2,11,17,20
653:13,19
658:11 667:10
667:14 668:14
671:4,13,22
675:11 678:21
707:18,22
738:11,15
758:3 760:9
761:8 764:5
**priority** 457:18
519:20 521:6
521:15 522:5
522:14 523:3
523:13,19
524:8,13,22
525:6 743:12
**probably** 728:20
750:14
**problem** 540:17
626:4 666:5
**Procedure**
781:16
**proceeding**
671:14
**process** 734:4,4
**processing**
508:16 647:10
736:7 762:6
**processor** 493:17
**product** 719:21
720:1 739:3,16
740:14
**products** 457:3,8
704:10,14
738:9,17,19,22
739:6,9,12
**professor** 451:8

456:4,15
**program** 690:13
**programming**
547:7
**project** 454:5
**promotions**
709:7
**proper** 675:15
**properties**
546:15
**proposed** 436:12
467:21
**proposition**
690:6
**propositions**
690:8
**protocol** 466:3
685:6,7
**protocols** 753:19
**prove** 700:4
713:6
**provide** 451:19
492:18 543:9
627:13 656:22
699:18 733:17
737:13 760:1
775:1
**provided** 427:9
489:5 629:20
669:15 714:14
717:6,9 718:21
**provides** 500:12
**providing** 570:7
656:12 716:22
738:8
**provisional**
457:18 458:2
**PTO** 538:20
**Public** 410:8
417:5 780:1,18
**publications**
641:12 708:7
**publish** 665:15
666:7 739:17
**published**
665:22 666:3

**pull** 527:17
**purchased**
739:15 781:13
**purposes** 424:14
424:18 426:12
449:20 466:11
466:19
**pushes** 508:16
**put** 460:1 479:22
527:13 528:8
530:21 559:9
588:2 590:10
611:6 639:3
649:10 663:21
687:8,12 691:6
710:17 751:2
752:13 770:10
**putting** 662:19

**Q**

**Q1** 647:2
**qualifies** 603:22
**quarter** 692:16
**queries** 636:7
**query** 598:19
634:9 660:21
726:2
**querying** 659:11
**question** 438:12
448:18 453:15
462:21 463:4
464:19 465:1
466:15 467:5
478:2 497:9,15
505:20 506:17
509:7,19
512:19,19
517:11 524:2
532:18 547:16
552:9 554:18
566:18 567:2,6
567:16,17,19
568:17 569:21
571:1,15
575:22 576:16
576:18,19

577:1 583:11
584:2 587:16
613:9,22
616:19 621:22
622:1 630:15
630:18 643:12
644:18 651:2
651:14 652:8
654:5,18,18
655:5 659:22
660:7 676:2
680:1 681:12
681:18 682:6
683:9 684:1,1
684:2,9,12,13
684:16,20,20
685:3,4,13,14
686:1,2,3
688:9,12 689:7
700:17 703:1
707:21 709:21
712:22 721:11
721:14 723:7
724:6,8,11
730:12,14,19
731:7,10,11,13
731:15 732:10
733:7 736:13
737:2 745:11
751:7,21
755:20,21
756:1 761:15
763:2 771:8
774:22 776:22
**questioning**
509:19
**questions** 428:3
447:20 646:20
655:13 711:20
723:15 734:2,3
734:5 763:19
768:8 770:5
771:21 773:18
774:1 775:16
778:1 779:1,4
781:16 782:14

782:16
**queue** 762:6
**quick** 451:19
635:7
**quite** 497:14
516:1 570:5
676:1
**quote** 772:4

_____

**R**

**R** 411:1 412:1
415:14 590:1
**raised** 436:9
651:4 652:9
683:6
**raises** 654:4
**Rajami** 601:2,7
601:9 608:20
612:17
**Ramos** 412:11
416:17 748:22
750:21
**range** 511:19
**rationale** 698:19
**re-exam** 414:19
534:20 535:14
560:18 605:18
605:19 618:20
618:22 683:7
687:13 691:5,8
691:14,16
**Re-examination**
528:19
**reach** 732:15
**reached** 530:18
674:20 675:7
**reaches** 637:8
**reaction** 419:19
732:6
**read** 448:19
449:19 460:10
469:8 473:2
510:6 548:12
550:20 551:18
552:1,8,10
609:2,5,15,20

611:2 616:20
619:13,16
627:21 629:15
631:7 634:22
635:8 640:16
645:13 651:18
653:22 654:8
658:15 680:15
686:14 696:10
701:6 723:3,6
735:4 756:17
761:9 767:1
782:10
**reading** 482:2
508:7,14 544:7
564:14,15,16
626:17 655:1
656:1 667:6,12
685:21
**ready** 781:11
**realistic** 662:8
**realized** 709:1
**really** 420:20
567:19 570:22
573:10 730:18
750:3
**reask** 684:16
**reason** 518:7
609:4 613:16
654:14 700:21
732:6
**reasonably**
437:2
**reasons** 501:6
607:8 615:3
706:9 726:8
**rebut** 499:9
772:20
**rebuttal** 413:9
417:18,21
418:8,16
419:19,21
422:5 428:8
448:16 521:9
564:7,21
565:19 601:13

602:14,16
635:9 636:19
638:9,12
652:22 655:16
656:15 657:1
684:6 701:4
703:16 708:22
769:18 771:4
**rebutting** 631:11
701:1,7 703:11
737:15 750:4
757:3
**recall** 423:5,15
423:19 426:7
426:11,15,16
427:2,16
429:18 431:18
432:2 445:5
447:18 450:2
454:14,21
457:7 463:4,7
504:22 521:3
521:17,21
524:1 532:7,9
534:17,19
535:3,4,17
537:15,18
538:8 539:19
539:20,21
540:2 550:4
560:15,17,18
561:20 563:5
570:7 571:9
574:12 585:4
588:16 592:15
592:20 606:20
620:9 655:15
656:12 664:5
666:15 670:17
671:17,20
672:5,7,22
673:12 687:6
705:20 708:21
710:10 716:9
717:15,20,20
724:2 735:7

739:2 743:13
743:20 749:12
749:19,21
750:5 757:4,17
764:8,11 770:8
770:11 771:21
772:2,7 773:18
776:16 778:1
**recalling** 427:11
445:2 454:17
455:19,21
457:9 527:11
534:21 537:16
537:22 538:7
539:7,9 561:13
623:12 672:2
716:17 717:2
719:19 728:4
735:14 738:22
740:16 743:5
758:12,16
**receive** 549:6,7
566:13,21
575:15
**received** 420:21
705:17 708:17
759:20
**receives** 511:12
549:10 567:5
709:13
**receiving** 421:9
489:3 709:5
**recess** 442:2
485:20 527:22
589:3 646:14
696:19 763:12
**recite** 486:19
698:6
**recited** 489:17
498:2,5 499:14
505:12 507:13
510:20 515:12
548:7 593:22
594:3 601:17
697:10 701:11
**recites** 474:12

487:11 501:8
594:18 616:21
645:2
**reciting** 712:20
**recognize** 447:15
450:22 451:3
561:7 672:15
676:5 693:1
718:7
**recognized**
448:7 664:18
**recollection**
421:3 429:13
536:15,20
539:13,17
550:11 562:7
562:14 580:21
581:6,12
582:14 627:10
632:18 672:8
673:4,20 681:7
687:10 696:14
731:17 737:1
738:18 740:20
769:15
**reconstrue** 478:1
**record** 416:2,13
442:1,5 469:9
485:19 486:1
527:21 528:3
552:8,11 589:2
590:8 608:4
611:4 646:13
646:17 674:8,9
674:11 696:18
696:22 712:7,8
712:11 763:8
763:11,15
779:8 780:3
**recorded** 782:14
782:16
**redirect** 461:4,7
461:9,11 468:7
470:22 471:9
487:12 488:17
506:14,21

507:8 508:9
510:20 512:14
512:20,20
513:14 514:7
515:1,11,18
517:7,17 518:3
518:19,22
545:18 546:14
546:18 547:1,8
547:10,19
551:2,5 552:18
552:20 553:15
554:12 555:17
558:16 559:5
569:8 570:15
574:22 583:1,5
593:9,21 594:2
594:14 609:10
610:9,18
615:12,15,21
634:7,16 635:1
763:7
**redirection**
510:15,16
511:4,6 549:7
**reduced** 780:5
**redundant**
481:20 587:22
**reexamination**
413:15,17,21
414:6,8,10,11
414:12,14,16
525:13 527:1,6
527:10 528:5
528:16,22
531:4,11,14
542:1,5 557:22
558:5 559:12
560:3,6,9
561:10,19
591:5 599:11
599:17 600:2
600:14,19
601:16 602:20
603:10 604:7
604:15 605:4

605:14 606:14
611:11,17,19
612:5,12,15,21
613:12 614:11
614:16 617:20
618:3,4,6,13
619:9 623:21
624:6,9 625:9
626:12 631:18
632:10,14
634:21 638:5
639:6,12,14
640:7,15 641:2
649:14,20,22
650:12 651:5,9
653:20 656:19
657:16,20
658:3,12 668:2
668:10,13
669:2 692:4
768:21 769:5
**reexaminations**
525:17 562:6
642:4 656:6,13
657:9 717:5
**reexamining**
658:4
**reexams** 717:16
717:18
**refer** 457:13
547:15 643:14
715:3 720:5
753:18 759:5
**reference** 414:13
414:15 503:7
543:5 553:21
600:17 601:8
601:22 603:14
603:16,18
604:3,10,21
605:7 643:12
643:18,21
648:22 659:22
660:3 667:7,13
681:20 683:3
683:14,18

695:12 712:19
721:14 742:13
753:1 757:15
761:4 764:20
766:4,7 767:17
767:21,22
768:19 769:1
769:10
**referenced**
425:15 449:7
541:16 586:19
676:7 693:12
781:11
**references**
518:16 529:22
530:2 586:16
601:3 602:5,11
602:17,21
603:9 604:6,14
606:14 608:22
612:11,14,20
613:4,10,11
614:10,15
641:22 648:14
649:6 652:11
652:18,21
653:7,11 688:5
722:8 749:18
753:20 764:5
764:10 765:9
765:14 767:5
767:12 768:18
769:4,13
**referencing**
749:19
**referred** 433:9
439:17 453:9
453:19 601:3
660:14 694:5
742:4,5
**referring** 420:13
461:20 490:20
490:22 522:9
548:2 549:2
572:14 574:13
578:12,15

602:11 608:6
617:5 620:11
626:15 641:18
647:22 648:18
648:21 657:12
657:12 660:13
661:19 689:17
690:16 713:3
720:20,21
726:7 727:9
738:13 745:19
746:1 748:16
748:19 752:20
755:7,19
**refers** 457:17
464:1 466:2
628:20 687:15
689:18 694:6
**reflected** 464:6
**refusing** 723:13
**regarded** 512:2
**regarding** 428:9
433:4 558:6
616:16 624:9
628:10 691:17
698:21 704:21
730:1 763:19
770:6 771:4,13
771:22
**regards** 634:2,5
635:11,16
636:22 637:3
639:14 642:9
**registrations**
760:6,7
**regular** 730:22
**Reichman**
409:10 410:5
411:5,14
416:19 781:2
**reiterate** 694:22
**rejected** 626:8
627:3 696:1
**relate** 433:3
**related** 440:11
525:17 778:9

