# Exhibit K56

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Kove IO, Inc., | Civil Action No. 1-18-cv-08175 |
| Plaintiff, | Hon. Matthew F. Kennelly |
| v. | **JURY TRIAL DEMANDED** |
| Amazon Web Services, Inc., | |
| Defendant. | |

## REBUTTAL EXPERT REPORT OF MICHAEL GOODRICH
## REGARDING VALIDITY OF U.S. PATENT NOS. 7,103,640; 7,233,978; AND 7,814,170

Executed on this 18th day of August, 2023, at Irvine, California

_____

Dr. Michael Goodrich

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

    A.     Scope and Summary of Analysis .......................................................... 1

    B.     Qualifications ....................................................................................... 2

II.    LEGAL PRINCIPLES ................................................................................... 2

    A.     Person of Ordinary Skill in the Art ...................................................... 3

    B.     Claim Construction ............................................................................... 5

    C.     Anticipation .......................................................................................... 8

    D.     Obviousness .......................................................................................... 9

    E.     Written Description and Enablement ................................................... 10

    F.     Eligibility ............................................................................................ 12

    G.     Double Patenting ................................................................................ 13

III.   CLAIM CONSTRUCTION .......................................................................... 14

    A.     The Court's Ordered Constructions .................................................... 14

    B.     Mr. Greene's Alternative Constructions Are Improper and Unnecessary ........... 15

        1.     "network" / "system" ............................................................... 16

        2.     "location server" ...................................................................... 21

        3.     "providing / determine / determining / retrieving location information or servers" and "return / sending / transmits / transmitting a redirect message" ............... 22

IV.    BACKGROUND ............................................................................................ 24

    A.     Background of the Patented Technology .............................................. 24

    B.     Background Of The Alleged Prior Art ................................................. 24

        1.     The Domain Name System ("DNS") (RFC1034 and BIND and DNS) ... 24

        2.     Cache Resolver System (Sherman and Karger/Sherman) ........ 30

        3.     Minami ..................................................................................... 34

        4.     Neimat ...................................................................................... 35

        5.     Karger '618/'420 ...................................................................... 37

        6.     Venkatasubramanian ................................................................ 39

        7.     OracleNamesAdminGuide (ONAG) ........................................ 40

        8.     OracleUnleashed ...................................................................... 44

        9.     Steen ......................................................................................... 45

        10.    Wolff ........................................................................................ 47

11.  Skagerwall ........................................................................... 48

12.  Yocum ................................................................................. 51

13.  Boukobza ............................................................................ 52

V.  THE ASSERTED CLAIMS ARE PATENTABLE UNDER 35 U.S.C. § 101 ............... 53

A.  The Asserted Claims Are Not Directed To An Abstract Idea ............................ 54

B.  The Asserted Claims Claim An Inventive Concept ................................... 66

VI.  CLAIMS 3, 6, 10, 14, 17, 23, 24, AND 30 OF THE '978 PATENT ARE NOT INVALID FOR DOUBLE PATENTING ...................................................... 68

VII.  THE ASSERTED CLAIMS HAVE SUFFICIENT WRITTEN DESCRIPTION AND ARE ENABLED ................................................................... 79

VIII.  KOVE'S ASSERTED PATENT CLAIMS ARE VALID OVER CITED ART ............. 87

A.  Analysis under Court ordered claim constructions ............................... 87

1.  '170 Patent ...................................................................... 89

a.  Claims 6, 8, and 15 patent are not anticipated by RFC1034 and/or BIND ......................................................... 92

i.  Neither RFC1034 or BIND disclose or teach "identifier"/ "identifier string," "location," and "location information," as required by the claims 6, 8, and 15. ............................ 92

ii.  Neither RFC1034 or Bind disclose or suggest "location" or "location information," as required by claims 6, 8, 12, and 15. .................................................................. 95

iii.  Neither RFC1034 or BIND disclose or teach "wherein the programming logic is further configured to return a redirect message if the location server lacks the location information for the desired entity, the redirect message comprising a list of at least one other location server known to have the location information for the desired entity," as recited by claim 6 and as required by claim 15 (emphasis added) ............................................................ 97

iv.  RFC1034 and/or BIND do not anticipate claims 6, 8, and 15. .................................................................. 100

b.  Claims 1 and 2 of the '170 patent are not obvious in view of RFC1034 and/or BIND, in combination with Karger '618/'420 100

i.  Neither RFC1034 or BIND teach or suggest "the portion of the data location information included in a corresponding one of the data location servers is based on a hash function

## I.    INTRODUCTION

1.      I have been retained by counsel for Plaintiff Kove IO, Inc. ("Kove") to serve as an expert in Kove IO, Inc. v. Amazon Web Services, Inc. (Case No. 1-18-cv-08175).  I expect to testify at a trial regarding the matters set forth in this expert report, if asked about those matters by the Court or the parties' attorneys.

### A.    Scope and Summary of Analysis

2.      The scope of this report is to examine and analyze the Expert Report of Joseph B. Greene Regarding Invalidity of U.S. Patent Nos. 7,103,640, 7,233,978, and 7,814,170 and the opinions, analysis, and evidence therein, as well as to examine and analyze the validity generally of U.S. Patent Nos. 7,103,640 ("'640 patent"), 7,233,978 ("'978 patent"), and 7,814,170 ("'170 patent") (collectively, the "Asserted Patents").  Specifically, I have been asked to analyze the following claims of the Asserted Patents (the "Asserted Claims"):

| U.S. Patent No. | Asserted Claims |
|---|---|
| 7,103,640 ("'640 patent") | 17, 18, 24 |
| 7,233,978 ("'978 patent") | 3, 6, 10, 14, 17, 23, 24, 30 |
| 7,814,170 ("'170 patent") | 1, 2, 6, 8, 12, 15 |

**Table A**: Identification of Asserted Patents and Asserted Claims.

3.      In formulating my opinions in these matters, I reviewed the materials indicated in the materials considered list, provided as Exhibit B to this report. Based on the analysis set forth in this report, I have made the following determinations:

- The Asserted Claims of the '640 patent are valid under each of 35 U.S.C. §§ 101, 102, 103 and 112.

- The Asserted Claims of the '978 patent are valid under each of 35 U.S.C. §§ 101, 102, 103 and 112.

- The Asserted Claims of the '170 patent are valid under each of 35 U.S.C. §§ 101, 102, 103 and 112.

**B.     Qualifications**

4.     My complete qualifications and professional experiences are set forth in my Curriculum Vitae, provided as Exhibit A to this report, which details my education, work experience, and publications.

5.     I am being compensated at a rate of $750 per hour for my work on this litigation. The opinions found within this report are mine, and the analysis on which they are based was performed by me or at my direction, supervision, and review.

6.     I do not have any known financial interest in Kove or in the outcome of this litigation. My compensation in no way depends on or is affected by the results of my analysis, my conclusions or opinions, or the outcome of this litigation.

**II.     LEGAL PRINCIPLES**

7.     While I am not an attorney, I have been informed of certain legal principles that relate to forming opinions regarding anticipation, obviousness, and patent eligibility. My understanding of such principles is set forth below.

8.     I have been instructed that the claims of an issued patent are presumed to be valid. Because of this standard, I understand that for a patent to be found invalid in U.S. District Court, invalidity must be proven by clear and convincing evidence. I understand that this standard is higher than that for infringement, which I have been instructed is a preponderance of the evidence.

9.     I also have been instructed that I must apply the court's claim constructions in conducting any analysis of invalidity. Specifically, I understand that an anticipation, obviousness, or eligibility analysis each require me to apply the court's claim construction. These analyses also require me to review each claim independently, on a claim-by-claim basis. And I have been

instructed to conduct my analysis from the perspective of a person having ordinary skill in the art at the time of the invention. I further understand that I should read the claim language to have its plain and ordinary meaning as that meaning would be understood by a person of skill in the art at the time of the invention. I also understand that wherever the court has provided a claim construction, I am to apply that construction.

10. I understand that a claim can "depend" from an independent claim. In those instances, each limitation of the independent claim is incorporated into the dependent claim's scope. Claims can also depend from other dependent claims. In those cases, a dependent claim B, which depends from dependent claim A, incorporates every limitation of dependent claim A.

### A. Person of Ordinary Skill in the Art

11. I understand that a person of ordinary skill in the art ("POSA") is a hypothetical person who is presumed to have been familiar with the relevant art at the time of the invention. I understand that factors to be considered in determining the level of ordinary skill in the art may include: (A) the type of problems encountered in the art; (B) prior art solutions to those problems; (C) the rapidity with which innovations are made; (D) the sophistication of the technology; and (E) the educational level of active workers in the field. I further understand that in a given case, every factor may not be present, and one or more factors may predominate.

