# Exhibit K59

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KOVE IO, INC., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Hon. Matthew F. Kennelly |
| v. | Jury Trial Demanded |
| AMAZON WEB SERVICES, INC., | |
| Defendant. | |

**REBUTTAL EXPERT REPORT OF ANANTH GRAMA REGARDING
U.S. PATENT NOS. 7,103,640, 7,233,978, AND 7,814,170**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

# TABLE OF CONTENTS

I.   INTRODUCTION AND BACKGROUND ..................................................................1

    A.   Qualifications ............................................................................................ 3

    B.   Other Matters ............................................................................................ 8

    C.   Compensation ............................................................................................ 8

    D.   Materials Reviewed .................................................................................. 8

II.  PERSON OF ORDINARY SKILL IN THE ART .............................................9

III. STATE OF THE ART .............................................................................................12

    A.   References Considered ........................................................................... 12

    B.   Technology Background ........................................................................ 15
        1.   Distributed Database Management ......................................................15
        2.   The Oracle Database Management System .........................................17
        3.   Cloud Computing ...............................................................................23
        4.   Load Balancing ..................................................................................24
        5.   Data Organization ..............................................................................26
            a.   Range Partitioning .......................................................................26
            b.   Round-Robin ...............................................................................28
            c.   Hashing .......................................................................................29
        6.   Caching ..............................................................................................30
        7.   Re-Routing Requests ..........................................................................32
            a.   Forwarding ..................................................................................33
            b.   Redirection ..................................................................................33
        8.   Domain Name Services .......................................................................35

    C.   Known Technologies in the State of the Art ....................................... 36

IV.  KOVE AND THE ASSERTED PATENTS .........................................................39

    A.   Kove ......................................................................................................... 39

    B.   General Description of the Asserted Patents ....................................... 41

    C.   Priority Date .......................................................................................... 45

    D.   Summary of the Asserted Claims ........................................................ 47

V.   AMAZON AND THE ACCUSED PRODUCTS .............................................53

    A.   Simple Storage Service ("S3") ............................................................. 56

    B.   DynamoDB ("DDB") ............................................................................ 63

VI.  EXAMINATION HISTORY OF THE ASSERTED PATENTS .................69

    A.   History of the '640 Patent ..................................................................... 70

    B.   History of the '978 Patent ..................................................................... 73

    C.   History of the '170 Patent ..................................................................... 78

VII. SOURCE CODE REVIEW ...................................................................................81

VIII.TESTING OF THE ACCUSED AMAZON PRODUCTS .............................84

IX.  BACKGROUND ON PATENT LAW ..................................................................................99

X.  CLAIM CONSTRUCTION .......................................................................................101
   A.  The Court's Constructions............................................................................. 101
   B.  Additional Construction Is Required Due to Kove's Limiting Statements In The *Ex Parte* Reexaminations. .................................................................................................. 103

XI.  AMAZON DOESN'T INFRINGE THE ASSERTED CLAIMS UNDER THE CURRENT CLAIM CONSTRUCTIONS. ..................................................................................................110
   A.  DDB Doesn't Infringe the Asserted Claims. ................................................ 111
      1.  DDB Does Not Use the Required "Identifier-Location" Associations...................... 111
      2.  DDB Lacks the Required "Location Server." ................................................ 114
      3.  DDB Doesn't Use the Required Hashing Methods. ........................................... 117
      4.  DDB Doesn't Use the Required Redirect Messages. ........................................ 119
      5.  DDB Doesn't Infringe the Transfer Claims. .............................................. 123
   B.  S3 Doesn't Infringe the S3 Asserted Claims. .............................................. 126
      1.  S3 Does Not Use the Claimed "Identifier-Location" Associations.......................... 127
      2.  S3 Lacks the Claimed "Location Server.".................................................. 131
      3.  S3 Doesn't Use the Required Hashing Methods. ........................................... 138
      4.  S3 Doesn't Use the Required Redirect Messages. ......................................... 141
      5.  S3 Doesn't Infringe the Transfer Claims. ............................................... 144

XII.  AMAZON DOESN'T INFRINGE THE ASSERTED PATENTS UNDER THE ADDITIONAL PROPOSED CLAIM CONSTRUCTIONS ..............................................................................152
   A.  DDB Doesn't Infringe the Asserted Claims. ................................................ 153
      1.  ................................................................................153
      2.  ██████████████████████████████████████████████████████ .157
      3.  █████████████████████████████████████████████████████████████ ....158
   B.  S3 Doesn't Infringe the S3 Asserted Claims. .............................................. 161
      1.  ................................................................................161
      2.  ██████████████████████████████████████████████████ ....168
      3.  ████████████████████████████████████ .......170

XIII. AMAZON DOESN'T INFRINGE THE ASSERTED PATENTS UNDER THE DOCTRINE OF EQUIVALENTS ...................................................................................176
   A.  S3 Doesn't Infringe the Asserted Patents Under the Doctrine of Equivalents. ................ 176
   B.  DDB Doesn't Infringe the Asserted Patents Under the Doctrine of Equivalents. ............... 180

XIV. ANY ALLEGED BENEFITS ASSOCIATED WITH THE ASSERTED PATENTS ARE LIMITED .......184
   A.  The Scope of The Asserted Patents Is Limited. ........................................... 187
   B.  The Scope Of The Redirect Claims Is Narrow And The Benefits Are Limited. ................. 190
   C.  The Scope Of The Hashing Claims Is Narrow And The Benefits Are Limited. ................. 192
   D.  The Scope of The Transfer Claims Is Narrow And The Benefits Are Limited. ................. 194
   E.  The Benefits of The Asserted Patents to S3 Are Minimal. .................................. 195
      1.  Dr. Goodrich's Determination ████████████████████████████ .200
      2.  Dr. Goodrich's Estimates ███████████████████████ .204
      3.  Dr. Goodrich's Cost ███████████████████ .208

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

4. Dr. Goodrich's ........................................ 209
5. Dr. Goodrich's ........................................ 211

F. Dr. Goodrich's ........................................ 214
1. Dr. Goodrich's ........................................ 216
2. Dr. Goodrich ........................................ 218

XV. AMAZON'S PRODUCED PATENT PURCHASE AGREEMENTS AND LICENSES INVOLVE SIMILAR TECHNOLOGY THAT IS COMPARABLE TO THE ASSERTED PATENTS ........................................ 222

A. ........................................ 223
B. ........................................ 225
C. ........................................ 227
D. ........................................ 229
E. ........................................ 230
F. ........................................ 231
G. ........................................ 233
H. ........................................ 235
I. ........................................ 236
J. ........................................ 239

XVI. NON-INFRINGING ALTERNATIVES EXISTED FOR THE ASSERTED CLAIMS OF THE ASSERTED PATENTS. ........................................ 240

A. There Were Multiple Non-Infringing Alternatives Available For S3. ........................................ 242
B. There Were Multiple Non-Infringing Alternatives Available For DDB. ........................................ 244

## I. INTRODUCTION AND BACKGROUND

1. I have been retained in the above-captioned matter by Amazon Web Services, Inc. ("Amazon" or "Defendant") to investigate and opine on certain issues relating to U.S. Patent Nos. 7,814,170[1] ("the '170 patent"), 7,103,640[2] ("the '640 patent"), and 7,233,978[3] ("the '978 patent") (collectively, the "Asserted Patents") that Kove IO, Inc. ("Kove" or "Plaintiff") has asserted against Amazon's Simple Storage Service ("S3") and DynamoDB ("DDB") (together, the "Accused Products").

2. Per Kove's March 2, 2023 Fourth Amended Final Infringement Contentions, Kove has asserted claims 1, 2, 6, 8, 12, and 15 of the '170 patent, claims 17, 18, and 24 of the '640 patent, and claims 3, 6, 10, 14, 17, 23, 24, and 30 of the '978 patent (the "Asserted Claims") against at least one of the Accused Products. For DDB, Kove has asserted all of these claims, while for S3, Kove only asserts claims 1 and 2 of the '170 patent and claims 6, 17, 23, 24, and 30 of the '978 patent (the "S3 Asserted Claims").[4] Dr. Goodrich offers the conclusion that S3 directly infringes claims 17, 18, and 24 of the '640 patent, but this appears to be an error, as he only provides analysis of S3's alleged infringement of the S3 Asserted Claims, consistent with Kove's infringement contentions.[5] Accordingly, I have limited my analysis to the asserted claims in this case that Dr. Goodrich actually analyzed. To the extent Dr. Goodrich supplements his opinions, I reserve the right to provide corresponding supplemental analysis.

---

[1] KOV_00197981.

[2] KOV_00038863.

[3] KOV_00059914.

[4] Ex. A and D to Kove's March 2, 2023 Fourth Amended Final Infringement Contentions.

[5] Goodrich Report, p.1 and Ex. D.

3. As detailed in this report, I have come to the following opinions:

   a. S3 doesn't infringe directly or under the doctrine of equivalents any of the S3 Asserted Claims using the current claim constructions;

   b. S3 doesn't infringe directly or under the doctrine of equivalents any of the S3 Asserted Claims using Amazon's additional proposed claim constructions;

   c. DDB doesn't infringe directly or under the doctrine of equivalents any of the Asserted Claims using the current claim constructions;

   d. DDB doesn't infringe directly or under the doctrine of equivalents any of the Asserted Claims using Amazon's additional proposed claim constructions;

   e. Amazon's additional proposed claim constructions are correct and warranted;

   f. The Asserted Claims are narrow and have limited benefits;

   g. Licenses and purchase agreements produced by Amazon include technology similar to the technology of the Asserted Patents; and

   h. There were multiple available and acceptable non-infringing alternatives to the Asserted Claims.

4. The above opinions reflect my own personal knowledge and experience, independent analysis, personal review of relevant materials, and independent judgment. My opinions and explanations are consistent with the general knowledge and understanding of the field. As a result, portions of this report may be substantially similar to opinions and statements in reports or declarations authored by other experts relating to the present technology or the Asserted Patents.

5. My report and opinions are based on the presently known facts and history of the Asserted Patents, Asserted Claims, and Accused Products. I reserve the right to supplement or

update my report and opinions based on any additional relevant information, including information regarding the Asserted Patents, the Asserted Claims, and their prosecution histories. This includes, without limitation, any additional reports or testimony from Kove's experts, and any additional information about the prosecution history for any of the Asserted Patents, e.g., any additional information about the previous post-grant proceedings or additional action in any of the pending or future post-grant proceedings regarding the Asserted Claims or the Asserted Patents.

### A. Qualifications

6.     I summarize some of my relevant educational background, work experience, and other relevant qualifications below. A more detailed recitation of my professional qualifications and background is reflected in my Curriculum Vitae ("CV"), attached as Appendix A.

7.     I earned my B.S. (1989) degree in Computer Science from the Indian Institute of Technology. I then earned my M.S. (1990) degree in Computer Engineering from Wayne State University. I then continued my formal education, earning a Ph.D. in Computer Science from the University of Minnesota at Minneapolis in 1996.

8.     During my time working toward my PhD, I worked as a Visiting Research Scientist for Hewlett Packard Labs, before beginning my teaching career as an Assistant Professor at Purdue University in 1996. Over the past three decades at Purdue, I've been promoted and granted additional roles numerous times before achieving my current positions of Samuel D. Conte Professor of Computer Science and Associate Director of the Center for Science Information.

9.     In the decades I have spent teaching, I have taught many classes relevant to the subject matter of this case. For example, I have taught the following courses:

Distributed Systems
Parallel Computing
Foundations of Computer Science

> Data Structures
> Compilers: Principles and Practice
> Analysis of Biochemical Networks
> Introduction to Computational Science
> Numerical Analysis
> Data Mining
> Introduction to Scientific Computing

In these courses, I cover many topics relevant to this case, including how to design a distributed database, analysis of various components of a distributed database, and how to use metrics to analyze a database and its functions.

10.     Over the course of the last three decades of scholarship, I have authored numerous publications relevant to the subject matter of this case. These include eleven books that I have written all or part of. They are:

1.      Sudhir Kylasa, Chih-Hao Fang, Fred Roosta, Ananth Grama, Parallel Optimization Techniques for Machine Learning, in Parallel Algorithms in Computational Science and Engineering, (Ananth Grama and Ahmed Sameh, eds.), Springer Nature, pp. 381-417, 2020;

2.      Ananth Grama, Vipin Kumar, Load Balancing for Parallel Optimization Techniques, Encyclopedia of Optimization, pp 1905-1911, 2009;

3.      Ananth Grama, Anshul Gupta, George Karypis, and Vipin Kumar, Introduction to Parallel Computing, Addison Wesley, 2003 (ISBN: 0-201-64865-2) http://www.aw.com/catalog/academic/product/1,4096,0201648652,00.html.;

4.      Anastasios Antoulas, Dan Sorensen, Kyle Gallivan, Paul Van Dooren, Ananth Grama, Christoph Hoffmann, and Ahmed Sameh, Model Reduction and Real-time Control of Dynamic Data Driven Systems, Dynamic Data Driven Application Systems, Kluwer Academic Publishers, Amsterdam, F. Darema, Ed., 2005;

5.      Ananth Grama and Naren Ramakrishnan, Data Mining Applications in Bioinformatics, In Data Mining for Scientific and Engineering Applications, Kluwer Academic Press, 21 pp, 2001;

6.      Ananth Grama and Vipin Kumar, Load Balancing of Parallel Search Techniques, In Encyclopedia of Optimization, Kluwer Academic Press, pp 203-209, 2000;

7. Ananth Grama, Vipin Kumar, George Karypis, and Anshul Gupta, Scalability Analysis for Petaflop Scale Parallel Algorithms, In Ultrascale Computing, 2000;

8. Ananth Grama, Vipin Kumar, and Ahmed Sameh, Parallel Hierarchical Solvers and Preconditioners for Boundary Element Methods, In Thomas Campbell, Roy Nicolaides, and Manuel Salas, editors, Computational Electromagnetics and Its Applications, volume 5, pages 212-229, Kluwer Academic Publishers, 1997. ICASE/LaRC Interdisciplinary Series in Science and Engineering;

9. Vipin Kumar, Ananth Grama, Anshul Gupta, and George Karypis, Introduction to Parallel Computing: Design and Analysis of Algorithms. Benjamin Cummings/ Addison Wesley (ISBN 0-8053-3170-0), 600 pp, Redwood City, 1994; and

10. Ananth Grama, Vipin Kumar, and Panos Pardalos, Parallel Processing of Discrete Optimization Problems, In Encyclopedia of Microcomputers, pages 129-149, Marcel Dekker Publishers, NY, 1992.

11. My publications further include numerous relevant scholarly articles. The following articles provide ten specific examples, with others listed in my CV:

1. Vikram Ravindra, Huda Nassar, David Gleich, and Ananth Grama, Aligning Spatially Constrained Graphs, IEEE Transactions on Knowledge and Data Engineering, Sept. 2022;

2. T Cowman, M Coskun, A Grama, M Koyuturk, Integrated querying and version control of context-specific biological networks, Database, 2020;

3. Sudhir Kylasa, Giorgos Kollias, and Ananth Grama, Social ties and checkin sites: Connections and latent structures in Location Based Social Networks, Social Network Analysis and Mining, 6(1): 95:1-95:14, 2016;

4. Karthik Kambatla, Giorgos Kollias, Vipin Kumar, and Ananth Grama, Trends in Big-Data Analytics, Journal of Parallel and Distributed Computing, 74(7), 2561 - 2573, 2014;

5. Alex Verstak, Naren Ramakrishnan, Layne Watson, Jian He, Clifford Shaffer, and Ananth Grama, Using Hierarchical Data Mining to Characterize Performance of Wireless System Configurations, Advances in Engineering Software, 65, pp 66-77, Nov 2013;

6. Ronaldo A. Ferreira, Mehmet Koyuturk, Suresh Jagannathan, Ananth Grama, Semantic indexing in structured peer-to-peer networks, Journal of Parallel Distributed Computing, 68(1): 64-77 (2008);

7. Ronaldo Ferreira, Murali Krishna Ramanathan, Suresh Jagannathan, and Ananth Grama, Randomized Protocols for Duplicate Elimination in Peer-to-Peer Storage Systems, IEEE Trans. Parallel and Distributed Systems, 18(5), pp 686-696, May 2007;

8. Ronaldo Ferreira, Suresh Jagannathan, and Ananth Grama. Locality in Structured Peer-to-Peer Networks, Journal of Parallel and Distributed Computing, 66(2), pp 257-273, February 2006;

9. Ioannis Ioannidis and Ananth Grama, Level Compressed DAGs for Lookup Tables, Computer Networks, 49(2), pp 147-160, 2005; and

10. Vipin Kumar, Ananth Grama, and V. Nageshwara Rao, Scalable Load Balancing Techniques for Parallel Computers, Journal of Parallel and Distributed Computing, 22(1):60-79, 1994.

12. Over my decades contributing to this field, I have presented on topics relevant to the subject matter of the Asserted Patents and the Accused Products. For example, my work has been highlighted at the following ten conferences:

1. Changlong Wu, Mohsen Heidari, Ananth Grama, Wojciech Szpankowski, Precise Regret Bounds for Log-loss via a Truncated Bayesian Algorithm, NeurIPS 2022

2. Xuejiao Kang, David F. Gleich, Ahmed Sameh, and Ananth Grama, Distributed Fault Tolerant Linear System Solvers based on Erasure Coding, International Conference on Distributed Computing Systems (ICDCS), 2478-2485, 2017;

3. Naresh Rapolu, Srimat Chakradhar, and Ananth Grama, M-Lock: Accelerating Distributed Transactions on Key-Value Stores Through Dynamic Lock Localization, IEEE CLOUD (best student paper), pp 179-187, 2013;

4. Karthik Kambatla, Naresh Rapolu, Jalaja Padma, Patrick Eugster, Ananth Grama, Revisiting I/O middleware for the Cloud, 8th USENIX Conference on File and Storage Technologies (FAST), Work in Progress Report, 2010;

5. Asad Awan, Suresh Jagannathan, Ananth Grama, Scalable Data Collection in Sensor Networks, High Performance Computing conference, pp 415-426, 2008;

6. Murali Krishna Ramanathan, Ananth Grama, Suresh Jagannathan, Sieve: A Tool for Automatically Detecting Variations Across Program Versions, 21st IEEE/ACM International Conference on Automated Software Engineering, (ASE), pp 241-252, September 2006;

7. Christoph Hoffmann, Ahmed Sameh, and Ananth Grama High-Fidelity Simulation of Large Scale Structures Proceedings 4th International Conference on Computational Science - ICCS, pp 664-671, 2005;

8. Hemant Mahawar, Vivek Sarin, and Ananth Grama, Parallel Performance of Hierarchical Multipole Algorithms for Inductance Extraction, High Performance Computing (HiPC), pp 450-461, 2004;

9. Ioannis Ioannidis, Ananth Grama, Mikhail Atallah, Adaptive Trie Data Structures for IP Lookups, INFOCOM 10 pp (IEEE Digital Library), 2003; and

10. Dow-Yung Yang, Akshay Johar, Wojciech Szpankowski, and Ananth Grama, Summary Structures for Frequency Queries on Large Transaction Sets, In Data Compression Conference, pp 238-247, Snowbird, UT, March 2000.

13. Through my work over the past three decades on teaching, researching, and analyzing distributed networks like those in this case, I have been recognized with the following awards:

1. NSF CAREER Award [1998]

2. Purdue University Faculty Scholar [2002]

3. Fellow, American Association for the Advancement of Science (AAAS) [2013]

4. Distinguished Alumnus, University of Minnesota [2015]

5. Purdue University Named Professor [2017]

6. Samuel D. Conte Professor of Computer Science

7. Purdue College of Science Research Award [2018]

        8.      Amazon Research Award [2021][6]

**B.**     **Other Matters**

      14.     I have not offered any other expert testimony in any litigation in the last five years, but my previous history as an expert witness is outlined in my CV.

**C.**     **Compensation**

      15.     In connection with my work as an expert, I am being compensated at a rate of $600 per hour. I am also reimbursed for reasonable and customary expenses associated with my work in this case. I receive no other forms of compensation related to this case. No portion of my compensation is dependent or otherwise contingent upon the results of these matters or the specifics of my testimony.

**D.**     **Materials Reviewed**

      16.     In formulating my opinions in these matters, I have reviewed numerous documents and references relevant to the materials. For example, I have reviewed the '640, '978, and '170 patents, their file histories, their related applications, and their corresponding post-grant proceedings. I have also reviewed the source code for the Accused Products, the produced technical documents describing the Accused Products, and the testimony of the respective engineers for the Accused Products. I have further reviewed the other expert reports in this case, and specifically, the reports of Dr. Michael Goodrich, Mr. Fanous, and Mr. Bergman served by Kove on July 3, 2023, and Mr. Greene's report served by Amazon on July 3, 2023. I share Mr.

---

[6] I was named as one of 100 recipients of an Amazon Research Award, for my proposal on scaling causal inference from large observational datasets. This award requires no deliverables or work product to Amazon. ███████████████████████████████████████████████ I had no obligations to Amazon in exchange for this recognition and it does not affect my technical analysis in this matter.

Greene's views on the case, and specifically his descriptions of the state of the art, POSITAs, claim construction, and other portions of his analysis that overlap with mine. Because his descriptions reflect my own understanding, I have adopted some of his explanations as my own as well. My reference to a document includes the other references cites therein. I also reviewed all of other materials cited herein or identified in Appendix B, and I also relied on my experience and expertise in the field.

17.     In connection with live testimony in these proceedings, should I be asked to provide it, I may use as exhibits various documents that refer to or relate to the matters contained within this report, or which are derived from the results and analyses discussed in this report. Additionally, I may create or direct the creation of certain demonstrative exhibits to assist me in testifying.

18.     I am prepared to use any or all of the materials cited herein or in Appendix B, and supplemental charts, models, and other representations based on those materials, to support my live testimony in these proceedings regarding my opinions. If called upon to do so, I will offer live testimony regarding the opinions in this report.

## II.     PERSON OF ORDINARY SKILL IN THE ART

19.     I understand that a person of ordinary skill in the art in the field of technology of the patent when the application was filed (a "POSITA") is a hypothetical person that is presumed to be aware of all the relevant prior art at the time of the invention. I have adopted the understanding of a POSITA in my analysis here.

20.     I understand that the following factors may affect the level of skill of one of ordinary skill in the art: (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) the prior-art solutions to those problems; (4) the rapidity with which

innovations are made; (5) the sophistication of the technology; and (6) the educational level of active workers in the field. A POSITA is also a person of ordinary creativity in the art.

21.     It is my understanding that I must analyze the claims from the perspective of a POSITA as of the time of the invention. I understand that the applications that issued as the '640, '978, and '170 patents were filed between September 13, 2000 and February 13, 2006, and list the following applications as related:

   a.  Provisional Application No. 60/209,070 (filed on June 2, 2000);

   b.  Provisional Application No. 60/277,408 (filed on March 19, 2001);

   c.  Application No. 09/111,896 (filed on July 8, 1998);

   d.  Application No. 09/367,461 (filed on August 13, 1999);

   e.  Application No. 09/503,441 (filed on February 14, 2000); and

   f.  Application No. 09/661,222 (filed on September 13, 2000).[7]

22.     Additionally, I understand that Kove has asserted that co-inventors John Overton and Stephen Bailey were in possession of the claimed inventions by October 28, 1999.[8] For purposes of this report, I analyzed and applied the evidence and claim constructions from the perspective of a POSITA on or before the earliest possible priority date for the Asserted Claims, e.g. September 1999.[9] The analysis in this report would apply equally, however, if it is determined that the relevant time for the perspective of a POSITA is anywhere in the 1998 to 2001 timeframe

---

[7] *See* '978 patent at Cover.

[8] *E.g.*, 5/17/23 J. Overton Dep. Tr. at 761:21-763:18, Ex. 8; Kove's May 7, 2023 Seventh Amended Objections and Responses to Amazon's Interrogatories (Nos. 1, 2, 5, 6, 9), Appendix B at 33 (claim 3), 38 (claim 6), 39 (claim 10), and 53 (claim 14).

[9] My opinions wouldn't change regarding the scope and content of the prior art and claim interpretation if the relevant time is found to be the filing date of any of the purportedly related applications dated from July 8, 1998 through September 13, 2000.

based on the filing dates of the patent and related applications. And as discussed below, it is my opinion that the Asserted Patents aren't entitled to the July 8, 1998 filing date.

23.     For the Asserted Patents, it is my opinion that a POSITA would have had a bachelor's degree in computer science (or a similar field) and at least two years of experience working with database management software systems. Alternatively, a POSITA would have had a Master's degree or similar post-graduate studies in the field of database management software systems with fewer years of experience.

24.     I am aware of the qualifications of such a skilled artisan because I have worked with and taught engineers with similar capabilities. By 1998, I had worked in both public and private enterprises. I had earned my PhD in the field of computer science and was a Professor at Purdue training those very skilled artisans to work in this industry. This remained true throughout 1998 and 1999, when I was working with individuals who met the above criteria of persons of ordinary skill in the art and had written books, published articles, and spoke at conferences regarding many of the topics at issue in this case.

25.     Thus, I am familiar with the understanding and knowledge of persons of ordinary skill in the art as of 1998, 1999, and up through today as I remain an active member of the field. And during the 1998-1999 timeframe, I was at least as qualified as the POSITA that I have identified above. Thus, I understand the perspective of a POSITA, which I have applied in my analysis.

## III.     STATE OF THE ART

26.     In reaching my opinions on the Asserted Patents and Accused Products, I have considered the state of the relevant art. I provide in this section a brief introduction to the state of the art for the Asserted Patents as of at least September 1999.[10] I have endeavored to make my explanation straightforward and to focus on the aspects of the art most relevant to the Asserted Claims.

### A.     References Considered

27.     I considered the following references in considering the state of the art at the time of the claimed inventions:

| Reference | Filing Date | Publication/Issue Date |
|---|---|---|
| "DNS RFC1034 Domain names – Concepts and Facilities" by Mockapetris ("RFC1034"); | N/A | November 1987 |
| "An Adaptive Data Placement Scheme for Parallel Database Computer Systems" by Hua and Lee ("Hua DBMS"); | N/A | August 1990 |
| "Design and Implementation of DDH: A Distributed Dynamic HashingAlgorithm" by Devine ("Devine DDH"); | N/A | October 1993 |
| "Scale in Distributed Systems" by Neuman ("Neuman"); | N/A | 1994 |
| U.S. Patent No. 5,542,087 to Neimat ("Neimat"), assigned to Hewlett-PackardCo.; | Oct. 15, 1993 | July 30, 1996 |
| "Consistent Hashing and Random Trees: Distributed Caching Protocols forRelieving Hot Spots on the World Wide Web" by Karger et al. ("Karger '97"); | N/A | 1997 |

---

[10] I understand that Kove has claimed a priority date of October 28, 1999 for most Asserted Claims. Kove asserts that the co-inventors had conceived of the Asserted Claims at least by October 28, 1999. Kove's May 7, 2023 Seventh Amended Objections and Responses to Amazon's Interrogatories (Nos. 1, 2, 5, 6, 9), Appendix B at 33 (claim 3), 38 (claim 6), 39 (claim 10), and 53 (claim 14). This state of the art reflects that date, but the approximate state of the art would be similar anytime from July 1998 through 2000.

| Reference | Filing Date | Publication/Issue Date |
|---|---|---|
| "Load Management in Distributed Video Servers" by Venkatasubramanian and Ramanathan ("Venkatasubramanian"); | N/A | May 1997 |
| "Resource Location in Very Large Networks" by Partha Dasgupta ("Dasgupta"); | N/A | June 1994 |
| "Distributed Web Caching System with Consistent Hashing" by Sherman("Sherman"); | N/A | February 1999 |
| "Web Caching with Consistent Hashing" by Karger, Sherman, et al. ("Karger/Sherman"); | N/A | March 4, 1999 |
| Dynamic Load Balancing on Web-server Systems by Valeria Cardellini et al., IEEE Internal Computing, vol. 3, no. 3, pp. 28-39 ("Cardellini"); | N/A | May-June 1999 |
| "Distributed cooperative Web servers" by Baker and Moon ("Baker"); | N/A | May 17, 1999 |
| Paul Albitz and Cricket Liu, DNS and BIND, O'Reilly & Associates, Inc., 3rd ed. ("BIND and DNS"); | N/A | September 1, 1998 |
| U.S. Patent No. 6,212,521 to Minami ("Minami"), assigned to Fujitsu Ltd.; | July 26, 1997 | April 3, 2001 |
| U.S. Patent No. 6,430,618 to Karger ("Karger '618"), assigned to Massachusetts Institute of Technology; | March 3, 1998 | August 6, 2002 |
| U.S. Patent No. 6,553,420 to Karger ("Karger '420"), assigned to Massachusetts Institute of Technology[11]; | June 2, 1998 | April 22, 2003 |
| "Locating Copies of Objects Using the Domain Name System" by Kangasharju et al. ("Kangasharju"); | N/A | January 1, 1999 |
| "Location-Independent Naming for Virtual Distributed Software Repositories" by Shirley Browne et al, ACM SIGSOFT Software Engineering Notes ("Browne") | N/A | August 1995 |

[11] The Karger '618 and '420 patents are in the same patent family and closely related. Therefore, I refer to these patents together herein as "Karger '618/420."

| Reference | Filing Date | Publication/Issue Date |
|---|---|---|
| "Oracle Names Administrator's Guide, Release 2.0, Oracle Corporation, ("OracleNamesAdminGuide"); | N/A | 1996[12] |
| "Oracle 8 Server: Unleashed" by Joseph Greene, Advanced Information Systems, Inc. et al ("OracleUnleashed"); | N/A | February 2, 1998 |
| "Locating Objects in Wide-Area Systems" by Maarten van Steen, Franz J. Hauck, Philip Homburg, and Andrew S. Tanenbaum, IEEE Communication Magazine, pp. 104-109 ("Steen"); | N/A | January 1998 |
| U.S. Patent No. 6,185,601 to James J. Wolff, assigned to Hewlett-Packard Company ("Wolff"); | April 15, 1998 | February 6, 2001 |
| U.S. Patent No. 6,473,781 to Roger Skagerwall and Kaj Nygren, assigned to Telefonaktiebolaget LM Ericsson ("Skagerwall"); | October 28, 1998 | October 29, 2002 |
| U.S. Patent No. 6,230,183 to Peter B. Yocum, Catherine K. Eilert, and John E. Arwe, assigned to International Business Machines Corporation ("Yocum"); and | March 11, 1998 | May 8, 2001 |
| U.S. Patent No. 6,122,664 to Marcel Boukobza and Gerard Sitbon, assigned to Bull S.A. ("Boukobza"). | June 27, 1997 | September 19, 2000 |

28.    In sum, my explanation of the state of the art is based on my review of the Asserted Patents, including but not limited to the above statements, the references, my firsthand experience as a POSITA at the relevant priority date, and Mr. Greene's July 3 Report.

