# Exhibit K95



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/019,034 | 11/19/2021 | 7233978 | | 3927 |

184647        7590        10/27/2022
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway
Suite 300
Redwood City, CA 94065

| EXAMINER |
|---|
| CAMPBELL, JOSHUA D |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/27/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

**UNITED STATES PATENT AND TRADEMARK OFFICE**

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

FISCH SIGLER LLP
5301 WISCONSIN AVENUE, NW
FOURTH FLOOR
WASHINGTON, DC 20015

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/019,034* .

PATENT UNDER REEXAMINATION *7233978* .

ART UNIT *3992* .

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

## DETAILED ACTION

1)      This Office action addresses claims 1, 3, 6, 10, 14, 17, 23, 24, 30, and 31 of United States Patent

Number 7,233,978 (hereinafter " '978 patent") for which it has been determined in the Order Granting Ex

Parte Reexamination mailed January 12, 2022, regarding Reexamination Control No. 90/019,034

(hereinafter the "Order") that a substantial new question of patentability was raised in the Request for *Ex*

*Parte* reexamination filed on November 19, 2021 (hereinafter the "Request").

2)      This action is Final.

3)      The examiner has considered the declaration of Michael T. Goodrich filed on September 28,

2022.

4)      The rejections of claims 3, 10, and 14 under pre-AIA 35 U.S.C. 103(a) as being unpatentable over

ONAG in view of OSG, further in view of McGarvey has been withdrawn in view of patent owner's

response filed September 28, 2022.

5)      The rejections of claim 6 under pre-AIA 35 U.S.C. 103(a) as being unpatentable over ONAG in

view of OSG, further in view of Rajani has been withdrawn in view of patent owner's response filed

September 28, 2022.

### *Status of Claims*

6)      Claims 1-31 are pending:

   a.      Claims 1 and 31 are rejected as discussed below.

   b.      Claims 3, 6, 10, 14, 17, 23, 24, and 30 are found patentable as discussed below.

   c.      Claims 2, 4, 5, 7-9, 11-13, 15, 16, 18-22, and 25-29 are not subject to reexamination.

*Rejections*

7)    The following rejections are utilized by the examiner below, referencing the proposed prior art

listed on page *vi* of the Request:

> *Issue 1:*        Claims 1 and 31 in view of ONAG and OSG

8)    The rejections below are confined to what has been deemed to be the best available art from the

Request. However, prior to conclusion of this reexamination proceeding, claims must be patentable over

all prior art cited in the order granting reexamination in order to be considered patentable or confirmed on

the reexamination certificate.

*Priority and Patent Term*

9)    The '978 patent was a continuation-in-part of application 09/661,222, filed on September 13,

2000 (U.S. Patent 7,103,640), a continuation-in-part of application 09/503,441, filed on February 14,

2000 (abandoned), a continuation-in-part of application 09/367,461, filed on August 13, 1999

(abandoned), a continuation-in-part of application 09/111,896, filed on July 8, 1998 (abandoned). The

Overton application also relied on Provisional Applications 60/277,408, filed on March 19, 2001 and

60/209,070, filed on June 2, 2000.

> MPEP 2701(I) states the following:

> *A patent granted on a continuation, divisional, or continuation-in-part application that was filed*
>
> *on or after June 8, 1995, will have a term which ends twenty years from the filing date of earliest*
>
> *application for which a benefit is claimed under 35 U.S.C. 120, 121, 365(c), or 386(c) regardless*
>
> *of whether the application for which a benefit is claimed under 35 U.S.C. 120, 121, or 365(c) was*
>
> *filed prior to June 8, 1995.*

Based on the citation above, the Overton patent is expired. The term of twenty years from the filing date

of the earliest filed application (09/111,896, filed on July 8, 1998) for which a benefit is claimed plus the

term adjustment of 810 days under 35 U.S.C. 154(b) has passed. The patent expired on September 25, 2020.

10)      37 C.F.R. 1.530(j) states, "No enlargement of claim scope. No amendment may enlarge the scope of the claims of the patent or introduce new matter. ***No amendment may be proposed for entry in an expired patent. Moreover, no amendment, other than the cancellation of claims, will be incorporated into the patent by a certificate issued after the expiration of the patent.*** " (emphasis added). Thus, because the patent is expired no amendments of the claims will be allowed aside from the cancellation of claims.

Additionally, in making the determination of whether to order reexamination, the Office will determine the proper meaning of the patent claims by giving the claims their broadest reasonable interpretation consistent with the specification (see In re Yamamoto, 740 F.2d 1569 (Fed. Cir. 1984)), except in the case of an expired patent (in a reexamination involving claims of an expired patent, claim construction is pursuant to the principle set forth by the court in Phillips v. AWH Corp., 415 F.3d 1303, 1316, 75 USPQ2d 1321, 1329 (Fed. Cir. 2005) (words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention, see Ex parte Papst-Motoren, 1 USPQ2d 1655 (Bd. Pat. App. & Inter. 1986)).

