# Exhibit K140

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| *In re*: Reexam of U.S. Patent No. 7,233,978 | Confirmation No.: 3927 |
| Control No. 90/019,109 | Art Unit: 3992 |
| Filed: August 31, 2022 | Examiner: Sorrell, Eron J. |
| For: **Method and Apparatus For Managing Location Information In a Network Separate From The Data To Which The Location Information Pertains** | |

## Patent Owner's Reply to Office Action in *Ex Parte* Reexamination

***Mail Stop "Ex Parte* Reexam"**
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

Patent Owner hereby replies to the Office Action dated April 3, 2023, issued in the above-captioned *ex parte* reexamination. The due date for reply is July 3, 2023, based on the Office's granting-in-part of a petition for an extension of time. No additional fees are believed to be necessary, however, to prevent abandonment of this reexamination, please contact the undersigned representative for payment information.

## *Status of the Claims*

The '978 patent is expired. A listing of each claim under reexamination is provided below. Although no claim amendments are proposed in this response, Patent Owner nonetheless provides this listing of original claims from U.S. Patent No. 7,233,978 to Overton et al. ("the '978 patent") for ease of reference and review.

The following claims are subject to *ex parte* reexamination:

17. (Patent Claim)  A method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information, wherein each of the plurality of location servers stores unique set of location information of an aggregate set of location information, the method comprising:

    providing a transfer protocol configured to transport identifier and location information, the location information specifying the location of information related to the identifier;

    storing location information formatted according to the transfer protocol at a first location server;

    receiving an identifier and a location relevant to the identifier at the first location server;

    storing the received location in a location store at the first data location server, the location store comprising a plurality of identifiers, each identifier associated with at least one location, wherein the received location is associated with the received identifier in the location store; and

    transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit.

18. (Patent Claim) The method of claim 17, wherein receiving an identifier and a location comprises receiving the identifier and the location at the first location server from an application server, wherein the location comprises an address for the application server.

19. (Patent Claim) The method of claim 17, wherein receiving an identifier and a location comprises receiving the identifier and the location at the first location server from a physical object, wherein the identifier identifies the physical object and wherein the location comprises a geographic location for the physical object.

20. (Patent Claim) The method of claim 19, wherein the physical object comprises a vehicle.

21. (Patent Claim) The method of claim 19, wherein the physical object comprises a portable telecommunications device.

22. (Patent Claim) The method of claim 17, wherein transferring a portion of the identifier and location associations comprises:

identifying a portion of identifier and location associations on the first location server to be transferred to the second location server and identifying a data set state of the identified portion at an initial time;

copying a data set for the identified portion corresponding to the identified data set state from the first location server to the second location server and maintaining a second data set containing changes to the identified portion since the initial time;

identifying a data set state for the second data set;

ceasing operation of the first location server with respect to the identified portion and copying the second data set to the second location server, wherein the second data set corresponds to the identified data set state for the second data set; and

initiating operation of the second location server for the identified portion of identifiers and location associations.

23. (Patent Claim) The method of claim 17, wherein the performance criterion comprises an amount of available persistent storage space in the first location server.

24. (Patent Claim) The method of claim 17, wherein the performance criterion comprises a transaction rate limit.

25. (Patent Claim) The method of claim 17, wherein the transaction rate limit comprises a processor speed limit.

26. (Patent Claim) The method of claim 17, wherein the transaction rate limit comprises a network connection bandwidth limit.

27. (Patent Claim) The method of claim 17, further comprising transmitting a location server map from the first location server, the location server map comprising information identifying the second location server and a list of identifiers associated with the second location server.

28. (Patent Claim) The method of claim 27, wherein the first and second location servers are part of a location server cluster comprising a plurality of location servers, and wherein

transmitting the location server map comprises transmitting the location server map to each of the plurality of data location servers asynchronously.

29. (Patent Claim) The method of claim 27, wherein transmitting a location server map comprises transmitting the location server map to a client in response to query received at the first location server from the client regarding an identifier that is not resident on the first location server.

30. (Patent Claim) The method of claim 17, wherein transferring a portion of the identifiers and associated locations to a second location server when a performance criterion of the first data location server reaches a predetermined performance limit further comprises monitoring the performance criterion and automatically transferring the portion of identifiers and associated locations when the first location server reaches the predetermined limit.

# *Remarks*

Claims 17-30 '978 patent are currently subject to *ex parte* reexamination. Claims 17, 23-24, and 30 stand rejected in the Office Action dated April 3, 2023 ("Office Action"). Claims 18-22, 25-29, and 31 have been confirmed patentable. Patent Owner thanks the Office for confirming patentability of these four claims and respectfully traverses the rejections as to the remaining claims. Based on the following remarks, Patent Owner respectfully requests that the Examiner reconsider all outstanding rejections and that they be withdrawn.

## I.    Status of Related Matters

The '978 patent is the subject of litigation in *Kove IO, Inc., v. Amazon Web Services, Inc.,* Case No. 1:18-cv-08175 (N.D. Ill.).

## II.    Information Disclosure Statements

Patent Owner previously submits information disclosure statements (IDSs) concurrently herewith.

## III.    Statement of Substance of Examiner Interview

Patent Owner, Co-Inventor John Overton, Dr. Michael Goodrich, and Patent Owner's representatives Khue Hoang (Reg. No. 44,767) and Naveed Hasan (Reg. No. 72,688) thank Examiners Sorrell, Fuelling, and Pokrzywa for the Interview conducted on June 13, 2023. Examiner Sorrell requested Patent Owner provide further clarification about certain aspects of the reexamined claims, including distinguishing the ONAG's Names Servers from OracleUnleashed and Boukabza's tablespace architecture. In this Response, Patent Owner provides the requested clarifications, as well as detailed support for the patentability of the reexamined claims over the asserted prior art, whether considered individually or in combination.

## IV.    Status of Reexaminations of Related Patents

Patent Owner notes that claims 1, 2, 6, 8, 9, 12, and 15 of related U.S. Patent No: 7,814,170 patent ("'170 patent") and claims 17-18 and 24 of related U.S. Patent No: 7,103,640 ("'640 patent") and have been confirmed to be patentable in Reexamination Control Nos. 90/019,035 and 90/019,036, respectively. Claims 3, 6, 10, 14, 17, 23-24, and 30 of the '978 patent have been confirmed to be patentable in Reexamination Control No. 90/019,034. Reexamination of claims

1, 2, 6, 8, 9, 12, and 15 of the '170 patent and claims 17-18 and 24 of the '640 patent have been ordered in Reexamination Control Nos. 90/019,165 and 90/019,166, respectively. Reexamination of claim 6 of the '978 patent has been ordered in Reexamination Control No. 90/019,162.

## V.  *Response to Substantive Rejections in the Office Action*

The Office Action includes three grounds of rejections:

Ground 1: Claims 17, 23-24, and 30 are rejected under pre-AIA 35 U.S.C. § 103(a) as allegedly being obvious over ONAG in view of Boukobza.

Ground 2: Claims 17, 23-24, and 30 are rejected under pre-AIA 35 U.S.C. § 103(a) as allegedly being obvious over ONAG in view of OracleUnleashed.

Ground 3: Claims 17, 23-24, and 30 are rejected under pre-AIA 35 U.S.C. § 103(a) as allegedly being obvious over Ault in view of Yocum and Boukobza.

Patent Owner respectfully traverses the rejections, each of which are addressed below.

### A.  **Relevant Prosecution History**

The '978 patent was filed as U.S. Patent Application 09/872,736 ('736 application) on June 1, 2001 and issued on June 17, 2007. The Office stated the following in the Notice of Allowability of the '736 application: "The Examiner finds the applicant's arguments on page 10 lines 9-27 of the amendment filed November 1, 2006 to be persuasive. The applicant argued in substance that Lumelsky does not teach a system and method for management of location information separate from the data to which the location information pertains, but instead relates to manipulation of the actual data (multimedia objects in Lumelsky) rather than just location information for that data." Notice of Allowability of the '736 application (2/13/2007) at p. 3.

### B.  **Related *Inter Partes* Review (IPR) and *Ex Parte* Reexaminations**

Patent Owner notes that claims 3, 6, 10, 14, 17, 23-24, and 30 of the '978 patent were previously confirmed to be patentable over ONAG, OracleSG, Rajani, and McGarvey in *Ex Parte* Reexamination Control No. 90/019,034. With respect to claim 17, Examiner Campbell in the '034 Reexam stated, "Under the Phillips construction, the ordinary and customary meaning as

understood by a person of ordinary skill in the art at the time of the invention of the requirement of explicitly 'transferring a portion of the identifiers and associated locations to a second data location server' would require that the identifiers and associated locations first be stored on the first data location server and then be transferred from said first location server to said second location server. The mere concept of having more than one location servers that contain potentially different identifiers and associated locations as discussed in the ONAG and OSG references in combination with the discussions of optimization found in ONAG and OSG does not actually teach the act of 'transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit' as it is claimed. Neither the McGarvey nor the Rajani references cure the deficiencies of the teachings of the ONAG and OSG references." Non-Final Office Action in the '034 Reexam at pp. 35-36.

Claims 1, 3, 6, 10, 14, 17, 23, 24, 30, and 31 of the '978 patent were also challenged by the Requester of the present Reexamination in an IPR (IPR2020-00276) filed on December 12, 2019. The Requester (the Petitioner in the IPR) cited Internet Engineering Task Force Network Working Group Request for Comments 1034 (RFC1034), which describes Domain Name Service (DNS), to challenge the validity of the claims. The Patent Trials and Appeals Board (Board) agreed with the Patent Owner that the term "identifier," as recited in the '978 patent, should be construed as uniquely identifying a single entity. The Board denied institution of the IPR on June 16, 2020.

