# Exhibit K141



# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/019,109 | 08/31/2022 | 7233978 | | 3927 |

| | | | |
|---|---|---|---|
| 184647          7590          11/22/2022 | | EXAMINER | |
| Reichman Jorgensen Lehman & Feldberg LLP | | SORRELL, ERON J | |
| 100 Marine Parkway | | | |
| Suite 300 | ART UNIT | PAPER NUMBER | |
| Redwood City, CA 94065 | 3992 | | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/22/2022 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)



UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patents and Trademark Office
P.O.Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS

FISCH SIGLER LLP
5301 WISCONSIN AVENUE NW, SUITE 400
WASHINGTON, DC 20015

November 22, 2022

## EX PARTE REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. : 90019109
PATENT NO. : 7233978
ART UNIT : 3992

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified ex parte reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the ex parte reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| | Control No. | Patent Under Reexamination |
|---|---|---|
| **Order Granting Request For** *Ex Parte Reexamination* | 90/019,109 | 7233978 |
| | Examiner | Art Unit | AIA (FITF) Status |
| | ERON J SORRELL | 3992 | No |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed 08/31/2022 has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐  PTO-892,  b)☑  PTO/SB/08,  c)☐  Other: _____

1. ☑  The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

/ERON J SORRELL/
Primary Examiner, Art Unit 3992

cc:Requester ( if third party requester )

## *Decision*

A Third-Party Requester, Amazon Web Service, Inc., has filed a Request for *Ex Parte* reexamination of claims 17, 23, 24, and 30, of U.S. Patent No. 7,233,978 to Overton et al. ("the '978 Patent"). The Request was granted a filing date of August 31, 2022.

MPEP 2240 recites in part,

**37 C.F.R. 1.515   Determination of the request for ex parte reexamination.**

(a) Within three months following the filing date of a request for an ex *parte* reexamination, an examiner will consider the request and determine whether or not a substantial new question of patentability affecting <u>any claim</u> of the patent is raised by the request and the prior art cited therein, with or without consideration of other patents or printed publications. A statement and any accompanying information submitted pursuant to § 1.501(a)(2) will not be considered by the examiner when making a determination on the request. The examiner's determination will be based on the claims in effect at the time of the determination, will become a part of the official file of the patent, and will be given or mailed to the patent owner at the address provided for in § 1.33(c) and to the person requesting reexamination.

The Request is found to raise at least one Substantial New Question of Patentability (SNQ), therefore the Request is hereby, **GRANTED**.

## *Listing of Prior Art*

The Request alleges the existence of at least one SNQ based on the following patents and/or printed publications:

  i.  Oracle Names Administrator's Guide, Release 2.0 (Oracle Corp., Redwood City, CA), published 1996 ("ONAG");

 ii.  U.S. Patent No. 6,122,664 to Marcel Boukobza, filed on June 27, 1997, issued September 19, 2000 ("Boukobza");

iii.  Joseph B. Greene, Oracle8 Server Unleashed, 1st ed. (Sams Publishing, Indianapolis, Ind.), ISBN: 0672306816, published October 1, 1995 ("OracleUnleashed");

 iv.  U.S. Patent No. 5,617,568 to Michael B. Ault, filed on December 14, 1994, issued April 1, 1997 ("Ault"); and

  v.  U.S. Patent No. 6,230,183 to Peter B. Yocum, filed on March 11, 1998, issued May 8, 2001 ("Yocum").


Of the five (5) references listed above, Boukobza, OracleUnleashed, Ault, and Yocum are newly cited with the Request, while ONAG was cited in a prior examination of the '978 Patent.


## *Third Party Requester's Position*

The Request alleges the following SNQs which have been grouped/re-organized for discussion purposes:

**SNQ I:** ONAG in view of Boukobza to raise SNQs over claims 17, 23, 24, and 30. This group of SNQs is based on proposed rejections of claims 17, 23, 24, and 30 under 35 USC § 103(a) as being obvious over ONAG in view of Boukobza.

**SNQ II:** ONAG in view of OracleUnleashed to raise SNQs over claims 17, 23, 24, and 30. This group of SNQs is based on proposed rejections of claims 17, 23, 24, and 30 under 35 USC § 103(a) as being obvious over ONAG in view of OracleUnleashed.

**SNQ III:** Ault in view of Yocum and Boukobza to raise SNQs over claims 17, 23, 24, and 30. This group of proposed SNQs is based on proposed rejections of claims 17, 23, 24, and 30 under 35 USC § 103(a) as being obvious over Ault in view of Yocum and further in view of Boukobza.

### *Analysis of the '978 Patent*

The '978 Patent issued on June 19, 2007, maturing from U.S. Patent application No. 09/872,736 filed June 1, 2001 as a continuation-in-part of application no. 09/661,222 filed on September 13, 2000, now U.S. Patent No. 7,103,640, and a continuation-in-part of application no. 09/503,441 filed on February 14, 2000, now abandoned, and a continuation-in-part of application no. 09/367,461, filed August 13, 1999, now

abandoned, and a continuation-in-part of application no.

09/111,896, filed June 8, 1998, now abandoned. The '978

Application also claims priority to provisional application no.

60/277,408, filed Mar. 19, 2001, and provisional application no.

60/209,070, filed June 2, 2000.

