# Exhibit 84

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| KOVE IO, INC.,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>AMAZON WEB SERVICES, INC.,<br><br>　　　　　　Defendant. | Civil Action No. 1:18-cv-08175<br><br>Hon. Matthew F. Kennelly<br><br>Jury Trial Demanded |

**EXPERT REPORT OF JOSEPH B. GREENE REGARDING
INVALIDITY OF U.S. PATENT NOS. 7,103,640, 7,233,978, AND 7,814,170**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ...................................................................1

    A.   Qualifications ...................................................................................2

    B.   Other Matters ...................................................................................4

    C.   Compensation ..................................................................................4

    D.   Materials Reviewed .........................................................................4

    E.   Person of Ordinary Skill in the Art ..................................................5

II. STATE OF THE ART .................................................................................................7

    A.   References Considered.......................................................................8

    B.   Technology Background ....................................................................11

         1.   Domain Name Services .........................................................11

         2.   Distributed Database Management ........................................12

         3.   The Oracle Database Management System .............................13

         4.   Cloud Computing ..................................................................19

         5.   Load Balancing .....................................................................20

    C.   Known Technologies in the State of the Art........................................22

III. OVERVIEW OF THE ASSERTED PATENTS ..........................................................25

    A.   General Description of the Asserted Patents .......................................25

    B.   Priority Date.....................................................................................26

    C.   Summary of the Asserted Claims .......................................................27

IV. EXAMINATION HISTORY OF THE ASSERTED PATENTS ...................................30

    A.   History of the '640 Patent ..................................................................31

    B.   History of the '978 Patent ..................................................................34

    C.   History of the '170 Patent ..................................................................38

V. CLAIM CONSTRUCTION ........................................................................................42

    A.   The Court's Constructions .................................................................42

    B.   Additional Construction Is Required Due to Kove's Limiting Statements In The Ex Parte Reexaminations...................................................................44

VI. OVERVIEW OF THE PRIOR ART ...........................................................................51

    A.   OracleNamesAdminGuide .................................................................51

         1.   OracleNamesAdminGuide's Names Servers ............................54

         2.   OracleNamesAdminGuide's Non-Hierarchical Configuration............56

         3.   OracleNamesAdminGuide's SQL*Net Utility ..................................61

         4.   OracleNamesAdminGuide's Location Information.............................61

         5.   OracleNamesAdminGuide's Identifier ..................................66

        6.     OracleNamesAdminGuide's Redirect Messaging ............................68

B.    OracleUnleashed ................................................................................70

C.    Steen .................................................................................................81

        1.     Steen's Object Name ..............................................................82

        2.     Steen's Data Location Information ..........................................83

        3.     Steen's Partitioned Subnodes .................................................83

        4.     Steen's Hashed Subnodes ......................................................84

D.    Wolff .................................................................................................86

E.    Skagerwall .........................................................................................88

F.    Yocum ...............................................................................................91

G.    Boukobza ...........................................................................................97

H.    Neimat .............................................................................................101

I.    Minami ............................................................................................102

J.    RFC1034 ("DNS") ..........................................................................102

K.    Karger '618/420 ..............................................................................103

L.    Venkatasubramanian .......................................................................104

M.   Cache Resolver System ...................................................................105

VII.  INVALIDITY LEGAL STANDARDS ...............................................................107

A.    Invalidity ........................................................................................107

B.    Anticipation and Obviousness .........................................................108

C.    Double Patenting ............................................................................110

D.    Subject Matter Eligibility ...............................................................111

E.    Written Description .........................................................................111

VIII. THE ASSERTED CLAIMS CLAIM UNPATENTABLE SUBJECT MATTER. ....................115

IX.  CLAIMS 3, 6, 10, 14, 17, 23, 24, AND 30 OF THE '978 PATENT ARE INVALID FOR DOUBLE PATENTING. ..........................................................................................124

X.  THE ASSERTED CLAIMS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION AND ENABLEMENT. .........................................................................................127

A.    Hierarchical and Non-Hierarchical Server Structures .................................129

B.    Location Server ...............................................................................136

XI.  THE ASSERTED CLAIMS ARE INVALID AS BEING ANTICIPATED AND OBVIOUS OVER PRIOR ART PATENTS AND PUBLICATIONS UNDER THEIR ORIGINAL SCOPE. ...................138

