**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KOVE IO, INC.,<br><br>    *Plaintiff,*<br><br>v.<br><br>AMAZON WEB SERVICES, INC.,<br><br>    *Defendant.* | Case No. 1:18-cv-8175<br><br>█████████████ |

**AMAZON'S MOTION TO EXCLUDE OPINIONS OF
DR. GOODRICH AND MR. BERGMAN**

Alan M. Fisch
*alan.fisch@fischllp.com*
R. William Sigler
*bill.sigler@fischllp.com*
Jeffrey M. Saltman (*pro hac vice*)
*jeffrey.saltman@fischllp.com*
Lisa Phillips (*pro hac vice*)
*lisa.phillips@fischllp.com*
FISCH SIGLER LLP
5301 Wisconsin Avenue NW, Suite 400
Washington, D.C. 20015
Telephone: (202) 362-3500

Ken K. Fung (*pro hac vice*)
*ken.fung@fischllp.com*
FISCH SIGLER LLP
400 Concar Drive
San Mateo, CA 94402
Telephone: (202) 362-3500

*Attorneys for Amazon Web Services, Inc.*

## **TABLE OF CONTENTS**

I.    This Court Should Exclude Dr. Goodrich's Opinions on New Theories That Kove Failed to Disclose in Its Contentions. ............................................................. 1

    A.    This Court Should Exclude Dr. Goodrich's Opinion That the Alleged Non-Hierarchical Configuration of Servers Share a "Namespace." .................... 1

    B.    This Court Should Exclude Dr. Goodrich's Opinions on Kove's New "Transferring" and "Hash Table" Doctrine of Equivalents Theories .................. 4

II.   This Court Should Exclude Dr. Goodrich's Opinions Contradicting the Court's New Claim Construction. ............................................................................ 6

III.  This Court Should Exclude Dr. Goodrich's "Hash Table" DOE Opinion Under Prosecution History Estoppel. .................................................................... 11

IV.   This Court Should Exclude Mr. Bergman's "Bargaining Split Conclusion." ............ 13

V.    This Court Should Exclude Mr. Bergman's Opinions Because He Fails to Apportion Damages Between Infringing Features and Non-Infringing Features. ..... 17

    A.    Opinions on S3 and Hashing Limitations ........................................... 18

    B.    Opinions on S3 and Scaling Limitations ........................................... 21

    C.    Opinions on DDB and Scaling and Hashing Limitations ................................. 23

## TABLE OF AUTHORITIES

**Cases**

*Apple, Inc. v. Samsung Electronics Co.*,
No. 5:12-cv-630, 2014 WL 12917334 (N.D. Cal. Jan. 9, 2014) ........................................ 4, 14

*Baxter Int'l, Inc. v. CareFusion Corp.*,
No. 15-cv-9986, 2020 WL 10486005 (N.D. Ill. Aug. 12, 2020) ................................ 1, 4, 20, 21

*Droplets, Inc. v. Nordstrom*,
No. 12-cv-3733, 2022 WL 2670163 (N.D. Cal. Jan. 12, 2022) ........................................ 16, 17

*Droplets, Inc. v. Yahoo! Inc.*,
No. 12-cv-3733, 2021 WL 9038355 (N.D. Cal. Aug. 9, 2021) ................................................ 20

*Dynetix Design Sols., Inc. v. Synopsys, Inc.*,
2013 WL 4538210 (N.D. Cal. Aug. 22, 2013) ........................................................................ 23

*EMC Corp. v. Pure Storage, Inc.*,
154 F. Supp. 3d 81 (D. Del. 2016) ........................................................................................... 9

*Ericsson, Inc. v. D-Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ................................................................................. 18, 20, 24

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ................................................................................................ 6

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prod. Grp., LLC*,
879 F.3d 1332 (Fed. Cir. 2018) ........................................................................................ 15, 19

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002) ............................................................................................................... 11

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) .............................................................................................. 20

*Fujitsu Ltd. v. Tellabs Operations, Inc.*,
No. 08-cv-3379, 2012 WL 3018027 (N.D. Ill. July 23, 2012) .................................................. 1

*Georgia-Pacific Corp. v. United States Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) ....................................................................................... 18

*GPNE Corp. v. Apple, Inc.*,
No. 12-cv-2885, 2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ........................................ 15, 17

*Integrated Tech. Corp. v. Rudolph Techs., Inc.*,
734 F.3d 1352 (Fed. Cir. 2013) .............................................................................................. 11

*Laser Dynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ................................................................ 17

*Lawrence v. Raymond Corp.*,
  No. 09-cv-1067, 2011 WL 3418324 (N.D. Ohio Aug 4, 2011)................................. 15

*LoganTree LP v. Garmin Int'l, Inc.*,
  No. 17-cv-1217, 2021 WL 5998293 (D. Kan. Dec. 20, 2021) ................................. 4

*Medline Indus., Inc. v. C.R. Bard, Inc.*,
  511 F. Supp. 3d 883 (N.D. Ill. 2021)........................................................ 1, 4

*Omega Pats., LLC v. CalAmp Corp.*,
  13 F.4th 1361 (Fed. Cir. 2021) ............................................................ 19

*Open Text S.A. v. Box, Inc.*,
  No. 13-cv-4910, 2015 WL 349197 (N.D. Cal. Jan. 23, 2015) ............................... 16

*Pharma Tech Solutions, Inc. v. LifeScan, Inc.*,
  942 F.3d 1372 (Fed. Cir. 2019) ............................................................ 13

*Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharms. Inc., USA*,
  No. 07-cv-5855, 2011 WL 383861 (D.N.J. Feb. 3, 2011)..................................... 17

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
  620 F.3d 1305 (Fed. Cir. 2010) ............................................................ 13

*Stopinc Aktiengesellschaft v. J.W. Hicks, Inc.*,
  131 F. Supp. 3d 763 (N.D. Ind. 2015) ...................................................... 11

*TASER Int'l, Inc. v. Karbon Arms, LLC*,
  No. 11-cv-426, 2013 WL 6773663 (D. Del. Dec. 19, 2013)................................... 16

*Trading Techs. Int'l, Inc. v. CQG, Inc.*,
  No. 05-cv-4811, 2014 WL 4477932 (N.D. Ill. Sept. 10, 2014)............................... 1

*Ultratec, Inc. v. Sorenson Commc'ns, Inc.*,
  No. 13-cv-346, 2014 WL 5080411 (W.D. Wis. Oct. 9, 2014)................................. 14

*VirnetX, Inc. v. Cisco Systems, Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ................................................ 17, 18, 21, 24

## I. THIS COURT SHOULD EXCLUDE DR. GOODRICH'S OPINIONS ON NEW THEORIES THAT KOVE FAILED TO DISCLOSE IN ITS CONTENTIONS.

In this district, the law prohibits an expert from relying on new theories that weren't disclosed at the contentions stage.[1] This serves the purpose of the Local Patent Rules' requirements for contentions: to provide notice and clarify issues in discovery.[2] Kove relied on this law at summary judgment in seeking to strike an opinion of Amazon's noninfringement expert, arguing that "[b]ecause AWS is bound by its final contentions, its new theory is untimely and should be excluded."[3] This Court agreed with Kove and excluded that opinion, stating that the "proper remedy for the disclosure of a previously undisclosed [invalidity or infringement] theory or argument in either party's expert report is preclusion."[4] Amazon asks that the Court apply this same law to exclude Kove's infringement expert's opinions offering three new theories that Kove didn't include in its infringement contentions.

