# Exhibit 12

Page 1

IN THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DISTRICT DIVISION

_____

KOVE IO, INC.,                          )
       Plaintiff,                       )
                                        )    Civil Action No.
   -against-                           )    1:18-cv-08175
AMAZON WEB SERVICES, INC.,              )
       Defendant.                       )
_____)

\*\*\* HIGHLY CONFIDENTIAL TRANSCRIPT \*\*\*

VIDEO-RECORDED REMOTE DEPOSITION OF

JAMES W. BERGMAN

Zoom Recorded Videoconference

09/19/2023

10:59 a.m. (EDT)

REPORTED BY: AMANDA GORRONO, CLR

CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 6

1          AUTOMATED MESSAGE:  Recording in
2     progress.
3          THE TECH:  All right.  This is the
4     beginning of the videotaped deposition of Jim
5     Bergman in the matter of Kove IO versus
6     Amazon Web Services.
7          Today's date is September 19, 2023,
8     and the time is 10:59 a.m. Eastern.
9          Counsel, please introduce yourselves
10    after which our court reporter will swear in
11    the witness.
12         MR. SALTMAN:  Jeff Saltman from
13    Fisch Sigler LLP on behalf of the defendant,
14    Amazon Web Services.  And with me is Paul
15    Choi, also from Fisch Sigler.
16         MR. ADLER:  This is Adam Adler from
17    Reichman Jorgensen Lehman Feldberg on behalf
18    of Kove and the witness.
19 JAMES W. BERGMAN, called as a witness, having
20 been first duly sworn by a Notary Public of the
21 State of New York, was examined and testified as
22 follows:

Page 7

 1                THE WITNESS:  I do.
 2     EXAMINATION
 3     BY MR. SALTMAN:
 4          Q.    Good morning, Mr. Bergman.
 5          A.    Good morning, Mr. Saltman.
 6          Q.    Could you please state your full
 7     name for the record?
 8          A.    Yes, it's James Wayne Bergman.
 9          Q.    And, Mr. Bergman, what is your work
10     address?
11          A.    3525 Highland Avenue, Suite 110,
12     Costa Mesa, California 92626.
13          Q.    And we're doing this deposition
14     remotely.  Mr. Bergman, is anyone there in the
15     room with you?
16          A.    There's not.
17          Q.    Okay.  And aside from the Zoom and
18     the exhibit share, do you have any other programs
19     on your computer?
20          A.    I do not.
21          Q.    Aside from the copies of your
22     opening report, your supplemental report and your

Page 189

1     A.     Say that one more time, please.

2     Q.     Sure.

3     The low end of your damages figure

4 is approximately ███████ less than the

5 operating profit that DynamoDB earned during the

6 damages period, right?

7     A.     Mathematically, that is right. I

8 don't think that's a fair comparison of those two

9 numbers but mathematically, yes.

10     Q.     And then on the high end, your

11 damages figure is approximately ███████ more

12 than the operating profit that DynamoDB earned

13 during the damages period, right?

14     A.     During the period in which they were

15 using and benefiting from the patented

16 technology, yes. Mathematically, that's right.

17     Q.     All right. Turning to Page 104.

18     A.     Okay.

19     Q.     And in Paragraph 248, you said,

20 "Using hash functions to distribute" --

21     MR. SALTMAN: Sorry, strike that.

22 BY MR. SALTMAN:

Page 190

1       Q. In Paragraph 248 in the second

2 sentence, it says, "Using hash functions to

3 distribute ▮▮▮▮▮▮▮▮▮▮ is beneficial

4 because it allows for the even distribution of

5 ▮▮▮▮▮▮▮▮▮▮ while...ensuring that requests

6 for a given ▮ are consistently routed to the

7 same ▮."

8       Do you see that?

9       A. I do.

10       Q. What -- you don't -- you don't have

11 a citation for that -- for that proposition,

12 right?

13       A. I do not.

14       Q. Okay. And what -- what is the basis

15 for that statement?

16       A. That's going to be based on my

17 discussions with Dr. Goodrich.

18       Q. Do you know whether ▮▮▮ are ever

19 replicated on multiple ▮?

20       A. I do not.

21       Q. Do you know --

22       MR. SALTMAN: Strike that.

Page 191

1     BY MR. SALTMAN:

2          Q.    Do you know what the various

3     components of the ▇▇▇▇▇▇ are?

4                MR. ADLER:  Objection; form.  Vague.

5          A.    What do you mean when you say

6     "component"?

7     BY MR. SALTMAN:

8          Q.    Sure.

9                Does the ▇▇▇▇▇▇ include any other

10    components aside from just a server, for example?

11               MR. ADLER:  Same objection.

12         A.    That didn't help me.  Are you

13    talking like physical components?  Software

14    components?

15    BY MR. SALTMAN:

16         Q.    Let's start with software.  Let's do

17    software.

