# Exhibit OO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

_____

                          )

KOVE IO, INC.,            )

                          )

        Plaintiff,        )

                          )

     v.                  )  No. 1:18-cv-08175

                          )

AMAZON WEB SERVICES, INC., )

                          )

        Defendant.        )

_____)

** HIGHLY CONFIDENTIAL **

The videotaped deposition of

MELISSA BENNIS, taken at One South Wacker Drive,

Chicago, Illinois, before Janice M. Kocek, CSR,

CLR, commencing at the hour of 9:02 a.m. on

Friday, September 1st, 2023.

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

1  negotiation.

2          Do you see that?

3     A.    I do.

4     Q.    Does that mean that th ▮▮▮▮▮▮▮▮)

5  is economically and technically comparable in your

6  opinion?

7          Let me ask that question better.

8          Does that mean that th ▮▮▮▮▮▮▮)

9  is economically and technically comparable to the

10  license that would be arrived at in the

11  hypothetical negotiation?

12     A.    So, for instance, at page 110 I

13  describe that the hypothetical negotiators would

14  consider that the ▮▮▮▮▮▮▮) and the

15  hypothetical negotiation include patents that are

16  very similar in both technology and application.

17          And then I go to discuss the various

18  patents.

19     Q.    I see that.  And this is one of those

20  yes-or-no question situations.

21          Is it your opinion that the ▮▮)

▮▮)  ▮▮▮▮▮) is economically and technically

Page 91

1    comparable to the license to be considered at the

2    hypothetical negotiation?

3        A.    I mean, like I was actively describing,

4    I think that, again, it's my understanding that

5    these patents are considered to be technically

6    comparable.

7            I think this agreement is a purchase

8    agreement for patents that are deemed to be

9    technically comparable.  So there are differences

10   in, for instance, a purchase agreement as opposed

11   to a license agreement.  But, like I mentioned, I

12   understand that the hypothetical negotiators would

13   consider the agreement highly relevant.

14       Q.    That's not quite an answer to my

15   question.  I didn't ask whether some of the

16   licenses in the agreement are technically

17   comparable.

18           I asked -- and we can take them one at

19   a time -- is it your opinion that the ██

20   ████████  is technically comparable to the

21   agreement that would be arrived at at the

22   hypothetical negotiation?

Page 96

1    detail patents beyond these two.

2              The focus was on these two given that

3    they were identified by Dr. Grama as being very

4    similar to the patents-in-suit.  So that alone --

5    if -- if Amazon is purchasing patents amongst

6    others, whether it's amongst others or not that

7    are comparable or not, but there's patents that

8    were being purchased that are being understood to

9    be comparable, that is relevant.

10        Q.    Right.  So -- and I'm not quibbling

11   with anything.

12              I just -- my question is -- and -- my

13   question is and we want to know, whether when you

14   testify at trial you are going to testify that

15   this license -- sorry, that when you testify at

16   trial whether you are going to testify that this

17   agreement is technically comparable.

18        A.    I think what's described in my report

19   is the patents are understood to be technically

20   comparable, which makes the license that contains

21   them relevant.

22              There's no two -- I think your --

Page 101

1  this license, knowing what I know about it, and

2  the comparability of the patents that are included

3  would be relevant to the -- to the hypothetical

4  negotiators.

5       Q.  That's not -- my question is:  Is it

6  technically comparable, and is it a yes, or is it

7  a no, or is it I can't answer yes or no?

8       A.  Perhaps it's that I can't answer yes or

9  no because you're trying to force a license to be

10  comparable when I'm thinking of a patent and being

11  comparable.

12       Q.  Okay.

13       A.  Okay.  So if you're talking about is a

14  license -- how about this.

15         Can you help me understand what you

16  mean by a license being comparable?

17       Q.  I think -- I think you just clarified

18  it but I want to say it back to make sure I got it

19  right.

20         In your analysis, you considered

21  whether any of the patents in these agreements

22  would be technically comparable, correct?

Page 102

1     A.   Yes.

2     Q.   And you did not consider whether the

3  license as a whole would be technically

4  comparable, correct?

5     A.   So what distinction are you making?  I

6  don't understand.

7         What terms -- what terms of a license

8  are you calling technical?

9     Q.   I'm -- I'm referring to the overall

10  package of the -- of the technology included in a

11  license.

12         But I take your position to be, and let

13  me know if this is wrong, that so long as there is

14  one patent in a license agreement or a purchase

15  agreement that is technically comparable, then the

16  agreement itself is you would say relevant.

17     A.   Relevant.

18     Q.   But you would not say comparable?

19         And -- and -- and the reason why you

20  wouldn't say comparable is because in your view

21  the term "comparable" does not make sense when

22  applied to an agreement as a whole and only makes

1    them, who is selling the patents.  So they would

2    have had to have been comfortable with the market

3    value that they were receiving for the patents.

4    So it's still a marker despite the ultimate use

5    for the value of those patents.  I just don't

6    think you can ignore that.

7         Q.    Another agreement that you consider is

8    th ███████████████████, correct?

9         A.    Yes.

10        Q.    And you begin your discussion of

11   ███████████████ on page 111.

12           Do you see that?

13        A.    I do.

14        Q.    In the context of Georgia-Pacific

15   factor 2, you evaluated whether the ████████

███    ███████████ was comparable to the agreement that

17   would be reached at the hypothetical negotiation,

18   correct?

