**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Kove IO, Inc.,<br><br>    Plaintiff,<br><br> v.<br><br>Amazon Web Services, Inc.,<br><br>    Defendant. | Civil Action No. 1:18-cv-08175<br><br>Hon. Matthew F. Kennelly<br><br>Jury Trial Demanded |

**KOVE IO, INC.'S OPPOSITION TO AMAZON'S MOTION TO EXCLUDE OPINIONS
OF DR. GOODRICH AND MR. BERGMAN**

# TABLE OF CONTENTS

**Page**

I.  Dr. Goodrich's Infringement Theories Are Not New. .................................................................1

    A.  Kove Adequately Disclosed Its "Key" Theory, Which Points To Evidence Regarding The ███████. ...............................................................................................................................1

    B.  Kove's "Hash Table" Doctrine Of Equivalents Theory Is Not New. ..................................4

    C.  Kove's "Transferring" Doctrine Of Equivalents Theory Is Not New. ...............................5

II.  As The Court Determined, Goodrich's Infringement Opinions Are Consistent With The Court's New Claim Construction..........................................................................................................7

III.  ███ Remain In The Case As To The 978 Patent .................................................................9

IV.  There is no prosecution history estoppel ..............................................................................10

V.  Bergman's Damages Opinions Are Rigorous, Sound, and Tied To The Facts Of The Case ..12

    A.  Bergman Properly Apportioned Damages Between Infringing and Noninfringing Features. ...................................................................................................................................13

        1.  AWS's Motion Ignores Goodrich's Extensive Opinions Regarding the Technical Benefits of the Asserted Claims Upon Which Mr. Bergman Relied. ........................ 14

        2.  Bergman's Analysis Accounts for Non-Infringing Functions. ................................... 15

            a.  Hash Functions Claims (S3) ............................................................................... 15

            b.  Scaling Claims (S3) .............................................................................................. 18

            c.  Hash Function Claims (DDB) and Scaling Limitations (DDB) .......................... 19

    B.  Bergman's Bargain Split is Rigorously Tied to the Facts of the Case...............................21

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Almondnet, Inc. v. Amazon.com, Inc. et al.*,
  6:21-CV-00898 (W.D. Tex.)............................................................25

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014)......................................................14

*AstraZeneca AB v. Apotex Corp.*,
  782 F.3d 1324 (Fed. Cir. 2015)......................................................18

*Ballard v. Zimmer, Inc.*,
  2015 WL 110146 (N.D. Ill. Jan. 7, 2015) .........................................3

*Brady for Smith v. SSC Westchester Operating Co. LLC*,
  533 F. Supp. 3d 667 (N.D. Ill. 2021) ..............................................20

*Carnegie Mellon Univ. v. Marvell Tech. Grp. Ltd.*,
  807 F.3d 1283 (Fed. Cir. 2015)...............................................12, 15

*Daedalus Blue, LLC v. Microstrategy Inc.*,
  2023 WL 5690212 (E.D. Va. July 24, 2023) ....................................25

*Droplets, Inc. v. Yahoo! Inc.*,
  2021 WL 9038355 (N.D. Cal. Aug 9, 2021) .....................................25

*DSM IP Assets B.V. v. Lallemand Specialties, Inc.*,
  2018 WL 1950413 (W.D. Wis. April 25, 2018) .................................22

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
  285 F.3d 609 (7th Cir. 2002) .........................................................15

*Eli Lilly & Co. v. Hospira, Inc.*,
  933 F.3d 1320 (Fed. Cir. 2019).......................................................11

*Eli Lilly and Co. v. Teva Parenteral Medicines, Inc.*,
  2015 WL 735724 (S.D. Ind. 2015) ...................................................6

*Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*,
  879 F.3d 1332 (Fed. Cir. 2018).......................................................24

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722, 122 S. Ct. 1831 (2002).......................................10, 11

*Insituform Techs., Inc. v. CAT Contracting, Inc.*,
    385 F.3d 1360 (Fed. Cir. 2004)...........................................................................11

*Lawrence v. Raymond Corp.*,
    2011 WL 3418324 (N.D. Ohio Aug. 4, 201)........................................................24

*Longhorn HD LLC. v. Netscout Sys., Inc.*,
    No. 2022 WL 903934 (E.D. Tex. Mar. 27, 2022)................................................25

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009).............................................................12, 13, 22

*Oil-Dri Corp. of Am. v. Nestlé Purina Petcare Co.*,
    2018 WL 1071443 (N.D. Ill. Feb. 26, 2018) .........................................................1

*Paice LLC v. Toyota Motor Corp.*,
    504 F.3d 1293 (Fed. Cir. 2007)..............................................................................6

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
    35 F.4th 1367 (Fed. Cir. 2022) .............................................................................25

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
    849 F.3d 1360 (Fed. Cir. 2017).............................................................................13

*Sheridan v. Johnston*,
    2016 WL 11444333 (N.D. Ill. Jan. 27, 2016) .......................................................3

*Stollings v. Ryobi Techs., Inc.*,
    725 F.3d 753 (7th Cir. 2013) ................................................................................14

*Summit 6, LLC v. Samsung Elecs. Co., Ltd.*,
    802 F.3d 1283 (Fed. Cir. 2015).............................................................12, 13, 22

*Virnetx, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014).......................................................................13, 22

*Wi-Lan Inc. v. Vizio, Inc.*,
    2018 WL 669730 (D. Del. Jan. 26, 2018) (Stark, J.) ...........................................1

*Wonsey v. City of Chicago*,
    940 F.3d 394 (7th Cir. 2019) ................................................................................20

**Rules**

Rule 30(b)(6).................................................................................................................6

Rule 702.....................................................................................................................12

Rules 26(a) and 37(c)..................................................................................................3

Plaintiff Kove IO, Inc. ("Kove") respectfully submits this Opposition to Defendant Amazon Web Services, Inc.'s ("AWS's") Motion to Exclude Opinions of Dr. Goodrich and Mr. Bergman.

## I. DR. GOODRICH'S INFRINGEMENT THEORIES ARE NOT NEW.

Infringement contentions are meant to "provid[e] notice to Defendants of Plaintiff's infringement theories"; they "need not . . . actually prove [the] infringement case." *Wi-Lan Inc. v. Vizio, Inc.*, 2018 WL 669730, at *1 (D. Del. Jan. 26, 2018) (Stark, J.). "[T]he purpose of infringement contentions is to provide notice of the plaintiff's theories of infringement early in the case[.]" *Oil-Dri Corp. of Am. v. Nestlé Purina Petcare Co.*, 2018 WL 1071443, at *2 (N.D. Ill. Feb. 26, 2018) (attribution omitted).

### A. Kove Adequately Disclosed Its "Key" Theory, Which Points To Evidence Regarding The ████████.

AWS asserts Dr. Goodrich's report contains a ████████ infringement theory that was not disclosed in its infringement contentions and should be excluded. AWS's Daubert Motion ("Mot.") at 1-4. AWS incorrectly conflates Kove's infringement theory with the evidence used to prove that infringement theory–████████ is merely <u>evidence</u>, not a <u>theory</u>. But regardless of the label used, ████████ was disclosed in the infringement contentions.

