**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| KOVE IO, INC., | |
| *Plaintiff,* | Case No. 1:18-cv-8175 |
| v. | ███████████████ |
| AMAZON WEB SERVICES, INC., | |
| *Defendant.* | |

**AWS'S RESPONSE TO KOVE'S MOTION FOR
SANCTIONS AND TO EXCLUDE CERTAIN
EXPERT OPINIONS**

Alan M. Fisch
*alan.fisch@fischllp.com*
R. William Sigler
*bill.sigler@fischllp.com*
Jeffrey M. Saltman *(pro hac vice)*
*jeffrey.saltman@fischllp.com*
Lisa N. Phillips *(pro hac vice)*
*lisa.phillips@fischllp.com*
FISCH SIGLER LLP
5301 Wisconsin Avenue NW, Suite 400
Washington, D.C. 20015
202.362.3500

Ken K. Fung *(pro hac vice)*
*ken.fung@fischllp.com*
FISCH SIGLER LLP
400 Concar Drive
San Mateo, CA 94402
(202) 362-3500

*Attorneys for Amazon Web Services, Inc.*

# TABLE OF CONTENTS

I.   KOVE'S MOTION FOR SANCTIONS SHOULD BE DENIED. ............................... 1

    A.   Kove Shows No Prejudice. .................................................................. 2

    B.   AWS Complied with Its Discovery Obligations and Took All Reasonable
        Steps to Preserve and Produce Relevant ESI. ...................................... 6

    C.   Kove's Requested Relief Is Inappropriate. .......................................... 9

II.  THE CHALLENGED DAMAGES OPINIONS ARE ADMISSIBLE ...................... 11

    A.   Economic Comparability ................................................................... 11

    B.   Technical Comparability .................................................................... 13

    C.   Econnectix Transaction ..................................................................... 15

    D.   Non-Infringing Alternatives .............................................................. 16

III. THE CHALLENGED TECHNICAL OPINIONS ARE ADMISSIBLE. .................. 17

    A.   The Challenged Non-Infringement Opinions Are Timely. ................. 17

    B.   Dr. Grama Hasn't Offered Any "Practice the Prior Art" Opinions. ... 21

    C.   The Challenged "Non-Hierarchical" Opinions Are Admissible. ........ 23

    D.   AWS Will Adhere to the Court's Claim Constructions. ..................... 25

    E.   The Challenged OTDP Opinions Are Admissible. ............................ 25

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*01 Communique Lab., Inc. v. Citrix Sys. Inc.*,
 889 F.3d 735 (Fed. Cir. 2018) ................................................... 23

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
 694 F.3d 1312 (Fed. Cir. 2012) ........................................ 12, 14

*Adasa, Inc. v. Avery Dennison Corp.*,
 55 F.4th 900 (Fed. Cir. 2022) ................................................. 14

*Apple Inc. v. Samsung Elecs. Co.*,
 No. 5:12-cv-630, 2014 WL 173409 (N.D. Cal. Jan. 9, 2014) ................... 17

*Ayers v. Heritage-Crystal Clean, LLC*,
 No. 1:20-cv-5076, 2022 WL 2355909 (N.D. Ill. June 1, 2022) ................ 10

*Baxter Int'l Inc. v. CareFusion Corp.*,
 No. 15-cv-9986, 2020 WL 10486005 (N.D. Ill. Aug. 12, 2020) ................ 17

*Bio-Rad Lab'ys v. 10X Genomics*,
 967 F.3d 1353 (Fed. Cir. 2021) ............................................... 14

*Bone Care Int'l, LLC v. Pentech Pharms., Inc.*,
 No. 08-cv-1083, 2010 WL 3894444 (N.D. Ill. Sept. 30, 2010) ............... 21

*CaramelCrisp LLC v. Putnam*,
 No. 19-cv-2699, 2022 WL 1228191 (N.D. Ill. Apr. 26, 2022) ............... 1, 6

*Covarrubias v. Wendy's Rest.*,
 No. 19-cv-4866, 2021 WL 4258701 (N.D. Ill. June 21, 2021) ................ 10

*Does 1-5 v. City of Chicago*,
 No. 18-cv-3054, 2019 WL 2994532 (N.D. Ill. July 9, 2019) .................. 3

*Domanus v. Lewicki*,
 284 F.R.D. 379 (N.D. Ill. 2012) ............................................... 9

*DR Distributors, LLC v. 21 Century Smoking, Inc.*,
 513 F. Supp. 3d 839 (N.D. Ill. 2021) ........................................ 10

*Droplets, Inc. v. Yahoo! Inc.*,
 No. 12-cv-3733, 2022 WL 2670188 (N.D. Cal. Feb. 28, 2022) ............... 23

*Ericsson, Inc. v. D-Link Sys., Inc.*,
 773 F.3d 1201 (Fed. Cir. 2014) ............................................... 12

*Finjan Inc v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) ..................................................................... 12, 13

*Flair Airlines, Ltd. v. Gregor, LLC*,
  No. 18-cv-2023, 2018 WL 8445779 (N.D. Ill. Dec. 14, 2018) ................................. 3

*Franklin v. Howard Brown Health Ctr.*,
  No. 17-cv-8376, 2018 WL 4784668 (N.D. Ill. Oct. 4, 2018) ................................. 10

*Haynes v. Dart*,
  No. 08-cv-4834, 2010 WL 140387 (N.D. Ill. Jan. 11, 2010) ................................... 8

*Hollis v. CEVA Logistics U.S., Inc.*,
  603 F. Supp. 3d 611 (N.D. Ill. 2022) ................................................................ 10

*I4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) ........................................................................ 16

*In re Loc. TV Advert.*,
  No. 18-cv-6785, 2023 WL 5607997 (N.D. Ill. Aug. 30, 2023) ............................ 3, 6

*Integra Lifesciences I, Ltd. V. Merck*,
  331 F.3d 860 (Fed. Cir. 2003) ........................................................................ 15

*Jones v. Bremen High Sch.*,
  No. 08-cv-3548, 2010 WL 2106640 (N.D. Ill. May 25, 2010) ............................ 2, 9

*Krumweide v. Brighton Assocs., L.L.C.*,
  No. 05-cv-3003, 2006 WL 1308629 (N.D. Ill. May 8, 2006) ................................. 2

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ......................................................................... 14

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ...................................................................... 14

*Pable v. Chicago Transit Authority*,
  No. 1:19-cv-7868, 2023 WL 2333414 (N.D. Ill. Mar. 2, 2023) ............................ 10

*Promega Corp. v. Applied Biosys.*,
  2013 WL 9988881 (N.D. Ill. May 28, 2013) ..................................................... 25

*Snider v. Danfoss, LLC*,
  No. 15-cv-4748, 2017 WL 2973464 (N.D. Ill. July 12, 2017) ............................ 2, 3

*Solaia Tech. LLC v. ArvinMeritor, Inc.*,
  361 F. Supp. 2d 797 (N.D. Ill. 2005) ........................................................... 17, 20

*Space Data Corp. v. Alphabet Inc.*,
  No. 16-cv-3260, 2018 WL 10454865 (N.D. Cal. Dec. 17, 2018) ............................................ 17

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*,
  279 F.3d 1357 (Fed. Cir. 2002) .......................................................................... 22, 23

*Torgersen v. Siemens Bldg. Tech., Inc.*,
  No. 1:19-cv-4975, 2021 WL 2072151 (N.D. Ill. May 24, 2021) ............................................ 10

*TVIIM, LLC v. McAfee, Inc.*,
  No. 13-cv-4545, 2015 WL 4148354 (N.D. Cal. July 9, 2015) ................................................. 12

*Walsh v. LG Chem Am.,*
  No. 18-cv-1545, 2021 WL 11878781 (D. Ariz. Mar. 15, 2021) ............................................. 21

*Worldpay, US, Inc. v. Haydon*,
  No. 17-cv-4179, 2018 WL 5977926 (N.D. Ill. Nov. 14, 2018) ............................................. 1, 3

**Rules**

Fed. R. Civ. P. 37 ........................................................................................................ passim

## I. KOVE'S MOTION FOR SANCTIONS SHOULD BE DENIED.

Kove waited until September 8, 2023 to first file its motion seeking discovery sanctions. That was five months after this Court's April 7, 2023 deadline "for filing any further motions relating to fact discovery" had passed.[1] And there's no excuse for Kove's failure to adhere to the Court's deadline, as Kove had many opportunities to timely move. Kove knew that there were ███ potential metrics by mid-2020, and that AWS was requesting further specificity on what metrics Kove wanted.[2] Kove knew the details of AWS's document retention policy by August 25, 2021, at the latest, when Kove first took the deposition of AWS's Donal Walsh.[3] And Kove then described this same spoliation theory in a brief that it filed on October 7, 2021, in response to an AWS request for a protective order.[4] Hence, Kove's motion should be denied as untimely.

