# Exhibit 8

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

_____
                                )
KOVE IO, INC.,                  )
                                )
　　　　Plaintiff,               )
                                )
　　v.                          )　No. 1:18-cv-08175
                                )
AMAZON WEB SERVICES, INC.,      )
                                )
　　　　Defendant.               )
_____)


\*\* HIGHLY CONFIDENTIAL \*\*

　　　　The videotaped deposition of
MELISSA BENNIS, taken at One South Wacker Drive,
Chicago, Illinois, before Janice M. Kocek, CSR,
CLR, commencing at the hour of 9:02 a.m. on
Friday, September 1st, 2023.

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

1      Q.    I'm sorry.  I didn't understand.
2            Can you try again?
3      A.    I believe your question to me was what
4  do I -- what do I view economic comparability to
5  be.
6      Q.    What do you understand it to mean?
7      A.    Right.  So similar from an economic
8  perspective.
9      Q.    I'm sorry.  I don't understand.
10           If I were to ask you, as I have, but
11 I'll ask again, what does it mean to say that two
12 agreements are economically comparable, you would
13 say?
14     A.    I would have the same answer.
15     Q.    Which would be?
16     A.    So, again, are you -- you're -- can we
17 put it in a little more context?
18           So do you want to say -- do you want to
19 say -- do you want to talk about a license in
20 general or what do you want to talk about in terms
21 of economic comparability?
22     Q.    In terms of factor No. 2, when you are

1　evaluating, you have agreements that -- and you
2　are evaluating, you want to see whether one
3　agreement would be comparable to another
4　agreement, how would you make that determination?
5　　　A.　So, again, subject matter.  For the
6　subject matter, if it's similar, are the terms
7　similar -- are the economic terms similar, are the
8　rates of exchange similar, is it for the same
9　amount of subject matter.
10　　　　　We talked about the fact that in the
11　patent agreements where there's maybe a handful of
12　patents versus lots and lots of patents, that
13　might be different.  But things of that nature.
14　　　Q.　And so based off of that description
15　that you just gave, is it your opinion that the
16　█████████ is economically comparable to the
17　agreement that would be reached at the
18　hypothetical negotiation?
19　　　A.　Yes.
20　　　Q.　And based on that same definition but
21　for technical comparability, is it your opinion
22　that the █████████ would be technically

Page 108

1  comparable to the agreement that would be reached
2  at the hypothetical negotiation?
3          MR. SALTMAN:  Objection.  Asked and
4      answered.
5          THE WITNESS:  And, again, I don't know
6      how to say it any other way.  I think we've
7      been talking about th ▓▓▓▓▓▓▓▓▓▓.  We've
8      talked about the fact that the patents are
9      understood to be technically comparable.
10             So that fact along with the
11     economic terms that define the agreement
12     would be relevant to the hypothetical
13     negotiation and would result in comparable
14     terms.
15 BY MR. ADLER:
16   Q.   Okay.  Now, we've spoken a lot about
17 technical comparability.
18             And you relied on Dr. Grama --
19 Dr. Grama's opinion that the agreements are
20 technically comparable -- I'm sorry, that the
21 patents in the agreement are technically
22 comparable?

```
 1   each of the -- each of the licenses that we didn't
 2   discuss, this question specifically on, right,
 3   each of the licenses on the table except fo ▇.
 4        A.    In general, I examined the total
 5   compensation exchanged for rights that included
 6   patents comparable to the patents-in-suit.
 7        Q.    All right.  One of the bases for your
 8   damages opinions -- and this is on page 24 of your
 9   report at the bottom -- is Kove's value placed on
10   its business in the patents-in-suit, correct?
11        A.    You said on the bottom of page 24 of my
12   report?
13        Q.    Yep.
14        A.    It's one of the considerations I made
15   was the value that Kove's placed on the business
16   of the patents-in-suit?
17        Q.    Yep.
18        A.    Yes.
19        Q.    And one data point that you used for
20   that was what you describe as, on page 105, "the
21   undiscounted value of the trust assets through the
22   life of the patents-in-suit," which was
```

1   $1.14 million, correct?

2      A.   Yes.

3      Q.   And that $1.14 million, that's based on

4   the $100,000 up-front payment from Econnectix, the

5   forgiveness of certain claims, and the assumption

6   of receiving a $50,000 royalty payment, correct?

7      A.   That's correct.

8      Q.   And on page 107 you state that (as

9   read):  ...the hypothetical negotiators would

10  consider relevant the $1.14 million maximum of the

11  OverX trust assets given the competitive bidding

12  process involving third parties.

13           Correct?

14      A.   Yes.

15      Q.   And when you say that they would

16  consider it relevant, what does that mean?

17      A.   Well, in this instance, the valuation

18  of the OverX trust assets as purchased by

19  Econnectix is a data point that shows a market

20  value marker of the assets.

21      Q.   And so is it your opinion that this

22  transaction out of a liquidation process is

1  technically and economically comparable to a
2  license that would result from the hypothetical
3  negotiation?
4      A.   No, I don't think I've said that
5  anywhere.  It's more a consideration of value of
6  the assets that were owned by the licensor at the
7  time of the hypothetical negotiation.  So it's an
8  informative data point.
9      Q.   You understand that OverX was the prior
10 operating company that had the assets, correct?
11          (Witness reviewing document.)
12 BY MR. ADLER:
13     Q.   And you're reading your report right
14 now to refresh yourself of the facts that you used
15 to inform your opinion?
16     A.   I'm reviewing my report at the moment,
17 yes.
18          I have the understanding that OverX was
19 the owner of the assets at an earlier point in
20 time.  I think that was your question.
21     Q.   Yeah.  And OverX effectively went into
22 a liquidation process by entering into an

1　STATE OF ILLINOIS )
2　COUNTY OF C O O K )
3　　　　I, Janice M. Kocek, CSR, CLR, License
　　No. 084-002871, do hereby certify:
4　　　　That the foregoing deposition of
　　MELISSA BENNIS, was taken before me at the time
5　and place therein set forth, at which time the
　　witness was put under oath by me;
6　　　　That the testimony of the witness and all
　　objections made at the time of the examination
7　were recorded stenographically by me, were
　　thereafter transcribed under my direction and
8　supervision and that the foregoing is a true
　　record of same.
9　　　　I further certify that I am neither
10　counsel for nor related to any party to said
11　action, nor in any way interested in the outcome
12　thereof.
13　　　　IN WITNESS WHEREOF, I have subscribed my
14　name this 13th day of September, 2023.
15
16
17
18
19
20　　　　　　　　　　　_Janice M. Kocek_
21　　　　_____
22　　　　JANICE M. KOCEK, CSR, CLR