# Exhibit 13

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| *In re*: Reexam of U.S. Patent No. 7,233,978 | Confirmation No.: 3927 |
| Control No. 90/019,034 | Art Unit: 3992 |
| Filed: November 19, 2021 | Examiner: CAMPBELLK, Joshua D. |
| For: **Method and Apparatus For Managing Location Information In a Network Separate From The Data To Which The Location Information Pertains** | Atty. Docket: |

# DECLARATION OF MICHAEL T. GOODRICH, PH.D.

I, Michael T. Goodrich, hereby declare as follows:

1.    I have been asked by Patent Owner Kove IO, Inc. ("Kove") to offer my expert opinions in the above-captioned matter.  I submit this declaration in support of Kove's Reply to the Non-Final Office Action dated June 28, 2022 ("Office Action").

2.    I participated in the Examiner Interview that took place on September 12, 2022, along with Kove's counsel, Khue Hoang and Naveed Hassan, its CEO, John Overton, and another company representative, Robert Dellenbach.

# I.    BACKGROUND AND QUALIFICATIONS

3.    Attached hereto as Exhibit A is a true and correct copy of my Curriculum Vitae ("CV").  I received a Bachelor of Arts degree in Mathematics and Computer Science from Calvin University in 1983, a Master of Science in Computer Science from Purdue University in 1985, and a Ph.D. in Computer Science from Purdue University in 1987.

4.    I am a Distinguished Professor in the Department of Computer Science at the University of California, Irvine, where I have been a faculty member since 2001.  The Distinguished Professor title at University of California, Irvine is a campus-level distinction reserved for above-scale faculty who have achieved the highest levels of scholarship over the course of their careers and have earned national and international distinctions and honors of the highest level. I was a professor in the Department of Computer Science at Johns Hopkins University from 1987-2001.

5.    I have authored and coauthored over 300 publications, including several widely adopted books, such as *Introduction to Computer Security* and *Algorithm Design and Applications*.  My research includes contributions to data structures and algorithms, information security and privacy, networking, graph algorithms, computational geometry, distributed and

parallel algorithms, and cloud security. For example, I have published research articles on topics in cloud computing and storage, hashing, data structures, and network and distributed computing. Using the indexing scheme of my CV, examples of such publications include P-3, P-5, B-1, B-3 through B-14, Ch-4, Ch-7, Ch-8, Ch-10, Ch-12, J-7, J-26, J-36, J-38, J-41, J-45, J-56, J-60, J-69, J-72, J-78, J-83, J-84, C-41, C-43, C-51, C-53, C-62, C-63, C-64, C-72, C-77, C-78, C-85, C-104, C-105, C-107, C-111, C-122, C-125, C-133, C-147, C-151, C-152, C-153, C-155, C-156, C-159, C-161, C-162, C-163, C-165, C-167, C-168, C-171, C-172, C-174, C-180, C-182, C-193, C-199, C-200, C-202, C-207, C-209, and C-210.

6.      In addition, I have consulting experience in matters involving algorithms, cryptography, machine learning, digital rights management, computer security, networking, software, and storage technologies.

7.      I am a Fellow of the American Association for the Advancement of Science (AAAS), a Fulbright Scholar, a Fellow of the Institute of Electrical and Electronics Engineers (IEEE), and a Fellow of the Association for Computing Machinery (ACM). I am a foreign member of the Royal Danish Academy of Science and Letters. I am also a recipient of the IEEE Computer Society Technical Achievement Award and the Pond Award for Excellence in Undergraduate Teaching.

8.      My research has been supported by the Defense Advanced Research Projects Agency (DARPA), the National Science Foundation (NSF), the Office of Naval Research (ONR), the Army Research Office (ARO), and the National Security Agency (NSA). For example, I was co-principle investigator on an approximately $700K NSF grant funding (grants 6 and 19 in my CV) to build distributed data repositories and network query infrastructures for astrophysical data; a $350K NSF grant to build out network connectivity and applications at

Johns Hopkins University (CV, grant 11); a $900K grant from NSF to study high-bandwidth distributed computing (CV, grant 24); an approximately $500K grant from the ONR to study scalable methods for the analysis of network-based data (CV, grant 31); a $500K grant from NSF to study trustworthy cloud computing (CV, grant 33); an approximately $400K NSF grant to study privacy-preserving cloud computing (CV, grant 34); and an approximately $150K grant from NSF to study security protocols for advanced data structures (CV, grant 37).

9.      I am a co-inventor on several U.S. patents, including U.S. Patent No. 7,257,711, "Efficient Authenticated Dictionaries with Skip Lists and Commutative Hashing," which discloses secure distributed data authentication schemes based on cryptographic hash functions and digital signatures; U.S. Patent No. 7,299,219, "High Refresh-Rate Retrieval of Freshly Published Content using Distributed Crawling," which discloses a technology for quickly retrieving website data that can change frequently, so as to be stored in a search engine; U.S. No. Patent 8,681,145, "Attribute Transfer Between Computer Models Including Identifying Isomorphic Regions in Polygonal Meshes," which teaches how to map one mesh-based computer model to another; and U.S. Patent No. 9,152,716, "Techniques for Verifying Search Results Over a Distributed Collection," which discloses a system for searching the Internet so as to produce cryptographically verifiable search results that can be produced by a search engine.

