# Exhibit 1

Page 417

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

_____

KOVE IO, INC.,            )
                          )
        Plaintiff,        )
                          )
v.                        )   No. 1:18-cv-08175
                          )
AMAZON WEB SERVICES, INC.,)
                          )
        Defendant.        )
_____)   VOLUME II

HIGHLY CONFIDENTIAL

Video-recorded deposition of JOHN OVERTON, PH.D., taken at 161 North Clark Street, Chicago, Illinois, before Donna M. Kazaitis, IL-CSR, RPR, CRR, commencing at the hour of 8:06 a.m. on Wednesday, May 17, 2023.

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 708

 1   DNS.
 2          Q.   Have you ever given any other
 3   presentations at Yale?
 4          A.   I don't think so.
 5          Q.   You can't remember one way or the
 6   other?
 7          A.   I might have given something for
 8   religion to the theology department in some other
 9   context but it's vague.  I mean I don't recall the
10   time or anything.  It would have been years before
11   this.
12          Q.   Since this presentation in October
13   2002, have you given any other presentations at
14   Yale?
15          A.   No.
16          Q.   Have you been invited to give any
17   other presentations at Yale since 2002?
18          A.   No.
19               MR. SIGLER:  All right.  Why don't we
20   take a break.
21               THE VIDEOGRAPHER:  Going off the
22   record at 3:21 p.m.

Page 709

1                (A recess was taken.)

2                THE VIDEOGRAPHER:  Going on the record

3  at 3:41 p.m.

4                (Deposition Exhibit 87 was marked

5                  for identification.)

6  BY MR. SIGLER:

7      Q.  Mr. Overton, I'm passing you Exhibit

8  87.  (Document tendered to the witness.)

9           Do you have Exhibit 87 in front of

10  you, sir?

11      A.  I do.

12      Q.  There's a page of metadata attached to

13  the front of Exhibit 87.  Do you see that, sir?

14      A.  I do.

15      Q.  And then if you turn to the next page,

16  do you see that this is a paper called "Consistent

17  Hashing and Random Trees:  Distributed Caching

18  Protocols for Relieving Hotspots on the Worldwide

19  Web"?

20      A.  Yes.

21      Q.  Are you familiar with this paper?

22      A.  Vaguely.

Page 710

1　　Q.　Turning back to the front page of this
2　document.  Do you see there that there's a
3　custodian ID about four lines down?
4　　A.　Yes.
5　　Q.　And this indicates that you were the
6　custodian of this document.  Do you understand
7　that?
8　　A.　Okay, sure.
9　　Q.　There's a created date time about
10　three quarters of the way down the page.  Do you
11　see that?
12　　A.　I do.
13　　Q.　And the created date time is
14　January 3, 1999, at 2:52 p.m.; right?
15　　A.　I see that.
16　　Q.　Turn to the paper again, please.
17　　A.　Sure.
18　　Q.　There are six authors of the paper
19　identified near the top.  Do you see that?
20　　A.　I do.
21　　Q.　The first author identified is David
22　Karger.  Do you see that?

 1         A.    Yes.
 2         Q.    Have you ever communicated with
 3   Mr. Karger?
 4         A.    I don't believe so.
 5         Q.    Do you know who Mr. Karger is?
 6         A.    Not off the top of my head.
 7         Q.    Eric Lehman is listed as an author of
 8   this paper as well; right?
 9         A.    Yes.
10         Q.    Have you ever communicated with
11   Mr. Lehman?
12         A.    I don't believe so.
13         Q.    Do you know who Mr. Lehman is?
14         A.    I don't think so.
15         Q.    And a Tom Leighton is listed as an
16   author.  Do you see that?
17         A.    Yes.
18         Q.    Have you ever communicated with Tom
19   Leighton?
20         A.    I don't know.  The name's familiar.  I
21   don't recall.  I don't think I've communicated
22   with Tom Leighton.  The name is somehow more

1　the abstract it says: "The protocols work with

2　local control, make efficient use of existing

3　resources, and scale gracefully as the network

4　grows." Do you see that?

5　　　　A.　I do.

6　　　　Q.　There's a reference there to "scales

7　gracefully as the network grows." Do you see

8　that?

9　　　　A.　I do.

10　　　Q.　That refers to scalability; right?

11　　　A.　It could, yes.

12　　　Q.　And scalability is one of the things

13　you tout as a strength of the '640 Patent; right?

14　　　A.　Yes.

15　　　Q.　Continuing on to the next paragraph of

16　the abstract, there's a sentence that starts with

17　"Through the development." Do you see that?

18　　　A.　Yes.

19　　　Q.　It says: "Through the development of

20　good consistent hash functions, we are able to

21　develop caching protocols which do not require

22　users to have a current or even consistent view of

Page 716

 1　the network.  Do you see that?
 2　　　　A.  Yes.
 3　　　　Q.  The '640 Patent also uses hashing to
 4　organize data on a network; right?
 5　　　　A.  Yes.
 6　　　　Q.  And the '640 Patent uses a hash
 7　function like the one described here in this
 8　paper; right?
 9　　　　　　MR. CARDENAS-NAVIA:  Objection, form,
10　vague.
11　　　　　　THE WITNESS:  I have no idea.  This
12　doesn't describe what the function is or how it's
13　used.  It further is discussing caching, which is
14　the opposite, maybe not opposite, but a very, very
15　different concept than what we're doing in '640.
16　BY MR. SIGLER:
17　　　　Q.  Do you understand that this document
18　was produced to us from your files?
19　　　　A.  Yes.
20　　　　Q.  And that it was in your files at least
21　since January 3, 1999?
22　　　　　　MR. CARDENAS-NAVIA:  Objection, form,

