# Exhibit 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| KOVE IO, INC.,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>AMAZON WEB SERVICES, INC.,<br><br>　　　　　Defendant. | Civil Action No. 1:18-cv-08175<br><br>Hon. Matthew F. Kennelly<br><br>Jury Trial Demanded |

**EXPERT REPORT OF JOSEPH B. GREENE REGARDING INVALIDITY OF U.S. PATENT NOS. 7,103,640, 7,233,978, AND 7,814,170**

22. For the Asserted Patents, it is my opinion that a POSITA would have had a bachelor's degree in computer science (or a similar field) and at least two years of experience working with database management software systems. Alternatively, a POSITA would have had a Master's degree or similar post-graduate studies in the field of database management software systems with fewer years of experience.

23. I am aware of the qualifications of such a skilled artisan because I have worked with, supervised, and hired engineers with similar capabilities. By 1998, I had worked in both public and private enterprises, and with a wide variety of colleagues and clients in the database management software field. Throughout 1998 and 1999, I was working with individuals who met the above criteria of persons of ordinary skill in the art and had written multiple books teaching to this exact demographic in the field of database management software systems.

24. The books that I wrote in the 1990s were highly regarded in the field, indicating they were well tailored to those of ordinary skill in the art as well as helpful and informative to them. This speaks to my ability to assess the knowledge of the POSITA at the time and in this relevant field of technology.

25. Thus, I am familiar with the understanding and knowledge of persons of ordinary skill in the art as of 1998. And at the time, I was at least as qualified as the POSITA that I have identified above. From the 1990s until now, I have been working with colleagues and for clients and writing books for readers who met the above criteria of persons of ordinary skill in the art. Thus, I understand the perspective of a POSITA, which I have applied in my analysis.

## II. STATE OF THE ART

26. In reaching my opinions on patent validity under §101, §102, §103, and §112, I have considered the state of the relevant art. I provide in this section a brief introduction to the

state of the art for the Asserted Patents as of at least September 1999.[7] I have endeavored to make my explanation straightforward and to focus on the aspects of the art most relevant to the asserted claims.

### A. References Considered

27. In addressing both invalidity and patent eligibility, I considered the following references in considering the state of the art at the time of the claimed inventions:

| Reference | Filing Date | Publication/Issue Date |
|---|---|---|
| "DNS RFC1034 Domain names – Concepts and Facilities" by Mockapetris ("RFC1034"); | N/A | November 1987 |
| "An Adaptive Data Placement Scheme for Parallel Database Computer Systems" by Hua and Lee ("Hua DBMS"); | N/A | August 1990 |
| "Design and Implementation of DDH: A Distributed Dynamic Hashing Algorithm" by Devine ("Devine DDH"); | N/A | October 1993 |
| "Scale in Distributed Systems" by Neuman ("Neuman"); | N/A | 1994 |
| U.S. Patent No. 5,542,087 to Neimat ("Neimat"), assigned to Hewlett-PackardCo.; | Oct. 15, 1993 | July 30, 1996 |
| "Consistent Hashing and Random Trees: Distributed Caching Protocols forRelieving Hot Spots on the World Wide Web" by Karger et al. ("Karger '97"); | N/A | 1997 |

---

[7] I understand that Kove has claimed a priority date of October 28, 1999 for most asserted claims. Kove asserts that the co-inventors had conceived of the Asserted Claims at least by October 28, 1999. Kove's May 7, 2023 Seventh Amended Objections and Responses to Amazon's Interrogatories (Nos. 1, 2, 5, 6, 9), Appendix B at 33 (claim 3), 38 (claim 6), 39 (claim 10), and 53 (claim 14).This state of the art reflects that date, but the approximate state of the art would be similar anytime from July 1998 through 2000.

