# Exhibit 7

Page 1

*** HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER ***

1              IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF ILLINOIS

3                    EASTERN DIVISION

4

5    KOVE IO, INC.,                       )

6            Plaintiff,                   )

7      vs.                               ) No. 18 CV 8175

8    AMAZON WEB SERVICES, INC.,           )

9            Defendant.                   )

10

11           The ** HIGHLY CONFIDENTIAL ** remote video

12   teleconference deposition of STEPHEN BAILEY, PH.D.,

13   called for examination, taken pursuant to the Federal

14   Rules of Civil Procedure of the United States

15   District Courts pertaining to the taking of

16   depositions, taken before DINA G. MANCILLAS, a

17   Certified Shorthand Reporter within and for the State

18   of Illinois, CSR No. 84-3400 of said state, on

19   October 9, 2020, at 14:03 a.m. UTC.

20

21

22

23

24

Page 66

```
 1        A.      I don't know, actually.

 2        Q.      Do you hold any position with Kove IO?

 3        A.      No.

 4        Q.      Are you -- do you have any kind of

 5    contract or agreement with Kove IO?

 6        A.      I don't know.

 7        Q.      Did you ever sign --

 8        A.      Not that I recall.

 9        Q.      Okay.  When you looked for documents

10    responsive to the subpoenas in this case, did you

11    find any written agreements with a company called

12    Kove IO?

13        A.      Not that I found, no.

14        Q.      Do you hold any ownership interest in

15    Kove IO?

16        A.      I don't know.

17        Q.      You don't know if you own -- if you own

18    any portion of Kove IO?

19        A.      Correct.

20        Q.      Did you invest in Kove IO?

21        A.      No.

22        Q.      Did you invest in any of Mr. Overton's

23    companies?

24        A.      No.
```

1      Q.     I guess I'm -- help me, Dr. Bailey.

2   I'm having a little difficulty understanding how

3   you could not know whether you have any ownership

4   interest in Kove IO.

5              Do you -- did you ever give them any

6   money?

7      A.     No.

8      Q.     Do you have any understanding or

9   agreement with Kove IO that they will provide you

10  anything?

11     A.     No, not that I'm aware of.

12     Q.     Do you have any financial interest in

13  the litigation that Kove IO has brought against

14  Amazon Web Services?

15     A.     Yes.

16     Q.     What is your financial interest in this

17  litigation?

18     A.     I don't recall the details.

19     Q.     Is there a written agreement that lays

20  out your financial participation in this

21  litigation?

22     A.     I don't know.

23     Q.     You don't know?

24     A.     Correct.

Page 68

```
 1      Q.      When did you enter into an agreement
 2  providing that you would have a financial interest
 3  in this litigation?
 4      A.      I don't remember.
 5      Q.      Was it after 2001?
 6      A.      Yes.
 7      Q.      Was it after 2016?
 8      A.      I don't recall.
 9      Q.      What is -- what are the terms of that
10  agreement?
11      A.      I don't know.
12      Q.      You have no idea?
13      A.      Correct.  I don't recall.
14      Q.      Then why do you think -- why do you
15  think you have an interest in this case, sir?
16      A.      Because John told me.
17      Q.      What did Mr. Overton tell you?
18      A.      I don't recall the exact details, but
19  he told me that if there were proceeds, I would
20  benefit from it.
21      Q.      And so your understanding, as you sit
22  here testifying today, is that if Kove IO succeeds
23  in recovering anything against Amazon Web Services
24  in this case, you will -- you will receive some
```

1    share of that?

2        A.      Yes.

3        Q.      And you've never documented that in

4    writing?

5        A.      I haven't, no --

6        Q.      To the best of your recollection --

7        A.      -- that I recall.

8        Q.      -- sir, did you have -- you can't

9    recall?

10              Well, did you look for documents

11   relating to this subject when we served a subpoena

12   on you in this case, Dr. Bailey?

13       A.      I produced all the documents I have.  I

14   didn't look through them.

15       Q.      How did you know what to produce if you

16   didn't look at them?

17       A.      All the documents I have for -- for

18   this are in one single folder.

19       Q.      And you provided that folder to

20   counsel?

21       A.      Yes.

22       Q.      And do you have anywhere in your

23   possession, Dr. Bailey, any documentation of this

24   agreement that you will participate in the

Page 70

1   proceeds of this lawsuit?

2       A.      I don't know.

3       Q.      Well, I would ask, after this

4   deposition, that you look and see if you have

5   anything like that in your files.  And if you do,

6   provide it to counsel because it would be

7   responsive to the subpoenas that we served in this

8   case.

9               Will you agree to do that, sir?

10      A.       If the documents are there, then they

11  have them.

