# Exhibit K1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3    KOVE IO, INC.,                    )   Docket No. 18 C 8175
                                        )
 4                     Plaintiff,       )
                                        )
 5           vs.                        )
                                        )
 6    AMAZON WEB SERVICES, INC., et al.,)   Chicago, Illinois
                                        )   March 5, 2024
 7                     Defendants.      )   9:15 o'clock a.m.

 8                     TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE MATTHEW F. KENNELLY
 9

10    APPEARANCES:

11
      For the Plaintiff:     REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
12                           BY:  MR. COURTLAND REICHMAN
                                  MR. ADAM ADLER
13                           1909 K St, NW, Suite 800
                             Washington, DC 20006
14                           (605) 623-1480

15
                             REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
16                           BY:  MR. JAIME FRANCISCO CARDENAS-NAVIA
                             400 Madison Avenue, Suite 14D
17                           New York, NY  10017
                             (650) 623-1401
18

19

20

21    Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                             Official Court Reporter
22                           219 S. Dearborn Street, Suite 2102
                             Chicago, Illinois  60604
23                           (312) 435-5639

24

25
```

1  APPEARANCES CONTINUED:

2

3  For the Defendants:     FISCH SIGLER LLP
                           BY:   MR. ALAN M. FISCH
                                 MR. R. WILLIAM SIGLER
4                                MS. LISA N. PHILLIPS
                           5301 Wisconsin Avenue NW, Fourth Floor
5                          Washington, DC 20015
                           (202) 362-3500
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (The following proceedings were had by video:)

2            THE CLERK:  Case 18 C 8175, Kove v. Amazon.

3            THE COURT:  Good morning.  It's Judge Kennelly.  Can

4    plaintiff's counsel please give your names for the record.

5            MR. REICHMAN:  Good morning, your Honor.

6            Courtland Reichman for Kove, plaintiff.  And along

7    with me today is Jaime Cardenas-Navia and Adam Adler.

8            THE COURT:  Good morning.

9            MR. FISCH:  Good morning, your Honor.

10            Alan Fisch on behalf of Amazon.  I'm joined by Bill

11   Sigler and Lisa Phillips.  Thank you, sir.

12            THE COURT:  If you're not familiar with this program

13   and you want to make all those empty boxes go away, if you run

14   your cursor along the top of the screen, you'll see something

15   that says "layout."  If you click on that, you'll see

16   something that says "hide participants without video."  If you

17   click on that, it makes the boxes go away.

18            MR. FISCH:  Thank you.

19            MR. REICHMAN:  Thank you, your Honor.

20            THE COURT:  I want to start with the motion to

21   bifurcate.  And I've got a couple of questions.

22            So it looks like everybody agrees that inequitable

23   conduct is a question for the Court, not for the jury.  It

24   looks like everybody also agrees that on the obviousness type

25   double patenting as well, but it was less clear.  So I just

1   wanted to check with Amazon.  Do you agree that that's a
2   question ultimately for -- well, it's a question for me, not
3   for the jury?

4          MS. PHILLIPS:  Good morning, your Honor.  That's
5   correct.  It is a question for your Honor and not the jury,
6   but there are underlying factual questions just like in the
7   regular 103 obviousness determination.

8          THE COURT:  What does that mean?  What does that mean
9   as to who decides it?

10         MS. PHILLIPS:  The ultimate question of law is
11  decided by the Court.

12         THE COURT:  I mean what gets decided by the jury?

13         MS. PHILLIPS:  The jury can do an advisory opinion
14  on --

15         THE COURT:  I'm not talking about advisory opinions.
16  I'm not talking about advisory jurors.  I'm just talking about
17  who decides.  Is there --

18         MS. PHILLIPS:  The judge.

19         THE COURT:  Let me ask this question in the clearest
20  possible way I can imagine asking it.  Is there anything about
21  obviousness type double patenting that has to be decided by a
22  jury unless the parties waive a jury?

23         MS. PHILLIPS:  It doesn't have to be decided by a
24  jury, but it can be decided by a jury.  And that's the --

25         THE COURT:  No, a jury wouldn't be deciding it.  A

```
1    jury would be giving an advisory opinion.  Those are two
2    different things, with respect.
3            MS. PHILLIPS:  Yes, that's correct.
4            THE COURT:  Right?
5            MS. PHILLIPS:  Yes, that's right.
6            THE COURT:  Okay.  So everybody agrees that both of
7    these issues are issues for me, not for the jury.  We're going
8    to bifurcate them.  The motion to bifurcate is granted.
9            So the way we're going to do it -- it didn't strike
10   me that there's a huge amount of testimony involved that
11   pertains just to these defenses and not to anything else.  The
12   way we're going to do it is on whatever days those witnesses
13   are testifying -- and I'd like to know in a minute here who
14   they are, we'll just -- after the jury goes, we'll just stay a
15   little bit after class, so to speak, and get it done then.
