# Exhibit K2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| KOVE IO, INC.,<br><br>      *Plaintiff*,<br><br>   v.<br><br>AMAZON WEB SERVICES, INC.,<br><br>      *Defendant*. | Case No. 1:18-cv-8175<br><br>Judge Matthew F. Kennelly<br><br>Jury Trial Demanded |

## AMAZON WEB SERVICES, INC.'S FIFTH AMENDED FINAL UNENFORCEABILITY AND INVALIDITY CONTENTIONS

Alan M. Fisch
*alan.fisch@fischllp.com*
R. William Sigler
*bill.sigler@fischllp.com*
Jeffrey M. Saltman (*pro hac vice*)
*jeffrey.saltman@fischllp.com*
Lisa Phillips (*pro hac vice*)
*lisa.phillips@fischllp.com*
FISCH SIGLER LLP
5301 Wisconsin Avenue NW
Suite 400
Washington, DC 20015
202.362.3500

*Attorneys for Amazon Web Services, Inc.*

# TABLE OF CONTENTS

I. AMAZON'S RESERVATIONS OF RIGHTS ................................................................. 3

II. CURRENT IDENTIFICATION OF PRIOR ART FOR PATENTS-IN-SUIT ......................... 4

   A. PRIOR ART PATENTS AND PUBLICATIONS ............................................................... 4
   B. PRIOR ART SYSTEMS ............................................................................................ 6

III. SELECTION OF CURRENT GROUNDS OF INVALIDITY ............................................ 9

   '170 PATENT CLAIMS 1, 2, 6, 8, 12, AND 15 ............................................................ 9
   '640 PATENT CLAIMS 17, 18, AND 24 ...................................................................... 10
   '978 PATENT CLAIMS 1, 3, 6, 10, 14, AND 31 .......................................................... 10
   '978 PATENT CLAIMS 17, 23, AND 30 ...................................................................... 11
   '978 PATENT CLAIM 24 .......................................................................................... 12

IV. EXEMPLARY OBVIOUSNESS ARGUMENTS AND REASONS TO COMBINE THE IDENTIFIED PRIOR ART ......................................................................................... 13

V. INVALIDITY CLAIM CHARTS FOR PATENTS-IN-SUIT ............................................ 78

VI. INVALIDITY OF PATENTS-IN-SUIT BASED ON 35 U.S.C. § 112 .............................. 79

VII. INVALIDITY OF PATENTS-IN-SUIT BASED ON 35 U.S.C. § 101 .............................. 84

VIII. UNENFORCEABILITY CONTENTIONS AGAINST PATENTS-IN-SUIT ......................... 86

IX. DOCUMENT PRODUCTION ..................................................................................... 86

Pursuant to the Local Patent Rules and the Court's January 3, 2022 Minute Entry (Dkt. No. 489), the Court's February 25, 2022 Minute Entry (Dkt. No. 512) granting Motions to Amend Final Infringement and Invalidity Contentions (Dkt. Nos. 508, 510, and 511)), the Parties' agreement on amending contentions, in light of the Court's December 17, 2021 Claim Construction Memorandum Opinion and Order (Dkt. No. 484), and the Court's Minute Entries regarding Amazon's Motion for Additional Claim Construction (Dkt. Nos. 579 and 580), Defendant Amazon Web Services, Inc. ("Amazon") provides the following Fifth Amended Final Unenforceability and Invalidity Contentions to Plaintiff Kove IO, Inc. ("Kove") for the Asserted Claims of the Patents-in-Suit, as defined herein. This disclosure contains the information required by LPR 3.1(b) (including as related to LPR 2.3(b) and (c)). As required by the Local Patent Rules, Amazon herein identifies twenty-five prior art references, four prior art grounds per asserted claim, and four non-prior art grounds per asserted claim.

## I. AMAZON'S RESERVATIONS OF RIGHTS

These contentions are limited to the claims identified in Kove's Third Amended Final Infringement Contentions Under Local Patent Rule 3.1 served on February 10, 2023 (the "Asserted Claims") for U.S. Patent Nos. 7,814,170 ("the '170 patent"), 7,103,640 ("the '640 patent"), and 7,233,978 ("the '978 patent") (collectively the "Patents-in-Suit").

These contentions are based on Amazon's current knowledge, understanding, and beliefs based on the facts and information available at this time and are subject to supplementation and/or amendment as provided in the Local Rules, the Federal Rules of Civil Procedure, and/or any order of this Court, including the Court's December 17, 2021 Claim Construction Memorandum Opinion and Order (Dkt. No. 484). Amazon also reserves the right to supplement and/or amend these contentions based on future discovery, rulings in related proceedings, and

any future amendments made by Kove to its infringement and validity contentions. For at least this reason, nothing contained in these contentions should be understood or deemed to be an express or implied admission or contention with respect to the proper construction or scope of any terms in the asserted claims.

Further, these contentions are contingent on the Court's adoption of Amazon's proposed constructions reflecting Kove's statements in reexaminations of the Patents-in-Suit that materially alter the scope of the claims. If one or more of Amazon's proposed constructions are not adopted by the Court, Amazon expressly reserves the right to rely on Amazon's Fourth Amended Final Unenforceability and Invalidity Contentions.

## II. CURRENT IDENTIFICATION OF PRIOR ART FOR PATENTS-IN-SUIT

Amazon provides below an identification with particularity of thirty items of prior art that anticipate or render obvious each Asserted Claim of the Patents-in-Suit. Amazon further incorporates-by-reference the prior art references and grounds identified in the pending *ex parte* reexamination of the Patents-in-Suit. Specifically:

- *Ex Parte* Reexamination of U.S. Patent No. 7,233,978 (RE 90/019,162);

- *Ex Parte* Reexamination of U.S. Patent No. 7,814,170 (RE 90/019,165); and

- *Ex Parte* Reexamination of U.S. Patent No. 7,103,640 (RE 90/019,166).

Amazon also reserves the right to argue that the proper priority date for any claim of the Patents-in-Suit is the patent's filing date and that the claims are not supported by earlier-filed applications.

### A. Prior Art Patents and Publications

Subject to Amazon's reservations set forth above, Amazon lists below twenty-five (25) items ofprior art that Amazon currently believes either anticipate or render obvious the Patents-

in-Suit in combination with one or more other references and/or the knowledge of one of

ordinary skill in the art around the time of invention.[1]

1. "DNS RFC1034 Domain names – Concepts and Facilities" by Mockapetris(1987) ("RFC1034");

2. "An Adaptive Data Placement Scheme for Parallel Database Computer Systems" by Hua and Lee (1990) ("Hua DBMS");

3. "Design and Implementation of DDH: A Distributed Dynamic Hashing Algorithm" by Devine (1993) ("Devine DDH");

4. "Scale in Distributed Systems" by Neuman (1994) ("Neuman");

5. U.S. Patent No. 5,542,087 to Neimat ("Neimat"), assigned to Hewlett-Packard Co., issued July 30, 1996;

6. "Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hot Spots on the World Wide Web" by Karger et al. (1997) ("Karger '97");

7. "Load Management in Distributed Video Servers" by Venkatasubramanian and Ramanathan (1997) ("Venkatasubramanian");

8. "Resource Location in Very Large Networks" by Partha Dasgupta (1994) ("Dasgupta");

9. "Distributed Web Caching System with Consistent Hashing" by Sherman (1999) ("Sherman");

10. "Web Caching with Consistent Hashing" by Karger, Sherman, et al. (1999) ("Karger/Sherman");

11. Dynamic Load Balancing on Web-server Systems by Valeria Cardellini et al., IEEE Internal Computing, vol. 3, no. 3, pp. 28-39, May-June 1999 ("Cardellini");

12. "Distributed cooperative Web servers" by Baker and Moon (1999) ("Baker");

13. Paul Albitz and Cricket Liu, DNS and BIND, O'Reilly & Associates, Inc., 3rd ed. 1998 ("BIND and DNS");

14. U.S. Patent No. 6,212,521 to Minami ("Minami"), assigned to Fujitsu Ltd., issued April 3, 2001;

15. U.S. Patent No. 6,430,618 to Karger ("Karger '618"), assigned to Massachusetts Institute of Technology, issued August 6, 2002;

16. U.S. Patent No. 6,553,420 to Karger ("Karger '420"), assigned to Massachusetts

---

[1] Amazon's identification of four prior art grounds per asserted claim is found in Section III. The remaining references on this list are included, in an abundance of caution, because they provide evidence of the background knowledge and common sense of those of ordinary skill in the art at the alleged time of invention of the Patents-in-Suit.

Institute of Technology, issued April 22, 2003[2];

17. Domain Name System (DNS) as described in the next section;

18. Cache Resolver system as described in the next section.

19. "Oracle Names Administrator's Guide, Release 2.0, Oracle Corporation, 1996 ("OracleNamesAdminGuide");

20. "Oracle 8 Server: Unleashed" by Joseph Greene, Advanced Information Systems, Inc. et al, 1998 ("OracleUnleashed");

21. "Locating Objects in Wide-Area Systems" by Maarten van Steen, Franz J. Hauck, Philip Homburg, and Andrew S. Tanenbaum, IEEE Communication Magazine, January 1998, pp. 104-109 ("Steen");

22. U.S. Patent No. 6,185,601 to James J. Wolff, assigned to Hewlett-Packard Company, issued February 6, 2001 ("Wolff");

23. U.S. Patent No. 6,473,781 to Roger Skagerwall and Kaj Nygren, assigned to Telefonaktiebolaget LM Ericsson, issued October 29, 2002 ("Skagerwall");

24. U.S. Patent No. 6,230,183 to Peter B. Yocum, Catherine K. Eilert, and John E. Arwe, assigned to International Business Machines Corporation, filed on March 11, 1998, issued on May 8, 2001 ("Yocum"); and

25. U.S. Patent No. 6,122,664 to Marcel Boukobza and Gerard Sitbon, assigned to Bull S.A., filed on June 27, 1997, issued on September 19, 2000 ("Boukobza").

## B. Prior Art Systems

To the extent a prior art reference identified herein describes a system that was publicly available or invented prior to the patents-in-suit, Amazon contends the underlying system as a whole constitutes the identified prior art for the purposes of these contentions. For example:

**Domain Name System (DNS):** Amazon contends that BIND 8.1, a prior art Domain Name System (DNS) implementation anticipates and/or renders obvious claims of the Asserted Patents, as described herein. Paul Mockapetris created DNS in 1983 and the Internet Engineering Task Force published the original specifications for DNS in November of that year. The following year, four University of California at Berkeley students, Douglas Terry, Mark Painter,

---

[2] The Karger '618 and '420 patents are in the same patent family and closely related. Therefore, Amazon refers to these patents together herein as "Karger '618/420."

David Riggle, and Songnian Zhou, wrote the first Unix name server implementation for the BerkeleyInternet Name Domain (BIND).

The Computer Systems Research Group at Berkeley released BIND versions up to version 4.8.3. Digital Equipment Corporation released versions 4.9 and 4.9.1 and Vixie Enterprises released version 4.9.2. Since then, the Internet Software Consortium (ISC) has released versions from 4.9.3 onward.  In May 1997, ISC released the first version of BIND 8.  In September 2000, ISC released the first version of BIND 9. ISC stopped supporting BIND 8 in 2007.

In November 1987, the Internet Engineering Task Force published RFC 1034,which superseded the 1983 DNS specifications.

Thus, DNS was well-known and widely used before the earliest alleged priority date of the Patents-in-Suit.  As one example, the inventors of the Patents-in-Suit used DNS, as apparent from the face of the Asserted Patents. (*See, e.g.*, '978 patent, col. 24:1.) Based on the history of DNS, it is likely that the inventors were using a version of BIND 8. BIND 8 was used by Sherman and Karger/Sherman in the Cache Resolver system described below. Accordingly, for the purposes of these contentions, Amazon contends that BIND 8.1, a version of DNS and available as of May 1997, is a prior art DNS system that anticipates and/or renders obvious claims of the Asserted Patents, as described herein. BIND 8.1 can be found at ftp://ftp.isc.org/isc/bind8/src/DEPRECATED/8.1/bind-src.tar.gz and has already been produced. Additional information describing this DNS system can be found in the produced documents, including BIND and DNS, RFC 1034, Sherman, Karger/Sherman, Baker, and Cardellini.

Moreover, a person of skill in the art would be knowledgeable regarding the use and operation of DNS. As described in BIND and DNS, "[i]f you're connected to the Internet …

DNS is a must." (BIND and DNS, 9.) "Think of DNS as the *lingua franca* of the Internet: nearly all of the Internet's network services use DNS. That includes the World Wide Web, electronic mail, remote terminal access, and file transfer." (*Id.*) And the BIND software "is the most popular implementation of the DNS specs." (*Id*. at xi.)

**Cache Resolver System:** Amazon contends that the Cache Resolver system as described in Distributed Web Caching System with Consistent Hashing by Alexander Sherman (February 1999) ("Sherman") and Web Caching with Consistent Hashing by Karger, Sherman, et al. (March 4, 1999) ("Karger/Sherman") anticipates and/or renders obvious claims of the Asserted Patents, as described herein. Both Sherman and Karger/Sherman describe aspects of the same Cache Resolver system. Therefore, citations herein regarding Sherman apply equally to Karger/Sherman, and vice versa. Amazon contends that all of the features and functionality of DNS are inherent to systems using DNS, such as the use of DNS in the Cache Resolver system. In particular, the Cache Resolver system uses DNS servers running BIND 8 and the program "dnshelper." The authors of these papers used the Cache Resolver system.

The Cache Resolver system was known at least by February 1999. Alexander Sherman made the Cache Resolver system known to at least Madhu Sudan and Arthur C. Smith when he submitted his thesis to the Department of Electrical Engineering and Computer Science at MIT. Dr. Sudan was Dr. Sherman's Thesis Supervisor and Dr. Smith was the Chairman, Department Committee on Graduate Students at that time. David Karger, Alex Sherman, Andy Berkheimer, Bill Bogstad, Rizwan Dhanidina, Ken Iwamoto, Brian Kim, Luke Matkins, and Yoav Yerushalmi, the authors of Karger/Sherman made the Cache Resolver system known to at least the readers of the May 1999 issue of Computer Networks: The International Journal of Computer and Telecommunications Networking, which included a copy of the Karger/Sherman paper that

describes the Cache Resolver system.

## III. SELECTION OF CURRENT GROUNDS OF INVALIDITY

Pursuant to LPR 3.1(b), Amazon specifically identifies below the four (4) prior art grounds per asserted claim and four (4) non-prior art grounds asserted against Kove's patents at this time. The prior art grounds are further supported by the attached claim charts Exhibits 1-3.

### '170 Patent Claims 1, 2, 6, 8, 12, and 15

Amazon contends that '170 patent claims 1, 2, 6, 8, 12, and 15 are invalid for failure to meet the conditions for patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. § 101 et seq., 35 U.S.C. §§ 101, 102, 103, and/or 112, the requirements of the Code of Federal Regulations, as well as general principles of patent law.

Amazon asserts the following four prior art grounds for these claims at this time. These prior art grounds are further supported by the accompanying claim chart exhibits as well as Sections IV-V herein.

1. Obviousness based on the combination of OracleNamesAdminGuide, OracleUnleashed, Steen, and Wolff (*see* Exhibit 1A);

2. Obviousness based on Skagerwall alone or in combination with Wolff (*see* Exhibit 1B);

3. Obviousness based on the combination of U.S. Patent No. 5,542,087 to Neimat, DNS, and Karger '618/420 (*see* Exhibit 1C);

4. Obviousness based on the combination of U.S. Patent No. 6,212,521 to Minami, DNS, and Karger '618/420 (*see* Exhibit 1D).

Amazon asserts the following four non-prior art grounds for these claims at this time. These non-prior art grounds are further supported by Sections IV-VII.

1. Unpatentable under 35 U.S.C. § 101 (as described in Amazon motion to dismiss[3], *see* Dkts. 38, 45 etc. and Section VII below);

---

[3] To the extent that the district court has determined that the Asserted Patents are not unpatentable under 35 U.S.C. § 101 (*see* Dkt. 110), Amazon maintains its position for the purposes of appeal.

2. Lack of proper written description support under 35 U.S.C. § 112, ¶ 1 (*see* Section VI);

3. Lack of enablement under 35 U.S.C. § 112, ¶ 1 (*see* Section VI);

4. Indefiniteness under 35 U.S.C. § 112, ¶ 2 (*see* Section VI).

## '640 Patent Claims 17, 18, and 24

Amazon contends that '640 patent claims 17, 18, and 24 are invalid for failure to meet the conditions for patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. § 101 et seq., 35 U.S.C. §§ 101, 102, 103, and/or 112, the requirements of the Code of Federal Regulations, as well as general principles of patent law.

