1      IN THE UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3    KOVE IO, INC.,                        )   Docket No. 18 C 8175
                                           )
4                        Plaintiff,        )
                                           )
5              vs.                         )
                                           )
6    AMAZON WEB SERVICES, INC., et al.,    )   Chicago, Illinois
                                           )   March 21, 2024
7                        Defendants.       )   1:30 o'clock p.m.

8                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE MATTHEW F. KENNELLY
9

10   APPEARANCES:

11
     For the Plaintiff:    REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
12                         BY:  MR. COURTLAND REICHMAN
                                MS. GINA CREMONA
13                              MR. ADAM ADLER
                                MR. JAIME FRANCISCO CARDENAS-NAVIA
14                              MS. SAVANNAH CARNES
                           100 Marine Parkway, Suite 300
15                         Redwood Shores, CA  94065
                           (650-623-1401
16

17

18

19

20

21

22   Court Reporter:       MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                           Official Court Reporter
23                         219 S. Dearborn Street, Suite 2102
                           Chicago, Illinois  60604
24                         (312) 435-5639

25

APPEARANCES CONTINUED:

For the Defendants:     FISCH SIGLER LLP
                        BY:   MR. ALAN M. FISCH
                              MR. R. WILLIAM SIGLER
                              MR. JEFFREY M. SALTMAN
                              MR. BRANDON P. EVANS
                              MS. LISA N. PHILLIPS
                        5301 Wisconsin Avenue NW, Fourth Floor
                        Washington, DC 20015
                        (202) 362-3500

1    (The following proceedings were had in open court:)

2            THE CLERK:  Case 18 C 8175, Kove v. Amazon.

3            THE COURT:  All right.  So we need to get people's

4    appearances on the record.  I don't know if you've given -- I

5    assume everybody has given names to the court reporter.  But

6    why don't you just put on the record now whoever is going to

7    talk and we can just take it from there.

8            MR. REICHMAN:  Sure.  Thank you, your Honor.

9            Courtland Reichman for the plaintiff, Kove.  And with

10   me today is Adam Adler.

11           THE COURT:  Say it again.  What's the last name?

12           MR. REICHMAN:  Adam Adler.

13           THE COURT:  Adler.

14           MR. REICHMAN:  Savannah Carnes, Gina Cremona, and

15   Jaime Cardenas-Navia.

16           THE COURT:  Okay.  Thanks.

17           MR. FISCH:  Good afternoon, your Honor.

18           Alan Fisch on behalf of AWS.  I'm joined by Bill

19   Sigler, Jeff Saltman, Lisa Phillips, and Brandon Evans.  Thank

20   you, sir.

21           THE COURT:  Okay.  Sorry about the lights in here.  I

22   don't know what the story is.  It's like about a third of them

23   are out.  We'll get it fixed or we'll get somebody to get it

24   fixed.

25           So there's a lot of stuff.  I sent out an order

1   yesterday basically saying the things that I wanted to talk

2   about, and it looks like one of the stipulations that got

3   filed later yesterday maybe takes a couple of those off the

4   table, but we can kind of sort that out as we go.

5           So my plan for this, I'm not going to issue written

6   rulings on anything.  There's just going to be a minute entry.

7   My plan on this was to go through everything that I am

8   prepared to rule on without hearing more argument, starting

9   with the defendant's Daubert motions, then the plaintiff's

10  Daubert motions, then the defendant's motions in limine, then

11  the plaintiff's motions in limine, and then go back and talk

12  about the ones that we need to talk about.  So that's the

13  plan.

14          And if we get -- if we get to something and it looks

15  like I'm about to rule on something that has now been taken

16  off the table by the stipulation, somebody jump up and say you

17  don't need to rule on that, so it will save me a couple of

18  minutes.

19          So you're going to want to order the transcript, but,

20  you know, obviously feel free to take notes.

21          So I'm going to start with the defendant's Daubert

22  motions.  And Melissa, I'll get you something afterwards.  You

23  don't have to worry about keeping track as we go.

24          THE CLERK:  Okay.

25          THE COURT:  The first one has to do with the damages

1  expert, Bergman, B-E-R-G-M-A-N, and it's his bargaining --

2  what's referred to as his bargaining split opinion.  Bottom

3  line, I think the opinion is sufficiently explained and it's

4  tied to the facts in the case as required by *Exmark*

5  *Manufacturing Company v. Briggs & Stratton Power Products*

6  which was a case cited by the defendants.  I don't think this

7  is a situation where Bergman has just recited factors and then

8  pulled the number out of the air.  I think he's explained it

9  sufficiently.  And, you know, to the extent there's not a

10  precise formula, it's a hypothetical negotiation, and so

11  there's some lack of precision that's kind of inherent in the

12  process.  So that motion's denied.

13          The next issue on Bergman has to do with what are

14  referred to -- I'm just going by the titles here -- S3 and

15  hashing limitations.  So the plaintiff's, what I'll refer to

16  as technical expert whose name is Goodrich, concludes that

17  almost all of the benefits of something called cache, which I

18  guess is spelled c-a-c-h-e, derived from hashing; and Bergman,

19  the damages expert, in turn relies on that.

20          I think it's sufficiently supported.  The fact that

21  the defendant's expert differs is not a basis to exclude it.

22  What this boils down to in my view is a dispute over where the

23  benefits of the alleged infringing system were derived, and I

24  don't think that's a basis for exclusion.

25          There are disputes about the analysis of claimed

1  non-infringing alternatives, but I think those are matters for
2  cross-examination and argument about weight, not for
3  exclusion.
4          The next opinion has to do with S3 and the scaling
5  limitations.  The argument is that Mr. Goodrich, upon whom
6  Bergman relies, maybe it's Dr. Goodrich, I don't know,
7  overstates the scaling claims value within S3.  I think the
8  plaintiff has the better of this argument as well.  The
9  non-infringing alternative that's considered by Goodrich and
10  relied on by Bergman I think is sufficiently narrowed to
11  address only the allegedly infringing aspects of S3.
12          The next issue has to do with DDB, which I think is
13  sometimes referred to as DynamoDB, and that has to do with
14  both hashing and scaling limitations.  And, again, I think the
15  analysis by Bergman is sufficiently explained and supported as
16  based on alternatives, non-infringing alternatives that
17  exclude only the claimed infringing features of DynamoDB.
18          There's a dispute over the extent to which the
19  infringing features contribute to the value of the patent, but
20  that's a basis for cross-examination and presentation of
21  contrary evidence, not exclusion.
22          The rest of the Daubert motion has to do with
23  Goodrich, the technical expert.
24          First is his opinion that -- regarding the
25  non-hierarchical -- it has to do with the -- what's referred

1   to as the name space issue.  The defendant basically argues

2   that it's not in the plaintiff's infringement contentions and

3   also that the infringement contentions relating to this were

4   too conclusory.  There wasn't -- I will just point out,

5   although it's not really a basis or at least a basis by itself

6   for decision, that there was no motion that I'm aware of to

7   either strike the infringing contentions as unduly conclusory

8   or to ask for them to be supplemented in any way.  That aside,

9   I agree with the plaintiff's argument that this name space

10  issue involves evidence supporting the theory, not the theory.

11  So I don't think that the fact that it wasn't disclosed, if

12  that's the case, is a basis for excluding that opinion.

13          The other issues on Goodrich have to do with Doctrine

14  of Equivalents theories regarding the transferring and table

15  limitations.

16          MR. REICHMAN:  Your Honor, is that one that was --

17          THE COURT:  Is that one of the ones that's off the

18  table now?

19          MR. REICHMAN:  I remember DOE.

20          THE COURT:  Does everybody agree that's off the table

21  now?

22          UNIDENTIFIED SPEAKER:  Yes.

23          THE COURT:  I know there's a DOE issue off the table.

24  I don't think it's this one.  Let me just see.  The thing

25  that's off --

1        MR. ADLER:  The item that's off is --

2        THE COURT:  It's the prosecution history estoppel

3    issue.

4        MR. ADLER:  That's right.

5        UNIDENTIFIED SPEAKER:  That's correct.

6        THE COURT:  I think that may be part of this.  I got

7    to tell you, I did all of this before I saw any of these

8    things.

9        I tell you what, I'm just going to go ahead and do

10   what I was going to do, and if ends up not mattering, you

11   know, we'll never get those three minutes back, but so what.

12       Anyway, on this, I agree with the plaintiff, Kove,

13   that there aren't any new and undisclosed theories.  First of

14   all, the supposed missing step in the infringement contentions

15   regarding the transferring limitations is a question of

16   whether there are three steps or two.  I don't think it's

17   actually missing.  I think it's sufficiently disclosed.

18       The other issue has to do with hash table.  The hash

19   table index or reference to hash table indexes, I think that

20   is, as the plaintiff argues, it's a description of how hash

21   tables work.  So it's just an explanation or evidence to

22   support the disclosed theory, not a new and undisclosed

23   theory.  And I'll also point out that the defendant was able

24   to address both of these issues in its response of expert

25   reports.  So even if there was a problem, there wasn't

1    prejudice.

2         The next issue on Goodman has to do with his alleged
3    contradiction of claim constructions.  And there are basically
4    two issues.  I found on summary judgment that the plaintiff
5    had limited the claims to server structures with
6    non-hierarchical configurations, and also said that the
7    plaintiff had defined, quote/unquote, non-hierarchical as a
8    server, as any server can return location information or
9    information that's used by the client to locate a server that
10   has location information.

11        The argument here is that Goodrich says that
12   something called a KFC would know which brick master,
13   sometimes referred to as BM as a short, to query not that a
14   KFC would know what other KFCs contain in its claim but that's
15   contrary to the claim limitation -- or to the claim
16   construction.  I actually don't agree with that and I agree
17   with the plaintiff that this basically amounts to a
18   rehashing -- no pun intended -- of arguments made by the
19   defendant that were overruled on summary judgment or during
20   claim construction.  And I don't really see anything in
21   Dr. Goodrich's opinion that contradicts the claim construction
22   that Judge Pallmeyer made back in I think December 2021.

23        The other issue relates to Dynamo database or
24   DynamoDB.  Just kind of cutting to the bottom line here,
25   again, I think this argument is largely a redo of summary

1  judgment arguments that were overruled.

2  Dr. Goodrich's opinion that says that when a --
3  something called an MN, metadata -- which is short for
4  metadata nodes -- gets a request for location information, the
5  MN provides it or provides information used to determine which
6  MN has the location information.  That's basically his view.
7  Again, I don't think there's anything about that that's
8  contrary to the claim limitation.

9  The last issue on Goodrich has to do with brick
10  manager.  That's one of the things I need to hear more about.
11  So we're going to come back to that one later.  Let me just
12  put a little Post-it note there.

13  Continuing on through the motion, the last thing --
14  and this I think is the thing that was withdrawn.  It's what's
15  referred to as the Goodrich hash table Doctrine of Equivalents
16  opinion.  I think that's the thing that got withdrawn.  Is
17  that right?

18  UNIDENTIFIED SPEAKER:  That's correct.

19  THE COURT:  Okay.  That one I'm just not going to
20  deal with.

21  So that's everything in the defendant's Daubert
22  motion other than the one thing we got to talk about.

23  So I'm going to turn over to the plaintiff's motion.
24  Spoliation, which was the first issue there, is one of the
25  things we have to talk about.  So I'm going to start with the

1  Daubert issues and just give me a second here to get my notes
2  reorganized.

3        Yeah, so there's a few of these that we have to talk
4  about.  I'm going to rule on the ones that we -- that I don't
5  think we do have to talk about.

6        So the first set of issues have to do with experts
7  named Bennis, B-E-N-N-I-S, and Grama, I don't know if that's
8  how it's pronounced, G-R-A-M-A.  The first is license
9  comparisons that were done by Bennis who's a defense I think
10 damages expert.  I think his opinion regarding the
11 comparability of these particular licenses is sufficiently
12 explained.  The issues that are raised are matters for
13 cross-examination, not a basis for exclusion.

14        The second issue has to do with what's referred to as
15 technical comparability.  This has to do with the expert named
16 Grama.  How is that pronounced anyway?

17        MR. SIGLER:  It's Grama.

18        THE COURT:  Grama.  Thanks.

19        Basically the argument is that the opinion is at too
20 general a level of comparison and it's too conclusory.  I
21 disagree with that.  The degree of similarity is disputed in
22 terms of the comparability, but again I think that's a matter
23 for cross-examination.

24        The next issue has to do with the damages expert
25 Bennis regarding transactions referred to as the e-Connetix,

1   E-C-O-N-N-E-T-I-X, I think, transactions.  The argument is

2   that there's not any analysis or a sufficient analysis of

3   comparability.

4        I agree with the defense argument that this testimony

5   is relevant under Georgia-Pacific Factor 1 having to do with

6   history of the patents regarding the hypothetical negotiation

7   analysis, and the degree of contextual differences are a

8   matter of cross-examination, not exclusion.

9        The last point under this particular heading is an

10  argument that non-infringing -- that non-infringing

11  alternatives are discussed that were not disclosed in

12  interrogatory responses, and I think this pertains to both

13  Bennis and Grama.  I think the defendant has sufficiently

14  shown that it is not citing these items as non-infringing

15  alternatives but rather for other purposes.  So I disagree

16  with that argument.  And by Kove as well.

17       The next set of opinions or the next set of issues

18  has to do with non-infringement opinions.  Give me a second

19  here.  There's one of these we need to hear argument on.

20  That's the one involving naming convention hierarchy.  So I'm

21  going to bypass that.

22       I'm overruling the other arguments that are made by

23  Kove in this motion.  The first has to do with parent/child or

24  what's referred to otherwise as root/leaf, L-e-a-f, hierarchy

25  among bricks in -- bricks within brick managers in the S3

1    product.  I agree with the defendant that this is just a

2    different way to describe a relationship that was disclosed in

3    the contentions.  The argument generally here is that these

4    items were supposedly only in Grama's rebuttal report and not

5    in the final infringement contentions.  Anyway, I disagree

6    with that.

7          The second issue is naming convention hierarchy.

8    We're going to come back to that.

9          The third issue is what's referred to as the theory

10   that -- theory regarding the KFC cache being too full.  I

11   think the defendant's caching theory is sufficiently disclosed

12   in the contentions.  Here, it's just explained more in the

13   report.  I don't think that's a problem.

14         The last issue is referred to what's called -- it's

15   referred to as primary key, quote/unquote, as not being a,

16   quote/unquote, identifier in the DDB product.  Again, I think

17   that's sufficiently disclosed in the contentions on

18   non-infringement.  And this is just more detail on previously

19   disclosed theories.

20         Okay.  So the next issue has to do with -- next

21   general categorization has to do with practicing the prior

22   art.  That's one we got to come back to.  So we're skipping

23   over that one.

24         The next one has to do with what are argued to be

25   immaterial, quote/unquote, hierarchy opinions.  We're going to

1    come back to that one.

2           The last has to do with what are referred to as new

3    claim construction supposedly being offered by Grama.  So as I

4    understand the response by AWS at page 25, they're agreeing

5    not to use that.  And I will say that I would have sustained

6    the motion even if you hadn't agreed to that.  So that piece

7    is granted.

8           We're over to invalidity opinions.  I think this may

9    be moot at this point because it has to do with obviousness

10   type double patenting which I think is off the table now.  Is

11   that right?

12          MR. FISCH:  Correct, sir.

13          MS. CREMONA:  Correct, your Honor.

14          THE COURT:  By the way, it is really dark in here.

15   Isn't it?  We used to have things where we could make it go up

16   and down.  They took them away like ten years ago.  I don't

17   know why.  Sorry about that.

18          Okay.  So I'm going to skip over that one.

19          Spoliation we're going to come back to.

20          Now, I'm into the motions in limine and I got these

21   in a different spot.

22          So starting off with the defendants.  Just so you

23   know why I start off with the defendants on both sides is they

24   concern stuff in the plaintiff's case.  So, for me, it's

25   always been logical to deal with the defendant's motions in

1  limine first.

2       So there are ten of them of which we have to talk

3  about four.  And those four are 5, 6, 7 and 10.  So I'm going

4  to deal with the other ones.

5       First is defendant's motion in limine 1 having to do

6  with use of pejorative language, specifically, stealing,

7  copying, pirating, trespassing, misappropriating in relation

8  to infringement.  I think this is better left for trial.  And

9  if something is done that looks like it's offending, make an

10  objection, I'll rule on it.  And I mean, kind of the deterrent

11  factor for the other side is that it's not a good thing to

12  have juries told that you've said something wrong.  And so I

13  think there's enough kind of inherent deterrence there that we

14  don't have to deal with this now.  So that one's deferred.

15       Number two has to do with disparaging a party as a

16  bully, harassing, greedy, corrupt or dishonest or I guess

17  similar words.  I'm sustaining that one for now because it's

18  argumentative, but if -- when we get to closing arguments, if

19  somebody thinks there's a basis to use one of those terms or

20  something similar, just bring it up with me outside the jury's

21  presence before closing arguments and I'll deal with it.

22       Defendant's motion in limine number 3, the title of

23  this is presence of witnesses and disparaging deposition

24  testimony is lesser than live testimony.  So I'm granting this

25  motion.

1   So, you know, there's reference made to the Seventh

2   Circuit pattern jury instructions. So, first of all, jury

3   instructions, the jury instructions, the standard jury

4   instructions say that deposition testimony is to be taken the

5   same way as in court testimony. And so to some extent, the

6   argument that is being addressed in this motion in limine, if

7   it were made, would be contrary to those instructions. And

8   the rule is, and, you know, maybe the instruction itself on

9   missing witnesses in the Seventh Circuit pattern instructions

10  is not a model of clarity, but if you read the comments, the

11  thrust of them is that missing witness arguments are generally

12  barred in the Seventh Circuit.

13  And the bottom line reason for this, I don't think

14  this is actually discussed in the comments -- give me a second

15  here. The bottom line reason for that is that it's a civil

16  case. Everybody's available to both sides because you can

17  take their depositions before trial.

18  So, you know, I've been doing this for 24 years and 8

19  months now. I can't say that I've never seen a civil case

20  where a missing witness instruction has been appropriate, but

21  I'll just say this: If I have, I don't remember it. It would

22  be pretty rare. So I'm granting motion in limine number 3.

23  Motion in limine number 4 has to do with referring to

24  discovery disputes, motions, rulings or the sufficiency of

25  production in the presence of the jury. Aside from the

1 spoliation issue which we'll come back to, I'm granting that
2 motion. It's just not appropriate to talk about that kind of
3 stuff in the presence of the jury. And in all likelihood, the
4 witnesses aren't going to know anything about it anyway.

5 Motion in limine number 5 -- so now we've gotten to
6 things I'm going to skip over. 5, 6, and 7 I'm skipping over,
7 going to 8.

8 The title of 8 is barring any reference to Amazon
9 statements about the litigation in SEC filings. I'm granting
10 that under Rule 403. I think this has, at best, minuscule
11 probative value, and it's likely to be highly confusing. If
12 there's some suggestion that the defendant might open the
13 door, if the plaintiff thinks that's happened, raise it
14 outside the jury's presence with me and I'll address it.

15 And that's true with anything like this. If somebody
16 thinks the other side has opened the door to something I've
17 excluded, you don't get to just go into it, you have to raise
18 it at a sidebar. So motion in limine number 8 is granted.

19 Next is 9 referring to references to witnesses'
20 compensation and stock options. Regarding stock options, I'm
21 granting that, Rule 403. Tiny probative value. And the
22 unfair prejudice would be significant.

23 Regarding compensation other than that, here's what
24 I'm going to say, what I wrote in my notes. If you want to go
25 there, have at the capillary. That's opposed to having at the

1    jugular. If you want to talk about that somebody's making

2    $138,000 a year or $247,000 a year and that they're going to

3    lie about that, just go for it is what I say. I don't think

4    there's a basis to exclude it. But you would be going for the

5    capillary as opposed to the jugular on that one. But it's

6    your call. So motion in limine number 9 is granted in part.