780:6
relates 744:8
  762:2
relationship
  534:15 576:7
  576:14,15
  577:11 578:2
  680:13 745:8
  778:3
relationships
  481:2,3 491:9
  492:18 553:14
  661:4 680:8
  744:19 774:8
  777:7 778:2
relatively 728:18
Release 415:4
  752:15,19
relevant 617:12
  634:9,17
  666:17 691:3
  711:7
reliable 733:3,6
relied 425:15
  433:16 436:3
  437:1 693:14
  705:20 721:1
  731:16 733:4
relies 606:21
rely 657:7
  705:12,16
  729:16
relying 699:1
  716:7,16
  727:17 731:20
  732:15 749:12
  749:16
remain 634:15
remember 421:7
  529:5 703:14
  763:19 764:4
  770:4 773:22
  775:15
remembering
  537:4 538:10
remind 711:21

reminds 663:18
  664:1
render 445:15
  482:16 483:11
  621:5 701:21
  734:22
rendered 620:16
  703:17
rendering
  772:10
reorganization
  690:14
reorganized
  690:7
repeat 505:20
  506:17 660:6
  682:5 751:7
repeated 660:18
replace 618:21
report 413:10,11
  415:11 417:19
  417:21 418:2,9
  418:12,17,19
  419:8,9,18,21
  419:22 420:7
  420:17,21
  421:9,11,13,13
  422:4,5,16,19
  423:8,14,18
  424:6,15,18
  425:6,9,16,18
  426:13 427:15
  427:20 428:2,3
  428:9,19 429:2
  429:6,12,17
  430:1,5,9
  431:14,16
  432:13,19
  433:17,18
  436:18 437:18
  444:15 445:1
  446:3,13
  448:16 457:9
  458:17 460:11
  463:6 464:21
  465:3,5,12

467:17 469:14
  480:21 483:15
  484:11 485:12
  486:5 489:17
  489:21 490:8
  492:5,15
  494:14 512:13
  514:19 518:15
  519:19 520:12
  521:19 524:3
  564:7,21
  565:19 601:13
  602:14,16
  620:14 631:11
  632:9,17 635:9
  636:19 638:9
  638:12 643:15
  644:1 652:22
  655:8,16,17
  656:5,15 657:7
  657:17 665:9
  684:6 685:20
  687:22 693:11
  693:21 694:17
  697:6 700:17
  700:20 701:8
  703:1,2,4,12
  703:18,21
  711:17,22
  712:14 713:10
  715:2 720:2,4
  720:11 725:13
  726:15 737:16
  749:14,21
  753:1 754:19
  755:8,19,21
  756:9 757:13
  757:20 759:15
  759:22 769:19
  771:2,10,13
  772:3,15,19
  773:8 774:13
  775:4 776:6,7
  778:14,15
REPORTED
  409:18

reporter 410:7
  417:2,9
REPORTER-...
  780:1
reports 422:16
  424:10,12,17
  432:4 521:14
  734:16
repositories
  474:14,20
  570:18 575:19
  576:5,10 577:3
repository 571:6
  571:18 573:4,8
  573:9,13
  585:16,20
representation
  765:19
representative
  753:21
representatives
  754:5
represented
  533:18,22
  534:6 549:5
representing
  416:21 420:14
request 413:14
  489:3,6 507:14
  511:12 525:21
  527:6 565:16
  566:9,17,22
  567:5,14,21
  568:9 600:14
  600:18 601:16
  636:5 640:6
  641:10 642:2
  650:11,20
  651:5 652:3,7
  687:12 691:4
  742:9 744:9,10
  762:5 779:9
requested
  486:22 487:8
  488:1,11
  489:12 493:3

494:18 545:20
  546:6 547:3
  549:6 598:4
  644:16 690:13
requester 526:20
  526:22 600:18
  640:14 652:7
requester's
  526:17
requests 508:11
  566:13 636:2
  690:10 741:17
require 438:10
  469:3 472:18
  473:15 474:9
  475:4,22
  477:11,18
  478:13 479:18
  480:12 484:2
  484:16 485:4
  487:5,20 488:9
  489:9 490:9,16
  491:8 497:5,11
  498:10,22
  499:15 500:13
  501:9 502:13
  503:4 515:20
  516:3,7,12,15
  519:2 538:22
  542:22 543:16
  545:18 546:4
  547:19 552:21
  553:5 554:6
  558:12,22
  591:20 592:6
  597:19 634:6
  637:18 702:5
  703:1 758:8
  776:19 777:5
required 469:12
  481:19 482:15
  497:16,22
  510:8,9 535:21
  545:8 553:15
  595:11,21
  596:12 627:8

639:1 675:15
**requirement**
472:9 495:2
519:7,10 548:9
637:15 638:22
**requirements**
474:6 481:9
513:20 538:3
576:2 593:12
645:13,14
663:10
**requires** 437:5
437:14 445:10
468:5 470:6,8
473:22 476:16
479:8 480:3
481:1 482:4
493:8 494:10
494:22 497:1,1
498:5 500:4,9
505:14 544:9
544:20 545:4
552:18 553:17
555:7 559:6
592:12,18
593:8,18 594:3
594:13 595:1
597:14 621:6
621:11 622:9
635:17 637:4
667:1 701:16
774:2,17
776:10 778:11
**requiring** 473:8
510:3 537:4
777:14
**research** 662:17
662:18 738:3
**researchers**
454:6 738:5
**Resilient** 454:4
**resolving** 636:7
**resources** 741:17
741:21 744:10
744:15,20
745:9,14

**respect** 438:22
439:4 440:10
441:9 443:21
460:12 461:12
479:14 484:9
485:11 492:2
493:11 496:8
499:10 501:13
502:5 507:20
510:2 512:22
514:11 517:19
521:9 523:4
525:4 530:15
534:20 539:22
542:17 546:13
546:16 556:2,9
558:4 563:1
565:19 572:15
574:2 579:5
629:7,19
630:19 644:11
647:6,15
648:22 654:5
656:18 658:17
660:22 661:11
685:2 705:17
710:1 716:16
722:21 734:13
747:6 754:20
756:14 757:3
774:20 778:18
778:21
**respectfully**
629:5,21 633:7
633:16
**respectively**
468:19
**respond** 484:8
485:10 499:9
518:14 555:20
686:2 703:15
**responding**
633:10 657:19
702:9,21
749:15
**responds** 555:18

**response** 489:2
507:18 510:21
549:8,13,19
550:1,19
551:12 565:16
566:9,17
567:14,20,22
568:8 574:19
630:14,20
631:9,21 632:4
633:9 634:21
656:18 691:4
695:15 716:1
716:11,18
727:20 732:3
770:15
**responses**
715:22 727:18
727:19 730:2
732:2,14
**responsibility**
578:21
**responsible**
580:14 662:1
726:18
**responsive** 684:8
684:12
**rest** 552:17
**restricts** 613:17
**resulting** 760:15
**results** 630:4,13
631:6,18 632:2
**retained** 422:11
737:10
**retrieve** 489:4
**return** 442:9
486:20 487:6
487:21 488:10
489:10 547:8
**returned** 565:16
566:9 567:14
568:8
**Returning** 729:6
**reuse** 718:22
**revenue** 705:17
**review** 421:15

424:17 425:10
425:21 426:13
426:22 427:14
431:10,13,16
431:21 432:4,7
448:7,14,20
449:1,4,17
458:4 632:7
703:2 706:19
708:22 769:3
781:13
**reviewed** 424:12
425:2 427:6
435:12 608:17
655:9
**reviewing**
418:19 643:22
658:11 693:19
772:2
**RFC1034** 604:2
604:5 605:22
613:2 768:14
**Rice** 454:9
**right** 417:17
419:6,12,17,18
421:1 422:8,9
422:12,13,16
422:17 424:10
424:11,13
425:2,11 427:6
427:7,21,22
428:6,16,17
430:12 431:21
432:12 433:12
433:18,19
434:1,15 435:5
435:6,9 436:5
436:16,19,20
439:9,13,16,21
440:9,18,19
441:8,21,21
442:3 444:17
444:18 445:18
446:17,22
449:6,20,21
450:19 452:21

453:8,21,22,22
454:1 455:6,7
455:9,10,12,15
455:16 456:2,5
456:6,9,10
457:15,21
458:11,15,21
459:5,12,13,17
459:21,22
465:6,21 467:9
467:16,21
468:15 469:4
470:3,13 471:5
471:10,16,17
472:20 474:9
475:2,5,7,15
476:2,18
477:22 478:14
479:1,17,19
482:8 483:17
484:17 485:17
485:21 486:3,9
486:12 488:1
488:12 492:9
492:14 493:10
494:19,20
495:2,5 496:3
496:12,13,19
496:20 498:1
500:19 501:19
502:19 503:16
503:17 505:18
506:2 507:7
509:3 511:4,9
511:13 513:18
514:1,3,8
515:13 516:12
517:17 519:4,5
519:8 520:7
521:2 522:4,7
522:16 525:1
525:11,13,18
526:12 527:2
527:19 528:1
529:1,10,11,13
529:18 530:3

530:10,18
531:9,14,17,20
531:21 532:1,4
532:22 533:6,9
533:15,20
535:1 540:22
541:4,6,10,12
541:13,20
542:2,5 543:4
543:8,17 544:1
545:5,13 546:2
546:7 547:4,20
553:3 554:8
555:9,14 556:8
556:9,19
557:15,18,22
558:6 559:7
560:7,10,13,22
561:22 562:8
564:2,6,16
565:2,9 566:4
566:13,22
568:1,15 569:5
569:15 572:1
573:20 574:1
576:11 577:4
578:5,7,11
579:2 580:2
581:11,15,19
582:1,10 583:6
583:7,20
584:13,17,22
585:12,16
586:6,8,11,20
587:18 588:20
588:22 590:6
590:16,20,21
591:1,5,6,8,14
591:15 592:8
592:19 593:16
594:5 595:3,22
596:5 598:8,13
599:4,7,8,20
600:7,9,10,12
600:16 601:2,7
601:20 602:2

603:10,20
604:7,9,11,15
604:17 605:4
605:11,14
606:1,14
608:13,15,18
608:19 609:4
609:13,17,19
610:3,6,10
611:1,6 612:1
612:3,5,8,17
612:19 613:12
614:5,12,17
615:4,9,22
616:8 617:8
618:7 619:11
619:15 620:16
620:20 621:16
622:4,12,18
623:6,9,18
624:10,13,13
624:14,14,16
624:18 625:4,5
625:11,13,20
626:8,12 627:1
627:4,9,15,18
628:6,9 629:2
629:6,14,18
631:6,19 632:7
632:14,16,17
633:14,18
634:4,4 635:5
635:22 636:15
638:12 639:12
639:13,15,18
639:19 640:7,9
640:10,15
641:3,7,8,17
642:9 646:11
646:15,19
648:17 649:6,7
649:12,19,20
650:1,4,13,21
651:10,16
652:1,15,19
653:1,4,20