12. I understand that the priority date claimed for each of the '640, '978, and '170 patents is as early as July 8, 1998. And, as explained in Section VIII of my July 6, 2023 Corrected Opening Expert Report, I have determined that the inventions described in the Asserted Claims of the Asserted Patents are entitled to the dates of invention shown in the table below. Therefore, when I refer to a person of ordinary skill in the art in this report, I am referring to a person of ordinary skill in the art as of the dates identified below for the respective patent and claim at issue.

| U.S. Patent No. 7,233,978 | |
|---|---|
| **Asserted Claims** | **Date of Invention** |
| 3, 6, 10, 14 | October 28, 1999 |
| 17, 23, 24, 30 | June 2, 2000 |
| U.S. Patent No. 7,814,170 | |
| **Asserted Claims** | **Date of Invention** |
| 1, 2, 6, 8, 12, 15 | October 28, 1999 |
| U.S. Patent No. 7,103,640 | |
| **Asserted Claims** | **Date of Invention** |
| 17, 18, 24 | October 28, 1999 |

**Table B:** Summary of invention dates for the Asserted Claims.

13.     In my opinion, a POSA with respect to the '640, '978, and '170 patents, at the time of the inventions, would have a bachelor's degree in Computer Science (or equivalent), and one to two years of industry experience in software engineering, networking, or data storage and retrieval. An advanced degree in Computer Science, or equivalent, could be substituted for one to two years of industry experience in software engineering, networking, or data storage and retrieval. Further, four or more years of industry experience in software engineering, networking, or data storage and retrieval could be substituted for a bachelor's degree in Computer Science and one to two years of industry experience in software engineering, networking, or data storage and retrieval. For example, the '640, '978, and '170 Patents identify their field of invention as the storage and retrieval of information across a distributed network.[1]

14.     I understand that AWS disputes that the Asserted Claims are entitled to the invention dates identified above in Table B. For example, I understand that AWS contends the Asserted claims are not entitled to priority dates earlier than their actual filing dates. *See* AWS's Second Supplemental and Amended Response Interrogatory No. 19 (April 13, 2023). Even if the Asserted Claims were entitled to a priority date not earlier than their actual filing date, which I do

---

[1] '640 Patent at 1:25-30, '978 Patent at 1:30-33, '170 Patent at 1:29-32.

not agree with, my analysis and conclusions with respect to the understanding of a person of ordinary skill in the art would be the same as that explained above.

## B. Claim Construction

15. I am informed that claim construction is a matter of law for the Court to decide. I understand that the Court has construed certain terms of the Asserted Claims, as set forth in the Court's December 17, 2021 Memorandum and Opinion Order.[2] The Court's constructions are summarized in the table below:

| Claim Term | Court's Construction |
|---|---|
| "location information" | '978: "one or more identifiers and their associated locations" |
| | '170/'640: "information pertaining to one or more locations of data and/or the identities of one or more location servers" |
| "location server" | "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients" |
| "client" | "a network-attached component (which may be software or hardware) that initiates update or lookup of identifier/location mappings from a location server with location request messages" |
| "based on a hash function used to organize the data location information across the plurality of data location servers . . . based on the hash function applied to the identifier string" | "the portion of the data location information included in a corresponding one of the data location servers is based on a hash function that maps identifier strings to one or more of the data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string" |
| "data pertaining to the entity" | "data pertaining to a person or thing (real, digital, or abstract) distinct from that data" |

**Table C:** The Court's Claim Constructions

[2] Dkt. 484.

16.     I also understand that the parties have agreed to the construction of certain other claim terms, as set forth in Exhibit B to the parties' Joint Claim Construction Chart (Updated).[3] The agreed-to constructions are summarized in the table below.

| Claim Term | Agreed Construction |
|---|---|
| "location" | an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored |
| "identifier"/"identifier string"/"identification string" | a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server |
| "hash table" | a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table |
| "data location sewer network" | data location server network |
| Preamble<br><br>'978 patent: claim 14 | Preamble after "comprising" limits the claim |
| Preamble<br><br>'978 patent: claim 17 | Preamble after "having" limits the claim |

**Table D:** The Parties' Agreed Constructions

17.     I understand that AWS has requested additional claim construction briefing and has proposed additional constructions for certain terms based on the doctrine of prosecution history disclaimer, which the Court has not ruled on or adopted.[4]  I also understand that Kove disagrees further claim construction is appropriate or necessary.[5]  I further understand the Court denied AWS's request for additional claim construction briefing without prejudice to the presentation of such claim construction arguments during briefing on summary judgement.[6]  AWS's proposed constructions are summarized in the table below.

---

[3] Dkt. 382.
[4] Dkt. 539; Dkt. 571.
[5] Dkt. 553; Dkt. 578.
[6] Dkt. 579.

| Claim Term | AWS's Proposed Further Construction |
|---|---|
| "network" / "system" | [network/system] arranged in a non-hierarchical, cluster topology |
| "location server" | a network-attached component that maintains, for satisfying every request for the location of data on the network, a set of at least one of (1) identifier/location mappings or (2) information about the location of such mappings that are modified or returned in response to all location request messages from clients |
| "providing" / "determin[e/ing]" / "retrieving" location information or servers | providing, without performing any request iterations, … location information / determin[e/ing], without performing any request iterations, … location servers / retrieving in two or fewer request iterations location information |
| "return" / "sending" / "transmit[s/ting]" a redirect message | return / sending / transmit[s/ting] a redirect message without performing any request iterations |

**Table E:** AWS's Proposed Additional Construction

18.     While I understand that claim terms are generally given their ordinary and customary meaning to a person of ordinary skill in the art in light of the patent's specification, I also understand that under the doctrine of prosecution history disclaimer, when a patent applicant surrenders or "disavows" claim scope during prosecution before the PTO, the ordinary and customary meaning of a claim term may not apply. I further understand that this doctrine does not apply where the alleged disavowal is "ambiguous" or is not both "clear and unmistakable" to a person of ordinary skill in the art.

19.     I have reviewed the Court's constructions (Dkt. 484) and the parties agreed-to claim constructions (Dkt. 382) and applied those constructions in my analysis. To the extent claim terms have not been construed or their meaning has not agreed to by the parties, unless expressly indicated otherwise, I have used their plain and ordinary meaning to a person of ordinary skill in the art at the time of the invention for the patent at issue.

20.     Where applicable, I also separately address Mr. Greene's opinions that are based on AWS's alternative proposed constructions set forth in Table E above.

**C.    Anticipation**

21.    I understand that for a claim to be anticipated, each and every limitation in that claim must be disclosed in a single prior art reference.

22.    I understand that a limitation can be inherently disclosed as a part of an anticipation analysis, but the standard for inherency is quite high and strict.  Inherency may not be established by probabilities or possibilities.  Inherency requires inevitability.  I understand that to be inherent in a reference, the alleged limitation must be inevitable or necessarily present in the art.  Such a showing must be accompanied by some evidence that makes clear that the missing matter alleged to be inherent is necessarily present or the natural result flowing from the operation as taught would result in performance of the questioned function.

23.    I understand that the Asserted Patents predate the America Invents Act and the pre-AIA version of 35 U.S.C. § 102 applies to any anticipation analysis.  I have been instructed that under the pre-AIA version of the law, a claim is anticipated under § 102(a) only if the invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention thereof by the applicant for patent.

24.    I have been instructed that under the pre-AIA law, a claim is anticipated under § 102(b) only if the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

25.    Pre-AIA anticipation law also included a provision allowing for anticipation under § 102(e) where the invention was described in (1) an application for patent, published under section 122(b), by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the

invention by the applicant for patent, except that an international application filed under the treaty defined in section 351(a) shall have the effects for the purposes of this subsection of an application filed in the United States only if the international application designated the United States and was published under Article 21(2) of such treaty in the English language.

26.     References that are ambiguous to the presence or description of a particular claim element do not anticipate a claim.

27.     I also understand that for a reference to qualify as "prior art" for anticipation or obviousness, it must meet certain criteria. For example, I also understand that a prior art reference must be enabling. That is, the description in a prior art reference must be sufficient to enable a person of skill in the art at the time of the invention to make and use the claimed invention without undue experimentation. Several factors govern whether a disclosure would require undue experimentation. These are: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

**D.     Obviousness**

28.     I understand that a patent claim may be invalid if it would have been obvious at the time of the invention. As with anticipation, to evaluate obviousness, I must apply the Court's claim constructions.

29.     In determining whether the subject matter of a patent claim is obvious, I must consider the scope and content of the prior art, differences between the prior art and the claims at issue, the level of ordinary skill in the pertinent art, and any secondary considerations.

30.     I understand that, generally, a party seeking to invalidate a patent as obvious must demonstrate by clear and convincing evidence that a skilled artisan would have had reason to

combine the teaching of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success from doing so.

31.     An obviousness argument may be based on a single reference, but in those cases, there must be an apparent reason for a skilled artisan to modify that reference in a manner to arrive at the claimed invention.

32.     An obviousness argument may be based on multiple references.  But an invention is not obvious simply because all of the claimed limitations were known in the prior art at the time of the invention. There must be some motivation in the prior art leading a person of skill in the art to combine the references and suggesting a reasonable likelihood of success.

33.     I understand that evidence of obviousness, especially when that evidence is proffered in support of an obvious-to-try theory, is insufficient unless it indicates that the possible options skilled artisans would have encountered were finite, small, or easily traversed, and that skilled artisans would have had a reason to select the route that produced the claimed invention.

34.     I understand that inherency and obviousness are different, distinct concepts. Inherency may supply a missing claim limitation in an obviousness analysis, but inherency must be carefully circumscribed in the context of obviousness.

35.     I understand that a reference that teaches away from the claimed invention can preclude a determination that the reference renders a claim obvious.  A reference teaches away when a skilled artisan would be discouraged from following the path set out in the reference or would be led in a direction divergent from the path that was taken by the applicant.

### E.     Written Description and Enablement

36.     I understand that pre-AIA 35 U.S.C. § 112, ¶ 1 requires that "[t]he specification shall contain a written description of the invention, and of the manner and process of making and

using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same . . . ."