[12] Publicly available no later than May 7, 1997, as determined in at least Reexamination Control Nos. 90/019,034, 90/019,035, 90/019,036, and 90/019,109.

B.      **Technology Background**

29.      In this section, I discuss the state of the art relevant to the subject matter of the Asserted Patents, as it would have been known, understood, and appreciated by a POSITA prior to the asserted 1999 priority date. I rely on and incorporate the understandings below regarding such known features and technologies to support my opinions.

1.      **Distributed Database Management**

30.      A distributed database is a network of databases managed by multiple database servers that appear to a user as a single logical database. The main benefit of such a database is that the data of physically separate databases can be logically combined and potentially made accessible to all users on a network.[13] A distributed database system across separate machines "provides great flexibility and allows significant gains in performance."[14] The use of separate machines, though, requires development of database management solutions to coordinate between distributed devices.[15] Location transparency, performance monitoring and optimization, and automation all became important features of distributed database management by the early 1990s.

31.      Performance monitoring and optimization ensured that the distributed system could meet the users' demands as efficiently and effectively as possible. Accordingly, companies relied on a database administrator ("DBA") to maintain database performance. As the book OracleUnleashed explains:

> It is the DBA's responsibility to periodically monitor the database during peak transactional activity, searching for bottlenecks and resource contention. One of the

---

[13] Oracle7 Server Concepts, Release 7.3 (Oracle Corp., Redwood City, CA), published 1996.

[14] Boukobza at 1:53-54; *see also* Steen at Abstract.

[15] Steen at Abstract; Skagerwall at Abstract.

primary concerns with transactional activity is the management of the rollback segments. The database should be able to handle all concurrent transactions effectively. If the database is not monitored during transactional activity and adjusted appropriately, company productivity will inevitably suffer.[16]

32.     Such performance optimizing steps were commonplace for DBAs. For example, U.S. Pat. No. 6,185,601 to Wolff ("Wolff") describes using redirect commands to divert processing demands on an overloaded server:

> Client load rebalancing refers to the ability of a client, enabled with processes in accordance with the current invention, to re-map a path through a plurality of nodes to a resource. *The re-mapping may take place in response to a redirection command emanating from an overloaded node, e.g. server.* The embodiments disclosed allow more efficient, robust communication between a plurality of clients and a plurality of resources, via a plurality of nodes. Resources can include, but are not limited to, computers, memory devices, imaging devices, printers, and data sets. A data set can include a database or a file system.[17]

33.     I understand that co-inventor Dr. Overton was a DBA for Oracle's competitor Informix Corporation in the late 1980's.[18] Dr. Overton acknowledged the DBA's role in maintaining and optimizing databases with the latest technologies in the field to minimize server failures.[19]

---

[16] OracleUnleashed at 478. Citations are to the exhibit's lower-right page number.

[17] Wolff at 5:25-38.

[18] 7/21/23 J. Overton Dep. Tr. at 998:5-10.

[19] 7/21/23 J. Overton Dep. Tr. at 998:11-1000:15.

### 2.    The Oracle Database Management System

34.    Oracle Corporation was founded in 1977 for the exclusive purpose of developing a commercial relational database system.[20] The company released its first commercially available database in 1979, Oracle v2.[21]

35.    By 1992, Oracle Corporation had released Oracle version 7. Oracle7 included full functionality for distributed databases.

36.    Oracle Corporation's *Oracle7 Server Concepts* manual explains the concept of a distributed database as follows:

> A distributed database is a network of databases managed by multiple database servers that appear to a user as a single logical database. The data of all databases in the distributed database can be simultaneously accessed and modified. The primary benefit of a distributed database is that the data of physically separate databases can be logically combined and potentially made accessible to all users on a network.[22]

37.    Commercially available databases would combine many different specific utilities and packages and were each designed to meet the individual needs of the users on a network. This included Oracle, as well as competitor products offering many of the same features, like Microsoft's SQL Server.[23] This means that many configuration choices were both possible and optional. To operate as a distributed database, a system needed to include a management utility stored on each client and database server for sending requests to a database instance and for

---

[20] https://investor.oracle.com/faq/default.aspx (Ex. 22 to '034, '035, & '036 Reexamination Requests, Investor Relations – FAQ at 3).

[21] Oracle v2, https://web.archive.org/web/20190930122821/http://cs-exhibitions.uni-klu.ac.at/index.php?id=403 (*See* Ex. 12 to '034, '035, and '036 Reexamination Requests, Oracle v2 at 2).

[22] Oracle7 Server Concepts at 71-72 (Ex. 13 to '034, '035, & '036 Reexamination Requests).

[23] 5/24/23 R. Blackman Dep. Tr. at 15:3-15 (█████████████████████████).

returning responses and data from the database to the client over the network. An Oracle7 system may have hosted dozens of database instances on any given database server. So, to make a connection, the management utility had to know the client's and database server's IP address or "Host name," the ports used, the database instance, and transport protocol.

38.    Two advances in the Oracle7 system were the expansion of location transparency and the use of hashing in distributed databases. In distributed databases, location transparency hides the actual location of data from the users, allowing them to "see through" the location and internal storage information to the data itself. Location transparency is an important feature for maintaining and updating a distributed database on an ongoing basis. As the book *Oracle: The Complete Reference* details:

> Over the life span of an application, its data will very likely move from one database to another, or from one host to another. Therefore it will simplify maintenance of an application if the exact physical location of a database object is shielded from the user (and the application).[24]

39.    A development supporting location transparency is the idea of "caching." As described and shown in Figure 2-2 OracleNamesAdminGuide, each Names Server includes a "cache" for storing location information:

> The Oracle Names Server is a network service comprised of multiple components. Each Oracle Names Server contains:
>
> • the cache—the Names cache is an in-memory database of all data required to resolve names. The cache contains the following types of data:
>
> – system information—includes the service addresses of all of the Names Servers.

---

[24] Oracle DBA Handbook at 13 (Ex. 15 to '034, '035, & '036 Reexamination Requests).

– registration information—includes all registered TNS services which includes other Names Servers and information automatically generated by the Names Server when it was installed.[25]



Figure 2 – 2  Oracle Names Server Components
Using the Dynamic Discovery Option

The cache can include both "authoritative" data (e.g., data the specific Names Server is assigned to manage) as well as "non-authoritative" data (e.g., data assigned to another Names Server for management). This unauthoritative data can be used to eliminate the need for repeated requests between Names Servers for the same location information. OracleNamesAdminGuide describes that this unauthoritative data may be "flushed" from the cache at any time.

> In a distributed installation, you can remove all non-authoritative data from a server cache by using the FLUSH command:
>
> NAMESCTL> FLUSH
>
> As shown, this command flushes the current Names Server. If you want to flush another Names Server or multiple Names Servers, supply their names as arguments to the FLUSH command.

---

[25] OracleNamesAdminGuide at 32-33 (Ex. 5 to '034, '035, & '036 Reexamination Requests). Citations are to the exhibit's lower-right page number.

40.     In 1996, Oracle Corporation introduced further distributed database capabilities. This included the release of Oracle version 7.3 and the Oracle tools and utilities SQL*Net release 2.3.3 and Oracle Names release 2.0. Being a commercial product, there were many options for how to locate and retrieve data stored on the database on Oracle v.7.3. Oracle Names supported different networking technologies such as DECnet, which have unique retrieval requirements. Even within TCP/IP networking, there were many ways to configure both the location alias and the location response such as IP address versus DNS alias.

41.     SQL*Net is the name for Oracle's add-on networking utility. This utility provides the network underpinnings for distributed databases. The 1994 *Oracle DBA Handbook* explains that SQL*Net makes it "possible to create synonyms that give applications true network transparency; the user who submits the query will not know the location of the data that is used to resolve it."[26] SQL*Net Client runs on each client and interfaces with applications running on the client. SQL*NET Listener runs on database servers, listens on multiple network ports and IP addresses for client requests, and returns requested information to clients.

42.     Oracle Names is the moniker for Oracle's distributed database name server utility and provides a directory of databases on Names Servers.[27] Names Servers are intermediaries that provide connection information, including location, to clients requesting data entities from corresponding data storage servers. Using Oracle Names, a client seeking a data entity requests the location of the data entity from a Names Server, receives a location response from the Names Server, then requests the data entity itself from the data storage server identified in the location

---

[26] Oracle DBA Handbook at 13 (Ex. 15 to '034, '035, & '036 Reexamination Requests).

[27] At times, those in the field refer to Oracle Names as "Oracle*Names."

response. With Oracle Names, all of the tasks of managing distributed databases were handled via a global naming service, available to all hosts in a network. As the book *Oracle: The Complete Reference* explains:

> This changes the way in which database links are resolved. Before, when a database link was specified, the database first looked at the user's private database links. If none with the matching name was found, then the available public database links were checked.
> Oracle*Names adds an additional level to this. Now, if the first two checks do not return a match for the database link name, then the Oracle*Names server's list of global database link names is searched for the database link. If the link name is found there, Oracle*Names will return the link's specifications and resolve the query.

> This greatly simplifies the administration of *location transparency*—the ability to mask the physical location of data-in a distributed environment. The information related to remote data access is now stored in a central location. The impact of this is felt every time an object's location is changed. For example, if there were multiple links using explicit connections to a single demote database, then a pre-Oracle*Names modification to the user's password would require dropping and re-creating multiple database links.[28]

43.    Oracle Corporation maintains a separate manual for Oracle Names release 2.0, which is titled *Oracle Names Administrator's Guide, Release 2.0*.[29]

44.    Oracle Names and SQL*Net allow customers to create unique customer identifiers associated with a data set's network address, and to use those identifiers to query Names Servers to locate where in the system the data set resides.

45.    Like most relational database management system ("RDBMS") products at the time, Oracle7 included hashing capability. Hashing was a well-known approach at the time for

---

[28] Oracle: The Complete Reference at 8 (Ex. 14 to '034, '035, & '036 Reexamination Requests).

[29] AMZ_KOVE_000528884.

improving performance and had been around for decades before October 1999. Hashing is a technique that converts a search term (e.g., text data) into a numerical index using a function (also called a Hash Function) that associates a location in a table (also called a Hash Table) with the search term. A query term can be searched by applying the same Hash Function and checking if the query term exists in the Hash Table. This algorithm, well known in the industry is implemented in many places in the Oracle code including query algorithms. The *Oracle DBA Handbook* explains Oracle7's use of this hashing capability as follows:

> In Oracle7, a second type of cluster is supported. Hash clusters use hashing functions on the row's cluster key to determine the physical location where the row should be stored. This will yield the greatest performance benefit for queries of the form shown in the following listing.
>
> ```
> SELECT name
> FROM employee
> WHERE empno = 123;
> ```
>
> In this example, the EMPLOYEE table is queried for an exact match for the EMPNO column. If that table was part of the hash cluster, and EMPNO was part of the cluster key, then the database could use the hashing function to quickly determine where the data was physically located.[30]

46.     And as the *Oracle DBA Handbook* illustrates, it was understood in the art that hashing reduced the processing cost and time for query results:

> Queries in which a column's value is compared to an exact value are called equivalence queries. In Oracle7, a new type of cluster, called a hash cluster, is made available. This type of cluster stores a row in a specific location based on its value in the cluster key column. Every time a row is inserted, its cluster key value is used to determine which block it should be stored in; this same logic can be used during queries to quickly find data blocks that are needed for retrieval.[31]

---

[30] Oracle DBA Handbook at 5-6 (Ex. 15 to '034, '035, & '036 Reexamination Requests).

[31] Oracle DBA Handbook at 9 (Ex. 15 to '034, '035, & '036 Reexamination Requests).

47.     In 1997, Oracle Corporation released Oracle version 8. In this version of the product, Oracle introduced several new features to enhance performance, including parallelism, partitioning, and optimization, as described in more detail in Sections II, VI, and XII.[32]

48.     Today, Oracle is up to version 21. And many of the capabilities just discussed remain features of that current version.

### 3.     Cloud Computing

49.     Cloud computing refers to the delivery of on-demand computing services (e.g., servers, storage, networking, databases, etc.) over the internet. Cloud computing originated in the 1960s, when IBM virtualized operating systems, allowing multiple users to share the same resources.[33] Cloud computing allows users to access services as needed without the user having to buy, own, and/or maintain its own physical data centers and servers. Computing services are hosted at a remote data center managed by a cloud services provider ("CSP").[34] The CSP, in turn, bills users based on usage or based on a subscription fee charged at regular intervals (monthly, quarterly, annually, etc.). Cloud computing utilizes both physical servers and virtual IT infrastructure

---

[32] OracleUnleashed at 40.

[33] A Brief History of Cloud Computing, IBM.com, Jan. 6, 2017 (available at https://web.archive.org/web/20230628083034/ibm.com/cloud/blog/cloud-computing-history, last accessed on August 16, 2023).

[34] What is a Cloud Service Provider, CloudSecurityAlliance.com, Apr. 4, 2020 (available at https://cloudsecurityalliance.org/blog/2020/04/30/what-is-a-cloud-service-provider/, last accessed on August 16, 2023).

(including servers, operating system software, networking, and other software) that can be pooled and divided irrespective of physical hardware boundaries.[35]

50.　　The three most common cloud computing services are software as a service ("SaaS"), platform as a service ("PaaS"), and infrastructure as a service ("IaaS"). In SaaS, users access the cloud *via* a web browser, a dedicated desktop client, or an application that integrates with a desktop or mobile system.[36] PaaS provides software developers with an on-demand platform (e.g., hardware, software stacks, and other infrastructure) to run, develop, and manage applications without the cost and complexity of maintaining the required platform on the users' premises. IaaS provides on-demand access to fundamental computing resources (e.g., servers, networking, and storage) on a pay-as-you-go basis, enabling users to expand or shrink resources as needed.[37]

### 4.　　Load Balancing

51.　　Load balancing is a method of increasing efficiency by distributing tasks over available computing resources (e.g., multiple servers in a server farm). Load balancing can avoid uneven distribution of tasks, where some nodes are overloaded while others are left idle or used at below their capacity. Balancing distribution decreases response time and reduces latency in the

---

[35] What is a Cloud Service Provider, CloudSecurityAlliance.com, Apr. 4, 2020 (available at https://cloudsecurityalliance.org/blog/2020/04/30/what-is-a-cloud-service-provider/, last accessed on August 16, 2023).

[36] What is a Cloud Service Provider, CloudSecurityAlliance.com, Apr. 4, 2020 (available at https://cloudsecurityalliance.org/blog/2020/04/30/what-is-a-cloud-service-provider/, last accessed on August 16, 2023).

[37] What is a Cloud Service Provider, CloudSecurityAlliance.com, Apr. 4, 2020 (available at https://cloudsecurityalliance.org/blog/2020/04/30/what-is-a-cloud-service-provider/, last accessed on August 16, 2023).

network. Load balancing emerged in the early to mid-1990s and predates the Asserted Patents by years.[38]

52.     Load balancing may be used to provide a single Internet service from multiple servers. For example, many applications may run on multiple servers in a server farm. User requests to transmit a packet of data across the Internet are sent to a load balancer.[39] The load balancer, in turn, routes each request to the specific server in the server farm best suited to handle that request. The best server may be one with the fewest current connections to clients or one with the fastest response time. By distributing workload using these guides, load balancers improve efficiency by decreasing response time and reducing network latency.[40]

53.     One specific type of load balancing is called elastic load balancing. Elastic load balancing automatically distributes incoming traffic across multiple servers in real time by continuously monitoring the availability of the servers, acting as the initial point of contact for incoming traffic and scaling load balancers as server traffic changes.[41] Elastic load balancers also monitor

---

[38] *See* Subramanian, Raghu "An Analysis of Diffusive Load-Balancing," Proceedings of the Sixth Annual ACM Symposium on Parallel Algorithms and Architectures, 1994.

[39] What is a Load Balancer?, F5.com (available at https://www.f5.com/glossary/load-balancer#:~:text=A%20load%20balancer%20is%20a,users)%20and%20reliability%20of%20applications, last accessed on August 16, 2023).

[40] Latency, Load Balancing Glossary – Kemp, (available at https://kemptechnologies.com/glossary/latency, last accessed on August 16, 2023).

[41] What is an Elastic Load Balancer (ELB), HG Insights (available at https://hginsights.com/glossary/elastic-load-balancer-elb#:~:text=An%20Elastic%20Load%20Balancer%20(ELB)%20is%20a%20virtual%20appliance%20that,makes%20it%20more%20fault%20tolerant, last accessed on August 16, 2023).

whether servers are functioning properly, stopping traffic to malfunctioning servers, and rerouting requests to functioning servers to avoid delays in the event of server failure.[42]

### 5. Data Organization

54. As databases were spread out over multiple discs and multiple servers, the question of how to distribute that data came to the forefront. The traditional "entry sequence" method of adding data to the single store as it was entered and slowly filling up the available storage would no longer suffice because by assigning data to a single store at a time, you undermine the benefits of distributing the data to begin with, i.e., load balancing and improved performance. Thankfully, there have been many ways of organizing data on a distributed database since early on in the field, and each of the following was routine at least as early as 1990. In "*Parallel Database Systems*," David DeWitt and Jim Gray describe these routine data distribution methods as of June 1992.[43] One feature common to every database is the "object identifier," which is the system's way of referring to a specific piece of stored data.

### a. Range Partitioning

55. The simplest way to assign data to different storage destinations is "Range Partitioning." In Range Partitioning, the different destinations are assigned based on an alphanumerical

---

[42] What is an Elastic Load Balancer (ELB), HG Insights (available at https://hginsights.com/glossary/elastic-load-balancer-elb#:~:text=An%20Elastic%20Load%20Balancer%20(ELB)%20is%20a%20virtual%20appliance%20that,makes%20it%20more%20fault%20tolerant, last accessed on August 16, 2023). Amazon offers an elastic load balancer, called ELB, which has not been accused of infringement in this case. https://aws.amazon.com/elasticloadbalancing/, last accessed August 16, 2023).

[43] Dewitt and Gray, *Parallel Database Systems*, The Future of High-Performance Database Systems, Communications of the ACM, Vol. 35, No. 6, pp. 90-91(June 1992) (available at https://people.eecs.berkeley.edu/~brewer/cs262/5-dewittgray92.pdf, last accessed on August 16, 2023).

range from the object identifier (A-C, D-G, F-L, etc.).[44] Range Partitioning is simple to employ and requires no specialized hardware.[45] However, because the data is not distributed in a random way, the datastores can be more susceptible to hotspots. "Hotspots" or items with "heat" refer to a high demand on the system, which can cause performance problems. For example, if a specific item is accessed much more frequently, there is a higher likelihood that the server it is stored on will be overburdened and fail. As shown in the below excerpt of Figure 7 from Dewitt, Range Partitioning is a very simple, but effective concept.



---

[44] Dewitt and Gray, *Parallel Database Systems*, The Future of High-Performance Database Systems, Communications of the ACM, Vol. 35, No. 6, pp. 90-91(June 1992) (available at https://people.eecs.berkeley.edu/~brewer/cs262/5-dewittgray92.pdf, last accessed on August 16, 2023).

[45] Dewitt and Gray, *Parallel Database Systems*, The Future of High-Performance Database Systems, Communications of the ACM, Vol. 35, No. 6, pp. 90-91(June 1992) (available at https://people.eecs.berkeley.edu/~brewer/cs262/5-dewittgray92.pdf, last accessed on August 16, 2023).

b. **Round-Robin**

56.     Round-Robin distribution is the "entry sequence" version of distributed database assignment, with each new object assigned to a new datastore in a specific sequence.[46] As shown in the below excerpt of Figure 7 from Dewitt, Round-Robin distribution is another simple, but effective way to distribute data evenly among distributed datastores, and provides some randomization to the assignment of data to the store.



---

[46] Dewitt and Gray, *Parallel Database Systems*, The Future of High-Performance Database Systems, Communications of the ACM, Vol. 35, No. 6, pp. 91(June 1992) (available at https://people.eecs.berkeley.edu/~brewer/cs262/5-dewittgray92.pdf, last accessed on August 16, 2023).

### c. Hashing

57.     Hashed distribution applies a hash function to the object identifier and then distributes the data to a respective store based on the result.[47] Hash functions are designed to randomize the results from the object identifier so that the data is randomly distributed across the database.[48] This randomization is a critical piece of making sure that "hot" data objects or services will not be grouped together on a single server. By randomizing the locations for the hot object or the hot service, hashing results in load balancing protection. As shown in the below excerpt of Figure 7 from Dewitt, hashed distribution is an effective way to distribute data evenly among distributed datastores, and provides the necessary randomization to protect the database from heat.



[47] Dewitt and Gray, *Parallel Database Systems*, The Future of High-Performance Database Systems, Communications of the ACM, Vol. 35, No. 6, pp. 90-91(June 1992) (available at https://people.eecs.berkeley.edu/~brewer/cs262/5-dewittgray92.pdf, last accessed on August 16, 2023).

[48] Dewitt and Gray, *Parallel Database Systems*, The Future of High-Performance Database Systems, Communications of the ACM, Vol. 35, No. 6, pp. 90-91(June 1992) (available at https://people.eecs.berkeley.edu/~brewer/cs262/5-dewittgray92.pdf, last accessed on August 16, 2023).

58.     Each of these distribution mechanisms has its strengths and weaknesses and the benefits of each method must be taken into account when selecting which one to apply to each system in its design.[49] For example, Range Partitioning tends to group objects with similar attributes on the same data store, which makes sequential and associative access more efficient. As another example, hashing distribution tends to randomize object location, minimizing the likelihood of grouping multiple "hot" objects together. This distribution mechanism would be the most resilient to "heat" or high-volume access requests because the transactions would be distributed evenly across the database.

### 6.     Caching

59.      Caching is a fundamental optimization technique that improves performance by reducing the effective access time of memory.[50] This technique was well known before the Asserted Patents. For instance, the Stanford Dash architecture detailed in a 1992 publication described using caching to optimize performance.[51]

60.     Caches include a pool of entries, where each entry has associated data. Each entry's associated data is a copy of the data retrieved from another, slower location holding the system's canonical copy of the data. Caches typically store data in a portion of memory which is quick to access so that there's no need to access the data from slower storage, like a hard drive, or a remote computer.

---

[49] Dewitt and Gray, *Parallel Database Systems*, The Future of High-Performance Database Systems, Communications of the ACM, Vol. 35, No. 6, pp. 92 (June 1992) (available at https://people.eecs.berkeley.edu/~brewer/cs262/5-dewittgray92.pdf) (last accessed on August 16, 2023).

[50] *See*, *e.g.*, D. Lenoski, *et al.*, "The Stanford DASH Multiprocessor," IEEE Computer, pp. 63-79 (March 1992).

[51] *Id.*

61.     Typically, when a CPU requests data, the cache is checked first. This check uses an identifier specifying the data requested. If the data exists in the cache (i.e., a cache hit), then the data is returned from the cache to the CPU. If, however, the data does not exist in the cache (i.e., a cache miss), then the data is retrieved from the hard disk drive. When a cache miss occurs, a copy of the data is typically added to the cache so that when a future request for the same data occurs, the data is retrieved from the cache instead (i.e., a cache hit). By avoiding the need to access the slower storage, overall system performance is improved.

62.     Most caches are "bounded." This means that whenever a new item is added to the cache, an item must be removed. The process by which an item replaces another is called the cache's replacement policy. It is well known that the best replacement policy is to replace the least recently used (LRU) data item with the new item. However, many other replacement policies exist, including removing the least frequently accessed, the least recently accessed, a randomized entry, or any number of other options depending on the needs of the specific system the cache is on.

63.     As the above shows, the basic technique of caching data is wholly separate from the technique of hashing data. For example, the Stanford Dash[52] architecture utilized a distributed directory-based protocol to coordinate the caches across different systems and did not require hashing.[53] Both hashing and caching can be included in distributed database systems without the other, but they can also be combined. The prior art shows that incorporating hashing into a cache system, particularly a distributed cache system, was known before 1998.

---

[52] *See* D. Lenoski, *et al.*, "The Stanford DASH Multiprocessor," IEEE Computer, pp. 63-79 (March 1992).

[53] *Id.*

64.    Dr. Overton acknowledged at deposition that he did not invent caching:

Q: You didn't invent the concept of caching data; did you?

A: That is correct.[54]

65.    This makes sense, because the Asserted Patents were intended to eliminate caching. As Dr. Overton also testified, "one very foundational component of our patents and of the technology is to eliminate caching."[55] He also testified that the technology underlying the Asserted Patents "was not about caching."[56]

66.    And Kove has echoed this sentiment to the Patent Office, where Kove is currently seeking to differentiate the Asserted Claims from the prior art's use of cached memory. As Kove stated, the invention was intended to *replace* caching.

> That is, the Inventors invented a protocol that *replaced storing caches* and state information across the network, with a stateless approach that allows clients to compute the location of data's location information based on a dynamically created relationship between the data and its location. The Inventors sought to find a way to achieve seamless dynamic and spontaneous global search and retrieval of data across a distributed network. The result are the claims embodying the Inventors' network distributed tracking protocol ("NDTP").[57]

### 7.    Re-Routing Requests

67.    Very early on in networking, and again in distributed databases and computing, came the issue of what to do when a request was sent to the wrong network location. If the request went to the wrong location, the request would fail. Failure is never a preferable outcome for a network, so solutions were found very quickly. Two of the most common solutions to this problem

---

[54] 5/17/23 J. Overton Dep. Tr. at 699:1-3.

[55] 5/17/23 J. Overton Dep. Tr. at 733:4-15.

[56] 5/17/23 J. Overton Dep. Tr. at 732:14-21.

[57] 7/3/23 Reexamination Control No. 90/019,109 ("the '109 Reexamination") Non-Final Office Action ("NFOA") at 8 (emphasis added).

are request forwarding and request redirection. Both forwards and redirects were well-known by at least the early 1990's, well before the Asserted Patents.

### a. Forwarding

68.     In most systems, the best option when a server receives a request from a client that should have gone elsewhere is to forward that request on to the correct server destination. Using forwards minimizes the extra steps needed to get the request to its proper destination.



### b. Redirection

69.     At least as early as May 1996, RFC1945 defined the HTTP/1.0 specification, which includes status code 302 responses. These responses include updated temporary location

information for a requested resource.[58] With the information provided in the 302 response, the client can make another request to retrieve the requested resource.