***Information Disclosure Statement***

11)      Where the IDS citations are submitted but not described, the examiner is only responsible for cursorily reviewing the references. The initials of the examiner on the PTO-1449 indicate only that degree of review unless the reference is either applied against the claims, or discussed by the examiner as pertinent art of interest, in a subsequent office action.

See Guidelines for Reexamination of Cases in View of In re Portola Packaging, Inc., 110 F.3d 786, 42 USPQ2d 1295 (Fed. Cir. 1997), 64 FR at 15347, 1223 Off. Gaz. Pat. Office at 125 (response to comment 6).

Consideration by the examiner of the information submitted in an IDS means that the examiner will consider the documents in the same manner as other documents in Office search files are considered by the examiner while conducting a search of the prior art in a proper field of search. The initials of the examiner placed adjacent to the citations on the PTO-1449 or PTO/SB/08A and 08B or its equivalent mean that the information has been considered by the examiner to the extent noted above.

Regarding IDS submissions MPEP 2256 recites the following: "Where patents, publications, and other such items of information are submitted by a party (patent owner or requester) in compliance with the requirements of the rules, the requisite degree of consideration to be given to such information will be normally limited by the degree to which the party filing the information citation has explained the content and relevance of the information."

Accordingly, the IDS submissions have been considered by the Examiner only with the scope required by MPEP 2256, unless otherwise noted. The items which have been crossed out on the information disclosure statements have not been considered.

### *Claim Rejections*

12)   ***Claim Rejections - 35 USC § 103***

The following is a quotation of pre-AIA 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

***Issue 1***

13)    Claims 1 and 31 are rejected under pre-AIA 35 U.S.C. 103(a) as being unpatentable over ONAG

("Oracle Names Administrator's Guide, Release 2.0" published 1996) in view of OSG ("Oracle DBA

Survival Guide, 1st ed." published October 1, 1995).

   **Regarding independent claim 1,** ONAG discloses a system having a plurality of location

servers ("Names servers" in ONAG) for managing location information and providing location

information to location queries, the system comprising:

*See* OracleNamesAdminGuide at 32:



Figure 2 – 1  Components of a Network Using Oracle Names
with the Dynamic Discovery Option

Oracle Names version 2.0 is a supporting product for Oracle7 release 7.3
and SQL*Net release 2.3. Oracle Names makes network address and
database link information available to all nodes throughout the network.
Each database server's network address is stored with a name that is
used to identify it. Client applications can then request a database
connection with a simple name rather than a lengthy address.

                                              (page 20 of ONAG)

The Names Server has a single purpose: to resolve, or assist in resolving,
a client-initiated name request. It interprets the request, then looks up
the name in its cache, or it calls a Names Server in another region. The
response or error conditions are passed back to the client.

                                              (page 52 of ONAG)

a first location server containing a first set of location information corresponding to at least one entity, the

location information comprising an identifier and at least one location string associated with the identifier,

wherein the identifier ("named Poultry" of ONAG) identifies an entity and the location string ("address"

of ONAG) specifies a location of data pertaining to the entity

> The Names Server has a single purpose: to resolve, or assist in resolving,
> a client-initiated name request. It interprets the request, then looks up
> the name in its cache, or it calls a Names Server in another region. The
> response or error conditions are passed back to the client.
>
> Figure 3 – 11 shows a client requesting access to a Names Server named
> POULTRY and a Names Server providing the answer. A flat naming
> model is assumed.

(page 52 of ONAG)

> The sequence of events is as follows:
> 1. The client application issues a connection request to SQL*Net of
> the form:
> `sqlplus scott/tiger@POULTRY`
> where POULTRY is a database service name defined in the Oracle
> Names Server.
> SQL*Net determines from the client configuration in the
> SQLNET.ORA file that the client's default domain is WORLD and
> the preferred Names Server is the one shown. SQL*Net sends the
> Names Server a request to resolve the name POULTRY.WORLD.
> 2. The Names Server receives the request, looks it up in the cache,
> then sends the response back to the client.
> 3. The client receives the answer and substitutes the address in
> place of the initial name POULTRY.
> 4. The client contacts POULTRY and establishes a standard
> SQL*Net client–server connection.

(pages 52-53 of ONAG)

Additionally, OSG further supports this discussion by explaining that SQL*Net (such as

that of ONAG) uses executable code to make it easier for users to connect to various databases

and find their data; however, "the burden of providing the translation between the easy names and

the exact server and instance address falls on the DBA." (page 87 of OSG, see also pages 20, 27

and 694 of OSG)


a second location server comprising a second set of location information, wherein at least a portion of the

second set of location information differs from the first set of location information; and

ONAG discloses the use of multiple Names Servers, the Names Servers containing different sets

of location information and communicating between each other to resolve the different sets of

locations information on behalf of the client.