### C. Overview of claimed technology and continued patentability of the claims

Towards the latter half of the 1990's, data storage was still relatively manageable. Most data could be stored locally, on local drives, compact discs (CDs) or disk drives. Single servers were often sufficient for data storage needs. Not long thereafter, the amount and size of data began increasing, soon reaching exponential rates. Networking became ubiquitous and storing data in single servers became impractical if not impossible. This paved the way for distributed data collection environments.

Distributed data collection involves managing data stored and retrieved among multiple databases or data repositories connected by a network. Conventional distributed data collection

environments maintained a static relationship between data and its location. Accordingly, every time data moved from one location to the next, all of the systems that maintained the static relationship had to be updated. As a result, while conventional distributed data collection environments allowed for dispersed storage, doing so made reliably locating and retrieving the data challenging, particularly where data is added or removed dynamically. '978 patent at 1:38-44.

The Inventors of the '978 patent predicted networking would become ubiquitous and data would become explosive, years before it actually happened. The Inventors understood that maintaining a static relationship between data and its location in traditional distributed data collection environments (*i.e.,* tree structures) would become untenable, given the growing unreliability of locating and retrieving dispersed data, particularly where the data in the components of the network could change location, unbeknownst to one another. The Inventors invented a protocol that dynamically creates relationships between data and its locations using an algorithm or function. That is, the Inventors invented a protocol that replaced storing caches and state information across the network, with a stateless approach that allows clients to compute the location of data's location information based on a dynamically created relationship between the data and its location. The Inventors sought to find a way to achieve seamless dynamic and spontaneous global search and retrieval of data across a distributed network. The result are the claims embodying the Inventors' network distributed tracking protocol ("NDTP").

### *1.* **The problems with the existing systems**

The Inventors studied then-existing systems to determine if there were ways to improve efficiency and scalability in locating and retrieving distributed data. They concluded that conventional systems were fundamentally limited in the types of searches that could be performed and the forms of data returned based on the search. '978 patent at 1:45-55. For example, the '978 patent states, "One example is where a client requests files based on a subject, like a person's name. In the search results, therefore, only text files of peoples' names may be retrieved. Another problem in current retrieval systems is that the client may receive text and image files in the search results, but could not seamlessly access the image files. Yet another problem in current retrieval systems is that video and sound files related to the request may not even be found in the search

results. For example, a doctor might be able to retrieve medical records on a specific patient, but cannot view an MRI or X-Ray results associated with that record." *Id.* at 1:55-58.

The Inventors recognized that while Doman Name Service's (DNS) "names and machine" mapping format is analogous to the "entity identifier and data location" mappings in the NDTP protocol (*Id.* at 23:60-24:11), NDTP has a foundationally different structure that enables it to support "very fast, very diverse, and very large scale mapping manipulations" (*id.*), which names services like DNS cannot do because of their tree-node organizational structure.

Conventional systems consistently used hierarchical-tree structures when attempting to scale their networks. For example, ONAG acknowledged that a network may follow either a flat naming model or a hierarchical naming model but cautioned that "[a] flat naming model should be used when the actual number of services is small (under 100), when the likelihood of future growth of network services is *minimal....*" ONAG at p. 40 (emphasis added). More pointedly, ONAG discouraged the use of "flat" structures in larger networks, in contrast to hierarchical structures which ONAG noted "allow[s] for future growth or greater naming autonomy." *Id.* at p. 41. This illustrates that POSAs, at the time of invention, would have understood that conventional data systems were dependent on hierarchical structures.

The Inventors understood the challenges that existed in locating and retrieving data in a distributed data collection environment and addressed the challenges with the inventions of the '978 patent. Their invention, as embodied in the claims of the '978 patent, enables a client to retrieve data through any server in the network and receive in response the location information associated with a desired entity. The structured relationships of the invention allow clients to access data in distributed environments through a non-hierarchical, limitlessly scalable, server structure that enables retrieval of requested information in not more than two iterations.

The Inventors further recognized that as the amount of data grows in the databases, the number of location servers may need to increase without affecting the efficacy of the search of the location information. As such, the '978 patent also allows for linearly scaling the location servers without affecting the efficacy of the search of location information because of the capability of computing the location of data's location information based on a dynamically created relationship between the data and its location. For example, the '978 patent states "NDTP handles NDTP

server scaling with the NDTP's redirection mechanism, which is managed through an NDTP server 12, or set of such servers. This redirection mechanism allows arbitrary distribution of the data set across completely independent machines. The set of machines managing the NDTP server data set may be referred to as an NDTP server cluster 50, as shown in FIG. 5. The NDTP redirection mechanism exploits this by permitting the distribution of identifiers to location mappings across members of an NDTP server cluster. An advantage of distributing an NDTP server data set across independent machines is that both capacity and transaction rate scale can be increased. In one embodiment, each additional machine in an NDTP server cluster 50 linearly increases capacity, by adding main and secondary storage, and transaction rate, by adding processing power and network bandwidth (assuming a properly scalable network infrastructure is employed)." *Id.* at 15:47-63. This allows for seamlessly transferring portions of location information from one server to another when the server reaches a performance limit while still allowing the client to query and retrieve the desired location information from the Names Servers without any change in the process.

The '978 patent also maintains one to many relationships between identifiers and locations of data distributed across a network. *See e.g., id.* at 8:14-25. For example, the '978 patent states "The NDTP server efficiently maintains and dispenses one to many relationships between identifiers and locations. In other words, an identifier may be associated with any number of locations. In embodiments where the location information relates to locations of application servers containing data or routing information for finding data, the NDTP server is updated to indicate an association between the identifier and the application server's location when data for a particular identifier is added to an application server. When a query is performed for an identifier, the NDTP server supplies the set of application servers in which data may be found for that identifier." *Id.* This allows for efficient tracking of location of information associated with an individual entity in a distributed data network. Specifically, the '978 patent explains "An 'entity identifier' or an 'identifier' is a unique encoding, which may be a string in one embodiment, with which zero or more data location specifiers are associated in an NDTP server. A 'data location' or 'location' is an encoding, for example a string, that is a member of a set of associations with an identifier in an NDTP server. An 'NDTP client' or a 'client' is a network-attached component that initiates add, delete, lookup and update of identifier/location mappings, or associations, from an NDTP server with NDTP request messages. An 'NDTP server' or a 'server'

is a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to NDTP request messages from clients." *Id.* at 4:25-38. The '978 patent further states, "The communication flow may represent a client 112 requesting an identifier/location association(s) from the NDTP server, which may be a server constellation construed in either of two forms (see FIGS. 19 and 20), and then querying directly based on the identifier/location association(s) received from the NDTP server." *Id.* at 18:50-56.

By requiring that each identifier uniquely identify a single entity, the locations for the data pertaining to the single entity using the identifier can quickly be located. *See e.g., id.* at 4:19:43; 4:57-5:22; 8:14-25; 18:38-19:3. This way, the location servers in the network do not have to execute any extraneous steps for determining or identifying a given entity when resolving a location query. *Id.*

### 2. The '978 patent invention's improvements over the prior art

The invention taught in the '978 patent differed from and improved upon pre-existing systems, including tree-based systems like DNS and other names service systems like Oracle Names Service in certain foundational ways.

**First**, the '978 patent teaches separating the data's location from the data itself, treating them as distinct.

Claim 17 and its dependent claims require identifiers and their associated locations (i.e., location information) be uniquely stored in each location server in a claimed plurality of location servers. As claimed in the claims and as taught by the specification and construed by the district court (*see* Section V.D below and NPLs 42 and 43, as filed in the IDS form 1), location information stored in the location servers specifies the data's location, not the data itself. This contrasts with prior art systems like ONAG where aliases of the type taught in Names Server merely point to the databases where data is believed to be stored, and not to the actual data itself. The crux of the '978 patent, which is present in every claim via its recitations of "identifier," "location information," and "location servers," requires the data and its location to be distinct from one another.

The claimed identifier must also uniquely identify a single entity so that the identifier may be used to query the location server and retrieve the location information of the data pertaining to the respective entity. [NPL 31]

11

The specification teaches that these relationships are fundamental to the invention:

Col. 1:59-67: "A distributed data collection is a system where *data is stored and retrieved among multiple machines connected by a network.* Typically, each machine in which some portion of the data in a distributed data collection may reside is called a 'data repository machine', or simply a 'data repository'. One commonly asked question in a data repository environment is: *Where is data associated with a particular entity in a distributed data collection? The data location is a key question* when a distributed data collection has highly dynamic data distribution properties."

Col. 8:14-22: "The NDTP server efficiently maintains and dispenses one to many relationships between identifiers and locations. In other words, an identifier may be associated with any number of locations. In embodiments where the location information relates to locations of application servers containing data or routing information for finding data, the NDTP server is updated to indicate an association between the identifier and the application server's location when data for a particular identifier is added to an application server."

Col. 23:63-24:1: "NDTP is designed for use in the larger context of a distributed database system including, but not limited to, addressing and namespace services. As such, it supports an architecture in which *information about where data associated with particular application entities can be managed and obtained independently of the data itself.*"

Figure 18 of the '978 patent (annotated below) illustrates the separation of the data location information from the data itself:



**'978 patent, Fig. 18 (annotated with colored boxes)**

The NDTP Server Constellation 110 (red box) includes data location servers that store the location of specific units of data stored in application server 114 (green box). '978 patent at 18:38-56. The data stored in application server 114 may be moved to any repository. *Id.* at 8:14-25, 18:38-56. The location of the data, if it is moved, will be updated in the data location servers in the NDTP Server Constellation 110. *Id.* at 8:14-25; 18:38-56; 24:6-11. Locating the data requires querying the NDTP Server Constellation 110. *Id.* at 18:38-56. Specifically, the '978 patent states, "The communication flow may represent a client 112 requesting an identifier/location association(s) from the NDTP server, which may be a server constellation construed in either of two forms (see FIGS. 19 and 20), and then querying directly based on the identifier/location association(s) received from the NDTP server." *Id.* at 18:50-56.