**The '978 Patent has expired.** Per MPEP 2240 (emphasis

added),

> "In making the determination of whether to order
> reexamination, the Office will determine the proper meaning
> of the patent claims by giving the claims their broadest
> reasonable interpretation consistent with the specification
> (see *In re Yamamoto,* 740 F.2d 1569 (Fed. Cir. 1984)),
> except in the case of an expired patent (in a reexamination
> involving claims of an expired patent, claim construction
> is pursuant to the principle set forth by the court
> in *Phillips v. AWH Corp.,* 415 F.3d 1303, 1316, 75 USPQ2d
> 1321, 1329 (Fed. Cir. 2005) (words of a claim "are
> generally given their ordinary and customary meaning" as
> understood by a person of ordinary skill in the art in
> question at the time of the invention, see *Ex parte Papst-
> Motoren,* 1 USPQ2d 1655 (Bd. Pat. App. & Inter. 1986)))."

The challenged claims of the '978 Patent are toward a

method for scaling the capacity or transaction rate of a

location server in a system of location servers. Claim 17

(reproduced below), is the only independent claim in the Request

and is considered representative. Claims 23, 24, and 30 all

depend directly from claim 17.

*17. A method of scaling at least one of capacity and
transaction rate capability in a location server in a system
having a plurality of location servers for storing and*

*retrieving location information, wherein each of the plurality
of location servers stores unique set of location information of
an aggregate set of location information, the method comprising:*

*providing a transfer protocol configured to transport
identifier and location information, the location
information specifying the location of information
related to the identifier;*

*storing location information formatted according to the
transfer protocol at a first location server;*

*receiving an identifier and a location relevant to the
identifier at the first location server;*

*storing the received location in a location store at the
first data location server, the location store
comprising a plurality of identifiers, each identifier
associated with at least one location, wherein the
received location is associated with the received
identifier in the location store; and*

*transferring a portion of the identifiers and associated
locations to a second data location server when a
performance criterion of the first location server
reaches a predetermined performance limit.*

### *Review of Prosecution History*

<u>Original Prosecution</u>

Reviewing the original prosecution of the of the '736
application which matured into the '978 Patent, the Examiner
finds that claims 1, 4, 6-8, 10, 12, 15-37 and 45 were allowed
in a Notice of Allowance mailed 2/13/2007 and subsequently
renumbered as claims 1-31. In that action, the Examiner provided
the following reasons for allowance:

However, the prior art of record fails to teach or suggest individually or in combination a system in which a location query requests from multiple servers location information, separate from the data objects to which the location information pertains, to be returned to the requestor. The Examiner finds the applicant's arguments in page 10, lines 9-27 of the amendment filed November 1, 2006 to be persuasive. The applicant argued in substance that Lumelsky does not teach a system and method for management of location information separate from the data to which the location information pertains, but instead relates to manipulation of the actual data (multimedia objects in Lumelsky) rather than just the location information for that data.

After issuance, claims 1, 3, 6, 10, 14, 17, 23, 34, 30, and 31 were later challenged in *Inter Partes* Review IPR2020-00276 filed December 12, 2019 and *Ex Parte* Reexamination proceeding 90/019,034 filed November 19, 2021.

Prior IPR Proceeding

Claims 1, 3, 6, 10, 14, 17, 23, 24, 30, and 31 of the '978 Patent were challenged in IPR2020-00276 citing RFC1034, US Patent No. 5,542,087 to Neimat, and "Load Management in Distributed Video Servers" by Venkatasubramanian. The Patent Trial and Appeal Board (PTAB) denied institution finding the petitioner did not demonstrate a reasonable likelihood of prevailing in their challenge of the claims.

Concurrent *Ex Parte* Proceeding

Claims 1,3,6,10,14,17,23,24,30, and 31 were also challenged in *Ex Parte* Reexamination proceeding 90/019,034, citing ONAG, Oracle DBA Survival Guide (OSG), U.S. Patent 5,777,989 to McGarvey, U.S. Patent No. 5,301,286 to Rajani.

In a non-final Office action mailed 6/28/22, independent claim 17 was confirmed as patentable. The Examiner in that proceeding provided the following statement of Reasons of Patentability/Confirmation,

12) Claims 17, 23, 24, and 30 are confirmed over the prior art that was explained in the request and determined to raise a substantial new question of patentability in the order granting reexamination because the art of record does not teach:

> *transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit.*                    (as found in claim 17)

With that, if a new reference or combination of references teaches, **transferring a portion of identifiers and associated locations to a second location server when a performance criterion of the first location server reaches a predetermined performance limit,** then that new reference or combination of references would raise a SNQ.

### *Substantial New Questions of Patentability*

SNQ I: The Request alleges ONAG in view of Boukobza raises SNQs over claims 17, 23, 24, and 30. Upon review, and for the reasons discussed below, the Examiner agrees. ONAG in view of Boukobza raises SNQs over claims 17, 23, 24, and 30.

**ONAG**

ONAG is a book documenting version 2.0 of "Oracle Names" which is a product supporting Oracle7 release 7.3 and SQL*Net release 2.3 which makes network addresses and database link information available to all nodes in the network via a Names Server. Each database server's network address is stored with a name used to identify it in the Names Server. Client applications can request a connection to a database using a name instead of a long address. See ONAG at 1-2. The Names Server can also store database link definitions, V1 connect strings, and other name server names and addresses. See *Id.*, page 1-5.

The purpose of the Names Server is to resolve client-initiated name requests. The following events, shown illustratively at figure 3-11 (reproduced below), occur when a

client initiates a name request.