A.    Motivation to Combine and Reasonable Expectation of Success Summary .............139

B.    DNS, Karger '618/420, Neimat, and Venkatasubramanian Obviousness Combinations 146

C.    Cache Resolver System, Neimat, and Venkatasubramanian Obviousness Combination 149

D.    Neimat, DNS, and Karger '618/420 Obviousness Combinations............................152

E.   Minami, DNS, and Karger '618/420 Obviousness Combinations ............................157

XII.  THE ASSERTED CLAIMS ARE INVALID AS BEING ANTICIPATED AND OBVIOUS OVER PRIOR ART PATENTS AND PUBLICATIONS IN THEIR NEW SCOPE. ...................................................163

A.   Motivation to Combine and Reasonable Expectation of Success Summary .............164

B.   OracleNamesAdminGuide, OracleUnleashed, and Wolff Obviousness Combinations 167

C.   Skagerwall and Wolff Obviousness Combinations ....................................................175

D.   OracleNamesAdminGuide, OracleUnleashed, Steen, Yocum, and Boukobza, Obviousness Combinations .................................................................................................177

E.   Skagerwall, Boukobza, and Yocum Obviousness Combination .................................187

F.   Neimat, DNS, and Karger '618/420 Obviousness Combinations ...............................192

G.   Minami, DNS, and Karger '618/420 Obviousness Combinations ..............................197

XIII. SECONDARY CONSIDERATIONS DON'T SUPPORT NON-OBVIOUSNESS OF THE ASSERTED PATENTS. ............................................................................................................................204

A.   There Is No Evidence Of Anyone Copying The Asserted Patents. ...........................204

B.   There Is No Evidence Of Any Long-Felt-But-Unsolved-Need For The Asserted Patents. ...............................................................................................................................204

C.   There Is No Evidence Of Any Failure To Develop The Asserted Patents. ...............206

D.   There Is No Evidence Of Any Commercial Success Of Or Industry Praise For The Asserted Patents. ................................................................................................................206

E.   There Is No Evidence Of Any Skepticism of Skilled Artisans To The Asserted Patents. ...............................................................................................................................208

# I.      INTRODUCTION AND BACKGROUND

1.      I have been retained in the above-captioned matter by Amazon Web Services, Inc. ("Amazon" or "Defendant") to investigate and opine on certain issues relating to U.S. Patent Nos. 7,814,170[1] ("the '170 patent"), 7,103,640[2] ("the '640 patent"), and 7,233,978[3] ("the '978 patent") (collectively the "Asserted Patents") that Kove IO, Inc. ("Kove" or "Plaintiff") has asserted against Defendant.

2.      As detailed in this report, I have come to the following opinions about the Asserted Patents in this case:

   a. Claims 1, 2, 6, 8, 12, 15 of the '170 Patent, claims 17, 18, and 24 of the '640 Patent, and claims 3, 6, 10, 14, 17, 23, 24, and 30 of the '978 Patent (collectively the "Asserted Claims") are all invalid in their original scope as anticipated and/or rendered obvious by prior art references and systems that predate the earliest possible priority date.

   b. The asserted '978 Patent claims are invalid for double patenting based on the overlapping claimed inventions of the '640 and '170 Patents.

   c. The Asserted Patents aren't entitled to a July 8, 1998 priority date.

   d. Amazon's additional proposed claim constructions are correct and warranted because a POSITA would understand that Kove's statements in Reexamination Control Nos. 90/019,034, 90/019,035, and 90/019,036 changed the scope of the Asserted Claims.

   e. The Asserted Claims are invalid for lack of written description and enablement required for a POSITA to understand the scope of the invention.

---

[1] KOV_00197981.

[2] KOV_00038863.

[3] KOV_00059914.

    f.   The Asserted Claims are invalid in their new scope as anticipated and/or rendered obvious by prior art references and systems that predate the earliest possible priority date.

    g.   Kove's evidence does not support any secondary considerations of non-obviousness for the Asserted Patents.

3.    The above opinions reflect my own personal knowledge and experience, independent analysis, personal review of relevant materials, and independent judgment. My opinions and explanations are consistent with the general knowledge and understanding of the field. As a result, portions of this report may be substantially similar to opinions and statements in reports authored by other experts relating to the present technology or the Asserted Patents including, for example, my testimony from the related reexamination proceedings.