### A. THIS COURT SHOULD EXCLUDE DR. GOODRICH'S OPINION THAT THE ALLEGED NON-HIERARCHICAL CONFIGURATION OF SERVERS SHARE A "NAMESPACE."

In its recent summary judgment decision, this Court found that "Kove clearly and unambiguously limited the asserted claims to location server structures that have a 'non-hierarchical' configuration."[5] Here, for both S3 and DDB, Kove's infringement expert Dr. Goodrich opines that

---

[1] *E.g.*, *Baxter Int'l, Inc. v. CareFusion Corp.*, No. 15-cv-9986, 2020 WL 10486005, at *1 (N.D. Ill. Aug. 12, 2020) ("Expert infringement reports may not introduce new theories not previously set forth in infringement contentions."); *Trading Techs. Int'l, Inc. v. CQG, Inc.*, No. 05-cv-4811, 2014 WL 4477932, at *2 (N.D. Ill. Sept. 10, 2014) (same).

[2] *Trading Techs.*, 2014 WL 4477932, at *2 (citing *Fujitsu Ltd. v. Tellabs Operations, Inc.*, No. 08-cv-3379, 2012 WL 3018027, at *4 (N.D. Ill. July 23, 2012)).

[3] *See* Dkt. 699 at 46–47 (arguing that Local Patent Rules "exist to prevent trial by ambush" and that "Dr. Grama's rebuttal report unveiled the brand-new theory that AWS does not infringe because … a single piece of AWS's DDB source code (in his view) shows a parent–child/master–slave relationship").

[4] Dkt. 739 at 29–30 (quoting *Medline Indus., Inc. v. C.R. Bard, Inc.*, 511 F. Supp. 3d 883, 890 (N.D. Ill. 2021)) (alteration in original); *see also id*. at 29 (stating that contentions should "fully convey" theory).

[5] *Id*. at 19; *accord id*. at 15 ("In sum, Kove's reexamination statements clearly and unambiguously disavowed hierarchical location server configurations. AWS's proposed construction, providing that location

---

1

the required non-hierarchical configuration of location servers is defined by "sharing a namespace."[6] But Kove's infringement contentions don't ever refer to the concept of a "namespace," much less do so when identifying the required "network of location servers" in the accused products. Because Dr. Goodrich's report improperly introduced this new infringement theory for the first time, this Court should exclude Dr. Goodrich's testimony on that theory.

By way of example, asserted claim 6 of the '978 patent describes a system "having a plurality of location servers." When analyzing this claim against S3, in view of Amazon's proposed "non-hierarchical" construction, Dr. Goodrich states in his report:

> While I disagree with AWS's proposed construction, if it is applied, claim 6 of the '978 patent is still infringed. The network or system of each set of two or more ███ within a group of regions that share a namespace for buckets is arranged in a non-hierarchical, cluster topology.[7]

Dr. Goodrich also opines that ███ sharing a "namespace" constitute a non-hierarchical configuration of location servers when analyzing the other claims that Kove asserts against S3.[8] And Dr. Goodrich provides analogous opinions that ███████████ sharing a namespace constitute the non-hierarchical configuration of location servers for claims asserted against DDB.[9]

---

servers must be arranged in 'non-hierarchical structures,' is therefore appropriate."); *id.* at 19 (construing "'plurality of location servers' to require 'location servers in non-hierarchical structures'").

[6] *E.g.*, Dkt. 700-53 (Ex. D to Goodrich Rep.) at ¶ 79 ("For each group of regions that share a namespace for buckets, each set of two or more ███ within the group constitutes 'a plurality of location servers'" in S3.); Dkt. 700-54 (Ex. E to Goodrich Rep.) at ¶ 80 (similar, for DDB).

[7] Dkt. 700-53 at ¶ 121; *see also id.* at ¶ 79 (similar).

[8] *Id.* at ¶ 175 (same, in section of report on '978 claim 17 (note: ¶ 175 continues to refer to "claim 6," which appears to be an artifact from copy-and-pasting ¶ 121)); *id.* at ¶¶ 128, 132 (similar); *id.* at ¶ 198 (similar, for '170 claim 1); *id.* at ¶¶ 179, 184, 189 (for '978 claims 23, 24, and 30, incorporating by reference analysis of claim 17); *id.* at ¶¶ 197, 228 (for '170 claims 1 and 2, incorporating by reference analysis of '978 claim 6). As noted in previous briefing, Kove asserted seven claims against S3, and 17 claims (including those seven) against DDB. Dkt. 689 at 4.

[9] *E.g.*, Dkt. 700-54 at ¶ 116 ("The network or system of each set of two or more ███████, such as groups within one or more Availability Zones and/or Regions, is arranged in a non-hierarchical, cluster topology."); *id.* at ¶¶ 80–81 (similar, for same claim ('978 claim 3)); *id.* at ¶¶ 204, 241, 305, 327 (similar, for '170 claims 1, 6 and '640 claims 17, 18, respectively); *id.* at ¶¶ 120, 127, 143, 161, 189, 193, 197, 237,

By contrast, Kove's operative Fourth Amended Final Infringement Contentions, served March 20, 2023, fail to disclose the new "namespace" theory. Kove's contentions addressed the constructions that Amazon proposed based on Kove's disclaimers in the reexamination proceedings. Yet, Kove's contentions include only broad and tautological statements that fail to provide any notice of the "namespace" theory in Dr. Goodrich's report. For instance, when addressing the components of S3 allegedly satisfying the requirement for a non-hierarchical configuration of location servers, Kove's contentions state:

> The network and system of ███████ is arranged in a non-hierarchical, cluster topology. The network and system of ███████ is arranged in a non-hierarchical, cluster topology. The network and system of the Accused Instrumentalities is arranged in a non-hierarchical, cluster topology.[10]

Kove's contentions include analogous statements about the ████ in DDB.[11] And, rather than providing notice of Kove's "namespace" theory, other relevant portions of Kove's contentions suggest that any group of two or more components that Kove may later select can satisfy the requirement for a non-hierarchical configuration of location servers.[12] Thus, just as the Court recently found when excluding portions of Amazon's expert's opinions on the basis that Amazon's non-infringement contentions failed to provide adequate notice, this Court should likewise exclude Dr. Goodrich's opinions on Kove's undisclosed "namespace" theory.[13]

Indeed, had Kove disclosed its "namespace" theory, Amazon would've had an opportunity

---

270, 276, 351 (incorporating by reference relevant analysis for other asserted claims).

[10] Ex. 1 (Kove 4th Am. Infr. Contentions, Ex. A) at 2.

[11] Ex. 2 (Kove 4th Am. Infr. Contentions, Ex. B) at 42.

[12] *See, e.g.*, Ex. 1 at 18 (equating "network comprising a plurality of data location servers" with "network of ████, such as groups within one or more cells, Availability Zones, and/or regions…."); Ex. 2 at 42 (equating "network comprising a plurality of location servers" "████████, such as groups within one or more Availability Zones and/or regions").