18               Does the ▇▇▇▇▇▇ include multiple

19    software components?

20               MR. ADLER:  Objection to form.

21    Vague.

22         A.    I don't -- I don't know all the

Page 192

1    components that are in the ▮▮▮▮▮. My
2    understanding is that even if it didn't have the
3    ▮▮▮, it would still use the ▮▮ for routing
4    functionality to route requests to a ▮▮▮
5    ▮▮▮▮▮. But other than that, I don't know.
6    BY MR. SALTMAN:
7         Q.   We talked earlier that your
8    understanding is that S3 uses ▮▮▮▮▮▮▮▮ to
9    identify the correct ▮▮ to serve the ▮▮▮,
10   right?
11        A.   Could you repeat that one more time?
12        Q.   Sure.
13             Your understanding is that S3 uses
14   ▮▮▮▮▮▮▮ to identify the correct ▮▮▮▮▮▮▮
15   to retrieve the ▮▮▮, correct?
16             MR. ADLER:   Objection to form.
17      Vague.
18        A.   I think what we talked about before
19   is when we were talking about the patents using
20   hash functions to distribute location information
21   across a group of location servers as well as to
22   efficiently locate and retrieve location

Page 193

1    information in a system.
2    BY MR. SALTMAN:
3         Q.   Aside from using that hash function,
4    what other functionality does the ▇▇▇▇ do?
5         A.   ▇▇▇▇▇▇ --
6              MR. ADLER:  Objection to the extent
7      it calls for a technical conclusion.
8         A.   I want to make sure I understand.
9              ▇▇▇▇▇▇▇ or the ▇ itself?
10   BY MR. SALTMAN:
11        Q.   ▇▇▇▇▇▇.
12        A.   I don't know.  That's outside the
13   scope of my expertise.
14        Q.   Do you know whether --
15             MR. SALTMAN:  Strike that.
16   BY MR. SALTMAN:
17        Q.   Your opinion is focusing on the use
18   of ▇▇▇▇▇▇ to identify the correct ▇,
19   correct?
20        A.   My opinion is focusing on what the
21   impact to AWS would be from lack of having access
22   to the patents-in-suit.

```
 1    BY MR. SALTMAN:
 2         Q.    Where would the partitioning that
 3    the user would have to do, where would that data
 4    be located?
 5               MR. ADLER:  Objection to form.
 6      Vague.
 7         A.    I mean, it would -- under -- under
 8    this hypothetical, it would still be located in
 9    AWS and stored at AWS with -- as it's storing
10    objects now.
11    BY MR. SALTMAN:
12         Q.    Sorry.  Let me be more specific.
13               Within S3, where would the data that
14    a user would have to partition be located?
15               MR. ADLER:  Objection to form.
16      Vague.  Confusing.
17         A.    If you're talking about the actual
18    objects themselves that are being stored and not
19    the location information -- is that what you're
20    referring to?
21    BY MR. SALTMAN:
22         Q.    I'm just trying to figure out what
```

Page 208

1   data would need to be partitioned by the user,
2   because it seems to me when I read this and
3   knowing what I know about the patents, they
4   relate to location information which in -- under
5   -- under your analysis is the ██████.
6           So what I'm trying to figure out
7   is -- I was trying to figure out -- it says the
8   ████████████████, and I was trying to say that
9   the ██████ where what being partitioned.  You
10  didn't like that.  So I'm trying to figure out
11  what's being partitioned here.
12          So where -- let me just ask again so
13  we have a clear record and then you can hopefully
14  try to answer with a better understanding of what
15  I'm trying to get at.
16          Where would the data be located that
17  users would have to partition if AWS didn't have
18  access to the scaling claims of the asserted
19  patents?
20          MR. ADLER:  Objection to form.
21  Vague.  Confusing.
22      A.   So I don't know where the data would

Page 209

1    actually have to be located.  And I guess, maybe

2    I can help by saying what I understand is without

3    access to the patents, because the ▮▮▮▮▮▮

4    cannot scale, customers would have to manage

5    their own data.  They would have to manage the

6    location information themselves about where their

7    data actually resides.

8           So right now, this is being

9    performed seamlessly behind the scenes.  That

10    provides seamless scalability and that without

11    access to the patents, that burden would be

12    placed on the customer, where the customer would

13    have to say I am keeping track, I know where my

14    data is, and I'm going to have my datas located

15    here and I have to keep track all that.

16           That's what I'm trying to

17    distinguish is the partitioning relates to

18    knowing where your data is.  That burden is

19    placed on the user.