19        A.    If it would be relevant, yes.

20        Q.    Did you not evaluate whether the

21   agreement would be comparable?

22        A.    So I sense we're going to go through

1    the same exercise that we did for th ███

██   ████████     And that is that I have the

3    understanding that the patents that are contained

4    within the agreement are considered technically

5    comparable and, as such, it made the agreement

6    relevant.

7         Q.    Did you consider or analyze whether the

8    ████████████████  was comparable to the

9    agreement that would be reached at the

10   hypothetical negotiation?

11        A.    And to add onto the points that I made

12   with respect to the patents, I understand that

13   this was a license that Amazon took with respect

14   to rights to practice the patents in a

15   nonexclusive manner.  So I do have the

16   understanding that they would have been relevant

17   or comparable in those regards.

18        Q.    This isn't -- this isn't is a trick

19   question but I feel like you haven't answered it.

20             Did you consider or analyze whether the

21   ████████████████  was comparable to the

22   agreement that would be reached at the

Page 146

1    hypothetical negotiation?

2       A.    And I have the same answer.

3       Q.    Is that a yes?

4       A.    The answer I provided was that I

5    understand that the patents that are contained

6    within th ███████████ are understood to be

7    technically comparable to the patents-in-suit.

8    Amazon was a party to that agreement, just like it

9    would be to the hypothetical agreement.  In this

10   case it's a nonexclusive license.

11      Q.    Are you refusing to answer my question

12   with a yes or no?

13      A.    No, I don't feel like that.

14      Q.    Will you answer my question with a yes

15   or no?

16      A.    Well, I'm not sure it's a yes-or-no

17   question.

18      Q.    The question is:  Did you consider or

19   analyze whether the ████████████████ was

20   comparable to the agreement that would be reached

21   at the hypothetical negotiation?

22      A.    Right.

1   comparable?

2        A.    And, again, I think -- I think of --

3   and perhaps it's just how you and are thinking

4   about these things.  But I think of patents as

5   comparable.  They're -- they're -- they teach

6   technology, for example.

7             There can be agreements that have

8   comparable terms but they're never going to be

9   identical by definition.  So because of those

10  differences -- it's not the same licensor, for

11  example -- they're relevant.

12       Q.    So --

13       A.    So it's -- it's -- the elements that

14  are helpful are helpful because they're

15  comparable.  But I'm just saying like the license

16  as a whole isn't -- I just don't want to suggest

17  it's a comparable/identical license.  There are

18  differences.  But it's still informative.

19       Q.    So in your opinion, unless -- if two

20  licenses -- unless they're identical, you would

21  say two license agreements can't be comparable

22  with one another?

Page 149

1              MR. SALTMAN:  Objection.

2         Mischaracterizes testimony.

3              THE WITNESS:  Yeah.  I think like we're

4         just playing word games.

5                   I think that these licenses are in

6         fact helpful and they would be informative to

7         the hypothetical negotiators and that's the

8         end of it.

9    BY MR. ADLER:

10        Q.    It's not -- it's not a secret.

11             The law -- the law in my understanding

12   states that you can only consider comparable

13   licenses at the hypothetical negotiation.

14             And so I'm asking -- now, my

15   understanding of the law can be incorrect and

16   you're not a legal expert.

17             But what I'm asking is:  Did you

18   consider whether the license, whether the

19   ███████████████████, was comparable?

20        A.    And like I've tried to describe, my

21   understanding is that the patents that are

22   contained within the ██████████████ are

1   comparable.  So if under the law that suggests

2   that the license is comparable, that's great.

3                But I'm just saying I'm not trying to

4   provide a legal interpretation here.  I am trying

5   to suggest that I think this license would be a

6   relevant data point to the hypothetical

7   negotiation.  It's a Georgia-Pacific factor to

8   consider the rates paid by the licensee, in this

9   case Amazon, for the use of other patents

10  comparable to the patents-in-suit.  So that's the

11  lens within which these agreements are -- are

12  analyzed.

13               So are they relevant?  Yes, they are.

14  Why?  Because they cover comparable patents --

15       Q.    Okay.  So --

16       A.    -- in part.  They also have -- so --

17  and as such, their economic terms are also

18  relevant.

19       Q.    Okay.  And so I think this will make it

20  easier -- because we've got, you know, eight,

21  something more of these things to go through -- to

22  understand what you mean when you're saying these

Page 154

1　　　Q.　　The commercial terms, the economic

2　terms, of those licenses are very different,

3　right?

4　　　A.　　Yes.

5　　　Q.　　And yet you consider both of them,

6　right?

7　　　A.　　Yes.

8　　　Q.　　Even though those terms are different

9　from each other, vastly, and even though both of

10　those licenses have differences between themselves

11　and what would be considered at the hypothetical

12　negotiation, right?

13　　　A.　　Yes.

14　　　Q.　　And you account for those differences

15　in -- in your assessment and your evaluation and

16　your application of how those would impact the

17　hypothetical negotiation, right?

18　　　A.　　Yes.

19　　　Q.　　But your opinion is both are still

20　worthy of consideration, notwithstanding the

21　potentially vast economic differences between

22　those licenses and the licenses that would be

Page 155

1    considered at the hypothetical negotiation?