The claim limitation at issue here is the word "identifier." This word was construed by the Court as "*a unique encoding that identifies an individual entity*, and with which zero or more location strings are associated in a location server." Dkt. 484, at 11 (emphasis added). Kove's infringement theory is that the "key" in AWS's systems satisfies the "identifier" limitation. Ex. YYY, Ex. D to Dr. Michael Goodrich Expert Report ("Goodrich Report") at ¶¶ 12, 81, 86, 93. In Kove's Final Infringement Contentions, it clearly identified that "key" theory. *E.g.*, Ex. JJJJ, Kove 2023/03/20 FIC, Ex. A, at 14-18.

1

By way of background, to ensure that the products store and retrieve the requested data (and only the requested data), AWS assigns each data item in S3 and DynamoDB a unique identifier. Ex. YYY at ¶¶ 3, 5, 9-12; Ex. QQQ at ¶¶ 3, 5, 7-16. That unique identifier is called a ███ in S3 and a ██████████ in DynamoDB. These identifiers are then used to store and retrieve each data item. Ex. YYY at ¶¶ 12, 23-24; Ex. QQQ at ¶¶ 9, 45. The universe within which ██████████████████████████ – or "name" – is referred to as a ██████████ Ex. YYY at ¶¶ 10, 12; Ex. TTT at 164:5-12; Ex. QQQ at ¶¶ 9, 11, 19, 39. This is analogous to a school making sure that no two children in the same classroom have the same name. Each such classroom constitutes its own ██████████. In the U.S., AWS has regions that are available to the public and regions that are for the government. Ex. TTT at 162:7-164:12. For S3, the three public regions ██████████, and the two government regions ██████████████ (i.e., there are ██ ██████ in the U.S. for S3). Ex. TTT at 162:7-164:12. For DynamoDB, each of the five regions ████████████████. Ex. QQQ at ¶¶ 9, 11, 19, 39. Keys and ████████ are unique identifiers because they each uniquely identify a data item. They are ████████████ ████████████████████████████████████.

Dr. Goodrich's expert report is perfectly consistent with Kove's infringement contentions. The theory is that the █████ and ████████ in AWS's S3 and DynmaoDB products satisfy the "identifier" limitation. As evidence supporting this theory, Dr. Goodrich relies on the fact that these keys are ██████████████████. That is, for S3, a key is ████████████ ████████████ that are available to the public (which share ████████), and for DynamoDB, a ████████ is ████████████████████████████. Ex. TTT at 162:7-164:12; Ex. QQQ at ¶¶ 9, 11, 19, 39.

That said, regardless of whether ████████ is evidence or a theory, it was disclosed in

Kove's infringement contentions. Kove's contentions specifically identify the ▮▮▮▮▮▮ and its relevance to the uniqueness requirement by pointing to AWS's own documents and testimony. *E.g.*, Ex. JJJJ, Kove 2023/03/20 FIC, Ex. A, at 5-7 ("namespace"), 17-18 (citing AWS engineer testimony about how ▮▮▮▮▮▮, which are part of the key, are "▮▮▮▮▮▮ all S3 regions that "▮▮▮▮▮▮▮▮"); Ex. PPP, Kove 2023/03/20 FIC, Ex. B, at 1, 5, (explaining that "DynamoDB uses ▮▮▮▮▮ to ▮▮▮▮▮▮ item"), 9 (explaining that data is stored in tables and that ▮▮▮▮▮▮▮ regions).[1]

AWS fails to point to any prejudice from Kove's infringement contentions. *Sheridan v. Johnston*, 2016 WL 11444333, at *6 (N.D. Ill. Jan. 27, 2016) (declining to exclude under Rules 26(a) and 37(c) where defendants alleged no prejudice and none was found); *Ballard v. Zimmer, Inc.*, 2015 WL 110146, at *7 (N.D. Ill. Jan. 7, 2015) (declining to exclude under Rules 26(a) and 37(c) in the absence of prejudice). AWS was on notice that Kove accused the ▮▮▮ and ▮▮▮ ▮▮▮ of satisfying the "identifier" limitation, and that Kove alleged that these ▮▮▮▮▮▮. Further, this is AWS's own product, and it knows how the ▮▮▮▮▮ ▮▮▮ data items and has unfettered access to its own product and literature.

This appears to be an attempt to reargue AWS's summary judgment motion. When AWS moved for summary judgment of noninfringement, the so-called ▮▮▮▮▮ theory was squarely at issue. *E.g.*, Dkt. 739 at 28 ("Kove's expert [Dr.] Goodrich contends that each group of two or more ▮▮▮▮▮▮▮▮▮▮▮▮ constitutes 'a system' of location servers.") (citing Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K54 ¶ 80). AWS made its argument that the system of location servers should be broader than merely the

---

[1] Additionally, Kove's infringement contentions disclosed to AWS that *any* combination of two or more of the alleged location servers, within any combination of Availability Zones and/or Regions, were accused of infringement. Ex. JJJJ, Kove 2023/03/20 FIC, Ex. A, at 1 . It then went on to cite the evidence of ▮▮▮▮ – i.e., ▮▮▮▮▮▮ – to demonstrate how the ▮▮▮ were "unique."

███████. Dkt. 686 at 18-19. And the Court rejected it. Dkt. 739, at 26-28. AWS now seeks a second bite at the apple by excluding the theory on which Kove prevailed at summary judgment. AWS's motion to exclude Dr. Goodrich's namespace opinions should be denied.

**B.  Kove's "Hash Table" Doctrine Of Equivalents Theory Is Not New.**

AWS contends Dr. Goodrich's doctrine of equivalents infringement theory for "hash table" is different than the theory disclosed in Kove's infringement contentions. Mot. at 4-6. In particular, AWS claims Dr. Goodrich's theory has an "additional element" in that it requires that "the table Kove identified must also then be 'indexed by a ██████' to create a new hash table index." *Id.* at 6. AWS misapprehends Kove's contentions and Dr. Goodrich's opinions—nothing in Dr. Goodrich's opinions regarding "hash table" is new.

As AWS acknowledges, Kove's infringement contentions disclosed the theory that the "hash table" limitation is met under the doctrine of equivalents in part because ████████████ maintain associations between ██████████████ and █████████████ Ex. PPP, 2023/03/20 FIC, Ex. B at 28-29 ("[T]he mapping in the █████ of the ████████████████ and their associated ██████████ performs substantially the same function[.]"), 40-42, Ex. IIII, 2023/03/20 FIC, Ex. C at 34-36, Ex. RRR, 2023/03/20 FIC, Ex. D at 20-22; Mot. at 6. Dr. Goodrich's opines as to that same theory. Ex. QQQ, Goodrich Rpt., Ex. E ¶¶ 124-125(*e.g.* "the mapping in the ███████████ of the ████████████████ and their associated ████████ performs substantially the same function").