Should the Court choose to consider the motion, though, it should be denied on its merits. As this Court has explained, "Rule 37(e) sets out five prerequisites that must be met before any sanctions may be imposed: (1) the information at issue must be [ESI]; (2) there must be anticipated or actual litigation; (3) [the ESI] should have been preserved; (4) the ESI must have been lost because a party failed to take reasonable steps to preserve it; and (5) the lost ESI must be unable to be restored or replaced through additional discovery."[5] If all five prerequisites are met, a court "evaluates whether the party seeking the ESI was prejudiced."[6] If so, the court may "order measures no greater than necessary to cure the prejudice."[7]

---

[1] Dkt. 611 (3-30-23 Minute Entry); *see also* Dkt. 679 (Kove's original motion).

[2] *See, e.g.*, Ex. 5 (Kove 10-15-20 letter) at 4.

[3] Dkt. 748-25, Ex. V to Kove's Initial Spoliation Motion, at 49:11–13.

[4] Dkt. 437 at 12–13; *see also* Dkt. 748-26 at 2 (Kove letter referring to "prevent[ing] further spoliation").

[5] *CaramelCrisp LLC v. Putnam*, No. 19-cv-2699, 2022 WL 1228191, at *5 (N.D. Ill. Apr. 26, 2022) (citing *Worldpay, US, Inc. v. Haydon*, No. 17-cv-4179, 2018 WL 5977926, at *3 (N.D. Ill. Nov. 14, 2018)).

[6] *CaramelCrisp*, 2022 WL 1228191, at *5.

[7] Fed. R. Civ. P. 37(e)(1). Under 37(e)(2), certain severe penalties further require a finding of intent. Kove

Here, Kove hasn't met at least three of the prerequisites, as it hasn't shown that the ESI at-issue should've been preserved, that AWS's actions were unreasonable, or that additional fact and expert discovery didn't replace the ESI. But without even reaching those factors, Kove's motion should be denied because Kove hasn't been prejudiced by the loss of any of the information that it claims should've been preserved.

## A. KOVE SHOWS NO PREJUDICE.

Under Rule 37(e), sanctions for spoliation of ESI always require a finding of "prejudice to another party from loss of the information." As this Court has explained, a party is prejudiced when spoliation substantially denies that party the ability to support or defend against a claim in the litigation.[8] Thus, if other evidence in a case can replace lost ESI that a plaintiff might've used to prove its claims, there's no prejudice, and no sanctions are appropriate, regardless of whether a party acted reasonably or unreasonably in preserving ESI.

For instance, *Snider v. Danfoss, LLC* involved a plaintiff's civil rights claims against her former employer.[9] This Court found that the defendant had "mechanically and blindly followed its 90-day destruction policy in the face of a clear threat of litigation," resulting in the deletion of both the plaintiff's and her direct supervisor's workplace emails.[10] Though the other prerequisites for relief under Rule 37(e) were satisfied, the Court concluded that "no prejudice has been shown, and consequently, no sanctions are warranted."[11] As the Court explained, the defendant had already

---

stated that it's seeking relief under (e)(1), instead, because it doesn't require intent. Dkt. 748 at 10.

[8] *E.g.*, *Krumweide v. Brighton Assocs., L.L.C.*, No. 05-cv-3003, 2006 WL 1308629, at *10 (N.D. Ill. May 8, 2006); *Jones v. Bremen High Sch.*, No. 08-cv-3548, 2010 WL 2106640, at *8 (N.D. Ill. May 25, 2010).

[9] No. 15-cv-4748, 2017 WL 2973464 (N.D. Ill. July 12, 2017), *adopted* 2017 WL 3268891 (Aug. 1, 2017).

[10] 2017 WL 2973464, at *6.

[11] *Id*. at *8; *see id*. at *6 ("First, [the] emails are ESI…. Second, litigation was anticipated…. Third, there was a duty to preserve…. Fourth, the ESI was lost….Fifth, … the entirety of the ESI cannot be restored.").

reviewed "over 22 gigabytes of data" and produced "over 400 pages of emails" from other employees.[12] Because the plaintiff could rely on that and other evidence (e.g., testimony) in place of the lost ESI to prove her case, there was no prejudice— or, as the decision put it, "No harm, no foul."[13] And this Court and others have repeatedly denied requests for Rule 37 sanctions in circumstances where prejudice to the party seeking the ESI is lacking.[14]

Here, Kove's expert reports and depositions confirm that there's no harm, no foul here, as Kove hasn't suffered any prejudice that would permit Rule 37 sanctions. To begin with, there's nothing unusual or improper per se about an expert using the available information produced in discovery to extrapolate about other time periods. Kove's damages expert, Mr. Bergman, testified that he does it "all the time," in response to questions about the same ESI that Kove relies on in its motion. As he testified:

> AWS Atty: [F]or the 2012 and 2013 data, you had to extrapolate that data, correct?
> Mr. Bergman: Yes.
> AWS Atty: Okay. And that's because AWS didn't have pre-2014 usage data, right?
> Mr. Bergman: right.
> AWS Atty: Okay. And have you had to extrapolate data going back … like this in prior cases?
> Mr. Bergman: All the time.
> AWS Atty: … It's a pretty common technique for experts when data isn't available, right?
> Mr. Bergman: Yes.[15]

And though Kove's infringement expert, Dr. Goodrich notes in his report that some metrics

---

[12] *Id*. at *2.

[13] *Id*. at *1.

[14] *See, e.g.*, *id*. at *8; *Does 1-5 v. City of Chicago*, No. 18-cv-3054, 2019 WL 2994532, at *7 (N.D. Ill. July 9, 2019) ("[E]ven if the alleged recording should have been preserved," there's "no prejudice."); *In re Loc. TV Advert.*, No. 18-cv-6785, 2023 WL 5607997, at *8 (N.D. Ill. Aug. 30, 2023) (finding "no prejudice to Plaintiffs resulted from [ESI's] loss"); *Worldpay*, 2018 WL 5977926, at *3 (similar); *see also Flair Airlines, Ltd. v. Gregor, LLC*, No. 18-cv-2023, 2018 WL 8445779, at *1 (N.D. Ill. Dec. 14, 2018) (denying sanctions motion relying on speculation), *adopted* 2019 WL 1465736 (Apr. 3, 2019).

[15] Ex. 1 at 93:22–94:13 (no objections).

that he considered were limited in time, he never states in his report or declaration attached to Kove's motion that this prevented him from proceeding with his analysis. On the contrary, he confirmed that the detailed information that AWS provided was sufficient. For instance, in the first paragraph of Dr. Goodrich's opening report that Kove cites in the appendix to its motion (Ex. U), Dr. Goodrich cited five metrics that AWS produced showing ███████████████.[16] He then used them to opine on how much ██████ would increase, on average and at the ██████████ ██████████, absent the allegedly infringing ██████ feature. And in doing so, he confirmed that the data being "limited in time" wouldn't impact his opinions:

> Nevertheless, the produced ███████████████████████████████. Based on the available data, my best estimate is that the impact to ████████ would not have changed significantly over the relevant period.[17]

Thus, contrary to Kove's assertions that it was prejudiced by a lack of data—including, specifically, data showing ██████████████████████ for S3 GET requests[18]—Dr. Goodrich already provided opinions on that topic, based on the available data AWS produced. And he expressly predicted that the unavailable data wouldn't show any "significant[]" change.