10.     I have taught courses at Johns Hopkins University, Brown University, and University of California, Irvine, at both the undergraduate and graduate levels. Topics of my courses have included computer security, algorithms, data structures, networking, algorithm engineering, computational geometry, and parallel processing. In addition, I have mentored 22 Ph.D. students over the years, who have written their Ph.D. theses on topics in algorithms, data structures, networking, parallel processing, and computer security and privacy.

11.     I have served as an editor on several technical journals, including Computational Geometry: Theory and Applications, Journal of Computer & System Sciences, Journal of Graph Algorithms and Applications, Int. Journal of Computational Geometry & Applications, and Information Processing Letters.  I have also served on many program committees (PCs) for top conferences and workshops in Computer Science, including serving as PC chair in several instances, including ACM Symposium on Computational Geometry (SoCG), ACM Symposium on Theory of Computing (STOC), Workshop/Symposium on Algorithms and Data Structures (WADS), Algorithm Engineering and Experimentation (ALENEX, which I co founded with Dr. Catherine McGeoch in 1999), IEEE Symposium on Foundations of Computer Science (FOCS), ACM-SIAM Symposium on Discrete Algorithms (SODA), International Symposium on Graph Drawing (GD), International Colloquium on Automata, Languages, and Programming (ICALP), ACM Conference on Computer and Communications Security (CCS), European Symposium on Algorithms (ESA), IEEE International Parallel and Distributed Processing, Symposium (IPDPS), ACM Symposium on Parallel Algorithms and Architectures (SPAA), ACM Symposium on Advances in Geographic Information Systems (GIS), IEEE Symposium on Security and Privacy (S&P), IEEE International Conference on Big Data, IEEE International Conference on Data Engineering (ICDE), and International Symposium on Algorithms and Computation (ISAAC).

## II.     LEVEL OF ORDINARY SKILL IN THE ART

12.     I understand that the analysis of whether a patent is anticipated or obvious is performed from the perspective of a person of ordinary skill in the art at the time of the patented inventions (or a "POSITA").  I further understand, that the "person of ordinary skill in the art" is a hypothetical person who is presumed to be familiar with the relevant scientific field and its literature at the time of the invention.  This hypothetical person is also a person of ordinary

creativity capable of understanding the scientific principles applicable to the pertinent field.

13.    I understand that the level of ordinary skill in the art may be determined by reference to certain factors, including (1) the type of problems encountered in the art, (2) prior art solutions to those problems, (3) the rapidity with which innovations are made, (4) the sophistication of the technology, and (5) the educational level of active workers in the field. I further understand that in a given case, every factor may not be present, and one or more factors may predominate.

14.    In my opinion, the appropriate level for one of ordinary skill in the art (POSITA) as of the date of the invention of U.S. Patent No. 7,233,978 ("the '978 patent) is an individual with at least a bachelor's degree in Computer Engineering, Computer Science or comparable degree and two years of experience developing software tools and/or computer systems for use in the area of network data and data structures in networked environments. This description is approximate, and more work experience could compensate for less education or more education could compensate for less work experience.

15.    Based on my training and experience, I believe that I am a person of greater-than-ordinary skill in the relevant art, and I have been since before the priority date for the '978 patent. Further, in my capacity as a university professor, I have taught persons of ordinary skill in the art. Thus, I believe I can provide opinions about the qualifications of one of ordinary skill at the time of the invention.

## III.    THE OFFICE ACTION IN THE REEXAM OF THE '978 patent

16.    I understand that claims 1, 3, 6, 10, 14, 17, 23-24, and 30-31 '978 patent are subject to *ex parte* reexamination. Claims 1, 3, 6, 10, 14, and 31 stand rejected for the reasons set forth in the Office Action. Claims 17, 23-24, and 30 have been confirmed as patentable. Claims

1, 10, 14, and 31 are independent claims.  Claims 3 and 6 depend from claim 1.

17.    I understand that claims 1 and 31 are rejected under pre-AIA 35 U.S.C. § 103(a) as allegedly being obvious over OracleNamesAdminGuide ("ONAG ") in view of OracleSG.  I also understand claims 3, 10, and 14 are rejected under pre-AIA 35 U.S.C. § 103(a) as allegedly being obvious over ONAG in view of OracleSG and in further view of McGarvey.  (Office Action, p. 8).  I also understand claim 6 is rejected under pre-AIA 35 U.S.C. § 103(a) as allegedly being obvious over ONAG in view of OracleSG and in further view of Rajani.  (Office Action, p. 8).

18.    I have reviewed the '978 patent, the Office Action, and each of the asserted references (Oracle Admin, OracleSG, McGarvey, and Rajani).  I have also reviewed the claim constructions that were ordered in the co-pending litigation, including the claim constructions that were agreed to by the parties in that litigation.  (*See* Claim Construction section below).

## IV.    OVERVIEW OF THE TECHNOLOGY

19.    The '978 patent is directed to a network distributed tracking wire transfer protocol for storing and retrieving data across a distributed data collection.  ('978 patent, Abstract).  The '978 patent describes storing data separately from its location information.  Specifically, the '978 patent states "NDTP is designed for use in the larger context of a distributed database system including, but not limited to, addressing and namespace services. As such, it supports an architecture in which information about where data associated with particular application entities can be managed and obtained independently of the data itself." ('978 patent, 23:63-24:1).