Page 717

 1　calls for speculation.
 2　　　　　THE WITNESS:  Well, I see that there's
 3　the date on the metadata that says created date
 4　time of '99.
 5　BY MR. SIGLER:
 6　　　　Q.　So this document has a created date of
 7　January 3, 1999; right?
 8　　　　A.　As expressed on that page, yes.
 9　　　　Q.　You filed the application that became
10　the '640 Patent on September 13, 2000; right?
11　　　　A.　Yes.
12　　　　Q.　And that's more than a year after
13　January 3, 1999; right?
14　　　　A.　Yes.
15　　　　Q.　Did you submit this paper to the
16　Patent Office when you applied for the '640
17　Patent?
18　　　　A.　I don't know.  I don't know why I
19　would have.  This is very different than our
20　invention.
21　　　　Q.　Why don't you -- you have the '640
22　Patent?

Page 731

1　BY MR. SIGLER:

2　　　Q.　I can't remember if it was yesterday

3　or today, but I believe you described your

4　invention a ██████████████████████

5　██████████████?

6　　　A.　██████████████████████.

7　　　Q.　So woul ██████████████████████

8　██████████████████████ infringe the claims of

9　your patents?

10　　　　MR. CARDENAS-NAVIA: Objection to

11　form, vague, to the extent it calls for a legal

12　conclusion and expert testimony.

13　　　　THE WITNESS: I couldn't make a legal

14　conclusion.

15　BY MR. SIGLER:

16　　　Q.　Do you know what double patenting is?

17　　　A.　Yes, or I know the concept, heard of

18　the concept. I don't know if I know it

19　specifically in the legal terms when I'm in a room

20　with legal people.

21　　　Q.　Well, are you aware that you can't

22　claim the same invention multiple times?

Page 732

1          MR. CARDENAS-NAVIA:  Objection to
2    form, vague, calls for speculation, lack of
3    foundation.
4          THE WITNESS:  Could you restate that?
5    BY MR. SIGLER:
6       Q.   Let me ask you this:  Are there any
7    differences in the claims between your three
8    patents?
9          MR. CARDENAS-NAVIA:  Objection to
10   form, vague.
11         THE WITNESS:  That's also a legal
12   conclusion I think.
13   BY MR. SIGLER:
14      Q.   Okay.  I thought you testified a few
15   moments ago that the Karger paper wasn't material
16   to the inventions claimed in your patents.  Is
17   that what you said?
18      A.   When I looked at the abstract or some
19   portion of it as I was reading it, it was talking
20   about caching.  And what we were doing was not
21   about caching.
22      Q.   You were able to determine on your own

Page 733

1  that that paper wouldn't be material to the
2  examiner's examination of your applications;
3  right?
4       A.   I don't know that I'm expert in any of
5  this.  But when I looked at that, it would never
6  occur to me that that would be germane because
7  that's about caching and one of the critical
8  components, not the only one, but one very
9  foundational component of our patents and of the
10 technology is to eliminate caching.  You can
11 deploy it that way but that's not the part that's
12 the most distinctive.
13      Q.   And that's your view; right?
14      A.   I think it's -- yes, yes, that's my
15 view.
16      Q.   Can you take out the '978 Patent,
17 please.
18      A.   Sure.
19      Q.   And what exhibit number is that?
20      A.   12.
21      Q.   Can you turn to the claims, please?
22      A.   Sure.

Page 734

1     Q. Specifically -- sorry, I had the wrong
2 patent. That was the problem.
3         Can you take out the '640 Patent.
4 What exhibit number is that, sir, for the record?
5     A. 11.
6     Q. Let's go to Claim 24 of that patent,
7 please. Claim 24 says: "The system of Claim 18
8 wherein the location information comprises a
9 portion of a hash table distributed over the
10 plurality of data location servers." Do you see
11 that there, sir?
12     A. I do.
13     Q. And that Claim 24 in the '640 Patent
14 describes hashing location information; right?
15         MR. CARDENAS-NAVIA: Objection to
16 form, mischaracterizes the document.
17         THE WITNESS: I'm not a lawyer and
18 these are claims. I don't think I'm qualified to
19 discuss claims.
20 BY MR. SIGLER:
21     Q. You're not qualified to discuss the
22 claims of your own patents?

Page 826

1  STATE OF ILLINOIS )

2  COUNTY OF C O O K )

3      I, Donna M. Kazaitis, CRR, RPR, IL-CSR

4  No. 084-003145, do hereby certify:

5      That the foregoing deposition of JOHN

6  OVERTON, PH.D. was taken before me at the time and

7  place therein set forth, at which time the witness

8  was put under oath by me;

9      That the testimony of the witness and all

10 objections made at the time of the examination

11 were recorded stenographically by me, were

12 thereafter transcribed under my direction and

13 supervision and that the foregoing is a true

14 record of same.

15     I further certify that I am neither counsel

16 for nor related to any party to said action, nor

17 in any way interested in the outcome thereof.

18     IN WITNESS WHEREOF, I have subscribed my name

19 this 30th day of May, 2023.

20         *Donna M Kazaitis*

21         DONNA M. KAZAITIS, IL-CSR, RPR, CRR

22         IL-CSR License No. 084-003145