Page 8

| Reference | Filing Date | Publication/Issue Date |
|---|---|---|
| "Load Management in Distributed Video Servers" by Venkatasubramanian and Ramanathan ("Venkatasubramanian"); | N/A | May 1997 |
| "Resource Location in Very Large Networks" by Partha Dasgupta ("Dasgupta"); | N/A | June 1994 |
| "Distributed Web Caching System with Consistent Hashing" by Sherman ("Sherman"); | N/A | February 1999 |
| "Web Caching with Consistent Hashing" by Karger, Sherman, et al. ("Karger/Sherman"); | N/A | March 4, 1999 |
| Dynamic Load Balancing on Web-server Systems by Valeria Cardellini et al., IEEE Internal Computing, vol. 3, no. 3, pp. 28-39 ("Cardellini"); | N/A | May-June 1999 |
| "Distributed cooperative Web servers" by Baker and Moon ("Baker"); | N/A | May 17, 1999 |
| Paul Albitz and Cricket Liu, DNS and BIND, O'Reilly & Associates, Inc., 3rd ed. ("BIND and DNS"); | N/A | September 1, 1998 |
| U.S. Patent No. 6,212,521 to Minami ("Minami"), assigned to Fujitsu Ltd., issued; | July 26, 1997 | April 3, 2001 |
| U.S. Patent No. 6,430,618 to Karger ("Karger '618"), assigned to Massachusetts Institute of Technology; | March 3, 1998 | August 6, 2002 |
| U.S. Patent No. 6,553,420 to Karger ("Karger '420"), assigned to Massachusetts Institute of Technology[8]; | June 2, 1998 | April 22, 2003 |
| "Locating Copies of Objects Using the Domain Name System" by Kangasharju etal. ("Kangasharju"); | N/A | January 1, 1999 |

---

[8] The Karger '618 and '420 patents are in the same patent family and closely related. Therefore, I refer to these patents together herein as "Karger '618/420."

Page 9

be directly applied as taught, without any significant modification or obstacle in implementation, a POSITA would have no doubt or uncertainty in their combination. Thus, a POSITA would have a reasonable expectation of success.

437. As such, a POSITA would be further motivated to look to Boukobza for its performance monitoring and enhancement disclosures.

438. Likewise, Yocum teaches its system helps "enhance the performance of work requests."[504] A POSITA would have appreciated that Skagerwall's directory servers process work requests and could benefit from Yocum's enhancement to overcome the shared concern for "bottlenecks." As a result, a POSITA would look to Yocum's teachings on how to most effectively deploy multiple servers on a distributed system. As Yocum provides, it was well established in the prior art that the most effective way to manage multiple systems is with a queue:

> Systems in which incoming work requests are placed in a queue for assignment to an available server are well known in the art. Since the frequency at which the incoming requests arrive may not be readily controlled, the principal means of controlling system performance (measured by queue delay or the like) in such a queued system is to control the number of servers. Thus, it is known in the art to start an additional server when the length of the queue being served reaches a certain high threshold or to stop a server when the length of the queue being served reaches a certain low threshold.[505]

439. Accordingly, because Skagerwall contemplates a changing number of directory servers, and Yocum describes the well-established prior art method of using a queue to manage multiple servers, a POSITA would have an expectation of success in combining the two and wouldn't be burdened with any undue effort in doing so.

---

[504] Yocum at 1:27-28.
[505] Yocum at 1:13-23.

Page 191

440. Thus, based on Yocum's and Boukobza's teachings, a POSITA would have found it obvious for Skagerwall's directory servers to automatically transfer a portion of location information and associated identifiers from one server to another in response to performance criteria measurements. A POSITA would have been motivated to do so to overcome the shared concern for resource bottlenecks. A POSITA would have understood that location servers would routinely need to be added in an expanding system in response to performance levels, including transaction rates and available storage space. As such, a POSITA would have been motivated to automate the addition of location servers in Skagerwall's system to reduce any manual delay and more effectively maintain system performance.

441. Further, a POSITA would have had a reasonable expectation of success combining Skagerwall's system with Yocum and Boukobza's performance monitoring and transfers. Skagerwall, Yocum, and Boukobza are all directed towards similar technology and Yocum and Boukobza's teachings are directed specifically towards distributed server systems like Skagerwall's. Thus, there would have been a reasonable expectation of success in doing so here. For the reasons set forth above, it is my opinion that a POSITA would have been motivated to modify Skagerwall in view of Wolff, and that the POSITA would have had a reasonable expectation of success in doing so.