12              MR. CARDENAS-NAVIA:  Yes.  And, Terri,

13          we're going to comply with the subpoena as --

14          as we have been doing.  So if there's a

15          follow-up request, send it to us.  We'll be

16          happy to --

17              MS. MASCHERIN:  Well, there's no

18          follow-up request.  There's no follow-up

19          request.  There's a subpoena that includes a

20          request for any agreements with Kove.  So if

21          there are any agreements that relate to an

22          interest in the proceeds of this litigation,

23          they should have been produced pursuant to

24          that subpoena, and we expect that they will

Page 175

1      A.      Yes.

2      Q.      Do you know anything about the

3    circumstances under which the rights to the '640

4    patent were assigned from OverX to Econnectix?

5      A.      No.

6      Q.      And then the rest of the -- of the

7    chain of assignment appears to follow the same

8    pattern that we looked at before, from Econnectix

9    to Kove Corporation to Kove IO to Arctide, back --

10   then back to Kove IO.

11             Do you have any knowledge about why the

12   '640 patent was transferred all these various

13   times?

14     A.      No.

15     Q.      Or assigned, I should say.

16             MS. MASCHERIN:  Let's look at Tab

17        No. 6.  We'll mark this as AWS

18        Exhibit No. 26.

19             MR. GARCIA:  It's available if you

20        refresh.

21   BY MS. MASCHERIN:

22     Q.      This is the abstract of assignments for

23   the '978 patent, which is the third of the patents

24   that we've been talking about today, Dr. Bailey.

1           If we start at the very end on the

2    third page, we'll see an assignment in July of

3    2001 from you and Dr. Overton to OverX, Inc.

4           Did you assign your rights in what

5    became the '978 patent on or about that date?

6    A.    Yes.

7    Q.    And I won't go through each of the

8    items in the chain here, but the -- the

9    assignments that are summarized with regard to the

10   '978 patent follow the same pattern as the others

11   that we've just looked at.

12          Do you have any knowledge regarding why

13   it was that the rights to the '978 patent were

14   transferred amongst these various entities?

15   A.    No.

16   Q.    To your knowledge, are all of the

17   entities that are listed in these three patent

18   assignments that we've looked at entities that

19   were owned by John Overton?

20   A.    I don't know the ownership of any of

21   the entities.

22   Q.    Did you own any interest in either

23   OverX, Econnectix, LLC, Econnectix, Inc., Kove

24   Corporation, or Kove IO, or Arctide?

1      A.      I don't -- I don't know.

2      Q.      When you were employed by OverX, were

3  you issued any shares in the company as

4  compensation?

5      A.      I was issued stock options, yes.

6      Q.      What happened with regard to those

7  options?  Did you exercise them?

8      A.      I don't think so, but I don't remember.

9  I believe not.

10     Q.      What happened to OverX as a company?

11     A.      In the context of -- in what context?

12     Q.      Does it continue to exist today?

13     A.      I don't know.

14     Q.      Did it stay in business after you left?

15     A.      Yes.

16     Q.      How long did OverX stay in business

17  after you left?

18     A.      I don't know.

19     Q.      Was OverX ever able to commercialize

20  either the -- either of the two projects that you

21  worked on?

22             MR. CARDENAS-NAVIA:  Objection; vague.

23  BY THE WITNESS:

24     A.      I don't know.

Page 178

1    BY MS. MASCHERIN:

2         Q.    Did anyone ever buy either the OverX --

3    buy a license to either the OverX server or

4    XPress?

5         A.    I don't know.

6         Q.    Were you involved in any efforts to --

7    to market either of those projects that you worked

8    on at OverX to potential customers?

9         A.    Yes.

10        Q.    How were you involved?

11        A.    I don't remember in tremendous detail,

12   but what I do remember was some participation in

13   meetings with possible clients, customers of the

14   technology.

15        Q.    Do you recall who any of them were?

16        A.    Yes.  I remember two specifically.

24        A.    Again, I don't remember the full

1                    **CERTIFICATE**

2                         **OF**

3               **SHORTHAND REPORTER**

4

5          I, DINA G. MANCILLAS, a Certified

6   Shorthand Reporter of the State of Illinois,

7   CSR License No. 084-003400, do hereby certify:

8               That previous to the commencement of the

9   examination of the aforesaid witness, the witness was

10  duly sworn and/or duly affirmed by me to testify the

11  whole truth concerning matters herein;

12              That the foregoing deposition transcript

13  was stenographically reported remotely by me and was

14  thereafter reduced to typewriting under my personal

15  direction and constitutes a true and accurate record

16  of the testimony given and the proceedings had at the

17  aforesaid deposition;

18              That the said deposition was taken before

19  me at the time and place specified;

20              That I am not a relative or employee or

21  attorney or counsel for any of the parties herein,

22  nor a relative or employee of such attorney or

23  counsel for any of the parties hereto, nor am I

24  interested directly or indirectly in the outcome of

Page 240

1    this action.

2              IN WITNESS WHEREOF, I do hereunto set my

3    hand at Chicago, Illinois, this 16th of October,

4    2020.

5

6

7

8

9    _____

10              DINA G. MANCILLAS, CSR, RPR, CRR, CLR

11              CSR LICENSE NO. 084-003400

12

13

14

15

16

17

18

19

20

21

22

23

24