16           So who are the witnesses who are going to testify
17   with respect to -- on both sides with respect to inequitable
18   conduct and obviousness double patenting?
19           MR. REICHMAN:  Thank you, your Honor.  For the
20   plaintiff, it's going to be the two inventors, so Dr. Overton
21   and Dr. Bailey.
22           THE COURT:  They're both testifying about other
23   things as well, right?
24           MR. REICHMAN:  Yes, sir.
25           THE COURT:  Okay.  And anybody else on your end?
```

1      MR. REICHMAN:  Yeah, there's an expert.  And right
2   now I can't remember which of the experts it is.  But it's one
3   of the two experts.  Mr. Cardenas-Navia may know the answer.
4   But it's -- I believe it's Goodrich.  Yeah, it's Dr. Goodrich
5   who's testifying.
6      MR. CARDENAS-NAVIA:  That's correct.
7      THE COURT:  What about on the defense side?
8      MS. PHILLIPS:  It would be Dr. Grama and Mr. Greene.
9      THE COURT:  Are all of those people testifying live?
10      MR. REICHMAN:  They are for the plaintiff, your
11   Honor, yes.
12      THE COURT:  All five?
13      MS. PHILLIPS:  Yes.
14      THE COURT:  Okay.  Just make sure -- and even if
15   they're not done with their testimony, in other words, if
16   their testimony carries over from one day to another, we'll do
17   their testimony on these issues after court on, you know,
18   whatever the first day is they testify.  But just make sure
19   that when you're talking to those people about making travel
20   plans, that they need to build in that they're going to be
21   staying a little bit after.  Like I say, I don't think it's
22   going to be a huge amount of testimony, but that's maybe the
23   best way to do it.
24      Okay.  And I know that I can do an advisory jury.
25   This case is going to be complicated enough without throwing

1  more into the jury's lap as far as I'm concerned.

2  Okay.  So we're going to talk about the motion to

3  compel at this point.  And so I got the motion.  I got a

4  response that was filed yesterday.  Why don't I hear from

5  Amazon first in terms of anything else you want to tell me

6  after having read the response, and then I'll have some

7  questions for both sides.

8  MR. SIGLER:  Thank you, your Honor.  This is Bill

9  Sigler on behalf of Amazon.

10  Our motion addresses two agreements dated in 2023,

11  one in March 2023 and one in December 2023.  Those agreements

12  amended a 2015 agreement.  Kove's response provides the

13  seemingly salacious headline that they produced that 2015

14  agreement during discovery.  That was news to us in their

15  response.

16  When we looked for that agreement in the production

17  several weeks ago when these new agreements from 2023 were

18  produced, we didn't find it apparently because there was a

19  typo in the 2023 agreements on the date of that 2015 agreement

20  which Kove acknowledges in their reply brief at footnote 6.

21  Then we asked them, we told Kove, we didn't find this in the

22  production, please produce it to us.  They produced all three

23  agreements to us and they produced Dr. Overton to testify on

24  all three agreements last week.

25  The production of the 2015 --

1    THE COURT:  So wait a second.  At this point, you're

2  now agreeing that the 2015 agreement was there, but it was

3  misidentified by its date and, therefore, harder to find.  Is

4  that basically what you're saying?

5    MR. SIGLER:  Yes, your Honor.  And we asked Kove

6  about this a couple weeks ago when these new agreements were

7  produced and they produced that agreement to us.  They didn't

8  say, hey, we already produced this.

9    THE COURT:  Yeah, right.  But it was produced, right,

10  earlier?

11    MR. SIGLER:  Based on what they said in their

12  response.

13    THE COURT:  Has somebody gone back and looked now to

14  see if what they said is right?

15    MR. SIGLER:  It was produced, your Honor.  We checked

16  that when we got the response.

17    THE COURT:  Thanks.  That was easy.  You could have

18  done that two questions ago.  Go ahead.

19    MR. SIGLER:  Apologies, your Honor.

20    Regardless of the 2015 agreement, the two agreements

21  from 2023 are the ones that matter here.  They amend that

22  agreement and provide new information.  Kove executed those in

23  2023 --

24    THE COURT:  What's the significance of the new

25  information that's in the two 2023 agreements?

1      MR. SIGLER:  The new information is that there's a

2   change in the parties and the amounts that people have a stake

3   in this litigation.   There's also new information --

4          THE COURT:  Why does that matter?

5          MR. SIGLER:  It matters because it goes to witness

6   credibility.  It goes to witness bias.

7          THE COURT:  So who are the witnesses -- who are the

8   witnesses who are at issue who have a stake and their stake

9   got changed between 2015 and 2023?