Amazon asserts the following four prior art grounds for these claims at this time. These prior art grounds are further supported by the accompanying claim chart exhibits as well as Sections IV-V herein.

1. Obviousness based on the combination of OracleNamesAdminGuide, OracleUnleashed, Steen, and Wolff (*see* Exhibit 2A);
2. Obviousness based on Skagerwall alone or in combination with Wolff (*see* Exhibit 2B);
3. Obviousness based on the combination of U.S. Patent No. 5,542,087 to Neimat and DNS (*see* Exhibit 2C);
4. Obviousness based on the combination of U.S. Patent No. 6,212,521 to Minami and DNS (*see* Exhibit 2D).

Amazon asserts the following four non-prior art grounds for these claims at this time.

These non-prior art grounds are further supported by Sections IV-VII.

1. Unpatentable under 35 U.S.C. § 101 (as described in Amazon motion to dismiss, *see* Dkts. 38, 45 etc. and Section VII below);
2. Lack of proper written description support under 35 U.S.C. § 112, ¶ 1 (*see* Section VI);
3. Lack of enablement under 35 U.S.C. § 112, ¶ 1 (*see* Section VI);
4. Indefiniteness under 35 U.S.C. § 112, ¶ 2 (*see* Section VI).

## '978 Patent Claims 1, 3, 6, 10, 14, and 31

Amazon contends that '978 patent claims 1, 3, 6, 10, 14, and 31[4] are invalid for failure to meet the conditions for patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. § 101 et seq., 35 U.S.C. §§ 101, 102, 103, and/or 112, the requirements of the Code of Federal Regulations, as well as general principles of patent law.

Amazon asserts the following four prior art grounds for these claims at this time. These prior art grounds are further supported by the accompanying claim chart exhibits as well as Sections IV-V herein.

1. Obviousness over the combination of OracleNamesAdminGuide, OracleUnleashed, Steen, and Wolff (*see* Exhibit 3A);

2. Skagerwall and Wolff (*see* Exhibit 3B);

3. Obviousness based on the combination of U.S. Patent No. 5,542,087 to Neimat and DNS (*see* Exhibit 3E);

4. Obviousness based on the combination of U.S. Patent No. 6,212,521 to Minami and DNS (*see* Exhibit 3F).

Amazon asserts the following four non-prior art grounds for these claims at this time. These non-prior art grounds are further supported by Sections IV-VII.

1. Unpatentable under 35 U.S.C. § 101 (as described in Amazon motion to dismiss, *see* Dkts. 38, 45 etc. and Section VII below);

2. Invalid for Double Patenting (*see* Section VII);

3. Lack of proper written description support under 35 U.S.C. § 112, ¶ 1 (*see* Section VI);

4. Lack of enablement under 35 U.S.C. § 112, ¶ 1 (*see* Section VI).

### '978 Patent Claims 17, 23, and 30

Amazon contends that '978 patent claims 17, 23, and 30 are invalid for failure to meet the conditions for patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. § 101 et seq., 35 U.S.C. §§ 101, 102, 103, and/or 112, the requirements of

[4] Claims 1 and 31 have been finally rejected by the USPTO in Reexamination Control No. 90/019,034.

DEFENDANT AMAZON WEB SERVICES, INC.                    CIVIL ACTION NO. 1:18-CV-8175
FIFTH AMENDED FINAL UNENFORCEABILITY      11
AND INVALIDITY CONTENTIONS

the Code of Federal Regulations, as well as general principles of patent law.

Amazon asserts the following four prior art grounds for these claims at this time. These prior art grounds are further supported by the accompanying claim chart exhibits as well as Sections IV-V herein.

1. Obviousness based on the combination of OracleNamesAdminGuide, OracleUnleashed, Steen, Yocum, and Boukobza (*see* Exhibit 3C);

2. Obviousness based on the combination of Skagerwall, Steen, Yocum, and Boukobza (*see*Exhibit 3D);

3. Obviousness based on the combination of Neimat and DNS (*see* Exhibit 3E);

4. Obviousness based on the combination of U.S. Patent No. 6,212,521 to Minami, DNS, and Neimat (*see* Exhibit 3F);

Amazon asserts the four non-prior art grounds below for these claims at this time. These non-prior art grounds are further supported by Sections IV-VII.

1. Unpatentable under 35 U.S.C. § 101 (as described in Amazon motion to dismiss, *see* Dkts. 38, 45 etc. and Section VII below);

2. Invalid for Double Patenting (*see* Section VII);

3. Lack of proper written description support under 35 U.S.C. § 112, ¶ 1 (*see* Section VI);

4. Lack of enablement under 35 U.S.C. § 112, ¶ 1 (*see* Section VI).

## **'978 Patent Claim 24**

Amazon contends that '978 patent claim 24 is invalid for failure to meet the conditions for patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. § 101 et seq., 35 U.S.C. §§ 101, 102, 103, and/or 112, the requirements of the Code of Federal Regulations, as well as general principles of patent law.

Amazon asserts the following four prior art grounds for this claim at this time. These prior art grounds are further supported by the accompanying claim chart exhibits as well as Sections IV-V herein.

1. Obviousness based on the combination of OracleNamesAdminGuide, OracleUnleashed, Steen, Yocum, and Boukobza (*see* Exhibit 3C);

2. Obviousness based on the combination of the Skagerwall, Steen, Yocum, and Boukobza (*see* Exhibit 3D);

3. Obviousness based on the combination of Neimat, DNS, and Venkatasubramanian (*see* Exhibit 3E);

4. Obviousness based on the combination of U.S. Patent No. 6,212,521 to Minami, DNS, Neimat, and Venkatasubramanian (*see* Exhibit 3F).

Amazon asserts the four non-prior art grounds below for this claim at this time. These non-prior art grounds are further supported by Sections IV-VII.

1. Unpatentable under 35 U.S.C. § 101 (as described in Amazon motion to dismiss, *see* Dkts. 38, 45 etc. and Section VII below);

2. Invalid for Double Patenting (*see* Section VII);

3. Lack of proper written description support under 35 U.S.C. § 112, ¶ 1 (*see* Section VI);

4. Lack of enablement under 35 U.S.C. § 112, ¶ 1 (*see* Section VI).

## IV. EXEMPLARY OBVIOUSNESS ARGUMENTS AND REASONS TO COMBINE THE IDENTIFIED PRIOR ART

The Asserted Claims of the Patents-in-Suit relate to combinations of various systems and methods for storing and retrieving data in a computer network that were known in the art prior to the Patents-in-Suit. Where the combination of features recited in any particular asserted claim were not included in a single piece of prior art, as a general matter, it would have been obvious to modify the prior art to make such a combination. The individual features recited in the asserted claims were known to be available and suitable for use in computer networking systems.Thus, as discussed in specific instances in the attached charts, the inclusion of such known structures and/or features in the asserted claims was a matter not of innovation in the art, but of simple choices that would have been within the level of ordinary skill to implement and would have led to no more than the predictable results around the time of the Patents-in-Suit.

To show obviousness, Amazon intends to rely on the presence of various structures and

features, and combinations thereof, of the prior art described herein as a basis for incorporating those structures and features into other prior art described herein. The reasons justifying such modifications and combinations of prior art features is evident from the prior art itself, the knowledge of one of ordinary skill in the art, and the nature of the problems to be solved related to the Patents-in-Suit.

Furthermore, the combinations in the accompanying claim charts would have been readily made by one of ordinary skill in the art at the time of the alleged invention of the Patents-in-Suit, at least in that one of ordinary skill would have been motivated to combine the references disclosed herein in such a way as to render the alleged inventions obvious. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007); *Randall Mfg. v. Rea*, 733 F.3d 1355 (Fed. Cir. 2013). Each of the references disclosed herein was directed at the same or similar field of technology and to the same or similar problem as the Patents-in-Suit. As discussed in more detail below and in the accompanying invalidity claim charts, the teaching, suggestion, or motivation to combine these references may be found, explicitly or implicitly, for one or more of the following reasons:

(1) the combination results from a simple substitution of one known element for another to obtain predictable results;

(2) the combination results from the use of known techniques to improve similar methods in the same way;

(3) the combination results from applying a known technique to a known method ready for improvement to yield predictable results;

(4) the combination results from choosing a finite number of identified,predictable solutions, with a reasonable expectation of success, andtherefore is obvious to try;

(5) the combination results from known work in one field of endeavor prompting a variation of it for use in either the same field or a different one based on design incentives or other market forces and the variations would have been predictable to one of ordinary skill in the art; or

(6) the combination results from using known techniques or solutions to address a problem addressed by the invention or a problem that would be encountered by

one of ordinary skill in the art working in that field.

Amazon also intends to rely on the background knowledge and common sense of those of ordinary skill in the art at the alleged time of invention of the Patents-in-Suit to show invalidity of the Patents-in-Suit.

The accompanying invalidity claim charts identify specific claim limitations with combinations of references that render the Asserted Claims obvious. For each such combination of references, if any particular claim limitation is alleged not to be disclosed or inherent in those references, then it would have been obvious to one of ordinary skill in the art to combine the charted reference with one or more of the references identified in the charts for the particular claim limitations.

Furthermore, Amazon describes here additional evidence of obviousness related to the subject matter as a whole and certain specific feature of the Asserted Claims of the Patents-in-Suit. To the extent that Kove alleges that any of the prior art references charted in Amazon's Exhibits 1-3 do not disclose one of the limitations described below, it would have been obvious to one of ordinary skill in the art before the time of invention, for example, to include the following features in a distributed storage system such as claimed by the Asserted Patents. Amazon also refers Kove to Amazon's Second Amended Non-Infringement and Invalidity Contentions dated March 2, 2023 for additional information regarding the identified prior art and invalidity contentions, in particular, the claim charts which further illustrate where specifically in each item of prior art each element of each asserted claim is found. Amazon intends to rely on such evidence to support its contention that one of ordinary skill in the art would have had reason to combine the identified prior art as claimed.

**Data Location Server and Location Information:** To the extent that Kove contends that an identified piece of prior art does not disclose a claim limitation related to the use of data

location servers, the subject matter as a whole of each claim, including that limitation, would have been obvious to one of skill in the art before the invention. (*See, e.g.*, '170 patent claims 1, 2, 6, 8, 15; '640 patent claim 17, 18, 24; '978 patent claims 1, 3, 5, 10, 14, 17, 31.) The Patents-in-Suit recognize that "location" is not a requirement for its Network Distributed Tracking Protocol ("NDTP"). "NDTP can be used for any application in which one-to-zero or one-to-many associations amongstrings are to be maintained and accessed on a network. In applications of NDTP other than distributed databases, the term identifier is likely to make sense in most cases, but the term location may not." ('170 patent, 20:30-37; '640 patent, 20:18-25; '978 patent, 25:11-14.) The Microfiche Appendix filed with the '170 and '640 patents provide software code that is not location-specific, demonstrating that any key-value store can be used.

Further, the Court held in its Claim Construction Order (Dkt. No. 484) that "Location Server" should be construed as "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients." And the Court held that "Location Information" should be "one or more identifiers and their associated locations" for the '978 Patent, and "information pertaining to one or more locations of data and/or the identities of one or more location servers" for the '170 and '640 Patents. And these constructions by the Court support the finding that the identified prior art references disclose the claim limitations. For example, the Court held that a "location server" should not be limited to a NDTP server. And the Court held that for the '170 and '640 Patents, "location information" included "information pertaining to . . . the identities of one or more location servers" in addition to the "location of data stored in a distributed system."[5]

The concept of storing information about the location of data in a distributed network is

[5] Court's December 17, 2021 Claim Construction Memorandum Opinion and Order (Dkt. No. 484), at 18-19.

well known, even fundamental, in the field of computer science, for example. As the Domain Name Server (DNS) protocol recognized long before the alleged invention, there was a known problem in the art that "[t]he applications on the internet were getting more sophisticated and creating a need for general purpose name service," and "[t]he result was several ideas about name spaces and their management." (RFC1034, Section 2.1-2.2.) And the concept of storing information about the location of data, and information pertaining to the location of data is well known, even fundamental, in the field of computer science. For example, as the Domain Name Server (DNS) protocol recognized long before the alleged invention, there was a known problem in the art that "[t]he applications on the internet were getting more sophisticated and creating a need for general purpose name service," and "[t]he result was several ideas about name spaces and their management." (RFC1034, Section 2.1-2.2.). And RFC1034 discloses that not only are identification of data servers returned as responses to queries for data, but also information that "point toward a name server that has the desired information" of information "expected to be useful in interpreting the relevant RRs." (RFC1034, p. 17.)

In addition, the concept of separating information about the location of data from the data itself, for instance, is an obvious method of organizing information that is well known in computer science. Indeed, DNS uses "name servers" that store information about network address locations (the "where," for example, a mailbox address) that is separate from the underlying data (the "what" in the mailbox). (RFC1034, Sections 2.4, 3.1, 3.6, 3.7; Sherman, pgs. 34-39; Karger/Sherman, Section 3.) Sherman and Karger/Sherman stated: "The primary function of our DNS system is to resolve the virtual names generated by the users' Java Script function to the actual physical IP addresses of the caches." (Sherman, p. 37; Karger/Sherman, p. 10.) Dasgupta described a "completely scalable, non-hierarchical naming that is independent of

the entities['] location or affiliations."  (Dasgupta, Abstract.)

Neuman described techniques for reducing "the number of requests that must be handled by a name server" and explained that the "[a]dvantages to distribution are that only part of the naming database is stored on each server, thus reducing the number of queries and updates to be processed." (Neuman, 4.2.) One of skill would have been motivated to use such separation methods, for example, to use less space or memory in the part of the system with the location information in order to gain overall speed, efficiency, or computing ability related to that part of the system. Furthermore, to the extent any prior art discloses the use of oneserver, it would have been obvious to use more than one server to achieve further benefits. *See* MPEP § 2144.VI.B (Obviousness of Duplication of Parts).

Skagerwall provides an example of a location server network with a flat architecture, consistent with Kove's statements at the Patent Office and Amazon's proposed constructions. Like the '170 Patent, Skagerwall describes a system of directory servers "for communicating information, related to a plurality of tagged objects, in a network."[6] Skagerwall teaches that its system associates "data objects" (i.e. data entities) stored on application servers with respective "object data" stored on directory servers, including retrieval information (i.e., location information) using an "object tag" (i.e., identifier).[7]

---

[6] Skagerwall at 1:9-13.
[7] Skagerwall at 4:12-20.



**Skagerwall Fig.1 Annotated**

Skagerwall explains that its system resolves requests for data faster when organizing the directory servers according to a hash function. It states: "To avoid unnecessary look up operations for object tags at directory servers, as outlined above, it is preferred that object data is stored on directory servers according to the hashfunction."[8] This organization allows the system to determine which directory server contains the desired information based on the object tag (i.e., identifier) and quickly resolve the request.[9]

OracleNamesAdminGuide teaches location server networks with hierarchical, non-hierarchical, and mixed architectures. Like the '170 Patent, OracleNamesAdminGuide answers the question in a distributed data storage system: "where is my data?" OracleNamesAdminGuide describes a technique that separates the "where" (i.e., location of the data repository) from the "what" (i.e., the data itself).[10] OracleNamesAdminGuide does this by using specialized servers called Names Servers, which serve as intermediaries between clients requesting data and the

[8] *Id.* at 10:39-40.
[9] *Id.* at 9:18-31.
[10] OracleNamesAdminGuide at 20, 23, 33, 43-44, 52-53.

corresponding data storage servers.[11] A client seeking to locate data on

OracleNamesAdminGuide's network will query a Names Server to retrieve the data's network

address, then use that address to connect to the entity housing the data.

OracleNamesAdminGuide illustrates this network architecture in Figure 3-11 below. [12]



OracleNamesAdminGuide Fig. 3-11

At step ①, the client submits a request for the data located at POULTRY.WORLD.

OracleNamesAdminGuide uses its networking utility, SQL*Net, to send the client's request to

the Names Server. At step ②, the Names Server receives the request, looks up the location

information associated with the POULTRY.WORLD identifier, then sends that location

information to client. The client receives the location information from the Names Server at step

③, then the client uses that location information to contact the server housing the database

instance associated with POULTRY.WORLD. Finally, at step ④, the client contacts the server

and establishes a client-server connection.[13]

Steen teaches the use of hierarchical, non-hierarchical, and mixed topologies in its

---

[11] *See id.* at 20, 22.
[12] Steps 1-4 appear in OracleNamesAdminGuide's original Figure 3-11.
[13] *See id.* at 52-53; *see also id.* at 128-129 (describing location information syntax includes host name, port, and database instance along with the connection information).

location server networks. Like the '170 Patent, Steen describes a system for managing and locating data on a wide-area distributed network. As Steen states, its system "present[s] a scalable location service" to "optimize lookups."[14] In Figure 2, Steen provides a two-level system for managing and locating an object's contact addresses.