7    Number 10 is the last one on the defense side. This

8    has to do with references to other litigation involving either

9    party. I'm going to grant that one. I don't see other

10    lawsuits as relevant on the question of willfulness because

11    the question of willfulness addresses these patents and the

12    other lawsuits don't.

13    There is -- the other piece of that on the license

14    issue we're going to have to come back to. That's one of the

15    things I had on the list.

16    So now I'm flipping over to the plaintiff's motions

17    in limine. And there's a few of those that were not -- that

18    we have to defer. So I'm going to talk first about

19    plaintiff's motion in limine number 2. The title of that is

20    exclude evidence or argument regarding Kove's timing and

21    bringing this suit. I'm granting that motion. I don't think

22    it's relevant, and even if it were, I would exclude it under

23    Rule 403. I don't think the plaintiff's timing and filing of

24    the lawsuit has any bearing on the issue of the defendant's

25    willfulness. And I don't even really see there being a

1    straight-faced argument to the contrary by the defendant.

2         In addition, the timing of the plaintiff's filing of
3    suit really doesn't add much on the memory issues that are
4    discussed.  The point is that the events happened a long time
5    ago, not that the plaintiff waited to file suit.  And you can
6    cross-examine to your heart's content on that.  The idea that
7    you'd shift blame to the plaintiff for that is just -- like I
8    say, I think it has tiny probative value.  So that's number 2.

9         Number 7 was the one about claim construction.
10   There's some of that stuff we got to talk about and some we
11   don't.  I think I'm just going to leave that for now.

12        I'm skipping ahead to the last one on the plaintiff's
13   side, which is 8, which says precluding evidence or argument
14   regarding Kove's case against Google.  That motion's granted
15   to exclude that.  It's irrelevant.  And even if it wasn't, I'd
16   exclude it under Rule 403.  And, again, if the defendant
17   thinks the plaintiff has opened the door at some point, you
18   should raise that outside the jury's presence.

19        So we're now about to go back to the stuff that I
20   want to talk about.  And in terms of sequence, I want to talk
21   about the spoliation motion first.  So let me just get back to
22   my notes on this.  I got a couple questions in here and I just
23   got to track them down.

24        So, first of all, I want to make sure that I'm
25   completely understanding exactly what the nature of the cross

1 | is going to be, because the argument about prejudice that Kove
2 | is making largely has to do with the need for the damages
3 | expert, Bergman, to extrapolate backwards to periods where
4 | there's missing data because it wasn't preserved.  And what I
5 | want to get a handle on is exactly what -- because I think
6 | this is pretty much directly pertinent on the question of
7 | prejudice, is what's the nature of the cross going to be on
8 | Bergman's what I'll call -- I'm going to borrow this from
9 | another context, it's actually from drunk driving cases -- his
10 | retrograde extrapolation.  Just so you know, that's when they
11 | do the breathalyzer examination, then they have to figure out
12 | what your blood alcohol concentration was six hours earlier.
13 | It's called retrograde extrapolation.  Roughly similar.

14 | So what exactly is the cross going to be about that?

15 | MR. SALTMAN:  Your Honor, should I come to the podium
16 | or would you like me to stay here?

17 | THE COURT:  Unless you know what the cross of your
18 | expert is going to be, then you're not the right person to
19 | answer this.  I'm asking them.

20 | MR. REICHMAN:  You said Bergman which is our expert?

21 | THE COURT:  I'm sorry.  I didn't mean Bergman.

22 | MR. REICHMAN:  Did you mean Grama?

23 | THE COURT:  I mean the plaintiff damages expert.  No,
24 | that is your expert.  No, I'm sorry.  I've got you guys flip
25 | flopped.  You are the right guy.  Never mind.  Sorry about

1   that.  You had it right the first time.

2          And you are?

3          MR. SALTMAN:  Mr. Saltman.

4          THE COURT:  Saltman, right.

5          MR. SALTMAN:  Thank you, your Honor.

6          With respect to the cross-examination, it would

7   mostly focus on the technical expert and to the extent he is

8   cross-examined regarding his extrapolation back.  It would be

9   what was contained within Dr. Grama's report in paragraphs 442

10  to 445.  It has to do with what data for one specific set of

11  metrics, what data he chose to use based on the data that was

12  produced to extrapolate back.  And that's the only extent that

13  he would probably be cross-examined.

14         THE COURT:  There's no intention to criticize him for

15  extrapolating?

16         MR. SALTMAN:  No, your Honor.

17         THE COURT:  Because he's pretty much got to.  He

18  doesn't have any other choice, right?

19         MR. SALTMAN:  Correct, your Honor.

20         THE COURT:  I would assume that's true for both

21  sides.  They have to extrapolate backwards.

22         And there's not going to be an argument that you

23  should have found better data for that period of time or

24  anything like that?

25         MR. SALTMAN:  No, your Honor.

1          THE COURT:  Okay.  Now, that he said that, my

2   question for plaintiff's counsel is explain to me how you're

3   harmed.  Because he's extrapolating, everybody's

4   extrapolating, it's something that experts normally do.

5   Explain to me how you're harmed.

6          MR. REICHMAN:  Well, in fairness, their expert does

7   not extrapolate.  He thinks the entire analysis is flawed.

8   He's just criticizing our expert for extrapolating.

9          THE COURT:  But is he criticizing him for

10  extrapolating or is he criticizing him for how he did the

11  extrapolation?

12         MR. REICHMAN:  It's how he extrapolates.

13         THE COURT:  Those are two different things.

14         MR. REICHMAN:  I understand.  I can be more precise.

15  It's how he's extrapolating.  And our point is really that

16  he's criticizing for how he's extrapolating and he was

17  required to extrapolate because the data was not preserved.

18         THE COURT:  Right.  But, again, it just seems to me

19  that there's -- if you were to say, you know, you've

20  extrapolated, you shouldn't have done that, then it would be a

21  pretty obvious answer, so, yeah, I couldn't do it because

22  there wasn't any data.

23         If the criticism is the way you extrapolated doesn't

24  make any sense or it's not logical or it's not reasonable or

25  whatever, it doesn't seem to me that that particular cross

1  brings into play -- that that particular cross leads to

2  prejudice because the data was destroyed.

3      MR. REICHMAN:  I think it does, in fairness, and I

4  think it's a little broader than that.

5      THE COURT:  Why do you have to do anything other than

6  have him say, look, I extrapolated because we didn't have any

7  data for that period, full stop?

8      MR. REICHMAN:  I think what he would need to say is

9  because it was not maintained.  Because them not having it

10  suggests that it's not important to AWS, that's why they don't

11  have such data.  And they did have it.  And if they kept it,

12  we would know.

13      This is a truly important metric.  The jury can see

14  that this is important to AWS.  It's one of the things that

15  they think is very important about the accused technology.

16  And if I told you, you said, Mr. Reichman, is something

17  important?  Your client doesn't even track it, how important

18  can it be?  I don't want the jury thinking that AWS simply did

19  not track this metric because it wasn't important.  The jury

20  needs to know that they do track it; they didn't maintain that

21  data.

22      THE COURT:  Okay.  So let me ask it in a slightly

23  different way.  Why would you necessarily have to do anything

24  more in explaining the need for extrapolation, that I did that

25  because the data no longer existed at the time I did my

1  analysis.

2          MR. REICHMAN:  Well, in part, because their expert's
3  report says that they didn't destroy the data.  So if he's
4  going to get up and say they didn't destroy any data, then you
5  need to say, well, they did.

6          THE COURT:  This is who?

7          MR. REICHMAN:  The defendant's expert, Grama.

8          THE COURT:  Is Grama going to say that?

9          MR. SALTMAN:  Your Honor, it's only in response if
10  their expert says that data was destroyed and characterizes it
11  that way.

12          THE COURT:  I'm not going to get into how many angels
13  dance on the head of that particular pin, so let's just avoid
14  that.

15          So he's basically saying he's only going to bring it
16  up if you bring it up.

17          MR. REICHMAN:  And I need to bring it up, that they
18  had the data and they no longer have it.

19          THE COURT:  I guess my point is why -- is if you look
20  at your guy's -- your person's testimony as kind of a
21  self-contained hole, why does he need to say anything more
22  than, I did this because the data no longer existed at the
23  time I did my analysis?

24          MR. REICHMAN:  He can say that as long as then that's
25  not prompting them --

1          THE COURT:  If I let him say that, do you have a

2   problem with that?

3          MR. SALTMAN:  No, your Honor.

4          THE COURT:  And is that going to generate cross

5   that's going -- I mean, you will understand, I assume, that if

6   I say that and if you start crossing him on the details of

7   that, it's like you went to the backdoor of the courtroom and

8   pushed really hard and flung it open.  Right?

9          MR. SALTMAN:  Yes, your Honor.  Understood.

10         THE COURT:  Okay.  That's the way we're going to do

11  it.  You can elicit that the reason that I did this is that

12  the data no longer existed at the time.

13         MR. REICHMAN:  Okay.

14         THE COURT:  That's kind of where it's going to be

15  left.  Not kind of.  That's where it's going to be left.  If

16  anybody goes farther than that, I'm going to have to start

17  saying stuff to the jury and you guys don't want me doing

18  that.  Okay.  So that's go going to be the ruling on that.

19         MR. REICHMAN:  Okay.

20         THE COURT:  I don't regard that, allowing him to

21  testify to that, as any kind of a sanction or anything.  He's

22  basically just explaining why he did what he did, and we're

23  not going to get into anything pejorative.

24         So the spoliation issue, I'm otherwise denying that

25  motion.

1    So I think then there was one other -- no, that was
2  the -- I'm sorry.  There were two other things in the
3  plaintiff's motions in limine.

4    So the next one has to do with Grama's opinion
5  regarding naming convention hierarchy.  This is in the
6  motion -- let me just get there.  It's in the plaintiff's
7  motion at page number 29.  No, that's not right.

8    MR. CARDENAS-NAVIA:  It's page number 19, your Honor.

9    THE COURT:  I had it wrong in the order.  Okay.  I'm
10  going to say there is no page 29.  That would be kind of hard
11  to do.  It's page 19.

12    Okay.  It's basically a four-sentence argument.  I'm
13  just going to read it out loud.  It kind of helps me just to
14  lay the groundwork:  "Grama opines that both accused products
15  are hierarchical because of 'naming conventions' for stored
16  data items."  I'm leaving out the citations.

17    "In his view, if multiple data items stored in
18  different regions can have the same name, then the system must
19  be hierarchical.  But 'naming convention' does not appear in
20  AWS's final non-infringing theories nor is this theory
21  otherwise disclosed.  It should be excluded."

22    So that's the argument made by Kove in this motion.

23    The response is a little longer, so I'm not going to
24  read that out loud.  But I think that's kind of enough of a
25  setup.  Let me get to the argument in the response.  So the

1    responsive argument is at pages 21 to 23.  I think I got that
2    part right at least.  No, not 21 to 23.  23 to 25.  Nope.
3    Wrong again.  21.  There it is.  Top of page 21.
4             All right.  So I guess I need to hear from both sides
5    on this.  I'm going to tell you that when we get into some of
6    this detail, I got kind of a little bit lost in the details.
7    So there's a virtue in simplicity.  Because, remember, you're
8    dealing with somebody who doesn't know this stuff unlike
9    probably pretty much everybody in the room that's facing this
10   way.
11            MR. CARDENAS-NAVIA:  Good afternoon, your Honor.
12            THE COURT:  It was Mister?
13            MR. CARDENAS-NAVIA:  Cardenas-Navia.
14            THE COURT:  Thanks.
15            MR. CARDENAS-NAVIA:  I'm hoping I can avoid getting
16   to the technical details but, of course, I do that if that's
17   helpful.
18            The primary thrust of our argument is that this idea
19   of the naming convention as a non-infringement theory just was
20   not in the contentions.  The words aren't there.  And Amazon
21   actually doesn't contest that it was in its non-infringement
22   contentions.  Its only argument is that it's responsive to our
23   name space infringement theory that they allege showed up for
24   the first time in our expert's infringement report.
25            But as your Honor recently just ruled, the name space

1  is not a theory.  It's just evidence in support of why the

2  claim limitation identifier is there.

3          THE COURT:  Okay.  Fair enough.  But if that's so,

4  why shouldn't they get to respond to your evidence that's in

5  the opinion of your expert?

6          MR. CARDENAS-NAVIA:  Well, I think there's a

7  conflation between name space and naming convention that's

8  going on.  Because it's not our use or reliance on name space

9  in our expert's infringement report.  That is -- I should say

10  it the other way.  Their use of naming convention in their

11  expert's report is not responsive to our expert's use of the

12  name space.

13          THE COURT:  Okay.

14          MR. CARDENAS-NAVIA:  I can explain that if your Honor

15  would like.

16          THE COURT:  Do.

17          MR. CARDENAS-NAVIA:  So name space, right, is this

18  concept that within regions of S3, no object, no data object

19  can have the same name.

20          THE COURT:  Okay.

21          MR. CARDENAS-NAVIA:  So a requirement of the claim,

22  it's the identifier claim limitation, is that each data entity

23  must be uniquely identified.  And so, you know, our expert

24  looked at the evidence and said, okay, within each region,

25  Amazon has a lot of evidence that each object is uniquely

1  identified by what we identify as an identifier.  And that's

2  not necessarily true across regions because they have

3  different name spaces.

4         So that's how Kove relies on the name spaces as

5  evidence to support our mapping of the identifier claim

6  limitation.

7         Amazon's theory, as best as I understand it about the

8  naming convention hierarchy, is that within different regions

9  of AWS, you can -- they give the example of DynamoDB, there's

10 something called table names, and you can have the same table

11 name in different regions but not within the same region.  And

12 they use that fact, Dr. Grama uses that fact to argue that

13 there is a hierarchy within the accused products.  And it's

14 essentially a different version.  It's more evidence in

15 support of their geographical hierarchy.

16        And so that evidence, that argument, the reliance on

17 naming convention is about the location server limitation and

18 whether it's non-hierarchical or not.

19        THE COURT:  If I can kind of boil that down

20 drastically, what you're basically saying is that AWS's

21 argument that this is just a response to the name space thing

22 is wrong, it's about something else altogether, and it should

23 have been disclosed and it wasn't.

24        MR. CARDENAS-NAVIA:  That's correct.

25        THE COURT:  Okay.  Let me hear from you guys.  It's

1  Mr. Sigler, right?

2        MR. SIGLER:  Yes, your Honor.  Thank you, your Honor.

3        That they disagree that this is responsive isn't a

4  test on Daubert.  I mean, in our view, this is responsive to

5  the name space theory that Dr. Goodrich offered up -- not

6  theory -- evidence that Dr. Goodrich offered up.  We're

7  entitled to provide contrary evidence to that in our expert's

8  report, and he's simply responding to Dr. Goodrich on this.

9        They should either both be in or they should both be

10  out, your Honor.  And your Honor's ruled that the name space

11  theory which does relate to how Dr. Goodrich is looking at

12  these products in a single region, your Honor ruled that that

13  was in and, therefore, Dr. Grama's response should be in as

14  well.

15        THE COURT:  Can I ask one more question of Kove's

16  counsel here?  So I get that you might argue that this isn't

17  all that significant, but I'm not really completely up on what

18  the back and forth was on the experts.

19        So obviously you got to take their expert's

20  deposition.  The thing that you're asking me to exclude now --

21  presumably it was on the table in one of his reports at the

22  time you took the deposition -- at the time you guys took the

23  deposition, right?

24        MR. CARDENAS-NAVIA:  That's correct.

25        THE COURT:  So you got to question him about it.

1  Right?

2          MR. CARDENAS-NAVIA:  Yes.

3          THE COURT:  Did you get a rebuttal report after that?

4          MR. CARDENAS-NAVIA:  No.

5          THE COURT:  And was that because it wasn't provided

6  for in the schedule or was that because you just chose not to

7  do one?

8          MR. CARDENAS-NAVIA:  That's correct.  The way the

9  expert reports were structured by the court order was that we

10  get our opening report, they get a rebuttal.

11          THE COURT:  And that's it.  And then you take the

12  depositions and that's it.

13          MR. CARDENAS-NAVIA:  Exactly.

14          THE COURT:  When your expert's -- when your

15  corresponding expert's deposition was taken, had Grama's

16  report come out yet?  I assume that's a yes, right?

17          MR. CARDENAS-NAVIA:  Yes, all the reports came out,

18  then the depositions were taken.

19          THE COURT:  And it's a fair answer if you don't know,

20  okay, just tell me you don't know.  Do you know whether your

21  expert when deposed was questioned about this issue in -- this

22  point in Grama's report?

23          MR. CARDENAS-NAVIA:  I would confirm, but I don't

24  believe so.

25          THE COURT:  It would stand to reason that he probably

1  wasn't.  Okay.

2       Do you know otherwise on your side?  I mean, I would

3  guess that you're not questioning something on somebody that

4  they didn't say in their report, but you might.

5       MR. SIGLER:  I took his deposition, your Honor.  To

6  the best of my recollection, I did not.

7       THE COURT:  Okay.  Then my last question for you is

8  that is your person -- so assuming I let them put this in, is

9  your person going to be prepared to say something about it

10  during his testimony?

11       MR. CARDENAS-NAVIA:  We could prepare him.  We

12  haven't had that opportunity.  We would need an opportunity to

13  do that.

14       THE COURT:  Yeah.  I'm not persuaded here that there

15  was a prejudicial non-disclosure.  I mean, I think there's

16  valid arguments on both sides about whether this is something

17  new or whether this is just something responsive.  I'm not

18  prepared to say that it's brand new.  If you want to have your

19  person on the plaintiff's side talk about this since the

20  defendant's expert is going to get to talk about this, just

21  front that with everybody first before you do it -- when I say

22  everybody, I mean with them -- before the person hits the

23  witness stand so we can hash out any issues that we have about

24  that.

25       MR. CARDENAS-NAVIA:  Understood.

1    THE COURT:  All right.  So that's the first of those

2  issues.

3    The second one has to do with what's referred to as

4  Grama's practicing the prior art testimony.  This is pages 21

5  and 22 of the motion.  Let me just get to my notes here.

6    Okay.  So it's pretty much hornbook law, at least if

7  you have a big enough hornbook, that there's no such thing as

8  a practicing the prior art defense to literal infringement.

9  There's plenty of federal circuit cases that say that.  One of

10 the ones that's cited is called *Tate*, T-A-T-E, *Access Floors*

11 *v. Interface Architectural* which is 279 F.3d at page 1365.

12 That's an opinion from 2002.

13    So the plaintiff's argument that Grama is opining

14 that the S3 product doesn't infringe because it practices what

15 was disclosed in a prior art paper which, according to Grama,

16 Overton, the CEO of Kove, says is different from the Kove

17 patents.  And there's a similar issue on the DDB product

18 regarding a piece of prior art referred to as Ault, I think,

19 A-U-L-T.

20    So as I'm understanding AWS's argument in response to

21 this motion, they're saying we're not asserting this as a

22 defense, we're not saying that practicing of what's called the

23 Karger or Karger method, K-a-r-g-e-r, is a defense.  Karger

24 method is what's in the earlier prior art paper for the S3

25 product.