654:6 656:4,7
657:15,21
658:6,14 659:2
659:4,20
660:10 661:13
662:4,5,12,13
663:15 664:16
664:19 665:1
665:11 668:11
668:15,18,20
669:5,6,8,12
669:18,19
670:4,8,13,14
671:2,5,6
674:1,7,10,13
674:17 675:8
676:7,10,12,15
676:17 677:2
677:13 678:2,3
678:12,15
679:14,16
680:19 681:2,3
681:9,15 682:2
683:1 686:17
687:2,16,17,19
688:5 689:16
691:1,6,13,14
691:17,20,21
692:1,5,8,11
692:12 696:9
696:13,15,17
696:20 697:2
697:13 698:14
701:17 702:2,6
703:7,8,17,19
704:5,6,7,11
704:12,15,18
705:16,19
706:2,4,6,7,10
706:13,14,15
706:21 707:2,5
707:11,12
708:2,15 711:7
712:5,9,13,21
715:6,7,20
716:7,13,20

717:4,18,22
718:7,14,16,17
719:3,5,7,9,18
719:22 720:14
721:2,13,15,18
722:13 723:18
724:15 725:4
727:6 729:8,11
729:18 730:3,7
731:19 732:7
732:17,19
733:1 735:5,17
736:1,4,8,16
736:19 737:8
737:18,22
738:9 740:2,4
741:3,15,22
742:20 743:19
744:16 745:4
746:12,15
747:1 748:2,15
749:5,9 750:6
750:9,22 751:5
751:14 752:5
753:1,9 754:6
758:17 759:10
759:13,17,20
760:12 761:8
761:11 762:13
762:19 763:9
763:13,18
764:12 765:4
766:3 767:15
769:21 771:19
772:7 779:6
**right-hand**
451:10 581:13
585:11 642:18
650:17 651:21
688:3 719:12
764:1
**rights** 760:15
**Rina** 743:19
**ring** 665:14
735:20 746:6,8
746:10,12,21

**ringing** 426:19
456:12,16
619:6
**rings** 747:7
**role** 573:10
**room** 431:3
**root** 443:17
574:7 577:16
**Rough** 779:11
779:13
**roughly** 421:16
422:2 431:5
**route** 578:15
**row** 451:21,22
**royalties** 760:16
**rules** 670:22
671:1 781:16
**ruling** 620:6
**run** 693:5,10
694:21

---

**S**

**S** 411:1 412:1
413:7 414:1
415:1,14,14
590:1,1,1
767:13
**S3** 464:15 465:8
704:10 706:2,9
706:13 724:17
726:22
**sake** 521:8,10
709:7
**sales** 704:14
**satisfy** 497:17
500:22 503:13
513:20 576:2
746:22 747:19
774:16
**Saturday** 421:14
447:18 464:20
465:7 638:19
708:21 743:3
743:22 748:19
750:2 759:16
**saw** 531:22

743:21 758:6
saying 473:19
  478:18 487:17
  489:7 498:19
  504:22 509:17
  512:19 521:4
  546:12,22
  551:7,12 564:7
  565:4 567:2,7
  567:9 572:16
  579:13 584:15
  586:10 587:1
  619:9,14
  625:15 627:6
  631:1,2 654:14
  654:15 662:21
  666:10,16
  692:7 702:10
  713:12,17
  744:8 747:4,5
  754:3,8 772:21
says 419:8
  425:14 440:22
  442:11 445:22
  448:1 449:16
  451:16 455:2,2
  486:18 487:1
  488:3 492:10
  492:15 493:13
  501:22 507:18
  508:13 511:11
  511:19 528:15
  529:7,10,14,16
  530:14,17
  547:7 548:10
  548:21 549:18
  549:22 551:1,4
  551:8,17 555:5
  560:12 563:15
  565:13 566:7
  567:21 568:2,5
  568:5,6 569:9
  569:14 578:8
  579:16 581:18
  582:11 583:16
  584:17,22

586:19 587:22
588:1,6 600:10
600:16 608:3
616:8 618:16
618:18 619:16
621:8 624:17
624:21 625:8
625:17,20
626:8,10,13,18
626:21 628:6
628:10,14
630:2 631:8
633:6 634:4
635:16 637:3
640:1,5,13
641:9,10,22
642:13,21
647:2,5,13,18
648:10 650:11
650:19,22
651:1,21 652:6
653:10 659:5,8
661:21 662:7
663:14 669:10
669:14 671:7
674:18,22
675:10 679:15
682:11 688:19
689:20 692:18
692:21 695:8
695:22 697:16
698:18 713:1
720:12,15
725:6 729:9
757:5 759:10
762:15 765:9
767:4,14
768:11,14
scalability
  460:13 726:21
scale 578:11
  579:11,12
  580:2 695:2
scaleable 461:1
  461:10
scaled 582:7

scales 578:7,13
  578:21 579:16
  580:5,7,9
scaling 579:1,5
  579:18 694:12
scholar 664:19
scholarly 664:21
science 451:18
  454:7 728:12
  728:18
scope 434:16
  457:6 464:18
  466:13,20
  467:11 471:12
  472:14 479:11
  481:11 483:1
  512:5 570:21
  597:8 693:18
  704:19 705:4
  760:13 769:7
  774:11 775:3
  776:5 777:10
  778:13
screen 712:14
search 496:16
second 441:13
  490:6 507:19
  520:10 526:15
  534:8 549:13
  549:19 551:4
  637:6,17,21
  638:17 647:4
  648:9 662:6
  674:5 675:14
  701:19 708:5
  739:7,21
second-to-last
  659:7
secondary
  628:11 629:8
  644:12 646:1,3
  646:5 703:18
  705:2,14,19,21
  714:22 717:6,7
section 432:15
  432:19,21

433:17 436:17
440:12,22
456:8 467:19
520:10 628:9
630:1 652:2
655:10 661:8
720:3 760:3
770:19 771:2
771:10 772:11
sections 420:9
  491:6
see 419:11 433:6
  434:5 435:22
  437:11,22
  441:4 442:14
  443:10 445:16
  446:9 448:11
  449:15 450:6
  451:14 452:3
  454:10 455:1
  468:11 469:21
  473:11 476:13
  486:10,16
  487:2 490:12
  492:12 493:5
  495:21,22
  497:10 501:21
  502:7 512:7
  513:6,9 515:8
  520:8,16 526:8
  526:13,18,19
  526:21 528:12
  528:15,21
  529:2,7,9,13
  530:11,13,16
  530:19 531:10
  537:8 540:7,9
  541:15 543:2
  543:22 544:22
  545:22 550:3
  553:1,11 555:8
  559:2 560:2,11
  562:3,8 563:7
  563:9,12
  574:10 582:18
  585:13 586:4,6

591:4,22 593:6
593:14 594:20
595:13 596:17
598:7 599:16
600:1,4,12,15
600:20 603:2
607:15 608:2
610:4,11
611:16,18
614:2 615:2,5
615:18 616:13
617:10 618:2,4
618:14,17
619:3 624:5,19
625:2,3,10,17
626:5,9 628:12
628:18 630:6
630:10,14
633:2,3,22
634:3,12,13
635:13,20
636:12 637:1,9
638:1 640:8
641:13 642:5,6
643:3 647:1,3
647:11,16
648:15,16
649:21 650:5
650:14 651:7
652:4,5,12
653:8,9,15
655:12 659:15
661:18 662:3
662:10 665:9
669:1,16
674:22 675:2,9
675:17 676:8
680:10 682:18
683:3,4,7
686:15,20
687:15 688:21
692:3,16 693:6
695:19 696:4
697:19 699:3
700:8,16 702:1
708:11 710:4

715:14 719:15
721:16 722:10
723:18 724:1,7
725:8 726:21
727:3 741:10
741:11 742:17
744:12 746:12
746:14 753:4,9
754:1 758:7
759:3 761:5
762:9 764:18
764:22 765:8
765:17 766:3,6
766:7,9 767:3
767:17,19,20
767:22 768:3,5
768:6 770:2,8
770:19 774:6
**seeing** 519:22
601:21 617:11
625:19 631:8
633:9 678:16
687:20
**seen** 426:2
449:22 450:2
492:17 518:2
619:5 664:3,5
666:3 707:21
716:3,8,10,20
727:22 758:9
758:15 765:6
**selected** 781:14
**selections** 616:11
**self-identifies**
761:22
**sell** 457:3
**send** 575:15
636:5
**sending** 690:5
**sends** 507:16
567:22
**sense** 503:18
620:3
**sent** 507:19
549:13,20
550:1

**sentence** 419:7
425:14 433:1
434:1 440:21
442:10 468:2
469:13 471:3
471:13 472:2
476:10 486:18
487:17 490:6
492:10,15
493:5 495:13
496:15 514:21
520:10 544:17
545:10 549:18
552:16 555:4
595:7 596:10
608:3 609:6
611:3 619:13
633:6 635:15
640:17 642:20
642:21 647:4
648:9 651:19
654:1,9 662:6
676:9 682:19
682:22 692:14
692:17 696:10
697:16 698:17
700:1,22 701:5
708:5 714:19
765:8 767:2
772:8
**separately**
421:13
**September**
416:5 428:15
526:12 560:13
590:20 600:7
611:22 618:9
625:1,12 767:5
780:11 781:7
782:9 783:10
**sequence** 574:17
**server** 462:14,18
463:2 468:5,6
468:9,14
469:16,19
470:2,15,19,20

471:3,15 472:5
472:11 473:8,8
473:9 474:1,11
474:14,22
475:9 480:4
486:19,21
487:6,8,14,20
487:22 488:4,9
488:11,19,21
489:10,12
491:9 492:2
493:1,14
494:11,16
495:8 500:22
502:1,9 504:11
505:14 507:15
507:17,19
508:12 510:17
510:18,19
511:12 517:5
545:20 546:5
547:3,9,12
548:11 549:3,3
549:9,11,13,19
553:7,12
554:14 558:13
558:19 563:19
564:10 565:6
566:2,12,16,21
567:3,3,5,10
567:10,22
571:5,17
572:15 573:8
573:12 574:14
575:12 582:11
582:20,21
583:3,6 584:18
585:1,9 587:3
588:1 593:8
594:15 597:11
598:3,5,20
609:12 615:14
615:17 634:8
634:16 635:18
636:1,4,6,9,10
636:10 637:7

637:18,20,21
637:22 638:16
638:17,18
639:1 644:7,8
644:12,15
646:1,2 659:18
660:9 675:14
675:15 677:15
677:16 678:2,9
679:11 680:10
693:2,4,8
694:8,20 695:2
724:5 742:14
774:17 776:3
776:11
**server-centric**
441:2 442:12
507:9 508:1,8
508:10 511:9
**server/server**
565:9
**servers** 439:5
440:11 441:10
442:20 444:1
453:3,7 460:15
461:2,12 462:4
462:5 468:21
469:3 470:9,12
471:7,19
472:20 473:22
474:2,3 475:5
476:2,18
477:12,19
478:14 479:9
479:19 480:14
481:4 482:5
483:21 484:17
485:1,5 487:15
488:20 491:4
491:10 492:4
492:21 493:9
493:15,16,20
494:1,2,3,10
494:14 495:8
495:19 496:12
497:3,6,21