37.     I understand that written description is a question of fact, judged from the perspective of one of ordinary skill in the art as of the relevant filing date.

38.     I understand that the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to one skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.  In other words, I understand that the test requires an objective inquiry into the four corners of the specification to determine if the specification describes an invention understandable to a person of ordinary skill to show that the inventor actually invented the invention claimed.

39.     I understand that the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology.  I also understand that the written description need not include information that is already known and available to the experienced public.

40.     I understand that the enablement requirement of § 112 is satisfied when one skilled in the art, after reading the specification, could practice the claimed invention without undue experimentation.  I understand that the following factors may be considered when analyzing whether the amount of experimentation is undue: (1) quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

41.     I also understand that the patent need not teach what is well known in the art to one skilled in the art.

### F. Eligibility

42.     I understand that the question of patent eligibility under 35 U.S.C. 101 is an issue of law, to be decided by the Court. I further understand that this Court has already determined the Asserted Claims to be patent eligible under Section 101 in a prior ruling. *See* Dkt. 110. Nevertheless, I have been asked to consider and provide opinions as to the Asserted Claim's patent eligibility, in response to Mr. Greene's opinions, to the extent permitted by the Court.

43.     I understand that for claims to be patent-eligible, they must be drawn to patent eligible subject matter. I understand that there is a two-step analysis for eligibility. First, the Court must determine whether the claims are directed to an abstract idea. If the claims are not directed to an abstract idea, I understand that that ends the analysis. I have been instructed that claims are patent eligible and not directed to an abstract idea if they are directed to a solution that is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks. I have also been instructed that a claim that provides a specific means or method that improves the relevant technology is not directed to an abstract idea. I have further been informed that where a claimed invention achieves an improved technological result in conventional industry practice, it is not abstract. I understand that software-based innovations can make non-abstract improvements to computer technology and be deemed patent eligible at step 1. Additionally, I have been informed that a claim whose focus is on a specific asserted improvement in computer capabilities or meeting a challenge unique to computer networks is eligible at step 1.

44.     If a claim is directed to an abstract idea, I understand that the second step of the analysis considers whether the elements of the claim contain an inventive concept sufficient to transform the abstract idea into a patent eligible application. I have been instructed that an inventive concept can be found in the non-conventional and non-generic arrangement of known,

conventional pieces. I understand that claims that recite a specific, discrete implementation may be eligible at step 2. Additionally, I understand that claims are patent eligible at step 2 when the claim limitations involve more than performance of well-understood, routine, and conventional activities previously known to the industry.

45. I also understand that at step 2, the elements of each claim must be examined both individually and as an ordered combination in order to determine whether it contains an "inventive concept," beyond what was "well-understood," "routine," and "conventional," that transforms the nature of the claim into a patent eligible application.

46. Additionally, I understand that in an eligibility analysis, the claim must be considered as a whole and in light of the specification.

47. I also understand that any subsidiary facts to the eligibility analysis must be proved by clear and convincing evidence.

## G. Double Patenting

48. I understand that the double patenting doctrine is designed to prevent a patent owner from extending his exclusive rights to an invention through claims in a later-filed patent that are not patentably distinct from claims in the earlier filed patent. I understand that obviousness-type double patenting must be proven by clear and convincing evidence and is an issue of law premised on underlying factual inquiries.

49. I understand that the analysis for obviousness-type double patenting requires two steps: (1) construction of the claims in the earlier patent and the claim in the later patent to identify any differences, and (2) determination of whether the differences in subject matter between the claims render the claims patentably distinct.

50. I also understand that for a double patenting analysis the language of the claims themselves is what matters and not the specification, but that the specification can be used for construing the claims.

## III. CLAIM CONSTRUCTION

### A. The Court's Ordered Constructions

51. I understand the Court's December 17, 2021 Memorandum and Opinion Order sets forth the Court's constructions and the parties' agreed-to constructions of certain terms of the Asserted Claims.[7] I understand these constructions to be the operative constructions that I must (and have) applied in rendering my opinions in this report. They are summarized below[8]:

| Claim Term | Ordered Construction |
|---|---|
| location information | '978 patent: one or more identifiers and their associated locations<br><br>'640/'170 patents: information pertaining to one or more locations of data and/or the identities of one or more location servers |
| location server | a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients |
| client | a network-attached component (which may be software or hardware) that initiates update or lookup of identifier/location mappings from a location server with location request messages |
| based on a hash function used to organize the data location information across the plurality of data location servers…based on the hash function applied to the identifier string | the portion of the data location information included in a corresponding one of the data location servers is based on a hash function that maps identifier strings to one or more of the data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string |
| data pertaining to the entity | data pertaining to a person or thing (real, digital, or abstract) distinct from that data |

| Claim Term | Agreed-to Construction |
|---|---|

---

[7] Dkt. 484.
[8] *Id.*

| location | an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored |
|---|---|
| identifier<br>identifier string<br>identification string | a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server |
| hash table | a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table |
| data location sewer network | data location server network |
| preamble of claim 14 of the '978 patent | preamble after "comprising" limits the claim |
| preamble of claim 17 of the ''978 patent | preamble after "having" limits the claim |

### B. Mr. Greene's Alternative Constructions Are Improper and Unnecessary

52.     Mr. Greene proposes new or different constructions for certain claim terms, none

of which have been adopted by the Court.[9]

---

[9] Dkt. 539 at Appendix. A.

| Claims | Terms | Proposed Constructions |
|---|---|---|
| '640: 17, 18, 24<br>'170: 1, 2, 6, 8, 9, 12, 15<br>'978: 1, 3, 6, 10, 14, 17, 23, 24, 30, 31 | "network" / "system" | [network/system] **arranged in a non-hierar-chical, cluster topology** |
| '640: 17, 18, 24<br>'170: 1, 2, 6, 8, 9, 12, 15<br>'978: 1, 3, 6, 10, 14, 17, 23, 24, 30, 31 | "location server" | a network-attached component that maintains**, for satisfying every request for the location of data on the network,** a set of **at least one of (1)** identifier/location mappings **or (2) information about the location of such mappings** that are modified or returned in response to **all** location request messages from clients |
| '640: 17, 18<br>'170: 1, 2, 5, 6, 8, 9, 12<br>'978: 1, 3, 6, 10, 17, 23, 24, 30, 31 | "providing" / "determin[e/ing]" / "retrieving" location information or servers | providing**, without performing any request it-erations,** … location information / determin[e/ing]**, without performing any request it-erations,** … location servers / retrieving **in two or fewer request iterations** location information |
| '640: 17, 18<br>'170: 6, 15<br>'978: 3, 10, 14 | "return" / "sending" / "transmit[s/ting]" a redirect message | return / sending / transmit[s/ting] a redirect mes-sage **without performing any request iterations** |

53. Mr. Greene contends that these alternate constructions are appropriate because Kove made statements during reexamination proceedings of the Patents-in-Suit which he alleges changed the scope of its claims. I disagree.

### 1. "network" / "system"

54. As support for his opinion that the terms "network" and "system" should be construed to mean "arranged in a non-hierarchical, cluster topography," Mr. Greene includes quotes from Kove's responses in the three reexamination proceedings involving the Patents-in-Suit.[10] These quotes were selected from Kove's office action responses, where Kove explained

---

[10] 8/4/22 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ("8/4/22 '640 patent reexam response"); 8/11/22 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ("8/11/22 '170 patent

why certain prior art did not anticipate or render obvious the challenged claims because the art disclosed something different than what the claims claimed. For many (but not all) of the claims, this difference centered on the fact that the claim language itself made clear that the location servers were structured in a non-hierarchical topology. For example, with respect to claims 17 and 18 of the '640 patent, Kove explained what the claim language itself requires and what it means:

> Claims 17 and 18 require that "***each of the plurality of data location servers*** having computer executable code ***[be] configured to***" carry out specific activity. In particular, each location server must be able to "transmit[] a redirect message to the client if the identification string is not associated with a location string at the data location server, wherein the ***redirect message contains information for use by the client to calculate a location of a different data location server*** in the plurality of data location servers, ***wherein the different data location server contains the location string***."[11]

55.     Kove went on to explain that

> [b]y its plain language, the claim requires that each (i.e., every) location server must be configured to return information that the client uses to determine a second location server that contains the sought-after location string, if the first queried location server does not contain that location string.[12]

This means that

> ***each and every*** **server in the data location server network have the capability of transmitting information to the client that the client then processes to determine the server that contains its requested information**. This configuration **"collapses" the hierarchical composition** of Oracle Names, making it entirely different in practice and principle from what Oracle Admin discloses. Oracle Admin in no way teaches that Oracle Names network servers have this capability.[13]

56.     I agree with Kove that the plain language of claims 17 and 18 of the '640 patent

requires each server in the data location server network to be capable of transmitting information

---

reexam response"); 9/28/22 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ("9/28/22 '978 patent reexam response").
[11] 8/4/22 '640 patent reexam response at 23-24 (emphasis in original).
[12] *Id.*
[13] *Id.* (emphasis in original).

to the client via a redirect message that must contain information that would allow the client to determine the data location server with the location string information.[14]  I also agree with Kove that for each data location server to have this capability, they must be structured in a non-hierarchical cluster configuration, because not every server ordered in a hierarchical topology would have this capability.[15]  As such, Kove's statements did not change the scope of claims 17 or 18 (or, by extension, claim 24, which depends from claim 18) of the '640 patent.  The statements merely explained the claims for what they are.