70.     The prior art confirms that this redirection technique was well known. The Domain Name System, for example, can respond with resource records that point to a name server with the desired information.[59] And U.S. Patent No. 6,185,601 acknowledges how servers might become overwhelmed by too many client requests.[60] In this situation, the client load is rebalanced "in response to a redirection command emanating from an overloaded node, e.g., server."[61]

---

[58] E.g., RFC1945 (available at https://datatracker.ietf.org/doc/html/rfc1945, last accessed on August 16, 2023).

[59] AMZ_KOVE_000062528 ("DNS") at 17.

[60] AMZ_KOVE_000530100 ("Wolff") at 5:25-38.

[61] *Id.* at 2:44-46, 4:55-57.

71.     Using redirect messages in distributed databases was also known. OracleNamesAd-minGuide explains that in an Oracle database, multiple Names Servers exist. If an upper Names Server lacks the location information to answer a query, OracleNamesAdminGuide states the upper Names Server can forward the request to a lower Names Server. But, disabling this functionality is also possible in situations where the Names Servers might present a bottleneck.[62] When disabled, OracleNamesAdminGuide explains the upper Names Servers "simply tells the requestor the address of the Names Server that can answer the request."[63]

## 8.     Domain Name Services

72.      The Domain Name System ("DNS") is a naming system for computers, services, and other Internet resources and IP networks. The DNS includes a protocol that converts human-readable services or domains (*e.g.*, www.website.com) into a numerical IP address (*e.g.*, that computers use to identify each other on the network). Developed in the early 1980s by Paul Mockapetris, the DNS predates the Asserted Patents by almost two decades. Throughout the 1980's, numerous RFCs regarding the DNS were publicly available, including RFCs 882 and 883 (dated in November 1983) and RFCs 1034 and 1035 (dated in November 1987).[64]

73.     As websites became more developed with more services offered, simple domains became insufficient, and more specificity was needed. This led to the use of Fully Qualified Domain Names or "FQDNs," which provide a URL to the exact service or server that you wish to connect to. As a result, DNS tables needed to provide a table of FQDNs and the corresponding IP

---

[62] E.g., AMZ_KOVE_000528884 ("OracleNamesAdminGuide") at 137; *see also id.* at 119-20, 186-87.

[63] *Id.* at 137.

[64] RFCs 882, 883, 1034, and 1035.

addresses that satisfy that service. DNS would then simply convert the FQDN to a list of IP addresses that can satisfy the request or convert a specific IP address to the corresponding FQDN. This is the only function of a DNS server. For DNS to do anything further, it must contain additional configurations that could direct requests based on the time of day, random assignment, or any other designated field specified in the configurations.

### C. Known Technologies in the State of the Art

74.    The references disclosed during prosecution of the Asserted Patents evidence the state of the art at the time of the purported invention. Additionally, Kove, including the co-inventors of the Asserted Patents, have admitted that many of the below technologies were well-known by the time of the invention. Thus, at least the following relevant technologies were part of the state of the art and would have been known by a person of skill in the art by at least September 1999:

- Transport Protocols[65]

- Configuring Servers[66]

- Processors[67]

- Network Computing[68]

- Network Clients[69]

---

[65] 5/17/23 J. Overton Dep. Tr. at 684:11-13.

[66] 5/17/23 J. Overton Dep. Tr. at 687:8-11.

[67] 5/17/23 J. Overton Dep. Tr. at 686:10-12.

[68] A Brief History of Cloud Computing, IBM.com, Jan. 6, 2017 (available at https://web.archive.org/web/20230628083034/ibm.com/cloud/blog/cloud-computing-history, last accessed on August 16, 2023).

[69] 5/17/23 J. Overton Dep. Tr. at 686:1-9.

- Network Servers[70]

- Network Transactions[71]

- Network Messages[72]

- Client-Server Relationships[73]

- Server Clusters[74]

- Database Storage[75]

- Storage Availability[76]

- Data Dictionaries[77]

- Distributed Databases[78]

- Relational Databases[79]

- Data Queries and Responses[80]

- Metadata Management[81]

---

[70] 5/17/23 J. Overton Dep. Tr. at 686:1-9.

[71] *E.g.*, OracleUnleashed at 372.

[72] 5/17/23 J. Overton Dep. Tr. at 687:8-11.

[73] 5/17/23 J. Overton Dep. Tr. at 686:1-9.

[74] 5/17/23 J. Overton Dep. Tr. at 696:6-11.

[75] 5/17/23 J. Overton Dep. Tr. at 724:8-10.

[76] *E.g.*, OracleUnleashed at 241.

[77] 5/17/23 J. Overton Dep. Tr. at 729:2-4.

[78] 5/17/23 J. Overton Dep. Tr. at 670:20-671:5.

[79] 5/17/23 J. Overton Dep. Tr. at 670:17-19; 04/21/2023 A. Poling Dep. Tr. at 36:21-37:7.

[80] 5/17/23 J. Overton Dep. Tr. at 724:17-22.

[81] 5/17/23 J. Overton Dep. Tr. at 661:13-17.

- Location Services & Servers[82]

- Location Transparency[83]

- Directory Services & Servers[84]

- Name Services & Servers[85]

- Domain Name Services & Servers[86]

- Location Queries & Responses[87]

- Identification Strings[88]

- Location Strings[89]

- Partitioning[90]

- Caching[91]

- Redirection[92]

- Cloud computing[93]

---

[82] 5/17/23 J. Overton Dep. Tr. at 671:17-21.

[83] 5/17/23 J. Overton Dep. Tr. at 724:17-22.

[84] 5/17/23 J. Overton Dep. Tr. at 728:12-14.

[85] 5/17/23 J. Overton Dep. Tr. at 671:6-14.

[86] 5/17/23 J. Overton Dep. Tr. at 660:22-661:3; 671:9-11.

[87] 5/17/23 J. Overton Dep. Tr. at 726:15-17.

[88] 5/17/23 J. Overton Dep. Tr. at 725:17-19.

[89] E.g., Boukobza at 18:18-23.

[90] 5/17/23 J. Overton Dep. Tr. at 724:11-15.

[91] 5/17/23 J. Overton Dep. Tr. at 699:1-3.

[92] E.g., OracleUnleashed at 698, 729, 725; Wolff at Abstract.

[93] 5/17/23 J. Overton Dep. Tr. at 724:5-7; A Brief History of Cloud Computing, IBM.com, Jan. 6, 2017 (available at https://web.archive.org/web/20230628083034/ibm.com/cloud/blog/cloud-computing-history, last accessed on August 16, 2023).

- Hashing[94]

- Hashkeys[95]

- Hash Functions[96]

- Hash Tables[97]

- Automation[98]

- Performance Monitoring[99]

- Performance Metrics[100]

## IV.  KOVE AND THE ASSERTED PATENTS

### A.  Kove

75.  Kove was founded in 2004 with a principal place of business in Chicago.[101] Kove is the current owner of the Asserted Patents.[102]  Kove claims to be a "pioneer in high-performance

---

[94] E.g., '170 Patent at 15:15-19; '640 Patent at 15:1-20; '978 Patent at 17:19-40: 10/9/2020 S. Bailey Dep. Tr. at 190:1-16.

[95] 5/17/23 J. Overton Dep. Tr. at 726:1-14; 04/21/2023 A. Poling Dep. Tr. at 211:7-13.

[96] 5/17/23 J. Overton Dep. Tr. at 725:20-22.

[97] E.g., OracleUnleashed at 638.

[98] E.g., OracleUnleashed at 476.

[99] E.g., OracleUnleashed at 476.

[100] 5/17/23 J. Overton Dep. Tr. at 730:2-21.

[101] Complaint at 3.

[102] Complaint, at 3.

computer storage and data management technologies. It sells hardware and data management technology, creating solutions that overcome technological limitations in modern server architecture."[103]  Kove currently has 10 full-time employees.[104]

76.      Kove and its predecessor companies have not succeeded in commercializing the Asserted Patents. No one has ever paid for a license to the Asserted Patents or for the right to practice the technology in the Asserted Patents.[105] Dr. Overton also testified that Kove predecessors OverX and Econnectix tried to sell products that embodied the Asserted Patents but were unsuccessful.[106] Those commercialization efforts began in the late 1990s and included listing the products on websites, marketing the products, discussions with potential customers, attendance at conferences, and trial software licensing events.[107] The products were specifically marketed to at least 61 companies, none of which became customers.[108] By September 5, 2006, before the issuance of the first of the Asserted Patents, Econnectix stopped commercialization efforts for the embodying products.[109] Dr. Overton further testified that "there are no products created, made, sold, used, distributed, given away, produced, or manufactured by Kove, or a licensee, after the '640 Patent issued that practiced any of the patents-in-suit."[110]

---

[103] Complaint, at 2.

[104] 5/16/23 J. Overton Dep. Tr. at 53:4-6.

[105] 5/16/23 J. Overton Dep. Tr. at 120:13-121:14.

[106] 5/16/23 J. Overton Dep. Tr. at 133:4-134:12; 145:9-147:9.

[107] 5/16/23 J. Overton Dep. Tr. at 152:1-16.

[108] Kove's Sixth Amended Objections and Responses to AWS's Second Set of Interrogatories (Nos. 10 and 12), dated May 7, 2023, pp. 5-8.

[109] 5/16/23 J. Overton Dep. Tr. at 146:4-147:9; Kove's Third Amended Response to AWS's First Set of Interrogatories (No. 3), dated April 14, 2021, p. 3.

[110] 5/16/23 J. Overton Dep. Tr. at 155:20-156:3.

B.      **General Description of the Asserted Patents**

77.     The Asserted Patents contain substantially the same written descriptions and fig-ures. The Asserted Patents are directed to database management systems and methods for manag-ing information on a computer network. Specifically, the patents disclose John Overton and Ste-phen W. Bailey's network distributed tracking protocol, self-dubbed NDTP, for storing and re-trieving data entities across a distributed networking environment.[111] The Asserted Patents de-scribe technical implementations of the proposed protocol that include, for instance, the particular ways to format digital messages.[112]

78.     The Asserted Patents recognize that it was known in the art that distributed data-bases allow physical storage of a database to exist across multiple locations and that to access such data, a client would send a request to the server.[113] As the patents describe, it was known to provide distributed data collections across multiple machines connected by a network:

> A distributed data collection is a system where data is stored and retrieved among multiple machines connected by a network. Typi-cally, each machine in which some portion of the data in a distrib-uted data collection may reside is called a "data repository ma-chine", or simply a "data repository". One commonly asked question in a data repository environment is: Where is data associated with a particular entity in a distributed data collection? The data location is a key question when a distributed data collection has highly dynamic data distribution properties.[114]

---

[111] *See e.g.,* '170 patent at Abstract, 2:14-29, 4:8-10; '640 patent at Abstract, 2:12-27, 4:5-7; '978 patent at Abstract, 2:19-37, 4:20-21.

[112] *See* '170 patent at Figs. 7-17(b), 5:2-21, 5:30-53, 7:33-9; '640 patent at Figs. 1-9(b), 5:2-22, 5:31-50, 7:29-8:62; '978 patent at Figures 7-17(b), 8:27-37, 8:48-9:11, 10:45-12:40.

[113] *See* '170 patent at 1:36-38; '640 patent at 1:34-36; '978 patent at 1:38-41.

[114] '170 patent at 1:58-67; '640 patent at 1:56-65; '978 patent at 1:59-67.

79. And the Asserted Patents recognize that hashing algorithms were known in the art, such as the "hashpjw function presented by Aho, Sethi and Ullman in their text *Compilers, Principles, Techniques and Tools*."[115]

80. Based on my experience and review of the Asserted Patents, they offer solutions more relevant for small to mid-sized computing problems. The Background of the Invention of the Asserted Patents discusses disadvantages of prior art systems, and provides the example of a doctor's office being unable to retrieve an MRI or X-Ray results for a specific patient.[116] And figures in each patent illustrate this same medical office example as an "implementation environment" for NDTP.[117] A doctor's office may serve hundreds of customers, with thousands of medical records. But managing that data set is an exceedingly smaller computing problem than what Amazon and similar cloud computing providers must manage.

81. I note that the Patent Office doesn't test or analyze whether patentable ideas are better than other ideas or products in the same field. So, here, the Patent Office didn't decide that the Asserted Patents offer a better way to manage databases or information on a computer network than other systems and methods addressing these same technical issues. Indeed, the Patent Office had granted over seven million patents before granting the Asserted Patents. In 2006 alone, when the '640 Patent issued, the Patent Office granted 425,967 utility patents. And in 2007, when the

---

[115] '170 patent at 15:15-19; '640 patent at 15:1-20; '978 patent at 17:19-40.

[116] '640 patent at 1:53-55; '978 patent at 1:56-58; '170 patent at 1:55-57.

[117] '640 patent at 1:53-55, Fig. 10, 3:59-61; '978 patent at 1:56-58, 4:1-3, Fig. 21; '170 patent at 1:55-57, 3:61-63, Fig. 10.

'978 Patent issued, and 2010, when the '170 Patent issued, the Patent Office granted 456,154 and 490,226 utility patents, respectively.[118]

82.     Kove's failure to commercialize the Asserted Patents shows that its purported invention doesn't fit the needs of many companies needing solutions for managing databases or information on a computer network. Kove's predecessors marketed products embodying the Asserted Patents to many companies with needs for managing large sets of data, and all those companies declined to purchase Kove's embodying products. Those companies include Bank of America, Motorola, Nortel, HP, Lockheed Martin, IBM, and Cisco.[119]

83.     Also, OverX was founded in 1997, and began trying to sell OXLS (one of the embodying products) in 1998 or 1999, according to Dr. Overton.[120] And OverX and the subsequent owner of the Asserted Patents, Econnectix, each continued to try to sell embodying products until 2006.[121] As the first Accused Product, S3, launched in March 2006, OverX and Econnectix had at least six years to market their products that embodied the Asserted Patents without Amazon having a purportedly infringing product on the market, yet Kove failed to sell a single such product. This too shows that the concepts in the Asserted Patents were deemed by companies in the market—

---

[118] https://www.uspto.gov/web/offices/ac/ido/oeip/taf/h_counts.htm.

[119] Kove's Sixth Amended Objections and Responses to AWS's Second Set of Interrogatories (Nos. 10 and 12), dated May 7, 2023, pp. 5-8.

[120] 5/16/23 J. Overton Dep. Tr. at 149:19-150:18.

[121] *Id.* Econnectix sold OXLS under different model names. When the technology was transferred from OverX to Econnectix, Econnectix referred to OXLS as the Xpress Association Database, XTN for Telecommunications, XRN for Registry Services, XSN for Storage Services, and the Xpress Database. Kove's First Amended Response to AWS's Third Set of Interrogatories (No. 18), dated February 12, 2021, p. 3; 5/16/23 J. Overton Dep. Tr. at 130:19-134:9.

including many that Kove marketed to that had large data sets to manage—to not offer a beneficial solution for the technical issues they were facing.

84.     In addition, the one potential customer that Econnectix exchanged draft term sheets with for a license to Econnectix's technology embodying the patents, Telecommunications Systems, Inc. (TCS), is a small company based in Annapolis, Maryland that was providing 911 services in 2003 when these discussions occurred.[122] That TCS expressed some interest in the technology shows that its benefits are more likely to be attractive to entities engaged with smaller datasets.

85.     And Kove has succeeded in selling products that don't practice the Asserted Patents. Kove began achieving revenue on these products in 2007, after achieving no revenue selling products that embody the Asserted Patents for at least six years.[123] Kove's revenue derives from its sale of non-embodying products, such as the Xpress Disk and its counterpart XMC products, XFM products, and its more recent EMX products, now called Software Defined Memory products.[124] None of those products practice any claim of the Asserted Patents.[125]

---

[122] *See* Ex. 52 to 5/17/23 J. Overton Dep. Tr. As a reflection of TCS's size, the draft term sheet proposed an initial ten software licenses at $10,000 each, with each license covering a one or two socket system. Exs. 52 and 109 to J. Overton Dep. Tr.; 7/21/23 J. Overton Dep. Tr. at 944:10-948:15.

[123] 5/17/23 J. Overton Dep. Tr. at 541:4-13; 547:6-11.

[124] Kove's First Amended Response to AWS's Third Set of Interrogatories (No. 18), dated February 12, 2021, pp. 3-4; 5/16/23 J. Overton Dep. Tr. at 137:20-140:6; 282:4-284:3.

[125] 5/16/23 J. Overton Dep. Tr. at 138:5-17; 141:15-142:2; 283:19-284:3; 297:1-3.

86.     And it was about these products that don't practice any claim of the Asserted Patents that Kove communicated with Amazon personnel shortly before Kove filed this case. Between June 2017 and January 2018, representatives of Kove, including Dr. Overton, met and corresponded with Amazon employees multiple times.[126] Through these meetings, Kove sought to form a business relationship with Amazon, including by selling its Software Defined Memory products to Amazon.[127] Amazon ultimately declined to purchase any products from Kove.[128] As discussed above, the products Kove discussed with Amazon do not practice any claim of the Asserted Patents.[129] Those meetings occurred over 11 years after Kove stopped trying to sell products that embody the Asserted Patents.[130] During those meetings and correspondence, Kove never identified the Asserted Patents to Amazon.[131]

## C.     Priority Date

87.     I understand that the parties have not agreed on the priority date to which the Asserted Claims are entitled. I have therefore applied a priority date of September 14, 1999, which aligns with the filing date of U.S. Provisional Application No. 60/153,709 ("the '709

---

[126] KOV_00162949; KOV_00164168; KOV_00164169; KOV_00123467; KOV_00163368; KOV_00123540; KOV_00163365; KOV_00163382; AMZ_KOVE_000467813; AMZ_KOVE_000467814; AMZ_KOVE_000467839; AMZ_KOVE_000467845.

[127] 5/16/23 J. Overton Dep. Tr. at 283:3-284:14; 322:21-323:7; 8/11/21 S. Schick Dep. Tr. at 56:2-16.

[128] 5/16/23 J. Overton Dep. Tr. at 322:21-323:7; 8/11/21 S. Schick Dep. Tr. at 61:22-62:25; 76:11-23; 78:11-17.

[129] 5/16/23 J. Overton Dep. Tr. at 138:12-17; 141:15-142:2; 283:19-284:3; 297:1-3.

[130] 5/16/23 J. Overton Dep. Tr. at 149:6-13.

[131] 5/16/23 J. Overton Dep. Tr. at 324:3-325:9; KOV_00162949; KOV_00164168; KOV_00164169; KOV_00123467; KOV_00163368; KOV_00123540; KOV_00163365; KOV_00163382; AMZ_KOVE_000467813; AMZ_KOVE_000467814; AMZ_KOVE_000467839; AMZ_KOVE_000467845.

Application").[132] I further understand that Kove has also claimed a conception date of October 28, 1999.[133] I understand that the Asserted Patents attempt to claim priority to U.S. Provisional Application No. 09/111,896 (the "'896 Application"), dated July 8, 1998. It is my opinion that the Asserted Claims of the Asserted Patents claim subject matter not disclosed in the '896 Application and aren't entitled to its priority date. I further understand that the Examiners at the USPTO have agreed that the Asserted Claims aren't entitled to the July 8, 1998 priority date.[134] It is my further understanding that Kove does not claim priority to the '896 Application's July 8, 1998 priority date for any of the Asserted Claims.[135] If Kove changes this position, I reserve the right to supplement my analysis.

88.     Unless specifically noted, however, my opinions expressed in this report don't depend on whether the priority date is the filing date of the '896 Application or the '709 Application or any other date between October 1998-September 2000. As Dr. Goodrich agrees, a POSITA in this timeframe would have viewed the prior art in a similar way throughout that period.[136]

---

[132] Kove's May 7, 2023 Seventh Amended Objections and Responses to Amazon's Interrogatories (Nos. 1, 2, 5, 6, 9), 272-273.

[133] Kove's May 7, 2023 Seventh Amended Objections and Responses to Amazon's Interrogatories (Nos. 1, 2, 5, 6, 9), Appendices A-D. *See also*, Goodrich Report Ex. F.

[134] 05/08/2023 Grant in Reexamination Control No. 90/019,162; 04/04/2023 Grant in Reexamination Control No. 90/019,166; 03/29/2023 Grant in Reexamination Control No. 90/019,165.

[135] E.g., 5/17/23 J. Overton Dep. Tr. at 761:21-763:18, Ex. 8.

[136] Goodrich Report, ¶25.

### D.  Summary of the Asserted Claims[137]

89.  The Asserted Claims of the '640, '978, and '170 patents each recite methods and systems having multiple location servers. Each location server contains location information associated with identifiers and provides a responsive message if the location server contains the location information of a desired entity. In the below highlighted claims, I have italicized the representative language for shared elements.

90.  For example, representative claim 17 of the '640 patent recites:

> *A system for retrieving data location information for data stored in a distributed network, the system comprising*:
>
> a plurality of data repositories configured to store data, wherein the data is associated with a respective identifier string in each data repository;
>
> *a data location se[rv]er network having a plurality of data location servers, each of the plurality of data location servers containing location strings associated with respective identifier strings and each of the plurality of data location servers having computer executable code configured to execute the following steps*:
>
> *in response to receiving a data location request from a client to retrieve a lo-cation string associated with an identification string provided in the data location re-quest*, transmitting a redirect message to the client if the identification string is not associated with a location string at the data location server, wherein the redirect message contains information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string.

---

[137] This summary does not address every limitation of each claim. Further analysis of the claims is found below in Sections XI and XII. My further analysis explains multiple reasons that the Accused products don't infringe the Asserted Claims, but isn't an exhaustive list of every reason they don't infringe.

91.     Similarly, representative claim 3 (written in independent form)[138] of the '978 patent

recites:

> *A system having a plurality of location servers for managing location information and providing location information to location queries, the system comprising*:
>
> *a first location server containing a first set of location information corresponding to at least one entity, the location information comprising an identifier and at least one location string associated with the identifier, wherein the identifier identifies an entity and the location string specifies a location of data pertaining to the entity*
>
> *a second location server comprising a second set of location information, wherein at least a portion of the second set of location information differs from the first set of location information; and*
>
> programming logic stored on each of the location servers responsive to a location query identifying a desired entity to return a location message, the location message comprising at least one location of data pertaining to the desired entity, if the location server receiving the location query contains location information for the desired entity,
>
> wherein the programming logic further comprises logic responsive to the location query to return one of a location message or a redirect message, *wherein the location server receiving the query returns the location message if the queried location server contains location information for the desired entity*, and
>
> wherein the queried location server returns a redirect message if the queried location server lacks location information for the desired entity, the redirect message comprising information for finding a location server known to have location information relevant to the location query.

92.     Similarly, representative claim 1 of the '170 patent recites:

> *A system for managing data stored in a distributed network*, the system comprising:
>
> a data repository configured to store a data entity, wherein an identifier string identifies the data entity; and

---

[138] Since claim 3 of the '978 patent depends from claim 1, I've shown the limitations of claims 1 and 3 together as the representative claim.

*a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, at least one of the plurality of data location servers includes location information associated with the identifier string, each one of the plurality of data location servers comprises a processor and a portion of the data location information*, the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.

93.     In an interview with the Patent Examiner in the '109 Reexamination (detailed below in Section VI.C), Kove represented the claimed location server role in the figure below.



As demonstrated in the figure, a single entity is associated with a single identifier and the location server stores associations of that identifier with the entity's stored locations on the network.

94.     In addition to the basic location service and server functions, for purposes of my analysis here I've identified four categories of Asserted Claims. The first group requires the location servers to contain knowledge of the contents of the other location servers (the "Knowledge Claims"). These claims contain requirements for either location server redirect messages, hashed location server contents, or both (shown in italics in the representative claims below). The Knowledge Claims include claims 17, 18, and 24 of the '640 patent, claims 1, 2, 6, 8, 9, 12, and 15 of the '170 patent, and claims 3, 6, 10, and 14 of the '978 patent.

95.     For example, representative claim 17 of the '640 patent recites in relevant part:

> in response to receiving a data location request from a client to retrieve a location string associated with an identification string provided in the data location request, *transmitting a redirect message to the client if the identification string is not associated with a location string at the data location server, wherein the redirect message contains information for use by the client to calculate a location of a different data location server in the*

*plurality of data location servers, wherein the different data location server contains the location string.*

96.     Similarly, representative claim 1 of the '170 patent recites in relevant part:

>   *the portion of the data location information included in a corresponding one of the data location servers is based on a hash function* used to organize the data location information across the plurality of data location servers, and *each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.*

97.     And representative claim 3 of the '978 patent recites in relevant part:

>   wherein the queried location server *returns a redirect message if the queried location server lacks location information for the desired entity, the redirect message comprising information for finding a location server known to have location information relevant to the location query.*

98.     The second group of claims requires monitoring performance criterion of the location servers to trigger location information transfers (the "Transfer Claims"). The Transfer Claims include claims 17, 23, 24, and 30 of the '978 patent. Dr. Goodrich has chosen to refer to these four claims as the "Scaling Claims."[139] Because these claims refer to transferring data, and not scaling a database, I refer to them accordingly. The limitations of these claims would negatively affect an ability to scale (as I further detail below), so I do not agree with Dr. Goodrich's description.

99.     For example, representative claim 17 of the '978 patent, from which claims 23, 24, and 30 depend, recites in relevant part:

>   *transferring a portion of the identifiers and associated locations to a second data location server when a performance*

---

[139] Goodrich Report, ¶67.

> *criterion of the first location server reaches a predetermined performance limit.*

100.    The third group of claims requires that if a location server receives a request for location information that it doesn't contain, it must return to the client a redirect message that identifies the location server known to contain the requested location information (the "Redirect Claims"). The Redirect Claims include claims 17, 18, and 24 of the '640 patent, claims 3, 10, and 14 of the '978 patent, and claims 6, 8, 12, and 15 of the '170 Patent. This grouping aligns with Dr. Goodrich's claim group of the same name.[140]

101.    For example, representative claim 18 of the '640 patent, from which claim 24 depends, recites in relevant part:

> *sending a redirect message to the client in response to determining the one of the plurality of location servers fails to include the location information, the redirect message identifying which of the plurality of location servers includes the location information.*

102.    The fourth group of claims requires that the location information for the distributed database be stored in specific location servers according to a hash (the "Hashing Claims"). The Hashing Claims include claim 24 of the '640 patent, claims 6, 9, and 12 of the '978 patent, and claims 2 and 12 of the '170 patent. This grouping mirrors Dr. Goodrich's "Hash Function" group, but not all of these claims affirmatively recite the hash function—they instead rely on a hash table.[141] Thus, I instead refer to them as the Hashing Claims.

103.    For example, representative claim 24 of the '640 patent recites in relevant part:

> *the portion of the data location information included in a corresponding one of the data location servers is based on a hash*

---

[140] Goodrich Report, ¶67.

[141] Goodrich Report, ¶67.

> *function used to organize the data location information across the plurality of data location servers.*

104.     I understand that Dr. Goodrich only identifies three categories of claims, i.e., the "Hash Function Claims," "Scaling Claims," and "Redirect Claims." [142]  Based on the arguments made by Kove and the reasons for allowance in the reexaminations, both the Redirect Claims and the Hashing Claims require the location servers to "know" the contents of each other location server. Accordingly, the claims in both groups belong together in an additional shared group, i.e., the Knowledge Claims.

## V.     AMAZON AND THE ACCUSED PRODUCTS

105.     Amazon Web Services, Inc. ("Amazon") was founded in 2006.[143] It is a subsidiary of Amazon.com, Inc.[144] Work for Amazon ███████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

---

[142] Goodrich Report, ¶67.

[143] Amazon's Answer, Additional Defenses, and Counterclaims, at 43; 4/24/2023 S. Hayden Dep. Tr. at 354:23-24.

[144] Amazon.com, Inc. Form 10-K for the fiscal year ended December 31, 2022, at Exhibit 21.1.

[145] 5/1/23 A. Jassy Dep. Tr. at 10:16-15:15 (███████████████████████).

[146] AMZ_KOVE_000532766 at AMZ_KOVE_000532768-69.

[147] AMZ_KOVE_000532766 at AMZ_KOVE_000532770.

[REDACTED][149]

106.    Amazon earns revenue from "global sales of compute, storage, database, and other services for start-ups, enterprises, government agencies, and academic institutions."[150]  Amazon offers the world's most comprehensive and broadly adopted cloud, with over 200 fully featured services from data centers around the world. Millions of customers, including startups, the largest enterprises, and government agencies use Amazon to lower costs, become more agile, and innovate faster.[151]

107.    Amazon advertises that it is "[t]he leading cloud," because it has the "[m]ost functionality," the "[l]argest community of customers and partners," and is the "[m]ost secure," with the "[f]astest pace of innovation," the "[m]ost proven operational expertise," and "the most extensive global cloud infrastructure."[152]

108.    Amazon provides a highly reliable, scalable, low-cost infrastructure platform that powers hundreds of thousands of businesses in 190 countries around the world.[153] Customers among the 7,500 government agencies that use AWS services include NASA, the CIA, Department

---

[148] AMZ_KOVE_000532766 at AMZ_KOVE_000532771.