Figure C — 4  Network Messages in a Multi–Level Foreign Name Resolution

3.  The root Names Server does not have the answer (because root only
    knows about its direct child regions), but forwards the request to a
    Names Server in region DR2.

4.  The receiving server in DR2 forwards the request to a Names Server
    in region DR2.1.

5.  The name is retrieved from its authoritative Names Server in DR2.1.

6.  The names Server in region DR2 caches the answer and returns it to
    the root.

7.  The root caches the answer and returns it to the preferred Names
    Server in  region DR1.

8.  The preferred Names Server caches the answer and returns it to the
    client.

9.  The client establishes a connection to the destination server.

        (page 191 of ONAG, see also pages 189, 190, and 193 of ONAG)

programming logic stored on each of the location servers responsive to a location query identifying a

desired entity to return a location message, the location message comprising at least one location of data

pertaining to the desired entity, if the location server receiving the location query contains location

information for the desired entity.

Figure 2–2 shows the components of the Names Server using the
Dynamic Discovery Option and their relationships.



Figure 2 – 2 Oracle Names Server Components
Using the Dynamic Discovery Option

(page 33 of ONAG)

ONAG describes a portable software that runs on a variety of computer platforms (pages
62-63 of ONAG). An example found on page 129 of ONAG shows a query and the systems
response, reproduced below:

```
NAMESCTL> QUERY BONES.DEM.MEDICINE A.SMD
Total response time:     0.04 seconds
Response status:         normal, successful completion
Authoritative answer:    yes
Number of answers:       1
Canonical name:          bones.dem.medicine
TTL:                     1 day
Alias translations:
    from:                bones.dem.medicine
    to:                  bones.dem.medicine
Answers:
    data type is "a.smd"
        Syntax is ADDR:...{DESCRIPTION=(ADDRESS=
    (COMMUNITY=tcp){PROTOCOL=TCP}{Host=cowboy}
    {Port=1522}}{CONNECT_DATA={SID=rodeo}}}
```

As can be seen in the example above, the request from the client for location information results
in a response ("Answers") which provides the location information for the desired entity (see also
page 109 of ONAG).

Additionally, OSG further supports this discussion by describing an SQL query to be used explicitly to "determine the location of your data files" (page 152 of OSG).



To the extent it could be argued that ONAG fails to teach certain limitations, OSG teaches an SQL query to be used explicitly to "determine the location of your data files" (page 152 of OSG, see also disclosure of "easy name" synonyms for specifying a database – pages 86-87, 181, 189-190, and 352 of OSG).

ONAG and OSG are in the same field of art and discuss managing distributed database systems using Oracle7 technology, and its associated tools and utilities (see pages 5, 22, and 52-54 of ONAG and pages 20, 27, and 695 of OSG). They contain overlapping disclosures focused on the similar purposes of improving query efficiency and resolution of user access.

A POSITA would have found it obvious for ONAG to associate location information (i.e. connection descriptor) with an identifier (i.e. network-service-name-alias) and respond to queries with location messages. As OSG explains, ONAG's SQL*Net makes it easier for users to connect to various databases and find their data; however, "the burden of providing the translation between the easy names and the exact server and instance address falls on the DBA." (page 87 of OSG). Making use of identifiers

to improve the users' experience and to ease their ability to find their desired data entity is a primary objective of an Oracle database administrator ("DBA").

Indeed, before the '978 Patent, POSITAs were combining these teachings in Oracle7 systems in the 1990s, and OSG includes techniques explaining to DBAs how to improve their systems (page 19 OSG). And OSG directs DBAs to combine OSG's teachings with various reference manuals and resources to take advantage of all of Oracle7's capabilities. For example, to use SQL*Net effectively, OSG provides that a DBA should record error messages and consult "specific product manuals (for example, SQL*Net)" for solutions (pages 44 and 52 of OSG).

For those reasons, a POSITA would have been motivated to associate an identifier with ONAG's data and location information for use in optimizing query efficiency, based on OSG's teachings. As OSG explains, a POSITA was often asked to help improve query efficiency during the relevant timeframe:

> You may be regarded by your project team as the database guru because you have the title of DBA [database administrator]. If this is the case, try to obtain as much knowledge as possible about the DBMS [database management system] and query optimization through training courses and books. It may mean more work for you, but it could save many hours of project team labor if you can quickly provide your compatriots with the answers that they need.
>
> (page 51 of OSG)

**Regarding independent claim 31,** ONAG discloses a system for managing location information and providing location information to location queries, the system comprising:

*See* OracleNamesAdminGuide at 32:



Figure 2 – 1  Components of a Network Using Oracle Names
with the Dynamic Discovery Option

Oracle Names version 2.0 is a supporting product for Oracle7 release 7.3
and SQL*Net release 2.3. Oracle Names makes network address and
database link information available to all nodes throughout the network.
Each database server's network address is stored with a name that is
used to identify it. Client applications can then request a database
connection with a simple name rather than a lengthy address.