<u>**Second**</u>, the '978 patent teaches using an identifier that uniquely identifies a single entity, such that the locations of the data pertaining to the entity can be retrieved using the identifier.

Claim 17 embodies this by requiring "location information specifying the location of information related to the identifier." The specification explains the relationships among identifiers, data location, and location server:

Col 4:25-38: "An 'entity identifier' or an 'identifier' is a unique encoding, which may be a string in one embodiment, with which zero or more data location specifiers are associated in an NDTP server. A 'data location' or 'location' is an encoding, for example a string, that is a member of a set of associations with an identifier in an NDTP server. An 'NDTP client' or a 'client' is a

network-attached component that initiates add, delete, lookup and update of identifier/location mappings, or associations, from an NDTP server with NDTP request messages. An 'NDTP server' or a 'server' is a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to NDTP request messages from clients."

Col. 4:57-67: "The location may be address information for the application server(s) containing information relevant to the identifier or address information for the application server(s) through which data relevant to the identifier may be accessed. In one embodiment, when a client queries the NDTP server for information pertaining to an entity, the NDTP server preferably returns a list of all locations for the specified entity. The client then can directly access the various locations, relieving the NDTP server of any further involvement in the transaction and allowing the NDTP server to handle more queries."

Col. 8:14-25: "The NDTP server efficiently maintains and dispenses one to many relationships between identifiers and locations. In other words, an identifier may be associated with any number of locations. In embodiments where the location information relates to locations of application servers containing data or routing information for finding data, the NDTP server is updated to indicate an association between the identifier and the application server's location when data for a particular identifier is added to an application server. When a query is performed for an identifier, the NDTP server supplies the set of application servers in which data may be found for that identifier."

The relationships among entity, identifier, location information, location server, and data pertaining to the entity are schematically depicted in the figure below:



**Patent Owner's Figure A**

Consider the movie entity, "Casablanca." Data pertaining to that movie may, for example, be 4K, SD, and .MOV versions of the film. A unique "identifier" is used to identify the entity, and the same identifier is associated with data locations or "location strings" that, together with the identifier, are stored as "location information" in a location server. Location string 1 specifies where the 4K version of the movie is stored, location string 2 specifies where the SD version is stored, and location string 3 specifies where the .MOV version is stored. As such, "data pertaining to" the movie (i.e., the various versions of the film) are distinct from their "location information" (identifier + location strings) which is stored in a location server.

**Third**, the '978 patent teaches a configuration for organizing data location information in location servers such that the number of servers can be limitlessly scaled.

Claim 17 and its dependents, for example, are methods for scaling a location server's capacity and/or transaction rate capability by requiring that when a location server reaches a performance limit for a performance criteria, a portion of the identifiers and associated locations stored in that location server be transferred to a different location server.

Figure 19 of the '978 patent illustrates the organization of the data location information.

# FIG. 19



**'978 patent, Fig. 19 (annotated with colored dots and boxes)**

In Figure 19, the NDTP Server Constellation 110 includes NDTP servers 120a and 120b. *Id.* at 18:61-19:3. The ellipses are added to illustrate the disclosed teaching that the number of NDTP servers can scale to however many are desired (Server 0 to Server N). *Id.* at 15:45-53. NDTP servers 120a and 120b store location information for data stored in application servers. *See e.g., id.* at 8:14-25; 18:50-19:3. Each unit of data is associated with an identifier that uniquely identifies an entity. *See e.g., id.* at 4:19-43; 23:61-24:11. The location information for the data is organized across NDTP servers 120a and 120b and can each store a portion of the location information– *i.e.*, the location information is distributed among the location servers in the network. *Id.* In contrast to the hierarchical "tree" structure of prior systems like ONAG, the configuration taught by the '978 patent allows for linear scaling of the location servers. Particularly, the patent teaches seamlessly adding location servers based on the growth of a network. Each new or existing location server is configured to store a portion of the location information and the algorithm or function used to divide up the location information, irrespective of the amount of data distributed across one or more repositories and the amount of movement of the data across the one or more repositories. This allows for easily locating the location information in networks

16

of any size. *See e.g., id.* at 8:14-25. As anticipated by the Inventors, the explosion of the Internet, in which moving data rapidly across any scale of system or complexity became <u>de facto</u>, without requiring tree structures with caches.

### 3. Reasons for continued patentability

Currently, claims 17, 23, 24, and 30 are rejected as obvious based on ONAG in view of Boukabza; ONAG in view of OracleUnleashed; and Ault in view of Yocum and Boukabza. Patent Owner respectfully traverses each rejection. The Examiner's rejections rely on initially perceived similarities between certain disclosures in the references and the claims, but closer study shows that the cited references and the invention are foundationally different, and that these differences make claims 17, 23, 24, and 30 novel and patentable.

In this Reply, Patent Owner details the lack of disclosure in the references and the lack of motivation to combine ONAG and/or Ault with any other reference (or combinations thereof). For at least the issues addressed in this Reply, Patent Owner respectfully requests the Examiner reconsider and withdraw the rejections pending against claims 17, 23, 24, and 30 and find them patentable.

### D. Claim Construction

As noted in the Office Action, the claims of the '978 patent must be given their ordinary and customary meaning in light of the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005) (*en banc*). *See* Office Action at 4. The Broadest Reasonable Interpretation (BRI) standard <u>may not</u> be applied to the claims in the instant reexamination proceeding because the claims are expired. *In re Rambus*, 694 F.3d 42 (2012). *See also In re CSB-Sys. Int'l, Inc.*, 832 F.3d 1335, 1341 (Fed. Cir. 2016) (confirming that "when an expired patent is subject to reexamination, the traditional *Phillips* construction standard attaches").

In its Request for Reexamination, the requestor proposed constructions for certain claim terms based on positions that had been taken in the parallel litigation (*Kove IO, Inc., v. Amazon Web Services, Inc.*, Case No. 1:18-cv-08175) involving the same patent and the same parties. Since that time, (1) the parties to the litigation (i.e., requestor and Patent Owner) have agreed on the constructions of certain claim terms (*see* NPL 30 in an Information Disclosure Statement (IDS)

Form 1), and (2) the Court in the Northern District of Illinois overseeing the litigation has issued a claim construction Order regarding other terms (*id.*, NPL 31). The parties' agreed-to constructions and the Court's ordered constructions are fully supported by disclosures in the specification, as evidenced by the citations and analysis in the Court's Memorandum and Order. *Id.*, NPL 30 and 43.

### *1.* **Claim Construction Summary Table**

A summary chart of the construed terms is as follows:

| Claim Term | Construction |
|---|---|
| identifier/identifier string | a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server (NPL 31) |
| location/data location | an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored (NPL 31) |
| location server/server | a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from [] clients (NPL 30) |
| location information | one or more identifiers and their associated locations (NPL 30) |
| hash table | a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table (NPL 31) |
| data pertaining to an entity | data pertaining to a person or thing (real, digital, or abstract) distinct from that data (NPL 30) |

Patent Owner respectfully submits that the above-referenced constructions, which were construed in accordance with the *Philips* standard, be adopted in the instant reexamination.

### *2.* **Independent claim 17**

Claim 17 recites:

> **[17.pre]** A method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information, wherein each of the plurality of location servers stores unique set of location information of an aggregate set of location information, the method comprising:

**[17.a]** providing a transfer protocol configured to transport identifier and location information, the location information specifying the location of information related to the identifier;

**[17.b]** storing location information formatted according to the transfer protocol at a first location server;

**[17.c]** receiving an identifier and a location relevant to the identifier at the first location server;

**[17.d]** storing the received location in a location store at the first data location server, the location store comprising a plurality of identifiers, each identifier associated with at least one location, wherein the received location is associated with the received identifier in the location store; and

**[17.e]** transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit.

Claims 17, 23-24, and 30 must be interpreted in light of the appropriate claim constructions and not in a vacuum. In particular, the claim terms must be construed in accordance with the *Phillips* standard and viewed in light of the claim language itself and the specification, as understood by a person of ordinary skill in the art (POSA) at the time of the invention.

Claim 17 describes scaling the capacity and/or transaction rate capability of location servers. As claimed, scaling location servers requires transferring a portion of location information (i.e., identifiers and their associated locations) from a first location server where they were previously stored to a second location server, based on performance criteria of the first location server. Specifically, claim 17 articulates the scaling of location servers as follows "A method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information [...], the method comprising: [...] transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit."

> **E.** **ONAG and Boukabza, alone or in combination, do not render any of Claims 17, 23-24, or 30 obvious.**

ONAG is a manual that provides information about Oracle Names products. (ONAG at 5). Oracle Names involves making network address and database link information in a distributed database network available to all nodes in the network (id.), using Names Severs to store such information in cache (The Names Server receives the request, looks it up in the cache, then send the response back to the client) (*id.* at 53; see also id. at 37).

Boukabza teaches a process for monitoring object types of nodes from a management node in data processing systems using distributed configured agents. (Boukabza, Abstract). Boukabza provides examples of monitoring objects, including Oracle instances, for parameters including "ORA_FRAGMENTS_TS" which verifies "the condition which corresponds to the case in which the largest of the extents ('MAX_EXTENTS') of the tables of the table space ('Tablespace') is smaller than the largest hole of the table space…" (Boukabza, 15:1-26).