Figure 3 – 11 shows a client requesting access to a Names Server named POULTRY and a Names Server providing the answer. A flat naming model is assumed.

Note: The service name is the same as the global object name. For example, a global database name might be POULTRY.WORLD, which is also the service name.



Figure 3 – 11  Client–Server Connection

The sequence of events is as follows:

1.  The client application issues a connection request to SQL*Net of the form:

    ```
    sqlplus scott/tiger@POULTRY
    ```

    where POULTRY is a database service name defined in the Oracle Names Server.

    SQL*Net determines from the client configuration in the SQLNET.ORA file that the client's default domain is WORLD and the preferred Names Server is the one shown. SQL*Net sends the Names Server a request to resolve the name POULTRY.WORLD.

2.  The Names Server receives the request, looks it up in the cache, then sends the response back to the client.

3.  The client receives the answer and substitutes the address in place of the initial name POULTRY.

4.  The client contacts POULTRY and establishes a standard SQL*Net client–server connection.

Only step 1 and the acknowledgement of Step 4 are seen by the user, unless an error occurs.

In a more complex example, the Names Server may be

distributed across a plurality of physical servers that service

different administrative regions, whereby names must be resolved

across different administrative regions. ONAG discloses that

finding an authoritative name server in such an environment

might require iteration as shown in figure C-4 (reproduced

below).

Figure C – 4 shows this process and the sequence of events assuming
that no data has been previously cached.

1.  The client sends request to preferred Names Server in its local
    region (DR1).

2.  The preferred Names Server in DR1 issues request for the Names
    Servers authoritative for the destination server (in region DR2.1).



Destination Server

Figure C – 4  Network Messages in a Multi-Level Foreign Name Resolution

3.  The root Names Server does not have the answer (because root only
    knows about its direct child regions), but forwards the request to a
    Names Server in region DR2.

4.  The receiving server in DR2 forwards the request to a Names Server
    in region DR2.1.

5.  The name is retrieved from its authoritative Names Server in DR2.1.

6.  The names Server in region DR2 caches the answer and returns it to
    the root.

7.  The root caches the answer and returns it to the preferred Names
    Server in region DR1.

8.  The preferred Names Server caches the answer and returns it to the
    client.

9.  The client establishes a connection to the destination server.

ONAG also discusses ways in which the name resolution
process can be optimized including having multiple names servers
in an administrative region and caching information learned
through answering queries. See *Id.*, page C-18, C-21.

ONAG qualifies as prior art under 35 USC 102(b).

**Boukobza**

Boukobza teaches a method and system for monitoring a
plurality of object types of a plurality of nodes including a
management node. See Boukobza, Abstract. Boukobza's system makes
use of autonomous agents in each node which measure specific
parameters of each application, test for conditions on these
parameters relative to certain thresholds, and then execute
actions in order to warn of a problem or to reconfigure or to
correct. The collected measurements relate to all types of

objects to be monitored including Oracle databases. See *Id.*,

lines 39-65 of column 2. The corrective actions are completely

configurable by the administrator and may include actions such

as adding a server if the cpu utilization point reaches a

predetermined threshold. See *Id.*, columns 14, lines 40-58 of

column 14. Moreover, Boukobza teaches it is possible to measure,

among other things, cpu time, disk space, I/O, the storage, the

exchange rate, the number of users, etc. See Id., lines 43-51 of

column 34.

In a specific example, Boukobza teaches monitoring the

Oracle parameter "ORA_FRAGMENT_TS" in which the measurement

consists of verifying the condition which corresponds to the

case in which the largest of the extents ("MAX_EXTENTS") of the

tables of the table space ("Tablespace") is smaller than the

largest hole of the table space, and if true, sending an action

proposition window which indicates the "Tablespace" must be

reorganized to make the "Tablespace" larger or through

requesting a standard "export_operation_tables/import" to be

executed. See *Id.*, lines 18-32 if column 15. Thus, Boukobza

expressly discloses the claimed limitation in claim 17 of

"transferring a portion of identifiers and associated locations

to a second location server when a performance criterion of the

first location server reaches a predetermined performance limit"

which was the limitation indicated as being patentable over the

art of record in concurrent *Ex Parte* Reexamination proceeding

90/019,034.

Boukobza qualifies as prior art under 35 USC 102(e).


**SNQ I Analysis:**

As shown above, the combination of ONAG and Boukobza can be

reasonably interpreted as disclosing subject matter relevant to

the limitations found patentable in a prior examination of the

'978 Patent. ONAG was considered in determining the

patentability of claim 17 of the '978 Patent, however it was not

considered in combination with Boukobza. Boukabza is newly cited

with respect to the '978 Patent and its teachings are

significant as it expressly discloses the limitation found

patentable in concurrent EP proceeding 90/019,034. ONAG in view

if Boukobza is a new combination of references. Moreover, there

is a substantial likelihood that a reasonable Examiner would

consider these teachings from this new reference combination to

be important in deciding the patentability of claim 17,

therefore ONAG in view of Boukobza is seen as raising a SNQ over

claim 17, which question having not been decided in a prior

examination of the '978 Patent. Since dependent claims carry

with them each of the limitations of the claim(s) from which it

depends, for the same reasons as mentioned above, ONAG in view

of Boukobza is seen as raising a SNQ over dependent claims 18-
30.