4.    My report and opinions are based on the presently known facts and history of the Asserted Patents and Asserted Claims. I reserve the right to supplement or update my report and opinions based on any additional relevant information, including information regarding the Asserted Patents, the Asserted Claims, and their prosecution histories. This includes, without limitation, additional testimony from John Overton, and any additional information about the prosecution history for any of the Asserted Patents, e.g. any additional information about the previous post-grant proceedings or additional action in any of the pending or future post-grant proceedings regarding the Asserted Claims or the Asserted Patents.

**A.    Qualifications**

5.    I summarize some of my relevant educational background, work experience, and other relevant qualifications below. A more detailed recitation of my professional qualifications and background is reflected in my Curriculum Vitae ("CV"), attached as Appendix A.

6.    I am an expert in managing distributed databases and networks. I have dedicated more than three decades of my professional career to implementing, managing, and analyzing

| '640 Patent: Claims 17–18, 24 | | |
|---|---|---|
| '640 Patent: Claims 17 | "data location sewer network" | "data location server network" |
| '978 Patent: Claim 14 | "Preamble" | Preamble after "comprising" limits the claim |
| '978 Patent: Claim 17 | "Preamble" | Preamble after "having" limits the claim |

103.    I have applied these constructions in rendering my opinions in this case. For the remaining claim terms, I have applied their ordinary and customary meaning.

**B.    Additional Construction Is Required Due to Kove's Limiting Statements In The Ex Parte Reexaminations.**

104.    It is my understanding that statements made during reexamination proceedings become part of the prosecution history. Accordingly, I understand that when reexamination statements impact the meaning of claims after claim construction, the parties may seek additional construction by the court before trial.

105.    In December 2021, the Court issued its first claim construction ruling.[130] In August through September of 2022, Kove made limiting statements about the scope of the Asserted Claims in the '034, '035, and '036 Reexaminations that narrowed the scope of the claims to survive the reexaminations of the Asserted Patents.[131] As a result, I understand that the Court will consider

---

[130] Dkt. 484.

[131] *E.g.*, August 4, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ('640 patent) at 23 (emphasis in original); August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 25 (emphasis in original); September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 36.

Amazon's proposed additional constructions based on Kove's limiting statements.[132] Those proposed constructions are:[133]

| | APPENDIX A | | |
|---|---|---|---|
| Claims | Terms | Proposed Constructions | |
| '640: 17, 18, 24 '170: 1, 2, 6, 8, 9, 12, 15 '978: 1, 3, 6, 10, 14, 17, 23, 24, 30, 31 | "network" / "system" | [network/system] **arranged in a non-hierarchical, cluster topology** | |
| '640: 17, 18, 24 '170: 1, 2, 6, 8, 9, 12, 15 '978: 1, 3, 6, 10, 14, 17, 23, 24, 30, 31 | "location server" | a network-attached component that maintains, **for satisfying every request for the location of data on the network,** a set of **at least one of (1)** identifier/location mappings **or (2) information about the location of such mappings** that are modified or returned in response to **all** location request messages from clients | |
| '640: 17, 18 '170: 1, 2, 5, 6, 8, 9, 12 '978: 1, 3, 6, 10, 17, 23, 24, 30, 31 | "providing" / "determin[e/ing]" / "retrieving" location information or servers | providing, **without performing any request iterations,** … location information / determin[e/ing], **without performing any request iterations,** … location servers / retrieving **in two or fewer request iterations** location information | |
| '640: 17, 18 '170: 6, 15 '978: 3, 10, 14 | "return" / "sending" / "transmit[s/ting]" a redirect message | return / sending / transmit[s/ting] a redirect message **without performing any request iterations** | |

106. It is my understanding that courts usually construct claim terms based on the ordinary and customary meaning to an ordinary skilled artisan at the time of invention. I further understand that there are exceptions where the court may construct the terms otherwise. For example, I understand that when a patentee makes clear and unambiguous disavowals during the prosecution of the claims, the court will construe the claim terms in accordance with those disavowals. I understand that this is called the doctrine of prosecution disclaimer, which ensures

---

[132] Dkt. No. 580.
[133] Dkt. No. 539 at Appendix A.



Figure 3 – 11  Client–Server Connection

123.    OracleNamesAdminGuide explains that large installations benefit from having a central directory service that captures connection information in one system for all clients to use.[159] OracleNamesAdminGuide teaches storing connection information (e.g., host name, port, and database instance) associated with a client-side alias identifier.[160]

124.    I understand that the Court has ruled that the claim term "location server" means "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients." A POSITA would have understood that OracleNamesAdminGuide teaches that each Names Server is a location server. This is because each Names Server attaches to the network and maintains data location identifiers and returns those identifiers in response to query messages from clients. And OracleNamesAdminGuide explains that each Names Server is capable of modifying and updating data location identifiers.