[13] *See* Dkt. 739 at 29–30.

to respond in its non-infringement contentions and to develop evidence in fact discovery relating to this theory. Kove's failure has prejudiced Amazon—to be sure, Kove successfully argued that Dr. Grama's theory deemed untimely at summary judgment had prejudiced Kove's claim construction and fact and expert discovery efforts.[14] Kove shouldn't now be permitted to advance its untimely "namespace" theory through its expert.

**B.** **THIS COURT SHOULD EXCLUDE DR. GOODRICH'S OPINIONS ON KOVE'S NEW "TRANSFERRING" AND "HASH TABLE" DOCTRINE OF EQUIVALENTS THEORIES.**

The Local Patent Rules require that a patentee alleging infringement under a doctrine of equivalents theory "must include an explanation of each function, way, and result that is equivalent and why any differences are not substantial" in its final infringement contentions.[15] And this Court reiterated at summary judgment that an expert's opinion should be excluded if it isn't "fully convey[ed]" in a party's contentions.[16] Indeed, as other courts have explained, while experts may cite additional evidence in their reports, they may not "impermissibly substitute[] a new theory altogether."[17] That's what Kove has done here, through Dr. Goodrich's DOE opinions on the required "transferring" and "hash table" claim limitations.

First, '978 patent claim 17e requires "transferring a portion of the identifiers and associated locations to a second data location server."[18] Dr. Goodrich opined that S3 satisfies that limitation

---

[14] *See* Dkt. 699 at 47 ("Kove reasonably relied on AWS's noninfringement contentions to guide what discovery to take or not take, how to advocate for construction of certain claim terms, and what positions to address in its expert reports.")

[15] LPR 3.1(a)(2); *see also Baxter*, 2020 WL 10486005, at *1 (These explanations must "provide notice of the scope of the plaintiff's infringement theory.").

[16] Dkt. 739 at 29.

[17] *LoganTree LP v. Garmin Int'l, Inc.*, No. 17-cv-1217, 2021 WL 5998293, at *7 (D. Kan. Dec. 20, 2021) (quoting *Apple, Inc. v. Samsung Electronics Co.*, No. 5:12-cv-630, 2014 WL 12917334, at *1 (N.D. Cal. Jan. 9, 2014)); *see also Medline*, 511 F. Supp. 3d at 904 (highlighting similarity of N.D. Cal. and N.D. Ill. local patent rules).

[18] Dkt. 687-3 ('978 patent) at 27:40–41.

under the DOE with a three-step process that includes: (1) "removing a ████████████ from one ████"; (2) "assigning ownership of that ████ to another ████": and (3) "subsequently ████████████ information for that ████."[19] But this differs from Kove's infringement contentions, where Kove identified a two-step process as satisfying this limitation. Specifically, Kove's infringement contentions relied only on the first and third steps above, with no mention of "assigning ownership" of any ████ to another ████.[20]

Dr. Goodrich redefined Kove's DOE theory by adding the "assigning ownership" step. Under Kove's original theory, a ████████████ disappears from one ████ (or ████████) and reappears on another ████ (or ████████) by unspecified means. But Dr. Goodrich's theory specifies those means. Under his theory, the reappearance is predicated on the first ████ assigning ownership of the ████████████ to another ████. By waiting until Dr. Goodrich's report to disclose this step, Kove deprived Amazon of the opportunity to respond in its non-infringement contentions and develop contrary record evidence. As noted, preclusion is the proper remedy.[21] Thus, this Court should exclude Dr. Goodrich's opinions on S3 based on Kove's undisclosed three-step theory for '978 claim 17's "transferring" limitation.

Second, asserted claims 2 and 12 of the '170 patent, claim 24 of the '640 patent, and claim 6 of the '978 patent require a "hash table."[22] For DDB, Dr. Goodrich opined that a particular "use of a ████████" satisfies that limitation under the DOE.[23] Specifically, Dr. Goodrich

---

[19] Dkt. 700-53 at ¶¶ 169–70.

[20] *See* Ex. 4 (Kove contentions, Ex. D) at 35 (identifying steps of "removal/inaccessibility/copying of certain ████████████ on one ████ or ████" and "caching/storage of those ████████████ on a different ████ or ████").

[21] Dkt. 739 at 29–30.

[22] Dkt. 687-1 ('640 patent) at 24:7; Dkt. 687-2 ('170 patent) at 21:12, 22:13; Dkt. 687-3 ('978 patent) at 26:3.

[23] Dkt. 700-54 at ¶ 125.

identifies the association of "███████████ and their associated ███████████," the combination of which is then "input into a ████████ to index the table."[24] By contrast, Kove's infringement contentions only identify the association of "███████████████ and their associated ████████."[25] Indeed, Kove's original theory doesn't mention indexing.[26]

Again, Dr. Goodrich's insertion of an additional element—here, indexing—redefined Kove's DOE theory. Under Kove's original theory, DDB forms the functional equivalent of a hash table when it associates two values: ████████ and ███████████. But Dr. Goodrich added that the table Kove identified must also then be "indexed by a █████" to create a new hash table index.[27] This addition changes the identity of the accused hash table. While Kove's contentions identified the ████████████████ associations as the hash table, Dr. Goodrich's report accuses an undefined index of those associations created using a █████. And again, this belated DOE theory violates the local rules, and deprived Amazon of the opportunity to respond in its non-infringement contentions and develop contrary record evidence. Hence, this Court should also exclude Dr. Goodrich's opinions based on Kove's undisclosed indexing theory for the "hash table" limitations of '170 claims 2 and 12, '640 claim 24, and '978 claim 6.

## II. THIS COURT SHOULD EXCLUDE DR. GOODRICH'S OPINIONS CONTRADICTING THE COURT'S NEW CLAIM CONSTRUCTION.

As the Federal Circuit explained in *Exergen Corp. v. Wal-Mart Stores, Inc.*: "Once a district court has construed the relevant claim terms, … that legal determination governs for purposes of trial. No party may contradict the court's construction to a jury."[28]

---

[24] *Id.* at ¶ 124.

[25] Ex. 2 at 28, 41; Ex. 3 (Kove contentions, Ex. C) at 36; Ex. 5 (Kove contentions, Ex. E) at 25.

[26] *Id.*

[27] Dkt. 700-54 at ¶ 124.

[28] 575 F.3d 1312, 1321 (Fed. Cir. 2009).