20    BY MR. SALTMAN:

21         Q.   Okay.  So would the user have to

22    partition the -- their underlying data, or is it

1    they have to keep track of the location of the
2    data in the -- in this scenario?
3         A.    I'm not sure I understand the
4    distinction.
5         Q.    Sure. Sure. Let me -- let me
6    clarify.
7         So you refer to users having to
8    partition their own data across the ▮▮▮▮▮▮
9    ▮▮▮▮ here. Is that the user would have to
10   partition their actual object data, or is it they
11   would have to partition the location information
12   data?
13        MR. ADLER: Objection to form.
14       Vague. Confusing. Further objection to the
15       extent it requires or calls for a technical
16       opinion.
17        A.    So my understanding is that it's
18   not -- that it's partitioning their data so it's
19   partitioning their -- not the ▮▮▮▮ but their
20   actual data.
21   BY MR. SALTMAN:
22        Q.    Okay. And if we go back -- sorry.

Page 342

1    A.    Yes.

2    Q.    Does AWS ignore profits when

3 deciding whether to pursue a project?

4      MR. ADLER: Objection to form.

5    A.    I don't believe they ignore profit.

6 BY MR. SALTMAN:

7    Q.    Does AWS look at the long-term

8 profitability of a project?

9    A.    I would think that they do, yeah.

10    Q.    And are you aware of any AWS

11 agreements in which they've given up the majority

12 of profits associated with a service or project?

13    A.    I mean, I describe in Paragraph 614

14 ████████████████████████, ████████████████████████

15 ████████████████████████████████████████

16 ████████████████.

17      As for agreements themselves, I

18 haven't seen anything in agreements but I

19 wouldn't expect to see something like that in an

20 agreement. It wouldn't make sense to put

21 something like that into an agreement. An

22 agreement is going to tell you how much we're

1    paying for something.  It's not going to tell you

2    how we came up for how much we are going to pay

3    for something.

4        Q.   All right.  And then in Paragraph 16

5    [sic], that's where you reach your conclusion

6    that the parties would agree that Kove would

7    receive at least 50 percent of the incremental

8    profits and up to 100 percent?

9            MR. ADLER:  Was that 16?

10          MR. SALTMAN:  617.

11          MR. ADLER:  617.  Okay.

12          MR. SALTMAN:  Sorry.  Let me

13     rephrase so it's clear.

14   BY MR. SALTMAN:

15        Q.   And then in Paragraph 617, this is

16    where you reached the conclusion that Kove would

17    receive at least 50 percent of the incremental

18    profits and up to 100 percent of the incremental

19    profits, right?

20        A.   Of those calculated incremental

21    profits, yes.

22        Q.   Yeah.  And the basis for that, are

Page 344

```
 1    the numbers 1 through 5 earlier in that

 2    paragraph, right?

 3         A.    Yes.

 4         Q.    And do you provide a formula as to

 5    why the number is at minimum 50 percent?

 6         A.    I do not have a formula.  I do have

 7    a formula in paragraph -- sorry -- Footnote 12 --

 8    1232 that shows what this split would look like

 9    taking into account the sort of downstream

10    impacts that we talked about.  But I don't have a

11    specific formula for the 50 percent.

12         Q.    Okay.  And that's based -- the

13    50 percent is based on the -- the qualitative

14    analysis that you conducted in the

15    Georgia-Pacific analysis and throughout your

16    report, right?

17         A.    It's based on those particular

18    factors, yes.

19               MR. SALTMAN:  Okay.  All right.  I

20       have no further questions at this time and I

21       pass the witness.

22               MR. ADLER:  Great.  Can we go off
```

Page 345

1     the record and take a quick break.

2           MR. SALTMAN: Sure.

3           THE TECH: All right. The time is

4     7:05 p.m. We're off the record.

5           AUTOMATED MESSAGE: Recording

6     stopped.

7           (Recess taken.)

8           AUTOMATED MESSAGE: Recording in

9     progress.

10          THE TECH: All right. The time is

11     7:15 p.m. We are back on the record.

12    EXAMINATION

13    BY MR. ADLER:

14       Q. Good afternoon, Mr. Bergman.

15       A. Good afternoon.

16       Q. I've got a few questions for you

17    about some of the topics that were covered in the

18    main body of today's deposition.

19          One of the -- the issues that you

20    discussed towards the beginning of the deposition

21    was the Econnectix liquidation.

22          Do you recall that?

Page 391

1　　CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2　　　　　　I, Amanda Gorrono, the officer

3　　before whom the foregoing deposition was

4　　taken, do hereby certify that the foregoing

　　　transcript is a true and correct record of

5　　the testimony given; that said testimony was

　　　taken by me stenographically and thereafter

6　　reduced to typewriting under my direction;

7　　and that I am neither counsel for, related

　　　to, nor employed by any of the parties to

8　　this case and have no interest, financial or

9　　otherwise, in its outcome.

10　　　　　　IN WITNESS WHEREOF, I have hereunto

11　　set my hand this 19th day of September, 2023.

12

13

14

15

16　　AMANDA GORRONO, CLR

17　　CLR NO: 052005 - 01

18　　Notary Public in and for

19　　The State of New York

20　　County of Suffolk

21　　My Commission No. 01G06041701

22　　Expires: 01/07/2027