2          A.     Right.

3          Q.     And you would just -- for the aspects

4    of them that have an economic difference, you

5    would discount the weight that you would assign to

6    that license or you would discount the terms of

7    that license.

8                 You would account for that somehow,

9    right?

10         A.     What was the last part?

11         Q.     You would account for the differences

12   between a license that you would consider as

13   comparable -- technically comparable, excuse me,

14   and the license that would be considered at the

15   hypothetical negotiation?

16                Let me try again.

17                You would assign more weight to a

18   license that has more similarities to the license

19   that would be considered at the hypothetical

20   negotiation and less weight to one that would have

21   fewer similarities, right?

22         A.     Generally speaking, overall with all

Page 164

1       A.     I can't speak to that.

2       Q.     Why not?

3       A.     I -- I -- I'm not privy to Amazon's

4    litigation spending.  I'm just aware, in general,

5    that litigation can be expensive.

6       Q.     Do you have any familiarity with --

7    familiarity with how much patent litigation costs?

8       A.     I just have a general awareness that it

9    can be very expensive.

10      Q.     Did you consider the amount of money

11   that Amazon would need to spend to defend the

12   ████████   litigation?

13      A.     Not specifically.

14      Q.     How many patent cases have you served

15   as a testifying expert in?

16      A.     I'm not sure exactly.  A large number.

17      Q.     And in how many of those patent cases

18   that you've served as an expert -- scratch that.

19             And when you serve as an expert and you

20   go through trial and offer your expert opinion,

21   you would agree that you typically charge hundreds

22   of thousands of dollars from start to finish of

Page 165

1    your engagement, right?

2        A.    I mean, it can vary widely.

3        Q.    Can you recall any instances where you

4    have testified at trial where the total amount

5    billed in connection with your work and your

6    team's work on the matter has been less than

7    $100,000?

8        A.    I don't know either way.

9        Q.    Can you recall any cases where you've

10   testified all the way through trial where the

11   total amount billed by you and your team has been

12   greater than $100,000?

13       A.    Yes.

14       Q.    Have you billed more than $100,000 in

15   this case?

16       A.    I believe so.

17       Q.    Parties to a settlement frequently take

18   into account litigation risks when settling,

19   right?

20       A.    Yes.

21       Q.    What was the stage of litigation being

22   settled in the ████████ case?

Page 166

1        A.      I'm not sure.

2        Q.      What discovery has been completed?

3        A.      I'm not sure.

4        Q.      Had any discovery been completed?

5        A.      I was not involved in that case so I
6    don't know.

7        Q.      Do you know if there has been extensive
8    damages discovery?

9        A.      I don't know.

10       Q.      Do you know whether the parties had
11   gone through claim construction?

12       A.      I don't.

13       Q.      Do you know if the parties had gone
14   through dispositive motions?

15       A.      I don't.

16       Q.      Do you know if the parties have engaged
17   in any expert discovery?

18       A.      Like I mentioned, I was not involved in
19   that case so I'm not privy to the details.

20       Q.      Information regarding the stage of the
21   case is publicly available, right?

22       A.      I could imagine through maybe docketing

Page 167

1   activity.

2      MR. ADLER:   I'm going to mark this as

3     Exhibit 3.

4       (Bergman Deposition Exhibit 3

5       was marked for identification.)

6   BY MR. ADLER:

7     Q.   I have marked as Exhibit 3 the docket

8   in th █████████ case.

9       Do you see that in front of you?

10     A.   I do.

11     Q.   Did you review the docket sheet when

12   analyzing the comparability of the settlement

13   agreement?

14     A.   I did not.

15     Q.   Did you review the docket sheet when

16   analyzing the relevance of the ████████)

  ██    ██████████?

18     A.   The relevance? So, for example, I

19   think, as we were talking about, the ████████)

20   terms are relevant given that they involve patents

21   that are deemed to be technically comparable to

22   the patents-in-suit.

Page 178

1    existence of implementable noninfringing

2    substitutes or alternatives, for example.

3         Q.    You don't offer any opinions in your

4    report regarding how the duration of th ████████

█    ████████ would impact or weigh in comparison to the

6    duration of the license that would be involved in

7    the hypothetical negotiation, right?

8         A.    I think we covered the fact that I

9    don't mention the duration of th ████████

█    ████████ within my report.  I do talk about the

11   duration of the hypothetical license within factor

12   3 of the Georgia-Pacific analysis.

13        Q.    Dr. Grama doesn't offer an opinion that

14   AWS, or Amazon, is practicing the ████████

15   patents, correct?

16        A.    Can you say that one more time, please?

17        Q.    Dr. Grama didn't offer an opinion as to

18   whether Amazon was practicing the ████████

19   patents, correct?

20        A.    That's not something I noted one way or

21   the other in my report.

22        Q.    On page 114 of your report you state

1      Q.      And so if I were to ask you today if

2   you have an opinion regarding the amount of that

3   ████████████████████ that would be an

4   apples-to-apples comparison with the amount that

5   would be paid at the hypothetical negotiation, you

6   wouldn't be able to provide that sort of

7   quantification; would you?

8      A.      So as we've now discussed, there were

9   elements of th ████████████ that perhaps

10  included more aspects than what the hypothetical

11  negotiation would include.