AWS's complaint is with Dr. Goodrich's opinion that a "hash table index" is created wherein "the combination of ███████████████ and their associated ██████████████ is "input into a ██████████ to index the table." Mot. at 6. But "indexing" is not a new theory, it is simply how hash tables work. In other words, when there is a hash table, the hash is used as

an index into a table. This is merely evidence of how the hash table works, not a new theory.[2]

### C. Kove's "Transferring" Doctrine Of Equivalents Theory Is Not New.

AWS alleges that one detail of Dr. Goodrich's doctrine of equivalents analysis for the "transferring" claim limitation was not adequately disclosed. Mot. at 4-5. Specifically, AWS contends that Kove's infringement contentions only partially specify how ███████████████ (the claimed "location information") are transferred from one ███ (the claimed "location server") to another.[3] *Id.* AWS takes aim at Dr. Goodrich's expert report, which explained that the transfer involves assigning the ownership of ████████████████ to a different ████. *Id.*

The problem with AWS's argument is that Kove's infringement contentions disclosed the allegedly missing step in Dr. Goodrich's "transferring" theory. In describing Kove's literal infringement theory for the "transferring" claim, Kove states that "each ███████ a different set of ███████████████████ than other ████, *as determined by the* ████████ ████." Ex. RRR, 2023/03/20 FIC, Ex. D at 23 (emphasis added). Kove also explains that "a portion of a ████████████████████████ . . . are *transferred* to another ████ cache *per the* ██████████[.]" Ex. RRR, 2023/03/20 FIC, Ex. D at 32 (emphasis added); *see also* Ex. SSS, 2020/02/13 FIC, Ex. D at 97-99 (same). Kove's contentions thus disclosed Kove's theory that it is the ████████████ in S3 that determines which ████ are assigned to cache particular portions of the ████████████████, and that a change in assignments by the ████████████ results in the claimed "transferring." *Id.* And, as AWS acknowledges, Kove's contentions explain how this change in assignments at the ███████████

---

[2] To the extent AWS attempts to point to the portions of Dr. Goodrich's equivalents opinions that reference his literal infringement analysis for the "hash table" claim term, that does not improve AWS's position either, because there is no dispute that those opinions were disclosed in Kove's contentions. Ex. QQQ, Goodrich Rpt., Ex. E, ¶ 124.

[3] AWS refers to ██████████ Mot. at 5, and so does Goodrich in his report. Kove's contentions sometimes refers to the same concept as ████████████

leads to the actual transfer of ███████████████ from one ███ to another. Ex. RRR, 2023/03/20 FIC, Ex. D at 32-35 (citing deposition testimony of AWS's Rule 30(b)(6) witness, Seth Markle, that describes the transfer process (Ex. TTT, Markle Tr. at 271:15-273:18)); *see also* Mot. at 5 (acknowledging that "subsequently caching the ██████████████████ was disclosed in Kove's contentions) (cleaned up). This is the same way in which Dr. Goodrich describes the functionality in his expert report. Ex. YYY at ¶¶ 56, 59-60, 127, 165, 169-170.

Kove's explanation of its doctrine of equivalents theory for the "transferring" limitation, which directly follows its literal infringement analysis, relies on the same transferring mechanism as its literal infringement theory. *See* Ex. RRR, 2023/03/20 FIC, Ex. D at 35. Its equivalents analysis incorporated that discussion by reference and addressed just those aspects of the claim that arguably were not satisfied by the literal infringement analysis. This is consistent with Federal Circuit precedent, which states that an expert need not "re-start his testimony at square one when transitioning to a doctrine of equivalents analysis." *See Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007); *Eli Lilly and Co. v. Teva Parenteral Medicines, Inc.*, 2015 WL 735724, at *2-3 (S.D. Ind. 2015). Kove's equivalents analysis focuses on AWS's position as to the mechanism of transferring a portion of its location information to a different location information. Ex. RRR, 2023/03/20 FIC, Ex. D at 35. In short, the portion AWS claims is missing is present in the infringement contentions–what AWS complains about merely goes to its disagreement with Kove's analysis.

In fact, AWS addressed the "transferring" issue in its noninfringement contentions, in the context of both literal and equivalents infringement. *E.g.*, Ex. UUU, 2023/03/21 FNC, Ex. D at 69 ("Kove asserts that 'each ████████ a different set of ██████████████████████ than other ████, as determined by the ██████████████,'"), 95-96, 99, 104-105.

AWS cannot point to any prejudice. It fully addressed Dr. Goodrich's equivalents theory in its expert report. Ex. WWW, Grama Reb. Rpt. ¶¶ 319 ("Dr. Goodrich's assertion that the '███████████' is involved in transferring ██████████████████████ from a first ███ to a second ███ is also insufficient to establish infringement because the use of a ████████████ does not imply any 'transferring' of data."), 387-391 ("Despite Dr. Goodrich's interpretation of the term 'ownership,' the █████ are not bound by any assigned key ranges at all. Even in an instance where a █████ receives a request associated with a key it is not assigned to, it doesn't deny or redirect the request"); *see also id.* ¶¶ 286-290, 304. AWS may disagree with the merits of Kove's equivalents theory, but that is not a basis to exclude it.

## II.  AS THE COURT DETERMINED, GOODRICH'S INFRINGEMENT OPINIONS ARE CONSISTENT WITH THE COURT'S NEW CLAIM CONSTRUCTION

AWS effectively asks the Court to revisit its decision denying AWS's motion for summary judgment of noninfringement. AWS challenges the sufficiency of evidence by arguing that Dr. Goodrich's opinions do not show that the "location servers" claim limitation is satisfied. *E.g.*, Mot. at 11. The time for summary judgment is past, and the Court already concluded that Kove's evidence creates a genuine issue of material fact. In all events, Dr. Goodrich's report fully explains why the Court's construction for "location servers" is met by the accused products.

AWS's motion cherry-picks snippets of Dr. Goodrich's opinions and concludes that they "contradict" the Court's construction for the "location servers" claim limitation and are "conclusory and unsupported." Mot. at 8-10. AWS argues that neither █████ nor █████—the alleged location servers in S3 and DynamoDB, respectively—have a non-hierarchical structure because they do not have the requisite "knowledge." *Id.* at 9-10.

This is a recycling of the same arguments AWS made on summary judgment. *See, e.g.*, Dkt. 686, at 17 ("But 'a non-hierarchical, cluster topology' isn't present in the accused S3 and

7

DDB products—instead, their structures are hierarchical."), 18-21 ("[C]ourts 'should discount any expert testimony that is clearly at odds with the claim construction[.]'"); Dkt. 714, at 17-18 ("Here, all 17 asserted claims . . . require location servers in a 'non-hierarchical' configuration, where every single location server either has the location information to respond to a request, or *knows* which of the other location servers has it.") (emphasis added), 19-21 ("[T]he components in S3 and DDB that receive and respond to requests don't keep track of where data objects are stored, much less where *all* data objects are stored."). The Court rejected these arguments, finding that, "[d]rawing all reasonable inferences in Kove's favor, a reasonable juror could accept Kove's description of the accused products as well as Goodrich's testimony and conclude that S3 and DynamoDB contain a plurality of location servers within the availability zones that are arranged in a non-hierarchical configuration and therefore infringe Kove's patents." Dkt. 739 at 28.

Regardless, Dr. Goodrich's analysis of "location servers" is fully consistent with the Court's construction. For the S3 accused product, Dr. Goodrich explains that when ███ receive a request for location information, they provide it. *See, e.g.*, Ex. YYY at ¶¶ 80-93. ███ also know which other ███ is assigned to cache the location information for any given request by accessing the ████████ *See, e.g.*, *id*. at ¶¶ 28, 56, 103, 119, 123, 130, 165, 209, 213. ███ thus have the knowledge that AWS incorrectly contends that they lack. Mot. at 7-9.

With respect to DynamoDB, Dr. Goodrich explains that ███ store a portion of the location information. *See, e.g.*, Ex. QQQ at ¶¶ 32, 96, 102, 136, 148. When ███ receive a request for location information, they either provide it if they have it, or provide information that is used by the ████████ (the alleged "client") to determine which ███ stores the requested location information. *See, e.g.*, *id*. at ¶¶ 90, 320, 343. The ███ thus possess knowledge about which ███

stores the requested location information.[4]  AWS may disagree with Kove about what ██ and ██ "know," but that is not a sufficient basis to exclude Dr. Goodrich's opinions.