And Dr. Goodrich repeatedly offers such opinions throughout his report, including in other paragraphs directly stating that the metrics that AWS produced were sufficient. For example, in ¶ 107, which Kove's appendix also cites, Dr. Goodrich states that "AWS has produced data that can be used to estimate the speed differential between the amount of time it takes to retrieve an ██████ from the ████████████ and the amount of time it takes to retrieve an ██████ from the ████████████"[19]

---

[16] *Compare* Dkt. 700-52 at 43–44, n.58 (citing five metrics (e.g., AMZ_KOVE_000401268, ███████████ for GET requests Apr. 2016 to Sept. 2020)) *with* Dkt. 748-24 at 1 (Ex. U acknowledging one of those five).

[17] Dkt. 700-52 at ¶ 120. The percentiles refer to the ██████████████ of retrievals.

[18] *See* Dkt. 748-24 (Ex. U) at 1. Kove also includes the ████████████ But Kove doesn't explain how this would show anything that the information that AWS produced doesn't show.

[19] Dkt. 700-52 at ¶ 107.

Similarly, in ¶ 112, Dr. Goodrich states that:

> AWS produced the average aggregate ▋ lookup time (T) and the ▋ hit rate dating back to April 24, 2016. I can estimate what the ▋ would have been back to that date by using the data AWS provided to estimate the value of Tc going back to that date. ***Fortunately,*** ▋ ***is relatively predictable and does not vary much over time, such that I would expect the*** ▋ ***to stay roughly the same throughout the entire damages period***.[20]

And there are many other examples throughout his report and Mr. Bergman's.[21] Particularly in view of those opinions, Kove fails to identify any lost ESI that resulted in prejudice and would permit an award of Rule 37 sanctions.

Indeed, AWS has produced a mountain of discovery, including ▋ metrics and hours of related testimony, in response to Kove's 237 RFPs, 90 Rule 30(b)(6) topics, 25 interrogatories, and the remarkable volume of letters and emails that Kove sent throughout discovery reinterpreting or tacking more demands onto those more formal discovery requests.[22] Illustrating the scope of the relevant discovery that AWS has provided, Kove's 1,580-document exhibit list for trial currently includes ▋ AWS metrics documents.[23] And when designating deposition testimony for trial, Kove designated 36 passages of testimony from Donal Walsh ▋

▋), covering ▋ AWS metrics documents, plus 17 passages of testimony from Shiv Pal Singh ▋ covering ▋ more metrics documents.[24] Thus, AWS produced multiple metrics, plus voluminous other discovery, that corresponds to each item listed in the appendix attached to Kove's motion (Dkt. 748-24). AWS also produced all available metrics

---

[20] *Id.* at ¶ 112 (emphasis added).

[21] *See, e.g., id.* at ¶¶ 111, 114, 120, 249 (n.172), 264; Dkt. 745-11 at ¶¶ 166, 220; *see also id.* at ¶ 400 (Mr. Bergman's graph showing growth in usage of DDB over time).

[22] *See* Ex. 2 (appendix listing produced metrics documents).

[23] Ex. 3 (exhibit list). Dr. Goodrich's report cited ▋ of these documents, but Kove's appendix only lists ▋ Dkt. 748-24. Each metrics document is a CSV or Excel file with the available data for a given metric.

[24] Ex. 4 (Kove's deposition designations).

and information that this Court ordered on December 30, 2022, when granting-in-part and deny-ing-in-part Kove's previous motion to compel hardware and metrics information.[25] And the dec-larations from Mr. Walsh that AWS served in connection with that product details, for instance, the metrics AWS ███████████████████████████████████████████████ ████ of the accused products.[26]

Yet, Kove doesn't attempt to identify the relevant metrics and other discovery that AWS has already produced for each item of ESI listed in the appendix to Kove's motion.[27] Kove also doesn't explain why the information that AWS has produced is inadequate, or how any missing ESI substantially denied Kove the ability to support or defend against any claim in this litigation. Nor does Kove give any reason why any missing ESI would actually be favorable to its case. Dr. Goodrich's declaration only states that he would've considered the missing information.[28] And as this Court's case law confirms, the fact that information is missing, without more, is insufficient to show prejudice. This Court should thus deny Kove's motion, due to the lack of prejudice.

**B.** **AWS COMPLIED WITH ITS DISCOVERY OBLIGATIONS AND TOOK ALL REASONA-BLE STEPS TO PRESERVE AND PRODUCE RELEVANT ESI.**

Of the five prerequisites for Rule 37(e) sanctions, the most relevant here are that the ESI: "should have been preserved" (No. 3); was lost "because a party failed to take reasonable steps to preserve it" (No. 4); and can't "be restored or replaced through additional discovery" (No. 5).[29] As the Advisory Committee Notes explain, these are fact-specific inquiries.[30] And the facts here show

---

[25] Dkt. 562 at 2; Dkt. 748-16 (Ex. M); Dkt. 748-70 (Ex. NNN).

[26] Dkt. 748-16 (Ex. M); Dkt. 748-70 (Ex. NNN).

[27] As noted, Kove's appendix (Ex. U) doesn't cite all the metrics that AWS produced for each item.

[28] Dkt. 748-1 at ¶ 17.

[29] *CaramelCrisp*, 2022 WL 1228191, at *5.

[30] Fed. R. Civ. P. 37, Advisory Committee Note to 2015 Amendment; *see also Loc. TV Advert.*, 2023 WL 5607997, at *5 ("Reasonable does not mean perfect.").

that these prerequisites aren't met and Kove's characterizations of the record are incorrect.

S3 and DDB both provide cloud data storage services to customers. This requires a massive physical infrastructure, including thousands of individual devices, located in the over ███ ████ that AWS currently maintains across the globe. Early in discovery, AWS informed Kove that these devices generate operational data for more than ███ potentially relevant metrics, and asked Kove to further specify what metrics it was looking for. Kove acknowledged this, for example, in a letter it sent three and a half years ago, on October 15, 2020. As Kove states in that letter:

> This dialogue … began with AWS stating that there are over ███ potential metrics that are measured within S3 and DynamoDB that relate to the components and functionality that Kove has defined as the "Relevant Features." …. Per the discussions over many months, the notion was that we would provide guidance as to the types of metrics that Kove is looking for and AWS would provide information about the types of metrics that exist within those categories.[31]

AWS thereafter provided more information on what was available, and repeatedly produced metrics in response to Kove's evolving demands. For example, in February 2021, Kove requested 15 metrics for S3 and DDB, "as far back as data is available."[32] The first item on that list sought ██████████████████████████████████. AWS produced that. By contrast, Kove's motion now focuses on certain percentiles. AWS also produced that, as far back as available, once Kove specified that it was seeking it. This history and the metrics produced in response to Kove's many requests are detailed in AWS's 19-page response to Interrogatory 14.[33]

Thus, AWS repeatedly asked Kove to specify what metrics it was seeking, beyond Kove's broadly worded RFPs. AWS then provided those metrics to the extent available. This was

---

[31] Ex. 5 (Kove 10-15-2020 letter) at 4 ("In our call we suggested that it would be helpful to have further discussions regarding the metrics that AWS has, so that through a mutual dialogue the scope of discovery of those metrics can be defined. You indicated that you were open to initiating this dialogue.").

[32] Dkt. 748-63 (Kove 2-8-2021 letter) at 2.