20.    The '978 patent describes a "NDTP Server Constellation," which includes data location servers that store the location of specific units of data stored in data repositories.  ('978 patent, 8:14-25; 18:38-56; 24:6-11).  The '978 patent teaches that if the data is moved from a

data repository, the location of the data is updated in the data location servers in the NDTP Server Constellation. ('978 patent, 8:14-25; 18:38-56; 24:6-11). The '978 patent states, "The communication flow may represent a client 112 requesting an identifier/location association(s) from the NDTP server, which may be a server constellation construed in either of two forms (see FIGS. 19 and 20), and then querying directly based on the identifier/location association(s) received from the NDTP server." ('978 patent, 18:50-56).

21. The '978 patent further teaches organizing data location information in location servers such that every location server is configured to either identify another location server that has the requested information. For example, in Figure 19 of the '978 patent, the NDTP Server Constellation 110 includes NDTP servers 120a and 120b. ('978 patent, 18:60-19:3). NDTP servers 120a and 120b store location information for data stored in data repositories. (*See, e.g.,* '978 patent, 8:14-25; 18:38-19:3; 24:6-11). Each unit of data is associated with an identifier that uniquely identifies an entity. (*See, e.g.,* '978 patent, 4:19-43; 8:14-25). The location information for the data is organized across data location servers 120a and 120b using an algorithm or function. (*See, e.g.,* '978 patent, 17:6-67). The location information for the data is thereby divided up and each of data location servers 120a and 120b stores a portion of the location information for the data based on applying the algorithm or function on the identifier. (*See e.g.,* '978 patent, 8:14-25; 12:41-52; 17:6-67; 18:38-19:3; 24:6-11).

22. As an example, the '978 patent uses a hash function to divide and distribute the location information across the data location servers. (*See e.g.,* '978 patent, 12:41-52; 17:6-67). The '978 patent presents a unique approach to using the hash function. Specifically, while hash functions have been well-known in the art, portioning, organizing, and distributing location information using a hash function across multiple servers had not been contemplated.

23.     The data location servers in the NDTP Server Constellation store the algorithm or function use to divide up the data. ('978 patent, 12:41-52; 17:6-67). As such, the each of the data location servers in the NDTP Server Constellation are configured to (1) determine, using the function, which other data location server stores the location information for a particular unit of data ('978 patent, 12:41-52; 17:6-67); (2) transmit a list of location servers which contains the location server known to have the location information ('978 patent, 12:41-52; 17:6-67); and (3) transmit the algorithm or function to the client to enable the client to determine which one of the data location servers stores the location information for the particular unit of data ('978 patent, 12:41-52; 17:6-67).

24.     Furthermore, the '978 patent requires that an identifier uniquely identify a single entity such that the locations of the data pertaining to the single entity can be retrieved using the identifier. The '978 patent states, "An "entity identifier" or an "identifier" is a unique encoding, which may be a string in one embodiment, with which zero or more data location specifiers are associated in an NDTP server. A "data location" or "location" is an encoding, for example a string, that is a member of a set of associations with an identifier in an NDTP server. An "NDTP client" or a "client" is a network-attached component that initiates add, delete, lookup and update of identifier/location mappings, or associations, from an NDTP server with NDTP request messages. An "NDTP server" or a "server" is a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to NDTP request messages from clients." ('978 Patent, 4:25-38).

25.     The '978 patent further states "The NDTP server efficiently maintains and dispenses one to many relationships between identifiers and locations. In other words, an identifier may be associated with any number of locations. In embodiments where the location

information relates to locations of application servers containing data or routing information for finding data, the NDTP server is updated to indicate an association between the identifier and the application server's location when data for a particular identifier is added to an application server. When a query is performed for an identifier, the NDTP server supplies the set of application servers in which data may be found for that identifier." ('978 Patent, 8:14-25).

26.    By using an identifier that uniquely identifies a single entity, the '978 Patent allows for efficient retrieval of the locations of data pertaining to the entity distributed across a network. This way, the locations of the data in the one or more location servers can be readily retrieved using the identifier for a particular entity.

## V.    CLAIM CONSTRUCTION

27.    It is my understanding that the '978 patent is expired. It is my understanding that, in this event, a claim term must be given the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, in view of the specification and prosecution history. It is my further understanding that the Broadest Reasonable Interpretation (BRI) standard may not be applied to the claims in the instant reexamination proceeding because the claims are expired.

28.    Furthermore, it is my understanding that the parties in the co-pending litigation, who are the Patent Owner and the requestor that requested reexamination, have agreed on the constructions of certain claim terms (*see* NPL 42 in an Information Disclosure Statement (IDS) filed July 12, 2022), and the Court in the Northern District of Illinois overseeing the litigation has issued a claim construction Order regarding other terms (*Id.,* NPL 43).

29.    I have reviewed these claim constructions and have been asked to adopt them in rendering my opinions in this Declaration.

## VI.    CLAIMS 1, 10, 14, and 31

30.    I understand that claims 1, 10, 14, and 31 each recite the term "identifier. I further understand that based on the claim construction the term "identifier" must *uniquely* identify an *individual* entity, with zero or more location strings associated with it in a location server.  (NLP 43).

31.    Furthermore, based on my review of the claim construction of the term "identifier" and the Specification and claims of the '978 patent, in my opinion a POSITA would understand claims 1, 10, 14 and 31 that the claimed location queries include, expressly or impliedly, identifiers identifying entities.