F. **Neimat, DNS, and Karger '618/420 Obviousness Combinations**

442. Appendix D-1c is a claim chart that details my element-by-element analysis establishing the invalidity of the Asserted Claims of the '170 Patent as obvious over Neimat, DNS, and Karger '618/420. Appendix D-2c is a claim chart that details my element-by-element analysis establishing the invalidity of the Asserted Claims of the '640 Patent as obvious over Neimat, DNS, and Karger '618/420. And Appendix D-3e details my element-by-element analysis establishing

Page 192

the invalidity of the Asserted Claims of the '978 Patent as obvious over Neimat, DNS, Karger '618/420, and Venkatasubramanian.

443. As those charts show, DNS builds upon Neimat's disclosed generation of a correct memory address from a character or digit string, such as a record key value, and informs a POSITA as to how to implement a response that includes data location information. In DNS, not only are identification of data servers returned as responses to queries for data, but also information that "point toward a name server that has the desired information" of information "expected to be useful in interpreting the relevant RRs."[506] This was well known in the art. For example, Browne appreciated that "[f]or a name to be useful, there must be some means of resolving a name to a location fromwhich the resource can be retrieved or accessed" such as in DNS.[507] As a further example, Kangasharju similarly recognized "[i]t is highly desirable for host in the Internet to be able to determine the locations (i.e., the IP addresses) of all object servers that contain copies of a specified URL."[508] A POSITA would have been motivated to modify Neimat with DNS for several reasons.

444. Both Neimat and DNS contemplate databases storing information in a distributed manner across multiple computers. Neimat explains that a network of computers allows for the pooling of processing and memory resources to overcome limitations on traditional databases.[509] Neimat's database accommodates "any numbers of clients and servers, and allows the database storage to extend to occupy any number of servers."[510] To facilitate this, Neimat describes how a

---

[506] RFC1034 at 17.
[507] Browne, 182.
[508] Kangasharju, 3.
[509] Neimat at 7:48-67.
[510] Neimat at 6:37-39; *see also id.* at 1:36-40, 8:12-15.

Page 193

database can identify the location of a record based on a record key value.[511] Similarly, DNS confirms there was a known problem in the art that "[t]he applications on the internet were getting more sophisticated and creating a need for general purpose name service," and "[t]he result was several ideas about name spaces and their management."[512] DNS explains the size of the database and frequency of updates requires a distributed design.[513] Accordingly, the database is distributed among servers in a redundant manner.[514] Indeed, both Neimat and DNS avoid a centralized directory and instead contemplate distributing responsibility.[515] And like Neimat's technique for generating a correct memory address, DNS describes a technique "for mapping between object names and domain names"[516] A POSITA therefore would have had a reasonable expectation of success in combining Neimat with DNS, based on their substantial similarities, and such a combination wouldn't require anything more than routine skill.

445. A POSITA would have also had a reasonable expectation of success in combining the references because Neimat doesn't specify what information is retrieved as part of the data record.[517] DNS describes how responses to queries include identification of data servers along with information pointing to the name server with the desired information.[518] And DNS explains how

---

[511] Neimat at 4:41-60, 5:23-67.
[512] RFC1034 at 1-3.
[513] *Id.* at 2-3.
[514] *Id.* at 18-20, *see also id.* at 2 (describing one of the primary goals of DNS as providing "a consistent name space which will be used for referring to resources."), 5, 7, 9, 11-13, 17, 19-20, 29, 37; BIND and DNS, 231-232.
[515] Neimat at 6:14-17 (describing avoiding using "a typical master site of the prior art that memory address computations must go through to perform operations"); RFC1034 at 2-4 (describing maintaining the database in a distributed manner).
[516] Neimat at 4:41-60; RFC1034 at 9.
[517] *See* Neimat at 8:28-47.
[518] RFC1034 at 17 ("For example, a name server that doesn't have the requested information may know a name server that does; a name server that returns a domain name in a relevant RR may also return the RR that binds that domain to an address.").