10         MR. SIGLER:  Dr. Overton has an interest in it.  His

11  stake -- from what we can tell from these agreements, his

12  stake was shifted to a different company that he also --

13         THE COURT:  Moved into an LLC, right?

14         MR. SIGLER:  That's correct, your Honor.  A new LLC

15  that we just found out about a couple of weeks ago.

16         THE COURT:  Okay.  So it wasn't a difference in the

17  percentage for Overton; it was just moved into a different

18  entity?

19         MR. SIGLER:  One can assume that looking at the

20  agreements.  That's part of the problem.  We asked Dr. Overton

21  questions about these issues at the deposition last week and

22  he was unable to provide certainty on these issues.

23         THE COURT:  I understand.  But one would think -- and

24  I'm going to just confess that I have not flyspecked these

25  agreements -- but one would think that we're not leaving it up

1  to anybody's memory about how much of a stake they own.  It's

2  in a document somewhere.

3        So does the -- I get that Overton said he didn't know

4  on some stuff.  I'm asking you about the document.  Does the

5  document reflect that his percentage changed as opposed to

6  just moving the percentage, whatever it was from his name to

7  this LLC?

8        MR. SIGLER:  It looks like it's the same percentage,

9  your Honor, but there are also dollar amounts in the

10  agreements and other information that he was unable to tell us

11  what those meant.  We were unable to tell whether that

12  information pertained to evaluation of the patents, evaluation

13  of the case, evaluation of the company that was involved.

14        THE COURT:  What's the percentage of Dr. Overton --

15  is he a doctor?  I assume he's a doctor -- Dr. Overton's

16  stake?

17        MR. SIGLER:  He has I believe around           .

18        THE COURT:           .  Okay.

19        The other guy is?  The other one is who?

20        MR. SIGLER:  The other inventor, Mr. Bailey, is also

21  identified in the agreement.  There's different numbers --

22        THE COURT:  Did Bailey's percentage change between

23  2015 and 2023?

24        MR. SIGLER:  It doesn't appear that way, your Honor,

25  but we weren't able to tell.  There's two different numbers in

1    the agreement in terms of what his shares are and what the
2    value is.  And no one has been able to tell us what those
3    numbers mean.  And all three of these agreements were produced
4    after we deposed Mr. Bailey in the case.
5              THE COURT:  Okay.  So Overton -- if Overton had
6    ███████, by definition, Bailey can't have more than
7    ███████.
8              MR. SIGLER:  That's what it appears based on the
9    numbers in the agreement.
10             THE COURT:  Unless we're doing something other than
11   base ten.
12             MR. SIGLER:  Agreed, your Honor.  I'm only hesitant
13   because of the uncertainty with which Overton answered our
14   questions on this.  He deferred all of our questions --
15             THE COURT:  Fair enough.  Whether Overton's
16   percentage is ███████, it's got to add up to a hundred
17   percent.  Is there any identification in any of the documents
18   you have of anybody else who has a percentage?
19             MR. SIGLER:  Yes.  A company owned by Mr. Dellenbach
20   who has been identified as Kove's general counsel as well as a
21   person named Lee Auspitz.
22             THE COURT:  What was the last person?
23             MR. SIGLER:  Lee Auspitz, A-U-S-P-I-T-Z, I believe it
24   is.
25             THE COURT:  Right.  And what can you glean from the

1  documents regarding the ownership percentages of Dellenbach's

2  company and Auspitz?

3         MR. SIGLER:  Well, there's different percentage

4  numbers given for them, but it appears for both of them, it's

5  between ███████████████ .

6         THE COURT:  And are either Dellenbach or Auspitz

7  testifying, to your knowledge?

8         MR. SIGLER:  To my knowledge, they're not on Kove's

9  list.

10        THE COURT:  Okay.  So let's just start with them.

11  What would be -- if Dellenbach and Auspitz are not testifying,

12  what would be the relevance of whatever adjustments, changes,

13  modifications, whatever you want to call it were made

14  regarding their ownership?

15        MR. SIGLER:  I'm not sure what relevance that would

16  have.  I haven't -- we haven't asked for Auspitz's deposition,

17  but we would like Dellenbach's because Overton deferred to him

18  on what all this means.  He's the architect of these

19  agreements.  That's why we want to take his deposition.

20        THE COURT:  Right.  So what is it -- you've already

21  got presumably from Overton and Bailey that they have a stake

22  in the outcome.  You've got that.  What more are you going to

23  get from another deposition that's actually admissible at

24  trial?

25        MR. SIGLER:  Mr. Bailey hedged on whether he had a

1  stake in the outcome and what that was and whether it was

2  written down.  We put that deposition testimony in our brief,

3  and he was unsure about all that.