■ **Figure 2.** *The logical organization of the location service as a virtual search tree.*

In the first level, Steen describes using a directory system for resolving an object name to an "object handle."[15] The object handle includes location information for a contact record. Then, in the second level, Steen teaches that the client/user uses the object handle to obtain object contact addresses.

In Steen's top level, Steen teaches the use of a non-hierarchical architecture, consistent with Kove's statements at the Patent Office and Amazon's proposed constructions. Steen explains that a directory node dir(R) stores object names (i.e., identifiers) associated with object handles (i.e., location information). Steen explains that these high-level servers can be partitioned into multiple subnodes, creating a non-hierarchical cluster of servers to handle a

---

[14] Steen at 104.
[15] Steen at Abstract.

distributed workload, as shown below in annotated Figure 6.



**Steen Figure 6 Annotated**

For a partitioned dir(R), each subnode is configured and functions as its own server and contains its own subset of location information. Steen explains that it's important for each subnode to be "aware" of how the location information is distributed amongst the subnodes, allowing for requests to be re-routed to the subnode containing the correct location information. Steen provides an exemplary hashing method and explains that more complicated methods can be applied as the system scales up.[16] Then, in the second level, Steen teaches that the client/user uses the object handle to obtain object contact addresses from a hierarchical location server network. Thus, Steen's teachings provide a non-hierarchal top layer, hierarchical bottom layer, and in their combination, a mixed topology location server network.

Therefore, it would have been obvious to one of skill to employ data location servers and utilize location information in a distributed network, particularly in view of the references identified below:

- U.S. Patent No. 6,212,521 to Minami (see, e.g., cols. 7-8);
- DNS (see, e.g., RFC1034, Sections 2.4, 3.1, 3.6, 3.7);

---

[16] *Id.* at 108.

DEFENDANT AMAZON WEB SERVICES, INC.                         CIVIL ACTION NO. 1:18-CV-8175
FIFTH AMENDED FINAL UNENFORCEABILITY   22
AND INVALIDITY CONTENTIONS

- Cache Resolver system (see, e.g., Sherman, pp. 34-39; Karger/Sherman, Section 3);
- Skagerwall (see, e.g., cols. 1:9-13, 4:12-20, 9:18-31, 10:39-40, Figure 1);
- OracleNamesAdmineGuide (see, e.g., 20, 23, 33, 43-44, 52-53, 128-129, Figure 3-11);
- Steen (see, e.g., Abstract, 104, 108, Figures 2, 6) and/or
- the common sense and background knowledge in the art.

These references contain specific teachings that would lead a skilled artisan to combine them with other prior art disclosing distributed networks. For example, RFC1034 states that DNS uses distributed name servers and local caches to increase the amount of memory and improve performance: "The sheer size of the database and frequency of updates suggest that it must be maintained in a distributed manner, with local caching to improve performance." (RFC1034, 2.) RFC1034 discloses that this caching occurs to reduce name server load: "A veryimportant goal of the resolver is to eliminate network delay and name server load from most requests by answering them from its cache of prior results." (*Id*., 29.) Thus, DNS discloses the use of a distributed network to ensure scalability and performance. The Cache Resolver system specifically refers to DNS and a skilled artisan would therefore use DNS's teachings as motivation to combine the Cache Resolver system with other art.

Neimat similarly discloses scaling a distributed network: "The present invention accommodates any number of clients and servers, and allows the database storage to extend to occupy any number of servers." (Col. 6:37-39; *see also* 1:36-40, 8:12-15.) Likewise, Minami states, "[A] first object of the present invention is to provide a data management system which relieves processing loads imposed on individual data management servers by distributing data registration and retrieval tasks and reducing the amount of data maintained in each server." (Col. 3:38-43.) Thus, a skilled artisan seeking to ensure scalability and improve performance in a distributed network would be motivated to combine references that disclose location servers, such as DNS, with references disclosing distributed networks, such as Minami or Neimat.

And a POSITA would have appreciated that Steen's principle of "anycasting" allows for faster resolution of clients' requests because multiple servers can resolve any given query. As a result, a POSITA would have been motivated by OracleNamesAdminGuide's goal of "lightning fast" resolution to incorporate anycasting to its data storage. This would have resulted in multiple data repositories where each server connects to OracleNamesAdminGuide's Names Service (i.e., location server network). A POSITA would have understood that Steen's partitioned group of location servers organized in a non-hierarchical configuration results in each server containing a subset of the data location information originally stored on the first location server. Further, a POSITA would have been motivated to adopt Steen's partitioning approach for grouping OracleNamesAdminGuide's Names Servers to maintain "lightning fast" resolutions to data queries. Thus, applying either (1) OracleUnleashed's teachings toward partitioning servers and datasets or (2) Steen's teachings toward partitioning a location server into a group of servers to OracleNamesAdminGuide's Names Servers would have rendered obvious that the data location server network has a plurality of data location servers.

Further, based on OracleUnleashed's teachings, a POSITA would have been motivated and found it obvious to have OracleNamesAdminGuide's system associate each data repository's data with a respective identifier string. OracleUnleashed explains that SQL*Net, which OracleNamesAdminGuide utilizes, makes it easier for users to connect to various databases and find their data, which is advantageous because "[y]our users do not want to write complex queries."[17] A POSITA would have understood that associating respective identifier strings with data improves the users' experience and to ease the ability to find desired data since that is one of the objectives of an Oracle DBA. The benefits of associating data with a respective identifier string

[17] *See* OracleUnleashed at 255.

are directly perceived by the end user, and a DBA would have been motivated to simplify the users' experience in this manner. [18]

Thus, a POSITA would have found it obvious to have each of OracleNamesAdminGuide's data repositories' data be associated with a respective identifier string for use in optimizing query efficiency, based on OracleUnleashed's teachings.[19] During the relevant timeframe, Oracle DBAs were often asked to help improve query efficiency, as OracleUnleashed details:

> It seems pretty obvious that a search method that works well for one of these types of queries is probably not the best method for the others. In fact, Oracle and most other databases have a number of search algorithms in their systems that are designed to handle different needs. This is what enables them to work in such a large number of environments and applications. When an application is performing slowly on a well-tuned database, the first thing you should **check is how the query is being processed to ensure that it is as efficient as it can be.**[20]

Based on the commonplace need for efficiency in running queries, a POSITA would have been motivated to associate a respective identifier string with data because this allows OracleNamesAdminGuide's Names Server to quickly return one or more locations associated with the identifier string to the query requestor with minimized cost.[21]

**Hash Function:** To the extent that Kove contends that an identified piece of prior art does not disclose a claim limitation related to the use of a hash function, the subject matter as a whole of each claim, including that limitation, would have been obvious to one of skill in the art before the invention. (*See, e.g.*, '170 patent claim 1.f, 6.c, 15.a; '640 patent claim 24; '978 patent claim 6.) The specifications of the asserted patents themselves concede that the "preferably applied" hash function was "well-known" in computer science. ('170 patent, col. 15:12-18.) Numerous other publications before the filing of the Patents-in-Suit describe the useof hash

---

[18] *Id.*
[19] *See* OracleUnleashed at 452.
[20] OracleUnleashed at 652 (emphasis added).
[21] *See* OracleUnleashed at 452.

functions in distributed systems. As one example, the prior art recognized that it was well understood "for clients to use a standard hash function to determine from which server to request a document." (U.S. Patent No. 6,553,420 to Karger, col. 3:23-50; *see also* U.S. Patent No. 6,430,618 to Karger.) And the Court's adoption of the parties' agreed construction of "hash table" as "a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table" further supports this finding.

Karger, for example, described a hashing technique known as consistent hashing, which stored and retrieved data by a hashed key across a set of distributed and dynamic server machines. (*See* "Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hot Spots on the World Wide Web" by Karger et al. (1997).) This seminal paper showed how hash keys serve to partition the data across the servers and is cited over 2,500 times as indicated by Google Scholar. It also declared: "We believe the ideas have broader applicability. In particular, consistent hashing may be a useful tool for distributing information from name servers such as DNS and label servers such as PICS in a load-balanced and fault tolerant fashion." As another example, Dasgupta describes a "name to server mapping [that] is controlled by a set of well known hash functions." (Dasgupta, 4.4.) Courts have similarly recognized that hash functions are "generic and basic mathematical or algorithmic functions that do not make a patent inventive." *Symantec Corp. v. Zscaler, Inc*., No. 17-cv-04426-JST, 2018 WL 1456678, at *7 (N.D. Cal. March 23, 2018).

OracleUnleashed also teaches the benefits of the well-known hashing techniques and implementing them into distributed database servers. For example, OracleUnleashed provides that SQL statements used for data requests should use hashing and indices to optimize

performance. "The well-tuned SQL statement uses indexes or hashing as available. If possible, the application should also take advantage of features such as array processing and discrete transactions."[22]

OracleUnleashed further describes the performance decision a DBA makes when considering hashing for various tables.

> The decision to use hash clusters is an important one. Hash clusters can be beneficial because, when they are effectively used, the requested data can be retrieved in just one J/O. Unfortunately, if a hash cluster is used on a table that is not a good candidate for hashing, performance can be severely degraded.[23]

> Because hashing uses the value of the data to calculate the data block the desired data is in, hashing is best used on tables that have unique values for the cluster key and that are queried primarily by equality queries on the cluster key. In the case of equality queries, the data is usually retrieved in one read operation. The cluster key need not be a single column; if the typical query uses an equality on a set of columns, use these columns to create a composite key.[24]

OracleUnleashed describes how hashing data on a server results in a hash table used to look up its location based on 'unique values' for entries.

> Because hashing uses the value of the data to calculate the data block the desired data is in, hashing is best used on tables that have unique values for the cluster key and that are queried primarily by equality queries on the cluster key. In the case of equality queries, the data is usually retrieved in one read operation. The cluster key need not be a single column; if the typical query uses an equality on a set of columns, use these columns to create a composite

---

[22] *Id.* at 372.
[23] *Id.* at 394.
[24] *Id.* at 395.

key.[25]

And OracleUnleashed teaches multiple hashing methods providing the benefit of organizing data using hash clusters and hash joins:

> A hash cluster is similar to a cluster but uses a hash function rather than an index to reference the cluster key. A hash cluster stores the data based on the result of a hash function (a numeric function that determines the data block in the cluster based on the value of the cluster key).[26]

> Hash joins greatly enhance the performance of two joined tables, where one table is significantly larger than the other. Hash joins replace the "sort-merge" join algorithm and is only supported by the cost-based optimizer. The hash join works by splitting two tables into partitions. A partition is read into memory and a hash table is created. This hash table is then used to map join columns from the other table, eliminating the sometimes resource-expensive sort-merge. In the hash join method, both tables are scanned only once.[27]

Skagerwall further provides examples of a hashtable showing the available directory servers and their contents:

> In the example of FIG. 2 the hashtable comprises 8 entries, addresses of available servers are stored as records in respective sequential entries of the hashtable. Thus, the hashtable constitutes an ordered list of all available directory servers, as shown in FIG.2.The records stored in the hashtable H are indicated by A, B, C and D stand for addresses of four directory servers DS; DS1-DSn. However, any other order is possible, e.g., D, B, A, C.

> To avoid unnecessary lookup operations for object tags at directory servers, as outlined above, it is preferred that object data is stored on directory servers according to the hashfunction, which may be executed by search means SM indicated in FIG.2. The search means SM groups object tags, preferably in

---

[25] *Id.* at 638.
[26] OracleUnleashed at 394.
[27] OracleUnleashed at 638.

correspondence with the number of objects and the number of available directory servers, i.e., a target directory server for storing as well as for retrieving object data is determined based on an identifier of an object tag, which, e.g., maybe a number assigned to the tag, and the number of available directory servers DS;DS1-DSn.[28]



**Skagerwall Fig. 2 Annotated**

Therefore, it would have been obvious to one of skill to employ a hash function to organize data in a distributed system, and further in view of the references identified below:

- U.S. Patent No. 5,542,087 to Neimat (see, e.g., col. 8);
- U.S. Patent No. 6,212,521 to Minami (see, e.g., cols. 10, 14);
- U.S. Patent No. 6,553,420 to Karger (see, e.g., cols. 3-4; see also U.S. Patent No. 6,430,618 to Karger);
- DNS (see, e.g., RFC1034, p. 13);
- Cache Resolver system (see, e.g., Sherman, pp. 34-39; Karger/Sherman, Section 3);
- OracleUnleashed (see, e.g., 372, 394, 395, 638);
- Skagerwall (see, e.g., 3:51-54, 10:31-49, Figure 2); and/or
- the common sense and background knowledge in the art.

---

[28] Skagerwall at 10:31-49.

These references contain specific teachings that would lead a skilled artisan to use hash functions to organize data in other distributed networks, such as those disclosed in DNS, Neimat, and Minami. For example, the stated purpose of Karger '618/420 is to distribute requests efficiently "among a plurality of resources." Karger's hashing avoids the known problem in the art of having to spend costly resources to reshuffle data when there is a change in the number of servers. As Karger explains, a reason to use "consistent hashing" is because "for most of the set of requests the allocation is consistent even as resources are added and removed" and "consistent hashing avoids increasing loads and spread when the number of servers change." (Col. 6:28-41.)

As explained above, DNS, Neimat, and Minami similarly disclose the enhancement of performance and scalability in a distributed network. Thus, one of skill would have been motivated to use the consistent hashing of Karger to avoid reshuffling and overload problems in other distributed networks, such as DNS, Neimat, or Minami. Consistent hashing would also complement the fundamental performance and scalability goals of other distributed networks, such as DNS, Neimat, and Minami. A skilled artisan seeking to ensure scalability and improve performance in a distributed network would be motivated to combine references that disclose hashing, such as Karger '618/420, with references disclosing distributed networks, such as DNS, Minami, or Neimat.

And hashing datasets makes it easier to find a piece of data at a later point. As a result, a POSITA would have been motivated to hash the partitioned location servers taught by the combination of OracleNamesAdminGuide and OracleUnleashed. Doing so would allow any Names Servers on the network to "know" the location of a desired piece of location information. As a result of this knowledge, it would have been obvious to a POSITA that, if a Names Server received a request it could not resolve because it lacked the location data, it would redirect the

client to a Names Server containing the desired location data. Because OracleNamesAdminGuide and OracleUnleashed share the common goal of parsing data sets quickly, a POSITA would have been motivated to use OracleUnleashed's hashing table techniques in OracleNamesAdminGuide's Names Servers to quickly and efficiently determine the location of the requested data. It was understood in the art that DBAs would actively search for resources to solve problems that may arise in the specific database environment that they are working in.

As a system's configuration becomes more complex requiring more information to uniquely identify the data's location, the storage and processing requirements for the OracleNamesAdminGuide's Names Servers increase along with it. A DBA would have been motivated to minimize these burdens and operate the Names Servers at optimal efficiency. This would have furthered OracleNamesAdminGuide's goal of having its Names Servers identify the requested data's location "lightning fast."[29] Based on the desire to maximize efficiency in running queries, a POSITA would have been motivated to combine OracleNamesAdminGuide's and OracleUnleashed's techniques of locating data using hashing location tables to quickly return location information associated with the requested data.

Based on Skagerwall's teachings, a POSITA would have appreciated that the directory servers store the hash table and that the hash table contains the list of available directory servers with their respective contents. Further, a POSITA would have understood that the access server (i.e., client) uses portions of the hash table to identify which directory server to send its data request based on the information in the redirect message. A POSITA would have concluded that sending the entire hash table or storing the entire hash table at the client would be too cumbersome. This would have frustrated Skagerwall's goal of facilitating data retrieval by

---

[29] OracleNamesAdminGuide at 60.

lowering the efficiency of the system and Wolff's goals for optimizing network performance and reliability. As a result, a POSITA would have found it obvious to break the hash table into portions, to distribute those portions to the directory server, and to send only the relevant portion to the client. Further, a POSITA would have understood that this portion includes at least the portion describing the object tag requested by the client. As a result, a POSITA would have understood that Skagerwall teaches or renders obvious that all relevant directory server contents be stored in a hash table across the directory server network.