1       But I will tell you that my reaction in reading AWS's
2   argument, and I'm particularly focused on the carryover from
3   page 22 to 23 of the response.  And let me just get to that.
4   So this sentence appears.  It's the carryover sentence from 22
5   to 23 talking about what Grama is doing.  He's not doing this,
6   he's not doing this.  Here's the last sentence.  It says,
7   "Instead, he's showing that S3 uses a non-infringing public
8   domain method that Dr. Overton testified differs from the
9   claimed methods."
10      That sentence could have been written by Kove because
11  it's basically their argument, that what Grama is saying is
12  that we're using this non-infringing public domain method,
13  which is what the prior art is, and Overton testified that's
14  different from the claimed methods.  So I guess my initial
15  take on your response is it kind of confirms what Kove is
16  saying.
17      What am I missing?  Can you explain it to me better
18  or differently?
19      MR. EVANS:  Good afternoon, your Honor.  Brandon
20  Evans on behalf of AWS.
21      Your Honor, this case is different from the cases
22  that Kove cites because the issue here is that AWS's source
23  code specifically references this method, pardon me, as an
24  explanation of what it's doing in S3.  Dr. Goodrich in his
25  infringement report has an appendix that notes the source code

1  that he relies on in considering infringement.  He

2  specifically cites the piece of source code in question here

3  that contains this comment about the Karger paper.  This

4  comment states that AWS uses an implementation of Karger.

5        It would be prejudicial to us to not allow us to

6  explain what the Karger method is when our source code's

7  description of this method is we use the Karger method.

8        THE COURT:  Okay.  So let me just kind of try to

9  repeat back to you in my less knowledgeable way what I think

10  you just said.  What I think you just said is that the

11  plaintiff's expert refers to the Karger method --

12        MR. EVANS:  Correct.

13        THE COURT:  -- in his report and, therefore, we need

14  to be able to explain what that is and why it is that he's

15  right that that's what we're doing.

16        MR. EVANS:  Correct, your Honor.  To put a finer

17  point on that, he accuses a piece of our source code of

18  infringing, and that piece of source code refers to the fact

19  that it is an implementation of the Karger method.  So in

20  order for us to explain why the Karger method does not

21  infringe, we have to be able to explain what that method is.

22        THE COURT:  Okay.  Pause for a second.  Unless you

23  need to say something else.  It looks like you need to say

24  something else.

25        MR. EVANS:  Your Honor, the Federal Circuit law on

1   this matter is concerned, if you think of the three aspects of

2   this like a triangle.  You have the accused product here, you

3   have the claims over here, and you have the piece of prior art

4   here.  What the Federal Circuit prohibits in its practicing of

5   the prior art defense is connecting the claims and the accused

6   product through the prior art in this triangle piece.

7          What we do and what the Federal Circuit has cautioned

8   that you must do is directly compare the accused products to

9   the claims.  We do that, your Honor.  Dr. Grama does that.  He

10  does that in paragraphs 271 to 282 of his report for S3.  He

11  does it in his supplemental report in paragraphs 8 of that

12  supplemental report for DDB amongst other places.

13         That's not what we're doing, your Honor.  We're not

14  seeking to compare the accused product and the -- the accused

15  product and the claims through Karger.  We are going to

16  directly compare the accused product to the claims.

17         THE COURT:  Okay.  So let me hear from plaintiff's

18  counsel on this.  I'd actually like you to focus more on the

19  first part of what he said than the second part, but you can

20  say anything you want.  I don't know who it is that's going to

21  talk about this.  Basically, when I say the first part, what I

22  mean is the contention that, well, Goodrich talks about this,

23  so we need to be able to do that in order to explain what

24  we're doing.

25         MR. CARDENAS-NAVIA:  Dr. Goodrich does not analyze

1  the Karger reference as part of his infringement analysis --

2           THE COURT:  Does he mention it in his report?

3           MR. CARDENAS-NAVIA:  He cites -- as he was saying, he

4  cites the AWS source code and in it there is a comment that

5  references the Karger paper.

6           THE COURT:  In it?  What's the "it" in his report?

7           MR. CARDENAS-NAVIA:  Excuse me?

8           THE COURT:  You said "in it" there's a comment.

9  What's the "it"?

10          MR. CARDENAS-NAVIA:  In his -- in the source code

11  there is a comment.  And our expert's report cites to that

12  source code and excerpts it.  At trial it's not something that

13  would come in as part of his direct.  He's not analyzing the

14  Karger paper to prove infringement.  He's analyzing the source

15  code and the technical documents and all the other evidence

16  about why S3 --

17          THE COURT:  So he's not going to testify about it, in

18  other words, is what you're saying?

19          MR. CARDENAS-NAVIA:  No.

20          THE COURT:  Go ahead and finish what you wanted to

21  say.

22          MR. CARDENAS-NAVIA:  That's the thrust, your Honor.

23  We agree with your observation that kind of what they're

24  saying is exactly the prior art -- sorry, the practicing the

25  prior art defense.  What they were saying is it's kind of a

1  distinction without a difference.  If you're doing something

2  other than just looking at the accused product and mapping it

3  to the claims and it involves the prior art, you're

4  essentially stepping into that practicing the prior art

5  defense.

6        THE COURT:  Okay.  What else would you like to tell

7  me on your side?

8        MR. EVANS:  Your Honor, if we could have control of

9  the presentation system, we can pull up where this appears in

10  Dr. Goodrich's report.

11        THE COURT:  Wait a second.  What are you going to

12  use, a device or the ELMO?

13        MR. EVANS:  The laptop.

14        THE COURT:  Give me a second.  Go ahead.

15        MR. EVANS:  Thank you, your Honor.

16        So this is Exhibit 8 to Dr. Goodrich's report.  It is

17  his source code appendix regarding S3.  You can see the

18  underlined text here.  He does specifically reference this

19  comment implementing this paper as infringing.

20        And he goes to explain here at the bottom here,

21  "According to those amazon" --

22        THE COURT:  You got to read slower.

23        MR. EVANS:  Pardon me.

24        THE COURT:  Everybody speeds up when they read.

25  Don't do that.  Go ahead.

1          MR. EVANS:  Thank you, your Honor.

2          At the bottom of this -- of the page here, it reads,

3   "According to Amazon comments, Amazon S3 implements consistent

4   hashing."

5          Consistent hashing is one of the features that they

6   accuse of infringing here, your Honor.  Because what Amazon

7   does is implement this Karger paper, we have to be able to

8   explain what that method is.  We have to be able to refer --

9          THE COURT:  Well, you have to explain what the method

10  is, but why do you have to explain that it's prior art?

11         MR. EVANS:  Your Honor --

12         THE COURT:  That's the problem, right?  That's the

13  problem that's being focused on is that you're not saying not

14  just that we're not doing what we're accused of doing and

15  we're not just saying that it's not infringing for this

16  reason.  We're saying that and part of the reason for that is

17  that this other guy wrote a paper on it ten years ago.  That

18  seems to me that's the part that crosses the line.

19         MR. EVANS:  Sure, your Honor.  And it goes to the

20  narrative richness of this.  We have to be able to explain

21  why --

22         THE COURT:  Narrative richness?

23         MR. EVANS:  Yes, your Honor.

24         THE COURT:  I'm just going to say that narrative

25  richness is to patent trials as military music is to music.

1  Just saying.

2       MR. EVANS:  Understood, your Honor.

3       THE COURT:  I don't think we have to worry too much

4  about narrative richness here.

5       MR. EVANS:  Understood, your Honor.  But your Honor,

6  in order to explain the source code and to explain -- pardon

7  me, your Honor.

8       Your Honor, our argument here is not that -- we

9  aren't arguing that this is prior art.  We want to say that

10  Kove's inventor, Dr. Overton, specifically notes that this

11  method is different.  He confirmed that three times at his

12  deposition.

13       THE COURT:  See, that's a different story.  I mean,

14  you can elicit from -- you can elicit from Overton, I suppose

15  you're going to do that, that didn't you say that what they're

16  doing is different from what you're doing.  I get that.

17       But I mean, it seems to me that you can do all of

18  that and your expert can talk about it without taking the next

19  step and saying, and the reason for that is it was in this

20  other paper and it's the Karger method that was published

21  years before.  That seems to me to be the problematic part.

22       So that's my ruling.  You can't go into that.  You

23  can explain what you're doing, you can explain why it's not

24  infringing, but you can't go into the fact that it's prior

25  art.  There you go.  So that motion is granted to that extent.

1       Then the last thing in this motion has to do with

2   what are referred to as the hierarchy opinions, and I don't

3   think this is one of the things that's off the table.  It's --

4   in the motion, it's pages 22 and 23.  And in the response,

5   it's pages 23 to 25.

6       I'm just going -- I'm just going to be honest, as

7   honest as I can with you about this.  By this point I did my

8   best on this stuff.  But on this point, you were too far into

9   the weeds for me.  I wasn't quite getting it.  So somebody

10  needs to do a little simplifying here.

11      So why don't I get the motion explained and then the

12  response, the motion explained and then the response.  I did

13  that backwards.

14      MR. CARDENAS-NAVIA:  Yes, your Honor.  I'll try to

15  simplify.

16      What our motion is doing is building off of your

17  Honor's summary judgment order where Amazon presented certain

18  arguments about hierarchies.  And in denying the summary

19  judgment motion, your Honor found that these theories -- your

20  Honor agreed with Kove that these theories are irrelevant and

21  immaterial.

22      THE COURT:  Can you be specific about what you're

23  talking about?

24      MR. CARDENAS-NAVIA:  Yes.  So the claim term I'm

25  talking about here is the plurality of location servers which

1    your Honor construed as being arranged in non-hierarchical

2    configurations.  So it's that claim limitation in particular.

3            THE COURT:  Okay.

4            MR. CARDENAS-NAVIA:  In the opinions, there's two

5    categories of them.  One is about geographic hierarchies that

6    AWS has a region on the East Coast and on the West Coast and

7    in Asia and in Europe.  And Kove's response was, well, we're

8    going to prove infringement within regions in which case your

9    Honor agreed, well, then talking about those geographic

10   hierarchies, that's irrelevant to the issue of are the

11   location servers within a region arranged in a

12   non-hierarchical configuration.  That's the first bucket of

13   opinions that we believe are irrelevant and should be

14   excluded.

15           The second bucket of opinions are sort of various

16   components that AWS says are non- -- have hierarchies in them

17   and they're not the location servers.  It has nothing to do

18   with how your Honor construed the term non-hierarchical, your

19   explanation of how it has -- there's various capabilities that

20   a location server has to be able to do in terms of providing

21   location information and related information.  Instead, these

22   are, you know, hierarchies and how the data are stored or

23   hierarchies in the algorithm that's used to store locations

24   within a single server.

25           It's essentially a bunch of hierarchies that, again,

1   are not focused at your Honor's construction which is about

2   the arrangement of location servers in a non-hierarchical

3   configuration.  And, again, that was analyzed as part of the

4   Court's summary judgment order.  So essentially what the Court

5   said was irrelevant in summary judgment should not come in.

6           THE COURT:  Okay.  Mr. Sigler.

7           MR. SIGLER:  Thank you, your Honor.  Could we switch

8   back --

9           THE COURT:  It's still there.  At least it should be.

10  Maybe I flipped it off.  There you go.  You might want to make

11  it bigger.

12          MR. SIGLER:  Thank you, your Honor.

13          The Court at summary judgment stated that the

14  pertinent question was whether S3 or DDB contained location

15  server structures or configurations where the servers are

16  arranged in a non-hierarchical topology.

17          For us, part of answering that question is to show

18  that S3 and DDB don't have any component that meets that

19  location server requirement.  And there's a construction for

20  that.

21          Beyond that, your Honor, the Court also in its

22  summary judgment order stated on page 24 that it was assuming

23  that the product had location servers for purposes of the

24  analysis at summary judgment.  It was assuming that what Kove

25  was pointing to as the location servers, the KFCs, the

1 | metadata notes, were location servers.

2 | We dispute that, your Honor, and I'd like to walk
3 | through that for the Court to show what we're going to show at
4 | trial.

5 | Here's the construction of location server that Judge
6 | Pallmeyer entered: "It's a network-attached component that
7 | maintains a set of identifier/location mappings that are
8 | modified or returned in response to location request messages
9 | from clients."

10 | So to show infringement, Kove needs to show a
11 | component in our system that maintains a set of
12 | identifier/location mappings. In addition, as your Honor
13 | found in the summary judgment decision, there needs to be a
14 | group of location servers -- or excuse me -- the plurality of
15 | location servers that's claimed needs to be in a
16 | non-hierarchical configuration.

17 | To show that we don't have a location server, your
18 | Honor, we need to be able to talk about the other components
19 | in the S3 system and the DDB system that are involved with
20 | getting the data.

21 | Dr. Grama's opinions are consistent with this. S3 --
22 | I have the hierarchy of S3 on the screen here. All of these
23 | components in this hierarchy are involved in locating data,
24 | not just -- there's not one component in this system that
25 | contains those identifier and location mappings that are

required of a location server. Our witnesses and our expert
need to have the ability to talk about these other components
in the system, what functions they perform, what role they
play in matching up an identifier and a location.

Similarly, here's where Dr. Grama talks about this in
his report for S3. He talks about it at paragraphs -- for
example, 267 and 271, he's talking about how the KFCs, the
brick managers, other components called the R2D2s, another
component called SkyNet, how all of those pieces of this
system play a role in finding the data that you're looking
for.

Similarly, your Honor, this is an example of the
hierarchy of DDB. All of these components similarly play a
role in that.

It seems that Kove is trying to preclude our expert
and preclude us from talking about what these other components
do. There's more involved here than just the metadata nodes
that Kove is pointing to as location server.

Again, Dr. Grama in his report talks about how these
different components play a role in this system. He talks
about the ALFs. He talks about the storage nodes. He talks
about the request router in DDB. And later on in his report,
he relates all this to his non-hierarchical opinions. In
paragraph 351 of his report, he talks about how the fact that
there is not a location server, a component in S3 that meets

1  the definition of a location server, that fact shows that

2  there's not a set of non-hierarchical location servers.  So it

3  interrelates.  And he does that for DDB as well at paragraph

4  330.

5  In addition, his arguments about regions, how the

6  regions are relevant to this, those remain relevant.  Kove

7  didn't cross move for summary judgment that all of that was

8  irrelevant.  The Court, of course, in summary judgment was

9  looking at the evidence in the most favorable light to Kove

10  and found that a reasonable juror could agree with Kove that

11  this regions distinction wasn't dispositive.

12  Similarly, a reasonable juror could agree with

13  Dr. Grama.  The fact that S3 and DDB are divided into regions

14  shows that they don't have this non-hierarchical approach and

15  that they don't work in the way that Kove says they work.

16  That's all I have on this, your Honor, unless you

17  have more questions.

18  THE COURT:  Okay.  What else would you like to say?

19  MR. REICHMAN:  One moment, if I may, your Honor.

20  THE COURT:  Sure.

21  MR. CARDENAS-NAVIA:  Your Honor, what Amazon's

22  counsel walked through are those examples --

23  THE COURT:  Do me a favor.  Put back up that first

24  diagram, if you wouldn't mind, the one that had the little

25  tree in it.  No, the one before that.  The one involving S3.

1          So what's -- can you just -- is there a way for you
2     to show me on this diagram what you think he's doing that's
3     wrong?
4          MR. CARDENAS-NAVIA:  Yes.
5          THE COURT:  You can draw on the screen.  Put your
6     finger on it and draw.
7          MR. CARDENAS-NAVIA:  I'll slide over here then.
8          Yes, your Honor.  So on this screen here, there's a
9     number of components.  There's a web server.  I don't know if
10    that's showing up.
11         THE COURT:  Maybe it's not letting you draw.  It's
12    good that we're doing this right now because then we'll know.
13    Run your finger across the screen a couple of times.  See,
14    it's not working.
15         MR. CARDENAS-NAVIA:  I see the cursor is kind of
16    stuck at the bottom.
17         THE COURT:  So that's item two that we got to get
18    tech up here for.
19         MR. CARDENAS-NAVIA:  But I can indicate --
20         THE COURT:  You can talk me through it.  It's working
21    on this one which is probably the one that it needs to work
22    on, but it needs to work on yours too.
23         MR. CARDENAS-NAVIA:  So at the top of the diagram is
24    the client.  That's not alleged to be a location server.  Then
25    it's an S3 web server.  That's not alleged to be a location

1   server.  Then if you go down to the right, there's a Blob

2   assembler, SkyNet, R2D2s; none of those are alleged to be

3   location servers.

4           THE COURT:  Is the reference to SkyNet and R2D2, is

5   that like some tech person's version of humor?

6           MR. SIGLER:  Yes, your Honor.

7           THE COURT:  All right.  Got to get their jollies

8   somewhere, I guess.

9           MR. CARDENAS-NAVIA:  And so this diagram illustrates

10  our point.  It illustrates exactly the types of irrelevant

11  hierarchies that your Honor found were immaterial during

12  summary judgment.

13          THE COURT:  What about the other side of the diagram,

14  the KFCs and the brick manager?

15          MR. CARDENAS-NAVIA:  So Kove accuses the KFCs of

16  being location servers, and Kove accuses the KFCs within a

17  region or within an availability zone as being the network of

18  location servers.  So in terms of whether those are

19  non-hierarchical, that's an analysis within that circle, KFCs.

20          The same goes for the brick managers, the BMs below.

21  Our analysis is within that.

22          THE COURT:  So you're saying that within that -- I

23  mean, if you were to -- if you were to take that and kind of

24  spread it out in an org chart, you would say that the BM

25  level, that's infringing, the KFC level is also infringing,

1  but you're not saying that the stuff on the right is

2  infringing at all.

3      MR. CARDENAS-NAVIA:  That's right.  That's not --

4  that's not part of our infringement theory.  There are related

5  to the location server limitation.

6      THE COURT:  Okay.  So what I got from Mr. Sigler, and

7  I'm going to have him explain it again in a minute, my take --

8  my layperson's take-away from this is, yeah, I get that, we

9  get that what's being accused here, but we need to explain how

10  our system works and all of this other stuff is necessary to

11  explain how our system works and how it gets -- you know, how

12  it finds the data and to explain -- the way -- in order to

13  explain why it's different from what the patent claims call

14  for, we have to be able to explain all this other stuff.

15      Is that like close enough for government work?

16      MR. SIGLER:  That's absolutely correct, your Honor.

17  Our point is that our system doesn't work in the way that they

18  say it does and that the KFCs and the brick -- excuse me, the

19  KFCs that they've accused of being a location server don't

20  meet the definition of a location server.  These other

21  components are involved in the process of getting the data,

22  and we need to be able to talk about this.

23      THE COURT:  I get your point.  Respond to him.

24      MR. CARDENAS-NAVIA:  And we're trying to prohibit a

25  specific use of this evidence.  We're definitely not trying to

1  keep this evidence or an explanation of the system out.  We're

2  going to give the exact same explanation of how the system

3  works.  I actually don't believe there is any significant

4  disagreements over how the system works.

5  THE COURT:  Yeah, so I have to say, I don't think

6  that what's being proposed here by AWS's expert is irrelevant.

7  You know, there's theoretically some possibility of confusion,

8  but I don't really think it's significant.

9  So I'm going to deny the motion.

10  So we're done with all the Daubert and related stuff

11  now.

12  So now we're down to the motions in limine that I

13  haven't dealt with yet.  So we're going to go back to the

14  defendant's motions in limine and I think it's 5, 6, 7, and

15  10, although I think there's maybe one that's off the table at

16  this point.  Maybe not.  No, it was the plaintiff's one that's

17  off the table.  Right.

18  So defendant's -- let me get back to that.

19  Defendant's motions in limine.  Actually, there is one other

20  thing that I skipped over, but we'll come back to it.

21  Defendant's motion in limine number 5, references to

22  post grant proceedings in the Patent Office.

23  Okay.  I'm looking at page 7 of the defendant's

24  motions.  And my questions really are not, I guess, directly

25  pertinent I suppose to the motion in limine, but you refer in

1   there to some of the ongoing re-examinations, three of them in
2   particular.  And they're in process, the Patent Office hasn't
3   issued any rulings, et cetera, et cetera.