498:7,11 499:2
499:4,17,19
500:6 501:1,11
501:12,18
502:18 503:13
503:15,22
504:19 505:7
508:17 515:6
515:13,21
516:8,10 517:7
517:16,22
518:18 519:4
543:6,17
544:10 545:9
551:10 553:9
553:14,19,21
554:3,11,13
556:2,10,11,14
556:14,16
559:7 569:17
569:20 570:3
570:14,19
572:17 573:3
574:3,15
575:18 576:1,1
576:3,9 577:2
577:10 582:1
582:12,15,15
582:16,19
583:10,20
584:13,21
585:6,7 586:8
586:9,13
587:18 592:2,8
593:20 594:5
594:21 595:3
596:1,6,7,13
596:16,22
597:6,15,20
598:10,11
608:9,11
610:19 617:2
635:2 636:3,9
642:22 643:2,8
644:13,21
645:5,7,9,11

645:15,20
646:1 660:15
694:4 720:10
722:17 723:1
726:17 738:14
742:8 754:17
755:3,15
756:14,21
757:10 758:1
762:3,7,9,13
762:16,18
773:19 774:2,8
775:16,21
776:2 777:8,14
778:3,8
**service** 452:17
659:12 721:15
721:18,21
762:5
**Services** 409:4
412:3 640:14
781:6 782:7
783:8
**set** 419:9 452:15
563:18 564:9
565:4,14 566:7
567:12,12
568:7,19 616:9
685:5 715:22
726:18 727:19
730:7 732:2
772:14 773:7
780:11
**sets** 533:3 582:9
**setting** 453:14
**seven** 431:5
**severs** 576:20
**share** 421:18,19
**shared** 478:7
479:15 480:21
484:11 485:12
498:18
**sheet** 675:1
781:15 782:15
783:6
**Sherman** 603:14

603:15,18
605:22 613:2
769:10
**shoehorn** 747:15
**short** 527:16
**shorthand** 491:2
780:1
**show** 437:9
521:11 575:2
582:5 677:10
690:22 699:7
699:12 700:10
701:9 705:2,7
713:19 714:1,8
723:8,13
730:20 731:1,3
735:13
**showing** 550:6
575:6,9 631:20
702:4,5 703:5
706:22 729:17
**shown** 520:15
522:2 549:2
575:4 576:16
577:17 582:10
584:4,5 585:10
598:17 631:17
667:4 669:11
674:1 676:11
676:15 677:13
713:22 746:8
**shows** 661:10
680:8 682:1
727:5 729:8,11
**sic** 475:18 767:6
**side** 447:1 455:1
563:8 573:21
578:5 581:13
585:11 586:7
586:15 688:3
**Sigler** 412:5,6,12
413:3 416:14
416:15,15
417:11 425:7,8
429:20,21
434:22 438:13

439:6 441:15
442:6 443:3
444:11 447:5
447:10 449:14
453:16 457:11
460:4,5,16
461:3,13
462:22 463:17
464:22 466:17
467:6,15 469:1
471:14 472:3
472:16 477:15
478:9,19 479:3
479:4,16 480:9
481:6 482:1,19
483:13 484:12
485:14 486:2
489:19 491:21
498:20 500:15
503:1 504:16
505:16,22
506:11,19
508:21,22
509:8 511:1
513:22 514:17
515:16,17
516:21,22
517:2,3,13
519:16,18
522:12,13
523:16 524:5
524:20 526:1
527:15 528:7
531:1,6 532:19
533:12 534:1
534:10 536:11
537:11,12
538:12 539:10
540:3,5,12,16
540:21 543:12
543:13 546:21
550:15,16
551:20 557:5
559:14,20
561:3,6 564:13
566:11,19

569:12,13
570:10 571:2
571:12 572:6
573:19 576:8
576:17 578:4
579:7,22
580:18 587:14
588:8,20 590:9
590:15 595:17
595:18 597:21
599:1,13
604:18,19
606:7 607:2,13
607:14 611:8
611:13 614:21
617:6,22 620:4
620:12 621:13
622:2 623:17
624:1 629:11
629:12 635:3
639:10 640:20
640:22 642:15
643:13,19
646:8,18 648:6
649:16 655:3
657:5,6,14
660:4 663:13
665:4,5,21
668:4 671:19
672:4,14 674:6
674:12 676:4
678:20 679:22
680:2,18
681:21 682:7
683:10 684:10
685:19 691:10
694:18 696:15
697:1 698:8
700:18 702:17
712:4,12
714:20 715:17
715:18 718:6
720:22 721:12
722:4,7 724:10
724:13 731:8
732:16 734:7

734:17 735:3
735:16 736:14
737:4,5 738:7
738:16 741:2
742:15 743:15
745:1,2 746:20
747:20,21
748:11 749:1
750:20 751:2,9
751:19 753:14
753:15 755:9
755:13 756:2
756:19 758:21
759:8,9 761:1
761:21 762:11
762:17,21
763:4 766:15
767:9 769:6
771:15 772:16
773:9 774:10
775:2 776:4
777:9 778:12
778:20 779:3
779:13
**sign** 781:12,13
**signature** 418:5
428:12 557:12
781:11,15
782:6,19
783:22
**signed** 418:8,13
428:15,20
541:9,12
557:14,15,17
590:19,22
761:14 781:15
**significant** 647:7
708:9 709:16
**signing** 781:14
**similar** 473:5,14
581:3,8 610:15
634:10 672:17
**similarly** 483:2
**simple** 451:20
**simply** 474:4
**simultaneously**

724:15
**Sincerely** 781:18
**single** 482:20
483:9 518:1,9
518:15 549:2
693:4 699:11
699:12 754:5
**sir** 417:15
432:14 433:6
433:21 434:5
435:22 437:11
438:2 442:15
444:17 445:16
446:9 448:11
452:3 460:2
465:2 466:10
467:18,21
468:11 469:21
471:5 473:11
476:6,13 487:2
490:12 493:5
495:21 512:7
515:8 519:21
520:16 525:11
529:4 531:7
540:8 541:1
543:2 544:22
545:22 553:1
555:8 559:2
561:7 569:3
580:20 583:10
591:22 593:14
594:10,20
595:13 596:17
598:7 599:17
615:4,18
616:13 619:3
627:1 628:18
630:6 633:2
634:12 635:13
636:12 637:1,9
638:1 639:2
641:13 642:5
643:3 648:15
651:7 653:15
659:15 662:3

668:8 675:17
687:2 690:19
692:11 693:6
696:13 697:19
699:3 700:8
715:14 722:10
741:6 744:5,12
753:5 754:1
757:19 759:1
769:17
**sit** 425:13 426:19
427:12 429:3
445:2 454:17
454:21 455:21
456:12,16
457:9 527:12
534:22 619:7
623:13 632:18
717:14 735:15
**sitting** 418:15
423:5 427:3,17
428:22 445:5
518:10 521:22
524:6 532:10
537:17 538:8
560:21 568:20
655:20 666:18
670:18 673:14
687:6 710:7
716:9 724:22
728:3 729:14
757:18 758:12
769:15
**sixth** 688:3
715:21 727:19
732:2 740:6
**size** 579:11
693:3 695:3
**Skagerwall**
414:13 601:19
601:21 602:14
605:20 612:22
614:12,14
641:15 642:1,8
642:21 643:6
643:12,17,21

644:6,11,20
645:1,8,15
646:3 647:5,8
647:14 652:14
653:6,10,18
654:3 658:18
**Skagerwall's**
645:20
**skepticism**
715:12
**skill** 435:20
436:5 437:9
439:4 478:12
494:8 495:6
500:18 503:18
504:4,13 505:4
505:11 508:6
510:9 516:6,17
522:19 523:1,7
524:16 525:5
544:6 548:6,15
567:9 578:14
637:14 646:7
692:22 742:12
775:20 776:9
776:20 777:6
778:7
**skilled** 437:2,20
511:21
**skipped** 609:14
**slash** 765:15,16
**slide** 564:17
569:2,2,6,10
569:11,14,18
570:1,17
573:21 578:6
580:20,22
581:5,7,9,14
583:8,15
584:11 585:12
585:18 587:17
588:10,18
669:15 671:7,9
672:5,7,16,19
673:1,3,7,17
676:10,18

677:1,21 681:5
681:8 682:10
686:17 687:9
687:14 688:1
688:22 690:16
690:21 718:14
718:22 719:9
719:10,12,13
720:12 721:1,4
722:8 723:11
723:12,16,17
725:2,4 726:1
727:1 729:7,7
729:15,17,19
730:20,22
**slides** 536:19,21
538:10 562:4
562:15,22
588:3,4 730:8
730:10
**slightly** 530:13
**slow** 726:2
**slowly** 725:17
**SM** 647:2
**small** 728:19,19
**smaller** 682:16
690:3
**SMQ** 641:11
**SNQ** 651:2
**so-called** 572:13
694:15
**software** 452:2
**solve** 666:5
**somebody**
670:15 728:4
730:7,9 766:18
**someone's**
732:11
**someplace**
757:15
**soon** 587:12
**sorry** 423:21
444:7 466:16
490:5 509:6
517:11 530:6
540:11,13

549:17 563:16
569:22 570:22
571:14 584:1
606:4 626:1,1
661:7 664:1
676:2 681:13
682:4,5 683:22
684:4 687:20
688:10 710:9
726:6 734:2
739:6 745:12
748:9 751:6
761:15
**sort** 421:5 501:6
577:14 664:8
670:16 699:16
720:9 739:6
**sought-out**
644:8
**soul** 728:13
**sound** 482:17
483:12 509:16
571:10 654:15
667:17 736:2
**sounded** 509:17
509:21
**sounds** 462:15
580:7 599:7
636:18 638:14
655:21
**space** 693:5,10
694:21 736:7
744:11
**spaces** 694:14
**spanning** 764:3
771:3
**spans** 771:11
**speak** 431:7
456:22 535:2,6
537:20 538:2
539:11,14,18
554:21 556:20
556:21 587:10
633:8 644:1
673:9 732:9,12
738:11 756:8

speaking 467:12
535:3 538:15
538:16 638:14
751:16
speaks 583:22
731:6
specific 462:12
464:14 509:1,3
551:2 598:5,11
623:12 721:14
753:18 764:9
specifically
458:12,14
601:17 602:18
616:8 676:6
689:14 706:4
707:6 754:11
770:9
specification
437:7,7,15
440:15 441:6
441:11 442:18
446:6,7,16
470:7 500:11
503:20 504:4
504:17 505:17
506:1,13,20
508:19 509:2
509:11 510:2
511:2,16,18
512:10 544:13
548:8,14
550:18 553:17
721:20
specifications
439:7,11
495:20 500:2
515:7 582:17
698:21 713:15
specificity 510:2
543:10 545:19
546:5,19 547:2
547:20 548:1
594:16 598:13
644:9
specifies 563:20

564:11
specify 496:9
564:1
speculation
481:11 482:7
483:1 484:7
489:14 498:13
499:7 501:5
523:22 524:10
536:1 538:6
587:20 597:8
620:1,8 621:18
622:20 623:11
642:11 665:19
720:19 734:11
speculative
482:10 710:20
spend 421:11
617:11 635:6
spent 421:16
422:3
spirit 512:5
split 660:17
667:3
spoke 537:22
538:7,9 539:16
673:12
spread 422:1
stack 446:22
447:1 748:20
750:15
stamp 624:12
stand 478:6
479:13 480:7
480:20 484:10
485:11 489:16
498:17 499:10
standard 446:11
446:15 621:8
623:2,4 691:10
701:10 702:4
703:9 770:9,13
770:16 771:12
772:13,14,18
773:2,7
start 417:17