57.      Kove presented similar explanations for claims 1, 6, and 15 of the '170 patent, all of which have particular claim limitations requiring each location server in the server network to know which location server among them contains the location of the desired data.[16]  Accordingly, Kove's statements did not alter the scope or meaning of the claims, but rather merely explained them.

58.      Mr. Greene also included quotes from Kove's office action response in the '978 reexamination to support his contention that "all claims" should be construed in his alternative fashion.[17]  But Mr. Greene did not address the fact that that '978 patent reexamination did not include claims 17, 23, 24, or 30 – all of which the examiner had found to be patentable.[18] Moreover, Kove never made any statements regarding non-hierarchical topology with respect to claim 6 – a fact Mr. Greene ignores.  For claims 3, 10, and 14, Kove provided the same explanations, pointing out that each includes "redirect message" limitations that require locations servers to know or provide information to ascertain where the sought-after data is.  Accordingly, as in all the

---

[14] 8/4/22 '640 patent reexam response at 23-24.
[15] *Id.*
[16] 8/11/22 '170 patent reexam response at 25.
[17] Greene Invalidity Report at ¶ 109, FNs 134 and 139.
[18] 6/28/222 '978 patent reexam Non-Final Office Action at 1, 35-36.

reexaminations, Kove's statements did not alter the scope or meaning of the claims, but merely explained them.

59.     Mr. Greene also annotated a slide that Kove provided during reexamination of the '978 patent, which I copy below:



The original graphic (without Mr. Greene's annotations) appears to be Patent Owner's Figure C from the 8/28/22 '978 patent reexam response.  It depicts Figures 18 and 19 of the '978 patent, alongside a figure from the ONAG prior art reference.  As Kove explained in its response, the Oracle reference on the left depends on a hierarchical structure, meaning if a queried server does not have the requested information, it must forward the request to the next node and so on until it reaches a root server.[19]  Kove contrasted that with the embodiment shown in patent Figures 18 and

---

[19] 8/28/22 '978 patent reexam response at p. 34.

19, using the patent figures to demonstrate how claims 3, 10, and 14, with their respective limitations requiring each location server to know which location server contains the locations of the desired data, are different than the Oracle art.[20]  This again, is the same explanation of what the claims, by virtue of their plain claim language, require, and as such does not in any way change (let alone narrow, as Mr. Greene argues) the scope of the claims.

60.    Mr. Greene opines that "Kove's statements require the proposed construction to reflect the scope compared to the Oracle art during reexamination."  But as I have explained, and as Kove's own reexamination statements concerning the particular claims demonstrate, the language of the structured combination of the claims themselves *already* reflect their scope compared to the Oracle art.  It is therefore my opinion that there is no need for further construction of any claim term.

61.    I also disagree with Mr. Greene's position that the terms "network" and "system" are the terms that Kove allegedly changed by virtue of its statements during reexamination. Although it is my opinion that no further construction (of any term of any claim) is warranted, it is also my opinion that defining "network" and "system" as things "arranged in a non-hierarchical, cluster topology" is not supported by the claim language or the specification, does not accurately reflect Kove's explanations, and would result in undue confusion.   First, "network" and "system" are not used synonymously in the claims.  The term "system" is used to refer to the entire system of the claim, i.e., it encompasses the "network," which is a component of the system.[21]  There is no support – and Mr. Greene identifies none – for treating these terms synonymously.  Kove also never made any statements regarding the structure of the claimed "system," leaving Mr. Greene

---

[20] 8/28/22 '978 patent reexam response at p. 35.
[21] See, e.g., claim 6 of the '170 patent.

no basis on which to argue for construction of that term. Second, the term "network" is used in varying ways in the claims, not all of which are related to Kove's statements regarding non-hierarchically configured location servers. For example, in claim 17 of the ''640 patent, the preamble claims, "A system for retrieving data location information for data stored in a distributed *network*, the system comprising:." Among the elements of the system is a "data location server *network*." As the claim language shows, these are two different networks – the "data location server network" may be simply one part of the overall "distributed network." Mr. Greene does not address this or provide any explanation for why the term network should be construed in an undifferentiated way.

### 2. "location server"

62. Mr. Greene opines that the Court's construction of "location server" should be modified to include the additional language below (in red italics):

> A network-attached component that maintains*, for satisfying every request for the location of data on the network,* a set of *at least one of (1)* identifier/location mappings *or (2) information about the location of such mappings* that are modified or returned in response to *all* location request messages from clients.

I disagree. Mr. Greene cites to the same quotations in support of this new construction as he did for his construction of "network/system," but for the reasons explained above, none of Kove's statements was intended to result (or actually resulted) in a narrowing of its claims' scopes in any way – they merely explain what the claims' language already says. Moreover, as Mr. Greene himself acknowledges, these additional changes to the Court's construction "don't appear in the patent claims, specifications, or the Court's construction of the claim terms."[22] Importantly, Kove's reexamination statements make clear that it is the inclusion of specific limitations, e.g., a redirect message containing particular information, that result in the overall claimed system being

---

[22] Greene Invalidity Report at ¶ 313.

able to return the desired location information.  The *location servers* themselves, as Mr. Greene himself admits[23], are not so limited, and therefore there is no support for construing them that way.

### 3. "providing / determine / determining / retrieving location information or servers" and "return / sending / transmits / transmitting a redirect message"

63.     Mr. Greene opines, without any meaningful analysis, that "all terms should be construed to require that the claimed location servers must also … (2) resolve every request to the requesting client in two or fewer steps."  I disagree that any further construction is needed.  Mr. Greene again selects quotes from Kove's reexamination proceedings to support his position, but each of the quotes does nothing more than repeat what the claim language already claims.  None alter the scope of the claims.   For example, Mr. Greene quotes from the 8/4/22 '640 reexam response:

> The[] invention, as embodied in the claims of the '640 patent, enables a client to retrieve data by sending a query to any server in the network, not just servers organized by a tree, and having that server be capable of providing information that permits the client to calculate the location of a second server known to contain the requested information. Claims 17 and 18 therefore require every server in the network be able to return information for calculating the location of the server that contains the requested information.

This merely parrots what claims 17 and 18 themselves already say.  Claim 17 contains the limitation:

> in response to receiving a data location request from a client to retrieve a location string associated with an identification string provided in the data location request, transmitting a redirect message to the client if the identification string is not associated with a location string at the data location server, wherein *the redirect message contains information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string*.

And claim 18 contains the limitation:

---

[23] Greene Invalidity Report at ¶ 312.

if the data location server does not contain the location string associated with the identification string, the location server transmits a redirect message to the client, *wherein the redirect message contains redirect information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string*.

Thus, both claims plainly recite the need for each server in the network to be able to return information for calculating the location of the server that contains the requested information – which is all that Kove's statement says. There is no basis, and Mr. Greene offers none, for construing a claim to repeat what the claims already say. I also note that Mr. Greene again opines that "*all* terms should be construed," without differentiation.[24] I disagree. In addition to there being no need for further construction, as I've explained, Mr. Greene also ignores that Kove's statements pertain to particular claims, not "all terms."

64. Mr. Greene opines that the terms "providing / determine / determining / retrieving location information or servers" and "return / sending / transmits / transmitting a redirect message" should be construed to add the limitation "without performing any request iterations" or "in two or fewer request iterations." In addition to being wholly unnecessary for the reasons I've explained, Mr. Greene provides no explanation for his word choice. The phrase "without performing any request iterations" does not appear in Kove's reexamination statements, nor is it clear what that phrase even means. Moreover, Mr. Greene apparently opines that every asserted claim should be similarly limited, even though Kove's statements pertained only to claims requiring "redirect messages" with specific characteristics. For example, claims 17, 23, 24, and 30 of the '978 patent were never discussed in any reexamination Mr. Greene cites because they were not subject to reexamination in those proceedings.

---

[24] Greene Invalidity Report at ¶ 113.

## IV. BACKGROUND

### A. Background of the Patented Technology

I provide a discussion of the patented technology in my July 6, 2023 Corrected Opening Expert Report of Michael Goodrich, which I incorporate here by reference.

### B. Background Of The Alleged Prior Art

65. Mr. Greene relies on several references, including non-patent publications, which he alleges are prior art to the Asserted Claims. Among these are what he calls the "DNS System" and the "Cache Resolver System." I understand that no actual "system" of either kind has been identified or produced in this case. Rather what Mr. Greene relies on are multiple publications that purport to describe the systems. To avoid confusion, wherever possible, I will refer to the individual publications instead of referring to them in the collective, as Mr. Greene often does.

### 1. The Domain Name System ("DNS") (RFC1034 and BIND and DNS)[25]

66. Mr. Greene alleges that the asserted claims are anticipated or obvious based on the Domain Name System ("DNS"). Specifically, Mr. Greene identifies "DNS" as "BIND version 8.1"[26] and alleges that this DNS system is described in the publications "DNS and BIND" ("BIND"), RFC1034, and two papers, Sherman and Karger/Sherman.[27] The BIND publication Mr. Greene relies on is the Third Edition of a "Help for System Administrators" handbook, authored by Paul Albitz and Cricket Liu, bearing a copyright date of September 1998, and which states that it describes BIND version 8.1.2.[28] The RFC1034 reference Mr. Greene relies on is a "Network Working Group Request for Comments: 1034," entitled "DOMAIN NAMES – CONCEPTS AND FACILITIES," dated November 1987. And, as explained in further detail

---

[25] Mr. Greene primarily relies on RFC1034 and Bind to describe DNS.
[26] Greene Invalidity Report at ¶ 220; *see also* Appendix C, Exhibit 1a at 1.
[27] Greene Invalidity Report at ¶ 220.
[28] BIND at xi (AMZ_KOVE_000081149).

below, Sherman and Karger/Sherman concern a "cache resolver" system, which as far as I am aware, does not exist outside the context of these papers (and Mr. Greene does not point to any evidence otherwise, nor does he rely on an source code for any of the alleged systems he identifies as "DNS") and runs a BIND 8.0 implementation of DNS that uses custom software.