[149] AMZ_KOVE_000487544.

[150] Amazon.com, Inc. Form 10-K for the fiscal year ended December 31, 2022, at 66.

[151] https://aws.amazon.com/what-is-aws/?nc2=h_ql_le_int, last accessed on August 18, 2023.

[152] https://aws.amazon.com/what-is-aws/?nc2=h_ql_le_int, last accessed on August 18, 2023.

[153] https://d1.awsstatic.com/whitepapers/aws-overview.pdf, last accessed on August 18, 2023.

of Defense, Social Security Administration, Department of Veterans Affairs, and Department of Health and Human Services.[154] Private industry customers include Coca-Cola, Toyota, Philips, Petco, Taco Bell, and Netflix.[155] The designs and solutions that Amazon chooses for its services must be able to serve the needs of these and its millions of other customers.

109.    The massive scale of Amazon and the Accused Products (as detailed further below) require certain design choices. For example, as the infrastructure scales in response to demand, failures become a concern—the more computers you have in your system, the larger the number of failures. For this reason, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████

---

[154] https://aws.amazon.com/government-education/government/, last accessed on August 18, 2023.

[155] https://aws.amazon.com/?nc2=h_lg.

A. **Simple Storage Service ("S3")**

110. S3 was publicly announced and offered for sale in the United States on March 14, 2006 as one of Amazon's first three service offerings.[156] This launch occurred over 12 years before Kove filed this case on December 12, 2018.[157] Work on the service █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[156] Supplemental Responses to Plaintiff's First Set of Interrogatories (Nos. 1-6), dated June 11, 2021, p. 30; 05/17/23 J. Overton Dep. Tr. Exhibit 97: Press release Amazon Web Services Launches, dated March 14, 2006 (AMZ_KOVE_000061904).

[157] *See* Complaint.

[158] 6/4/21 A. Vermeulen Dep. Tr. at 43:12-44:24 ("████████████████████████████████ ██████"); 99:12-21 ("█████████████████████████████████████████████ █████████).

[159] 6/4/21 A. Vermeulen Dep. Tr. at 52:20-53:1 ████████████████████████████████ ██████████████████████); 67:21-25 (████████████████████████████████ ██████████").

[160] 6/4/2021 A. Vermeulen Dep. Tr. at 71:11-73:9 (███████████████████████████████ ██████████); 79:8-80:19 (██████████████████████████████████); 80:20-84:15 (██ ████████); 85:5-87:4 (██████████████████ ██████).

[161] 5/23/23 A. Vermeulen Dep. Tr. at 17:12-18:18 (██████████████████████████).

███████████████████████[162] As described in the press release announcing the launch, S3 was

designed to store data on the internet and maximize the benefits of scale for developers.

> Amazon S3 is storage for the Internet. IT's designed to make web-scale computing
> easier for developers. Amazon S3 provides a simple web services interface that can
> be used to store and retrieve any amount of data, at any time, from anywhere on the
> web. It gives developer access to the same highly, scalable, reliable, fast, inexpen-
> sive data storage infrastructure that Amazon uses to run its own global network of
> websites. The service aims to maximize benefits of scale and pass those benefits on
> to developers.[163]

111.    S3 is "an object store that uses unique key-values to store as many objects as you

want."[164] S3 is used by "[c]ustomers of all sizes and industries… to store and protect any amount

of data for a range of use cases."[165] AWS has defined four common use cases for S3: store and

distribute static web content and media; serve as an origin store for a content delivery network,

such as Amazon CloudFront; host entire static websites and as a data store for computation and

large-scale analytics, such as financial transaction analysis, click stream analytics, and media trans-

coding; and solution for backup and archiving of data."[166]

112.    Amazon has stated that "███████████████████████████████

████████████████████████████████████████████████████

---

[162] 6/4/2021 A. Vermeulen Dep. Tr. at 83:9-84:15 (discussing advantages for engineers using S3).

[163] AMZ_KOVE_000061904.

[164] https://docs.aws.amazon.com/AmazonS3/latest/userguide/Welcome.html, last accessed on August 18, 2023; https://docs.aws.amazon.com/AmazonS3/latest/userguide/UsingObjects.html, last accessed on August 18, 2023.

[165] https://docs.aws.amazon.com/AmazonS3/latest/userguide/Welcome.html, last accessed on August 18, 2023.

[166] Supplemental Response and Objections of Amazon Web Services, Inc. to Plaintiff's Third Set of Interrogatories (No. 11), dated April 20, 2023, at 12.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██ ,,[167]

113.    Some notable S3 customers include: Apple, Dropbox, Netflix, The Walt Disney Company, Airbnb, Samsung, and 3M.[168]

114.    S3 has been widely used by millions of Amazon customers. For instance, ████████

███████████████████████████████████████████████████████

██████ .[169]

115.    ███████████████████████████████████████████████

████████████████████████████████████████ ██ ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████ .[171]

116.    Other usage data reinforces the incredible scale and technical needs for S3 to operate effectively. For example, ████████████████████████████

███████████████████████████████████████████████████████

---

[167] Supplemental Response and Objections of Amazon Web Services, Inc. to Plaintiff's Third Set of Interrogatories (No. 11), dated April 20, 2023, at 12.

[168] *See* https://aws.amazon.com/s3/customers/, last accessed on August 18, 2023.

[169] AMZ_KOVE_000226779; AMZ_KOV_000269492; Number of Active S3 Users from Bennis Damages Report.

[170] J. Bergman Report, Exhibit 11.1.

[171] J. Bergman Report, Exhibit 11.1.



117.

118.

---

[172] J. Bergman Report at 72.

[173] J. Bergman Report at 72.

[174] 04/19/2023 S. Singh Dep. Tr. at 233:19-236:4 & Ex. 65; 01/30/2020 S. Markle Dep. Tr. at 211:4-10; 189:20-190:20; 206:20-207:13.

[175] 04/19/2023 S. Singh Dep. Tr. at 233:19-236:4 & Ex. 65; 01/30/2020 S. Markle Dep. Tr. at 211:4-10; 189:20-190:20; 206:20-207:13.

[176] AMZ_KOVE_000065279 at AMZ_KOVE_000065280.

[178]

119.

---

120.



[179] AMZ_KOVE_000069221.

[180] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[181] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[182] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[183] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[184] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[185] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[186] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[187] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

121.





**B.    DynamoDB ("DDB")**

122.    DDB was first publicly announced and offered for sale in the United States on January 18, 2012.[188] This launch occurred over six years before Kove filed this case on December 12, 2018.[189]

---

[188] Supplemental Responses to Plaintiff's First Set of Interrogatories (Nos. 1-6), dated June 11, 2021, p. 30.; 5/17/23 J. Overton Dep. Tr. Exhibit 98: Amazon Web Services Launches Amazon DynamoDB - A New NoSQL Database Service Designed for the Scale of the Internet, dated January 18, 2012.

[189] *See* Complaint.



123.

<sup>194</sup>

”195

<hr/>

190 AMZ_KOVE_000525421 at AMZ_KOVE_000525423.

191 AMZ_KOVE_000525421 at AMZ_KOVE_000525423-24.

192 5/24/23 R. Blackman Dep. Tr. at 45:6-11 (                                    );
51:5-19 (                              ); 68:17-69:6 (                      ); 70:2-
5 (                                          ); 93:3-14 (
    ); 103:20-21 ("                        ").

193 Amazon's Amended Supplemental Objections and Responses to Plaintiff's Fourth Set of Inter-
rogatories (Nos. 12-16), dated April 14, 2023, pp. 33-34; AMZ_KOVE_000446229 at
AMZ_KOVE_000446252.

194 Supplemental Response and Objections of Amazon Web Services, Inc. to Plaintiff's Third Set
of Interrogatories (No. 11), dated April 20, 2023, pp. 15-16.

195 Supplemental Response and Objections of Amazon Web Services, Inc. to Plaintiff's Third Set
of Interrogatories (No. 11), dated April 20, 2023, pp. 16-18.

124.    Some notable DDB customers include: Nike, Capital One, Lyft, Expedia, and the U.S. Census Bureau.[196]

125.    DDB has been widely used by hundreds of thousands of Amazon customers. ▮

███████████████████████████████████████████████████

██████████████████████████████████ [197]

126.    ████████████████████████████████████████████

███████████████████████████████████████████ ██ █

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ [199]

127.    Other usage data reinforces the incredible scale and technical needs for DDB to operate effectively. For example, ████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████ ██ ███████████████████████

███████████████████████████████████████████████████

---

[196] *See* https://aws.amazon.com/dynamodb/?nc2=h_ql_prod_fs_ddb, last accessed on August 18, 2023.

[197] AMZ_KOVE_000390625; AMZ_KOV_000275138 at 5140; Number of Active DynamoDB Users from Bennis Damages Report.

[198] J. Bergman Report, Exhibit 17.1.

[199] J. Bergman Report, Exhibit 17.1.

[200] J. Bergman Report at 95.

██████████████████████████████████████████████████████████

██████ [201]

128.    The designs and solutions that Amazon chooses for its DDB service must be able to serve the storage, usage, and other demands that its customers place on the service. Amazon's Dr. Swami Sivasubramanian, the first General Manager of DynamoDB, testified ████████

██████████████████████████████████████████████████████████

████████████████████████ [202]

129.    █████████████████████████████████████████████

██████████████████████ .

---

[201] J. Bergman Report at 95.

[202] 5/10/23 S. Sivasubramanian Dep. Tr. at 41:10-18 (████████████████████████████████████████████████████████████████████████ ); 106:3-107:11 (████████████████ ); 119:15-121:4 (██████████████████████ ); 158:4-21 (████████████████████████████████████████ ); 187:5-13 (████████████████████████████████████████████████ ██████ ").



130. In DynamoDB,

131.



## VI.    EXAMINATION HISTORY OF THE ASSERTED PATENTS

132.    Each of the Asserted Patents was considered and rejected during original examination for similar reasons and each has been subject to multiple post-grant proceedings with overlapping prior art. Further, in the completed *ex parte* reexamination proceedings some of the Asserted Patents' claims were cancelled, while the surviving Asserted Claims were deemed allowable based on similar explanations as detailed below.

A. **History of the '640 Patent**

133.     During original prosecution, the Patent Office twice rejected the '640 claims on ineligibility, indefiniteness, anticipation, and obviousness grounds.[203] After an Examiner's Interview, the applicant cancelled claims 1-23 and submitted new claims 24-49.[204] In response, the Examiner allowed the claims without providing reasons for allowance.[205]

134.     A third party (Aneeta Mishra), ██████████████████,[206] challenged claims of the '640 Patent in a Request for Reexamination on July 23, 2020, but the request was denied.[207] The prior art cited had no connection to the prior art I discussed above in explaining the state of the art in September 1999.

135.     Amazon filed its original request for *ex parte* reexamination (Reexamination Control No. 90/019,036) of claims 17, 18, and 24 of the '640 patent in view of:

- Oracle Names Administrator's Guide, Release 2.0 ("ONAG");
- Oracle DBA Survival Guide, 1st ed. ("OSG");
- U.S. Patent No. 5,777,989 ("McGarvey"); and
- U.S. Patent No. 5,301,286 ("Rajani").[208]

---

[203] *See* '640 History at 440-49, 488-98 (12/25/2004, 02/09/2005 Office Actions) ('640 History begins at KOV_00002868).

[204] *See* '640 History at 514-26 (08/09/2005 Remarks).

[205] *See* '640 History at 542-50 (11/14/2005 Notice of Allowance) (including an Examiner's Amendment cancelling claims 1-23 and adding new claims 24-48 to address a misnumbering of the claims).

[206] 01/24/2022 Mishra Declaration, ¶8.

[207] Reexamination Control No. 90/014,552 (produced as KOV_00060091 – KOV_00060955).

[208] Reexamination Control No. 90/019,036, Nov. 19, 2021 Request (produced as KOV_00233308 – KOV_00237608).

Based on Amazon's cited prior art, arguments, and expert evidence, the Patent Office granted that request, and ordered reexamination of the three challenged claims.[209]

136.    On May 4, 2022, the Reexamination Specialist issued an Office Action rejecting the challenged claims.[210] Kove filed a reply to that Office Action on August 4, 2022. Seeking to distinguish the claims over the prior art, Kove limited the scope of the claims to a system of location servers organized in a non-hierarchical cluster structure, wherein each location server must be able to respond to any location request with either the location of the data or the location of a server known to contain the requested location data without an intervening traversal, and wherein each request must be resolved in two or fewer traversals.[211] Kove then distinguished that narrowed scope from the primary prior art reference, OracleNamesAdminGuide, asserting that the Oracle system uses messages that can only traverse up and down a hierarchy of location servers because they couldn't "know" the contents of other location servers.[212] Building on that incorrect premise, Kove contended that Oracle's system can't meet the "redirect message" and "hash" limitations recited in the challenged claims.[213] Based on Kove's arguments that Oracle's Name Server's couldn't know each other's content and relied on traversing up and down a hierarchical tree, the examiner allowed the claims.[214]

---

[209] Reexamination Control No. 90/019,036, Dec. 23, 2021 Decision.

[210] Reexamination Control No. 90/019,036, May 4, 2022 Office Action.

[211] Reexamination Control No. 90/019,036, Aug. 4, 2022 Patent Owner's Reply to Office Action at 10, 23-25, 39-40.

[212] *Id*.

[213] *See*, *e.g.*, *id*. at 42-43.

[214] *See*, *e.g.*, Reexamination Control No. 90/019,036, Sept. 22, 2022 Notice of Intent to Issue *Ex Parte* Reexamination Certificate.

137.    Amazon filed its request for an additional reexamination on February 17, 2023.[215]
The request asserted substantial new questions of patentability ("SNQs") based on (1) U.S. Pat.
No. 6,473,781 ("Skagerwall") alone or in view of U.S. Pat. No. 6,185,601 ("Wolff"); (2) ONAG
in view of Maarten van Steen's IEEE article "Locating Objects in Wide-Area Systems" ("Steen")
and/or OracleUnleashed; and (3) Steen in view of Skagerwall and/or Wolff. The request further
asserted that each of these three SNQs teaches or discloses the "knowledge" or "awareness" of
other servers limitation found to be missing in the previous reexamination, i.e., the claimed loca-
tion servers having knowledge about or ability to determine the contents of the other location serv-
ers. For example, Skagerwall teaches a flat system of directory servers, where storing the location
of each entry for its retrieval is assigned to its respective "primary" directory server. Skagerwall
then discloses methods for any queried directory server to determine which other directory server
is the primary one for each respective entry.[216] And Wolff teaches network awareness so that when
a server can't process a client's request, the server can send a message redirecting the client to use
another server that can.[217] SNQs 1 and 3 in the request each relied entirely on prior art that the
Patent Office hadn't previously considered. And SNQ 2 relied on two new references (Steen and
OracleUnleashed), and new citations and arguments from the previously submitted Oracle-
NameAdminGuide reference addressing the new limitations from Kove's disclaimers.

138.    On April 4, 2023, the Patent Office ordered reexamination in Reexamination Con-
trol No. 90/019,166 of the three challenged claims including the previously allowed "awareness"

---

[215] Reexamination Control No. 90/019,166 (produced in part as KOV_00264360 –
KOV_00279931).

[216] Skagerwall at 10:21-26; 12:9-53.

[217] Wolff at Abstract, 5:25-38.

limitations, in light of the three SNQs based on the new Skagerwall, Wolff, ONAG, OracleUn-
leashed, and Steen references.

139.    It is my understanding that all of the asserted '640 Patent claims are pending review
by the Patent Office in Reexamination Control No. 90/019,166.[218]

### B.    History of the '978 Patent

140.    During prosecution, the Patent Office twice rejected the claims of the '978 patent
on anticipation and obviousness grounds.[219] After an Examiner's Interview and the applicant's
amendments to the claims, the Examiner allowed the claims.[220] The Examiner stated in the Notice
of Allowability that "the prior art of record fails to teach or suggest individually or in combination
a system in which a location query requests from multiple servers location information, separate
from the data objects to which the location information pertains, to be returned to the reques-
tor."[221]

141.    Amazon timely filed a petition seeking *inter partes* review of claims 1, 3, 6, 10, 14,
17, 23, 24, 30, and 31, based on four unpatentability grounds.[222] The Patent Trial and Appeal Board

---

[218] I understand that after the USPTO instituted reexamination, Kove filed a petition to terminate
the proceeding. I understand this petition was opposed by Amazon, similar to previously failed
attempts by Kove to terminate other reexamination proceedings.

[219] *See* '978 History at 304-14, 353-64 (08/22/2005, 06/01/2006 Office Actions). ('978 History
begins at KOV_00002445).

[220] *See* '978 History at 373-75 (08/24/2006 Examiner Interview Summary), 376-90 (11/01/2006
Amendment), 402-05 (02/13/2007 Notice of Allowance).

[221] '978 History at 402-05 (02/13/2007 Notice of Allowance).

[222] *See* Request at 14; *Amazon Web Services, Inc. v. Kove IO, Inc.*, IPR2020-00276, Paper 2. ('276
IPR Materials produced as KOV_00057829 – KOV_00059684).

denied institution on the merits in June 2020.[223] Amazon's subsequent requests for *ex parte* reex-

amination of the '978 patent don't rely on any of the same grounds or prior art as that denied IPR

petition.[224]

142.    On November 19, 2021, Amazon filed a request for *ex parte* reexamination (Reex-

amination Control No. 90/019,034) of claims 1, 3, 6, 10, 14, 17, 23, 24, 30, and 31, in view of:

- Oracle Names Administrator's Guide, Release 2.0 ("ONAG");
- Oracle DBA Survival Guide, 1st ed. ("OSG");
- U.S. Patent No. 5,777,989 ("McGarvey"); and
- U.S. Patent No. 5,301,286 ("Rajani").[225]

143.    On December 23, 2021, based on Amazon's arguments and submitted expert evi-

dence, the Examiner found that each ground of the request raised a SNQ affecting each of the

challenged claims.[226]

144.    The Examiner issued a Non-Final Office Action on June 28, 2022, rejecting claims

1, 3, 6, 10, 14, and 31, but not claims 17, 23, 24, and 30.[227] In doing so, the Examiner explained

---

[223] Request at 14; Reexamination Control No. 90/019,034, Dec. 23, 2021 Decision on Request at 7; *Amazon Web Services, Inc. v. Kove IO, Inc.*, IPR2020-00276, Paper 23 (PTAB June 16, 2020).

[224] *See* Reexamination Control No. 90/019,034, Dec. 23, 2021 Decision on Request at 7 (noting that IPR2020-00276 petition challenged the '978 claims in view of "Network Working Group RFC 1034," U.S. Patent No. 5,542,087 (Neimat), and "Load Management in Distributed Video Servers") ('034 History produced as KOV_00225519 – KOV_00226382).

[225] Reexamination Control No. 90/019,034, Nov. 19, 2021 Request. Amazon also filed requests for *ex parte* reexamination of claims of Patent Owner's U.S. Pat. Nos. 7,814,170 and 7,103,640 patents, which were granted and assigned Nos. 90/019,035 and 90/019,036. In September 2022, the USPTO issued Notices of Intent to Issue *Ex Parte* Reexamination Certificate confirming the challenged claims in those proceedings.

[226] Reexamination Control No. 90/019,034, Dec. 23, 2021 Decision on Request.

[227] *See* 06/28/2022 Office Action in Reexamination Control No. 90/019,034.

that the ONAG reference discloses the location server and location information limitations included in all ten challenged claims.[228]

145.    To distinguish the rejected claims from the ONAG prior art, Kove disclaimed embodiments taught in the '978 patent's specification. Specifically, Kove limited the claims' to non-hierarchical structures and distinguished them from the prior art's hierarchical and mixed topologies by asserting that the distributed hash-based redirection of the invention only works in flat, non-hierarchical configurations.[229] More particularly, Kove argued that, the redirection requirement "*cannot be met* in hierarchical configurations such as Oracle's Names Server because location servers in tree-structures do not receive a location query from a client and return a redirect message to the client."[230]

146.    But the '978 patent itself teaches that its claimed "Network Distributed Transport Protocol" (NDTP) is applicable to the architectures that Kove argued were incompatible. For example, when describing how the NDTP hash-based redirection mechanisms work, the '978 patent specification explains that the NDTP invention is "suitable for diverse topology deployments, [and] some applications might still benefit from a specifically hierarchical server topology."[231] In the prior reexamination of the related '640 patent, Kove acknowledged that the '640 patent's similar specification includes embodiments with systems having hierarchical configurations, before

---

[228] *Id.* at 5-9.

[229] 09/28/2022 Patent Owner's Reply to Office Action in Reexamination Control No. 90/019,034 at 36 ("These limitations cannot be met in hierarchical configurations.").

[230] *Id*. at 9 (emphasis added).

[231] '978 patent at 7:43-51.

arguing that the claimed invention only works with a flat, non-hierarchical topology.[232] Based on these statements by Kove disclaiming embodiments in the specification, claims 3, 6, 10, and 14 survived in Reexamination Control No. 90/019,034 ("the '034 Reexamination"), while claims 1 and 31 were cancelled.

147.    On August 31, 2022, Amazon filed an additional request (Reexamination Control No. 90/019,109, "the '109 Reexamination") for *ex parte* reexamination limited to claims 17, 23, 24, and 30 in view of:

- Oracle Names Administrator's Guide, Release 2.0 ("ONAG");
- U.S. Patent No. 6,122,664 ("Boukobza");
- U.S. Patent No. 5,617,568 ("Ault");
- U.S. Patent No. 6,230,183 ("Yocum"); and
- Oracle8 Server Unleashed ("OracleUnleashed").[233]

148.    The Patent Office ordered reexamination for claims 17, 23, 24, and 30 based on the new grounds of the '109 Reexamination due to the new prior art references and expert evidence.[234] On April 3, 2023, the four Transfer Claims were rejected based on all three SNQs presented in the request.[235]

149.    On February 17, 2023, Amazon filed an additional request (Reexamination Control No. 90/019,162, "the '162 Reexamination") for *ex parte* reexamination of claims 3, 6, 10, and 14.

---

[232] 08/04/2022 Patent Owner's Reply to Office Action in Reexamination Control No. 90/019,036 at 36.

[233] 08/31/2022 Request in Reexamination Control No. 90/019,109. ('109 Reexamination produced as KOV_00237613 - KOV_00238661).

[234] 11/22/2022 Determination – Reexamination Ordered at 28-29 in Reexamination Control No. 90/019,109.

[235] 04/03/2023 NFOA at 4 in Reexamination Control No. 90/019,109.

That request raised SNQs based on (1) Skagerwall alone or in view of Wolff; (2) OracleNamesAdminGuide in view of Steen and/or OracleUnleashed; and (3) Steen in view of Skagerwall and/or Wolff.[236]

150.    Each of those three SNQs in the '162 Reexamination teaches or discloses the "knowledge"/"awareness" limitation identified as missing in the '034 Reexamination, i.e., the claimed location servers having knowledge about or ability to determine the contents of the other location servers.[237] For example, Skagerwall teaches a flat system of directory servers, where storing the location of each entry for its retrieval is assigned to its respective "primary" directory server. Skagerwall then discloses methods for any queried directory server to determine which other directory server is the primary one each respective entry.[238]

151.    It is my understanding that all of the asserted '978 patent claims are pending review[239] by the Patent Office in Reexamination Control Nos. 90/019,109 and 90/019,162.[240]

---

[236] '162 Reexamination produced in part as KOV_00238662 – KOV_00254742.

[237] 09/28/2022 Patent Owner's Reply to Office Action at 9, 36 in Reexamination Control No. 90/019,034.

[238] Skagerwall at 10:21-26; 12:9-53.

[239] Claims 17, 23, 24, and 30 are rejected in the '109 Reexamination, while claim 6 is being reexamined in the '162 Reexamination. Claims 3, 10, and 14 were not included in the order for reexamination in the '162 Reexamination, but are pending review in Amazon's petition challenging their omission.

[240] In Reexamination No. 90/0019,162 claim 6 was instituted, while claims 3, 10, and 14 of the '978 patent weren't. But they are before the Director to institute reexamination under petition. The other '978 claims are under review in Reexamination No. 90/019,109.

C.      **History of the '170 Patent**

152.    During original prosecution, the Patent Office twice rejected the '170 claims on ineligibility, indefiniteness, double-patenting, anticipation, and obviousness grounds.[241] After the applicant's amendments to the claims and the filing of two terminal disclaimers, the Examiner allowed the claims.[242] The Examiner stated the following in the Notice of Allowability:

> The prior art of record fails to teach neither singly nor in combination, the claimed limitations of "a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, at least one of the plurality of data location servers includes location information associated with the identifier string, each one of the plurality of data location servers comprises a processor and a portion of the data location information, *the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.*" (emphasis added) as stated in claims 17, and "programming logic stored on the location server, wherein the programming logic is configured to return, in response to a location query related to a desired entity, a location message, the location message in conformance with the transfer protocol and comprising at least one location associated with the desired entity, wherein the programming logic is further configured to return the location message if the location server contains location information for the desired entity, and *wherein the programming logic is further configured to return a redirect message if the location server lacks the location information for the desired entity, the redirect message comprising a list of at least one other location server known to have the location information for the desired entity.*" (emphasis added) as stated in claim 20 and similarly

---

[241] *See* '170 History at 92-102, 170-174 (10/28/2008, 09/02/2009 Office Actions) ('170 History begins at KOV_00003457).

[242] *See* '170 History at 126-136 (03/02/2009 Amendment), 151-157 (05/08/2009 Response and Terminal Disclaimer), 187-193 (10/27/2009 Response and Terminal Disclaimer), 205-208 (11/18/2009 Notice of Allowance).

in claim 35. These limitations, in conjunction with other limitations in the independent claim, are not specifically disclosed or remotely suggested in the prior art of record.[243]

153.    Claims 1, 2, 6, 8, 9, 12, and 15 of the '170 patent were examined in Reexamination Control No. 90/019,035 ("the '035 Reexamination") in view of:

- Oracle Names Administrator's Guide, Release 2.0 ("Oracle-NamesAdminGuide");
- Oracle DBA Survival Guide, 1st ed. ("OracleSG");
- U.S. Patent No. 5,777,989 ("McGarvey"); and
- U.S. Patent No. 5,301,286 ("Rajani").[244]

154.    Based on Amazon's cited prior art, arguments, and expert evidence, the Patent Office granted that request, and ordered reexamination of the three challenged claims.

155.    On May 11, 2022, the Reexamination Specialist issued an Office Action rejecting the challenged claims. Kove filed a reply to that Office Action on August 11, 2022. Seeking to distinguish the claims over the prior art, Kove limited the scope of the claims to a system of location servers organized in a non-hierarchical cluster structure, wherein each location server must be able to respond to any location request with either the location of the data or the location of a server known to contain the requested location data without an intervening traversal, and wherein each request must be resolved in two or fewer traversals. Kove then distinguished that narrowed scope from the presented primary prior art reference, OracleNamesAdminGuide, asserting that the Oracle system uses messages that can only traverse up and down a hierarchy of location servers.

---

[243] '170 History at 206-207 (11/18/2009 Notice of Allowance) (emphasis in original).

[244] Reexamination Control No. 90/019,035, Nov. 19, 2021 Request ('035 Reexamination produced as KOV_00229876 - KOV_00233168; KOV_00237227).

Building on that incorrect premise, Kove contended that Oracle's system can't meet the "redirect message" and "hash" limitations recited in the challenged claims. Based on those arguments, the examiner allowed the claims.[245]

156.    Amazon filed an additional request (Reexamination Control No. 90/019,165) for reexamination of all asserted claims of the '170 patent on February 17, 2023.[246] The request asserted SNQs based on (1) Skagerwall alone or in view of Wolff; (2) OracleNamesAdminGuide in view of Steen and/or OracleUnleashed; and (3) Steen in view of Skagerwall and/or Wolff. The request further asserted that each of these three SNQs teaches or discloses the "knowledge" limitation found to be missing in the previous reexamination, i.e., the claimed location servers having knowledge about or ability to determine the contents of the other location servers.[247] For example, Skagerwall teaches a flat system of directory servers, where storing the location of each entry for its retrieval is assigned to its respective "primary" directory server. Skagerwall then discloses methods for any queried directory server to determine which other directory server is the primary one each respective entry. And Wolff teaches network awareness so that when a server can't process a client's request, the server can send a message redirecting the client to use another server that can.