(page 20 of ONAG)

The Names Server has a single purpose: to resolve, or assist in resolving,
a client-initiated name request. It interprets the request, then looks up
the name in its cache, or it calls a Names Server in another region. The
response or error conditions are passed back to the client.

(page 52 of ONAG)

a location server operating in accordance with a transfer protocol, the transfer protocol comprising

instructions for manipulating an identifier and at least one location associated with the identifier, wherein

the identifier uniquely specifies an entity and wherein each location specifies a location of data in a

network pertaining to the entity, the location server containing location information corresponding to at

least one entity and formatted according to the transfer protocol, and wherein the location of data for the

location comprises an application server in communication with the network; and

The Names Server has a single purpose: to resolve, or assist in resolving,
a client-initiated name request. It interprets the request, then looks up
the name in its cache, or it calls a Names Server in another region. The
response or error conditions are passed back to the client.

Figure 3 – 11 shows a client requesting access to a Names Server named
POULTRY and a Names Server providing the answer. A flat naming
model is assumed.

(page 52 of ONAG)

The sequence of events is as follows:

1. The client application issues a connection request to SQL*Net of
the form:

```
sqlplus scott/tiger@POULTRY
```

where POULTRY is a database service name defined in the Oracle
Names Server.

SQL*Net determines from the client configuration in the
SQLNET.ORA file that the client's default domain is WORLD and
the preferred Names Server is the one shown. SQL*Net sends the
Names Server a request to resolve the name POULTRY.WORLD.

2. The Names Server receives the request, looks it up in the cache,
then sends the response back to the client.

3. The client receives the answer and substitutes the address in
place of the initial name POULTRY.

4. The client contacts POULTRY and establishes a standard
SQL*Net client–server connection.

(pages 52-53 of ONAG)

   Additionally, OSG further supports this discussion by explaining that SQL*Net (such as

that of ONAG) uses executable code to make it easier for users to connect to various databases

and find their data; however, "the burden of providing the translation between the easy names and

the exact server and instance address falls on the DBA." (page 87 of OSG, see also pages 20, 27

and 694 of OSG)

programming logic stored on the location server responsive to a location query identifying a desired entity

to return a location message, the location message comprising locations associated with the desired entity,

wherein the location server returns the location message if the location server contains location

information for the desired entity.

Figure 2–2 shows the components of the Names Server using the
Dynamic Discovery Option and their relationships.



Figure 2 – 2  Oracle Names Server Components
Using the Dynamic Discovery Option

(page 33 of ONAG)

ONAG describes a portable software that runs on a variety of computer platforms (pages

62-63 of ONAG).  An example found on page 129 of ONAG shows a query and the systems

response, reproduced below:

```
NAMESCTL> QUERY BONES.DEM.MEDICINE A.SMD
Total response time:    0.04 seconds
Response status:        normal, successful completion
Authoritative answer:   yes
Number of answers:      1
Canonical name:         bones.dem.medicine
TTL:                    1 day
Alias translations:
    from:               bones.dem.medicine
    to:                 bones.dem.medicine
Answers:
    data type is "a.smd"
        Syntax is ADDR:...{DESCRIPTION=(ADDRESS=
    {COMMUNITY=tcp}{PROTOCOL=TCP}{Host=cowboy}
    {Port=1522}}{CONNECT_DATA={SID=rodeo}}}
```

As can be seen in the example above, the request from the client for location information results

in a response ("Answers") which provides the location information for the desired entity (see also

page 109 of ONAG).

Additionally, OSG further supports this discussion by describing an SQL query to be used explicitly to "determine the location of your data files" (page 152 of OSG).



To the extent it could be argued that ONAG fails to teach certain limitations, OSG teaches an SQL query to be used explicitly to "determine the location of your data files" (page 152 of OSG, see also disclosure of "easy name" synonyms for specifying a database – pages 86-87, 181, 189-190, and 352 of OSG).

ONAG and OSG are in the same field of art and discuss managing distributed database systems using Oracle7 technology, and its associated tools and utilities (see pages 5, 22, and 52-54 of ONAG and pages 20, 27, and 695 of OSG). They contain overlapping disclosures focused on the similar purposes of improving query efficiency and resolution of user access.