> *1.* **ONAG in view of Boukabza does not teach or suggest "transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit," as recited by claim 17.e**

The Examiner acknowledges that ONAG "fails to teach" claim element [17.e]. *See* Office Action at 9. The Examiner relies on Boukabza to satisfy this requirement. However, Boukabza does not cure the deficiencies of ONAG.

Boukabza describes monitoring object types of nodes. *See* Boukabza at Abstract. The object type may be a database or server. *See id.* at 12:12-17. In particular, Boukabza has examples of monitoring parameters for Oracle tablespace instances. (Boukabza, 15:1-26)

The Examiner primarily relies on the following portion of Boukabza as satisfying claim element 17.e:

> the parameter ORA_FRAGMENT_TS", in which the measurement consists of verifying the condition which corresponds to the case in which the largest of the extents ("MAX_EXTENTS") of the tables of the table space ("Tablespace") is smaller than the largest hole of the table space, and if this condition is true, of sending an action proposition window in which it is indicated that the table space ("Tablespace") must be reorganized according to the following propositions:
> either a file is automatically created to enlarge the table space ("Tablespace"),
> or it requests when a standard "export_operation_tables/import" command is to be executed,
> or the administrator is requested to program the start of his reorganization utility.
> the parameter "ORA_SCANLOG", in which the Oracle errors to be processed in the file "alert.log" are pre-defined. A predefined action class corresponds to each error. Example:

*Id.* at 15:18-36 (highlights added); *see also* Office Action at 9. Specifically, the Examiner alleges Boukabza can export a table in response to a MAX_EXTENT error. Office Action at 9-11. The Examiner assumes the exporting of the table corresponds to the transferring step in claim element 17.e and the MAX_EXTENT is the predetermined performance limitation. *Id.* The Examiner also cites Boukabza at 32:10-16 to further describe the MAX_EXTENT error. *Id.* However, Boukabza does not cure ONAG's deficiencies as to claim element 17.e for multiple reasons.

> **a)** **Oracle "tablespace" referenced in Boukabza is different from and incompatible with ONAG's "names servers," making the references not relevant to or combinable with one another**

The Examiner alleges that a POSA would find it obvious or be motivated to implement Boukabza's import/export operation and MAX_EXTENT to transfer a portion of the database nicknames and service addresses stored in a first ONAG Names Server to a second ONAG Names Server when the first ONAG Names Server encounters a MAX_EXTENT. Office Action 9-11. Patent Owner disagrees for multiple reasons.

A POSA would not find it obvious or be motivated to modify or and/or combine ONAG with Boukabza to satisfy claim element 17.e because ONAG's architecture would not support

such a modification. As such, a POSA would not have a reasonable expectation of success to satisfy the claim requirements of claim element 17.e

**First,** as indicated above, a Names Server could not transfer a portion of the database names and service addresses to other Names Servers because Names Servers stores the database names and service addresses in *cache*—not a traditional relational database. *See e.g.*, ONAG at pp. 32-33 and 36. Boukabza's export/import tables is configured for traditional relational databases. Boukabza at 15:18-36. ONAG does not describe how the database names and service addresses are structured in the cache memory, other than calling the cache an in-memory database. ONAG pp. 32-33; 36. In-memory databases store data in specialized structures that are different from traditional relational database structures to allow for quick retrieval of data. ONAG at 33. In this regard, there is no teaching or suggestion that the tablespace functionality discussed in Boukabza could be replicated in the Name Servers' cache memory.

**Second**, a Names Server will not encounter a performance limit, such as MAX_EXTENTS. *See e.g.*, ONAG at p. 45. MAX_EXTENTS in Oracle defines the outer limits of a database table. Boukabza at 15:18-36 and 32:10-16. The limits of a given table storing the database names and service addresses will be defined at the network definition database. A POSA would understand that the Names Server will not add anything to the particular copy of database names and services addresses. Therefore, the extents of the table will not change size once the Names Server receives the copy of the database names and service addresses.

**Third**, transferring a *portion* of database names and service addresses across Names Servers would make ONAG inoperable. ONAG indicates that a network may include multiple administrative regions. *See e.g.*, ONAG at p. 43-45. Each administrative region may include one or more Names Servers. *Id*. Each Names Server in a given administrative region stores a copy of the database names and service addresses for the respective administrative region. This allows for clients and other Names Servers to query the appropriate Names Server servicing a given region for a service address of a database that may reside in the respective region. Transferring database names and service addresses across regions would break ONAG's organizational structure and a client's query to fail or take an extended amount of time to resolve.

**Fourth**, ONAG would not transfer *a portion* of database names and service addresses across Names Servers in the same administrative region because each of the Names Servers in a given adminstirative region store the identical database names and service addresses. ONAG at p. 44 and 173. This is because the Names Servers store the database names and service addresses in cache. If a Names Server in a given administrative region crashes or goes offline, the Names Server loses all of the data stored in the cache. *See e.g.,* ONAG at 29. As such, an additional Names Server in the administrative region with identical database names and services addresses for clients to query the administrative region. *See e.g., id.* Storing only portions of databse names and service addresses in the Names Servers in an administrative region would make querying inoperable if a Names Server in an administrative region crashed or went offline. Therefore, ONAG would not transfer *a portion* of database names and service addresses across Names Servers in the same administrative region.

ONAG and Boukabza are devoid of any reasoning to motivate the transferring a portion of location information across location servers in response to a location server reaching a performance limit. Therefore, the combination of ONAG and Boukabza to allegedly satisfy claim 17's requirements is an exercise of impermissible hindsight, and not modifications or combinations a POSA would have made at the time of the invention.

> *b)* **Even if Boukabza and ONAG are compatible references, combining them would not render Claim 17 obvious because Boukabza does not disclose or suggest element [17.e]**

Claim [17.e] requires "*transferring a portion* of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit."

**First**, Boukabza is silent about transferring a *portion* of the identifiers and associated locations from a first location server to a second location server. *See* Boukabza at 15:18-36.

**Second**, Boukabza does not teach or suggest transferring identifiers and associated locations between *servers*. Boukabza only describes exporting and importing tables within a tablespace. *Id.* Boukabza does not indicate where tables are stored or whether or how portions of those tables can be transferred to a different server.

**Third**, Boukabza is completely silent with respect to transferring *location information* between *location servers*. Boukabza only describes exporting and importing tables within a *tablespace*. *Id.* Claim 17 requires transferring portions of identifiers and associated locations, not the data to which the location pertains. The Office recognized and relied on this requirement to overcome prior art during the prosecution of the '736 application (which issued as the '978 patent), stating in the Notice of Allowability, "The Examiner finds the applicant's arguments on page 10 lines 9-27 of the amendment filed November 1, 2006 to be persuasive. The applicant argued in substance that Lumelsky does not teach a system and method for management of location information separate from the data to which the location information pertains, but instead relates to manipulation of the actual data (multimedia objects in Lumelsky) rather than just location information for that data." Notice of Allowability of the '736 application at p. 3. Similarly, here, Boukabza is silent about separating storage of data from its location information and only relates to manipulation of actual data rather than location information for that data.

For at least the reasons above, Boukabza does not teach or suggest claim element 17.e.

> ### *2.* ONAG in view of Boukabza does not teach or suggest "identifiers," as required by Claim 17

Claim 17 and its dependent claims require "identifiers," which the specification teaches to be (and which a district court has construed to mean) "a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server." '978 patent, 2:26-27; 4:25-28; *see also* NPL 31.

The Examiner relies on ONAG as disclosing the claimed "identifiers." Specifically, the Examiner cites ONAG pp. 42-43 and p. 20: ("*A client can request a network service within its default domain using the service's simple, unqualified name, that is, without specifying a domain name. If a user requests a name without a '*.' character in it, the default domain name will be automatically appended* to *the database service or database link name requested.*" And see also See page 20, "*Oracle Names makes network address and database link information available* to *all nodes throughout the network. Each database server's network address is stored with a name that is used* to *identify it. Client applications can then request a database connection with a simple name rather than a lengthy address.*"). Office Action, pp. 6-7.

The "identifiers" allegedly disclosed in ONAG however do not *uniquely* identify entities, as "identifiers" are required to do.

ONAG describes using service names (e.g., canonical names or aliases) or database links to retrieve network addresses of network objects and services. *Id.* at pp. 52-54. Names Servers "single purpose" is to resolve or assist in resolving a client-initiated name request. For example, ONAG describes the following process when attempting to retrieve a network address for a database service "1. The client application issues a connection request to SQL*Net of the form: sqlplus scott/tiger@POULTRY where POULTRY is a database service name defined in the Oracle Names Server. SQL*Net determines from the client configuration in the SQLNET.ORA file that the client's default domain is WORLD and the preferred Names Server is the one shown. SQL*Net sends the Names Server a request to resolve the name POULTRY.WORLD. 2. The Names Server receives the request, looks it up in the cache, then sends the response back to the client. 3. The client receives the answer and substitutes the address in place of the initial name POULTRY. 4. The client contacts POULTRY and establishes a standard SQL*Net client–server connection." *Id.* at pp. 52-53. In this example, the network addresses service name is "POULTRY" and is presumably an example of what the Examiner believes to be an "identifier" of the claims.

But service names / database links are not unique. ONAG allows users to create public and private names or database links to network services or objects. ONAG defines a public database links as, "A database link created by a DBA on a local database which is accessible to all users on that database." *Id.* at p. 202. ONAG also defines a private database link as "A DBlink created by one user for his or her exclusive use." *Id.* Thus, ONAG does not restrict users from assigning identical private and public database links to two different databases.