   **SNQ II:** The Request alleges ONAG in view of OracleUnleashed

raises SNQs over claims 17, 23, 24, and 30. Upon review and for

the reasons discussed below, the Examiner agrees. ONAG in view

of OracleUnleashed raises SNQs over claims 17, 23, 24, and 30.


**ONAG**

   ONAG is a book documenting version 2.0 of "Oracle Names"

which is a product supporting Oracle7 release 7.3 and SQL*Net

release 2.3 which makes network addresses and database link

information available to all nodes in the network via a Names

Server. Each database server's network address is stored with a

name used to identify it in the Names Server. Client

applications can request a connection to a database using a name

instead of a long address. See ONAG at 1-2. The Names Server can

also store database link definitions, V1 connect strings, and

other name server names and addresses. See *Id.*, page 1-5.

   The purpose of the Names Server is to resolve, or assist in

resolving client-initiated name requests. In operation, the

following events, shown illustratively at figure 3-11

(reproduced below), occur when a client initiates a name

request.

Figure 3 – 11 shows a client requesting access to a Names Server named
POULTRY and a Names Server providing the answer. A flat naming
model is assumed.

> Note:  The service name is the same as the global object name.
> For example, a global database name might be
> POULTRY.WORLD, which is also the service name.



Figure 3 – 11  Client–Server Connection

The sequence of events is as follows:

1.  The client application issues a connection request to SQL*Net of the
    form:

    ```
    sqlplus scott/tiger@POULTRY
    ```

    where POULTRY is a database service name defined in the Oracle
    Names Server.

    SQL*Net determines from the client configuration in the
    SQLNET.ORA file that the client's default domain is WORLD and
    the preferred Names Server is the one shown. SQL*Net sends the
    Names Server a request to resolve the name POULTRY.WORLD.

2.  The Names Server receives the request, looks it up in the cache, then
    sends the response back to the client.

3.  The client receives the answer and substitutes the address in place of
    the initial name POULTRY.

4.  The client contacts POULTRY and establishes a standard SQL*Net
    client–server connection.

Only step 1 and the acknowledgement of Step 4 are seen by the user,
unless an error occurs.

In a more complex example, the Names Server may be
distributed across a plurality of physical servers that service

different administrative regions, whereby names must be resolved

across different administrative regions. ONAG discloses that

finding an authoritative name server in such an environment

might require iteration as shown in figure C-4 (reproduced

below).

Figure C – 4 shows this process and the sequence of events assuming
that no data has been previously cached.

1.  The client sends request to preferred Names Server in its local
    region (DR1).

2.  The preferred Names Server in DR1 issues request for the Names
    Servers authoritative for the destination server (in region DR2.1).



Figure C – 4  Network Messages in a Multi-Level Foreign Name Resolution

3. The root Names Server does not have the answer (because root only knows about its direct child regions), but forwards the request to a Names Server in region DR2.

4. The receiving server in DR2 forwards the request to a Names Server in region DR2.1.

5. The name is retrieved from its authoritative Names Server in DR2.1.

6. The names Server in region DR2 caches the answer and returns it to the root.

7. The root caches the answer and returns it to the preferred Names Server in region DR1.

8. The preferred Names Server caches the answer and returns it to the client.

9. The client establishes a connection to the destination server.

ONAG also discusses ways in which the name resolution process can be optimized including having multiple names servers in an administrative region and caching information learned through answering queries. See *Id.*, page C-18, C-21.

ONAG qualifies as prior art under 35 USC 102(b).

**OracleUnleashed**

OracleUnleashed is a book detailing version 8 of the Oracle database management system ("Oracle8"). OracleUnleashed describes Oracle8 as a "significant upgrade" to the Oracle database management system. See OracleUnleashed, page 8. Some of the key enhancements include parallel processing made possible through the use of partitioned tables; incremental backups where only updated parts of the tablespace or database are backed up instead of the entire tablespace or database; and improved

replication. See *Id.*, page 11. Table partitioning is performed by dividing a table into multiple sections based on some logical index value and each section can be stored on a different disk. See *Id.*, page 12.

OracleUnleashed provides an overview of the administrative requirements of Oracle 8, including concepts related to tablespace maintenance and performance tuning. OracleUnleashed states that performance can be monitored and adjusted for a variety of means and that partitioning greatly enhances database performance. The administration and tuning are simplified via features that make the partitions easy to create, move, split, and so on. See *Id.*, pages 424-425. In Oracle8, the units of data are the partitions rather than the tables as in earlier versions. As the tables get bigger however, the partition size does not increase rather the number of partitions increases. The use of partitions is what allows parts of the table to be relocated to a different device. See *Id.*, pages 840. With that teaching, OracleUnleashed expressly discloses the claimed limitation in claim 17 of "transferring a portion of identifiers and associated locations to a second location server when a performance criterion of the first location server reaches a predetermined performance limit" which was the limitation indicated as being patentable over the art of record in concurrent *Ex Parte* Reexamination proceeding 90/019,034.

OracleUnleashed OU qualifies as prior art under 35 USC
102(b).