---

[159] *See* OracleNamesAdminGuide at 21-22.
[160] *See*, *e.g.*, OracleNamesAdminGuide at 23, 52-53, 128-29.

### 2. OracleNamesAdminGuide's Non-Hierarchical Configuration

125. The Asserted Patents disclose that their purported invention covers systems having hierarchical, non-hierarchical, and mixed configurations. For example, the '640 Patent states that its Server Redirection Mechanism allows for clusters and hierarchical topologies: "NDTP provides two mechanisms for server redirection. The redirection mechanisms allow *cluster and hierarchical topologies, and mixtures of such topologies* ...."[161] Similarly, the '170 Patent also describes its Server Redirection Mechanism allows for clusters and hierarchical topologies: "NDTP provides two mechanisms for server redirection. The redirection mechanisms allow *cluster and hierarchical topologies, and mixtures of such topologies* ...."[162] And the '978 Patent also explains that "[h]ierarchical and clustered [non-hierarchical] topologies may be created using a server-centric or client-centric approach" and provides the following figures illustrating non-hierarchical, hierarchical, and mixed embodiments.[163]



**'978 Patent Figure 5**
**Showing A Non-hierarchical Structure**

---

[161] '640 Patent, 14:26-31.
[162] '170 Patent, 14:43-46.
[163] '978 Patent at 19:39-49, Figs. 5 (non-hierarchical), 6 (mixed), & 21 (hierarchical).



**'978 Patent Figure 6**

**Showing A Mixed Structure**



**'978 Patent Figure 21**

**Showing A Hierarchical Structure**

126.    Being a commercially available product released before this patent was filed,

Oracle Names had to be designed to fit the needs of a wide variety of clients to be commercially

viable which led to support for a wide variety of configurations in its design. Far from being

mutually exclusive, the Asserted Patents emphasize that their teachings are applicable to

hierarchical architectures. In describing how the NDTP redirection mechanisms work, the '170

and '640 Patents explain that "some applications might still benefit from a *specifically hierarchical server topology*."[164] And the '978 Patent echoes that "a hierarchical NDTP server topology, such as the NDTP server tree 52 shown in FIG. 6, may be utilized."[165]

127.　Further, the Asserted Patents claim the same hierarchical architecture that Kove previously asserted is incompatibly required by the Oracle prior art. Specifically, claim 25 of the '640 Patent and claim 26 of the '978 Patent expressly recite that its claimed system covers hierarchical configurations where each location server functions as a "client" for retransmitting data location requests:

> 25. The system of claim 18, further comprising a plurality of servers *related in a logical hierarchy* between the client and the data location servers, wherein *each of the plurality of servers is configured to function as a next client* and retransmit the data location request to a next logically associated server until a data location server receives the data location request.[166]
>
> 9. The system of claim 1, wherein the plurality of location servers are arranged in a network topology having a plurality of nodes organized in a logical hierarchy, wherein each node comprises at least one location server and wherein each node is connected to at least one other node in the logical hierarchy.[167]

128.　Like the Asserted Patents, OracleNamesAdminGuide discloses some embodiments with systems having hierarchical configurations and other embodiments with systems having non-hierarchical configurations. Oracle Names is a toolkit with many options that allowed customers to use their knowledge of the requirements to build a configuration best suited to their needs. As detailed in Section VI.A, OracleNamesAdminGuide teaches an

---

[164] '170 Patent, 16:36-38; '640 Patent, 16:19-21.
[165] '978 Patent, 7:47-49.
[166] '640 Patent, Claim 25.
[167] '978 Patent, Claim 9.

embodiment having a system with a non-hierarchical configuration for its Names Servers. For example, OracleNamesAdminGuide teaches a system for small-scale applications that uses a non-hierarchical "flat naming model."[168] A POSITA would understand that OracleNamesAdminGuide's non-hierarchical configuration has no local region nor requires a client's location query to go up or down a network "tree" to reach a root server.