In its recent decision, this Court granted in part Amazon's request for additional construction, based on Kove's disclaimers. Specifically, this Court found that "[d]uring the reexamination proceedings, Kove clearly and unambiguously limited the asserted claims to location server structures that have a 'non-hierarchical' configuration."[29] And this Court found it unnecessary to further construe the term "non-hierarchical," because its meaning was undisputed in the context of Kove's patents.[30] As this Court explained, quoting from Kove's definition of the term, a "non-hierarchical" configuration of location servers requires at a minimum that "any given server is able to return either the requested information or information useable by the client to locate the server with the requested information."[31] By contrast, location servers in "hierarchical structured networks do not 'know' what's contained in other servers throughout the network" and "do not necessarily store information for finding the location server having the desired location information."[32]

In light of this Court's finding that the asserted claims require a "non-hierarchical" configuration, and given the requirement of "non-hierarchical" configurations, this Court found that it would be "redundant" to construe the asserted claims to also require that "each location server contains the relevant location information, or information to locate the relevant location information" (i.e., Amazon's second request). As this Court summarized:

> Kove has conceded that the mandate that "each server in the server network" must be enabled to "return the requested information" or "know which location server contains the location(s) of the desired data" is disclosed by the "non-hierarchical

---

[29] Dkt. 739 at 19; *accord id*. at 15 ("In sum, Kove's reexamination statements clearly and unambiguously disavowed hierarchical location server configurations. AWS's proposed construction, providing that location servers must be arranged in 'non-hierarchical structures,' is therefore appropriate."); *id*. at 19 ("This Court therefore construes the claim term 'plurality of location servers' to require 'location servers in non-hierarchical structures.'"); *see also id*. at 18 (rejecting Kove arguments attempting to carve out '978 claims 6, 17, 23, 24, and 30 from "the 'non-hierarchical configuration' disclaimer").

[30] *Id*. at 18–19.

[31] *Id*. at 18 (quoting Dkt. 687-32 at 40 as example of Kove "describ[ing] what 'non-hierarchical' meant").

[32] *Id*. at 18–19 (quoting Dkt. 700-131 at 25 and Dkt. 687-32 at 36).

configuration" that the claims require. [Dkt. 687] ¶ 33; *see also id*. ¶ 34 ("These limitations cannot be met in hierarchical configurations … because each location server in tree-structures do not necessarily store information for finding the location server having the desired location information.").[33]

Here, Dr. Goodrich purported to address Amazon's proposed constructions, but his opinions contradict those constructions and what this Court found as a requirement for establishing a non-hierarchical configuration. As noted, each location server in the network must be enabled to return the requested information or "know which location server contains the location(s) of the desired data." But Dr. Goodrich fails to apply this requirement when analyzing the "plurality of location servers" (or the network or system of location servers) required by the asserted claims.

For example, Dr. Goodrich states that in S3 "each set of two or more ██████" within a group that shares a namespace "constitutes 'a plurality of location servers.'"[34] But when he provides his opinions on what the accused location servers/████ "know," he doesn't state that a ████ would "know" what any other ████ contains, much less explain how any given ████ would "know" which other ████ "contains the location(s) of the desired data." Rather, Dr. Goodrich asserts that a ████ would "know" which ████████████ to query:

> Every ████ has to know which ████ to query in case of a cache miss. ████ thus store a copy of the partition metadata to keep track of where the partitions are in the ████.[35]

In other words, a ████ would "know" to go down the chain to a separate layer in the hierarchy—namely, ████, which Dr. Goodrich acknowledges are separate components.[36] Dr. Goodrich's

---

[33] *Id*. at 21–22.

[34] Dkt. 700-53 (Ex. D to Goodrich Rep.) at ¶ 79.

[35] *Id*. at ¶ 30.

[36] *See, e.g., id*. at ¶ 28 ("[E]ach ████ caches a different set of █████████████ for the ████ in their respective range. Other S3 components, such as ████████████████, use ██████████ to determine which ████ should receive a request for a given ████."); *id*. at ¶ 30 ("████ do not talk directly to a ████, but instead to a ██████████, which is aware of how the ████████ is partitioned and will use ████████████ to reach the correct ████."); *see also id*. at ¶¶ 39, 45, 58, 113 (further describing

report thus indicates that when a ▮▮▮ is unable to return the requested information (▮▮▮▮▮▮), the ▮▮▮ doesn't know which other ▮▮▮ may contain the location(s) of the desired data. That fails to meet the requirement for a "non-hierarchical" configuration, where the location servers/accused ▮▮▮ must "necessarily store information for finding the location server having the desired location information" that the asserted claims require.[37]

As a result, Dr. Goodrich's opinions are inconsistent with this Court's claim construction rulings, including his opinion that the plurality of location servers is met by any "set of two or more ▮▮▮" in S3. This Court expressly "construe[d] the claim term 'plurality of location servers' to require 'location servers in non-hierarchical structures.'"[38] Given Dr. Goodrich's description of what ▮▮▮ "know," his opinion on what constitutes a "plurality of location servers" is inconsistent with this Court's ruling. And as the District of Delaware stated in *EMC Corp. v. Pure Storage, Inc.,* "expert testimony inconsistent with the Court's claim construction is unreliable and unhelpful to the finder of fact," and "should be excluded under the *Daubert* standard."[39] Here, Dr. Goodrich's opinions on what constitutes the required plurality or system/network of location servers should be excluded for that reason, and because they are conclusory and unsupported.

Dr. Goodrich provides similarly improper opinions when analyzing DDB. For example, he and Kove identified ▮▮▮▮▮▮▮ as the accused location servers in DDB.[40] In his report, he also describes "every group of two or more ▮▮▮▮▮▮▮" as satisfying a redirect message limitation, without addressing how any ▮▮▮ would know which location server contains the

---

mechanism for identifying/sending requests to correct ▮▮▮); *id.* at ¶ 121 (describing ▮▮▮ as "a separate layer of servers that are distinct from the ▮▮▮").

[37] Dkt. 739 at 19 (quoting Dkt. 687-32 at 36) (emphasis omitted); *id.* at 21 (same).

[38] *Id.* at 19; *see also id.* at 18–19, 21 (quoting Kove definitions of "non-hierarchical").

[39] 154 F. Supp. 3d 81, 109 (D. Del. 2016).

[40] *E.g.*, Dkt. 739 at 24–25, n.4.

location(s) of the desired data, as the non-hierarchical configuration requires and as Kove described in the reexaminations.[41] Indeed, in his validity report, Dr. Goodrich repeatedly stated that the claims require that each location server must know which server contains the relevant location information with "certainty and specificity," and used that requirement to distinguish Amazon's prior art.[42] For instance, he opined that '170 patent claim 1 "requires that each location server is configured to determine which location server stores the sought-after location information with certainty and specificity based on the plain language of claim 1."[43]

Rather, he describes the ▉▉▉ as storing undefined "▉▉▉▉▉▉ metadata."[44] Dr. Goodrich provides no analysis of what the scope of the "▉▉▉▉▉ metadata" is. He also doesn't state if or how it relates to his theory that "every group of two or more ▉▉▉▉▉▉" would satisfy the requirement for the plurality of location servers that "any given server is able to return either the requested information or information useable by the client to locate the server with the requested information." Further, Dr. Goodrich acknowledges that the metadata an ▉▉▉ contains isn't always correct and requires updated versions.[45] But he provides no analysis on how incorrect metadata about an undefined group of other ▉▉▉ would meet the requirement for knowing what any other ▉▉▉ contains, much less with "specificity and certainty." Without providing

---

[41] *Compare* Dkt. 700-54 at ¶¶ 109–111 (analyzing redirect limitation in '978 claim 3) *with* Dkt. 739 at 18–21; Dkt. 700-127 at 35 (stating that claim 3 "require[s] networks with non-hierarchical … configurations of location servers that enable each server in the server network to ***know*** [emphasis in original] which location server contains the location(s) of the desired data," and representing redirect message limitation as an "example" that would show this).

[42] *See* Dkt. 687 at ¶¶ 51–54 (providing specific quoted examples from Dr. Goodrich's report).