12          But because that license included

13  rights to patents that I understand to have been

14  comparable, and Amazon would have similarly been

15  the licensee, I understand that the terms would

16  have been relevant.

17     Q.      Do you have an opinion regarding the

18  amount of ████████████████ that would apply

19  to the reasonable -- to the hypothetical

20  negotiation in an apples-to-apples comparison?

21          MR. SALTMAN:  Objection.  Vague.

22          THE WITNESS:  I think that's the answer

Page 186

1      agreement highly relevant to the hypothetical

2      negotiation.

3   BY MR. ADLER:

4      Q.     And then my follow-up question was:

5   You don't -- do you recognize a distinction

6   between highly relevant and economically

7   comparable?

8      A.     And, again, I think the same exercise

9   with respect to this license would suggest that

10   the terms of this license are relevant because

11   they are terms representing a license to

12   comparable patents.   Amazon was the licensee.

13   It's for a relatively limited number of patents.

14   It was close to -- relatively close to the date of

15   the hypothetical negotiation, for whatever that's

16   worth.

17      Q.     The total amount of the license -- the

18   total amount of this agreement, sorry, was

19   ███████████████, right?

20      A.     Yes.

21      Q.     And the total amount of the license is

22   one of the key data points in your reasonable

Page 194

1    such as that. I've instead taken more the overall

2    terms and considerations as they were laid out in

3    the ultimate payment terms into consideration.

4       Q.    You understand that Mr. Hayden

5    testified that Amazon didn't even know that they

6    were using the patents covered by th ███████

██   ████████ , correct?

8       A.    I note on page 115 of my report his

9    testimony that Amazon purchased th ████████

██   ████████ for two reasons, one, the technology is

11    relevant to what Amazon was doing. So I have a

12    memory of that testimony.

13       Q.    Do you have an understanding as to

14    whether Amazon knew they were using the patents or

15    not?

16       A.    I'm sorry. Say that again.

17       Q.    Did you consider Amazon's awareness as

18    to whether it was using the patents?

19       A.    My only memory sitting here is what

20    I've noted here in the report with respect to his

21    testimony.

22       Q.    And Dr. Grama doesn't offer an opinion

Page 196

1    an instance where that would have been an only

2    consideration for Amazon.  So I think in any given

3    negotiation there's multiple factors that may

4    weigh more heavily in the ultimate determination

5    of value.

6         Q.    All things being equal, except for

7    this, would Amazon pay more for patents that it

8    knows it infringes than for patents it might not

9    even use?

10        A.    I think all else equal, that could be a

11   possibility, yes.

12        Q.    And did you offer an opinion as to the

13   specific value that the parties at the

14   hypothetical negotiation would have assigned to

15   this difference?

16        A.    In a hypothetical world?

17        Q.    At the hypothetical negotiation.

18        A.    So sorry.  In relation to what?

19        Q.    In relation to the difference between

20   the ███████████████ for which Amazon was not

21   sure that it practiced the patents and the

22   hypothetical negotiation where they assume that

Page 197

1     there's infringement.

2     A.     So I hear you asserting that Amazon

3     wasn't using th ███████████████.   I don't know

4     whether or not that's true.

5     I think, again, the terms of the

6     ███████████████ would have been considered by

7     Amazon, and Econnectix for that matter, for

8     purposes of the data point at the hypothetical

9     negotiation.

10     Q.     So you don't offer an opinion as to the

11     specific value that the parties to the

12     hypothetical negotiation would have assigned to

13     this factor, to the difference in certainty of

14     whether they infringe?

15     A.     Are we back to the validity and

16     infringement question in general or what -- what's

17     the -- what is your question exactly?

18     Q.     With respect to the ███████████████,

19     you agree that there's uncertainty as to whether

20     Amazon infringed the patents, correct?

21     A.     There's uncertainty as to infringement,

22     yes.

Page 203

 1        Q.    I'm actually going to go back a second

 2    because I forgot a question that I wanted to ask

 3    about two of the licenses we already discussed.

 4              Do you intend to testify to the jury

 5    that th ███████████ is economically and

 6    technically comparable to the license that would

 7    have been considered at the hypothetical

 8    negotiation?

 9        A.    So to that I would have the same answer

10    that I did when you asked me the same about the

11    ████████████.

12              So the same would apply to really the

13    ████████████████████████ agreements,

14    that because they deal with patents that I

15    understand to be technically comparable and they

16    have characteristics that make them similar to the

17    hypothetical negotiation here, I do believe them

18    to be highly relevant to the hypothetical

19    negotiation and worthy of consideration by the

20    hypothetical negotiators.

21        Q.    I did not hear in your response the --

22    a determination that these licenses for the ████

Page 209

1    of the report I noted that those three would be

2    considered the most relevant to the hypothetical

3    negotiators.

4        Q.    And what are the reasons why th ▮

▮    ▮▮▮▮▮▮▮ would not be considered in the -- would

6    not be counted in that most relevant category?

7        A.    Of -- for the reasons I just described

8    specific to the language on page 119 of my report.

9        Q.    Would there be any reasons other than

10   the volume of licenses in the ▮▮▮▮▮▮▮▮▮?

11       A.    And the cross-licensing aspects, like I

12   mentioned.