## III.    ██ REMAIN IN THE CASE AS TO THE 978 PATENT

AWS's motion assumes that ██████████ are no longer accused of infringement based on a footnote in the Court's summary judgment order. Mot. at 23. The Court's summary judgment order does not address the impact of the claim construction on ██ instead stating that "Kove admits that ██ do not employ a 'non-hierarchical' configuration." Dkt. 739, at 25 n.4. The Court's order did not grant summary judgment of noninfringement for the ██ Dkt. 739 at 23-30.

AWS appears to be reading the Court's footnote broader than the underlying briefing would permit.  In the summary judgment briefing, Kove showed that ██ are arranged in a non-hierarchical configuration:

> AWS itself says that its constructions "require a *location server* network/system 'arranged in a non-hierarchical, cluster topology.'" Mot. 16-17 (emphasis added). Any hierarchies in components other than location servers are therefore irrelevant. **A reasonable jury could find that each of S3 and DDB have *location servers* arranged in non-hierarchical topologies. Dr. Goodrich identif**ies S3's ██████████████ as location servers for claims 1 and 2 of the '170 patent and both ██ and ████ **as location servers for claims 17, 23, 24, and 30 of the '978 patent**. ASMF ¶¶ 26, 28. **And he explains why they are non-hierarchically arranged**. *Id.* ¶ 28; *infra* § III.C.2. Dr. Grama does not dispute Dr. Goodrich's reasoning. ASMF ¶ 28.

Dkt. 699 at 45 (bolding added); *see also* Dkt. 700 (Kove Response to AWS SMF), ¶ 62 (citing Goodrich Report (Dkt. 700-53) ¶ 175). In the next paragraph Kove went on to explain that AWS's arguments regarding ████ are irrelevant because ██████ are used to store data

---

[4] AWS's argument that location servers "must know which server contains the relevant location information with 'certainty and specificity'" is an attempt to argue for a different claim construction than what the Court adopted in its summary judgment order and so should not be considered. Mot. at 10. Further, AWS wrongly asserts that "the metadata an ██ contains isn't always correct and requires updated versions." *Id.* It is ██████ (the alleged "clients") that sometimes have out-of-date location information, and they can obtain the latest location information from the ██ as part of a "redirect." *See, e.g.*, Ex. QQQ at ¶¶ 33-34.

(*i.e.*, they do not relate to the structure of location servers), and even then, only for ███ *Id.* And

for ███ Kove reiterated its argument that it did not think any disclaimer would apply to claims

17, 23, 24, and 30 of the '978 patent.[5] *Id.* Specifically, Kove stated, "[a]s for ███ Kove does not

allege that they are location servers in claims that require non-hierarchical structures." *Id.* (citing

ASMF ¶ 26). Kove's point was that ███ were not location servers in the claims that it understood

(and argued) required non-hierarchical structures – namely, claims other than claims 17, 23, 24,

and 30 of the '978 patent. In other words, it was reiterating its argument as to the permissible

scope of its disclaimer. While Kove ultimately lost that argument, it was not saying that ███ did

not have a non-hierarchical structure – indeed, that would have made no sense because it just had

explained that ███ do, indeed, have a non-hierarchical structure (the block quote *infra*).

Accordingly, Kove did not waive the right to argue that ███ have a non-hierarchical

structure – it expressly made that argument in the briefing. Accordingly, the ███ remain in the

case as to claims 17, 23, 24, and 30 of the '978 patent.

## IV. THERE IS NO PROSECUTION HISTORY ESTOPPEL

The doctrine of prosecution history estoppel prevents patentees from using the doctrine of

equivalents to reclaim claim scope that was forfeited during prosecution. *Festo Corp. v. Shoketsu

Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734-735, 122 S. Ct. 1831, 1838-1839 (2002). AWS

claims this doctrine requires the exclusion of Dr. Goodrich's equivalents infringement theory for

claims with the "hash table" limitation.[6]

AWS relies on a claim amendment during the prosecution of the patent application that

---

[5] The Court ultimately disagreed with this point, but that is not determinative of this issue.
[6] AWS identifies claim 2 of the '170 patent, claims 18 of the '640 patent, and claims 6, 17, 23, 24, and 30 of the '978 patent as the claims for which its argument applies. Mot. at 11 n.48. However, only claim 2 of the '170 patent and claim 6 of the '978 patent have the "hash table" limitation, and Kove does not assert an equivalents infringement theory for claim 2 of the '170 patent with respect to DynamoDB. Kove therefore assumes that its DynamoDB equivalents theory for claim 6 of the '978 patent is all that is at issue in AWS's motion. In all cases, Kove's arguments apply to all claims with a "hash table."

issued as the '978 patent. The claim, which was numbered "10" at the time but issued as claim 6, had the following limitation added: "indexed by a hash table." Dkt. 745 at 11-13. AWS also points to Kove's remark during prosecution that: Lumelsky "[did] not teach an indexing function operative to map each of the plurality of identifiers to a respective one of the plurality of index designation." Dkt. 746-8 (2/22/06 Response to Non-Final Office Action) at 14-15.

However, courts have established that prosecution history estoppel does not apply if a claim amendment was made for a reason that had only a tangential relation to the equivalent. *Festo*, 535 U.S. at 740-41, 122 S. Ct. at 1842 (providing the following exceptions to prosecution history estoppel: (1) the rationale underlying the amendment bears no more than a tangential relation to the equivalent in question; (2) the equivalent was unforeseeable at the time of the application; or (3) there was some other reason suggesting that the patentee could not reasonably be expected to have described the equivalent.); *see also Eli Lilly & Co. v. Hospira, Inc.,* 933 F.3d 1320, 1331 (Fed. Cir. 2019) (holding "[t]he reason for Lilly's amendment … was to narrow original claim 2 to avoid Arsenyan, which only discloses treatments using methotrexate, a different antifolate. *See* DRL J.A. 7879-80 (overcoming the Arsenyan anticipation rejection by arguing that it 'does not disclose pemetrexed disodium.'") and *Insituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1368 (Fed. Cir. 2004) (holding "'the rationale underlying' the amendment narrowing the scope of literal claim coverage … bears "no more than a tangential relation to the equivalent in question," accused Process 1.")

First, Kove's remark regarding Lumelsky is irrelevant to the amendment to claim 10 (now claim 6) because it was about a totally different claim. The remark was in reference to claim 38, which was subsequently canceled. Dkt. 746-8 at 14-15. Kove's statement was never about issued claim 6 and cannot be relied on to implicate claim 6.

Second, Kove did not amend claim 10 (now claim 6) to favor "one-to-one hash tables" over equivalents like the one identified by Dr. Goodrich. Dkt. 745 at 13. Rather, the amendment clarified that the indexed location store is indexed by a hash table. Kove did not limit the claim based on any remarks in the 11/1/06 Response to Non-Final Office Action (Dkt. 476-9); nor did the Patent Office interpret the amendment in a manner that would exclude equivalents. In fact, the Patent Office did not mention a "hash table" or claim 6 at all in its reasons for allowing the claims of the '978 patent. Dkt. 746-10 (2/13/2007 Notice of Allowance) at 3. In short, there are no prosecution events that would exclude an equivalent.