[33] Ex. 6.

reasonable, given that there are over ███ potential metrics. And AWS's policy of not retaining operational data for S3 and DDB for more than ███████ is likewise reasonable. At his Rule 30(b)(6) deposition, AWS's head of engineering for DDB, Donal Walsh, explained that "███████ █████████████████████████████████████████████████████████████████████████████████ [34] Indeed, just for DDB, it costs nearly ██████████ per month to store the operational data for all the available metrics.[35] And if AWS were required to retain that operational data for just one additional year, the cost of doing so ██████████ would already exceed Kove's maximum estimate of the compensatory damages for DDB ████████████ by more than ██████████.[36]

Courts and commentators recognize that the spoliation analysis in these circumstances isn't as simple as asking whether a defendant imposed a litigation hold. As the Patent Case Management Judicial Guide, published by the Federal Judicial Center, has observed:

> Spoliation is more complicated in the context of electronic discovery …. Computer data is in an almost constant state of fluctuation, being altered, overwritten, and otherwise changed. Attempting to arrest this process could prove disastrous for many systems and/or result in enormous costs to the preserving party.[37]

Here, not only is the ESI at issue extremely expensive to store, it's also relatively unlikely to be important, given that Kove's experts found the data that AWS could produce sufficient. Thus, one or more pre-requisites to relief under Rule 37(e) aren't satisfied. If AWS deleted ESI it had a duty preserve, it did so despite taking reasonable steps, including repeatedly asking Kove what data it wanted. Alternatively, the fifth prerequisite (which overlaps in-part with prejudice) isn't satisfied

---

[34] Ex. 7 at 431:11–16; *see also id*. at 430:1–436:11 (further explaining how AWS stores the data).

[35] *Id*. at 431:22–432:19.

[36] Dkt. 745-11 at ¶¶ 13, 618. The figure of ███ million is ██████████████ (the cost for April 2023, as Mr. Walsh testified).

[37] (3d Ed.), Ch. 4.4.1; *accord, e.g., Haynes v. Dart*, No. 08-cv- 4834, 2010 WL 140387, at *4 (N.D. Ill. Jan. 11, 2010) (Failure to institute litigation hold "it is not per se evidence of sanctionable conduct.").

because other evidence can make up for any lost ESI, such as the wealth of information AWS produced and Kove's expert evidence. As the Advisory Committee Notes state:

> [Sometimes] the content of the lost information may be fairly evident, the information may appear to be unimportant, or the abundance of preserved information may appear sufficient to meet the needs of all parties. Requiring the party seeking curative measures to prove prejudice may be reasonable in such situations.[38]

That's the situation here. And for the all the reasons above, Kove doesn't establish that the prerequisites to Rule 37 sanctions are satisfied.

### C. KOVE'S REQUESTED RELIEF IS INAPPROPRIATE.

Kove requests "[c]urative measures under Rule 37(e)(1)," because "[i]ntent does not matter under this subdivision."[39] But even if all prerequisites for relief under Rule 37(e)(1) were satisfied, the measures that Kove is requesting would still be inappropriate. As noted, Rule 37(e)(1) provides that, "upon finding prejudice," a court "may order measures no greater than necessary to cure the prejudice." In this and other spoliation contexts, a court's discretion in granting sanctions "is guided by three principal factors: (1) a breach of the duty to preserve evidence; (2) the level of culpability for the breach; and (3) the prejudice that resulted from the breach."[40] Here, for all the reasons detailed above, even if Kove could show that sanctions are warranted, Rule 37(e)(1) and all three of those factors would mandate minimal or no curative measures.

And the seven cases that Kove cites, as support for the relief Kove is requesting, confirm such relief would be inappropriate here. None of those cases involve patent infringement, much less accused products similar to the cloud storage services at issue.[41] None address analogous

---

[38] Fed. R. Civ. P. 37, Advisory Committee Notes to 2015 Amendment.

[39] Dkt. 748 at 9.

[40] *Domanus v. Lewicki*, 284 F.R.D. 379, 386 (N.D. Ill. 2012) (citing *Jones*, 2010 WL 2106640, at *5), objections sustained on other grounds, 2012 WL 3307364 (Aug. 13, 2012).

[41] *See* Dkt. 748 at 11 (citing cases).

circumstances where: (1) the ESI consists of computer-generated operational data from thousands of devices; (2) that ESI is expensive to store and can be used to generate ███ potential metrics; (3) the defendant repeatedly asked the plaintiff what data it wanted and has already produced ███ ██████████████, including the most relevant information; and (4) the plaintiff's own experts agree that what the defendant produced is sufficient. AWS hasn't found any cases where a plaintiff pursued Rule 37 sanctions, despite such circumstances, as Kove has done here.

In other words, this isn't a case like *Hollis* or *Covarrubias*, which Kove cites, where the missing ESI was critical video evidence of an incident giving rise to the litigation.[42] As this Court noted in *Hollis*, "video recorded evidence is so powerful that the Supreme Court altered how summary judgment motions are decided when [it] contradicts testimony of a party."[43] AWS's reasonable actions and the potential prejudice here aren't comparable. And the remaining cases that Kove cites all involve extreme culpable conduct. For instance, in *Torgersen* and *Pable*, one party intentionally destroyed evidence to thwart discovery at its most basic level.[44] The *DR Distributors*, *Ayers*, and *Franklin* cases involve discovery abuse that's nearly as flagrant.[45] And Kove's inability to provide a single analogous case that supports this unnecessary motion shows that it's baseless.

---

[42] *Hollis v. CEVA Logistics U.S., Inc.*, 603 F. Supp. 3d 611, 622 (N.D. Ill. 2022) ("[V]ideo of the incident would have definitively established what occurred."); *Covarrubias v. Wendy's Rest.*, No. 19-cv-4866, 2021 WL 4258701, at *4 (N.D. Ill. June 21, 2021) (similar).

[43] *Hollis*, 603 F. Supp. 3d at 622; *accord Covarrubias*, 2021 WL 4258701, at *4 (It's "all but impossible" to substitute testimony for the "objective evidence that the surveillance footage would have provided").

[44] *Pable v. Chicago Transit Authority*, 2023 WL 2333414, at *37 (N.D. Ill. Mar. 2, 2023) ("Pable intentionally deleted the Signal messages … and lied about the spoliation–twice, under oath"); *Torgersen v. Siemens Bldg. Tech., Inc.*, 2021 WL 2072151, at *5 (N.D. Ill. May 24, 2021) (finding intentional conduct).

[45] *Franklin v. Howard Brown Health Ctr.*, No. 17-cv-8376, 2018 WL 4784668, at *6 (N.D. Ill. Oct. 4, 2018) (finding "gross negligence," and "that's viewing things favorably to [spoliator]"); *Ayers v. Heritage-Crystal Clean, LLC*, No. 1:20-cv-5076, 2022 WL 2355909, at *4 (N.D. Ill. June 1, 2022) ("All parties agree Ayers intentionally deleted ESI that he had a duty to preserve."); *DR Distributors, LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 982 (N.D. Ill. 2021) (finding that counsel may not have acted with intent, but they failed to investigate, and court wasn't "confident about the innocence" of party they represented).

## II.   THE CHALLENGED DAMAGES OPINIONS ARE ADMISSIBLE.

### A.   ECONOMIC COMPARABILITY

Contrary to Kove's assertion, Ms. Bennis addressed the economic comparability of each of the licenses in her report's discussion of *Georgia-Pacific* factor 2. For example, Ms. Bennis's report analyzes the economic comparability of the ████████████ to a hypothetical license between Kove and AWS. She explains that the agreement was a purchase of the patents rather than a license, included a total of █ patents (█ technically comparable to the patents-in-suit), was structured as ████████, and that those patents had additional intangible value since they could be used in litigation.[46] Similarly, she details that the ████████ was a purchase of ██ patents—compared to the hypothetical license's three—that it was structured as ████████, its proximity in time to the hypothetical negotiation, and that the commitment to make "████████ ████████████████████████████████████."[47]

Ms. Bennis similarly analyzes each of the other 6 agreements, comparing them to the hypothetical license, including the number of patents involved, the circumstances of the parties negotiating, and the agreement's scope (lump sum vs. running royalty), amongst other factors. She also notes the agreements' differences, like cross licensing arrangements and indirect negotiations through third-parties, which affect those licenses' comparability to the hypothetical negotiation.[48]

And Ms. Bennis didn't "expressly disclaim an opinion on comparability," as Kove asserts.[49] Rather, she did the opposite. For example, Kove asked her if she thought the ██

---

[46] Dkt. 748-43 (Ex. NN) at 115–16.