32.    Specifically, '978 Patent states "When a query is performed for an identifier, the NDTP server Supplies the set of application servers in which data may be found for that identifier" ('978 patent, 8:23-25).  Furthermore, the '978 patent states "In one embodiment, the NDTP server network front end preferably services NDTP query requests in a FIFO style by reading the NDTP GET message, performing the lookup for the identifier in the NDTP server location store, and writing the NDTP GET RSP message." ('978 patent, 13:52-56).

33.    Moreover, the '978 patent states "The communication flow may represent a client 112 requesting an identifier/location association(s) from the NDTP server, which may be a server constellation construed in either of two forms (see FIGS. 19 and 20), and then querying directly based on the identifier/location association(s) received from the NDTP server." ('978 patent, 18:50-56).

34.    In light of the above, in my opinion, a POSITA at the time of this invention would understand that claims 1, 10, 14 and 31 require that the claimed location queries include, expressly or impliedly, identifiers identifying entities.

# VII. CLAIMS 3, 10, and 14

35.     It is my opinion that a POSITA at the time of this invention would understand claims 3, 10, and 14, through various limitations in each of the claims, to require a non-hierarchical cluster configuration as taught by the '978 patent.

36.     Specifically, claim 10 recites "the plurality of location servers are arranged in a cluster topology such that each location server contains a unique set of location information of an aggregate set of the location information [...] programming logic stored on each of the plurality of location servers responsive to a location query for a desired identifier to return one of a location message [...] a redirect message if the queried location server does not contain location information relevant to the desired identifier, wherein the redirect message comprises information for finding a location server having location information related to the desired identifier."

37.     A POSITA at the time of this invention would understand the aforementioned limitations of claim 10 connotes a non-hierarchical cluster configuration as taught by the '978 patent. (*See e.g.,* '978 patent, 18:38-19:3). As an initial matter, claim 10 explicitly states that the location servers are arranged in a cluster topology. For example, claim 10 requires that every location server in the server network is configured to transmit a redirection message that includes information to find the location server storing the desired location information. *See, e.g., id.* at 18:64-19:3 (which expressly discloses an embodiment of "As discussed above, if the client does not receive the data requested, it will receive a redirection response message (NDTP RDR RSP) from the contacted server 120a (arrow 2). The client then uses the information it receives to ask another server 120b for the operations the client wants to initiate (arrow 3). A successful response from the second server 120b is then sent to the client (arrow 4)."). Therefore, claim 10

requires that the information will allow finding the location server having the location information with certainty. As such, a POSITA at the time of this invention would understand claim 10 connotes a non-hierarchical cluster configuration.

38. Claim 14 recites a "redirect message to the client if the queried location server does not contain data location information relevant to the entity identified in the query, the redirect message comprising information for finding a location server storing the entity identified in the query."

39. A POSITA at the time of this invention would understand the aforementioned limitations of claim 14 connotes a non-hierarchical cluster configuration as taught by the '978 patent. (*See e.g.*, '978 patent, 18:38-19:3). This is because claim 14 requires each location server in the network to be configured to transmit a redirect message to a client. As such, a POSITA at the time of this invention would understand that these requirements impose a non-hierarchical cluster configuration.

40. Claim 3 recites "redirect message comprising information for finding a location server known to have location information relevant to the location query." A POSITA at the time of this invention would understand the aforementioned limitations of claim 3 connotes a non-hierarchical cluster configuration as taught by the '978 patent. (*See e.g.*, '978 patent, 18:38-19:3). This because claim 3 requires that the information in the redirect message will allow for finding the location server <u>known</u> to have the location information with specificity and certainty. Therefore, a POSITA at the time of this invention would understand claim 3 recites a non-hierarchical cluster configuration.

41. A POSITA would be aware that hierarchical server configurations do not, in general, allow a server to perform an immediate redirection to another server known to contain

specific information (such as the location information for a given identifier). For instance, as shown in the hierarchical organization shown in Fig. C-4 of the ONAG reference, the DR1 node is three hops away from the DR2.1 node; hence, it has no immediate knowledge of what is stored at the DR2.1 node.



Oracle Admin., Fig. C-4

42. ONAG teaches that nodes in the Names Server hierarchical structure only have knowledge of their direct children. (Oracle Admin, p. 151, 191). This limited knowledge does not allow any server in the Names Server network to have information that identifies with specificity which other server contains the desired location information. *See, e.g.,* my summary of Oracle Names below.

43. Therefore, a POSITA at the time of this invention would understand that the "redirect message" limitations of claims 3, 10, and 14, in view of the specification's disclosures, claim a non-hierarchical cluster network configuration as taught by the '978 patent. (*See e.g.,* '978 patent, 16:21-31; 18:9-21).

## VIII. ORACLE NAMES

44. ONAG discloses a fundamentally different configuration than the '978 patent.

45.     Specifically, ONAG describes the Oracle Names system.  Oracle Names allows for assigning aliases to network services in a network.  (Oracle Admin, 30-32; 52-54).  A client device may query a Names Server for the network address of a network service using the network service's name or link.  (*Id.*)

46.     As I explained during the Examiner Interview on September 12, 2022, ONAG allows users to create private and public names or links for the network service or object. (*See e.g.,* ONAG, 54, 100, 129).  For example, ONAG states that a private database link is "A DBlink created by one user for his or her exclusive use." (ONAG, 200). Furthermore, ONAG states that a public database link is "[a] database link created by a DBA on a local database which is accessible to all users on that database. (ONAG, 200).