Page 194

this data is cached throughout the system.[519] A POSITA would have therefore understood that DNS's teachings of what to store in the distributed database and what responses to provide could be utilized by Neimat's distributed database system. And implementing DNS's teachings in Neimat's system would only require routine skill.

446. Further, the charts also show how Karger '618/420 built on top of Neimat's disclosed generation of a correct memory address from a character or digit string, such as a record key value, and informs a POSITA as to how to implement a consistent hashing technique in a network of computers. A POSITA would have been familiar with the use of hashing generally in distributed systems as Neimat describes.[520] Karger '618/420 confirms it was well understood "for clients to use a standard hash function to determine from which server to request a document."[521] And Neimat contemplates using alternative hashing functions.[522]

447. Karger '618/420 discloses a "consistent hashing" function, which "avoids increasing load and spread when the number of servers changes."[523] Consistent hashing is a technique that shows how hash keys serve to partition data across multiple servers.[524] Karger '420/618 explains its technique is helpful for distributed systems that store amounts of data too large to effectively serve from one server.[525] Karger '618/420 also explain its techniques avoids known problems in the art including the need to reallocate data as the number of servers changes.[526]

---

[519] *Id.* at 5, 11-12; *see also* BIND and DNS at 231-232.
[520] *E.g.*, Neimat at 8:57-9:16.
[521] Karger '618 at 3:18-44; *see also id.* at 10:13-25; Karger '420 at 3:23-50; *see also id.* at 10:22-34.
[522] *E.g.*, Neimat at 8:57-9:16.
[523] Karger '618 at 6:21-33; Karger '420 at 6:29-41.
[524] *See* "Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hot Spots on the World Wide Web" by Karger et al. (1997).
[525] Karger '618 at 18:14-17; Karger '420 at 19:47-50.
[526] Karger '618 at 6:21-33; Karger '420 at 6:29-41.

One skilled in the art would recognize that consistent hashing as taught by Karger '618/420 could be used to improve the operation of a distributed system such as disclosed by Neimat when a server is added to or removed from that system. Thus, one of skill would have been motivated to use the consistent hashing of Karger '618/420 to avoid reshuffling and overload problems in other distributed systems. Consistent hashing would also complement the fundamental performance and scalability goals of other distributed systems, including those of Neimat.

448. A POSITA would have had a reasonable expectation of success in modifying Neimat's teachings with Karger '618/420's consistent hashing teachings. Karger '618/420 confirm that consistent hashing is a well-known technique that avoids certain problems in distributed systems. Implementing Karger '618/420's consistent hashing teachings would further Neimat's goals of a distributed system that lacks any centralized directory and of a system expandable to any size.[527] And implementing Karger '618/420's consistent hashing teachings in Neimat's system require only routine skill.

449. Further, Appendix D-3e shows how Venkatasubramanian builds on top of Neimat's disclosed generation of a correct memory address from a character or digit string, such as a record key value, and informs a POSITA as to how to implement load management in a distributed system. And Neimat acknowledges the need to efficiently load the servers in the distributed system.[528] Venkatasubramanian provides a specific example of load management that considers factors including memory size, CPU load, and network and disk bandwidth.[529]

---

[527] *See* Neimat at 6:1-40.
[528] *See* Neimat at 5:20-23, 6:26-28, 8:12-15.
[529] Venkatasubramanian at 529.

450. Venkatasubramanian describes policies for load management in a distributed system with high-performance video servers.[530] Venkatasubramanian's policies manage load through data replication/dereplication and request mitigation.[531] One skilled in the art would recognize the specific load management techniques Venkatasubramanian describes are applicable to Neimat's system where efficient loading of the servers is needed. Thus, one of skill would have been motivated to apply Venkatasubramanian's load management policies to efficiently utilize the distributed system's resources.

451. A POSITA would have had a reasonable expectation of success in modifying Neimat's teachings with Venkatasubramanian's load management teachings. Venkatasubramanian provides examples of load management in distributed systems including specific metrics considered.[532] Implementing Venkatasubramanian's load management teachings would further Neimat's desire to efficiently use its servers.[533] And implementing Venkatasubramanian's teachings in Neimat's system would require nothing more than routine skill.