4         THE COURT:  He was deposed before the documents got

5  turned over.  Overton's the guy you did recently for like an

6  hour or two?

7         MR. SIGLER:  That's correct.  Excuse me, Dr. Bailey

8  was deposed before any of these agreements were produced.

9         THE COURT:  Okay.  Put aside Bailey then.

10        So what more do you think you're going to get out of

11  Overton then with yet another deposition that you don't

12  already have?  I mean, you've already got that he has an

13  ██████████  ownership.  Yeah, it's not in his name now, it's in

14  an LLC, but he controls the LLC.  You've got that.

15        What more are you going to get out of another

16  deposition of him that's relevant and admissible?

17        MR. SIGLER:  We don't want another deposition of

18  Dr. Overton.  We'd like Bailey and we'd like Dellenbach

19  because Dellenbach was the architect of these agreements and

20  Dr. Overton deferred to him on the meaning of the terms of

21  these agreements, the numbers, the valuations, the dollar

22  amounts per shares, all that Dr. Overton deferred to

23  Mr. Dellenbach on.

24        THE COURT:  What are you going to get -- okay.  Let's

25  just talk about Dellenbach then.  What are you going to get

1  out of him that you don't already have?  You've got that these

2  two people had a stake in the outcome.  You've got the

3  approximate percentage.  You've got that it was originally --

4  if it matters, which I don't think it probably does -- that it

5  was originally in his own name and now it's in an LLC for

6  Overton.  What more is Dellenbach going to be able to tell you

7  that's going to be admissible at trial?

8         MR. SIGLER:  Well, presumably, he's going to be able

9  to tell me with certainty what the numbers in these agreements

10 mean and also how the recovery works in terms of all of the

11 entities and people involved.  Because there's a whole other

12 calculation.  It's not a straightforward calculation just

13 based on what's stated in these agreements.  There are other

14 entities involved as well.

15         THE COURT:  The other entities that you're referring

16 to, are we talking about the litigation funder?

17         MR. SIGLER:  There's that piece of it, your Honor, as

18 well as others who are identified in other documents

19 potentially.  There's a lot of different agreements and at

20 least four or five LLCs and three or four trusts involved in

21 this too.

22         THE COURT:  Okay.  But in terms of admissibility at

23 trial, putting aside the people who are going to testify and

24 have a stake in the outcome, and I get the argument about bias

25 and interest for them, what does it matter?  Why is it

1    relevant who gets what part of the pie if there's a pie to

2    divide up after trial?

3           MR. SIGLER:  It's relevant to bias and credibility,

4    your Honor, with respect to these witnesses.  There are also

5    further questions about --

6           THE COURT:  I tried to carve that out of the question

7    and I did that on purpose because that was exactly the answer

8    that I didn't want to get from you.  Okay.  We know that it's

9    -- we know that Overton and Bailey's stake in the outcome, you

10   know, within some reasonable limits is admissible to show

11   their bias and interest.  Put that to the side.  Put that to

12   the side.

13          What are you going to get out of Dellenbach or what

14   are you going to get by knowing who all gets proceeds if the

15   plaintiff wins a verdict in the case that's going to be

16   admissible in some way, shape, or form at the trial?

17          MR. SIGLER:  There are dollar amounts for values of

18   the shares in these entities in those agreements.  Kove has

19   put this agreement, at least one of them, the December 2023

20   agreement is on their exhibit list, and it is identified as a

21   document that their damages expert may use.  It says Bergman

22   documents on their exhibit list, it's Exhibit 289.

23          I don't know -- I don't have clairvoyance to know

24   what they're going to use it for, but they have put it on

25   their list as a --

1     THE COURT:  I can ask them that.  Besides that, is

2   there something else?

3     MR. SIGLER:  It may go to valuations placed on the

4   patents, valuations placed on the company.

5     THE COURT:  What case do you have, because it sure as

6   heck wasn't cited, that says that that comes in in determining

7   the valuation of a reasonable royalty or whatever it is we're

8   talking about?

9     MR. SIGLER:  It's relevant to a piece of the damages

10  here, your Honor.  Their damages expert is apparently going to

11  talk about it at trial.

12    THE COURT:  Okay.  Look, here's how this is falling

13  on the ears of the decisionmaker.  I'm asking you how it's

14  relevant and your answer is it's relevant.  It doesn't work

15  that way.  That's circular.

16        How is it relevant?  Last chance.

17    MR. SIGLER:  It's relevant to the valuation of the

18  assets here, your Honor.

19    THE COURT:  You still didn't answer.  Let me go over

20  to Kove for a second.  For what purpose are you intending to

21  -- so A, are you intending to introduce the 2023 agreements,

22  one or both of them, and if so, for what purpose?