**Redirection:** To the extent that Kove contends that an identified piece of prior art does not disclose a claim limitation related to the use of redirection, the subject matter as a whole of each claim, including that limitation, would have been obvious to one of skill in the art before the invention. (*See, e.g.*, '170 patent claims 6.c, 15.e; '640 patent claim 17.c, 18.e; '978 patent claims 3, 10.b, 14.c.) The concept of redirection—*i.e.*, searching a first server for information and then searching a second server for information if the first server does not have that information—is obvious and conventional in the field of computer science. For example, DNS provides responses from DNS name servers, including referring the requester to another set of name servers. "The response by the name server either answers the question posed in the query, refers the requester to another set of name servers, or signals someerror condition." (RFC1034, p. 16.) One of skill would have been motivated to employ redirection for example, for the obvious benefit of improving the ability of a system to locate information. It would have also been obvious for a system to employ redirection on the client side or the server side. Cardellini, for example, recognized "[t]he approach of routing the document requests from the client side can be applied to any replicated Web-server architecture even when the nodes are loosely or not coordinated at all." (Cardellini, p. 3.)

OracleUnleashed provides various examples of how redirect messages can help resolve requests in different scenarios. For example, OracleUnleashed describes redirects for URL requests, for maintaining password privacy, and in the OWA utility package.

> The WAS has some powerful features for redirecting incoming URL requests in some unique ways.[30]

> There are some security considerations with the ODBC cartridge. Since calls to the cartridge include the sql parameter, which allows any valid DML statement to be used, then a user could theoretically build his or her own URL to invoke the cartridge, with a SQL parameter such as DELETEcontacts. There are some steps you can take to prevent this, such as only allowing certain IP addresses to access the system, or turning on password security for the ODBC cartridge. If password security is used, application developers must embed the password in their URL's that call the ODBC cartridge. Therefore, developers must take extra steps to ensure that their applications' calls to the ODBC cartridge do not include the password in any HTML that is written to the browser. Instead, any embedded hyperlinks to executables must first refer to a procedure that, in turn, redirects the call to the ODBC cartridge. Otherwiser, a savvy user can click the View-> View Source menu option in his or her browser, and in a couple of minutes identify the pass- word to the ODBC cartridge from the HTML code.[31]

> OWA_UTIL Very useful package that includes various utilities, including those that get CGI environment variables, generate MIME type responses, redirect URLs, print preformatted tables of data, and so forth. Lets you deal directly with HTTP.[32]

By providing skilled artisans with these key features of the Oracle8 system and explaining the considerations necessary to maximize its benefits, OracleUnleashed helps artisans to merge various functions and features and implement the full range of capabilities contained

---

[30] *Id.* at 698.
[31] *Id.* at 729.
[32] *Id.* at 725.

within an Oracle system.

Skagerwall teaches that exactly which kernel component performs the identification steps is a design choice by explaining that any component can complete this step: "[O]ther components of the system kernel K may serve as means for identifying the correct directory servers."[33] Accordingly, a POSITA would have understood that either the queried directory server (i.e., location server) or the access server (i.e., client) could perform the identification step depending on the needs of the system and its specific design.

Thus, it would have been an obvious matter of design choice for Skagerwall's queried directory server to send to the access server (i.e., client) information for contacting another directory server having the location of the requested data rather than having the queried directory server forward the request to the other directory server. For example, for a system where there is only one access server, it may have limited processing power so that any extra burden should be minimized. In such a system, a POSITA would have understood the benefits of having the queried directory server find the correct directory server and obtain the desired location information, and return the addresses (i.e., location strings) to the access server. Conversely, for a system with multiple access servers, the processing power may be more limited on the directory servers. In such a system, a POSITA would have understood that it's more efficient to minimize the processing requirements of the queried directory server. Thus, for such a system with multiple access servers, a POSITA would have been motivated to design the system such that the queried directory server returns to the pertinent access server (i.e., client) the information to calculate the location of the primary directory server. It would have been understood to a POSITA that the system would return such information in a "redirect message."

---

[33] Skagerwall at 10:21-26.

Wolff explains that the network will optimize performance by redirecting requests from an overloaded server, e.g., a server that can't satisfy the request, to another server that can satisfy the request with a "redirection command" from the overloaded server:

Client load rebalancing refers to the ability of a client, enabled with processes in accordance with the current invention, to re-map a path through a plurality of nodes to a resource. *The re-mapping may take place in response to a redirection command emanating from an overloaded node, e.g. server.* The embodiments disclosed allow more efficient, robust communication between a plurality of clients and a plurality of resources, via a plurality of nodes. Resources can include, but are not limited to, computers, memory devices, imaging devices, printers, and data sets. A data set can include a database or a file system.[34]

Therefore, it would have been obvious to one of skill to employ redirection in a distributed system, and further in view of the references identified below:

- U.S. Patent No. 5,542,087 to Neimat (see, e.g., col. 10);
- U.S. Patent No. 6,212,521 to Minami (see, e.g., col. 9);
- DNS (see, e.g., RFC1034, pp. 15-17);
- Cache Resolver system (see, e.g., Sherman, pp. 34-39; Karger/Sherman, Section 3);
- OracleUnleashed (see, e.g., 698, 725, 729);
- Skagerwall (see, e.g., 10:21-26);
- Wolff (see, e.g., 5:25-38);and/or
- the common sense and background knowledge in the art.

These references contain specific teachings that would lead a skilled artisan to use redirection in other prior art disclosing distributed networks. For example, RFC1034 describes: "In addition to relevant records, the name server may return RRs that point toward a name server that has the desired information or RRs that are expected to be useful in interpreting the relevant

RRs. For example, a name server that doesn't have the requested information may know a name server that does; a name server that returns a domain name in a relevant RR may also return the RR that binds that domain name to an address." (RFC1034, 17.) Further, as explained above, RFC1034 discloses the goals of enhancing scalability and performance in a distributed network—a goal also disclosed by other distributed network references, such as Neimat and Minami. Therefore, a skilled artisan would have understood that redirection can be used to enhance scalability and performance in a distributed network, and would have understood that a server in Neimat or Minami could similarly be used advantageously to point toward a server with the desired information if that information is not on that server. A skilled artisan would therefore have been motivated to combine references that disclose redirection, such as DNS, with references disclosing distributed networks, such as Neimat or Minami.

And based on Wolff's teachings, a POSITA would have found it obvious to have Skagerwall's queried location server transmit a redirect message to the access server (i.e., client) if that location server doesn't contain the location string associated with the identification string wherein the redirect message has information for use by the access server to calculate a location of another directory server containing the location string. A POSITA would have been motivated to do so because this would optimize performance of Skagerwall's system to send the retrieval instructions to the client in the redirect message rather than letting the request fail at the first directory server. Doing so would further Skagerwall's goal to "facilitate the retrieval of information."[35] Without incorporating Wolff's redirection command message, the request for location information would fail if the directory server didn't contain the requested data, thus frustrating Skagerwall's goal of "facilitating the retrieval of information." Allowing failures to

---

[35] Skagerwall at Abstract.

occur would be inefficient for the system and cause less reliability for successful data retrieval. A POSITA would have been motivated to incorporate Wolff's redirection techniques in Skagerwall's system to provide the user with the most reliable and beneficial system of data retrieval possible.

**Load Balancing:** To the extent that Kove contends that an identified piece of prior art does not disclose a claim limitation related to the use of a load balancing, such as based on a performance criterion, the subject matter as a whole of each claim, including that limitation, would have been obvious to one of skill in the art before the invention. (*See, e.g.*, '978 patent claims 17.e, 23, 24, 30.) The concept of transferring information from one server to another when the server is full, for example, is obvious and conventional in the field of computer science.

Hua DBMS recognizes, for instance, "since effective data placement is an important lever for load balancing, it is normally the determining factor for the performance of a multi-processor system." (Hua DBMS at 494.) Devine DDH states as background "[i]deally, no server is responsive for more than its proportional share of the total data size. This principle can be enforced by actively checking the local load level against the global load level and then performing adaptive load balancing to ameliorate hot spots." (Devine DDH at 3.) Baker notes that "[i]f there is a way to distribute [a collection of Web documents] in such a way that the load is evenly distributed despite the dynamically changing Web access patterns, then the problem of load balancing, one of the most important issues of creating a distributed Web server, has been solved." (Baker, 1215.) Baker then describes a distributed cooperative Web server system that "effectively eliminates the bottleneck of centralized resources, while balancing the load among distributed web servers." (Baker, Abstract.) One of skill would have been motivated to employ

load balancing, for example, for the obvious benefit of improving system performance, speed, and efficiency.

OracleNamesAdminGuide discloses that its system has at least two Names Servers on the network for fault tolerance and load balancing: "Oracle recommends that each administrative region should have at least two Names Servers. If one Names Server is unavailable, clients will automatically forward requests to the other…. There is also an issue of network loading, or load balancing. Although any given Names Server is only engaged for a short period of time when a client initiates a connection, the goal is to keep name resolutions lightning fast.… [L]oad balancing across multiple Names Servers can increase system performance."[36]

And in Steen's top level, Steen teaches the use of a non-hierarchical architecture consistent with Kove's statements at the Patent Office and Amazon's proposed constructions. Steen explains that a directory node dir(R) stores object names (i.e., identifiers) associated with object handles (i.e., location information). Steen explains that these high-level servers can be partitioned into multiple subnodes, creating a non-hierarchical cluster of servers to handle a distributed workload, as shown below in annotated Figure 6.



**Steen Figure 6 Annotated**

[36] *Id.* at 60.

DEFENDANT AMAZON WEB SERVICES, INC.        CIVIL ACTION NO. 1:18-CV-8175
FIFTH AMENDED FINAL UNENFORCEABILITY   38
AND INVALIDITY CONTENTIONS

For a partitioned dir(R), each subnode is configured and functions as its own server and contains its own subset of location information. Steen explains that it's important for each subnode to be "aware" of how the location information is distributed amongst the subnodes, allowing for requests to be re-routed to the subnode containing the correct location information. Steen provides an exemplary hashing method and explains that more complicated methods can be applied as the system scales up.[37] Then, in the second level, Steen teaches that the client/user uses the object handle to contain object contact addresses from a hierarchical location server network. Thus, Steen's teachings provide a non-hierarchical top layer, hierarchical bottom layer, and in their combination, a mixed topology location server network.

Wolff teaches methods for load rebalancing on a distributed network. For example, Wolff explains that its "[m]ethods for load rebalancing by clients in a network are disclosed. Client load rebalancing allows the clients to optimize throughput between themselves and the resources accessed by the nodes."[38]

As Wolff describes, servers will not always be able to fulfill each request received from a given client. For example, Wolff describes an "overloaded" server which has received too many requests and lacks the processing power to fulfill them all:

> In operation at time T=0, normal client 100A is shown accessing memory resource 118 via path 70 through overloaded server 104. At the same time, aware client 102A is shown accessing memory resource 18, via path 74, through overloaded server 104A. At time T=1, process 102P1, implemented on aware client 102A, detects the overload condition of server 104A, and accesses memory resource 118 via an alternate path 76 through server 106A. Thus, in this subsequent state, the load on server 104A is reduced and the access by aware client 102A to memory resource 118 is enhanced. Normal client 100A cannot initiate the processes 35 discussed

---

[37] Steen at 108.
[38] Wolff at Abstract.

above in connection with the aware client 102A and is unable to select an alternate path 72 to the underutilized server 106A.[39]

Wolff explains that the network will optimize performance by redirecting requests from an overloaded server, e.g., a server that can't satisfy the request, to another server that can satisfy the request with a "redirection command" from the overloaded server:

> Client load rebalancing refers to the ability of a client, enabled with processes in accordance with the current invention, to re-map a path through a plurality of nodes to a resource. *The re-mapping may take place in response to a redirection command emanating from an overloaded node, e.g. server.* The embodiments disclosed allow more efficient, robust communication between a plurality of clients and a plurality of resources, via a plurality of nodes. Resources can include, but are not limited to, computers, memory devices, imaging devices, printers, and data sets. A data set can include a database or a file system.[40]

Boukobza is directed towards monitoring the performance of a plurality of components in a system.[41] As shown below in Figure 1, Boukobza discloses a means to monitor machines $N_2$-$N_N$.[42]

---

[39] *Id.* at 5:25-38.

[40] *Id.* at 5:25-38.

[41] *See* Boukobza at Abstract.

[42] *See id.* at 4:36-39.



**Boukobza Figure 1**

Boukobza teaches the use of an autonomous agent to monitor components in a system:

[T]he use of autonomous agents makes it possible to ensure the proper running of the applications monitored in all of the nodes by means of an autonomous and efficient decision processing applied locally to the objects to be processed, when necessary to very rapidly feedback the useful information from the nodes to be monitored to the management node, and to automatically initiate actions on certain conditions or possibly to recommend an action. In this way, an effective monitoring of the objects functioning in the plurality of nodes is ensured and a significant increase in performance is obtained due to the independent capacity available to the various autonomous agents in their operation, the process applied in this case making it possible to measure specific parameters of each object, to test conditions

on these parameters relative to thresholds, and then to execute an action in order to warn of a problem, to reconfigure or to correct.[43]

Boukobza identifies certain parameters as important to monitor for system performance, including processing and storage:

> Finally, relative to specific module "system", it must be possible, among other things, to monitor and measure the cpu time, the disk space, the inputs/outputs, the storage, the exchange rate, the number of users*, the pagination, the network, etc. Thus it is possible, for example, to measure the cpu utilization per second, with default display, or the input/output rate per second, or to identify the processors which are the largest users of cpu and collect them in order to perform an autonomous analysis ("offline", tbc). [44]

Further, Boukobza teaches comparing the performance parameters to predetermined thresholds. It states: "If the average number of queued requests is >10 (the example 10 is slightly greater than the average number of active clients requesting a service from the server) then action to add a server (up to the max)."[45]

Boukobza further provides taking corrective steps to improve performance based on the performance parameter measurements compared to the predetermined thresholds:

> In this way, an effective monitoring of the objects functioning in the plurality of nodes is ensured and a significant increase in performance is obtained due to the independent capacity available to the various autonomous agents in their operation, the process applied in this case making it possible to measure specific parameters of each object, to test conditions on these parameters relative to thresholds, and then to execute an action in order to warn of a problem, to reconfigure or to correct. [46]

---

[43] Boukobza at 34:53-35:2.

[44] Boukobza at 34:43-51.

[45] *Id.* at 33:63-67.

[46] *Id.* at 34:60-35:2.

Boukobza also teaches automating corrective steps to maintain performance of the systems based on predetermined levels: "If the wait time/number of responses ('v$queue.wait/ v$queue.totalq') in the response queue of the dispatcher is increasing regularly and the cpu utilization rate of the node is not too high (<80w), then it is necessary to add a dispatcher with the same protocol (automatic action or recommendation)."[47]

Yocum teaches a method for optimizing performance of a class of servers based on specific user goals: "The present invention allows system management of the number of servers across a cluster of system for each of a plurality of user performance goal classes based on the performance goals of each goal class."[48]

Yocum describes monitoring the performance of the class using specific performance indices to look for opportunities for improvement:

> FIG. 4 shows the logic flow to assess improving performance by starting additional servers 163. FIGS. 4-6 illustrate the steps involved in making the performance index delta projections provided by the fix means 118 to the net value means 124. At 1401, a new number of servers 163 is selected to be assessed. The number must be large enough to result in sufficient receiver value (checked at 1405) to make the change worthwhile. The number must not be so large that the value of additional servers 163 is marginal, for example, not more than the total number of queued and running work requests 162. The next step is to calculate the additional CPU the additional servers 163 will use; this is done by multiplying the average CPU used by a work request by the additional servers 163 to be added.
>
> At 1402, the projected number of work requests 162 at the new number of servers 163 is read from the server ready user average graph shown in FIG. 5. At 1403, the current and projected queue delays are read from the queue delay graph shown in

[47] *Id.* at 32:53-58.

[48] Yocum at 2:28-32.

FIG. 6. At 1404, the projected local and multisystem performance index deltas are calculated.[49]



Yocum Figure 4



Yocum Figure 5

---

[49] *Id.* at 10:37-56.

Therefore, it would have been obvious to one of skill to employ load balancing in a distributed system, and further in view of the references identified below:

- U.S. Patent No. 5,542,087 to Neimat (see, e.g., col. 13);
- "Load Management in Distributed Video Servers" by Venkatasubramanian and Ramanathan (1997);
- OracleNamesAdminGuide (see, e.g., 60);
- Steen (see, e.g., 108, Figure 6);
- Wolff (see, e.g., Abstract, col. 5:25-38);
- Yocum (see e.g., Abstract, cols. 2:28-32, 10:37-56, Figures 4, 6);
- Boukobza (see e.g., Abstract, cols. 4:36-39, 32:53-58, 33:63-67, 34:43-35:2, Figure 1);and/or
- the common sense and background knowledge in the art.