4          So my question for you is on those re-examinations
5   that are ongoing, are any of the arguments that are being made
6   before the Patent Office to try to challenge the validity of
7   the various claims, are any of those same arguments being made
8   in the defense of this lawsuit at the trial that's going to
9   happen starting on April 1st?

10         Actually, the mic at your seat works too.  I should
11  have told you that before you had to wear out the carpeting.

12         MR. SIGLER:  It's a mix, your Honor.  Some of them
13  are.

14         THE COURT:  Some yes.  So here's my question.  So
15  what happens -- I mean, this can't be the first time in
16  history that you've had stuff like this going on or people
17  have had stuff like this going on.  Let's say what happens is
18  that you've got -- let's just simplify it.  There's an
19  argument that's being made to support invalidity here and it's
20  also being made in front of the Patent Office.  And the jury
21  in this case finds against AWS, in other words, finds the
22  patents valid, rejects the argument.  What happens to the
23  re-examination?

24         MR. SIGLER:  The re-examination keeps going, your
25  Honor.

1    THE COURT:  So the finding by a federal court doesn't
2  bind the Patent Office on it?

3    MR. SIGLER:  It doesn't bind the Patent Office, no.

4    THE COURT:  Okay.  But it would work -- so their
5  finding binds us, but ours -- I am not -- it is what it is.
6  I'm just making sure I understand it.

7    So if the Patent Office like, let's say, next week
8  came out with a decision sustaining that invalidity argument,
9  that claim would be out of this case basically, right?

10    MR. SIGLER:  I think Kove would probably want to
11  appeal that.

12    THE COURT:  They'd say let's keep it in and we'll see
13  what happens on appeal.  But let's say what happened is that,
14  you know, it was a really super fast ruling and the Federal
15  Circuit two days later affirmed it, then it would be out of
16  this case, right?

17    MR. SIGLER:  That's correct.

18    THE COURT:  That's the Patent Office saying the
19  patent is invalid.

20    MR. SIGLER:  Once you reach finality and the appeal
21  is exhausted.

22    THE COURT:  But it doesn't work the other way.  In
23  other words, if the Patent Office moves slowly on this
24  argument, the jury here finds it's invalid, you appeal that,
25  Federal Circuit says we agree with the jury on that, does even

1  the Federal Circuit's decision not bind the Patent Office?

2          MR. SIGLER:  I believe it's a matter of finality,

3  your Honor, which one gets to finality first.

4          THE COURT:  Whichever gets there first.  But the

5  there is not me.  It's the court of appeals?

6          MR. SIGLER:  When all appeals are exhausted, yes,

7  your Honor.

8          THE COURT:  Is he right?

9          MR. REICHMAN:  Yes.  It's a race to finality.  So

10  they're two co-equal branches of government.  One is

11  executive.

12          THE COURT:  Got it.

13          MR. REICHMAN:  Yeah.

14          THE COURT:  I think there was one other question I

15  have.

16          Okay.  So the plaintiff -- so Kove in response to

17  motion in limine number 5 which is the one we're talking about

18  here -- hang on a second.  I just got to find the reference --

19  cites Microsoft against i4i.  That's little i, numeral 4,

20  little i.  So what's your view of that point?  It's probably

21  not the world's greatest question.  Let me try it again.  Hang

22  on a second.  I just got to find the right page here.

23          So basically, basically, Kove is taking what I'll

24  call the i4i case as establishing the proposition that the

25  Patent Office's prior consideration and I guess rejection of

1  invalidity challenges is relevant and admissible in a later
2  lawsuit over infringement.

3        So what's your view of that?  That's a better
4  question I think.

5        MR. SIGLER:  We've got a distinguishable set of
6  circumstances, your Honor.  It's kind of a special case in
7  that we had that first set of EPRs where some claims were
8  canceled, some claims survived, but that was on the basis of
9  Kove narrowing its claims which the Court is aware of from
10  summary judgment and has implemented claim construction that
11  includes that narrowing.

12        We went back to the Patent Office and have now
13  submitted different combinations of prior art that we believe
14  invalidate the claims under that new scope that Kove narrowed
15  to in the first set.  And so this is the first time that the
16  Patent Office is looking at the claims under that narrowed
17  scope and this additional art that we provided to the Patent
18  Office which we think shows it's invalid.

19        THE COURT:  Okay.  So your basic point here is that
20  the prior determinations by the Patent Office that upheld the
21  patent, you're not trying to reassert those same arguments
22  here, and so why does what the Patent Office dealt with those
23  arguments matter?  That's basically what you're saying, right?

24        MR. SIGLER:  Correct, your Honor.  Kove's position
25  seems to me that the completed re-exam should come in --

1    THE COURT:  We got it through, it's been upheld,

2  that's evidence that supports the validity of the patents.

3  And your point is those are different issues.

4    MR. SIGLER:  Correct, your Honor.  That's correct.

5    THE COURT:  What's wrong with what he just said, if

6  anything?  Wait a second.  It's Ms.?

7    MS. CARNES:  Carnes.  Good afternoon, your Honor.

8  Just to start, when the Patent Office did the re-examination,

9  they were applying a more narrow construction.

10    MR. REICHMAN:  They were applying the construction

11  they stated.

12    MS. CARNES:  They were applying the construction that

13  they stated.

14    But with i4i, i4i stands for a very simple principle

15  which is that if a reference is before the Patent Office, the

16  Patent Office considers a reference as part of their

17  examination.  That fact, that fact is relevant for the jury's

18  consideration.

19    And so whether or not it was the identical ground or

20  identical combination, which is what I understand Amazon's

21  point to be is that it's a different combination presented,

22  the Federal Circuit has addressed that in *Sciele*, S-C-I-E-L-E,

23  and that goes to the weight the jury should give it, not

24  whether it's admissible or relevant for consideration.

25    THE COURT:  Okay.  So let me just -- let me just tell

1  you what I got from your argument so you can tell me whether
2  I'm getting it right.

3       What I think I'm hearing you say is that the Patent
4  Office considered some of these references.  They may have
5  considered them in different combinations than what's being
6  proposed here as a basis for invalidity, but they considered
7  them, and the fact that they considered them and still held
8  the patent valid is something that the jury ought to hear
9  about.

10       MS. CARNES:  That is correct.

11       THE COURT:  And what you went on to then say is that
12  the fact that it's a different combination, that goes to
13  weight -- that goes to weight and a jury ought to be able to
14  sort that out.

15       So here's my question back to you.  How the heck are
16  12 lay people supposed to do that?

17       MS. CARNES:  So I guess --

18       THE COURT:  In other words, they'd hear from you
19  that, well, okay, reference A got submitted to the Patent
20  Office and the Patent Office upheld the patent.  And they'd
21  hear from the other side, well, when they said that, it wasn't
22  really reference A, it was reference A combined with reference
23  B, and here reference A isn't being combined with reference B,
24  it's being combined with reference C and that's different and
25  so what the Patent Office did doesn't really matter.  That's

1 kind of an oversimplified version.  That's basically what

2 we're talking about here, right?

3          MS. CARNES:  In a sense.  I don't think it has to

4 involve any jargon.

5          THE COURT:  I'm not talking about jargon.  I'm just

6 talking about how -- why -- it just seems to me it's a

7 question -- when you say it's a question about weight, I'm

8 going to translate that into Rule 403 terms.  It sounds like

9 it's a question about probative value and the possibility on

10 the one side and the possibility for confusion on the other

11 side.

12          MS. CARNES:  That's correct, your Honor.  And an

13 important clarification.  One of the combinations that Amazon

14 is presenting in their invalidity grounds is identical to what

15 was a ground, a combination that was presented to the Patent

16 Office.  So the Patent Office --

17          THE COURT:  Which one are we talking about?

18          MS. CARNES:  May I check?

19          THE COURT:  Yeah, please.  Not that you may, you must

20 so we make sure we get it right.

21          MR. REICHMAN:  Can I interpose and just boil down?

22          THE COURT:  I want to have her hear everything, so

23 wait until she's done.

24          MR. REICHMAN:  Okay.

25          THE COURT:  Go ahead.

1      MS. CARNES:  For the '978 patent for claims 3, 10,

2   and 14, Skagerwall and Wolff, that combination was considered.

3   And that's S-K-A-G-E-R-W-A-L-L, and Wolff, W-O-L-F-F.  And

4   what the parties abbreviate as ONAG, O-N-A-G, Oracle

5   Unleashed, and Steam, that combination was also presented.

6      THE COURT:  And you're saying those same two

7   combinations are being offered by AWS in this case as a basis

8   for invalidity?

9      MS. CARNES:  That is correct.

10      THE COURT:  Okay.  So let me ask you a question.  I

11   haven't forgotten about you, Mr. Reichman.  I'm going to get

12   back to you in a second.  Let me ask you a question on a

13   different topic.

14      MS. CARNES:  I'm terribly sorry to interrupt.  I made

15   a slight mistake in what I said.  I said claims 3, 10, and 14.

16   It's claim 10.

17      THE COURT:  Just claim 10.

18      MS. CARNES:  Yes.

19      THE COURT:  Okay.

20      MS. CARNES:  That's because we've narrowed the issues

21   in dispute.  I'm sorry.

22      THE COURT:  That's okay.  So let's say that what we

23   were talking about here wasn't a combination, it was a single

24   prior art reference and it was an anticipation argument, and

25   that prior art reference is mentioned in the list of prior art

1  patents that the Patent Office considered when it issued the
2  patent.  In other words, it's right in there.
3        MS. CARNES:  Yes.
4        THE COURT:  So when a jury gets that, do people
5  typically get to argue that the Patent Office already did
6  that, so just kind of take their word for it?
7        MS. CARNES:  Oh, no.  There is a presumption of
8  validity.
9        THE COURT:  Yeah.  The fact that the Patent Office
10 considered the reference doesn't add to the presumption?
11       MR. REICHMAN:  Yes, it does.  That's what I wanted to
12 say.  i4i stands for the proposition that if a prior art
13 reference, not a combination, not an anticipation argument, if
14 a reference is in front of the Patent Office --
15       THE COURT:  Single reference.
16       MR. REICHMAN:  Single, double, triple, it doesn't
17 matter, if that piece of prior art, the Schmidt prior art, is
18 in front of the Patent Office, that's admissible evidence.
19       THE COURT:  Okay.  How does that typically happen on
20 the ground in an actual patent trial?  How does it come in?
21       MR. REICHMAN:  Just the way you suggested, your
22 Honor.  The defendant would say, they claim -- this is i4i.
23 They claim that -- we're telling you that the Patent Office
24 didn't even consider the Sullivan reference.  So that deserves
25 -- take that into account when you're applying the clear and

1  convincing standard.  That's what i4i stands for.

2  And the flip side is also true.  The Patent Office
3  did consider it and you should take that into account when
4  deciding.

5  One way or the other, if a reference was in front of
6  the Patent Office, the Supreme Court's rule is that the jury
7  gets to hear about it.

8  THE COURT:  Okay.  But the jury presumably needs to
9  be told what to do with it.  They're always going to get an
10  instruction saying a patent is presumed valid.

11  MR. REICHMAN:  That's correct.

12  THE COURT:  What instruction are they going to get,
13  what sentence or two are they going to get about this thing?

14  MR. REICHMAN:  I'll paraphrase it.  I don't have it
15  memorized.

16  THE COURT:  Go ahead.  Wing it.

17  MR. REICHMAN:  Ladies and gentlemen, you're entitled
18  to consider whether a prior art reference was in front of the
19  Patent Office in deciding whether the defendant has made its
20  proof by clear and convincing evidence.  It's probative.  If
21  the reference was not in front of the Patent Office in making
22  that determination, it's also probative if it was.

23  This is not part of the instruction.  I just want to
24  make sure I say it, your Honor.  One cannot so easily avoid
25  i4i as claiming a different combination.  It has nothing to do

1  with combinations.  If a prior reference is in front of the

2  Patent Office, it's admissible.

3        THE COURT:  Okay.  Back to you, Mr. Sigler.  Thanks.

4        MR. SIGLER:  Thank you, your Honor.

5        This is going to be a circus if we let these in, your

6  Honor.  We've got two of the references that were mentioned

7  here.

8        THE COURT:  The proposition that a patent

9  infringement trial could be a circus, actually that maybe

10  makes it slightly more appealing.  I'm not sure that's helping

11  your side.  I'm being facetious.

12        MR. SIGLER:  A side show, your Honor.  We'll call it

13  a side show.

14        Two of the prior art references that were just

15  mentioned, Skagerwall and Wolff, there's kind of mixed rulings

16  on those.  There's only one claim that's still at issue in the

17  case in the '978 claim.

18        THE COURT:  This is claim 10.

19        MR. SIGLER:  Yes, that's right, your Honor, where the

20  Patent Office denied an EPR on that, and we've actually

21  petitioned to the director to overturn that decision and keep

22  the re-examination moving.

23        But, currently, for all the claims that we challenge

24  in the '170 and '640 patents, they are currently undergoing

25  re-examination based on that Oracle art that was mentioned,

1  the Oracle names guide, Oracle Unleashed, and the Steam

2  article is one ground, and then another ground is the

3  Skagerwall and Wolff combination.  So there are ongoing

4  re-examinations where the Patent Office has said that those

5  references create a substantial question of patentability.

6        THE COURT:  That's not a final ruling.  That's just

7  the thing that gets you basically to a hearing or something

8  like that.

9        MR. SIGLER:  That's correct, your Honor.  It's not a

10  final ruling.  But we have essentially a mixed bag of final

11  rulings on these combinations in one patent but not the

12  others.

13        THE COURT:  I don't think -- I mean, honestly, why

14  should they go in the same bag?  In other words, something

15  that the Patent Office has said as a matter of finality, in

16  other words, we've considered these references, they don't

17  invalidate the patent.  It seems to me those are in a

18  different bag.  It's not a mixed bag.  It's a different bag

19  from the Patent Office saying we've considered these

20  references and we want to hear more because they might

21  invalidate the patent.  I mean, that second part, you'd have

22  to explain the whole course of EPRs and IPRs and whatever the

23  other one is called.  To explain that on the first one, I

24  don't think you would.

25        MR. SIGLER:  Agreed, your Honor.  That's a fair

1   statement.  But the circumstances here where we have a second
2   set of EPRs that are still pending and we have some prior art
3   references that the Patent Office is still looking at, it
4   creates complications here.  If Kove's going to say, for
5   example, that the Patent Office has looked at Skagerwall and
6   Wolff and determined that the patents are still valid over
7   them, then we should be able to say that the Patent Office is
8   looking at those prior art references against other claims
9   still.

10          THE COURT:  Okay.  So let me ask you the same
11  hypothetical which is different from this that I asked
12  Ms. Carnes on the other side.

13          So let's say we weren't talking about a combination.
14  We were talking about a single prior art reference.  It's
15  listed in the patent.  The Patent Office considered it.  They
16  issued the patent despite that.  The infringement lawsuit
17  happens.  The accused infringer comes in and says that
18  patent -- that prior art reference renders the patent invalid.
19  Okay?

20          Does the jury get told something about the fact that
21  the Patent Office considered that and rejected it?  Considered
22  that reference and issued the patent in any event?

23          MR. SIGLER:  I think it would be fair to have the
24  jury know that under that circumstances.

25          THE COURT:  That's what i4i talks about, right?

1    MR. SIGLER:  Yes.

2    THE COURT:  Why is this different from that?

3    MR. SIGLER:  Because we have obviousness combinations

4    and we have a different scenario.

5    THE COURT:  If I confine this to something where it

6    was the same combination -- and I get that it only concerns

7    one claim of one patent -- but if it's the same combination,

8    why is that different from the situation where the Patent

9    Office has listed a reference in the issued patent?

10   MR. SIGLER:  I mean, if your Honor wants to handle it

11   that way --

12   THE COURT:  If you want to tell me it's different,

13   now would be the time.

14   MR. SIGLER:  I don't think that would be different.

15   I mean, I'm swimming upstream against i4i on that narrow piece

16   of it.

17   THE COURT:  So I was told that on '978, claim 10,

18   there's this Skagerwall and Wolff references which were

19   considered in combination and the Patent Office concluded

20   those didn't invalidate the patent, and then there was this

21   other one that had the acronym which I'm blanking on right

22   now.

23   Do you disagree with the premise of that, in other

24   words, that the Patent Office considered those particular

25   combinations and didn't find them to be a basis for

1  invalidating claim 10 of the '978 patent?

2  MR. SIGLER:  I don't disagree with that, your Honor.

3  THE COURT:  So I think that comes in.  But just that.

4  I mean, I think beyond that, I think it's -- I think it gets

5  too confusing to explain, and we're going to have to have a

6  jury instruction that deals with this.  I'm hoping that you

7  may already have something like that in there.  But if you

8  don't, you need to work on that.

9  We're going to move on to something else.

10  MR. SIGLER:  Thank you, your Honor.

11  THE COURT:  The next one.  So this is -- oh, yeah.

12  Motion in limine number 6, references to Amazon or AWS's size

13  or wealth, comparing the size or wealth of the parties, David

14  and Goliath references.

15  And this, I will just say, there is a logical

16  relationship between this and one of the plaintiff's

17  arguments, that being the one about litigation financing,

18  that's plaintiff's motion in limine number 1.  It's pretty

19  common in these situations where we get to a point where

20  everybody is arguing at cross purposes with themselves.  So

21  this is -- these are the two motions where each side says,

22  please don't tell them anything about our money.  Okay?  So

23  the plaintiff's saying don't let them talk about our

24  litigation financing, and the defendant is saying don't let

25  them talk about how we're like the third biggest company in

1  the world or whatever it is.  But that's an observation.

2  The question I want to pose for the defendant is that
3  in response -- and I'm looking at page 12 of Kove's response
4  to motion in limine -- to the motions in limine.  I'm going to
5  read four sentences:  "AWS's size is at the heart of this
6  case.  Kove's inventions were intended to facilitate hyper
7  cloud infrastructure and become a critical technology for AWS
8  precisely because of its extraordinary size.  The inventions
9  allows AWS to offer a service at a scale never before seen in
10  computing.  AWS is seeking to bar any mention of size no
11  matter the context would exclude directly probative and
12  critical evidence."

13  My question for the defense is what do you have to
14  say about that?  Because that was the one point in the
15  response that kind of resonated a little bit at least.

16  MR. SALTMAN:  Thank you, your Honor.  What we're
17  seeking through this motion is to avoid inflaming the jury by
18  including statements like Kove included in its complaint, for
19  example.  This case is about assuring a level-playing field so
20  small competitors like Kove can compete fairly.  It's not the
21  idea that Amazon is big and Kove is small.  The jurors are
22  going to understand that.  It's more those types of statements
23  where you could bias the jury against large companies saying
24  that Kove has not been able to compete fairly because of
25  Amazon.  Amazon is a behemoth is another word they used in

1  their complaint.  That was more of the focus of our motion.

2           THE COURT:  So it sounds like you don't have a

3  problem with Kove trying to make the point in whatever way

4  they're making it that one of the things that their claimed

5  invention does is to allow this huge cloud infrastructure

6  that, you know, makes -- at this big scale, right?

7           MR. SALTMAN:  No, your Honor, we disagree.

8           THE COURT:  Fair enough.  Can you tell me on the

9  plaintiff's side exactly what -- exactly what you want to put

10 in that you think they're trying to keep out by motion in

11 limine number 6?  Is it anything other than what I just

12 mentioned?

13          MS. CARNES:  No.  No, your Honor.  We just need to be

14 able to talk about size because of scalability.

15          THE COURT:  Well, the size of what I guess is the

16 thing?