542:11 595:7
690:13 777:2
started 420:18
420:20 421:7
starting 432:15
444:15 447:20
524:17 544:17
607:6 654:20
714:11 733:12
starts 451:13
454:3 486:15
550:21 634:1
635:11 636:21
653:6 661:17
692:13,18
768:3
state 410:8 417:6
468:3 469:15
472:5 473:5
475:17 476:8
495:14 496:15
504:17 506:13
506:20 514:22
542:19 558:12
593:1 594:12
595:8 597:22
644:5 654:3
697:9 700:2
759:22 780:19
stated 633:13
754:15
statement
460:10 487:1
489:18 521:18
615:2 616:16
619:1,11,17
629:1,4,16
631:7 658:8
662:19 667:12
667:20 715:20
744:17,21
754:8,14 761:9
764:16 765:5
766:14
statements
473:14 607:7

620:14 654:22
656:1,17
703:15,16
757:8
states 409:1
434:2 435:12
436:21 437:18
445:8 446:3
490:7 526:9
544:19 545:18
609:3 610:17
611:4 615:10
618:11 625:16
629:5 632:21
648:18 649:4
651:3 726:1
741:8
stating 468:13
594:22 631:3
753:16
status 613:6,21
staying 636:20
Steen 414:15
602:1,4,6,8,14
605:20 612:22
641:16 642:1,9
648:12,14,19
648:22 649:5,9
652:15 658:19
659:4,6,8,14
659:18,21
660:2,9,13
661:6,9 662:12
664:3,9,12
665:12,13,16
666:11 667:6
stemmed 458:2
stenographically
780:4
Stephen 454:16
458:21 537:13
537:15,18
stepping 433:15
steps 445:10
558:15 701:16
Steve 459:2

stop 734:6,6,6
storage 448:3,8
450:5,10,15
455:3 459:20
store 502:2,10
566:3 635:19
742:8
stored 464:1,3
563:21 564:12
637:19 638:15
638:22
stores 451:22
643:1 644:8
storing 567:12
598:5,11 645:4
726:20
straight 474:21
494:6
stray 524:17
Street 409:21
411:14 782:2
783:2
stress 679:8
strike 425:7
429:20 443:3
460:4 479:3
508:21 515:16
516:21 517:2
519:16 522:12
537:11 543:12
550:15 569:12
595:17 604:18
607:13 629:11
640:20 657:5
665:4 679:22
684:10 715:17
722:4 737:4
745:1 747:20
759:8 777:1
string 468:10
488:4,22 489:4
489:5 494:5
558:19 608:12
615:13,14
strings 677:14
678:8 679:10

strokes 616:1
698:15
structural 778:2
structure 472:19
473:16 474:9
476:17 491:4
492:3,18,22
493:10 494:12
494:15 495:1
502:8 518:17
544:20 545:12
555:6 556:3,8
569:15,19
577:9,13 586:5
586:5 596:14
725:18 726:3
774:3 776:1
structured
469:17 470:2
470:12 501:1
503:15 517:8
572:18 580:12
structures
504:15 596:20
597:4 598:10
739:14 740:13
756:13
students 663:19
study 617:16
stuff 550:21
sub 666:11,20,21
667:4
sub-article
450:12,15
sub-elements
674:3
sub-node 659:9
659:12 661:11
662:1
sub-nodes
660:17,19,21
661:3 662:13
663:4
sub-sub 666:22
subject 437:4
445:14 450:9

626:12 700:6
700:13 701:20
702:6,11,20
703:5 712:20
713:7,9 714:3
714:10,17
738:3 772:12
772:19
submitted 421:4
432:8 519:11
541:22 542:4
557:20 558:1
581:10 591:4
599:3 658:12
769:3
subsidiaries
760:11,17,19
760:22
substance 633:8
substantial
651:1,14 652:8
654:4 655:5,13
substantially
654:17
success 633:1
698:22 704:5,8
704:10,14
successes 705:8
successful
507:18 549:12
549:19 550:1
550:18 551:13
sued 737:12
sufficiency
436:22 437:14
sufficient 522:1
548:5 710:21
sufficiently
774:15
Suffolk 780:20
suggest 518:3,19
535:13 539:2
570:15 663:11
675:12 722:2
747:9 748:5,13
749:8 754:22

suggesting 648:1
suggestion 667:8
suggests 762:8
762:13
Suite 409:21
411:6,14 781:3
782:2 783:2
summaries
540:2
summary 413:16
413:18,22
487:16 488:6
489:6 528:5,16
531:4,11
532:21 559:12
560:3,5 625:17
625:20 626:6,7
669:2 671:3
674:15,18
676:7
supervisor
538:19
supplemental
414:9 428:3,8
429:2,5,12,17
430:1,5,9
617:18 618:12
618:19 620:13
support 500:12
510:1,6 542:4
542:7 557:21
558:3 570:6
702:13 705:13
705:18
supported
495:19 515:6
544:12 553:17
563:1
supports 548:22
551:2 580:17
supposed 477:5
supposedly
662:22
sure 418:12
420:18 426:2
428:19 431:20

447:3 538:17
548:17 620:10
643:14 647:20
648:4 674:6
686:5 712:1
720:20 726:6
733:5,9,16
746:18 751:10
773:14
Sure! 670:9
surface 654:16
surprisingly
728:19
swear 417:3
sworn 417:5
system 464:8
468:18 474:13
474:19 484:22
491:12 501:22
503:13 546:10
546:13 554:4
571:4,16
579:19 586:17
586:18 616:21
623:16 663:3,9
694:12 720:10
757:5 762:4,16
762:19
systems 454:5
468:20 688:8
689:3 720:13
720:17 721:6,8
742:8 753:19

**T**

T 413:7 414:1
415:1,14 590:1
624:22
T-trees 496:17
table 451:22
453:9,10,19,21
502:3,5,11,11
520:15,18
521:11 522:3
523:5 565:21
597:11 617:1

635:19 643:7
644:20 645:1,5
645:9,11,12,14
746:9,10
tables 451:17,19
452:1,5,7,9,11
452:14,16,21
453:1,3,5,7
643:2 682:15
690:2 713:17
tablespace
682:15,16,17
690:3,3,4,7,7
690:10,10
take 434:20
441:16 446:19
449:7 485:15
518:12 588:20
616:20 636:16
638:6 646:10
646:21 647:21
648:4,20 649:2
667:7 674:14
696:16 712:4
726:17 732:21
739:4 754:9
769:18
taken 442:2
485:20 527:22
589:3 646:14
696:19 754:4
763:12 780:3,4
talk 423:12,16
450:14 495:12
510:13 519:20
521:21 552:16
553:13 556:3
587:7 635:1
644:10 661:13
683:20 684:15
709:11 711:4
726:14 756:14
756:15
talked 480:1
544:11 555:21
571:3 581:17

638:19 708:20
729:13 743:3
750:2 751:22
759:15
**talking** 442:22
507:5 544:5
554:2 556:13
572:8,8 591:13
667:18 685:1
689:4 694:3
734:15
**talks** 474:13
506:8 507:7
574:18 720:3
**task** 518:14
**taught** 441:10
543:1,20 544:3
552:22 559:1
572:13 587:2
591:21 593:5
**TCP** 577:21
**teach** 437:19
608:4,22 611:5
615:11 644:6
645:8 675:12
**teaches** 569:6,15
570:2 642:22
643:7 644:20
691:1
**teaching** 573:21
682:2
**teachings** 645:2
647:7 688:8
689:3 747:7
754:19,21
**technical** 724:5
734:16 735:2
**technologies**
413:12 448:10
449:10 450:8
458:18 459:1,7
**technology**
443:22 448:2,6
448:8,13,20
449:1,4,16
458:4,9 459:10

514:1 706:19
707:7,10,16
720:6 724:21
**telecommunic...**
720:17 721:5,7
**telephonic** 532:4
**tell** 477:17 478:6
479:5 480:11
489:9 539:3
548:15 564:18
710:14 723:9
728:8,9,21
**telling** 509:9
593:16
**ten** 413:12 448:9
449:9 450:7
**term** 436:2
463:16,20
476:12 477:4
492:2 565:8,12
568:13 578:22
721:3,10
**terms** 420:1
421:20 429:7
435:16 436:7
439:3 469:12
476:22 477:8
478:3 482:10
491:12 538:18
563:8 677:20
677:22 678:6
680:9 693:13
733:12 734:14
750:3 754:16
**test** 436:22 437:5
437:13 703:5
**testified** 417:6
732:13,18
735:8
**testify** 479:13
480:6,19
498:15
**testimony** 425:3
426:13 442:20
478:16 479:21

480:16 481:12
485:10 509:5
509:15 551:15
667:10 682:4
709:8 715:20
716:11 728:1,4
729:22 731:21
733:1,4,8,10
733:11,14,15
755:6 780:4,4
**tests** 445:18
**text** 451:11
493:12 618:19
689:20 695:19
695:22
**textbook** 740:8
**Thank** 417:9
444:12 447:6
448:18 485:14
489:20 499:21
525:11 526:5
599:15 605:11
611:15 614:22
625:10 633:18
639:2 649:18
658:20 680:19
689:13 690:15
692:11 697:4
714:21 763:4
769:17 779:5
**Thanks** 751:5
**themes** 570:14
**thereof** 760:10
**thereunder**
760:15
**thing** 516:12
540:13 578:16
588:3,6 622:6
628:4 663:19
**things** 438:19
452:7,13,15,22
460:20 461:7
462:7 508:9
513:19 555:20
578:20 582:9
614:8 654:21

666:4 685:9
698:4 707:14
722:14 725:17
726:13 747:11
**think** 423:11
429:7 431:19
439:2,17,18
441:15 444:21
450:7,9 460:22
462:9 469:9
477:12 482:20
492:1 503:17
506:4 513:8
514:4 516:2
517:18 518:10
523:9 524:11
524:14,19
529:21 537:2
537:17 550:5
552:8 553:8
564:6 567:6,8
568:10,21
571:20 572:4
577:22 587:15
587:21 588:6
588:13 599:5
622:5 626:17
639:1 662:20
664:8,10
666:17,17,20
700:19 710:22
744:2 748:20
748:22 750:20
751:21 752:10
757:20 767:4
**thinking** 720:8
**third** 451:12
495:13 528:13
531:9 534:8
559:22 612:4
618:10 639:20
639:22 640:1,3
650:6,8 668:20
676:18,21
706:12 739:21
760:17,19,20

**third-party**
526:16,19,22
527:1 600:17
**Thompson**
743:18 752:10
**thought** 464:20
472:7 554:1
630:19 662:19
678:21 684:3
685:7,8 691:3
709:6 714:7
720:9 733:10
**three** 425:2
443:18 500:2
599:2 696:7
713:1 719:4
772:4
**threshold** 616:10
617:8
**Thursday**
779:11,14
**tight** 756:18
**time** 416:6 422:3
435:20,21
438:3,15
441:21,21
442:3 457:2
459:17,21
463:5,8 485:17
485:21 518:12
524:11,19
527:19 528:1
542:20 558:20
562:4 588:22
590:2,6 591:17
593:2,10
594:17 616:20
617:4,11,15
623:6,7 629:20
635:6 636:16
637:14 638:6
646:11,15
647:21 648:4
648:20 649:3
659:12 665:20
666:16 674:7