67. Mr. Greene has not identified any actual DNS system or implementation of a DNS system other than the series of documentary references above. In particular, Mr. Greene does not rely on any source code for a BIND version 8.1 implementation of DNS. Nor has he presented any evidence that the "DNS system (BIND version 8.1) was known by at least May 1997." Instead, Mr. Greene refers to the references, sometimes collectively, sometimes individually or in irregular combinations, as "DNS," often without differentiating among them. For example, he refers to RFC1034 alone as "DNS,"[29] which is inconsistent with his identification of BIND version 8.1 as DNS, because RFC1034, which is dated May 1987, significantly predates BIND version 8.1.

68. Mr. Greene's reliance on Sherman and Karger/Sherman in "describing" DNS is also confusing and inconsistent, particularly his assertion that "[a]ll of the features and functionally of DNS are inherent to systems using DNS, such as the use of DNS in the Cache Resolver system."[30] First, Mr. Greene does not define what constitutes "DNS" in that statement. Second, the cache resolver system taught in Sherman and Karger/Sherman papers uses a BIND 8.0 implementation, not BIND 8.1 (which Mr. Greene says is the "DNS system" he relies on). As noted above, Mr. Greene has undertaken no effort to determine whether there are any relevant and material differences among the various BIND versions. Sherman and Karger/Sherman also refer

---

[29] Greene Invalidity Report at ¶ 221.
[30] Greene Invalidity Report at ¶ 230.

to DNS servers as a part of their Cache Resolver system to be running custom software called "dnshelper," which Sherman identifies as "one of our programs," not something "inherent" to DNS.[31] Thus, Mr. Greene's vague and unsupported statement that "all features and functionality of DNS [of whatever variety] are inherent to systems using DNS, such as [Sherman and Karger/Sherman]" is obviously inaccurate.

69.    For these reasons, I conclude that Mr. Greene has not provided any evidence for the specific version of DNS he relies on, which he identifies as "BIND version 8.1," but which is not found in RFC1034, BIND, Sherman, or Karger/Sherman.

70.    Mr. Greene states that DNS was not previously considered by the Patent Office.[32] I disagree. For example, the '640 Patent distinguishes DNS from the invention of the '640 Patent at 14:2-17 and at 20:4-17 (highlighting added); see also '978 Patent at 23:61-24:11, '170 Patent at 14:17-32, 20:17-29:

> NDTP is designed for use in the larger context of a distributed data collection. As such, it supports an architecture, in which information about where data associated with particular application entities, can be managed and obtained independently of the data itself. One way to understand this is as a highly dynamic DNS for data. DNS maintains a mapping between names and machines. NDTP and its associated servers maintain a mapping between entity identifiers and data locations. The identifier/location mapping maintained by NDTP servers is much more dynamic (more frequent updates), than the domain name/IP address mapping maintained by DNS. NDTP is designed to support very fast, very diverse, and very large scale mapping manipulations.

71.    Thus, I conclude that the Examiner for the Patents-in-Suit was aware of DNS and allowed the issued claims of the Patents-in-Suit in view of DNS.

---

[31] Sherman at 37 and Karger/Sherman at 10.
[32] Greene Invalidity Report at ¶ 222.

72. At a general level, DNS is a distributed naming system for internet resources in which domain name data is stored on a plurality of "name" servers.[33] The domain name data is stored in a hierarchical tree structure[34], an example of which is shown in the figure below.



RFC1034 at 10.

73. Each node on the tree corresponds to a domain.[35] Name servers store domain name data — called "resource records" — for one or more domains.[36] For redundancy purposes, there are always at least two name servers storing the same resource records.[37] Clients can retrieve resource records by sending a request — called a "query" — to a name server that identifies the

[33] RFC1034 at 6-7.
[34] *Id*.
[35] *Id*. at 7, 11-12; *see also* BIND at 13, 15-16.
[36] RFC1034 at 7, 11-12.
[37] *Id*. at 19.

requested information, and the name server returns the corresponding resource records.[38] Resource records store many types of data, including domain names, host names, and IP addresses.[39]

74. RFC1034 describes the use of DNS to obtain the resource records for mail exchange servers and other hosts.[40] With respect to mail exchanges, RFC1034 gives an example, excerpted below.

```
For example, a mailer tying to send mail to Mockapetris@ISI.EDU might
ask the resolver for mail information about ISI.EDU, resulting in a
query for QNAME=ISI.EDU, QTYPE=MX, QCLASS=IN.  The response's answer
section would be:

    ISI.EDU.        MX      10 VENERA.ISI.EDU.
                    MX      10 VAXA.ISI.EDU.

while the additional section might be:

    VAXA.ISI.EDU.   A       10.2.0.27
                    A       128.9.0.33
    VENERA.ISI.EDU. A       10.1.0.52
                    A       128.9.0.32

Because the server assumes that if the requester wants mail exchange
information, it will probably want the addresses of the mail exchanges
soon afterward.
```

*Id*. at 17. A client that wants to send mail to Mockapetris@ISI.EDU sends a query to a name server requesting the mail exchange information for "ISI.EDU."[41] The domain names for the requested mail exchanges are provided, as well as the IP addresses for the corresponding mail exchange servers.[42] As shown in the example, a domain name of a respective mailbox does not uniquely identify a single mailbox exchange server.[43]

---

[38] *Id*. at 6-7, 17.
[39] *Id*. at 13.
[40] *Id*. at 1.
[41] *Id*.
[42] *Id*.
[43] *Id*.

75.     RFC1034 also provides an example of DNS being used to provide resource records containing IP addresses.  The excerpt below shows a response to a query requesting the host IP addresses for the domain name "SRI-NIC-ARPA."

```
The response from C.ISI.EDU would be:

              +---------------------------------------------------+
    Header    | OPCODE=SQUERY, RESPONSE, AA                       |
              +---------------------------------------------------+
    Question  | QNAME=SRI-NIC.ARPA., QCLASS=IN, QTYPE=A           |
              +---------------------------------------------------+
    Answer    | SRI-NIC.ARPA. 86400 IN A 26.0.0.73                |
              |               86400 IN A 10.0.0.51                |
              +---------------------------------------------------+
    Authority | <empty>                                           |
              +---------------------------------------------------+
    Additional | <empty>                                          |
              +---------------------------------------------------+
```

*Id*. at 40.

76.     The multiple IP addresses in the response indicate that there are multiple hosts for the same domain name.[44] As with the mail exchange example, RFC1034 (and similarly, BIND, Sherman, and Karger/Sherman) provide no indication about what occurs after these IP addresses are returned, or about what data is stored on the hosts located at the IP addresses.

77.     BIND – which stands for Berkeley Internet Name Domain Software – is one implementation of the DNS specifications.[45]  The BIND reference (which is the reference Mr. Greene relies on) is the BIND version 8.1.2 implementation.  Mr. Greene does not identify or rely on any reference that discloses or discusses the BIND 8.1 implementation of DNS.

78.     As compared with the invention of the '170, '640, and '978 patents, conventional implementations of DNS have very limited functionality focused on mapping domain names to

---

[44] *Id*.
[45] BIND at xi.

servers, and therefore, DNS is not capable of handling massive amounts of rapidly changing data.[46] Because various parts of the domain space are managed by different entities that maintain their own name servers, name servers generally do not know which other name server contains the resource records to answer a given query.[47] As a result, multiple queries are often necessary.[48] RFC1034 also does not disclose scaling up or down of name servers to handle fluctuations in the number of requests.