157.    On March 29, 2023, the Patent Office ordered reexamination of all seven challenged claims, including the previously allowed "knowledge" limitations, in light of the three SNQs and the new Skagerwall, Wolff, ONAG, OracleUnleashed, and Steen references.

---

[245] *See*, *e.g.*, Reexamination Control No. 90/019,035, Sept. 27, 2022 Notice of Intent to Issue *Ex Parte* Reexamination Certificate.

[246] '165 History production produced in part as KOV_00254745 – KOV_00264356.

[247] *See*, *e.g.*, Reexamination Control No. 90/019,165, Feb. 17, 2023 Request.

158.     It is my understanding that all of the asserted '170 Patent claims are pending review by the Patent Office in Reexamination Control No. 90/019,165.[248]

## VII.    SOURCE CODE REVIEW

159.     Source code is the version of software as it is originally written by a human in plain text. It provides the instructions for software.

160.     With that in mind, ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████[249]

161.     ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████

162.     ██████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[248] I understand that after the USPTO instituted reexamination, Kove filed a petition to terminate the proceeding. I understand this petition was opposed by Amazon, similar to previously failed attempts by Kove to terminate other reexamination proceedings.

[249] ████████████████████████████████████████████████████

163.

164.

---

[250] 4/23/23 S. Markle Dep. Tr. at 218:16-19 ( ); 5/5/23 T. Rath Dep. Tr. at 70:21-22 ( ).

165. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████ ██ ████████████████████████████████
████████████████ ██ ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

166. ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████ ██
████████████████████████████████████████████
████████████████████████████████████████████
████████ ██ █████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

---

[251] 05/04/23 R. Blackman Dep. Tr. at 24:3-11.

[252] 05/05/23 T. Rath Dep. Tr. at 9:4-12:18.

[253] 04/27/23 S. Markle Dep. Tr. at 28:13-36; 197:9-14.

[254] 04/27/23 J. Hamilton Dep. Tr. at 37:23-40:14.

167. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

## VIII.   TESTING OF THE ACCUSED AMAZON PRODUCTS

168.     Independently testing an accused product and its software is also critical to an infringement analysis. Well-designed testing also shows how an accused system actually operates. While the source code provides details on how the system should operate when the source code runs, testing confirms that how the system actually runs is consistent with the relevant source code. Testing and source code are inextricably linked. For example, if you need to know what goes into making a cake, you can either read the recipe or watch the baker follow that recipe from start to finish. The source code provides the recipe for accessing data on the Accused Products, while testing the Accused Products allows me to observe their behavior when accessing data according to that source code recipe. So, if you properly test, you will arrive at the correct answer as to whether there is infringement. Conversely, if you don't properly test, you may arrive at the wrong answer in determining infringement.

169.     ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

170.

171.

172.

173.

174.

175.

176.

177.

---

[255] Within the user interface, the locations for creating buckets were identified as "Availability Zones." But it is my understanding that these "Availability Zones" identified within the user interface refer to the regions in AWS's global infrastructure. *See* Ex. 2 (AWS Global Infrastructure) (available at https://aws.amazon.com/about-aws/global-infrastructure/?p=ngi&loc=0, last accessed on August 16, 2023).

178.

179.

180.

181.

██████████████████████████████████████████

███████

182.  ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████

183.  ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

█████████████████

184.  ████████████████████████████████████

██████████

185.  ████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████





186.

187.

188.

189.

190.

191.

192.



193. ██████████████████████████████████████████

██████████████████████████████████████████████

████

194. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

195. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████

196. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████



197.

## IX.    BACKGROUND ON PATENT LAW

198.    I am not an attorney. I have been provided with and reviewed the relevant legal principles summarized in this report and I applied them in my analysis. These principles are as follows.

199.    Direct Literal Infringement:[256] I understand that patent infringement is a two-step process. More specifically, the two steps of a patent infringement analysis are: (1) the claims of the patent must be interpreted by the Court, and (2) the claims, as interpreted by the Court, are compared to the accused products. There is patent infringement only if the accused product includes or performs every element of a patent claim. If an accused product is missing even a single claim element, then there can be no infringement.

200.    The patentee has the burden to show that the defendant infringes a patent claim by a preponderance of the evidence. I understand that means that the patentee must show that it is more likely than not that the defendant infringes a patent claim. A defendant can infringe a patent claim by making, using, selling, or offering to sell the accused product in the United States. A defendant can also infringe a patent by importing an accused product into the United States.

201.    To prove direct infringement, the patentee must show that the defendant makes, uses, sells, offers to sell, or imports the accused product into the United States and that the accused product literally meets each and every element of the asserted claim.

---

[256] Dr. Goodrich doesn't provide any opinions regarding indirect infringement by either S3 or DDB or willful infringement. As a result, I haven't included the law relevant to those legal issues and haven't performed any analysis relating to them. In the event Dr. Goodrich later provides supplemental opinions relating to either indirect or willful infringement, I reserve the right to address them.

202.    Direct Infringement Under the Doctrine of Equivalents: I understand that there can also be infringement even if a claim limitation isn't literally present in the accused product. More specifically, an accused product can infringe under the doctrine of equivalents. A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claim and the accused product is insubstantial. This showing must be made on a limitation-by-limitation basis, as opposed to on the invention as a whole. One way of showing infringement under the doctrine of equivalents is to show, on a limitation-by-limitation basis, that the accused product performs substantially the same function, in substantially the same way, with substantially the same result. I understand this is commonly referred to as the function-way-result test.

203.    Non-Infringing Alternatives: I understand that a non-infringing alternative must be a feasible and acceptable product or method that doesn't infringe the Asserted Patents. And, in determining the feasibility of a non-infringing alternative, one can consider whether the defendant could have readily implemented the alternative, whether the alternative was well-known in the field at the time of the first alleged infringement, and whether the defendant had the necessary know-how to use the non-infringing alternative.

204.    While a proposed non-infringing alternative must be feasible, it isn't necessary to show that the alternative existed or was actually marketed at the time of infringement. Rather, the defendant must demonstrate only that the alternative was more than theoretically possible, and that the alternative was marketable and would have been acceptable to both the defendant and its customers.

## X.   CLAIM CONSTRUCTION

205.   Kove agrees that the Asserted Patents have expired.[257] I understand that the Asserted Claims should be given their ordinary and customary meaning to a POSITA at the time of invention. Unless otherwise noted, I have applied this standard in rendering my opinions.

### A.   The Court's Constructions

206.   I understand that the Court has issued the following constructions:[258]

| Affected Patents & Claims | Claim Term | Court's Construction |
|---|---|---|
| '978 Patent: Claims 1, 3, 6, 10, 14, 17, 31<br><br>'170 Patent: Claims 1–2, 6, 8, 15<br><br>'640 Patent: Claims 17–18, 24 | "location information" | '978: "one or more identifiers and their associated locations"<br><br>'170/'640: "information pertaining to one or more locations of data and/or the identities of one or more location servers" |
| '978 Patent: Claims 1, 3, 6, 10, 14, 17, 23, 30, 31<br><br>'170 Patent: Claims 1, 6, 8, 12, 15<br><br>'640 Patent: Claims 17, 18, 24 | "location server" | "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients" |
| '978 Patent: Claim 14<br><br>'170 Patent: Claim 15<br><br>'640 Patent: Claims 17–18, 24 | "client" | "a network-attached component (which may be software or hardware) that initiates update or lookup of identifier/location mappings from a location server with location request messages" |
| '170 Patent: Claim 1 | "based on a hash function used to organize the data location information across the plurality of data location servers . . . based on | "the portion of the data location information included in a corresponding one of the data location servers is based on a hash function that maps identifier strings to one or more of the data location servers, and each one of the data |

---

[257] Dkt. 145 at 8.

[258] Dkt. 484 at 35.

| Affected Patents & Claims | Claim Term | Court's Construction |
|---|---|---|
| | the hash function applied to the identifier string" | location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string" |
| '978 Patent: Claim 6<br><br>'170 Patent: Claims 2, 12<br><br>'640 Patent: Claim 24 | "data pertaining to the entity" | "data pertaining to a person or thing (real, digital, or abstract) distinct from that data" |

207.    I further understand that the Court has recognized the following constructions for terms agreed upon by the parties:[259]

| Affected Patents & Claims | Claim Term | Court's Construction |
|---|---|---|
| '978 Patent: Claims 1, 3, 6, 10, 14, 17, 23-24, 30, 31<br><br>'170 Patent: Claims 1–2, 6, 8, 12, 15<br><br>'640 Patent: Claims 17–18, 24 | "location" | "an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored" |
| '978 Patent: Claims 1, 3, 6, 10, 14, 17, 23-24, 30, 31<br><br>'170 Patent: Claims 1–2, 6, 8, 12, 15<br><br>'640 Patent: Claims 17–18, 24 | "identifier/identifier string/identification string" | "a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server" |
| '978 Patent: Claims 1, 3, 6, 10, 14, 17, 23-24, 30, 31<br><br>'170 Patent: Claims 1–2, 6, 8, 12, 15<br><br>'640 Patent: Claims 17–18, 24 | "hash table" | "a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table" |

---

[259] Dkt. 484 at 2 (Recognizing terms from Appendix B of Dkt. 382).

| Affected Patents & Claims | Claim Term | Court's Construction |
|---|---|---|
| '640 Patent: Claims 17 | "data location sewer network" | "data location server network" |
| '978 Patent: Claim 14 | "Preamble" | Preamble after "comprising" limits the claim |
| '978 Patent: Claim 17 | "Preamble" | Preamble after "having" limits the claim |

208.    I have applied these constructions in rendering my opinions in this case. For the remaining claim terms, I have applied their ordinary and customary meaning to a POSITA as of September 1999.

**B.    Additional Construction Is Required Due to Kove's Limiting Statements In The *Ex Parte* Reexaminations.**

209.    I understand Kove's statements during the reexamination proceedings are part of the prosecution history. I understand that the Court will consider Amazon's proposed additional constructions based on Kove's limiting statements.[260] Those proposed constructions are:[261]

---

[260] Dkt. No. 580.

[261] Dkt. No. 539 at Appendix A.

**APPENDIX A**

| Claims | Terms | Proposed Constructions |
|---|---|---|
| '640: 17, 18, 24 '170: 1, 2, 6, 8, 9, 12, 15 '978: 1, 3, 6, 10, 14, 17, 23, 24, 30, 31 | "network" / "system" | [network/system] **arranged in a non-hierarchical, cluster topology** |
| '640: 17, 18, 24 '170: 1, 2, 6, 8, 9, 12, 15 '978: 1, 3, 6, 10, 14, 17, 23, 24, 30, 31 | "location server" | a network-attached component that maintains**, for satisfying every request for the location of data on the network,** a set of **at least one of (1)** identifier/location mappings **or (2) information about the location of such mappings** that are modified or returned in response to **all** location request messages from clients |
| '640: 17, 18 '170: 1, 2, 5, 6, 8, 9, 12 '978: 1, 3, 6, 10, 17, 23, 24, 30, 31 | "providing" / "determin[e/ing]" / "retrieving" location information or servers | providing, **without performing any request iterations,** … location information / determin[e/ing], **without performing any request iterations,** … location servers / retrieving **in two or fewer request iterations** location information |
| '640: 17, 18 '170: 6, 15 '978: 3, 10, 14 | "return" / "sending" / "transmit[s/ting]" a redirect message | return / sending / transmit[s/ting] a redirect message **without performing any request iterations** |

210.    It is my understanding that courts usually construe claim terms based on the ordinary and customary meaning to a POSITA at the time of the alleged invention. I further understand that there are exceptions where the court may construe the terms otherwise. For example, I understand that when a patentee makes clear and unambiguous disavowals during the prosecution of the claims, the court will construe the claim terms in accordance with those disavowals. I understand that this is called the doctrine of prosecution disclaimer, which ensures that claims aren't construed one way to obtain their allowance and in a different way against alleged infringers.

211.    It is my opinion that Kove's reexamination disclaimers require additional construction because they narrowed the scope of the claims to avoid what was disclosed in the asserted prior art. Accordingly, additional construction is necessary to prevent the claims from

obtaining allowance with a narrow construction while being asserted against Amazon with a different, broader construction.

212.     As Mr. Greene has explained in his report, to overcome the Oracle prior art that Amazon submitted to the Patent Office, Kove narrowed the scope of the Asserted Claims in three ways.[262] After my review of the record, I agree with Mr. Greene that a POSITA would understand that Kove made it clear that the Asserted Claims only cover: (1) location servers in non-hierarchical, cluster structures, where each location server (2) contains the relevant location information or information to locate the relevant location information for every request, and (3) can resolve every request in two or fewer steps.

213.     In my opinion, all of the Asserted Claims should be construed to require a non-hierarchical structure. In the reexaminations of the Asserted Patents, Kove's responses consistently stated that this structure is required for the Asserted Claims and that the alleged invention cannot function without it:

> In contrast, claims 17 and 18 recites a *non-hierarchical* cluster con-figuration.[263]
>
> Although the '640 specification discloses hierarchical applications for NDTP as possible embodiments, claims 17 and 18 require non-hierarchical structure, as explained here and throughout this reply.[264]

---

[262] Greene Report, §108.

[263] August 4, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ('640 patent) at 23 (emphasis in original).

[264] *Id.*, n. 2 (emphasis in original).

ln contrast, claims 1, 6, and 15 of the '170 patent require networks with *non-hierarchical* (or "cluster") configurations of location servers that enable each server in the server network to know which location server contains the location(s) of the desired data.[265]

Each of the claims at issue require, expressly or impliedly, a non-hierarchical cluster configuration of locations servers in a network.[266]

Claim 6's non-hierarchical configuration is embodied [sic] the requirement that the location server must be able to return a "redirect message" where "the redirect message compris[es] a list of at least one other location server known to have the location information for the desired entity." **This limitation cannot be met in hierarchical configurations…**[267]

In contrast, independent claims 10 and 14 and dependent claim 3 of the '978 patent require networks with non-hierarchical (or "cluster") configurations of location servers that enable each server in the server network to know which location server contains the location(s) of the desired data.[268]

Furthermore, **these limitations cannot be met in hierarchical configurations** such as Names Server because location servers in tree-structures do not receive a location query from a client and return a redirect message to the client.[269]

214. Kove also made this same argument requiring a non-hierarchical structure to the Reexamination Specialist in the '034 Reexamination of the '978 patent. Specifically, Kove included it in a PowerPoint presentation on September 22, 2022, highlighting the non-hierarchical

---

[265] August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 25 (emphasis in original).

[266] *Id.*

[267] *Id.* at 26 (emphasis added).

[268] September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 35.

[269] *Id.* at 36 (emphasis added).

invention against the hierarchical Oracle prior art. I have reviewed and agree with Mr. Greene's annotated version of that slide below.[270]



215.     In reading this slide, a POSITA could only understand the claims to require a non-hierarchical topology for enabling the "horizontal scaling" and to enable the claimed "redirect

---

[270] KOV_00226308 (PowerPoint Slide); KOV_00226137-226140 ('034 Reexamination Interview Summary).

message." A POSITA would further understand that hierarchical structures with vertical scaling are incompatible with the claims.

216.    Kove has repeated these clear and unambiguous statements throughout the reexaminations on each of the Asserted Patents. As a result, a POSITA would understand that the Asserted Claims require non-hierarchical structures and are incompatible with both hierarchical and mixed structures. Thus, it is my opinion that Kove's statements require the proposed construction to reflect the scope Kove argued to avoid the Oracle art during each of the reexaminations.

217.    Second, all terms should be construed to require that the claimed location servers must also (1) have either location information or information about which server contains the location information for every network request and (2) resolve every request to the requesting client in two or fewer steps. A POSITA would understand in reviewing the reexaminations that Kove repeatedly argued these requirements for the claims:

> The[] invention, as embodied in the claims of the '640 patent, enables a client to retrieve data by sending a query to any server in the network, not just servers organized by a tree, and having that server be capable of providing information that permits the client to calculate the location of a second server known to contain the requested information. Claims 17 and 18 **therefore require every server in the network be able to return information for calculating the location of the server that contains the requested information**.[271]

> [T]he '640 patent **requires that each and every server in the data location server network have the capability of transmitting information to the client that the client then processes to determine the server that contains its requested information**. This configuration "collapses" the hierarchical composition of Oracle Names, making it entirely different in practice and principle from

---

[271] August 4, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ('640 patent) at 10 (emphasis in original).

what Oracle Admin discloses. Oracle Admin in no way teaches that Oracle Names network servers have this capability.[272]

Furthermore, claim 10 requires **each location server be configured to transmit a redirect message** comprising information to for finding a location server having location information.[273]

Their invention, as embodied in the claims of the '170 patent, enables a client to retrieve data through any server in the network and receiving in response the location information associated with a desired entity. Claims 1, 6, and 15 (and their dependent claims) require the servers in the network to provide the relevant location information. In other words, **any queried server will either have the requested information or will identify which other server contains the requested information**.[274]

For example, if a queried server receives a request for the data locations associated with a particular identifier but does not have it, that server will return a message to [sic] indicating which other server in the network contains the requested information.[275]

The structured relationships of the invention allow clients to access data in distributed environments through a **non-hierarchical**, limitlessly scalable, server structure **that enables retrieval of requested information in not more than two iterations**.[276]

---

[272] *Id.* at 23 (emphasis in original).

[273] September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 36.

[274] August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 11 (emphasis in original).

[275] *Id.* at 25.

[276] August 4, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ('640 patent) at 10 (emphasis added); September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 36 (same); August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 11 (same).

218. Based on these repeated, clear, and unambiguous statements, a POSITA would understand that the Asserted Claims only apply to location servers that (1) have either location information or information about which server contains the location information for every network request and (2) resolve every request to the requesting client in two or fewer steps. Thus, it is my opinion that Kove's arguments require the proposed construction to reflect the scope asserted to avoid the Oracle art during reexamination.

219. Accordingly, it is my opinion that a POSITA would understand that Kove's arguments in the '034, '035, and '036 Reexaminations require the additional proposed constructions.[277]

220. In Sections X and XII, I have applied these additional constructions in my analysis. Unless otherwise noted, these are the only sections where I have applied these constructions.

## XI. AMAZON DOESN'T INFRINGE THE ASSERTED CLAIMS UNDER THE CURRENT CLAIM CONSTRUCTIONS.

221. Kove has asserted claims of the Asserted Patents against the Accused Products. To any extent Kove supplements its infringement contentions and/or other disclosures to accuse any additional products or additional infringement theories, I reserve the right to provide supplemental analysis.

222. As discussed above in section IV.D, the Asserted Claims are grouped as the Knowledge Claims, the Transfer Claims, the Hashing Claims, and the Redirect Claims.

---

[277] I understand that co-inventor John Overton, one of the attendees at the reexamination interviews, was unable to remember any details about the interviews. If additional information becomes available about these interviews and the prosecution history, I may supplement my report with additional analysis. 5/17/23 J. Overton Dep. Tr. at 788:17-22; 770:22-771:11.

A.    **DDB Doesn't Infringe the Asserted Claims.**

223.    Kove has accused DDB of infringing all of the Asserted Claims. It is my opinion that DDB does not infringe any of the Asserted Claims for at least the following reasons.

1.    **DDB Does Not Use the Required "Identifier-Location" Associations.**

224.    Each of the Asserted Claims requires at least one of an identifier, identification string, or identifier string. The Court recognized the parties' agreement regarding the construction of each of these terms as "a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server."[278] Each of the Asserted Claims further requires that the object identifiers be associated with respective object locations.[279] The Court recognized the parties' agreement regarding the construction of location as "an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored."[280] As I explain below, DDB does not rely on the claimed identifier, the claimed location, or the claimed identifier-location associations stored in a location server.

225.    ███████████████████████████████████████

███████████████████████████████████████████

███████    ███████                    ███    █

---

[278] Dkt. 484 at 2 (Recognizing terms from Exhibit B of Dkt. 382).

[279] *See e.g.*, '640 patent at cl. 17 (requiring "*location strings associated with respective identifier strings*").

[280] *Id.*

[281] AMZ_KOVE_000065279 at AMZ_KOVE_000065280.

[282] AMZ_KOVE_000065279 at AMZ_KOVE_000065280.



226.

[283] AMZ_KOVE_000065279 at AMZ_KOVE_000065281.

[284] AMZ_KOVE_000065279 at AMZ_KOVE_000065281.

[285] AMZ_KOVE_000065279 at AMZ_KOVE_000065281.

[286] 5/5/23 T. Rath Dep. Tr. at 178:20-179:16 (). *See also*, 179:18-180:14 .).

[287] AMZ_KOVE_000065279 at AMZ_KOVE_000065281.

227.

[redacted]290

228.    Thus, DDB does not infringe any of the Asserted Claims because it lacks the required identifier/identifier string/identification string associated with an object location. For at least this reason, it is my opinion that DDB doesn't infringe the Asserted Claims.

---

[288] Goodrich Report Ex. E., ¶ 83.

[289] AMZ_KOVE_000010429.

[290] AMZ_KOVE_000010429, 000010430 ("[redacted]"); AMZ_KOVE_000006576 at p. 29 ("[redacted]")

## 2. DDB Lacks the Required "Location Server."

229.    Each of the Asserted Claims requires one or more location servers. The Court has construed "location server" as "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients."[291] As I explain below, none of the components in DDB constitutes a "location server" as construed by the Court.

230.    First, the Court has construed the term "client" as "a network-attached component (which may be software or hardware) that initiates update or lookup of identifier/location mappings from a location server with location request messages."[292]  So, to meet this requirement, the client must "initiate[] update or lookup of identifier/location mappings."

---

[291] Dkt. 484 at 35.

[292] Dkt. 484 at 35.

[293] 5/5/23 T. Rath Dep. Tr. at 175:17-176:6 (

").

231.    Second, to meet the Asserted Claims, the location server must store "a set of iden-

tifier/location mappings." No component of DDB satisfies this requirement. ███████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

    ████████████████████████████████████████████████

232.    ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

█████████████████████████

---

[294] AWS_SRC_CODE_000000157.



233. ███████████████████████████

█████████████████████████████████████
█████████████████████████████████████
█████████████████████████████████████
████████████████████████[296]

████████████████████████████████

---

[295] 5/5/23 T. Rath Dep. Tr. 44:22-45:5 ("████████████████████
████████"). *See also*, *id.*, 49:11-14 ("█████████████████████
█████████████████████████████████████████████████
████████████████████████████████████████████████").
[296] 5/5/23 T. Rath Dep. Tr. 181:9-23 at ("…████████████████
███████████████████████").

234.    Dr. Goodrich opines that the "location server" requirement of the Asserted Claims ███████████████████████████████████ The Court construed the "location server" as "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients." As I explained above, █████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████

235.    Thus, DDB doesn't meet the claimed "location server." For at least this reason, it is my opinion that DDB doesn't infringe the Asserted Claims.

### 3.    DDB Doesn't Use the Required Hashing Methods.

236.    Each of the Hashing Claims requires that the location information be organized through hashing. As I explained above in Section III.B.5.c, features of hashing data include applying a hash function to the data to assign it a storage location, storing the assignments in a hash table, and applying the hash function to requests for the data. As I explain below, none of the components in DDB hashes any of the metadata used to eventually locate the data.

237.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[297] *See*, *e.g.*, Goodrich Report, Ex. E, ¶ 81.

[298] Goodrich Report, Ex. E, ¶33.

███████████████████████████████████████████████

████████████████████.

238. ████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████[299]

239. ████████████████████████████████████

███████████████████████████████████████████████

███████████████ ██ ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

240. ████████████████████████████████████

██████ ██ ████████████████████████████████████

██████

---

[299] AMZ_KOVE_000504893.

[300] Goodrich Report, Ex. E, ¶ 122.

[301] Section VIII.

241. Thus, DDB doesn't use the required hashing from the Hashing Claims. For at least this reason, it is my opinion that DDB doesn't infringe the Hashing Claims.

### 4. DDB Doesn't Use the Required Redirect Messages.

242. Each of the Redirect Claims requires that if a location server receives a request for location information that it doesn't contain, it must return to the client a redirect message that identifies the location server known to contain the requested location information.[302] In my opinion, DDB does not use the required location server redirect messages for at least the following reasons.

243. 

---

[302] Section IV.C.

[303] 5/5/23 T. Rath Dep. Tr. at 175:17-176:6 (

"); S. Sivasubramanian Dep. Tr. 490:20-491:19 ("

").

244.     Additionally, none of the DDB components are configured to send any redirect messages identifying a server of its class "known to contain" the requested location information if they do not contain the requested data.

245.

306

246.

---

[304] Goodrich Report, Ex. E, ¶114.

[305] AWS_SRC_CODE_000000101 at AWS_SRC_CODE_000000101-102.

[306] 5/5/23 Rath Dep. Tr. at 206:12-208:3 (



247.

---

[307] *Id.*

[308] 5/5/23 T. Rath Dep. Tr. at 181:9-23 ("

")

[309] AWS_SRC_CODE_000000948.



248.

249.

250.

---

251.    Thus, DDB doesn't use the redirect message required by the Redirect Claims. For at least this reason, it is my opinion that DDB doesn't infringe the Redirect Claims.

### 5.    DDB Doesn't Infringe the Transfer Claims.

252.    DDB doesn't meet several limitations of the Transfer Claims.

253.    First, the Transfer Claims require a "unique set of location information of an aggregate set of location information."

---

[311] Goodrich Report, Ex. E, ¶ 111.

[312] Goodrich Report, Ex. E, ¶165.

[313] *See, e.g.,* Goodrich Report, Ex. E, ¶147.

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████

254.    Second, no "transferring" of "identifiers" or "associated locations" from "the first location server" occurs.  The claims state: "transferring … the identifiers and associated locations."  As the claims show, "the identifiers and associated locations" are the identifiers and associated locations on "the first location server"—the same "first location server" that reaches the "predetermined performance limit."  So, to satisfy the claim language, the "transferring" must take place from the "first location server" that reaches the "predetermined performance limit" to the "second location server." ████████████████

████████████████████████████████████████
████████████████████████████████████████
█████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
█████████████████████

255.    Third, Dr. Goodrich has not substantiated that any "transferring a portion of the identifiers and associated locations" takes place. ████████████████████

---

[314] Goodrich Report, ¶242; 4/21/23 D. Walsh Dep. Tr. at 114:16-116:3; AMZ_KOVE_00046392.

[315] Goodrich Report, Ex. E, ¶ 5.

256.    Fourth, Dr. Goodrich does not show that the "transferring a portion of the identifiers and associated locations" limitation is satisfied.

257.    Fifth, there are no "predetermined performance limits" that trigger any "transfer" of identifiers and associated locations.

---

[316] Goodrich Report, Appendix B, ¶392.



258.    Sixth, the location servers themselves don't initiate a "transfer" in response to detecting that a performance criterion has reached a predetermined performance limit. ▮▮▮▮

259.    Thus, the MNs fail to transfer their contents to another MN based on a predetermined limit as required by the Transfer Claims. For at least all of these reasons, it is my opinion that DDB doesn't infringe the Transfer Claims.

**B.    S3 Doesn't Infringe the S3 Asserted Claims.**

260.    Kove has accused S3 of infringing claims 6, 17, 23, 24, and 30 of the '978 patent and claims 1 and 2 of the '170 patent (the "S3 Asserted Claims").[320] It is my opinion that S3 doesn't infringe any of these claims for at least the following reasons.

---

[317] *See* 6/14/23 D. Walsh Dep. Tr. at 413:11-15.

[318] Goodrich Report, Appendix B, ¶392.

[319] *See* Amazon's April 14, 2023 Amended Supplemental Objections And Responses To Plaintiff's Fourth Set of Interrogatories (Nos. 12-16), p. 9.

[320] Although his summary states that S3 infringes all of the Asserted Claims, Dr. Goodrich's Exhibit E addresses only these claims with respect to S3, which is consistent with Kove's infringement contentions as detailed above. *Compare*, Goodrich Report, at ¶3 to Goodrich Report Ex. E. If Dr. Goodrich supplements his opinions to include any of the other Asserted Claims, including the claims of the '640 patent, I reserve the right to address them.

### 1. S3 Does Not Use the Claimed "Identifier-Location" Associations.

261.     Each of the S3 Asserted Claims requires at least one of an identifier, identification string, or identifier string. The Court recognized the parties' agreement regarding the construction of each of these terms as "a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server."[321] Each of the S3 Asserted Claims further requires that the object identifiers be associated with respective object locations. The Court recognized the parties' agreement regarding the construction of location as "an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored." As I explain below, in my opinion, S3 does not rely on the claimed identifier, the claimed location, or the claimed identifier-location associations stored in a location server.

---

[321] Dkt. 484 at 2 (Recognizing terms from Appendix B of Dkt. 382).