A POSITA would have found it obvious for ONAG to associate location information (i.e. connection descriptor) with an identifier (i.e. network-service-name-alias) and respond to queries with location messages. As OSG explains, ONAG's SQL*Net makes it easier for users to connect to various databases and find their data; however, "the burden of providing the translation between the easy names and the exact server and instance address falls on the DBA." (page 87 of OSG). Making use of identifiers

to improve the users' experience and to ease their ability to find their desired data entity is a primary objective of an Oracle database administrator ("DBA").

Indeed, before the '978 Patent, POSITAs were combining these teachings in Oracle7 systems in the 1990s, and OSG includes techniques explaining to DBAs how to improve their systems (page 19 OSG). And OSG directs DBAs to combine OSG's teachings with various reference manuals and resources to take advantage of all of Oracle7's capabilities. For example, to use SQL*Net effectively, OSG provides that a DBA should record error messages and consult "specific product manuals (for example, SQL*Net)" for solutions (pages 44 and 52 of OSG).

For those reasons, a POSITA would have been motivated to associate an identifier with ONAG's data and location information for use in optimizing query efficiency, based on OSG's teachings. As OSG explains, a POSITA was often asked to help improve query efficiency during the relevant timeframe:

> You may be regarded by your project team as the database guru because you have the title of DBA [database administrator]. If this is the case, try to obtain as much knowledge as possible about the DBMS [database management system] and query optimization through training courses and books. It may mean more work for you, but it could save many hours of project team labor if you can quickly provide your compatriots with the answers that they need.
>
> (page 51 of OSG)

### Response to Arguments

14)     This is a response to the Patent Owner's (PO) response filed on September 28, 2022 in reference to the following issues:

a.     Regarding the rejection of claims 1 and 31 in view of ONAG and OSG (pages 41-49 of PO response):

PO argues that the combination of ONAG and OSG do not teach or suggest an "identifier" that uniquely identifies a single entity as required by claims 1 and 31.

**Examiner respectfully disagrees.** ONAG discloses two basic naming models for

naming objects in the network, a flat naming model and a hierarchical naming model. ONAG

discusses the flat naming model as follows:

> All names are unique within a single domain—the WORLD domain.
> The WORLD domain is predefined in the Oracle Network Manager for
> customers choosing a flat naming model.
>
>> Note: A flat naming model should be used when the actual
>> number of services is small (under 100), when the likelihood of
>> future growth of network services is minimal, and the entire
>> SQL*Net network is centrally administered.
>
> Figure 3 – 5 shows a flat naming model. The actual database service
> names are appended with ".WORLD" as in CONFIG.WORLD,
> FLIGHTS.WORLD, etc.



> Figure 3 – 5  Flat Naming Model
>
> All names in the WORLD domain must be unique. The Network
> Manager has a validation feature that ensures that all names you enter
> are unique.

(page 40 and 41 of ONAG)

As can be seen in the citation above, in the flat naming model all of the names would be

contained within one domain and all of the names would be unique, thus in the flat naming model

all of the identifiers (names) uniquely identify a single entity (object). ONAG discusses that this

model would be used for only a small number of services (less than 100). However, it still clearly

teaches the use of identifiers that uniquely identify single entities. ONAG also discusses the

hierarchical naming model as follows:

You can divide names into a hierarchical structure to allow for future growth or greater naming autonomy. For example, if a requirement is that administrators in Europe must be able to assign names without consulting US administrators, they can do so from within different domains. This does not mean they must maintain different administrative regions, just different domains. A single administrative region can contain and thus control many domains.

## Domains

All network names include one or more *domains*. A *domain* is a group of machines and network services. Domains are usually hierarchically related for organizational and administrative purposes. However, all network names could instead reside in a single domain—the WORLD domain.

The top level domain is the predefined *root domain*. All other domains are hierarchically below the root.

> Note: The WORLD domain always appears in Network Manager. Because it is not used in hierarchical configurations, however, it is not shown in the following figures.

Figure 3 – 6 shows a hierarchical naming model with five domains: the (ROOT) domain, ACME domain, US.ACME, EUROPE.ACME, and ROW.ACME (Rest of World) domains.



Figure 3 – 6 Hierarchical Naming Model

Within each domain all names must be unique, but across domains they can be repeated. Notice that both WEATHER and HISTORY are repeated, but the full global names are unique (that is, HISTORY.ROW.ACME vs. HISTORY.EUROPE.ACME).

Network domains are similar to file directories used by many operating systems (such as UNIX) in that they are hierarchical; however, unlike file systems, network domains may or may not correspond to any physical arrangement of databases and other objects in a network; they are name spaces.

You can extend this hierarchy to any number of levels (for example, you could divide EUROPE further into UK, GREECE, and so forth,) but each additional level increases the knowledge users must retain to request names.