While there may be instances in ONAG where the public or private names may be different, ONAG is distinct from the '978 patent because ONAG does not restrict its users from creating a name or a link that may point to two different network objects. That is, in contrast to the '978 patent, ONAG's structure allows for users to assign the same name or link to different network objects because ONAG uses multiple parameters such as, network object name, link, type, user information, etc. to locate the network object. ONAG at pp. 128-129.

ONAG does not require that private and public uses of POULTRY resolve to the same canonical address. Rather, when a user queries a Names Server using POULTRY, ONAG first determines whether POULTRY is included in the user's private names or database links. If so, ONAG directs the query to network address 2, even if POULTRY is included the public names or database links. As such, POULTRY can simultaneously identify two different databases, and therefore, does not uniquely identify a single database.

ONAG provides numerous examples of allowing users to use non-unique names or links (i.e., alleged "identifiers") for network services or objects, including the process of locating a database link as: "Server TOM receives the SQL statement shown and checks its data dictionary for a private or public database link called JERRY. When it does not find one, SQL*Net determines from the client configuration in the SQLNET.ORA file that the client's default domain is WORLD and the preferred Names Server is the one shown. SQL*Net then sends the Names Server a request to resolve the database link name JERRY.WORLD." ONAG at 54. ONAG further states, "When a database link is used to select information from a remote database table (for example, SELECT * FROM EMP@HR.US.ORACLE.COM), Oracle searches for a connect descriptor in the following locations in the following order: 1. the user's private database links 2. the database public database links 3. the Oracle Names Server global database links." *Id.* at 110. Therefore, when processing a query, ONAG first checks for the name or database link in the user's private database links. To this end, a POSA would not understand this configuration to teach that a name or link be unique but rather that the same name or link may be used to identify different things, i.e., a user's private database as well a public database.

ONAG's use of non-unique names or database links for network services or objects is further illustrated in its querying process. ONAG teaches that, "If the QUERY command is used with just a name as a parameter, the Names Server responds with the number of pieces of data with that name, and the time required to complete the operation." *Id.* at p. 129. ONAG provides the following example of a query:

Example:

```
NAMESCTL> QUERY BONES.DEM.MEDICINE A.SMD
Total response time:     0.04 seconds
Response status:         normal, successful completion
Authoritative answer:    yes
Number of answers:       1
Canonical name:          bones.dem.medicine
TTL:                     1 day
Alias translations:
    from:                bones.dem.medicine
    to:                  bones.dem.medicine
Answers:
    data type is "a.smd"
        Syntax is ADDR:...{DESCRIPTION={ADDRESS=
        {COMMUNITY=tcp}{PROTOCOL=TCP}{Host=cowboy}
        {Port=1522}}{CONNECT_DATA={SID=rodeo}}}
```

*Id.* In this example, the "number of answers" is 1. However, if multiple network objects are found using the same name or database link, the number of answers would be more than 1. As such multiple network objects or database links may be retrieved using the same name or database link, making the alleged "identifier" non-unique as to what it's identifying.

Furthermore, ONAG requires that the query command include the network object name and network object type. *Id.* at p. 129. As such, ONAG attempts to identify network object using the network object name and network object type. This further confirms that a POSA would have understood the network object name to be non-unique; otherwise, the network object type would not be needed to locate the network object. Therefore, ONAG does not disclose that the network objects in the network from having non-unique names.

Therefore, ONAG does not teach that the identifier uniquely identify an entity, as required in Claim 17 and its dependents. *Id.*

Boukabza is not relied upon and does not teach or suggest identifiers stored in location servers that identify a single entity and are associated with locations for data pertaining to the entity. Therefore, ONAG in view of Boukabza does not teach or suggest "identifiers," as required by claim 17.

27

### 3. ONAG in view of Boukabza does not render any of dependent claims 23-24 and 30 obvious

Claims 23-24 and 30 are patentable over ONAG in view of Boukabza based on their dependency to claim 17 and their own respective features.

Specifically, ONAG in view of Boukabza does not teach or suggest a performance criterion that comprises a transaction rate limit, as required by claim 24. The Examiner relies on the following portion of Boukabza to allegedly teach claim 24's limitations: "Finally, relative to specific module "system", it must be possible, among other things, to monitor and measure the cpu time, the disk space, the inputs/outputs, the Storage, the exchange rate, the number of users, the pagination, the network, etc. Thus it is possible, for example, to measure the cpu utilization per Second, with default display, or the **input/output rate per second**, or to identify the processors which are the largest users of cpu and collect them in order to perform an autonomous analysis ("offline", tbc)." Boukabza at 34:43-51 (emphasis added); *see also* Office Action at p. 13. However, Boukabza only describes monitoring the input/output rate per second and is completely silent about initiating a transfer of data from a first server to a second server based on an input/outrate rate. Therefore, ONAG in view of Boukabza does not teach or suggest a "performance criterion comprises a transaction rate limit," as recited by claim 24.

### F. ONAG and OracleUnleashed, alone or in combination, do not render any of Claims 17, 23-24, or 30 obvious

OracleUnleashed is a reference guide for Oracle8. In relevant part, it discusses tablespace maintenance concepts, including partitioning of tables and indexes into "smaller, easier-to-manage pieces" which can be stored at the tablespace level. OracleUnleashed at 452. The cited portions of OracleUnleased relied upon by the Examiner also discusses monitoring, including monitoring of tablespaces (*id.* at 471) and managing data by "moving data in and out of the database," including partitions and relocating parts of a table to another drive (*id.* at 868).

### 1. ONAG in view OracleUnleashed does not teach or suggest "transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit," as recited by claim 17.e

The Examiner acknowledges that ONAG "fails to teach" claim element [17.e]. *See* Office Action at 20-21. The Examiner relies on OracleUnleashed to satisfy the requirements of claim element 17.e. However, OracleUnleashed does not cure the deficiencies of ONAG.

OracleUnleashed is a manual that describes Oracle 8 products. OracleUnleashed at p. 29. The Examiner primarily relies on OracleUnleashed's partitioning feature to satisfy the requirements of claim element 17.e. *See e.g.,* Office Action at pp. 20-21. The Examiner alleges that OracleUnleashed describes partitioning databases that allows for breaking tables and indexes into smaller pieces. *See e.g.,* OracleUnleashed at pp. 424-425. The Examiner further alleges that OracleUnleashed monitors the performance of databases and can move the partitions to improve performance. *See e.g., id.* at pp. 424-425, 443-444, and 840. However, OracleUnleashed does not cure ONAG's deficiencies as to claim element 17.e for multiple reasons.

> *a)* **Oracle "tablespace" referenced in OracleUnleashed is different from and incompatible with ONAG's "names servers," making the references not relevant to or combinable with one another**

The Examiner alleges a POSA would find it obvious or be motivated to implement OracleUnleashed's monitoring and partitioning to transfer a portion of the database nicknames and service addresses stored in a first ONAG Names Server to a second ONAG Names Server when the first ONAG Names Server encounters performance issues. Office Action 20-22. Patent Owner disagrees for multiple reasons.

A POSA would not find it obvious or be motivated to modify or and/or combine ONAG with OracleUnleashed to satisfy claim element 17.e because ONAG's architecture would not support such a modification. As such, a POSA would not have a reasonable expectation of success to satisfy the claim requirements of claim element 17.e

**First,** as indicated above, a Names Server could not transfer a portion of the database names and service addresses to other Names Servers because Names Servers stores the database names and service addresses in *cache*—not a traditional relational database. *See e.g.,* ONAG at pp. 32-33; 36. OracleUnleashed's partitioning is configured for traditional relational databases. OracleUnleashed at pp. 424-425, 443-444, and 840. ONAG does not describe how the database names and service addresses are structured in the cache memory, other than calling the cache an

in-memory database. ONAG pp. 32-33; 36. In-memory databases store data in specialized structures that are different from traditional relational database structures to allow for quick retrieval of data. ONAG at 33. In this regard, there is no teaching or suggestion that the tablespace functionality discussed in OracleUnleashed could be replicated in the Name Servers' cache memory.

**Second**, a Names Server will not encounter a performance limit, such as MAX_EXTENTS. *See e.g.,* ONAG at p. 45. MAX_EXTENTS in Oracle defines the outer limits of a database table. OracleUnleashed at pp. 443-444. The limits of a given table storing the database names and service addresses will be defined at the network definition database. A POSA would understand that the Names Server will not add anything to the particular copy of database names and services addresses. Therefore, the extents of the table will not change size once the Names Server receives the copy of the database names and service addresses.

**Third**, transferring a *portion* of database names and service addresses across Names Servers would make ONAG inoperable. ONAG indicates that a network may include multiple administrative regions. *See e.g.,* ONAG at p. 43-45. Each administrative region may include one or more Names Servers. *Id.* Each Names Server in a given administrative region stores a copy of the database names and service addresses for the respective administrative region. This allows for clients and other Names Servers to query the appropriate Names Server servicing a given region for a service address of a database that may reside in the respective region. Transferring database names and service addresses across regions would break ONAG's organizational structure and a client's query to fail or take an extended amount of time to resolve.

**Fourth**, ONAG would not transfer *a portion* of database names and service addresses across Names Servers in the same administrative region because each of the Names Servers in a given adminstirative region store the identical database names and service addresses. ONAG at p. 44 and 173. This is because the Names Servers store the database names and service addresses in cache. If a Names Server in a given administrative region crashes or goes offline, the Names Server loses all of the data stored in the cache. *See e.g.,* ONAG at 29-30. As such, an additional Names Server in the administrative region with identical database names and services addresses for clients to query the administrative region. *See e.g., id.* Only storing portions of databse names and service addresses in the Names Servers in an administrative region would make querying

inoperable if a Names Server in an administrative region crashed or went offline. Therefore, ONAG would not transfer *a portion* of database names and service addresses across Names Servers in the same administrative region.