**SNQ II Analysis:**

As shown above, the combination of ONAG and OracleUnleased
can be reasonably interpreted as disclosing subject matter
relevant to the limitations found patentable in a prior
examination of the '978 Patent. ONAG was considered in
determining the patentability of claim 17 of the '978 Patent,
however it was not considered in combination with
OracleUnleashed. OracleUnleashed is newly cited and its
teachings are significant because it expressly discloses the
limitation found patentable in concurrent *Ex Parte* Reexamination
proceeding 90/019,034. ONAG in view if OracleUnleashed is a new
combination of references. Moreover, there is a substantial
likelihood that a reasonable Examiner would consider these
teachings from this new reference combination to be important in
deciding the patentability of claim 17, therefore ONAG (ONAG) in
view of OracleUnleashed is seen as raising a SNQ over claim 17,
which question having not been decided in a prior examination of
the '978 Patent. Since dependent claims carry with them each of
the limitations of the claim(s) from which it depends, for the
same reasons as mentioned above, ONAG in view of OracleUnleashed
is seen as raising a SNQ over dependent claims 18-30.

   **SNQ III:** The Request alleges Ault in view of Yocum and
Boukobza raises SNQs over claims 17, 23, 24, and 30. Upon review
and for the reasons discussed below, the Examiner agrees. Ault
in view of Yocum and Boukobza raises SNQs over claims 17, 23,
24, and 30.


**Ault**

   Ault discloses concepts related to a distributed computing
environment (DCE) and in particular a distributed file system
(DFS) of the DCE. The DFS provides a database storing the
location of all the files in the file system. When files move,
the DFS automatically updates the database of the new locations.
See Ault, lines 32-43 of column 2. According to Ault, a central
component of the DCE is a directory service which provides a way
for users to name and locate objects. See *Id.*, lines 2-4 of
column 3. Ault discloses that by integrating the DFS with the
directory service, the user able to access files in a consistent
manner from different workstations in a distributed environment.
Further, the directory service ensures each resource is
identified by a unique and consistent name including computers,
application services, and files. As shown in figure 4
(reproduced below), a file located anywhere in a worldwide DCE

can be readily located using the directory service. See *Id.*,

line 55 of column 4 to line 8 of column 5.



**FIG. 4**    **PRIOR ART**

In a particular embodiment, shown in figure 7 (reproduced

below), Ault describes a file set location server which

maintains a database of all the file sets. The database is used

to keep track of the physical locations where the file sets are

stored.



FIG. 7          PRIOR ART

A client that requires access to one of the file sets, first sends a request to the file set location server/database for the physical location of the file set. After receiving the location, the client contacts the particular DFS file server storing the particular file set. A server wishing to export files sets must register their exported file sets at the file set location server. See *Id.*, line 62 of column 5 to line 9 of column 6.

Ault qualifies as prior art under 35 USC 102(b).

**Yocum**

Yocum teaches a method and system that allows for managing the number of servers assigned to different service classes based on performance goals for each service class. Tradeoffs between classes are made that consider the impact of adding or removing servers from competing classes. See Yocum, lines 28-34

of column 2. Yocum discloses multiple work queues can be
allocated for each service class, wherein the multiple work
queues are independently managed by changing the location of the
data. See *Id.*, lines 32-43 of column 8. Yocum teaches performing
calculations when determining to add servers such that the
number of servers added is large enough to make the change
worthwhile, but not so large as to make the value of the
additional servers marginal. See *Id.*, lines 37-57 of column 10.

    Yocum qualifies as prior art under 35 USC 102(e).

**Boukobza**

    Boukobza teaches a method and system for monitoring a
plurality of object types of a plurality of nodes including a
management node. See Boukobza, Abstract. Boukobza's system makes
use of autonomous agents in each node which measure specific
parameters of each application, test for conditions on these
parameters relative to certain thresholds, and then execute
actions in order to warn of a problem or to reconfigure or to
correct. The collected measurements relate to all types of
objects to be monitored including Oracle databases. See *Id.*,
lines 39-65 of column 2. The corrective actions are completely
configurable by the administrator and may include actions such
as adding a server if the cpu utilization point reaches a
predetermined threshold. See *Id.*, columns 14, lines 40-58 of

column 14. Moreover, Boukobza teaches it is possible to measure, among other things, cpu time, disk space, I/O, the storage, the exchange rate, the number of users, etc. See Id., lines 43-51 of column 34.

In a specific example, Boukobza teaches monitoring the Oracle parameter "ORA_FRAGMENT_TS" in which the measurement consists of verifying the condition which corresponds to the case in which the largest of the extents ("MAX_EXTENTS") of the tables of the table space ("Tablespace") is smaller than the largest hole of the table space, and if true, sending an action proposition window which indicates the "Tablespace" must be reorganized to make the "Tablespace" larger or through requesting a standard "export_operation_tables/import" to be executed. See *Id.*, lines 18-32 if column 15. Thus, Boukobza expressly discloses the claimed limitation in claim 17 of "transferring a portion of identifiers and associated locations to a second location server when a performance criterion of the first location server reaches a predetermined performance limit" which was the limitation indicated as being patentable over the art of record in concurrent EP proceeding 90/019,034.

Boukobza qualifies as prior art under 35 USC 102(e).

**SNQ III Analysis:**

As shown above, the combination of Ault, Yocum, and Boukobza can be reasonably interpreted as disclosing subject matter relevant to the limitations found patentable in a prior examination of the '978 Patent. Ault, Yocum, and Boukobza are are all newly cited with the instant Request and have never been considered in determining the patentability of the '978 Patent. Boukabza teachings are significant as it expressly discloses the limitation found patentable in concurrent EP proceeding 90/019,034. Moreover, there is a substantial likelihood that a reasonable Examiner would consider these teachings from this new reference combination to be important in deciding the patentability of claim 17, therefore Ault in view of Yocum and Boukobza is seen as raising a SNQ over claim 17, which question having not been decided in a prior examination of the '978 Patent. Since dependent claims carry with them each of the limitations of the claim(s) from which it depends, for the same reasons as mentioned above, Ault in view of Yocum and Boukobza is seen as raising a SNQ over dependent claims 18-30.