129. Further, as shown below in Figure 3-5, OracleNamesAdminGuide specifies that its small-scale system is non-hierarchical because "[a]ll names are unique within a single domain—the WORLD domain. The WORLD domain is predefined in the Oracle Network Manager for customers choosing a flat naming model."[169] For a client query such as for data in location CONFIG, OracleNamesAdminGuide teaches that the system will append WORLD to the query as in CONFIG.WORLD.[170] OracleNamesAdminGuide discloses that, "[i]n the most common case of a single, central administrative region, all Names Servers contain identical data, and give identical results."[171]



OracleNamesAdminGuide Fig. 3-5

---

[168] OracleNamesAdminGuide at 40-41.
[169] OracleNamesAdminGuide at 40.
[170] OracleNamesAdminGuide at 41.
[171] OracleNamesAdminGuide at 45.

130.    And OracleNamesAdminGuide details that its flat non-hierarchical configuration is different from a hierarchical configuration for large-scale applications of more than 100 services.[172] Below, OracleNamesAdminGuide's Figure 3-8 illustrates how a system having the "flat" non-hierarchical configuration differs from other systems having a hierarchical configuration.[173]



Figure 3 – 8  Two Centralized Administration Alternatives

131.    A POSITA would have understood that OracleNamesAdminGuide teaches each Names Server is a location server. As explained above, the Court construed the term "location server" as "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients." As

---

[172] OracleNamesAdminGuide at 40-41.
[173] OracleNamesAdminGuide at 44-45.

discussed above, OracleNamesAdminGuide teaches that each Names Server attaches to the network and maintains data entity location identifiers and returns those identifiers in response to query messages from clients. And OracleNamesAdminGuide explains that each Names Server is capable of modifying and updating data entity location identifiers.[174]

### 3. OracleNamesAdminGuide's SQL*Net Utility

132.     SQL*Net is Oracle's networking utility that enables remote data access between programs and databases. SQL*Net allows users to distribute applications and databases to different machines while continuing to communicate as if they were located on the same machine.[175] OracleNamesAdminGuide teaches that SQL*Net is an application that "works with the Oracle Server and enables two or more computers … to exchange data through a network. SQL*Net supports distributed processing and distributed database capability. SQL*Net runs over and interconnects many communications protocols."[176] And OracleNamesAdminGuide teaches that, using SQL*Net, Names Servers communicate network address information to clients.[177]

### 4. OracleNamesAdminGuide's Location Information

133.     For Oracle7 distributed databases, location information includes the host name,[178] port, and database instance. For responding to a client's connection request, OracleNamesAdminGuide teaches that each Names Server would contain this location information to assist in resolving requests for connection and location information. As explained

---

[174] *E.g.*, OracleNamesAdminGuide at 67 (explaining Names Servers store modified connect data), 101 (explaining administrator modifying data then refreshing Name Server).
[175] *See* OracleNamesAdminGuide at 29-30, 36, 53-54, 203.
[176] OracleNamesAdminGuide at 203.
[177] *See* OracleNamesAdminGuide at 20, 23, 52-53.
[178] A POSITA would have understood that a "host name" may include a direct IP address or a host name that uses DNS to obtain an IP address.

230.     Both Sherman and Karger/Sherman describe aspects of the same Cache Resolver system. Therefore, citations herein regarding Sherman apply equally to Karger/Sherman, and vice versa. All of the features and functionality of DNS are inherent to systems using DNS, such as the use of DNS in the Cache Resolver system. In particular, the Cache Resolver system uses DNS servers running BIND 8 and the program "dnshelper." The authors of these papers used the Cache Resolver system. The Cache Resolver system describes how consistent hashing is used to help reduce the amount of inter-cache communication.[306]

231.     The inventors of the Asserted Patents were familiar with Karger and Sherman's consistent hashing work. Dr. Overton wrote a draft letter to Paul Carmichael claiming that the patents-in-suit include "method claims and specific system claims regarding distributed hash tables."[307] In this letter, Dr. Overton demonstrated his knowledge of this work being done at MIT (where Dr. Karger is a professor) regarding distributed hash tables and systems, but claimed that the work only post-dated the patents-in-suit. Even further, Dr. Overton was at least aware of Karger's consistent hashing system since at least January 3, 1999. Specifically, co-inventor Overton had a copy of Karger's article "Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hotspots on the Web" in his files at least since that date.[308] In my view, this article and Karger's work at MIT are material to the subject matter of the applications that became the Asserted Patents.