[43] Dkt. 700-54 at ¶ 51.

[44] *See*, *e.g.*, *id*. at ¶ 111.

[45] *Id*. ("▉▉▉▉▉▉ are programmed to, upon receiving the request, check the metadata version in the request against the ▉▉▉▉▉ metadata version. If the metadata version in the request is lower (indicating that the ▉▉▉▉▉ does not have the requested information)….").

any analysis of the scope of ███ addressed by the "████████ metadata" or any analysis of the reliability of its contents, Dr. Goodrich fails to apply the minimum requirement for establishing "every group of two or more ████████████" as the accused plurality/network of location servers in a non-hierarchical configuration.

Overall, Dr. Goodrich never provides an opinion that an accused location server would know the contents of other location servers in a manner consistent with this Court's claim construction rulings. And this Court should exclude his opinions that S3's ████ and DDB's ████ constitute a "plurality of location servers," or a claimed system/network of location servers, as inconsistent with this Court's summary judgment decision or otherwise unreliable.

## III. THIS COURT SHOULD EXCLUDE DR. GOODRICH'S "HASH TABLE" DOE OPINION UNDER PROSECUTION HISTORY ESTOPPEL.

Prosecution history estoppel prevents a patentee from "recapturing through the doctrine of equivalents the subject matter that the applicant surrendered during prosecution."[46] Estoppel applies when the applicant made a narrowing claim amendment during prosecution as a condition to secure the patent.[47] Here, this law estops Kove and Dr. Goodrich from asserting a DOE theory for the asserted claims including a "hash table" limitation,[48] because Kove surrendered the scope of what it now calls an equivalent during prosecution.

In 2005-06, during the original prosecution, the Patent Office twice rejected pending '978 patent claims as anticipated by U.S. Patent No. 6,466,980 ("Lumelsky") and/or obvious over

---

[46] *Stopinc Aktiengesellschaft v. J.W. Hicks, Inc.*, 131 F. Supp. 3d 763, 770–71 (N.D. Ind. 2015) (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002)).

[47] *See Integrated Tech. Corp. v. Rudolph Techs., Inc.*, 734 F.3d 1352, 1356 (Fed. Cir. 2013) (citing *Festo Corp*, 535 U.S. at 736–37).

[48] I.e., '170 claim 2, '640 claim 18, and '978 claims 6, 17, 23, 24, and 30.

Lumelsky and U.S. Patent No. 6,578,068 ("Bowman-Amuah").[49] Following the second rejection, Kove revived several withdrawn claims, including application claim 10, which issued as claim 6 and originally contained the limitation: "the location information in the location server is maintained in an indexed location store."[50] In the revived version of application claim 10, however, Kove added "indexed by a hash table" at the end of the claim.[51] These amendments were intended to overcome the two prior art rejections. Indeed, Kove stated in the corresponding remarks that these amendments distinguished "each of the reintroduced claims, along with their respective dependent claims, … over Lumelsky."[52] And in the remarks accompanying earlier amendments, Kove distinguished Lumelsky by contending it teaches three separate components (but not a function) to interact with placement recommendations for data, including a "placement module," "replica directory service," and "server directory service."[53] According to Kove, Lumelsky thus "[did] not teach an indexing function operative to map each of the plurality of identifiers to a respective one of the plurality of index designation," as required by the claimed method.[54] The examiner then relied on this distinction in allowing the claims.[55]

Here, by asserting the DOE for this limitation, Kove is ignoring its narrowing amendments and argument to distinguish the prior art. Like Lumelsky, DDB doesn't use ███████████ to map each identifier to ████████████. DDB doesn't store a hash table comprised of location information in the form of an identifier. Instead, DDB relies ███████, like Lumelsky,

---

[49] Ex. 6 (08/22/05 Non-Final Office Action) at 2, 8; Ex. 7 (06/01/06 Final Office Action) at 2, 9.

[50] *See* Ex. 8 (2/22/06 Response to Non-Final Office Action) at 3 (withdrawn claim language).

[51] Ex. 9 (11/1/06 Response to Non-Final Office Action) at 3.

[52] *Id.* at 15

[53] Ex. 8 at 14–15.

[54] *Id.*

[55] Ex. 10 (Notice of Allowance) at 3.

. DDB first translates the unique ▮▮▮ into a ▮▮▮, before mapping the ▮▮▮ to ▮▮▮ applicable to multiple ▮▮▮, requiring another ▮▮▮ input to locate the requested item.[56] The method claimed in the asserted patents, on the other hand, requires a one-to-one hash table rather than the ▮▮▮ of DDB and Lumelsky.

The Federal Circuit holds that such a clear disclaimer invokes estoppel. For example, in *Pharma Tech Solutions, Inc. v. LifeScan, Inc.*, the court barred a patent owner from recapturing through the DOE any system that measured blood glucose level when, during prosecution, it had added limitations that required measurement and analysis of specific markers.[57] The court reasoned that because the patent owner had specifically stated that "the present invention compares analyte concentration readings at different times" to overcome prior art during prosecution, it had clearly disclaimed all methods that did not measure and compare analyte concentrates.[58] This case is no different. Kove disclaimed plurality arrays in favor of one-to-one hash tables and should thus be estopped from reclaiming hash tables through Dr. Goodrich's opinions. Because of that, Dr. Goodrich's opinion that DDB infringes the hash table limitation of claim 2 of the '170 patent, claim 18 of the '640 patent, and claims 6, 17, 23, 24, and 30 of the '978 patent under the DOE, as expressed in Exhibit E to his expert report, should be excluded.

## IV.  THIS COURT SHOULD EXCLUDE MR. BERGMAN'S "BARGAINING SPLIT CONCLUSION."[59]

In his damages report, Kove's expert Mr. Bergman claims that he employed the "income

---

[56] *See* Dkt. 687-68.

[57] 942 F.3d 1372, 1377 (Fed. Cir. 2019).

[58] *Id.* at 1382; *accord*, *e.g.*, *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1316–17 (Fed. Cir. 2010).

[59] Ex. 11 (Mr. Bergman's July 3, 2023 report) at ¶¶ 617–19.

approach" to determine that the patents' value to Amazon is $1.034B.[60] In the "Bargaining Split Conclusion" section of his report, Mr. Bergman further states that it's his "opinion that the parties to the hypothetical negotiation would agree that Kove would receive at least 50% of the incremental profits, and up to 100% of the benefits … attributable to the use of the patents-in-suit."[61] And he then applies bargaining splits of 50/50 and 0/100 (i.e., multiplies that value by 0.5 and 1.0 to determine Kove's damages) to conclude that the "damages due to Kove for [the alleged infringement] are $517 million to $1.034 billion."[62]

According to Mr. Bergman's report, he evaluated the following considerations to come to his bargaining splits of 50% and 100%:

> (1) the significant ecosystem benefits available to AWS,
>
> (2) the value of AWS's internal use as described in *Georgia Pacific* 6,
>
> (3) the benefits to speed, availability and durability not captured in the incremental benefit analysis,
>
> (4) the lack of non-infringing alternatives as described in Section XIV.A,
>
> (5) AWS's historical decision-making process regarding how much to invest in projects that impact its customers.[63]

But other than listing those considerations, Mr. Bergman doesn't explain how they result in a bargaining split of 50% or 100%. For instance, he doesn't explain why Amazon would've agreed to give Kove 100% of the profits attributable to the patents, as that eliminates any value in

---

[60] *E.g.*, *id*. at ¶ 618. The income approach to calculating a reasonable royalty "compare[s] the infringer's profits without infringement to the infringer's profits with infringement." *Ultratec, Inc. v. Sorenson Commc'ns, Inc.*, No. 13-cv-346, 2014 WL 5080411, at *4 (W.D. Wis. Oct. 9, 2014); *see also Apple, Inc. v. Samsung Elecs. Co*, No. 12-cv-630, 2014 WL 794328, at *3 (N.D. Cal. Feb. 25, 2014) ("Using the Income Approach, Dr. Chevalier separately looks at the subset of profits … due to [the patented] technology, less the return Samsung would have enjoyed had it used the next-best alternative to that technology. … '[P]rofits generated on products utilizing the patented technology that are in excess of the next best alternative represent an amount up to which the licensee should be willing to pay for access to the technology.'").