13       Q.    You don't offer an opinion that the ▮

14   ▮▮▮▮ is economically comparable to the

15   hypothetical negotiation, right?

16       A.    What do you mean by that?

17       Q.    Instead of making a conclusion or

18   expressing an opinion as to whether it's

19   economically comparable, you expressed an opinion

20   in terms of relevance, correct?

21       A.    Again, I've -- I've talked about the

22   comparability of the patents.  So really the

Page 210

1  subject matter.  I have talked about the -- the

2  ███████████████, for example, licenses being

3  different than th ███████████████████████

4  given just the volume of patents and rights that

5  were exchanged.

6        Other economic terms, I mean, I think

7  the fact that these are all lump-sum agreements is

8  an economic term that would be important to

9  consider.  So those are types of things that I

10  would consider to be economic inputs or pieces of

11  important information that would be considered by

12  the hypothetical negotiators.

13        So when you say -- what was your words,

14  "economically"?

15      Q.    Comparable.

16      A.    "Comparable."

17        So those are elements that I do think

18  would be economically comparable to the

19  hypothetical license.

20      Q.    So you -- you've identified aspects or

21  elements of the ██████████ that are

22  economically comparable but do not offer an

Page 211

1   opinion as to whether the agreement as a whole

2   would be economically comparable, correct?

3       A.   I mean, again, I think there's aspects

4   of it that are informative, like for example, the

5   -- the structure.  But I think given the -- like I

6   mentioned, the sheer volume of patent rights

7   exchanged and the cross-licensing --

8   cross-licensing aspects, it's a little harder to

9   narrow in on what value may have been assignable

10   to any given patents.  There's just -- there's

11   just kind of more going on in that particular

12   license.

13       Q.   And so there are some aspects of the

14   license that are relevant to the hypothetical

15   negotiation and other aspects of the license that

16   are not relevant to the hypothetical negotiation,

17   right?

18       A.   I think that's right.

19       Q.   Now, you said before that this

20   agreement includes a lot of patents.

21          Do you know how many patents were

22   included in the ████████?

Page 212

1      A.      So as mentioned on page 119 of the

2   report ███████████████████████████████.

3      Q.      And Dr. Grama evaluated just a small

4   subset of the patents for technical comparability,

5   correct?

6      A.      That's my understanding.

7      Q.      Dr. Grama didn't offer any opinions to

8   the technical comparability of the licenses he did

9   not review, correct?

10     A.      Sorry.

11     Q.      He didn't offer any opinions to the

12  technical comparability of the other licenses --

13  I'm sorry, of the other patents -- forgive me, of

14  the other patents in the agreement, correct?

15     A.      I don't know.

16     Q.      You didn't rely on any opinions from

17  Dr. Grama other than those that are referenced in

18  your report, correct?

19     A.      Other opinions on the other patents?

20     Q.      Technical comparability, yes.

21     A.      Right.

22     Q.      How much value did Amazon assign --

Page 215

1     A.     I can't recall without looking at the

2     license.

3     Q.     When forming your opinions, did you

4     consider whether the two patents that Dr. Grama

5     identified as technically comparable would have

6     read on S3 or DynamoDB?

7     A.     Say that one more time, please.

8     Q.     When -- when forming your opinions, did

9     you consider whether the two patents that

10    Dr. Grama identified as technically comparable

11    would have read on S3 or DynamoDB?

12    A.     One more time, please.

13    Q.     When forming your opinions, did you

14    consider whether the two patents that Dr. Grama

15    identified as technically comparable would have

16    read on S3 or DynamoDB?

17           I can ask the question with slightly

18    fewer words.

19           When forming your opinions, did you

20    consider whether the two patents were practised by

21    Amazon, by S3 or DynamoDB?

22    A.     I don't exactly recall sitting here.  I

Page 216

1    am aware -- what I'm trying to recall as I'm

2    sitting here is my conversations with Dr. Grama

3    who spoke about these patents and how they were

4    comparable to the patents-in-suit.

5              My memory, of course, is Dr. Grama's

6    belief that these patents-in-suit are not

7    practiced by Amazon.  So I'm trying to distinguish

8    in my mind if we talked about these particular

9    patents in the same vein or more just in terms of

10   them being similar regardless of the practice.

11   Q.    When forming your opinions, did you

12   have an understanding as to whether Amazon

13   evaluated these two patents?

14   A.    How so?

15   Q.    In any -- in any way.

16   A.    Did Amazon -- what's the question?

17   Q.    When forming your opinions, did you

18   consider or evaluate whether Amazon had

19   specifically identified or considered these two

20   patents?

21   A.    Well, my general awareness is Amazon

22   would have been aware of the patents to which it

Page 219

1      Q.    Amazon never agreed that the patents in

2   th ███████████ were valid, correct?

3      A.    I don't have that awareness.

4      Q.    You don't have that awareness, meaning

5   you don't know whether they agreed or not?

6      A.    I don't know that Amazon would have

7   said these patents are valid, if that's what you

8   mean.

9      Q.    Did you --

10      A.    I do know that that's the amount that

11   they paid for the right to practice ██████████

██   ████████████.

13      Q.    Do you have an understanding as to

14   whether Amazon viewed the patents in the ████

██   ████████ as valid?