## V. BERGMAN'S DAMAGES OPINIONS ARE RIGOROUS, SOUND, AND TIED TO THE FACTS OF THE CASE

Bergman's analysis is thorough, methodologically sound, and tied to the facts of the case. Bergman's detailed opinions far exceed the Federal Circuit's standards for admissibility. *See, e.g.*, *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) (considering how *Daubert* and Rule 702 apply in patent damages setting).

In patent cases, damages are assessed using the construct of a hypothetical negotiation, in which the parties assume infringement and validity, and have knowledge of the future through what is known as the "book of wisdom." *See, e.g.*, *Carnegie Mellon Univ. v. Marvell Tech. Grp. Ltd.*, 807 F.3d 1283, 1303-04 (Fed. Cir. 2015); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324-25, 1333-34 (Fed. Cir. 2009). One recognized method for calculating a reasonable royalty is to base the royalty on the profits that an infringer made by use of the invention. *See id.*

Bergman's damages opinions are consistent with those principles. Bergman relied on the opinions of Kove's technical expert (Goodrich) to understand the technical benefits associated with AWS's use of the inventions. Goodrich identified these benefits by comparing the performance of the accused products against the performance of non-infringing alternatives. Ex.

XXX, Bergman Report ¶¶ 268-78, 282-303, 324-44, 357, 360, 373, 376-77, 386, 388-93, 419, 425-28; *see* Ex. OOO at ¶¶ 64-295 (describing, modeling, and quantifying technical benefits), 296-345 (distinguishing AWS's proposed non-infringing alternatives). The Federal Circuit has expressly approved this methodology. *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) (apportionment can "be based on consideration of the costs and availability of non-infringing alternatives and the potential infringer's cost savings."); *Summit 6*, 802 F.3d at 1296.

Bergman used Goodrich's opinions on technical benefits and used a variety of sources, including AWS cost models, internal valuations, Kove's industry expert (Karim Fanous), and witness testimony to estimate the profits attributable to those benefits. Exs. XXX at ¶¶ 284-91, 304-23, 330-35, 337-74 (S3), 378-86, 394-429 (DynamoDB) & Ex. 2-5; Ex. AAAA.

Finally, Bergman considered substantial benefits of the invention that could not be quantified, the *Georgia-Pacific* factors, and other evidence to estimate how the parties would have agreed to split the profits at the hypothetical negotiation (the "bargain split"). Bergman ultimately concluded that the parties would reasonably have agreed to a bargain split in which Kove obtained 50%-100% of the quantified incremental benefit. *Id*. at ¶¶ 543-619. Bergman's report is incredibly detailed and specific, spanning 227 pages (with an additional 150 pages of schedules).

### A. Bergman Properly Apportioned Damages Between Infringing and Noninfringing Features.

The adequacy of an expert's apportionment goes to weight rather than admissibility. The Federal Circuit requires experts to apportion damages to the patented invention – but apportionment opinions do not require "absolute precision." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014). Instead, "it is well-understood that this process may involve some degree of approximation and uncertainty." *Id.*; *see Lucent*, 580 F.3d at 1325 (similar).

Bergman's opinion includes multiple levels of apportionment that isolate the technical

benefits associated with AWS's use of the Asserted Claims. *See* Ex. XXX at, *e.g.*, ¶¶ 264, 278-79, 281-82, 323, 597 (explaining that Bergman's methodology sought to "isolate[] the incremental benefit of the patented technology"); *id.* at, *e.g.*, ¶¶ 369, 363-64 & Ex. 2 (adjusting estimates to account for non-patented features).

### 1. AWS's Motion Ignores Goodrich's Extensive Opinions Regarding the Technical Benefits of the Asserted Claims Upon Which Mr. Bergman Relied.

AWS complains that "what Bergman defined as non-infringing alternative[s] failed to include numerous non-infringing components and features," and criticizes Bergman for "not explaining" why he chose particular non-infringing alternatives. Mot. at 18-19. At best, this goes to the weight of Bergman's opinions, not admissibility.[7] But flaws with this argument go deeper.

As an initial matter, AWS challenged the wrong expert. Bergman did not "define" or "explain" non-infringing alternatives by himself. That task was performed by Goodrich. *See* Ex. OOO at ¶¶ 84, 144, 158, 168, 177, 191-92, 197-98, 210, 216, 221, 223-24, 230, 239-41, 252, 267, 270-71, 279 (identifying potential non-infringing alternatives); Ex. XXX at ¶ 278 (explaining that Bergman's understanding of the non-infringing alternatives came from Goodrich). This makes sense because the identification of technical benefits requires technical expertise.[8] That should be the end of the matter, since AWS has not challenged (or even acknowledged) the substance of Goodrich's opinions.

Damages experts can rely on opinions provided by technical experts in forming their opinions. *Apple Inc. v. Motorola Inc.*, 757 F.3d 1286, 1321 ("Consistent with Rule 703, patent

---

[7] *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314-15 (Fed. Cir. 2014) ("That the gatekeeping role of the judge is limited to excluding testimony based on unreliable principles and methods is particularly essential in the context of patent damages. This court has recognized that questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'") (citing *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 766 (7th Cir. 2013)).

[8] Indeed, AWS itself relies on its technical expert, Anath Grama, to form the factual predicate for its motion. This underscores the fact that the core of AWS's motion is a dispute between technical experts.

damages experts often rely on technical expertise outside of their field when evaluating design around options or valuing the importance of the specific, infringing features in a complex device.") (overruled on other grounds); *see also Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1303 (Fed. Cir. 2015) (damages expert "could, indeed must," rely upon technical and industry experts); *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). Accordingly, AWS's complaint about whether Bergman analyzed the right alternatives does not require exclusion.

### 2. Bergman's Analysis Accounts for Non-Infringing Functions.

AWS claims that Bergman fails to account for non-infringing functionalities. This is incorrect. AWS's argument misapprehends Kove's non-infringing alternatives and it takes as true conclusions that are heavily disputed among the technical experts. *See* Mot. at 20-21.

#### a. Hash Functions Claims (S3)

AWS claims that several of the benefits Kove attributes to ▓▓▓▓ were actually benefits of other, non-infringing functions of the "▓▓▓"[9] Specifically, AWS claims that Kove's alternatives fail to account for three functions that – in AWS's view – comprise most of the value of the ▓▓: caching, replication, and mapping. In presenting this argument, AWS ignores Goodrich's and Bergman's "skip graph" alternative, as well as explicit apportionments included in their reports. Ex. XXX at ¶¶ 275, 279 n.722, 313; Ex. OOO at ¶¶ 103, 172-77.

As context, the Asserted Claims cover the use of "hashing" to organize location information. S3 infringes the ▓▓▓▓▓ claims through a component called the ▓▓▓▓ To estimate the technical benefits of Kove's invention, Goodrich compared the performance of the

---

[9] The term "▓▓ is shorthand for the ▓▓▓▓▓▓ As explained in Kove's expert report, "The ▓▓▓▓ is a caching layer in S3 that uses a ▓▓▓▓▓▓ across the various ▓▓▓. AWS relies on the ▓▓ to serve approximately ▓▓ of requests, if not more, very quickly from the ▓▓, and allows AWS to drastically reduce the load and burden on ▓▓▓▓▓▓." Ex. OOO at ¶ 76.

 against non-infringing alternatives that did not use ████████, including an alternative that removed the ████ component, and a separate alternative that maintained the ████ but replaced the infringing ████████ with a non-infringing "skip graph" structure. Ex. OOO at ¶¶ 84 (removal of the ████ 172-77 (skip graphs).