[47] *Id.* at 110–11.

[48] *See, e.g., id.* at 124 (addressing differences between the ████████ and the hypothetical negotia-tion); *id.* at 127 addressing differences between the ████████ and the hypothetical negotiation).

[49] Dkt. 748 at 13.

████████ was economically comparable. She responded: "Yes."[50] And in context, each citation in Kove's string cite of supposed concessions is to Kove's counsel's questions pressing Ms. Bennis to use the phrase "economically comparable," while ignoring that she then testifies about the economic elements that hypothetical negotiators would consider when referring to each agreement.[51] And Kove cites no authority conditioning an expert opinion's admissibility on use of the magic words "economically comparable." The Northern District of California denied a similar *Daubert* motion on this basis in *TVIIM, LLC v. McAfee, Inc.*, stating that the movant "cites to no authority requiring experts to use the magic words 'economically comparable transaction' in order to save themselves from *Daubert* exclusion, and the Court is not aware of any such authority."[52]

Kove disagrees that the licenses are comparable, but that's a matter for cross examination, not exclusion.[53] Indeed, in *Finjan Inc v. Secure Computing Corp.*, the Federal Circuit found expert testimony on past licenses proper, where it noted that the parties weren't competitors, the license provided significant intangible value, and the license involved a lump sum.[54] Here, Ms. Bennis explains that several license agreements ████████████████████████████████████ ████████████████ [55] She notes that some included assets beyond the patent licenses, and each arose under different negotiating postures.[56] And she adjusted the terms of the most comparable licenses

---

[50] Ex. 8 at 107:14–19 ("Q. [I]s it your opinion that the ████████████ is economically comparable to the agreement that would be reached at the hypothetical negotiation? A. Yes.").

[51] *See, e.g., id.* at 213:17–19.

[52] No. 13-cv-4545, 2015 WL 4148354, at *3 (N.D. Cal. July 9, 2015).

[53] *E.g., Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility.").

[54] 626 F.3d 1197, 1211–12 (Fed. Cir. 2010); *see also ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (similar).

[55] *See, e.g.*, Dkt. 748-43 (Ex. NN) at 114, 124.

[56] *See, e.g., id.* at 111, 116, 119, 121, 124.

to account for differences in the hypothetical negotiation.[57] Like *Finjan*, her opinions thus "account for differences in the technologies and economic circumstances of the contracting parties" and will assist the jury.[58] Accordingly, this Court shouldn't exclude them.

### B.  TECHNICAL COMPARABILITY

Dr. Grama's analysis of technical comparability is well-supported, contrary to Kove's assertion. For each of the patents in the license agreements, Dr. Grama identifies the specific technology involved and concludes that they're comparable. For example, when discussing a patent in the ███████, Dr. Grama states that "I have reviewed the '732 patent and it is my opinion that it describes matching service requests to service providers and is, as Mr. Hayden testified, directed towards load balancing which is very similar to the Asserted Patents."[59] And in his analysis of the ██████ patents, Dr. Grama identifies that the Patent Office found one (Yocum) to be relevant prior art to the '978 patent during the '109 reexamination proceedings and identifies the specific features—scaling, mapping requests to servers, performance monitors, identifying bottlenecks, and routing requests to servers—that make it comparable.[60]

Kove cites paragraph 502 of Dr. Grama's report as a representative example of his technical comparability analysis and partially reproduces it in its motion.[61] But the citation lacks context. In the preceding paragraph, Dr. Grama quotes Scott Hayden, Amazon's Chief IP Counsel, who testified that the patents relate to "how you index and map [documents or content] so you know

---

[57] *Id.* at 159–60. For example, she noted that a hypothetical negotiation assumes the "patents-in-suit are known to be valid and infringed," unlike past licenses, and adjusted upward accordingly. *Id.* at 160.

[58] *Finjan*, 626 F.3d at 1212.

[59] Dkt. 748-32 (Ex. CC) at ¶ 483.

[60] *Id.* at ¶ 496.

[61] Dkt. 748 at 16.

where to get them, where they're located."[62] Dr. Grama then goes on to explain that Dr. Goodrich "ignores [the patents'] general technical area and attempts to distinguish them on the basis of the exact method used to address the same problem as the Asserted Patents. Because they relate to mapping and locating data, they are at least somewhat comparable to the Asserted Patents."[63]

Dr. Grama's opinions mirror those the Federal Circuit endorsed in *Bio-Rad Laboratories v. 10X Genomics*, where the expert showed "baseline comparability" by testifying that certain patents were technologically comparable to the patents-in-suit because they related to microfluids or thermal PCR cylinders.[64] And, as the Federal Circuit explained, after a baseline showing of comparability, "the degree of comparability" is best addressed by the jury.[65] And Kove's assertion that "load balancing" is as general as "RFID technology" is like saying that "smog emission sensors" are as broad of a technological category as "automobiles."[66] "Load balancing," which describes particular processes for distributing tasks in computer networks, is a narrower field than those the Federal Circuit routinely excludes.[67] Indeed, each of the cases that Kove cites excludes previous licenses directed to general fields—"PC-related"[68] and "DVD-related" patents.[69] Thus, Dr. Grama's report provides a sufficient basis to evaluate the patents' technical comparability.

---

[62] Dkt. 748-32 at ¶ 501 (citations omitted).

[63] *Id.* at ¶ 503.

[64] 967 F.3d 1353, 1374 (Fed. Cir. 2021).

[65] *Id.* (citing *ActiveVideo*, 694 F.3d at 1333).

[66] *See* Dkt. 748 at 16. Kove cites *Adasa, Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 915 (Fed. Cir. 2022) to argue that "the fact that two technologies relate to the same general field (e.g., load balancing, distributed systems, RFID technology) isn't enough [to show that two patents are technologically comparable]." But *Adasa* doesn't mention load balancing or distributed systems and refers only to RFID technology.

[67] Dkt. 748-32 at ¶ 51.

[68] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1328 (Fed. Cir. 2009).

[69] *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 80 (Fed. Cir. 2012).

## C. ECONNECTIX TRANSACTION

As a data point in her analysis, Ms. Bennis also analyzes Econnectix's purchase of the assets of the OverX Trust, which included the applications that would become the asserted patents. Kove asserts that she should be barred from mentioning this and other transactions involving the patents-in-suit because she didn't opine that they were "economically comparable."

But Ms. Bennis didn't assert that these arms-length transactions were licenses for comparable patents under *Georgia-Pacific* factor 2. Rather, she discussed them as relevant to the history of the patents-in-suit under *Georgia-Pacific* factor 1. As the Federal Circuit has found, a previous sale of the asserted patents is relevant to the hypothetical negotiation.[70] Thus, Ms. Bennis didn't claim that the OverX liquidation transaction represents the definitive value of the patents-in-suit; instead, she used it as one data point among others when evaluating their fair market value.[71] As she explained, the liquidation included a competitive bid process that received multiple bids.[72] She then used the purchase price to quantify "the maximum, undiscounted value … through the life of the patents."[73] And since no entity that has ever owned the patents has ever licensed them or sold a product that embodies the patents, this liquidation sale is the only true market valuation of the patents available.[74] Ms. Bennis considered this constellation of factors, and Kove's belief that other factors mitigate the value of the liquidation sale is a basis for cross examination, not exclusion. Indeed, the Federal Circuit holds that "[q]uestions about what facts are most relevant or reliable to

---

[70] *Integra Lifesciences I, Ltd. V. Merck*, 331 F.3d 860, 871 (Fed. Cir. 2003) (acquisition price of a company "together with all of its products, patents and know-how" was relevant to a jury's reasonable royalty award).