47.     ONAG does not require or restrict that the names or links to uniquely identify a single network service or object.  For example, ONAG allows a database administrator to assign a public name or link "Poultry" to a first database and a private user to assign a private name or link "Poultry" to a second database. (*See e.g.,* ONAG, 54, 100, 129).  In this scenario, the name or link "Poultry" does not identify a *single* network object, rather, it identifies two different network objects (e.g., a first database and a second database).

48.     During the interview, Examiner Campbell pointed to ONAG's querying process to illustrate a location query that identifies an entity (as required by claims, 1, 10, 14, and 31). (ONAG, 128-129).  However, in my opinion, ONAG's querying process further illustrates that ONAG allows for non-unique names or links to be assigned to network objects.  For example, ONAG's query requires two or more parameters, including a name (e.g., network object name) and network object type. (ONAG, 128-129). This illustrates that ONAG uses both the network object name and network object type to locate the network object.

49.     Furthermore, ONAG states the following about the querying process:

Example:

```
NAMESCTL> QUERY BONES.DEM.MEDICINE A.SMD
Total response time:     0.04 seconds
Response status:         normal, successful completion
Authoritative answer:    yes
Number of answers:       1
Canonical name:          bones.dem.medicine
TTL:                     1 day
Alias translations:
    from:                bones.dem.medicine
    to:                  bones.dem.medicine
Answers:
    data type is "a.smd"
        Syntax is ADDR:...(DESCRIPTION=(ADDRESS=
        (COMMUNITY=tcp)(PROTOCOL=TCP)(Host=cowboy)
        (Port=1522))(CONNECT_DATA=(SID=rodeo)))
```

ONAG, 129.

50.     As shown in the example query above, ONAG identifies all of the possible answers (or results) based on the query parameters.  This demonstrates that there may be multiple answers or results based on a single name or link.  That is, the query may return two or more network objects that match a single name or link.

51.     Therefore, in my opinion, ONAG does not teach an identifier that is used to uniquely identify a single network object.

52.     Furthermore, ONAG relies on a hierarchical structure where any given node only knows about its direct children, such that requests and responses can only be made between nodes immediately "above" or "below."  (Oracle Admin, 190-192).  Figure C-4 depicts an example of an Oracle Names network:



53.     ONAG provides the following description of how a request is sent and information is returned in a Names system: "1.  The client sends request to preferred Names Server in its local region (DR1).  2.  The preferred Names Server in DR1 issues request for the Names Servers authoritative for the destination server (in region DR2.1).  3.  The root Names Server does not have the answer (because root only knows about its direct child regions), but forwards the request to a Names Server in region DR2.  4.  The receiving server in DR2 forwards the request to a Names Server in region DR2.1.  5.  The name is retrieved from its authoritative Names Server in DR2.1.  6.  The names Server in region DR2 caches the answer and returns it to the root.  7.  The root caches the answer and returns it to the preferred Names Server in region DR1.  8.  The preferred Names Server caches the answer and returns it to the client.  9.  The client establishes a connection to the destination server."  (Oracle Admin, 191, emphasis added).

54.     ONAG describes a configuration that is akin to conventional Domain Names Service (DNS) or Names Service systems.  In fact, ONAG touts its compatibility with DNS by disclosing:

> Many companies already have global naming standards for their PC LANs, large hosts, or mail systems.  If such policies exist, you can use them as the basis for the Oracle Names naming model.  Using the same structure leverages the investment in the education users already have with global names.

For example, many companies with TCP/IP networks use the Domain Name Service (DNS) model for communication on the worldwide Internet. In this model, all naming models are hierarchical from a set of base domains such as:

• COM – commercial organizations

• EDU – educational institutions

• MIL – military

• ORG – organizations

Individual companies are then assigned domains within which to build their naming model (for example, ACME.COM). To adapt any example in this book to the DNS Internet model, add a single high-level domain, such as COM (or other stem). For organizations which are on the Internet, and therefore already have one or more DNS domains, the sensible choice is to align their Oracle naming domains with their DNS domains.

(Oracle Admin, 56-57).

55.     In this regard, ONAG describes a system that is built on top of DNS or Names

Service. Like DNS or Names Service, ONAG relies on traversing network paths and

relationships organized in a hierarchical tree structure.

56.     Oracle Admin's hierarchical configuration is foundationally different from the

non-hierarchical cluster configuration required by claims 3, 10, and 14. An important distinction

is that, unlike the non-hierarchical cluster configuration required by claims 3, 10, and 14, the

Names Servers in Oracle Admin's hierarchical structure does not allow for data location

information to be portioned and organized across the Names Servers based on a hash function.

Furthermore, Oracle Admin's hierarchical structure does not enable each and every Names

Server to be configured to determine the location of the requested location information (e.g., the

specific data location server storing the location information).

57.     Another important distinction is, unlike the non-hierarchical cluster configuration

required by claims 3, 10, and 14, ONAG Names Servers do not have information about what is

stored by other Names Server in the hierarchy outside of their direct children. Therefore, ONAG Names Servers cannot determine with certainty which Names Server stores the requested location information. For instance, as excerpted above, the "**root only knows about its direct child regions**." Oracle Names Servers are also not configured to transmit such information directly back to the client.