G. Minami, DNS, and Karger '618/420 Obviousness Combinations

452. Appendix D-1d is a claim chart that details my element-by-element analysis establishing the invalidity of the Asserted Claims of the '170 Patent as obvious over Minami, DNS, and Karger '618/420. Appendix D-2d is a claim chart that details my element-by-element analysis establishing the invalidity of the Asserted Claims of the '640 Patent as obvious over Minami, DNS, and Karger '618/420. And Appendix D-3f details my element-by-element analysis establishing the

---

[530] Venkatasubramanian at 528.
[531] Venkatasubramanian at 528-529.
[532] Venkatasubramanian at 529 (identifying disk space, disk bandwidth, network transfer bandwidth, bandwidth availability, memory buffer space, CPU cycles).
[533] *See* Neimat at 5:20-23, 6:26-28, 8:12-15.

Page 197

invalidity of the Asserted Claims of the '978 Patent as obvious over Minami, DNS, Karger '618/420, Neimat, and Venkatasubramanian.

453. As those charts show, DNS builds upon Minami's data management system that distributes data registration and retrieval tasks, and informs a POSITA as to how to implement a response that includes data location information. In DNS, not only are identification of data servers returned as responses to queries for data, but also information that "point toward a name server that has the desired information" of information "expected to be useful in interpreting the relevant RRs."[534] This was well known in the art. For example, Browne appreciated that "[f]or a name to be useful, there must be some means of resolving a name to a location fromwhich the resource can be retrieved or accessed" such as in DNS.[535] As a further example, Kangasharju similarly recognized "[i]t is highly desirable for host in the Internet to be able to determine the locations (i.e., the IP addresses) of all object servers that contain copies of a specified URL."[536] A POSITA would have been motivated to modify Minami with DNS for several reasons.

454. Both Minami and DNS contemplate databases storing information in a distributed manner across multiple computers. Minami explains that prior systems require a single data management server, or require multiple data management servers, with or without server synchronization mechanisms.[537] Each of these prior systems have performance bottlenecks that tend to become worse as the network grows.[538] Minami therefore reduces processing loads on individual servers by distributing data registration and retrieval tasks and reducing the amount of

---

[534] RFC1034 at 17.
[535] Browne, 182.
[536] Kangasharju, 3.
[537] Minami at 2:65-3:30.
[538] *Id.* at 3:31-34.

Page 198

data each server maintains.[539] Similarly, DNS confirms there was a known problem in the art that "[t]he applications on the internet were getting more sophisticated and creating a need for general purpose name service," and "[t]he result was several ideas about name spaces and their management."[540] DNS explains the size of the database and frequency of updates requires a distributed design.[541] Accordingly, the database is distributed among servers in a redundant manner.[542] Indeed, both Minami and DNS avoid a centralized directory and instead contemplate distributing responsibility.[543] And like Minami's retrieval technique which processes a search keyword to identify a primary server with a secondary server having the corresponding data record, DNS describes a technique "for mapping between object names and domain names."[544] A POSITA therefore would have had a reasonable expectation of success in combining Minami with DNS, based on their substantial similarities, and such a combination wouldn't require anything more than routine skill.

455. A POSITA would have also had a reasonable expectation of success in combining the references because Minami doesn't specify what information is retrieved as part of the record.[545] DNS describes how responses to queries include identification of data servers along with

---

[539] *Id.* at 3:38-47.
[540] RFC1034 at 1-3.
[541] *Id.* at 2-3.
[542] *Id.* at 18-20, *see also id.* at 2 (describing one of the primary goals of DNS as providing "a consistent name space which will be used for referring to resources."), 5, 7, 9, 11-13, 17, 19-20, 29, 37; BIND and DNS, 231-232.
[543] Minami at 2:65-3:34 (comparing prior art systems to the described distributed technique); RFC1034 at 2-4 (describing maintaining the database in a distributed manner).
[544] Minami at 28:12-32; RFC1034 at 9.
[545] *See* Minami at 28:12-57.

information pointing to the name server with the desired information.[546] And DNS explains how this data is cached throughout the system.[547] A POSITA would have therefore understood that DNS's teachings of what to store in the distributed database and what responses to provide could be utilized by Minami distributed system. And implementing DNS's teachings in Minami's system would only require routine skill.