23    MR. REICHMAN:  We don't intend to do so, your Honor,

24  unless ownership is contested and it somehow becomes relevant

25  to ownership.  It was protective that we have it on there.

1   That's number one.  And number two --

2            THE COURT:  No, no, no.  I don't want you to answer

3   questions I haven't asked.  I just want you to answer

4   questions I asked.

5            MR. REICHMAN:  I'm answering the question.

6            THE COURT:  You're not intending to use it unless

7   it's brought up by somebody else.

8            MR. REICHMAN:  For two purposes and I said one of

9   them.

10           THE COURT:  Okay.  What's the second one?

11           MR. REICHMAN:  If they try and attack it as to

12  valuation of the patent, then we would respond perhaps with

13  that.  But we have not --

14           THE COURT:  So your damages expert is -- did I get

15  that right, Bennett, or something like that?

16           MR. REICHMAN:  Bergman, sir.

17           THE COURT:  Your damages expert, what's the name?

18           MR. REICHMAN:  Bergman.  Mr. Bergman.

19           THE COURT:  Bergman.  I knew it was a B something.

20  So is Bergman relying on the 2023 agreements or the 2015

21  agreement for that matter in any way, shape, or form in his

22  opinion or her opinion?

23           MR. REICHMAN:  No, sir.  No, sir.

24           THE COURT:  Okay.  So let me put all that to the

25  side.

1     Now, we'll talk about the -- what I'll refer to as

2    the theme argument.  Okay.  I want to make sure I'm getting

3    this right.  So my take-away from the motion on this is that,

4    well, Kove -- we think Kove is going to pitch this case as

5    David versus Goliath or maybe like Lilliputians versus

6    Goliath, going to be smaller than David.  And we need to be

7    able to bring out that it's not really David because there's

8    this very rich person behind -- this very rich entity behind

9    them.  Am I getting that right?

10     MR. SIGLER:  That's correct, your Honor.

11     THE COURT:  Okay.  So let me ask you -- I'm going to

12    play law professor for a second.  All right?

13     So let's say you had a small company and Elon Musk

14    owned a hundred shares of this small company.  And the small

15    company says, well, we're a small company, David versus

16    Goliath.  Would you get to put in, well, wait a second,

17    somebody who's worth a hundred billion dollars owns 50 -- owns

18    100 shares of your company?  That's a no.  You wouldn't.

19    Okay.

20     So what's relevant is what the contribution was.  And

21    what I'm told here is that what the contribution was from the

22    litigation funder is ███████ or something like that.  Is

23    there some reason to believe it's more than that?

24     MR. SIGLER:  That's what Dr. Overton testified to,

25    your Honor.  I have no way of knowing if it's more than that.

1  And this December 2023 agreement refers to the funder.  It

2  refers to the funding that's been provided for the agreement.

3  It doesn't have the details --

4          THE COURT:  So a litigation funder provided -- let's

5  just take it as a given that the litigation funder provided

6  ██████████.  And let's say the litigation funder itself is

7  worth $8 billion.  Would you be able to get that in?  Is there

8  some theory under which you'd be able to get in that this

9  company that gave you ██████████ is actually worth 8 billion

10 so maybe it's -- you know, what's out there?

11         MR. SIGLER:  I think there would be a theory to get

12 it in, your Honor.

13         THE COURT:  A theory that you can imagine the judge

14 accepting?

15         MR. SIGLER:  Perhaps.  I don't know the underlying

16 facts of these agreements, though, without seeing them which

17 is the only --

18         THE COURT:  What's the only agreement that you

19 haven't seen?  I thought you had gotten these two 2023

20 agreements?  Is there some other agreement then?  Oh, this is

21 the funder agreement.

22         MR. SIGLER:  Correct, your Honor.  Those agreements

23 are referred to in the December 2023 agreement that was

24 produced.  But there's redactions.  And there's clear

25 reference to a funder being involved and there's different

1  amounts of money in that agreement.  Dr. Overton was not able

2  to provide testimony on those issues.  I would really need to

3  see the agreements to answer these questions.

4       And in response to what Kove said in their opposition

5  brief, these aren't just straight litigation funding

6  agreements.  These agreements were an investment in Kove.

7  It's an investment in their ████████████████, not just

8  an investment in the litigation.  So there's a difference.

9       THE COURT:  They put money into the company and part

10  of what they're getting out or maybe all of what they're

11  getting out is a percentage of the litigation proceeds.

12  Right?

13       MR. SIGLER:  That's what Dr. Overton said.  Again,

14  without seeing the agreements, I can't --

15       THE COURT:  Let's assume that's right.  And,

16  therefore, what, that's relevant to the case?