These references contain specific teachings that would lead a skilled artisan to use load balancing in other prior art disclosing distributed networks, such as DNS and the Cache Resolver system. DNS discloses the transfer of RRs from one location server to another: "Whole zones can be transferred between name servers by transferring the RRs." (RFC1034, 20.) Further, DNS is "intentionally extensible" (RFC1034, 1), and as explained above, it is expressly concerned about server load and performance. Neimat discloses one way of transferring records from one server to another in order to ensure servers are efficiently loaded: transferring when a predetermined storage criterion is reached. (Col. 13:26-27.) One of ordinary skill would have understood Neimat to be a solution to the problem of server load disclosed in RFC1034 and would combine these two references for at least this reason. As another reason, Neimat proposes a solution to the well-known problem of memory "collisions" (Col. 13:32-37), which is a problem experienced in distributed data storage systems such as the system disclosed in RFC1034.

Venkatasubramanian likewise teaches load management based on the amount of "disk space." (Venkatasubramanian, 529). But Venkatasubramanian also teaches that load management based on storage space (as in Neimat) is only one approach, and that a combination of that approach with others is preferred. Specifically, Venkatasubramanian states that "disk bandwidth, memory buffer space, CPU cycles, and network transfer bandwidth" are different variables that may be "necessary for supporting" a request. (*Id*.) Venkatasubramanian explicitly teaches the combination of these different approaches for system optimization: "Performance evaluations indicate that a load management procedure which uses a judicious combination of the different policies performs best for most server con-figurations." (*Id*., 528.) Thus, Neimat teaches one method of load balancing (based on disk space), and Venkatasubramanian expressly teaches Neimat's method while presenting methods of load balancing based on other performance criteria, including transaction rate, as alternatives to Neimat's method. One of ordinary skill would have therefore modified Neimat in view of Venkatasubramanian's teaching.

A skilled artisan would therefore have been motivated to combine references disclosing load balancing, such as Neimat and Venkatasubramanian, with other references disclosing distributed networks, such as DNS or the Cache Resolver system.

OracleUnleashed and Steen teaches it would have been obvious to have OracleNamesAdminGuide's system include a plurality of location servers. For instance, as illustrated below in Figure 19.4, OracleUnleashed describes the benefits of partitioning a dataset into "smaller, easier-to-manage pieces":

> A new feature of Oracle8 is that of partitioning. Partitioning enhances Oracle's support for very large databases as ***partitioning breaks tables and indexes into smaller, easier-to-manage pieces,*** storing these pieces at the tablespace level. Partitioned tables/indexes are nothing more than a logical collection of tablespaces

(see Figure 19.4).

***Partitioning greatly enhances database performance. This performance can be monitored and adjusted*** in a variety of manors. Read/write activity can be load-balanced among the disk drives/disk arrays. The Oracle optimizer recognizes partitions and can select from partitions that contain the data being selected. The Oracle Parallel Server can divide work based on the number of partitions.

Availability is higher, backups are easier, and recovery is shorter. High availability is the single goal of most computer systems. Recovery and time to recover are always an issue. Downtime for maintenance or backups is not possible with some applications. Machine failures are inevitable. Partitions can be backed up online, individually, and only the ones that have changes. This makes the backup/recovery process much quicker. If recovery is needed, the other partitions not affected are still available online.

Administration and tuning is much easier. ***Oracle8 partitioning has many features that make partitions easy to create, move, split, and so on.*** One can even swap in an existing non-partitioned table structure and data to an existing table partition. Tuning is enhanced with additional indexing features available.[50]



FIGURE 19.4.
Oracle tablespace layout example.

DEFENDANT AMAZON WEB SERVICES, INC.
FIFTH AMENDED FINAL UNENFORCEABILITY        47
AND INVALIDITY CONTENTIONS

CIVIL ACTION NO. 1:18-CV-8175

A POSITA would have been motivated by OracleUnleashed's descriptions of the performance benefits of partitioning to apply its teachings to any of OracleNamesAdminGuide's underperforming Names Servers. A POSITA would have had a reasonable expectation of success because both OracleUnleashed and OracleNamesAdminGuide describe the same product lines and intended to be used in conjunction with each other. Further, a POSITA would have understood that Steen's partitioned group of location servers organized in a non-hierarchical configuration results in each server containing a subset of the data location information originally stored on the first location server. Further, a POSITA would have been motivated to adopt Steen's partitioning approach for grouping OracleNamesAdminGuide's Names Servers to maintain "lightning fast" resolutions to data queries.

And Steen, Skagerwall and Wolff describe the challenges of scalability-expanding the networks and maintaining performance.[51] For instance, Steen explains its system is scalable to service clients and objects located around the world:

> The service should allow clients and objects to be located anywhere in the world, and be able to support a huge number of objects. We anticipate that eventually, one billion users with 1000 objects each will be registered with the location service, adding up to lOI2 objects.[52]

Similarly, Wolff explains that such swift growth risks overloading a system, making a server a "bottleneck" in the system.[53] And Skagerwall echoes this same bottleneck concern for scaling up a system, emphasizing the need to reduce processing load whenever possible on a variety of servers.[54]

---

[51] *E.g.*, Skagerwall, 1:59-62; Steen at 105.
[52] Steen at 105.
[53] Wolff, 2:1-2.
[54] Skagerwall, 5:31-36, 18:54-58.

And Boukobza discloses that its approach applies to a variety of distributed systems, including Oracle and Tuxedo. Using the exemplary Oracle system, Boukobza discloses reorganizing data tables to improve performance:

> "[T]he parameter ORA-- FRAGMENT—TS", in which the measurement consists of verifying the condition which corresponds to the case in which the largest of the extents ("MAX—EXTENTS") of the tables of the table space ("Tablespace") is smaller than the largest hole of the table space, and if this condition is true, of sending an action proposition window in which it is indicated that the table space ("Tablespace") must be reorganized according to the following propositions: either a file is automatically created to enlarge the table space ("Tablespace"), or it requests when a standard "export-- operation-- tables/import" command is to be executed, or the administrator is requested to program the start of his reorganization utility.[55]

Boukobza recognizes that the exemplary Oracle system uses SQL requests relying on identifiers (SID's) and location information (Connect Strings):

> [A]ccess to the objects:
>
> param ident=HEALTH. Access to the bases (*by SQL connect, the DB String* user/passwdOldbString dbc/dbcGT:or714 is supplied by the user). If the connection is KO: action ORA CONN FAIL and recording in the file "actionlog."[56]
>
> OBJECT or 716 orage, NODE=orage,
>
> DESC=(ORACLE, ***ORACLE SID***=or716, ORACLE HOME=fora716,
>
> UNIX ADMIN USER=ora716, ORACLE USER=sys, ORACLE PASSWORD=change on install,
>
> ***CONNECT STRING***=P:or716, TNS ADMIN=fora716/network/admin)
>
> DISPLAY=(GRAPH=(graph or716, TITLE=or,716graph)).[57]

---

[55] Boukobza at 15:18-32.

[56] *Id.* at 31:35-40.

[57] *Id.* at 18:18-23.

Further, Boukobza touts the "significant gains in performance" its disclosures teach to combat "slow reaction times" and provide improved "access to objects."[58] OracleNamesAdminGuide also seeks to avoid such "slow reaction times," with a stated goal for its Name Servers to be "lightning fast."[59] To prevent or reduce slow reaction times on OracleNamesAdminGuide's Names Servers, a POSITA would have been motivated to apply Boukobza's performance tuning teachings to help achieve OracleNamesAdminGuide's desired "lightning fast" reaction times.

Boukobza also describes its applicability to Oracle systems, making it likely that one working with OracleNamesAdminGuide would look to Boukobza to boost performance. Boukobza teaches using Oracle products as a specific example of its application: "For this reason, measurements are collected in order to perform a later analysis for the purpose of a statistical examination of the monitored activity. These collected measurements relate to all the types of objects to be monitored, for example in this case *instances such as data bases like Oracle (trademark of Oracle Corporation*

Boukobza then teaches methods applicable to SQL*Net and TNS Names Services, as shown in the below exemplary code, including the use of identifiers, connect strings, and the SQL*Net protocol language itself.[60]

---

[58] Boukobza at 1:53-2:6, 31:35.

[59] *See* OracleNamesAdminGuide at 60.

[60] Boukobza at 7:1-31.

```
==> OBJECT object_ident,
[NODE = node] [BACKUP_NODE = backup_node]
DESC = (
SYSTEM, UNIX_ADMIN_USER=, GIBUS_ROOT=
!TUXEDO, {V1CONFIG=<config_path>
  !TUXCONFIG=<tuxconfig>TUXDIR=<tuxdir>,
  APPDIR=<appdir>,
LANG=<lang>, UNIX_ADMIN_USER=,
  LIBPATH=<libpath>, QMCONFIG=<qmconfig>
  }
!ORACLE,  {V1CONFIG=<config_path>
  !ORACLE_SID=<sid>, ORACLE_HOME=<oracle_home>,
  UNIX_ADMIN_USER=, ORACLE_USER=<user>,
  ORACLE_PASSWORD=<password>,
  CONNECT_STRING=<connect_string>, TNS_ADMIN
    =<tns_admin>,
  }
!INFORMIX, INFORMIXSERVER=<informixserver>, INFORMIXDIR=
    <informixdir>,
  ONCONFIG=<onconfig>, UNIX_ADMIN_USER
    =,
!SYBASE, SYBASE=M<sybdir>, DSQUERY=<servername>,
  UNIX_ADMIN_USER=, SYBASE_USER
    =<user>,
  SYBASE_PASSWORD=<password>,
!XCP2POOL, CONFDIR=<confdir>, UNIX_ADMIN_USER
    =
!GLOBALUNIX_ADMIN_USER=,
  COMPONENTS=((object_ident, father_sev), . . . )
  }
[obj_display_clause]
  [SCANLOG=([LOGFILE=(logpathname, [logpathname] . . . )]
    [ERROR_CONTROL=error_control-file]
```

Oracle System Identifier →

Location Information →

← Names Service

**Boukobza 7:1-31 Annotated**

Each of these exemplary code components included in Boukobza's teachings is a portion of the Names Service that OracleNamesAdminGuide describes. OracleNamesAdminGuide discloses that Oracle SID is "[a] unique name for an Oracle database instance."[61] Likewise, OracleNamesAdminGuide says that a "connect string can be mapped to a service name in the Oracle Names database. The service name you enter acts as an alias for the SQL*Net V1 connect string, making it easy to access a server."[62] And finally, OracleNamesAdminGuide states that TNS or "TNSNAMES.ORA" is a name resolution service, e.g., Names Service. Accordingly,

---

[61] OracleNamesAdminGuide at 202.

[62] *Id.* at 23.

Boukobza specifically provides its monitoring and tuning design for use alongside the Names Servers described in OracleNamesAdminGuide. A POSITA would therefore have been motivated to combine the performance tuning methods of Boukobza with the plurality of location servers described in OracleNamesAdminGuide.

Further, a POSITA would have a reasonable expectation that Boukobza's teaching were developed and intended to be used on location servers like the Names Servers of OracleNamesAdminGuide. Accordingly, a POSITA would not need to modify either Boukobza or OracleNamesAdminGuide significantly to combine the references. Because the teachings could be directly applied as taught, a POSITA would have no doubt or uncertainty in their combination. Thus, a POSITA would have a reasonable likelihood of success in modifying OracleNamesAdminGuide's system based on Boukobza's teachings, and wouldn't need to undertake significant effort in achieving this modification.

Based on Boukobza's teachings, a POSITA would have found it obvious for OracleNamesAdminGuide's system to automatically transfer a portion of location information and associated identifiers from one Names Server to another Names Server in response to performance criteria measurements. A POSITA would have been motivated to do so because this minimizes the time necessary to monitor and address performance criteria like storage usage and transaction limits for DBAs having limited time and resources to devote to maintaining performance. A POSITA would have understood that Names Servers would routinely need to be added in an expanding system in response to performance levels, including transaction rates and available storage space. As such, a POSITA would have been motivated to automate the addition of Names Servers to OracleNamesAdminGuide's system to reduce any manual delay and more

effectively maintain system performance.[63]

Similarly, Skagerwall discloses a scalable plurality of location server storing locations associated with identifiers. And Boukobza teaches monitoring the system to maintain performance levels.[64] Boukobza provides that monitoring can be focused on certain criterion and limits.[65] Further, Boukobza discloses that that corrective actions can include adding a server or exporting data.[66]

Boukobza teaches performance threshold monitoring and corrective actions.[67] And a POSITA would have understood that location server performance is an area to monitor because of their frequent use and connection to everything being done on the database. As a result, a POSITA would have been motivated to monitor Skagerwall's location servers' performance to ensure they maintain quality service for the users. Accordingly, a POSITA would have been motivated to apply Boukobza's teachings to monitor those location servers' performance and set specific thresholds. A POSITA would have been further motivated to set up corrective actions including adding additional location servers, reorganization, etc. Further, a POSITA would have understood that, in order maximize the benefit of the additional location server, the location and identifier information should be organized to reflect the best structure given the database structure. For a database such as the one provided by Skagerwall, a POSITA would have been motivated to export the location information related to either one office of the business or a specific time frame or similar partition structure. As a result, a POSITA would have found it obvious to separate the set of location information data into separate portions and transfer some

---

[63] *See* Boukobza at 2:39-46, 32:53-67.
[64] E.g., Boukobza at 34:52-35:22.
[65] Boukobza at 34:43-51.
[66] Boukobza at 33:60-67.
[67] *See* Boukobza at 15:18-33, 32:4-16, 33:60-67, 34:43-35:22.

portion of them onto a separate server to improve the performance.

And Yocum similarly identifies "resource bottlenecks" as obstacles for optimal server efficiency that can cause them to fail to meet performance goals:

> Each system then determines the resource bottleneck causing the receiver class to miss its goals. If the resource bottleneck is the number of servers, each system determines whether and how many servers should be added to the receiver class…To ensure the availability of a server capable of processing each of the work requests in the queue, each system determines whether there is a work request in the queue with an affinity only to a subset of the cluster that does not have servers for the queue and, if so, starts a server for the queue on a system in the subset to which the work request has an affinity.[68]

And Yocum provides that, while adding servers may be an optimal solution in some instances, other circumstances may merely require changing the location of the data from one server to a second server:

> In FIG. 1 the number 107 of servers 163 is shown stored in the class table entry 106, which might be taken to imply a limitation of one queue 161 per class. However, this is merely a simplification for illustrative purposes; those skilled in the art will recognize that multiple queues 161 per class can be independently managed simply by changing the location of the data. The fundamental requirements are that the work requests 162 for a single queue 161 have only one goal, that each server 163 has equal capability to service requests, and that a server cannot service work on more than one queue 161 without notification from and/or to the workload manager 105.[69]

---

[68] Yocum at Abstract.

[69] *Id.* at 8:32-43.



**Yocum Figure 1**

As such, a POSITA would have been motivated to have the Oracle system use a performance criterion that monitors a transaction rate limit, based on Yocum's teachings. For a system with a high transaction volume where processing capability and time are concerns, a POSITA would have been motivated to set a transaction rate limit as a performance criterion and to employ a second location server which could handle a portion of the transactions for the system and improve performance times.

Further, a POSITA would have also been motivated to apply Yocum's assessment and corrective actions to Skagerwall's location servers. Skagerwall emphasizes the need to transfer data in response to capacity demands, while Yocum targets eliminating resource bottlenecks and assessing and responding to performance issues. A POSITA would have a reasonable expectation of success because both Skagerwall's location servers and Yocum's changing data locations are established parts of the art which a POSITA would have been familiar with and could easily implement without making significant changes to either.

**Client**: To the extent that Kove contends that an identified piece of prior art does not disclose a claim limitation related to the use of a client, the subject matter as a whole of each claim, including that limitation, would have been obvious to one of skill in the art before the invention. (*See, e.g.*, '170 patent claim 15; '640 patent claim 17, 18, 24; '978 patent claims 14.) For example, the Court held that a "client" should be construed as "a network-attached component (which may be software or hardware) that initiates update or lookup of identifier/location mappings from a location server with location request messages."[70] And in its order, the Court further held that the location mappings from location servers are not limited to NDTP servers.[71] This clarification by the Court supports a finding that the identified prior art references disclose the claim limitations relating to the use of a client.