17          MS. CARNES:  Well, for example, just the sheer scale

18 of how much information is in S3.  The extent of usage is

19 staggering.  We're talking about -- some numbers are going to

20 be large in terms of the amount --

21          THE COURT:  Numbers of what?  Give me an example.

22          MS. CARNES:  Like data, data stored.  Information.

23          THE COURT:  But data storage, you know, the amount of

24 terabytes or whatever four levels above terabytes is isn't --

25 I don't regard that as being an object of this motion.  This

1   talks about the parties' relative size and wealth.

2           MS. CARNES:  Your Honor, you said something a little

3   earlier about how the parties are often arguing against each

4   other and both sides wanting to keep out of each other's

5   money.  We're not -- we're not trying to talk about their

6   money here.  We're not trying to talk about their wealth.

7           THE COURT:  So I'm going to make this easy.  You

8   don't get to talk about their wealth, you don't get to talk

9   about their size.  You can talk about the size of the system

10  that your patent supposedly allows.  Okay?  That you can talk

11  about.  But talking about how Amazon is this gigantic company

12  or it's on the fortune 2 or fortune 1 or whatever it is and

13  all of that -- I mean, you've --

14          MR. REICHMAN:  We're not doing that.

15          THE COURT:   -- largely stipulated to keep that out

16  anyway.

17          MR. REICHMAN:  We're not doing that.

18          THE COURT:  So that's the ruling on that motion.

19          MR. REICHMAN:  Okay.

20          THE COURT:  Now we're to number 7, defendant's motion

21  number 7.  Let me just get to it here.

22          All right.  So the motion asks to exclude evidence

23  regarding overall revenue and profit for the accused products,

24  S3 and DDB.  And the plaintiff basically says -- and I'm

25  trying to summarize and paraphrase here.  We need -- the

1  plaintiff says, we need to be able in order -- in order to

2  establish how much of the revenue and/or profits from the

3  infringing elements of these products are, we need to start

4  with the overall and kind of work our way down.

5         Am I getting that kind of right?

6         MR. REICHMAN:  I object, your Honor, on grounds of

7  vagueness to the question.

8         THE COURT:  Okay.

9         MR. REICHMAN:  The overall product revenue.

10        THE COURT:  Let's just talk about S3.

11        MR. REICHMAN:  Not company revenue, just product.

12        THE COURT:  The way I was getting this is that in

13  order for our people, presumably it's our expert and us in

14  argument, to be able to talk about what's -- what are we

15  entitled to recover as damages for the infringing aspects of

16  S3 --

17        MR. REICHMAN:  Yes, sir.

18        THE COURT:  -- we need to start off with, this is

19  what the total revenue from S3 is and --

20        MR. REICHMAN:  And apportion it down.

21        THE COURT:  -- and apportion it down.

22        MR. REICHMAN:  You said overall, not the company,

23  just the product.  Right.

24        THE COURT:  All right.  So is that what you're trying

25  to preclude on this motion?  And if so, why shouldn't they be

1   able to do that?

2           MR. SALTMAN:   Thank you, your Honor.

3           Mr. Bergman, their damages expert's opinions are

4   based on two factors:  increased cost and reduced price.  And

5   neither of those factors necessarily implicates overall profit

6   or overall revenues.  And so Mr. Bergman can show those

7   without showing the fact that, as Ms. Carnes says, S3 --

8           THE COURT:   Does he talk about them in his analysis,

9   the things you want to exclude?

10          MR. SALTMAN:   They are exhibits in his report.

11          THE COURT:   What's the context in which he talks

12  about them?

13          MR. SALTMAN:   He talks about them as showing -- when

14  he's showing the decrease in price, he uses the revenue to

15  show that the price would have been decreased or revenues

16  would have been decreased.

17          THE COURT:   And what's that number, the overall

18  revenue for?

19          MR. SALTMAN:   What is the number for S3?

20          THE COURT:   Yeah.

21          MR. SALTMAN:   I believe during the damages period,

22  it's approximately $8.6 billion.

23          THE COURT:   Is that over a significant period?

24          MR. SALTMAN:   Approximately eight years.

25          THE COURT:   So it's a billion a year for eight years.

1    MR. SALTMAN:  Correct, your Honor.

2    THE COURT:  And is that the kind of number you're

3    trying to keep out by this?

4    MR. SALTMAN:  Yes, your Honor.

5    THE COURT:  Now that we have a number, an actual

6    number we're talking about, if somebody can maybe walk me

7    through why Bergman has to talk about that number in order to

8    get to whatever bottom line he gets to.

9    MR. REICHMAN:  I'll give you the top line, your

10   Honor, and then if you want to drill down, I have my team.

11   Maybe I can boil it down.

12   In apportionment, right.  He starts with the product

13   revenue and then he apportions it down.  And one of the things

14   he's saying is when you look at the profits attributable to

15   the accused products, to the accused features, excuse me, he

16   apportions it down to a billion dollars that was received.

17   And then he says -- and you know this already, your Honor, but

18   when he was doing the profit split, he said the fact that they

19   also made several billion dollars more with the invention

20   that's not part of the attributable profit informs the profit

21   split.

22   So he has to both be able to talk to where these

23   profits came from, that they're just a part or apportioned

24   down and, when doing the bargaining split, the fact that they

25   made several billion dollars more would inform how the

1  hypothetical negotiation would go.

2      And Mr. Adler can walk you through the details if you
3  want.  I thought that might be enough.

4      THE COURT:  That's kind of the level I was looking
5  for.  Tell me why they shouldn't be able to do that.  I know
6  you already told me, but tell me again now that I have it in a
7  little bit more nice, neat package so to speak.

8      MR. SALTMAN:  Thank you, your Honor.  I believe the
9  additional revenue he's talking about was not -- that counsel
10 was talking about is not quantified in Mr. Bergman's report.
11 He's talking about revenue or benefits, rather, associated
12 with things like speed which Mr. Bergman did not calculate in
13 his report.

14     I believe the only revenue is -- that was done as I
15 described when there's reduced pricing, it was calculated --
16 the revenue was used to calculate that.

17     THE COURT:  To me it sounds like it's relevant and
18 it's not unfairly prejudicial.  The motion is denied.

19     MR. SALTMAN:  Thank you, your Honor.

20     THE COURT:  So the last one then is number -- in the
21 defendant's motions is number 10.  References to other
22 litigation.  All right.  Give me a second.  Oh, it was the
23 second part of the question.

24     Okay.  So I said that I concluded that the other
25 lawsuits aren't relevant on willfulness because willfulness

1   addresses the patents-in-suit and the other lawsuits concern

2   other patents.  But there's -- let's see here.  Let me just

3   zero in on it.

4           Okay.  One of the things that the -- that Kove says

5   in response to motion in limine number 10, and I'm looking at

6   page -- it starts at the bottom of page 18 to the response and

7   it carries over to page 19 -- is that some of the licenses

8   arose from litigation and so they have to be able to explain

9   something about the litigation in order to do a comparability

10  analysis.

11          Am I understanding that correctly?  Am I

12  understanding Kove's argument correctly on that?

13          MS. CARNES:  That's correct, your Honor.

14          THE COURT:  Okay.  So what's wrong with that, if

15  there's anything wrong with it?  This is Ms. Phillips.

16          MS. PHILLIPS:  Good afternoon, your Honor.

17          AWS actually agrees that the litigations that relate

18  to the comparable licenses that it relies on in its damages

19  calculations are relevant here and that both parties can

20  discuss them in that context, and we did include that in our

21  opening brief in note 81.

22          THE COURT:  Okay.  So there's really not a dispute

23  then.

24          MS. PHILLIPS:  That's correct.

25          THE COURT:  Then you're good on that.

1    Now we're done with the defendant's motions in

2  limine.

3    We're going back to the plaintiff's.  The first one

4  is number 1.  That's the one about litigation financing.  I'm

5  going to read to you the note that I wrote to myself verbatim:

6  I need to know more about exactly how the defendant wants to

7  use this.  The response doesn't really say.  Find out.

8    So that's my question for you.

9    MR. REICHMAN:  I'm sorry, I didn't keep up.  Can you

10  tell me what number we're on?

11    THE COURT:  The one about litigation financing, Kove

12  number 1.

13    Go ahead.  How exactly do you want to use it?

14    MS. PHILLIPS:  Again, your Honor, AWS agrees it won't

15  raise litigation funding unless Kove opens the door to it.

16    THE COURT:  How would they open the door?  What would

17  be a way?

18    MS. PHILLIPS:  One example would be if Dr. Overton

19  testifies that the litigation is bleeding him dry.

20    THE COURT:  Okay.

21    MS. PHILLIPS:  Or that Kove isn't able to develop

22  more products because it doesn't have the money.

23    THE COURT:  So basically what you're saying, you're

24  not going to inject litigation financing unless you think

25  they've opened the door, in which case you're going to have to

1  ask me at a sidebar.

2          MS. PHILLIPS:  That's correct.

3          THE COURT:  Okay.  That's the ruling then.  It

4  doesn't come in unless the door gets opened and then you got

5  to raise it with me outside the presence of the jury.

6          The next one is number 3 which is -- the title of

7  which is Exclude Evidence Or Argument About AWS/ATI's Patents,

8  ATI being Amazon Technologies, Inc., As Related to

9  Non-Infringement Or Invalidity.

10         Okay.  And the argument in response to this, give me

11  just a second, is that -- the part that I really want to ask

12  you about is they say, wait a second, that's part of the

13  willfulness calculation.  We need to be -- we want to be able

14  to say that, no, we were doing what we patented here.  You're

15  going to tell me if I'm saying this wrong.  We want to be able

16  to say, we're doing what we patented here, and therefore even,

17  among other things, even if the jury finds that we infringed,

18  we didn't do it willfully because we were just trying to

19  follow our own patents.

20         Am I getting that particular argument more or less

21  right?

22         MR. EVANS:  That's correct, your Honor.

23         THE COURT:  What's wrong with that?  Do you disagree

24  with that and, if so, why?

25         MS. CARNES:  Sure, your Honor.  So two points.  If I

1  can direct you to a quote from the Federal Circuit saying

2  that's not permissible.  We quote it on page 4 of our

3  response.  It's Advanced Cardiovascular Systems --

4          THE COURT:  Hang on a second.  Let me get there.

5  Page 4 of the response.

6          MS. CARNES:  Yes, sir.

7          THE COURT:  I was going to say, I'm not seeing

8  anything about Advanced Cardiovascular --

9          MS. CARNES:  I'm sorry.  Of our brief.

10         THE COURT:  The response is your brief.  You may have

11  the wrong page.  I'm sorry.  I'm looking at the wrong thing.

12 It's my mistake.  It's your brief, right, page 4.

13         MR. REICHMAN:  Your Honor, can I clarify?

14         THE COURT:  *Advanced Cardiovascular Systems v.*

15 *Medtronics*.  Sorry about that.  Yes, go ahead.

16         MR. REICHMAN:  I want to make sure I understood your

17 question because I think maybe you're talking past each other.

18 If the question is can the patents be used for willfulness --

19         THE COURT:  Yeah.

20         MR. REICHMAN:  -- that's how we're using them.  It's

21 fine for them to use them that way.  There's no problem.

22         Ms. Carnes was answering a different question.

23         THE COURT:  I asked my question bad because you

24 answered the question I intended to ask.

25         MR. REICHMAN:  I thought so.

1          THE COURT:  On the defense side, are you intending to
2   use the Amazon AWS patents for anything other than that
3   specific purpose to try to rebut willfulness?
4          MR. EVANS:  No, your Honor.
5          THE COURT:  You get to do that, but you don't get to
6   do anything else.  Hang on a second.
7          Now we're on plaintiff's motion number 4.  This goes
8   back to the practicing the prior art issue.  My guess is, and
9   you'll tell me if I'm wrong, the ruling that I made a few
10  minutes ago, whenever it was, on Grama and what can be said
11  along these lines and what can't, in other words, he can talk
12  about -- let me just pause for a second to make sure I get
13  this right -- he can talk about what AWS's system does and why
14  it's different from the patented system, but he can't bring
15  into play the fact that what we're doing is what was in the
16  Karger paper or whatever the other earlier reference was.
17         I'm guessing that resolves this motion too.  Does
18  anybody think it doesn't?
19         MS. CARNES:  That's our understanding, sir.
20         THE COURT:  Are there any additional issues involved
21  I guess is really the question?
22         MR. EVANS:  No, your Honor.
23         THE COURT:  Okay.  Fine.  So I've resolved that one.
24         Now we're onto plaintiff 5.  Somewhere in here we're
25  going to start hitting on the things that are now moot.  This

1    one is moot now.  5 is moot.  6 is moot.

2           So now we're to 7 which was my least favorite one to

3    deal with which is why we're doing it last.  It probably would

4    have been a reason to do it first.

5           Okay.  So this is the whole amalgam of stuff where

6    the contention is by the plaintiff that the defense -- and

7    it's largely I think the expert Grama -- are planning to do or

8    say things that are at odds with the claim construction.  This

9    is going to get a little tedious.

10          Why don't we take a five-minute break before we do it

11   because we've been going for about an hour and a half.  So

12   just take a five-minute break and we'll pick it up right here.

13     (Short break.)

14          THE COURT:  Okay.  I think we got everybody back, so

15   we're going to pick up with plaintiff's motion in limine

16   number 7 and it's going to be kind of a mixed bag of me

17   walking through it and then asking questions and then trying

18   to make rulings.

19          So it's a series of points where Kove is saying that

20   AWS is trying -- and I think it's -- in some instances, it's

21   in proposed jury instructions, in some instances it's in the

22   testimony of Dr. Grama, in some instances maybe it's both --

23   trying to change or add to claim constructions.

24          And I guess, you know, there's two things.  Number

25   one, the claim constructions are what they are, and witnesses

1    and lawyers don't get to contradict them at trial.  But

2    secondly, and this is a point I'll come back to in a second,

3    if there's a dispute -- if there's still a dispute over what a

4    claim means, I might be ticked off that it wasn't brought to

5    my attention earlier, but it doesn't absolve me from needing

6    to resolve it because kind of the paradigmatic error A1 that a

7    judge in a case like this can permit is to allow experts to

8    give differing claim constructions and have the jury figure it

9    out.  That's kind of a nice way of saying to the Federal

10   Circuit, please tell us to do this all over again, which I

11   don't think any rational person would want to invite.

12           So with that background, the first issue has to do

13   with the term non-hierarchical.  So the claim construction

14   ruling was that the phrase plurality of location servers means

15   location servers in a non-hierarchical structure.  And then it

16   was further stated that non-hierarchical, the term

17   non-hierarchical meant, comma, as Kove had defined it, comma,

18   that any given server can return the requested information or

19   information usable by the client to locate the server that has

20   the requested information.

21           So those are rulings that have been made.  And the

22   argument here is that AWS, and I think it's a jury instruction

23   in this instance, changes the definition of non-hierarchical.

24   And it's really the second part of it, the part after the "or"

25   to require that a server would have to know, k-n-o-w, which

1  location server contains the location information of the
2  desired data.

3          So my first reaction to that is, no, that's changing
4  the claim construction, and I actually rejected that in the
5  summary judgment ruling and it was ruled on I think pretty
6  definitively -- not pretty definitely -- definitively in the
7  claim construction ruling by Judge Pallmeyer.  That argument
8  was lost.  It's not that the -- any given server has to know
9  -- if it doesn't have the information itself, it has to know
10 which one has it.  It's that it has to have information that
11 can be used by the client to locate the server that has it.
12 And I don't know if that difference is significant, but it's a
13 difference, and we're going to go with what the ruling was.

14         But here's my question because in the further
15 discussion -- and this is one of these multiple terms that
16 takes up the most space in the briefs.

17         This kind of comes from a suggestion that's made by
18 AWS in the response.  So it's a question for Kove.  Can I
19 include -- is there any reason why I can't include in the
20 instructions, when we're talking about what claim terms mean,
21 the definition of, quote, non-hierarchical, close quote, that
22 you effectively say was determined, and that's
23 non-hierarchical means any given server can return the
24 requested information or information usable by the client to
25 locate the server that has the requested information?  Is

1  there any reason why we can't include that in the definitions
2  that are given to the jury in the instructions?
3          MR. CARDENAS-NAVIA:  No, your Honor.
4          THE COURT:  And does that not solve your problem?
5  You kind of say in the response that it does, but I wasn't a
6  hundred percent certain.
7          MR. SIGLER:  We'd prefer the further construction,
8  your Honor.
9          THE COURT:  Yeah, I don't think the further
10  construction is right.  So that's the way we're going to go
11  with it.  We're going to include that definition of
12  non-hierarchical in the instructions.
13          Okay.  The second term has to do with identifier and
14  location.  Okay.  So -- and, again, it helps me to just kind
15  of put out there a summary of what I understand the arguments
16  to be.
17          So according to Kove, Kove says that AWS wants to
18  argue that only one location may be associated with each
19  identifier.  However, Kove says, on claim construction, the
20  term identifier was interpreted to mean zero or more location
21  strings are associated.  So zero or more doesn't mean just
22  one.  It means zero or more than zero so AWS is wrong.
23          The response by AWS is that's not what we're arguing.
24  And that's kind of where I lost the thread.  So tell me what
25  you think is wrong with Kove's argument on this.  If you're

1  not arguing what they say you're arguing, how is this coming
2  up?

3          MR. SIGLER:  In the one paragraph --

4          THE COURT:  You can stay sitting down.  It's just
5  easier.  What you need to do, though, is get the mic closer to
6  you.  Pull the mic.  You'll hurt your neck doing that.  There
7  you go.

8          MR. SIGLER:  Thank you, your Honor.  In paragraph 262
9  of Dr. Grama's report, which is the one paragraph that Kove
10  has asked to --

11          THE COURT:  Is there a way you can put that up on the
12  screen?  It might be helpful to do that.

13          MR. SIGLER:  Sure.

14          THE COURT:  I think you still have it.  Yeah.  262.
15  Okay.  You got it right there.  Go ahead.

16          MR. SIGLER:  Yeah, I've blown it up here, your Honor.
17  Essentially Dr. Grama is just stating factually what's going
18  on in S3 here.  He's just stating that per the underlying
19  language, that the objects are split into 18 shards which are
20  stored in separate R2D2s which is a piece of the hierarchy in
21  S3.  And then he's stating later on that as a result, there's
22  no single location to associate with the user key.  He's just
23  stating that factually.  He's not making an argument on that.

24          Kove in their brief indicates that they believe he
25  did make an argument along those lines in his deposition; but

1 in his deposition, Dr. Grama was talking generally about a

2 hypothetical. He was not talking about the meaning of

3 location in terms of the claim constructions here. And that's

4 made clear in our briefing.

5          THE COURT: Okay. And it's a hypothetical presumably

6 that's posed to him by Kove's counsel.

7          MR. SIGLER: That's right.

8          THE COURT: Not something that he was affirmatively

9 stating in his report or anything like that.

10          MR. SIGLER: No. As a matter of fact, he came back

11 and said that this is not what I'm referring to.

12          THE COURT: Okay. So why do I need to make a ruling

13 on this?

14          MR. CARDENAS-NAVIA: Your Honor, if they're not going

15 to make that argument, then we're fine.

16          THE COURT: I mean, it sounds like he's coming -- I

17 think that Mr. Sigler's description of what paragraph 262 is

18 doing is accurate. He's not arguing with the claim

19 construction. He's just talking about how the system works.

20          You might want be to careful not to ask him the same

21 hypothetical question that you asked him before that elicited

22 this. If you do, you're going to get what you pay for, so to

23 speak. But I'm not inclined to preclude this particular

24 testimony.