674:10 696:17
696:20 712:5,9
719:18 724:3
728:12,14
737:2 738:5,21
739:2 743:6,14
756:18 758:8
763:9,13 779:6
779:15 781:16
**Time's** 762:20
763:2
**time-wasting**
684:11
**times** 711:2
**title** 428:7 450:4
450:7 562:1
569:5 741:15
**titled** 432:16
723:18
**today** 416:10,16
417:2 418:15
418:21 419:1,2
421:21 423:6
423:22 425:13
426:20 427:3
427:12,17
428:22 429:4
430:13,16,21
431:3,8,11,14
431:17 432:1,5
432:10 445:2,6
454:18,21
455:22 456:13
456:17 457:10
463:16,21
476:21 479:15
480:22 484:11
485:13 498:18
518:10 521:22
524:7 527:12
532:10 534:22
537:18 538:8
544:5 560:21
568:20 581:17
588:18 619:7
623:14 632:19

655:20 666:18
670:18 673:14
685:11 686:10
686:13 687:7
703:13 710:7
716:9 717:15
724:22 728:3
729:14 732:1
735:15 749:13
757:18 758:13
769:1,14,16
770:5 773:19
779:11,13
**Today's** 416:5
**told** 467:2,12
481:14 543:14
545:2 553:3
555:10 621:2,3
621:5 623:3
698:4 766:17
775:20 778:7
**Tom** 455:8
456:19,21
752:6,7,8
**top** 448:9 487:17
488:7 489:7,18
521:12 522:3
523:5 526:16
562:2 581:16
586:6,10,11,19
607:10 615:5
618:11,16,18
640:5 650:19
658:8 659:6
661:10 692:3
692:13 706:9
764:4
**topological**
481:2 578:3
**topologies** 438:4
438:9 440:11
441:1,8 442:11
442:19 502:18
505:2,6 506:9
507:6 508:5
510:13 511:3

513:2,11 573:7
**topology** 438:15
438:21 440:6
440:17 443:11
443:14,15,20
444:3,4 469:20
470:10,13,18
471:1,4,8,20
472:6,12 474:4
474:19 475:1,5
476:1 477:11
477:19 478:13
479:9 480:5,13
481:5 482:4,21
483:17 484:3
484:15 485:2,5
491:8 495:10
495:18 496:3
496:19 497:2,5
497:21 498:6
498:10 499:1,3
499:16,18
500:5 501:10
501:12,13,17
501:17 503:5
504:5,6,6,14
505:15 508:2
508:14,15
510:4 513:7
514:16 515:5
515:13,20
516:9 519:3
544:9 545:9
551:9 553:18
569:7 570:19
570:20 571:5,6
571:7,17,18,22
572:5,13,13,20
573:3,12,13,15
578:9 579:11
579:20 587:2
595:21 597:15
597:19 627:9
646:6 694:16
774:19 776:12
777:15

**total** 421:16,20
**totally** 747:11
**track** 724:16
**tracked** 724:18
725:1
**tracking** 466:3
723:22
**tracks** 466:3
724:14
**trade** 768:18
**transcript** 409:7
415:16 427:14
727:18 735:13
779:10 780:3
781:10,12
782:11
**transcription**
782:13,15
**transcripts**
425:3,10 427:5
431:22 432:3
**transfer** 522:6,8
638:21
**transferred**
637:20 638:16
**transferring**
637:5,16
638:11 675:12
676:6,14
**transmit** 471:8
593:9
**transmitted**
552:19
**transmitting**
468:6 558:15
615:12,21
**treating** 671:12
**tree** 544:20
545:12 555:6
556:3,8 578:9
661:12
**tree-structured**
660:16
**trees** 496:16
**trial** 434:13
477:16 479:5

479:13 480:12
480:19 482:8
484:5 485:8
489:8,15 498:8
498:15 499:2,8
686:16
**trick** 610:14
728:14
**tried** 535:7
556:22 557:1
**trillions** 724:17
**true** 513:18
516:7 519:9,14
579:8 598:15
598:16 690:5
726:4 780:3
782:13,15
**truthful** 418:12
**try** 465:13
474:17 538:21
617:4,16
662:18 667:8
685:2 747:15
**trying** 457:3
554:20 570:13
577:8,8 579:4
582:4,5 588:19
610:13 623:14
662:20 677:9
680:15 683:5
701:3 702:15
713:12 714:19
728:14 729:14
732:10 734:13
750:12
**TS** 682:12
**turn** 419:4 443:8
462:5 465:17
497:1 526:14
530:1 541:6
559:21 599:22
639:20 650:15
651:20 675:4
753:3 763:22
764:12,19
767:15 768:1

769:21 770:17
771:7,19
773:16
turning 424:21
486:13 645:18
646:9 714:22
twice 588:6
two 423:9,22
430:21 445:10
462:1 497:8,11
513:7 551:2
561:21 580:6
603:3 627:7
681:18,19
683:19 694:4
701:16 714:15
749:17
two-thirds 630:2
630:8 653:5
type 448:7
460:13,22
461:9,10
470:21,22
494:9 496:21
497:18 502:13
510:15,16
511:5 513:14
518:19 538:19
546:15,18
555:17 574:22
593:21 640:2
670:21 722:17
726:21 745:5
746:9
typed 420:9
429:8
typefaced 760:5
types 463:2,10
694:4 707:13
753:18
typewriting
780:5
typically 464:1
typing 420:1,1
429:7 542:14
542:15 562:17

562:18
typos 418:18,21
496:5

---

**U**

U 415:14
ubiquitous
452:1,12,15
UC 605:16
ultimately
598:21
uncommon
718:22
underlined
618:18
understand
436:7,13,22
437:5,19 445:9
446:4 463:18
482:3,15
483:11 491:20
494:8 495:7,14
496:16 500:19
505:11 508:7
515:1 516:14
529:18 542:20
544:8 554:10
558:21 571:21
576:21 584:7,9
591:18 593:3
593:11 594:18
614:7 617:4
622:21 627:5
628:20,22
654:11 695:15
697:16 701:15
714:6 715:10
717:1 730:19
730:19,22
731:7,11,15,22
742:13 774:7
775:22 776:20
777:7 778:10
understandable
437:8
understanding

434:11,12
436:3 437:13
445:20 466:10
477:3 479:6
497:8 503:9
509:6,13
532:18 571:1
586:4 587:11
607:18 613:17
631:4 634:14
655:4 671:11
681:17 683:13
686:10 699:6,9
700:11 703:10
713:14 719:8
732:20 739:15
745:11 749:16
755:22 766:12
773:7
understands
556:21
understood
419:3 445:21
450:13 467:4
473:18 510:8
511:19 512:3
518:14 538:16
554:2,8,16,18
554:22 556:15
556:18 587:9
596:7 622:7
637:13 658:7
731:13
unexpected
630:4,12 631:5
631:18 632:2
unfortunately
496:4 764:15
unique 563:15
677:12 678:6
679:4,7,13
United 409:1
651:3 741:8
University
414:21 454:6,9
454:9 456:5

715:5 718:3,11
Unleashed 649:5
unpatentable
696:2,8
unsolved 628:16
629:14
update 451:17
updates 726:2
upper 528:17
600:10 624:13
624:17 625:7
628:6 640:10
641:7 642:18
650:10,16
651:21 692:1
764:1
USC 696:1
use 438:20 443:5
443:22 460:14
461:1 463:20
477:5 487:13
488:18 496:18
504:7,10
506:14,21
513:13 516:6
516:17 522:2
522:22 523:12
536:13 558:17
562:4 575:19
576:10 577:3
586:3 596:4
615:16 623:3
634:6 636:6,8
643:7 644:20
645:1,8,12
661:22 687:18
699:11 713:8
713:11 738:19
747:7
useful 725:7,15
725:16 726:9
726:12
uses 549:10
662:12
utility 690:14
760:5

---

**V**

v 411:4 781:6
782:7 783:8
vague 438:6,17
443:7 453:11
457:5 460:8,19
461:6,17
462:20 463:13
464:17 466:14
467:10 468:16
471:11,21
472:13 473:17
476:19 477:20
478:15 479:10
479:20 480:15
481:10 482:6
482:22 484:6
484:18 489:13
490:18 491:16
495:3 498:12
499:6 500:7
501:3 502:20
504:2,21
505:19 506:16
509:4 512:16
514:9 517:9
525:2 535:22
538:5 539:6
548:3 566:14
567:1 568:16
570:4 572:2
573:16 575:21
576:13 577:5
579:3 580:3
588:11 597:7
598:14 606:15
607:22 619:22
620:22 621:18
623:10 634:19
643:10 647:19
654:13 657:10
662:14 663:18
665:18 666:14
667:9,13,16
671:15 680:6
681:16 682:3

683:2 693:18
700:14 702:7
714:5 736:10
742:1 745:10
745:15 746:17
747:2 748:3
749:11 750:10
751:15 754:13
761:18 762:14
**valid** 419:15,16
621:4 622:9
634:15
**validity** 419:18
420:7,17
421:11 422:19
423:8,13,17
424:5,14,18
425:6,9,22
426:1,6,9,13
427:15,20
428:9 429:6
432:13,19
433:18 446:12
467:17 469:14
483:15 521:10
632:9,17 656:5
657:7,17 697:6
703:18 711:17
753:1
**value** 709:12
734:14
**van** 664:9,11
665:12,13,16
667:6
**various** 542:21
591:19 680:9
680:13 698:21
738:3
**vast** 708:16
**venerable**
451:18
**Venkatasubra...**
605:6,12,15
606:1 613:3
768:17,22
**venues** 666:3

**verdict** 483:11
**verifying** 682:13
689:22
**version** 666:4,6
666:8 695:1,6
**versions** 666:7
**versus** 416:9
556:14 567:4
**vertically** 578:7
578:13,19,22
579:1,6,15,16
580:12 582:7,8
**VI** 770:19 771:2
771:10 772:11
**video** 416:7
**VIDEO-REC...**
409:8 410:4
**videoconference**
529:11 532:12
535:5,9 669:8
672:9 673:1,3
683:16
**videographer**
412:19 416:1,3
417:1 441:20
442:3 485:17
485:21 527:19
528:1 588:22
590:6 646:11
646:15 674:7
674:10 696:17
696:20 712:5,9
756:7 763:9,13
779:6
**view** 459:9
470:11 481:7
487:19 493:7
494:21 496:10
501:16 502:16
508:18 509:1
518:6 539:21
598:9 654:4
659:3,5 667:5
696:2,8 697:11
747:17,22
756:20

**viewed** 692:18
692:21
**VIII** 520:11
**Vision** 723:19
**visual** 586:2,2
677:19
**Vol** 781:1,8
782:8 783:9
**VOLUME** 409:6
410:5

_____

**W**

**Wait** 626:14
**waive** 781:14
**walked** 552:15
**walking** 678:10
**want** 419:6
441:16,20
447:19 450:14
457:13,13
463:8 524:11
524:19 540:14
588:4 616:5
617:10,15
635:6 636:16
638:6 648:3,20
649:2 664:12
666:16 674:5
674:14 692:14
732:10 767:1
**wanted** 680:11
**wants** 549:12
**warning** 756:6
**Washington**
409:21 411:15
412:8,13
416:15 782:3
783:3
**wasn't** 533:18
571:15 607:21
610:13,22
670:16 684:4
**Wasum** 765:22
767:13
**way** 451:12,19
453:13,18