## 2. Cache Resolver System (Sherman and Karger/Sherman)

79.     Mr. Greene alleges that "a cache resolver system" anticipates or renders obvious the asserted claims. Mr. Greene alleges this cache resolver system is described in two publications, which he refers to as "Sherman" and "Karger/Sherman."[49] Mr. Greene does not rely on any source code for the alleged "cache resolver system." The Sherman reference is a bachelors-masters thesis by Alexander Sherman, dated February 1999 and stamped "JUL 15 1999" and "WITHDRAWN FROM MIT LIBRARIES", and titled, "Distributed Web Caching System with Consistent Hashing." Mr. Greene has not established with clear and convincing evidence that this reference is a public printed document or that it was indexed in a way that could be found by a POSITA performing a search for its subject matter.[50] Indeed, the stamp "WITHDRAWN FROM MIT LIBRARIES" suggests that this document was at least at some point in time no longer a part of the MIT Library archives, possibly even as of the priority date of the Patents-in-Suit. Mr. Greene states that the Sherman thesis would be known to Madhu Sudan and Arthur C. Smith,[51] who are

---

[46] *Id*. at 6-7 (name server resource records are viewed as "essentially static").
[47] *Id*. at 6-7.
[48] *Id*. at 18-19 (name servers provide referrals to other name servers that are merely "closer" to the desired information).
[49] Greene Invalidity Report at ¶¶ 229-232.
[50] *Id*.
[51] *Id*.

identified on its cover, but Mr. Greene has not established that either of them are persons of ordinary skill in the art. Further, I understand that it is common practice for theses to be considered confidential until they are deposited in a library and indexed. The Karger/Sherman reference is a paper co-authored by David Karger, Alex Sherman, and seven other individuals, self-dated March 4, 1999, and titled "Web Caching with Consistent Hashing." Mr. Greene has not established with clear and convincing evidence that Karger/Sherman is a public printed document or that it was indexed in a way that could be found by a POSITA performing a search for its subject matter.[52] For example, Karger/Sherman is stamped "Preprint submitted to Elsevier Preprint." I understand that paper submissions are typically considered to be confidential until they are accepted for publication and published, and this document is instead marked as a submitted preprint. Mr. Greene also mentions a publication with the same title in the journal, *Computer Networks*, with a May 1999 publication date, but Mr. Greene has not established that this is the same reference that he relies on.[53]

80. Mr. Greene also alleges that "[a]ll of the features and functionality of DNS are inherent to systems using DNS, such as the use of DNS in the Cache Resolver system."[54] He cites that "the Cache Resolver system uses servers running BIND and the program 'dnshelper.'" I disagree with Mr. Greene's assertion that "all features and functionality of DNS are inherent to systems using DNS." The statement is too broad and vague to be supportable and is contradicted by Mr. Greene's own citation to BIND (which is just one implementation of DNS) and "dnshelper" (which the Sherman paper clearly states is the author's program and not "inherent" to DNS).[55]

---

[52] *Id*.
[53] *Id*.
[54] *Id*. at ¶230.
[55] Sherman at 37.

81.     For example, Karger/Sherman states that "We could set up our own DNS servers, and modify them to support consistent hashing."[56] Karger/Sherman further states that dnshelper "monitors the set of caches, and runs consistent hashing to map all of the 1000 virtual names to the range of only the live cache machines."[57] Mr. Greene does not provide any evidence of whether the modifications made to DNS to support consistent hashing affects DNS, as described in RFC 1034 and BIND. In my opinion, modifying DNS to support consistent hashing would change the implementation of DNS described in RFC 1034 and/or BIND. That is, modifying DNS to support consistent hashing would involve modifying the structure and definitions of virtual names, assigning of virtual names to cache machines, the mapping of virtual names to the IP addresses of cache machines, etc. For example, Sherman states that dnshelper "uses consistent hashing to map all of the virtual names to physical addresses of only the live machines" and that "[i]f any of the mappings change, it writes the new mappings to a 'records' file and signals BIND to update itself by reloading that file."[58] In this regard, features that Mr. Greene alleges are inherent to DNS, as described in RFC 1034 and/or BIND, would not be inherent after such modifications.

82.     With respect to the alleged Cache Resolver System, Sherman and Karger/Sherman describe cache resolver as a web-caching system that allows for resolving URL strings.[59] The system components of cache resolver are illustrated in Sherman's Figure 4.1 (reproduced below).

---

[56] Karger/Sherman at 10.
[57] *Id*.
[58] Sherman at 37; *see also* Karger/Sherman at 10.
[59] Sherman at 9; *see also* Karger/Sherman at 9-11.



Users' Browsers:

Sherman at 35.

83.     As described in Sherman, in cache resolver, a browser may implement a JavaScript function which will receive a request for a resolving a URL string.[60]   The JavaScript function generates a list of virtual names of cache machines based on the URL string.[61]   Sherman states, "Browsers make DNS requests to resolve virtual names of proxy caches in terms of concrete IP addresses.   Then, they contact a proxy cache with a given IP.   Asynchronously from users' requests, DNS units monitor proxy caches as discussed in section 4.3.1.   (This monitoring is indicated with dashed lines.)   DNS units run consistent hashing to map all the virtual names to IP addresses of only the live cache machines."[62]   To this end, the browser will send a request to DNS

---

[60] *Id*. at 36.
[61] *Id*.
[62] *Id*. at 35.

to resolve the virtual names into an IP address of the cache machine.[63]  DNS will return the IP address of the cache machine that corresponds to the virtual machine.[64]

84.    As compared with the '170, '640, and '978 patents, like DNS, in cache resolver various parts of the domain space are managed by different entities that maintain their own name servers, name servers generally do not know which other name server contains the resource records to answer a given query.[65] As a result, multiple queries are often necessary.[66] As such, the cache resolver system described in Sherman and Karger/Sherman is not capable of handling massive amounts of rapidly changing data.  Cache resolver also does not allow for scaling up or down of name servers to handle fluctuations in the number of requests.[67]  Further, a POSITA would understand that the queries to what is illustrated as "DNS" in Figure 4-1 (excerpted above) in Sherman are for domain names of cache servers.

### 3.    Minami

85.    Minami is a data management system disclosed in U.S. Patent 6,212,521, which was filed Mar. 27, 1998.[68]  Minami describes assigning keywords to records and retrieving the records using the keywords.[69]  Minami's system includes a terminal, primary server, secondary server, and system supervisory server.[70]  Minami states, "When the terminal 40 has encountered an event that needs data registration, its data registration request unit 400 issues a data registration request message.  The data to be registered here actually consists of a data object, the body of a

---

[63] *Id*. at 36-37.
[64] *Id*.
[65] *Id*. at 6-7.
[66] *Id*. at 18-19 (name servers provide referrals to other name servers that are merely "closer" to the desired information).
[67] *Id*. at 39-40.
[68] Minami at Abstract.
[69] *Id*.
[70] Minami at Fig. 3.

record, and search keyword information that allows the record to be retrieved from target data storage. In the present context of the ATM-ARP server application, the registration data is a set of IP and ATM addresses, where the IP address serves as a search keyword. When a request for data retrieval has arisen in some process in the terminal 40, a data retrieval request unit 401 issues a data retrieval request message. FIG. 3 depicts internal commands 402 and external commands 403 which respectively represent an internal process and an external process that may raise such requests."[71]

86.     In Minami, each of the primary areas is divided into secondary areas and each primary area includes a primary server and secondary servers.[72] In response to receiving a request to retrieve a record, secondary servers of a given area are searched iteratively. If the record is not found in a given area, the request if forwarded to a different area.[73] The primary or secondary servers do not know which server stores the location of the desired record.[74]

87.     As compared with the '170, '640, and '978 patents, Minami does not teach or suggest location information of data separate from the data itself. Minami also does not disclose data location information or location information (relationship between identifiers and locations or location servers), identifiers (not uniquely associated with entities), or location servers.

### 4.     Neimat

88.     Neimat is U.S. Patent 5,542,087, which was filed Oct. 15, 1993, and is directed to generating a memory address using a record key value.[75] Fig. 2 (reproduced below) illustrates the process for generating the memory address.

---

[71] *Id*. at 9:54-67
[72] *Id*. at 28:12-32.
[73] *Id*. at 8:61-9:12.
[74] *Id*.
[75] Neimat at Abstract.



**FIG. 2**

89.     As shown in Fig. 2, a client generates a key value and a first memory address using the key value.[76] The client can generate the first memory address from the key using a hash function.[77] The client transmits the key value, including the first memory address to a first server.[78] The first server determines whether the first memory address is the correct memory location for the record.[79] If the first memory address is not the correct memory address for a record, the first server generates a second memory address using the key value and transmits the key value

---

[76] *Id.* at 8:48-9:52.

[77] *Id.*

[78] *Id.* at 9:52-55.

[79] *Id.* at 9:56-10:13.

including the second memory address to a second server.[80] The second server determines whether the second memory address is the correct memory location for the record.[81] If the third memory address is not the correct memory address for a record, the second server generates a third memory address using the key value and transmits the key value including the third memory address to a third server.[82] The servers do not know and cannot determine which server stores the location of the record.

90.     As compared with the '170, '640, and '978 patents, Neimat does not teach or suggest location information of data separate from the data itself. Neimat also does not disclose data location information or location information (relationship between identifiers and locations or location servers), identifiers (not uniquely associated with entities), or location servers.

### 5.     Karger '618/'420

91.     Mr. Greene relies on two patents he refers to collectively as "Karger '618/'420." The '618 patent is U.S. Patent No. 6,430,618 to Karger et al., filed March 13, 1998, and issued on August 6, 2002. The '420 patent is U.S. Patent No. 6,553,420 to Karger et al., filed June 2, 1998, and issued on April 22, 2003. The '420 patent is a continuation in part of the '618 patent. I understand that the material included at column 18, line 9 through column 19, line 28 of the '420 patent is new matter not found in the '618 patent. However, Mr. Greene does not appear to rely on any of the new matter contained in the '420 patent and instead cites only to information common to both the '618 and '420 patents. While I do not understand Mr. Greene's purpose for referring to two different patents as though they were one, because he only relies on common citations, I will, for those limited citations, adopt his convention of referring to the '618 patent as "Karger

---

[80] *Id*. at 10:14-59.
[81] *Id*. at 10:60-11:28.
[82] *Id*. at 11:29-64.

'618/'420." I reserve the right to amend and/or supplement my opinions if Mr. Greene is permitted to rely on matter found only in the '420 patent.

92.     Karger '618/'420 describes allocating resources by distributing requests resources.[83] A flowchart of for allocating resources is illustrated in Karger '618 and '420's Fig. 4A (reproduced below).