██████████████████████████████████████████████

262. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

263. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

264. ██████████████████████████████████████████

████████████████████████████████████████████████

---

322 *See* AMZ_KOVE_000442191.

323 1/30/2020 S. Markle Dep. Tr. at 120:15-17 ("█████████████████
████████████████████████████████").

324 AWS_SRC_CODE_000001424 at AWS_SRC_CODE_000001424;
AMZ_KOVE_000012903; 4/27/23 J. Hamilton Dep. Tr. at 108:18-19 ("███████
████████████████████████████████").

325 AMZ_KOVE_000012900 at AMZ_KOVE_000012902-04.

326 AWS_SRC_CODE_000001417 at AWS_SRC_CODE_000001417-1422 (███████
██████████████████████████████████████).

327 AWS_SRC_CODE_000001059.



265.

266.

---

[328] 6/4/2021 A. Vermeulen Dep. Tr. at 166:6-10 (

).

[329] 4/19/23 S. Markle Dep. Tr. at 86:12-17 (

"); 1/30/2020 S. Markle Dep. Tr. at 176:7-8 ("

"), 176:12 ("                                        ").

[330] AMZ_KOVE_000012900 at AMZ_KOVE_000012901.

[331] AMZ_KOVE_000012900 at AMZ_KOVE_000012901.

267. ████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████

████████████████████████████████████

268. ████████████████████████████████████████

████████████████████████████████████████

████ [334]

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[332] AWS_SRC_CODE_000001109; 4/19/23 S. Markle Dep. Tr. at 86:18-20 ("████████████████████████████████████ ████████████").

[333] E.g., 1/30/2020 S. Markle Dep. Tr. at 224:17-19 ("████████████████████████████ ██████████████████████").

[334] AWS_SRC_CODE_000001059.

269.

270. Thus, S3 does not rely on the claimed identifier-location mappings. And, for at least this reason, it is my opinion that S3 does not infringe the Asserted Claims.

**2. S3 Lacks the Claimed "Location Server."**

271. Each of the S3 Asserted Claims requires one or more location servers. The Court has construed "location server" as "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients."[335] As I explain below, in my opinion, none of the components in S3, constitute a "location server" as construed by the Court.

272. First, the Court has construed the term "client" as "a network-attached component (which may be software or hardware) that initiates update or lookup of identifier/location mappings from a location server with location request messages."[336] As a result, the client must "initiate[] update or lookup of identifier/location mappings."

---

[335] Dkt. 484 at 35.

[336] Dkt. 484 at 35.

273.



274.

But Dr. Goodrich's new reading of "client" not only contradicts the Court's construction of the term, but also contradicts the inventors' understanding of the term. For example, Dr. Bailey, one of the named inventors of the Asserted Patents testified that "client . . . in the context of the product we built" refers to, for example, "a patient . . . retriev[ing] medical recodes . . . so that's one - - one person."[341] Indeed, Dr. Bailey further explained:

> And logically, the client is essentially the software entity in this case that sits on the other end of the -- on the client end of the -- the protocol for -- for data location . . . It could be -- it could be a machine. It doesn't need to be a person. It could be any entity. Basically, it's just any entity that wants to locate and retrieve a piece of information.[342]

275. And this is consistent with how the patents describe "client." For example, the patents describe the "client" in the context of being one end point of a NDTP connection:

---

[337] Goodrich Report, Ex. D, ¶¶83-84.

[338] AMZ_KOVE_000012900.

[339] AMZ_KOVE_000012900. *See also* S. Markle Dep. Tr. at 167:5-18.

[340] Goodrich Report, Ex. D, ¶ 85.

[341] *See* 10/9/20 S. Bailey Dep. Tr. at 95:12-20.

[342] *See* 10/9/20 S. Bailey Dep. Tr. at 99:3-14.



343

---



████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

 345

276.    Dr. Goodrich relies on a single unasserted dependent claim to support this new interpretation of "client."[346] But this is a misreading of the claim. A POSITA would understand that Claim 25's "next client" does not refer to the initial components of the data repository. Instead, it

---

[344] '978 patent, Fig. 1.

[345] *See, e.g.,* 5/23/23 A. Vermeulen Dep. Tr. at 24:6-16 ████████████████
████████████████████████████████████████████████████████████████
)

[346] Goodrich Report, Ex. D, ¶ 85 (citing to claim 25 of the '640 patent, "further comprising a plurality of servers related in a logical hierarchy between the client and the data location servers, wherein each of the plurality of servers is configured to function as a next client and retransmit the data location request to a next logically associated server until a data location server receives the data location request.")

relates to simple gateways, routers, or switches that a connection must pass through to traverse the internet. As the claim states, these "next clients" simply "retransmit" the request. They are not part of the processing of the request ████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████

277.    Second, the location server must store "a set of identifier/location mappings." No component of S3 satisfies this requirement at least ████████████████████████████████

███████████████████████████.[347]

278.    ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████[49]

279.    ████████████████████████████████████████████████████

█████████████████████████

---

[347] 4/19/23 S. Markle Dep. Tr. at 86:10-17 ("████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████").

[348] Goodrich Report, Ex. E, ¶78.

[349] AMZ_KOVE_000012900 at AMZ_KOVE_000012901; 4/19/23 S. Markle Dep. Tr. at 82:18-20 ("█████████████████████████████████████████████████████████").



[50]

280. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████ ████████████████████
████████████████████████

281. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████.[353]

---

[350] AMZ_KOVE_000012900 at AMZ_KOVE_000012901; 4/19/23 S. Markle Dep. Tr. at 142:1-2 ("████████████████████████████████████████████████████.").

[351] 1/30/2020 S. Markle Dep. Tr. at 172:5-6 ("█████████████████████ █████), 173:10-11("████████████████████████████████████████).

[352] See AMZ_KOV_000226532 at AMZ_KOV_000226533-34.

[353] AWS_SRC_CODE_000001084.



282. ████████████████████████████████

████████████████████████████████

████

283. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████ [355]

284.     During his deposition, Dr. Overton was asked about this very paper.[356] Dr. Overton was in possession of this paper since at least January 3, 1999, well before the Asserted Patents.[357] Dr. Overton testified that the model in the paper was "very different" and a "very different concept" than the '640 patent.[358] I agree. The concept of caching is very different than that of the claimed location servers described in the Asserted Patents.

285.     Thus, S3 doesn't use the required "location server." For at least this reason, it is my opinion that S3 doesn't infringe the S3 Asserted Claims.

### 3.     S3 Doesn't Use the Required Hashing Methods.

286.     Each of the Hashing Claims requires that the location information be organized through hashing. As I explain above in Section III.B.5.c, features of hashing data include applying a hash function to the data to assign it a storage location, storing the assignments in a hash table, and applying the hash function to requests for the data.

287.

---

[356] 5/17/23 J. Overton Dep. Tr. at 709:15-20.

[357] 5/17/23 J. Overton Dep. Tr. at 710:1-15.

[358] 5/17/23 J. Overton Dep. Tr. at 716:13-16 ("These [the Consistent Hashing model and his '640 patent] look very different"); ("It further is discussing caching, which is the opposite, maybe not opposite, but a very, very different concept than what we're doing in '640.").

[359] Goodrich Report, ¶81.



288. [redacted]

As Kove described in the reexaminations, the claims required the location server to *know* what the other location servers contained.

> In contrast, claims 1, 6, and 15 of the '170 patent require networks with *non-hierarchical* (or "cluster") configurations of location servers that enable each server in the server network to know which location server contains the location(s) of the desired data.[363]

> Each of the claims at issue require, expressly or impliedly, a non-hierarchical cluster configuration of locations servers in a network.[364]

---

[360] *See* AMZ_KOV_000226532 at AMZ_KOV_000226533-34; 1/30/20 S. Markle Dep. Tr. at 271:15-16 ("[redacted]"); 6/4/21 A. Vermeulen Dep. Tr. at 226:1-15 ([redacted]); AWS_SRC_CODE_000000541-544.

[361] *E.g.*, AMZ_KOVE_000400711 at AMZ_KOVE_000400715.

[362] *See* AMZ_KOV_000226532 at AMZ_KOV_000226533-34; 1/30/20 S. Markle Dep. Tr. at 271:15-16 ("[redacted]"); 6/4/21 A. Vermeulen Dep. Tr. at 226:1-15 ([redacted]).

[363] August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 25 (emphasis in original).

[364] *Id.*

> Claim 6's non-hierarchical configuration is embodied [sic] the requirement that the location server must be able to return a "redirect message" where "the redirect message compris[es] a list of at least one other location server known to have the location information for the desired entity." **<u>This limitation cannot be met in hierarchical configurations…</u>**[365]
>
> In contrast, independent claims 10 and 14 and dependent claim 3 of the '978 patent require networks with non-hierarchical (or "cluster") configurations of location servers that enable each server in the server network to know which location server contains the location(s) of the desired data.[366]

289. [REDACTED].[367]

290. Finally, claim 2 of the '170 patent and claim 6 of the '978 patent require the location associations to be indexed by a hash table. [REDACTED]

[365] *Id.* at 26 (emphasis added).

[366] September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 35.

[367] AWS SRC CODE 000001380 at AWS SRC CODE 000001380 ([REDACTED]).

[368] Goodrich Report, Ex. D, ¶111.

[369] *See* Goodrich Report, Ex. D, ¶112-113.

███████████████████████████████████████████████████████

██████████████████████████████."[371]

291. Thus, S3 doesn't use the claimed hash location information required by the Hashing Claims. For at least these reasons, it is my opinion that S3 doesn't infringe the Hashing Claims.

#### 4. S3 Doesn't Use the Required Redirect Messages.

292. Each of the Redirect Claims requires that if a location server receives a request for location information that it doesn't contain, it must return to the client a redirect message that identifies the location server known to contain the requested location information. In my opinion, S3 does not use the claimed location server redirect messages for at least the following reasons.

293. ████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

294. ████████████████████████████████

██████████████████████████████████████

████████████████████████

295. ████████████████████████████████

██████████████████████████████████████

---

[370] *See, e.g.,* 01/30/20 S. Markle Dep. Tr. at 271:15-16 ("████████████████████████████
██████████████████")

[371] *See* Goodrich Report, Ex. D, ¶113.

[372]

296.

[375]

297.

---

[372] *See* AMZ_KOVE_000226532 at AMZ_KOVE_000226534; AMZ_KOVE_000400711.

[373] AMZ_KOVE_000437136 at AMZ_KOVE_000437136.

[374] AMZ_KOVE_000400711 at AMZ_KOVE_000400716.

[375] AWS_SRC_CODE_000001368.

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

298.　████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████

299.　████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████



300. ████████████████████████████████████████████

██████████████████████████████████████████████████

301.     Thus, S3 doesn't use the redirect message required by the Redirect Claims. For at least this reason, it is my opinion that S3 doesn't infringe the Redirect Claims.

**5.     S3 Doesn't Infringe the Transfer Claims.**

302.     S3 doesn't meet several limitations of the Transfer Claims.

████████████████████████████████████████████

303.     ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████[376]

---

[376] AWS_SRC_CODE_000001377 at AWS_SRC_CODE_000001377.



304. ███████████████████████████████

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████

305. ███████████████████████████████

███████████████████████████████████

---

377 *See, e.g.,* 1/30/2020 S. Markle Dep. Tr. at 272:18-273:18 (███████████████
███████████████████████")

306.    Second, S3 does not contain a "transfer protocol configured to transport identifier and location information."

307.    Finally, the Transfer Claims require "transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit."

308.    First, no "transferring" of "identifiers" or "associated locations" from "the first location server" ever occurs.  The claims require: "transferring … the identifiers and associated locations." As the remainder of these claims make clear, "the identifiers and associated locations" are the identifiers and associated locations on "the first location server"—the same "first location server" that reaches the "predetermined performance limit."  Therefore, a POSITA would understand that, to meet the claim limitation, the "transferring" must take place from the "first location server" that reaches the "predetermined performance limit" to the "second location server."

---

[378] AMZ_KOVE_000012916.

309. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████[379]

██████████████████████████████████████████████████

310. Even further, the claims require the transfer to take place at a predetermined limit, like a minimum space availability. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████[381]

---

[379] AWS_SRC_CODE_000001084.

[380] AWS_SRC_CODE_000001086.

[381] AWS_SRC_CODE_000001086.



311.    Dr. Goodrich alleges these claims are met under two different theories. Neither is correct.

312.

313.

---

[382] Goodrich Report, Ex. E, ¶¶49-55.

[383] Goodrich Report, Ex. E, ¶¶56-60.

314. ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████ █ ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████

315. ███████████████████████████████████████████

███████████████████████████████████████████████████

█████ █ ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

316.    A POSITA would understand a transfer as going from the original server to the new
server, ████████████████████████████████████████████ Further, the claim requires
"transferring a portion." This requires both the first and second server to contain some of the orig-
inal set of data, i.e., for both servers to retain a role in the network. █████████████████████

---

[384] 1/30/20 S. Markle Dep. Tr. at 268:19–273:18.

[385] Goodrich Report, Ex. E, ¶¶58

317.

318.

319.    Finally, to satisfy this claim limitation, Kove must show that the location server *itself* determines that a predetermined performance limit is reached and engages in the "transfer-ring" step.

---

386 Goodrich Report, Ex. E, ¶¶49-55
387 Goodrich Report, Ex. E, ¶165

320. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████[388]

321. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

322. ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████

323.   Moreover, the claims state: "transferring … the identifiers and associated locations." As the remainder of these claims make clear, "the identifiers and associated locations" are the identifiers and associated locations on "the first location server"—the same "first location

---

[388] 03/13/2023 Infringement Contentions, Ex. D at 99.

server" that reaches the "predetermined performance limit." Therefore, a POSITA would understand that, to satisfy the claim language, the "transferring" must take place from the "first location server" that reaches the "predetermined performance limit" to the "second location server."



324.

325. For at least these reasons, it is my opinion that S3 doesn't infringe the Transfer Claims.

## XII. AMAZON DOESN'T INFRINGE THE ASSERTED PATENTS UNDER THE ADDITIONAL PROPOSED CLAIM CONSTRUCTIONS

326. As discussed in section X.B, Kove's statements during the '034, '035, and '036 reexaminations disclaimed subject matter in order to overcome the prior art references. Specifically, Kove's statements added additional limitations to all of the Asserted Claims requiring (1) location servers in non-hierarchical, cluster structures, where each location server (2) contains the relevant location information or information to locate the relevant location information for every request, and (3) can resolve every request in two or fewer steps.

327. It is my opinion that the Accused Products do not meet any of these additional requirements based on Kove's disclaimers. As a result, the Amazon Products do not infringe the Asserted Claims under the additional proposed claim constructions. To any extent Kove supplements its infringement contentions and/or other disclosures to accuse any additional products or additional infringement theories, I reserve the right to provide supplemental analysis of those products. Further, to the extent Kove makes any more narrowing statements disclaiming subject matter

in the pending reexaminations, or any additional post-grant proceedings, I further reserve the right to provide additional analysis on those additional constructions.

### A. DDB Doesn't Infringe the Asserted Claims.

328.    Kove has accused DDB of infringing all of the Asserted Claims. It is my opinion that the Accused DDB do not infringe any of the Asserted Claims for at least the following reasons.

### 1.    ████████████████

329.    According to the proposed construction, the Asserted Claims require a location server network/system "arranged in a non-hierarchical, cluster topology."[389]

330.    Dr. Goodrich alleges that MNs are location servers arranged in a non-hierarchical cluster formation.[390] First, as discussed for both the current contentions above and proposed contentions below, MNs fail to qualify as location servers.

331.    Further, DDB has multiple hierarchical aspects to its topology. DDB divides its data storage into geographical hierarchies and then organizes its components into hierarchies which themselves contain logical hierarchies.

332.    First, DDB's network is arranged into hierarchical regions that reflect the geography for their customers.[391] Specifically, like all AWS products, DDB is divided into regions.[392] Some regions are only available for some products, and for DDB there are 17 regions available for

---

[389] Dkt. No. 539 at Appendix A.

[390] Goodrich Report, Ex. E, ¶116.

[391] Ex. 2 (AWS Global Infrastructure) (available at https://aws.amazon.com/about-aws/global-infrastructure/?p=ngi&loc=0, last accessed on August 16, 2023).

[392] Ex. 2 (AWS Global Infrastructure) (available at https://aws.amazon.com/about-aws/global-infrastructure/?p=ngi&loc=0, last accessed on August 16, 2023).

most users.[393] Within those regions, there is a second layer of geographic hierarchy called availability zones.



333. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

---

[393] Ex. 2 (AWS Global Infrastructure) (available at https://aws.amazon.com/about-aws/global-infrastructure/?p=ngi&loc=0, last accessed on August 16, 2023).

334. ██████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████ 394



335. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████ 396

---

394 AMZ_KOVE_000064710 at AMZ_KOVE_000064722.

395 *See e.g.,* AMZ_KOVE_000065855.

396 *See e.g.,* AMZ_KOVE_000065855.

██████████████████████████████████████

336.  ███████████████████████████████████████

█████████████████████████████████████[397]



337.  ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████

338.  Indeed, Dr. Swami Sivasubramanian, the first General Manager of DynamoDB,

████████████████████████[398]

---

[397] AWS_SRC_CODE_000000157.

[398] 5/10/23 S. Sivasubramanian Dep. Tr. at 136:6-19; 161:1-15; 5/11/23 S. Sivasubramanian Dep. Tr. at 491:4-492:15.

339.     Thus, DDB's structure contains multiple levels of hierarchy, and does not satisfy the requirement for the system to be "arranged in a non-hierarchical, cluster topology." As a result, my opinion is that for at least this reason, DDB does not infringe the Asserted Claims.

### 2. DynamoDB Has No Location Servers That Can Respond To Any Request On The Network.

340.     According to the proposed construction, the Asserted Claims require a location server that "maintains, for satisfying every request for the location of data on the network, a set of at least one of (1) identifier/location mappings or (2) information about the location of such." [399]

341.     ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

342.     ████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

---

[399] Dkt. No. 539 at Appendix A.

[400] Goodrich Rpt., ¶315, Ex. E.

[401] AMZ_KOVE_000498930 at AMZ_KOVE_000498931.

[REDACTED]

343. [REDACTED]

[REDACTED] As a result, my opinion is that for at least this reason, DDB does not infringe the Asserted Claims.

**3.** [REDACTED]

344.     In reexaminations of the Asserted Claims, Kove argued that the claims required location information to reach the client in two or fewer request iterations. For example, Kove described the claimed invention would be able to request their desired data after a maximum of two request iterations.

> The structured relationships of the invention allow clients to access data in distributed environments through a non-hierarchical, limitlessly scalable, server structure that enables retrieval of requested information in not more than two iterations.[403]

---

[402] AMZ_KOVE_000498930 at AMZ_KOVE_000498931.

[403] August 4, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ('640 patent) at 10 (emphasis added); September 28, 2022 Patent

345.    Thus, according to the proposed construction, the Asserted Claims require that the client receive the location information for all stored data in two or fewer request iterations or that the first location server return the location server containing the location information without an intervening request.[404] Specifically, claims 17 and 18 of '640 patent, claims 1, 2, 5, 6, 8, 9, and 12 of the '170 patent, and claims 1, 3, 6, 10, 17, 23, 24, and 30 of the '978 patent require "providing, without performing any request iterations…location information"/"determin[e/ing], without performing any request iterations,…location servers"/retrieving in two or fewer request iterations location information."[405] Claims 17 and 18 of '640 patent, claims 6 and 15 of the '170 patent, and claims 3, 10, and 14 of the '978 patent require "return/sending/transmit[s/ting] a redirect message without performing any request iterations.[406]

346.    DDB does not satisfy this requirement. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████[409]

---

Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 36 (same); August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 11 (same).

[404] Dkt. No. 539 at Appendix A.

[405] Dkt. No. 539 at Appendix A.

[406] Dkt. No. 539 at Appendix A.

[407] AMZ_KOVE_000065279 at AMZ_KOVE_000065280-81.

[408] AMZ_KOVE_000065279 at AMZ_KOVE_000065281.

[409] AMZ_KOVE_000065279 at AMZ_KOVE_000065280-81.



413

347.

---

[410] AMZ_KOVE_000065279 at AMZ_KOVE_000065280.

[411] AMZ_KOVE_000065279 at AMZ_KOVE_000065280.

[412] AMZ_KOVE_000065278-79 at AMZ_KOVE_000065281.

[413] AMZ_KOVE_000065278-79 at AMZ_KOVE_000065281.

███████████████████████████████████████████████

██████████████████████████████

348.     Thus, DDB does not satisfy the requirement that the client receives location infor-
mation within two request iterations. For at least this reason, DDB does not infringe any of the
asserted claims.

**B.      S3 Doesn't Infringe the S3 Asserted Claims.**

349.     Kove has accused S3 of infringing some of the Asserted Claims. It is my opinion
that S3 does not infringe any of the S3 Asserted Claims for at least the following reasons.

**1.      S3 Is Hierarchical.**

350.     According to the proposed construction, the Asserted Claims require a location
server network/system "arranged in a non-hierarchical, cluster topology."[414]

351.     ████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████ █ ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

---

[414] Dkt. No. 539 at Appendix A.

[415] *E.g.*, Goodrich Report, Ex. D, ¶54 ████████████████████████████████

███████████████████████████████████████████████ .

352.     S3 has multiple hierarchical aspects to its topology. S3 divides its data storage into geographical hierarchies and then organizes its components into hierarchies which themselves contain logical hierarchies.

353.     First, S3's network is arranged into hierarchical regions that reflect the geography for their customers.[416] Specifically, like all AWS products, S3 is divided into regions.[417] Some regions are only available for some products, and for S3 there are 17 regions available for most users.[418] Within those regions, there is a second layer of geographic hierarchy called availability zones.

---

[416] Ex. 2 (AWS Global Infrastructure) (available at https://aws.amazon.com/about-aws/global-infrastructure/?p=ngi&loc=0, last accessed on August 16, 2023).

[417] Ex. 2 (AWS Global Infrastructure) (available at https://aws.amazon.com/about-aws/global-infrastructure/?p=ngi&loc=0, last accessed on August 16, 2023).

[418] Ex. 2 (AWS Global Infrastructure) (available at https://aws.amazon.com/about-aws/global-infrastructure/?p=ngi&loc=0, last accessed on August 16, 2023).



354.    In my opinion, these geographic divisions and the resulting hierarchy are necessary for products of S3's scale.[419]

355.



[420]

---

[419] Ex. 2 (AWS Global Infrastructure) (available at https://aws.amazon.com/about-aws/global-infrastructure/?p=ngi&loc=0, last accessed on August 16, 2023). ("The AWS Global Infrastructure enables companies to be extremely flexible and take advantage of the conceptually infinite scalability of the cloud. Customers used to over provision to ensure they had enough capacity to handle their business operations at the peak level of activity. Now, they can provision the amount of resources that they actually need, knowing they can instantly scale up or down along with the needs of their business, which also reduces cost and improves the customer's ability to meet their user's demands.")

[420] AMZ_KOVE_000062766.



356.

357. ████████████████████████████████████
████████████████████████████████████████
██████████[421]



358. ████████████████████████████████████
████████████████████████████

359. ████████████████████████████████████
████████████████████████████████████████
███████████████████████[422]

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

360. ████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████"

[421] AWS_SRC_CODE_000000798 at AWS_SRC_CODE_000000803.

[422] AWS_SRC_CODE_000001405 at lines 56-64; *see also,* AWS_SRC_CODE_000001396.



361. ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████ And the concept of a Merkle Tree is not new. Indeed, it was patented

by Ralph C. Merkle in the early 1980s.[424] And below is the figure from Ralph C. Merkle's patent,

showing the similarity in structure of AWS's hierarchical tree design:[425]

---

[423] *See* AMZ_KOVE_000086390.

[424] *See* Ex. 3 (U.S. Patent No. 4,309,569, issued on January 5, 1982).

[425] *See* Ex. 3 (U.S. Patent No. 4,309,569, issued on January 5, 1982) compared to the tree hierarchical architecture of S3 in AMZ_KOVE_000062766.



362. ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
426 ████████████████████████████████████████████████████

363. ████████████████████████████████████████████████████

████████████████████ 427

---

364. ████████████████████████████████████████ and does not satisfy Kove's requirement for the system to be "arranged in a non-hierarchical, cluster topology." As a result, my opinion is that for at least this reason, S3 does not infringe the S3 Asserted Claims.

### 2. S3 Has No Location Servers That Can Respond To Any Request On The Network.

365. According to the proposed construction, the Asserted Claims require a location server that "maintains, for satisfying every request for the location of data on the network, a set of at least one of (1) identifier/location mappings or (2) information about the location of such." [428]

366.



---

[428] Dkt. No. 539 at Appendix A.

[429] Goodrich Rpt., Ex. E, ¶315.

[430] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[431] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[432] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[433] AMZ_KOVE_000069619 at AMZ_KOVE_000069620.

367.

368.

369.

---

[434] *See, e.g.,* AMZ_KOVE_000487443 at 35:31.

[435] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[436] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[437] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

370. 

[438]

371.

As a result, my opinion is that for at least this reason, S3 does not infringe the S3 Asserted Claims.

### 3.    S3 Requires More Than Two Iterations To Locate Data.

372.    In reexaminations of the Asserted Claims, Kove argued that the claims required location information to reach the client in two or fewer request iterations. For example, Kove described the requirements of claims would be able to request their desired data after a maximum of two request iterations.

> The structured relationships of the invention allow clients to access data in distributed environments through a non-hierarchical, limitlessly scalable, server structure that enables retrieval of requested information in not more than two iterations.[439]

---

[438] AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

[439] August 4, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ('640 patent) at 10 (emphasis added); September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 36 (same); August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 11 (same).

373. Thus, according to the proposed construction, the Asserted Claims require that the client receive the location information for all stored data in two or fewer request iterations or that the first location server return the location server containing the location information without an intervening request.[440] Specifically, claims 17 and 18 of '640 patent, claims 1, 2, 5, 6, 8, 9, and 12 of the '170 patent, and claims 1, 3, 6, 10, 17, 23, 24, and 30 of the '978 patent require "providing, without performing any request iterations…location information"/"determin[e/ing], without performing any request iterations,…location servers"/retrieving in two or fewer request iterations location information." [441] Claims 17 and 18 of '640 patent, claims 6 and 15 of the '170 patent, and claims 3, 10, and 14 of the '978 patent require "return/sending/transmit[s/ting] a redirect message without performing any request iterations. [442]

374. S3 does not satisfy this requirement.



375.

---

[440] Dkt. No. 539 at Appendix A.

[441] Dkt. No. 539 at Appendix A.

[442] Dkt. No. 539 at Appendix A.

[443] AMZ_KOVE_000012900 at AMZ_KOVE_000012901.



376.

444 AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

445 AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

446 AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

447 AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

448 AMZ_KOVE_000012900 at AMZ_KOVE_000012902.



377.

---

449 AMZ_KOVE_000012916.

378.

379.



380.

"

381.

---

450 1/30/2020 S. Markle Dep. Tr. at 165:13-166:24.

451 1/30/2020 S. Markle Dep. Tr. at 167:5-18.

452 1/30/2020 S. Markle Dep. Tr. at 170:9-12. *See also* Id. at 171:2 (")

453 AMZ_KOVE_000012900 at AMZ_KOVE_000012902.

██████████████████████████████████████████████████████

████████████████████

382.     Thus, S3 does not satisfy the requirement that the client receives location infor-

mation within two request iterations. For at least this reason, S3 does not infringe any of the S3

Asserted Claims.

## XIII.   AMAZON DOESN'T INFRINGE THE ASSERTED PATENTS UNDER THE DOCTRINE OF EQUIVALENTS

383.     The Accused Products don't infringe any of the Asserted Claims under the doctrine

of equivalents. My understanding is that Dr. Goodrich has included theories for infringement under

the doctrine of equivalents that Kove didn't include in its infringement contentions. To the extent

he is allowed to maintain these theories, I address them below.

### A.     S3 Doesn't Infringe the Asserted Patents Under the Doctrine of Equivalents.

384.     Dr. Goodrich identifies S3 as infringing claim 2 of the '170 patent, and claims 6,

17, 23, 24, and 30 of the '978 patent under the doctrine of equivalents.[454]

385.     For claim 2 of the '170 patent and claim 6 of the '978 patent, ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████[455]

---

[454] Goodrich Report Ex. E. Should Dr. Goodrich provide supplemental analysis relating to any of the other Asserted Claims addressing the doctrine of equivalents with respect to S3, I reserve the right to respond.

[455] Goodrich Report Ex. E at ¶¶71, 107.

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

386. █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████

387. █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[456] Dkt. 484 at 2 (Recognizing terms from Appendix B of Dkt. 382).