Dividing the set of names into three domains does not necessarily require three administrative regions. Administrative regions simply represent individual Network Manager installations. ACME may well determine that names can be assigned (or decided upon) by the administrator in EUROPE or ROW, but forwarded to the administrator at the ACME world headquarters in Boise, Idaho to be entered into the Network Manager.

Default Domains

Each client has a default domain in the naming model. The default
domain is the domain within which most of the client's name requests
are conducted. This is usually the domain the client resides in, but it
could be another domain from which the client often requests services.
A client can request a network service within its default domain using
the service's simple, unqualified name, that is, without specifying a
domain name. If a user requests a name without a "." character in it, the

default domain name will be automatically appended to the database
service or database link name requested.

(page 41-43 of ONAG)

As can be seen in the citation above, the hierarchical naming model requires that within each

domain all names must be unique, but across domains they can be repeated. However, this

repeating of names within separate domains still does not support PO's position, because as stated

in the citation above the full global names are actually based on the hierarchy to include the other

elements of the hierarchical structure to uniquely identify a single entity. The citation above

gives the following example, "Notice that both WEATHER and HISTORY are repeated, but the

**full global names are unique** (that is, HISTORY.ROW.ACME vs

HISTORY.EUROPE.ACME)." (emphasis added). Thus, the hierarchical naming model also

clearly discloses identifiers (full global names) that uniquely identify an entity (object). The

citation even goes on to explain how the system handles when a client makes a request, in that if

the client only specifies a name the default domain of said client is appended to the request to

make a full global name.


PO argues that the combination of ONAG and OSG do not teach or suggest "wherein the

location of data […] comprises an application server in communication with the network" as

required by claim 31.

**Examiner respectfully disagrees.** PO defines application server as follows, "Typically,

each machine in which some portion of the data in a distributed database may reside is called an

application server." Thus, it would appear that PO is attempting to argue that the combination of

ONAG and OSG does not teach a machine in which some portion of the data in a distributed

database resides on. This is obviously not a reasonable interpretation of the ONAG and OSG

references. In any of the discussions in ONAG and OSG, the resulting location/address provided

by the system in response to a client request constitute the location/address of "a machine in

which some portion of the data in a distributed database resides on" or in PO's own words, an

application server. For example, this citation from the rejection:

> Oracle Names version 2.0 is a supporting product for Oracle7 release 7.3
> and SQL*Net release 2.3. Oracle Names makes network address and
> database link information available to all nodes throughout the network.
> Each database server's network address is stored with a name that is
> used to identify it. Client applications can then request a database
> connection with a simple name rather than a lengthy address.

(page 20 of ONAG)

In the citation above, the database that the client is requesting a connection to is by PO's own

definition an application server.

PO argues that a POSA would not be motivated to modify ONAG with OSG to satisfy

the requirements of claims 1 and 31. More specifically, PO argues that because ONAG and OSG

do not teach an identifier that uniquely identifies a single entity that a POSA would understand

that the combination would not satisfy claim 1 and 31's requirements.

**Examiner respectfully disagrees.** As discussed above, the allegation that ONAG and

OSG do not teach an identifier that uniquely identifies a single entity is not factual. Thus, the

arguments based on this premise are moot.

b.        Regarding the rejection of claims 10, 14, and 3 in view of ONAG, OSG, and McGarvey

(pages 49-68 of PO response):

**Examiner agrees.** The claims have been confirmed as discussed in the "Statement of

Reasons for Patentability and/or Confirmation".

c.      Regarding the rejection of claim 6 in view of ONAG, OSG, and Rajani (pages 69-70 of PO response):

**Examiner agrees.**  The claim has been confirmed as discussed in the "Statement of Reasons for Patentability and/or Confirmation".

d.      Regarding the secondary considerations of non-obviousness (pages 70-77 of PO response):

PO argues that there is long felt but unsolved needs and industry praise, thus the claims are not obvious (pages 71-73 of PO response).

**Examiner respectfully disagrees.**  In this case, no objective evidence of a nexus between specifically the scope and language of claims 1 and 31 is presented in regards to any of the specific submitted evidence of secondary considerations has been shown.  Thus, the statements made amount to nothing more than allegations without any actual evidence of a nexus to the claimed invention.   Examiner notes that the PO provided discussions of both the use of hash tables and hash functions, features which are not contained within either claim 1 or 31. These features are contained in claim 6 which has been confirmed.

PO argues that there is evidence of the failure of others and unexpected results, thus the claims are not obvious (pages 73-76 of PO response).

**Examiner respectfully disagrees.**  In this case, once again no objective evidence of a nexus between specifically the scope and language of claims 1 and 31 is presented in regards to any of the specific submitted evidence of secondary considerations has been shown.  Thus, the statements made amount to nothing more than allegations without any actual evidence of a nexus to the claimed invention.   Examiner notes that the PO has provided absolutely no discussion of regarding claims 1 and 31 in this section.