ONAG and OracleUnleashed are devoid of any reasoning to motivate the transferring a portion of location information across location servers in response to a location server reaching a performance limit. . Therefore, the combination of ONAG and OracleUnleashed to allegedly satisfy claim 17's requirements is an exercise of impermissible hindsight, and not modifications or combinations a POSA would have made at the time of the invention.

> ### *b)* Even if OracleUnleashed and ONAG are compatible references, combining them would not render Claim 17 obvious because OracleUnleashed does not disclose or suggest element [17.e]

Claim [17.e] requires "transferring a portion of the identifiers and associated locations to a second data location server *when a performance criterion* of the first location server *reaches a predetermined performance limit.*"

**First**, OracleUnleashed does not teach or suggest transferring a partition from a first server to a second server *when* (or if)[1] *a performance criterion of the first server reaches a predetermined performance limit.* While OracleUnleashed describes monitoring tables for errors such as "MAXEXTENTS" and mentions that partitions can be moved, OracleUnleashed does not specify that partitions are moved *when* (or if) a "MAXEXTENTS" error is encountered. *See e.g., id.* at pp. 443 and 840. That is, OracleUnleashed is completely silent regarding transferring a partition from a first server to a second server when (or if) a performance criterion of the first server reaches a predetermined performance limit. As such, there is no teaching or suggestion of "transferring a portion of the identifiers and associated locations to a second data location server" in response to the detection of an event. In other words, OracleUnleashed does not teach or suggest the when/if an event occurs, *then* carry out the action required by the claim.

---

1 During the Interview, Supervising Examiner Fuelling stated that he interpreted "when" to be synonymous with "if." Patent Owner takes no position on this issue because Patent Owner does not think it is germane to any argument here. In other words, Patent Owner submits that OracleUnleashed does not teach or suggest this limitation, whether "when" is read to mean "if" or not.

**Second**, OracleUnleashed is completely silent with respect to partitioning and transferring *location information* across location servers. OracleUnleashed only describes partitioning tables including *data* in a *tablespace*—not the location for that data. *See e.g., id.* at pp. 424-425, 443-444, and 840. Claim 17 requires transferring portions of identifiers and associated locations, not the data to which the location pertains. The Office recognized and relied on this requirement to overcome prior art during the prosecution of the '736 application (which issued as the '978 patent), stating in the Notice of Allowability, "The Examiner finds the applicant's arguments on page 10 lines 9-27 of the amendment filed November 1, 2006 to be persuasive. The applicant argued in substance that Lumelsky does not teach a system and method for management of location information separate from the data to which the location information pertains, but instead relates to manipulation of the actual data (multimedia objects in Lumelsky) rather than just location information for that data." Notice of Allowability of the '736 application at p. 3. Similarly, here, OracleUnleashed only relates to manipulation of actual data rather than location information for that data.

For at least the reasons above, OracleUnleashed does not teach or suggest claim element 17.e.

### 2. ONAG in view of OracleUnleashed does not teach or suggest identifiers, as required by claim 17

As discussed above, ONAG does not teach or suggest an identifier that uniquely identifies a individual entity as required in Claim 17 and its dependents. Section V.E.2.

OracleUnleashed is not relied upon and does not teach or suggest identifiers stored in location servers that identify a single entity and are associated with locations for data pertaining to the entity. Therefore, ONAG in view of OracleUnleashed does not teach or suggest "identifiers," as required by Claim 17 for all the reasons detailed in Section V.E.2.

### 3. ONAG in view of OracleUnleashed do not render dependent claims 23-24 and 30 obvious

Claims 23-24 and 30 are patentable over ONAG in view of OracleUnleashed based on their dependency to claim 17 and their own respective features.

**G. Ault in view of Yocum and Boukobza, alone or in any combination, do not render any of Claims 17, 23-24, or 30 obvious**

Ault describes a system for managing a distributed file service (DFS). Ault at Abstract. The DFS architecture is illustrated in Fig. 7 (reproduced below).



**FIG. 7    PRIOR ART**

*Id.* at Fig. 7. As shown in Fig. 7, DFS includes a DFS client 52, cache manager 62, fileset location server 64, file set location database 66, file server 54, and fileset 56. Ault states "The file set location server maintains a database 66 of all file sets. This database is utilized to keep track of the physical locations where file sets are stored. If a DFS client 52 requires access to one of the file sets, it sends a request first to the file set location server/database 64, 66 to inquire about the physical location of the file set. [sic] After receiving location information, the client 52 then contacts the actual particular DFS file server 54 wherein the particular file set or file system 56 resides." *Id.* at 6:1-9.

Yocum describes a system for controlling the number of servers in a multi-cluster environment. Yocum at Abstract. Yocum describes adding new servers to a network based on the length of a queue reaches a threshold. *Id.* at 1:13-23.

**1. Ault in view of Yocum and Boukobza does not teach or suggest "transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first**

**location server reaches a predetermined performance limit," as
recited by claim 17.e**

The Examiner acknowledges that that the combination of Ault and Yocum does not teach claim element 17.e. Office Action at 30-33. The Examiner relies on Boukabza for claim element 17.e. *Id.* The Examiner alleges that a POSA would be motivated and find it obvious to modify Ault's file location server with Boukabza's exporting tables in response to encountering a "MAXEXTENTS" to transfer a portion of file location information across file location servers. *See* Office Action at 30-33; *see also* Boukabza at 15:18-36 and 32:10-16. Patent Owner respectfully disagrees for the following reasons:

*a)* **Ault's architecture (with or without Yocum) does not support
transferring a portion of location information from one
location server to another**

A POSA would not find it obvious or be motivated to modify or and/or combine the Ault-Yocum combination with Boukabza to satisfy claim element 17.e because Ault's architecture (with or without Yocum) would not support such a modification.

Ault provides a brief description of file location servers and only describes an implementation with a single file location server. *Id.* at Fig. 7 and 6:1-9. There is no teaching or suggestion of a plurality of file location servers. Yocum does not teach or suggest location servers at all. As such, Ault (with or without Yocum) does not teach or suggest the architecture of DFS that includes multiple file location servers. *See e.g., id.* at 6:58-62.

Ault does not provide any detail about how to configure a network that includes multiple file location servers. For example, Ault does not specify how the file locations would be distributed across multiple file location servers. Moreover, Ault does not specify how a DFS client would determine which file location server to query based on the distribution of the file locations across the multiple file location servers. Such teachings are also missing from Yocum and Boukabza, and were not readily known in the art at the time of the priority date of the '978 patent. Absent these teachings, a POSA would not be able to configure the Ault-Yocum combination with Boukabza's import/export tables functionality to satisfy the requirements claim element 17.e.

> ### *b)* Even if Ault, Yocum, and/or Boukabza are compatible references, combining them would not render Claim 17 obvious because Boukabza does not disclose or suggest element [17.e]

As indicated above, Claim [17.e] requires "*transferring a portion* of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit."

The Examiner relies only on Boukabza for the disclosure of claim [17.e]. But Boukabza does not cure the deficiencies of Ault (with or without Yocum) for the following reasons.

**First**, Boukabza does not teach or suggest transferring a *portion* of the identifiers and associated locations from a first location server to a second location server. Section V.E.b.

**Second**, Boukabza does not teach or suggest transferring identifiers and associated locations between *servers*. Section V.E.b.

**Third**, Boukabza is completely silent with respect to transferring *location information* between *location servers*. Section V.E.b.

For at least the reasons above, Boukabza does not teach or suggest claim [17.e], and therefore Ault in view of Yocum and Boukabza do not teach or suggest claim [17.e].

> ### *2.* Ault in view of Yocum and Boukabza does not teach or suggest "identifiers," as required by claim 17

Claim 17 and its dependent claims require "identifiers," which the specification teaches to be (and which a district court has construed to mean) "a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server." '978 patent, 2:26-27; 4:25-28; *see also* NPL 31.

The Examiner relies on Ault as disclosing the claimed "identifiers." However, Ault is completely silent regarding "identifiers." For example, the Office Action states for element [17.d]:

> storing the received location in a location store at the first data location server, the location store comprising a plurality of identifiers, each identifier associated with at least one location,

> wherein the received location is associated with the received identifier in the location store (*see lines 62 of column 5 to line 9 of column 6,* "The file set location server maintains a database 66 of all file sets. This database is utilized to keep track of the physical locations where file sets are stored. If a DFS client 52 requires access to one of the file sets, it sends a request first to the file set location server/database 64 66 to inquire about the physical location of the file set.").

Office Action at 28. The Examiner cites to Ault at 5:62-6:9, but that does not describe (and nowhere in Ault is there disclosure of) an identifier and how it is stored in the file location server. To the extent "file sets" are alleged to be "identifiers," Ault's disclosures as to "file sets" do not qualify because file sets do not *uniquely* identify entities, as "identifiers" are required to do – at most, file sets are data (e.g., files stored in computer). *See id.* Furthermore, even when assuming arguendo that Ault's file location servers store identifiers, the identifier in the file location server would identify a file set (i.e., the data) and not an entity. Therefore, Ault does not teach or suggest "identifiers," as required by claim 17.