### *Summary of the Proposed SNQs*

The Examiner agrees with the following groups of proposed SNQs:

SNQ I: ONAG in view of Boukobza to raise SNQs over claims 17, 23, 24, and 30;

SNQ II: ONAG in view of OracleUnleashed to raise SNQs over claims 17, 23, 24, and 30;

SNQ III: Ault in view of Yocum and Boukobza to raise SNQs over claims 17, 23, 24, and 30.

### 35 USC 325(d)

A review of the post grant history of the '978 patent indicates that the patent was the subject of two prior post grant challenges.

On December 12, 2019, Petitioner Amazon Web Services filed a petition (IPR2020-00276) seeking *inter partes* review claims 1, 3, 6, 10, 14, 17, 23, 24 30 and 31 of the '978 patent. The petition presented the following grounds as raising a reasonable likelihood in prevailing (RLP):

RLP 1: Claims 1, 3, 6, 10, 14 and 31 as anticipated by RFC 1034.

RLP 2: Claim 6 as being obvious over RFC 1034.

RLP 3: Claims 17, 23 and 30 as being obvious over RFC 1034 in view of Neimat.

RLP 4: Claim 24 as being obvious over RFC 1034 in view of Neimat and Venkatasubramanian.

On June 16, 2020, the Board issued decision denying institution of *inter partes* review holding that the petition failed to adequately explain how the "host" and "domain name" in RFC 1034

satisfied the requirement of the claimed "identifier" in
independent claims 1 and 17.

On November 19, 2021, third party requester Amazon Web
Services filed a request for *ex parte* reexamination (90/019,034)
of claims 1, 3, 6, 10, 14, 17, 23, 34 30 and 31 of the '978
patent. The request presented the following grounds as raising a
substantial new question of patentability (SNQ):

> SNQ 1: Claims 1, 17, 23, 24, 30 and 31 and being obvious
> over ONAG in view of OSG
>
> SNQ 2: Claims 3, 10 and 14 as being obvious over ONAG in
> view of OSG and McGarvey
>
> SNQ 3: Claim 6 being obvious over ONAG in view of OSG and
> further in view of Rajani.

On January 12, 2022, *ex parte* reexamination was ordered and
on June 28, 2022, the examiner issued a non-final Office action
which indicated that claims 1, 3, 6, 10 and 14 were unpatentable
over the cited prior art, but that claims 17, 23, 24 and 30 were
allowable over the prior art combination of ONAG in view of OSG.
In the June 28, 2022 first action on the merits, the examiner
indicated that combination of ONAG and OSG failed to disclose
the claimed limitation of "transferring a portion of identifiers
and associated locations to a second location server when a
performance criterion of the first location server reaches a
predetermined performance limit" (See independent claim 17). On
October 27, 2022, a final rejection was issued which finally

rejected claims 1 and 31 and confirmed claims 3, 6, 10, 14, 17,

23, 24 and 30.

A comparison between the instant request for *ex parte*

reexamination of the '978 patent as compared to the prior denied

petition for *inter partes* review (IPR2020-00276) and the pending

*ex parte* reexamination proceeding (90/019,034) indicates that

the request is not based on same or substantially the same prior

art or arguments as previously presented.

In particular, with respect to the prior denied IPR

petition (IPR2020-00276), none of the prior art presented in the

instant request for reexamination overlaps with prior art

presented in the petition. As indicated above, the examiner has

determined newly presented prior art references of Boukobza and

Oracle both disclose teachings which meet the claimed limitation

in independent claim 17 of an "identifier". This teaching was

determined by the Board not be present in the grounds asserted

in the denied IPR.  Thus, because the grounds apply new prior

art and art discloses limitations missing from the prior art

presented in the IPR petition, both prior art and arguments

presented in instant reexamination request are not the same or

substantially the same as those previously presented in the

IPR2020-00276 petition.

Further, with respect to the prior pending *ex parte*

reexamination proceeding (90/019,034), while two of the grounds

asserted as raising a substantial new question of patentability

(SNQ) rely on the ONAG prior art reference which was previously

presented in the 90/019,034, these two grounds also rely on

newly presented secondary references Boukobza (SNQ 1) and

OracleUnleased (SNQ 2). Still further as stated above, both

newly presented Boukobza and OracleUnleashed expressly disclose

teachings meeting the claimed limitation in claim 17 of

"transferring a portion of identifiers and associated locations

to a second location server when a performance criterion of the

first location server reaches a predetermined performance

limit". This limitation was indicated as being patentable over

the art of record in concurrent pending *ex parte* reexamination

proceeding (90/019,034). Thus, because the grounds presented in

the reexamination request apply new prior art and the art

discloses limitations the Examiner determined were missing from

the prior art grounds asserted in the prior pending

reexamination proceeding (90/019,034), both prior art and

arguments presented in instant reexamination request are not the

same or substantially the same as those previously presented in

the 90/019,034.

Accordingly, because the grounds presented in the instant

request for *ex parte* reexamination of the '978 patent are not

based on the same or substantially the same prior art or

arguments, a discretionary denial pursuant to 35 USC 325(d) is

not implicated and reexamination is ordered based on the

Examiner's determination that the prior art presented raising a

substantial new question of patentability of the requested

claims.