---

[306] Sherman at 13, 22-40.
[307] See KOV_00057828. The metadata for this letter indicates it was created on October 31, 2005, during the prosecution of the patents-in-suit. Kove's April 10, May 12 and May 27, 2020 privilege logs provide a date of November 4, 2005.
[308] 5/17/23 J. Overton Dep. Tr., at 709:9-710:14, Ex. 87.

232.     Specifically, Karger '97 teaches many of the concepts in the Asserted Patents and claimed in the Asserted Claims. Like the Network Distributed Transport Protocol described in each Asserted Patents' specification, Karger '97 describes "protocols for distributed networks that can be used to decrease or eliminate the occurrence of hot spots" in networks. Further, many of the Asserted Claims describe hashing the contents of location service servers. Karger '97 teaches protocols "based on a special kind of hashing we call consistent hashing" and that "consistent hash functions may eventually prove to be useful in other applications such as distributed name servers and/or quorum systems." Karger '97 further describes how broad these applications are, providing that "[w]e believe these ideas have broader applicability. In particular, consistent hashing may be a useful tool for distributing information from name servers such as DNS and label servers such as PICS in a load-balanced and fault tolerant fashion." Karger '97 thus described a hashing technique known as consistent hashing which stored and retrieved data by a hashed key across a set of distributed and dynamic server machines.[309] As a result, a POSITA at this time would have considered this article highly relevant to the purported invention described in the Asserted Patents.

## VII.    INVALIDITY LEGAL STANDARDS

### A.    Invalidity

233.     As discussed below, I understand that a claim that contains a limitation for which there is no written description is invalid. Similarly, I understand that a claim in means-plus-

---

[309] And Karger '97 is cited in the Dynamo paper (Dkt. No. 1, Ex. 21) that Kove identifies as supporting its infringement allegations. And other work of Dr. Karger was the basis for objections by the Examiner during the prosecution of a later patent application that claimed priority to the patents-in-suit but was abandoned, further showing the materiality of Dr. Karger's work at MIT. *See, e.g.*, KOV_00061409.

function format for which the specification does not disclose adequate corresponding structure is indefinite.

234.     I understand claims must also be novel and non-obvious, and are invalid if shown to be anticipated by or obvious in light of prior art.

235.     I understand that the party challenging the patent's validity must present clear and convincing evidence that the patent claims are invalid. I understand that each claim of a patent must be considered separately in an invalidity analysis.

236.     I understand that a "preponderance of the evidence" is such evidence that causes a trier of fact to be persuaded that the fact sought to be proved is more likely than not to be true. Proving a fact by "clear and convincing evidence" is a higher burden than proving a fact by a "preponderance of the evidence" standard. I have applied the "clear and convincing evidence" standard throughout my report.

237.     I understand that because the earliest application to which the Asserted Patents claim priority was filed before March 16, 2013, the validity provisions of the America Invents Act ("AIA") don't apply to the Asserted Patents. Therefore, I have considered invalidity under the pre-AIA versions of the patent statutes. But my opinions and conclusions regarding validity would remain the same under the post-AIA version of the patent statutes.

## B.     Anticipation and Obviousness

238.     I understand that under pre-AIA 35 U.S.C. §102, a person isn't entitled to a patent for an invention if the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country more than one year prior to the date of the application for patent in the United States. I also understand that a person may not receive a patent for an invention if the invention was known or used by others in this country or patented or

260.     When determining whether a specification contains adequate written description, I understand that one must make an objective inquiry into the four corners of the specification from the perspective of a POSITA. A patentee may rely on information that is well-known in the art for purposes of meeting the written description requirement. However, when the four corners of the specification contradict information that the patentee alleges is well-known to a POSITA, such information doesn't demonstrate that the patentee possessed the claimed invention. In addition, a description that merely renders the invention obvious does not satisfy the written description requirement.

## VIII.   THE ASSERTED CLAIMS CLAIM UNPATENTABLE SUBJECT MATTER.

261.     As part of this report, I have also been asked to provide my opinion on whether the asserted patents are invalid under 35 U.S.C. § 101 under *Alice*[313] and *Mayo*.[314] I understand that early on in this case, before discovery, Kove's limiting statements in reexamination, testimony by the inventors, and the Court's claim constructions, the Court ruled on this issue, denying Amazon's motion to dismiss and finding that the claims were not ineligible under 35 U.S.C. § 101. However, after being informed of the relevant standards for making this determination and taking the intervening developments into account, it is my opinion that the asserted patents are invalid under 35 U.S.C. § 101.