[61] Ex. 11 at ¶ 617.

[62] *Id*. at ¶ 619.

[63] *Id*. at ¶ 617.

licensing the patents—something no rational business would do. He also provided no basis to quantify how any particular consideration impacted his conclusion. And he provided no explanation of how these considerations led him to choose his bargaining splits of 50/50 and 0/100, rather than 40/60 and 20/80, or any other values. Indeed, Mr. Bergman testified that he didn't rely on any "formula" to arrive at his 50/50 split, but instead on a qualitative analysis of the *Georgia-Pacific* factors generally.[64] Mr. Bergman's methodology in multiplying the alleged value of the patents-in-suit by 50% and 100%, to conclude that damages are "$517 million to $1.034 billion," thus employs the "black box" approach that courts routinely find impermissible.

As the district court in *Lawrence v. Raymond Corp.* explained: "An expert is not a black box into which data is fed at one end and from which an answer emerges at the other."[65] Under *Daubert*, "the Court must be able to see the mechanisms" that the expert employed "in order to determine if they are reliable and helpful."[66] Courts thus routinely exclude expert opinions that, like Mr. Bergman's here, merely rely on a list of qualitative factors, without providing any quantifiable connection between those factors and the expert's conclusion. For instance, in *Exmark Manufacturing Co. Inc. v. Briggs & Stratton Power Products Group, LLC*, the Federal Circuit found that it was error not to exclude the opinion of an expert who "merely addressed the *Georgia-Pacific* factors in light of the facts and then plucked the 5% royalty rate out of nowhere" as it's

---

[64] Ex. 12 at 343:15–344:11–18 ("Q. And do you provide a formula as to why the number is at minimum 50 percent? A. I do not have a formula. I do have a formula in [footnote 1232] …. But I don't have a specific formula for the 50 percent. Q. [And] the 50 percent is based on [the] qualitative analysis that you conducted in the *Georgia-Pacific* analysis and throughout your report, right? A. It's based on those particular factors, yes."); *see also* Ex. 11 at 226, n.1232 (footnote Mr. Bergman referred to in testimony, stating that "[t]aking into account AWS's ecosystem benefit estimation of between ▋ and ▋ times, results in a profit split to Kove of between ▋ and ▋ (50% / ▋ and 50% / ▋).").

[65] No. 09-cv-1067, 2011 WL 3418324, at *7 (N.D. Ohio Aug 4, 2011); *accord GPNE Corp. v. Apple, Inc.*, No. 12-cv-2885, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014).

[66] *Lawrence*, 2011 WL 3418324, at *7.

"not enough" to "simply assert that a particular royalty rate is reasonable in light of the evidence without tying the proposed rate to that evidence."[67]

For this very reason, the Northern District of California in 2022 excluded Mr. Bergman's royalty-rate opinion in *Droplets v. Nordstrom*.[68] There, Mr. Bergman's report asserted that he had relied on the *Georgia-Pacific* factors and three additional considerations—namely, Nordstrom's typical return on investment (ROI), discounted lifetime net contribution per customer, and overall gross margin—to conclude that Droplets was entitled to 35% of the profit attributable to its patents.[69] Specifically, Mr. Bergman concluded that his "*Georgia-Pacific* analysis suggests a profit split to Droplets greater than 50%."[70] He then concluded that the parties would've agreed to a profit split between 20% and 50% in a hypothetical negotiation based on Nordstrom's typical ROI and gross margin information.[71] But the court found these opinions inadmissible on multiple grounds. As the court explained, Mr. Bergman's analysis of the *Georgia-Pacific* factors (and convoyed sales, in particular) failed to detail any reliable methodology for arriving at his starting point of "greater than 50%," and excluded it on that basis.[72] And the court further found his opinions inadmissible because the additional factors that he considered weren't related to the infringing

---

[67] 879 F.3d 1332, 1351 (Fed. Cir. 2018); *see also, e.g.*, *TASER Int'l, Inc. v. Karbon Arms, LLC*, No. 11-cv-426, 2013 WL 6773663, at *1 (D. Del. Dec. 19, 2013) (excluding opinion under *Daubert* and FRE 702 because expert "offer[ed] almost no basis as how he arrived at this royalty rate other than that he considered the above numbers and factors"); *Open Text S.A. v. Box, Inc.*, No. 13-cv-4910, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) (excluding opinion because expert's "method is a 'black box … and the jury cannot see how the pieces fit together or how the data drives the conclusion").

[68] No. 12-cv-3733, 2022 WL 2670163 (N.D. Cal. Jan. 12, 2022) (where Droplets was represented by the same attorneys as Kove is here).

[69] *Id*. at *1–2.

[70] *Id*. at *1.

[71] *Id*. at *1–2. Mr. Bergman concluded that the midpoint of that range (i.e., 35%) was the appropriate profit split. *Id*. at *2.

[72] *Id*. at *3.

features of the accused products, and he failed to explain "how [they] compel[led] a 35/65 profit split" between Droplets and the defendant.[73]

Here, too, he fails to explain why a 50% (much less 100%) bargaining split is appropriate and relies on unquantifiable, qualitative factors. While some courts have held that an expert may assume that the parties would split profits evenly "after considering the factors of the case,"[74] the Federal Circuit has specifically cautioned in *VirnetX, Inc. v. Cisco Systems, Inc.* that an expert may not assume a 50-50 split "without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand."[75] And Mr. Bergman fails to explain how any of the five factors he purports to consider result in at least an even split of profits, just as he failed to explain how historical data mandated a 35/65 bargaining split in *Droplets*.[76] His testimony would be unhelpful to the jury, and this Court should exclude it.[77]

## V. THIS COURT SHOULD EXCLUDE MR. BERGMAN'S OPINIONS BECAUSE HE FAILS TO APPORTION DAMAGES BETWEEN INFRINGING FEATURES AND NON-INFRINGING FEATURES.

As the Federal Circuit has explained, the patentee "must in every case give evidence tending to separate or apportion the patentee's damages between the patented feature and the unpatented features."[78] And that evidence "must be reliable and tangible, and not conjectural or speculative."[79] Indeed, a patentee can seek "only those damages that are attributable to the infringing

---

[73] *Id.* at *4–5.