16      A.    I don't.

17      Q.    And so is it fair to say that you

18   didn't offer an opinion as to the specific value

19   the parties to the hypothetical negotiation would

20   have assigned to any certainty as to the validity

21   of the patents?

22      A.    As we talked about earlier, the fact

1    that validity and infringement would not have been

2    determined when each of these licenses would have

3    been negotiated is a factor that would have been

4    considered separately by the hypothetical

5    negotiators.

6       Q.    And so you didn't assign a specific

7    value to -- to either of those, the difference

8    between validity and infringement, in th ▮

▮     ▮ and the hypothetical negotiation,

10   correct?

11       A.    So I answered that question this

12   morning.

13       Q.    Now, the ▮ was part of

14   a settlement, right?

15       A.    I believe that's correct.

16       Q.    What was the stage of litigation

17   associated -- associated with that litigation?

18   I'm sorry.

19         What was the stage of litigation at the

20   time the ▮ was entered?

21       A.    Sitting here, I'm not sure I recall. I

22   think if you would be willing to show me the

Page 221

1   license, it may be helpful.

2       Q.    You don't reference the stage of the

3   litigation in your report; do you?

4       A.    I do not.

5       Q.    And in your report you don't reference

6   the predicted amount of judgment on -- the size of

7   the judgment that each party would have as it

8   relates to the claims at issue in that case,

9   correct?

10      A.    I do not.

11      Q.    And in your report you don't consider

12  the probability that either party would succeed in

13  that litigation, correct?

14      A.    No, I don't talk about that.

15      Q.    And in your report you don't analyze or

16  consider the costs of further litigation in the

17  event that the parties would not have reached a

18  settlement agreement?

19      A.    My report is centered around the terms

20  that were known.

21      Q.    And is it your -- and none of these

22  facts that I've just mentioned the litigation were

Page 234

1    was a cross-license, which is different than my

2    hypothetical negotiation.

3        Q.    Okay.  Is it your opinion that a

4    license or agreement that contained comparable

5    patents would always be relevant to the

6    hypothetical negotiators?

7        A.    A license that contained comparable

8    patents, I think -- I think you're asking kind of

9    a broad hypothetical.  But if it contained

10   comparable patents, it would make sense to me that

11   it would be -- make sense to consider it.

12       Q.    Let's discuss the ████████████.

13   This is discussed in your report on page 119.

14            The ██████████) is not included

15   in your discussion of Georgia-Pacific factor 15,

16   correct?

17       A.    Not specifically, no.

18       Q.    And so is it your opinion that -- but

19   even so, it's your opinion that this license would

20   have been considered at the hypothetical

21   negotiation?

22       A.    Yes.

Page 236

1   infringement.

2           Would the same answer that you gave

3   before with respect to the previous licenses apply

4   to this agreement as well?

5       A.    Yes.

6       Q.    Regarding how that would be -- how you

7   would you weigh that at the hypothetical

8   negotiation?

9       A.    Yes.

10      Q.    Which is to say you considered it in

11  reaching your damages estimate?

12      A.    Yes.

13      Q.    But did not expressly value this

14  difference?

15      A.    It was a consideration amongst all the

16  various data points and facts and circumstances.

17      Q.    And as with the ███████████, the

18  ███████████ covered a large number of

19  patents, right?

20      A.    Yes.

21      Q.    Do you know how many patents?

22      A.    I'm not sure I recall sitting here.

Page 242

1      Q.    In your report you identified numerous

2 differences between th █████████████████ and the

3 license that would be considered at the

4 hypothetical negotiation, correct?

5      A.    Yes.

6      Q.    You didn't assign a specific value to

7 any of those differences; did you?

8      A.    I recognized within my report that

9 there are differences between th ███████████

10 and the hypothetical license.

11      Q.    My question wasn't -- were you done?

12      A.    No.

13      Such as the fact that ██████

████ ████████████ through a party known as █████ And in

15 the hypothetical negotiation the patent owner

16 would negotiate directly with AWS.

17      Q.    And the ████████████████ was also

18 entered into to avoid the threat of litigation?

19 To reduce the threat of litigation, correct?

20      A.    Yes, I understand that.

21      Q.    But you didn't offer any opinions

22 regarding the size of that threat or significance

Page 243

1    of that threat, correct?

2         A.    I don't know that I've thought about it

3    quite like that.

4         Q.    When you say you didn't -- you don't

5    know if you thought about it quite like that, that

6    means you didn't offer any -- you didn't consider

7    the litigation risk, correct?

8              MR. SALTMAN:  Objection.

9         Mischaracterizes testimony.

10             THE WITNESS:  I don't think I said

11        quite that.  I recognize the fact that there

12        was -- or was the threat of litigation.

13        Again, without looking at the license, I

14        can't recall completely.  But I also

15        recognize that the -- the -- again, like I

16        mentioned, the licensor would have been

17        different structurally than the licensor in

18        the hypothetical negotiation.

19             It was just -- there was some --

20        there was some meaningful economic

21        differences in this license compared to

22        certain of the other ones.  But I did

Page 244

1      consider it just given, again, the thought

2      that certain of the patents that were part of

3      the ultimate agreement were considered

4      comparable.