Goodrich ultimately identified several discrete technical benefits attributable directly to AWS's infringement of the hash function claims, including a ████████ in availability, a ████ ████ decrease in average request speed, a drastic reduction in the number of servers needed to operate S3, and similar improvements to durability and scalability. *Id.* ¶¶ 76-185.

Bergman used Goodrich's quantified benefits as inputs and built models to determine how the technical benefits translated into lower costs and increased revenues. For example, Bergman used AWS's pricing models and performance guarantees to determine that the ████████ in availability attributable to the Kove Patents allowed AWS to earn ████████ in additional profits. Ex. XXX at ¶¶ 316-22. Similarly, Bergman used AWS cost models and capacity analyses, in tandem with technical assumptions provided by Goodrich, to determine that, absent infringement, AWS would have incurred an additional ████████ in increased hardware costs (since AWS would have needed ████████ more servers to operate S3). *Id.* ¶¶ 304-15.

At bottom, AWS's criticisms amount to a disagreement between the experts. Goodrich concludes that all or almost all of the benefits of the ████ derive from hashing; Grama disagrees. That disagreement does not provide a basis to exclude Bergman's opinions.

<u>Caching:</u> AWS observes that the asserted claims do not cover caching. This is not disputed—both Bergman and Goodrich acknowledge that AWS would have access to caching in the non-infringing alternatives. Indeed, Bergman expressly reduces his damages estimate by ████████ to account for the fact that AWS would continue to cache requests in the non-infringing

alternative.  *See* Ex. XXX at ¶ 313.  The experts further consider caching in connection with the "skip graph" non-infringing alternative.  Ex. OOO at ¶¶ 172-84; Ex. XXX at ¶ 278 n.722.  AWS's argument does not require exclusion – at most, it is a disagreement to the implications of caching.

Replication: AWS correctly observes that the Asserted Claims do not cover replication. But Kove does not claim replication as a benefit of the invention, and Kove's non-infringing alternatives do not implicate any replication issues.

As explained above, one of Kove's non-infringing alternatives entails removing the infringing ▮ from S3.  AWS claims that "most of the benefits" of the ▮ arise not from infringement, but from replication.  Mot. at 20.  That certainly is AWS's opinion, but Kove's expert disagrees and explains that the ▮ does *not* replicate location information.  Ex. YYY at ¶¶ 27-28 (explaining that each key is assigned to just ▮ in the ▮).  At trial, AWS may explore this issue on cross-examination – but mere disagreement between experts is not a valid basis for exclusion.

In any event, Goodrich's analysis of the skip graph non-infringing alternative confirms that there is no appreciable value in whatever replication may exist since the skip graph maintains the same replication policies as the infringing system yet fails to capture any meaningful benefits of the ▮ and is not even close to technically acceptable.  *See* Ex. OOO at ¶¶ 179, 174 & 182-84. Bergman expressly considered Goodrich's opinions regarding skip graphs and concluded that "the cost impact to S3 would be greater from use of skip graphs than not using caching at all."  Ex. XXX at ¶ 279 n.722.  Bergman further discounted skip graphs based on Goodrich's conclusion that they would not be technically acceptable and, if considered, would result in higher damages relative to other alternatives.  *See id.* ¶¶ 275, 386.

Mapping: AWS claims that Kove's non-infringing alternative for the hashing claims in S3

17

fails to account for non-infringing "mapping of requests to the appropriate ███." Mot. at 20. AWS is incorrect. Both of Kove's non-infringing alternatives for S3 include mapping functionality. *See* Ex. OOO at ¶¶ 128-29, 182.[10]

### b. Scaling Claims (S3)

Several of the asserted claims ("the Scaling Claims") disclose a mechanism for transferring location information between servers upon reaching a "predetermined performance limit." Ex. OOO at, *e.g.*, ¶ 186. S3 infringes the Scaling Claims by transferring locations between ███ ████████████████████████████████████████████████████████ ████████████████. *Id.* ¶ 188.[11]

To estimate the technical benefits of the Scaling Claims, Goodrich compared the performance of the infringing S3 against several non-infringing alternatives, including alternatives in which AWS would transfer locations based on predicted usage, would use a smaller fraction of their server capacity to reduce the frequency at which transferring would be needed, or would transfer locations at regular time intervals rather than "in response" to the reaching of a limit. Ex. OOO at ¶¶ 191-96, 210-12. Goodrich found each of these alternatives unacceptable, and concluded that, without access to the Scaling Claims, the best available alternative would be for AWS to impose performance limits on their customers. *See id.* ¶¶ 197-204. Bergman then evaluated the impact of that change and concluded that the "limitless" performance enabled by the Scaling Claims commands a 20% price premium in the market. Ex. XXX ¶¶ 344-55. This

---

[10] Separately, AWS's assertion that caching, mapping, and replication are value drivers is at odds with the opinions of their own expert, who asserts that those concepts were "known technologies" that were conventional in the art. *See* Ex. WWW, Grama Report ¶ 74. The Federal Circuit has explained that experts need not apportion to conventional technologies of that kind. *See AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1339 (Fed. Cir. 2015) ("It is not the case that the value of all conventional elements must be subtracted from the value of the patented invention as a whole when assessing damages.").

[11] In an aside, AWS claims that Bergman's opinions regarding ███████████ servers "should be excluded as contrary to the Court's summary judgment decision." Mot. at 23. As explained above, Kove's infringement theories regarding ███████████ are still in the case. *See supra* at Sec. III.

18

conclusion was based on internal AWS pricing analyses that considered the same feature, as well as opinions offered by Kove's industry expert, Karim Fanous. *See id.* ¶¶ 344-55; Ex. ZZZ, Karim Fanous Expert Report ("Fanous Report") ¶¶ 58-63, 105-13. Bergman then applied the 20% price premium and concluded that AWS's use of the Scaling Claims for S3 allowed it to obtain ▮▮▮ ▮▮▮ in additional profits. Ex. XXX at ¶ 355.

AWS challenges Bergman's analysis by alleging that his non-infringing alternative improperly removes "S3's entire ▮▮▮▮▮ (i.e., the ▮▮▮ and ▮▮▮)." Mot. at 22. In fact, that is not Bergman's (or Goodrich's) non-infringing alternative. Goodrich makes clear that S3 would maintain its ▮▮▮ and continue using both ▮▮▮ and ▮▮ servers. *See* Ex. OOO at ¶ 198.

The non-infringing alternative *actually* considered by Goodrich (and, in turn, by Bergman) is narrowly drawn to address only the infringing aspects of S3. *See id.* ¶ 198 & n.139 (explaining that the non-infringing alternative changes only one aspect of S3's index and noting that all cost assumptions would remain the same).[12] Thus, Kove does not claim any benefits from the "replication, layered caching, and randomization across numerous layers of the S3 system," since those features (if they exist) are also present in Kove's non-infringing alternative. Indeed, Bergman accounts for this limited scope in his report. *See* Ex. XXX ¶¶ 344-56 (quantifying incremental benefit only with respect to manual partitioning feature and not assigning any lost revenues to a reduction in speed or replication). In other words, there is no additional benefit for Bergman to apportion.

### c. Hash Function Claims (DDB) and Scaling Limitations (DDB)

While a heading suggests AWS seeks to exclude Bergman's damages opinions relating to

---

[12] Goodrich identifies an additional non-infringing alternative that would apply if AWS is found to infringe both the hash function claims and the scaling claims. *See* Ex. OOO at ¶¶ 230-31. However, even in this alternative, AWS would continue to use both ▮▮▮ and ▮▮ servers. *See id.* ¶¶ 103, 230.