[71] Dkt. 748-43 (Ex. NN) at 157–58; Ex. 8 at 262:15–20 (The "valuation of the OverX trust assets as purchased by Econnectix is a data point that shows a market value marker of the assets.").

[72] Dkt. 748-43 at 104.

[73] *Id*. at 105.

[74] *Id.* at 102.

calculating a reasonable royalty are for the jury."[75]

### D. NON-INFRINGING ALTERNATIVES

Kove also asserts that AWS relies on new non-infringing alternatives. But Kove mischaracterizes Dr. Grama's and Ms. Bennis's rebuttals to Kove's experts. For example, 13 of the 14 paragraphs of Dr. Grama's report that Kove points to as disclosing new non-infringing alternatives appear in the section entitled "Any Alleged Benefits Associated With the Asserted Patents Are Limited."[76] These paragraphs don't address non-infringing alternatives, which Dr. Grama opines on in a different section of his report entitled "Non-infringing Alternatives Existed For The Asserted Claims."[77] Instead, the paragraphs cited by Kove address how the benefits associated with the asserted patents' technology are limited when analyzing the claims' scope.[78]

Dr. Grama doesn't propose new alternative, non-infringing systems in these challenged paragraphs. Rather, he shows that Dr. Goodrich's assumptions on functionality don't result in the conclusions he reaches. In ¶ 471, for example, Dr. Grama states that Dr. Goodrich failed to complete his analysis of the ████████████████████ in DynamoDB when he didn't consider that removal of the ████ could lead to latency decreases since metadata requests would check against the ████████████ directly rather than first checking against the ████.[79] And the one paragraph Kove cites in Dr. Grama's non-infringing alternatives section criticizes Dr. Goodrich's failure to consider that the design choice described in ¶ 534 (which Kove doesn't dispute was

---

[75] *I4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010).

[76] *Compare* Dkt. 748 at 18 *with* Dkt. 748-32 (Ex. CC) at Section XIV. The only cited paragraph that appears in the section of Dr. Grama's report addressing non-infringing alternatives is ¶ 535.

[77] *Id.* at Section XVI.

[78] *Id.* at ¶ 419 ("For example, in most cases, it would be more efficient to ████ the request before it ever arrives at any location server."); ¶¶ 424–25 ("[A]ny benefits of this narrow scope are limited….").

[79] *Id*. at ¶ 471.

properly disclosed) already exists in other AWS systems and could've been implemented in S3 and DDB.[80] Ms. Bennis offers similar analysis in her report. For example, on pages 29–30 and 54, rather than offering a new non-infringing alternative, she criticizes Mr. Bergman for assuming that removal of the ███████ component necessarily means removal of the associated hardware rather than repurposing it.[81] Indeed, Kove first explicitly disclosed the removal of the ███████ as the basis for its damages calculation in Mr. Bergman's report.[82] And Ms. Bennis was responding to that assertion. As such, there's no basis to exclude any of the opinions that Kove addresses in section II.A.5. of its motion.

## III. THE CHALLENGED TECHNICAL OPINIONS ARE ADMISSIBLE.

### A. THE CHALLENGED NON-INFRINGEMENT OPINIONS ARE TIMELY.

In this district, expert testimony may be offered for all theories disclosed in contentions.[83] Thus, if a party provided notice of a non-infringement theory in its contentions, its expert may elaborate on that theory through examples and evidence.[84] As this court explained in *Solaia Technology LLC v. ArvinMeritor, Inc.*, an expert may "elaborate in more detail" upon previously disclosed theories, so long as there's "nothing contradictory in [the expert's] opinions."[85] Dr. Grama's non-hierarchical, transferring, and identifier opinions that Kove challenges provide more detail on previously disclosed theories, and don't contradict them. So, they shouldn't be excluded.

---

[80] *Id.* at ¶¶ 534–35.

[81] Dkt. 748-43 at 29–30, 54. And her analysis on page 87 mirrors Dr. Grama's testimony about the limited scope of the benefits at issue as she considered the failure to commercialize the patents-in-suit. *Id.* at 87.

[82] Kove identified "S3 without the ███████" as a potential alternative in its Interrogatory No. 7 response. Ex. 9 at 24. But Kove didn't elaborate on that theory or provide it as the basis for its damages calculation.

[83] *Baxter Int'l Inc. v. CareFusion Corp.*, No. 15-cv-9986, 2020 WL 10486005, *1 (N.D. Ill. Aug. 12, 2020).

[84] *See, e.g., Solaia Tech. LLC v. ArvinMeritor, Inc.*, 361 F. Supp. 2d 797, 811 (N.D. Ill. 2005); *see also Space Data Corp. v. Alphabet Inc.*, No. 16-cv-3260, 2018 WL 10454865, at *2 (N.D. Cal. Dec. 17, 2018).

[85] 361 F. Supp. 2d at 811; *see also Apple Inc. v. Samsung Elecs. Co.*, No. 5:12-cv-630, 2014 WL 173409, at *1 (N.D. Cal. Jan. 9, 2014) (Contentions and expert reports needn't be "coextensive.").

**Parent-child (Grama ¶¶ 357–58):** Dr. Grama opined that S3 fails to meet the non-hierarchical location server requirement in part because ███████████████████████████████████ ████████████████. Kove suggests that ¶¶ 357–358 should be excluded on the basis that AWS's contentions didn't include the words "parent-child" or "root-leaf." As AWS explained at summary judgment, in connection with DDB, AWS's non-infringement contentions disclosed the theory that S3 and its components are ████████████████████████ and don't infringe for that reason.[86] Beyond that, however, "parent-child" and tree metaphors are just common ways of describing the relationship between hierarchical layers, like the generations in a family tree—not a new theory. In the same way, these words can be (and often are) used to describe hierarchies in computer science. For example, in his book "Data Structures and Algorithms in Java," Kove's Dr. Goodrich explained that a "tree is an abstract data type that stores elements hierarchically. With the exception of the top element, each element in a tree has a parent element and zero or more children."[87]

And Kove itself used this parlance to describe hierarchical structures in this case, well before AWS's March 2023 contentions and Dr. Grama's August 2023 report. For instance, in 2021–22 reexamination filings, Kove's expert Dr. Goodrich argued that Oracle's hierarchical structure distinguished it from Kove's claims, using the same parent, child, and root descriptions:

> In a hierarchical structure like Oracle Admin, each node contains address information about its ***parent and child*** nodes.[88]
>
> The ***root*** [Oracle] Names Server does not have the answer (because [the] ***root only knows about its direct child regions***)….[89]

---

[86] Dkt. 748-51 (AWS non-infr. contentions, Ex. A) at 3–4; *see also id.* at 35, 42–43, 49 (further explaining ██ s lack knowledge required for non-hierarchical claims); Dkt. 748-54 at 5, 23–24, 43, 62, 114 (similar).

[87] Ex. 14, *Data Structures and Algorithms in Java (4th ed.)*, Goodrich et al. at 376; *see also id.* at 377 (defining tree "as a set of nodes storing elements such that the nodes have a parent-child relationship").

[88] Ex. 13 (9-28-22 Goodrich Decl., '034 EPR) at ¶ 82 (emphasis added) (also stating that Oracle's hierarchical structure requires traversing up and down a hierarchical "tree").

[89] Ex. 10 (8-4-22 Goodrich Decl., '036 EPR) at ¶ 35 (emphasis added); *see also id.* at ¶¶ 33, 37 (similar).