## IX.      A PERSON OF ORDINARY SKILL IN THE ART (POSITA) WOULD NOT BE MOTIVATED TO MODIFY ONAG WITH ORACLESG TO SATISFY THE REQUIREMENTS OF CLAIMS 1 AND 31

58.      It is my opinion a POSITA would not turn to Oracle Admin and/or OracleSG to achieve the requirements of claims 1 and 31. As stated above, claims 1 and 31 recite the term "identifier." The location queries claimed in claims 1 and 31 include, expressly or impliedly, identifiers identifying entities. Furthermore, the term "identifier" is construed as uniquely identifying a *single* entity.

59.      As further stated above, ONAG does not teach or suggest an "identifier" that *uniquely* identifies a *single* entity.

60.      OracleSG also does not teach or suggest an "identifier" that uniquely identifies a single entity. OracleSG further discloses "synonyms," but these "are merely alternative names for tables." (OracleSG at p. 181). OracleSG teaches that "synonyms" can be public or private; hence, synonyms are not disclosed in OracleSG as being unique identifiers. Indeed, by disclosing the synonyms may be "private or public", and given an example using non-unique synonyms, a POSITA would understand that synonyms will, in general, not be unique identifiers, since individual user's private synonyms with the same name can refer to different tables. (OracleSG, 189). That is, the same synonym may be associated with the multiple databases,

tables, or views. (*Id*). Therefore, the synonym is not unique to the database, table, or view. (OracleSG, 189).

61.     As an initial matter, in my opinion, a POSITA would not be motivated or find it obvious to modify ONAG with OracleSG to achieve the limitations of claims 1 and 31 because OracleSG is deficient for the same reasons as ONAG.

62.     Furthermore, in my opinion, a POSA would not be motivated or find it obvious to modify ONAG and/or OracleSG to use identifiers that uniquely identify a single entity because ONAG and/or OracleSG use private or public names or links for network objects differently than the '978 patent uses identifiers. In contrast to the '978 patent, which uses identifiers to locate the data distributed in a network, ONAG and/or OracleSG allow for users to create public or private names or links for individual network objects so that the respective users may locate the respective network objects based on their personal needs and requirements. (*See e.g.,* ONAG, 54, 100, 110, 128-129; OracleSG, 189-190).

63.     For example, a corporation implementing ONAG and/or OracleSG may have multiple departments, including Human Resources (HR) and Tax. The users of the HR department may need to readily locate an employees database including HR information and the users of the Tax department may need to readily locate a different employees database including tax information. In this scenario, the HR department may assign the employees database including HR information the name or link "Employees" and the Tax department may also assign the employees database including tax information the name or link "Employees."

64.     ONAG and/or OracleSG teaches that both departments may use the same name to point to different databases because it allows both departments to access their respective databases using the name or link. ONAG and/or OracleSG allow the same name or link to point

to different network objects because ONAG and/or OracleSG do not use the network object's name or link to uniquely identify the network object. Rather, ONAG and/or use a combination of multiple parameters, including a network object name or link, type of network object, user information, etc., when attempting to identify and locate the network object. (*See e.g.,* ONAG, 54, 100, 110, 128-129; OracleSG, 181, 189-190).

65. Therefore, a POSITA would not find it obvious or be motivated to modify ONAG and/or OracleSG to use identifiers that uniquely identify a single entity because doing so would prevent users of ONAG and/or OracleSG from using the private or public names or links as intended by ONAG and/or OracleSG.

66. Moreover, a POSITA would not have had reasonable expectation of success to modify ONAG with OracleSG to meet the claim requirements of claims 1 and/or 31. As stated above, ONAG and OracleSG allow users to assign public or private names or links to network objects. (*See e.g.,* ONAG, 54, 100, 110, 128-129; OracleSG, 181, 189-190). ONAG and/or OracleSG do not prevent the use of non-unique names or links for different network objects.

67. Modifying ONAG and/or OracleSG to impose a restriction of an identifier uniquely identifying a single entity would involve changing the functionality of public and private names or links, as provided by ONAG and/or OracleSG. In this regard, using identifiers that uniquely identify a single entity would require substantially reconstructing ONAG and/or OracleSG such that the same private and public names or links are restricted from being used for two different network objects. Therefore, in my opinion, a POSITA would not have had reasonable expectation of success to modify ONAG with OracleSG to meet the claim requirements of claims 1 and/or 31.

68. Furthermore, in my opinion, modifying ONAG and/or OracleSG to use identifiers

that uniquely identify a single entity would change the principle operation underpinning ONAG and/or OracleSG.

69. As described above, ONAG and/or OracleSG use private or public names or links to allow users to assign names or links to network objects based on the users' personal needs or requirements. This allows users' to readily locate a single network object using the private or public names or links. Therefore, requiring identifiers to uniquely identify a single network object would prevent users using ONAG and/or OracleSG from assigning any name or link based on their needs or requirements. As such, imposing such a restriction would change the principle operation underpinning ONAG and/or OracleSG.

## X. A PERSON OF ORDINARY SKILL IN THE ART (POSITA) WOULD NOT BE MOTIVATED TO MODIFY ONAG WITH ORACLESG AND/OR MCGARVEY TO SATISFY THE REQUIREMENTS OF CLAIMS 3, 10, and 14

70. In my opinion, a POSITA would not be motivated or find it obvious to modify ONAG with OracleSG to satisfy the requirements of the term "identifier," as recited in claims 10 and 14, based on the reasons stated above. McGarvey is not relied upon and does not teach or suggest an "identifier" that uniquely identifies a single entity.