456. Further, the charts also show how Karger '618/420 build on top of Minami's data management system that distributes data registration and retrieval tasks, and informs a POSITA as to how to implement a consistent hashing technique in a network of computers. A POSITA would have been familiar with the use of hashing generally in distributed systems as Minami describes.[548] Karger '618/420 confirms it was well understood "for clients to use a standard hash function to determine from which server to request a document."[549]

457. Karger '618/420 discloses a "consistent hashing" function, which "avoids increasing load and spread when the number of servers changes."[550] Consistent hashing is a technique that shows how hash keys serve to partition data across multiple servers.[551] Karger '420/618 explains its technique is helpful for distributed systems that store amounts of data too large to effectively serve from one server.[552] Karger '618/420 also explain its techniques avoids

---

[546] RFC1034 at 17 ("For example, a name server that doesn't have the requested information may know a name server that does; a name server that returns a domain name in a relevant RR may also return the RR that binds that domain to an address.").
[547] Id. at 5, 11-12; see also BIND and DNS at 231-232.
[548] E.g., Minami at 10:43-46.
[549] Karger '618 at 3:18-44; see also id. at 10:13-25; Karger '420 at 3:23-50; see also id. at 10:22-34.
[550] Karger '618 at 6:21-33; Karger '420 at 6:29-41.
[551] See "Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hot Spots on the World Wide Web" by Karger et al. (1997).
[552] Karger '618 at 18:14-17; Karger '420 at 19:47-50.

known problems in the art including the need to reallocate data as the number of servers changes.[553] One skilled in the art would recognize that consistent hashing as taught by Karger '618/420 could be used to improve the operation of a distributed system such as disclosed by Neimat when a server is added to or removed from that system. Thus, one of skill would have been motivated to use the consistent hashing of Karger '618/420 to avoid reshuffling and overload problems in other distributed systems. Consistent hashing would also complement the fundamental performance and scalability goals of other distributed systems, including those of Minami.

458. A POSITA would have had a reasonable expectation of success in modifying Minami's teachings with Karger '618/420's consistent hashing teachings. Karger '618/420 confirm that consistent hashing is a well-known technique that avoids certain problems in distributed systems. Implementing Karger '618/420's consistent hashing teachings would further Minami's goals of a distributed system distributing data registration and retrieval tasks and reducing the amount of data each server maintains.[554] And implementing Karger '618/420's consistent hashing teachings in Minami's system require only routine skill.

459. Further, Appendix D-3f shows how Neimat builds on top of Minami's data management system that distributes data registration and retrieval tasks and informs a POSITA as to how to accommodate performance limitations. Minami seeks to avoid concentration of workloads in its distributed system.[555] Neimat provides a specific example of how a memory location "collision" is handled, including splitting the particular memory location and "moving approximately half of the records" to a new location.[556]

---

[553] Karger '618 at 6:21-33; Karger '420 at 6:29-41.
[554] See Minami at 3:38-47.
[555] See Minami at 2:65-3:4.
[556] Neimat at 13:26-37, 14:42-48.

460. Neimat discloses generating of a correct memory address from a character or digit string, such as a record key value. And Neimat explains how its technique addresses situations where a "collision" occurs, and data is moved into a new memory location.[557] One skilled in the art would recognize the specific memory management technique Neimat describes are applicable to Minami's distributed system. Indeed, as Neimat acknowledges, collisions are well known to those of ordinary skill in the art.[558] Thus, one of skill would have been motivated to apply Venkatasubramanian's load management policies to efficiently utilize the distributed system's resources.

461. A POSITA would have had a reasonable expectation of success in modifying Minami's teachings with Neimat's memory management teachings. Neimat provides a specific example of memory management in distributed systems. Implementing Neimat's memory management teachings would further Minami's desire to avoid concentration of workloads.[559] And implementing Neimat's teachings in Minami's system would require nothing more than routine skill.