17       MR. SIGLER:  How the funder valued the case, how the

18  funder valued the patents, all that's relevant.  I mean,

19  they're making an investment in Kove in exchange for this.  I

20  mean, there's relevant information in there.  And, again, it's

21  referred to in this December 2023 agreement.

22       THE COURT:  Didn't Judge Pallmeyer rule on that,

23  maybe in a different context, but didn't Judge Pallmeyer rule

24  on that when she still had the case on this question of how a

25  litigation funder values the company is relevant?  She

1  basically concluded that it's work product, right?  Or that

2  it's otherwise not discoverable?

3          MR. SIGLER:  She concluded if it was a litigation

4  funding agreement, a true litigation funding agreement, in

5  other words, I'm going to give you this amount of money and,

6  in exchange, I get a piece of the litigation.

7          That's not what we have here.  We have an investment

8  in Kove's business.  Kove carved that out of what they were

9  asking for in that protective order.  We addressed this in our

10  briefing.  Kove said we're not talking here about an

11  investment in the business that is linked to the litigation.

12  We're talking about just straight-up litigation funding

13  agreements.  That was the ruling that Judge Pallmeyer made.

14          THE COURT:  Why would that make a difference?  I

15  don't understand.

16          MR. SIGLER:  It's a different type of agreement, your

17  Honor.

18          THE COURT:  And, therefore, what?  Why?  I kind of

19  feel like the little kid on that Verizon commercial where the

20  dad says something and the kid keeps asking why.  Why does

21  that make a difference?  I need an answer to that question.

22  Don't keep telling me what the difference is.  I get that

23  there's a difference.  Why does the difference matter?

24          MR. SIGLER:  The difference matters.  It's about the

25  value of Kove as a business and those types of issues, your

1   Honor.  Also --

2          THE COURT:  How does the value of Kove as a business

3   become relevant in the litigation?  The litigation is about

4   whether a patent has been infringed, whether the patent is

5   valid, and what amount of damages, if any, the plaintiff is

6   entitled to recover if it's valid and infringed?

7          MR. SIGLER:  Again, part of it is I haven't seen the

8   agreements so it's difficult to answer these questions about

9   what's in there, what statements Kove made to the funder, what

10  statements the funder made.  And Kove has said in its response

11  brief that these agreements are evidence that the funder

12  placed great value on this case.  They've made these

13  statements.

14         THE COURT:  But they're not intending to offer that

15  into evidence unless I see Mr. Reichman raise his hand right

16  now and say, oh, wait a second, Judge, yes, we are.  And, by

17  the way, I don't see any hands.

18         If somebody says something in a brief doesn't mean

19  it's admissible at trial.

20         MR. SIGLER:  Understood, your Honor.  Understood.

21  Part of this process is to get clarification on that.  Now, we

22  have clarification that Kove is apparently not intending to

23  use the December 2023 agreement despite it being on their

24  exhibit list.

25         THE COURT:  Okay.  Mr. Reichman or whoever wants to

1   address this on the plaintiff's side, what would you like to

2   tell me?

3          MR. REICHMAN:  I would just tell you that this is not

4   an investment in Kove.  It's a distinction without a

5   difference, but it's not an investment in Kove.  It is in the

6   nature of a loan that's secured by the litigation and other

7   assets.  Again, I don't think it makes a difference for these

8   purposes.

9          And then on the earlier point, just two

10  clarifications.  The second one is Mr. Bailey was deposed

11  before the 2015 agreement was produced.  We noted that in our

12  brief.  That's true.  But the 2015 agreement was produced

13  three years ago, well into the discovery period.  And if AWS

14  wanted to depose him on it, they should have asked during the

15  discovery period, not waited three years to make that request,

16  your Honor.  Beyond that --

17         THE COURT:  What about this question about Overton

18  being unclear on the details and really deferring to

19  Dellenbach?  What would be the -- would there be something

20  wrong in saying Mr. Dellenbach has to appear for a video

21  deposition for an hour just to kind of explain what these

22  agreements -- the 2023 agreements mean in relation to the 2015

23  agreement?

24         MR. REICHMAN:  Yes, sir.  In the abstract, there's

25  nothing wrong with it.  But the question is it's prep for

1  trial time.  And all we're talking about -- they've got the

2  percentages.  They're literally in these agreements.  I'm

3  holding it up.  They're in the agreements and they're just set

4  forth in black and white.  They know that Bailey and

5  Dr. Overton have significant percentages, and they can impeach

6  away with their interest in this litigation.