For example, in addition to disclosing DNS "name servers" that store information about network locations (RFC1034, Sections 2.4, 3.1, 3.6, 3.7; Sherman, pgs. 34-39; Karger/Sherman, Section 3.), RFC1034 further discloses that its system contain "DNS software" that is run when a name server is locating information contained in a RR responsive to a location query. (RFC1034, 15.) Likewise, Karger/Sherman discloses implementation of its system in both

---

[70] Court's December 17, 2021 Claim Construction Memorandum Opinion and Order (Dkt. No. 484), pp. 21-23.
[71] *Id.*, pp. 21-22.

hardware and software: "In order to get around the problem, we decided to use DNS. We could set up our own DNS servers, and modify them to support consistent hashing. This consistent hashing could be "propagated" to browsers during name resolution. More precisely, we wrote an autoconfigure script that performs a standard hash of the input URL to a range of 1000 names that we call virtual caches. We then used DNS to map the 1000 virtual cache names onto actual code IP addresses via consistent hashing." (Karger/Sherman, p. 10; see also Sections 2-3.) Additionally, Neimat reflects that the processor sites necessarily includes executable code to execute, for example, the steps described with respect to Figure 2. (Neimat, 8:48-11:64.)

OracleNamesAdminGuide teaches location server networks with hierarchical, non-hierarchical, and mixed architectures. Like the '170 Patent, OracleNamesAdminGuide answers the question in a distributed data storage system: "where is my data?" OracleNamesAdminGuide describes a technique that separates the "where" (i.e., location of the data repository) from the "what" (i.e., the data itself).[72] OracleNamesAdminGuide does this by using specialized servers called Names Servers, which serve as intermediaries between clients requesting data and the corresponding data storage servers.[73] A client seeking to locate data on OracleNamesAdminGuide's network will query a Names Server to retrieve the data's network address, then use that address to connect to the entity housing the data.

OracleNamesAdminGuide illustrates this network architecture in Figure 3-11 below. [74]

---

[72] OracleNamesAdminGuide at 20, 23, 33, 43-44, 52-53.
[73] *See id.* at 20, 22.
[74] Steps 1-4 appear in OracleNamesAdminGuide's original Figure 3-11.



OracleNamesAdminGuide Fig. 3-11

At step ①, the client submits a request for the data located at POULTRY.WORLD. OracleNamesAdminGuide uses its networking utility, SQL*Net, to send the client's request to the Names Server. At step ②, the Names Server receives the request, looks up the location information associated with the POULTRY.WORLD identifier, then sends that location information to client. The client receives the location information from the Names Server at step ③, then the client uses that location information to contact the server housing the database instance associated with POULTRY.WORLD. Finally, at step ④, the client contacts the server and establishes a client-server connection.[75]

And Steen teaches the use of hierarchical, non-hierarchical, and mixed topologies in its location server networks. Like the '170 Patent, Steen describes a system for managing and locating data on a wide-area distributed network. As Steen states, its system "present[s] a scalable location service" to "optimize lookups."[76] In Figure 2, Steen provides a two-level system for managing and locating an object's contact addresses.

---

[75] *See id.* at 52-53; *see also id.* at 128-129 (describing location information syntax includes host name, port, and database instance along with the connection information).
[76] Steen at 104.

DEFENDANT AMAZON WEB SERVICES, INC.                        CIVIL ACTION NO. 1:18-CV-8175
FIFTH AMENDED FINAL UNENFORCEABILITY    58
AND INVALIDITY CONTENTIONS



■ **Figure 2.** *The logical organization of the location service as a virtual search tree.*

In the first level, Steen describes using a directory system for resolving an object name to an "object handle."[77] The object handle includes location information for a contact record. Then, in the second level, Steen teaches that the client/user uses the object handle to obtain object contact addresses.

In Steen's top level, Steen teaches the use of a non-hierarchical architecture. Steen explains that a directory node dir(R) stores object names (i.e., identifiers) associated with object handles (i.e., location information). Steen explains that these high-level servers can be partitioned into multiple subnodes, creating a non-hierarchical cluster of servers to handle a distributed workload, as shown below in annotated Figure 6.

[77] Steen at Abstract.

DEFENDANT AMAZON WEB SERVICES, INC.                          CIVIL ACTION NO. 1:18-CV-8175
FIFTH AMENDED FINAL UNENFORCEABILITY        59
AND INVALIDITY CONTENTIONS



**Steen Figure 6 Annotated**

For a partitioned dir(R), each subnode is configured and functions as its own server, and contains its own subset of location information. Steen explains that it's important for each subnode to be "aware" of how the location information is distributed amongst the subnodes, allowing for requests to be re-routed to the subnode containing the correct location information. Steen provides an exemplary hashing method and explains that more complicated methods can be applied as the system scales up.[78] Then, in the second level, Steen teaches that the client/user uses the object handle to obtain object contact addresses from a hierarchical location server network. Thus, Steen's teachings provide a non-hierarchal top layer, hierarchical bottom layer, and in their combination, a mixed topology location server network.

And Wolff teaches methods for load rebalancing on a distributed network. For example, Wolff explains that its "[m]ethods for load rebalancing by clients in a network are disclosed. Client load rebalancing allows the clients to optimize throughput between themselves and the resources accessed by the nodes."[79]

As Wolff describes, servers will not always be able to fulfill each request received from a given client. For example, Wolff describes an "overloaded" server which has received too many

---

[78] *Id.* at 108.
[79] Wolff at Abstract.

DEFENDANT AMAZON WEB SERVICES, INC.   CIVIL ACTION NO. 1:18-CV-8175
FIFTH AMENDED FINAL UNENFORCEABILITY  60
AND INVALIDITY CONTENTIONS

requests and lacks the processing power to fulfill them all:

> In operation at time T=0, normal client 100A is shown accessing memory resource 118 via path 70 through overloaded server 104. At the same time, aware client 102A is shown accessing memory resource 18, via path 74, through overloaded server 104A. At time T=1, process 102P1, implemented on aware client 102A, detects the overload condition of server 104A, and accesses memory resource 118 via an alternate path 76 through server 106A. Thus, in this subsequent state, the load on server 104A is reduced and the access by aware client 102A to memory resource 118 is enhanced. Normal client 100A cannot initiate the processes 35 discussed above in connection with the aware client 102A and is unable to select an alternate path 72 to the underutilized server 106A.[80]

Wolff explains that the network will optimize performance by redirecting requests from an overloaded server, e.g., a server that can't satisfy the request, to another server that can satisfy the request with a "redirection command" from the overloaded server:

> Client load rebalancing refers to the ability of a client, enabled with processes in accordance with the current invention, to re-map a path through a plurality of nodes to a resource. *The re-mapping may take place in response to a redirection command emanating from an overloaded node, e.g. server.* The embodiments disclosed allow more efficient, robust communication between a plurality of clients and a plurality of resources, via a plurality of nodes. Resources can include, but are not limited to, computers, memory devices, imaging devices, printers, and data sets. A data set can include a database or a file system.[81]

Therefore, it would have been obvious to one of skill to employ data location servers in a distributed network, particularly in view of the references identified below:

- U.S. Patent No. 6,212,521 to Minami (see, e.g., cols. 7-8);
- DNS (see, e.g., RFC1034, Sections 2.4, 3.1, 3.6, 3.7);
- U.S. Patent No. 5,542,087 to Neimat (see, e.g., cols. 8-11);

---

[80] *Id.* at 5:25-38.
[81] *Id.* at 5:25-38.

- Cache Resolver system (see, e.g., Sherman, pp. 10, 34-39; Karger/Sherman, Sections 2-3);
- OracleNamesAdminGuide (see, e.g.,20, 22, 23, 33, 43-44, 52-53, Figure 3-11);
- Steen (see, e.g., Abstract, 104, 108, Figures 2, 6);
- Wolff (see, e.g., Abstract, 5:25-38); and/or
- the common sense and background knowledge in the art.

These references contain specific teachings that would lead a skilled artisan to combine them with other prior art disclosing distributed networks that include client components. For example, DNS discloses a system having a plurality of DNS name servers that manage location information, such as DNS resource records, and provide location information to location queries, called standard queries in DNS. And each DNS name server is attached to a DNS network and maintains a set of domain name/address mappings that are modified or returned in response to standard queries from clients. (*See*, *e.g*., RFC1034, Sections 2.4). And the Cache Resolver system discloses that "system clients" are responsible for sending requests to caches or directories in a distributed web caching system. (*See., e.g.,* Sherman, p. 15.) And similarly, both Neimat and Minami disclose systems using a client that interacts with a server site of data retrieval and storage. (*See., e.g.,* Niemat, 5:23-37, 8:16-67; Minami, Abstract.)

A skilled artisan would therefore have been motivated to combine references disclosing distributed data systems that include a client component, such as Neimat and Minami, with other references disclosing distributed networks, such as DNS or the Cache Resolver system.

And a POSITA would have appreciated that Steen's principle of "anycasting" allows for faster resolution of clients' requests because multiple servers can resolve any given query. As a result, a POSITA would have been motivated by OracleNamesAdminGuide's goal of "lightning fast" resolution to incorporate anycasting to its data storage. This would have resulted in multiple data repositories where each server connects to OracleNamesAdminGuide's Names Service (i.e.,

location server network). A POSITA would have understood that Steen's partitioned group of location servers organized in a non-hierarchical configuration results in each server containing a subset of the data location information originally stored on the first location server. Further, a POSITA would have been motivated to adopt Steen's partitioning approach for grouping OracleNamesAdminGuide's Names Servers to maintain "lightning fast" resolutions to data queries. Thus, applying either (1) OracleUnleashed's teachings toward partitioning servers and datasets or (2) Steen's teachings toward partitioning a location server into a group of servers to OracleNamesAdminGuide's Names Servers would have rendered obvious that the data location server network has a plurality of data location servers.

Further, based on OracleUnleashed's teachings, a POSITA would have been motivated and found it obvious to have OracleNamesAdminGuide's system associate each data repository's data with a respective identifier string. OracleUnleashed explains that SQL*Net, which OracleNamesAdminGuide utilizes, makes it easier for users to connect to various databases and find their data, which is advantageous because "[y]our users do not want to write complex queries."[82] A POSITA would have understood that associating respective identifier strings with data improves the users' experience and to ease the ability to find desired data since that is one of the objectives of an Oracle DBA. The benefits of associating data with a respective identifier string are directly perceived by the end user, and a DBA would have been motivated to simplify the users' experience in this manner.[83]

Thus, a POSITA would have found it obvious to have each of OracleNamesAdminGuide's data repositories' data be associated with a respective identifier string for use in optimizing query

---

[82] *See* OracleUnleashed at 255.
[83] *Id.*

efficiency, based on OracleUnleashed's teachings.[84] During the relevant timeframe, Oracle DBAs

were often asked to help improve query efficiency, as OracleUnleashed details:

> It seems pretty obvious that a search method that works well for one of these types of queries is probably not the best method for the others. In fact, Oracle and most other databases have a number of search algorithms in their systems that are designed to handle different needs. This is what enables them to work in such a large number of environments and applications. When an application is performing slowly on a well-tuned database, the first thing you should **check is how the query is being processed to ensure that it is as efficient as it can be.**[85]

Based on the commonplace need for efficiency in running queries, a POSITA would have

been motivated to associate a respective identifier string with data because this allows

OracleNamesAdminGuide's Names Server to quickly return one or more locations associated with

the identifier string to the query requestor with minimized cost.[86]

And Steen, Skagerwall, and Wolff describe the challenges of scalability-expanding the

networks and maintaining performance. [87] For instance, Steen explains its system is scalable to

service clients and objects located around the world:

> The service should allow clients and objects to be located anywhere in the world,
>
> and be able to support a huge number of objects. We anticipate that eventually, one
>
> billion users with 1000 objects each will be registered with the location service,
>
> adding up to lOI2 objects.[88]

Similarly, Wolff explains that such swift growth risks overloading a system, making a

server a "bottleneck" in the system.[89] And Skagerwall echoes this same bottleneck concern for

scaling up a system, emphasizing the need to reduce processing load whenever possible on a

---

[84] *See* OracleUnleashed at 452.
[85] OracleUnleashed at 652 (emphasis added).
[86] *See* OracleUnleashed at 452.
[87] *E.g.*, Skagerwall, 1:59-62; Steen at 105.
[88] Steen at 105.
[89] Wolff, 2:1-2.

variety of servers.[90]

**Data Pertaining to the Entity**: To the extent that Kove contends that an identified piece of prior art does not disclose a claim limitation related to the use of data pertaining to the entity, the subject matter as a whole of each claim, including that limitation, would have been obvious to one of skill in the art before the invention. (*See*, *e.g.,* '170 Patent, claim 1; '978 Patent, claims 1, 31.) For example, the Court held that the term "data pertaining to the entity" should be construed as "data pertaining to a person or thing (real, digital, or abstract) distinct from that data."[91] This clarification by the Court that the entity may be "real, digital, or abstract" further supports a finding that the identified prior art references disclose the claim limitations relating data pertaining to the entity.

For example, RFC1034 discloses different types of resources in the resource record, including "abstract resources." (*See., e.g.,* RFC1034, 11-12.) And the Cache Resolver system, Neimat, and Minami discloses that the "thing" that the data pertains to may be real, digital, or abstract as well. (*See*., *e.g.,* Sherman, p. 37; Neimat, 8:16-67; Minami, 3:48-4:9.)

OracleNamesAdminGuide explains that its SQL*Net uses location information to form a "connection descriptor," also called a connect string or dbstring. The client uses this information to establish a client-server connection.[92] OracleNamesAdminGuide explains that its connection descriptor is a "specially formatted description of the destination for a network connection. Connect descriptors are constructed using a set of keywords and values. They are mapped to *service names* to provide more convenient reference."[93] And OracleNamesAdminGuide explains

---

[90] Skagerwall, 5:31-36, 18:54-58.

[91] Court's December 17, 2021 Claim Construction Memorandum Opinion and Order (Dkt. No. 484), pp. 31-35.

[92] *See* OracleNamesAdminGuide at 23 (explaining the prior version of Oracle Names used the term "connect string"), 100 (teaching prior Oracle versions refer to descriptors as "dbstring [which] is a database name defined in the Names Server").

[93] *Id.* at 200; *see also id.* at 202 (describing that a connect descriptor may include a system identifier

that each "unique network location [is] used to identify a network object such as a database service, client, Interchange, or Names Server. TNS addresses have a specific format. Addresses must be unique."[94]

As shown below in Figure 3-11, OracleNamesAdminGuide teaches that the client device sends to the Names Server a request for the POULTRY.WORLD database instances. The Names Server uses the identifier POULTRY.WORLD to identify the location information (e.g., host name, port, and database instance) and sends this location information to the client. Using this location information, the client contacts the server housing the POULTRY.WORLD database instance, then uses SQL*Net to make the connection.[95]



OracleNamesAdminGuide Fig. 3-11

Similarly, OracleNamesAdminGuide provides an exemplary request to the Names Server for connection and location information using "QUERY BONES.DEM.MEDICINE A.SMD" to the Oracle7 system.[96] Like the above POULTRY.WORLD example, OracleNamesAdminGuide teaches that the SQL*Net client sends a request to the Names Server for the desired database

---

("SID"), which is a "unique name for an Oracle database instance…. The SID is included in the CONNECT DATA parts of the connect descriptors in a TNSNAMES.ORA file, and in the definition of the network listener in the LISTENER.ORA file").

[94] *Id.* at 199.

[95] *See* OracleNamesAdminGuide at 52-53.

[96] *See id.* at 129.

using the corresponding BONES.DEM.MEDICINE identifier. The Names Server uses the identifier BONES.DEM.MEDICINE from the request to identify the location information (e.g., host name, port, and database instance) and send this location information to the client. The client then uses this location information to connect to the server storing the BONES.DEM.MEDICINE database. OracleNamesAdminGuide details the resulting query metrics and location information sent to the client from the Name Server as follows:

| | |
|---|---|
| Total response time: | 0.04 seconds |
| Response status: | normal, successful completion |
| Authoritative answer: | yes |
| Number of answers: | 1 |
| Canonical name: | bones.dem.medicine |
| TTL: | 1 day |
| Alias translations: | |
|     from: | bones.dem.medicine |
|     to: | bones.dem.medicine |
| Answers: | |

data type is 'a.smd'

```
    Syntax          is          ADDR:          ...
(DESCRIPTION=(ADDRESS=(COMMUNITY=tcp)(PROTOCOL=TCP)(Ho
st=cowboy) (Port=1522)) (CONNECT_DATA=(SID=rodeo)))[.]"
```
[97]

This illustrates that OracleNamesAdminGuide's Names Server completed the response in an *a.smd* output format in 0.4 seconds, and labeled the response status as normal and successfully completed. And the Names Server responds (i.e., "answers") to the client's query by providing the location information for BONES.DEM.MEDICINE.[98] This location information includes the host name "cowboy,"[99] port 1522, and database instance "rodeo" along with the

---

[97] *Id.*

[98] *See id.*

[99] A POSITA would understand thqt the host name would be converted to an IP address using a DNS server before the connection string was compiled.