25          Okay. So the next term is hash table, quote/unquote.

1  And Kove's argument is that -- and Judge Pallmeyer when she

2  did the claim construction, adopted an agreed-upon

3  construction of that term.  That's found at pages 30 and 31, I

4  believe, of the -- maybe I have that wrong.  Yeah, pages 30

5  and 31.  It's one paragraph basically of the claim

6  construction ruling from back in December of 2021.

7       So according to Kove, however, AWS's expert Grama

8  says that there has to be, quote/unquote, randomization.  And

9  the argument is that's not part of the claim construction.

10 It's an add-on.  This was agreed to.  Also, by the way, it's

11 not in the non-infringement contentions, but I'm kind of more

12 focused on the first part.

13      The way I understand AWS's argument is that -- hang

14 on a second.  Well, maybe you should explain it to me.  Maybe

15 that's the better way to do it.

16      MR. SIGLER:  Sure, your Honor.  Our argument is that

17 the construction for hash table requires a hash function.

18 Randomization is just how a hash function works.  That's what

19 Dr. Grama is talking about.  If I could put slide 71 on.

20 That's what he's talking about here on his report.

21      THE COURT:  Paragraph 57 just for the record.

22      MR. SIGLER:  Yes.  He references randomization here.

23 And turning to the next slide, this is actually a book written

24 by Dr. Goodrich, Kove's expert, and he refers to randomization

25 as well in the hash function.  He talks there in the

1 highlighted part about scale and shift parameters that are

2 randomly chosen in the construction.

3       The point of all of this, your Honor, is that the

4 experts agree that hash function involves randomization.

5 Dr. Grama was --

6       THE COURT:  Why does that matter?  How does that fit

7 in with the overall arguments?

8       MR. SIGLER:  Dr. Grama has offered the opinion that

9 in his report in certain areas that randomization is one

10 factor in a hash function, and he's pointed out that the

11 accused functionality here doesn't perform that.

12       THE COURT:  Okay.  There was a statement made in the

13 response at page 16 by AWS that kind of caught my eye.  I'm

14 quoting it.  AWS -- so this is in response to the reference

15 that there was an agreed-upon claim construction.  And the

16 statement in the response at page 16 says that AWS did not

17 abandon any proposed construction that would address this

18 which kind of -- that's kind of like something jumping off the

19 page and waving red flags and honking and sounding alarm bells

20 that, uh-oh, we got to revisit claim construction.

21       So what did you intend by that statement in the

22 response?

23       MR. SIGLER:  That was responding to Kove's point that

24 in the claim construction process, that we had a proposed

25 construction that involved randomization, but then there was

1  an agreed construction.  We were just pointing out that -- I
2  believe this was agreed during the claim construction hearing
3  or right after it.
4          THE COURT:  Okay.
5          MR. SIGLER:  So we were just factually pointing that
6  out, your Honor.
7          THE COURT:  Yeah, but when you -- when you make an
8  argument that the claim construction should be X and then
9  there's a hearing and then you say either during or after the
10  hearing, well, okay, we agree that it should be Y, that's kind
11  of the definition of abandoning X, where I come from.  Just
12  plain old litigation.
13          I mean, if you argued one thing and then you said,
14  well, never mind, we agree to this other thing, that kind of
15  does mean that you abandoned the initial position because you
16  agreed to something different.
17          MR. SIGLER:  Understood, your Honor.  This was a
18  compromise reached I think in realtime at the claim
19  construction hearing.
20          THE COURT:  You don't get to pull it back.  That's
21  the whole point.  The case was litigated from December 17th of
22  2021 on based on the agreed-upon construction.  You don't get
23  to change it.  But you're telling me you're not.
24          And so can you explain to me how you think they are
25  changing something?

1          MR. CARDENAS-NAVIA:  Yes.  It's the randomization

2     requirement, your Honor.  The term was construed.  The parties

3     agreed on it.

4          THE COURT:  Can you go back to that paragraph 50,

5     whatever it was, the previous slide that you had up there,

6     Mr. Sigler or whoever.  Thanks.  Go ahead.  57.

7          So before you finish that thought, let me tell you

8     what I got from what was told to me about paragraph 57 from

9     Dr. Grama's report.  He's not saying that there's -- he's not

10    saying that the claim requires randomization.  He's saying

11    that that's how hashing works.

12         MR. CARDENAS-NAVIA:  Your Honor --

13         THE COURT:  At least how hashing works in their

14    system.

15         MR. CARDENAS-NAVIA:  We're not seeking to strike that

16    paragraph or we're not taking any issue with that paragraph.

17    We're focused on paragraphs 236, 237, and 240 of Dr. Grama's

18    report.

19         THE COURT:  Does anybody have those that they can put

20    up so I can look at them?  I can switch this over to your side

21    if you've got something.

22         MR. CARDENAS-NAVIA:  I actually have a paper copy.

23         THE COURT:  Dare I say it, a hard copy?  Oh, my God,

24    somebody's got a hard copy of this thing?  I have to say I am

25    impressed if you do.  You get a gold star.  We're going to use

1  the ELMO.  Okay.  So when you open the ELMO, use both hands
2  because -- that's why I said use two hands.  If you use one
3  hand, it can go flying over the other side.
4          MR. REICHMAN:  It's Exhibit 6 to the motion just so
5  you know.
6          THE COURT:  Oh, okay.  Well, let me still let you put
7  it on the ELMO.  This is Kove 6?
8          MR. CARDENAS-NAVIA:  Yes.
9          THE COURT:  I have it, but you've got it on the
10 screen too.  You said 236.
11         MR. CARDENAS-NAVIA:  Paragraph 236, 237, and 240
12 which is on the next page.
13         THE COURT:  That's okay.  So explain to me why that
14 matters.
15         MR. CARDENAS-NAVIA:  Right.  Our concern is not the
16 expert talking about hashing.  Our concern is the expert
17 adding an additional requirement to the claims, the term hash
18 table that was construed by the Court, and saying not only do
19 you have to meet what was in the Court's construction, there
20 also has to be randomization.
21         THE COURT:  Okay.  Can you kind of focus in on where
22 his report says that.
23         MR. CARDENAS-NAVIA:  This first sentence:  "Each of
24 the hashing claims requires that the location information be
25 organized through hashing."

1    THE COURT:  That doesn't say anything about

2  randomization.

3    MR. CARDENAS-NAVIA:  One second.  Paragraph 240 is

4  the best example.

5    THE COURT:  Okay.  I think in order for me to

6  understand 240, I'm going to have to read 238 and 249.  So let

7  me do that for a second.

8    It really just is 240.  239 doesn't say anything

9  about this.  So 240 says, finally -- it seems to be a separate

10  point for Dr. Grama.  "Finally, as my testing shows, there is

11  no randomization in any of the DDB requests I made.  As a

12  result, the DDB data storage and location process does not

13  involve hashing any data."

14    So what you're saying is that that basically looks

15  like he's reading a randomization requirement into the

16  definition of --

17    MR. CARDENAS-NAVIA:  And there's one more sentence

18  can I direct your Honor to?  It's in paragraph 237.

19    THE COURT:  237.

20    MR. CARDENAS-NAVIA:  I have it up on the screen.

21  It's at the very bottom.

22    THE COURT:  "Dr. Goodrich does not point to any

23  indication that there is any randomization (a requirement for

24  hash tables) applied in the partition map cache, nor have I

25  found any such evidence of this."

1          Okay.

2          MR. CARDENAS-NAVIA:  So that's it right there.  It's

3     above and beyond what's in the Court's construction.  You must

4     also show randomization --

5          THE COURT:  Okay.

6          MR. CARDENAS-NAVIA:  -- possibly to some degree.

7          THE COURT:  I need you to explain this if there's

8     something to explain on your end, Mr. Sigler.

9          MR. SIGLER:  If the appropriate result can be to

10    strike those two sentences, your Honor.

11         THE COURT:  Does that solve your problem?

12         MR. CARDENAS-NAVIA:  As long as randomization is not

13    raised as a separate limitation that needs to be met to

14    satisfy the claims, we're good.

15         THE COURT:  I think to the extent that these

16    sentences or any testimony suggests that randomization is

17    separately required, it is contrary to the claim construction.

18    So I'm not going to allow it.

19         So you're not going to be handing this report to the

20    jury.  We're really talking about testimony.  At least I hope

21    you're not.  If you do, we'll probably -- we'll have to bar

22    the exits because they'll run if you try to hand them the

23    report, and I'll be right behind them.

24         Okay.  So we're going to move to number 4, location

25    server.  So the argument by Kove is that they're saying that

1   Dr. Grama reads location server to prohibit the location

2   server from also storing the requested data.  And the argument

3   is that AWS had initially proposed that construction but

4   withdrew it.  That's memorialized in Judge Pallmeyer's claim

5   construction opinion in a footnote on page 19 and, therefore,

6   the point is basically forfeited.

7          What I get from the response is that -- well, two

8   things.  Number one, well, Dr. Grama doesn't actually say

9   this, but then goes on to say but it's right.

10          So I kind of am hung up on the proposition that this

11  had been a proposed claim construction that was withdrawn.

12  And I mean, it should be fairly obvious that if you propose a

13  claim construction and you withdraw it, that means you kind of

14  gave up that point.  I could leave out the kind of in that

15  sentence.

16          So what am I missing?

17          MR. SIGLER:  Can you switch it over to ours, your

18  Honor, and I'll show you.

19          THE COURT:  Sure.  Okay.  So we're looking at --

20          MR. SIGLER:  We're looking at an interview agenda

21  from one of the re-examinations, one of the completed

22  re-examinations.

23          THE COURT:  Okay.

24          MR. SIGLER:  This is an interview agenda that Kove

25  submitted.  This was after the claim construction occurred in

1  this case with Judge Pallmeyer.  And if we look at this --

2  THE COURT:  The date on this is July 21st of 2022.

3  MR. SIGLER:  That's correct, your Honor.  Kove

4  distinguishes Oracle prior art in this re-examination.  This

5  is where they're meeting with the examiner to explain how

6  they're distinguishing their prior art.  And they say that the

7  Oracle references do not teach separating data from location

8  information as required in all re-examined claims of the '640

9  and '170 patents.  Kove's stating right there that it's a

10  requirement of at least all those claims in the '640, '170

11  patents to separate the data from the location information.

12  That's essentially what Dr. Grama is talking about here, the

13  location -- the location information and the data don't exist

14  in the same place in these inventions.

15  THE COURT:  Okay.  So the sentence in Judge

16  Pallmeyer's claim construction opinion, which is page 19,

17  footnote 6 says -- and this is six months, seven months before

18  the meeting that this document you put up here references --

19  "AWS has withdrawn its request for a construction specifying

20  that a location server does not store data to which locations

21  pertain."

22  So here's my question for you.  So you got this

23  document at some point in time, and I take it that your point

24  is, oh, wait a second, this is after the claim construction

25  hearing and Dr. Overton went in there and he gave this point

1    up.

2    July the 21st of 2022 or whatever that date was is 20
3    months ago today. Where you been? Why didn't somebody come
4    in and say, hey, we want to unwithdraw our concession in the
5    claim construction hearing, we want a new claim construction
6    on this? Where you been? Why am I getting this in a motion
7    in limine in a response to a motion in limine that's filed
8    about two weeks before the trial date?

9    MR. SIGLER: Point taken, your Honor.

10    THE COURT: Okay. I think you forfeited the point by
11    not bringing it up. I mean, I get what you're saying here,
12    but I think you forfeited the point by not bringing it up. It
13    was conceded and you had an opportunity to come in and ask for
14    a modification of that based on later discovered evidence.
15    You didn't. So I'm granting the motion in limine on that one.

16    Now we're to number 5 which is the term location.
17    The argument is that the claim construction opinion at page 11
18    noted an agreed-upon construction. I'm just going to read it,
19    although it's pretty dense: Location means, quote, an
20    encoding that is a member of a set of associations with an
21    identifier in a location server and that specifies where data
22    pertaining to the entity identified by the identifier is
23    stored, close quote.

24    Kove's argument is that Dr. Grama adds to this that
25    something can't be -- cannot be a location if the data moves

1   but the location stays the same.  And he says that the
2   location must be everything you need to find the data you're
3   looking for.

4           So Kove's argument is this is adding to the claim
5   construction and also, oh, by the way, if it's right, it
6   writes out of the patent the preferred embodiment which would
7   be contrary to a tool of claim construction.

8           The way I understand AWS's argument in response is
9   that location and identifier are two different things and the
10  testimony or the statement by Dr. Grama is a statement about
11  what a person of ordinary skill in the art would understand,
12  not a claim construction, and he isn't contradicting the claim
13  construction.

14          So here's my question.  It's really a question for
15  the defendant.  Okay, I get it.  It's testimony about what a
16  person of ordinary skill in the art would understand, but
17  isn't it also an interpretation of the patent claim language?
18  Because we don't typically have at a patent jury trial
19  witnesses up on the stand talking about a claim term and one
20  expert witness says, this is what a person of ordinary skill
21  would understand this claim term to mean, the other expert
22  says, no, this is what a person of ordinary skill would
23  understand this claim term to mean.

24          We don't have that happen in front of a jury because
25  that's what I referred to before as a bedrock error by a trial

1  judge.  So that's kind of what it sounds like is happening
2  here.
3          MR. SIGLER:  If I could get -- I think I still have
4  control, your Honor.
5          THE COURT:  Yes.  You've got it.  There you go.
6          MR. SIGLER:  Let me just get to the testimony, your
7  Honor.
8          THE COURT:  So we're looking at Dr. Grama's
9  deposition?
10         MR. SIGLER:  Yes, and this is the testimony that Kove
11  highlighted.  Here in this testimony, they fixated on this
12  quote here.
13         THE COURT:  Okay.  So let me just read the question
14  and answer into the record.
15         MR. SIGLER:  Sure.
16         THE COURT:  "Okay.  So the hard drive controller has
17  to interpret that data to go to a specific physical location,
18  correct?
19      "ANSWER:  Absolutely.  But the key here is that that
20  location uniquely tells you where that data is.  It's all that
21  you need to find exactly the data that you're looking for."
22          Okay.  Go ahead.
23         MR. SIGLER:  He's answering a hypothetical that
24  doesn't involve the definition of location in this case.  He
25  makes that clear in the very next page of his testimony, if I

1   can get it to come up.  And he says, again, this entire

2   conversation was prefixed as a POSITA, not in the claim term

3   language of location.  He's not applying the definition of

4   location in this case.  He made that clear.  He hasn't offered

5   this opinion.

6           THE COURT:  Okay.  I get what you're saying.  He's

7   not offering the opinion.  What's the problem?

8           You know, it's a function of depositions, that the

9   deposition is being taken by the other side and the other side

10  is the side that's choosing the questions.  And just because

11  somebody -- I get why you make the motion, but the fact that

12  somebody said something in a deposition in response to a

13  question doesn't mean, at least without more, that they're

14  intending to offer that opinion.

15          MR. CARDENAS-NAVIA:  There is more.  It's in his

16  report --

17          THE COURT:  What's the more?

18          MR. CARDENAS-NAVIA:  -- which is what led me to ask

19  those questions.  It's paragraphs 264 --

20          THE COURT:  Which exhibit is this?  I've got those on

21  here.  I can pull it up.

22          MR. CARDENAS-NAVIA:  This is Grama's report which is

23  Exhibit 6.

24          THE COURT:  Still 6.  What was the paragraph again?

25          MR. CARDENAS-NAVIA:  Paragraph 264 is where it

1    starts.

2            THE COURT:  264.  Okay.  I'm there.

3            MR. CARDENAS-NAVIA:  If they're not making this

4    theory -- if they're not going to make this argument at trial,

5    I don't need to explain it.

6            THE COURT:  Is it just paragraph 264?

7            MR. CARDENAS-NAVIA:  265 and 267 as well.

8            And he's talking about what would be required to

9    request the object and then saying even more of it would need

10   to be there, but it's not in what Kove contends is the

11   location and so it can't be location.  And what those

12   requirements, the technical requirements he's laying out is

13   what you would need to exactly get to the data with no other

14   kind of help or information from anywhere else whatsoever.

15           THE COURT:  And somewhere in what you've just

16   referenced, Dr. Grama is saying is because either it does that

17   or doesn't do that, then it doesn't infringe?

18           MR. CARDENAS-NAVIA:  That's correct.  This is all --

19   if you go back to paragraph 261, you know, the heading is S3

20   does not use the claimed identifier location associations, and

21   then he starts listing his reasons why not.  Paragraph 262 is

22   first, 263 is second, and then 264 is part of that explanation

23   of why it's not a location in his view.

24           THE COURT:  Okay.  What about that?

25           MR. SIGLER:  He's saying here, your Honor -- and if I

1    could -- what they criticize in their motion, your Honor, was

2    paragraphs 265 and 266.  Here he's stating essentially how the

3    S3 system works.  There we go.  He's explaining that what Kove

4    has accused as being the location is something called an iNode

5    that contains a Blindex.  And essentially in S3, a Blindex is

6    like a code name for a data object.  It's not something that

7    tells you where the data for that object is located.

8            That's our contention in this case.  At most, it can

9    be an identifier which is the other half of that equation in

10   the code patents, an identifier and location mapping.

11           That Blindex as he's explaining here in paragraphs

12   265 and 266, it never changes.  It's immutable.  So no matter

13   where that object, that piece of data you're looking for is

14   moved around in the system, that Blindex doesn't change.  It

15   doesn't tell you how to get to that object.

16           And that's what he's explaining here.  He's

17   explaining how the entire S3 system works, how it goes through

18   that hierarchy that I showed you before, your Honor, involving

19   SkyNet and eventually getting down to the R2D2s.

20           And he goes on to explain --

21           THE COURT:  So that first sentence in 265 says,

22   "Instead, an iNode contains a Blindex, which does not change

23   even when the location of the associated data on S3 changes

24   and so is not location data."

25           So that seems to be another way of saying that if the

1  location data -- hang on a second.  I want to make sure I'm

2  not stating this wrongly.  I'm not as conversant with the

3  terminology.  Give me a second.

4         That seems to me at least to my untrained eye and

5  brain would be that he's saying that something can't be

6  location data if it doesn't change when the actual location of

7  the data moves.  I think that's what he's saying.  And that's

8  what Kove is arguing is an add-on to the claim construction.

9         MR. CARDENAS-NAVIA:  That's exactly how we viewed it.

10  If they're saying they're not going to make that argument,

11  then that's one thing.  But we understand them to be making

12  it.  And it would read out preferred embodiments.

13         THE COURT:  So are you making that argument?

14         MR. SIGLER:  No, your Honor.  I'd like to explain our

15  argument, though, just to make it clear what argument we are

16  making.

17         THE COURT:  So listen to what he's saying because I'm

18  going to ask you whether it's okay.  Go ahead.

19         MR. SIGLER:  Our argument is that that Blindex is not

20  location data.  It's not the location required under these

21  claims when you have that mapping of an identifier and a

22  location.

23         THE COURT:  Because?

24         MR. SIGLER:  Because it doesn't tell you where the

25  data is.  It doesn't give you any information --

1          THE COURT:  What does it give you?

2          MR. SIGLER:  It gives you -- it's essentially another

3    name for the requested object from the client.  S3 assigns it

4    another name in the system.  That name is then taken -- it

5    includes a name and certain other numbers.  That is taken from

6    the KFC back up to the router and then over to the other piece

7    of the system that I showed you, the Blob assembler, SkyNet,

8    the R2D2s.

9          THE COURT:  Okay.

10         MR. SIGLER:  As Dr. Grama's explaining here when he

11   talks about SkyNet, as he says, that's the caching layer on

12   top of the MC that provides very low latency mappings between

13   volume IDs, which is part of the Blindex, and the R2D2 is

14   hosting the volumes.  He's saying that happens over in SkyNet.

15   That's one of our non-infringement positions, your Honor.

16   That what's going on in the KFC is just a translation of the

17   requested -- the request from the client into a different name

18   which is the Blindex.  Then that has to be taken to another

19   part of the system in order to find the data.