454:19 462:12
463:20 472:7,8
482:12 483:10
483:22 484:1
490:22 494:9
496:20,22
498:2,4 499:13
504:9 505:3,3
505:7,9,11
506:4 508:10
516:5,16
517:18 518:11
553:9 554:16
555:16 556:18
572:18,21
574:18 577:14
577:20 579:10
579:13 580:8
587:8,10 597:1
597:16,20
621:19,21
630:2,8 645:12
646:4 653:5
664:8 667:3
680:14 692:17
709:3 722:16
747:12 758:14
**ways** 483:4
580:7 705:7
**we'll** 428:1
444:12 465:15
666:5,8,8
671:9 686:15
695:14,14
710:4
**we're** 416:17,21
442:5 464:19
477:4 482:8
486:1 524:17
527:15,21
528:3 554:2
556:13 586:10
590:8 599:5
606:19 608:19
646:13,17
674:8,11

685:10 694:22
695:7 696:21
712:11 740:7
749:13 750:3
756:18 762:20
763:15
**we've** 481:13
485:15 498:19
551:7 599:2
602:3,5,6,11
641:18 662:19
**Web** 409:4 412:3
640:14 742:10
768:11 781:6
782:7 783:8
**websites** 710:11
**week** 619:10
**welcome** 424:2
486:3 526:6
697:2
**well-known**
664:22 735:22
736:3,6,15,18
737:21 743:8
743:12,14
**weren't** 653:19
727:11
**WHEREOF**
780:10
**white** 724:5
**wide** 511:19
742:10
**window** 690:6
**Wisconsin** 412:7
412:12
**withdraw**
724:10
**withdrawing**
686:3
**Withdrawn**
523:11
**witness** 412:4
413:2 417:3,4
417:8 441:18
444:6 527:18
540:14,17

559:17 561:5
639:8 643:22
693:19 718:5
724:12 748:9
750:12,18,22
751:4 780:10
781:13 782:8
782:19 783:9
**witnesses** 426:14
**Wolff** 602:12,18
602:22 603:1
605:21 613:1
641:15 642:1,8
647:6,14
652:14 653:6
653:10,18
654:4 658:18
**word** 438:20
516:6 579:12
601:4,5 609:14
610:16,16
638:7 678:16
678:18 713:11
722:6 764:20
773:3 774:6
**word-for-word**
564:18
**worded** 713:5
**wording** 568:22
**words** 437:5
497:11,13
539:7,9 544:2
564:5 565:13
565:20 570:8
588:2,10
617:10 631:1
631:22,22
632:5 633:3,11
633:15 635:7
636:17 642:12
647:16 648:16
654:15 655:1
655:21 656:1
663:21 675:9
676:2 687:8
713:8 772:20

**work** 422:4,15
450:1 451:13
451:16 454:3
459:16 505:10
527:9 571:10
709:5 725:18
731:22 735:18
735:21 737:21
750:8 751:12
758:10 762:5
**worked** 421:20
421:22 422:7
422:11 451:2,5
456:20,22
527:11 581:4,6
581:9 707:10
707:16 737:17
737:19
**working** 420:17
421:11 459:20
738:5
**works** 505:3
527:4 555:16
732:22
**world** 413:13
448:10 449:11
450:8 709:4
728:19,19
742:10 760:4
**wouldn't** 462:8
471:18 568:15
667:18,19
710:17
**write** 552:2
730:10
**writes** 633:16
**written** 436:18
477:1 717:3
739:5,8,11
774:9,16
776:21 781:22
**wrong** 540:12
**wrote** 542:12
605:17

————————
　　　　**X**
————————

**X** 413:1,7 414:1
415:1

————————
　　　　**Y**
————————

**Yale** 414:20
715:4 718:3,11
728:2,5,7,11
728:18 729:1,3
730:15 731:4
**yeah** 421:19
438:10 439:18
439:22 444:7
450:14 457:17
465:10 475:6
486:11 488:15
492:1 524:11
533:16 539:8
540:16 547:5
548:17 552:13
559:17 571:20
572:10 575:22
577:7 587:15
599:7 601:3
609:14 613:8
613:15 616:19
621:20 622:16
626:13,15
655:9 667:19
676:22 682:8
682:19 684:4
720:5 730:6
746:7 750:21
751:10,22
765:13
**year** 421:17
524:13 525:7
539:8
**years** 422:1
448:3,6 665:1
731:18
**Yep** 529:12
532:2
**yesterday**
418:19 430:19
432:3
**Yocom** 415:5

602:12,18,22
605:21 612:22
758:19 759:3,6
761:10,16,22
**York** 409:12,12
410:6,6,8
411:7 416:8,8
417:6 454:8
780:19 781:4

————————
　　　　**Z**
————————

**zero** 678:8 679:9
**Zoom** 537:16,17
537:19
**ZyBooks** 740:9

————————
　　　　**0**
————————

**01** 780:17
**01/07/2027**
780:22
**01G06041701**
780:21
**034** 638:4
**035** 602:20
603:10,20
604:6,15 605:4
605:14,19
**036** 557:21
613:12 614:11
614:16 618:3
**052005** 780:17
**052005-01**
409:19
**09/11/2023**
409:14 410:1

————————
　　　　**1**
————————

**1** 415:11 419:4
445:10 447:20
447:22 465:4,7
473:6,15,20
474:8,12 475:3
475:20 479:7
479:14 480:2
492:20 493:7
493:13 495:16

501:22 502:4
503:11 542:20
543:15 544:7
545:7,7 549:5
574:7 577:16
592:11 607:20
610:10,11
626:8,11 627:3
627:14 632:12
651:2,15,19
652:9 653:12
654:6 658:5,17
688:18 762:1
775:12,17
**1.202.362.3522**
412:13
**1.21** 760:3
**1:01** 589:1,4
**1:18-cv-08175**
409:4
**1:58** 590:2,7
**10** 415:10 447:4
447:6,8,13
475:15,18,22
480:10,19
515:3 519:1
572:22 591:14
591:18 592:5
595:11,22
596:12 597:17
626:11,18,21
634:2,5,10
641:2 770:20
778:18,22
**10/019,034**
414:11 623:21
624:7
**10:26** 485:18
**10:39** 485:22
**100** 647:20
756:16
**10017** 411:7
781:4
**102** 443:17
**103(a)** 696:1
**106** 443:18

756:11
**1060** 704:2,5,9
706:1
**1061** 706:16,18
**1062** 708:3
717:10
**1063** 711:13
715:1,2 718:19
**1070** 656:16
**1071** 657:1
**1076** 657:1
**108** 444:5,7,10
659:14 661:9
**11** 416:5 541:9
591:11 616:5
616:16 617:5
617:17 725:2
767:17 768:13
781:7 782:9
783:10
**11:40** 527:20
**11:49** 528:2
**110** 549:4 585:2
**112** 549:1
**1198** 706:5
**11th** 780:11
**12** 447:16 495:16
503:11 515:2
519:1,19,22
520:2,4,6,9
521:5 526:3
549:2,5 550:2
550:4,8,12
551:8 560:13
581:17 610:1
651:3,15
652:10 653:1,3
653:12 658:5
658:17 776:15
**1205** 718:13
**120a** 549:3,9
**120b** 507:19
549:11,13,19
**127** 684:5
**13** 523:13,19
658:21 659:1,2

661:9 669:5
672:20 673:10
701:11 742:18
748:22,22
749:2 769:9,21
**130** 508:17
**137** 530:10
**14** 446:21 447:3
475:15,19,22
480:10,19
515:3 519:2
591:14,18
592:5 593:4,7
593:17,22
594:3 595:12
595:22 596:12
597:17 607:16
626:11,18,21
634:2,5,11
641:2 655:11
770:20 778:19
778:22
**14D** 411:6 781:3
**15** 433:13,21
434:2 473:6,15
473:21 474:8
475:3 479:7,14
480:3 506:7
511:18 515:2
519:1 542:21
543:15 544:8
545:18 546:4
546:11,16
547:14,19
552:18,21
553:5,13 555:6
555:12 565:18
607:3,6,11,16
607:16 610:6
610:18 645:3
652:10 653:13
654:6 658:5,17
688:17 689:1
763:7 776:15
**150** 422:3,7,14
**158** 697:5,8

771:3,11
772:12
**159** 697:15
**16** 564:8,21
639:18 642:16
642:18 651:3
651:16 768:16
768:17
**165** 698:9
**17** 468:4,17,19
469:3,10
470:14,16
472:18 475:20
477:17 478:5
482:3 486:8
487:11 488:2
489:9,16
490:11,15,20
491:14 503:6
506:6 515:4
519:2 522:9,15
548:18 550:22
550:22 551:18
552:5 558:12
559:5 612:7
626:11,18,22
636:22 637:4
642:21 651:6
656:20 673:22
675:15,20
676:11 680:4
680:11 692:5
695:22 770:20
773:16,20
774:9
**17(e)** 676:15
**170** 419:15 457:4
460:18 461:5
461:15 466:1,7
473:6,15,21
474:8 475:4
479:8,14 480:3
492:20 493:8
493:13 495:16
503:11 515:2
519:1 521:7

529:1 541:16
543:1,20 544:3
544:8,13 545:3
546:4 548:18
552:22 553:5
556:7 572:22
599:17 650:1
651:4,16
652:10 653:13
653:20 658:3,5
658:13,18
697:11 700:7
702:20 704:18
705:13,18
707:2 712:21
714:3,12 775:8
775:12,17
776:15 777:4
777:12
**1730** 409:21
782:2 783:2
**179** 489:22
**18** 413:9 417:14
417:18,18,20
418:9 432:13
468:4,17,19
469:3,10
470:15,16
472:18 477:18
478:5 486:8
489:9,16 507:4
515:4 519:2
551:19 558:12
559:5 612:8
616:21 689:1
**18:22** 552:6
**18:38** 593:7
**180** 699:20 701:6
702:16 703:11
712:16 771:22
**181** 712:1
**182** 771:3,11
772:12
**184** 489:22 490:2
490:3
**185** 492:7

**189** 495:12,13
496:10 503:9
**19** 413:11 417:14
418:1 428:4,7
435:2,11 440:1
440:15,22
442:8 507:7,20
508:14 511:7
544:15,18
557:10 646:21
647:1
**19:3** 593:7
**1909** 411:14
**191** 512:13
514:18,22
515:12,20
**1950s** 451:19
452:6,8
**1990s** 736:1,4,16
736:19 737:22
738:8,20
**1996** 523:20
524:8,12
**1997** 684:7
**1998** 521:7,16
523:8,14
664:15 739:20
740:1,18,21
742:18
**1999** 520:20
521:2 522:7
525:9
**1A** 626:10,13,16

――――――――
**2**
――――――――
**2** 432:14 445:13
495:16 503:11
544:20 545:3,6
549:9 562:13
574:7 575:14
577:16 609:4
624:17,17
625:15,16,22
626:2,2,5
640:10 650:16
651:3,15,19