Karger '618 and '420 Fig. 4A.  With respect to Fig. 4A, Karger '618 states, "In one aspect of the present invention a mathematical mapping space is chosen and a mapping is used to locate requests and resources in the mathematical space.  A specific mathematical relationship is also chosen to match a request with a resource in the mathematical space.  A request is assigned to the resource

[83] Karger '618 at Abstract; *see also* Karger '420 at abstract.

whose location in the mapping space has the specific mathematical relationship with the request's location in the mathematical mapping space. Referring to FIG. 4A, a request is mapped to at least one location in the mathematical mapping space (Step 492). Available resources are each mapped to at least one location in the mathematical mapping space (Step 494). These steps, step 492 and step 494, do not have to occur in the order shown, each can be accomplished independently from the other. In fact, in one embodiment, the resources are mapped once, and the mapping is stored for future use with each request. Having mapped the request and the resources to the mathematical mapping space, the request is allocated to a resource based on a mathematical relationship between the request and the resource in the mathematical mapping space (Step 496)."[84] The requests may be mapped using a hash function.[85]

93.    Mr. Greene primarily relies on Karger '618/'420's disclosures of a hash function to satisfy the limitations related to the hash function in claim 1 of the '170 patent, claim 24 of the '640 patent, and claim 6 of the '978 patent. However, Karger '618/'420does not teach or suggest separating location of data from the data itself. Furthermore, Karger '618/'420 does not describe data location information or location information (relationship between identifiers and locations or location servers), identifiers (not uniquely associated with entities), or location servers, and therefore does not teach or suggest using a hash function to organize locations across location servers and using the same hash function to determine the location server storing the sought-after location.

### 6.    Venkatasubramanian

94.    Venkatasubramanian is a paper authored by Venkatasubramanian et al., titled "Load Management in Distributed Video Servers," and dated May 1997. Other than noting that it

---

[84] Karger '618 at 9:18-38; *see also* Karger '420 at 9:27-47.
[85] Karger '618 at 10:13-19; *see also* Karger '420 at 10:22-26.

is self-dated May 1997, Mr. Greene provides no evidence or analysis that Venkatasubramanian is a printed publication that was published and indexed in a way that POSITA could find it by performing a search for its subject matter as of the priority date of the Patents-in-Suit. [86] The paper describes load management in video servers.[87] Venkatasubramanian describes storing video content in servers to be accessed by subscribers.[88] Venkatasubramanian allows for replicating video objects to allow for additional subscribers to access the video content.[89] The video object can also be de-replicated when additional storage is needed.[90] The video objects can be allocated to various servers for load management issues.[91]

95.    Mr. Greene appears to rely on Venkatasubramanian to allegedly teach the limitations of claim 24 of the '978 patent.

96.    As compared with the '978 patent, Venkatasubramanian does not teach or suggest separating location of data from the data itself. Furthermore, Venkatasubramanian does not describe data location information or location information (relationship between identifiers and locations or location servers), identifiers (not uniquely associated with entities), or location servers, and therefore does not teach or suggest determining whether a location server has reached a predetermined performance limit.

### 7.    OracleNamesAdminGuide (ONAG)

97.    OracleNamesAdminGuide is a manual that provides information about Oracle Names products.[92] Oracle Names involves making network address and database link information

---

[86] Greene at ¶ 226.
[87] Venkatasubramanian at 1.
[88] *Id*.
[89] *Id* at 1-2.
[90] *Id*.
[91] *Id* at 3.
[92] ONAG at 5.

in a distributed database network available to all nodes in the network.[93] Figure 3-11 depicts a client-server connection in Oracle Names:



Figure 3 – 11  Client–Server Connection

98.     *Id*. at Figure 3-11. Oracle Names depends on a *hierarchical* structure where a client can only query to the node immediately "above" or "below" it in the "tree."  If the queried server does not have the requested information, that server forwards the query to the next higher node and so on until it reaches the root server.  The root server, if it has the desired information registered, will forward the request down successive nodes until it arrives at the server last known to have the information.  As the example in Fig. C-4 shows, and as explained on pages 190-192 of ONAG, even a modestly sized environment with a handful of servers may take numerous iterations to return a query.

99.     ONAG's Figure C-4 (reproduced below) depicts the process by which a client sends a request for information to the Names Service network:

---

[93] *Id.*



100.    *Id*. at Figure C-4. ONAG describes the process of requesting information in a Names Service network as: "1.  The client sends request to preferred Names Server in its local region (DR1).  2.  The preferred Names Server in DR1 issues request for the Names Servers authoritative for the destination server (in region DR2.1).  3.  The root Names Server does not have the answer (because root only knows about its direct child regions), but forwards the request to a Names Server in region DR2.  4.  The receiving server in DR2 forwards the request to a Names Server in region DR2.1.  5.  The name is retrieved from its authoritative Names Server in DR2.1. 6.  The names Server in region DR2 caches the answer and returns it to the root.  7.  The root caches the answer and returns it to the preferred Names Server in region DR1.  8.  The preferred Names Server caches the answer and returns it to the client.  9.  The client establishes a connection to the destination server."[94]

101.    ONAG teaches that if a queried server does not have the requested information, that server forwards the request to the next server up the hierarchy until one is able resolve the request; if none can, the process errors out.[95] Oracle Names requires traversals up and down the hierarchical

---

[94] *Id*. at 191.
[95] *Id.* at 190-192.

tree in order to resolve a request and return a response.[96]  ONAG indicates its compatibility with

DNS-based systems by disclosing:

> Many companies already have global naming standards for their PC LANs, large hosts, or mail systems.  If such policies exist, you can use them as the basis for the Oracle Names naming model.  Using the same structure leverages the investment in the education users already have with global names.
>
> For example, many companies with TCP/IP networks use the Domain Name Service (DNS) model for communication on the worldwide Internet.  In this model, all naming models are hierarchical from a set of base domains such as:
>
> • COM - commercial organizations
>
> • EDU - educational institutions
>
> • MIL - military
>
> • ORG – organizations
>
> Individual companies are then assigned domains within which to build their naming model (for example, ACME.COM).  To adapt any example in this book to the DNS Internet model, add a single high-level domain, such as COM (or other stem).  For organizations which are on the Internet, and therefore already have one or more DNS domains, the sensible choice is to align their Oracle naming domains with their DNS domains.

102.    *Id.* at 56-57. As described above, Oracle Names is dependent on its network paths.

103.    As will be described in detail below, ONAG differs from asserted claims for multiple reasons.

104.    First, ONAG does not teach or suggest an "identifier," "location," or "location information," as required by all of the asserted claims. Specifically, ONAG does not teach suggest an "identifier" that uniquely identifies an individual entity and that is associated with a location of data pertaining to the entity, where the entity is distinct from the data.

105.    Second, Oracle Names Servers do not know what is stored in other Names Servers. As such, ONAG does not teach or suggest transmitting a redirect message to a client that contains

---

[96] *Id.*

either the location server(s) that store the sought-after location or information for finding/calculating the location server storing the desired location.

106. Third, ONAG does not teach distributing the location information across location servers and determining the location server containing the sought after location using a hash function.

### 8. OracleUnleashed

107. OracleUnleashed is a reference guide for Oracle8.[97] Oracle8 is an upgrade to Oracle7's database management system.[98] OracleUnleashed describes the various features of Oracle8's database management system, including managing data and database tables in the traditional relational database space.[99] Furthermore, OracleUnleashed describes partitioning of database tables.[100]

108. OracleUnleashed does not describe data location information or location information (relationship between identifiers and locations or location servers), identifiers (not uniquely associated with entities), or location servers, and therefore does not teach or suggest using a hash function to organize locations across location servers and using the same hash function to determine the location server storing the sought-after location. Furthermore, OracleUnleashed is silent about transmitting redirect messages. Moreover, OracleUnleashed does not teach or suggest transferring location information across location servers when or if a performance criterion of a given server reaches a predetermined performance limit.

---

[97] OracleUnleashed at 36
[98] *Id.*
[99] *Id.* at 36-38.
[100] *Id.* at 394, 638.

### 9. Steen

109.    Steen is a paper titled "Locating Objects in Wide-Area Systems," authored by M. van Steen et al., dated January 1998.   The paper describes locating mobile objects (e.g., a telephone) in a network.[101] Steen describes using a names service system to bind a name to a mobile object's address.[102]   The names and addresses are stored in hierarchical system, as shown in Figure 2 (reproduced below).