[457] *See* AMZ_KOV_000226532 at AMZ_KOV_000226533-34; 1/30/20 S. Markle Dep. Tr. at 271:15-16 ("███████████████████████████████████████████████"); 6/4/21 A. Vermeulen Dep. Tr. at 226:1-15 (█████████████████████████████████).

[458] August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 25 (emphasizing the need to "know" the location of the location data stored in each location server for the claims' allowance); 26 (emphasis added); September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 35.

388.    For claims 17, 23, 24, and 30 of the '978 patent, Dr. Goodrich contends that the "transferring a portion of the identifiers and associated locations to a second data location server" limitation is met through the doctrine of equivalents.

461

389.

---

459 *E.g.*, AMZ_KOVE_000400711 at AMZ_KOVE_000400715.

460 *See* AMZ_KOV_000226532 at AMZ_KOV_000226533-34; 1/30/20 S. Markle Dep. Tr. at 271:15-16 (" "); 6/4/21 A. Ver-meulen Dep. Tr. at 226:1-15 ( ).

461 Goodrich Report Ex. D at 89-90.

████████████████████████████████████████

████████████████████████████████████████

███ ███ ██████████████████████████████████

████████████████████████████████████████

██████████████████████████████ ████ ██████

█████████████████████[464]

390. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████ ████ ███████████████████

████████████████████████████████████████

391.    Thus, in my opinion, S3 does not infringe any of these claims under the doctrine of

equivalents.

---

[462] *See* AMZ_KOV_000226532 at AMZ_KOV_000226533-34; 1/30/20 S. Markle Dep. Tr. at 271:15-16 ("████████████████████████████████); 6/4/21 A. Vermeulen Dep. Tr. at 226:1-15 (██████████████████████).

[463] AMZ_KOVE_000437136 at AMZ_KOVE_000437136.

[464] AMZ_KOVE_000400711 at AMZ_KOVE_000400716.

[465] AMZ_KOVE_000012916.

[466] *See, e.g.,* 1/30/2020 S. Markle Dep Tr. at 272:18-273:18.

**B.    DDB Doesn't Infringe the Asserted Patents Under the Doctrine of Equivalents.**

392.    Dr. Goodrich identifies DDB as infringing claim 2 of the '170 patent, claim 18 of the '640 patent, and claims 6, 17, 23, 24, and 30 of the '978 patent under the doctrine of equivalents.[467]

393.    For claim 6 of the '978 patent, claim 18 of the '640 patent, and claim 2 of the '170 patent, ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████"[468]

---

[467] Goodrich Report, ¶3. Should Dr. Goodrich provide supplemental analysis relating to any of the other Asserted Claims addressing the doctrine of equivalents with respect to DDB, I reserve the right to respond.

[468] Ex. D to Kove's March 2, 2023 Fourth Amended Final Infringement Contentions.

394.

395.

---

469 E.g., OracleUnleashed at 638.

470 AMZ_KOVE_000065279 at AMZ_KOVE_000065280-81.

471 Goodrich Report, Ex. E, ¶124.

396. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ ████ ████████████████████████

████████████████████████████████████████████████████

████████

397. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ So, in my opinion, DDB doesn't infringe these claims under the doctrine of equiva-

lents.

398. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

399.     Specifically, a POSITA would understand that the claim that became issued claim

6 was initially withdrawn by the applicants' election after a restriction requirement.[473] The pending

claims were twice rejected as anticipated by U.S. Patent No. 6,466,980 to Lumelsky and/or obvious

over Lumelsky in view of U.S. Patent No. 6,578,068 to Bowman-Amuah.  The examiner deter-

mined that the Lumelsky-Bowman-Amuah combination contained all pending claim limitations.

Following the second rejection, the applicants revived several of the withdrawn claims, including

application claim 10 (which issued as claim 6) and originally contained a limitation reading "the

---

[472] Goodrich Report, Ex. E, ¶124.

[473] 11/01/06 NFOA Response at 3.

location information in the location server is maintained in an indexed location store."[474]   In the revived version of application claim 10, however, the applicants added the language "indexed by a hash table" at the end of the claim.  A POSITA would understand that the applicants made these amendments to application claim 10 (issued claim 6) in order to overcome the two prior art rejections. Indeed, applicants stated in the corresponding remarks: "each of the reintroduced claims, along with their respective dependent claims, distinguish over Lumelsky . . . ."[475]   Thus, Kove's prosecution *amendment* estops it from arguing it is entitled to any range of equivalents for this claim limitation.

400.    And in the remarks accompanying earlier amendments, the applicants distinguished Lumelsky by contending it teaches three separate components (but not a function) to interact with placement recommendations for data, including a replica directory service and server directory service, but does not teach an indexing function to map each of the plurality of identifiers to a respective one of the plurality of index designations.  It was this distinction that the examiner relied on in allowing the claims – *i.e.*, "Lumelsky does not teach a system and method for management of location information separate from the data to which the location information pertains. . . ." Here, however, by asserting the doctrine of equivalents for this limitation, Kove is ignoring its narrowing amendments and its argument to distinguish the prior art – both required to obtain issued claim 6.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[474] 02/22/06 NFOA Response at 3.

[475] 11/01/06 NFOA at 15.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Thus, Kove's prosecution *argument* also estops it from arguing it is entitled to a range of equivalents for this claim limitation.

401.    Thus, DDB does not infringe these claims under the doctrine of equivalents.

## XIV.   ANY ALLEGED BENEFITS ASSOCIATED WITH THE ASSERTED PATENTS ARE LIMITED

402.    Dr. Goodrich has asserted that there are certain benefits that he believes are associated with the Asserted Patents. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

403.    As a reflection of the overall limited benefits of the Asserted Patents, Kove and its predecessor companies have been unable to commercialize them. No one has ever paid for a license to the Asserted Patents or for the right to practice the technology in the patents-in-suit.[477]

404.    Further, Kove's predecessors OverX and Econnectix tried to sell products that embodied Asserted Patents but were unsuccessful.[478] Those commercialization efforts began in the late 1990s and included listing the products on websites, marking the products, discussions with potential customers, attendance at conferences, and trial software licensing events.[479] The products

---

[476] Goodrich Report, ¶¶64-75.

[477] 5/16/23 J. Overton Dep. Tr. at 120:13-121:14.

[478] 5/16/23 J. Overton Dep. Tr. at 133:4-134:12; 145:9-147:9.

[479] 5/16/23 J. Overton Dep. Tr. at 152:1-16.

were marketed to at least 61 companies, none of which became customers.[480] By September 5, 2006, before the issuance of the first of the Asserted Patents, Econnectix stopped commercialization efforts for the embodying products.[481] Dr. Overton further testified that "there are no products created, made, sold, used, distributed, given away, produced, or manufactured by Kove, or a licensee, after the '640 Patent issued that practiced any of the patents-in-suit."[482]

405. And, as I explained above, Kove's and its predecessors' failure to commercialize the Asserted Patents shows that the purported invention doesn't fit the needs of many companies needing solutions for managing databases or information on a computer network. OverX and Econnectix marketed products embodying the Asserted Patents to companies with needs for managing large sets of data, including Bank of America, Motorola, Nortel, HP, Lockheed Martin, IBM, and Cisco, and they all declined to purchase embodying products.[483]

406. Also, as noted, Kove's predecessors had at least six years to market products that embodied the Asserted Patents without Amazon having a purportedly infringing product on the market, yet they failed to sell a single such product. This too shows that the concepts in the Asserted Patents were deemed by companies in the market—including many that OverX and Econnectix marketed to that had large data sets to manage—to not offer a beneficial solution for the technical issues they were facing.

---

[480] Kove's Sixth Amended Objections and Responses to AWS's Second Set of Interrogatories (Nos. 10 and 12), dated May 7, 2023, pp. 5-8.

[481] 5/16/23 J. Overton Dep. Tr. at 146:4-147:9; Kove's Third Amended Response to AWS's First Set of Interrogatories (No. 3), dated April 14, 2021, p. 3.

[482] 5/16/23 J. Overton Dep. Tr. at 155:20-156:3.

[483] Kove's Sixth Amended Objections and Responses to AWS's Second Set of Interrogatories (Nos. 10 and 12), dated May 7, 2023, pp. 5-8.

407. In addition, as detailed above, the one potential customer (TCS) that Econnectix exchanged draft term sheets with for a license to technology embodying the patents shows that its benefits are more likely to be attractive to entities engaged with smaller datasets.[484]

408. And further, that Kove has succeeded in selling products that don't practice the Asserted Patents shows that it can sell product that the market believes will provide benefits to the technical issues faced.[485]

409.



---

[484] *See* Ex. 52 to 5/17/23 J. Overton Dep. Tr.

[485] 5/17/23 J. Overton Dep. Tr. at 541:4-13; 547:6-11.

[486] J. Bergman Report, pp. 55-56.

[487] https://aws.amazon.com/s3/storage-classes/, last accessed August 16, 2023).

[488] *Id. See also*, AMZ_KOVE_000423473, at AMZ_KOVE_000423500.

[489] https://aws.amazon.com/s3/storage-classes/, last accessed August 16, 2023) (discussing that SIA has 99.999999999% across multiple availability zones, while One Zone has 99.999999999% for one availability zone).

A.  **The Scope of The Asserted Patents Is Limited.**

410.    The Asserted Patents provide limited improvement over what was already known in the prior art. In fact, every element of the Asserted Claims (and some portions of Kove's expansive infringement theory beyond their actual limitations) was part of the prior art and was already in use in distributed databases prior to the Asserted Patents, including:

- Transport Protocols[490]

- Configuring Servers[491]

- Processors[492]

- Network Computing[493]

- Network Clients[494]

- Network Servers[495]

- Network Transactions[496]

- Network Messages[497]

- Client-Server Relationships[498]

---

[490] 5/17/23 J. Overton Dep. Tr. at 684:11-13.

[491] 5/17/23 J. Overton Dep. Tr. at 687:8-11.

[492] 5/17/23 J. Overton Dep. Tr. at 686:10-12.

[493] A Brief History of Cloud Computing, IBM.com, Jan. 6, 2017 (available at https://web.archive.org/web/20230628083034/ibm.com/cloud/blog/cloud-computing-history, last accessed on August 16, 2023).

[494] 5/17/23 J. Overton Dep. Tr. at 686:1-9.

[495] 5/17/23 J. Overton Dep. Tr. at 686:1-9.

[496] E.g., OracleUnleashed at 372.

[497] 5/17/23 J. Overton Dep. Tr. at 687:8-11.

[498] 5/17/23 J. Overton Dep. Tr. at 686:1-9.

- Server Clusters[499]

- Database Storage[500]

- Storage Availability[501]

- Data Dictionaries[502]

- Distributed Databases[503]

- Relational Databases[504]

- Data Queries and Responses[505]

- Metadata Management[506]

- Location Services & Servers[507]

- Location Transparency[508]

- Directory Services & Servers[509]

- Name Services & Servers[510]

---

[499] 5/17/23 J. Overton Dep. Tr. at 696:6-11.

[500] 5/17/23 J. Overton Dep. Tr. at 724:8-10.

[501] E.g., OracleUnleashed at 241.

[502] 5/17/23 J. Overton Dep. Tr. at 729:2-4.

[503] 5/17/23 J. Overton Dep. Tr. at 670:20-671:5.

[504] 5/17/23 J. Overton Dep. Tr. at 670:17-19; 04/21/2023 A. Poling Dep. Tr. at 36:21-37:7.

[505] 5/17/23 J. Overton Dep. Tr. at 724:17-22.

[506] 5/17/23 J. Overton Dep. Tr. at 661:13-17.

[507] 5/17/23 J. Overton Dep. Tr. at 671:17-21.

[508] 5/17/23 J. Overton Dep. Tr. at 724:17-22.

[509] 5/17/23 J. Overton Dep. Tr. at 728:12-14.

[510] 5/17/23 J. Overton Dep. Tr. at 671:6-14.

- Domain Name Services & Servers[511]

- Location Queries & Responses[512]

- Identification Strings[513]

- Location Strings[514]

- Partitioning[515]

- Caching[516]

- Redirection[517]

- Cloud computing[518]

- Hashing[519]

- Hashkeys[520]

- Hash Functions[521]

---

[511] 5/17/23 J. Overton Dep. Tr. at 660:22-661:3; 671:9-11.

[512] 5/17/23 J. Overton Dep. Tr. at 726:15-17.

[513] 5/17/23 J. Overton Dep. Tr. at 725:17-19.

[514] E.g., Boukobza at 18:18-23.

[515] 5/17/23 J. Overton Dep. Tr. at 724:11-15.

[516] 5/17/23 J. Overton Dep. Tr. at 699:1-3.

[517] E.g., OracleUnleashed at 698, 729, 725; Wolff at Abstract.

[518] 5/17/23 J. Overton Dep. Tr. at 724:5-7; A Brief History of Cloud Computing, IBM.com, Jan. 6, 2017 (available at https://web.archive.org/web/20230628083034/ibm.com/cloud/blog/cloud-computing-history, last accessed on August 16, 2023).

[519] E.g., '170 patent at 15:15-19; '640 patent at 15:1-20; '978 patent at 17:19-40: 10/9/2020 S. Bailey Dep. Tr. at 190:1-16.

[520] 5/17/23 J. Overton Dep. Tr. at 726:1-14; 04/21/2023 A. Poling Dep. Tr. at 211:7-13.

[521] 5/17/23 J. Overton Dep. Tr. at 725:20-22.

- Hash Tables[522]

- Automation[523]

**B.     The Scope Of The Redirect Claims Is Narrow And The Benefits Are Limited.**

411.     It is my opinion that any benefits provided by the Redirect Claims are limited. The Patent Office has identified the narrow scope of the claims repeatedly. For example, in Reexamination 90/014,552, the Patent Office reviewed the examination history of the '640 Patent in detail.[524] The Patent Office compares the claims before and after the February 9, 2005 Office Action as follows:

> [C]laim 5 that was rejected in the 2/9/05 office action and allowed claims 17 and 18 all generally recite a system comprising a data repository, a client, and a server entity (or network of servers), wherein the server attempts to locate data requested by the client in the data repository and provide that location information back to the client…Both sets of claims also recite the use of identification strings that identify data and location strings that identify data locations, and the server sending a redirect message to the client if the server cannot locate the requested location string.[525]

412.     Accordingly, "a system comprising a data repository, a client, and a server entity (or network of servers), wherein the server attempts to locate data requested by the client in the data repository and provide that location information back to the client" with "the use of identification strings that identify data and location strings that identify data locations, and the server sending a redirect message to the client if the server cannot locate the requested location string" was already present in the prior art.

---

[522] E.g., OracleUnleashed at 638.

[523] E.g., OracleUnleashed at 476.

[524] KOV_00060098-107.

[525] KOV_00060104.

413.    The Patent Office concluded that the only distinguishing feature between the prior art and the granted claim was the contents of the redirect message, e.g., locating the different location server calculated as containing the location string:

> The distinguishing feature between the rejected claims and the allowed claims appears to be *the contents of the redirect message*…[rejected claims] all include limitations regarding the redirect message, however none of them require the redirect message to comprise information for use by the client to calculate the location of a different location server, wherein the different location server contains the location string.[526]

414.    Thus, the benefit of the Redirect Claims is limited to those that use redirect messages with the exact claim contents identified by the Patent Office.

415.    In my opinion, the value of this exact configuration is minimal at best. Systems strive for efficiency, but the claimed redirect message procedure of redirecting the location request back to the client before it is re-sent to the second location server is inefficient. Even at the most basic configuration, sending the redirect message back to the client requires a total of four messages before the client receives the desired location information. Instead of redirecting the client, the first location server could simply forward the request to the second location server, which then returns the location information to the client. This requires only three messages to achieve the same result, saving time and resources.

416.    Any minimal value of the claimed redirect message is further lessened by the fact that, rather than return the location information to the requesting client, most systems would benefit from simply returning the requested data itself, cutting out additional messages. For example, using the claimed redirect message takes the original four steps, plus an additional two for the client to request and then receive object itself, for a total of six steps. Instead, if the first location

---

[526] KOV_00060104-105 (emphasis added).

server forwarded the request to the second location server which then requested the object directly to be returned to the client, it would take only four steps for the client to obtain the requested data object.

417.    In sum, any narrow inventive scope of the Redirect Claims doesn't provide any significant value over the prior art, and in fact, could be a hindrance to many systems.

### C.    The Scope Of The Hashing Claims Is Narrow And The Benefits Are Limited.

418.    It is my opinion that the scope of, and any benefits provided by, the Hashing Claims are limited. The Patent Office has identified the narrow scope of the claims repeatedly during reexamination. For example, in the '034 Reexamination, the Patent Office outlined how for the exemplary claim 6 of the '978 patent, the location information must be indexed by a hash table stored on each location server. The Patent Office provided the following description comparing it to the prior art:

> In regards to dependent claim 6, the claim requires that "the location information in the location server is maintained in an indexed location store indexed by a hash table." If Oracle's Names Server had this ability, there would be no need to pass requests up and down a hierarchy of Names Servers; it could determine on its own the Names Server having the desired information and send the request directly to that Names Server. While OSG discloses the use of hashing in resolving queries, it fails to disclose the use of hashing at any given server (i.e., by any given Names Server) to determine the location server/Names Server that contains the desired location information. [527]

This explanation by the Patent Office confirms the narrow scope of the Hashing Claims since hashing to resolve queries was part of the prior art. The scope is limited to hashing by each location server to identify the contents of other locations servers and identify the location server containing the location information needed.

---

[527] KOV_00226339.

419.    The benefits of this narrow scope are limited. For example, in most cases, it would be more efficient to hash the request before it ever arrives at any location server. This would cut out the incorrectly addressed request before the resources were wasted. It would also prevent the need to store the hash table on every location server, by instead storing it at the client. The Hashing Claims actually *require* an initial failure to have any applicability at all, because the hash only gets applied if the request reaches an incorrect location server. In short, the scope of the Hashing Claims would apply only to a very few configurations of distributed databases, and lacks broad application.

420.    Rather than analyze the narrow scope of the Hashing Claims and their benefits to the Accused Products, however, Dr. Goodrich instead describes the broad benefits of hashing as a whole—a technique that has been known since the 1960's. ██████████████████████████

████████████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████[528]█████████████████████████████

421.    But, as acknowledged in the specifications themselves, hash functions pre-dated the Asserted Patents. They cite to the already routine "hashpjw function presented by Aho, Sethi and Ullman in their text *Compilers, Principles, Techniques and Tools*."[529] And "consistent hashing" was also disclosed in the prior art.[530]

---

[528] Goodrich Report, ¶82 (citation omitted).

[529] '170 Patent at 15:15-19; '640 Patent at 15:1-20; '978 Patent at 17:19-40.

[530] 5/16/2023 J. Overton Dep. Tr. at 709:15-20, 710:1-15; 716:13-16 (testifying about Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hot Spots on the World Wide Web by Karger et al.).

422.    The narrow inventive scope of the Hashing Claims doesn't provide any significant value over the prior art, and in fact, could be a hindrance to many systems.

**D.    The Scope of The Transfer Claims Is Narrow And The Benefits Are Limited.**

423.    It is my opinion that the scope of, and any benefits provided by, the Transfer Claims are exceedingly limited. Indeed, in the '034 Reexamination, the Patent Office outlined how for the exemplary claim 17 of the '978 patent, the location information must be stored on a first location server and then transferred from the first location server to the second location server. The Patent Office provided the following description comparing claim 17 to the prior art:

> The mere concept of having more than one location servers that contain potentially different identifiers and associated locations as discussed in ONAG and OSG references in combination with the discussions of optimization found in ONAG and OSG does not actually teach the act of "transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion reaches a predetermined performance limit" as it is claimed." [531]

This explanation confirms the narrow scope of the Transfer Claims. As identified, the claim applies only to the very specific technique of moving data from one location server to another location server in response to a specific performance criterion being met. Even further, the claim requires that the portions on each data location server be "unique."

424.    In my opinion, any benefits of this narrow scope are limited. ███████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████

---

[531] KOV_00226339.

████████ The Transfer Claims actually *require* the server to be the only one with any given location information creating a potential for bottlenecking, because there is only one server to handle requests for each piece of location information. This server would represent an unacceptable single point of failure. Any load-balancing benefit to transferring a portion of the location information is undercut by the preclusive effect of the "uniqueness" requirement preventing much more effective and valuable techniques like replication and multiplicity of requests.

425.    Thus, the narrow inventive scope of the Transfer Claims doesn't provide any significant value over the prior art, and in fact, could be a hindrance to many systems.

**E.    The Benefits of The Asserted Patents to S3 Are Minimal.**

426.    Dr. Goodrich also errs by claiming the prior art technique of hash functions as a whole and applying them to S3. ████████████████████████████████

---

[532] Goodrich Report, ¶84.

[533] Goodrich Report, ¶84.

427. ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████ ██

██████████████████████████████████████████████

██████████████████████████████████ ██ ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

428.     Further, the Asserted Claims have no connection to the technique or benefits of caching (which was known well before September 1999). Indeed, Dr. Overton acknowledged at deposition that he did not invent caching:

Q: You didn't invent the concept of caching data; did you?

A: That is correct.[536]

---

[534] AMZ_KOVE_000012900 at AMZ_KOVE_000012902; AMZ_KOVE_000069619 at AMZ_KOVE_000069620.

[535] *See, e.g.,* 1/30/2020 S. Markle Dep Tr. at 272:18-273:18 (████████████████████ ███████████████████████")

[536] 05/17/23 J. Overton Dep. Tr. at 699:1-3.

429. Dr. Overton further testified that "one very foundational component of our patents and of the technology is to eliminate caching."[537] He also testified that the technology underlying the Asserted Patents "was not about caching."[538]

430. As a result, the entire premise of Dr. Goodrich's performance metric analysis is flawed.

431.



[539]

432.

433.

[537] 05/17/23 J. Overton Dep. Tr. at 733:4-15.

[538] 05/17/23 J. Overton Depo. Tr. at 732:14-21.

[539] Goodrich Report at ¶85.

*Id.*

[540] Goodrich Report at ¶105.



434.

435.



436.

---

[545] AMZ_KOVE_000091659 (

[546] AMZ_KOVE_000091659, at AMZ_KOVE_000091661.

[547] Goodrich Report at ¶106.
*See* AMZ_KOVE_000091659, at AMZ_KOVE_000091660.

[548] AMZ_KOVE_000091659 ("

[549] Goodrich Report at ¶106.

[550] *Id.* (citing AMZ_KOVE_000401270; AMZ_KOVE_000532846). *See also*, Amazon Supplemental Objections and Responses to Fourth Set of Interrogatories, June 9, 2023, at 15.



1.

437.

438.

439.

440.

[551] *See* Goodrich Report at ¶¶107-110 ( ).

[552] *See* Amazon Supplemental Objections and Responses to Fourth Set of Interrogatories, June 9, 2023, at 15.

[553] Goodrich Report at Exhibit C, tab 1.

441.

442.

---
554 Goodrich Report at ¶111 (emphasis added).

555 Goodrich Report at ¶112.

556

443.

444.

[557] Goodrich Report at ¶113.

[558] Goodrich Report, Exhibit C, at tab 2, column F.

[559]

[560] Goodrich Report at ¶113.

445.

561 *See* Goodrich Report at ¶113.

562 *See* Goodrich Report at ¶113.

563 Goodrich Report at ¶114.
AMZ_KOVE_000401271, as shown in Dr. Goodrich's Exhibit C, at tab 2, column B. *See also,*
Amazon Supplemental Objections and Responses to Fourth Set of Interrogatories, June 9, 2023,
at 16.

564 Goodrich Report at ¶114.

Goodrich Report at ¶113.



**2.**

446.

567

447.

448.

---

[565] Goodrich Report at ¶114.

[566] Goodrich Report at ¶116.

[567] *See, e.g.,* the Cache Resolver System described in Distributed Web Caching System with Consistent Hashing by Alexander Sherman (February 1999) and Web Caching with Consistent Hashing by Karger, Sherman, et al. (March 4, 1999). *See also* RFC1034 stating that DNS uses distributed name servers and local caches to increase the amount of memory and improve performance.

[568] Goodrich Report at ¶117.

[569] Goodrich Report at ¶103.



449.

_____

[570] Goodrich Report, Exhibit C, tabs 3 and 4.

[571] Goodrich Report, Exhibit C, tab 3 (citing AMZ_KOVE_000532845).

[572] Goodrich Report, Exhibit C, tab 4.

[573] Goodrich Report at ¶118.

[574] Goodrich Report, Exhibit C, tab 4, column D.

[575] Goodrich Report at ¶118.

[576] Goodrich Report, Exhibit C, tab 4, column D.

450. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ ████ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████[578]

451. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████

452. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[577] Goodrich Report at ¶119.

[578] Goodrich Report at ¶118.

[579] Goodrich Report at ¶122.

[580] Goodrich Report at ¶103.

[REDACTED]

582

453.   [REDACTED]

[REDACTED]



581 AMZ_KOVE_000439096.

582 Goodrich Report at ¶123.

583 Goodrich Report at ¶120 ([REDACTED]) (citing AMZ_KOVE_000532844 and AMZ_KOVE_000527782).

584 AMZ_KOVE_000401268, at B2.

585 AMZ_KOVE_000527781, at B3. [REDACTED]

Goodrich Report at ¶120 ("…[REDACTED]

[REDACTED]

| ███████ | ████████ | % Increase (4ms) | █████████ | █████████ |
|---|---|---|---|---|
| ██████████ | ██████████ | ████ | █████ | █████ |
| ██████████ | ██████████ | ███ | █████ | █████ |
| ██████████ | ██████████ | ████ | ████ | █████ |

**3.** ██████████████████████████████

454. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████

455. ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[586] AMZ_KOVE_000527781, at C3.

[587] AMZ_KOVE_000527781, at D3.

[588] AMZ_KOVE_000527781, at E3.

[589] Goodrich Report at ¶123.

[590] *Id.*

[591] Goodrich Report at ¶103.

[592] Goodrich Report at ¶125.



**4.**

456.

---

[593] Goodrich Report at ¶126.

[594] *Id.*

[595] Goodrich Report at ¶¶131 (
Table F (Goodrich Report at ¶151), Table G (Goodrich Report at ¶157), Table H1 (Goodrich Report at ¶158), and Table H2 (Goodrich Report at ¶161)).

[596] Goodrich Report at ¶133.

[597] AMZ_KOVE_000472967.

[598] *See* AMZ_KOVE_000506367 at AMZ_KOVE_000506369.

[599] *See* AMZ_KOVE_000472964 at AMZ_KOVE_000472967-000472968.

457.



458.

---

[600] Goodrich Rpt. at ¶¶153-156; 158-163.

[601] Goodrich Rpt. at ¶149 (citing to AMZ_KOVE_000070457).

**5.** █████████████████████████████████
████████████████████████

459. ███████████████████████████████
██████████████████ ██████████████████████
████████████████████████████████████████

460. ███████████████████████████████
████████████████████████████████████████
██ █████████████████████████████████████
██ █████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

461. ███████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████ ███ ███████████████████

---

[602] *See, e.g.*, Goodrich Report at ¶85 (████████████████████████████████
████████████████████").

[603] Goodrich Report at ¶103.

[604] *Id.*

[605] AMZ_KOVE_000436351.

[REDACTED]

[REDACTED]

[REDACTED] [606]

462. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

463. [REDACTED]

[REDACTED]

[REDACTED] [607]

---

[606] AMZ_KOVE_000436351.

[607] AMZ_KOVE_000062052.

464. ████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ [608]

465. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

---

[608] Cache Resolver System described in Distributed Web Caching System with Consistent Hashing by Alexander Sherman (February 1999) at 38 ("our caches are more likely to keep the popular content in RAM and thus serve it faster.").

466. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████ ████ █████████████████████████████████

████████████████████████████████████████████

███████████████████ [610]

**F.** ████████████████████████████████████

467. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████



[609] *See, e.g.,* AMZ_KOVE_000012900-000012902 (████████████████████████ ████████████████████████████████████████████ "); 1/30/20 S. Markle Dep. Tr. at 294:21-295:5 (" ████████████████████████████ ")

[610] ████████████████████████████████████████████

468. 

469.

---

[611] *See, e.g.,* Goodrich Report at ¶240.

[612] *See, e.g.,* Goodrich Report at ¶85, n. 159 citing AMZ_KOVE_000394193.

[613] Goodrich Report at fn. 164.

[614] *See* 4/21/23 D. Walsh Dep. Tr. at 117:15-118:9



**1.**

470.

471.

---

[615] *See* 6/14/23 D. Walsh Dep. Tr. at 431:6-433:4.

[616] Goodrich Report at ¶244-249.

[617] Goodrich Report at ¶249.

472.