PO argues that there is evidence of commercial success, thus the claims are not obvious (pages 76-77 of PO response).

**Examiner respectfully disagrees.** In this case, none of the evidence provided has provided any actual evidence of a nexus between the commercial success and the claimed invention. Additionally, it is important to point out the product family is facilitated by numerous patents and numerous independent claims within said patents. Thus, without any actual evidence of a nexus between the commercial success and the claimed invention found in claim 1 and 31 it would be impossible to prove that claims 1 and 31 of this specific patent and not one of the other patents is the reason for commercial success.

Regarding the discussion of the commercial success of the invention, objective evidence of non-obviousness including commercial success must be commensurate in scope with the claims. In re Tiffin, 448 F.2d 791, 171 USPQ 294 (CCPA 1971). In ex parte proceedings before the Patent and Trademark Office, an applicant must show that the claimed features were responsible for the commercial success of an article if the evidence of non-obviousness is to be accorded substantial weight. See In re Huang, 100 F.3d 135, 140, 40 USPQ2d 1685, 1690 (Fed. Cir. 1996).

In considering evidence of commercial success, care should be taken to determine that the commercial success alleged is directly derived from the invention claimed, in a marketplace where the consumer is free to choose on the basis of objective principles, and that such success is not the result of heavy promotion or advertising, shift in advertising, consumption by purchasers normally tied to applicant or assignee, or other business events extraneous to the merits of the claimed invention, etc. In re Mageli, 470 F.2d 1380, 176 USPQ 305 (CCPA 1973) (conclusory statements or opinions that increased sales were due to the merits of the invention are entitled to little weight); In re Noznick, 478 F.2d 1260, 178 USPQ 43 (CCPA 1973).

PO has not provided any actual evidence of nexus that the success is directly derived from the actual claimed invention found in claims 1 and 31 as required. Rather PO has merely alleged that the claimed invention has "substantial overlap" with the accused products. As clearly stated, the PO must prove that the success is "directly derived" and not merely related to the claimed invention. These allegations can not serve as proof that the claimed elements meet the requirements for showing evidence of commercial success.

### *Statement of Reasons for Patentability and/or Confirmation*

15)    Claims 3, 6, 10, 14, 17, 23, 24, and 30 are confirmed over the prior art that was explained in the request and determined to raise a substantial new question of patentability in the order granting reexamination because the art of record does not teach:

> *wherein the programming logic further comprises logic responsive to the location query to return one of a location message or a redirect message, wherein the location server receiving the query returns the location message if the queried location server contains location information for the desired entity, and wherein the queried location server returns a redirect message if the queried location server lacks location information for the desired entity, the redirect message comprising information for finding a location server known to have location information relevant to the location query.*
>
> (as found in claim 3)

> *wherein the location information in the location server is maintained in an indexed location store indexed by a hash table.*                    (as found in claim 6)

> *wherein a queried location server returns a location message if the queried location server contains location information for the desired identifier, and a redirect message if the*

*queried location server does not contain location information relevant to the desired*

*identifier, wherein the redirect message comprises information for finding a location*

*server having location information related to the desired identifier.*

(as found in claim 10)

*sending a redirect message to the client if the queried location server does not contain data*

*location information relevant to the entity identified in the query, the redirect message*

*comprising information for finding a location server storing the entity identified in the*

*query.*                                                 (as found in claim 14)

*transferring a portion of the identifiers and associated locations to a second data location*

*server when a performance criterion of the first location server reaches a predetermined*

*performance limit.*                                     (as found in claim 17)

In a reexamination proceeding involving claims of an expired patent, claim construction pursuant to the principle set forth by the court in Phillips v. AWH Corp., 415 F.3d 1303, 1316, 75 USPQ2d 1321, 1329 (Fed. Cir. 2005) (words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art in question at the time of the invention) should be applied since the expired claim are not subject to amendment. See *Ex parte* Papst-Motoren, 1 USPQ2d 1655 (Bd. Pat. App. & Inter. 1986).

In regards to independent claims 10 and 14 and dependent claim 3, the claims all require the use of a "redirect message comprising information for finding a location server known to have location information relevant to the location query" (as found in claim 3, similar language in claims 10 and 14). Oracle's Names Servers forward name requests up and down a hierarchy of Names Servers until the Names Server containing the desired information is reached, and the desired information is returned in the same way, traversing the network of Names Servers.  This fact gives evidence to the fact that any given

Names Server has no information regarding which specific Names Server stores a desired information item. Were any given Names Server to have such information, then the Names Server would simply pass the request directly to that Names Server, instead of forwarding the request up and down a hierarchy of Names Servers. Since any given Names Server has no information regarding which specific Names Server stores a requested item, there would be no way for the Names Server to include such information in a redirect message returned to the requesting device.