> 3.  **Ault in view of Yocum and Boukabza do not teach or suggest "each of the plurality of location servers stores unique set of location information of an aggregate set of location information," as recited by claim element 17.pre.**

The Examiner alleges that "[i]t would have been obvious to one of ordinary skill in the art at the time of the Patent Owner's invention to modify the combination of Ault, Yocum and Boukabza with the above further teachings of Boukabza such that a portion of the identifiers and associated locations are transferred to a second location server when the performance criterion of the first location server reaches a predetermined threshold. Said modification would result in each of the plurality of location servers storing a unique set of location information of an aggregate set of location information. Boukabza suggests such corrective actions (see lines 18-32 of column 15). One of ordinary skill would have been motivated to make such modification in order to prevent possible application suspending errors from occurring as suggested by Boukabza (see lines 14-15 of column 32, ' ... this incident must be prevented.')." Office Action at pp. 32-33. However, the Examiner has not demonstrated why "Said modification would result in each of the plurality of location servers storing a unique set of location information of an aggregate set of location information." *Id.* Indeed, neither Boukabza nor Yocum teach or suggest a system that

include multiple location servers that store a unique set of location information of an aggregate set of location information.

### 4. Ault in view of Yocum and Boukabza do not render dependent claims 23-24 and 30 obvious

Claims 23-24 and 30 are patentable over Ault in view of Yocum and Boukabza based on their dependency to claim 17 and their own respective features.

## VI. Secondary Considerations of Non-Obviousness

Significant evidence also supports a finding that the claims at issue are not obvious. As set forth in MPEP § 2141:

> The framework for the objective analysis for determining obviousness under 35 U.S.C. 103 is stated in *Graham v. John Deere Co.*, 383 U.S. 1, 148 USPQ 459 (1966). Obviousness is a question of law based on underlying factual inquiries. The factual inquiries enunciated by the Court are as follows:
>
> > (A) Determining the scope and content of the prior art;
> >
> > (B) Ascertaining the differences between the claimed invention and the prior art; and
> >
> > (C) Resolving the level of ordinary skill in the pertinent art.
>
> Objective evidence relevant to the issue of obviousness must be evaluated by Office personnel. *Id.* at 17-18, 148 USPQ at 467. Such evidence, sometimes referred to as 'secondary considerations,' may include evidence of commercial success, long-felt but unsolved needs, failure of others, and unexpected results.

Here, evidence of secondary considerations of non-obviousness includes the following:

### 1. Long felt but unsolved needs and industry praise

Many people and institutions have written about the long need for technology that would enable a highly scalable information database, which is enabled by the technology of the asserted claims. For example, in February 2004, years after the invention of the '978 patent, an article reported on work being conducted at MIT that asked the question, "Wouldn't it be better to store

data in the nooks and crannies of the Internet, a few keystrokes away from any computer, anywhere?" *10 Emerging Technologies That Will Change Your World*, at www.technologyreview.com (February 2004) (attached as Exhibit A) at 44. The article characterized a long-felt need for "making digital files easier to maintain and access while eliminating the threat of catastrophes that obliterate information, from blackouts to hard-drive failures." *Id.* The article goes on to discuss using "distributed hash tables" to identify the locations of "files scattered around the Internet." *Id.* The benefits of distributed hash tables that are praised in the article, including the potential to "change the basic operation of the Internet," (*id.* at 47), are achieved by the use of a distributed storage architecture that implements a hash function, which is embodied in claim 1 of the '170 patent (and its dependent claims).

Additional evidence that speaks to a long felt but unmet need for the inventions of the '978 patent include: U.S. Patent No. 5,542,087 to Neimat at 1:6-4:36 (IDS, U.S. Pat. cite no. 2); U.S. Patent No. 5,230,047 to Frey at 1:30-2:12 (IDS, U.S. Pat. cite no. 1); "Distributed Name Servers: Naming and Caching in Large Distributed Computing Environments" by Terry at §§ 1.1-1.3, 2.1, 2.5(IDS, NPL cite no. 15); DNS RFC1034 Domain names Concepts and Facilities by Mockapetris at §§ 2.1-2.2 (IDS, NPL cite no. 11); "An Adaptive Data Placement Scheme for Parallel Database Computer Systems" by Hua and Lee at § 1 (IDS, NPL cite no. 5); "Design and Implementation of DDH: A Distributed Dynamic Hashing Algorithm" by Devine at § 1 (IDS, NPL cite no. 4); "Scale in Distributed Systems" by Neuman at Abstract, §§ 1, 3.1-3.4 (IDS, NPL cite no. 12); "Location-Independent Naming for Virtual Distributed Software Repositories" by Browne et al. at § 1 (IDS, NPL cite no. 2); "A Model for Worldwide Tracking of Distributed Objects" by van Steen, Hauck, and Tanenbaum at § 1, 4 (IDS, NPL cite no. 14); "The Core Legion Object Model" by Lewis and Grimshaw at § 1, 2, 6 (IDS, NPL cite no. 9); "Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hot Spots on the World Wide Web" by Karger et al. at § 1 (IDS, NPL cite no. 7); "Load Management in Distributed Video Servers" by Venkatasubramanian and Ramanathan at §§ 1.1 (IDS, NPL cite no. 16); "Distributed Web Caching System with Consistent Hashing" by Sherman at Abstract, §§ 1.1-1.2 (IDS, NPL cite no. 13); "Web Caching with Consistent Hashing" by Karger, Sherman, et al. at Abstract, § 1 (IDS, NPL cite no. 8); "Locating Copies of Objects Using the Domain Name System" by Kangasharju et al. at Abstract, § 1 (IDS, NPL cite no. 6); "Resource Location in Very Large Networks" by Partha Dasgupta at §§ 3.4, 3.5 (IDS, NPL cite no. 17); Dynamic Load Balancing on Web-server Systems by Valeria Cardellini

et al., IEEE Internal Computing, vol. 3, no. 3, pp. 28-39 at § 1, 2, 4 (IDS, NPL cite no. 3); "Distributed cooperative Web servers" by Baker and Moon at Abstract, § 1, 2 (IDS, NPL cite no. 1); Paul Albitz and Cricket Liu, DNS and BIND, O'Reilly & Associates, Inc., 3rd ed. 1998 at Preface, § 1 IDS, NPL cite no. 18, which was mistakenly identified as "Dasgupta" in the SB-08, but was submitted to the Office with the IDS); U.S. Patent No. 6,212,521 to Minami at 1:37-3:35 (IDS, U.S. Pat. cite no. 8); U.S. Patent No. 6,430,618 to Karger at 1:31-6:19 (IDS, U.S. Pat. cite no. 11); U.S. Patent No. 6,553,420 to Karger at 1:36-6:26 (IDS, U.S. Pat. cite no. 20); U.S. Patent No. 6,807,632 to Carpentier at 1:22-4:23(IDS, U.S. Pat. cite no. 19).

### 2. Failure of others and unexpected results

Individuals and entities have written about the failure of others to develop technology that would enable a highly scalable information database, which was achieved by the technology of the asserted claims. For example, *Distributed Name Servers: Naming and Caching in Large Distributed Computing Environments* by Douglas Brian Terry ("Terry") (*see* IDS, NPL cite no. 15) observes that "[e]xisting distributed name services, which manage names based on their syntactic structure, may lack the flexibility needed by large, diverse, and evolving computing communities." Terry at p. 1 (Abstract).

Terry provides a summary of several distributed name services that were developed to manage and locate data in distributed database systems but were unable to manage highly scalable systems. For instance, Terry describes the "NIC Name Server" of ARPANET, which ran into problems as it began to grow. Terry observed that "[w]ith the growth in size of the ARPANET and its expansion into the DARPA Internet . . . maintaining up-to-date host name to network address mappings became increasingly difficult on individual hosts." *Id.* at p. 8. According to Terry, "[t]he development of an experimental NIC Name Server" only "slightly alleviated the situation by allowing the host table information to be retrieved incrementally via network protocols." *Id.* As another example, Terry discusses the "DARPA Domain Name System," which suffered "inadequacies of central administration" but eventually gave way to "a decentralized scheme" that would "permit information on network entities to be distributed and replicated" on the DARPA Internet. *Id.* at 9. Terry also identifies a number of other systems that attempted to provide solutions for identifying and locating information in distributed databases, such as "BIND Server," "PUP Name Lookup Server," "Grapevine," "Clearinghouse," "CSNET Name Server,"

"Cambridge Name Server," "COSIE Name Server," and "R* Catalog Manager." *Id.* at 9-11. Terry describes how these systems work, *see id.* at 11-17, but notes that these systems "stress[] functionality, while performance considerations have remained of secondary importance." *Id.* at 17.

Terry observed that while "[s]ignificant work has been done in the area of communication protocols for accessing name services and in the area of database management systems for storing object attributes," "[t]he currently unresolved problems in designing name services concern how to manage large distributed name spaces." *Id.* at 20. According to Terry, existing technologies "fail to adequately address some of the problems ... for very large and diverse computing environments," including problems related to:

- "Name resolution" (e.g., with respect to limitations of "location-dependent names"),
- "Administrative control" (e.g., with respect to inflexible means for "[c]hanging an object's name"),
- "Overhead costs" (e.g., with respect to "[a] lack of scalability" and associated high costs that render large network applications "infeasible"),
- "Adaption" (e.g., with respect to existing technologies' "lack [of] flexibility to scale up to very large environments"), and
- "Performance" (e.g., with respect to "response times for name service lookups or updates").

*Id.* at 20-22. Terry noted "[t]he DARPA Internet's Domain Name System seems to come the closes to handling very large and diverse computing environments," but observed that "a more flexible approach to name management" was still needed. *See id.* at 22.