On October 6, 2022, Patent Owner filed a petition under 37

CFR 1.181, 1.182 and 1.183 seeking waiver of the rules and

consideration of Patent Owner's petition under 1.181 addressing

the applicability of 35 USC 325(d). On October 27, 2022, Third

Party Requester filed an Opposition to Patent Owner's October 6,

2022 petition.  On November 12, 2022, Patent Owner filed a

petition seeking to have the Director expunge Third Party

Requester's October 27, 2022 Opposition.

On November 21, 2022, the Office issued a decision which:

1.) granted Patent Owner's 1.183 petition by waiving 37 CFR
1.530(a) and 37 CFR 1.540 to permit entry and consideration
of any information regarding § 325(d) issues set forth in
the Patent Owner's October 6, 2022,

2.) indicated that Requester's October 27, 2022 opposition
has a right of entry and *sua sponte* waived the provisions
of 37 CFR 1.535 and 37 CFR 1.540 to the extent necessary to
permit entry and consideration of any information regarding
§ 325(d) issues set forth in the requester's October 27,
2022 opposition,

3.) expunged Patent Owner's November 12, 2022 expungement
petition as an improper paper, and

4.) forwarded the proceeding to the CRU for consideration
ofPar the 35 U.S.C. 325(d) information presented in Patent
Owner's October 6, 2022 combined petition and requester's
October 27, 2022 opposition.

The following discussion addresses Patent Owner's arguments
as set forth in their October 6, 2022 petition as to why the
facts warrant a discretionary denial and termination of
reexamination pursuant to 35 USC 325(d).


Becton Dickinson and Advanced Bionics factors

Patent Owner's arguments regarding the factors identified by the
PTAB in Becton Dickinson and clarified by the PTAB in Advanced
Bionics are not persuasive. See IPR2017-01586, Paper No. 8 (PTAB
Dec. 15, 2017) (Becton) and IPR2019-01469, Paper No. 6 (PTAB
Feb. 13, 2020) (Advanced Bionics). An *ex parte* reexamination
proceeding is not a trial proceeding.  The Becton factors were
specifically formulated to apply to AIA trial proceedings, not
to *ex parte* reexamination proceedings.  The PTAB's Trial
Practice Guide expressly states, in reference to the Becton
factors (emphasis added): "The above-listed factors are
considered by the Board when determining whether to institute a
trial.  When determining whether to order *ex parte*
reexamination, however, the Office may not necessarily consider
these factors. An *ex parte* reexamination proceeding is not a
trial proceeding, and the considerations with respect to issues
involving 35 U.S.C. § 325(d) may differ due to the different
nature of an *ex parte* reexamination proceeding." See Patent
Trial and Appeal Board Consolidated Trial Practice Guide

(November 2019), page 63. Moreover, even if the Office were to

consider the Advanced Bionics/Becton factors in this instance,

the Office has determined that the grounds presented in the

instant request that raise an SNQ are not the same or

substantially the same as the prior art or arguments relied upon

in the prior IPR proceeding or prior *ex parte* reexamination

proceeding involving the '978 patent as set forth [above].


Roadmapping

Patent Owner repeatedly asserts that discretion under 35 U.S.C.

325(d) is warranted because requester uses the prior decisions

on its previous challenges "as a roadmap in an attempt to

overcome those prior deficiencies." Even assuming, arguendo,

that requester is using the PTAB's and examiner's analyses from

the prior proceedings as a "roadmap" for the instant request,

the language of § 325(d) does not prohibit a requester from

addressing, in a subsequent reexamination request, deficiencies

that were identified with respect to a prior IPR petition or *ex*

*parte* reexamination request.  Concerns regarding curing

deficiencies in a previously filed IPR petition are more

prominent in the PTAB's analysis under § 314(a) for

discretionary denials of serial IPR petitions to ensure the

efficient use of the IPR review process as opposed to under §

325(d) (second sentence), which focuses on the presence of the

same or substantially the same prior art or arguments. See,

e.g., General Plastic Industrial Co., Ltd. v. Canon Kabushiki

Kaisha, IPR2016-01357, Paper No. 19 (PTAB Sept. 6, 2017), p. 17

(In discussing General Plastic "factor 3" (i.e., whether at the

time of filing of the second petition the petitioner already

received the Patent Owner's preliminary response to the first

petition or received the Board's decision on whether to

institute review in the first petition) the PTAB states that

"[t]he absence of any restrictions on follow-on petitions would

allow petitioners the opportunity to strategically stage their

prior art and arguments in multiple petitions, using our

decisions as a roadmap, until a ground is found that results in

the grant of review.").  Further, to the extent Patent Owner

relies on earlier PTAB decisions that pre-date the PTAB's

section 325(d) decisions in Advanced Bionics and Becton

Dickinson to support its argument that "roadmapping" is a

section 325(d) consideration, such reliance is inapt because in

its earlier PTAB decisions, the PTAB conflated its analyses

under 35 U.S.C. 314(a) and 35 U.S.C. 325(d) (second sentence)

and has since separated the analyses.