262.     I have been informed that when performing an analysis of invalidity under 35 U.S.C. § 101 under *Alice* and *Mayo*, two steps must be met for a finding of invalidity. First, it must be shown that the claims at issue are directed to a patent-ineligible concept, such as a law of nature, abstract phenomenon, or abstract idea. And second, if step one is met, it must be shown that the

---

[313] *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 573 U.S. 208 (2014).
[314] *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012).

claims contain no inventive concept. It is my opinion that the asserted patents meet both steps and are therefore invalid for at least this reason.

263.    I have been informed that step one is met if, for example, the claims simply consist of generalized steps to be performed on a computer using conventional computer activity. It is my opinion that the asserted claims consist of generalized steps performed on generic and conventional computers. For example, claim 17 of the '978 patent describes generalized location services (yellow) and transport protocols (green):

> 17. A method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information, wherein each of the plurality of location servers stores unique set of location information of an aggregate set of location information, the method comprising:
>
> providing a transfer protocol configured to transport identifier and location information, the location information specifying the location of information related to the identifier;
> storing location information formatted according to the transfer protocol at a first location server;
>
> receiving an identifier and a location relevant to the identifier at the first location server;
>
> storing the received location in a location store at the first data location server, the location store comprising a plurality of identifiers, each identifier associated with at least one location, wherein the received location is associated with the received identifier in the location store; and
> transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit.

264.    As shown above, the '978 Patent claims include a generic "location server" and "location stores" that only "store and retrieve location information." And the patent specification

confirms that the functions performed by the claimed servers "may be implemented on any of a number of standard computer platforms."[315]

265.    And this is further supported by the Court's claim construction of "location server." The Court construed this term as "**network-attached component** that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients."[316] And in its ruling, the Court further cautioned construing the term to a specific kind of server.[317] As such, in light of the patent's specification and the Court's claim construction order, a POSITA would understand that these "location servers" and "location stores" could be implemented on any conventional, standard, and well-known computer or server.

266.    It is also my opinion that the functions claimed relate to the abstract idea of receiving and storing location information based on some undefined "predetermined" "criterion." The claims and the specification vaguely state a "criterion" or "protocol" in which the storing and retrieving is performed. And that dependent claims include examples, such as available storage space and transaction rate limit,[318] does not clarify the issue as these parameters are innate in any resource storage system. For example, if a single drawer in a file cabinet was full of files, then it would be normal to move files to accommodate new files. Or if certain files were constantly accessed more than others, it would be likely to store those in a more readily accessible place for convenience.

---

[315] '978 Patent, Col. 7:36-38.
[316] Dkt. No. 484.
[317] "[I]t would be improper to limit the construction of "location server" with the use of "NDTP."" *Id.* at 21.
[318] *See, e.g.,* '978 Patent, claims 23 and 24.

18. A system for retrieving data location information for data stored in a distributed network, the system comprising:

a data repository configured to store data, wherein the data is associated with an identifier string;

a client responsive to a data query to query a data location server for location information associated with the identifier string;

a data location server network comprising a plurality of data location servers, at least one of the plurality of data location servers containing location information associated with the identifier string, wherein each of the plurality of data location servers comprises computer executable code configured to execute the following steps in response to receiving a data location request from the client:

if the data location server contains the location string associated with the identification string provided in the data location request, the data location server transmits location information for use by the client to calculate a location of the data associated with the identification string;

if the data location server does not contain the location string associated with the identification string, the location server transmits a redirect message to the client, wherein the redirect message contains redirect information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string.

272.    Like the '170 and '978 patents, the '640 patent relies on the use of conventional, standard, and well-known computers or servers. And again, the implementation is an undefined "computer executable code" that performs the same abstract idea of storing and retrieving location based on location identifiers. The only primary difference in the '640 patent is the inclusion of a redirect message. But this is similarly abstract as a pointer to other storage locations within a storage system is a general idea that would be implemented in storage systems of varying mediums. For example, looking again at a library card catalogue, if a given item's

location isn't written on a particular card, there would likely be information guiding the reader to another card to inspect. As such, it is my opinion that the '640 patent claims are also directed to a patent-ineligible concept.