[74] *Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharms. Inc., USA*, No. 07-cv-5855, 2011 WL 383861, at *13 (D.N.J. Feb. 3, 2011).

[75] *VirnetX, Inc.*, 767 F.3d at 1332.

[76] 2022 WL 2670163 at *4–5.

[77] *See, e.g.*, *GPNE*, 2014 WL 1494247, at *4.

[78] *Laser Dynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012).

[79] *Id.*

features of the product."[80] And where multi-component products are involved, as is the case here, damages awarded for patent infringement "must reflect the value attributable to the infringing features of the product, and no more."[81]

In his report, Mr. Bergman claims to have "directly or indirectly" apportioned damages between the alleged patented features and unpatented features of the accused products, for purposes of calculating a reasonable royalty using the "income approach" and *Georgia-Pacific* factor 15.[82] Mr. Bergman further claims that his analysis "only measure[d] the differences between the infringing Accused Products and a non-infringing system."[83] But, as detailed below, what Mr. Bergman defined as a non-infringing system failed to include numerous non-infringing components and features of the accused products. Mr. Bergman thus failed to properly apportion damages between alleged infringing and non-infringing features of S3 and DDB. And under *Daubert* and Federal Circuit precedent, this Court should exclude his opinions.

### A. OPINIONS ON S3 AND HASHING LIMITATIONS

For the hashing limitations in the claims Kove asserted against S3,[84] Mr. Bergman quantifies the incremental benefit—i.e., the difference between the allegedly infringing product and the best available non-infringing alternative for purposes of calculating a reasonable royalty using the income approach—as ▇▇▇▇▇▇.[85] According to Mr. Bergman, that figure is based on cost

---

[80] *VirnetX, Inc. v. Cisco Sys., Inc*, 767 F.3d 1308, 1326 (Fed. Cir. 2014).

[81] *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

[82] Ex. 11 at ¶ 597. *Georgia-Pacific* factor 15 contemplates "the amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement"). *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[83] Ex. 11 at ¶ 597.

[84] I.e., claims 1 and 2 of the '170 patent and claim 6 of the '978 patent.

[85] Ex. 11 at ¶¶ 304, 323, 591.

increases associated with the removal of S3's entire ███████.[86] In other words, his non-infringing alternative to S3 is a system that doesn't include the entire ███████.

But excising that entire component fails to properly apportion between infringing and non-infringing features. The hashing claims relate to hashing the location information in a location server.[87] But the ███████ does far more than just hashing. Indeed, hashing and caching are separate techniques. Hashing randomizes the location of data.[88] Caching is a storage technique that optimizes data access times by storing copies of frequently accessed data in faster portions of memory.[89] And at his deposition, Kove's CEO and co-inventor Dr. Overton affirmed that the patents aren't related to caching. He testified that "one very foundational component of our patents and of the technology is to eliminate caching."[90] Mr. Bergman doesn't explain why the hashing techniques claimed by the patents require the removal of a component that also primarily practices caching techniques known in the prior art.[91] To the extent the ███████ practices the patent, the hashing claims relate only to how requests are routed to the ███████, not what happens once those requests arrive.[92]

Specifically, Mr. Bergman fails to consider the other functionalities of the ███████ that

---

[86] *Id*. at ¶ 282.

[87] *See, e.g.*, Dkt. 687-3 ('978 patent) at claim 6.

[88] *See* Dkt. 700-59 at ¶ 57 ("Hash functions are designed to randomize the results from the object identifier so that the data is randomly distributed across the database.").

[89] *See id.* at ¶¶ 59–61.

[90] Dkt. 687-61 at 732:22–733:12.

[91] *See id.* ¶ 59 ("This technique was well known before the Asserted Patents. For instance, the Stanford Dash architecture detailed in a 1992 publication described using caching to optimize performance."); *see also Omega Pats., LLC v. CalAmp Corp.,* 13 F.4th 1361, 1377 (Fed. Cir. 2021) (damages opinion must "adequately and reliably apportion[ ] between the improved and conventional features of the accused [product]"). (quoting *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1348 (Fed. Cir. 2018)) (alterations in original).

[92] Dkt. 700-59 at ¶¶ 418–19, 426–27.

contribute to serving requests through caching, including replication of ███ (i.e., the alleged location information) across multiple ██████ and the mapping of requests to the appropriate ███.[93] Replication of █████ provides S3 with the ability "not to be overburdened with requests," since requests can be served by multiple ████.[94] And the mapping functionality points the requests to the ████ tasked with retrieving the ████ within their ██████, not to where data should be stored. In other words, rather than randomizing the distribution of data, the mapping functionality randomizes the distribution of requests.[95] Together, these non-infringing functionalities contribute most of the benefits to the ██████.[96]

Mr. Bergman's report doesn't explain why the minimal benefits attributable to hashing necessarily result in a damages figure that also includes many other benefits not attributable to hashing. Such a damages calculation isn't "based on the incremental value that the patented invention adds to the end product," as the Federal Circuit requires.[97] And it's not enough to merely point to any component that infringes as contributing to the total damages. Indeed, this district held in *Baxter International v. CareFusion Corp.* that "if the smallest salable unit—or smallest identifiable technical component—contains non-infringing features, additional apportionment is still required."[98] In that case, the court determined that even when the asserted patent was "fundamental" to the operation of the infringing product, a patentee must apportion out damages that can be

---

[93] *Id.* at ¶ 427.

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Ericsson*, 773 F.3d at 1226.

[98] No. 15-cv-9986, 2022 WL 952276, at *4 (N.D. Ill. Mar. 30, 2022) (citing *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1310-11 (Fed. Cir. 2018)); *but see Droplets, Inc. v. Yahoo! Inc.*, No. 12-cv-3733, 2021 WL 9038355 (N.D. Cal. Aug. 9, 2021) (holding no further apportionment necessary "where patented and unpatented components were analogous to a single functioning unit").

attributed to non-infringing features.[99] It wasn't enough for the patentee to identify the value of the smallest infringing component of the system (there, the "PC Unit"); it must go on to analyze how much value the patented features contribute to that component.[100] Thus, applying the teachings of *Baxter*, Mr. Bergman's ultimate figure should have accounted for the fact that most of the value he ascribes to the hashing claims results from non-infringing features since the non-infringing features (e.g. replication and request mapping) independently provide value to S3 and the ██ ██.

And this wasn't a case of Mr. Bergman finding those features irrelevant after consideration—he was unaware when he offered his opinions that the ██ had non-infringing features. For example, Mr. Bergman testified that he didn't know that ██ are involved in replication of ██.[101] He also conceded that he didn't know the subcomponents of the ████.[102] Despite that, he calculates the incremental benefits of the patents by removing access to the entire ██ ██. In doing so, he removes non-infringing functionalities, and without an understanding of what any one component is responsible for, and which component(s) supposedly infringe. His excision of the ███ doesn't properly apportion out the non-patented features, and his opinion that the hashing claims provide ████ in incremental benefit to S3 should thus be excluded for lacking a reliable basis.[103]

### B.   OPINIONS ON S3 AND SCALING LIMITATIONS

Mr. Bergman's opinions on the incremental value imparted by the "predetermined

---

[99] *Baxter Int'l*, 2022 WL 952276, at *4.