5    BY MR. ADLER:

6        Q.    And you didn't offer an opinion as to

7    the specific value that the parties to the

8    hypothetical negotiation would have assigned to

9    the threat of litigation with respect to this

10   license, correct?

11       A.    Well, again, I think the ultimate terms

12   speak for themselves.  So I don't know that I went

13   about the analysis quite like you're describing.

14       Q.    Another license you consider is the --

15   actually, scratch that.

16             Back to the previous license and then

17   we'll move on.

18             As -- as we had in a previous -- in

19   connection with our discussion of a previous

20   license, you do not intend to tell the jury when

21   you testify that the ███████████████ is

22   economically comparable, correct?

1     A.    I think if asked I would tell the jury

2  what I explain within my report, which is

3  (as read):  Given the economical differences, the

4  hypothetical negotiators would consider the

5  ████████████ less relevant to the

6  hypothetical negotiation.

7     Q.    Okay.  And then we're actually going to

8  cover that question first for the next one.  This

9  time with respect to th ████████.

10       You offered an opinion with respect to

11  the ████████ and their role at the

12  hypothetical negotiation, correct?

13     A.    Yes.

14     Q.    And even though you don't include the

15  ████████ in your discussion with

16  Georgia-Pacific factor 15, it's your opinion that

17  the parties in the -- it's your opinion that the

18  negotiators at the hypothetical negotiation would

19  have considered the ████████, correct?

20     A.    Again, because this is another example

21  of an Amazon license that included rights to

22  patents that are deemed relatable to the

Page 246

1    technologies of the patents-in-suit, it seemed

2    prudent to consider the terms.  But, again, I

3    think given some of the differences and the nature

4    of the license itself, the hypothetical

5    negotiators would consider it less relevant and

6    the others.

7        Q.    And so as with the other agreements

8    that we've discussed, including the previous

9    license, you -- you don't intend to testify to the

10   jury that the ███████████ are economically

11   comparable to the agreement at the hypothetical

12   negotiation, correct?

13       A.    I think there are some economical

14   differences that don't make it as relevant.

15       Q.    And so you would describe the ███

     █ ███████████ like you do in your report and would

17   not offer an opinion that they are economically

18   comparable?

19            MR. SALTMAN:  Objection.  Asked and

20       answered.

21            THE WITNESS:  Yeah.  I think my

22       opinions on it speak for themselves and what

Page 247

1          I just described.

2     BY MR. ADLER:

3          Q.    Is it your opinion that these license

4     agreements that you've recognized as less relevant

5     are still relevant?

6          A.    I think it would have been imprudent to

7     not review and consider them given my

8     understanding that they contain patents that are

9     comparable -- deemed comparable in some means to

10    the patents-in-suit.

11         Q.    You don't offer an opinion as to the

12    specific value or discount factor in terms of

13    weighting that the parties to the hypothetical

14    negotiation would have assigned to less relevant

15    licenses versus more relevant licenses?

16         A.    I can't think of an example of any

17    weighting mechanism.  I think the -- being able to

18    discuss the fact that certain licenses are more

19    relevant than others is sufficient.

20         Q.    Would the parties to the hypothetical

21    negotiation have considered the less relevant

22    licenses?

Page 262

1                    , correct?

2          A.    Yes.

3          Q.    And tha              , that's based on

4     th          up-front payment from Econnectix, the

5     forgiveness of certain claims, and the assumption

6     of receiving          royalty payment, correct?

7          A.    That's correct.

8          Q.    And on page 107 you state that (as

9     read):  ...the hypothetical negotiators would

10    consider relevant the              maximum of the

11    OverX trust assets given the competitive bidding

12    process involving third parties.

13              Correct?

14         A.    Yes.

15         Q.    And when you say that they would

16    consider it relevant, what does that mean?

17         A.    Well, in this instance, the valuation

18    of the OverX trust assets as purchased by

19    Econnectix is a data point that shows a market

20    value marker of the assets.

21         Q.    And so is it your opinion that this

22    transaction out of a liquidation process is

Page 263

1  technically and economically comparable to a

2  license that would result from the hypothetical

3  negotiation?

4      A.  No, I don't think I've said that

5  anywhere.  It's more a consideration of value of

6  the assets that were owned by the licensor at the

7  time of the hypothetical negotiation.  So it's an

8  informative data point.

9      Q.  You understand that OverX was the prior

10  operating company that had the assets, correct?

11          (Witness reviewing document.)

12  BY MR. ADLER:

13      Q.  And you're reading your report right

14  now to refresh yourself of the facts that you used

15  to inform your opinion?

16      A.  I'm reviewing my report at the moment,

17  yes.

18          I have the understanding that OverX was

19  the owner of the assets at an earlier point in

20  time.  I think that was your question.

21      Q.  Yeah.  And OverX effectively went into

22  a liquidation process by entering into an

1      A.    Not specifically, no.

2      Q.    And you would agree that it wasn't

3  until four years after the sale of the patents to

4  Econnectix that the patents actually issued,

5  correct?

6      A.    I think that's right with respect to

7  the '640 patent.

8      Q.    Do you know what an assignment for the

9  benefit of creditors is?

10     A.    I'm not sure I can give a fulsome

11  depos- -- excuse me, a fulsome definition sitting

12  here today.

13     Q.    Did you consider the intricacies of the

14  a process for the assignment for the benefit of

15  creditors in forming your opinions?