DynamoDB's use of ▮▮▮▮▮▮▮▮, AWS does not present any arguments on the issue. Instead, its argument is directed exclusively to Bergman's analysis of Scaling Claims in DynamoDB. Mot. at 23-24. These arguments do not provide a basis to exclude any opinions relating to hash function damages. The Court should not consider any arguments on this issue raised for the first time in reply. *Brady for Smith v. SSC Westchester Operating Co. LLC*, 533 F. Supp. 3d 667, 677 (N.D. Ill. 2021) (citing *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019)).[13]

As to the scaling limitations, Goodrich provides a detailed analysis regarding the technical benefits of the Scaling Claims. Ex. OOO at ¶¶ 260-75 (Dynamo DB). After considering several non-infringing alternatives, Goodrich concludes that, without the Scaling Claims, AWS would not be able to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* ¶¶ 267-72 (Dynamo DB). Goodrich further concludes that the next best alternative to infringing is a version of DynamoDB in which users ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* ¶¶ 271-72. Bergman evaluated the impact of that change and concluded that the ▮▮▮▮▮▮▮▮▮▮▮▮ enabled by the Scaling Claims ("▮▮▮▮▮▮▮▮") commands a 50% price premium in the market. Ex. XXX at ¶ 416. Bergman reached that conclusion after considering AWS's own pricing for similar features, as well as a pricing analysis performed by Kove's industry expert. *Id*. ¶¶ 393-415; Ex. ZZZ, Fanous Report ¶¶ 94-104. Bergman then applied the 50% price premium and concluded that AWS's use of the Scaling Claims in DynamoDB allowed it to obtain ▮▮▮▮▮▮▮▮ in additional profits. Ex. XXX at ¶¶ 416-18.

---

[13]Regardless, any argument on the issue would fail for the same reasons discussed above. In evaluating the hash function claims for DynamoDB, Goodrich concluded that Kove's claims facilitate ▮▮▮▮▮▮▮▮. Ex. OOO at ¶¶ 233-43. Goodrich acknowledged that AWS *could* cache without Kove's invention, but noted that such a solution would be unworkable, since AWS's cache could only store 16 gigabytes of data, and, without hash functions, AWS would need to store ▮▮▮▮▮▮ *Id.* In other words, without Kove's invention, AWS would only be able to cache ▮▮▮▮ of what is needed, relative to the infringing design. Goodrich rejected this result as technically unacceptable. *Id.* ¶¶ 243-51. Similarly, Bergman rejected this result as economically infeasible, since it would require AWS to incur over ▮▮▮▮▮▮▮▮ in additional hardware expenses. Ex. XXX at ¶¶ 377-86; Ex. AAAA.

In challenging Bergman's opinions, AWS claims that Kove's invention is responsible for "no more than 1%" of the claimed technical benefits and criticizes Bergman for failing to apply that one-percent apportionment. Mot. at 24. Again, that AWS has different opinion is no reason to exclude Kove's expert. Needless to say, Kove disputes AWS's one-percent valuation, and its experts explain in detail why. *See* Ex. OOO at ¶¶ 268-69 (noting that "all subsequent requests . . . would fail"); *id.* ¶¶ 262-66. At trial, the jury should have the opportunity to hear from both side's experts, weigh credibility, and decide for themselves which expert has the better end of the apportionment question.

Finally, Kove's non-infringing alternative does not change the way that DynamoDB uses "replication, layered caching, and randomization," except to the extent that those features are derivative benefits of infringement. *See* Ex. OOO at ¶ 272 (non-infringing alternative would not change any aspects of DynamoDB other than how metadata is handled); Mot. at 24. Thus, there was no additional apportionment for Bergman to provide.

**B.      Bergman's Bargain Split is Rigorously Tied to the Facts of the Case.**

AWS seeks to exclude Bergman's so-called bargain split (a/k/a "profit split"), which is the final step of Bergman's reasonable royalty analysis. Mr. Bergman's bargain split is rigorously tied to the facts of the case and based on sound and recognized methodologies, and thus AWS's *Daubert* challenge should be denied.

To put this in context, the bargain split comes after Bergman has undertaken an extensive quantitative analysis to arrive at a calculation of incremental benefits of the patented claims. Ex. XXX at ¶¶ 280-429. In the final step of the reasonable royalty analysis, Bergman analyzes how the parties to a hypothetical negotiation would allocate these carefully calculated and quantified incremental profits between them – i.e., once the profits attributable solely to the patented invention are isolated, the question is how the parties would split those profits in the hypothetical

negotiation. *See* Ex. XXX at ¶¶ 602-20. By definition, the bargain split is based on a *hypothetical* negotiation, so by necessity it must be estimated.

The Federal Circuit does not require quantitative precision for the reasonable royalty as a whole[14] or the bargain split in particular. Instead, the Federal Circuit simply requires that the expert sufficiently tie a bargain or profit split to the facts of the case. *See*, *e.g.*, *Summit 6,* 802 F.3d at 1299; *Virnetx*, 767 F.3d at 1331-32; *Lucent*, 580 F.3d at 1325 ("[A]ny reasonable royalty analysis necessarily involves an element of approximation and uncertainty.") (attribution omitted)); *see also DSM IP Assets B.V. v. Lallemand Specialties, Inc.,* 2018 WL 1950413, *5 (W.D. Wis. April 25, 2018) (50% profit split opinion was sufficiently tied to facts of the case).

Here, each aspect of Bergman's bargain split analysis is directly tied to the facts of the case and includes an analysis of both qualitative and quantitative evidence.[15] For example, Bergman's bargain split opinions consider his extensive incremental benefit analysis, wherein Bergman analyzes the incremental benefit in great quantitative and qualitative detail. Ex. XXX at ¶¶ 605, 617 and 280-429. In particular, Bergman points out in detail the substantial profits AWS made that were not taken into account in quantifying the profit to be split between the parties to the hypothetical negotiation,[16] which included the inability to quantify the impact of substantial customer losses absent the use of the invention especially as it relates to AWS's largest customers.[17] At bottom, because the parties to the negotiation would understand these and other

---

[14] *Summit 6*, 802 F.3d at 1296 (where the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder).

[15] *See, e.g.*, Ex. XXX at ¶¶ 602-20 and the other sections and paragraphs of the Bergman Report referenced therein.

[16] *See, e.g.*, Ex. XXX at ¶¶ 276, 300, 301-03, 319, 325, 339, 343, 354, 356, 372, 374, 418-20, 424-27, 425-27, 429, 590, 605, 617.