When Kove updated its validity contentions, it again used the same "parent-child" parlance, stating, for instance, that "Steen's hierarchical configuration does not have any knowledge of what is stored in the other nodes in the network, beyond their direct parent/children."[90] Thus, Dr. Grama's opinion that the ███ are hierarchical because they're organized into "parent-child" or "root-leaf" relationships came as no surprise to Kove, and Grama ¶¶ 357–58 shouldn't be excluded.[91]

**Full ███████ (Grama ¶¶ 309–10):** AWS's contentions disclose the theory that S3's ████████ is a cache and that caching is different than the "transferring" requirements of certain asserted claims. For example, AWS's non-infringement contentions state:

> The systems described by Kove do not move data from one place to another. While ████████████ information in the process of fulfilling requests, caching is not equivalent to transferring. Kove appears to rely on the fact that when data is removed from one machine in the system, then at some later point, due to various other user requests or actions taken in the system, the data later appears at another machine in the system.[92]

Dr. Grama elaborates on this distinction by detailing what caching is and how the ███ implement it rather than transferring. Caches only store a finite amount of frequently accessed data, and use elimination policies to identify which entries to delete when a new item is saved. Dr. Grama summarized this known cache feature as "whenever a new item is added to the cache, an item must be removed."[93] And Kove demonstrated its awareness of this in its infringement contentions, relying on an AWS engineer's testimony that "when a ███████ is too full, the ███ would try to find an

---

[90] Ex. 11 (Kove's Validity Contentions, Ex. 3A) at 15; *see also id.* at 11–12 (Oracle lacks required non-hierarchical structure because "root Names Server … only knows about its direct child regions.").

[91] The Court's exclusion of Dr. Grama's DDB parent-child opinion doesn't support exclusion of his S3 opinion. AWS's non-infringement contentions for DDB did disclose the theory that DDB's ████████ are non-hierarchical and use a tree structure. *See* Dkt. 748-52 (AWS operative March 2023 contentions, Ex. B) at 3–4, 16–17, 25–26. AWS's summary judgment motion cited an incorrect exhibit for this disclosure.

[92] Dkt. 748-54 (AWS contentions, Ex. D) at 104–05 (emphasis added).

[93] Dkt. 748-32 (Ex. CC) at ¶ 62.

▮▮ that hadn't been accessed recently and select that for removal."[94] Hence, Dr. Grama's report describes a feature of caching previously acknowledged by all parties. And, as noted, the local rules permitted him to provide additional support for a previously disclosed theory, so long as it doesn't contradict that theory.[95] Paragraphs 309 and 310 of his report follow that guidance.

**Identifier (Grama ¶ 227):** The Court's construction for "identifier/identifier strings" provides that it's "a unique encoding that identifies an individual entity" associated with "zero or more location strings … in a location server."[96] Thus, the claimed identifier must both uniquely identify an entity and be associated with locations in a location server. AWS's contentions disclosed that the ▮▮▮▮▮▮▮▮ in DDB can't meet these identifier requirements. For instance, AWS has consistently explained that the ▮▮▮▮ isn't unique to individual items:

> In addition, the ▮▮▮▮ are not "identifier strings" within the meaning of claim 1, because *they correspond to whole* ▮▮▮▮*, rather than individual items.*[97]

And AWS's contentions state that the ▮▮▮▮ isn't associated with alleged location servers:

> ▮▮ do not include "location information associated with the identifier string." For purposes of claim limitation 1a, Kove asserts that a ▮▮▮▮ satisfies the "identifier string" requirement. DynamoDB does not satisfy the "location information associated with the identifier string" limitation in claim 1d because the ▮▮▮▮ are not "associated with" any ▮▮▮▮[98]

Thus, because neither the ▮▮▮▮ nor ▮▮▮▮ satisfies both roles required by the Court's construction, neither can be an "identifier," and Kove had notice of this theory. Beyond

---

[94] Dkt. 745-4 (Ex. D to Kove's 4th Am. Infr. Contentions) ▮ 35.

[95] *Solaia*, 361 F. Supp. 2d at 811.

[96] Dkt. 484 at 2 (Recognizing terms from Appendix B of Dkt. 382).

[97] Dkt. 748-52 (AWS contentions, Ex. B) at 23; *see also id.* at 20–21 ("The ▮▮▮▮ referenced by a ▮▮▮▮ stores ▮▮▮▮ upper and lower bounds, which represent many ▮▮▮▮. Therefore, a single ▮▮▮▮ corresponds to the values associated with numerous ▮▮▮▮."); *accord id.* at 61.

[98] *Id.* at 27; *see also id.* at 22 ("In the ▮▮▮▮ are associated with ▮▮▮▮, not ▮▮▮▮. The ▮▮▮▮ table is used to look up mappings between ▮▮▮▮ and ▮▮▮▮, not ▮▮▮▮."); *id.* at 39 (similar).

that, it's necessary for Dr. Grama to be able explain the ████████████████, because Dr. Goodrich and Kove have inaccurately and confusingly conflated these components.[99] For both these reasons, Kove's request to strike Dr. Grama's ¶ 227 should be denied.

**Naming Convention (Grama ¶¶ 194–97):** Dr. Grama's opinion that S3 and DDB are hierarchical because they use "███████████████" for storing data responds to Dr. Goodrich's "namespace" theory. As AWS's *Daubert* motion shows, Dr. Goodrich's namespace theory was untimely, and should be excluded. If the Court excludes that opinion, AWS withdraws Grama Report ¶¶ 194–97. Should the Court decline to strike Dr. Goodrich's opinion though, Dr. Grama should be permitted to respond to it. As this Court stated in *Bone Care International, LLC v. Pentech Pharmaceuticals, Inc.*, rebuttal reports "are by nature responsive, and necessitate a showing of facts supporting the opposite conclusion" from that of the opposing party's experts.[100]

### B. DR. GRAMA HASN'T OFFERED ANY "PRACTICE THE PRIOR ART" OPINIONS.

Kove's motion omits that it has accused the very functionality of S3 that Dr. Grama addresses in ¶¶ 283–84. Kove's infringement contentions and Dr. Goodrich both cite the source code module discussed in these paragraphs as evidence of infringement.[101] And Dr. Goodrich specifically relies on this ███████████████████████████████████████████

████████████████████████████████████████████████

█████████████████ In rebuttal, Dr. Grama explains why this ████████████ method from

---

[99] *See, e.g.*, Dkt. 687 at ¶ 85 (quoting Dr. Goodrich reference to "███████████████").

[100] No. 08-cv-1083, 2010 WL 3894444, at *15 (N.D. Ill. Sept. 30, 2010) (internal quotation omitted); *see also Walsh v. LG Chem Am.*, No. 18-cv-1545, 2021 WL 11878781, at *2 (D. Ariz. Mar. 15, 2021) ("Plaintiff's rebuttal expert necessarily must raise new theories to rebut [Defendant]'s expert report…. To hold otherwise would vitiate the purpose of a rebuttal altogether.").

[101] *E.g.*, Dkt. 745-5 (Kove contentions, Ex. E) at 8.