71. Furthermore, as stated above, claims 3, 10, and 14 require that the location servers are arranged in a non-hierarchical cluster configuration.

72. At the time of the invention of the '978 patent, conventional distributed data collection systems implemented DNS or Names Service systems, which rely on hierarchical structures. ONAG is similar to DNS, and as described in Oracle Admin, borrows the DNS system to allow clients to search for network addresses of network services. (*See e.g.,* Oracle Admin, 56-57 and 190-192).

73.     ONAG's disclosures reflect the prevailing view at the time of the invention that hierarchical, tree-like data structures were necessary to manage the storage and retrieval of large quantities of data.  *See, e.g.,* ONAG at p. 56 (highlighting added):

> For example, many companies with TCP/IP networks use the Domain Name Service (DNS) model for communication on the worldwide Internet. In this model, all naming models are hierarchical from a set of base domains such as:
>
> • COM - commercial organizations
>
> • EDU - educational institutions
>
> • MIL - military
>
> • ORG – organizations

74.     In one instance, ONAG expressly discouraged the use of "flat" structures in situations where the number of services is not small (e.g., greater than 100) and the "likelihood of future growth of network services" is not minimal.  (Oracle Admin., p. 40).

75.     ONAG does not contemplate a non-hierarchical cluster configurations that allow for the aforementioned features of claims 3, 10, and 14.  OracleSG and Rajani do not either.

76.     OracleSG is not useful in motivating a POSITA to arrive at the claims of the '978 patent.  OracleSG "focuses on the job of a database administrator" ("DBA") and describes the functions of Oracle Products "as background material to understand how to deal with problems and why things work the way they do."  OracleSG at p. 19.  OracleSG recommends using "Oracle Network Manager" to generate the network configuration files for SQL*Net version 2, but rather than disclosing a tool to perform a "translation between the easy names and the exact server", OracleSG teaches that this burden "falls on the DBA".  (OracleSG, 86-87).  A POSITA would understand that this is a high-level characterization of part of the job description of a DBA, not a motivation to combine Oracle tools.

77.     Claim 10 explicitly requires that the location servers are arranged in a cluster configuration. Claim 10 further requires that each location server be configured to transmit a redirect message and the redirect message include information to find the location server having the desired location information.  In this regard, in my opinion, claim 10 requires that information is used to find the location server having with the desired location information with certainty.

78.     Claim 14 requires that each location server be configured to transmit a redirect message to a client. Like claim 10, the redirect message includes information to find the location server having the desired location information.  As such, in my opinion, claim 14 requires that information is used to find the location server having with the desired location information with certainty.

79.     Claim 3 requires that requires that each location server be configured to transmit a redirect message. The redirect message includes information for finding the location server *known* to have the desired location information. As such, claim 3 requires that the information allow for finding the location server known to have the desired location information with specificity and certainty.

80.     ONAG does not teach or suggest a redirect message that includes information that can be used to determine with specificity or certainty the Names Server that contains the requested location information.

81.     Oracle Admin's "turning forwarding off" feature does not allow a Names Server to determine the location server that contains the requested location information.  Rather, ONAG indicates that forwarding can be turned off for a Names Server.  (Oracle Admin, 190-192).  If that Names Server is queried, the queried Names Server returns information about the next

Names Server that *can* handle the query. (Oracle Admin, 190-192). The queried Names Server does not know with any certainty which Names Server contains the requested location information. (Oracle Admin, 190-192).

82. Oracle Admin's hierarchical structure discourages such an implementation. In a hierarchical structure like Oracle Admin, each node contains address information about its parent and child nodes. The nodes do not know what information is *stored* in the other nodes in the network outside of its direct children. The hierarchical structure requires traversing up and down the hierarchical-tree to retrieve the requested location information. *See, e.g.,* Oracle Admin., 190-192 (the "root only knows about its direct child regions" and queries have to traverse a path in the tree hierarchy).

83. ONAG does not enable clients to redirect queries and does not teach or suggest transmitting a redirect message to a client. For example, ONAG states, "If FORWARDING_AVAILABLE is set to off, any clients who rely directly on that Names Server will be unable to resolve foreign names. *Clients are not capable of redirecting their requests as Names Servers would.* Their requests will fail at that point, even if other Names Servers are listed in the NAMES.PREFERRED_SERVERS configuration parameter." (*Id.,* 137) (emphasis added). Therefore, ONAG limits the client's capabilities to transmitting a names resolution request, receiving a network address for a network service from a Names Server, and connecting to the network service using the network address. (*See e.g.,* Oracle Admin, 30-32, 52-54, 190-192). As such, a POSITA would not understand ONAG to teach allowing clients to receive redirect messages, as required by claim 14.

84. Furthermore, a POSITA would understand that *each* Names Server is not configured to transmit a redirect message because ONAG prevents clients from redirecting its

own request. As such, the Names Server in communication with the client cannot transmit a redirect message to the client.

85.     McGarvey also describes a hierarchical configuration. McGarvey relies on the standard DNS protocol and specifically references RFC 1034, which defines DNS. For the reasons above, DNS, like Oracle Names, is hierarchical and not comparable to the cluster composition required in claims 3, 10, and 14.