462. Finally, Appendix 3F shows how Venkatasubramanian builds on top of Minami's data management system that distributes data registration and retrieval tasks, such as a record key value, and informs a POSITA as to how to implement load management in a distributed system. Minami seeks to avoid concentration of workloads in its distributed system.[560]

---

[557] *Id.*
[558] *Id.*
[559] *See* Minami at 2:65-3:4.
[560] *See* Minami at 2:65-3:4.

Venkatasubramanian provides a specific example of load management that considers factors including memory size, CPU load, and network and disk bandwidth.[561]

463. Venkatasubramanian describes policies for load management in a distributed system with high-performance video servers.[562] Venkatasubramanian's policies manage load through data replication/dereplication and request mitigation.[563] One skilled in the art would recognize the specific load management techniques Venkatasubramanian describes are applicable to Minami's system which avoids concentration of workloads. Thus, one of skill would have been motivated to apply Venkatasubramanian's load management policies to efficiently utilize the distributed system's resources.

464. A POSITA would have had a reasonable expectation of success in modifying Minami's teachings with Venkatasubramanian's load management teachings. Venkatasubramanian provides examples of load management in distributed systems including specific metrics considered.[564] Implementing Venkatasubramanian's load management teachings would further Minami's desire to avoid concentration of workloads.[565] And implementing Venkatasubramanian's teachings in Minami's system would require nothing more than routine skill.

---

[561] Venkatasubramanian at 529.
[562] Venkatasubramanian at 528.
[563] Venkatasubramanian at 528-529.
[564] Venkatasubramanian at 529 (identifying disk space, disk bandwidth, network transfer bandwidth, bandwidth availability, memory buffer space, CPU cycles).
[565] *See* Minami at 2:65-3:4.

### XIII. SECONDARY CONSIDERATIONS DON'T SUPPORT NON-OBVIOUSNESS OF THE ASSERTED PATENTS.

465. I have reviewed Kove's assertions regarding secondary considerations of non-obviousness, including those assertions set forth in Kove's Response to Interrogatory 4,[566] Kove's Replies in Reexam Control Nos. 90/019,034, 90/019,035, and 90/019,036,[567] and the depositions, including that of John Overton. I don't find these assertions are sufficient to overcome the prior art's showing of obviousness.

#### A. There Is No Evidence Of Anyone Copying The Asserted Patents.

466. Kove alleges that there is evidence of "copying" and claims that "entities, including AWS, have copied the patented inventions."[568] But Kove provides no evidence of any copying. Instead, Kove's only example of "copying" is "as evidenced by Kove's operative infringement contentions."[569] Kove's CEO John Overton was also unable to point to even a single other example of someone copying the alleged inventions.[570]

467. Thus, it is my opinion that there is no evidence of any copying to support the non-obviousness of the Asserted Patents.

#### B. There Is No Evidence Of Any Long-Felt-But-Unsolved-Need For The Asserted Patents.

468. Kove also alleges that there is evidence of "long-felt-but-unsolved-need" and claims that "entities have written about the long need for technology that would enable a highly

---

[566] 05/17/2023 J. Overton Dep. Tr., Ex. 85.
[567] See Ex. 22 (Final Validity Contentions) at 4-5; 08/04/2022 Patent Owner's Reply to Office Action in Reexamination Control No. 90/019,036 at 47; 08/04/2022 Patent Owner's Reply to Office Action in Reexamination Control No. 90/019,035 at 59-66; 09/28/2022 Patent Owner's Reply to Office Action in Reexam Control No. 90/019,034 at 70-77
[568] 05/17/2023 J. Overton Dep. Tr., Ex. 85 at 15.
[569] 05/17/2023 J. Overton Dep. Tr., Ex. 85 at 15.
[570] 05/17/2023 J. Overton Dep. Tr. at 650:10-21.

480. I declare that all statements made herein of my knowledge are true, and that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Dated: July 3, 2023

*Joseph B. Greene*

Joseph B. Greene