7          Finding out the specificity around the wherefores and

8  the legal terms, if he can even provide it because, mind you,

9  he's a lawyer and he's not going to testify as to privileged

10  matters, I don't see how that helps anything for this case.

11  It just takes time away from counsel's trial preparation.

12          THE COURT:  The thing that you just held up, which

13  exhibit to which filing is that?

14          MR. REICHMAN:  Sir, that is the Exhibit 6 to AWS's

15  filing.

16          THE COURT:  Wait a second.  My -- the computer, of

17  course, just chose this moment not to cooperate with me, of

18  course.  That's because that's what they do.

19          So it's AWS's motion to compel.

20          MR. REICHMAN:  Motion to compel.

21          THE COURT:  In the motion to compel.  Okay.  Let me

22  just get back to that.

23          MR. REICHMAN:  I can tell you what it is if you'd

24  like me to.

25          THE COURT:  That would be great.

1    MR. REICHMAN:  Okay.  This is the December 27th,
2  2023, agreement that amended the LLC agreement.
3    THE COURT:  I'm sorry.  I've now found the document,
4  the motion to compel.  Which exhibit to the motion to compel
5  is it?  Do you know?
6    MR. REICHMAN:  Yes, sir.  It's Exhibit 6.  I was
7  holding up the last page.
8    THE COURT:  All right.  Let me just pull it up here.
9  Exhibit 6 is a four-page document.
10    MR. REICHMAN:  Yes, sir.
11    THE COURT:  The thing that you were holding up.  Hang
12  on just one second here.
13    Okay.  Let's do it this way.  Is there a problem with
14  me sharing my screen with you to show you this document?
15    MR. REICHMAN:  As long as it's not a waiver of our
16  confidentiality, I don't think it is.
17    THE COURT:  It's not.  It's not.  I can't interpret
18  all the phone numbers that are calling in here.  Sadly, I'm
19  just going to tell you that -- well, let me put it up.  It's
20  going to be rotated.  It's going to be at a 90 degree angle
21  and I can't get that to go away for reasons that are not
22  entirely clear to me.  Give me just a second here.
23    All right.  Is that the thing you were holding up?
24    MR. REICHMAN:  Yes, sir.
25    THE COURT:  Okay.  When I go to get it to rotate, it

1 tells me it's under seal and it won't even let me rotate it.

2 I'm going to just kind of look like this for a second.  Pardon

3 me for looking like I'm sitting on my side.

4 So there are four member names over on the side

5 there, and it gives the percentages that each one of them has.

6 I take it that the first one is the LLC that corresponds to

7 Dr. Overton; is that right?

8 MR. REICHMAN:  Yes, sir.

9 THE COURT:  And then one of them is Bailey, one of

10 them is Auspitz.  And what's the fourth one?

11 MR. REICHMAN:  It's Mr. Dellenbach.

12 THE COURT:  That's Dellenbach.  Okay.

13 MR. REICHMAN:  Yes, sir.

14 THE COURT:  Okay.  Mr. Sigler, you've seen this

15 document, right, this thing that I have up here that's tilted

16 on its end?

17 MR. SIGLER:  Yes, your Honor, as has Dr. Overton.

18 THE COURT:  Hang on one second.  I'm going to take it

19 off because I want to be able to talk to you guys again.  And

20 I'm not quite as good at this stuff as you guys are.  There we

21 go.

22 Okay.  So what do you need somebody to interpret on

23 that?  It seems pretty clear.  You got four companies -- you

24 got four persons or entities.  There's a percentage for each

25 one of them.  Whether it's 3.53 percent or 3.78 percent, you

1  know that the person, if they're testifying, has a stake in
2  the outcome.  I'm not sure why you need more testimony about
3  that.  What am I missing?

4  MR. SIGLER:  Well, Dr. Overton wavered on the
5  percentage information, but he also -- there's a lot of other
6  information on here, too, such as the dollar amounts and
7  whether these entities are people who paid that amount for
8  their shares.  This is all covered in our brief on page 5.  He
9  said, I don't recall the structure of that.

10  THE COURT:  Why would that matter?

11  MR. SIGLER:  The valuation placed on the percentage
12  in this case, in these assets, I mean, these are really the
13  only assets involved here are the patents.

14  THE COURT:  So I'm overruling that argument.  I do
15  not think that that valuation has any bearing on any damages
16  calculation or any other issue in the case.

17  So now that I've ruled on that, is there some other
18  purpose for which you would need further interpretation of
19  this agreement?

20  MR. SIGLER:  Just certainty on what these numbers
21  mean, your Honor.