DEFENDANT AMAZON WEB SERVICES, INC.         CIVIL ACTION NO. 1:18-CV-8175
FIFTH AMENDED FINAL UNENFORCEABILITY     67
AND INVALIDITY CONTENTIONS

connection information ("protocol=TCP").[100]

Using this location information, OracleNamesAdminGuide teaches that the client contacts the server housing the BONES.DEM.MEDICINE database, then uses SQL*Net to connect to the database using one of the available network transport protocols, TCP/IP.[101] And using the below annotated version of OracleNamesAdminGuide's Figure 3-11,

Based on these teachings, a POSITA would have understood that OracleNamesAdminGuide's connection descriptor is built using the claimed "location information" (i.e., a data encoding that specifies the storage location of data and that is associated with an identifier for the data (e.g., network-service-name-alias) in a Names Server).

Skagerwall explains that the directory servers contain information for locating the data objects stored on the data repositories of the application servers (IS1 … ISp):

> It is a key aspect of the invention that the data base of object data is distributed over a plurality of directory servers DS; DS1-DSn, allowing that the number of objects can be scaled almost arbitrarily by adding new directory servers to the existing ones for storing new object data. Each of the directory servers DS; DS1-DSn preferably stores object data related to a small number of the range of available object tags T; T1-Tw. As mentioned above, object data related to an object tag preferably includes application identifiers AI1-Aim of application data packets related to the object *as well as information about storage locations of the application data packets, e.g., the addresses of application servers IS; IS1-Isp storing the application data packets*.[102]

Because the directory servers function to store location information for the object data, a POSITA would understand those directory servers to be the claimed "location servers" and that

---

[100] *See* OracleNamesAdminGuide at 129.

[101] *See id.* at 39, 201 (describing other available transport protocols, like DECnet).

[102] Skagerwall, 8:15-27 (emphasis added).

DEFENDANT AMAZON WEB SERVICES, INC.        CIVIL ACTION NO. 1:18-CV-8175
FIFTH AMENDED FINAL UNENFORCEABILITY   68
AND INVALIDITY CONTENTIONS

they would provide at least one location in response to a request.

Therefore, it would have been obvious to one of skill to employ data location servers in a distributed network, particularly in view of the references identified below:

- U.S. Patent No. 6,212,521 to Minami (see, e.g., col. 3);
- DNS (see, e.g., RFC1034, Sections 2.3, 2.4, 3.5, 4);
- U.S. Patent No. 5,542,087 to Neimat (see, e.g., cols. 8-11);
- Cache Resolver system (see, e.g., Sherman, pp. 10, 34-39; Karger/Sherman, Sections 2-3);
- OracleNamesAdminGuide (see, e.g., 23, 39, 52-53, 100, 129, 199-202);
- Skagerwall (see, e.g., 8:15-27); and/or
- the common sense and background knowledge in the art.

These references contain specific teachings that would lead a skilled artisan to combine them with other prior art disclosing distributed networks. For example, RFC1034 states that DNS uses distributed name servers and local caches to increase the amount of memory and improve performance: "The sheer size of the database and frequency of updates suggest that it must be maintained in a distributed manner, with local caching to improve performance." (RFC1034, 2.) RFC1034 discloses that this caching occurs to reduce name server load: "A very important goal of the resolver is to eliminate network delay and name server load from most requests by answering them from its cache of prior results." (*Id*., 29.) Thus, DNS discloses the use of a distributed network to ensure scalability and performance. The Cache Resolver system specifically refers to DNS and a skilled artisan would therefore use DNS's teachings as motivation to combine the Cache Resolver system with other art.

Neimat similarly discloses scaling a distributed network: "The present invention accommodates any number of clients and servers, and allows the database storage to extend to occupy any number of servers." (Col. 6:37-39; *see also* 1:36-40, 8:12-15.) Likewise, Minami states, "[A] first object of the present invention is to provide a data management system which

relieves processing loads imposed on individual data management servers by distributing data registration and retrieval tasks and reducing the amount of data maintained in each server." (Col. 3:38-43.) Thus, a skilled artisan seeking to ensure scalability and improve performance in a distributed network would be motivated to combine references that disclose location servers, such as DNS, with references disclosing distributed networks, such as Minami or Neimat.

And a POSITA would have appreciated that Steen's principle of "anycasting" allows for faster resolution of clients' requests because multiple servers can resolve any given query. As a result, a POSITA would have been motivated by OracleNamesAdminGuide's goal of "lightning fast" resolution to incorporate anycasting to its data storage. This would have resulted in multiple data repositories where each server connects to OracleNamesAdminGuide's Names Service (i.e., location server network). A POSITA would have understood that Steen's partitioned group of location servers organized in a non-hierarchical configuration results in each server containing a subset of the data location information originally stored on the first location server. Further, a POSITA would have been motivated to adopt Steen's partitioning approach for grouping OracleNamesAdminGuide's Names Servers to maintain "lightning fast" resolutions to data queries. Thus, applying either (1) OracleUnleashed's teachings toward partitioning servers and datasets or (2) Steen's teachings toward partitioning a location server into a group of servers to OracleNamesAdminGuide's Names Servers would have rendered obvious that the data location server network has a plurality of data location servers.

Further, based on OracleUnleashed's teachings, a POSITA would have been motivated and found it obvious to have OracleNamesAdminGuide's system associate each data repository's data with a respective identifier string. OracleUnleashed explains that SQL*Net, which OracleNamesAdminGuide utilizes, makes it easier for users to connect to various databases and

find their data, which is advantageous because "[y]our users do not want to write complex queries."[103] A POSITA would have understood that associating respective identifier strings with data improves the users' experience and to ease the ability to find desired data since that is one of the objectives of an Oracle DBA. The benefits of associating data with a respective identifier string are directly perceived by the end user, and a DBA would have been motivated to simplify the users' experience in this manner. [104]

Thus, a POSITA would have found it obvious to have each of OracleNamesAdminGuide's data repositories' data be associated with a respective identifier string for use in optimizing query efficiency, based on OracleUnleashed's teachings.[105] During the relevant timeframe, Oracle DBAs were often asked to help improve query efficiency, as OracleUnleashed details:

> It seems pretty obvious that a search method that works well for one of these types of queries is probably not the best method for the others. In fact, Oracle and most other databases have a number of search algorithms in their systems that are designed to handle different needs. This is what enables them to work in such a large number of environments and applications. When an application is performing slowly on a well-tuned database, the first thing you should **check is how the query is being processed to ensure that it is as efficient as it can be.**[106]

Based on the commonplace need for efficiency in running queries, a POSITA would have been motivated to associate a respective identifier string with data because this allows OracleNamesAdminGuide's Names Server to quickly return one or more locations associated with the identifier string to the query requestor with minimized cost.[107]

And Steen, Skagerwall and Wolff describe the challenges of scalability-expanding the networks and maintaining performance. [108] For instance, Steen explains its system is scalable to

---

[103] *See* OracleUnleashed at 255.
[104] *Id.*
[105] *See* OracleUnleashed at 452.
[106] OracleUnleashed at 652 (emphasis added).
[107] *See* OracleUnleashed at 452.
[108] *E.g.*, Skagerwall, 1:59-62; Steen at 105.

DEFENDANT AMAZON WEB SERVICES, INC.
FIFTH AMENDED FINAL UNENFORCEABILITY
AND INVALIDITY CONTENTIONS

CIVIL ACTION NO. 1:18-CV-8175

service clients and objects located around the world:

> The service should allow clients and objects to be located anywhere in the world, and be able to support a huge number of objects. We anticipate that eventually, one billion users with 1000 objects each will be registered with the location service, adding up to lOI2 objects.[109]

Similarly, Wolff explains that such swift growth risks overloading a system, making a server a "bottleneck" in the system.[110] And Skagerwall echoes this same bottleneck concern for scaling up a system, emphasizing the need to reduce processing load whenever possible on a variety of servers.[111]

**<u>Based on a Hash System</u>**: To the extent that Kove contends that an identified piece of prior art does not disclose a claim limitation related to the use of "the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string," the subject matter as a whole of each claim, including that limitation, would have been obvious to one of skill in the art before the invention. (*See*, *e.g.*, '170 Patent, claim 1.) For example, the Court held that this term should be construed to include both indirect mapping and direct mapping.[112] This clarification by the Court further supports a finding that the identified prior art references disclose this claim limitation is disclosed by the identified prior art references.

For example, RFC1034 discloses that various mapping conventions may be employed in

---

[109] Steen at 105.
[110] Wolff, 2:1-2.
[111] Skagerwall,  5:31-36, 18:54-58.
[112] Court's December 17, 2021 Claim Construction Memorandum Opinion and Order (Dkt. No. 484), pp. 24-30.

its distributed data system, that "can be quite simple or fairly complex" where "[m]ultiple mappings or levels of mapping may be required." (*See., e.g.,* RFC1034, 9-10.) RFC1034 further discloses examples of different types of mapping schemes, such as the mapping of addresses to host names and specific mapping schemes, such as for mailboxes. (*Id.*) The Cache Resolver system similarly discloses multiple hashing and mapping methods, such as hashing of URLs and Consistent Hashing. (Sherman, pgs. 15, Section 3; Karger/Sherman, Sections 2-3.) And Neimat and Minami further disclose various methods of hashing and mapping key values to produce addresses. (*See., e.g.,* Neimat, 8:57-67, 9:43-65, 10:13-26; Minami, Abstract, 7:52-57, 10:43-46, 14:6-47, 18:21-19:34, 28:12-32.)

OracleUnleashed also teaches the benefits of the well-known hashing techniques and implementing them into distributed database servers. For example, OracleUnleashed provides that SQL statements used for data requests should use hashing and indices to optimize performance. "The well-tuned SQL statement uses indexes or hashing as available. If possible, the application should also take advantage of features such as array processing and discrete transactions."[113]

OracleUnleashed further describes the performance decision a DBA makes when considering hashing for various tables.

> The decision to use hash clusters is an important one. Hash clusters can be beneficial because, when they are effectively used, the requested data can be retrieved in just one J/O. Unfortunately, if a hash cluster is used on a table that is not a good candidate for hashing, performance can be severely degraded.[114]
>
> Because hashing uses the value of the data to calculate the data block the

---

[113] *Id.* at 372.
[114] *Id.* at 394.

desired data is in, hashing is best used on tables that have unique values for the cluster key and that are queried primarily by equality queries on the cluster key. In the case of equality queries, the data is usually retrieved in one read operation. The cluster key need not be a single column; if the typical query uses an equality on a set of columns, use these columns to create a composite key.[115]

OracleUnleashed describes how hashing data on a server results in a hash table used to look up its location based on 'unique values' for entries.

Because hashing uses the value of the data to calculate the data block the desired data is in, hashing is best used on tables that have unique values for the cluster key and that are queried primarily by equality queries on the cluster key. In the case of equality queries, the data is usually retrieved in one read operation. The cluster key need not be a single column; if the typical query uses an equality on a set of columns, use these columns to create a composite key.[116]

And OracleUnleashed teaches multiple hashing methods providing the benefit of organizing data using hash clusters and hash joins:

A hash cluster is similar to a cluster but uses a hash function rather than an index to reference the cluster key. A hash cluster stores the data based on the result of a hash function (a numeric function that determines the data block in the cluster based on the value of the cluster key).[117]

Hash joins greatly enhance the performance of two joined tables, where one table is significantly larger than the other. Hash joins replace the "sort-merge" join algorithm and is only supported by the cost-based optimizer. The hash join works by splitting two tables into partitions. A partition is read into memory and a hash table is created. This hash table is then used to map join columns from the other

[115] *Id.* at 395.
[116] *Id.* at 638.
[117] OracleUnleashed at 394.

table, eliminating the sometimes resource-expensive sort-merge. In the hash join method, both tables are scanned only once.[118]

Skagerwall further provides examples of a hashtable showing the available directory servers and their contents:

In the example of FIG. 2 the hashtable comprises 8 entries, addresses of available servers are stored as records in respective sequential entries of the hashtable. Thus, the hashtable constitutes an ordered list of all available directory servers, as shown in FIG.2.The records stored in the hashtable H are indicated by A, B, C and D stand for addresses of four directory servers DS; DS1-DSn. However, any other order is possible, e.g., D, B, A, C.

To avoid unnecessary lookup operations for object tags at directory servers, as outlined above, it is preferred that object data is stored on directory servers according to the hashfunction, which maybe executed by search means SM indicated in FIG.2. The search means SM groups object tags, preferably in correspondence with the number of objects and the number of available directory servers, i.e., a target directory server for storing as well as for retrieving object data is determined based on an identifier of an object tag, which, e.g., maybe a number assigned to the tag, and the number of available directory servers DS;DS1-DSn.[119]

---
[118] OracleUnleashed at 638.
[119] Skagerwall at 10:31-49.



**Skagerwall Fig. 2 Annotated**

Therefore, it would have been obvious to one of skill to employ a hash function to organize data in a distributed system, and further in view of the references identified below:

- U.S. Patent No. 5,542,087 to Neimat (see, e.g., col. 8);
- U.S. Patent No. 6,212,521 to Minami (see, e.g., cols. 10, 14);
- U.S. Patent No. 6,553,420 to Karger (see, e.g., cols. 3-4; see also U.S. Patent No. 6,430,618 to Karger);
- DNS (see, e.g., RFC1034, p. 13);
- Cache Resolver system (see, e.g., Sherman, pp. 34-39; Karger/Sherman, Section 3);
- OracleUnleashed (see, e.g., 372, 394, 395, 638);
- Skagerwall (see, e.g., 3:51-54, 10:31-49, Figure 2); and/or
- the common sense and background knowledge in the art.

These references contain specific teachings that would lead a skilled artisan to use hash functions to organize data in other distributed networks, such as those disclosed in DNS, the Cache Resolver system, Neimat, and Minami for the same reasons discussed above to "Hash Functions."

DEFENDANT AMAZON WEB SERVICES, INC.              CIVIL ACTION NO. 1:18-CV-8175
FIFTH AMENDED FINAL UNENFORCEABILITY   76
AND INVALIDITY CONTENTIONS

And hashing datasets makes it easier to find a piece of data at a later point. As a result, a POSITA would have been motivated to hash the partitioned location servers taught by the combination of OracleNamesAdminGuide and OracleUnleashed. Doing so would allow any Names Servers on the network to "know" the location of a desired piece of location information. As a result of this knowledge, it would have been obvious to a POSITA that, if a Names Server received a request it could not resolve because it lacked the location data, it would redirect the client to a Names Server containing the desired location data. Because OracleNamesAdminGuide and OracleUnleashed share the common goal of parsing data sets quickly, a POSITA would have been motivated to use OracleUnleashed's hashing table techniques in OracleNamesAdminGuide's Names Servers to quickly and efficiently determine the location of the requested data. It was understood in the art that DBAs would actively search for resources to solve problems that may arise in the specific database environment that they are working in.

As a system's configuration becomes more complex requiring more information to uniquely identify the data's location, the storage and processing requirements for the OracleNamesAdminGuide's Names Servers increase along with it. A DBA would have been motivated to minimize these burdens and operate the Names Servers at optimal efficiency. This would have furthered OracleNamesAdminGuide's goal of having its Names Servers identify the requested data's location "lightning fast."[120] Based on the desire to maximize efficiency in running queries, a POSITA would have been motivated to combine OracleNamesAdminGuide's and OracleUnleashed's techniques of locating data using hashing location tables to quickly return location information associated with the requested data.

Based on Skagerwall's teachings, a POSITA would have appreciated that the directory

---

DEFENDANT AMAZON WEB SERVICES, INC.          CIVIL ACTION NO. 1:18-CV-8175
FIFTH AMENDED FINAL UNENFORCEABILITY     77
AND INVALIDITY CONTENTIONS

servers store the hash table and that the hash table contains the list of available directory servers with their respective contents. Further, a POSITA would have understood that the access server (i.e., client) uses portions of the hash table to identify which directory server to send its data request based on the information in the redirect message. A POSITA would have concluded that sending the entire hash table or storing the entire hash table at the client would be too cumbersome. This would have frustrated Skagerwall's goal of facilitating data retrieval by lowering the efficiency of the system and Wolff's goals for optimizing network performance and reliability. As a result, a POSITA would have found it obvious to break the hash table into portions, to distribute those portions to the directory server, and to send only the relevant portion to the client. Further, a POSITA would have understood that this portion includes at least the portion describing the object tag requested by the client. As a result, a POSITA would have understood that Skagerwall teaches or renders obvious that all relevant directory server contents be stored in a hash table across the directory server network.