20         THE COURT:  Okay.  Do you understand what he was

21   saying?

22         MR. CARDENAS-NAVIA:  Most of it.  The part about we

23   would just want to say it's a name, that's not what our motion

24   is about.  We would be fine with that.  It's as long as they

25   don't say this first sentence in paragraph 265, that the

1  reason it's not a location is not just that they think it's a

2  name but that it doesn't change even when the location

3  changes.  They shouldn't make that and they shouldn't make the

4  argument that it has to be everything you need to get to the

5  data.  Because both of those are contrary to the Court's

6  construction and our additional requirements.

7          MR. SIGLER:  If I can just respond to that, your

8  Honor.  The fact that it doesn't change is evidence that it's

9  not a location.  That's our point.  That as a factual matter,

10  that Blindex doesn't change no matter where you put the data

11  in the system.  So that's additional evidence showing that

12  it's not a location.

13          MR. CARDENAS-NAVIA:  They're preferred embodiments

14  where that exact scenario is true.

15          THE COURT:  Is he right about that?

16          MR. SIGLER:  No, your Honor.  I don't believe he is.

17          THE COURT:  Look, I'm just going to tell you folks,

18  and I'm going to be just as candid as I can be.  There is no

19  planet on which I'm going to ever understand this stuff as

20  well as either of you do.  There just isn't one.  Okay?

21          I'm going to have to make a ruling on this.  Okay?

22  And I'm not going to be able to make it right now because I'm

23  going to have to go back and reread a bunch of this stuff a

24  whole bunch of times in order to try to figure it out.  And

25  then I'm going to make a ruling.  And there's two

1  possibilities.  It's binary.  I could be right or I could be
2  wrong.

3       If I'm wrong, then you all are going to be doing
4  this -- a good chance you're all going to be doing this all
5  over again at some point in time, which, again, may be great
6  for lawyers getting paid by the hour, but in the overall
7  scheme of things, probably not the best thing in the world.

8       It would be far better for you I think just in terms
9  of hedging risk, okay, if you were able to work something out
10 on this and tell me what it is so that I don't have to make a
11 choice that has at least a 50/50 percent chance -- 50/50
12 chance of being wrong.

13      But I'll do that.  I'll -- I'm taking this one under
14 advisement and I will do my best to figure it out.

15           MR. CARDENAS-NAVIA:  We'll certainly try --

16           THE COURT:  I'm going to kind of put a drop-dead time
17 on you by -- today is Thursday -- close of business tomorrow
18 because I'm going to have to be working on this stuff over the
19 weekend.

20      We're going to move on to the last two things which
21 is set -- I'm sorry, maybe it's the last thing.  No.  The last
22 two things.  Unique set and set.

23           Okay.  So some of the claims require the location
24 server to maintain, quote, a unique set of an aggregate set of
25 location information.  Kove says that AWS is contending this

1   requires no overlap at all between sets.  In other words, you

2   can't have one that was described as A plus B plus C and then

3   another one described as C plus D plus E because the C would

4   overlap.  And according to Kove, that confuses location sets

5   with locations.  The claim requires the set to be unique, not

6   each component of the set, and so it's contrary to the plain

7   language.

8          AWS's response is Kove is trying to reopen claim

9   construction.

10         To which my response is, okay, maybe they are, but

11  don't I still have to make a decision about it?  And then --

12  and I think the answer to that is yes because, again, I can't

13  have one expert up on the witness stand saying that the claim

14  requires this and another expert up on the witness stand

15  saying that the claim doesn't require this, it requires that

16  because then that makes the jury decide claim construction

17  which you can't do.

18         So I get that maybe they're trying to reopen claim

19  construction, but what's the merits, what's the response on

20  the merits to what Kove is arguing?

21         MR. SIGLER:  Your Honor, on set --

22         THE COURT:  If you're not going to use that ELMO

23  anymore, you can put it down.  That will be less blinding to

24  you.  There's an elbow on it.  It folds.  You take that ring,

25  just pull straight down on the ring.  There used to be a ring.

1  Maybe the ring broke off.  That arm breaks in half towards
2  you.  There you go.
3          MR. SIGLER:  Okay.  Thank you, your Honor.
4          So on set, your Honor, it only now appears in the
5  '978 claims.
6          THE COURT:  Okay.
7          MR. SIGLER:  Both independent claims recite a
8  plurality of location servers where each location server
9  contains or stores a unique set of an aggregate set of
10  location information.
11          THE COURT:  Okay.
12          MR. SIGLER:  So it doesn't matter if the set can mean
13  something less than a complete set elsewhere in the claims or
14  specification because the only claims we're concerned with now
15  say that we have a unique set of an aggregate set.  So that's
16  our response on that.
17          THE COURT:  Okay.  So if we're talking about -- I
18  spent the weekend with my grandson.  If we're talking about
19  Pokemon cards, okay, and he's got a set of Pokemon cards which
20  has these three particular Pokemon -- or maybe they're
21  pokemen, I never quite got that, if the plural of Pokemon is
22  pokemen -- and it's 1, 2, and 3, and he says this is a unique
23  set of Pokemon cards and I have a set that has 3, 4, and 5,
24  and I say, yours is unique and so is mine because they're
25  different.  Am I right that they're both unique even though

1  there's one thing that overlaps in the two of them?

2  MR. SIGLER:  We're talking about unique now.  I was

3  talking about set, your Honor.

4  THE COURT:  Well, I was talking about unique.  That's

5  where I started.  So that's number 6.  Set is number 7.

6  MR. SIGLER:  Okay.  I mean, there's no disclosure at

7  least in the specification that there can be an overlap, so

8  that's what we're basing this off of.

9  THE COURT:  This is a question about what unique

10  means.  And if Pokemon cards 1, 2, and 3 don't appear anywhere

11  else even though 3 might appear in combination with other

12  things somewhere else, that would seem to me to be a unique

13  set.  If we can maybe make them closer to patent law, you

14  know, when you're talking about combination of references for

15  obviousness purposes, if you have one combination as

16  references 1, 2, 3 and the next combination as references 3,

17  4, 5, those are unique even though there's one of them that's

18  in both of them, because we're talking about the set, not each

19  component of the set.

20  MR. SIGLER:  Understood, your Honor.  I agree with

21  you on that outside the scope of the patent.  But the

22  specification talks about set A being a copy of set A, set B

23  being a copy of set B and so on.  There's no disclosure of any

24  overlap between them.  And it also --

25  THE COURT:  Does it exclude the possibility of there

1  being overlap between individual components of the set?

2  MR. SIGLER:  It doesn't exclude it, but it

3  consistently refers to it in that way, your Honor.  And it

4  also says, for example, the '978 patent at column 16, lines 64

5  to 66 that each NDTP server will only maintain the portion of

6  the total association set which corresponds to its particular

7  identifiers.  So it's only maintaining its own particular set.

8  THE COURT:  Okay.  You wanted to talk about the term

9  set by itself.  Go ahead and do that.

10  MR. SIGLER:  Sure, your Honor.  As I mentioned, we've

11  got two claims where that appears now and each one --

12  THE COURT:  '978 you said?

13  MR. SIGLER:  Yes, claims 10 and 17.  And each one in

14  the claim language addresses a unique set of an aggregate set

15  of the location information.

16  So part of what Kove was arguing here, I believe, was

17  that set can mean something less than a complete set, but

18  that's kind of out of the picture now given what these claims

19  say because we're talking about a unique set of an aggregate

20  set.

21  THE COURT:  What do you understand the term aggregate

22  set to mean?

23  MR. SIGLER:  The complete set, your Honor.

24  THE COURT:  Got it.  Maybe -- okay.  Let me just look

25  at my notes here for a second and then I'll give you a chance

1    to respond.

2            So is this dispute about whether the whole set has to

3    be on a single location server?

4            MR. SIGLER:  Yes, your Honor.

5            THE COURT:  Oh, okay.  Because the look I was getting

6    from you sounded like I was speaking in a foreign language all

7    of a sudden.

8            MR. SIGLER:  I was just considering, your Honor.

9            THE COURT:  Go ahead and respond to what he said.

10           MR. CARDENAS-NAVIA:  On the unique set term or the

11   set term?

12           THE COURT:  All of it, in whatever sequence you think

13   is best.

14           MR. CARDENAS-NAVIA:  So for the unique set term,

15   agreed, there's no special lexicography here.  It's just the

16   normal term unique set that we would use them.  And very

17   pertinently, we cite to this evidence in our brief.  There

18   actually is a disclosure of something called replication --

19           THE COURT:  Actually, no, you don't have to talk

20   about that one.  Just talk about set, the second point, in

21   other words.

22           MR. CARDENAS-NAVIA:  So set, as I understood it, the

23   word he was honing on was there's a set within an aggregate

24   set.

25           THE COURT:  Correct.

1    MR. CARDENAS-NAVIA:  In his view, aggregate set has
2    to be the entire everything set.  But, you know, an aggregate
3    set is just its plain meaning, it is a larger set.  You have
4    sets within an aggregate set of information.  It doesn't have
5    to be the entire set everywhere.  The nature of these claims
6    are comprising claims.  It sets out limitations, you've got to
7    meet those limitations.  If you've got more, that's fine.

8         And so there's no -- there's nowhere anywhere in the
9    spec about you have to store literally every single piece of
10   location data for an entire system.  However, you might want
11   to define that in your -- on the claims.  It's just that the
12   set of data and locations that you define within a specific
13   infringement read, that is your aggregate set.  And then of
14   that, you store subsets of that on specific location servers.

15        I'll just say this for clarity.  Your Honor had a
16   question about whether the issue was about whether the entire
17   set is on a single location server.  That's not what I
18   understand the dispute to be about.

19        THE COURT:  Okay.  Respond to what he just said.

20        MR. SIGLER:  Sure, your Honor.  I mean, other than
21   what I've said before, I mean, we now have a construction of
22   non-hierarchical that requires each location server to have
23   the location we're looking for or essentially additional
24   information to go find -- to send back up to the client to go
25   find that information.

1           THE COURT:  Right.

2           MR. SIGLER:  So I mean, I think that also defines

3   like we're talking about a complete set here.  We're talking

4   about -- that's what we're talking about when we're talking

5   about an aggregate set.

6           MR. CARDENAS-NAVIA:  May I respond to that?

7           THE COURT:  I think the plaintiff has the better of

8   the argument on both of these points.  So that's the ruling.

9           MR. SIGLER:  Thank you, your Honor.

10          THE COURT:  Okay.  I'm kind of worn out talking about

11  motions.  I think we're done with them.  So we have other

12  stuff to talk about.

13          MR. REICHMAN:  Yes.  Before you snuck away --

14          THE COURT:  I'm not sneaking away.

15          MR. REICHMAN:  We have a few questions when you're

16  ready.

17          THE COURT:  Okay.  Let me just talk to you about

18  logistics generally.  So one of the things you probably

19  observed from these microphones is they actually work pretty

20  well, but they got to be pointed right at you.

21          I'm going to want people to question from podiums.

22  When we're arguing and stuff like this, it's okay to do it

23  from your seats.  But it's harder to have the microphone right

24  in front of you, so you're going to need to question from a

25  podium.  It doesn't matter which one you use.

1    I'm going to be out next Wednesday, Thursday, and

2  Friday because I have a JPML hearing.  You should arrange with

3  my courtroom deputy clerk to get in here and kind of, you

4  know, test your equipment, get everything set up and whatnot

5  so it's all ready to go on Monday morning.

6    So in terms of jury selection, I always pick 12

7  jurors.  They're all regular jurors.  They will all deliberate

8  as long as we have all of them left at the end.

9    I'll probably get -- because it's a little bit longer

10 trial, I'll probably get 30 -- let's figure on 30, Melissa.

11 We'll get 30 people.  They will fill out a written

12 questionnaire.  The written questionnaire I will get to you

13 before I leave town next week by email.  So what I need before

14 you leave is one person to take responsibility for having a

15 sheet of paper that has two email addresses per side that I'm

16 going to send this to, and then you'll circulate it within

17 your respective teams as you need to.

18    Where I'm going to get the -- so usually it's two

19 sides of one page.  The first side is basic background

20 information about employment, education, people that live in

21 your household, where you live and so on.  The backside of it

22 tends to be, generally speaking, yes/no answers to more

23 pertinent questions.  And I'll largely take those from the

24 proposed voir dire that you've given me in the final pretrial

25 order.

1        I'll circulate a draft of that hopefully no later

2 than Tuesday, although it might be Wednesday, by email, and

3 I'll ask for comments back by a particular date and time.  And

4 when you send the comments back, it will be reply all; in

5 other words, to me and to counsel on the other side.  I'll

6 give you -- I'll decide whatever modifications need to be

7 made.  There's a short cover letter that goes along with that

8 that explains at like a 30,000-foot level what the case is

9 about.  I'll give you that, too, to comment on.

10        Anyhow, when the jurors come in on Monday morning the

11 1st of April -- that's our date, right?  The 1st of April?

12 Right.  They will fill out those questionnaires in another

13 spot.  We'll duplicate it.  We'll probably make -- sorry, I

14 know you got more lawyers than this -- two sets per side

15 because doing much more than that takes way too long.  The

16 jurors will be brought up to the room at that point or brought

17 into the room at that point.  I'll give them the standard kind

18 of pep talk about jury service.  And then the jurors will be

19 questioned one at a time.

20        The way we do this now, it was one of the things we

21 changed in COVID to make things a little bit easier, each

22 juror will come up to the witness stand.  I'll ask them

23 general follow-up questions to their written answers, and then

24 if there's anything that has to be asked, which is probably

25 not terribly likely in a situation like this, if there's

1   anything that should be asked outside the presence of other
2   jurors, the way we'll handle that is the juror will put on
3   headphones.  There are headphones at the table, but there
4   ain't six, there ain't five, it's probably like two or three
5   and it is what it is.  The court reporter puts on headphones.
6   I turn on the white noise so only the people on the
7   headphones, the court reporter, me, and the witness or the
8   juror will be able to hear it.  And so all of the questioning
9   of a particular juror will be done when that person's up
10  there.

11          Then they're done.  We repeat.  We'll probably go
12  through all 30 people.  If we're short of 30 and I think we've
13  got enough giving consideration to likely cause challenges, we
14  might stop before we get to 30.

15          Once we're finished with that process, I'll ask you
16  at sidebar and -- what sidebar means now in here is white
17  noise and headphones.  We don't go to sidebar.  I'll tell you,
18  Put on the headphones, I'll turn on the white noise.  I'll ask
19  you at that point if there's any further follow-up questions
20  you want me to ask to particular jurors or to the panel as a
21  whole, I'll deal with any of that.  If we need to bring people
22  back up, we'll do that.  All the voir dire is going to be done
23  by me.

24          We will be done with that process before the lunch
25  break.  We will have the jurors probably at about -- let me

finish this spiel and I'll give you a chance to ask questions.
We'll probably have the jurors up here about 9:30-ish, maybe a
little earlier, maybe a little later. We'll get through that
whole process before the lunch break. We will probably deal
with cause challenges before the lunch break. And we'll do
all of those outside the presence of the jury again on the
headphones.

I'll rule on all the cause challenges, then you'll
know who is left. I'll then give you something like 15 or 20
minutes to go elsewhere and confer on the peremptory
challenges. Depending upon where we are, you'll either come
back after the lunch break and tell me that or we'll do it
before the lunch break.

And it's three per side. And we'll go back and
forth, plaintiff, defendant, plaintiff, defendant, plaintiff,
defendant.

Now, you don't have to strike people in a sequence.
In other words, you'll get a list that has the jurors listed
from 1 to 30. That's the sequence in which they'll be put on
the jury. You can strike juror number 4 first and juror
number 1 second. Okay? If you end up doing something that
looks like you're going to be wasting a peremptory challenge,
let's say, on juror number 30 who we're never going to get to,
I will probably tell you, hey, you're about to waste a
peremptory challenge, it's a free country, you can do that if

1  you want to.

2  But the bottom line is that once we go through that
3  process, the first 12 people on the list who have not been
4  excused for cause or stricken on a peremptory are the jurors.
5  So that process will be done either right before the lunch
6  break or right after.

7  Any questions about that?

8  MR. REICHMAN:  I think I understood, your Honor, but
9  I just want to be prepared.  When they're on the stand the
10 first time, you're asking the questions and we're not
11 following up, and then if we have other questions --

12 THE COURT:  You're going to tell me and then I'll
13 bring the person back up.

14 MR. REICHMAN:  Got it.  So we're not asking
15 questions?

16 THE COURT:  Correct.  Any other questions about that?
17 Okay.  That's item number one.

18 Item number two is my usual practice in civil and
19 criminal trials is to give the jury a preliminary set of
20 instructions before opening statements which, generally
21 speaking, would include not just the general, this is what
22 your job is as a jury, but also preliminary instructions on
23 the issues in the case.

24 Now, the tradeoff on that is that in a patent
25 infringement case, those preliminary instructions -- and we've

1   got in the Seventh Circuit set, which I'm hoping is what

2   everybody used, we've got a set of preliminary instructions

3   which are a truncated version of the final instructions, but

4   the truncated set of patent instructions is still pretty long

5   and complicated.

6          So the tradeoff is do I want to really do something

7   that has the potential of overloading the jury before you even

8   give opening statements?  And so I'm going to have to kind of

9   look and see what those look like in this case.  But if I

10  conclude that we're going to do the -- one way or another, I'm

11  either going to give you the cautionary only preliminary

12  instructions or the full-blown set of preliminary

13  instructions.  I'll send those to you by email probably more

14  like Wednesday or Thursday of next week and we'll ask again

15  for comments back, comments and objections back by return

16  email with a copy to opposing counsel.  I'll decide any

17  disputes.  I'll send you out a final version, and then on

18  Monday morning of the first day of trial, I'll give everybody

19  a chance to put on the record any objections they have to

20  those, in other words, before opening statements.

21         Again, those get read to the jury before openings.

22  They also get displayed to the jurors.  You will see that

23  there's -- in the jury box, there's probably about eight

24  screens.  So all the jurors will have screens that they can

25  see, and you have screens on the tables as well.

1    The deal on the screens, and I know you've got a lot
2 of people, is that the screens on this table are going to have
3 to be turned the other way because there's going to be stuff
4 up on the screens before the jurors get to see it.  I'm not
5 talking about instructions, I'm talking about evidence.  I'll
6 remind you of that when you're in here.  So that's how the
7 instructions will work.

8    Fast forwarding ahead, when we get to closings, what
9 will happen at some point as we get close to the end of the
10 trial is I'll give you a draft of the jury instructions and
11 we'll set aside some time to discuss those and people to make
12 arguments and objections about them.

13    I read the instructions and give them to the jurors
14 and display them to the jurors before the closing arguments,
15 not after.  And so it's perfectly okay for you to read from,
16 quote from or put up on a screen or put in a slide any
17 instruction or part of an instruction that you want to because
18 the jurors will have all of them at that point.

19    So any questions about any of that?  Go ahead,
20 Mr. Reichman.

21    MR. REICHMAN:  Follow-up on the timing if I may.
22    THE COURT:  Yeah.
23    MR. REICHMAN:  We're going to do the jury selection
24 which should be done in the morning, it sounds like, and then
25 it sounds like --

1    THE COURT:  You're going to be doing openings right

2  after lunch and you're going to be doing witnesses the first

3  day.

4    MR. REICHMAN:  That was my question.  Do you

5  typically get to an hour of witnesses?  Is that about right?

6    THE COURT:  It kind of depends on how long the jury

7  instruction goes.  I know I put time limits on the openings

8  and time limitations.