652:9 653:12
655:10,11
658:5,9,17
692:1 716:1
727:20 732:3
766:5 776:15
**2.0** 415:4 752:15
752:19
**2.1** 574:7
**2.2** 574:7 575:13
**20** 413:12 449:8
449:9,17
508:15 668:18
**2000** 457:15
522:16 525:1
525:10
**20006** 411:15
**2001** 457:21
739:21 759:12
**20015** 412:8,13
**2002** 718:15
**20036** 409:21
782:3 783:3
**2004** 449:17
452:12 457:2
458:5 459:21
715:7 718:19
718:21 739:22
**2006** 740:6
**2009** 665:10
**2011** 740:6
**2012** 708:20
709:2,9,19
710:17 711:2
**2014** 740:7
**2017** 760:9 761:8
**2018** 447:16
**2019** 421:21
422:11 711:9
**202** 409:22
411:15 412:9
782:4
**202)-232-0646**
781:17
**202)232-0646**
783:4

**2020** 526:12
**2022** 529:8
531:20 541:9
557:15 560:13
590:20 600:7
612:1 618:9
624:13 625:1
625:12
**2023** 416:5 418:9
422:6 428:16
520:11 639:18
650:4 651:6
668:18 669:5
672:20 673:10
691:20 780:11
781:7,20 782:9
783:10
**21** 413:14 443:9
513:4 525:20
526:3,8 529:8
531:20 573:1
628:5,6,8
691:19 731:18
**22** 413:15 528:4
528:8 532:1,13
551:19 611:22
632:20
**23** 413:17 475:20
486:13 487:18
488:7 489:7,18
490:11,15,20
491:14 503:6
522:9,16 531:3
531:7 555:2
626:11,18,22
656:20 692:5
695:22 727:1
729:7 770:20
**232-0646** 409:22
782:4
**24** 413:19 475:20
490:11,16,21
491:14 495:17
503:6,11 515:4
519:2 522:9,16
540:6,7,18

541:1 612:8
616:20 617:7,9
626:11,18,22
633:19 656:20
692:5 696:12
770:20
**25** 413:20 507:4
511:16 557:2,7
636:21
**250** 709:22
**26** 413:21 440:1
541:7 548:19
559:11,15,17
**27** 414:3 561:1,4
561:7 562:10
563:3 600:7
624:13 684:7
**278** 644:2
**28** 414:4 520:20
521:2 522:7
525:9 542:8,12
542:18 543:20
590:11,12,19
590:20 625:1
625:12
**283** 644:3
**288** 701:8 703:2
703:12 711:18
712:15,19
713:9
**29** 414:5 466:2
599:10,14
607:4 618:9
648:7,8,10
650:4 718:15
763:20
**2nd** 522:16

———————
**3**
**3** 419:7,8 424:21
475:15,18,22
480:10,19
515:3 519:1
520:3 549:12
591:14,18
592:5 594:9,13

594:18 595:1
595:11,22
596:12 597:17
599:22 612:10
624:20 626:11
626:17,18,21
626:21 634:6
634:10 640:1
641:2,7 645:3
650:7 651:20
651:21 668:22
719:9,10,11
770:20 777:21
778:4
**3:07** 646:12
**3:17** 646:16
**3:54** 674:8
**3:56** 674:11
**30** 414:7 475:20
490:11,16,21
491:14 503:6
522:9,16 558:8
558:11 611:9
611:10,14,16
626:11,18,22
656:20 665:1
692:5 696:1
770:20
**31** 414:9 592:17
617:18 618:1,2
626:8,11 627:4
627:14
**32** 414:11 623:19
623:20 624:2
**33** 414:12 639:4
639:5,8,21
646:20 695:17
695:18,20
**34** 414:13 643:17
643:20
**35** 414:14 591:11
591:16 592:3
649:13,17,19
650:3 657:22
658:1 696:1
**36** 414:15 660:2

660:5 689:1
**362-3620** 412:9
**37** 414:16 550:22
668:1,5,7
674:15
**38** 414:17 436:14
436:17,21
551:19 552:6
672:11,12,15
673:15,22
676:18 680:21
**382** 435:14
**39** 414:18 440:22
442:8 592:22
593:1 688:13
688:15
**391** 694:1
**394** 694:2

———————
**4**
**4** 466:1 507:20
520:3 521:12
522:3 523:5
549:14 557:15
615:1 619:1,17
626:7 716:1,2
716:12 723:12
723:16,17
727:20,21
732:3,4 760:9
761:8
**4.20** 613:1
**4:29** 696:18
**4:42** 696:21
**40** 414:19 440:22
442:9 594:8,13
691:7,11,13
756:10
**400** 409:11 410:6
411:6 416:8
781:3
**41** 414:20 437:18
718:1,2
**417** 413:3,9
**418** 413:11
**42** 414:22 740:22

741:4,5,8
750:19,20
**420** 605:21
614:17 767:21
767:22
**43** 415:3 752:13
752:14,18
**433** 703:21
**436** 715:1
**44** 415:5 450:16
451:11 454:2
455:1 602:16
756:11 758:18
758:19,22
**447** 415:10
**449** 413:12
**465** 415:11
**48** 444:14,16
**483** 656:16
**484** 435:13
**49** 445:8 701:12
703:4 770:2
771:12 772:14
772:19 773:8

---
**5**

**5** 686:17 687:9
727:3,5,10
729:7,9,11
**5:01** 712:6
**5:02** 712:10
**50** 446:2 513:9
513:10,10,12
655:12
**500** 421:22
422:12
**525** 413:14
**528** 413:15
**528888** 753:7,8
**53** 598:18
**5301** 412:7,12
**531** 413:17
**54** 513:8
**540** 413:19
**557** 413:20
**559** 413:21

**56** 467:17 468:3
469:14 595:5,8
597:22
**561** 414:3
**57** 473:4
**58** 475:17
**59** 475:11,18
770:10
**590** 414:4
**599** 414:5
**5A** 745:21 746:8
746:13
**5B** 745:22 746:9
746:13

---
**6**

**6** 473:6,15,20
474:8 475:3,20
479:7,14 480:2
491:19 495:16
496:5 497:18
498:16 499:12
501:7,13,14,15
501:21 502:7
502:15 503:3,9
505:13 513:5,6
515:2 519:1
520:11 542:21
543:15 544:7
545:18 546:4
546:10,13,15
547:7,14,18
552:20 553:5
553:13 555:6
555:12 592:15
597:12 600:10
609:9 610:2,16
626:11,17,21
635:12,16
640:19 641:2
647:9 651:3,15
652:9 653:12
654:6 658:5,17
661:10,14
667:4 762:1
764:1,4 770:20

776:15
**6,122,644** 684:7
**6,430,618** 414:22
741:1,9
**6.18** 613:1
**6:00** 763:10
**6:24** 763:14
**6:40** 779:7
**6:41** 779:15
**60** 476:5,10
507:4
**61** 544:15
**610** 603:5
**611** 414:7
**617** 414:9
**618** 603:5 605:21
614:17 742:3
742:22 743:17
744:14,18
745:3,13,18
747:6,16,18
748:1,5 750:7
750:13 751:11
752:3 767:19
**623** 414:11
**63** 486:5,7
**639** 414:12
**64** 457:14 545:16
545:17 546:20
552:13,16
553:20 554:6
555:1
**640** 419:14 457:4
457:15 460:18
461:5,15 466:8
468:4,17 470:7
472:18 477:18
482:3 486:9
487:11,20
495:17 503:12
515:4 519:2
521:6 531:16
558:6 572:22
611:20 612:8
616:21 618:5
697:11 700:7

702:20 704:17
705:13,18
707:1 712:21
714:3,12
773:13 774:21
775:6
**643** 414:13
**646** 411:8
**648** 559:1
**649** 414:14
**660** 414:15
**668** 414:16
**67** 506:7
**672** 414:17
**68** 697:6 770:17
**688** 414:18 644:2
**691** 414:19
**695** 644:3

---
**7**

**7** 432:15 433:1
511:8 655:11
764:4 768:3
773:15
**7,103,640** 428:10
**7,233,978** 428:10
**7,814,170** 428:11
651:4
**70** 698:10,18
**71** 698:18
**718** 414:20
**73** 632:3
**74** 555:2,4
556:15
**740** 414:22
**752** 415:3
**758** 415:5
**76** 632:3
**763** 413:5
**779** 415:16
**78** 771:7,19
**79** 490:4 603:16
714:18
**7th** 428:15

---
**8**

**8** 515:2 519:1
521:7,16 523:8
523:14 610:1
615:7,9 651:3
651:15 652:9
653:12 658:5
658:17 692:8
692:10,14
695:16 716:1
727:20 732:3
759:12 766:8
768:10 776:15
777:20
**800** 411:14
**812** 409:21 782:2
783:2
**8888** 753:14
**894-7305** 411:15

---
**9**

**9** 526:12 610:1
651:3,15
652:10 653:12
658:5,17 716:1
727:20 732:3
775:11
**9/22/2022**
618:22
**9:06** 409:15
410:2 416:6
**9:32** 441:22
**9:38** 442:4
**90/014,552** 526:9
**90/019,034**
560:10 591:7
632:11 647:10
**90/019,035**
528:20 542:1
599:20
**90/019,036**
531:14 558:4
611:17 618:7
**90/019,109**
414:16,19
656:19 668:2
668:11 691:8

| | | | | |
|---|---|---|---|---|
| 691:14 | 700:5 702:19 | | | |
| **90/019,162** | 704:18 705:13 | | | |
| 639:12 | 705:18 707:2 | | | |
| **90/019,165** | 712:19 713:20 | | | |
| 414:14 649:14 | 714:2,11,18 | | | |
| 649:20 | 770:21 777:17 | | | |
| **921-0704** 411:8 | **98** 756:15 | | | |
| **941** 693:22 | **99** 756:16 | | | |
| **949** 694:1 | | | | |
| **97** 756:10 | | | | |
| **978** 419:14 | | | | |
| 439:22 440:15 | | | | |
| 441:7 442:9,17 | | | | |
| 443:9 457:4,21 | | | | |
| 460:18 461:5 | | | | |
| 461:15,22 | | | | |
| 466:8 475:15 | | | | |
| 475:22 480:11 | | | | |
| 480:20 490:11 | | | | |
| 490:16,21 | | | | |
| 491:15,19 | | | | |
| 495:17 496:6 | | | | |
| 497:18 498:17 | | | | |
| 499:12 501:7 | | | | |
| 501:14,15,21 | | | | |
| 502:15 503:3,6 | | | | |
| 503:10 505:13 | | | | |
| 506:6 507:3,21 | | | | |
| 513:5,6 515:3 | | | | |
| 519:1 521:6 | | | | |
| 522:9,15 560:7 | | | | |
| 573:1 591:5,14 | | | | |
| 591:21 592:5 | | | | |
| 592:12,18 | | | | |
| 593:5,6,18 | | | | |
| 594:9 597:13 | | | | |
| 597:17 624:10 | | | | |
| 639:15 641:3 | | | | |
| 642:4,9 647:6 | | | | |
| 647:15,22 | | | | |
| 648:12 649:1 | | | | |
| 656:21 668:14 | | | | |
| 671:22 673:22 | | | | |
| 691:17 692:5 | | | | |
| 696:7,12 | | | | |
| 697:10 698:13 | | | | |