■ **Figure 2.** *The logical orga...*

110.    *Id*. at Fig. 2.   With respect to Figure 2, Steen states: "In our model for tracking objects, we assume hierarchical decomposition of a (worldwide) network into regions. This decomposition is relevant only to the location service.   With each region we associate a directory node capable of storing addresses that lie within that region.   This leads to a logical tree-based organization, as shown in Fig. 2.   Addresses are assumed to be location-dependent: the region in which an address lies is encoded in the address itself."[103]

---

[101] Steen at Abstract.
[102] *Id*. at 104.
[103] *Id*. at 105

111.    In Steen, each subnode only knows how the directory node with which it communicates. For example, Steen states "Because communication between directory nodes in the original search tree now takes place between their respective subnodes, each subnode should be aware of how the directory node with which it communicates is actually partitioned. This information is contained in a separate tree management service. This service also maintains the mapping of subnodes to physical nodes. Partitioning and mapping information is assumed to be relatively stable so that it can be easily cached by subnodes. This assumption is necessary to avoid having to query the management service each time a subnode needs to communicate with its parent or children, which would turn the management service into a potential communication bottleneck."[104]

112.    Unlike the '170, '640, and '978 patents, Steen does not teach or suggest an identifier that uniquely identifies an entity and that is associated with a location of data pertaining to the entity, where the entity is distinct from the data. Furthermore, Steen's servers do not know do not know what is stored in other servers.[105] As such, Steen does not teach or suggest transmitting a redirect message to a client that contains either the location server(s) that store the sought-after location or information for finding/calculating the location server storing the desired location. Moreover, Steen does not organize location information across location servers using a hash function and/or use the hash function to determine which server stores the sought-after location. Instead, servers in Steen are organized in a hierarchical structure that is essential to the functionality of the Steen system, and Steen's teaching regarding partitioning of tree nodes into subnodes does not change this essential feature. For example, Steen discloses, "In our model for

---

[104] *Id.* at 107-108.
[105] *See e.g., id.*

tracking objects, we assume hierarchical decomposition of a (worldwide) network into regions."[106] Further, with respect to its partitioning into subnodes approach, Steen likewise states, "Clearly, to construct a worldwide scalable location service it is necessary to adopt hierarchical solutions. For example, non-hierarchical solutions such as the read/write sets proposed in will not do, since it is much harder to exploit locality."[107]

### 10. Wolff

113.    Wolff is U.S. Patent No. 6,185,601 to Wolff, filed April 15, 1998 and issued February 6, 2001. Wolff describes optimizing network performance using client load rebalancing. Specifically, Wolff states: "Client load rebalancing refers to the ability of a client, enabled with processes in accordance with the current invention, to re-map a path through a plurality of nodes to a resource. The re-mapping may take place in response to a redirection command emanating from an overloaded node, e.g. server. The embodiments disclosed allow more efficient, robust communication between a plurality of clients and a plurality of resources, via a plurality of nodes. Resources can include, but are not limited to, computers, memory devices, imaging devices, printers, and data sets. A data set can include a database or a file system."[108] Furthermore, Wolff states: "In operation at time T=0, normal client 100A is shown accessing memory resource 118 via path 70 through overloaded server 104. At the same time, aware client 102A is shown accessing memory resource 18, via path 74, through overloaded server 104A. At time T=1, process 102P1, implemented on aware client 102A, detects the overload condition of server 104A, and accesses memory resource 118 via an alternate path 76 through server 106A. Thus, in this subsequent state,

---

[106] *Id.* at 105.
[107] *Id.* at 107 (citations omitted).
[108] Wolff at 2:41-51.

the load on server."[109] As such, in the event of a network bottleneck, Wolff reroutes a client requesting to connect to a memory resource via an alternate path.[110]

114.    In contrast to the '170, '640, and '978 patents, Wolff's client does not transmit a query to retrieve a location to a server or node.  Rather, Wolff's client transmits a request to connect to a given resource (e.g., memory resource).[111]  To this end, Wolff's server or note server does not determine or know which server (i.e., location server) stores the desired location information.  Rather, Wolff's server or node redirects the client to a different server or node that is not as burdened.[112]

### 11.    Skagerwall

115.    Skagerwall is U.S. Patent 6,473,781, which was filed October 27, 1998, and which describes a system and method for linking objects to information services.[113]  Skagerwall illustrates the system for linking objects to information services in Fig. 1 (reproduced below).

---

[109] *Id*. at 5:25-38.
[110] *Id*.
[111] *Id*. at 2:41-51.
[112] *Id*. at 5:25-38.
[113] Skagerwall at Abstract.

**FIG.1**



116. As shown in Fig. 1, a plurality of objects (D) are marked with tags T.[114] The tags can be active or passive tags that are configured to be read by a reader (R).[115] The directory servers (DS) may store object data associated with a given object.[116] The object data may include the address of an application server storing the application data associated with the object.[117]

117. The object is a real-world physical object. For example, Skagerwall states "The system is arranged to link the plurality of objects, which can, for example, be any products or items of the physical world to various kinds of information related to the objects."[118] Furthermore, a given tag may be associated with a group of objects. Skagerwall states "With the system according to the invention, the user is, e.g., able to access default information related to an object or a group of objects, for example, as provided by the manufacturer of the particular objects or products."[119] As such, a tag can identify more than one object.

---

[114] *Id.* at 6:40-44.
[115] *Id.* at 7:21-25.
[116] *Id.* 3:45-67.
[117] *Id.*
[118] *Id.* at 6:45-48.
[119] *Id.* at 6:59-62.

118.    FIG. 2*a* (reproduced below) shows a flow chart for storing, retrieving and relocating object data associated with an object tag.



119.    With respect to Fig. 2, Skagerwall states: "If in step S26 it has been determined that object data related to the object tag is not located at the identified primary directory server, in a step S28, the lookup request is forwarded to other directory servers. In case the number of directory servers has been increased recently, the lookup request may be forwarded to a directory server which is determined using the hash function based on a previous number of available directory servers."[120] Therefore, the primary directory server is not configured to determine with any certainty which directory server stores the desired location information.

---

[120] *Id*. at 12:63-66.

120.     Furthermore, Skagerwall explains that the access server identifies a target directory server that may store the desired object data.[121] The request for the object data is forwarded to the target directory server.[122] The target directory server determines whether it contains the desired location information.[123] If not, the request is returned to the access server.[124] Therefore, the access server may not be able to determine which directory stores the sought-after location information.[125]

121.     Skagerwall differs from the '170, '640, and '978 patents for multiple reasons.

122.     First, Skagerwall does not teach or suggest an identifier that uniquely identifies a single entity. Rather, Skagerwall describes a tag that can identify a group of objects or a certain type of object.[126]

123.     Second, Skagerwall is completely silent about transmitting a redirect message. Furthermore, Skagerwall's servers cannot determine which server stores the sought-after location, with certainty and/or specificity. In this regard, Skagerwall's servers cannot transmit a redirect message to a client that contains either the location server(s) that store the sought-after location or information for finding/calculating the location server storing the desired location.

124.     Third, Skagerwall does not teach or suggest transferring a portion of location information from a first server to a second server when or if the first server reaches a reaches a predetermined performance limit.

**12.     Yocum**

---

[121] *Id*. at 13:45-65.
[122] *Id.*
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] *Id.* at 6:45-48, 59-62.

125.     Yocum is U.S. Patent 6,230,183, which was filed March 11, 1998, and which describes a system for controlling the number of servers in a multi-cluster environment.[127] Yocum describes adding new servers to a network based on the length of a queue reaches a threshold.[128]

126.     Mr. Greene relies on Yocum to satisfy the limitations of claims 17, 23, 24, and 30 of the '978 patent. However, Yocum does not teach or suggest separating location of data from the data itself. Furthermore, Yocum does not describe data location information or location information (relationship between identifiers and locations or location servers), identifiers (not uniquely associated with entities), or location servers. Moreover, Yocum does not teach or suggest transferring a portion of location information from a first server to a second server when or if the first server reaches a reaches a predetermined performance limit.

### 13.     Boukobza

127.     Boukobza is U.S. Patent 6,122,664, which was filed June 27, 1997, and which describes a process for monitoring object types of nodes from a management node in data processing systems using distributed configured agents.[129]  The object type may be a database or server.[130] Boukobza provides examples of monitoring objects, including Oracle instances, for parameters including "ORA_FRAGMENTS_TS" which verifies "the condition which corresponds to the case in which the largest of the extents ('MAX_EXTENTS') of the tables of the table space ('Tablespace') is smaller than the largest hole of the table space…"[131] Boukobza describes exporting and importing tables within a tablespace.[132] Specifically, Boukobza states "the parameter ORA FRAGMENT TS", in which the measurement consists of Verifying the condition

---

[127] Yocum at Abstract.
[128] *Id*. at 1:13-23.
[129] Boukobza at Abstract.
[130] *Id*. at 12:12-17.
[131] *Id*. at 15:1-26.
[132] *Id*. at 15:18-36.

which corresponds to the case in which the largest of the extents ("MAX EXTENTS") of the tables of the table space ("TableSpace") is Smaller than the largest hole of the table space, and if this condition is true, of sending an action proposition window in which it is indicated that the table space ("TableSpace") must be reorganized according to the following propositions: either a file is automatically created to enlarge the table Space ("TableSpace"), or it requests when a Standard "export operation tables/import' command is to be executed, or the administrator is requested to program the start of his reorganization utility."[133]

128.    Mr. Greene relies on Boukobza to satisfy the limitations of claims 17, 23, 24, and 30 of the '978 patent. However, Boukobza does not teach or suggest separating location of data from the data itself. Furthermore, Boukobza does not describe data location information or location information (relationship between identifiers and locations or location servers), identifiers (not uniquely associated with entities), or location servers. Moreover, Boukobza does not teach or suggest transferring a portion of location information from a first server to a second server when or if the first server reaches a reaches a predetermined performance limit.

## V.    THE ASSERTED CLAIMS ARE PATENTABLE UNDER 35 U.S.C. § 101

129.    I understand that the Court has already resolved the issue of patent eligibility under § 101 by determining that the asserted claims are not directed to an abstract idea under *Alice* step one.[134]  I also understand that because the Court resolved the issue under *Alice* step one, that it did not need to proceed to *Alice* step two.  I disagree with Mr. Greene that any of the events that occurred after the Court's determination (*e.g.*, statements in reexamination, testimony by inventors, and claim construction) should affect the Court's analysis and conclusion on patent

---

[133] *Id*. at 15:18-32.
[134] *See*, Dkt. 110.