---

[618] *Id.*

[619] *Id.*

[620] AMZ_KOVE_000532840.



**2.** ████████████████████████████████

473. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

474. ████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████

---

[621] AMZ_KOVE_000532841.

[622] ████████████████████████████████████████

[623] Goodrich Report at ¶¶252-259.

[624] 5/24/23 R. Blackman Dep. Tr. at 69:7-14.

[625] *Id.* ("█████████████████████████████████████████ ")



475. [redacted][628]

476. [redacted]

[626] *See* 5/24/23 R. Blackman Dep. Tr. at 69:3-6 ([redacted]"); 107:1-4 ("[redacted]")

[627] *See* 5/24/23 R. Blackman Dep. Tr. at 69:1-6.

[628] Goodrich Report at ¶259; *See* 5/24/23 R. Blackman Dep. Tr. at 101:12-13 ("[redacted]

[629] Goodrich Report at ¶260-275.

[630] Goodrich Report at ¶264, referring to AMZ_KOVE_000532855.

477.

478.

[631] AMZ_KOVE_000532855.

[632] Goodrich Report at ¶268.

[633] *Id.*

[634] Goodrich Report at ¶269.

[635] AMZ_KOVE_000483279 ("_____
_____") *See also* AMZ_KOVE_000532795
_____

[636] Goodrich Report at ¶¶276-282.

′′[639]

479.

480.

---

[637] Goodrich Report at ¶281.

[638] AMZ_KOVE_000483119, 14.

[639] Dr. Goodrich further quotes Mr. Walsh in support.

. *See* Goodrich Report at ¶281, fn. 195, citing Walsh III Tr. at 343:6-44 [sic].

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████ [641]

## XV. AMAZON'S PRODUCED PATENT PURCHASE AGREEMENTS AND LI-CENSES INVOLVE SIMILAR TECHNOLOGY THAT IS COMPARABLE TO THE ASSERTED PATENTS.

481.    I understand that as part of the litigation, Amazon has identified ██ license agreements for comparison with the Asserted Patents. I have reviewed the technology covered in each of these agreements and provide my analysis below. Of the patents I reviewed, I believe that the patents in the ███████████████████████████ provide the most similar technology to the Asserted Patents, but with a broader scope and applicability than the Asserted Patents. The rest of the agreements also include patents that are directed to technology that's similar to the Asserted Patents.

---

[640] *See, e.g.,* 4/21/23 D. Walsh Dep. Tr. at 114:16-116:3; AMZ_KOVE_000463924.

[641] *See, e.g.,* AMZ_KOVE_000064710 and AMZ_KOVE_000065855 (████████████ ████████████); AMZ_KOVE_000012871-000012873 (████████████ ██).

**A.** ███████████████████████████████████ [642]

482. I understand that in the ██████████████████████████████

████████████████████████████████████████████████████.[643] In my

opinion, the purchased patents included at least two that are more foundational to the field of net-

working performance and durability than the Asserted Patents. Dr. Goodrich opined that the tech-

nology described in these patents is not comparable to that of the Asserted Patents.[644] I disagree.

As discussed below, certain of the patents included in this agreement are very comparable to the

Asserted Patents and include more foundational technology that are applicable to distributed sys-

tems.

483. For example, ████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████

---

[642] AMZ_KOVE_000089617-AMZ_KOVE_000089641 ██████████████████████████████████████).

[643] *Id.* at AMZ_KOVE_000089620, AMZ_KOVE_000089630-AMZ_KOVE_000089631, AMZ_KOVE_000089633, and AMZ_KOVE_000089635.

[644] Goodrich Report, ¶¶ 350-354.

[645] AMZ_KOVE_000089617-AMZ_KOVE_000089641, at AMZ_KOVE_000089633.

[646] 4/24/2023 S. Hayden Dep. Tr. at 193:25-194:1.

484.    Dr. Goodrich asserted that the "technology described in the ██████████ is distinguishable from and not comparable to the Asserted Patents [because it's] not directed to storing and retrieving location information in a distributed network where location information is managed separately from the data to which the location information pertains" and isn't "relevant to distributing, maintaining, scaling, and/or retrieving the location, including through the use of identifiers, location servers, or redirect messages."[647] I disagree, since the ███████████████████ ███ and is very similar to the technology in the Asserted Patents in both technology and application. The ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████, it would still provide more foundational technology than the Asserted Patents.

485.    ████████████████████████████████████████ ███████████████████████████████████████ ██████ ██████████████████████████████████ ██████████████████████████"[649] I have reviewed the ██████████ ████████████████████████████████████████████ ████

486.    Dr. Goodrich opined that "the technology described in the ████████ is distinguishable from and not comparable to the technology of the Asserted Patents ████████████

---

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████[650] These two systems are fundamentally different, as the ████████████████████████████

████████████████ whereas the Asserted Patents can accommodate any request to access stored

data."[651] But Dr. Goodrich's analysis focuses on very specific differences between the ████████████

and the Asserted Patents rather than addressing whether the ████████ is directed generally to

similar technology. The ████████ is very similar to the Asserted Patents in both technology and

application. ██████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████, it would still be more foundational technology than the Asserted Patents.

**B.** ████████████████████████████████████

487.  I understand that in the ████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████.[652] Mr. Hayden identified these lots as including patents relevant to the technol-

ogy of the Asserted Patents "████████████████████████████████████████████

---

[650] Dr. Goodrich's opinions regarding the ████████ appear to directly contradict his opinions
regarding whether S3 infringes the S3 Asserted Claims.
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████" Goodrich
Report, ¶¶ 354.

[651] Goodrich Report, ¶¶ 354.

[652] AMZ_KOVE_000530371-AMZ_KOVE_000530388 (████████████████████████████████
████████████████████████████████████████████████████████████).

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ''655

488. I reviewed ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[653] 4/24/2023 S. Hayden Dep. Tr. at 129:10-13 (▓▓▓▓▓▓▓▓▓▓). *See also*, AMZ_KOVE_000530371-AMZ_KOVE_000530388, at AMZ_KOVE_000530382.

[654] 4/24/2023 S. Hayden Dep. Tr. at 129:20-22 (▓▓▓▓▓▓▓▓▓▓). *See also*, AMZ_KOVE_000530371-AMZ_KOVE_000530388, at AMZ_KOVE_000530385.

[655] 4/24/2023 S. Hayden Dep. Tr. at 130:5-6 (▓▓▓▓▓▓▓▓▓▓). *See also*, AMZ_KOVE_000530371-AMZ_KOVE_000530388, at AMZ_KOVE_000530386.

[656] AMZ_KOVE_000530371-AMZ_KOVE_000530388, at AMZ_KOVE_000530382, AMZ_KOVE_000530385, AMZ_KOVE_000530386.

489.    Dr. Goodrich asserts that each of these four patents "are distinguishable from and not comparable to the Asserted Patents because [they don't] involve storing or retrieving data in a distributed network in accordance with the conventions claimed in the Asserted Patents."[657] Again, Dr. Goodrich attempts to distinguish the patents in these lots based on the specific manner they disclose rather than the general technology they relate to. In my opinion, as these patents █████ ████████████████████████████████████████████████████████████ they are similar to the Asserted Patents in technology and application.

490.    But in my opinion, the technology licensed in this agreement is more foundational than the Asserted Patents.

**C.**    ████████████████████████████████████████████

491.    I understand that in the ██████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████.[658] Mr. Hayden identified the ██████████████████████████ as relevant to the technology of the Asserted Patents. Specifically, he testified the "████████████████████████ ████████████████████████████████████████████████████████ ██████████████"[659] Because ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

---

[657] Goodrich Report, ¶¶ 403, 405, and 407.

[658] AMZ_KOVE_000087922-38 at AMZ_KOVE_000087937. *See also* 4/24/2023 S. Hayden Dep. Tr. at 139:4-5 ("██████████████████████████████████████████").

[659] 4/24/2023 S. Hayden Dep. Tr. at 143:2-5.

492.    And, more specifically, ████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

493.    Dr. Goodrich states that the ████████ would not be comparable to the Asserted Patents because they are "not used for a distributed data collection system and [do] not involve storing and retrieving data across a distributed network using the conventions claimed in the Asserted Patents."[660] Dr. Goodrich again focuses on the specific methods the ████████ use rather than their general technology in rejecting them as not comparable to the Asserted Patents. In my opinion, since the ██████████████████████████████████████████████████████ they are somewhat comparable to the technology in the Asserted Patents, though not as comparable as patents in some of the other agreements I discuss.

494.    In my opinion, the ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████. I also note that the agreement ████████

██████████████████████████████.

---

[660] Goodrich Report, ¶381.

**D.** ███████████████

495. I understand that in the ██████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████.[661] Mr. Hayden explained that the ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████"[662] Because ███████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

496. Further, ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

---

[661] AMZ_KOVE_000530389-423 at AMZ_KOVE_000530392-393; 4/24/2023 S. Hayden Dep.
Tr. at 248:13-19 ("████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████").

[662] 4/24/2023 S. Hayden Dep. Tr. at 258:13-19.

497.    Dr. Goodrich fails to reference any specific patent in his analysis of this license. As he reserves the right to address any patents from the ██████ identified as technically comparable,[664] I reserve the right to respond.

498.    In my opinion, the ██████ would cover technology comparable to the Asserted Patents ████████████████████████████████████ ██████████. I note that the agreement also ████████████████████████.

**E.**    ████████████████████████████████

499.    I understand that in the ████████████████████████

████████████████████████████████

████████████████.[665] Mr. Hayden identified ████████ as including patents relevant to the technology of the Asserted Patents.[666] ████████

████████████████████████████████

████████████████████████████████

---

[663] 08/31/2022 Request in Reexamination Control No. 90/019,109. ('109 History produced as KOV_00237613 - KOV_00238661).

[664] Goodrich Report, ¶385.

[665] AMZ_KOVE_000530329-AMZ_KOVE_000530345 (██████████████████ ██).

[666] 4/24/2023 S. Hayden Dep. Tr. at 84:21-85:17.

500.    Dr. Goodrich asserts that the ██████████ is distinguishable because the "Asserted Patents teach a novel and entirely different way to search data."[667] He also contends that the ████ ████ is distinguishable because it "does not involve storing and retrieving data across a distributed network using the conventions claimed in the Asserted Patents."[668] I disagree, since both the ████████████████████████████████████████████████████████████ ██████████████████████████ the same general technology of the Asserted Patents. And, in my opinion, these patents relate to the same technical area as the Asserted Patents but address it in a different way. This shows that they are somewhat comparable.

**F.**    ████████████████████████████

501.    I understand that in the ████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████.[669] Mr. Hayden identified ████████████ as including patents relevant to the technology of the Asserted Patents.[670] He testified that patents ████████ ████████████████████████████████████████████████████████████

---

[667] Goodrich Report, ¶388.

[668] Goodrich Report, ¶390.

[669] AMZ_KOVE_000530346-AMZ_KOVE_000530370, at AMZ_KOVE_000530362 ████ ██████████████████████████).

[670] 4/24/2023 S. Hayden Dep. Tr. at 110:14-111:9.

.''[671] Mr. Hayden expanded on the relevance of patents

''[672]

502.

which is comparable to the technology disclosed in the Asserted Patents.

503.    Dr. Goodrich describes the

to distinguish it from how he characterizes the Asserted Patents as "having the data decoupled from its location information."[674] He then asserts that "[w]ithout this decoupling, the technology described in                cannot achieve the same benefits, such as scalability, as the Asserted Patents."[675] He similarly opines that the technology of the isn't comparable because the "Asserted Patents teach a novel and entirely different way to address the                problems… because the                does not involve storing or retrieving data in a distributed network in accordance with the conventions claimed in the Asserted Patents." I

---

[671] 4/24/2023 S. Hayden Dep. Tr. at 111:10-24.

[672] 4/24/2023 S. Hayden Dep. Tr. at 112:2-10.

[673] AMZ_KOVE_000530346-AMZ_KOVE_000530370, at AMZ_KOVE_000530362.

[674] Goodrich Report, ¶ 395.

[675] *Id.*

disagree, since both the ███████████████████████████████████████████, the same

technology Dr. Goodrich contends is claimed in the Asserted Patents. Dr. Goodrich's opinion on

these patents again ignores their general technical area and attempts to distinguish them on the

basis of the exact method used to address the same problem as the Asserted Patents. Because they

relate to ███████████████, they are at least somewhat comparable to the Asserted Patents.

504.    In my opinion, the technology licensed in this agreement is more foundational than

the Asserted Patents.

**G.** ████████████████████████████████████
████████████████

505.    I understand that in the ███████████████████████████

████████████████████████████████████████████

███.[676] Mr. Hayden testified that, ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███"[677]

506.    Dr. Goodrich selected and reviewed four patents ████████████████

███████████[678]

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[676] AMZ_KOVE_000532602-AMZ_KOVE_000532623, AMZ_KOVE_000532601. *See also*, 4/24/2023 S. Hayden Dep. Tr. at 288:24-289:9
████████████████████████████████████ ").

[677] 4/24/2023 S. Hayden Dep. Tr. at 288:18-289:9.

[678] Goodrich Report, ¶ 411.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████ As a result, in my opinion, the technology described is at least somewhat comparable to that of the Asserted Patents.

507.    Dr. Goodrich appears to agree with my assessment of the technology disclosed in ████████████████████████████████████████████.[679] But he comes to the opposite conclusion, stating that "[t]hese patents are distinguishable from and not comparable to the Asserted Patents because they do not involve storing or retrieving data in a distributed network in accordance with the conventions claimed in the Asserted Patents."[680] I disagree, given that the general technology in each of these patents is related to ███████████████████████████████████ ████████

508.    In my opinion, these patents teach foundational technology that is more relevant to the Accused Products than the Asserted Patents.

---

[679] Goodrich Report, ¶412-415.

[680] Goodrich Report, ¶416.

**H.** ██████████████████████

509.    I understand that in the ████████████████████████████████████

████████████████ .[681] Mr. Hayden testified that the ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ "[682] I re-

viewed the patents ████████████████████████ ,[683] specifically, ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████ In my opinion, the technology described in these patents is comparable to that of the Asserted Patents. But the context and application of these patents is different than the Asserted Patents, because they represent more foundational technology for ████████████████ than the Asserted Patents.

510.    Dr. Goodrich asserts that the ████████████████████ "are distinguishable from the Asserted Patents because ████████████████████████████████████████

---

[681] AMZ_KOVE_000528537-AMZ_KOVE_000528550, at AMZ_KOVE_000528548-AMZ_KOVE_000528549 (████████████████████████████████████████ ).

[682] 4/24/2023 S. Hayden Dep. Tr. at 229:18-20; 230:22-24; 231:6-8.

[683] AMZ_KOVE_000528537-AMZ_KOVE_000528550, at AMZ_KOVE_000528548.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████ [and] do not involve storing or retrieving data in a distributed network in

accordance with the conventions claimed in the Asserted Patents."[684] Although I agree with Dr.

Goodrich's assessment of the technology described in these patents, I disagree that they aren't

comparable to the Asserted Patents. His descriptions of the technology indicate that each of these

patents is relevant to ██████████████████████████████████, the very

technical categories Kove asserts are covered by the Asserted Patents. Given the similarities, in

my opinion, the general technology described in the ████████████████ is comparable to the

general technology of the Asserted Patents, but the context and application is different.

511.   As the technology in the ████████████████████████████████

████ is more foundational and relevant to the Accused Products than the Asserted Patents, in my

opinion, they have more value than the Asserted Patents.

**I.**   ████████████████████████████████████

512.   I understand that in the ████████████████████████████

███████████████████████████████████████████████████████

████████████████████.[685] Mr. Hayden testified that ████████████████

███████████████████████████████████████████████████████

---

[684] Goodrich Report, ¶374.

[685] AMZ_KOVE_000487488-AMZ_KOVE_000487498, at AMZ_KOVE_000487496 (███████
████████████████████).

███████ ,,[686] It is my opinion that this portfolio contains similar technology to that in the Asserted Patents and is comparable.

513. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████ all problems Kove asserts are also addressed by the Asserted Patents.

514. Similarly, another of the patents is ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████ , all problems Kove asserts are also addressed by the Asserted Patents.

515. A fourth patent included among the ████████████████████

████████████████████████████████████████

---

[686] 4/24/2023 S. Hayden Dep. Tr. at 218:21-25.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████, the technology of

the Asserted Patents. Further.████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ related to those in the Asserted Patents.

516.  ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████, something that the Asserted Patents don't address.

517.  Dr. Goodrich contends that all of these patents and patent applications are distin-

guishable from the Asserted Patents. Specifically, he asserts "the technology described ████████

███████████████████████████████████████████████

████████████████████████████ [and] the Asserted Patents provide for

storing the location of data separate from the data itself in location servers… allow[ing] for scaling

---

[687] AMZ_KOVE_000487488-AMZ_KOVE_000487498, at AMZ_KOVE_000487496.

location servers… [which] allows for distributing, maintaining, scaling, and/or retrieving the lo-

cations of data."[688] With respect to the ████████████████████████████████████

███ Dr. Goodrich opines they aren't comparable because they ███████████████████████

██████████████████████████████)[and] do not include a distributed data

collection environment."[689] Finally, Dr. Goodrich alleges that ███████████████████████

█████████████████████████ [and] do not involve storing or retrieving data in a distrib-

uted network in accordance with the conventions claimed in the Asserted Patents."[690] But I disa-

gree, as Dr. Goodrich ignores that each of these patents and applications is generally related to

████████████████████████████████████████████████████████████████

███. The general technology of these patents and applications, in my opinion, is comparable to

that of the Asserted Patents and also cover aspects related to █████████████████████.

518.    The patents and patent applications covered by this license are directed to methods

for ████████████████████████████████████████████also discussed in the Asserted

Patent. Thus, in my opinion, the ██████████████ covers similar technology and is comparable

to the Asserted Patents.

**J.**    ███████████████████████████████████

519.    I understand that in the ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[688] Goodrich Report, ¶363.

[689] Goodrich Report, ¶366.

[690] Goodrich Report, ¶367.

███████████████████████████████████████████████████████

██████████████████████████████████

520.    The technology described in this patent provides ████████████████████

████████████████████████████████. Indeed, Mr. Hayden stated that ████████████

███████████████████████████████████████████████████████

███"[691] But because this patent is ████████████████ they are less comparable than the patents in

other agreements I have reviewed. But it still generally relates to the idea of ████████████

████████████████████████.

## XVI.    NON-INFRINGING ALTERNATIVES EXISTED FOR THE ASSERTED CLAIMS OF THE ASSERTED PATENTS.

521.    I understand that alternative technologies or design choices that could have been

implemented and that don't infringe the asserted claims are referred to as non-infringing alterna-

tives. █████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

522.    I understand that non-infringing alternatives to an infringing product or service

must be feasible and acceptable. I understand that the feasibility of a non-infringing alternative

includes whether the defendant, at the time of first alleged infringement could have readily imple-

mented the alternative, whether the alternative was well known in the field, and whether the de-

fendant had the necessary know-how to make or use the non-infringing alternative. I further un-

---

[691] 4/24/2023 S. Hayden Dep. Tr. at 182:17-183:2.

derstand that non-infringing alternatives are not required to have existed at the time of first infringement. Rather, a defendant must demonstrate merely that the alternative was more than a theoretical possibility, and that the alternative was acceptable.

523.

---

[692] Supplemental and Amended Responses to Plaintiff's First Set of Interrogatories (Nos. 1-6), dated April 13, 2023, p. 20.

[693] 05/05/23 T. Rath Dep. Tr. at 252:15-253:13.

[694] 04/27/23 J. Hamilton Dep. Tr. at 178:21-179:18.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ [696]

524.    ████████████████████████████████████████████████████

████████████████████████████████████████████████

## A.  There Were Multiple Non-Infringing Alternatives Available For S3.

525.    I understand that for S3 the earliest date of alleged first infringement was June 19, 2007. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ [697]

526.    For example, claim 1 of the '170 patent and its dependents require that a "portion of the data location information included in a . . . data location server[] is based on a hash function used to organize the data location information across the plurality of data location servers." ██████

████████████████████████████████████████████████████████████

---

[695] *See* 04/27/23 J. Hamilton Dep. Tr. at 183:8-21 ("███████████████████████
████████████████████████████████████████████████████████
██████████████")

[696] *See, e.g.,* 05/23/23 A. Vermeulen Dep. Tr. at 41:16-21 ("████████████████
████████████████████████████████████████████████████████████
██████")

[697] *See* Sections XIV.E.5., XIV.F.1.

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████ ██ ██████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████

527.    As an additional example, claim 1 of the '978 patent and its dependents requires that the location information comprise an identifier and a location string associated with the identifier. Claim 1 requires that a location message be returned in response to a location query. ████

███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████

528.    Further, Claim 17 of the '978 patent and its dependents require "transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit." ████████

---

[698] *See* 05/23/23 A. Vermeulen Dep. Tr. at 83:17-85:2.

**B. There Were Multiple Non-Infringing Alternatives Available For DDB.**

529.    I understand that for DDB the earliest date of alleged first infringement was January 18, 2012.

[699]

530.

---

[699] *See also*, Supplemental and Amended Responses to Plaintiff's First Set of Interrogatories (Nos. 1-6), dated April 13, 2023 ("Response to Interrogatory No. 3"), at 22, 24, and 26.

Page **244**

[REDACTED]

[REDACTED] [701]

531.    For example, claim 17 of the '640 patent requires that each data location server retrieves "location strings" associated with an "identification string." [REDACTED]

[REDACTED]

---

[700] *See* 5/5/23 T. Rath Dep. Tr. at 255:5-12 [REDACTED]
[REDACTED] ").

[701] *See* 5/5/23 T. Rath Dep. Tr. at 255:14-256:17 ([REDACTED]
[REDACTED] )

[702] Response to Interrogatory No. 3, at 23.

[703] 5/5/23 T. Rath Dep. Tr. at 252:15-253:13.

[704] 5/5/23 T. Rath Dep. Tr. at 253:14-255:4.

[705] 5/5/23 T. Rath Dep. Tr. at 251-253. ([REDACTED]
[REDACTED] ").

532.



---

[706] Goodrich Report ¶¶ 313-315.

[707] Goodrich Report ¶¶ 314.

[708] *See* 5/5/23 T. Rath Dep. Tr. at 45:11-23 ("
")

533.    Claim 18 of the '640 patent requires that the "location information" be used by a client to "calculate" a "location," ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████[710]

534.    Claim 18 of the '640 patent also requires the location server to transmit a "redirect message" to the client containing redirect information for use by the client to calculate a location,

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

---

[709] *See supra*, at Section XIII.B.

[710] Response to Interrogatory No. 3, at 23.

[711] *See supra*, at Section XIII.B.

[712] Response to Interrogatory No. 3, at 23.

[713] Response to Interrogatory No. 3, at 23.

[714] Response to Interrogatory No. 3, at 23.

535.

536.    And claim 1 of the '170 patent requires that a "portion of the data location infor-

mation included in a . . . data location server[] is based on a hash function used to organize the

data location information across the plurality of data location servers."

---

[715] Response to Interrogatory No. 3, at 23.

[716] 5/5/23 T. Rath Dep. Tr. at 255:5-256:17.

[717] Goodrich Report ¶318. *See also*, *id*. at ¶ 316.



[718] Goodrich Report Ex. E, ¶¶124-125.

[719] 5/5/23 T. Rath Dep. Tr. at 258:3-260:24 (                                         ).

[720] 5/5/23 T. Rath Dep. Tr. at 258:3-260:24 (                                         ). *See also*, Response to Interrogatory No. 3, at 24.

[721] Response to Interrogatory No. 3, at 24.

[722] Response to Interrogatory No. 3, at 24.



537.

[723] *See, e.g.,* 5/5/23 T. Rath Dep. Tr. at 259:24-260:24

"). *See also*, 5/5/23 T. Rath Tr. at 255:5-256:17.

[724] *See, e.g.,* 5/5/23 T. Rath Dep. Tr. at 258:3-260:24

"). *See also*, 5/5/23 T. Rath Tr. at 248:11-250:17

).

[725] Goodrich Report ¶322. *See also*, *id.*, ¶¶ 323-326.

[726] Goodrich Report ¶¶323, and 325-326.

[727] Goodrich Report ¶323.

(redacted)

[729]

538.    As an additional example, claim 6 of the '170 patent requires programming logic configured to return in response to a location query related to a desired entity, a location message comprising a location associated with the desired entity. (redacted)

---

[728] Goodrich Report ¶324.

[729] *See supra*, at ¶510, n. 608-609, and n. 612-613.

[730] Response to Interrogatory No. 3, at 24-25.

[731] Response to Interrogatory No. 3, at 25.

[732] Response to Interrogatory No. 3, at 25.

[733] Response to Interrogatory No. 3, at 25.

Page 251

██████████████████████████████████

██████████████████████████████████

████████████ [734]

539.  ██████████████████████████████

██████████████████████████████████

████████████████████ ████ █████████

██████████████████████████████████

██████████████████████████████████

██████ ████ █████████████████████████

██████████████████████████████████

██████████████████████████████████

████████████████████████

540.    Further, claim 15 of the '170 requires, for example, "sending a redirect message to the client in response to determining the one of the plurality of location servers fails to include the location information, the redirect message identifying which of the plurality of location servers includes the location information." █████████████████████ ████ █████████

██████████████████████████████████

██████████████████████████████████

---

[734] Response to Interrogatory No. 3, at 25.

[735] Goodrich Report ¶327.

[736] Goodrich Report ¶328.

[737] See supra at Section XI.A, XII.A.



541.

---

[738] Response to Interrogatory No. 3, at 25.

[739] Response to Interrogatory No. 3, at 25.

[740] Response to Interrogatory No. 3, at 25.

[741] Response to Interrogatory No. 3, at 25.

[742] Goodrich Report ¶330.

542.    Claims 3 and 6 of the '978 patent, which depend from cancelled claim 1,[743] require two separate location servers with different location information from that on a first location server.

543.    For example, claim 10 of the '978 patent requires logic responsive to the location query to return one of a location message or a redirect message depending on whether the queried

[743] Claim 1 of the '978 patent was cancelled. *See* '034 Reexamination, Notice of Intent to Issue Reexamination Certificate, at 3 ("Claims 1 and 31 are canceled by the Examiner's Amendment."). I understand that, as claims 3 and 6 depend from it, claim 1's requirements are also part of these dependent claims.

[744] Response to Interrogatory No. 3, at 26 (providing alternatives to claim 1 of the '978 patent).

[745] Response to Interrogatory No. 3, at 26 (providing alternatives to claim 1 of the '978 patent)

location server contains location information for the desired entity or not.

544.    As a further example, claim 14 of the '978 patent requires a "redirect" message as other asserted claims and the alternatives available for those claims at the time of first alleged infringement would apply to this claim as well.

---

[746] Response to Interrogatory No. 3, at 26-27.

[747] Response to Interrogatory No. 3, at 27.

[748] Response to Interrogatory No. 3, at 27.



545.

no

---

[749] Response to Interrogatory No. 3, at 27.

[750] Response to Interrogatory No. 3, at 27.

[751] Response to Interrogatory No. 3, at 27.

[752] Response to Interrogatory No. 3, at 27.

[753] 5/5/23 T. Rath Dep. Tr. at 255:5-256:17.

██████████████████████████████████████████████████████

████████ ██████████████████████████████████████████████

██████████████████████████████████████████████████████

████████

546.     Further, claim 17 of the '978 patent requires that the alleged location information

comprise at least one application server address. ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ ██████ ████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████ ██████████ ██████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████

547.    ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████ ███

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

---

[754] Goodrich Report ¶¶333 and 335.

[755] Response to Interrogatory No. 3, at 27.

[756] 5/5/23 T. Rath Dep. Tr. at 264:13-21.

[757] Goodrich Report ¶¶336-338.

548.     Claim 17 also requires "transferring a portion of the identifiers and associated lo-
cations to a second data location server when a performance criterion of the first location server
reaches a predetermined performance limit."

---

[758] Response to Interrogatory No. 3, at 28.

[759] Response to Interrogatory No. 3, at 28.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ ████████

█████████████████████████████████████████████████████████

█████████████████████████████ [761]

549. █████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████ ████████ ██████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████

550. Thus, it is my opinion that there were multiple non-infringing alternatives available to both S3 and DDB which would have been available and acceptable at the time of alleged first infringement.

---

[760] Response to Interrogatory No. 3, at 28.

[761] Goodrich Report ¶¶340-343.

[762] 5/5/23 T. Rath Dep. Tr. at 268:7-21. *See also*, 5/5/23 T. Rath Dep. Tr. at (████████████████ ████████████████████████████████████████████████████████ ").

551.     I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Dated:  8/18/2023

Dr. Ananth Grama