In regards to dependent claim 6, the claim requires that "the location information in the location server is maintained in an indexed location store indexed by a hash table." If Oracle's Names Server had this ability, there would be no need to pass requests up and down a hierarchy of Names Servers; it could determine on its own the Names Server having the desired information and send the request directly to that Names Server. While OSG discloses the use of hashing in resolving queries, it fails to disclose the use of hashing at any given location server (i.e., by any given Names Server) to determine the location server/Names Server that contains the desired location information.

In regards to independent claim 17, the claim requires explicitly "transferring a portion of the identifiers and associated locations to a second data location server" when a performance criterion reaches a limit. Under the Phillips construction, the ordinary and customary meaning as understood by a person of ordinary skill in the art at the time of the invention of the requirement of explicitly "transferring a portion of the identifiers and associated locations to a second data location server" would require that the identifiers and associated locations first be stored on the first data location server and then be transferred from said first location server to said second location server. The mere concept of having more than one location servers that contain potentially different identifiers and associated locations as discussed in the ONAG and OSG references in combination with the discussions of optimization found in ONAG and OSG does not actually teach the act of "transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit" as it is claimed. Neither the McGarvey nor the Rajani references cure the deficiencies of the teachings of the ONAG and OSG references. Therefore, none of the references

considered in this reexamination proceeding properly disclose at least the discussed limitations of the claimed invention, either alone or in combination.

*Conclusion*

16)     **THIS ACTION IS MADE FINAL.**

A shortened statutory period for response to this action is set to expire two months from the mailing date of this action.

**Extensions of time under 37 CFR 1.136(a) do not apply in reexamination proceedings.** The provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Further, in 35 U.S.C. 305 and in 37 CFR 1.550(a), it is required that reexamination proceedings "will be conducted with special dispatch within the Office."

**Extensions of time in reexamination proceedings are provided for in 37 CFR 1.550(c).** A request for extension of time must specify the requested period of extension and it must be accompanied by the petition fee set forth in 37 CFR 1.17(g). Any request for an extension in a third party requested ex parte reexamination must be filed on or before the day on which action by the patent owner is due, and the mere filing of a request will not effect any extension of time. A request for an extension of time in a third party requested ex parte reexamination will be granted only for sufficient cause, and for a reasonable time specified. Any request for extension in a patent owner requested ex parte reexamination (including reexamination ordered under 35 U.S.C. 257) for up to two months from the time period set in the Office action must be filed no later than two months from the expiration of the time period set in the Office action. A request for an extension in a patent owner requested ex parte reexamination for more than two months from the time period set in the Office action must be filed on or before the day on which action by the patent owner is due, and the mere filing of a request for an extension for more than two months will not effect the extension. The time for taking action in a patent owner requested ex parte reexamination

will not be extended for more than two months from the time period set in the Office action in the absence of sufficient cause or for more than a reasonable time.

The filing of a timely first response to this final rejection will be construed as including a request to extend the shortened statutory period for an additional two months. In no event, however, will the statutory period for response expire later than SIX MONTHS from the mailing date of the final action. See MPEP § 2265.

17)     In order to ensure full consideration of any amendments, affidavits or declarations, or other documents as evidence of patentability, such documents must be submitted in response to this Office action.  Submissions after the next Office action, which is intended to be a final action, will be governed by the requirements of 37 CFR 1.116, after final rejection and 37 CFR 41.33 after appeal, which will be strictly enforced.

18)     All correspondence relating to this ex parte reexamination proceeding should be directed as follows:

By U.S. Postal Service Mail to:

      Mail Stop Ex Parte Reexam
      ATTN: Central Reexamination Unit
      Commissioner for Patents
      P.O. Box 1450
      Alexandria, VA 22313-1450

By FAX to:

      (571) 273-9900
      Central Reexamination Unit

By hand to:

      Customer Service Window
      Randolph Building
      401 Dulany St.

Alexandria, VA 22314

By EFS-Web:

Registered users of EFS-Web may alternatively submit such correspondence via the electronic filing system EFS-Web, at

https://efs.uspto.gov/efile/myportal/efs-registered

EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded) directly into the official file for the reexamination proceeding, which offers parties the opportunity to review the content of their submissions after the "soft scanning" process is complete.

Any inquiry concerning this communication or earlier communications from the Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

/JOSHUA D CAMPBELL/
Primary Examiner, Art Unit 3992

Conferees:

/ADAM L BASEHOAR/
Primary Examiner, Art Unit 3992

/ALEXANDER J KOSOWSKI/
Supervisory Patent Examiner, Art Unit 3992