Additional evidence that speaks to the failures of others to solve the problem solved by the inventions of the '978 patent include: U.S. Patent No. 5,542,087 to Neimat at 1:6-4:36 (IDS, U.S. Pat. cite no. 2); U.S. Patent No. 5,230,047 to Frey at 1:30-2:12 (IDS, U.S. Pat. cite no. 1); "Distributed Name Servers: Naming and Caching in Large Distributed Computing Environments" by Terry at §§ 1.1-1.3, 2.1, 2.5(IDS, NPL cite no. 15); DNS RFC1034 Domain names Concepts and Facilities by Mockapetris at §§ 2.1-2.2 (IDS, NPL cite no. 11); "An Adaptive Data Placement Scheme for Parallel Database Computer Systems" by Hua and Lee at § 1 (IDS, NPL cite no. 5);

"Design and Implementation of DDH: A Distributed Dynamic Hashing Algorithm" by Devine at § 1 (IDS, NPL cite no. 4); "Scale in Distributed Systems" by Neuman at Abstract, §§ 1, 3.1-3.4 (IDS, NPL cite no. 12); "Location-Independent Naming for Virtual Distributed Software Repositories" by Browne et al. at § 1 (IDS, NPL cite no. 2); "A Model for Worldwide Tracking of Distributed Objects" by van Steen, Hauck, and Tanenbaum at § 1, 4 (IDS, NPL cite no. 14); "The Core Legion Object Model" by Lewis and Grimshaw at § 1, 2, 6 (IDS, NPL cite no. 9); "Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hot Spots on the World Wide Web" by Karger et al. at § 1 (IDS, NPL cite no. 7); "Load Management in Distributed Video Servers" by Venkatasubramanian and Ramanathan at §§ 1.1 (IDS, NPL cite no. 16); "Distributed Web Caching System with Consistent Hashing" by Sherman at Abstract, §§ 1.1-1.2 (IDS, NPL cite no. 13); "Web Caching with Consistent Hashing" by Karger, Sherman, et al. at Abstract, § 1 (IDS, NPL cite no. 8); "Locating Copies of Objects Using the Domain Name System" by Kangasharju et al. at Abstract, § 1 (IDS, NPL cite no. 6); "Resource Location in Very Large Networks" by Partha Dasgupta at §§ 3.4, 3.5 (IDS, NPL cite no. 17); Dynamic Load Balancing on Web-server Systems by Valeria Cardellini et al., IEEE Internal Computing, vol. 3, no. 3, pp. 28-39 at § 1, 2, 4 (IDS, NPL cite no. 3); "Distributed cooperative Web servers" by Baker and Moon at Abstract, § 1, 2 (IDS, NPL cite no. 1); Paul Albitz and Cricket Liu, DNS and BIND, O'Reilly & Associates, Inc., 3rd ed. 1998 at Preface, § 1 IDS, NPL cite no. 18, which was mistakenly identified as "Dasgupta" in the SB-08, but was submitted to the Office with the IDS); U.S. Patent No. 6,212,521 to Minami at 1:37-3:35 (IDS, U.S. Pat. cite no. 8); U.S. Patent No. 6,430,618 to Karger at 1:31-6:19 (IDS, U.S. Pat. cite no. 11); U.S. Patent No. 6,553,420 to Karger at 1:36-6:26 (IDS, U.S. Pat. cite no. 20); U.S. Patent No. 6,807,632 to Carpentier at 1:22-4:23(IDS, U.S. Pat. cite no. 19).

Much has also been written about the unlikelihood of the inventions of the asserted claims. *See, e.g., Resource Location in Very Large Networks* by Partha Dasgupta ("Dasgupta") §§ 3.4, 3.5 (*see* IDS, NPL cite no. 17). Dasgupta observed that "[w]hile such networks" as the Internet and telephone systems "are quite common, what is not so common is completely scalable, non-hierarchical naming that is independent of the entities location or affiliations." *Id.* at 156 (Abstract). According to Dasgupta, this problem "has been studied in many contexts," but "most results are not scalable for really large worldwide networks." *Id.* For example, Dasgupta discusses known technologies, such as "The Domaine Name System (DNS)," "Amoeba," "The V

System," "Clouds," "Locus," "Clearinghouse," and "Galaxy," but finds them limited in terms of scalability because they rely on hierarchical naming. *Id.* at 157-158. While Dasgupta advocates for a non-hierarchical naming system to achieve "a scalable name service" and suggests that such solutions "may actually be implementable (or desirable)," Dasgupta observes that "[t]he bad news is that we have been unable to come up with a straightforward algorithmic solution to this problem, that is scalable and fault tolerant and works with feasible complexity." *Id.* at 159. Dasgupta initially posits that "such a algorithmic solution indeed may not exist." *Id.* Dasgupta ultimately concludes that "[t]here is no straightforward solution" and proffers only a "workable" solution with "plenty of room for improvement." *Id.* at 162.

### 3. Commercial success

Entities, including AWS, use the asserted claims in products accused of infringing claims 17, 18, and 24, like Amazon Web Services DynamoDB, and have had substantial commercial success. For example, DynamoDB customers include companies with extremely large-scale data storage and data management needs, including household names like Netflix (video entertainment streaming), Zoom (video conferencing platform), Disney (Disney+ video entertainment streaming), Dropbox (cloud-based data storage), Snap Inc. (Snapchat messaging ap), CapitalOne (mobile banking apps), Amazon (workflow engines for order fulfillment), and many others. Exhibit B (https://aws.amazon.com/dynamodb/customers/). Entities have written that "[m]any of the world's fast-growing enterprises use Amazon's DynamoDB service to manage their big data," including "[e]nterprises such as Airbnb, Toyota, Capital One, and many more." Exhibit C (https://www.contino.io/insights/aws-dynamodb). Reasons for this significant commercial success include "DynamoDB's cost-effective, high performance, throughput, lower latency, and reduced cost of ownership." *Id.* DynamoDB is regarded as "one of the most popular cloud-based NoSQL database services," which "provides reliable, scalable, and highly available databases to users with millisecond range latency at any scale." Exhibit D (https://dynobase.dev/dynamodb-use-cases/). DynamoDB is said to be popular in (and has "revolutionized") a wide range of industry segments (described as "most industries worldwide"), including the "Gaming Industry" (e.g., improving multiplayer gaming), "Transportation Industry" (e.g., improving vehicle tracking), "Entertainment Industry" (e.g., improving customization of user experience), "Social Media Industry" (e.g., improving ability to feed information in real time), and "Retail Industry" (e.g., improving resiliency and persistence of shopping experience). *Id.* AWS boasts that

"DynamoDB is popular with developers building serverless applications." Exhibit E (https://aws.amazon.com/getting-started/hands-on/purpose-built-databases/dynamodb/). DynamoDB is regarded as one of "the most popular options for NoSQL databases," "widely deployed," and "used by more than 100,000 AWS customers." Exhibit F (https://www.missioncloud.com/blog/resource-choosing-the-best-nosql-database-aws-dynamodb-vs-mongodb-performance). DynamoDB is considered one of the "market leaders for NoSQL databases." Exhibit G (https://www.bmc.com/blogs/mongodb-vs-dynamodb/).

The claimed inventions contain substantial overlap with the accused products. The benefits of the products accused of infringing claims 1, 3, 6, 10, 14, 17, 23-24, and 30-31 – *i.e.,* the combination of massive scalability and throughput, high availability, low latency, and high durability, which are directly enabled by Kove's patented technology – are identified by AWS as defining features of DynamoDB. For example, AWS touts DynamoDB as "designed to run high-performance, internet-scale applications that would overburden traditional relational databases."[2] According to AWS, "DynamoDB is a key-value and document database that can support tables of virtually any size with horizontal scaling," which "enables DynamoDB to scale to more than 10 trillion requests per day with peaks greater than 20 million requests per second, over petabytes of storage."[3] AWS states that DynamoDB "delivers low-latency performance at any scale"[4], has a throughput capacity that is "practically unlimited"[5], and has "99.999% availability"[6].

## VII. Conclusion

All of the stated grounds of rejection have been properly traversed, accommodated, or rendered moot. The Patent Owner therefore respectfully requests that the Examiner reconsider all presently outstanding rejections and that they be withdrawn. The Patent Owner believes that a full

---

[2] Exhibit H (https://aws.amazon.com/dynamodb/features/?pg=dynamodbt&sec=hs).

[3] *Id.*

[4] Exhibit I (https://aws.amazon.com/blogs/database/amazon-dynamodb-auto-scaling-performance-and-cost-optimization-at-any-scale/).

[5] Exhibit J (https://aws.amazon.com/dynamodb/faqs/?trk=94bf4df1-96e1-4046-a020-b07a2be0d712&sc_channel=ps&sc_campaign=acquisition&sc_medium=ACQ-P|PS-GO|Brand|Desktop|SU|Database|DynamoDB|US|EN|Text|IE&ef_id=Cj0KCQjwuaiXBhCCARIsAKZLt3n_9aEOrFdTiWqnipW7mQbvIbqDk_kV84UNDDs5wDKIfmkitIZHRbUaAgoZEALw_wcB:G:s&s_kwcid=AL!4422!3!610000101513!e!!g!!aws%20dynamodb)

[6] Exhibit K (https://aws.amazon.com/dynamodb/).

and complete reply has been made to the outstanding Office Action and, as such, the present reexamination proceeding is in condition for a Notice of Intent to Issue a Reexamination Certificate. If the Examiner believes, for any reason, that personal communication will expedite this proceeding, the Examiner is invited to telephone the undersigned at the number provided.

Prompt and favorable consideration of this Reply is respectfully requested.

Respectfully submitted,

REICHMAN JORGENSEN LEHMAN & FELDBERG LLC

/Khue V. Hoang/
Khue V. Hoang, Reg. No. 44,767
Signed under 37 C.F.R. § 1.34 Acting in a Representative Capacity for Patent Owner

Date:    7/3/2023

1909 K Street, NW, Suite 800
Washington, DC 20006
(202)