*In re Vivint*

To the extent Patent Owner is relying on Vivint as supporting

termination of the present reexamination proceeding as

"abusive," such argument is not persuasive.  The present

reexamination proceeding is distinguishable from Vivint. Vivint

held that it was arbitrary and capricious for the Office to

subsequently order reexamination on a patent after denying

institution of a prior IPR on the same patent where the decision

to deny institution of the prior IPR relied on § 325(d) "for its

core analysis" to conclude that the IPR was "a case of

undesirable, incremental petitioning." Vivint, 14 F.4th at 1353.

Patent Owner's expansive interpretation of Vivint is contrary to

the Federal Circuit's own characterization of its ruling in

Vivint as "narrow" and "limited."  Vivint, 14 F.4th at 1354

(stating, "Our holding today is narrow. Section 325(d) applies

to both IPR petitions and requests for *ex parte* reexamination.

Thus, the Patent Office, when applying § 325(d), cannot deny

institution of IPR based on abusive filing practices then grant

a nearly identical reexamination request that is even more

abusive."). Unlike Vivint, there are no prior proceedings

involving the '978 patent that were denied on the basis of

undesirable, incremental or abusive petitioning under § 325(d).

Unlike the fact pattern in Vivint, in the requester's first

challenge involving the '978 patent, the Office denied

institution of IPR2020-00276 because requester failed to

demonstrate a reasonable likelihood that it would prevail in

establishing the unpatentability of at least one challenged

claim of the '978 patent. in the requester's second challenge

involving the '978 patent, the Office granted the request and

ordered the 90/019,034 reexamination, which proceeding has

progressed to the point where the examiner has confirmed the

patentability of the claims being challenged in the present

reexamination proceeding. Accordingly, Patent Owner's reliance

on Vivint as supporting termination of the present reexamination

proceeding is inapt.


Argument that Requester could have raised the art in the
previous proceedings

Patent Owner's argument that discretion under 35 U.S.C. 325(d)

is warranted because requester failed to demonstrate that

Boukobza, OracleUnleashed, Ault, or Yocum request "was

previously unknown or unavailable to it" is not persuasive.

What the requester presented in a prior proceeding, not what the

requester could have presented in a prior proceeding, is the

relevant consideration under § 325(d), as set forth above.

Whether the art or arguments presented in a reexamination

request could have been presented in a prior proceeding is not a

consideration for exercising discretion § 325(d), rather it is a

consideration evaluated by the PTAB with respect to

discretionary denials of serial petitions under 35 U.S.C.

314(a). See General Plastic Industrial Co., Ltd. v. Canon

Kabushiki Kaisha, IPR2016-01357, Paper No. 19 (PTAB Sept. 6,

2017), p. 9 ("[W]hen exercising discretion to deny institution

of an *inter partes* review, [the PTAB] may consider … 2. whether

at the time of filing of the first petition the petitioner knew

of the prior art asserted in the second petition or should have

known of it….").  What a petitioner "raised or reasonably could

have raised" is also a consideration under the estoppel

provisions of 35 U.S.C. 315(e) and 35 U.S.C. 325(e).

Accordingly, Patent Owner's arguments that the Request

should be terminated under 325(d) are not persuasive.

In conclusion, as stated above, in view of the facts that

the prior art and arguments presented in the instant request for

*ex parte* reexamination are not the same or substantially the

same as those previously presented in the prior denied IPR

petition and in the pending *ex parte* reexamination proceeding, a

discretionary denial of reexamination pursuant to 35 USC 325(d)

is not indicated and reexamination is Ordered based on the

determination above that the cited prior art raises an SNQ to

the claims of the '978 patent

### Scope of the Proceeding

Claims 17-30 of U.S. Patent No. 7,233,978 are subject to

reexamination. Claims 18-22 and 25-29 were not challenged in the

Request but are being included by the Examiner *sua sponte* as they all depend from claim 17.

## *Extensions of Time*

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that *ex parte* reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)). Extensions of time in *ex parte* reexamination proceedings are provided for in 37 CFR 1.550(c).

## *Conclusion*

ALL correspondence relating to this *ex parte* reexamination proceeding should be directed as follows:

**Please mail any communications to:**

Attn: Mail Stop *"Ex Parte Reexam"*
Central Reexamination Unit
Commissioner for Patents
P. O. Box 1450 Alexandria VA 22313-1450

**Please FAX any communications to:**

(571) 273-9900
Central Reexamination Unit

**Please hand-deliver any communications to:**

    Customer Service Window
    Attn: Central Reexamination Unit
    Randolph Building, Lobby Level
    401 Dulany Street
    Alexandria, VA 22314

    **By EFS-Web**

        Registered users of EFS-Web may alternatively submit
    such correspondence via electronic filing system EFS-Web,
    at

        https://efs.uspto.gov/efile/myportal/efs-registered

        EFS-Web offers the benefit of quick submission to the
    particular area of the Office that needs to act on the
    correspondence.  Also, EFS-Web submissions are "soft
    scanned" (i.e., electronically uploaded) directly into the
    official file for the reexamination proceeding, which
    offers parties the opportunity to review the content of
    their submissions after the "soft scanning" process is
    complete.

Any inquiry concerning this communication or earlier
communications from the Reexamination Legal Advisor or Examiner,
or as to the status of this proceeding, should be directed to
the Central Reexamination Unit at telephone number (571) 272-
7705.


    Signed:

    /ERON J SORRELL/
    Primary Examiner, Art Unit 3992

    Conferees:     /JOSEPH R POKRZYWA/
                   Primary Examiner, Art Unit 3992

    /MICHAEL FUELLING/
    Supervisory Patent Examiner, Art Unit 3992