273.     As stated before, I have been informed that when the first step is met, by showing that the asserted claims are directed to a patent-ineligible concept, a second inquiry of "inventive concept" must be performed to determine validity under 35 U.S.C. § 101. And it is my understanding that the inclusion of a conventional computer or network components is insufficient to meet the requirements of an inventive concept. And in the case of all three Asserted Patents, it is my opinion that there is no inventive concept beyond the abstract idea of storing and retrieving resources through a method of correlated identifiers.

274.     As explained above, the asserted claims point to generic "servers" and "processors" capable of storing and retrieving resources. And a POSITA would understand that these claimed functions are performed in conventional, standard, and well-known computers or network components. As such, the inclusion of these generic computer and network components can't be the "inventive concepts" necessary to meet the requirements for validity under 35 U.S.C. § 101.

275.     And as discussed above, the claimed data storage and retrieval methods can't be the inventive concept either. In all three instances, the patent simply states that the resource to location correlation is done by some undefined "protocol," "hash," or "code." And as explained above, a POSITA would understand that this resource to location correlation would be implemented by a well-known method, such as a hashing function. The specifications themselves

acknowledge that hashing was well known in the art, referencing the "hashpjw function presented by Aho, Sethi and Ullman in their text *Compilers, Principles, Techniques and Tools*."[322]

276.    Further, as outlined above in Section II.C, inventor John Overton has admitted that many of the routine, well-understood, and conventional limitations were not inventive:

- Transport Protocols[323]

- Configuring Servers[324]

- Processors[325]

- Client-Server Relationships[326]

- Server Clusters[327]

- Database Storage[328]

- Distributed Databases[329]

- Data Queries and Responses[330]

- Location Services & Servers[331]

- Directory Services & Servers[332]

- Location Queries & Responses[333]

---

[322] '170 Patent at 15:15-19; '640 Patent at 15:1-20; '978 Patent at 17:19-40.
[323] 5/17/23 J. Overton Dep. Tr., at 684:11-13.
[324] 5/17/23 J. Overton Dep. Tr., at 687:8-11.
[325] 5/17/23 J. Overton Dep. Tr., at 686:10-12.
[326] 5/17/23 J. Overton Dep. Tr., at 686:1-9.
[327] 5/17/23 J. Overton Dep. Tr., at 696:6-11.
[328] 5/17/23 J. Overton Dep. Tr., at 724:8-10.
[329] 5/17/23 J. Overton Dep. Tr., at 670:20-671:5.
[330] 5/17/23 J. Overton Dep. Tr., at 724:17-22.
[331] 5/17/23 J. Overton Dep. Tr., at 671:17-21.
[332] 5/17/23 J. Overton Dep. Tr., at 728:12-14.
[333] 5/17/23 J. Overton Dep. Tr., at 726:15-17.

- Identification Strings[334]

- Hashkeys[335]

- Hash Functions[336]

277. And the network architecture type required to implement the Asserted Claims cannot be the inventive concept either. The patents' specifications require a hierarchical server structure to implement the claimed inventions.[337] And despite this disclosure, Kove has taken the position that only a non-hierarchical server structure is capable of implementing the Asserted Claims.[338] Further, it is my understanding that .[339] But regardless of the server structure architecture Kove claims its patents cover, it is undisputed that these server structure types were well-known and traditional in the field.[340] As such, any claimed server architecture by Kove can't be the inventive concept necessary to overcome the second step of a 35 U.S.C. § 101 analysis.

---

[334] 5/17/23 J. Overton Dep. Tr., at 725:17-19.

[335] 5/17/23 J. Overton Dep. Tr., at 726:1-14.

[336] 5/17/23 J. Overton Dep. Tr., at 725:20-22.

[337] *See, e.g.,* '640 Patent, 14:28-31, 16:14-38, 17:22-24, 17:61-18:16, 18:36-58; '170 Patent, 14:43-46, 16:32-56, 17:38-42, 18:9-30, 18:49-19:4; '978 Patent, 7:37-53; 19:38-48.

[338] *See, e.g.,* August 4, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ('640 patent) at 23; August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 25-26; September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 35-36.

[339] *See, e.g.,* 05/17/2023 J. Overton Dep. Tr. at 793:3-7.

[340] *See, e.g.,* '640 Patent, 16:15-19 ("While the NDTP server topology supported by the server redirection mechanism described above and shown in FIGS. 9(a) and 9(b) is an extremely powerful and **general scaling technique, suitable for diverse topology deployments**.")(emphasis added).

480.    I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Dated: July 3, 2023

Joseph B. Greene

Joseph B. Greene