[100] *Id.*

[101] Ex. 12 at 190:18–20.

[102] *Id.* at 191:2–192:5.

[103] *See VirnetX, Inc.*, 767 F.3d at 1329 (excluding expert testimony that "failed to apportion value between the patented features and the vast number of non-patented features contained in the accused products.").

performance limit" limitations in the claims asserted against S3 are similarly unreliable.[104] For those claims, which he dubs the "scaling" claims, Mr. Bergman's non-infringing alternative to S3 is a product that doesn't include S3's entire index system (i.e., ██████████████).[105] And Mr. Bergman measures the incremental benefit of the patents by purporting to calculate the value of S3's ability to "seamlessly scale."[106] But his hypothetical non-infringing alternative eliminates the entire index system and would require users to manually partition their data.[107] Mr. Bergman thus performed his incremental benefit analysis under the incorrect assumption that S3's ability to scale derives solely from the patents.[108] It doesn't.[109] Just as with his opinions on the hashing claims, Mr. Bergman's analysis here overstates the scaling claims' value to S3.

For example, Mr. Bergman's understanding is that, without the asserted patents, S3's ████ can't scale at all.[110] But Kove's patents don't broadly cover the concept of scaling. Rather, the claims are limited to transferring location data in response to a "predetermined performance limit."[111] And as AWS documentation and Dr. Grama's report shows, S3 scales primarily through ██████████████████████████████████████████████████████, and not through the ██████████████████████.[112] So, Mr. Bergman fails to apportion the scalability

---

[104] I.e., '978 claims 17, 23, 24 and 30 (reciting limitations relating to transfer of location information if location server reaches a "predetermined performance limit").

[105] Ex. 11 at ¶¶ 325–327.

[106] *Id.* at ¶¶ 349–354.

[107] *Id.* at ¶ 327.

[108] *Id.* at ¶¶ 326–27; Ex. 12 at 208:16–209:5.

[109] *E.g.*, Dkt. 700-59 at ¶ 466 & n.609 (quoting S3 documentation: "[t]ypically we replicate ████ 5 times" and that's written onto "18 hosts simultaneously").

[110] Ex. 12 at 208:16–209:5.

[111] *See* Dkt. 700-59 at ¶¶ 99, 423–425, 466.

[112] *Id.* ¶ 466 & n. 609 (quoting S3 documentation).

benefits of the ▮▮▮ allegedly covered by the patented technology from other non-infringing features of S3 that also allow it to scale. This renders Mr. Bergman's opinion unreliable.[113]

Moreover, as the Court held in its summary judgment order, Kove has admitted that ▮▮▮ do not employ a 'non-hierarchical' configuration," and thus cannot be the location servers covered by these claims.[114] And ▮▮▮ can't infringe the claims if they aren't location servers.[115] Thus, even if Mr. Bergman's analysis properly apportioned the value of scalability, his opinions in paragraphs 326–72 and any calculations (e.g., in paragraph 374) related to damages for infringement of '978 patent claims 17, 23, 24, and 30 by the ▮▮▮ should be excluded as contrary to this Court's summary judgment decision.

## C.  OPINIONS ON DDB AND SCALING AND HASHING LIMITATIONS

Mr. Bergman also fails to properly apportion the incremental benefits derived from the asserted claims in his analysis of DDB.[116] As with S3, Mr. Bergman's opinion is that the non-infringing alternative to DDB is a product that removes the entire index system—DDB's ▮▮▮—and that system would require users to partition their own data.[117] But the asserted claims' scope is again narrower than his opinion suggests.

As noted, the relevant claims require transferring data in response to "a predetermined performance limit."[118] In DDB's architecture, that would mean using that predetermined limit to

---

[113] *See Dynetix Design Sols., Inc. v. Synopsys, Inc.*, 2013 WL 4538210, at *3 (N.D. Cal. Aug. 22, 2013) (excluding expert who "relied on the blanket assumption that, once he selected the smallest salable unit … he could end the analysis").

[114] Dkt. 739 at 25, n.4.

[115] *E.g.*, claim 17 (requiring method to be practiced on a "plurality of location servers").

[116] I.e. '978 claims 17, 23, 24 and 30. While Mr. Bergman also analyzes the value of the hashing claims analyzed above, he concludes that the total damages are equivalent to the value of these scaling claims, on the basis that infringement of either set of claims requires removal of DDB's ▮▮▮. *See* Ex. 11 at ¶ 428.

[117] *E.g.*, *id.*

[118] Dkt. 700-59 at ¶¶ 99, 254, 423–25.

transfer the alleged location data from one ██ to another. But assuming the ██ meet this limitation, 99% of requests in DDB never reach the ██—instead, the ████████ serves them. Indeed, as Mr. Bergman states, "DynamoDB serves the vast majority of requests (over 99%) from a ████████ stored on each request router, without needing to consult the ████ ██."[119] And Dr. Grama explained that the 99% of requests served from the caches don't involve auto-partitioning—i.e., they don't transfer data according to a predetermined limit as the claims require.[120] And thus, the benefit of auto-partitioning to DDB is no more than 1% of the load balancing and scalability benefits.[121] In other words, this alone should reduce his damages calculation for DDB from ████████ to ████████.

And similar to S3, DDB uses non-patented features to provide scalability, including ████ ████████.[122] Mr. Bergman cites no evidence tying those features to the asserted claims and instead takes the entire value of scalability instead of limiting his analysis to the alleged accused functionality of the MNs (i.e., transferring the alleged location information in response to a "pre-determined limit"). Thus, Mr. Bergman fails to apportion any of the non-patented elements of DDB allowing it to scale, and his opinion should be excluded.[123]

Accordingly, this Court should preclude Mr. Bergman from providing testimony based on his opinions that (1) rely on an impermissible "black box" approach to determine that Kove would be entitled 50% or 100% of the incremental profits attributable to the patents-in-suit, and (2) fail to properly apportion the value of infringing and non-infringing features.

---

[119] Ex. 11 at ¶ 376.

[120] Dkt. 700-59 at ¶ 480.

[121] *Id.*

[122] *Id.*

[123] *See VirnetX, Inc.*, 767 F.3d at 1329; *Ericsson*, 773 F.3d at 1226.

Dated: February 16, 2024      Respectfully Submitted,

             */s/ R. William Sigler*
             Alan M. Fisch
             *alan.fisch@fischllp.com*
             R. William Sigler
             *bill.sigler@fischllp.com*
             Jeffrey M. Saltman (*pro hac vice*)
             *jeffrey.saltman@fischllp.com*
             Lisa Phillips (*pro hac vice*)
             *lisa.phillips@fischllp.com*
             FISCH SIGLER LLP
             5301 Wisconsin Avenue NW, Suite 400
             Washington, D.C. 20015
             Telephone: (202) 362-3500

             Ken K. Fung (*pro hac vice*)
             *ken.fung@fischllp.com*
             FISCH SIGLER LLP
             400 Concar Drive
             San Mateo, CA 94402
             Telephone: (202) 362-3500

             *Attorneys for Amazon Web Services, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 16, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Northern District of Illinois, via the CM/ECF system, and thereby served a copy on all counsel of record.

*/s/ R. William Sigler*
R. William Sigler