16     A.    No.

17     Q.    Have you ever worked on a case

18  involving an assignment for the benefit of

19  creditors?

20     A.    I have been involved in a bankruptcy

21  matter.  I'm not sure if that has come up in other

22  matters or not.

Page 267

1          Q.     Now, this liquidation occurred in 2002,

2     right?

3          A.     Yes.

4          Q.     What was the state of the market at the

5     time?

6          A.     How do you mean?

7          Q.     For a company that was looking to sell

8     potential intellectual property assets, what was

9     the market like for this kind of asset at that

10    time?

11              MR. SALTMAN:  Objection.  Vague.

12              THE WITNESS:  Oh, I certainly can't

13         speak to that.  I think the fact that it was

14         put out for public sale and public sale

15         transpired, those terms speak for themselves.

16    BY MR. ADLER:

17         Q.     This was after the first burst of the

18    tech bubble, right?

19         A.     I'm not sure.

20         Q.     Do you have an understanding of whether

21    there was a large appetite for investing in tech

22    assets at the time?

Page 268

1      A.      I can't -- I certainly can't speak to

2      -- I just can't speak to something so broad, a

3      question so broad sitting here.

4      Q.      Wouldn't it be important to consider

5      the state of the market at the time that this

6      transaction took place if you're using it as a

7      comparator to the hypothetical negotiation?

8      A.      Oh, I don't know that I said I was

9      considering this.  In fact, I think you asked me

10     if I was considering this comparable to a

11     hypothetical negotiation.

12             I think it would have been a benchmark

13     that would have been important in terms of the

14     parties, how they approached the hypothetical

15     negotiation at the time.  I think that's the

16     context in which this is considered.

17     Q.      So are you not using this transaction,

18     this liquidation, as a comparator at the

19     hypothetical negotiation?

20             MR. SALTMAN:  Objection.  Vague.

21             THE WITNESS:  Well, like I mentioned, I

22         discuss it in that I think it's important to

Page 273

1    tasked with disposing the assets as quickly as

2    possible?

3          A.    I don't know.

4          Q.    Do you have an understanding that they

5    had to dispose of the assets within 60 days?

6          A.    I don't know.

7          Q.    Do you have an understanding that it's

8    easier to dispose of assets when you have more

9    time to find the right buyer?

10         A.    That might be an incomplete

11   hypothetical.

12         Q.    All things equal, would you agree that

13   it's easier to dispose of an asset for its fair

14   value if you have more time to find the correct

15   buyer?

16         A.    Well, I mean, I can think of an example

17   of not if you know the right buyer.

18         Q.    And if you don't know the right buyer?

19         A.    I can't -- I mean, I don't know.  These

20   are broad hypotheticals.

21         Q.    Do you have an understanding of how

22   much the Founders Capital Corporation was found to

Page 274

1   liquidate all the holdings?

2      A.   I don't.

3      Q.   Do you have an understanding of who

4   Founders Capital reached out to to try to sell the

5   assets?

6      A.   So I mention on pages 103 to 104 of my

7   report the agreement that existed that stated that

8   Founders in its capacity as trustee -- et cetera,

9   et cetera -- determines that such private or

10   public sale will garner the highest net return for

11   the trust assets.

12      And there ended up being a competitive

13   bidding process but that's all I can really speak

14   to.

15      Q.   Do you have an understanding as to who

16   was involved in that bidding process?

17      A.   Noted here on page 104 of my report,

18   Econnectix competed against others for the trust

19   assets including an entity called

 

21      Q.   Do you know whether the Founders

22   reached out to Amazon in connection with the

Page 275

1    assets?

2         A.    I don't.

3         Q.    Do you have an understanding of how

4    companies were contacted to place bids?

5         A.    I don't.

6         Q.    Did you consider the methods and -- did

7    you consider who was reached out to in the bidding

8    process when forming your opinions regarding the

9    significance of the liquidation?

10        A.    Can you say that again, please?

11        Q.    Did you consider who -- did you

12   consider the process that the trustee -- that the

13   trust used to identify and contact potential

14   bidders when forming your opinions regarding the

15   significance of this liquidation?

16        A.    All I can really speak to is the values

17   that were ultimately transacted.  Mr. Overton

18   himself testified that it was a competitive

19   bidding process.

20              I don't know if you're trying to

21   suggest that had something gone differently that

22   the valuation would have been much different.  But

Page 389

1   STATE OF ILLINOIS )

2   COUNTY OF C O O K )

3           I, Janice M. Kocek, CSR, CLR, License
No. 084-002871, do hereby certify:

4           That the foregoing deposition of
MELISSA BENNIS, was taken before me at the time

5   and place therein set forth, at which time the
witness was put under oath by me;

6           That the testimony of the witness and all
objections made at the time of the examination

7   were recorded stenographically by me, were
thereafter transcribed under my direction and

8   supervision and that the foregoing is a true
record of same.

9           I further certify that I am neither

10  counsel for nor related to any party to said

11  action, nor in any way interested in the outcome

12  thereof.

13          IN WITNESS WHEREOF, I have subscribed my

14  name this 13th day of September, 2023.

15

16

17

18

19

20          _Janice M. Kocek_

21  _____

22          JANICE M. KOCEK, CSR, CLR