[17] *Id.*.; Ex. ZZZ, Fanous Report ¶¶ 29-30, 34, 42, 43, 56, 62, 64-70, 94, 71-93. Bergman relies on, among other things, the opinions Kove's industry expert Fanous as it relates to the impact that the absence of Kove's invention would have on AWS's customers. *See* note 16, *supra*. AWS does not challenge the

unquantified transformational impacts under the "book of wisdom," Bergman opines that this would drive the parties to provide Kove with a substantial share of the incremental benefits that were capable of being quantified.[18]

Bergman also evaluated the impact of his partly qualitative and partly quantitative case-specific *Georgia Pacific* analysis on the hypothetical negotiation.  Ex. XXX at ¶¶ 606-10; 543-617.  For example, with respect to *Georgia Pacific* factor 6, Bergman considered convoyed sales (*i.e.*, the increased profits from other products resulting from infringement not captured in his quantification of incremental benefits).  *Id.* ¶¶ 555-73, 610, 617, n.1232.  Specifically, Bergman considered an internal AWS analysis showing that " █████████████████████████████████ ████████████████████████████████████████████████████████████ ." *Id.* ¶ 559.  In view of that analysis (and other data point), Bergman quantified convoyed sales to be between ████████ the accused product revenue. *Id.* ¶¶ 559, 610, 617. This benefit is substantial and is one of numerous factors that Bergman relies on for his 50% to 100% bargain split. *Id.* ¶¶ 610, 617.[19]

Bergman's proposed bargain split is further supported by deposition testimony from core S3 and DynamoDB witnesses.  According to these witnesses, AWS invests in S3 and DynamoDB features that are important to customers even when there is no direct quantifiable profit from doing so.  AWS does so because it knows that the downstream unquantified upsides will result in substantial long-term benefits.  For example, the general manager of DynamoDB testified that "[i]f it is critical need for customers, ██████████████, we actually would probably build it…we

---

admissibility of Fanous's opinions relating to the substantial customer impact and losses that would likely stem from the absence of the patented functionalities.

[18] *See, e.g.*, Ex. XXX at ¶¶ 605, 617; note 16, *supra*.

[19] To put this in context, had Bergman captured these substantial convoyed sales benefits in his calculation of incremental benefits, then the lower end of his damages range would only provide Kove with ████████ of the incremental profits that capture such sales. *Id.* at n.1232.

would do what's right for the customers." Ex. XXX at ¶ 615; Ex. BBBB, 5/11/2023 Swami Sivasubramanian Tr. at 334:21-335:11. In other words, the testimony of AWS's key S3 and DynamoDB leaders directly supports the notion that AWS would take ███████████ ████████████████████████████████████ that are not otherwise captured by Bergman's quantification of the incremental benefit. *See* Ex. XXX at ¶¶ 611-16. The key S3 and DynamoDB leaders that provided this testimony include Jassy (the visionary for the S3 accused product, the founder of AWS and the former AWS CEO), Bartenstein (S3 director of project engineering for S3 and former senior manager of product management for S3), Henry (S3's general manager during key times) and Sivasubramanian (DynamoDB's general manager during key times).[20]

At bottom, Bergman's bargain split analysis is directly tied to the facts of the case, is reasonable, and should not be excluded. The cases cited by AWS are inapposite. For example, *Lawrence v. Raymond Corp.,* 2011 WL 3418324, *7 (N.D. Ohio Aug. 4, 201) is a products liability case and involved a cursory expert analysis that has no correlation to Bergman's analysis here. AWS also cites cases that do not target a bargain split analysis as the final step of detailed quantifications of the incremental benefit but instead exclude opinions as to the reasonable royalty rate as whole where there was no explanation as to how any aspect of the royalty rate was derived. *See, e.g.*, *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC,* 879 F.3d 1332, 1349-50 (Fed. Cir. 2018).

AWS puts much weight on a single decision in which Mr. Bergman's bargain split was excluded while ignoring numerous instances in which courts have rejected challenges to Mr.

---

[20] Ex. XXX at ¶¶ 611-16.; Ex. CCCC, Jassy Tr. 6:4-21; 35:2-13; Ex. DDDD, Bartenstein Tr. 25:8-27:22-235:11-236:5; Ex. EEEE, Henry Tr. 18:18-19:23, 21:7-23; 257:17-258:10, 259:3-1; Ex. FFFF (AMZ_KOVE_00048001); Ex. GGGG, 5/10/2023 Sivasubramanian Tr. 16:9-17; Ex. BBBB, 5/11/2023 Sivasubramanian Tr. 334:21-335:11.

Bergman's bargain split methodologies.  Courts around the country have endorsed Bergman's analysis – to point to one contrary example is akin to arguing that if a judge is ever reversed on appeal, all of his opinions are suspect.  For example, AWS fails to mention that in *Droplets v. Yahoo*, while excluding Bergman's bargain split opinion as to Nordstrom, the same court denied the motion to exclude Bergman's bargain split as to Yahoo.  *Droplets, Inc. v. Yahoo! Inc.*, 2021 WL 9038355, *7 (N.D. Cal. Aug 9, 2021).  AWS also fails to mention that a district court recently rejected Amazon and AWS's challenges to Mr. Bergman's bargain split in the case of *Almondnet, Inc. v. Amazon.com, Inc. et al.*, 6:21-CV-00898 (W.D. Tex.).[21]  AWS also ignores other patent cases in which courts rejected challenges to Mr. Bergman's bargain split opinions.  *See, e.g., Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 35 F.4th 1367, 1379 (Fed. Cir. 2022); *Daedalus Blue, LLC v. Microstrategy Inc.*, 2023 WL 5690212, *1 (E.D. Va. July 24, 2023); *Longhorn HD LLC. v. Netscout Sys., Inc.*, No. 2022 WL 903934, *3 (E.D. Tex. Mar. 27, 2022).  Here, as in the other cases in which Bergman's bargain or profit split opinions were admitted, Bergman's opinions are directly tied to the facts of the case and should not be excluded.

---

[21] The court summarily rejected AWS's arguments.  *See* Ex. HHHH Judge Albright 1/4/2024 Tr. at 61:19-20 (summary denial); *see also id.* at 37:11-13, 38:24-39:4,45:9-47:10, 57:12-59:24 (profit split arguments).

Dated: February 23, 2024

Respectfully submitted,

/s/ Courtland L. Reichman

Khue V. Hoang *(pro hac vice)*
khoang@reichmanjorgensen.com
Jaime F. Cardenas-Navia *(pro hac vice)*
jcardenas-navia@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
400 Madison Avenue, Suite 14D
New York, NY 10017
Telephone: (212) 381-1965
Facsimile: (650) 560-3501

Christine E. Lehman *(pro hac vice)*
clehman@reichmanjorgensen.com
Adam Adler *(pro hac vice)*
aadler@reichmanjorgensen.com
Philip Eklem *(pro hac vice)*
peklem@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Telephone: (202) 894-7310
Facsimile: (650) 560-3501

Amy Ruhland *(pro hac vice)*
aruhland@reichmanjorgensen.com
Taylor Mauze *(pro hac vice)*
tmauze@reichmanjorgensen.com
Navid Bayar *(pro hac vice)*
nbayar@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
901 S. Mopac Expressway, Building 1, Suite 300
Austin, TX 78746
Telephone: (650) 623-1401
Facsimile: (650) 560-3501

Renato Mariotti (State Bar No. 6323198)
renatto.mariotti@bclplaw.com
Holly H. Campbell (State Bar No. 6320395)
holly.campbell@bclplaw.com
BRYAN CAVE LEIGHTON PAISNER LLP
161 North Clark Street, Suite 4300
Chicago, IL 60601
Telephone: (312) 602-5000

Courtland L. Reichman *(pro hac vice)*
creichman@reichmanjorgensen.com
Shawna L. Ballard *(pro hac vice)*
sballard@reichmanjorgensen.com
Gina H. Cremona *(pro hac vice)*
gcremona@reichmanjorgensen.com
Savannah Carnes *(pro hac vice)*
scarnes@reichmanjorgensen.com
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 560-3501

***ATTORNEYS FOR PLAINTIFF***
***KOVE IO, INC.***

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 23rd day of February, 2024, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Northern District of Illinois, Eastern Division, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

*/s/ Courtland L. Reichman*
Courtland L. Reichman