[102] Ex. 15 (Goodrich Op. Rep. Appx. A) at ¶ 77.

what's known in the industry as the ███████████ (after its first named author) is evidence that "the ████ fail to satisfy the location server limitation of the claims."[103] Dr. Grama further explains that the ███████████ method is "very different than that of the claimed location servers described in the Asserted Patents."[104] And Dr. Grama notes that Dr. Overton agreed with this at deposition, where he testified that the ███████████ is a "very different concept" from his patents.[105]

Thus, Dr. Grama's opinion is that the ███████████ doesn't infringe, and the co-inventor's testimony confirms that. Fairness dictates that he be permitted to present that opinion, since Kove is relying on S3's use of the ███████████ to show infringement. And this isn't a "practicing the prior art" argument. The Federal Circuit's prohibition on that defense seeks to prevent defendants from subverting the clear-and-convincing evidentiary burden that invalidity requires by camouflaging invalidity arguments as non-infringement arguments.[106] Here, Dr. Grama doesn't opine or suggest that because S3 practices the prior art, this means S3 can't infringe or else the asserted claims would be invalid. To be sure, none of AWS's elected trial invalidity contentions—which, per the local rules, were limited to 4 grounds of invalidity per claim—rely on ████ as a lone invalidating reference. So, Dr. Grama isn't "forsak[ing] any comparison between the asserted claims and the accused product, [while] relying instead upon purported similarities between the accused product and the prior art."[107] Instead, he's showing that S3 uses a non-infringing, public

---

[103] Dkt. 748-32 (Ex. CC) at ¶ 283; *see id.* at ¶¶ 271–85; *Id.* at ¶ 283 (S3 source code states that it implements "the ███████████).

[104] *Id.* at ¶ 284.

[105] *Id.* at ¶¶ 283–84.

[106] *Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1367 (Fed. Cir. 2002).

[107] *Id.* at 742.

domain method that Dr. Overton testified differs from the claimed methods. This opinion is admissible, and shouldn't be stricken.[108]

Likewise, Dr. Grama properly referenced Kove's statements to support his conclusion that DDB doesn't infringe "because it doesn't use the claimed unique identifier-location associations and location servers."[109] More specifically, Dr. Grama opined that ███████ don't meet the "identifier" limitation because they only identify ███████, which are not limited to single items.[110] Kove made a near-identical argument in the reexaminations—i.e., identifying "a file set" ███████ "and not an entity" within it "does not teach or suggest [the claimed] 'identifiers.'"[111] Applying Kove's own logic for why ███████ don't meet the "identifier" limitation isn't an improper "practicing the prior art" defense. Therefore, the Court should deny Kove's motion to strike Grama Report ¶¶ 283–84 and Supp. Report ¶¶ 9–12.

## C. THE CHALLENGED "NON-HIERARCHICAL" OPINIONS ARE ADMISSIBLE.

S3 and DynamoDB are complex products composed of many interconnected components. Together, they allow a user to access data from right next door or from across the globe.[112] But no component could complete this process on its own. And there are dozens of components involved in the analysis of whether S3 and DDB use "non-hierarchical" location servers. Kove's contentions show this, identifying the following as parts of the "accused instrumentalities" in S3:

███████████████████████████████████████████████

---

[108] *See 01 Communique Lab., Inc. v. Citrix Sys. Inc.*, 889 F.3d 735, 742 (Fed. Cir. 2018) (expert opinion proper when it compares the accused product to construed claims and notes similarity to prior art); *Tate*, 279 F.3d at 1365–66; *Droplets, Inc. v. Yahoo! Inc*., No. 12-cv-3733, 2022 WL 2670188, at *1 (N.D. Cal. Feb. 28, 2022) (refusing to exclude expert opinion where Kove's counsel made same argument as here).

[109] Dkt. 748-58 (Ex. BBB) at 3 (heading III).

[110] *Id*. at ¶¶ 8, 11–12.

[111] *Id*. at ¶ 10.

[112] *See e.g.*, Ex. 12 (Goodrich Dep.) at 297:16–298:11.

[black redaction bar]

Kove's contentions are also not limited to a single region; rather, Kove specifically accused S3 and DynamoDB of infringing in multiple combinations of regions. For S3, for example:

> **S3:** "a plurality of location servers (a network of ████████████. such as groups within one or more cells, Availability Zones, and/or regions"[114]

Because neither S3 nor DynamoDB operate "within a region," the manner in which data is located across regions is relevant. Each of these components and regions—and the connections between them—plays a part in S3 and DynamoDB's ability to identify and retrieve user data. For instance, responding to the simplest data request in S3 involves the end user device, ███████████████ ██████████████████████████████.[115] Thus, one of AWS's noninfringement arguments is that the accused "location servers" don't return the claimed "location information." Rather, as AWS has detailed, finding the requested data requires ████████████████████████ ████████████████████████████████████████████

And contrary to what Kove argues, this Court's summary judgment decision is no basis to exclude Grama Report ¶¶ 331–35, 338–39, 352–64, and 194–97. Specifically, this Court found that the mere existence of hierarchical structures outside the single layer of accused location servers didn't defeat summary judgment—i.e., that, "[d]rawing all reasonable inferences in Kove's favor, a reasonable juror could accept Kove's description of the accused products."[116] But the flip side is also true: a reasonable juror could accept AWS's description of the accused products, and find that none of the accused location servers in S3 or DDB satisfies the necessary requirements. And the

---

[113] Dkt. 745-4 (Kove contentions, Ex. D) at 1; *see also* Dkt. 745-5 (Ex. E) at 1 (similar, for DDB).

[114] Dkt. 745-4 (Ex. D) at 1–2; *see also* Dkt. 745-5 (Ex. E) at 1 (similar, for DDB).

[115] Dkt. 687 at ¶ 16.

[116] Dkt. 739 at 28.

sole case that Kove cites doesn't support exclusion. The ruling in *Promega* excluded a defendant's CTO from providing an expert opinion that directly contradicted the court's claim construction,[117] and AWS has no intention of doing that here.

### D.    AWS WILL ADHERE TO THE COURT'S CLAIM CONSTRUCTIONS.

Dr. Grama offered opinions on Kove's disclaimers at the Patent Office, and what the proper construction of the claims should be based on those disclaimers. More specifically, Grama Report ¶¶ 136 and 145–146 recount the reexamination proceedings and conclude that Kove disclaimed hierarchical structures.[118] Grama Report ¶¶ 211–219 and 326 then propose constructions based on these disclaimers. At summary judgment, the Court largely adopted the substance of AWS's and Dr. Grama's proposed constructions, though it declined to adopt the proposed requirement that the location server "can resolve every request in two or fewer steps." Dr. Grama won't offer any opinions at trial from these paragraphs that reference this "two or fewer steps" proposal, or any other opinions advocating for or using constructions that the Court hasn't adopted.

### E.    THE CHALLENGED OTDP OPINIONS ARE ADMISSIBLE.

The Court denied Kove's summary judgment motion on AWS's OTDP defense, but struck portions of Mr. Greene's report that rely on the specifications rather than the claims. Thus, Amazon won't offer Mr. Greene's opinions that rely on the specifications. But that doesn't mean Amazon can't argue at trial that the claims are invalid for double patenting. The Court has already held that "Greene's comparison chart and the portions of his report that appropriately address [OTDP] are admissible."[119] So, the Court should deny Kove's motion to strike the OTDP opinions.

---

[117] *See Promega Corp. v. Applied Biosys.*, 2013 WL 9988881, at *3 (N.D. Ill. May 28, 2013).

[118] Dkt. 748-32 (Ex. CC) at ¶¶ 136, 145–146.

[119] Dkt. 739 at 44.

Dated: February 23, 2024

Respectfully Submitted,

*/s/ R. William Sigler*
Alan M. Fisch
*alan.fisch@fischllp.com*
R. William Sigler
*bill.sigler@fischllp.com*
Jeffrey M. Saltman (*pro hac vice*)
*jeffrey.saltman@fischllp.com*
Lisa Phillips (*pro hac vice*)
*lisa.phillips@fischllp.com*
FISCH SIGLER LLP
5301 Wisconsin Avenue NW, Suite 400
Washington, DC 20015
202.362.3500

Ken K. Fung (*pro hac vice*)
*ken.fung@fischllp.com*
FISCH SIGLER LLP
400 Concar Drive
San Mateo, CA 94402
202.362.3500

*Attorneys for Amazon Web Services, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 23, 2024, I electronically filed the foregoing under seal with the Clerk of the Court for the United States District Court for the Northern District of Illinois, via the CM/ECF system, and also served a copy on all counsel of record via email.

*/s/ R. William Sigler*
R. William Sigler