86.     McGarvey does not teach a redirect message. McGarvey only teaches that a host can have multiple DNS servers and when one fails the host can try the next one. (McGarvey, 5:1-43). The failure message a host gets from a first DNS server is not the "redirect message" required by the claims because it does not contain indicate which server contains the requested location information. It is merely an indication of a domain name not being found. (McGarvey, 5:38-43). Indeed, the first DNS server has no knowledge of the second DNS server because they are on different networks, as disclosed in McGarvey. (McGarvey, 5:5-43). Instead, the host issuing the queries already knows the address of the second DNS server and can send its request there. Indeed, the specification of McGarvey teaches sending the queries to multiple DNS servers (on different networks) in parallel. (McGarvey, 5:5-43).

87.     A POSITA at the time of the invention would not be motivated to modify Oracle Names to allow transmitting a redirect message indicating information to find the Names Server that contains the requested location information based on OracleSG and/or McGarvey's teachings.

88.     A POSITA would not be motivated to modify Oracle Names into a cluster composition that provides for determining which Names Server contains the requested location information, as required by claims 3, 10, and 14; or to do so by combining it with OracleSG

and/or McGarvey.

89.    A POSITA would not be motivated to modify ONAG with OracleSG and McGarvey to achieve the requirements of claims 3, 10, and 14 because doing so would require extensive reengineering and redesigning of ONAG.  As an initial matter, ONAG teaches away from using Dynamic Discovery for complicated networks. (Oracle Admin, 21). ONAG explicitly states, "If you have a *simple* existing network that is growing, the Dynamic Discovery Option is a good choice." (Oracle Admin, 21) (emphasis added). ONAG teaches that Dynamic Discovery (or "DDO") is "not a good choice" and is "not suitable" for "large, enterprise-scale networks." (Oracle Admin, 21). A POSITA would understand Oracle Admin's teaches to discourage the use of DDO in combination with large-scale networks. Furthermore, ONAG teaches that its Dynamic Discovery Option only works with SQL*Net 2.3. (Oracle Admin, 21). In view of this, a POSITA would not have a reasonable expectation of success in modifying or combining ONAG with one or more of the complex networks described in OracleSG and/or McGarvey to achieve the requirements of claims 3, 10, and 14.

90.    Furthermore, ONAG describes a hierarchical tree structure and claims 3, 10, and 14 requires a non-hierarchical cluster configuration.  Therefore, attempting to modify ONAG with OracleSG and McGarvey to achieve the requirements of claims 3, 10, and 14 would require abandoning Oracle Admin's hierarchical structure and reconfiguring ONAG such that Names Servers are configured to transmit a redirect message indicating information to find the Names Server that includes the requested location information.

91.    These modifications to ONAG would be non-trivial to a POSITA at the time of the invention.  Furthermore, the required modifications to ONAG are not taught or suggested in OracleSG or McGarvey nor were they readily known in the art at the time.  As such, the

reengineering and redesign of ONAG would be so extensive that a POSITA would not have a reasonable expectation of success of achieving the requirements of claims 3, 10, and 14.

92.　　A POSITA would not be motivated to modify ONAG with OracleSG and McGarvey to achieve the requirements of claims 3, 10, and 14 because doing so would change the principle operation underpinning ONAG.

93.　　ONAG's principle operation involves traversing a hierarchical tree configuration of Names Severs to retrieve a network address. Attempting to modifying ONAG to satisfy claims 3, 10, and 14 requirements would involve abandoning ONAG's hierarchical structure, requiring substantial reconstruction and redesign of ONAG's elements (e.g., Names Servers).

94.　　Furthermore, ONAG explicitly prevents clients from redirecting their own request. (ONAG, 137). As such, Names Servers are restricted from transmitting the redirect messages to the clients. (ONAG, 137).

95.　　Therefore, attempting to modify ONAG to satisfy claim 14's requirements would require modifying ONAG system such that the client can receive redirect message. This would require substantial redesign and reconfiguration of the ONAG's elements.

## XI.　A PERSON OF ORDINARY SKILL IN THE ART (POSITA) WOULD NOT BE MOTIVATED TO MODIFY ONAG WITH ORACLESG AND/OR RAJANI TO SATISFY THE REQUIREMENTS OF CLAIM 6

96.　　In my opinion, a POSITA would not be motivated or find it obvious to modify ONAG with one or more of OracleSG and/or Rajani to satisfy the requirements of claim 6.

97.　　Claim 6 requires identifiers and their associated locations are maintained in an indexed location store indexed by a hash table.

98.　　ONAG, OracleSG, and/or Rajani are devoid of any reasoning to motivate

maintaining location information in an indexed location store indexed by a hash table. Therefore, in my opinion, absent using the '978 Patent as a guide in hindsight, the teachings in ONAG, OracleSG, and/or Rajani would not motivate a POSITA to maintain identifiers and their associated locations in an indexed location store.

99.     Furthermore, in my opinion, modifying ONAG to enable maintaining location information in an indexed location store indexed by a hash table in the Name Servers requires significant reengineering and reconfiguration of ONAG. Therefore, a POSA would not have had a reasonable expectation of success to configure ONAG with one or more of OracleSG and/or Rajani to satisfy claim 6's requirements.

I declare under penalty of perjury under the laws of California and the United States of America that the above facts are true and correct.

Executed on September 28, 2022.

_____

Dr. Michael T. Goodrich