22  THE COURT:  Okay.  I don't think the case has been
23  made for further discovery.  I think that defendant has enough
24  information to establish that particular witnesses may have a
25  percentage stake in the outcome.  I suspect that probably

1    wasn't a mystery at any point anyway.  My guess is that on

2    both of those people, Overton and Bailey, which are the two

3    people the plaintiff has said that they're going to call,

4    there's plenty of other cross-examination for bias, interest,

5    and other things that you have, and this is just -- you know,

6    whatever you might get out of this deposition is not even

7    frosting on the cake.  It's like one of the sprinkles that

8    goes on top of the frosting.

9         And I don't think that the question of what's been

10   referred to as valuation -- I'm using air quotes -- is a

11   relevant issue on damages or any other issue in the case.

12        So the motion to compel is denied for those reasons.

13   And there we have it.

14        So while I got you on the -- while I got you on the

15   phone here, or on the video here, going back to the other

16   question, you guys, can you give me a ballpark sense when the

17   people that, you know, are potentially going to testify on

18   inequitable conduct and obviousness type double patenting, on

19   each side, kind of the total length of the direct that just

20   relates to those specific issues?

21        So starting with the plaintiff, you said Overton,

22   Bailey, and Goodrich.  How much testimony on direct are we

23   talking about collectively from those three on those two

24   issues?

25        MR. REICHMAN:  I have to guess a little bit.

1    THE COURT:  I'm talking about testimony that's not
2  going in in front of the jury.
3    MR. REICHMAN:  Yeah, I get it.  I'm guessing, your
4  Honor, because we have not done that yet, but I'm guessing
5  about an hour for those two witnesses.
6    THE COURT:  Okay.  Well, there were three.  You said
7  two.  Overton, Bailey --
8    MR. REICHMAN:  The expert would probably be another
9  hour.  So two hours total.
10    THE COURT:  Two hours, you think, on these two?
11    MR. REICHMAN:  Honestly, I don't think that.  I'm
12  just trying to be protective.  I haven't even done the
13  examinations yet.  But no more than two hours.  I would guess
14  the whole thing is an hour and 15 minutes, beginning to end.
15    THE COURT:  The judge that I clerked for -- and this
16  is going to date me, this is back in the '80s -- he was
17  Presbyterian and he used to quote a Presbyterian preacher
18  saying no souls are saved after the first 15 minutes.  Just
19  sayin'.
20    So on the defense side, you had two people, I think
21  both experts.  Well, maybe one was an expert and one wasn't.
22  So total amount of time on just -- exclusive to inequitable
23  conduct and obviousness type double patenting.  You're muted.
24  You're muted.  I didn't hear any of that.  You were muted.
25    MS. PHILLIPS:  Got it.  Yes, your Honor.  They were

1   both experts and I believe, like Mr. Reichman, it's probably

2   an hour, hour and 15 minutes as well.

3          THE COURT:  Okay.  All right.  Just keep in mind that

4   I'm not a jury.  I'll get it quicker.  That's kind of what

5   that means.  It doesn't mean I'll get it on the first 15

6   seconds.

7          Okay.  Since you're here, is there anything else, any

8   logistical or other questions anybody needed to bring up with

9   me?  I know I'm going to see you in a couple of weeks.

10         MR. REICHMAN:  We've got a handful of questions, your

11  Honor, for the trial, but we'll save it for the pretrial

12  conference.

13         THE COURT:  If you want to do it now, we can do it

14  now.

15         MR. REICHMAN:  I did have one quick question.  I

16  understand your Honor's rule about -- and this affects prep,

17  that's why I'd rather ask earlier and know.  I see your

18  Honor's rule about the witnesses go up once.  I understand

19  that when it comes to fact witnesses.  But I assume that's not

20  the case with experts because that would -- and I can explain

21  that.

22         THE COURT:  Yeah, I figured I was going to get that

23  question at some point.  So you're presumably talking about

24  some expert that you have who is going to talk about both

25  infringement and invalidity and you want to have that person

1    talk about infringement in your case and then about invalidity

2    in rebuttal.

3            MR. REICHMAN:  And there's an important point that

4    goes with that.  The parties have agreed --

5            THE COURT:  That's okay.  That's fine.

6            MR. REICHMAN:  All right.  That's it.  Thank you.

7            THE COURT:  Any questions on the other side that you

8    had at all?

9            Okeydoke.  Thanks very much, everybody.  Take care.

10           MR. FISCH:  Thank you, your Honor.  I appreciate it.

11           MS. PHILLIPS:  Thank you, your Honor.

12     (Which were all the proceedings had in the above-entitled

13    cause on the day and date aforesaid.)

14      I certify that the foregoing is a correct transcript from
      the record of proceedings in the above-entitled matter.
15
      /s/ *Carolyn R. Cox, CSR, RPR, F/CRR*_____     March 6, 2024
16    Official Court Reporter
      United States District Court
17    Northern District of Illinois
      Eastern Division
18

19

20

21

22

23

24

25