## V.  INVALIDITY CLAIM CHARTS FOR PATENTS-IN-SUIT

Claim charts 1A-1D identify where specifically in each item of identified prior art each element of each asserted claim of the '170 patent is found.

**Exhibit 1A:** OracleNamesAdminGuide, OracleUnleashed, Steen, and Wolff;

**Exhibit 1B:** Skagerwall and Wolff;

**Exhibit 1C:** Neimat, DNS, and Karger '618/420; and

**Exhibit 1D:** Minami, DNS, and Karger '618/420.

Claim charts 2A-2D identify where specifically in each item of identified prior art each element of each asserted claim of the '640 patent is found.

**Exhibit 2A:** OracleNamesAdminGuide, OracleUnleashed, Steen, and Wolff;

**Exhibit 2B:** Skagerwall and Wolff;

**Exhibit 2C:** Neimat and DNS, and for claim 24 also Karger '618/420; and

**Exhibit 2D:** Minami and DNS, and for claim 24 also Karger '618/420.

Claim charts 3A-3F identify where specifically in each item of identified prior art each

element of each asserted claim of the '978 patent is found.

**Exhibit 3A:** OracleNamesAdminGuide, OracleUnleashed, Steen, and Wolff for claims 1, 3, 6, 10, 14, and 31;

**Exhibit 3B:** Skagerwall and Wolff for claims 1, 3, 6, 10, 14, and 31**;**

**Exhibit 3C:** OracleNamesAdminGuide, OracleUnleashed, Steen, Yocum, and Boukobza for claims 17, 23, 24, and 30;

**Exhibit 3D:** Skagerwall, Steen, Yocum, and Boukobza for claims 17, 23, 24, and 30;

**Exhibit 3E:** Neimat and DNS, and for claim 24 also Venkatasubramanian; and

**Exhibit 3F:** Minami and DNS, and for claims 17, 23, 24, and 30 also Neimat, and for claim 24 also Venkatasubramanian.

## VI.    INVALIDITY OF PATENTS-IN-SUIT BASED ON 35 U.S.C. § 112

Amazon contends that one or more of the Asserted Claims are invalid as indefinite under

35 U.S.C. § 112, ¶ 2. The Asserted Claims fail to particularly point out and distinctly claim the

subject matter that the patentee regards as its alleged invention such that one of ordinary skill in

the relevant art would be reasonably apprised of the bounds of the asserted claims when read in

light of the specification. *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).

For example, the following claim terms of the Patents-in-Suit are indefinite:

- **"*Based on a hash function*"** as used in claims 1 and 2 of the '170 patent and **"*hash table generated with the hash function*"** as used in claim 2 of the '170 patent.

A skilled artisan would not have understood the scope of "based on a hash function" as

found in claims 1 and 2 of the '170 patent.  Claim 1 recites: "the portion of the data location

information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers." Claim 2 depends from claim 1 and hence incorporates this limitation. The patents do not explain how to use the claimed "hash function," how it works, what it does, or what it means for a "portion" of "data location information" to be "based on" a "hash function used to organize the data location information across the plurality of data location servers." Similarly, a skilled artisan would not have understood the scope of "hash table generated with the hash function" in claim 2. The patents do not explain how the hash table is "generated with" the hash function or the relationship between this "hash table" and the "location information."

- **"*Performance criterion*" and "*predetermined performance limit*"** as used in claims 17, 23, 24, and 30 of the '978 patent.

A skilled artisan would not have understood the bounds of "performance criterion" or "predetermined performance limit." The '978 patent does not explain the range of "performance criteria," how to determine a "limit" for "performance criterion," or what it means for a "performance criterion" to be "predetermined."

- **"*The first data location server*"** as used in claims 17, 23, 24, and 30 of the '978 patent.

This limitation is indefinite because the phrase "the first data location server" lacks antecedent basis in the claim. A skilled artisan could not discern whether "the first data location server" is the same server as "a location server" recited earlier in the claim.

- **"*Programming logic … configured to return, in response to a location query related to a desired entity, a location message … comprising at least one location associated with the desired entity, wherein the programming logic is further configured to return the location message if the location server contains location information for the desired entity, and wherein the programming logic is further configured to return a redirect message if the location server lacks the location information for the desired entity,*"** as used in claim 6 of the '170 patent.

This limitation is indefinite because a skilled artisan could not discern whether the server

returns two messages or one message if the location server lacks location information for the desired entity.

In addition, the Asserted Claims include functional claim limitations governed by pre-AIA 35 U.S.C. § 112(6). Those claim limitations are indefinite because a skilled artisan could not recognize the structure in the specification and associate it with the corresponding function in the claims. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1352 (Fed. Cir. 2015) ("Under 35 U.S.C. § 112, paras. 2 and 6, therefore, if a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim, a means-plus-function clause is indefinite."). Those functional claim limitations include:

- **"*Hash function*,"** as used in claims 1 and 2 of the '170 patent.
- **"*Hash table*,"** as used in claims 2 and 12 of the '170 patent, claim 6 of the '978 patent, and claim 24 of the '640 patent.
- **"*Indexing function*"** or **"*indexed*,"** as used in claim 12 of the '170 patent and claim 6 of the '978 patent.
- **"*Calculate a location*,"** as used in claims 17, 18, and 24 of the '640 patent.
- **"*Configured to determine the … data location server[]*"** or **"*determining … the … location server[]*,"** as used in claims 1, 2, and 15 of the '170 patent.
- **"*Transfer protocol configured for manipulating*"** or **"*transfer protocol comprising instructions for manipulating*,"** as used in claims 10 and 31 of the '978 patent.
- **"*Transfer protocol configured to transport*,"** as used in claims 17, 23, 24, and 30 of the '978 patent.
- **"*Computer executable code configured to execute the following steps*,"** as used in claim 17, 18, 24 of the '640 patent.
- **"*Location server configured to receive*,"** or **"*programming logic*"** that is **"*configured to return*,"** as used in claims 6, 8, and 12 of the '170 patent.
- **"*Programming logic … responsive to*"** a **"*location query*,"** as used in claims 1, 3, 6, 10, and 31 of the '978 patent.

In addition, claims 1, 3, 6, 10, and 31 of the '978 patent, claims 1, 2, 6, 8, and 12 of the '170 patent, and claims 17, 18, and 24 of the '640 patent are indefinite because they include both apparatus and method limitations. *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F. 3d

1377, 1384 (Fed. Cir. 2005); *Rembrandt Data Techs., LP v. AOL LLC*, 641 F.3d 1331 (Fed. Cir.

2011).  For example:

- Claim 1 of the '978 patent includes both apparatus limitations (*e.g.*, a "location server") and steps requiring the performance of an action (*e.g.*, "programming logic … identifying a desired entity to return a location message").

- Claim 3 of the '978 patent includes both apparatus limitations (*e.g.*, a "location server") and steps requiring the performance of an action (*e.g.*, "programming logic … to return one of a location message or a redirect message").

- Claim 6 of the '978 patent includes both apparatus limitations (*e.g.*, a "location server") and steps requiring the performance of an action (*e.g.*, "is maintained in an indexed location store indexed by a hash table").

- Claim 10 of the '978 patent includes both apparatus limitations (*e.g.*, "plurality of location servers") and steps requiring the performance of an action (*e.g.*, "programming logic … responsive to a location query … to return one of a location message … and a redirect message").

- Claim 31 of the '978 patent includes both apparatus limitations (*e.g.*, "location server") and steps requiring the performance of an action (*e.g.*, "location server operating in accordance with a transfer protocol" and "programming logic … toreturn a location message").

- Claims 1 and 2 of the '170 patent include both apparatus limitations (*e.g.*, "a data location server network comprising a plurality of data location servers") and steps requiring the performance of an action (*e.g.*, "hash function used to organize the data location information across the plurality of data location servers" and in claim 2, "hash table generated with the hash function").

- Claims 6, 8, and 12 of the '170 patent include both apparatus limitations (*e.g.*, a "location server") and steps requiring the performance of an action (*e.g.*, "programming logic is configured to return … the location message" and "redirect message" and in claim 12, "indexed by a hash table distributed across a plurality of servers").

- Claims 17, 18, and 24 of the '640 patent include both apparatus limitations (*e.g.*, "data location server network") and steps requiring the performance of an action (*e.g.*, "computer executable code configured to execute the following steps" and in claim24, "hash table distributed over the plurality of data location servers").

In addition, the Asserted Claims lack sufficient written description and are not enabled.

All asserted claims with references to "hash" or "hashing" are invalid for lack of written

description and lack of enablement under 35 U.S.C. § 112, because the specification does not

adequately disclose or enable the hashing limitations recited in the claims.  The Patents-in-Suit

do not explain how to use the claimed "hash function" or "hash table," how it works, what it does, or how its output is used. For example, claim 6 of the '978 patent recites: "The system of claim 1, wherein the location information in the location server is maintained in an indexed location store indexed by a hash table." However, the specification neither describes nor enables location information within a location server being maintained in an indexed location store indexed by a hash table. Likewise, claims 1, 2, and 12 of the '170 patent and claim 24 of the '640 patent recite "hash function" and/or "hash table" limitations, but the specification neither describes nor enables those limitations.

In addition, each of the claim limitations characterized above as indefinite "functional claim limitations" is, in the alternative, invalid for lack of written description and lack of enablement. The claim limitations recite generic functions (*e.g.*, "based on a hash function" / "hash table," "indexing function" / "indexed," "calculate," "manipulate," "determine"). Alternatively, they recite "programming logic" or "computer executable code" that accomplishes functions, or servers that are "configured to" accomplish functions. In each case, the specifications do not describe or enable the full scope of those limitations because they do not explain *how* to accomplish those functions. As additional examples, claim 17 of the '978 patent, as well as dependent claims 23, 24, and 30, are invalid for lack of written description and lack of enablement. The specification does not describe or enable the full scope of the claim terms "performance criterion," "predetermined performance limit," and "monitoring the performance criterion and automaticallytransferring the portion of identifiers and associated locations when the first location server reaches the predetermined limit." Additionally, claim 6 of the '170 patent, as well as dependent claims 8 and 12, are not described or enabled because the '170 patent does not disclose how to configure programming logic to return both a location message

and a redirect message in response to a location query.

Amazon reserves the right to make additional arguments under 35 U.S.C. § 112 as the positions that Kove takes with regard to priority, infringement, claim interpretation of various terms that have been construed by the Court or terms that have not been construed by the Court, and responses to Amazon's invalidity arguments, become more clearly articulated or are modified and as Kove attempts to support its positions with specific reference to disclosures in its patents.

## VII. INVALIDITY OF PATENTS-IN-SUIT BASED ON 35 U.S.C. § 101

Each of the Asserted Claims is invalid as unpatentable subject matter under 35 U.S.C. § 101. The claims of the Asserted Patents recite abstract data-manipulation steps, such as "receiving" or "storing" information, on generic computer components, as described in detail in the briefing on the Amazon motion to dismiss, which is incorporated herein by reference. (*See* Dkt.38, 45.) The logic of this § 101 argument applies to all Asserted Claims.

Additionally, Amazon contends that claims of the '978 patent are unpatentable under the doctrine of obviousness-type double patenting. For example, the asserted claims of the '978 patent are invalid in view of the '170 patent, because the '978 patent claims are not patentably distinct from the '170 patent. As Kove admits, for example, claims of the '978 patent "recites substantially the same claimed architecture as claim 1 of the '170 patent… ." (Dkt. 44 at 10.) Any claim limitations added to the '978 patent claims are simply obvious variants. Likewise, the asserted claims of the '978 patent are invalid in view of the '640 patent because the '978 patent claims are not patentably distinct from the '640 patent. (*See id.*) Further, Kove alleges that the '978 patent claims are entitled to priority to the same application as the '170 and '640 patents, and, under this view of the claims, everything claimed in the '978 patent is necessarily disclosed

in, and not patentably distinct from, each of the prior applications in the '978 patent priority chain. Amazon also incorporates by reference its Motion for Judgment on the Pleadings (Dkt. 131- 132, 156, 162).

Further, in response to Amazon's Motion for Judgment on the Pleadings, Kove has taken theposition that claim construction may reveal distinctions between the claims of the '978 patent and the claims of the '640 and '170 patents. To the extent such distinctions exist, Amazon reserves the right to argue that the claims of the '978 patent are invalid for obviousness-type double patenting in view of the claims of the '640 and '170 patent, when viewed in light of the prior art references and combinations disclosed above with respect to the '978 patent.

For example, claims 1, 3, 6, 10, 14, and 31 of the '978 patent are invalid for obviousness-type double patenting in view of the '640 patent and '170 patent, further in view of the prior art references and combinations identified as anticipation and obviousness references for those claims. As a non-limiting example, claims 1, 3, 6, 10, 14, and 31 of the '978 patent are invalid for obviousness-type double patenting in view of the '640 patent and '170 patent, further in view of DNS.

Likewise, claims 17, 23, and 30 of the '978 patent are invalid for obviousness-type double patenting in view of the '640 patent and '170 patent, further in view of the prior art references and combinations identified as anticipation and obviousness references for those claims. As a non-limiting example, claims 17, 23, and 30 of the '978 patent are invalid for obviousness-type double patenting in view of the '640 patent and '170 patent, further in view of Neimat and/or DNS. Likewise, claim 24 of the '978 patent is invalid for obviousness-type double patenting in view of the '640 patent and '170 patent, further in view of the prior art references and combinations identified as anticipation and obviousness references for that claim.

As a non-limiting example, claim 24 of the '978 patent is invalid for obviousness-type double patenting in view of the '640 patent and '170 patent, further in view of DNS and/or Neimat and/or Venkatasubramanian.

## VIII.  UNENFORCEABILITY CONTENTIONS AGAINST PATENTS-IN-SUIT

Amazon incorporates by reference its Answer, Additional Defenses, and Counterclaims (Dkt. 129), which includes its unenforceability defenses and counterclaims. Amazon reserves the right to disclose additional contentions of unenforceability for the Patents-in-Suit if Amazon discovers additional facts giving rise to additional unenforceability defenses. Amazon's investigation of Kove's actions concerning the prosecution of the Patents-in-Suit and knowledge of the prior art is ongoing. For example, Amazon will seek the Rule 30(b)(6) corporate representative deposition of Kove regarding the prosecution of the asserted patents and knowledge of the prior art.

## IX.  DOCUMENT PRODUCTION

Pursuant to LPR 2.1(b)(2), Defendants have previously produced documents bearing Bates numbers AMZ_KOVE_000017145 - AMZ_KOVE_000017175, AMZ_KOVE_000044829 - AMZ_KOVE_000044859, AMZ_KOVE_000044908 - AMZ_KOVE_000044943, AMZ_KOVE_000044970 - AMZ_KOVE_000044982, AMZ_KOVE_000045035 - AMZ_KOVE_000045069, AMZ_KOVE_000061911 - AMZ_KOVE_000062127, AMZ_KOVE_000062299 - AMZ_KOVE_000062367, AMZ_KOVE_000062395 - AMZ_KOVE_000062662, AMZ_KOVE_000070463 - AMZ_KOVE_000070530, AMZ_KOVE_000075810 - AMZ_KOVE_000076531, AMZ_KOVE_000078678 - AMZ_KOVE_000078694, AMZ_KOVE_000080051 - AMZ_KOVE_000081655, AMZ_KOVE_000528877 - AMZ_KOVE_000530223 related to

prior art identified in these contentions.

Dated: March 2, 2023

Respectfully submitted,

*/s/ Jeffrey M. Saltman*
Alan M. Fisch
*alan.fisch@fischllp.com*
R. William Sigler
*bill.sigler@fischllp.com*
Jeffrey M. Saltman (*pro hac vice*)
*jeffrey.saltman@fischllp.com*
Lisa Phillips (*pro hac vice*)
*lisa.phillips@fischllp.com*
FISCH SIGLER LLP
5301 Wisconsin Avenue NW
Suite 400
Washington, DC 20015
202.362.3500

*Attorneys for Amazon Web Services, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above document was

served on all counsel of record via email on March 2, 2023.


Dated: March 2, 2023                                    */s/ Jeffrey M. Saltman*
                                                        Jeffrey M. Saltman