9    So we're going to go from -- and we'll get a little

10  bit later start on the first day because the jurors don't get

11  up here right at 9:00.  The plan is going to be to go from

12  9:00 -- and sometimes that may slide to 9:10 or 9:15 -- 9:00

13  to probably 4:45 or 5:00.  So yeah, you're going to have at

14  least an hour.  It's reasonable to assume that you'll have

15  something like 60 to 90 minutes of testimony the first day.

16    MR. REICHMAN:  That's what I thought.  Okay.  When

17  you're ready, I have a couple of other housekeeping issues.

18    THE COURT:  Let me go through the rest of my whole

19  pitch.  Did you have a question about the instruction stuff?

20    MR. FISCH:  Quickly, your Honor, the video, is that

21  going to be -- the parties have agreed to play the video --

22    THE COURT:  Yes, that will be in the instructions one

23  -- whether I do the shorter version or the longer version.

24    MR. FISCH:  Thank you, sir.

25    THE COURT:  So one of the things you got to figure

1   out from that is do we want to hand out the sample patent or

2   do we want to tell them, no, we're not going to bother with

3   that. There's the sample patent with the table and legs and

4   all that kind of stuff. So figure that out. I don't care.

5   However you want to do it. Just try to agree on the version

6   so we have something to hand to them.

7         While I'm thinking of copies of patents, in some

8   patent trials, particularly the more complicated the patent,

9   the lawyers like to have the jurors all having copies of them

10   with them so they can look at them on their own while the

11   experts are going through them. I'm all for that if you want

12   to do it.

13         MR. REICHMAN: We agreed.

14         THE COURT: You've agreed to it? Fine.

15         MR. REICHMAN: A jury notebook with the patents.

16         THE COURT: There you go. Good.

17         MR. REICHMAN: And the claim construction.

18         THE COURT: Okay.

19         MR. FISCH: And a note pad.

20         THE COURT: Well, the jurors get notes. They get to

21   take notes. We hand out the note pads on that. So just make

22   sure you're all comfortable with what's in those things. If

23   there's anything that's disputed, I need to know about it

24   obviously before anything goes to the jury.

25         My normal practice in civil cases is to allow jurors

1   to ask questions, but because we have time limits and because

2   -- I'm kind of disinclined to do it, but I'm willing to

3   consider it if people think that would be helpful.  Let me

4   tell you what -- and I don't know how many of you have tried

5   cases where jurors have asked questions before.

6          I didn't try IP cases for a living.  I did try one

7   trademark case, but I tried a lot of complicated cases, and

8   when we -- this is probably 15 years ago we participated as a

9   court in an ABA project that involved improving jury trials.

10  And one of the elements of that was allowing jurors to ask

11  questions.  And I was on the committee.  And I will tell you

12  as a trial lawyer who always thought I was going to be way

13  better prepared than the other side, I was initially dead set

14  against it because I figured, why should I let the jury clean

15  up my opponent's mistakes.

16         My experience in doing this for 15 years with jury

17  questions has been that's not what it's about.  I'll come back

18  to that in a second.  It involves the following:  A, in any

19  trial, no matter how simple, the lawyers know the stuff

20  frontward and backward.  You've been working on it for years,

21  you get it.  Jurors don't.  They're getting it delivered to

22  them with a firehose, and they don't get everything when you

23  tell them it.  That doesn't mean repeating it six times makes

24  them understand it.

25         So what my experience has been, that the overwhelming

1  majority of jury questions have been stuff that was probably

2  testified about but the jurors just didn't get it or it got

3  past them.

4          I've had over dozens of trials where I've done this.

5  One or two situations where a juror asked a question that

6  somebody had forgotten to ask.  And so here's my deal on that.

7  So in the situations where I allowed jurors to ask questions,

8  they get an instruction at the beginning of case that says,

9  here's how it works.  You'll get to ask questions of the

10 witnesses, you'll get to propose questions to ask to the

11 witnesses.  You might want to do that if you need to clarify

12 something or if there's something you didn't understand.  The

13 process is that when the witnesses are done testifying, the

14 lawyers have asked all of their questions, I'll turn to you,

15 the jury, to ask do you have any questions.  You'll write it

16 out on a piece of paper, and then the lawyers and I will

17 discuss the questions.  I may not be able to ask your question

18 because it may be that it's not the right question for that

19 witness or maybe it's not proper under the rules of evidence,

20 there may be another problem, I may need to rephrase it.  If I

21 think a question can be asked, then I'll ask the witness the

22 question, the witness will answer, and I'll give both sides a

23 chance to follow up.  That's the process.

24          What I tell lawyers is that it's a legitimate

25 objection when a juror asks a question because you're not

1  going to be making the objection in front of the jury, no, my

2  opponent forgot to ask the question and you shouldn't let the

3  jury clean it up for him, and I've sustained that objection a

4  couple times.

5      I had a copyright case actually in which the

6  plaintiff forgot to put on the actual damages.  They only put

7  on the statutory damages, and the juror asked the question,

8  how were you harmed by this and how much.  And the defendant

9  objected to it at sidebar saying, he didn't ask that.  He

10  waived it.  And I agreed with him.  I sustained the objection.

11  So anyway.

12      So I don't care.  It doesn't count against anybody's

13  time.  The downside would be if you get a lot of questions,

14  which sometimes happens, it might, you know, make our time

15  expand maybe by a little bit too much.  It might cause --

16  there might be a ripple effect from that.  But I'll take into

17  consideration whatever you folks think.  If both sides think,

18  yeah, we should allow the jurors to ask questions, then I'm

19  willing to go with that probably.  But you don't have to tell

20  me right now.  You can tell me later.

21      MR. FISCH:  I can tell you now, your Honor, if you

22  like.  We're fine with it.  We tried a case in the Eastern

23  District of Texas under Judge Mazzant where he had begun the

24  process of asking questions in that jurisdiction, and we found

25  it valuable.

1          MR. REICHMAN:  I feel like a dinosaur.  I'm not so

2    sure about it.  Can I think about it?

3          THE COURT:  Think about it.  That's fine.  You'll

4    tell me when -- when I send out the email that has the jury

5    questionnaire, in your response to that email when you give me

6    back your comments, you'll tell me what your position is.

7          MR. REICHMAN:  Yes, sir.

8          MR. FISCH:  Your Honor, one of the things that Judge

9    Mazzant did was to inform the jury that it was his ultimate

10   decision whether to ask a question.

11         THE COURT:  Yes, I tell them that.  Not exactly in

12   those words, but I tell them that.

13         MR. FISCH:  So it's not held against any party.

14         THE COURT:  I tell them that too.  There's a standard

15   instruction that we give on this that basically says

16   essentially that.

17         Okay.  I told you the length of the trial day.  We'll

18   usually take the lunch break at 12:30.  It will be an hour.

19   It might be five minutes before or five minutes after if we

20   can try to do it at a convenient place.  We'll take mid

21   morning and mid afternoon breaks as needed.

22         What am I leaving out?  Yes, one other thing.  I do

23   not know whether we have in this case any situations where one

24   side is calling people associated with the other side

25   adversely.  Is that likely to happen?

1    MR. REICHMAN:  We're not sure yet, your Honor.

2    THE COURT:  Okay.  So I believe that this is

3    discussed in the trial time limits order.  In fact, I'm pretty

4    sure it is, but let me repeat it anyway.

5    So I routinely exercise my authority under Rule 611

6    and specifically the commentary to that rule to control the

7    order of proof.  If a witness is on the stand, they're on the

8    stand for all purposes.  So in other words, we're not going to

9    have scope of cross-examination and have a witness bop back

10   and forth onto the stand in the plaintiff's case and then the

11   defendant's case.  So specific application of that.  If the

12   plaintiff calls in the defendant's case -- if the plaintiff

13   calls in the plaintiff's case a representative of the

14   defendant, then the entire examination by the defendant is

15   going to happen then.  So in other words, we're not going to

16   say, I'm just going to cross-examine him on this now, we're

17   going to call him back on the rest of this stuff later.

18   There's a limited exception to this which I'll come

19   back to.

20   So the witness is on the stand for all purposes.

21   There's not going to be any problem with scope of cross.  The

22   only situation where a person would resume the witness stand,

23   aside for one exception that I'm going to talk about in a

24   second, is if a witness has testified and then something came

25   up later that they have to get back on to answer.  Other than

1  that, no.

2        Now, the specific potential exception of that has to

3  do with experts talking about infringement and validity.  I

4  know that patent lawyers, at least -- I will just tell you,

5  the last four patent cases I tried were tried in Wilmington,

6  Delaware.  I tried four jury trials in Wilmington last year.

7        The way everybody wanted to do it out there is we

8  have our person -- the plaintiff has their person talk about

9  infringement but not validity.  The defendant then puts on

10  during their case their non-infringement and invalidity

11  experts, and then the plaintiff's expert comes back in

12  rebuttal and talks about validity.

13        If that's the way you want to do it here, that's

14  fine.  Is that the way --

15        MR. REICHMAN:  That's what we agreed to, your Honor.

16        THE COURT:  Then I'm good with that.

17        MR. REICHMAN:  How about this, just to refresh

18  because I know you have a lot of hearings every day.  We

19  talked about it at the last call.  And I raised that that's

20  how we're going to do the experts, and you said --

21        THE COURT:  That's fine then.  I didn't remember.

22        MR. REICHMAN:  Okay.

23        THE COURT:  I think I've pretty much exhausted

24  everything I need to tell you.

25        What other questions do you have or things you need

1　to bring up?

2　　　　MR. REICHMAN:　Just a couple housekeeping issues,

3　your Honor.　We already covered one, but just to say it.

4　We've agreed to the jury notebooks.　So we'll work on that and

5　we'll provide it and we've agreed to what's going to be in it.

6　　　　THE COURT:　Just make two extras, one for me and one

7　for a law clerk.　But you don't need to make more than two

8　extras.　And when I come back in my next life, I am going to

9　come back as having the monopoly on the binder concession in

10　the District of Delaware.　I swear to God.　It's like you get

11　there in the morning to go to court and there's this poor

12　hapless person outside that has a cart piled about 10 feet

13　high with binders, none of which get used by anybody that I

14　can see.　I want that concession.　There's money to be made.

15　　　　MR. REICHMAN:　That's true.

16　　　　The other one was I just don't know the rule in this

17　jurisdiction, and I apologize if it's obvious, about talking

18　to a witness after they've been passed on to cross.　In most

19　jurisdictions --

20　　　　THE COURT:　So my view of it is that -- and there's

21　no rule.　My view of it is if the witness is being examined by

22　an adverse person, they can't talk to anybody about their

23　testimony.

24　　　　MR. REICHMAN:　Okay.　That's my understanding.

25　　　　THE COURT:　Aside from that, no.

1       Something you said just jogged and then I lost it.

2  So I'll come back to it.

3       MR. REICHMAN:  About the notebook concession?

4       THE COURT:  No, no, no.  It was something after that.

5  Anyway, just go ahead.

6       MR. REICHMAN:  Once you pass the witness, there's no

7  talking to the witness, I wanted to clarify that.

8       I think that's it, your Honor, from our perspective.

9       MR. FISCH:  May I, your Honor?

10      THE COURT:  Sure.

11      MR. FISCH:  Thank you.  Just housekeeping matters.

12  How does your Honor feel about moving from the podium during

13  examination?

14      THE COURT:  The podium is on wheels.  Let's stick to

15  the podium.

16      MR. FISCH:  Okay.  And I presume you rotate the

17  podium this direction, your Honor.

18      THE COURT:  It's on wheels.  You rotate it that way

19  for opening statements and kind of half that way.  I will tell

20  you that podium, it has a tendency to have what I would refer

21  to as fatal caster errors.  So it's actually kind of a

22  two-person job.  You need to have one person on each side and

23  you need to be pushing down as you turn.

24      MR. FISCH:  Understood.

25      THE COURT:  That's the local knowledge.

1          MR. FISCH:  If one was to bring in a board or a
2     physical demonstrative --
3          THE COURT:  The tough part of that is where the heck
4     do you put it.
5          MR. FISCH:  I'm with your Honor.
6          THE COURT:  There's not a good space in here, and
7     that's one of the reasons why we have these individual
8     screens.  But if you have the situation where somebody wants
9     to be writing or drawing on something, usually where people
10    put it is kind of right in this little space here between the
11    witness stand and where the court reporter is.  I don't need
12    to see it.
13         MR. FISCH:  Right here, your Honor?
14         THE COURT:  Kind of right in there.  If you're
15    talking about a pad to draw on.  If you're talking about
16    something that's really wide, I've seen people put them up
17    there, but it kind of gets hard for people to see from too far
18    away.
19         MR. FISCH:  Understood on that.
20         And then, your Honor, just on the housekeeping of
21    maintaining time, is that something your Honor --
22         THE COURT:  I'll do it.  You'll get a spreadsheet at
23    the end -- you'll get an updated Excel spreadsheet at the end
24    of each day probably before you hit the door.
25         MR. FISCH:  That's great, your Honor.  Some places

1   invoke the rule, some jurisdictions invoke the rule about

2   witnesses being able to see opening or being excused before or

3   after opening.  What's your Honor's view on that?

4        THE COURT:  I don't have a preconceived view.  If

5   everybody agrees that the witnesses should be able to watch

6   the openings, I don't care about that.  Usually one side

7   doesn't like that and so I'm not going to force it.  Once

8   they're done, they can hang around if they're not going to be

9   coming back to testify.

10       MR. FISCH:  As your Honor knows, my final question of

11  the day, at least I hope, is that your Honor has seen that

12  we've sealed source code during portions of the testimony.

13       THE COURT:  Yeah.

14       MR. FISCH:  And that source code --

15       THE COURT:  I'm glad you brought this up.  Keep

16  going.

17       MR. FISCH:  The source code still is relevant.  What

18  we've done in other trials is when we get to a point where

19  we're going to use that source code, we ask to seal the

20  courtroom, show the source code, and when the source code's

21  done, we reopen the courtroom.

22       THE COURT:  Okay.  Don't take this the wrong way.

23  But do you actually think that there's going to be anybody

24  else who's not affiliated with one side or another who's going

25  to be watching this trial?

1  MR. FISCH:  You know, your Honor, I hear what you're

2  saying.  I don't know if I want that really to be the standard

3  or test as to whether --

4  THE COURT:  My question, as a practical matter, is it

5  going to make any difference?

6  MR. FISCH:  The defendant in this case is well known

7  and --

8  THE COURT:  Yeah.

9  MR. FISCH:  And I think, as your Honor knows, well

10  known defendants sometimes attract the media.

11  THE COURT:  So is the source code -- nobody's going

12  to be up there on the witness stand reading source code.

13  You're going to talk about something that's going to be

14  displayed somehow, right?

15  MR. FISCH:  No, your Honor, there will be some

16  instances in which we put the actual source code up and then

17  walk through what the source code does.  Not for protracted

18  periods of time obviously.  Your Honor, that would be as

19  boring to the jurors as it would be to everyone else in the

20  courtroom.  But there will --

21  THE COURT:  I'm glad you recognize that.

22  MR. FISCH:  I do, your Honor.  I tried a lot of these

23  cases.  I know your Honor knows that.  And we want to make it

24  palatable for everybody.

25  THE COURT:  So just logistically, how would this work

1  then?  You would say, okay, with this witness, we're going to

2  go into material that's under seal.  You'd ask me to excuse --

3  so who would have to be excused?  Is it everybody -- is it --

4  is there some people who are currently at counsel table would

5  have to get kicked out?

6          MR. FISCH:  No, they'd all be covered by the

7  protective order, your Honor.

8          THE COURT:  I don't remember how broad it is.

9          MR. FISCH:  That's fine.

10         THE COURT:  It's not AEO in other words?

11         MR. FISCH:  No, no, no.  It's our source code and

12  we'll let the other side see it in its entirety during the

13  trial.

14         THE COURT:  So somebody would tell me, on this

15  witness, we're going to be going into source code, we need to

16  close the courtroom, and so I would tell -- we'd kick

17  everybody out who is not on one or another teams and then lock

18  the door basically?

19         MR. FISCH:  It would be for a very short period of

20  time.  And I've done this in the past.  I know it sounds like

21  it could be disruptive, your Honor.  And I get that.  But it

22  doesn't happen very frequently.

23         THE COURT:  Okay.  Do you have a view on this?

24         MR. REICHMAN:  I do.  I think we're saying the same

25  thing.  We may be saying something a little different than

1  your understanding.  It would be for a portion of a witness's
2  testimony.
3          THE COURT:  No, I get that.  It's not the whole
4  testimony.
5          MR. FISCH:  It would just be, your Honor, we're about
6  to go into some source code issues and we would ask --
7          THE COURT:  That's fine.
8          MR. FISCH:  -- for a pause.
9          MR. REICHMAN:  And I can say also that if it's -- I
10 mean, I've got a different solution, but it's your source
11 code, so it's your right.  I'm not going to be --
12         MR. FISCH:  No, I want -- I want to be amenable --
13         THE COURT:  So the only thing that I will not know is
14 exactly who it is that gets kicked out.  I mean, let's say
15 we've got like five people sitting back there.  What
16 specifically am I supposed to say?
17         MR. FISCH:  Well, I think those that are not
18 affiliated with the parties will know who they are, and
19 certainly we'll be able to recognize people that are
20 affiliated with us.  If there's a question, they're just right
21 here to ask, your Honor.
22         THE COURT:  Fine.  I'm good with that.
23         MR. REICHMAN:  I'm good with it too.  I was just
24 going to say, we agree that it's something that meets the
25 standard for sealing a public proceeding if it's source code,

1 and that's all that we're talking about right now.

2 THE COURT: Is there anything more than source code?

3 MR. FISCH: There have been some financials, your

4 Honor, that are not publicly available. This is information

5 that is internal the company that has not been reported out to

6 shareholders or investors. It's not part of any --

7 THE COURT: Is this something a damages expert would

8 testify about?

9 MR. FISCH: Yes, your Honor. And there would be fact

10 witnesses that would talk about it from at least Amazon's

11 perspective because they would have to authenticate.

12 THE COURT: Any problem with that?

13 MR. REICHMAN: Well, personally, I don't have a

14 problem, but the court system has a problem with some of it.

15 It's a public proceeding.

16 THE COURT: Yeah, I get that.

17 MR. REICHMAN: So some financial data, of course I

18 can see that point. That's why I was clarifying.

19 THE COURT: Here's what I'm going to need you to do

20 because I think what we're talking about is essentially kind

21 of all defense data here.

22 Source code I get. You don't have to explain that.

23 What I need you to give me is some short -- and not like the

24 experts do where there's like 759 footnotes -- just some sort

25 of short position paper saying, these are the categories of

1  information -- this is the specific types of information --

2  not categories -- specific types of information aside from

3  source code that we think is going to come in at the trial

4  that we think requires you to exclude people from the

5  courtroom so that counsel can react to it and I can make a

6  decision about it.  So try to get that in by like, let's say,

7  next Wednesday or something.

8          MR. FISCH:  No worries, your Honor.  You've seen a

9  preview of that in some of the sealings that have occurred

10  already.

11         MR. REICHMAN:  Of course, that's a different

12  standard.  The sealing --

13         THE COURT:  I get that there's a different standard.

14  I get it.  Okay.  So get me something by next Wednesday.

15         MR. FISCH:  That concludes my questions, your Honor.

16  Thank you very much.  I appreciate it.

17         THE COURT:  Anybody got anything else?

18         MR. REICHMAN:  That's it, your Honor.  Thank you.

19         THE COURT:  Off the record.

20    (Which were all the proceedings had in the above-entitled

21  cause on the day and date aforesaid.)

22   I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.

23
    /s/ *Carolyn R. Cox, CSR, RPR, F/CRR*_____  March 22, 2024

24  Official Court Reporter
    United States District Court

25  Northern District of Illinois
    Eastern Division